**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES, AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON OCTOBER 9, 2018, AT 2:30 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion (this "Motion").

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively) authorizing the Debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto. In addition, the Debtors request a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

2 A detailed description of the Debtors' businesses and the reasons for commencing the chapter 11 cases is set forth in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of Chapter 11 Petitions and First Day Pleadings*, to be filed in connection herewith (the "First Day Declaration"). The terms "WLB Debtors" and "WMLP Debtors" shall have the meanings ascribed to them in the First Day Declaration.

3. The bases for the relief requested herein are sections 105(a), 362, 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

4. Westmoreland Coal Company and its Debtor and non-Debtor affiliates operate the sixth-largest coal-mining enterprise in North America, including 19 coal mines in six states and Canada. The Debtors primarily produce and sell thermal coal to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers. Headquartered in Englewood, Colorado, the Debtors and their non-Debtor subsidiaries employ approximately 2,971 individuals. The Debtors' revenue for the twelve-month period that ended August 31, 2018, totaled approximately $850 million. As of the Petition Date, the Debtors' aggregate prepetition indebtedness totaled approximately $1.1 billion.

5. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

6. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these

chapter 11 cases, and the Debtors' successful reorganization.[3] Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

7. The Debtors employ approximately 1,725 individuals in the United States on a full-time basis (collectively, the "Employees").[4] The Debtors employ approximately seven individuals on a part-time basis. Approximately 1,360 Employees are paid on an hourly basis and approximately 365 Employees receive a salary. Approximately 900 U.S.-based Employees (collectively, the "Represented Employees") are subject to one of seven collective bargaining agreements (collectively, the "CBAs") between the Debtors and the union members.[5]

8. The vast majority of the Debtors' employees exclusively rely on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to

---

3 In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Staff") from several staffing agencies (collectively, the "Staffing Agencies") to fulfill certain duties on a short-term basis. The Debtors currently retain approximately 15 Staffing Agencies in the aggregate, from which they employ Independent Contractors and/or Temporary Staff, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

4 Certain of the Employees employed by Westmoreland Coal Company provide services to Westmoreland Resource Partners, LP ("WMLP") pursuant to a shared services agreement between WMLP and Westmoreland Resources GP, LLC dated as of January 1, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Services Agreement") for which WMLP reimburses Westmoreland Coal Company.

5 The Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to any CBA, and the Debtors reserve all of their rights with regard to any such CBA.

continue paying their compensation and providing benefits. Consequently, the relief requested herein is necessary and appropriate.

**Employee Compensation and Benefits**

9. To minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, severance, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, tuition reimbursement, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

10. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, however, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

11. The Debtors estimate that they owe prepetition amounts of the Employee Compensation and Benefits in approximately the following amounts.[6]

| Relief Sought | Interim Amount | Total Amount |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $7,145,000 | $7,145,000 |
| Pre-Employment Expenses | $0 | $150,000 |
| Independent Contractors and Temporary Staff | $200,000 | $200,000 |
| Withholding Obligations | $4,000,000 | $4,000,000 |
| Expense Reimbursements | $0 | $400,000 |
| Non-Insider Spot Awards | $0 | $5,000 |
| **Employee Benefit Programs** | | |
| Health Insurance Programs | $2,515,000 | $13,000,000 |
| CBA Contributions | $450,000 | $450,000 |
| Life and AD&D Insurance | $55,000 | $55,000 |
| Disability Benefits | $107,000 | $107,000 |
| Benefits Broker and Administrator Fees | $50,000 | $50,000 |
| Workers' Compensation Program | $750,000 | $3,250,000 |
| 401(k) Plan Contributions | $525,000 | $525,000 |
| Retiree Medical Benefits | $1,250,000 | $5,350,000 |
| Paid Leave | $2,375,000 | $9,500,000 |
| Non-Insider Severance Awards | $0 | $350,000 |
| Non-Employee Director Compensation | $0 | $0 |
| WMLP Conflicts Committee Compensation | $0 | $0 |
| **Supplemental Employee Benefits** | | |
| Vehicle Allowance Program | $0 | $55,000 |
| Tuition Assistance Program | $0 | $190,000 |
| Employee Assistance Program | $0 | $80,000 |
| Tobacco Cessation Program | $0 | $1,000 |
| Hearing Aid Discount Program | $0 | $0 |
| **Total** | **$19,442,000** | **$44,863,000** |

12. The Debtors do not believe there are amounts owed to any individuals on account of the Employee Compensation and Benefits that exceed $12,850, the priority expense compensation and benefit cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## I. Compensation and Withholding Obligations.

### A. Unpaid Wages.

13. The Debtors pay Employees' wages, salaries, and other compensation on a bi-weekly basis (collectively, the "Employee Compensation"). The Debtors pay their Employees'

[6] This table is for illustrative purposes only and is qualified by the Motion and any Interim Order or Final Order with respect to the Motion.

wage and salary obligations (the "Wages") on either a salaried or hourly basis. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

14. As of the Petition Date, the Debtors estimate they owe approximately $7,145,000 to Employees on account of all accrued but unpaid wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to any applicable 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages"), substantially all of which will come due and owing in the first 25 days of these chapter 11 cases. The Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue paying Wages to their Employees on a postpetition basis in the ordinary course of business and consistent with past practice.

**B. Pre-Employment Expenses**.

15. In the ordinary course of business, the Debtors incur certain expenses associated with the Employee hiring process (collectively, the "Pre-Employment Expenses"). Pre-Employment Expenses generally include, but are not limited to, talent agencies, background screenings, and drug testing. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Pre-Employment Expenses is approximately $150,000. The Debtors seek authority to pay any unpaid Pre-Employment Expenses and to continue paying any such claims on a postpetition basis in the ordinary course of business and consistent with past practice.

**C. Independent Contractors and Temporary Staff Compensation**.

16. As discussed, the Debtors rely on Independent Contractors and Temporary Staff in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing mining, engineering, and other operational services, information technology services, and various other administrative functions. The Debtors rely on the support of Independent Contractors and Temporary Staff to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis.

17. The Debtors believe the authority to continue paying their Independent Contractors and the Staffing Agencies is critical to minimizing disruption of the Debtors' continued business operations. As of the Petition Date, the Debtors owe approximately $200,000 on account of the Independent Contractors and Temporary Staff, all of which will become due and owing within the first 25 days of these chapter 11 cases. The Debtors seek authority to pay any such prepetition claims, and to continue paying any such claims on a postpetition basis in the ordinary course of business and consistent with past practice.

**D. Withholding Obligations**.

18. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, and pre- or post-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients.

19. The Debtors also are required by U.S. law to withhold from the Employee Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for

remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate taxing authority at the same time Employees' payroll checks are disbursed.

20. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $4,000,000, substantially all of which will become due and owing within the first 25 days of these chapter 11 cases. The Debtors seek authority to pay any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business and consistent with past practice.

**E. Reimbursable Expenses (Final Order Only).**

21. In the ordinary course of business, the Debtors reimburse certain Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses incurred in the course of an Employee's duties. Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse their Employees with respect to any Expense Reimbursements likely would impose significant hardship on those Employees.

22. Due to the timing of when Employees submit expense reimbursements, it is often difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date. Based on historical practice, the Debtors estimate that as of the Petition Date, the Debtors estimate that approximately $400,000 is accrued but unpaid on account of Expense Reimbursements that remain unpaid. The Debtors seek authority to pay unpaid prepetition Expense Reimbursements, solely pursuant to the Final Order, and to continue paying prepetition and postpetition Expense Reimbursements in the ordinary course of business on a postpetition basis and consistent with past practice.

**F. Non-Insider Spot Awards (Final Order Only)**.

23. The Debtors provide a short-term incentive program (the "Spot Awards") across the Debtors' enterprise to their non-Insider Employees.[7] The Spot Awards align the Employees' incentives with those of the Debtors and their stakeholders by emphasizing workplace performance that goes above and beyond the Debtors' expectations. For example, an Employee may receive a Spot Award for completing a short-term project in less time than expected or where there were unusual difficulties to overcome. Individual Spot Awards typically range between $250 and $750. Employees subject to a collective bargaining agreement, part-time Employees, and Independent Contractors and Temporary Staff are not eligible to receive Spot Awards.

24. On average, the Debtors pay approximately $5,000 per month on account of the Spot Awards in the ordinary course of business. Because the Spot Awards are awarded based on ongoing performance where an Employee goes above and beyond performance expectations, the performance invariably takes into account efforts that took place before the Petition Date.

---

7 The relief sought under this Motion with respect to the Non-Insider Spot Award and the Non-Insider Severance Awards does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

The Debtors seek authority to honor any Spot Awards related to the prepetition period, solely pursuant to the Final Order, and to continue to award Spot Awards in the ordinary course of business on a postpetition basis and consistent with past practice.

## II. Employee Benefit Programs.

### A. Health and Welfare Programs.

25. The Debtors offer a comprehensive employee benefits package to eligible Employees for medical, dental, and vision care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including:

- health care coverage;
- life insurance;
- disability benefits;
- the 401(k) Plan (as defined herein); and
- certain other supplemental benefit programs.

26. The Debtors seek authority to pay any unpaid prepetition amounts due under the Health and Welfare Programs and to continue the Health and Welfare Programs in the ordinary course of business on a postpetition basis and consistent with past practice.

#### 1. Health Insurance Programs.

27. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans, the HSA, the FSA, the Dental Plans, the Vision Plan, and the Wellness Programs (each, as defined below, and, collectively, the "Health Insurance Programs"). The Debtors also subsidize or continue to provide certain benefits to certain retirees and former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Debtors pay approximately $3,000,000 per month in the aggregate on account

of the Health Insurance Programs. As of the Petition Date, the Debtors estimate that approximately $13,000,000 is accrued but unpaid on account of the Health Insurance Programs, approximately $2,515,000 of which will become due within the first 25 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Health Insurance Programs and to continue administering the Health Insurance Programs in the ordinary course of business and consistent with past practice.

**a. Medical Plans.**[8]

28. The Debtors offer their Employees medical and prescription drug benefit coverage (collectively, the "Medical Plan"). The Medical Plan is administered by AmeriBen ("AmeriBen") and WellDyne ("WellDyne") and utilizes the Anthem/Blue Cross Blue Shield network ("BCBS"). The Debtors pay AmeriBen a monthly administrative service fee and also pay WellDyne a per-prescription administrative service fee for administration of payments and benefits under the Medical Plan. Generally, the medical and prescription drug coverage provided under the Medical Plan depends on a variety of factors, including whether the coverage is sought for an individual or a family, whether treatment is sought "in-network," meaning at a provider in the BCBS network, or whether the coverage provided is "out-of-network." Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. Prescription coverage is provided to all Employees who enroll in the Medical Plan, although Employee out-of-pocket costs may vary depending on whether prescriptions are fulfilled through "in-network" or "out-of-network" providers. The Debtors pay approximately $1,300,000 per month on account of the Medical Plan.[9] Additionally, the Debtors provide certain of their

---

[8] For those Employees that participate in Health and Welfare Programs pursuant to a CBA, the Debtors make contributions (the "CBA Contributions") to certain trusts (*e.g.*, the Montana Operating Engineers-Construction and Mining Industry Health and Security Trust), as mandated by the applicable CBA, but do not administer the benefits thereunder themselves. As of the Petition Date, the Debtors estimate that approximately $450,000 is accrued but unpaid on account of the CBA Contributions, all of which will become due within the first 25 days of these chapter 11 cases. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the CBA Contributions and to continue paying prepetition and postpetition CBA Contributions in the ordinary course of business and consistent with past practice.

[9] The Debtors also contract for stop-loss coverage with their non-Debtor affiliate, Westmoreland Risk Management, Inc. ("WRMI"), and ReliaStar Life Insurance Company ("ReliaStar"), under which the Debtors pay approximately $280,000 per quarter to WRMI and approximately $50,000 per month to ReliaStar to insure against Medical Plan claims that exceed $500,000 per covered individual.

Employees with the opportunity to undergo comprehensive health and wellness exams, which are administered through the University of Colorado Hospital.

**b. Health Savings and Flexible Spending Accounts**.

29. The Debtors provide certain Employees to utilize health savings accounts (the "HSAs"), which accounts are administered by Optum. The HSAs cover certain incidental medical costs. Currently, approximately 750 Employees use the HSAs for medical costs. The Debtors match Employee contributions on a dollar-for-dollar basis depending on the Employee's elected level of health coverage up to a maximum match of $2,880. As of the Petition Date, the Debtors do not believe that there are any amounts accrued but unpaid on account of the HSAs.

30. The Debtors also provide certain Employees who participate in the Medical Plan with access to a flexible spending account (the "FSA"), also administered by Optum, which can be used to cover eligible health care and dependent child and elderly care expenses. Employees may have either a HSA or FSA, but not both. Currently, approximately 50 Employees use the FSAs for medical costs or dependent child and elderly care, for which the Debtors pay a combined monthly administration fee of approximately $2,800 for both the HSA and FSA (the "HSA and FSA Administration Fees"). The Debtors do not make any contributions to any Employee's FSA. As of the Petition Date, the Debtors do not believe that there are any amounts accrued but unpaid on account of prepetition HSA and FSA Administration Fees.

**c. Dental Plans**.

31. The Debtors provide certain Employees with dental insurance (the "Dental Plans") administered by AmeriBen. The Dental Plans are self-insured, and the Debtors pay an administrative service fee of approximately $2,800 per month on account of the Dental Plans. As of the Petition Date, the Debtors believe there is approximately $140,000 of accrued but unpaid amounts outstanding on account of the Dental Plans.

**d. Vision Plans**.

32. The Debtors also provide certain Employees the opportunity to purchase vision insurance (the "Vision Plan"), administered by Vision Service Plan and AmeriBen. The Vision Plan is self-insured, and the Debtors pay an administrative service fee of approximately $1,800 per month on account of the Vision Plan. As of the Petition Date, the Debtors believe there is approximately $20,000 of accrued but unpaid amounts outstanding on account of the Vision Plans.

**e. Wellness Programs (Final Order Only)**.

33. The Debtors provide certain Employees who comply with certain wellness program requirements a bi-weekly award in the amount of $50 (the "Wellness Award"). If the Employee is enrolled in a family Health Insurance Program, then both the Employee and his or her spouse must have satisfied the wellness requirements to be eligible for the Wellness Award. The Debtors pay approximately $27,500 per pay period on account of the Wellness Award.

34. The Debtors also provide certain Employees with a monthly $25 reimbursement to be used for health and fitness-related expenditures (*e.g.*, gym memberships) (the "Wellness Reimbursement," and, together with the Wellness Award, the "Wellness Programs"). The Wellness Reimbursement is administered by ThrivePass, to which the Debtors pay a monthly administration fee of approximately $1,500.

35. The Debtors also pay a benefits administrator, PHN (the "Wellness Vendor"), to collect and catalog information relevant to the Wellness Programs. The Debtors pay the Wellness Vendor approximately $39,000 per year.

36. As of the Petition Date, the Debtors believe that approximately $27,500 of accrued but unpaid amounts remain outstanding on account of the Wellness Programs. The Debtors seek authority to pay any unpaid prepetition amounts on account of the Wellness Programs, pursuant to a Final Order only, and to continue the Wellness Programs in the ordinary course of business on a

postpetition basis and consistent with past practice.

**2. Life and AD&D Insurance Programs.**

37. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Standard Life and AD&D Insurance") to Employees through Liberty Mutual, which provides maximum coverage of up to 200 percent of the applicable Employee's annual salary in the event of an Employee's death or injury, up to a maximum of $50,000, $90,000 or $400,000 depending on by which Debtor entity the Employee is employed. Certain Employees may also purchase supplemental life insurance (the "Voluntary Life Insurance") and supplemental accidental death and dismemberment insurance (the "Voluntary AD&D Insurance," and together with the Standard Life and AD&D Insurance and the Voluntary Life Insurance, the "Life and AD&D Insurance") through Liberty Mutual. The Voluntary Life Insurance provides maximum coverage of up to $500,000 for the applicable Employee, and in other varying amounts for such Employee's spouse and children.[10] The Voluntary AD&D Insurance provides maximum coverage of up to the lesser of $500,000 and ten times the applicable Employee's salary, and in other varying amounts for such Employee's spouse and children.[11] Certain of the policies are subject to escalating reductions starting at age 65. The Debtors are fully insured through the Life and AD&D Insurance and the Debtors pay approximately $55,000 per month with respect to their portion of the premiums for the Life and AD&D Insurance.

38. As of the Petition Date, the Debtors estimate that approximately $55,000 of accrued but unpaid amounts remain outstanding on account of the Life and AD&D Insurance, all of which will become due within the first 25 days of these chapter 11 cases. The Debtors seek authority to

---

10 Employees may purchase Voluntary Life Insurance for spouses up to $250,000 and for children up to $10,000.

11 An Employee may purchase Voluntary AD&D Insurance for spouses in $10,000 increments up to 60 percent of such Employee's supplemental coverage election and for children in $5,000 increments up to 25 percent of such Employee's supplemental coverage election.

pay prepetition amounts due on account of the Life and AD&D Insurance and to continue administering the Life and AD&D Insurance in the ordinary course of business and consistent with past practice.

**3. Disability Benefits Programs**.

39. The Debtors provide certain Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits on their date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their base monthly pay, up to a weekly maximum of $2,000, in the event of a qualified non-work related illness or injury (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their base weekly pay, up to a monthly maximum of $8,500, in the event of a qualified non-work related illness or injury (the "Long-Term Disability Benefits").

40. An Employee's Short-Term Disability Benefits begin after an Employee is absent from work for 14 days of due to injury or illness. The Short-Term Disability Benefits continue for a maximum of 26 weeks of any disability thereafter. The Long-Term Disability Benefits begin after an Employee is absent from work for 180 days due to any disability and continue until normal Social Security retirement age. The Short-Term Disability Benefits and the Long-Term Disability Benefits are fully insured through Liberty Mutual. The Debtors pay Liberty Mutual approximately $60,000 per month in premiums with respect to the Short-Term Disability Benefits and approximately $47,000 per month in premiums with respect to the Long-Term Disability Benefits.

41. Additionally, the Debtors provide certain key Employees with the opportunity to purchase supplementary disability insurance (the "Supplemental Long-Term Disability Benefits") through Unum Life Insurance Company of America ("Unum"). The Supplemental Long-Term

Disability Benefits supplement the Long-Term Disability Benefits by providing an additional six and two-thirds percent of the applicable Employee's annual salary up to a monthly maximum of $10,000.[12] The Debtors pay Unum approximately $60,000 per year in premiums with respect to the Supplemental Long-Term Disability Benefits.

42. Approximately 60 Employees currently are receiving Disability Benefits. As of the Petition Date, the Debtors estimate that approximately $107,000 is accrued but unpaid on account of the Disability Benefits and associated premiums, all of which will become due within the first 25 days of these chapter 11 cases. The Debtors seek authority to pay prepetition amounts due on account of the Disability Benefits and to continue providing the Disability Benefits in the ordinary course of business and consistent with past practice.

**4. 401(k) Plan.**

43. The Debtors provide all eligible Employees with the ability to participate in 401(k) defined contribution programs (collectively, the "401(k) Plans"). The 401(k) Plan currently is administered by Prudential Financial, Inc.[13] All administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employee. Employees generally are eligible to participate in a 401(k) Plan on the first day of the month following 30 days of employment. The 401(k) Plans generally provide for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plans are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plans (collectively, "401(k) Deductions").

---

[12] The $10,000 monthly cap is inclusive of any benefits received under the Long-Term Disability Benefits.

[13] The Debtors also engage Moreton Retirement Partners ("MRP") for advisory and consulting services related to the 401(k) Plan. Fees due to MRP are paid out of forfeitures under the 401(k) Plan.

As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $525,000 on account of prepetition 401(k) Deductions.

44. The Debtors match Employees' 401(k) Plan contributions on a discretionary, dollar-for-dollar basis between 50 percent and 100 percent of the first four to six percent of the Employees' annual compensation based on location (collectively, "401(k) Contributions"). Certain of the Debtors' operations also provide supplemental 401(k) Contributions in addition to, or in lieu of, matching the Employee's contribution. The Debtors contribute approximately $425,000 to their various 401(k) Plans per month on a weekly basis on account of 401(k) Contributions. As of the Petition Date, approximately $525,000 in prepetition 401(k) Contributions has not yet been transferred to the applicable 401(k) Plans.

**5. Retiree Medical Benefits.**

45. The Debtors provide medical benefits, such as health, dental, and prescription drug benefits, to certain retired Employees (the "Retiree Medical Coverage"). Retirees are eligible for the same Medical Plans, Dental Plans, and Vision Plans offered to active Employees.[14] The Debtors collect monthly premiums of approximately $100,000 on account of the Retiree Medical Coverage. The monthly costs of providing the Retiree Medical Coverage are approximately $1,250,000.

46. The Debtors also provide certain retired Employees and his or her spouse with a reimbursement account for medical expenses (each, a "Retiree Medical Savings Account"). Each Retiree Medical Savings Account operates similarly to a health savings account in that the Debtors contribute to the Employee's account upon establishment, and the Employee is entitled to

---

[14] Generally, the medical coverage offered to the retirees differs based on the specific plan in which a retiree chooses to participate, and participant costs differ based on the plan and whether the retiree only or the retiree and his or her family are covered by the applicable plan.

withdraw from Retiree Medical Savings Account to pay for eligible health care expenses. As of the Petition Date, there are approximately 20 active Retiree Medical Savings Accounts. Upon the retired Employee's death, the Employee's spouse or next of kin is entitled to use the remaining balance.

47. Finally, the Debtors also make contributions and provide retiree healthcare benefits to certain former Represented Employees pursuant to the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–22 (such obligations, together with the Retiree Medical Coverage and the Retiree Medical Savings Account, the "Retiree Medical Benefits"). As of the Petition Date, the Debtors estimate that they owe approximately $1,250,000 on account of Retiree Medical Benefits.[15]

**B. Employee Benefits Broker**.

48. The Debtors obtain their Health and Welfare Programs through their insurance brokers, Aon Risk Solutions, and its various affiliates, and Willis Towers Watson, and its various affiliates (collectively, the "Benefits Brokers").[16] The Benefits Brokers assist the Debtors in obtaining their comprehensive Health and Welfare Programs and evaluating benefit plan offerings. They also, among other things, help the Debtors with the procurement and negotiation of their Health and Welfare Programs, enabling the Debtors to obtain Health and Welfare Programs on advantageous terms and at competitive rates. The Debtors pay their Benefits Brokers an annual fee of approximately $195,000 for their services.

---

15 The Debtors reserve the right to reject a CBA under section 1113 of the Bankruptcy Code or terminate Retiree Medical Benefits under section 1114 of the Bankruptcy Code. Nothing herein shall require the Debtors to continue providing these benefits.

16 Prior to the Petition Date, the Debtors terminated their agreement with Lockton Companies, Inc., and its various affiliates ("Lockton"). The Debtors do not believe any remaining prepetition amounts are accrued but unpaid on account of the prior engagement with Lockton. However, out of an abundance of caution, the Debtors seek authority to pay any such amounts.

49. As of the Petition Date, the Debtors estimate they owe approximately $50,000 on account of accrued but unpaid fees to the Benefits Brokers (the "Unpaid Broker Fees"), all of which will be due and owing during the first 25 days of these chapter 11 cases. The Debtors seek authority to pay the Unpaid Broker Fees and to continue paying the Benefits Brokers on a postpetition basis in the ordinary course of business and consistent with past practice.

**C. Workers' Compensation Program.**

50. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate for claims arising from or related to their employment with the Debtors, including occupational pneumoconiosis ("black lung") claims under applicable state law (collectively, the "Workers' Compensation Program"). In addition, the Debtors also incur costs in connection with the Federal Mine Safety and Health Act of 1977, *see* 30 U.S.C. §§ 901–45 (the "Black Lung Benefits Act").[17] All Employees are entitled to participate in the Workers' Compensation Program.

51. Currently, the Debtors maintain coverage under the Workers' Compensation Program through Zurich American Insurance Company ("Zurich") and, for certain monopolistic states, directly to Montana, North Dakota, Ohio, and Wyoming (together with Zurich, collectively, the "Workers' Compensation Insurers"). The Debtors pay premiums to the Workers' Compensation Insurers on account of the Workers' Compensation Program. The annual cost of the Workers' Compensation Program is approximately $500,000.

52. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with

[17] As of the Petition Date, the Debtors estimate that they owe approximately $18,200,000 on account of obligations pursuant to the Black Lung Benefits Act.

applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[18] There are currently no open claims under the Workers' Compensation Program to which this would apply. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

53. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors estimate they owe approximately $750,000 on account of the Workers' Compensation Program or associated claims management fees, all of which will be due and owing during the first 25 days of these chapter 11 cases. The Debtors seek authority to continue the Workers' Compensation Program on a postpetition basis in the ordinary course of business and consistent with past practice and to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

**D. Paid Leave.**

54. The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for Holidays, Vacation, Sick Leave, Personal Leave, FlexLeave, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

---

[18] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. The Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

55. In the ordinary course of business, the Debtors provide vacation hours ("Vacation") to certain Employees as a Paid Leave benefit. Employees may accrue up to 200 hours of Vacation, depending on the Employee's position and location of employment, 240 hours of which may be carried over into the next year. This amount is a current cash payment obligation, as certain Employees may "sell" Vacation hours back to the Debtors at any time for a cash payout. In addition, the Debtors also offer Employees up to 80 holiday hours ("Holiday"), depending on the Employee's position and location of employment.

56. In the ordinary course of business, the Debtors provide sick leave ("Sick Leave") to certain Employees as a Paid Leave benefit. Employees are allotted up to 80 hours of Sick Leave for each calendar year, depending on the Employee's position and location of employment. Sick Leave may be used for personal illness, wellness and healthcare appointments, and for similar leave for an Employee's immediate family member. Employees may not carry over accrued but unused Sick Leave into the next calendar year. Employees who are terminated or resign are not entitled to a cash payment in lieu of accrued but unused Sick Leave.

57. Additionally, in the ordinary course of business, the Debtors provide personal leave ("Personal Leave") to certain Employees as a Paid Leave benefit. Employees are allotted up to 88 hours of Personal Leave for each calendar year, depending on the Employee's position and location of employment. This amount is a current cash payment obligation, as certain Employees may "sell" Personal Leave hours back to the Debtors at any time for a cash payout.

58. In the ordinary course of business, the Debtors provide leave ("FlexLeave") to certain Employees as a Paid Leave benefit. Employees who receive FlexLeave do not also receive Vacation, Sick, or Personal Leave. FlexLeave accrues at a specified rate based on a Employee's years of service. Employees may accrue up to a maximum amount of 240 hours of FlexLeave.

Like Vacation and Personal Leave, Employees may sell FlexLeave hours back to the Debtors at any time for a cash payout. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid Vacation, Personal Leave, and FlexLeave is approximately $9,500,000.

59. The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, leave provided under the Family and Medical Leave Act for Employees, voting, military leave, and all legally required leaves, including, but not limited to, crime victim and victim of domestic violence leave, volunteer firefighter leave, and leave for visits with children's teachers and school administrators, where applicable (collectively, the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

60. The Debtors believe that the continuation of the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. As a result, the Debtors seek authority to allow eligible Employees to use their Paid Leave in the ordinary course of business on a postpetition basis and consistent with past practice, and, upon entry of a Final Order, to pay any Vacation accrued in the ordinary course of business. To be clear, the Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**E. Non-Insider Severance Awards (Final Order Only).**

61. In the ordinary course of business, the Debtors have historically provided severance to certain non-Insider Employees upon an involuntary termination other than for cause or the sale of a facility, division, or segment of the Debtors' business. The severance awards provide varying amounts of pay and certain continued benefits to terminated Employees depending on that Employee's specific agreement (collectively, the "Non-Insider Severance Awards").

62. As of the Petition Date, the Debtors estimate that the outstanding costs related to the Non-Insider Severance Awards do not exceed approximately $350,000.[19] The Debtors seek authority to continue providing the Non-Insider Severance Awards on a postpetition basis in accordance with the Final Order, in the ordinary course of business and consistent with past practice for any non-Insider Employees that may be severed following the Petition Date.

**F. Postpetition Non-Employee Director Compensation and WMLP Conflicts Committee Compensation (Final Order Only).**

63. The WLB Debtors maintain a board of directors comprising seven non-Employees and one Employee (each, a "Director"). Each of the non-Employee Directors is compensated approximately $165,000 as an annual retainer, in addition to supplemental annual fees in amounts ranging from $7,500 to $20,000,[20] depending on which board committee the Director serves and whether the Director is chairman of any of those committees (together, the "Director Payments").

---

[19] The Debtors have identified certain non-Insider Employees (each, a "Specified Employee" and together, the "Specified Employees") who currently are employed by the Debtors, and thus are not presently eligible to receive a Non-Insider Severance Award. However, should a Specified Employee be severed, the Specified Employee likely would become eligible for a Non-Insider Severance Award (any such award, a "Potential Non-Insider Severance Award"). In the event a Potential Non-Insider Severance Award becomes due and owing, the Debtors will seek the consent of counsel to the Required Lenders (as defined in the proposed order approving the WLB Debtors' proposed postpetition secured debtor-in-possession financing) before making any such payment on account of a Potential Non-Insider Severance Award. As of the Petition Date, the aggregate amount of Potential Non-Insider Severance Awards is approximately $3,180,000.

[20] The Chairman of the full board of directors receives an annual fee in the amount of $55,000 in addition to the annual retainer amount.

In addition, each of the non-Employee Directors is entitled to expense reimbursement for out-of-pocket expenses (such expense reimbursement, the "Director Fees" and, together with the Director Payments, the "Director Compensation").[21]

64. Pursuant to a charter adopted on February 18, 2015, the board of directors of Debtor Westmoreland Resources GP, LLC ("WMGP") established a conflicts committee (the "Conflicts Committee") to investigate, review, evaluate and act upon any potential conflicts of interest between WMGP and its subsidiaries—i.e., WMLP and WMLP's seven Debtor-subsidiaries (collectively, the "WMLP Group")—on the one hand, and any of their affiliates outside of the WMLP Group on the other hand, among other duties. The Conflicts Committee consists of four outside, independent directors (collectively, the "Conflicts Committee Members"). Each of the Conflicts Committee Members receives a retainer, paid quarterly (the "Conflicts Committee Payments"), and is entitled to expense reimbursement for out-of-pocket expenses (such expense reimbursement, the "Conflicts Committee Fees" and, together with the Conflicts Committee Payments, the "Conflicts Committee Compensation").

65. The Debtors estimate that there are no amounts outstanding with respect to the Director Compensation or the Conflicts Committee Compensation as of the Petition Date. The Debtors request the authority, solely pursuant to the Final Order, to pay the Director Compensation and the Conflicts Committee Compensation as it comes due in the ordinary course of business and consistent with past practice.

[21] In addition to his service as a member of the Board of Directors of Westmoreland Coal Company, Jeffrey S. Stein serves as the Chief Restructuring Officer of Westmoreland Coal Company. Under Mr. Stein's consulting agreement with Westmoreland Coal Company, the parties have agreed that: (a) Mr. Stein will receive a monthly retainer of $125,000 during the pendency of these chapter 11 cases; (b) it will reimburse Mr. Stein for his reasonable and documented out-of-pocket expenses; and (c) Mr. Stein will receive a completion fee upon confirmation of Westmoreland Coal Company's chapter 11 plan, the payment of which shall be subject to, and disclosed in connection, with confirmation. As of the Petition Date, no amounts were outstanding under Mr. Stein's consulting agreement with respect to monthly retainer payments or reimbursable expenses.

**III. Supplemental Employee Benefits (Final Order Only).**

66. The Debtors offer supplemental employee benefits (collectively, the "Supplemental Benefits") to substantially all of their full-time Employees, including:

- vehicle allowance program;
- tuition reimbursement;
- employee assistance programs;
- tobacco cessation program; and
- hearing aid discount program.

**A. Vehicle Allowance Program.**

67. In the ordinary course of business, the Debtors provide a vehicle-allowance program for certain non-Insider Employees working at mining locations (the "Vehicle Allowance Program"). As part of the Vehicle Allowance Program, the Debtors provide these Employees an allowance on account of costs these Employees incur with respect to vehicles. The vehicles are not assigned to specific Employees, but instead are available for use on an as-needed basis. Because the Debtors' businesses require that these Employees travel to supervise production on-site, for example, the Debtors' inability to continue the Vehicle Allowance Program could impose disproportionate hardship on such Employees that often must travel for the Debtors' benefit.

68. The Debtors pay approximately $540,000 per year on account of the Vehicle Allowance Program. As of the Petition Date, the Debtors estimate that they owe approximately $55,000 on account of accrued but unpaid costs related to the Vehicle Allowance Program. The Debtors seek authority to pay any outstanding amounts on account of the Vehicle Allowance Program, solely pursuant to the Final Order, and to continue the Vehicle Allowance Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**B. Tuition Assistance Program.**

69. On a discretionary basis, the Debtors provide eligible Employees with the opportunity to continue their education under a tuition assistance program (the "Tuition Assistance Program"). All active, regular full-time Employees may be considered for tuition assistance for courses or degree programs subject to specific institutional criteria. Courses or degree programs selected must relate to the Employee's present job or to a reasonably predictable future assignment and to a logical program of individual development within the scope of the Debtors' business. The Debtors reimburse up to $100,000 of the cost of tuition, books, and applicable fees (the "Tuition Fees") associated with the furtherance of an Employee's education. Supplies, parking, and other expenses are not covered under the Tuition Assistance Program. As of the Petition Date, twenty Employees participate in the Tuition Assistance Program. The Debtors pay Tuition Fees of approximately $190,000 per year in the aggregate. As of the Petition Date, the Debtors estimate that they owe approximately $190,000 on account of accrued but unpaid Tuition Fees. The Debtors seek authority to pay any outstanding Tuition Fees, solely pursuant to the Final Order, and to continue paying the Tuition Fees in the ordinary course of business on a postpetition basis and consistent with past practice.

**C. Employee Assistance Program.**

70. The Debtors offer an employee assistance program (the "Employee Assistance Program"), which is automatically provided to eligible employees and their dependents. The Employee Assistance Program provides free and confidential resources, referrals, and counseling to Employees and their family members. Assistance is available for the personal and work life situations, including elder care, financial counseling, emotional health, wellness coaching, legal advice, and relationship challenges. The Debtors believe that maintaining the Employee Assistance Program is important to the overall wellbeing of their Employees. On

average, the Debtors pay approximately $80,000 per year in the aggregate on account of the Employee Assistance Program. As of the Petition Date, the Debtors do not believe they have any accrued but unpaid amounts due on account of the Employee Assistance Program. The Debtors seek authority, solely pursuant to the Final Order, to continue the Employee Assistance Program in the ordinary course of business and consistent with past practice.

**D. Tobacco Cessation Program.**

71. The Debtors permit Employees to participate in a tobacco cessation program (the "Tobacco Cessation Program") through National Jewish Health. The Tobacco Cessation Program provides free medication, resources, and support to Employees and their family members who wish to quit tobacco. On average, the Debtors pay approximately $1,000 per year on account of the Tobacco Cessation Program. As of the Petition Date, the Debtors do not believe they have any accrued but unpaid amounts due on account of the Tobacco Cessation Program. The Debtors seek authority, solely pursuant to the Final Order, to continue the Tobacco Cessation Program in the ordinary course of business and consistent with past practice.

**E. Hearing Aid Discount Program.**

72. The Debtors permit Employees to participate in a hearing aid discount program (the "Hearing Aid Discount Program") through EPIC Hearing Health Care at no cost to Employees and their family members. The Hearing Aid Discount Program offers a national alliance of independent ear physicians and audiologists dedicated to high-quality hearing care and provides savings between 35 percent and 50 percent on name-brand hearing aids and products. The Hearing Aid Discount Program is provided at no cost to the Debtors. Accordingly, as of the Petition Date, the Debtors do not believe they have any accrued but unpaid amounts due on account of the Hearing Aid Discount Program. The Debtors seek authority, solely pursuant to the Final Order,

to continue the Hearing Aid Discount Program in the ordinary course of business and consistent with past practice.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

73. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

74. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that

governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *Matter of Al Copeland Enterprise, Inc.*, 991 F.2d 233 (5th Cir. 1993)).

75. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

76. Similarly, applicable laws require the Debtors to maintain the Workers' Compensation Program. For example, if the Debtors fail to maintain the Workers' Compensation Program in the U.S., state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.

77. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns.*, 258 B.R. at 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

78. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ,* 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that

is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ,* 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing,* 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ,* 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

79. Payment of Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees, Independent Contractors, and Temporary Staff rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees, Independent Contractors, and Temporary Staff will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

80. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation

and Benefits owed to the Employees, Independent Contractors, and Temporary Staff, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The coal industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, the workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees, Independent Contractors, and Temporary Staff may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

81. Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re iHeartMedia, Inc.*, No. 18-31271 (MI) (Bankr. S.D. Tex. Apr. 12, 2018) (authorizing the debtors to continue the employee compensation and benefits programs on a postpetition basis); *In re EXCO Res., Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Feb. 22, 2018) (same); *In re Seadrill Ltd.*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Oct. 10, 2017) (same); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. June 30, 2016) (same); *In re Linn*

*Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same).[22] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice on a final basis from the outset of these cases.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Program Is Appropriate in this Case.

82. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

83. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of

[22] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

84. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and postpetition financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Emergency Consideration

85. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors

submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

86. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, granting the relief requested herein is essential to the Debtors' ability to transition their operations into these chapter 11 cases and maintain the value of their estates postpetition. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' ability to maintain their estates at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

87. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

88. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified

or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens

**Notice**

89. The Debtors will provide notice of this Motion to the following parties or their respective counsel (collectively, the "Notice Parties"): (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (d) the ad hoc group of lenders under the WLB Debtors' prepetition term loan facility due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (e) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (f) the administrative agent under the WLB Debtors' bridge loan facility due 2019; (g) the administrative agent under the WMLP Debtors' term loan facility due 2018; (h) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (i) the administrative agent under the WLB Debtors' proposed debtor-in-possession financing facility; (j) the lenders under the WLB Debtors' proposed debtor-in-possession financing facility; (k) any statutory committee appointed in these cases; (l) the United States Attorney's Office for the Southern District of Texas; (m) the Internal Revenue Service; (n) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (o) the offices of the attorneys general for the states in which the Debtors operate; (p) the Securities and Exchange Commission; (q) the Pension Benefit Guaranty Corporation; and (r) any party that

has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

90. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
October 9, 2018

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco (Bar No. 01797600)
Matthew D. Cavenaugh (Bar No. 24062656)
Jennifer F. Wertz (Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
mcavenaugh@jw.com
jwertz@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
michael.slade@kirkland.com
gregory.pesce@kirkland.com

-and-

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
stephen.hessler@kirkland.com

-and-

Anna G. Rotman, P.C. (TX Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Email: anna.rotman@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on October 9, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

# **Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (MI) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. __** |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Interim Order"), authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having

---

1 Due to the large number of debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion. The terms "WLB Debtors" and "WMLP Debtors" shall have the meanings ascribed to them in the First Day Declaration.

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on __________, 2018, at__:__ _.m., prevailing Central Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central Time, on __________, 2018, and shall be served on: (a) the Debtors, Westmoreland Coal Company, 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112, Attn.: Jennifer Grafton; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Gregory F. Pesce and Timothy R. Bow; (c) proposed co-counsel for the Debtors, Jackson Walker L.L.P., 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Patricia B. Tomasco, Matthew D. Cavenaugh, and Jennifer F. Wertz; (d) counsel to the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (e) counsel to the ad hoc group of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022, Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn.: Thomas Moers Mayer and Stephen Zide; (f) co-counsel to the ad hoc group

of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022, Porter Hedges LLP, 1000 Main Street, Houston, Texas 77002, Attn.: John F. Higgins; (g) counsel to the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (h) counsel to the administrative agent under the WLB Debtors' bridge loan facility; (i) counsel to the administrative agent under the WMLP Debtors' term loan facility due 2018; (j) counsel to the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018, Schulte Roth & Zabel, 919 Third Avenue, New York, NY 10022, Attn.: David M. Hillman and Kristine Manoukian; (k) counsel to the lenders under the WLB Debtors' proposed debtor-in-possession financing, (l) counsel to the administrative agent under the WLB Debtors' proposed debtor-in-possession financing facility, Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn.: Thomas Moers Mayer and Stephen Zide; (m) co-counsel to the administrative agent under the WLB Debtors' proposed debtor-in-possession financing facility, Porter Hedges LLP, 1000 Main Street, Houston, Texas 77002, Attn.: John F. Higgins; (n) counsel to the Conflicts Committee of the Board of Directors for Westmoreland Resource Partners GP, LLC, Jones Day, 77 W. Wacker Dr., Chicago, Illinois 60601, Attn.: Timothy Hoffman, Jones Day, 901 Lakeside Ave E, Cleveland, OH 44114 Attn.: Heather Lennox; (o) counsel to any statutory committee appointed in these cases; and (p) Office of the United States Trustee, 515 Rusk Street Houston, Texas 77002. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, in their sole discretion, to provide, and to pay any claims or obligations on account of, the Employee Compensation and Benefits in the ordinary course and in accordance with the Debtors' prepetition policies and prepetition practices,

irrespective of whether such obligations arose prepetition or postpetition; *provided* that pending entry of the Final Order, the Debtors shall not make any payment to any individual with respect to any prepetition claim on account of the Employee Compensation and Benefits in excess of $12,850; *provided*, *further* that payments on account of the Reimbursable Expense, the Spot Awards, the Wellness Program, the Non-Insider Severance Awards, Director Compensation, Conflicts Committee Compensation, or the Supplemental Benefits shall not be made by this Interim Order and shall be made solely pursuant to the Final Order. The Debtors shall maintain a matrix of anticipated amounts paid on account of Employee Compensation and Benefits, which shall include (a) the amount paid to date; (b) the Debtor or Debtors that made the payment; (c) the average amount paid to an Employee of each individual Debtor; and (d) the maximum amount paid to an Employee of each individual Debtor; *provided* that such matrix shall not include personally identifiable information of Employees. To the extent reasonably practicable, the Debtors shall provide a copy of such matrix to the advisors to the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement, attached to the First Day Declaration), the advisors to the Required Lenders (as defined in the DIP Order), and counsel to the ad hoc committee of certain lenders under the WMLP Debtors' prepetition term loan facility due 2018 (only to the extent that the relief herein affects the WMLP Debtors) every other week beginning two weeks after the Petition Date.

4. The Debtors are authorized to continue and/or modify, change, and discontinue the Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law, in consultation with the advisors to the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement, attached to the First

Day Declaration), the advisors to the Required Lenders (as defined in the DIP Order), and counsel to the lenders under the WMLP Debtors' term loan facility (solely with respect to benefits for Employee Compensation and Benefits related to the MLP Debtors). The Debtors will use best efforts to provide notice to the U.S. Trustee and any statutory committee of any material changes to the Employee Compensation and Benefits or new programs, policies, and benefits. For the avoidance of doubt, except as otherwise expressly set forth herein, nothing in this Interim Order should be construed as authorizing any payments on account of the Employee Compensation and Benefits that are outside the ordinary course of business without prior Court approval.

5. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code, *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

6. Pursuant to section 362(d) of the Bankruptcy Code: (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business; and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

7. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

8. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

9. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Employee Compensation and Benefits programs.

10. Solely with respect to the WMLP Debtors, notwithstanding anything to the contrary set forth herein: (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the WMLP Debtors under any orders authorizing the WMLP Debtors' use of cash collateral (in each case, the "Cash Collateral Order"), including any budget

in connection therewith (the "WMLP Budget"); and (b) to the extent there is any inconsistency between the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order and the WMLP Budget shall control.

11. Solely with respect to the WLB Debtors, notwithstanding anything to the contrary set forth herein: (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the WLB Debtors under the WLB Debtors' postpetition financing agreement (including with respect to any budgets governing or relating therewith, the "DIP Documents") and any orders (in each case, the "DIP Order") approving the DIP Documents and governing the WLB Debtors' use of cash collateral; and (b) to the extent there is any inconsistency between the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order and DIP Documents shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: __________, 2018
Houston, Texas

______________________________
UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

## Proposed Final Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket No. __** |

**FINAL ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Final Order"), authorizing the Debtors to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

1 Due to the large number of debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion. The terms "WLB Debtors" and "WMLP Debtors" shall have the meanings ascribed to them in the First Day Declaration.

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized, in their sole discretion, to provide, and to pay any claims or obligations on account of, the Employee Compensation and Benefits in the ordinary course and in accordance with the Debtors' prepetition policies and prepetition practices, irrespective of whether such obligations arose prepetition or postpetition.

3. The Debtors shall maintain a matrix of anticipated amounts paid on account of Employee Compensation and Benefits, which shall include (a) the amount paid to date; (b) the Debtor or Debtors that made the payment; (c) the average amount paid to an Employee of each individual Debtor; and (d) the maximum amount paid to an Employee of each individual Debtor; *provided* that such matrix shall not include personally identifiable information of Employees. To the extent reasonably practicable, the Debtors shall provide a copy of such matrix to the advisors to the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement, attached to the First Day Declaration), the advisors to the Required Lenders (as defined in the DIP Order), and counsel to the ad hoc committee of certain lenders under the WMLP

Debtors' prepetition term loan facility due 2018 (only to the extent that the relief herein affects the WMLP Debtors) every other week beginning two weeks after the petition date.

4. The Debtors are authorized to continue and/or modify, change, and discontinue the Employee Compensation and Benefits, and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law, in consultation with the advisors to the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement, attached to the First Day Declaration), the advisors to the Required Lenders, and counsel to the lenders under the WMLP Debtors' term loan facility (solely with respect to benefits for Employee Compensation and Benefits related to the WMLP Debtors). The Debtors will use best efforts to provide notice to the U.S. Trustee and any statutory committee of any material changes to the Employee Compensation and Benefits or new programs, policies, and benefits. For the avoidance of doubt, except as otherwise expressly set forth herein, nothing in this Final Order should be construed as authorizing any payments on account of the Employee Compensation and Benefits that are outside the ordinary course of business without prior Court approval.

5. The Debtors are authorized in their discretion to continue the Non-Insider Severance Awards and the Non-Insider Spot Awards and to pay and honor any amounts related to the Non-Insider Severance Awards and the Non-Insider Spot Awards in the ordinary course of business and consistent with past practices; *provided* that the Debtors will obtain the consent of the Required Lenders (as defined in the DIP Order) prior to making any payment on account of a Potential Non-Insider Severance Award to a Specified Employee; *provided*, *further*, that if counsel to the Required Lenders does not respond to such request within twenty four (24) hours of receipt, the Required Lenders shall be deemed to consent to such payment.

6. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

7. Pursuant to section 362(d) of the Bankruptcy Code: (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business; and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

8. Solely with respect to the WMLP Debtors, notwithstanding anything to the contrary set forth herein: (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the WMLP Debtors under any orders authorizing the WMLP Debtors' use of cash collateral (in each case, the "Cash Collateral Order"), including any budget in connection therewith (the "WMLP Budget"); and (b) to the extent there is any inconsistency between the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order and the WMLP Budget shall control.

9. Solely with respect to the WLB Debtors, notwithstanding anything to the contrary set forth herein: (a) any payment to be made, or authorization contained, hereunder shall be subject

to the requirements imposed on the WLB Debtors under the WLB Debtors' postpetition financing agreement (including with respect to any budgets governing or relating therewith, the "DIP Documents") and any orders (in each case, the "DIP Order") approving the DIP Documents and governing the WLB Debtors' use of cash collateral; and (b) to the extent there is any inconsistency between the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order and DIP Documents shall control.

10. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

11. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

12. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection

with any Employee Compensation and Benefits programs.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: ___________, 2018
Houston, Texas

______________________________________
UNITED STATES BANKRUPTCY JUDGE