# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## MOTION OF WESTMORELAND COAL COMPANY AND CERTAIN OF ITS SUBSIDIARIES FOR ENTRY OF AN ORDER (I) AUTHORIZING WESTMORELAND COAL COMPANY AND CERTAIN DEBTOR AFFILIATES TO ENTER INTO AND PERFORM UNDER THE STALKING HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING PROCEDURES WITH RESPECT TO SUBSTANTIALLY ALL ASSETS, (III) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, (IV) SCHEDULING BID DEADLINES AND AN AUCTION, (V) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION, AND (VI) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

> **A HEARING WILL BE HELD ON THIS MATTER ON NOVEMBER 13, 2018, AT 1:00 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

Westmoreland Coal Company and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>WLB Debtors</u>")[2] respectfully state the following in support of this motion (this "<u>Motion</u>").[3]

## <u>Introduction[4]</u>

1.      As described in the First Day Declaration, following months of good-faith, arm's-length discussions with their secured creditors, the WLB Debtors commenced these chapter 11 cases to effectuate a restructuring with the support of the Consenting Stakeholders on the terms set forth in the RSA.  More specifically, the RSA contemplates a going concern sale of substantially all of the WLB Debtors' assets pursuant to a chapter 11 plan, and the Consenting Stakeholders have agreed to provide the Stalking Horse Bid for certain of the WLB Debtors' assets, in the form of a credit bid by the Prepetition Secured Parties pursuant to the terms of the Stalking Horse Purchase Agreement.  The WLB Debtors and the Consenting Stakeholders have memorialized the terms of the Stalking Horse Bid in the Stalking Horse Purchase Agreement.  The proposed sale would preserve the WLB Debtors' operations and over a thousand jobs.  The WLB Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of their assets for all stakeholders is to market-test the Stalking Horse Bid through an auction process and to expeditiously sell the assets to the highest or otherwise best bidder pursuant to the Plan.

---

[2]    A detailed description of the Debtors' businesses and the reasons for commencing the chapter 11 cases is set forth in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>") [Docket No. 54].

[3]    The relief requested in this Motion is solely limited to Westmoreland Coal Company and its Debtor affiliates, other than the WMLP Debtors (as defined herein) (collectively, the "<u>WLB Debtors</u>").  The "<u>WMLP Debtors</u>" means, collectively, Westmoreland Resource Partners GP, LLC and Westmoreland Resource Partners, LP (and its subsidiaries).

[4]    Capitalized terms used in this section have the meanings ascribed to such terms below.

2.      To implement the sale and confirmation process contemplated by the RSA, the WLB Debtors submit this Motion, seeking for the Court to (a) approve the Bidding Procedures for the sale of substantially all of the WLB Debtors' assets, (b) set dates and deadlines in connection therewith (including a bid deadline, the date of the auction, and the hearing dates and objection deadlines relating to the solicitation and confirmation of the Plan), (c) approve procedures for the assumption and assignment of contracts and the resolution of related cure costs, and (d) approve the form and manner of notice of each of the foregoing.  The WLB Debtors also seek authority to enter into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder, which will provide a floor bid for the auction of the WLB Debtors' assets.  Importantly, there is **_no_** break-up fee or expense reimbursement in connection with the Stalking Horse Purchase Agreement, which will serve as a competitive baseline bid for the auction for the WLB Debtors' assets.

3.      The WLB Debtors will market test the Stalking Horse Bid to ensure that the WLB Debtors obtain the highest or otherwise best offer or combination of offers for the WLB Debtors' assets from either the Stalking Horse Bidder or other bidders.  If approved, the proposed Bidding Procedures will enable the WLB Debtors to expeditiously complete their chapter 11 restructuring.  As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interests of the WLB Debtors' estates and their stakeholders.  Accordingly, the WLB Debtors respectfully request that the Court grant this Motion.

### **Relief Requested**

4.      The WLB Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

> (i)      authorizing the WLB Debtors to enter into that certain Asset Purchase Agreement attached to the Bidding Procedures Order as **Exhibit 1** (the "Stalking Horse Purchase Agreement");

(ii)    authorizing and approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit 2** (the "<u>Bidding Procedures</u>") in connection with the sale of substantially all assets of the WLB Debtors free and clear of liens, claims, encumbrances, and other interests (the "<u>Sale</u>");

(iii)    scheduling (a) an auction in connection with the Sale (the "<u>Auction</u>"), (b) hearing dates (the "<u>Disclosure Statement Hearing</u>" and the "<u>Confirmation Hearing</u>") in connection with the approval of a disclosure statement (the "<u>Disclosure Statement</u>") and confirmation of a chapter 11 plan (the "<u>Plan</u>"), and (c) objection deadlines for the Disclosure Statement Hearing and the Confirmation Hearing;

(iv)    approving the form and manner of notice of the Auction, Disclosure Statement Hearing, and Confirmation Hearing, attached as **Exhibit 3** to the Bidding Procedures Order (the "<u>Sale Notice</u>"); and

(v)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "<u>Assigned Contracts</u>"), and approving the form and manner of notice thereof, attached as **Exhibit 4** to the Bidding Procedures Order (the "<u>Cure Notice</u>").

### <u>Jurisdiction and Venue</u>

5.    The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "<u>Amended Standing Order</u>"). The WLB Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    The bases for the relief requested herein are sections 105(a) and 363 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") and Bankruptcy Rules 2002 and 6004.

**Background**

7.       Westmoreland Coal Company and its Debtor and non-Debtor affiliates operate the sixth-largest coal-mining enterprise in North America, including 19 coal mines in six states and Canada.  The Debtors primarily produce and sell thermal coal to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers.   Headquartered in Englewood, Colorado, the Debtors and their non-Debtor subsidiaries employ approximately 2,971 individuals.  The Debtors' revenue for the twelve-month period that ended August 31, 2018, totaled approximately $850 million.  As of the Petition Date, the Debtors' aggregate prepetition indebtedness totaled approximately $1.1 billion.

8.       On October 9, 2018 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On October 18, 2018, the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 206].

**The Proposed Sale and Bidding Procedures**

**I.       Summary of Key Terms of the Stalking Horse Purchase Agreement**.[5]

9.       The pertinent terms of the Stalking Horse Purchase Agreement are summarized in the following table.[6]

---

[5]    Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement, the RSA or the Sale Transaction Term Sheet attached to the RSA.

[6]    The following summary is provided for convenience purposes only.  At the time of the filing of this Motion, the Stalking Horse Purchase Agreement has not yet been finalized and the terms described herein are subject to material revision in connection with the ongoing negotiations regarding the Stalking Horse Purchase Agreement.

| Term | Summary Description |
|------|---------------------|
| **Purchase Price**[7] | The aggregate consideration for the Core Assets shall consist of the following (collectively, the "<u>Purchase Price</u>"): |
| | i. pursuant to sections 1123 and 1124 of the Bankruptcy Code, a credit bid in an amount to be set forth in the Stalking Horse Purchase Agreement (as may be amended) in respect of the claims of the First Lien Lenders, |
| | ii. assumption of the Assumed Liabilities (including all Cure Costs related to Assumed Contracts), and |
| | iii. the payment of an amount in cash as may be necessary to satisfy Funded Liabilities (as defined below) at Closing to the extent the Non-Acquired Entities other than WMLP do not have sufficient cash on hand after giving effect to the adjustment to the WCC Cash Threshold contemplated below in respect of the Funded Liabilities. |
| | For the avoidance of doubt, the Purchaser shall not assume any Excluded Liabilities. |
| **Core Assets** | The "<u>Core Assets</u>" shall include: |
| | i. either (A) 100% of Westmoreland Coal Company's limited partnership equity interests in Westmoreland Canadian Investments, LP and 100% of Westmoreland Coal Company's equity in Westmoreland Canada, LLC or (B) 100% of WCC Holding, B.V.'s equity interests in Westmoreland Canada Holdings, Inc., as determined by the First Lien Lenders; |
| | ii. substantially all of the assets owned by the San Juan Sellers and used in the San Juan Business as specifically identified in the Stalking Horse Purchase Agreement, including the San Juan Assumed Contracts; |
| | iii. substantially all of the assets owned by the Colstrip Seller and used in the Colstrip Business as specifically identified in the Stalking Horse Purchase Agreement, including the Colstrip Assumed Contracts; |
| | iv. certain additional assets of the Overhead Sellers that relate to the Overhead Function as specifically identified in the Stalking Horse Purchase Agreement, including all encumbered cash and cash equivalents (whether restricted or unrestricted) in excess of the WCC Cash Threshold (as defined below), but excluding restricted cash in respect of reclamation obligations which Excluded Liabilities; |
| | v. all commercial tort claims and claims that may constitute commercial tort claims (known and unknown); and |

---

To the extent any of the terms described below are inconsistent with the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control in all respects.

[7] Pursuant to the Plan Term Sheet attached to the RSA, the DIP Facility will either (a) be assumed by the Stalking Horse Bidder and continue in force until the obligations under the DIP Facility are indefeasibly paid in full in cash in accordance with the DIP Facility or (b) paid in full in cash on the Plan Effective Date.

| Term | Summary Description |
|---|---|
| | vi.   all of the rights and claims of any WLB Debtor against any contractual counterparty to the Core Assets for preference or avoidance actions available to the WLB Debtors under the Bankruptcy Code, of whatever kind or nature, including those set forth in sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, against any contractual counterparty to the Core Assets asserting claims against any of the WLB Debtors, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing. |
| | The "WCC Cash Threshold" means aggregate encumbered and unencumbered cash and cash equivalents (whether restricted or unrestricted) of Westmoreland Coal Company and, if applicable, its subsidiaries other than the WMLP Debtors as of the close of business on the business day prior to the Effective Date in an amount to be set forth in the Stalking Horse Purchase Agreement (as may be amended). |
| | Westmoreland Canadian Investments, LP and its subsidiaries, and Westmoreland Canada Holdings, Inc. and its subsidiaries, are referred to herein as the "Acquired Entities."  Westmoreland Coal Company, together with its direct and indirect subsidiaries (including the other Sellers), other than the Acquired Entities, are referred to herein as the "Non-Acquired Entities." |
| **Excluded Assets** | The Transferred Assets (as defined below) shall not include the following, among other assets:  (i) all assets of the Non-Acquired Entities that are not Transferred Assets; (ii) contracts, leases and other obligations of the Non-Acquired Entities that are not Assumed Contracts; and (iii) equity securities of, or ownership in, the direct or indirect subsidiaries of Westmoreland Coal Company (including Westmoreland Coal Company's direct and indirect equity interests in the WMLP Debtors) other than the Acquired Entities (collectively, the "Excluded Assets"). |
| **Non-Core Assets** | The Core Assets shall not include the  Non-Core Assets.  "Non-Core Assets" include: (i) substantially all assets of the Non-Acquired Entities (other than Core Assets) used in the business and operations of each Non-Core Mine; and (ii) contracts, leases and other written obligations of the Non-Acquired Entities relating to the Non-Core Mines.[8] |
| **Marketing Process of Non-Core Assets** | Prior to and following the Petition Date, the WLB Debtors are marketing the Non-Core Assets for sale in accordance with the terms and conditions of the RSA.  To the extent any Non-Core Assets are not sold prior to the date of the Auction, they shall be included in the Auction. |
| **Sale of Non-Core Assets** | In the event that the WLB Debtors do not directly or indirectly transfer any Non-Core Assets to a third party acquirer on or before the Effective Date, then the WLB Debtors shall transfer any such Non-Core Assets to the Stalking |

---

[8]    For the avoidance of doubt, neither the Core Assets nor the Non-Core Assets include the equity securities of, or ownership in, the direct or indirect subsidiaries of Westmoreland Coal Company (including Westmoreland Coal Company's direct and indirect equity interests in the WMLP Debtors) other than the Acquired Entities.

| Term | Summary Description |
|------|---------------------|
| | Horse Bidder or other Successful Bidder on the Effective Date (any such asset so transferred, a "Transferred Non-Core Asset" and, all Transferred Non-Core Assets together with the Core Assets, the "Transferred Assets"). |
| **Funded Liabilities** | Notwithstanding anything to the contrary contained herein, (a) any claims related to the Transferred Assets asserted as of the applicable bar date for such claim and (b) any administrative expense tax liability under the Bankruptcy Code the amount of which is estimated (but subject to later finalization) as of the Effective Date but may be asserted after the Effective Date, in each case, where the assumption or payment of the allowed amount of each such claim is required under Section 1129(a)(9) of the Bankruptcy Code in order to receive entry of the Confirmation Order (collectively, the "Funded Liabilities") shall, at the option of the Stalking Horse Bidder, either (i) be assumed by the Stalking Horse Bidder or an affiliate thereof as designated by the Stalking Horse Bidder and become Assumed Liabilities or (ii) continue to be treated as Excluded Liabilities except that the WCC Cash Threshold shall be adjusted such that additional cash is retained by the Company at Closing to satisfy the amount of the Funded Liabilities; provided that in no event shall the amount of the Funded Liabilities be in excess of an amount to be mutually agreed by the parties prior to the Confirmation Hearing.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, the Stalking Horse Bidder and its affiliates shall have no obligation to assume or otherwise pay for unsecured claims, obligations or liabilities of the Non-Acquired Entities, including liabilities arising under retiree medical benefit plans, the Black Lung Act or the Coal Act. |
| **Sale of Assets Free and Clear of Interests** | The WLB Debtors have determined in their sound business judgment that the Sale is in the best interest of their estates, and the WLB Debtors will market test the Stalking Horse Bid.  The WLB Debtors request the Court approve the proposed sale of the Transferred Assets to the Successful Bidder or, if applicable, the Back-Up Bidder, free and clear of claims, liens, encumbrances, and other interests, except as expressly set forth in the Stalking Horse Purchase Agreement. |
| **Closing Conditions** | The Stalking Horse Purchase Agreement contains as a condition of the Stalking Horse Bidder and the WLB Debtors consummating the Sale on the Effective Date, that no injunctions or final other order or similar ruling or determination of any governmental authority preventing or delaying the consummation of the Sale.<br><br>The Stalking Horse Purchase Agreement contains the following conditions to the obligation of the Stalking Horse Bidder to consummate the Sale on the Effective Date:<br><br>• Entry of the Confirmation Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to the First Lien Lenders and the Stalking Horse Bidder and such Confirmation Order not being subject to any stay or appeal, and the WLB Debtors shall not be in breach of the Confirmation Order, which material breach remains uncured; |

| Term | Summary Description |
|------|---------------------|
|  | • The Stalking Horse Bidder shall have obtained all Regulatory Approvals required or appropriate to operate the Business and any Non-Core Mines included in the Transferred Non-Core Assets, if applicable, including, to the extent necessary to obtain any Regulatory Approval from the applicable State or federal regulators, the WLB Debtors and the Stalking Horse Bidder having entered into settlements with such regulators reasonably satisfactory to the Stalking Horse Bidder with respect to permit transfers, bonding requirements and regulatory compliance with respect to the Transferred Assets; |
|  | • No Event of Default (as defined in the DIP Credit Agreement) shall have occurred thereunder which (i) gives the secured parties thereunder a termination right, (ii) as a result of which, such secured parties shall have accelerated the repayment obligations of Westmoreland Coal Company, and (iii) has not been waived; |
|  | • Lien releases and termination statements with respect to all liens (other than Permitted Encumbrances) on the Transferred Assets; provided that lien releases shall not be required with respect to liens that are released by the Confirmation Order; |
|  | • Accuracy of the WLB Debtors' representations and warranties in the Stalking Horse Purchase Agreement on the Effective Date, except where such inaccuracies would not have a material adverse effect on the Sale (except with respect to typical fundamental representations of the WLB Debtors which shall be subject to a "true and correct" standard); |
|  | • The WLB Debtors' compliance, in all material respects, with their respective covenants; |
|  | • Each of the mining complexes comprising a part of the Canadian Business, San Juan Business, Colstrip Business, and the business of each Non-Core Mine included in the Transferred Assets, as applicable, will be delivered with at least the amount of (x) accounts receivable, (y) inventory and (z) operating cash, in each case, as set forth opposite the name of such complex on a schedule to be agreed; |
|  | • The objection deadline shall have passed for all counterparties to Assumed Contracts to object to assignment and assumption by the Stalking Horse Bidder, including with respect to the Cure Costs contained in the notices sent to such counterparties and set forth in the Stalking Horse Purchase Agreement; |
|  | • All "Material Contracts" (i.e., those identified on an agreed schedule to the Stalking Horse Purchase Agreement, which may be a subset of Assumed Contracts and contracts of the Acquired Entities) (i) will have been assigned to, and assumed by, the Stalking Horse Bidder or, to the extent required, will have been novated to the Stalking Horse Bidder or (ii) with respect to Material Contracts of an Acquired Entity, any necessary third party consents or approvals in respect of the contemplated change in control of such Acquired Entity shall have been obtained; |
|  | • The Employment Agreements (as defined below) shall each be in full force |

| Term | Summary Description |
|---|---|
| | and effect as of the Effective Date; |
| | • None of the Acquired Entities shall have been entered into and remain in the Applicant/Violator System, unless resolved by way of settlements with applicable State and federal regulators or otherwise, in form reasonably acceptable to the Stalking Horse Bidder; |
| | • Arrangements reasonably satisfactory to the Stalking Horse Bidder shall be in place regarding the Stalking Horse Bidder's securing of permit transfers and bonding and security arrangements with respect to the Acquired Entities and the Transferred Assets; |
| | • The Bankruptcy Court shall have determined that the WLB Debtors can sell the Transferred Assets free and clear of the successor clause in the UMWA CBAs, the UMWA shall have agreed to waive/remove the successor clause in the UMWA CBAs, or the Bankruptcy Court shall have granted a motion filed by the applicable WLB Debtor pursuant to 1113(c) of the Bankruptcy Code authorizing the applicable WLB Debtor to reject the UMWA CBAs, in each case, other than in respect of the CBAs included in the Assumed Contracts; |
| | • The Bankruptcy Court shall have granted motions filed by the applicable WLB Debtor (i) pursuant to section 1113 of the Bankruptcy Code terminating and/or modifying CBAs in connection with the Transferred Assets as requested by the Stalking Horse Bidder and (ii) pursuant to section 1114 of the Bankruptcy Code modifying retiree benefits in connection with the Transferred Assets as requested by the Stalking Horse Bidder; and |
| | • Since the execution of the Stalking Horse Purchase Agreement, no material adverse effect on the Transferred Assets or the Business (including any Non-Core Mines included in the Transferred Non-Core Assets, if applicable) shall have occurred. |
| | The Stalking Horse Purchase Agreement contains the following conditions to the obligations of the WLB Debtors to consummate the Sale on the Effective Date: |
| | • Accuracy of the Stalking Horse Bidder's representations and warranties on the Effective Date, except where such inaccuracies would not have a material adverse effect on the Sale (except with respect to typical fundamental representations of the Stalking Horse Bidder which shall be subject to a "true and correct" standard); |
| | • The Stalking Horse Bidder's compliance, in all material respects, with its respective covenants; |
| | • Entry of the Confirmation Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to the WLB Debtors and such Confirmation Order not being |

| Term | Summary Description |
|------|--------------------|
| | subject to any stay or appeal, and the Stalking Horse Bidder shall not be in breach of the Confirmation Order, which material breach remains uncured. <br><br> • The Stalking Horse Bidder shall have obtained all Regulatory Approvals required or appropriate to operate the Business (including any Non-Core Mines included in the Transferred Non-Core Assets, if applicable). |
| **Termination Events** | The Stalking Horse Purchase Agreement contains customary termination provisions, including: <br><br> i. by agreement of each of the WLB Debtors and the Stalking Horse Bidder; <br><br> ii. if the closing does not occur on or prior to the Outside Date (*i.e.*, March 31, 2019, subject to possible extension pursuant to the terms of the Stalking Horse Purchase Agreement); <br><br> iii. by notice from the Stalking Horse Bidder: <br><br>     a. upon a material breach by the WLB Debtors of covenants of the Stalking Horse Purchase Agreement, RSA, or the Confirmation Order, which breach (a) would cause any of the Stalking Horse Bidder's conditions to the closing not to be satisfied; <u>provided</u> that the Stalking Horse Bidder is not itself then in material breach and (b) has not been cured within ten (10) business days; <br><br>     b. upon any of the WLB Debtors entering into any material agreement, including any definitive purchase agreement, in furtherance of or with respect to a Successful Bid with any party other than the Stalking Horse Bidder; <br><br>     c. upon the dismissal or conversion of any of the Chapter 11 Cases; <br><br>     d. upon the appointment of a trustee or examiner with expanded powers; <br><br>     e. upon failure to meet Milestones (unless waived pursuant to the RSA); <br><br>     f. upon permanent denial of required Regulatory Approvals; or <br><br>     g. upon any declaration of an Event of Default under the DIP Credit Agreement that is not waived, cured, or determined by the Bankruptcy Court not to be an Event of Default; <br><br> iv. by written notice from the WLB Debtors:  upon a material breach by the Stalking Horse Bidder of any representation, warranty, covenant or agreement in the Stalking Horse Purchase Agreement or the Confirmation Order, which breach (a) would cause any of the WLB Debtors' conditions to the closing not to be satisfied; <u>provided</u> that none of the WLB Debtors is itself then in material breach and (b) has not been cured within ten (10) business days; or |

| Term | Summary Description |
|------|---------------------|
| | v.    at the written election of either the WLB Debtors or the Stalking Horse Bidder:<br><br>a.    if, at the end of the Auction, the Stalking Horse Bidder is not determined by the WLB Debtors to be the Successful Bidder (as defined below) or the Back-Up Bidder, with respect to any of the assets, and, if the Stalking Horse Bidder is the Back-Up Bidder, upon closing a sale transaction with the Successful Bidder; or<br><br>b.    if a court of competent jurisdiction or other governmental authority has issued an order or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the closing under the Stalking Horse Purchase Agreement and such order or action has become final and non-appealable. |
| **Representations and Warranties in Stalking Horse Purchase Agreement** | The WLB Debtors will make representations and warranties concerning: organization, subsidiaries, power and authority, noncontravention and consents, financial statements, capitalization (including in respect of Acquired Entities), good faith estimate of Cure Costs as of the signing date, related party transactions, regulatory approvals, litigation, material contracts, compliance with laws, licenses and permits, environmental matters, labor, employee, and pension/benefits matters, health and safety matters, insurance, real property, title to assets, intellectual property, taxes, absence of certain changes and no liability to brokers, and such other matters as the Stalking Horse Bidder may reasonably request based on its due diligence review prior to the execution of Definitive Agreements.<br><br>The Stalking Horse Bidder will make representations and warranties concerning: organization, power and authority, government authorization, noncontravention and consents, adequate assurance (as of the Effective Date) regarding assumed contracts, transferred permits and licenses and bonding, capability to effectuate the credit release in payment of the Purchase Price, inspection/no other representations, and no liability to brokers, and such other matters as Westmoreland Coal Company may reasonably request prior to the execution of the Definitive Documents. |
| **Covenants** | The Stalking Horse Bidder and the WLB Debtors will be subject to customary covenants and other covenants to be mutually agreed in the Stalking Horse Purchase Agreement, including with respect to conduct of business prior to the Effective Date (including in respect of cash management practices), cooperation, access, notification, efforts to obtain regulatory approvals and to obtain the transfer of permits and the replacement of associated bonding, and the satisfaction of applicable closing conditions. |

## II.     The Bidding Procedures.

10.     The WLB Debtors' entry into the Stalking Horse Purchase Agreement is designed to incentivize potential bidders and thereby maximize the potential value of their assets for the

benefit of the WLB Debtors' estates and their various stakeholders.  The WLB Debtors request approval and authorization of the Stalking Horse Purchase Agreement, subject only to higher or otherwise better offers in accordance with the procedures set forth in the Bidding Procedures.

11.     The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the WLB Debtors' assets, consistent with the timeline of these chapter 11 cases, to confirm that the bid represented by the Stalking Horse Purchase Agreement (the "Stalking Horse Bid," and the bidder thereunder, the "Stalking Horse Bidder") is the best offer, or promptly identify the alternative bid that is higher or otherwise better.

12.     The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Confirmation Hearing.  In fact, the Stalking Horse Purchase Agreement does not provide any limitation on the WLB Debtors' ability to market their assets prior to the Auction.  Indeed, the WLB Debtors and their advisors have already commenced a marketing and sale process to confirm the market value of their assets.  In creating the Bidding Procedures, the WLB Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer while at the same time preserving the opportunity to attract the highest or otherwise best offer.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the WLB Debtors' restructuring process, and create a path towards entry of an order confirming the Plan (the "Confirmation Order") that embodies the highest or otherwise best available recoveries to the WLB Debtors' stakeholders.

13.     Because the Bidding Procedures are attached as **Exhibit 2** to the proposed Bidding Procedures Order, they are not restated fully herein.  Generally speaking, however, the Bidding Procedures establish, among other things:[9]

- the WLB Debtors will serve the Bidding Procedures Order (setting forth the Sale and Confirmation Schedule), Bidding Procedures, Sale Notice, and Cure Notice upon the Notice Parties as soon as practicable after entry of the Bidding Procedures Order;

- the availability of, access to, and conduct during due diligence by "Acceptable Bidders";

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the WLB Debtors to determine the starting bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid (as defined in the Bidding Procedures), return of any good faith deposits, and certain reservations of rights.

14.     Importantly, the Bidding Procedures recognize and comply with the WLB Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the WLB Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the WLB Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the WLB Debtors' estates.

15.     Notably, the WLB Debtors have been marketing the Non-Core Assets, including those associated with the Non-Core Mines listed on **Schedule 1** to the Stalking Horse Purchase Agreement (the "Non-Core Asset Marketing Process") since August 2018.  Although the Stalking

---

[9]     The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

Horse Bid is only for the Core Assets, the Stalking Horse Bid provides a solution for substantially all of the WLB Debtors' assets, because the Stalking Horse Purchase Agreement includes an agreement by the Stalking Horse Bidder to also accept any of the Non-Core Assets to the extent a third party has not agreed, prior to the effective date of the Plan (the "Effective Date"), to acquire such Non-Core Assets.  The Non-Core Asset Marketing Process began in August 2018, and to date, approximately 36 parties have been contacted, with 14 having signed non-disclosure agreements and having been offered information regarding the Non-Core Assets.  Bids for the Non-Core Assets were requested by the WLB Debtors by October 17, 2018, and the WLB Debtors will evaluate whether to continue marketing the Non-Core Assets for sale based on those bids.  To the extent any Non-Core Assets are sold (or a binding agreement to sell such Non-Core Assets is entered into) pursuant to the Non-Core Asset Marketing Process prior to the date of the Auction, the applicable Non-Core Assets will not be part of the Auction.  However, to the extent any Non-Core Assets are not sold (or a binding agreement to sell such Non-Core Assets is not entered into) as a result of the Non-Core Asset Marketing Process before the date of the Auction, such Non-Core Assets may be sold as part of the Auction.

**III.    Proposed Sale and Confirmation Schedule**.

16.    The WLB Debtors are seeking approval of the Bidding Procedures and the Confirmation Schedule (as defined herein) in parallel to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the WLB Debtors to consummate a sale of substantially all of their assets.  A defined path toward confirmation of the Plan will drive the sale process in an expeditious and efficient manner, and the Confirmation Schedule is designed to encourage all prospective bidders to put their best bids forward at the outset of these chapter 11 cases in order to provide the highest or otherwise best available recoveries to the WLB Debtors' stakeholders.

17.    The WLB Debtors and the initial Consenting Stakeholders[10] negotiated a timeline in the RSA that will allow for a market test of the Stalking Horse Bid to achieve the highest or otherwise best offer for the WLB Debtors' assets through the Auction process, while at the same time ensuring that a solution for substantially all of the WLB Debtors' assets takes place expeditiously to maximize value for the WLB Debtors' stakeholders.  Following the Auction, the Sale will be promptly consummated through the Plan.  Together, the Bidding Procedures and proposed Confirmation Schedule set forth below establish a clear process and path forward that is intended to elicit the highest or otherwise best offer under the circumstances.

18.    The key dates and deadlines the WLB Debtors seek to establish pursuant to the Bidding Procedures Order are as follows (the dates set forth below, collectively, the "Confirmation Schedule"), subject to the right of the WLB Debtors, in consultation with the Consultation Parties[11] and subject to the RSA and the orders approving the WLB Debtors' postpetition financing facility, to modify the following dates, and, with respect to the dates in paragraph 18.b and 18.f, to seek Court approval to modify such dates:

> a.    **Disclosure Statement Objection Deadline**: The deadline by which all objections to the WLB Debtors' forthcoming motion to approve the Disclosure Statement (the "Disclosure Statement Motion") must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties is 4:00 p.m. (prevailing Central Time) on November 26, 2018 (the "Disclosure Statement Objection Deadline"); *provided* that if the Disclosure Statement Motion is filed after October 25, 2018, the Disclosure Statement Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is 28 days following

---

[10]    As defined in the RSA, "Consenting Stakeholders" means the signatories to the RSA who are "holders of, investment advisors, sub-advisors, or managers of discretionary accounts that hold, DIP Facility Claims, Prepetition Bridge Loan Claims, Prepetition Credit Agreement Claims or Prepetition First Lien Note Claims (each as defined in the RSA) that have, solely in their capacities as holders of the foregoing claims, executed and delivered counterpart signature pages to the RSA or Joinder Agreement thereto to counsel to the WLB Debtors.

[11]    "Consultation Parties" means the following parties:  (a) counsel or financial advisors to the DIP Lenders (as defined in the Final DIP Order); (b) counsel or financial advisors to the ad hoc group of Prepetition Secured Parties; (c) counsel to the DIP Agent; (d) counsel to the Prepetition Term Loan Agent; (e) counsel to the Prepetition Indenture Trustee; and (f) the official committee of unsecured creditors.

the date on which the Disclosure Statement Motion is filed on the Court's docket;

b.       **Disclosure Statement Hearing**: The hearing to consider approval of the Disclosure Statement and related solicitation documents pursuant to section 1125 of the Bankruptcy Code shall take place before the Honorable David R. Jones, United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"), on a date and at a time acceptable to the Court, the WLB Debtors, the Required Consenting Stakeholders, and the Required DIP Lenders (as defined in the orders approving the WLB Debtors' postpetition financing facility);

c.       **Bid Deadline**: **January 15, 2019, at 4:00 p.m. (prevailing Central Time)** is the deadline by which all "Qualified Bids" (as defined in the Bidding Procedures) must be **actually received** by the parties specified in the Bidding Procedures (the "Bid Deadline");

d.       **Auction**: **January 22, 2019, at 10:00 a.m. (prevailing Eastern Time)** is the date and time the Auction, if one is needed, will be held at the offices of counsel to the WLB Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022;

e.       **Confirmation Objection Deadline**: The deadline by which all objections to the Plan (including any Successful Bids (as defined in the Bidding Procedures)) must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "Confirmation Objection Deadline") is January 25, 2019, at 4:00 p.m. (prevailing Central Time); *provided* that if the Auction occurs after January 22, 2019, the Confirmation Objection Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction;

f.       **Confirmation Hearing**: The Confirmation Hearing approving the Sale to the Successful Bidder and confirming the Plan is scheduled to commence before the Court on **February 13, 2019**.

19.       On or before the commencement of the Confirmation Hearing is the deadline by which an objection to any Successful Bids must be filed with the Court and served so as to be actually received by the Notice Parties (as defined herein).  No party may object to the right of (i) the indenture trustee (the "Prepetition Indenture Trustee") under the WLB Debtors' 8.75% senior secured notes due 2022 (the "WLB Senior Secured Notes"), including its assignees or designees or (ii) the administrative agent (the "Prepetition Term Loan Agent" and together with

the Prepetition Indenture Trustee, the "Prepetition Secured Parties") under the WLB Debtors'

prepetition term loan facility due 2020 (the "WLB Term Loan"), including its assignees or

designees, to credit bid any of their respective claims, as set forth in the interim order approving

the WLB Debtors' postpetition financing facility [Docket No. 92 at ¶ 42] (the "Interim DIP

Order").

20.     A party's failure to timely file or make an objection in accordance with the Bidding

Procedures Order shall forever bar such a party from asserting any objection to the Disclosure

Statement Motion or the Plan, including the consummation of the Sale with the Successful Bidder,

and the assumption and assignment of certain executory contracts and unexpired leases to the

Successful Bidder, and such failure shall be deemed to constitute consent by such contract

counterparty (each a "Contract Counterparty" and collectively, the "Contract Counterparties") to

(a) the assumption and assignment of such executory contracts and unexpired leases, and

(b) consummation of the Sale.

**IV.     Form and Manner of Sale Notice**.

21.     The Auction, if any, shall take place at 10:00 a.m. (prevailing Eastern Time) on

January 22, 2019, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New

York 10022, or such later date and time or other place as selected by the WLB Debtors in

consultation with the Consultation Parties and subject to the RSA and the orders approving the

WLB Debtors' postpetition financing facility, and filed on the docket of these chapter 11 cases.

22.     As soon as practicable after entry of the Bidding Procedures Order, the WLB

Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 3** to the Bidding

Procedures Order, to be served on the following parties or their respective counsel, if known

(collectively, the "Notice Parties"): (a) the United States Trustee for the Southern District of Texas;

(b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis);

(c)  the Prepetition Indenture Trustee; (d) counsel to the Ad Hoc Group; (e)  the Prepetition Term Loan Agent; (f) the administrative agent under the WLB Debtors' debtor-in-possession financing facility; (g) counsel to any statutory committee appointed in these cases; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the Environmental Protection Agency; (k) the offices of the attorneys general for the states in which the WLB Debtors operate; (l) the Securities and Exchange Commission; (m) counsel to the Stalking Horse Bidder; (n) all parties who have expressed a written interest in some or all of the WLB Debtors' assets; (o) all known holders of liens, encumbrances, and other claims secured by the WLB Debtors' assets; (p) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (q) all known creditors of the WLB Debtors; (r) all registered holders of equity securities in the WLB Debtors; and (s) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

23.     In addition, as soon as practicable after entry of the Bidding Procedures Order, the WLB Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in *The New York Times (National Edition)* to provide notice to any other potential interested parties.

24.     The WLB Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held), the Bidding Procedures and the dates and deadlines related thereto, and the dates and deadlines related to the Disclosure Statement Hearing and the Confirmation Hearing.  Accordingly, the WLB Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction, the Disclosure Statement Hearing, or the Confirmation Hearing is required.

**V.**      **Summary of the Assumption and Assignment Procedures**.

25.      The WLB Debtors propose the procedures set forth below (the "<u>Assumption and Assignment Procedures</u>") for notifying the Contract Counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the WLB Debtors decide to assume and assign such contracts or leases in connection with the Sale.

     **A.**      **Notice of Assumption and Assignment.**

26.      As soon as practicable after entry of the Bidding Procedures Order (any such date, the "<u>Assumption and Assignment Service Date</u>"), the WLB Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice annexed as **<u>Exhibit 4</u>** to the Bidding Procedures Order on all executory contract and unexpired lease Contract Counterparties (other than any Debtor) and, include as **<u>Exhibit A</u>** to the Cure Notice, a list (the "<u>Assigned Contracts Schedule</u>") that specifies: (a) each of the WLB Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (*i.e.*, the Assigned Contracts), including the name of the Contract Counterparty to each such contract, and whether or not the underlying agreement would be considered an executory contract or unexpired lease under applicable nonbankruptcy law; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (c) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto. The WLB Debtors shall serve, via first class mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (w) instructions (the "<u>DCL Instructions</u>") regarding how to view the Assigned Contracts Schedule on the Debtors' case

website (the "Case Website");[12] (x) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (y) Cure Costs, if any; and (z) the procedures for objecting thereto ((x)-(z) collectively, the "Necessary Notice Information"), on each Contract Counterparty to the Assigned Contracts. The WLB Debtors shall serve on all parties that requested notice pursuant to Local Bankruptcy Rule 2002-1, via ECF, a modified version of the Cure Notice that contains the DCL Instructions and Necessary Notice Information.  Pursuant to the Bidding Procedures Order, service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice will be necessary.

27.     A Contract Counterparty listed on the Assigned Contract Schedule may file an objection (an "Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.   All Assigned Contract Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and actually received no later than January 10, 2019, at 4:00 p.m. (prevailing Central Time) (*i.e.*, three business days before the Bid Deadline of January 15, 2019) (the "Cure Objection Deadline").

28.     If a Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve

---

[12]     The URL is: www.donlinrecano.com/westmoreland.

the dispute prior to the Confirmation Hearing, such objection will be resolved at the Confirmation Hearing or such later date as determined by the Court.  To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion.  To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing.  If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

**B.      Supplemental Cure Notice.**

29.      If (i) the WLB Debtors discover contracts inadvertently omitted from the Assigned Contracts Schedule, or (ii) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, the WLB Debtors may, in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the WLB Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date and before the closing of the Sale:  (a) supplement the Assigned Contracts Schedule with previously omitted Assigned Contracts; (b) remove an Assigned Contract from the list of contracts ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contract.

30.     In the event that the WLB Debtors exercise any of the rights reserved above, the WLB Debtors shall promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Contract Counterparty, and its attorney, if known, at the last known address available to the WLB Debtors (a "Supplemental Cure Notice").   Each Supplemental Cure Notice shall include the same information with respect to listed Assigned Contracts as would have been included in the Notice of Assumption and Assignment.

31.     Any Contract Counterparty listed on the Assigned Contract Schedule as amended and attached to a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.   All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

32.     If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the WLB Debtors shall seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.   If there is no such objection, then the WLB Debtors shall obtain an order of this Court (a "Supplemental Assigned Contract Order") fixing the Cure Costs and approving the assumption and assignment of any Assigned Contract listed on a Supplemental Cure Notice.

**C.**   **Additional Notice of Assumption and Assignment Procedures.**

33.   If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the WLB Debtors or the Successful Bidder, or the property of any of them.

34.   Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the earlier of (a) the Confirmation Hearing or Supplemental Assigned Contract Hearing, as applicable, and (b) 4:00 p.m. (prevailing Central Time) on the date that is 14 days following (i) the Assumption and Assignment Service Date, or (ii) the date of Service of the Supplemental Cure Notice, as applicable, and such objections will be resolved at the Confirmation Hearing or Supplemental Assigned Contract Hearing, as applicable.   The WLB Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.

35.   The inclusion of an Assigned Contract on the Notice of Assumption and Assignment (or Supplemental Cure Notice) will not:  (a) obligate the WLB Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the WLB Debtors that such Assigned Contract is an executory contract.  Only those Assigned Contracts that are included on a

24

schedule of assumed and assigned contracts attached to the definitive agreement of the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

**Basis for Relief**

**I.     The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Are Consistent with the WLB Debtors' Reasonable Business Judgment.**

36.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

37.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

25

38.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.     The WLB Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.  This process includes both the Stalking Horse Purchase Agreement and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for substantially all of the WLB Debtors' assets.  The WLB Debtors are confident that the Bidding Procedures will allow the WLB Debtors to solicit additional offers and conduct the sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the assets and who can demonstrate the ability take on the assets, obligations, and liabilities being transferred.   In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     The WLB Debtors submit that the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously

approved by this district.  *See, e.g.*, *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (Bankr. S.D. Tex. Jan. 25, 2018) (approving similar bidding procedures); *In re EMAS CHIYODA Subsea Limited.,* No. 17-31146 (Bankr. S.D. Tex. Apr. 24, 2017) (same); *In re Vanguard Nat. Res., LLC*, No. 17-30560 (Bankr. S.D. Tex. Apr. 13, 2017) (same); *In re Sherwin Alumina Co.*, No. 16-20012 (Bankr. S.D. Tex. Mar. 16, 2016) (same); *In re University Gen. Health Sys., Inc.*, No. 15-31086 (Bankr. S.D. Tex. Oct. 15, 2015) (same).[13]

41.     Accordingly, for all of the foregoing reasons, the WLB Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the assets; (b) are consistent with other procedures previously approved by courts in this District; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

## II.     The Form and Manner of the Sale Notice Should Be Approved.

42.     Pursuant to Bankruptcy Rule 2002(a), the WLB Debtors are required to provide creditors with 21-days' notice of a hearing where the WLB Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the WLB Debtors seek approval of the Sale Notice as proper notice of the Auction.  The WLB Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  While the WLB Debtors

---

[13]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

will provide at least 28-days' notice of the Confirmation Hearing after a hearing at which the court

enters an order approving the Disclosure Statement, as required under Bankruptcy Rule 2002(b),

the WLB Debtors seek approval of the Sale Notice as proper notice of the Auction.  Accordingly,

the WLB Debtors request that this Court approve the form and manner of the Sale Notice.

**III.     The Assumption and Assignment of the Contracts Should Be Approved.**

      **A.     The Assumption and Assignment of the Assigned Contracts Reflects the WLB Debtors' Reasonable Business Judgment.**

43.     To facilitate and effectuate the Sale, the WLB Debtors are seeking authority to

assign or transfer the Assigned Contracts to the Successful Bidder to the extent required by such

bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its

executory contracts and unexpired leases, subject to the approval of the court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance

is provided.  The WLB Debtors' decision to assume or reject an executory contract or unexpired

lease must only satisfy the "business judgment rule" and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing Co. v.

Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard

to debtor's determination to assume unexpired lease); *In re Penn Traffic Co.*, 524 F.3d 373, 383

(2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a

contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136,

138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an

executory contract] is the business judgment standard.").

44.     Here, the Court should approve the decision to assume and assign the Assigned

Contracts in connection with the Sale as a sound exercise of the WLB Debtors' business judgment.

***First***, the Assigned Contracts are necessary to run the business and, as such, they are essential to

inducing the highest or otherwise best offer for the WLB Debtors' assets.  ***Second***, it is unlikely

that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. ***Third***, the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

45.     Accordingly, the WLB Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.**

46.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

47.     The WLB Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The WLB Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**C.** **Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

48.     Similarly, the WLB Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

49.     The WLB Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the WLB Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or

proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the WLB Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

## **Reservation of Rights**

50.     Nothing contained in this Motion or any actions taken by the WLB Debtors pursuant to relief granted in the Bidding Procedures Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the WLB Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the WLB Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the WLB Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the WLB Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

51.     To implement the foregoing successfully, the WLB Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the WLB Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

52.     The WLB Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated

31

basis); (c) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (d) the ad hoc group of lenders under the WLB Debtors' prepetition term loan facility due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (e) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (f) the administrative agent under the WLB Debtors' bridge loan facility due 2019; (g) the administrative agent under the WMLP Debtors' term loan facility due 2018; (h) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (i) the administrative agent under the WLB Debtors' proposed debtor-in-possession financing facility; (j) the lenders under the WLB Debtors' debtor-in-possession financing facility; (k) any statutory committee appointed in these cases; (l) the United States Attorney's Office for the Southern District of Texas; (m) the Internal Revenue Service; (n) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (o) the offices of the attorneys general for the states in which the Debtors operate; (p) the Securities and Exchange Commission; (q) counsel to the Stalking Horse Bidder, if any; (r) all known holders of liens, encumbrances, and other claims secured by the WLB Debtors' assets; (s) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder (t) the Pension Benefit Guaranty Corporation; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The WLB Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### <u>No Prior Request</u>

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the WLB Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: October 18, 2018

*/s/ Patricia B. Tomasco*

Patricia B. Tomasco (Bar No. 01797600)
Matthew D. Cavenaugh (Bar No. 24062656)
Jennifer F. Wertz (Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          ptomasco@jw.com
                mcavenaugh@jw.com
                jwertz@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                michael.slade@kirkland.com
                gregory.pesce@kirkland.com

-and-

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com

-and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:   (713) 836-3600
Email:          anna.rotman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

### <u>Certificate of Service</u>

I certify that on October 18, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Patricia B. Tomasco
Patricia B. Tomasco