**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    ptomasco@jw.com
             mcavenaugh@jw.com
             jwertz@jw.com

*Proposed Conflicts Counsel to the WLB Debtors and Local Counsel to the Debtors*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
             michael.slade@kirkland.com
             gregory.pesce@kirkland.com
*Proposed Counsel to the WLB Debtors*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
             stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Email:    anna.rotman@kirkland.com

---

[1]    Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

THE WLB DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES.[2] NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE WLB DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE WLB DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE WLB DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE WLB DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT MAY BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL OR STATE LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER FEDERAL AND STATE SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL OR STATE SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), dated October 25, 2018, and attached hereto as **Exhibit A**.

IN PREPARING THIS DISCLOSURE STATEMENT, THE WLB DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE WLB DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE WLB DEBTORS' BUSINESSES.  WHILE THE WLB DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE WLB DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE WLB DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE WLB DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE WLB DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE WLB DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE WLB DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE WLB DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE WLB DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE WLB DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE WLB DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE PLAN EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**................................................................................................1
    A.      The Plan ................................................................................................1
    B.      The Plan Structure ................................................................................2
    C.      The Sale Transaction ............................................................................3

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**................4
    A.      What is Chapter 11? .............................................................................4
    B.      Why are the WLB Debtors sending me this Disclosure Statement? .........5
    C.      Am I entitled to vote on the Plan? ..........................................................5
    D.      What will I receive from the WLB Debtors if the Plan is Consummated? .....5
    E.      What will I receive from the WLB Debtors if I hold an Allowed Administrative Claim or
          an Allowed Priority Tax Claim? ............................................................6
    F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
          Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and
          "Consummation?"................................................................................6
    G.      What are the sources of cash and other consideration required to fund the Plan? ...........6
    H.      Who Supports the Plan? .......................................................................7
    I.       Will there be releases and exculpation granted to parties in interest as part of the Plan? ........7
    J.      What is the deadline to vote on the Plan? ..............................................7
    K.      How do I vote for or against the Plan? ...................................................7
    L.      Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
          Confirmation Hearing set to occur? ......................................................7
    M.      What is the purpose of the Confirmation Hearing? ................................7
    N.      What is the effect of the Plan on the WLB Debtors' ongoing business? ......8
    O.      Does the Plan affect the Claims against or the Interests in the WMLP Debtors? ..........8
    P.      Who do I contact if I have additional questions with respect to this Disclosure Statement
          or the Plan? ........................................................................................8
    Q.      Do the WLB Debtors recommend voting in favor of the Plan? ................8

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES**........8
    A.      Corporate History................................................................................8
    B.      Prepetition Capital Structure ................................................................12
    C.      WMLP Debtors and Shared Services Agreement ..................................15

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES**........................................16
    A.      Adverse Market Conditions ..................................................................16
    B.      Acquisition and Expansion Efforts .......................................................16
    C.      Coal Industry Liabilities.......................................................................17
    D.      The Debtors' Proactive Approach to Addressing Liquidity Constraints...........17

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES**...............................................19
    A.      First Day Pleadings and Other Case Matters ........................................19
    B.      Employment and Compensation of Advisors .........................................21
    C.      Appointment of Official Committee .......................................................21
    D.      Summary of Claims Process, Bar Date and Claims Filed ......................21
    E.      Exclusivity .........................................................................................22
    F.      Postpetition Marketing, Bidding, and Auction Process ..........................22
    G.      Section 1113 and 1114 Process ...........................................................22

**ARTICLE VI. SUMMARY OF THE PLAN**..............................................................................23
    A.      General Settlement of Claims and Interests ..........................................23
    B.      Proposed Creditor Recoveries .............................................................24

C.     The Sale Transaction ................................................................................ 25
D.     Restructuring Transactions ...................................................................... 26
E.     The Plan Administrator ........................................................................... 26
F.     The Liquidating Trust ............................................................................. 27
G.     The Post-Closing Reconciliation Date .................................................... 27
H.     Corporate Action .................................................................................... 28
I.     Recoveries to Certain Holders of Claims and Interests ........................... 28
J.     Release, Injunction, and Related Provisions ........................................... 28

**ARTICLE VII. VOTING AND CONFIRMATION ................................................................. 31**
A.     *Classes Entitled to Vote on the Plan* ..................................................... 31
B.     *Votes Required for Acceptance by a Class* ............................................ 31
C.     *Certain Factors to Be Considered Prior to Voting* ................................ 32
D.     *Classes Not Entitled to Vote on the Plan* .............................................. 32
E.     *Solicitation Procedures* ......................................................................... 33
F.     *Voting Procedures* ................................................................................ 33
G.     *Confirmation Objection Deadline* .......................................................... 35
H.     Confirmation Hearing ............................................................................. 35
I.     Confirmation Standards .......................................................................... 35
J.     Acceptance by Impaired Classes ............................................................ 38
K.     Confirmation Without Acceptance by All Impaired Classes .................... 38

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.............................. 39**
A.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan........................................................... 40
B.     Certain Bankruptcy Law Considerations ................................................ 40
C.     Risk Factors Relating to Purchaser Stock Issued Under the Plan. ........... 43
D.     Disclosure Statement Disclaimer ........................................................... 45
E.     Liquidation Under Chapter 7. ................................................................. 46

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ................... 46**
A.     Certain U.S. Federal Income Tax Consequences of the Plan to the WLB Debtors and the Purchaser........................................................... 47
B.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims ............................................................................. 51
10.  Medicare Tax.......................................................................................... 56
C.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims ............................. 56

**ARTICLE X. CERTAIN SECURITIES LAW MATTERS ........................................................... 60**
A.     1145 Securities ...................................................................................... 60
B.     4(a)(2) Securities ................................................................................... 61

**ARTICLE XI. RECOMMENDATION OF THE WLB DEBTORS ................................................. 63**

**EXHIBITS**

**EXHIBIT A**        Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates

# ARTICLE I.
## INTRODUCTION[3]

The WLB Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the WLB Debtors in connection with the solicitation of votes to accept or reject the Plan.[4]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the WLB Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION. THE PLAN AND THE TRANSACTIONS EFFECTUATED THEREIN ARE SUPPORTED BY THE CONSENTING STAKEHOLDERS OF THE WLB DEBTORS.**

**EACH OF THE WLB DEBTORS' BOARDS OF DIRECTORS OR SOLE MEMBER HAS APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE WLB DEBTORS' ESTATES.  AS SUCH, THE WLB DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "BALLOT") SO AS TO BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN JANUARY 25, 2019, AT 4:00 P.M. (PREVAILING CENTRAL TIME).  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE WLB DEBTORS WILL SEEK THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON FEBRUARY 13, 2019, AT [  ]:00 A/P.M., PREVAILING CENTRAL TIME.**

**THE WLB DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE WLB DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  ACCORDINGLY, THE WLB DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE WLB DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

A.    *The Plan*

As more fully described below, the WLB Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the WLB Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Transferred Assets to the Purchaser, whose bid for the Transferred Assets will be selected as the highest or otherwise best bid at the WLB Debtors' Auction.  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the WLB Debtors' Estates that is or becomes available for distribution, in each case, generally in accordance with the priorities established by the Bankruptcy Code.  The WLB Debtors believe that the Plan accomplishes this objective and is in the best interest of the WLB Debtors' Estates, and therefore the WLB Debtors seek to confirm the Plan.

Generally speaking, the Plan:

---

[3]    If the Plan is not confirmed or the Plan Effective Date does not occur, the WLB Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Plan Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the WLB Debtors, and the WLB Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[4]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

(a) provides for the full and final resolution of all funded debt obligations;

(b) provides for 100 percent recoveries for Holders of Allowed Administrative Claims, Priority Tax Claims, DIP Facility Claims, Professional Fee Claims, Other Priority Claims and Other Secured Claims;

(c) provides for the distribution of the General Unsecured Claims Amount to Allowed Holders of General Unsecured Claims;

(d) provides for consummation of the Sale Transaction; and

(e) designates a Plan Administrator to (i) wind down the WLB Debtors' businesses and affairs; and (ii) pay and reconcile Claims as provided therein; and (iii) administer the Plan in an effective and efficient manner.

The WLB Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.  Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

B.      *The Plan Structure*

The Plan proposes to fund creditor recoveries from Cash on hand, the Purchaser Stock, debt issued by the Purchaser or any of its subsidiaries, the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Amounts made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan.  As set forth in more detail in **Article IV.D** below, following an extensive prepetition financing process and series of negotiations with the initial Consenting Stakeholders, on October 9, 2018, the WLB Debtors and the initial Consenting Stakeholders executed the RSA, which contemplates the Sale Transaction.  Although the WLB Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the WLB Debtors' assets are submitted in accordance with the Bidding Procedures, the Stalking Horse Purchase Agreement represents a floor bid for the sale of the WLB Debtors' assets.  The WLB Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the WLB Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the Plan Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code);

- Other Secured Claims will be treated in such a manner that they are Unimpaired;

- DIP Facility Claims will either be:

    o (i) if the Stalking Horse Purchaser is the Successful Bidder, assumed by the Stalking Horse Purchaser on the Plan Effective Date; or

    o (ii) if the Stalking Horse Purchaser is not the Successful Bidder, paid in full in Cash on the Plan Effective Date.

- Holders of First Lien Secured Claims will receive either:

      ○   (i) in the event the Stalking Horse Purchaser is the Successful Bidder, their *pro rata* share of (x) the Purchaser Stock and (if applicable) all debt issued or assumed (excluding any amounts assumed related to the DIP Facility) by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims, including but not limited to the WLB Debtors' Interests in the WMLP Debtors, which are not Transferred Assets; or

      ○   (ii) in the event the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not consummated, payment in full in Cash on the Plan Effective Date.

- Holders of General Unsecured Claims, including First Lien Deficiency Claims, against each of the WLB Debtors will receive their *pro rata* share of the General Unsecured Claims Amount; and

- existing Interests in the WLB Debtors will be cancelled without any distribution to the Holders of such Interests.

The WLB Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) to vote to accept the Plan.

C.    *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the WLB Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Restructuring Support Agreement dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders (as may be modified, amended, or supplemented from time to time in accordance with the terms thereof, the "RSA").[5] and the Plan.  Generally, the Sale Transaction contemplates that:

    (a)    the WLB Debtors shall, among other things, transfer the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets and all Transferred Causes of Action held by the WLB Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) pursuant to sections 363, 365, and/or and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

    (b)    the Purchaser shall issue, or cause to be issued, the Purchaser Stock for eventual distribution to the Holders of Allowed First Lien Secured Claims (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), as applicable;

    (c)    Cash proceeds (if any) of any Non-Core Asset Sale that are received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan; and

    (d)    the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any

---

[5]   A copy of the RSA is attached as Exhibit A to the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 54].

Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

A description of the Core Assets can be found on <u>Schedule 1</u> of the Plan. The Core Assets are generally comprised of the following assets and interests:

> (a)     100 percent of the equity interests in the Entities comprising the Company's Canadian business;

> (b)     the assets, business, and operation of the San Juan mine;

> (c)     the assets, business, and operation of the Rosebud "Colstrip" mine;

> (d)     certain contracts, leases, and other rights and other written obligations of the San Juan and Rosebud "Colstrip" mines; and

> (e)     certain assets related to the overhead function of the aforementioned mines and businesses.

A description of the Non-Core Assets can be found on <u>Schedule 2</u> of the Plan.  The Non-Core Assets are generally comprised of the following assets:

> (a)     the assets, business, and operation of the Absaloka mine;

> (b)     the assets, business, and operation of the Beulah mine;

> (c)     the assets, business, and operation of the Buckingham mine;

> (d)     the assets, business, and operation of the Haystack mine;

> (e)     the assets, business, and operation of the Jewett mine;

> (f)     the assets, business, and operation of the Savage mine; and

> (g)     the contracts, leases and other written obligations of the aforementioned mines.

In addition to the Core Assets and any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale, the Transferred Assets include any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date, other than (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan.

**ARTICLE II.**
**QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**

A.     *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.       *Why are the WLB Debtors sending me this Disclosure Statement?*

The WLB Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the WLB Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a sale of the WLB Debtors' assets to the Purchaser, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the WLB Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.       *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

       1.    *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.       *What will I receive from the WLB Debtors if the Plan is Consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the

WLB Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Allowed Amount | Anticipated Recovery |
|---|---|---|---|
| 1 | Other Priority Claims | $0 | 100% |
| 2 | Other Secured Claims[6] | $[●] | 100% |
| 3 | First Lien Secured Claims | $[●] | [●]-[●]% |
| 4 | General Unsecured Claims | $[●]-[●] | [●]-[●]% |
| 5 | Intercompany Claims | N/A | $[●] |
| 6 | Intercompany Interests | N/A | $[●] |
| 7 | Section 510(b) Claims | N/A | $[●] |
| 8 | WCC Interests | N/A | $[●] |

E.    *What will I receive from the WLB Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims, DIP Facility Claims, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

F.    *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Plan Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  "Consummation" means the occurrence of the Plan Effective Date.

G.    *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration:  (i) Cash on hand; (ii) the Purchaser Stock; (iii) debt issued (or assumed) by Purchaser or any of its subsidiaries; (iv) the Sale Transaction Proceeds (if any); (v) the Non-Core Asset Sale Proceeds (if any); (vi) the General Unsecured Claims Amount; (vii) the WLB Debtors' rights under the Sale Transaction Documentation; (viii) payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation; (ix) payments of Cure Amounts made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code; and (x) all Causes of Action not previously settled, released, or exculpated under the Plan, if any.

---

[6]    The projected amount of Allowed Other Secured Claims set forth herein assumes that the value of the collateral securing such obligations is sufficient in amount to satisfy such Allowed Other Secured Claims in full.

H.      *Who Supports the Plan?*

The Plan is supported by the WLB Debtors and the Consenting Stakeholders.

I.      *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan provides for releases and exculpation of the WLB Debtors and other parties in interest as set forth in <u>Article IX</u> of the Plan, including the Consenting Stakeholders and their respective Affiliates and representatives.  In addition to the releases in favor of those parties and the other Released Parties, there is an injunction against bringing claims and causes of action that were released against the Released Parties and Exculpated Parties.

J.      *What is the deadline to vote on the Plan?*

The Voting Deadline is **January 25, 2019, at 4:00 p.m., prevailing Central Time**; or if the Auction occurs after January 22, 2019, the Voting Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction).

K.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in **<u>Article VII.F.2</u>** of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

L.      *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **February 13, 2019, at [\_\_]:00 a/p.m., prevailing Central Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties by **January 25, 2019, at 4:00 p.m. (prevailing Central Time)**; *provided* that if the Auction occurs after January 22, 2019, the Confirmation Objection Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction.

The WLB Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *The New York Times* (national edition) and the *Houston Chronicle* to provide notification to those persons who may not receive notice by mail.  The WLB Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the WLB Debtors may choose.

M.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

N.      *What is the effect of the Plan on the WLB Debtors' ongoing business?*

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the WLB Debtors' assets will be transferred to the Purchaser, except for any Non-Core Assets sold to third parties.

O.      *Does the Plan affect the Claims against or the Interests in the WMLP Debtors?*

The plan is not proposed by the WMLP Debtors and does not restructure the funded indebtedness of the WMLP Debtors.

P.      *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the WLB Debtors' Notice and Claims Agent, Donlin, Recano & Company, Inc.:

> *By Hand Delivery or Overnight Mail at*:
>
> Donlin, Recano & Company, Inc.
> Re: Westmoreland Coal Company, et al.
> 6201 15th Avenue, Brooklyn, New York 11219
>
> *By electronic mail at*:
> westmorelandinfo@donlinrecano.com
>
> *By telephone at*:
> (800) 499-8519 (U.S. and Canada)
> (212) 771-1128 (International)

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the WLB Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the WLB Debtors' Notice and Claims Agent at www.donlinrecano.com/westmoreland (free of charge) or the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov (for a fee).

Q.      *Do the WLB Debtors recommend voting in favor of the Plan?*

Yes.  The WLB Debtors believe the Plan provides for a larger distribution to the WLB Debtors' creditors than would otherwise result from any other available alternative.  The WLB Debtors believe the Plan, which contemplates a sale of substantially all of the WLB Debtors' assets (other than Non-Core Assets sold to third parties) to the Purchaser, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.  As noted above, the Consenting Stakeholders support confirmation of the Plan.

## ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

A.      *Corporate History*

1.      *Formation and Business*

The WLB Debtors, the WMLP Debtors, and their non-Debtor affiliates (collectively, the "Company") began mining in Westmoreland County, Pennsylvania in 1854 as a Pennsylvania corporation.  In 1910, the Company incorporated in Delaware and focused on coal operations in Pennsylvania and the Appalachian Basin.  The Company has since grown into the sixth largest North American coal producer, maintaining domestic coal operations in Montana, Wyoming, North Dakota, Texas, New Mexico, and Ohio, and Canadian coal operations in Alberta and Saskatchewan.  The Company's headquarters is in Englewood, Colorado.

Today, the Company produces and sells thermal coal primarily to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers. The WLB Debtors market their coal primarily to large electric utilities with coal-fired, base-load-scrubbed power plants under long-term coal sales contracts. The WLB Debtors focus on acquiring thermal coal reserves that they can efficiently mine with their large-scale equipment.

The Company classifies its business into six segments: Coal - U.S., Coal - Canada, Coal - WMLP, Power, Heritage and Corporate. The principal operating segments for Company are the Coal - U.S., Coal - Canada, and Coal - WMLP segments. During the fourth quarter of 2017, the Company sold all of the assets that comprised the Power operating segment and terminated all related power agreements. The Company's two non-operating segments are Heritage and Corporate. The Heritage segment primarily includes the costs of benefits the Company provides to former mining operation employees, and the Corporate segment consists primarily of corporate administrative expenses and business development expenses. In addition, the Corporate segment contains the Company's captive insurance company, Westmoreland Risk Management Inc., a non-Debtor in these chapter 11 cases, and through which the Company has elected to retain some of its operating risks related to captive insurance.

2. *Mining Operations*

The WLB Debtors are comprised of entities that own and operate the Coal - U.S. segment. The WLB Debtors' reserves and operations are well positioned to serve their primary markets in the Midwest and Rocky Mountain regions of the United States. The WLB Debtors' operating assets are comprised of eight wholly owned mines located in Montana, North Dakota, Texas, Ohio, Wyoming, and New Mexico. Seven of those mines are active, while one mine is completing the reclamation phase of its respective mine life.

The WLB Debtors control approximately 318 million tons of proven and probable coal reserves. During the year ended December 31, 2017, the WLB Debtors' produced approximately 19 million tons of coal. The WLB Debtors' mines include:

- Absaloka Mine. The Absaloka mine is a 10,427 acre permitted, single-pit surface mine complex located near Hardin, Montana and the Crow Indian Reservation. The coal reserves are leased from the Crow Tribe of Indians. The Absaloka mine was expressly developed to supply Powder River Basin coal to a group of Midwestern utilities, including Xcel Energy's Sherburne County Station near Minneapolis, Minnesota. Over the years, it has also sold coal to several other upper Midwest utilities. Coal is shipped via a 38-mile rail spur to the main line of the Burlington Northern Santa Fe Railroad near Hysham, Montana. As of December 31, 2017, there were approximately 27.5 million tons of proven and probable reserves at the Absaloka mine.

- Beulah Mine. The Beulah mine is a 9,000-acre surface mine complex located 75 miles northwest of Bismarck, North Dakota. It currently produces lignite from one active pit. As of December 31, 2017, there was approximately 5 million tons of proven and probable reserves at the Beulah mine.

- Buckingham Mine. The Buckingham mine is an underground, room-and-pillar mine located in Southeast Ohio. It currently operates three (3) mining units within over 8,500 acres of permitted coal reserves, with an operation capacity of 1.2 million tons per year. Buckingham's coal is washed in a state-of-the-art preparation plant on-site and shipped by rail to Unit 4 of the Conesville Electrical Generating Station operated by American Electric Power. As of December 31, 2017, there were approximately 16.3 million tons of proven and probable reserves at the Buckingham mine.

- Haystack Mine. The WLB Debtors acquired the Haystack mine and its associated coal reserves in January 2017. The Haystack Mine produces sub-bituminous coal from the Adaville Geologic Formation and is located 20 miles northeast of Evanston in Southwestern Wyoming. As of December 31, 2017, there were approximately 12.8 million tons of proven and probable reserves at the Haystack mine.

- Jewett Mine. The Jewett mine is a 35,000-acre surface mine complex located between Dallas and Houston. It supplies lignite coal under a supply contract to the adjacent two-unit Limestone Electric Generating Station owned by NRG Texas ("NRG"). Beginning in 2017, the Jewett mine entered

the reclamation phase of its mine life where NRG is required to reimburse the WLB Debtors for agreed upon base reclamation costs during final reclamation plus a variable percentage management fee.

- Rosebud "Colstrip" Mine. The Colstrip mine is a 25,000-acre surface mine complex located in the northern Powder River Basin near Colstrip, Montana, and the Northern Cheyenne Indian Reservation. Rosebud is a large operation with three active pits and supplies almost all of its current production to the four-unit 2,100 megawatt Colstrip Power Station that is adjacent to the mine and was specifically designed to burn Colstrip coal. As of December 31, 2017, there were approximately 241 million tons of proven and probable reserves at the Colstrip mine.

- San Juan Mine. The San Juan mine was acquired on January 31, 2016 from BHP Billiton and supplies the requirements of the San Juan Generating Station operated by Public Service Company of New Mexico. The customer is located within close proximity to the mine and coal deliveries are provided via off-road mine trucks and conveyor belt. As of December 31, 2017, there were approximately 11.4 million tons of proven and probable reserves at the San Juan mine.

- Savage Mine. The Savage mine is an 874-acre strategically-placed single pit surface mine located on the Montana-North Dakota border. The Savage mine has a full-requirements contract with the 57 megawatt Lewis & Clark Station which utilizes emission control technologies and is owned by Montana Dakota Utilities, and a longstanding annual supply relationship with a sugar beet refinery near Sidney, Montana. As of December 31, 2017, there were approximately 3.7 million tons of proven and probable reserves at the Savage mine.

3. *Management*

The Debtors' current management team is composed of highly capable professionals with substantial industry experience. Information regarding Westmoreland Coal Company's executive officers is as follows:

| Name | Position |
|------|----------|
| Michael G. Hutchinson | Chief Executive Officer & President |
| Gary A. Kohn | Chief Financial Officer |
| Jennifer S. Grafton | Chief Administrative Officer & Chief Legal Officer |
| Jeffrey S. Stein | Chief Investment Officer & Chief Restructuring Officer |

*Michael G. Hutchinson.* Michael G. Hutchinson currently serves as Chief Executive Officer and President of Westmoreland Coal Company. He was appointed as interim Chief Executive Officer in November 2017 of Westmoreland Coal Company, and has served on its board of directors since 2012 as an independent director and as chairman of the Audit Committee. Mr. Hutchinson retired from Deloitte & Touche in July 2012 after a career spanning nearly 35 years, leading its Denver Energy and Natural Resources Practice for the last 15 years while, at the same time, managing the Audit and Enterprise Risk Management practice of the Denver office. Mr. Hutchinson serves on the board of directors of ONE Gas, Inc., a publicly traded natural gas utility, and as its audit committee chairman.

*Gary A. Kohn.* Gary A. Kohn currently serves as the Chief Financial Officer of Westmoreland Coal Company. He joined Westmoreland Coal Company as Vice President of Investor Relations in April 2016, and was named Interim Chief Financial Officer in November 2016. In addition to his investor relations focus, he has served in senior leadership positons across multiple functional areas including finance, treasury and strategy for publicly held companies including First Data, Western Union, Ciber and Intrepid Potash.

*Jennifer S. Grafton.*  Jennifer S. Grafton currently serves as Chief Administrative Officer and Chief Legal Officer of Westmoreland Coal Company.  She joined Westmoreland Coal Company in December 2008 as Associate General Counsel and was promoted to General Counsel and Secretary in February 2011.  Ms. Grafton focuses her practice on SEC compliance, corporate governance, Board management, risk management and employment/labor relations.

*Jeffrey S. Stein.*  Jeffrey S. Stein currently serves as Chief Restructuring Officer and Chief Investment Officer of Westmoreland Coal Company.  He was appointed as Chief Investment Officer in August 2017 and as Chief Restructuring Officer in April 2018, and has served as an independent director on the board of directors for Westmoreland Coal Company since August 2016.  Mr. Stein also serves on the audit, and nominating and corporate governance committees of the Westmoreland Coal Company board of directors.  Mr. Stein is Founder and Managing Partner of Stein Advisors LLC, a financial advisory firm that provides consulting services to institutional investors.  Mr. Stein currently serves as Chairman of the Board of Ambac Financial Group, Inc. (NASDAQ: AMBC) and as a director on the boards of Dynegy Inc., MLR Petroleum LLC, and Granite Ridge Holdings, LLC.

4.  *Customers*

Each of the Company's operating segments focuses on niche coal markets where the Company is able to take advantage of customer proximity and strategically located rail transportation.  The Coal - U.S. segment sells a substantial amount of the coal that they produce to power generation facilities. The majority of the Debtors' mines are in very close proximity to the customers' property, with economical delivery methods that include, in several cases, conveyor belt delivery systems linked to the customers' facilities.  The close proximity of their mines and coal reserves to their customers reduces transportation costs and provides the WLB Debtors with a significant competitive advantage with respect to retention of those customers.  The WLB Debtors typically enter into long-term, cost protected supply contracts with their customers.  The WLB Debtors' current coal sales contracts have a weighted average remaining term of approximately six years.

5.  *Competition*

The North American coal industry is intensely competitive.  In addition to competition from other coal producers, the WLB Debtors compete with producers of alternative fuels used for electrical power generation, such as nuclear energy, natural gas, hydropower, petroleum, solar, and wind.  Costs and other factors such as safety, environmental, and regulatory considerations related to alternative fuels affect the overall demand for coal as a fuel.  Political dynamics in the United States have additionally resulted in a reduction of the market demand for coal-based energy solutions.

The majority of the WLB Debtors' mines focus on coal markets where the WLB Debtors may take advantage of long-term coal contracts with neighboring power plants.  These mines give the WLB Debtors a competitive advantage based on three factors:

- the WLB Debtors are among the most economic suppliers to their principal customers as a result of transportation advantages over their competitors;

- nearly all of the power plants that the WLB Debtors supply were specifically designed to use the WLB Debtors' coal; and

- the plants to which the WLB Debtors supply are among the lowest cost producers of electric power in their respective regions and are among the cleaner producers of power from solid fossil fuels.

Certain of the WLB Debtors' mines produce coal for export customers and have contracts with railway and port entities for delivery.  The WLB Debtors' export customers may purchase coal from the WLB Debtors or from other producers around the world with similar coal quality, access to ports, and more economical shipping to the customer, as some of the WLB Debtors' competitors are located closer to the customers' facilities.

6. *Employees*

Between their mining operations and home office, the WLB Debtors employ approximately 1,732 individuals on a full- or part-time basis. These employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives. As of the Petition Date, the WLB Debtors are a party to seven active collective bargaining agreements (the "CBAs"), all of which are set to expire between 2019 and 2021.

The WLB Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans. The WLB Debtors also contribute to plans governed by the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. § 9701 et seq. (the "Coal Act"). Like other coal companies, the WLB Debtors also incur costs and make award payments in accordance with the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 901–45 (the "Black Lung Act").

Separately, the WLB Debtors are subject to other workers' compensation laws in the states in which they operate or used to operate. The WLB Debtors maintain workers' compensation coverage through third-party insurance providers. The WLB Debtors may be required to contribute additional premiums in the future depending on the number and amount of claims.

B.    *Prepetition Capital Structure*

1.    *The WLB Debtors' Prepetition Capital Structure*

Westmoreland Coal Company is the direct or indirect parent of each of the other WLB Debtors. The WLB Debtors are organized in the states of Colorado, Delaware, Montana, New York, Ohio, Texas, and Virginia. As described in greater detail below, as of the Petition Date, the principal amount of the WLB Debtors' consolidated funded debt obligations totaled approximately $760 million in the aggregate under the Bridge Loan Facility (as defined below), WLB Term Loan Facility (as defined below), and WLB Senior Secured Notes (as defined below).

(a)    Bridge Loan Facility

Debtors Westmoreland Coal Company and Westmoreland San Juan Holdings, Inc., and non-Debtor Prairie Mines & Royalty ULC are borrowers under a bridge loan facility (the "Bridge Loan Facility") pursuant to a credit agreement, dated as of May 21, 2018. As of the Petition Date, $90 million in principal amount was outstanding under the Bridge Loan Facility. The Bridge Loan Facility is secured by a first-lien security interest in substantially all of the Company's U.S. and Canadian assets, including the equity interests of Westmoreland Canadian Investments, LP ("WCI"), the holding company for the Company's Canadian business. This first lien collateral package is inclusive of substantially all of WLB's Canadian assets and WLB's U.S. assets, including all assets and equity of Westmoreland San Juan, LLC ("Westmoreland San Juan"), a wholly owned subsidiary of Westmoreland Coal Company, and its subsidiaries.

(b)    WLB Term Loan Facility

Debtor Westmoreland Coal Company is the borrower under a secured term loan facility (the "WLB Term Loan Facility") pursuant to a credit agreement, dated as of December 16, 2014. As of the Petition Date, approximately $320 million in principal amount was outstanding under the WLB Term Loan Facility. The WLB Term Loan Facility is secured by a first-lien security interest, junior and subordinate in all purposes and respects to the liens securing the Bridge Loan Facility and *pari passu* in all respects to the liens securing the WLB Senior Secured Notes, on substantially all of the WLB Debtors' U.S. assets (including a lien on 100 percent of the equity interests in WCI).

(c)    WLB Senior Secured Notes

Debtor Westmoreland Coal Company issued $350 million aggregate principal amount of 8.75% senior secured notes due 2022 (the "WLB Senior Secured Notes") under an indenture, dated as of December 16, 2014. As of the Petition Date, there is $350 million in principal amount of WLB Senior Secured Notes outstanding. The WLB

Senior Secured Notes are secured by a first-lien security interest, junior and subordinate in all purposes and respects to the liens securing the Bridge Loan Facility and *pari passu* in all respects to the liens securing the WLB Term Loan Facility, on substantially all of the WLB Debtors' U.S. assets (including a lien on 100 percent of the equity interests in WCI).

(d)      WLB's Common Stock

Westmoreland Coal Company is a publicly-held company that was previously listed on the NASDAQ Global Market ("NASDAQ"). It formerly traded on the NASDAQ, under the symbol "WLB," until April 25, 2018. Westoreland Coal Company now trades on the OTC Markets platform under the symbol "WLBAQ." For most of the six months prior to the Petition Date, Westmoreland Coal Company's common stock has traded over-the-counter at prices ranging between $0.07 and $0.41 per share. As of August 2, 2018, Westmoreland Coal Company has 18,788,532 outstanding shares of common stock, with $0.01 par value per share.

2.    *Other Non-Financial Obligations*

Like other coal companies, the WLB Debtors have contractual and statutory obligations relating to their current and retired employees, as well as asset retirement and reclamation obligations.

(a)      Pension Plan Obligations

The WLB Debtors have ongoing pension obligations related to their domestic operations, consisting of one multi-employer pension plan and multiple defined benefit pension plans. Specifically, the WLB Debtors contribute to a multi-employer defined benefit pension plan, the Central Pension Fund of the Operating Engineers (the "Central Pension Fund"), on behalf of employee groups at the Colstrip, Absaloka, and Savage mines that are represented by the International Union of Operating Engineers ("IUOE"). The minimum funding contributions for 2018 are $4,702,660.14 for the Central Pension Fund.

The WLB Debtors also provide defined benefit pension plans to qualified full-time employees pursuant to CBAs (collectively, the "Defined Benefit Pension Plans"). The Defined Benefit Pension Plans offer retirement benefits to employees and provide a fixed level of benefits upon retirement. In general, the level of benefits a retiree will receive is determined by certain formulas that consider factors such as years of service and the employee's maximum salary averaged over a continuous five-year period of employment. The WLB Debtors' funding policy is to annually contribute the minimum amount prescribed, as specified by applicable regulations.

Certain of the Defined Benefit Pension Plans on behalf of employees at the Beulah, Savage, and San Juan mines, as well as some of the WLB Debtors' employees at their corporate headquarters, are frozen to new participation, *i.e.*, these pension plans are no longer accepting new participants. As of January 2018, the Defined Benefit Pension Plans were underfunded (the liabilities and obligations to pay pensions under the Defined Benefit Pension Plans exceeded the asset value in the investment portfolio that has accumulated for the purpose to fund required payments) by approximately $29 million. If the WLB Debtors were to terminate the Defined Benefit Pension Plans, the termination liability is estimated to be approximately $77.3 million.

(b)      Labor Contracts and Legacy Labor Liabilities

The WLB Debtors are obligated to pay for certain retired coal miners in the form of continuing existing individual employer retiree health plans as well as payment of per-beneficiary premiums to the United Mine Workers of America ("UMWA") Combined Benefit Fund (the "UMWA Combined Benefit Fund").

The UMWA Combined Benefit Fund is a multi-employer health plan neither controlled by nor administered by WLB. The UMWA Combined Benefit Fund is designed to pay health care benefits to the UMWA workers who retired prior to 1976 and their dependents. The WLB Debtors make monthly premium payments into the UMWA Combined Benefit Fund. These payments are based on the number of the WLB Debtors' UMWA employees who retired prior to 1976, and the WLB Debtors' pro-rata assigned share of UMWA retirees whose companies are no longer in business. In 2017, the WLB Debtors paid $1.4 million on account of the UMWA Combined Benefit Fund,

13

and expected payments for 2018 are approximately $1.3 million.  The WLB Debtors also provide certain of these benefits to qualified full-time employees.

Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis (black lung disease) and their dependents may file disability claims with the Department of Labor (the "<u>DOL</u>"), which then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "<u>Black Lung Act Claims</u>").

Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "<u>Black Lung Fund</u>"). If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral or to obtain insurance for its payment obligations.  A coal operator's directors and officers may also be held personally liable for unpaid benefits.

The WLB Debtors are self-insured for federal and state black lung benefits for former employees and have established an independent trust to pay these benefits.  The WLB Debtors insure their current represented employees through arrangements with their unions, and their current nonrepresented employees are insured through third-party insurance providers.

As of December 31, 2017, the WLB Debtors have approximately $18.2 million in Black Lung Act obligations in excess of their independent trust assets.

(c)     Other Post-Employment Benefit

The WLB Debtors provide various other post-employment benefits ("<u>OPEB</u>"), primarily focused on postretirement healthcare, such as medical insurance, life insurance, and related benefits for certain of their former employees and, in some instances, their spouses and dependents.  Benefits, eligibility, and cost-sharing provisions vary by plan documents and CBAs.  As of December 31, 2017, the WLB Debtors estimate the present value of their OPEB obligations to be approximately $334 million, substantially all of which is attributable to the cost of heritage benefits (the "<u>Heritage Costs</u>") the WLB Debtors provide to former mining operation employees. The Heritage Costs consist of payments to the WLB Debtors' retired workers for medical benefits, workers' compensation benefits, black lung benefits and combined benefit fund premiums for coverage plans for UMWA retirees required by statute. Approximately $234 million of the Heritage Costs are derived from the WLB Debtors' obligations under expired or non-active CBAs, while the remaining $100 million are obligations attributable and stemming from the Coal Act. These obligations are described in further detail in **Article V.G** of this Disclosure Statement.

Additionally, the WLB Debtors sponsor 401(k) saving plans for U.S. employees and provide contributions to employee savings plans at their Canadian operations to assist employees in providing for their future retirement needs.  In May 2016, the WLB Debtors discontinued matching employees' 401(k) contributions with common shares of Westmoreland Coal Company stock and elected instead to match with cash contributions.  The WLB Debtors' expense for the year ended December 31, 2017 was $9.9 million, consisting entirely of cash contributions.

Finally, the WLB Debtors maintain a supplemental benefit pension plan (the "<u>SERP</u>") for former executives pursuant to employment or severance agreements.  The SERP is an unfunded non-qualified deferred compensation plan, which provides benefits to certain employees beyond the maximum limits imposed by the Employee Retirement Income Security Act ("<u>ERISA</u>") and the Internal Revenue Code.  The WLB Debtors do not expect to add new participants to their SERP program.

(d)     Asset Retirement Obligations

Like other coal companies, the WLB Debtors have asset retirement obligations that include both reclamation and selenium water treatment.  Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface

14

Mining Control and Reclamation Act as well as certain state laws and any applicable Canadian laws. Selenium water treatment obligations primarily represent the fair value of future anticipated costs for water treatment of selenium discharges, as required by current court orders, consent decrees, and mining permits.

The WLB Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both surface and underground mines in accordance with applicable reclamation laws in the U.S., as defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate.

The WLB Debtors' asset retirement obligations and liabilities for the year ended December 31, 2017 were approximately $474.5 million, which is inclusive of amounts classified as current liabilities and long-term liabilities.[7] The WLB Debtors have posted surety bonds, the majority of which are cash collateralized, to secure their asset retirement obligations in amounts required by regulatory authorities.

C.      *WMLP Debtors and Shared Services Agreement*

WMLP Debtor Westmoreland Resource Partners, LP ("WMLP") is a publicly-traded master limited partnership that was previously listed on the New York Stock Exchange (the "NYSE"). It formerly traded on the NYSE, under the symbol "WMLP," until October 9, 2018. WMLP now trades on the OTC Markets platform under the symbol "WMLPQ." WLB Debtor Westmoreland Coal Company holds a 94 percent limited partner ownership interest in WMLP and 100 percent of the equity interests of WLB Debtor Westmoreland Resource Partners, GP, LLC ("WMGP"), which, in turn, owns 0.164 percent of WMLP.

The board of directors of WMGP includes a conflicts committee (the "Conflicts Committee") to address potential conflicts of interest between WMLP and WMGP, as circumstances warrant. The Conflicts Committee consists solely of independent directors and has separate legal and financial advisors from WMGP and the other WLB Debtors.

WMLP and WMGP (but not Westmoreland Coal Company or any other WLB Debtor) are parties to that certain administrative and operational services agreement, dated as of January 1, 2015 (as amended, restated, modified and supplemented from time to time in accordance with the terms thereof, the "Shared Services Agreement"). Under the Shared Services Agreement, Westmoreland Coal Company (through WMGP) provides services (including personnel) to WMLP and Westmoreland Coal Company is ultimately reimbursed for related costs incurred on WMLP's behalf. The services provided by Westmoreland Coal Company (through WMGP) include, among other things, operating services, engineering services, and general and administrative services, including but not limited to legal, accounting, treasury, insurance administration and claims processing, risk management, health, safety and environmental, information technology, human resources, credit, payroll, internal audit, taxes, and engineering services. Where costs are specifically incurred on behalf of one of WMLP's affiliates, those costs are billed directly to WMLP, and are allocated to WMLP in a variety of methods when the cost or service applies equally to all employees. Additionally, the Shared Services Agreement provides for an annual fixed fee (the "Fixed Fee") to ultimately reimburse Westmoreland Coal Company for executive officers and other employees who devote less than a majority of their time to WMLP. For the year ended December 31, 2017, WMLP reimbursed Westmoreland Coal Company approximately $64.5 million for expenses, in the aggregate, for the services provided to WMLP primarily related to employee costs. WMLP also paid approximately $2.2 million to Westmoreland Coal Company on account of the Fixed Fee, consisting of $0.8 million for executive services and $1.4 million for corporate and other costs. As of the Petition Date, Westmoreland Coal Company (through WMGP) continues to provide services to WMLP.

---

[7]   This number has been discounted based on the Debtors' credit-adjusted risk-free interest rates.

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.     *Adverse Market Conditions*

Coal mining businesses across the U.S. and around the world are feeling pressure as a result of a variety of macroeconomic factors, and the fate of many of these companies is yet to be determined. Access to capital is the lifeblood of coal mining companies. With increasing leverage because of the constant need for capital and rising cost of capital in the industry, operating in the current environment has been—and likely will remain—challenging. In addition to capital, there are several requirements to maintain a coal mining business, including an inventory of economic sites to mine, a consistent mining program to offset the natural declines in production that occur almost immediately, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers and operators of coal-fired power plants.

World coal production in 2016 witnessed its largest decline in absolute terms since recordkeeping of such first began in 1971. A key factor in the declining demand for coal, and corresponding reduction in production, is the availability of inexpensive natural gas. This historically low natural gas pricing has made it difficult for any coal basin to compete. Unfortunately, it is a trend that experts expect to continue in the near future. The U.S. Energy Information Administration predicts that coal production will continue to decline throughout 2018, due to lower expected global demand for U.S. coal exports (down 17 percent in 2018 and an another expected five percent in 2019) and lower forecasts of coal use in the electric power sector (down five percent in 2018).

Moreover, coal's share of the U.S. energy market and prices for thermal and metallurgical coal have begun to recover, but the effects of past decline continue to impact the industry today. The recovering economic environment, lack of growth in energy demand generally, and a number of scheduled coal-fired plant retirements have precipitated this decline.

Lastly, the regulatory environment has also contributed to the WLB Debtors' current financial situation. Federal and state regulatory authorities impose obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality. Stricter enforcement of existing laws and the promulgation of new regulations have made it more costly for companies to use coal as an energy source. Despite recent rollbacks of some of these burdensome regulations, the costs of decades of compliance have further contributed to the WLB Debtors' financial difficulties. Other regulations, such as those governing mining and reclamation, have imposed even more direct costs on the coal industry. For example, the Alberta provincial government in Canada plans to eliminate all coal-fired power plants by 2030 due, in part, to political opposition in Canada to coal-based energy sources. Similar political dynamics in the United States have resulted in a reduction of the market demand for coal-based energy solutions.

B.     *Acquisition and Expansion Efforts*

Determined to continue their growth into one of the largest and most recognized coal operations today, the Company undertook significant acquisition and expansion efforts beginning in the early 2000s. In 2006, the Company acquired two coal-fired power-generating units in Weldon, North Carolina with a total capacity of approximately 230 megawatts (collectively, "ROVA"). In 2011, the Company purchased its Kemmerer mine from Chevron Mining Inc. for approximately $179 million in addition to approximately $14 million in working capital. In 2014, the Company purchased the Canadian coal operations of Sherritt International Corporation ("Sherritt") for approximately $312 million in cash and the assumption of Sherritt's capital leases valued at approximately $153 million. The Sherritt acquisition included substantially all of the assets and operations that now make up the Debtors' non-Debtor Canadian business. In early 2015, the Company completed its acquisition of Buckingham Coal Co. for $34 million and Oxford Resource Partners for $30 million. Roughly one year later, in February 2016, the Company acquired its San Juan operations for approximately $127 million.

These series of acquisitions within a relatively short timeframe nearly tripled the Company's debt obligations. However, the Company encountered challenges integrating its acquisitions into their business enterprise and realizing the synergies with their other assets. Additionally, coal sales and revenue did not rise proportionately, leaving the

16

Company significantly overleveraged. A continued decline in the coal sector only exacerbated the Company's liquidity concerns. During the fourth quarter of 2015, Westmoreland Coal Company determined that the long-lived assets at ROVA were impaired due to the continued decline in forecasted electricity prices. The carrying value of the ROVA assets were fully written off to zero as a result of an impairment charge of approximately $133.1 million to the Debtors' balance sheet. Westmoreland Coal Company then terminated its power purchase contracts associated with ROVA and formally disposed of the ROVA facilities in 2017. The sale generated $5 million of cash receipts, plus the accelerated receipt of a net amount of $12 million from terminating the power purchase contracts. Westmoreland Coal Company retained approximately $2.7 million of reclamation liabilities related to offsite ash storage under the terms of the sale.

C.    *Coal Industry Liabilities*

Under the Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977, as amended in 1981, each coal mine operator must pay federal black lung benefits to eligible current and former employee claimants and also make payments to a trust fund for the payment of benefits and medical expenses to eligible claimants who last worked in the coal industry prior to January 1, 1973.

As of December 31, 2017 and 2016, the WLB Debtors' black lung benefit obligations were $18.2 million and $17.6 million, respectively. With the implementation of the Patient Protection and Affordable Care Act in 2010 and the amendment of federal black lung regulations, the number of claimants who are awarded federal black lung benefits has increased and will likely continue to increase, as will the amounts of those awards. The WLB Debtors' payment obligations for federal black lung benefits have previously either been secured by insurance coverage or paid from a tax-exempt trust established for that purpose. Based on required funding levels, the WLB Debtors may have to supplement the trust corpus to cover the anticipated liabilities going forward.

When coupled with the external pricing pressure, increased regulation, political opposition to coal in the United States and Canada, and other costs associated with the WLB Debtors' businesses, these liabilities have hindered the WLB Debtors' ability to operate competitively in the current market environment.

D.    *The Debtors' Proactive Approach to Addressing Liquidity Constraints*

In 2016, the Debtors undertook a rigorous process to evaluate possible alternatives to deleverage their capital structure. To spearhead these efforts, on August 9, 2016, the Board of Directors of Westmoreland Coal Company appointed Jeffrey Stein as an independent director. On August 16, 2017, Mr. Stein was appointed by the Board of Directors of Westmoreland Coal Company as Chief Investment Officer to help lead shareholder value initiatives. On April 27, 2018, Mr. Stein was appointed by the Board of Directors of Westmoreland Coal Company as Chief Restructuring Officer to evaluate restructuring and refinancing alternatives regarding Westmoreland Coal Company and its subsidiaries to help lead their restructuring efforts.

In 2017, the Debtors retained Kirkland & Ellis LLP as legal advisor. In 2018, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor. The WLB Debtors also engaged Centerview Partners LLC ("Centerview") as their financial advisor and investment banker.

The efforts of the Debtors and their advisors to identify a viable restructuring path forward undertook heightened significance in early 2018 for two reasons. First, WMLP received an audit opinion with respect to the fiscal year ending December 31, 2017, which caused an event of default under WMLP's prepetition secured term loan facility (the "WMLP Term Loan Facility"), as of March 31, 2018. To address this matter, WMLP, Westmoreland Coal Company, and each lender under the WMLP Term Loan Facility entered into a forbearance and waiver agreement pursuant to which Westmoreland Coal Company and WMLP agreed to pursue a sale process with respect to WMLP's assets in accordance with an agreed-upon protocol. Second, Westmoreland Coal Company and its advisors determined that it would exhaust all of its remaining liquidity by May 31, 2018, a determination that led Westmoreland Coal Company to consider a number of potential financing alternatives to address its liquidity challenges. Those alternatives included considering the feasibility of raising new debt and/or amending the terms of the WLB Debtors' existing asset-based revolving loan facility (the "CIBC ABL Facility") to obtain access to incremental liquidity. At the same time, the Debtors began to focus on preparing for a potential chapter 11 filing.

In April 2018, Centerview began contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the WLB Debtors with sufficient liquidity to stabilize operations, protect its supply chain, satisfy surety collateral requirements, and position the WLB Debtors for a successful comprehensive restructuring process.

Centerview initially solicited proposals for DIP financing from eight potential lenders, including the WLB Debtors' existing secured creditors, large commercial banks, and other sophisticated alternative investment institutions.  Of the eight potential lenders that were contacted, seven executed non-disclosure agreements, or had similar agreements already in place, and were offered access to diligence materials.  The WLB Debtors' management and advisors engaged in numerous discussions with these potential lenders.  Following a period of initial diligence, Centerview requested that interested parties submit non-binding term sheets for a $110 million DIP financing by April 13, 2018.  The WLB Debtors received five separate proposals, including proposals from CIBC Bank USC ("CIBC"), who served as the administrative agent under the CIBC ABL Facility, the ad hoc group of certain lenders under the WLB Term Loan Facility and holders of the WLB Senior Secured Notes (the "Ad Hoc Group"), and three third-party lenders.  Ultimately, however, no third party who Centerview contacted was willing and/or able to provide a fully underwritten proposal of sufficient size due to, among other factors, the WLB Debtors' financial position, highly leveraged capital structure, and the severely distressed coal sector in which the WLB Debtors operate.

As a consequence, the WLB Debtors and their advisors focused their efforts on negotiations with the WLB Debtors' two existing lenders who submitted proposals, CIBC and the Ad Hoc Group.  CIBC's initial proposal was for a face amount $110 million ABL / term loan structure on terms that would not prime the liens of the WLB Debtors' existing lenders.  Despite the $110 million "headline" amount, the borrowing base formula contained in the proposed ABL component and CIBC's actual targeted commitment amount meaningfully reduced the actual, committed dollar amount of financing that would have been available.  Indeed, on a net basis, CIBC's initial proposal only provided a modest increase in liquidity to the WLB Debtors.

The Ad Hoc Group's initial proposal contemplated:  (a) providing the WLB Debtors with a $70 million prepetition bridge loan facility backstopped by the Ad Hoc Group, with the ability to convert the facility into debtor-in-possession financing upon a chapter 11 filing; (b) the continuation and expansion of the borrowing base under the existing CIBC ABL Facility; (c) a four-month debt service payment forbearance with respect to the WLB Term Loan Facility and WLB Senior Secured Notes in order to permit negotiations with the Ad Hoc Group regarding a consensual, holistic restructuring; and (d) the refinancing in full in cash of approximately $50.6 million in outstanding principal amount under the secured term loan facility (the "WSJ Term Loan Facility") held by Westmoreland San Juan, releasing its collateral to secure the new proposed facility and the prepetition Term Loan Facility and WLB Senior Secured Notes.

The Ad Hoc Group's proposal offered several key benefits to the WLB Debtors: (a) a material increase in liquidity that was not subject to borrowing base fluctuations (as would be the case under the CIBC proposal); (b) additional runway to remain out of chapter 11 and seek to negotiate a consensual, holistic restructuring with the Ad Hoc Group; and (c) a forbearance with respect to roughly $23 million in debt service payments that were scheduled to become payable during June and July 2018.

The principal issue associated with the Ad Hoc Group's proposal was that it required the WLB Debtors to grant a second-lien security interest on substantially all of their unencumbered assets, including 35 percent of the equity interests in WCI, to the existing holders of the WLB Senior Secured Notes and lenders under the WLB Term Loan Facility, in exchange for the consensual priming under the bridge loan facility of all liens previously held by such parties and a forbearance.  In addition, the initial proposal contemplated less than favorable economics in terms of the proposed interest rate, make whole amounts, and other fees.

Because none of the proposals provided sufficient liquidity, the WLB Debtors and their advisors determined to reach out to six additional potential third-party lenders to solicit interest in providing incremental liquidity to the WLB Debtors either in the form of a comprehensive DIP financing package or as an add-on to CIBC's initial proposal.  Of those contacted, four potential lenders executed non-disclosure agreements and were offered access to diligence materials.  Ultimately, none of these additional potential lenders were willing to provide financing that provided the WLB Debtors with sufficient liquidity, either on a comprehensive or incremental basis.

Concurrently with approaching additional third-party potential lenders, the WLB Debtors and Centerview continued discussions with both CIBC and the Ad Hoc Group in an effort to improve their respective proposals. The WLB Debtors and Centerview also pushed back on all significant economic and non-economic provisions of the proposed financing. These efforts culminated in a proposal by the WLB Debtors to both CIBC and the Ad Hoc Group that contemplated a combined $110 million facility, with both prepetition bridge loan and postpetition DIP financing components. The proposal included a total of $75 million in liquidity to be provided under the CIBC ABL Facility and a new $35 million term loan facility backstopped by the Ad Hoc Group. Consistent with the WLB Debtors' desire to negotiate the terms of a consensual restructuring prior to the WLB Debtors filing chapter 11 cases, the WLB Debtors sought a debt service payment forbearance with respect to the WLB Secured Term Loan Facility and WLB Senior Secured Notes and proposed to use the proceeds of the combined proposal to remain outside of chapter 11 for roughly four months to permit the parties to negotiate a comprehensive, consensual restructuring transaction.

In response to the WLB Debtors' proposal, on May 11, 2018, the Ad Hoc Group presented a revised proposal that contemplated a $110 million delayed draw bridge loan facility, with an initial draw of $90 million and an additional $20 million available on a delayed draw basis. This proposal presented a number of additional benefits to the WLB Debtors. First, while the revised proposal continued to provide for the cross-collateralization of the WLB Term Loan Facility and the WLB Secured Notes, the WLB Debtors were able to gain access to a full $110 million in financing and the benefit of time to negotiate a pre-arranged, consensual chapter 11 filing. Second, the WLB Debtors were able to use a portion of the initial proceeds to refinance in full in cash the CIBC ABL Facility and the WSJ Term Loan Facility. This allowed the WLB Debtors to release the collateral securing the CIBC ABL Facility and WSJ Term Loan Facility, and in turn use that collateral to create a more robust collateral package to secure the proposed bridge loan facility. Finally, a refinancing of the WSJ Term Loan Facility allowed the WLB Debtors to access a sizeable cash balance that was restricted under the terms of the WSJ Term Loan Facility. This in turn provided the WLB Debtors with additional liquidity that otherwise would have been unavailable to the WLB Debtors.

In response to the Ad Hoc Group's revised proposal, in an effort to preserve the CIBC relationship, the WLB Debtors requested that the Ad Hoc Group allocate $30 million in term loan commitments to CIBC and engage CIBC as the administrative agent under the facility. While the Ad Hoc Group agreed to this request, CIBC ultimately declined the opportunity to participate. In the absence of any actionable counterproposal that provided sufficient liquidity to the WLB Debtors, the WLB Debtors determined that the proposed bridge loan facility was the best feasible alternative available to the WLB Debtors. On May 21, 2018, the WLB Debtors entered into the Bridge Loan Facility.

The Bridge Loan Facility created significant runway for the WLB Debtors to engage with the Ad Hoc Group regarding a holistic, consensual restructuring proposal. These productive discussions culminated in the parties' entry into the RSA on October 9, 2018.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.      *First Day Pleadings and Other Case Matters*

On the Petition Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the WLB Debtors under chapter 11 of the Bankruptcy Code, the WLB Debtors also filed a number of first day motions and applications (collectively, the "First Day Pleadings") with the Bankruptcy Court. On October 9, 10, and 30, and November 13, 2018, the Bankruptcy Court entered orders granting interim and final relief, respectively, to, among other things:  (a) prevent interruptions to the WLB Debtors' businesses; (b) ease the strain on the WLB Debtors' relationships with certain essential constituents; (c) allow the WLB Debtors to retain certain advisors necessary to

assist the Debtors with the administration of the Chapter 11 Cases; and (d) allow the WLB Debtors to have access to postpetition financing and cash collateral (each, a "First Day Order").

1.   *Administrative Motions*

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the WLB Debtors filed First Day Pleadings seeking orders authorizing the joint administration of the WLB Debtors' and WMLP Debtors' Chapter 11 Cases, and establishing certain notice, case management and administrative procedures.

2.   *Operational Relief*

The WLB Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief.  The relief granted enabled the WLB Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things, orders authorizing the WLB Debtors:

- to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- to pay certain prepetition taxes and fees;

- to fulfill and honor all customer obligations the WLB Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new, and/or terminate any customer practices and incur customer obligations as the WLB Debtors deem appropriate;

- to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

- to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

- to make payment on account of prepetition Claims of certain shippers, lienholders, and 503(b)(9) claimants;

- to establish procedures to protect the WLB Debtors' Estates against the possible loss of valuable tax benefits;

- to establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances; and

- to continue making payments to their surety bond providers in accordance with their prepetition bonding arrangements with their respective state authorities.

3.   *Debtor-In-Possession Financing*

The WLB Debtors filed a motion seeking authority for the WLB Debtors to enter into a postpetition financing agreement and utilize the cash collateral of their secured lender constituents during the Chapter 11 Cases in accordance with the terms of the DIP Facility. The DIP Facility provides the WLB Debtors with $20 million in incremental liquidity.  In addition to providing the WLB Debtors with incremental liquidity, the DIP Facility provides the WLB Debtors with access to the use of the Cash Collateral on a consensual basis, and will allow the WLB Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of their WLB Debtors' Estates for the benefit of all stakeholders.  The DIP Facility also refinances the $90 million in

obligations outstanding under the Bridge Loan.  The refinancing of the amounts outstanding under the Bridge Loan is a material component of, and a condition, to both the DIP Facility and RSA.

    4.   *Automatic Stay*

The filing of the WLB Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the WLB Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the WLB Debtors, and both the commencement and the continuation of prepetition litigation against the WLB Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Plan Effective Date of the Plan.

B.    *Employment and Compensation of Advisors*

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed the following applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ certain advisors:  (a) on the Petition Date, the Debtors filed an application to retain Donlin, Recano & Company, Inc., as Notice and Claims Agent to the Debtors; (b) on October  22, 2018, the Debtors filed an application to retain Kirkland & Ellis LLP as counsel to the Debtors; (c) on October [29], 2018, the Debtors filed an application to retain Jackson Walker LLP as co-counsel to the Debtors; (d) on October 18, 2018, the WLB Debtors filed an application to retain Centerview as investment banker and financial advisor to the WLB Debtors; (e) on October 18, 2018, the Debtors filed an application to retain A&M as restructuring advisor to the Debtors; and (f) on October [29], 2018, the WLB Debtors filed an application to retain McKinsey Restructuring & Transformation Services U.S., LLC for the purpose of identifying areas of performance improvement in the Debtors' mining operations (e.g., revenue drivers for each business and cost structures), and developing infrastructure to support such performance improvement initiatives to enhance the Debtors' mining operations and reduce costs. Further, the Debtors filed motions seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.

C.    *Appointment of Official Committee*

On October 18, 2018, the United States Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 206], notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  Ohio Machinery Co., Wheeler Machinery Co., Nelson Brothers Mining Services, LLC, Tractor & Equipment Co., Consol Mining Company LLC, Pension Benefit Guaranty Corporation, and the UMWA. The Committee has retained Morrison & Foerster LLP as its legal counsel and Jefferies Group LLC and Berkeley Research Group, LLC as its investment banker and financial advisor, respectively.

Since the formation of the Committee, the WLB Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases, and the Committee has been an active participant in these Chapter 11 Cases. The WLB Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the WLB Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the WLB Debtors' businesses. The Committee has participated actively with the WLB Debtors' management and professional advisors in reviewing the WLB Debtors' business plans and operations.

D.    *Summary of Claims Process, Bar Date and Claims Filed*

On [November 8], 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.  Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at http://www.donlinrecano.com/westmoreland).

On [November 13], 2018, the Bankruptcy Court entered the Bar Date Order, which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date

notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' Chapter 11 Cases is **December 10, 2018 at 5:00 p.m., prevailing Central Time** (the "Bar Date"); and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is **April 8, 2019, at 5:00 p.m. prevailing Central Time**. The Bar Date Notice was published in *USA Today* (national edition), *Financial Times* (global edition), and any such other local publications on November 14, 2018, and copies were served on all Holders of Claims appearing in the Debtors' Schedules of Assets and Liabilities.

E.      *Exclusivity*

        Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause."  On October 25, 2018, the WLB Debtors' filed their Plan.  Without further order of the Bankruptcy Court, the WLB Debtors' exclusivity period to file a chapter 11 plan will expire on February 6, 2019, which is 120 days after the WLB Debtors filed for relief under chapter 11 of the Bankruptcy Code.

F.      *Postpetition Marketing, Bidding, and Auction Process*

        On October 18, 2018, the WLB Debtors filed the Bidding Procedures Motion, which, among other things established (a) dates and deadlines for the submission of bids and the auction of substantially all assets of the WLB Debtors except for any Non-Core Assets sold (or subject to a binding purchase agreement entered into) prior to the Auction, and (b) requirements for bids to be "Qualified Bids" that will be considered at the Auction.  Pursuant to the order approving the Bidding Procedures Motion, the final bid deadline for the Core Assets is **January 15, 2019 at 4:00 p.m. (prevailing Central Time)**.  On **January 22, 2019, at 10:00 a.m. (prevailing Eastern Time)**, the WLB Debtors will hold an auction for all or substantially all of their assets.

G.      *Section 1113 and 1114 Process*

        The reduction of the WLB Debtors' legacy labor liabilities continues to be a crucial and necessary step towards the WLB Debtors' successful emergence from chapter 11.  The WLB Debtors are signatories to seven collective bargaining agreements (the "Existing CBAs") with the UMWA and local union branches of the IUOE (collectively, the "CBA Counterparties").  The Existing CBAs, together with the Heritage Costs, represent costly and burdensome obligations to UMWA- and IUOE-represented employees and retirees.  Since as early as March 21, 2018, the WLB Debtors have discussed with various CBA Counterparties the possibility of entering into new wage agreements that would result in consensual modifications to their existing collective bargaining agreements and to the WLB Debtors' retiree healthcare obligations under the Existing CBAs (and together with the Heritage Costs and the statutorily-mandated benefits under the Coal Act, the "Retiree Benefits").  Specifically, the WLB Debtors put forth four proposals over the course of five months (spanning from March 2018 through July 2018), in the hopes of coming to a consensual arrangement that would reduce the burden of the WLB Debtors' OPEB obligations.  Simultaneous with these negotiations, the WLB Debtors identified and/or secured hundreds of thousands of dollars in other savings, including by identifying certain unprofitable contracts for rejection or renegotiation, increasing efficiency, and selling nonstrategic assets.

        Despite these best efforts, the WLB Debtors and their financial advisors concluded that, in light of the drop in coal demand and prices, increasingly adverse regulatory compliance requirements and unsustainable UMWA and IUOE wage, benefit, and retiree healthcare costs, these cost-saving measures alone would not enable the WLB Debtors to survive in the short-term or compete in the long-term.  On September 6, 2018, the WLB Debtors, in anticipation of these Chapter 11 Cases, sent a letter (the "September 6 Letter") to the UMWA informing it of (i) the WLB Debtors' contemplated chapter 11 filing, (ii) the WLB Debtors' proposed modification of their obligations related to the Retiree Benefits, and (iii) the proposed medical coverage constructs that the WLB Debtors could implement to continue to provide modified coverage to those UMWA- and IUOE-represented employees and retirees.  The WLB Debtors also requested that the UMWA consider representing the Coal Act retirees in the negotiations process, so as to allow the

WLB Debtors to begin negotiations with the UMWA on behalf of all retirees, which in turn would provide all parties with as much time as possible to obtain a consensual resolution regarding modification of the Retiree Benefits.

The UMWA responded to the the September 6 Letter with a letter on September 14, 2018 (the "September 14 Letter"), and stated that (i) any conversations related to modification of the Retiree Benefits were premature, as the WLB Debtors had not yet filed for chapter 11, and (ii) any effort to eliminate retiree health care benefits would result in the immediate halting of work at certain of the Company's more profitable mines.  The UMWA did not directly respond to the WLB Debtors' request that the UMWA represent the Coal Act retirees.

On September 21, 2018, in response to the September 14 Letter, the WLB Debtors sent a letter (the "September 21 Letter") to the UMWA requesting that it reconsider its position with respect to both refraining from negotiations regarding the Retiree Benefits until the chapter 11 filing and representing the Coal Act retirees. No formal reply was ever provided by the UMWA to the WLB Debtors in response to the September 21 Letter.

On October 23, 2018, the WLB Debtors sent a letter (the "October 23 Letter") with their proposals pursuant to sections 1113 and 1114 of the Bankruptcy Code to the UMWA.  The October 23 Letter contained proposals related to the CBAs for the Kemmerer mine and Beulah mine, and certain other Retiree Benefits.  The October 23 Letter also requested that the UMWA provide bargaining dates as soon as possible.

On October 23, 2018, the UMWA Combined Benefit Fund, and the United Mine Workers of America 1992 Benefit Plan (the "1992 Plan," and together with the UMWA Combined Benefit Fund, the "Coal Act Funds") filed an objection to the motion for entry of the DIP Order, filed a motion seeking appointment of an official retiree committee pursuant to section 1114(b) of the Bankruptcy Code, and initiated an adversary proceeding against all of the Debtors seeking a declaratory judgment from the Bankruptcy Court declaring that Debtors' Coal Act obligations are not subject to modification or elimination under section 1114 of the Bankruptcy Code.

**ARTICLE VI.**
**SUMMARY OF THE PLAN**

> **THIS __ARTICLE VI__ IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD __NOT__ BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS __ARTICLE VI__ AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

The Plan provides for the sale of all or substantially all of the WLB Debtors' assets through the Sale Transaction.  The key terms of the Plan are as follows:

A.      *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy

Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the WLB Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      *Proposed Creditor Recoveries*

The Plan proposes to fund creditor recoveries from Cash on hand, the Purchaser Stock, debt issued or assumed by the Purchaser or any of its subsidiaries, the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Amounts made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan. As set forth in more detail in **Article IV.D** below, following an extensive prepetition financing process and series of negotiations with the Consenting Stakeholders, on October 9, 2018, the WLB Debtors and the Consenting Stakeholders executed the RSA, which contemplates the Sale Transaction. Although the WLB Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the WLB Debtors' assets are submitted in accordance with the Bidding Procedures, the Stalking Horse Purchase Agreement, represents a floor bid for the sale of the WLB Debtors' assets. The WLB Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the WLB Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the Plan Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code);

- Other Secured Claims will be treated in such a manner that they are Unimpaired;

- DIP Facility Claims will either:

   o   (i) if the Stalking Horse Purchaser is the Successful Bidder, be assumed by the Successful Bidder on the Plan Effective Date; or

   o   (ii) if the Stalking Horse Purchaser is not the Successful Bidder, each DIP Facility Claim shall be paid in full in Cash on the Plan Effective Date.

- Holders of First Lien Secured Claims will receive either:

   o   (i) in the event the Stalking Horse Purchaser is the Successful Bidder, their *pro rata* share, based on the Allowed amount of their Credit Agreement Claims or First Lien Notes Claims, as applicable, of (x) the Purchaser Stock and (if applicable) all debt issued or assumed (excluding any amounts assumed related to the DIP Facility) by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims, including but not limited to the WLB Debtors' Interests in the WMLP Debtors, which are not Transferred Assets; or

   o   (ii) in the event the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not consummated, payment in full in Cash on the Plan Effective Date.

- Holders of General Unsecured Claims against each of the WLB Debtors will receive their *pro rata* share of the General Unsecured Claims Amount; and

- existing Interests in the WLB Debtors will be cancelled without any distribution to the Holders of such Interests.

The WLB Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) to vote to accept the Plan.

C.      *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the WLB Debtors (the "<u>Sale Transaction</u>") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Restructuring Support Agreement dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders (as may be modified, amended, or supplemented from time to time in accordance with the terms thereof, the "<u>RSA</u>").[8] and the Plan.  Generally, the Sale Transaction contemplates that:

(a)      the WLB Debtors shall, among other things, transfer the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets and all Transferred Causes of Action held by the WLB Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) pursuant to sections 363, 365, and/or and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)      the Purchaser shall issue, or cause to be issued, the Purchaser Stock for eventual distribution to the Holders of Allowed First Lien Secured Claims (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), as applicable;

(c)      Cash proceeds (if any) of any Non-Core Asset Sale that are received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan; and

(d)      the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

A description of the Core Assets can be found on <u>Schedule 1</u> of the Plan. The Core Assets are generally comprised of the following assets and interests:

(a)      100 percent of the equity interests in the Entities comprising the Company's Canadian business;

(b)      the assets, business, and operation of the San Juan mine;

(c)      the assets, business, and operation of the Rosebud "Colstrip" mine;

(d)      certain contracts, leases, and other rights and other written obligations of the San Juan and Rosebud "Colstrip" mines; and

---

[8]      A copy of the RSA is attached as <u>Exhibit A</u> to the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 54].

(e)  certain assets related to the overhead function of the aforementioned mines and businesses.

A description of the Non-Core Assets can be found on Schedule 2 of the Plan. The Non-Core Assets are generally comprised of the following assets and interests:

(a)  the assets, business, and operation of the Absaloka mine;

(b)  the assets, business, and operation of the Beulah mine;

(c)  the assets, business, and operation of the Buckingham mine;

(d)  the assets, business, and operation of the Haystack mine;

(e)  the assets, business, and operation of the Jewett mine;

(f)  the assets, business, and operation of the Savage mine; and

(g)  the contracts, leases and other written obligations of the aforementioned mines.

In addition to the Core Assets and any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale, the Transferred Assets include any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date, other than (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan.

D.  *Restructuring Transactions*

On the Plan Effective Date or as soon as reasonably practicable thereafter, the WLB Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions"), including:  (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the Purchaser's adoption of the terms and conditions of the distribution of the EIP Pool; (6) issuance of the Purchaser Stock and any debt issued or assumed by the Purchaser, each as set forth in the Plan and consistent with the Description of Transaction Steps; (7) any transaction described in the Description of Transaction Steps; and (8) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

E.  *The Plan Administrator*

On and after the Plan Effective Date, the Plan Administrator shall act for the WLB Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the WLB Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the WLB Debtors, and shall succeed to the powers of the WLB Debtors' managers, directors, and officers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the WLB Debtors' Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

Among other things, the Plan Administrator shall be responsible for:  (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount and the General Unsecured Claims Amount; (3) making distributions from the Wind-Down Amount and the General Unsecured Claims Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the WLB Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the WLB Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the WLB Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the WLB Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator's post-Plan Effective Date compensation shall be set forth in the Plan Supplement and paid by the WLB Debtors.

F.      *The Liquidating Trust*

On the Post-Closing Reconciliation Date or an earlier date, the Liquidating Trust will be formed to implement the Wind-Down, including the liquidation of the Liquidating Trust Assets, for the period after the creation of the Liquidating Trust.  The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the WLB Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.  For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.  Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust.  The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.  The Liquidating Trust will not be deemed a successor in interest to the WLB Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed First Lien Secured Claims on a *pro rata* basis as set forth in the Liquidating Trust Agreement.

The Plan Administrator shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the WLB Debtors and the Plan Administrator as set forth in the Plan and applicable non-bankruptcy law, and the Plan Administrator shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement.  On and after the Post-Closing Reconciliation Date or the earlier date on which the Liquidating Trust is formed, all references to the WLB Debtors in the Plan shall be deemed references to the Liquidating Trust, and all references to the Plan Administrator shall be deemed references to the Plan Administrator in his role as trustee of the Liquidating Trust (except for references to the WLB Debtors or the Plan Administrator in Article IV.R of the Plan).

G.      *The Post-Closing Reconciliation Date*

On the Post-Closing Reconciliation Date or an earlier date, (i) the WCC Interests  and certain remaining Claims shall automatically be canceled, released, and extinguished, and will be of no further force or effect, and (ii)

the Liquidating Trust Assets shall automatically be transferred to the Liquidating Trust, in each case without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Until the occurrence of the Post-Closing Reconciliation Date, Westmoreland Coal Company shall retain its rights, powers, and duties as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code, to the fullest extent necessary to implement the foregoing cancellation of the WCC Interests and treatment of certain remaining Claims, as more fully set forth in the Description of Transaction Steps.

H.      *Corporate Action*

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the WLB Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the WLB Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the WLB Debtors, including the creation of the Purchaser, the consummation of the Sale Transaction, and the issuance of Purchaser Stock in accordance with the Plan and the Sale Transaction Documentation, and any corporate action required by the WLB Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the WLB Debtors or the WLB Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Purchaser may be formed by a person or entity other than the WLB Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the WLB Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation.  The directors, managers, and officers of the WLB Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of Article IV.K of the Plan.

I.      *Recoveries to Certain Holders of Claims and Interests*

The recoveries to holders of Claims and Interests are described in **Article IV.D** of this Disclosure Statement, entitled "What will I receive from the WLB Debtors if the Plan is consummated?"

J.      *Release, Injunction, and Related Provisions*

The Plan contains certain releases, as described in **Article II.I** of this Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

The Plan provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting or vote to reject *and* who do not File a written objection to the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the WLB Debtors (the "WLB Debtor Releases") and the Released Parties (the "Third Party Releases").

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX.C of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the WLB Debtors and the Released Parties.  By objecting to the releases set forth in Article IX.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article IX.C of the Plan if you otherwise would be a Released Party thereunder.  The releases are an integral element of the Plan.**

The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

1.  *Release of Liens*

Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than the mortgages, deeds of trust, Liens, pledges or other security interests in place or to be issued for the DIP Facility if assumed by the Purchaser) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the WLB Debtors and their successors and assigns or (ii) the Purchaser (and if applicable, any third party purchasing the Non-Core Assets), in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the WLB Debtors.  In addition, the First Lien Notes Trustee and Credit Agreement Agent shall execute and deliver all documents reasonably requested by the WLB Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the WLB Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

2.  *Releases by the WLB Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the WLB Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the WLB Debtors, that the WLB Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a WLB Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' capital structure, the assertion or enforcement of rights and remedies against the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the WLB Debtors and after notice and opportunity for hearing; and (6) a bar to any of the WLB Debtors asserting any claim released by the releases herein against any of the Released Parties.

3.   *Releases by Holders of Claims and Interests*

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

4.   *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

5.   *Injunction*

**Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the WLB Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## ARTICLE VII.
## VOTING AND CONFIRMATION

On [December 18], 2018, the Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.   *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 3 | First Lien Secured Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the WLB Debtors, or the Notice and Claims Agent on behalf of the WLB Debtors, otherwise provide to you.

B.   *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.      *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the WLB Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the WLB Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the WLB Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.      *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Reject) |
| 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

E.      *Solicitation Procedures*

1.      *Notice and Claims Agent*

The WLB Debtors retained Donlin Recano & Company, Inc. ("Donlin Recano") to act, among other things, as the notice and claims agent (the "Notice and Claims Agent") in connection with the solicitation of votes to accept or reject the Plan.

2.      *Solicitation Package*

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of **December 13, 2018** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

3.      *Distribution of the Solicitation Package and Plan Supplement*

The WLB Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before **the date that is five (5) business days after entry of the Disclosure Statement Order**, which will be at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Central Time on January 25, 2019).

The Solicitation Package (except for the Ballots) may also be obtained: (a) from Donlin Recano by (i) visiting http://www.donlinrecano.com/westmoreland; (ii) writing to Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; or (b) for a fee via PACER at https://ecf.txsb.uscourts.gov.

At least 7 days prior to the Voting Deadline, the WLB Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at http://www.donlinrecano.com/westmoreland.  The WLB Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Donlin Recano by (i) calling the Debtors' restructuring hotline at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International); (ii) visiting the Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland; (iii) writing to Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; or (b) for a fee via PACER at https://ecf.txsb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice.  The WLB Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3 or 4—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided.  If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all

of the WLB Debtors' solicitation and voting procedures shall apply to all of the WLB Debtors' creditors and other parties in interest.

      1.     *Voting Deadline*

      The Voting Deadline is **January 25, 2019, at 4:00 p.m., prevailing Central Time**.  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

      2.     *Voting Instructions*

      As described above, the Debtors have retained Donlin Recano to serve as the Notice and Claims Agent for purposes of the Plan.  Donlin Recano is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** | |
| --- | --- |
| To be counted, all Ballots must be **actually received** by Donlin Recano by the Voting Deadline, which is **January 25, 2019, at 4:00 p.m., prevailing Central Time**, at the following address: | |
| **If by First Class Mail, Ballots must be sent to:** | **If by Hand Delivery or Overnight Mail, Ballots must be sent to:** |
| Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.**<br>Attn: Voting Department<br>PO Box 192016 Blythebourne Station<br>Brooklyn, NY 11219 | Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |
| **If by Email, scanned Ballots must be sent to:** | |
| WestmorelandVote@donlinrecano.com | |
| If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Donlin Recano at:<br>(800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International). | |

      More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  All votes to accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by:  (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually received** by Donlin Recano no later than the Voting Deadline at the return address set forth in the applicable Ballot.  Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

      Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder.  By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the WLB Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.  It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.      *Ballots Not Counted*

No Ballot will be counted if, among other things:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the WLB Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

G.      *Confirmation Objection Deadline*

Parties must object to Confirmation of the Plan by **January 25, 2019, at 4:00 p.m., prevailing Central Time** (the "Confirmation Objection Deadline").  All objections to the Plan must be filed with the Bankruptcy Court and served on the WLB Debtors and certain other parties in interest so that they are **actually received** on or before the Confirmation Objection Deadline.

H.      *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for **February 13, 2019, at [___]:00 a/p.m., prevailing Central Time.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth in this Disclosure Statement no later than the Confirmation Objection Deadline.  Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

I.      *Confirmation Standards*

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The WLB Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the WLB Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The WLB Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made

before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the WLB Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the WLB Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The WLB Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

1. *Best Interests of Creditors Test—Liquidation Analysis*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Plan Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Plan Effective Date, at least equal to the value of the recovery that each such Class member would receive if the WLB Debtors were liquidated under chapter 7 beginning on the Plan Effective Date.

The WLB Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After

accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the WLB Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the WLB Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal, the WLB Debtors believe that the Plan provides a greater recovery to holders of First Lien Secured Claims and Allowed General Unsecured Claims than would a chapter 7 liquidation. Liquidating the WLB Debtors' Estates under the Plan likely provides holders of First Lien Secured Claims and Allowed General Unsecured Claims with a larger, more timely recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Plan Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the WLB Debtors' business (or the Company) that the WLB Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly technical nature of the WLB Debtor's assets and the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the WLB Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the WLB Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the WLB Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the WLB Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the WLB Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the WLB Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the WLB Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2. *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the WLB Debtors' businesses. Accordingly, the WLB Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the WLB Debtors.

J.      *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.  Holders of Claims in Classes 5 and 6 will be deemed either impaired or unimpaired, and Claims and Interests in Classes 7 and 8 will receive no distribution under the Plan and are, therefore, presumed deemed to have rejected the Plan.

Claims in Classes 3 and 4 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.      *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the WLB Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the WLB Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.   *No Unfair Discrimination*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The WLB Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The WLB Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2.   *Fair and Equitable Test*

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the WLB Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a)   *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Plan Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)   *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the Plan Effective Date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

(c)   *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either:  (i)  each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Plan Effective Date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive  or retain any property under the plan on account of such junior interest.

**ARTICLE VIII.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the WLB Debtors' business or the Plan and its implementation.

A.      *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.*

      1.      *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

      The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the WLB Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

      2.      *The WLB Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

      To the extent that the WLB Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the WLB Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan.  Any such loss of support could adversely affect the WLB Debtors' ability to confirm and consummate the Plan.

      3.      *The WLB Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

      The WLB Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein.  For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement.  In addition, the WLB Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases.  As such, the estimated amount of Claims may materially change due to the WLB Debtors' ongoing review.  Accordingly, because certain Claims under the Plan will be paid on a *pro rata* basis, the WLB Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

      4.      *The WLB Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

      Although the WLB Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the WLB Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the WLB Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

      5.      *Certain Tax Implications of the WLB Debtors' Bankruptcy*

      Holders of Allowed Claims should carefully review **Article IX** of this Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the Chapter 11 Cases.

B.      *Certain Bankruptcy Law Considerations*

      The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

1. *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The WLB Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the WLB Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the WLB Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2. *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the WLB Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the WLB Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3. *The WLB Debtors May Not Be Able to Secure Confirmation of the Plan.*

The WLB Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. According to the Plan, there are various documents that must be in form and substance acceptable to the WLB Debtors, the Required Consenting Stakeholders, and/or the Purchaser, and there are certain funding amounts that must also be agreed to by these parties prior to Confirmation. If agreement cannot be reached on these documents or these funding amounts, Confirmation of the Plan may not occur. Further, if the requisite acceptances are not received, the WLB Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the WLB Debtors, or otherwise, that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the WLB Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The WLB Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment

41

of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.  *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5.  *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  The WLB Debtors believe that the Plan satisfies these requirements and the WLB Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6.  *Risk of Non-Occurrence of the Plan Effective Date.*

Although the WLB Debtors believe that the Plan Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Plan Effective Date will, in fact, occur.

7.  *Compliance with the DIP Facility.*

The DIP Facility is scheduled to mature on May 21, 2019 (the "DIP Maturity Date").  There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the WLB Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the WLB Debtors' liquidity and earnings.  There can be no assurance that the WLB Debtors will be able to comply with these covenants.  If the WLB Debtors fail to comply with such covenants and terms, the WLB Debtors would be required to obtain waivers or forbearance from the lenders under the DIP Facility and, if such waivers or forbearance are not obtained, there could be a material adverse effect on the WLB Debtors' financial condition and the WLB Debtors may not be able to consummate the Plan.

8.  *Applicable Securities Laws May Restrict Issuance of or Distribution of the Purchaser Stock.*

The Plan provides that, to the maximum extent allowable, to the extent the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser in connection with the Sale Transaction Documentation will be issued pursuant to and subject to the exemption from registration set forth in section 1145 of the Bankruptcy Code and will therefore be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities.  The exemption does not apply to a Holder that is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

These Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemptions

provided by sections 1145(b)(1) and 1145(c) of the Bankruptcy Code, unless the Holder is an "affiliate" of the Purchaser within the meaning of Rule 144 under the Securities Act.

In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  To the extent any Entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.

9.   *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

10.   *The WLB Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Professional Compensation Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

11.   *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article IX of the Plan provides for certain releases, injunctions, and exculpations.  However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

12.   *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the WLB Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the WLB Debtors from consummating the Plan.  If this occurs, the Chapter 11 Cases may be converted to cases under chapter 7 or dismissed.

C.   *Risk Factors Relating to Purchaser Stock Issued Under the Plan.*

1.   *Purchaser Stock May Lack Liquidity*

There is currently no market for the Purchaser Stock, and such a market may not develop because, among other things, Purchaser is under no obligation to list any of its securities on any national exchange.  Therefore, there can be no assurance as to the liquidity of the Purchaser Stock at any time after the Plan Effective Date.  If an active trading market does not develop or is not sustained, holders of the Purchaser Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value depending upon many factors including, without limitation, general market or economic conditions, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Purchaser.  Accordingly, holders of the Purchaser Stock may bear certain risks associated with holding securities for an indefinite period of time.

2.  *Dilution*

Future equity financings or other equity issuances by Purchaser could also have a dilutive effect on and adversely affect the value of the Purchaser Stock issued to the holders of First Lien Secured Claims on the Plan Effective Date.  The amount and dilutive effect of the foregoing could be material.

3.  *The Trading Price for the Shares of Purchaser Stock May Be Depressed Following the Plan Effective Date.*

Assuming that the Plan Effective Date occurs, shares of Purchaser Stock will be issued to Holders of certain Classes of Claims if the Stalking Horse Purchaser is the Successful Bidder. Following the Plan Effective Date, shares of Purchaser Stock may be sold to satisfy withholding tax requirements. In addition, Holders of Claims that receive shares of Purchaser Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of Purchaser Stock available for trading could cause the trading price for the shares of Purchaser Stock to be depressed, particularly in the absence of an established trading market for the Purchaser Stock.

4.  *Certain Holders of Purchaser Stock May Be Restricted in their Ability to Transfer or Sell their Securities*

To the extent that shares of the Purchaser Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act or applicable state securities laws.  Resales by holders of Claims who receive Purchaser Stock pursuant to the Plan that are deemed to be "underwriters," as defined in section 1145(b) of the Bankruptcy Code,  including holders who are deemed to be "affiliates" of the Purchaser within the meaning of Rule 144 under the Securities Act, would only be permitted without registration if they are able to comply with an exemption from registration under applicable federal and state securities laws, including Rule 144 under the Securities Act.  The Purchaser Stock may not initially be registered under the Securities Act or any state securities laws, and the WLB Debtors make no representation regarding the right of any holder of Purchaser Stock to freely resell the Purchaser Stock.  *See* **Article X** to this Disclosure Statement, entitled "Certain Securities Law Matters."

5.  *Restricted Securities Issued Pursuant to the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies*

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, including shares issued to holders who may be deemed "underwriters" within the meaning of Section 1145(b) of the Bankruptcy Code, such securities will be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act and applicable state securities laws.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act and applicable state securities laws, including Rule 144 under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  While the WLB Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of restricted securities will qualify for an exemption from registration under Rule 144.  In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Under applicable SEC guidance, securities issued under the Plan to holders who are deemed to be "affiliates" of the Purchaser, within the meaning of Rule 144 under the Securities Act, will also be subject to resale restrictions under the Securities Act, but will not be deemed to be "restricted securities."  Resale restrictions are discussed in more detail in **Article X** to this Disclosure Statement, entitled "Certain Securities Law Matters."

D.      *Disclosure Statement Disclaimer*

      1.      *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the WLB Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the WLB Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the WLB Debtors believe that such financial information fairly reflects the financial condition of the WLB Debtors, the WLB Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

      2.      *Information Contained in this Disclosure Statement Is for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

      3.      *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

      4.      *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The information contained herein is an estimate only, based upon information currently available to the WLB Debtors.

      5.      *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the WLB Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the WLB Debtors, the Consenting Stakeholders, Holders of Allowed Claims, or any other parties in interest.

      6.      *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The WLB Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Plan Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

      7.      *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the WLB Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the WLB Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8.   *Information Was Provided by the WLB Debtors and Was Relied Upon by the WLB Debtors' Advisors.*

The WLB Debtors' advisors have relied upon information provided by the WLB Debtors in connection with the preparation of this Disclosure Statement.  Although the WLB Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9.   *Potential Exists for Inaccuracies, and the WLB Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the WLB Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the WLB Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the WLB Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the WLB Debtors may subsequently update the information in this Disclosure Statement, the WLB Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.   *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or relating to the WLB Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the WLB Debtors.

E.   *Liquidation Under Chapter 7.*

If no chapter 11 plan can be confirmed, the WLB Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the WLB Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the WLB Debtors' liquidation analysis is set forth in **Article VII.I.1** of this Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

## ARTICLE IX.
## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the WLB Debtors, the Purchaser, and to certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the WLB Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the WLB Debtors or to certain Holders of Claims or Interests in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies,

financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the WLB Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the Purchaser Stock or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that Holders of Claims hold only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary also assumes that the various debt and other arrangements to which the WLB Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.      *Certain U.S. Federal Income Tax Consequences of the Plan to the WLB Debtors and the Purchaser*

1.      *In General*

The Plan provides that, if the Stalking Horse Purchaser is the Successful Bidder, the Sale Transaction may be structured as either (a) a taxable disposition of the Transferred Assets (a "Taxable Transaction") or (b) a disposition of the Transferred Assets in a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC (a "Tax-Free Reorganization").  As will be described in further detail in the Description of Transaction Steps, either structure provides that (a) relevant assets are transferred by the WLB Debtors to Purchaser; (b) following the Plan Effective Date, Westmoreland Coal Company (and potentially certain of its subsidiaries) remains in chapter 11 until the Post-Closing Reconciliation Date; (c) on either the Post-Closing Reconciliation Date or an earlier date, any of the WLB Debtors' remaining assets that were not transferred to Purchaser are transferred to one or more liquidating entities or, in the case of the WMLP Interests, cancelled; and (d) Westmoreland Coal Company and any of its subsidiaries that remained in chapter 11 following the Plan Effective Date shall commence liquidation.

2.      *Effects of Sale Transaction on Tax Attributes of WLB Debtors*

The tax consequences of the implementation of the Plan to Purchaser will differ depending on whether the Sale Transaction is structured as a Taxable Transaction or Tax-Free Reorganization.  The WLB Debtors have not yet

determined how the Sale Transaction will be structured, whether in whole or in part. Such decision will depend on, among other things, in a Tax-Free Reorganization the amount of tax attributes available to be transferred to Purchaser, applicable limitations on the use of such tax attributes after the transfer and the amount of the reduction in such tax attributes by excluded COD Income (defined below).

      (a)      *Recognition of Gain or Loss and Tax Basis of Assets Acquired by Purchaser*

            (i)      *Taxable Transaction*

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the WLB Debtors would recognize gain or loss upon a transfer of all or a portion of their assets in an amount equal to the difference between the aggregate fair market value of the assets transferred by the WLB Debtors and the WLB Debtors' aggregate tax basis in such assets. Such gain or loss would be reduced by the amount of such WLB Debtors' available net operating losses ("NOLs"), NOL carryforwards and any other available tax attributes, and the reduced amount of gain or loss would be recognized by the WLB Debtors (and the liability for which will constitute an Administrative Claim). The WLB Debtors have NOLs and expect that such NOLs are sufficient to offset any gain resulting from a Taxable Transaction.

In a Taxable Transaction, Purchaser will take a fair market value basis in the acquired assets. As a general matter, the WLB Debtors currently anticipate that in a Taxable Transaction, Purchaser will not acquire any stock of any U.S. subsidiary of Westmoreland Coal Company and, as a result, the tax basis of the assets of Westmoreland Coal Company's subsidiaries would not be expected to transfer to Purchaser in a Taxable Transaction.

            (ii)      *Tax-Free Reorganization*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, the WLB Debtors are not expected to recognize any gain or loss for federal income tax purposes. Purchaser should have carryover tax basis in any assets acquired pursuant to such transaction, subject to reduction due to COD Income, as described below. Furthermore, pursuant to a Tax-Free Reorganization, the WLB Debtors are not expected to recognize gain upon the distribution of Purchaser Stock to Holders of Allowed First Lien Secured Claims.

      (b)      *Preservation of Tax Attributes and Cancellation of Indebtedness Income*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the debtor issued, and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the satisfaction.

Pursuant to section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (where the reduction is subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.[9] A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC, though it has not been determined whether the WLB Debtors will make this election. The reduction in tax attributes occurs only after the taxable income (or

---

[9]    Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act (the "Tax Cut and Jobs Act"), interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions. It is unclear whether interest deductions that are deferred under section 163(j) are subject to reduction under section 108.

loss) for the taxable year of the debt discharge has been determined and any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD Income are first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The aggregate tax basis of the WLB Debtors in their assets (determined on an entity-by-entity basis, and in the case of an affiliated group of corporations, subject to the look-through rule described above) is not required to be reduced below the amount indebtedness (determined on an entity-by-entity basis) that the corresponding Purchaser will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The WLB Debtors expect to realize significant COD Income as a result of the consummation of the Plan. In addition, because WMLP is a partnership for U.S. federal income tax purposes, any eventual transaction with respect to the WMLP is expected to cause additional COD Income to be allocated to Westmoreland Coal Company. The exact amount of any COD Income that will be realized by the WLB Debtors will not be determinable until the consummation of the Plan.

The implications of these rules, and the more general question of whether Purchaser will succeed to any of the WLB Debtors' tax attributes, depends on whether the Sale Transaction is consummated as a Taxable Transaction or a Tax-Free Reorganization.

(i)     *Taxable Transaction*

In the event the transactions undertaken pursuant to the Plan are consummated as a Taxable Transaction and Purchaser is not treated as acquiring the stock of any entity that is taxed as a corporation for U.S. federal income tax purposes, the rules related to COD Income, worthless stock deductions and section 382 of the IRC (as described below) will generally be irrelevant, Purchaser will acquire all such assets with an aggregate tax basis equal to their aggregate fair market value (as determined under applicable tax rules), and Purchaser will not inherit any of the NOLs or other tax attributes of the WLB Debtors.

(ii)    *Tax-Free Reorganization*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser will succeed to some or all of the tax attributes of the WLB Debtors, depending upon, among other things; (a) whether certain tax attributes attributable to Westmoreland Coal Company's subsidiaries can be transferred to Westmoreland Coal Company prior to the consummation of the Plan; and (b) whether the equity of any of Westmoreland Coal Company's subsidiaries are transferred to Purchaser. However, such tax attributes will be subject to reduction for COD Income according to the rules described above.

(c)     *Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC*

After giving effect to the reduction in tax attributes from excluded COD Income, to the extent that the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser's ability to use

any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

(i)     *General Sections 382 and 383 Annual Limitations*

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs, certain recognized built-in losses if the corporation has an overall "net unrealized built in loss" as determined pursuant to IRS Notice 2003-65 and other tax attributes (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  This discussion refers to the limitation determined under sections 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, or approximately 2.43 percent for ownership changes occurring in November 2018).  If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65, the Section 382 Limitation may be increased to the extent that Purchaser recognizes certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65).  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

As noted above, sections 382 and 383 should only be relevant in a Tax-Free Reorganization pursuant to which Purchaser succeeds to some or all of the WLB Debtors' tax attributes.  The application of the rules related to "net unrealized built-in gains" and "net unrealized built-in losses" are subject to some uncertainty in situations like the one presented here, where the surviving company in an acquisitive "G" reorganization acquires some, but not all, of the transferor company's assets.

(ii)     *Special Bankruptcy Exceptions*

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Plan Effective Date of the plan of reorganization, and during the part of the taxable year prior to and including the Plan Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses are eliminated in their entirety.

If as of the Plan Effective Date the WLB Debtors expect to qualify for the 382(l)(5) Exception and not elect out of its application, the certificate of incorporation of the Purchaser would likely include certain restrictions on transfers with respect to the Purchaser Stock to minimize the likelihood of a subsequent "ownership change" and thus protect the value of its available tax attributes. If these restrictions are sought, subject to certain exceptions and potential thresholds, the certificate of incorporation of the Purchaser generally may restrict (i) any person or entity from accumulating 4.75% or more of any class of stock of the Purchaser through secondary acquisitions, and, if a person already owns 4.75% or more of such stock, from acquiring additional stock, and (ii) any person or entity that owns 4.75% or more of the Purchaser Stock from disposing of all or portion of such stock, subject to certain exceptions. The restrictions would further provide that any attempted transfer of Purchaser Stock in violation of the restrictions described above will be prohibited and void ab initio.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6)

Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy, along with certain integrated transactions. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The WLB Debtors have not determined whether Purchaser will be eligible for the 382(l)(5) Exception and, if eligible, whether Purchaser will decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Purchaser's ability to use any Pre-Change Losses after the Plan Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Plan Effective Date.

B.      *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims*

1.      *General Considerations*

In general, the U.S. federal income tax treatment of Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction or (b) a Tax-Free Reorganization. The U.S. federal income tax consequences to U.S. Holders of such Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

2.      *Consequences to Holders of First Lien Secured Claims*

The treatment of Holders of First Lien Secured Claims will vary depending upon whether the Stalking Horse Purchaser is the Successful Bidder. If the Stalking Horse Purchaser is the Successful Bidder then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 3 First Lien Secured Claims, each Holder thereof will receive its *pro rata* share of: (a) Purchaser Stock, (b) debt issued or

assumed by Purchaser or a Purchaser subsidiary (the "<u>Purchaser Debt</u>") and (c) Cash.  If the Stalking Horse Purchaser is not the Successful Bidder, Holders of such Claims will receive Cash.

      (a)      *Treatment of Holders of First Lien Secured Claims If the Sale Transaction Is Structured as a Tax-Free Reorganization and such Claims Are Treated as Securities*

If (a) the Sale Transaction is structured as a Tax-Free Reorganization[10] and (b) the First Lien Secured Claims are treated as securities, then the exchange of such Claims should be a partial tax-free exchange pursuant to section 354 of the IRC.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("<u>OID</u>")), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange, which should be equal to (i) the sum of (A) any Cash received and (B) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration, minus (ii) the U.S. Holder's adjusted basis, if any, in the Claim; and (b) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration that constitutes "other property" that is not permitted to be received under sections 354 and 356 of the IRC without recognition of gain.

With respect to non-Cash consideration that is treated as a "stock or security" of Purchaser, such U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the Cash and "other property" received plus (c) gain recognized (if any).  The holding period for such non-Cash consideration should include the holding period for the exchanged Claims.

With respect to non-Cash consideration that is not treated as a "stock or security" of Purchaser, U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to the property's fair market value (or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

      (b)      *Treatment of Holders of First Lien Secured Claims If The Sale Transaction Is Structured as a Taxable Transaction or such Claims Are Not Treated as Securities*

If (a) the Sale Transaction is structured as a Taxable Transaction or (b) the First Lien Secured Claims are not treated as securities, then the exchange of such Claims should be treated as a taxable exchange pursuant to section 1001 of the IRC.

A U.S. Holder of a First Lien Secured Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of (i) any Cash received, (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration, minus (b) the Holder's adjusted tax basis in its First Lien Secured Claim.

Such U.S. Holder should obtain a tax basis in the non-Cash consideration received, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID), and subject to the rules relating to market discount, equal to the consideration's fair market value (or issue price, in the case of debt instruments) as of

---

[10]   The Sale Transaction can only be structured as a Tax-Free Reorganization if the Stalking Horse Purchaser is the Successful Bidder.

the date such consideration is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

3.   *Consequences to Holders of General Unsecured Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 4 General Unsecured Claims, each Holder thereof will receive its *pro rata* share of Cash.

A U.S. Holder of a General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of any Cash received, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

4.   *Accrued Interest (and OID)*

To the extent that any amount received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the WLB Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Claim will be attributable to accrued interest on the debt constituting the surrendered Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC.  Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018.  Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

5.   *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder

elected to include market discount in income as it accrued).  To the extent that the surrendered Claims that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debt instruments but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

Section 451 of the IRC (as discussed above) generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018.  However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes.  Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

6.  *Certain Potential Issues Regarding the Purchaser Debt*

(a)  Cash Interest

Cash Interest on the Purchaser Debt will be includable by a U.S. Holder as ordinary interest income at the time it accrues or is received in accordance with such holder's regular method of accounting for U.S. federal income tax purposes.

(b)  Issue Price

The consideration received by U.S. Holders of surrendered Claims, which may include some combination of Purchaser Stock, Purchaser Debt, and Cash, collectively, would likely be treated as an investment unit issued in exchange for the surrendered Claims to the extent any Purchaser Debt is received on account of such Claims.  In such case, the issue price of the Purchaser Debt will depend, in part, on the issue price of the investment unit, and the respective fair market values of the elements of consideration that compose the investment unit.  The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument.  As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established securities market.  In general, a debt instrument will be treated as traded on an established securities market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.  Whether the investment unit should be considered "publicly traded" may not be known until after the Plan Effective Date.

If the investment unit is considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit on the date the Purchaser Debt is issued.  The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded.  If the investment unit is not publicly traded on an established market, but the surrendered Claims are publicly traded on an established market, the issue price of the investment unit may then be determined by reference to the fair market value of the surrendered Claims on the date the investment unit is issued. If neither the investment unit nor the surrendered Claims are publicly traded on an established market, then the issue price of the Purchaser Debt would generally be determined under section 1273(b)(4) or 1274 of the IRC, as applicable. Assuming either the investment unit or the surrendered Claims are publicly traded, the issue price of an investment

unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the Purchaser Debt.

An issuer's allocation of the issue price of an investment unit is binding on all Holders of the investment unit unless a Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

The surrendered Claims and the investment unit comprising the consideration received in exchange therefor, may be traded on an established securities market for the purposes described above even if no trade actually occurs and there are merely firm or indicative quotes with respect to such surrendered Claims or investment unit.

As discussed above, a debt instrument, such as the Purchaser Debt, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any Purchaser Debt have not yet been determined; to the extent not all the interest on the Purchaser Debt is unconditionally payable in cash at least annually, the Purchaser Debt may be considered to be issued with OID. Moreover, the Purchaser Debt could be treated as issued with OID to the extent the allocation rules described above result in the Purchaser Debt having an issue price that is less than their stated redemption price at maturity.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Plan Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems or (iii) certain qualifying non-U.S. securities exchanges, (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable rate published by the IRS).

(c)     *Acquisition Premium or Amortizable Bond Premium on Purchaser Debt*

If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the Purchaser Debt is greater than the issue price of such debt but less than the stated principal amount of such debt, such Purchaser Debt will have an "acquisition premium." Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the applicable Purchaser Debt for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. Alternatively, if a U.S. Holder's initial tax basis in Purchaser Debt exceeds its stated principal amount, the U.S. Holder will be considered to have acquired the Purchaser Debt with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of the Purchaser Debt on a constant yield method as an offset to stated interest when includible in income under such Holder's regular accounting method. If a U.S. Holder elects to amortize bond premium, such Holder must reduce its tax basis in the Purchaser Debt by the amount of the premium used to offset stated interest. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the Purchaser Debt. If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the Purchaser Debt is less than the issue price of such debt, *see* **Article IX.B.5** to this Disclosure Statement, entitled "Market Discount."

7.     *Dividends on Purchaser Stock*

Any distributions made on account of the Purchaser Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Purchaser as determined under U.S. federal income tax principles. Certain qualified dividends received by a non-corporate taxpayer are taxed at

preferential rates.  To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares.  Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

   8.  *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of non-Cash consideration received pursuant to the Plan.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the Holder held the applicable non-Cash consideration for more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  Under the recapture rules of section 108(e)(7) of the Code, a U.S. Holder may be required to treat gain recognized on such dispositions of the Purchaser Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for Purchaser Stock.

For a description of certain limitations on the deductibility of capital losses, see the section entitled "Limitation on Use of Capital Losses" below.

   9.  *Limitations on Use of Capital Losses.*

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

   10.  *Medicare Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

C.     *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims*

The following discussion includes only certain U.S. federal income tax consequences to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding

the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

1.   *Gain Recognition*

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.   *Interest Payments; Accrued but Untaxed Interest.*

Payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest) or Purchaser, with respect to the debt received under the Plan (in the case of interest payments with respect thereto);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the WLB Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interested described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent), the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that

are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3. *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other disposition (including a cash redemption) of its *pro rata* share of the non-Cash consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- in the case of the sale of Purchaser Stock, Purchaser is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Purchaser Stock under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the Purchaser Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market. In the event Purchaser Stock is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-

U.S. Holder held such interest.  At this time, and based on the WLB Debtors' current expectation regarding the relative value of Purchaser's investment in Canada compared to the value of Purchaser's U.S. assets, the WLB Debtors do not anticipate that Purchaser will be a USRPHC for U.S. federal income tax purposes on the Plan Effective Date.  However, the WLB Debtors cannot provide a guarantee of that result, nor can the WLB Debtors guarantee that Purchaser will not become a USRPHC in the future.

4.   *Dividends on Purchaser Stock*

Any distributions made with respect to Purchaser Stock will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares.  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange).  Except as described below, dividends paid with respect to Purchaser Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to Purchaser Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  Distributions to a Non-U.S. Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed above).

5.   *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of Purchaser Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include Purchaser Stock and the Claims).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occur after December 31, 2018.  Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of the Claims or the Purchaser Stock.

D.   *Information Reporting and Withholding*

The WLB Debtors, Purchaser, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally,

under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE X.
## CERTAIN SECURITIES LAW MATTERS

The WLB Debtors believe that the Purchaser Stock to be issued pursuant to the Plan, if the Stalking Horse Purchaser is the Successful Bidder, are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The WLB Debtors further believe that the offer, issuance, and initial distribution of the Purchaser Stock pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

A.     *1145 Securities*

1.     *Issuance*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act (the "1145 Securities") and state securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The WLB Debtors submit that, if the Stalking Horse Purchaser is the Successful Bidder, all Purchaser Stock issued pursuant to the Plan will be issued principally in exchange for the corresponding Allowed First Lien Secured Claims. Accordingly, the issuance of the Purchaser Stock satisfies all the requirements of section 1145(a)(1) of the Bankruptcy Code and is therefore exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described below). Recipients of any Purchaser Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

The exemption from registration of section 1145(a)(1) of the Bankruptcy Code is not available for holders that are deemed "underwriters" under section 1145(b)(1) of the Bankruptcy Code.  An "underwriter" is defined as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  Under section 2(a)(11), the term "issuer" includes "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."  Accordingly, "affiliates" of an issuer may be deemed to be "underwriters" for purposes of section 1145(b).  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be an "underwriter" for these purposes.

2.   *Subsequent Transfers*

Resales of 1145 Securities will generally be exempt from registration under the Securities Act and applicable state securities laws.  Holders deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code, including persons deemed to be "affiliates" within the meaning of Rule 144 under the Securities Act, may only resell Purchaser Stock pursuant to registration, or an exemption from registration, under applicable federal and state securities law.

The securities of the Purchaser received by Persons deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code, other than securities received by "affiliates," will be deemed to be "restricted securities," as defined in Rule 144 under the Securities Act.  Under applicable SEC guidance, securities issued under the Plan to holders who are deemed to be "affiliates" of the Purchaser will be subject to resale restrictions under the Securities Act, but will not be deemed to be "restricted securities." Holders of Purchaser Stock who are deemed to be "underwriters" may be entitled to resell their Purchaser Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if, in the case of "restricted securities," the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter," including whether such Person is an "affiliate" of the Purchaser, with respect to the Purchaser Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the WLB Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Purchaser Stock and, in turn, whether any Person may freely resell Purchaser Stock.  The WLB Debtors recommend that potential recipients of Purchaser Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state securities laws.

B.   *4(a)(2) Securities*

1.   *Issuance*

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

To the extent any entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act (the "4(a)(2) Securities") and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.  The WLB Debtors submit that the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  The 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

2. *Subsequent Transfers*

The 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.  The third-party holder of the Purchaser Stock will not be permitted to offer, sell, or otherwise transfer their 4(a)(2) Securities except pursuant to a registration statement or an available exemption from registration.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  It is the WLB Debtors' expectation that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of one percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations.  Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The WLB Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Plan Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

All 4(a)(2) Securities will be issued in certificated or book-entry form and will bear a restrictive legend. Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

Any Persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE WLB DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE WLB DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

**ARTICLE XI.**
**RECOMMENDATION OF THE WLB DEBTORS**

**In the opinion of the WLB Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.** In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. **Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

[*Balance of Page Intentionally Left Blank*]

Respectfully submitted,

Dated:  October 25, 2018

WESTMORELAND COAL COMPANY
on behalf of itself and all other WLB Debtors

*/s/ Michael G. Hutchinson*

Name: Michael G. Hutchinson
Title: Chief Executive Officer
Company: Westmoreland Coal Company

**Exhibit A**

**Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates**

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF WESTMORELAND**
**COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          ptomasco@jw.com
                 mcavenaugh@jw.com
                 jwertz@jw.com

*Proposed Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors*

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                 michael.slade@kirkland.com
                 gregory.pesce@kirkland.com

*Proposed Counsel to the Debtors and Debtors-in-
Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                 stephen.hessler@kirkland.com

- and -

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Email:          anna.rotman@kirkland.com

---

[1]     Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

<u>**TABLE OF CONTENTS**</u>

<u>**CONTENTS**</u>

INTRODUCTION ..........................................................................................................................4

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..................................................................................................**4**
A.     Defined Terms. ................................................................................................................4
B.     Rules of Interpretation. ..................................................................................................17
C.     Computation of Time. ....................................................................................................17
D.     Governing Law. .............................................................................................................17
E.     Reference to Monetary Figures. ....................................................................................17
F.     Controlling Document. ..................................................................................................17

**ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS** ......................................................**18**
A.     Administrative Claims. ..................................................................................................18
B.     Professional Compensation. ..........................................................................................18
C.     Priority Tax Claims. ......................................................................................................19
D.     DIP Facility Claims. ......................................................................................................20
E.     U.S. Trustee. ..................................................................................................................20
F.     Costs and Expenses of the Prepetition Secured Parties, the DIP Lenders, and the DIP Agent. ...................20

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**..............................**20**
A.     Summary of Classification. ...........................................................................................20
B.     Treatment of Claims and Interests. ...............................................................................21
C.     Special Provision Governing Unimpaired Claims. .......................................................24
D.     Elimination of Vacant Classes. .....................................................................................24
E.     Voting Classes; Presumed Acceptance by Non-Voting Classes. ...................................24
F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code...............24
G.     Subordinated Claims. ....................................................................................................25

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ...............................................**25**
A.     General Settlement of Claims. .......................................................................................25
B.     Sources of Plan Consideration. .....................................................................................25
C.     Sale Transaction. ...........................................................................................................25
D.     Vesting of Assets. ..........................................................................................................27
E.     Employee Incentive Plan ...............................................................................................28
F.     Wind-Down Amount. ....................................................................................................28
G.     Funded Liabilities. .........................................................................................................28
H.     The General Unsecured Claims Amount. .......................................................................28
I.     Wind-Down. ..................................................................................................................28
J.     Plan Administrator. .......................................................................................................28
K.     Cancellation of Notes, Instruments, Certificates, and Other Documents. .....................29
L.     Corporate Action. ..........................................................................................................29
M.     Dissolution of the Boards of the WLB Debtors. ...........................................................30
N.     Release of Liens. ...........................................................................................................30
O.     Effectuating Documents; Further Transactions. ............................................................30
P.     Exemption from Certain Taxes and Fees. .....................................................................30
Q.     Causes of Action. ..........................................................................................................31
R.     [Reserved] .....................................................................................................................31
S.     The Liquidating Trust. ...................................................................................................31
T.     The Post-Closing Reconciliation Date ..........................................................................31
U.     Closing the Chapter 11 Cases. ......................................................................................32

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................32**
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ....................................32
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .....................................33
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ..................................33
D.      D&O Policies. ...............................................................................................................................34
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........................34
F.      Reservation of Rights. ..................................................................................................................34
G.      Nonoccurrence of Plan Effective Date. ........................................................................................34

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................34**
A.      Timing and Calculation of Amounts to Be Distributed. ................................................................34
B.      Rights and Powers of the Plan Administrator. ..............................................................................35
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...................................35
D.      Compliance with Tax Requirements/Allocations. .........................................................................37
E.      Allocation of Plan Distributions Between Principal and Interest. ..................................................37
F.      Setoffs and Recoupment. ..............................................................................................................37
G.      Claims Paid or Payable by Third Parties. .....................................................................................37
H.      Indefeasible Distributions. ............................................................................................................38
I.      Exemption from Securities Laws. .................................................................................................38

**ARTICLE VII THE PLAN ADMINISTRATOR .....................................................................................38**
A.      The Plan Administrator. ................................................................................................................38
B.      Wind-Down. .................................................................................................................................40
C.      Exculpation; Indemnification; Insurance; Liability Limitation. ....................................................40
D.      Tax Returns. .................................................................................................................................40
E.      Dissolution of the WLB Debtors. .................................................................................................40

**ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
      DISPUTED CLAIMS ..................................................................................................................41**
A.      Allowance of Claims and Interests. ..............................................................................................41
B.      Claims and Interests Administration Responsibilities. ..................................................................41
C.      Estimation of Claims and Interests. ..............................................................................................41
D.      Adjustment to Claims or Interests without Objection. ...................................................................42
E.      Time to File Objections to Claims. ...............................................................................................42
F.      Disallowance of Claims. ...............................................................................................................42
G.      Amendments to Claims. ................................................................................................................42
H.      No Distributions Pending Allowance. ...........................................................................................42
I.      Distributions After Allowance. .....................................................................................................43
J.      Undeliverable Distribution Reserve. .............................................................................................43
K.      Single Satisfaction of Claims. ......................................................................................................43

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ......................43**
A.      Settlement, Compromise, and Release of Claims and Interests. ....................................................43
B.      Discharge of Claims and Termination of Interests. .......................................................................44
C.      Release of Liens. ..........................................................................................................................44
D.      Releases by the WLB Debtors. .....................................................................................................44
E.      Releases by Holders of Claims and Interests. ...............................................................................45
F.      Exculpation. .................................................................................................................................46
G.      Injunction. ....................................................................................................................................46
H.      Recoupment. .................................................................................................................................47
I.      Subordination Rights. ...................................................................................................................47
J.      Reimbursement or Contribution. ..................................................................................................47
K.      Reservation of the United States. ..................................................................................................47

**ARTICLE X EFFECT OF CONFIRMATION OF THE PLAN ................................................................48**
A.      Jurisdiction and Venue ..................................................................................................................48

B.      Order Approving the Disclosure Statement.................................................................48
C.      Voting Report...........................................................................................................48
D.      Judicial Notice.........................................................................................................48
E.      Transmittal and Mailing of Materials; Notice..........................................................49
F.      Solicitation...............................................................................................................49
G.      Burden of Proof.......................................................................................................49
H.      Bankruptcy Rule 3016(a) Compliance......................................................................49
I.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code ............49
J.      Securities Under the Plan .........................................................................................54
K.      Releases and Discharges..........................................................................................55
L.      Release and Retention of Causes of Action...............................................................55
M.      Approval of Purchase Agreement and Other Documents and Agreements...................55
N.      Confirmation Hearing Exhibits .................................................................................55
O.      Objections to Confirmation of the Plan.....................................................................55
P.      Exemption from Transfer Taxes with Respect to the Sale Transaction.........................55
Q.      Good Faith Purchaser Status.....................................................................................56
R.      Sale Free and Clear .................................................................................................56
S.      Retention of Jurisdiction..........................................................................................56
T.      Plan Supplement......................................................................................................56

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION,  THE PLAN EFFECTIVE
       DATE, AND THE POST-CLOSING RECONCILIATION DATE**..........................**56**
A.      Conditions Precedent to Confirmation......................................................................56
B.      Conditions Precedent to the Plan Effective Date........................................................56
C.      Conditions Precedent to the Post-Closing Reconciliation Date....................................57
D.      Waiver of Conditions...............................................................................................57
E.      Substantial Consummation.......................................................................................57
F.      Effect of Non-Occurrence of Conditions to the Plan Effective Date.............................58

**ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**............**58**
A.      Modification and Amendments..................................................................................58
B.      Effect of Confirmation on Modifications....................................................................58
C.      Revocation or Withdrawal of the Plan......................................................................58

**ARTICLE XIII RETENTION OF JURISDICTION** ...........................................................**58**

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ...........................................................**60**
A.      Immediate Binding Effect.........................................................................................60
B.      Additional Documents..............................................................................................61
C.      Payment of Statutory Fees........................................................................................61
D.      Dissolution of Statutory Committees.........................................................................61
E.      Reservation of Rights...............................................................................................61
F.      Successors and Assigns............................................................................................61
G.      Service of Documents...............................................................................................61
H.      Enforcement of Confirmation Order..........................................................................62
I.      Term of Injunctions or Stays....................................................................................62
J.      Compensation and Benefits Programs.......................................................................62
K.      Entire Agreement....................................................................................................63
L.      Exhibits..................................................................................................................63
M.      Nonseverability of Plan Provisions...........................................................................63
N.      Votes Solicited in Good Faith...................................................................................63
O.      Waiver....................................................................................................................63

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in Article I.A.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each WLB Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The WLB Debtors seek to consummate the Restructuring Transactions commencing on the Plan Effective Date.  Each WLB Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each WLB Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the WLB Debtors.  Reference is made to the Disclosure Statement for a discussion of the WLB Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.     Defined Terms.**

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates; (b) Allowed Professional Fee Claims; (c) DIP Facility Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims that are expected to remain unpaid in full in Cash as of the Post-Closing Reconciliation Date, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be the Voting Deadline; and (b) with respect to Professional Fee Claims, shall be 30 days after the Plan Effective Date.

3.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

4.     "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the WLB Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, the Bar Date Order, or pursuant to a Final Order); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable WLB Debtor.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "*Allow*" and "*Allowing*" shall have correlative meanings.

5.     "*Assigned Contracts and Leases*" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the WLB Debtors to the Purchaser pursuant to the Plan, as set forth in the Plan Supplement.

6.      "*Assumed Contracts and Leases List*" means the list of those Executory Contracts and Unexpired Leases to be assumed by the WLB Debtors or assumed and assigned by the WLB Debtors to the Purchaser (*i.e.*, the Assigned Contracts and Leases) pursuant to the Plan, as set forth in the Plan Supplement, which (with respect to the Assigned Contracts and Leases) shall be in form and substance reasonably acceptable to the Successful Bidder, subject to amendment by the WLB Debtors with the consent of the Successful Bidder (with respect to the Assigned Contracts and Leases) from time to time in accordance with the Sale Transaction Documentation and this Plan.

7.      "*Assumed Liabilities*" has the meaning set forth in the Sale Transaction Documentation.

8.      "*Auction*" has the meaning set forth in the Bidding Procedures Order.

9.      "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the WLB Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

10.      "*Ballot*" means the form of ballot approved by the Bankruptcy Court and distributed to Holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

11.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

12.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

13.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

14.      "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

15.      "*Bidding Procedures*" means the bidding procedures attached as **Exhibit 2** to the Bidding Procedures Order, as such bidding procedures may be amended from time to time in accordance with its terms.

16.      "*Bidding Procedures Order*" means the *Order (I) Authorizing Westmoreland Coal Company and Certain Debtor Affiliates to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures with Respect to Substantially All Assets, (III) Approving Contract Assumption and Assignment Procedures, (IV) Scheduling Bid Deadlines and an Auction, (V) Scheduling Hearings and Objection Deadlines with Respect to the Disclosure Statement and Plan Confirmation, and (VI) Approving the Form and Manner of Notice Thereof* [Docket No [●]], as such order may be amended, supplemented, or modified from time to time.

17.      "*Bridge Loan*" means that certain Fourth Amendment to the Credit Agreement dated as of May 21, 2018, by and among Westmoreland Coal Company, Prairie Mines & Royalty ULC, and Westmoreland San Juan, LLC, as borrowers, the guarantors party thereto, certain lenders party thereto, and the Bridge Loan Agent.

18.      "*Bridge Loan Agent*" means Wilmington Savings Fund Society, FSB, in its capacities as administrative and collateral agent under the Bridge Loan.

19.      "*Bridge Loan Claim*" means any claim on account of the Bridge Loan.

20.      "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

21.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

22.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Cause of Action*" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

23.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court pursuant to the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 71], as such order may be amended, supplemented, or modified from time to time.

24.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

26.     "*Claims Register*" means the official register of Claims against the WLB Debtors maintained by the Clerk of the Bankruptcy Court.

27.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

28.     "*Collateral*" means any property or interest in property of the Estate of any WLB Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

29.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 206], as may be reconstituted from time to time.

30.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

31.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

32.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the WLB Debtors seek entry of the Confirmation Order.

33.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

34.     "*Consenting Stakeholders*" means any Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that (a) hold DIP Facility Claims, Credit Agreement Claims, or First Lien Note Claims and (b) are or become party to the RSA.

35.     "*Consummation*" or "*Consummated*" means the occurrence of the Plan Effective Date.

36.     "*Core Assets*" means those assets, including the Purchased US Assets and Purchased Equity Interests (each as defined in the Stalking Horse Purchase Agreement), set forth on <u>Schedule 1</u> hereto.

37.     "*Credit Agreement*" means that certain Credit Agreement, dated as of December 16, 2014, by and among Westmoreland Coal Company, as borrower, the guarantors party thereto, the Credit Agreement Agent, and the other lender parties thereto, as may be amended (including pursuant to that certain Sixth Amendment, Resignation, Waiver, Consent and Appointment Agreement entered into as of October ___, 2018 (the "<u>Sixth Amendment</u>")), restated, or otherwise supplemented from time to time.

38.     "*Credit Agreement Agent*" means Wilmington Savings Fund Society, FSB (as successor in interest to Bank of Montreal), in its capacities as administrative and collateral agent under the Credit Agreement, or any of its successors, including the successor pursuant to the Sixth Amendment.

39.     "*Credit Agreement Claim*" means any Claim on account of the Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

40.     "*Cure Costs*" means, except to the extent otherwise provided in the Stalking Horse Purchase Agreement, the amount necessary to cure all monetary defaults under the Assigned Contracts and Leases pursuant to section 365(b) of the Bankruptcy Code.

41.     "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by the WLB Debtors under the Plan pursuant to sections 365 or 1123 of the Bankruptcy Code, as applicable, which notice shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Costs to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

42.     "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the WLB Debtors for directors, members, trustees, officers, and managers' liability.

43.     "*Debtors*" means, collectively, the WLB Debtors and the WMLP Debtors.

44.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

45.     "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacities as administrative and collateral agent under the DIP Facility.

46.     "*DIP Facility*" has the meaning set forth in the DIP Order.

47.     "*DIP Facility Claims*" means any Claims arising under the DIP Facility (as such term is defined in the DIP Order) or the DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

48.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

49.     "*DIP Order*" means the *Final Order (I) Authorizing Westmoreland Coal Company and Certain of Its Affiliates to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

50.     "*Disclosure Statement*" means the *Disclosure Statement to the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates*, dated as of [●] [Docket No. [●]], as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

51.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures with respect to the Plan [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

52.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a WLB Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

53.     "*Distribution Record Date*" means, other than with respect to those First Lien Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the WLB Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the WLB Debtors and the Required Consenting Stakeholders or designated in a Final Order.  The Distribution Record Date shall not apply to any First Lien Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with Article VI.C.4 of the Plan and, as applicable, the customary procedures of DTC.

54.     "*DTC*" means the Depository Trust Company.

55.     "*EIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, profit interests, or similar securities, as applicable, representing between 5 and 10 percent of the aggregate amount of Purchaser Stock, determined on a fully diluted and fully distributed basis, which shall be reserved for distribution to certain participating employees of the Purchaser pursuant to the Employee Incentive Plan.

56.     "*Employee Incentive Plan*" means an incentive plan for certain participating employees of the Purchaser to be established and implemented by the initial board of directors of the Purchaser following the Plan Effective Date and which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

57.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

58.     "*Estate*" means the estate of any WLB Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable WLB Debtor's Chapter 11 Case.

59.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the WLB Debtors; (b) the Consenting Stakeholders; (c) the Successful Bidder; (d) the DIP Lenders; (e) the DIP Agent; (f) the Holders of First Lien Claims; (g) the First Lien Notes Trustee; (h) the Credit Agreement Agent; (i) the Bridge Loan Agent; (j) the Holders of the Bridge Loan Claims; (k) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (l) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

60.     "*Executory Contract*" means a contract to which one or more of the WLB Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

61.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

62.     "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

63.     "*First Lien Claims*" means the Credit Agreement Claims and First Lien Notes Claims, which as of the Petition Date shall be deemed Allowed, with the Credit Agreement Claims being Allowed in the principal amount of $[319,773,165.17], and the First Lien Notes Claims being Allowed in the principal amount of $[350,000,000.00], *plus*, for each of the Credit Agreement Claims and the First Lien Notes Claims, accrued and unpaid interest, *plus* fees and other expenses due under the Credit Agreement and the First Lien Notes Indenture, as applicable.

64.     "*First Lien Deficiency Claim*" means the unsecured portion of any First Lien Claim to the extent that the value of the Collateral securing such First Lien Claim is less than the amount of the interest of such First Lien Claim in such Collateral as determined in accordance with section 506 of the Bankruptcy Code.  The Allowed amount of the First Lien Deficiency Claims, in the aggregate, shall be calculated as the Allowed amount of the First Lien Claims *minus* the Allowed amount of the First Lien Secured Claims.

65.     "*First Lien Notes*" means the 8.750% senior secured notes, due January 21, 2022, issued by Westmoreland Coal Company.

66.     "*First Lien Notes Claim*" means any Claim on account of the First Lien Notes and the First Lien Notes Indenture, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

67.     "*First Lien Notes Indenture*" means that certain indenture, dated as of December 16, 2014, by and among Westmoreland Coal Company, as issuer, the guarantors party thereto, and the First Lien Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

68.     "*First Lien Notes Trustee*" means U.S. Bank National Association, in its capacity as indenture trustee and collateral trustee under the First Lien Notes Indenture.

69.     "*First Lien Secured Claim*" means the Secured portion of any First Lien Claim, to the extent of the value of the Collateral securing such First Lien Claim as determined in accordance with section 506 of the Bankruptcy Code.  The Allowed amount of the First Lien Secured Claims, in the aggregate, shall be calculated as the total amount of the credit bid provided for in the Stalking Horse Purchase Agreement *plus* the aggregate amount of any Non-Core Asset Sale Proceeds *plus* the assets (or proceeds thereof) that (a) constitute Collateral securing the First Lien Claims and (b) are not Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors.

70.     "*Funded Liabilities*" means, collectively, subject to the Funded Liability Cap, (a) any Allowed Priority Claims related to the Transferred Assets that have been asserted on or prior to the Administrative Claims Bar Date or the applicable deadline in the Bar Date Order, as applicable, and (b) any tax liability that is an Administrative Claim that is asserted and Allowed, and in the case of such Claims described in both clauses (a) and (b), where the assumption or payment of the Allowed amount of each such Claim is required under section 1129(a)(9) of the Bankruptcy Code in order to obtain entry of the Confirmation Order; *provided* that the Funded Liabilities shall take into account any payments made or to be made by third parties, including insurers and sureties, in accordance with Article VI.G of the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, Funded Liabilities shall not include unsecured (i) Claims (including General Unsecured

Claims), (ii) obligations, or (iii) liabilities of the WLB Debtors, including liabilities arising under retiree medical benefit plans, the Black Lung Benefits Act, or the Federal Coal Mine Health and Safety Act of 1969 that are excluded liabilities under the Sale Transaction Documentation.

71.      "*Funded Liability Cap*" means such fixed amount in respect of the Funded Liabilities, which shall be mutually agreed by the Purchaser and the WLB Debtors prior to the commencement of the Confirmation Hearing, and which shall reflect and include a fixed amount in respect of estimated tax liabilities that are or will be Allowed Administrative Claims.

72.      "*General Unsecured Claim*" means any unsecured Claim (including any First Lien Deficiency Claims) against a WLB Debtor that is not:  (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Facility Claim; (d) a First Lien Secured Claim; (e) an Intercompany Claim; (f) a Section 510(b) Claim; (g) an Other Priority Claim; (h) an Other Secured Claim; (i) a Priority Tax Claim; (j) a Professional Fee Claim; or (k) a Secured Tax Claim.

73.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

74.      "*General Unsecured Claims Amount*" means an amount of Cash equal to the liquidation value of any assets of the WLB Debtors not subject to a lien and available for distribution after giving effect to the treatment of, or distribution on account of, all Allowed (a) First Lien Secured Claims, (b) Administrative Claims (including Professional Fee Claims), (c) Priority Tax Claims, (d) Other Priority Claims, and (e) Other Secured Claims, as such liquidation value shall be agreed upon by the WLB Debtors and the Required Consenting Stakeholders prior to the entry of the Disclosure Statement Order.

75.      "*Holder*" means an Entity holding a Claim against or Interest in a WLB Debtor, as applicable.

76.      "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

77.      "*Initial Distribution Date*" means the date on which the WLB Debtors or the Plan Administrator make initial distributions to Holders of Allowed Claims pursuant to the Plan.

78.      "*Insider Incentive Plan Order*" means any order of the Bankruptcy Court approving a motion by the Debtors seeking approval of a key employee incentive plan for insiders (as such term is defined in section 101(31) of the Bankruptcy Code).

79.      "*Intercompany Claim*" means any Claim against a WLB Debtor held by another WLB Debtor or an Affiliate of a WLB Debtor.

80.      "*Intercompany Interest*" means any Interest in one WLB Debtor held by another WLB Debtor or an Affiliate of a WLB Debtor, and, for the avoidance of doubt, shall not include any WMLP Interest or any Interest held by a WLB Debtor in the Purchaser.

81.      "*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any WLB Debtor, including options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any WLB Debtor (whether or not arising under or in connection with any employment agreement).

82.      "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

83.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

84.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

85.     "*Liquidating Trust*" means that certain trust to be created on the Post-Closing Reconciliation Date or an earlier date, as described in Article IVS.

86.     "*Liquidating Trust Agreement*" means the agreement to be executed as of the Post-Closing Reconciliation Date or an earlier date, establishing the Liquidating Trust pursuant to this Plan, substantially in the form Filed with the Plan Supplement.

87.     "*Liquidating Trust Assets*" means all remaining Retained Assets as of the Post-Closing Reconciliation Date or an earlier date, and all other assets of the WLB Debtors that have not been sold, transferred, or abandoned prior to the Post-Closing Reconciliation Date.

88.     "*Non-Core Assets*" means those assets set forth on Schedule 2 hereto.

89.     "*Non-Core Asset Marketing Process*" has the meaning set forth in the Bidding Procedures.

90.     "*Non-Core Asset Sale*" means, collectively, one or more sales of some or all of the Non-Core Assets.

91.     "*Non-Core Asset Sale Documents*" means the documents setting forth the definitive terms of the Non-Core Asset Sale.

92.     "*Non-Core Asset Sale Proceed*s" means any net Cash or net Cash equivalents that are proceeds from the Non-Core Asset Sale.

93.     "*Non-Insider Retention Plan Order*" means any order of the Bankruptcy Court approving a motion by the Debtors seeking approval of a key employee retention plan for employees that are not insiders (as such term is defined in section 101(31) of the Bankruptcy Code).

94.     "*Notice and Claims Agent*" means Donlin, Recano & Company, Inc., the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases [Docket No. 96].

95.     "*Ordinary Course Professional*" means an Entity (other than a Professional) retained and compensated by the WLB Debtors in accordance with the Ordinary Course Professionals Order.

96.     "*Ordinary Course Professionals Order*" means the *Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

97.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

98.     "*Other Secured Claim*" means any Secured Claim against any of the WLB Debtors, other than a DIP Facility Claim, a Credit Agreement Claim, or a First Lien Note Claim.

99.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

100.    "*Petition Date*" means October 9, 2018, the date on which the Chapter 11 Cases were commenced.

101.     "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

102.     "*Plan Administrator*" means an individual that shall be the representative of the WLB Debtors on and after the Plan Effective Date and shall have the rights, powers, and duties set forth in this Plan.  The identity and compensation of the Plan Administrator shall be agreed to by the WLB Debtors and the Required Consenting Stakeholders and shall be set forth in the Plan Supplement.

103.     "*Plan Administrator Agreement*" means that certain agreement entered into no later than the Plan Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan.

104.     "*Plan Effective Date*" means, with respect to the Plan and any applicable WLB Debtors, the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Plan Effective Date set forth in Article XIB of the Plan have been satisfied or waived in accordance with Article XID of the Plan.

105.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders and the Successful Bidder (to the extent the Stalking Horse Purchaser is not the Successful Bidder and to the extent related to the Sale Transaction), substantially final forms of which shall be Filed at least 7 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, including:  (a) the Assumed Contracts and Leases List; (b) the identity of the Plan Administrator and the compensation of the Plan Administrator; (c) the amount of the General Unsecured Claims Amount (which amount shall be disclosed prior to the entry of the Disclosure Statement Order); (d) the Wind-Down Budget; (e) the Description of Transaction Steps; (f) the Purchaser Documentation; (g) the Liquidating Trust Agreement; (h) those Transferred Causes of Action that shall be transferred to the Purchaser pursuant to the Sale Transaction; and (i) the Plan Administrator Agreement; *provided* that, through the Plan Effective Date, the Plan Supplement, and the exhibits thereto may be amended or modified in accordance with the Plan and the RSA.

106.     "*Plan Term Sheet*" means that certain term sheet setting forth the terms of the Plan attached as Exhibit A to the RSA.

107.     "*Post-Closing Reconciliation Date*" means the date not earlier than the Plan Effective Date, on which all conditions precedent to the occurrence of the Post-Closing Reconciliation Date to be set forth in the Description of Transaction Steps and Article XIC of the Plan have been satisfied or waived in accordance with Article XID of the Plan.

108.     "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

109.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

110.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

111.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

112.    "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

113.    "*Professional Fee Escrow Account*" means an account funded by the WLB Debtors with Cash as soon as possible after Confirmation and not later than the Plan Effective Date in an amount equal to the Professional Fee Escrow Amount.

114.    "*Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the WLB Debtors prior to and as of the Confirmation Date, which estimates Professionals shall, in consultation with the advisors to the Required Consenting Stakeholders, deliver to the WLB Debtors as set forth in Article IIB of the Plan.

115.    "*Proof of Claim*" means a proof of Claim Filed against any of the WLB Debtors in the Chapter 11 Cases.

116.    "*Purchaser*" means (a) a newly-formed Delaware limited liability company or (b) other entity, including a newly-formed subsidiary of the WLB Debtors, as selected by the Successful Bidder and set forth in the Description of Transaction Steps.

117.    "*Purchaser Documentation*" means any and all documentation, filings, forms, and other administrative or ministerial actions relating thereto, that are reasonably necessary or desirable with respect to the formation of Purchaser and to effectuate the Sale Transaction, which Purchaser Documentation shall be in form and substance acceptable to the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), and the organizational documents of Purchaser shall be in form reasonably acceptable to the WLB Debtors (it being understood that the WLB Debtors shall not have an approval right in any form over the equity and governance terms of the Purchaser, which shall be determined in the sole discretion of the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder).

118.    "*Purchaser Stock*" means the new common shares or limited liability company units, which may be in the form of common units, as applicable, in the Purchaser to be issued pursuant to the Plan, as set forth in the Description of Transaction Steps.

119.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

120.    "*Released Party*" means, collectively, and in each case in its capacity as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

121.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all holders of Claims and Interests that are deemed to accept the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not timely File a written objection to the releases in the Plan, (ii) vote to reject the Plan *and* who do not timely File a written objection to the releases in the Plan, or (iii) are deemed to reject or presumed to accept the Plan *and* who do not timely File a written objection to the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

122.     "*Required Consenting Stakeholders*" has the meaning set forth in the RSA.

123.     "*Restructuring Transactions*" means the transactions described in <u>Article IV</u>.

124.     "*Retained Assets*" means: (a) prior to the Post-Closing Reconciliation Date, the WMLP Interests, (b) the General Unsecured Claims Amount, (c) the Wind-Down Amount, (d) the D&O Policies, and (e) the WLB Debtors' rights and retained assets, including the Excluded Assets (as defined in the Sale Transaction Documentation), under the Sale Transaction Documentation.  For the avoidance of doubt, the Retained Assets shall not include: (x) the Transferred Assets; (y) any Causes of Action or Avoidance Actions released or transferred pursuant to the Plan; or (z) the Professional Fee Escrow Account.

125.     "*RSA*" means that certain Restructuring Support Agreement, dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders, including all exhibits and attachments thereto, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof.

126.     "*Sale Transaction*" means the transfer of the Transferred Assets to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to section 1123 of the Bankruptcy Code on the terms and conditions set forth in the Sale Transaction Documentation.

127.     "*Sale Transaction Documentation*" means one or more asset purchase agreements or purchase and sale agreements and related documents, pursuant to which the WLB Debtors will effectuate the Sale Transaction.

128.     "*Sale Transaction Proceed*s" means any Cash or Cash equivalents that are proceeds from the Sale Transaction (if any, in the event the Stalking Horse Purchaser consummates the Sale Transaction).

129.     "*Sale Transaction Term Sheet*" means that certain term sheet setting forth the terms of the Sale Transaction attached as <u>Exhibit B</u> to the RSA.

130.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the WLB Debtors pursuant to section 521 of the Bankruptcy Code.

131.     "*Section 510(b) Claims*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

132.     "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the

Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

133.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

134.    "*Securities Act*" means the U.S. Securities Act of 1933.

135.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

136.    "*Stalking Horse Purchaser*" means the newly-formed Delaware limited liability Entity or other form of Entity or Entities as selected by the Required Consenting Stakeholders to serve as the Buyer (as defined in the Stalking Horse Purchase Agreement) under the Stalking Horse Purchase Agreement.

137.    "*Stalking Horse Purchase Agreement*" means that certain Purchase and Sale Agreement, dated as of [October ●, 2018], between the WLB Debtors and the Stalking Horse Purchaser.

138.    "*Subsequent Distribution Date*" means a date following the Initial Distribution Date on which the Plan Administrator in its reasonable discretion elects to make distributions to Holders of certain Allowed Claims pursuant to the Plan.

139.    "*Successful Bidder*" means the Entity, which Entity may be the Stalking Horse Purchaser, whose bid for some or all of the Core Assets and, if applicable, the Transferred Non-Core Assets, is selected by the WLB Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures.

140.    "*Transferred Assets*" means the Core Assets, the Transferred Non-Core Assets, and the Transferred Causes of Action.

141.    "*Transferred Causes of Action*" means any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date; *provided* that Transferred Causes of Action shall not include (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan.

142.    "*Transferred Non-Core Assets*" means any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale prior to the Plan Effective Date.

143.    "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the WLB Debtors of an intent to accept a particular distribution; (c) responded to the WLB Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

144.    "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.J.

145.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the WLB Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

146.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

147.    "*U.S. Person*" has the meaning given to such term in rule 902 promulgated under the Securities Act.

148.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

149.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

150.    "*Voting Deadline*" means 4:00 p.m. (prevailing Central Time) on [●], 2019.

151.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Notice and Claims Agent.

152.    "*Wages Order*" means the *Final Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefits Programs* [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

153.    "*WCC Interests*" means the Interests in Westmoreland Coal Company outstanding immediately prior to the Plan Effective Date.

154.    "*Wind Down*" means the wind down and dissolution of the WLB Debtors' Estates as set forth in <u>Article VIIB</u>.

155.    "*Wind-Down Amount*" means Cash in an amount, calculated in accordance with the Stalking Horse Purchase Agreement, and to be determined by the WLB Debtors and acceptable to the Required Consenting Stakeholders, which amount shall be retained by the WLB Debtors in accordance with the terms of the Stalking Horse Purchase Agreement and used by the Plan Administrator to fund (a) the payment of Allowed Priority Claims under the Plan and (b) the Wind Down in accordance with the Wind-Down Budget.

156.    "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be agreed to by the Required Consenting Stakeholders and the WLB Debtors.  The Wind-Down Budget, a copy of which shall be Filed with the Plan Supplement, shall include line item estimates for, among other things, post-Plan Effective Date Professional fees and U.S. Trustee Fees, and will be financed by the Wind-Down Amount.

157.    "*WLB Debtors*" means, collectively, Absaloka Coal, LLC, Basin Resources, Inc., Buckingham Coal Company, LLC, Dakota Westmoreland Corporation, Haystack Coal Company, San Juan Coal Company, San Juan Transportation Company, Texas Westmoreland Coal Company, WCC Land Holding Company, Inc., WEI-Roanoke Valley, Inc., Western Energy Company, Westmoreland Coal Company, Westmoreland Coal Company Asset Corp., Westmoreland Coal Sales Company, Inc., Westmoreland Energy Services New York, Inc., Westmoreland Energy Services, Inc., Westmoreland Energy, LLC, Westmoreland Mining LLC, Westmoreland North Carolina Power LLC, Westmoreland Partners, Westmoreland Power, Inc., Westmoreland Resources Inc., Westmoreland San Juan Holdings, Inc., Westmoreland San Juan, LLC, Westmoreland Savage Corporation, Westmoreland Texas Jewett Coal Company, Westmoreland-Roanoke Valley, LP, and WRI Partners, Inc., and for the avoidance of doubt, does not include any of the WMLP Debtors.

158.    "*WMLP Debtors*" means, collectively, Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP, Westmoreland Kemmerer, LLC, Oxford Mining Company, LLC, Harrison Resources, LLC, Oxford Mining Company-Kentucky, LLC, Daron Coal Company, LLC, Oxford Conesville, LLC, and Westmoreland Kemmerer Fee Coal Holdings, LLC.

159.     "*WMLP Interests*" means the Interests in Westmoreland Resource Partners, LP outstanding immediately prior to the Plan Effective Date.

160.     "*WMLP Sale*" means sale(s) or other disposition(s) of substantially all assets of the WMLP Debtors.

**B.     Rules of Interpretation.**

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (11) any immaterial effectuating provisions may be interpreted by the WLB Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party.

**C.     Computation of Time.**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable after the Plan Effective Date.

**D.     Governing Law.**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

**E.     Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

**F.     Controlling Document.**

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan, the Disclosure Statement,

the Plan Supplement, and the Sale Transaction Documentation, the Sale Transaction Documentation shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

# ARTICLE II
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE
## CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

**A.**     **Administrative Claims.**

Except with respect to Professional Fee Claims, DIP Facility Claims, or as otherwise set forth herein, subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the WLB Debtors or the Plan Administrator, agree to less favorable treatment or such Holder has been paid by any applicable WLB Debtor prior to the Plan Effective Date, the WLB Debtors or the Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business; or (y) on the later of (i) the Plan Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the WLB Debtors.

Except as otherwise provided by Article IIA or by a Final Order entered by the Bankruptcy Court (including the Bar Date Order) on or prior to the Administrative Claims Bar Date, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the WLB Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the motion seeking approval of the Disclosure Statement and the notice of entry of the Disclosure Statement Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the WLB Debtors, their Estates, the Purchaser, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Plan Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

**B.**     **Professional Compensation.**

**1.**     **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 days after the Plan Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article IIA of the Plan.

### 2. Professional Fee Escrow Amount.

As soon as possible after Confirmation and not later than the Plan Effective Date, the WLB Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the WLB Debtors' Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the WLB Debtors and used solely in accordance with the Wind-Down Budget.

### 3. Estimation of Fees and Expenses.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date and shall deliver such estimate to the WLB Debtors by the earlier of (a) five Business Days after the Confirmation Date and (b) two Business Days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the WLB Debtors may estimate the unbilled fees and expenses of such Professional.

### 4. Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the WLB Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the WLB Debtors or the Plan Administrator. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the WLB Debtors and the Plan Administrator may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that (i) to the extent such amounts are unpaid as of the Plan Effective Date, they shall be paid from the Wind-Down Amount in accordance with the Wind-Down Budget; and (ii) the WLB Debtors must provide the Consenting Stakeholders with advance notice and copies of invoices before making any such payments of fees and expenses.

### 5. Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the WLB Debtors and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

### C.   Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the WLB Debtors or the Plan Administrator, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the WLB Debtors or the Plan Administrator, as applicable, and subject to the consent of the Required Consenting Stakeholders, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over

a period ending not later than five (5) years after the Petition Date; *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the WLB Debtors.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

**D.      DIP Facility Claims.**

All DIP Facility Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon, and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the DIP Order.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, (a) if the Stalking Horse Purchaser is the Successful Bidder, the DIP Facility and the Allowed DIP Facility Claims shall be assumed by the Successful Bidder on the Plan Effective Date and shall continue in force until the obligations under the DIP Facility are indefeasibly paid in full in Cash in accordance with the terms of the documents governing the DIP Facility, and (b) if the Stalking Horse Purchaser is not the Successful Bidder, each Allowed DIP Facility Claim shall be paid in full in Cash on the Plan Effective Date.  If the Successful Bidder assumes the DIP Facility, all Liens and security interests granted by the WLB Debtors to secure the obligations under the DIP Facility shall continue to secure the Collateral under the DIP Facility as transferred pursuant to the Sale Transaction, but such Liens and security interests shall be of no further force and effect with respect to the assets of the WLB Debtors or the Retained Assets without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  If the Allowed DIP Facility Claims are paid in full in Cash, then except as otherwise provided herein, all Liens and security interests granted by the WLB Debtors to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect with respect to the assets of the WLB Debtors or the Retained Assets without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  For the avoidance of doubt, the Plan Effective Date will only occur once the Allowed DIP Facility Claims are satisfied as provided in this paragraph.

**E.      U.S. Trustee.**

The WLB Debtors or the Plan Administrator, as applicable, shall timely pay all U.S. Trustee Fees for each quarter under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the WLB Debtors' businesses, until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the WLB Debtors shall file with the Bankruptcy Court quarterly operating reports in a form reasonably acceptable to the U.S. Trustee.

**F.      Costs and Expenses of the Prepetition Secured Parties, the DIP Lenders, and the DIP Agent.**

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable to the Prepetition Secured Parties (as defined in the DIP Order), the DIP Lenders, or the DIP Agent pursuant to the DIP Order shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash on the Plan Effective Date, or to the extent accrued after the Plan Effective Date, on a current basis in full in Cash as invoiced.  Nothing herein shall require the Prepetition Secured Parties, the DIP Lenders, the DIP Agent, or their respective professionals, to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to the payment of such Allowed Administrative Claims.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.      Summary of Classification.**

This Plan constitutes a separate chapter 11 plan for each WLB Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular WLB Debtor are placed in

Classes for each of the WLB Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the WLB Debtors have not classified Administrative Claims, Priority Tax Claims, DIP Facility Claims, and Professional Fee Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Plan Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.      Treatment of Claims and Interests.**

Except to the extent that the WLB Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, with the consent of the Required Consenting Stakeholders, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the WLB Debtors and the consent of the Required Consenting Stakeholders (not to be unreasonably withheld).

**1.      Class 1—Other Priority Claims.**

(a)      *Classification*:  Class 1 consists of all Other Priority Claims.

(b)      *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

2.  **Class 2—Other Secured Claims.**

    (a)    *Classification*:  Class 2 consists of all Other Secured Claims, including all Secured Tax Claims.

    (b)    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the election of the WLB Debtors (which election shall be subject to the consent of the Required Consenting Stakeholders):

        (i)    payment in full in Cash of such Allowed Other Secured Claim;

        (ii)    the Collateral securing such Allowed Other Secured Claim;

        (iii)    Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

        (iv)    such other treatment rendering such Allowed Other Secured Claim Unimpaired.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

3.  **Class 3—First Lien Secured Claims.**

    (a)    *Classification*:  Class 3 consists of all First Lien Secured Claims.

    (b)    *Allowance*:  The First Lien Secured Claims shall be Allowed in the amount of the Secured portion of the Allowed amount of the First Lien Claims in the aggregate (as set forth in <u>Article VIII.A.2</u> of the Plan).

    (c)    *Treatment*:  Each Holder of an Allowed First Lien Secured Claim will receive, as applicable:

        (i)    <u>If the Stalking Horse Purchaser is the Successful Bidder</u>, its Pro Rata share, based on the Allowed amount of its Credit Agreement Claim or First Lien Notes Claim, as applicable, of (x) the Purchaser Stock and (if applicable) all debt issued by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all other proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims and are not Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors; or

        (ii)    <u>If the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not Consummated</u>, payment in full in Cash.

    (d)    *Voting*:  Class 3 is Impaired under the Plan.  Each Holder of an Allowed First Lien Secured Claim is entitled to vote to accept or reject the Plan.

4.  **Class 4—General Unsecured Claims.**

    (a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)      *Treatment*:  Each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the General Unsecured Claims Amount as provided in <u>Article IVH</u>.

(c)      *Voting*:  Class 4 is Impaired.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**5.   Class 5—Intercompany Claims.**

(a)      *Classification*:  Class 5 consists of all Intercompany Claims.

(b)      *Treatment*:  Each Intercompany Claim will, at the election of the WLB Debtors (with such election being subject to the consent of the Required Consenting Stakeholders), be:

   (i)      Reinstated; or

   (ii)     canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)      *Voting*:  Class 5 is either:

   (i)      Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

   (ii)     Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Claims in Class 5 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Claim in Class 5 will not be entitled to vote to accept or reject the Plan.

**6.   Class 6—Intercompany Interests.**

(a)      *Classification*:  Class 6 consists of all Intercompany Interests.

(b)      *Treatment*:  Intercompany Interests will, at the election of the WLB Debtors (with such election being subject to the consent of the Required Consenting Stakeholders), be:

   (i)      Reinstated; or

   (ii)     canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)      *Voting*:  Class 6 is either:

   (i)      Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

   (ii)     Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Interests in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Interest in Class 6 will not be entitled to vote to accept or reject the Plan.

7.    **Class 7—Section 510(b) Claims.**

    (a)    *Classification:*  Class 7 consists of all Section 510(b) Claims.

    (b)    *Treatment:*  Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

    (c)    *Voting:*  Class 7 is Impaired and not receiving any distribution under the Plan.  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

8.    **Class 8—WCC Interests.**

    (a)    *Classification:*  Class 8 consists of all WCC Interests.

    (b)    *Treatment*:  ***On the Post-Closing Reconciliation Date***, WCC Interests will be canceled, released, and extinguished, and will be of no further force or effect.  Each Holder of a WCC Interest will not receive any distribution on account of such Interest.

    (c)    *Voting*:  Class 8 is Impaired and not receiving any distribution under the Plan.  Each Holder of a WCC Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**C.    Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the WLB Debtors with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**D.    Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.    Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Acceptance of the Plan by either Class 3 or 4 will satisfy section 1129(a)(10) of the Bankruptcy Code.  The WLB Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The WLB Debtors reserve the right to modify the Plan in accordance with <u>Article XII</u> to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.      **Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the WLB Debtors reserve the right to re-classify any Allowed Claim (except for any First Lien Claims or DIP Facility Claims) or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      **General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the WLB Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      **Sources of Plan Consideration.**

Cash on hand, the Purchaser Stock, debt issued (or assumed) by the Purchaser or any of its subsidiaries (as set forth in the Description of Transaction Steps), the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the Wind-Down Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the WLB Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.  Unless otherwise agreed in writing by the WLB Debtors and the Purchaser, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the WLB Debtors.

C.      **Sale Transaction.**

1.      **Sale Transactions.**

(a)      **The Transferred Assets**.

Following the Confirmation Date, the WLB Debtors shall be authorized to consummate the Sale Transaction to the Successful Bidder pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

Subject to the terms of the Sale Transaction Documentation, on the Plan Effective Date, the WLB Debtors shall consummate the Sale Transaction by, among other things, transferring the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets, and all Transferred Causes of Action held by the WLB Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the

Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan and the Confirmation Order.  Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction Documentation and the Plan, and any documents in connection herewith and therewith, shall be deemed authorized and approved without any requirement of further act or action by the WLB Debtors, the WLB Debtors' shareholders or boards of directors, or any other Entity or Person.  The WLB Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by, the Sale Transaction Documentation and this Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

The transactions contemplated by the Sale Transaction Documentation and this Plan are undertaken by the WLB Debtors and the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the transactions contemplated thereunder and hereunder shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease to the Successful Bidder).  The Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

If the Stalking Horse Purchaser is the Successful Bidder, the Sale Transaction may be structured either as a taxable transaction or a reorganization under section 368(a)(1)(G) (a "G Reorganization") of the Internal Revenue Code, as set forth in the Description of Transaction Steps.

(b)  **The Non-Core Asset Marketing Process.**

In accordance with the Bidding Procedures Order, and independent from the contemplated Sale Transaction, the WLB Debtors have marketed the Non-Core Assets for sale pursuant to the Non-Core Asset Marketing Process.  To the extent a third party has agreed, prior to the Plan Effective Date, to acquire a Non-Core Asset, such Non-Core Asset will not be a Transferred Asset and will not be included in the Sale Transaction.  However, any Non-Core Asset that a third party has not agreed to acquire by the Plan Effective Date will be a Transferred Asset transferred to the Purchaser pursuant to the Sale Transaction.  Cash proceeds (if any) of any Non-Core Asset Sale received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan.

2.  **Purchaser Stock.**

On the Plan Effective Date, Purchaser is authorized to issue or cause to be issued and shall issue the Purchaser Stock consistent with the Description of Transaction Steps for eventual distribution to the Holders of Allowed First Lien Claims (if the Stalking Horse Purchaser is the Successful Bidder) in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  The Purchaser Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the Purchaser Stock issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.  Other than as contemplated through the issuance of Purchaser Stock pursuant to this Plan, the Sale Transaction, and the Employee Incentive Plan, there shall exist on the Effective Date no nonvoting equity securities in the Purchaser.

3.  **Restructuring Transactions.**

Upon the entry of the Confirmation Order, the WLB Debtors, the Plan Administrator, and the Purchaser are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including:  (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent

with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the Purchaser's establishment of the EIP Pool; (6) issuance of the Purchaser Stock and any debt issued or assumed by the Purchaser, each as set forth in the Plan and consistent with the Description of Transaction Steps; (7) any transaction described in the Description of Transaction Steps; and (8) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**4.   Payment of Cure Costs and Other Amounts.**

On the Plan Effective Date, the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and this Plan.  The WLB Debtors (a) shall not have any obligation to make any payment or other distribution on account of any Cure Costs, and (b) shall have the obligation to pay the Purchaser for any amounts that are accrued as of the closing under the Sale Transaction Documentation prorated per diem as of such closing not yet due and payable with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and this Plan.

**5.   Purchaser Consent Rights**

Until such time as the Purchaser is formed and the Purchaser Documentation necessary for the Purchaser to take actions is finalized, all consent, consultation and other rights afforded to the Purchaser in the Plan shall be deemed granted to and controlled by the Required Consenting Stakeholders.

**D.   Vesting of Assets.**

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Plan Effective Date:  (a) the Transferred Assets shall be preserved and shall vest in the Purchaser, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Retained Assets shall vest in the WLB Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances.  For the avoidance of doubt, all Transferred Causes of Action shall be transferred to the Purchaser on the Plan Effective Date, and any Causes of Action held by the WLB Debtors on the Plan Effective Date that are not Transferred Causes of Action shall vest in the WLB Debtors on the Plan Effective Date (and for the avoidance of doubt, any Causes of Action associated only with Non-Core Assets sold to a third party may be transferred to such third party by the WLB Debtors as provided in the documentation for such Non-Core Asset Sales).

On and after the Plan Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the WLB Debtors may operate their businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, following the Plan Effective Date, the Purchaser may operate its businesses and use, acquire, or dispose of property, including the Transferred Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E.      Employee Incentive Plan

Following the Plan Effective Date, the initial board of directors of the Purchaser shall, in its sole discretion, adopt and implement the Employee Incentive Plan, which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

### F.      Wind-Down Amount.

On or prior to the Plan Effective Date, the WLB Debtors shall retain the Wind-Down Amount in accordance with the terms of the Stalking Horse Purchase Agreement, with such amount to be agreed upon by the Purchaser, the Required Consenting Stakeholders, and the WLB Debtors no later than five (5) Business Days prior to the Plan Effective Date.

### G.      Funded Liabilities.

At the option of the Purchaser (such option to be exercised no later than five (5) Business Days prior to the Plan Effective Date), the Funded Liabilities shall either (1) be assumed by the Purchaser (or an affiliate thereof as designated by Purchaser) and thereby become Assumed Liabilities, or (2) not be assumed by the Purchaser, in which case the Wind-Down Amount shall be adjusted such that additional Cash is retained by the WLB Debtors on the Plan Effective Date to satisfy the amount of the Funded Liabilities; *provided* that in no event shall the amount of the Funded Liabilities be in excess of the Funded Liability Cap.  The Funded Liabilities shall take into account any payments made or to be made by third parties, including insurers and sureties, in accordance with Article VIG of the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, Purchaser and its affiliates shall have no obligation to assume or otherwise pay for unsecured (i) Claims (including General Unsecured Claims), (ii) obligations, or (iii) liabilities of the WLB Debtors, including liabilities arising under retiree medical benefit plans, the Black Lung Benefits Act or the Federal Coal Mine Health and Safety Act of 1969.

### H.      The General Unsecured Claims Amount

The General Unsecured Claims Amount shall be used to make distributions on account of Allowed General Unsecured Claims on a Pro Rata basis as set forth in Article III.B.4.  If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount attributable to such Disallowed Claim shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan.

### I.      Wind-Down.

On and after the Plan Effective Date, in accordance with the Wind-Down Budget, the WLB Debtors shall (1) continue in existence for purposes of (a) winding down the WLB Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the Purchaser as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the Sale Transaction Documentation (including with respect to the transfer of permits to the Purchaser as contemplated therein), and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate as set forth in the Plan.

### J.      Plan Administrator.

On and after the Plan Effective Date, the Plan Administrator shall act for the WLB Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the WLB Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the WLB Debtors, and shall succeed to the powers of the WLB Debtors' managers, directors, and officers.  From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the WLB Debtors as further described in Article

VII.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

**K.      Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any WLB Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the WLB Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the WLB Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the WLB Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the WLB Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the WLB Debtors shall be fully released, settled, and compromised; *provided*, however, that notwithstanding anything to the contrary contained herein, any indenture or agreement that governs the rights of the DIP Agent, the Credit Agreement Agent, the Bridge Loan Agent, or the First Lien Notes Trustee shall continue in effect to allow each of them, as applicable, to (A) enforce its rights, Claims, and interests (and those of any predecessor or successor thereto) vis-à-vis any parties other than the WLB Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims, as applicable, in accordance with the terms of such agreements, (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims, as applicable, including any rights to priority of payment and/or to exercise charging liens, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Credit Agreement Agent, the Bridge Loan Agent, the First Lien Notes Trustee or Holders of DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims under the Plan, as applicable; *provided further, however*, to the extent the DIP Facility and the Allowed DIP Facility Claims are assumed by the Successful Bidder, nothing herein shall affect the enforceability of the rights, Claims and interests of the DIP Agent against such Successful Bidder under the agreements relating to the DIP Facility.

**L.      Corporate Action.**

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the WLB Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the WLB Debtors, the Plan Administrator, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the WLB Debtors, including the creation of the Purchaser, the consummation of the Sale Transaction, and the issuance of Purchaser Stock in accordance with the Plan and the Sale Transaction Documentation, and any corporate action required by the WLB Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the WLB Debtors or the WLB Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Purchaser may be formed by a person or entity other than the WLB Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the WLB Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation.  The directors, managers, and officers of the WLB Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of this Article IVL.

The authorizations and approvals contemplated by this Article IV .L shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

**M.**    **Dissolution of the Boards of the WLB Debtors.**

As of the Plan Effective Date, the existing boards of directors or managers, as applicable, of the WLB Debtors shall be dissolved without any further action required on the part of the WLB Debtors or the WLB Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any WLB Debtor shall be dismissed without any further action required on the part of any such WLB Debtor, the equity holders of the WLB Debtors, the officers, directors, or managers, as applicable, of the WLB Debtors, or the members of any WLB Debtor.

As of the Plan Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the WLB Debtors with respect to their affairs other than matters substantially related to the transactions described in Article IVC.1-2 of the Plan.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the WLB Debtors, and shall:  (a) file a certificate of dissolution for any of the WLB Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the WLB Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the WLB Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the WLB Debtors or their Estates for any tax incurred during the administration of such WLB Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the WLB Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the WLB Debtors or any of their affiliates.

**N.**    **Release of Liens.**

Except as otherwise expressly provided herein, on the Plan Effective Date, all Liens on any property of any WLB Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any WLB Debtors shall automatically be discharged and released.

**O.**    **Effectuating Documents; Further Transactions.**

The WLB Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**P.**    **Exemption from Certain Taxes and Fees.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction or the Sale Transaction Documentation or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the WLB Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Q.    Causes of Action.**

As of the Plan Effective Date, the WLB Debtors shall assign and transfer to the Purchaser all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation on the Plan Effective Date. The Transferred Causes of Action shall be set forth and described in the Plan Supplement, the description of which shall be subject to the consent of the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder). Any Causes of Action held by the WLB Debtors on the Plan Effective Date that are not Transferred Causes of Action shall vest in the WLB Debtors on the Plan Effective Date (and for the avoidance of doubt, any Causes of Action associated only with Non-Core Assets sold to a third party may be transferred to such third party by the WLB Debtors as provided in the documentation for such Non-Core Asset Sales).

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Purchaser or the WLB Debtors will not pursue any and all available Causes of Actions against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**R.    [Reserved]**

**S.    The Liquidating Trust**

On the Post-Closing Reconciliation Date or an earlier date, the Liquidating Trust will be formed to implement the Wind Down, including the liquidation of the Liquidating Trust Assets, for the period after the creation of the Liquidating Trust. The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the WLB Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor in interest to the WLB Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed First Lien Claims on a Pro Rata basis as set forth in the Liquidating Trust Agreement.

The Plan Administrator shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the WLB Debtors and the Plan Administrator as set forth in this Plan and applicable non-bankruptcy law, and the Plan Administrator shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement. On and after the Post-Closing Reconciliation Date or the earlier date on which the Liquidating Trust is formed, all references to the WLB Debtors in this Plan shall be deemed references to the Liquidating Trust, and all references to the Plan Administrator shall be deemed references to the Plan Administrator in his role as trustee of the Liquidating Trust (except for references to the WLB Debtors or the Plan Administrator in this Article IVS).

**T.    The Post-Closing Reconciliation Date**

On the Post-Closing Reconciliation Date or an earlier date, (i) the WCC Interests and certain remaining Claims shall automatically be canceled, released, and extinguished, and will be of no further force or effect, and (ii) the Liquidating Trust Assets shall automatically be transferred to the Liquidating Trust, in each case without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

31

Until the occurrence of the Post-Closing Reconciliation Date, Westmoreland Coal Company shall retain its rights, powers, and duties as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code, to the fullest extent necessary to implement the foregoing cancellation of the WCC Interests and treatment of certain remaining Claims, as more fully set forth in the Description of Transaction Steps.

Additional details about the Post-Closing Reconciliation Date shall be set forth in the Description of Transaction Steps.

**U.      Closing the Chapter 11 Cases.**

Upon the occurrence of the Plan Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Westmoreland Coal Company, and all contested matters relating to each of the WLB Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Westmoreland Coal Company.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, and the Post-Closing Reconciliation Date has occurred, the Plan Administrator shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the WLB Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Plan Effective Date, the WLB Debtors shall assume and assign to Purchaser, as part of the Sale Transaction, the Executory Contracts and Unexpired Leases that are required to be assigned to Purchaser pursuant to the Sale Transaction Documentation.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected on the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the WLB Debtors or assumed by the WLB Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Purchaser Documentation; *provided* that, notwithstanding anything to the contrary in the Plan, to the extent any (x) real property leases or related contracts (including royalty agreements and third-party conveyances) and (y) contracts for the purchase, sale, transportation or reclamation of coal, in the case of both (x) and (y), relating to the mines included in the Core Assets and Transferred Non-Core Assets to which any of the WLB Debtors is a party as of the Plan Effective Date are deemed to be, and treated as though they are, Executory Contracts or Unexpired Leases, such leases or contracts shall automatically be deemed assumed and assigned to the Purchaser on the Plan Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Sale Transaction Documentation and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan or Sale Transaction Documentation are effective as of the Plan Effective Date.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the WLB Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days after the earlier of the Plan Effective Date or the effective date of the rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 14 days after service of the WLB Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim. Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the WLB Debtors, the WLB Debtors' Estates, or the property for any of the foregoing without the need for any objection by the WLB Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the WLB Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate WLB Debtor, except as otherwise provided by order of the Bankruptcy Court.

**C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed by the WLB Debtors as set forth in Article V.A, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Costs in Cash on or about the Plan Effective Date, subject to the limitations described below and set forth in the Sale Transaction Documentation and Article IV.C herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the Cure Costs, (2) the ability of the Successful Bidder or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Unless otherwise provided by an order of the Bankruptcy Court or in the Sale Transaction Documentation, at least 14 days before the Voting Deadline, the WLB Debtors shall cause Cure Notices of proposed assumption to be sent to applicable counterparties. Any objection by such counterparty must be Filed, served, and actually received by the WLB Debtors not later than January 10, 2019 at 4:00 p.m. (prevailing Central Time) as set forth in the Bidding Procedures Order. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption.

In any case, if the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the WLB Debtors or, with respect to the Assigned Contracts and Leases, the Successful Bidder (in accordance with the Sale Transaction Documentation) will have the right to remove such Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Plan Effective Date.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or

Unexpired Lease at any time before the date that the WLB Debtors assume such Executory Contract or Unexpired Lease. **All liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.

**D.      D&O Policies.**

The D&O Policies shall be assumed by the WLB Debtors on behalf of the applicable WLB Debtor effective as of the Plan Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the WLB Debtors or the WLB Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Plan Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

**E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the WLB Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

**F.      Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contracts and Leases List, nor anything contained in the Plan or Sale Transaction Documentation, shall constitute an admission by the WLB Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any WLB Debtor or any other Entity, as applicable, has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the WLB Debtors or the Plan Administrator, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**G.      Nonoccurrence of Plan Effective Date.**

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.      Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the WLB Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the WLB Debtors or the Plan Administrator on behalf of the WLB Debtors, as applicable. In the event

34

that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**B.      Rights and Powers of the Plan Administrator.**

**1.      Powers of the WLB Debtors and the Plan Administrator.**

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter by the WLB Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the WLB Debtors or the Plan Administrator, as applicable.

On and after the Plan Effective Date, the Plan Administrator and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof.

The WLB Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Plan Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the WLB Debtors.

**2.      Fees of Plan Administrator and Expenses Incurred On or After the Plan Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash by the WLB Debtors if such amounts relate to any actions taken hereunder.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.      Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the WLB Debtors, the Plan Administrator, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date shall not apply to the First Lien Notes Trustee with respect to beneficial holders of the First Lien Notes Claims.

**2.      Delivery of Distributions on DIP Facility Claims.**

Notwithstanding any provision of the Plan to the contrary, to the extent the Stalking Horse Purchaser is not the Successful Bidder, all distributions on account of Allowed DIP Facility Claims shall be governed by the documents governing the DIP Facility and such distribution shall be deemed completed when made to the DIP Facility Agent, which shall be deemed the Holder of their respective portion of the Allowed DIP Facility Claims for purposes of distributions to be made hereunder.  The DIP Facility Agent shall hold or direct such distributions for the benefit of their respective Holders of Allowed DIP Facility Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the DIP Facility Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of DIP Facility Claims.

3.    **Delivery of Distributions on Credit Agreement Claims.**

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed Credit Agreement Claims shall be governed by the Credit Agreement and shall be deemed completed when made to the Credit Agreement Agent, which shall be deemed the Holder of their respective portion of the Allowed Credit Agreement Claims for purposes of distributions to be made hereunder.  The Credit Agreement Agent shall hold or direct such distributions for the benefit of their respective Holders of Allowed Credit Agreement Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the Credit Agreement Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of Credit Agreement Claims.

4.    **Delivery of Distributions on First Lien Notes Claims.**

Notwithstanding any provision of the Plan to the contrary, all distributions to Holders of Allowed First Lien Notes Claims shall be deemed completed when made to the First Lien Notes Trustee.  The First Lien Notes Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with beneficial holders of First Lien Notes Claims to the extent consistent with the customary practices of DTC.  Such distributions shall be subject in all respects to the rights of the First Lien Notes Trustee to assert its charging lien under the First Lien Notes Indenture against such distributions.  Distributions to be made to beneficial holders of First Lien Notes Claims may be eligible to be distributed through the facilities of DTC and as provided for under the First Lien Notes Indenture.

5.    **Delivery of Distributions in General.**

(a)    Payments and Distributions on Disputed Claims.

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator, be deemed to have been made by the Plan Administrator on the Plan Effective Date unless the Plan Administrator and the Holder of such Claim agree otherwise.

(b)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the WLB Debtors or the Plan Administrator, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)    Distributions.

On and after the Plan Effective Date, the WLB Debtors shall make the distributions required to be made on account of Allowed Claims under the Plan.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the WLB Debtors in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed. Subject to Article VI.E, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

6.    **Minimum;** *De Minimis* **Distributions.**

No Cash payment of less than $1,000, in the reasonable discretion of the Plan Administrator, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

**7.     Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made.   After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the WLB Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

**8.     Manner of Payment Pursuant to the Plan.**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator.

**D.     Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Plan Administrator shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies.   Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate.   The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.   All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

**E.     Allocation of Plan Distributions Between Principal and Interest.**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

**F.     Setoffs and Recoupment.**

Except as otherwise expressly provided herein, the WLB Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the WLB Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the WLB Debtors of any such Claim it may have against the Holder of such Claim.

**G.     Claims Paid or Payable by Third Parties.**

**1.     Claims Paid by Third Parties.**

The WLB Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a WLB Debtor.   Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a

distribution on account of such Claim and receives payment from a party that is not a WLB Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the WLB Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the WLB Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

 2. **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the WLB Debtors' insurance policies, surety agreements, other non-WLB Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-WLB Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the WLB Debtors' insurers, sureties, or non-WLB Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

 3. **Applicability of Insurance Policies.**

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the WLB Debtor's insurance policies with respect to such policies, including the D&O Policies.

**H. Indefeasible Distributions.**

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

**I. Exemption from Securities Laws.**

To the extent the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser in connection with the Purchaser Documentation or the assumption of the DIP Facility Claims to Holders of Allowed First Lien Claims or DIP Facility Claims (as applicable), shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  These Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "affiliate" of the Purchaser within the meaning of Rule 144 under the Securities Act.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  To the extent any Entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.

**ARTICLE VII**
**THE PLAN ADMINISTRATOR**

**A. The Plan Administrator.**

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Wind-Down Amount and the General Unsecured Claims Amount, and wind

down the businesses and affairs of the WLB Debtors, including: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount and the General Unsecured Claims Amount; (3) making distributions from the Wind-Down Amount and the General Unsecured Claims Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the WLB Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the WLB Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the WLB Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the WLB Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the WLB Debtors in the Plan Administrator Agreement shall be terminated.

    **1.   Plan Administrator Rights and Powers.**

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

    **2.   Retention of Professionals.**

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the WLB Debtors upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business by the WLB Debtors and shall not be subject to the approval of the Bankruptcy Court.

    **3.   Compensation of the Plan Administrator.**

The Plan Administrator's post-Plan Effective Date compensation, the amount and terms of which are subject to the consent of the Required Consenting Stakeholders, will be set forth in the Plan Supplement and paid by the WLB Debtors.

    **4.   Plan Administrator Expenses.**

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the WLB Debtors on or after the Plan Effective Date, or in any manner connected, incidental or related thereto, in effecting distributions from the WLB Debtors thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Retained Assets remaining from time to time in the hands of the Plan Administrator. Such costs, expenses and obligations shall be paid by the Liquidating Trust as they are incurred without the need for Bankruptcy Court approval.

**B.      Wind-Down.**

On and after the Plan Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the WLB Debtors' Estates.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall:  (1) cause the WLB Debtors to comply with, and abide by, the terms of the Sale Transaction Documentation and any other documents contemplated thereby; (2) take any actions necessary to wind down the WLB Debtors' Estates; *provided* that the WLB Debtors shall not be dissolved until the satisfaction of the conditions precedent to such dissolution in Article VIII; (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Plan Effective Date, except as set forth herein, the WLB Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the WLB Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to this Plan all Interests (except, prior to the Post-Closing Reconciliation Date, the WCC Interests), and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date.

The filing of the final monthly operating report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

**C.      Exculpation; Indemnification; Insurance; Liability Limitation.**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the WLB Debtors.  The Plan Administrator may obtain, at the expense of the WLB Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the WLB Debtors.  The Plan Administrator may rely upon written information previously generated by the WLB Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the WLB Debtors.

**D.      Tax Returns.**

After the Plan Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the WLB Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such WLB Debtor or its Estate for any tax incurred during the administration of such WLB Debtor's Chapter 11 Case, as determined under applicable tax laws.

**E.      Dissolution of the WLB Debtors.**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Post-Closing Reconciliation Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the WLB Debtors' Chapter 11 Cases, the WLB Debtors shall be deemed to be dissolved without any further action by the WLB Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the WLB Debtors is formed or any other jurisdiction.  The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the WLB Debtors in and withdraw the WLB Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the WLB Debtors' dissolution on or after the Post-Closing Reconciliation Date, the WLB Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the WLB Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement), such Cash or other property shall be immediately allocated and distributed to the Holders of Allowed First Lien Claims.

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.      Allowance of Claims and Interests.**

**1.      General.**

On and after the Plan Effective Date, the WLB Debtors shall have and shall retain any and all rights and defenses that the WLB Debtors had with respect to any Claim or Interest immediately before the Plan Effective Date, and, to the extent that any Claim or Interest constitutes a Transferred Asset, the Successful Bidder shall have and retain any and all rights and defenses that the applicable WLB Debtor had with respect to any Claim or any Interest immediately before the Plan Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the WLB Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

**2.      Allowance of First Lien Claims.**

The First Lien Claims shall be deemed Allowed as of the Petition Date, with the Credit Agreement Claims being Allowed in the principal amount of $[319,773,165.17], and the First Lien Notes Claims being Allowed in the principal amount of $[350,000,000.00], plus, for each of the Credit Agreement Claims and the First Lien Notes Claims, accrued and unpaid interest, plus fees and other expenses due under the Credit Agreement and the First Lien Notes Indenture, as applicable.

**B.      Claims and Interests Administration Responsibilities.**

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Plan Effective Date, the WLB Debtors, by order of the Bankruptcy Court, shall have the sole authority, in consultation with the Consenting Stakeholders with regard to all Claims: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**C.      Estimation of Claims and Interests.**

As of the Plan Effective Date, the WLB Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable law, including pursuant to section 502(c) of

the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**D.      Adjustment to Claims or Interests without Objection.**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**E.      Time to File Objections to Claims.**

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Plan Effective Date and (2) such other period of limitation as may be specifically fixed by the WLB Debtors or by a Final Order for objecting to such claims.

**F.      Disallowance of Claims.**

Other than with respect to Claims Allowed under the Plan, to the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall automatically be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the WLB Debtors by that Entity have been turned over or paid to the WLB Debtors or the Plan Administrator.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**G.      Amendments to Claims.**

On or after the Plan Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the WLB Debtors or the Plan Administrator, as applicable, and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action.

**H.      No Distributions Pending Allowance.**

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VIII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made

on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

**I.      Distributions After Allowance.**

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

**J.      Undeliverable Distribution Reserve.**

**1.      Deposits.**

If a distribution under the Plan to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed or is an Undeliverable Distribution, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.C.7.

**2.      Disclaimer.**

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Holder of a Claim, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notices of unclaimed distributions.

**3.      Distribution from Reserve.**

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an unclaimed or undeliverable distribution (*provided* that satisfaction occurs within the time limits set forth in Article VI.C.7), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the unclaimed or undeliverable distribution attributable to such Claim, including the interest that has accrued on such unclaimed or undeliverable distribution while in the Undeliverable Distribution Reserve, to such Holder.

**K.      Single Satisfaction of Claims.**

Holders of Allowed Claims may assert such Claims against the WLB Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the WLB Debtors based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

**ARTICLE IX**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.      Settlement, Compromise, and Release of Claims and Interests.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith

compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the WLB Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the WLB Debtors and their Estates and Causes of Action against other Entities.

**B.        Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the WLB Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the WLB Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

**C.        Release of Liens.**

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than the mortgages, deeds of trust, Liens, pledges or other security interests in place or to be issued for the DIP Facility if assumed by the Purchaser) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the WLB Debtors and their successors and assigns or (ii) the Purchaser (and if applicable, any third party purchasing the Non-Core Assets), in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the WLB Debtors.  In addition, the First Lien Notes Trustee and Credit Agreement Agent shall execute and deliver all documents reasonably requested by the WLB Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the WLB Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

**D.        Releases by the WLB Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the WLB Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the**

WLB Debtors, that the WLB Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a WLB Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' capital structure, the assertion or enforcement of rights and remedies against the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence. Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the WLB Debtors and after notice and opportunity for hearing; and (6) a bar to any of the WLB Debtors asserting any claim released by the releases herein against any of the Released Parties.

E.      Releases by Holders of Claims and Interests.

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement)

executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

F.       Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

G.       Injunction.

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the WLB Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to

46

any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## H.    Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the WLB Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the WLB Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## I.    Subordination Rights.

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## J.    Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## K.    Reservation of the United States.

As to the United States, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the WLB Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the United States against any of the WLB Debtors; or (d) any liability of the WLB Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-WLB Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the WLB Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

**ARTICLE X**
**EFFECT OF CONFIRMATION OF THE PLAN**

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

**A.      Jurisdiction and Venue**

On the Petition Date, the WLB Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The WLB Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

**B.      Order Approving the Disclosure Statement**

On [●], the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

**C.      Voting Report**

Prior to the Confirmation Hearing, the Claims and Notice Agent filed the Voting Report.  All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.  Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

**D.      Judicial Notice**

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing).

Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

**E.      Transmittal and Mailing of Materials; Notice**

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article IX of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests; (2) parties that requested notice in accordance with Bankruptcy Rule 2002; (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Disclosure Statement Order and the Bidding Procedures Order, and such transmittal and service were appropriate, adequate, and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Disclosure Statement Order and the Bidding Procedures Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

**F.      Solicitation**

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations.  The WLB Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article IX of the Plan.  The WLB Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser that were offered or sold under the Plan, and, pursuant to section 1125(e) of the Bankruptcy Code, no Released Party is or shall be liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such Securities.

**G.      Burden of Proof**

The WLB Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.  The Bankruptcy Court also finds that the WLB Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

**H.      Bankruptcy Rule 3016(a) Compliance**

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

**I.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

The Plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

**1.      Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

49

(a)       Standing

Each of the WLB Debtors has standing to file a plan and the WLB Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

(b)       Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, <u>Article III</u> of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

(c)       Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies all Classes of Claims and Interests that are not Impaired.

(d)       Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

(e)       No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, <u>Article III</u> of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

(f)       Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Immediately upon the Plan Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Plan Effective Date pursuant to the terms of the Plan.  Moreover, <u>Article IV</u> and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

(g)       Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The Purchaser Documentation complies with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code

(h)       Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired under the Plan, (ii) Class 3 (First Lien Claims), Class 4 (General Unsecured Claims), Class 8 (Section 510(b) Claims), and Class 9 (WCC Interests) are Impaired under the Plan, and (iii) Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the WLB Debtors or the Plan Administrator (with such election being subject to the consent of the Required Consenting Stakeholders).

(i)       Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to <u>Article VA</u> of the Plan, as of the Plan Effective Date, all Executory Contracts and Unexpired Leases listed on the Assumed Contracts and Leases

List will be deemed:  (A) assumed by the applicable WLB Debtor in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; and (B) if so indicated on the Assumed Contracts and Leases List, assigned to the other party identified as the assignee for each assumed Executory Contract or Unexpired Lease.  Pursuant to <u>Article VA</u> of the Plan, each WLB Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the WLB Debtors or assumed by the WLB Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Purchaser Documentation.  The WLB Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Assumed Contracts and Leases List pursuant to <u>Article V</u> of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b)(2) of the Bankruptcy Code.

The WLB Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan.  Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to <u>Article V</u> of the Plan will be legal, valid and binding upon the applicable WLB Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code.  Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

 (j) Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the WLB Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

In reaching an ultimate decision on substantive fairness, the Court considered the following factors:  (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

 (k) Cure of Defaults

<u>Article V</u> of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  The Cure Costs identified in the Assumed Contracts and Leases List and any amendments thereto, as applicable, represent the amount, if any, that the WLB Debtors or the Purchaser, as applicable, propose to pay in full and complete satisfaction of such default claims.  Any disputed cure amounts will be determined in accordance with the procedures set forth in <u>Article V</u> of the Plan, and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the WLB Debtors or the Purchaser, as applicable, will cure, or provide adequate assurance that the WLB Debtors or the Purchaser, as applicable, will promptly cure, defaults with Executory Contracts and Unexpired

Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

> (l)      Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including without limitation, provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, (v) procedures governing cure disputes, and (vi) indemnification obligations.

**2.    Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code**

The WLB Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.  In particular, the WLB Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.  Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.  Accordingly, the WLB Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

**3.    Section 1129(a)(3)–Proposal of Plan in Good Faith**

The WLB Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the WLB Debtors to reorganize.

**4.    Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable**

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved.  The fees and expenses incurred by Professionals retained by the WLB Debtors or the Committee shall be payable according to the orders approving such Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.  In addition, the fees of the Prepetition Secured Parties and the DIP Agent shall be paid as provided for in the Plan and the DIP Order.

**5.    Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy**

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the person proposed to serve as the Plan Administrator and his or her compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

**6.    Section 1129(a)(6)–Approval of Rate Changes**

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the WLB Debtors.

7. **Section 1129(a)(7)–Best Interests of Creditors and Interest Holders**

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable. The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable. With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Plan Effective Date, that is not less than the amount such Holder would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code.

8. **Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class**

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan. Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9. **Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

10. **Section 1129(a)(10)–Acceptance by at Least One Impaired Class**

At least one Impaired Class has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

11. **Section 1129(a)(11)–Feasibility of the Plan**

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the WLB Debtors or any successor to the WLB Debtors under the Plan, except as such liquidation is proposed in the Plan. Furthermore, the WLB Debtors will have adequate assets to satisfy their respective obligations under the Plan.

12. **Section 1129(a)(12)–Payment of Bankruptcy Fees**

Article XIVC of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

13. **Section 1129(a)(13)–Retiree Benefits**

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

**14. Section 1129(a)(14)–Domestic Support Obligations**

The WLB Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

**15. Section 1129(a)(15)–The WLB Debtors Are Not Individuals**

The WLB Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

**16. Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers**

Each of the WLB Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

**17. Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes**

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any). To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." To determine whether a plan is "fair and equitable" with respect to a class of interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan. The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

**18. Section 1129(c)–Confirmation of Only One Plan With Respect to the WLB Debtors**

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the WLB Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

**19. Section 1129(d)–Principal Purpose Not Avoidance of Taxes**

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**20. Section 1129(e)–Small Business Case**

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

**J. Securities Under the Plan**

Pursuant to the Plan, and without further corporate or other action, the Purchaser Stock and any debt issued or assumed by the Purchaser will be issued by the Purchaser on the Plan Effective Date subject to the terms of the Plan.

**K.**     **Releases and Discharges**

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the WLB Debtors and by Holders of Claims, constitute good faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan:  (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the WLB Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the WLB Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article IX of the Plan, are (i) essential elements of the Sale Transaction and Plan, (ii) terms and conditions without which the Consenting Stakeholders would not have entered into the RSA and the Purchaser would not have entered into the Sale Transaction Documentation, (iii) narrowly tailored, and (iv) in consideration of the substantial financial contribution of the Purchaser under the Plan.  Furthermore, the injunction set forth in Article IX is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

**L.**     **Release and Retention of Causes of Action**

It is in the best interests of Holders of Claims and Interests that the provisions in Article IVQ of the Plan be approved.

**M.**     **Approval of Purchase Agreement and Other Documents and Agreements**

All documents and agreements necessary to implement the Plan, including the Sale Transaction Documentation, are essential elements of the Plan, are necessary to consummate the Plan and the Sale Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the WLB Debtors, the Estates, and Holders of Claims and Interests.  The WLB Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Plan Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

**N.**     **Confirmation Hearing Exhibits**

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

**O.**     **Objections to Confirmation of the Plan**

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

**P.**     **Exemption from Transfer Taxes with Respect to the Sale Transaction**

The Sale Transaction constitutes a sale or transfer under a plan confirmed under section 1129 of the Bankruptcy Code and, accordingly, the Sale Transaction shall not be subject to any tax under any law imposing a

stamp tax or similar tax, including any real or personal property transfer tax, pursuant to section 1146(a) of the Bankruptcy Code.

**Q.      Good Faith Purchaser Status**

The Purchaser is a good faith purchaser for the purposes of section 363(m) of the Bankruptcy Code and entitled to the benefits thereof in relation to the Sale Transaction.

**R.      Sale Free and Clear**

All assets and rights sold by the WLB Debtors under the Sale Transaction Documentation are transferred, conveyed, and assigned to the Purchaser free and clear of all Liens, Claims, encumbrances, and interests pursuant to sections 363(f), 1123(a)(5), and 1141(c) of the Bankruptcy Code.

**S.      Retention of Jurisdiction**

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XIII of the Plan and section 1142 of the Bankruptcy Code.

**T.      Plan Supplement**

The WLB Debtors filed the Plan Supplement, which includes the following documents:  (1) the Assumed Contracts and Leases List; (2) the identity of the Plan Administrator and the compensation of the Plan Administrator; (3) the General Unsecured Claims Amount; (4) the Wind-Down Budget; (5) the Description of Transaction Steps; (6) the Purchaser Documentation; (7) the Liquidating Trust Agreement; (8) those Transferred Causes of Action that shall be transferred to the Purchaser pursuant to the Sale Transaction Documentation; and (9) the Plan Administrator Agreement; *provided* that the Description of Transaction Steps is subject to modification until the Plan Effective Date.  All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO CONFIRMATION,**
**THE PLAN EFFECTIVE DATE, AND THE POST-CLOSING RECONCILIATION DATE**

**A.      Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:  (1) the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order; and (2) the Sale Transaction Documentation shall not have been terminated in accordance with its terms.

**B.      Conditions Precedent to the Plan Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order; *provided* that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.      the occurrence of the Closing (as such term is defined and described in the Sale Transaction Documentation);

3.      the RSA shall not have terminated and remain in full force and effect;

4.      the General Unsecured Claims Amount (if any) shall have been funded;

5.      the Disclosure Statement Order and the Confirmation Order shall have been entered and shall not have been stayed, modified, or vacated on appeal;

6.      the WLB Debtors have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

7.      the establishment of a Professional Fee Escrow Account funded in the amount of estimated accrued but unpaid Professional fees incurred by the legal counsel and other advisors to the WLB Debtors and any statutory committees during the Chapter 11 Cases;

8.      the Purchaser (or an Affiliate thereof) has paid the Wind-Down Amount to the WLB Debtors in accordance with, and as limited by, the terms of the Sale Transaction Documentation;

9.      all schedules, documents, supplements and exhibits to the Plan shall be, in form and substance, in accordance with the terms of the RSA;

10.     all fees and expenses of the Bridge Loan Agent, the Credit Agreement Agent, the DIP Agent, the First Lien Notes Trustee and the Consenting Stakeholders payable pursuant to the DIP Order shall have been paid in full; and

11.     any and all requisite governmental, regulatory and third-party approvals and consents shall have been obtained.

On the Plan Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**C.      Conditions Precedent to the Post-Closing Reconciliation Date**

It shall be a condition to the occurrence of the Post-Closing Reconciliation Date that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the earlier to occur of (i) the closing of the WMLP Sale and (ii) if the Sale Transaction is structured as a G Reorganization, December 31, 2020; and

2.      the Plan Effective Date shall have occurred.

**D.      Waiver of Conditions.**

The conditions to Consummation of the Plan set forth in Article XI.B and the conditions to the Post-Closing Reconciliation Date set forth in Article XI.C may be waived by the WLB Debtors; *provided* that the conditions set forth in Article XI.B.1, Article XI.B.2, Article XI.B.3, Article XI.B.4, and Article XI.B.9 may not be waived without the consent of the Required Consenting Stakeholders and the condition set forth in Article XI.B.10 may not be waived without the consent of the parties named therein.

**E.      Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

**F.**      **Effect of Non-Occurrence of Conditions to the Plan Effective Date.**

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the WLB Debtors; (2) prejudice in any manner the rights of the WLB Debtors, the WLB Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the WLB Debtors, the WLB Debtors' Estates, any Holders, or any other Entity in any respect.

**ARTICLE XII**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.**      **Modification and Amendments.**

Subject to the limitations contained in the Plan, the RSA, and the Sale Transaction Documentation, the WLB Debtors, with the consent (not to be unreasonably withheld) of the Required Consenting Stakeholders and the Successful Bidder, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the RSA, and the Sale Transaction Documentation, the WLB Debtors, with the consent (not to be unreasonably withheld) of the Required Consenting Stakeholders and the Successful Bidder, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the WLB Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.

**B.**      **Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**      **Revocation or Withdrawal of the Plan.**

Subject to the terms of the RSA and the Sale Transaction Documentation, the WLB Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any WLB Debtor or all WLB Debtors, prior to the Confirmation Date.  If the WLB Debtors revoke or withdraw the Plan with respect to any WLB Debtor, or if Confirmation or Consummation does not occur with respect to any WLB Debtor, then:  (1) the Plan with respect to such WLB Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such WLB Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such WLB Debtor, and any document or agreement executed pursuant to the Plan with respect to such WLB Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such WLB Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the WLB Debtors, the WLB Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the WLB Debtors, the WLB Debtors' Estates, or any other Entity.

**ARTICLE XIII**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a WLB Debtor is party or with respect to which a WLB Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the WLB Debtors amending, modifying, or supplementing, after the Plan Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Assumed Contracts and Leases List or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a WLB Debtor that may be pending on the Plan Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1 of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Transaction Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.     Hear and determine all disputes involving the existence, nature, or scope of the WLB Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Plan Effective Date;

24.     Enforce all orders previously entered by the Bankruptcy Court;

25.     To resolve any disputes arising under the Sale Transaction Documentation or other documents related to the Sale Transaction;

26.     Hear any other matter not inconsistent with the Bankruptcy Code; and

27.     Enter an order concluding or closing the Chapter 11 Cases.


## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

### A.     Immediate Binding Effect.

Subject to Article VIII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the WLB Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-WLB Debtor parties to Executory Contracts and Unexpired Leases with the WLB Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.      Additional Documents.**

On or before the Plan Effective Date, the WLB Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The WLB Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the WLB Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**D.      Dissolution of Statutory Committees.**

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Plan Effective Date.

**E.      Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the WLB Debtors or any WLB Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the WLB Debtors or any WLB Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

**F.      Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**G.      Service of Documents.**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the WLB Debtors shall be served on:

**1.      the WLB Debtors:**

Westmoreland Coal Company
9540 South Maroon Circle, Suite 300
Englewood, Colorado 80112
Attention: Jennifer Grafton, Chief Legal Officer and Chief Administrative Officer
Email address: jgrafton@westmoreland.com

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654

Attention:  Gregory Pesce
Email addresses: gregory.pesce@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Stephen E. Hessler, P.C.
Email addresses: stephen.hessler@kirkland.com

**2.   the Consenting Stakeholders:**

Consenting Stakeholder Notice Parties (as defined in the RSA) listed on **Schedule 3** to the RSA.

with copies to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention:  Thomas Moers Mayer and Stephen Zide
Email addresses: tmayer@kramerlevin.com; szide@kramerlevin.com

After the Plan Effective Date, the WLB Debtors shall have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Plan Effective Date, the WLB Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**H.   Enforcement of Confirmation Order.**

On and after the Plan Effective Date, the WLB Debtors, the Plan Administrator, and the Successful Bidder, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan.

**I.   Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the injunction set forth in Article IX.G) shall remain in full force and effect in accordance with their terms.

**J.   Compensation and Benefits Programs.**

On the Plan Effective Date or as soon as practicable thereafter, the WLB Debtors shall pay all compensation and benefit obligations under any present compensation, benefit, or incentive programs, including any programs approved pursuant to the Wages Order, the Insider Incentive Plan Order (if any), and the Non-Insider Retention Plan Order (if any), other than any compensation, benefit, and incentive obligations assumed by the Purchaser pursuant to the Sale Transaction Documentation.  Immediately upon the occurrence of the Plan Effective Date, employee participants in the programs approved pursuant to any Insider Incentive Plan Order or Non-Insider Retention Plan Order shall be entitled to an award under such programs based on performance during the period between January 1, 2018 and the Plan Effective Date, to be paid by the WLB Debtors on the occurrence of the Plan Effective Date.  On and after the Plan Effective Date, the Plan Administrator shall have the authority to direct disbursements of the awards and allocations of such disbursements to be determined by the WLB Debtors' existing

independent directors, subject to and in accordance with any present compensation, benefit, or incentive programs expressly approved pursuant to a prior Court order, including the Wages Order, the Insider Incentive Plan Order (if any), or the Non-Insider Retention Plan Order (if any).

**K.      Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, the Sale Transaction Documentation, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**L.      Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the WLB Debtors' counsel at the address above or by downloading such exhibits and documents from the WLB Debtors' restructuring website at http://www.donlinrecano.com/westmoreland or the Bankruptcy Court's website at www.txsb.uscourts.gov/bankruptcy.

**M.      Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the WLB Debtors (with the consent of the Required Consenting Stakeholders), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided*, *further*, that any such alteration or interpretation shall be acceptable to the WLB Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the WLB Debtors; and (3) nonseverable and mutually dependent.

**N.      Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the WLB Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the WLB Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**O.      Waiver.**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the WLB Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted,

Dated:  October 25, 2018

WESTMORELAND COAL COMPANY
on behalf of itself and all other WLB Debtors

*/s/ Michael G. Hutchinson*

Name: Michael G. Hutchinson
Title: Chief Executive Officer
Company: Westmoreland Coal Company

**<u>Schedule 1</u>**

**Core Assets**

**[TO COME]**

**<u>Schedule 2</u>**

**Non-Core Assets**

**[TO COME]**