**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.* | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |


**OBECTION OF MAR-BOW VALUE PARTNERS, LLC,
A CREDITOR, TO THE DEBTORS' APPLICATION
FOR APPROVAL OF THE EMPLOYMENT OF
<u>MCKINSEY RESTRUCTURING AND TRANSFORMATION SERVICES U.S., LLC</u>**
(Relates to Docket No. 452)

TABLE OF CONTENTS

I.      Summary of Argument ................................................................................... 1

II.     McKinsey Is One Firm: MIO's Connections Are McKinsey RTS's Connections. ............ 7

        A.      McKinsey & Company, Inc. ................................................................. 8

        B.      McKinsey RTS ................................................................................. 9

        C.      McKinsey Investment Office .............................................................. 12

                1.      MIO Management ................................................................ 12

                2.      MIO Investments ................................................................. 13

                3.      Information Available About MIO Investments ......................... 14

        D.      McKinsey Is One Firm....................................................................... 18

        E.      McKinsey RTS's Attempt to Demonstrate That MIO Is Separate Utterly Fails
                on the Facts. .................................................................................. 25

        F.      McKinsey RTS's Attempt to Demonstrate That MIO Is Separate Also Utterly
                Fails on the Law............................................................................. 27

III.    McKinsey RTS Is Not Qualified to Serve as a Professional for the Debtors Because It
        Holds and Represents Multiple Interests That Are Adverse to the Debtors'
        Bankruptcy Estates and Because It Is Not Disinterested. ................................... 30

        A.      The Respective Fiduciary Obligations of McKinsey RTS and MIO
                Irreconcilably Conflict...................................................................... 31

        B.      McKinsey and Its Partners and Employees Assigned to Assist the Debtors
                Hold Disqualifying Interests *in the Debtors Themselves*...................... 33

        C.      McKinsey and Its Partners and Employees Assigned to Assist the Debtors
                Hold Disqualifying Interests *in Interested Parties*. ........................... 35

        D.      McKinsey RTS Represents at Least 237 Connections That Are "Interests
                Adverse to the Estate."..................................................................... 36

        D.      McKinsey RTS's Connections to Interested Parties Who Provide Services to
                MIO Are Disqualifying....................................................................... 40

        E.      McKinsey RTS's Connections to the Debtors' Competitors Are Disqualifying.. 41

        F.      McKinsey RTS Is Not "Disinterested.".................................................. 44

i

G.  Media Reporting of McKinsey RTS's Failure to Disclose its Connections and of Its Disqualifying Conflicts of Interest Are Likely Already Eroding Public Confidence in the Integrity of the Bankruptcy Cases in Which It Serves. ........... 46

H.  McKinsey RTS Also Holds an Interest Adverse to the Estate Because It Is Liable for Avoidable Preferences Totaling $1,565,000. ....................................... 49

IV.  McKinsey RTS's Declaration Unlawfully Concealed a Shocking 84 Connections, at Least. ................................................................................................................. 53

A.  McKinsey RTS's Declaration Unlawfully Conceals At Least *Ten* MIO Investment Connections *to the Debtors*. ................................................. 54

B.  McKinsey RTS's Declaration Unlawfully Conceals at Least *Seven* MIO Investment Connections *to Interested Parties*. ....................................... 55

C.  McKinsey RTS's Declaration Unlawfully Conceals a Total of at Least 84 Connections. .................................................................................................. 56

V.  McKinsey RTS Admits That Because It Used an Incomplete Interested Parties List, Its Investigation of Its Connections Is Incomplete; Therefore, Its Declaration Likely Does Not Disclose All of Its Connections. ....................................................... 61

VI.  McKinsey RTS's Declaration Violates the Case Law on a Professional's Disclosure Obligations Under Rule 2014. ......................................................................... 63

A.  This Court Has an Independent Duty to Determine Whether McKinsey RTS's Disclosure Declaration Complies with Rule 2014. ................................. 63

B.  This Court's Strict Enforcement of Bankruptcy Rule 2014 and 11 U.S.C. § 327 Is Critical to Maintain the Integrity of This Bankruptcy Case and the Public's Confidence. ................................................................................. 64

C.  Rule 2014 Is the Tool That Enables the Court to Enforce Section 327. ............... 66

D.  The Debtors and McKinsey RTS Bear the Burden of Proof. .............................. 67

E.  Rule 2014 Requires Not Just Disclosure of Interests That "Are Adverse" or Even "Might Be Adverse" to the Estate; It Mandates Disclosure of "All Connections." ............................................................................................. 67

F.  McKinsey RTS Did Not Identify All of Its Connections with All Interested Parties in Sufficient Detail for the Court to Fulfill Its Responsibility. ................. 69

G.  Rule 2014 Requires McKinsey RTS to Search for and Disclose the Connections of All of Its Affiliates. ....................................................... 73

H.       Effectively, McKinsey RTS Enters into Subcontracts with Its Affiliates; Rule 2014 Requires the Debtors to File a Separate Application for Each Such Affiliate. ...................................................................... 73

I.        Bankruptcy Rule 2014 Is Absolute in Its Requirement for the Full *Public* Disclosure of McKinsey RTS's Connections. ...................................................... 77

VII.   The Debtors Will Never Be Able to Meet Their Burden to Prove That McKinsey RTS Is Qualified to Serve as A Professional. .......................................................... 82

A.       McKinsey and McKinsey RTS have never disclosed all of their connections in any of their previous thirteen bankruptcy cases.................................................... 82

B.       *GenOn*, Which Was Filed in This District and Assigned to This Court, Is Among the Cases in Which McKinsey RTS Fraudulently but Successfully Concealed Its Disqualifying Conflicts of Interest................................................. 83

1.       McKinsey Fraudulently Concealed that NRG Energy Was a McKinsey Client While It Was Investigating GenOn's Substantial Claims Against NRG Energy...................................................................................... 85

2.       McKinsey Fraudulently Concealed That NRG Energy Was a McKinsey Client While It Was Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy. ................................................. 88

3.       McKinsey Fraudulently Concealed Asset Sales Conflicts, the Depth of Its Connections to NRG in Several Chapter 11 Cases, and its Prior Involvement in the Transactions and Bankruptcies that Created GenOn. ..................................................................................... 89

4.       McKinsey Received Avoidable Preference Payments from GenOn in Order to Avoid Disqualification as a Creditor. ......................................... 91

5.       McKinsey's Declarations in *GenOn* Fraudulently Concealed Numerous Connections, Including Connections to GenOn's Creditors and Competitors. ...................................................................................... 94

C.       In *In re SunEdison*, McKinsey RTS Also Obtained and Retained Employment by Unlawfully Concealing Its Disqualifying Conflicts of Interest. .................... 103

1.       McKinsey Fraudulently Concealed Its Connections in *SunEdison*. ....... 105

2.       McKinsey Unlawfully Concealed Fraudulent Pre-Petition Payments That It Orchestrated from SunEdison Affiliates Using Its Insider Status and Information....................................................................................... 113

3.       McKinsey Unlawfully Concealed Pertinent Facts Regarding Its "Business Arrangement" with SunEdison's Former CEO...................... 118

D.      In *ANR*, McKinsey RTS Also Committed Multiple Frauds on the Court. ......... 122

    1.      McKinsey RTS Unlawfully Concealed a MIO Investment in a First Lien Lender That Illegally Profited McKinsey by Over $50 Million..... 122

    2.      McKinsey RTS Unlawfully Concealed MIO Investments in at Least Four Entities That Were Major Equity Holders in *ANR*. ........................ 124

    3.      McKinsey Likely Invested Directly in ANR through Compass. ............ 125

    4.      McKinsey May Have Also Held Equity Interests in ANR and Contura through Its Investments in Blackrock, a McKinsey Client. .................... 125

    5.      Two McKinsey Partners Simultaneously Served Both ANR and United States Steel, Major Customer, on Coal Pricing Issues............................ 126

    6.      McKinsey Unlawfully Concealed at Least 31 MIO Connections in *ANR*. ................................................................................................... 127

    7.      McKinsey, Royal Bank of Canada and ANR .......................................... 128

    8.      McKinsey Still Conceals at Least 10 Additional Connections That Rule 2014 Required It to Disclose. ....................................................... 128

E.      McKinsey RTS's Misrepresentations to the United States Trustee Program in the *ANR* Case Caused the Program to Make False Representations to the Courts in That Case and in the *SunEdison* Case. ................................................ 131

VIII.   In Its Engagement Agreement, McKinsey RTS Unlawfully Disavows That It Is a Fiduciary in This Case and the Debtors Agreed. ............................................................ 134

IX.     The Engagement Agreement Between the Debtors and McKinsey RTS Was Not Negotiated "at Arm's-Length and in Good Faith," as McKinsey RTS and the Debtors Assert. ...................................................................................................................... 137

X.      McKinsey RTS's Rule 2014 Declaration Violates 28 U.S.C. § 1746. ........................... 138

XI.     Conclusion ...................................................................................................................... 141

## **TABLE OF AUTHORITIES**

Cases

APJL Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc.),
    2015 WL 925957 (B.A.P. 9th Cir. Mar. 3, 2015) ................................................... 67

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
    160 F.3d 982 (3d Cir. 1998) .................................................................................... 32

D. Ginsberg & Sons, Inc. v. Popkin,
    285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932) .................................................. 79

Halbert v. Yousif,
    225 B.R. 336 (E.D. Mich. 1998) ............................................................................ 68

In re ACandS, Inc.,
    297 B.R. 395 (Bankr. D. Del. 2003) ...................................................................... 76

In re AFI Holding, Inc.,
    530 F.3d 832 (9th Cir. 2008) .................................................................................. 44

In re Alpha Natural Res. Inc.
    (Bankr. E.D. Va. No. 15-33896 ...................................................................... passim

In re Am. Bus. Fin. Servs., Inc.,
    457 B.R. 314 (Bankr. D. Del. 2011) .................................................................... 134

In re Am. Energy Trading, Inc.,
    291 B.R. 154 (Bankr. W.D. Mo. 2003) .................................................................. 51

In re Am. Int'l Refinery, Inc.,
    676 F.3d 455 (5th Cir. 2012) ..................................................................... 44, 68, 70

In re Amdura Corp.,
    121 B.R. 862 (Bankr. D. Colo. 1990) ............................................................... 45, 46

In re Arkansas Co.,
    798 F.2d 645 (3d Cir. 1986) .................................................................................. 134

In re Arlan's Dept. Stores, Inc.,
    615 F.2d 925 (2d Cir. 1979) ...................................................................... 45, 72, 138

In re AroChem Corp.,
    176 F.3d 610 (2d Cir. 1999) .......................................................................... 32, 135

In re Bailey,
    151 B.R. 28 (Bankr. N.D.N.Y. 1993) .................................................................... 77

In re Barton,
    249 B.R. 561 (Bankr. E.D. Wash. 2000) ............................................................... 77

In re Begun,
    162 B.R. 168 (Bankr. N.D. Ill. 1993) .................................................................... 80

In re BH & P Inc.,
    949 F.2d 1300 (3d Cir. 1991)..................................................................... passim

In re Big Mac Marine, Inc.,
    326 B.R. 150 (8th Cir. BAP 2005) ...................................................................... 67

In re Big Rivers Elec. Corp.,
    355 F.3d 415 (6th Cir. 2004) ....................................................................... 32, 138

In re Boot Hill Biofuels, LLC,
    2009 WL 982192 (Bankr. D. Kan. Mar. 27, 2009) ............................................. 63

In re Borders Grp., Inc.,
    456 B.R. 195 (Bankr. S.D.N.Y. 2011) ............................................................... 76

In re Brook Valley VII, Joint Venture,
    496 F.3d 892 (8th Cir. 2007) ............................................................................ 32

In re Brooks Fashion Stores,
    124 B.R. 436 (Bankr. S.D.N.Y. 1991) ............................................................... 77

In re Bruno,
    327 B.R. 104 (Bankr. E.D.N.Y. 2005)............................................................... 80

In re Caesars Entm't Operating Co.
    (N.D. Ill., No. 15-01145 ................................................................................... 24

In re Caesars Entm't Operating Co.,
    561 B.R. 420 (Bankr. N.D. Ill. 2015) ................................................................ 67

In re Chapman,
    265 B.R. 796 (Bankr. N.D. Ill. 2001) ................................................................ 77

In re Churchfield Mgmt. & Inv. Corp.,
    100 B.R. 389 (Bankr. N.D. Ill. 1989) ................................................................ 72

In re Commonwealth of Puerto Rico,
    (D.P.R., No. 17-03283, filed July 3, 2017) ........................................................ 25

In re Endeavour Operating Corp. (D. Del., No. 14-121308) ...................................... 24

In re Enron Corp.,
    2002 WL 32034346 (Bankr. S.D.N.Y. 2002) .................................................... 66

In re eToys, Inc.,
    331 B.R. 176 (Bankr. D. Del. 2005) ...................................................... 66, 69, 91

In re EWC, Inc.,
    138 B.R. 276 (Bankr. W.D. Okla. 1992) ..................................................... 64, 80

In re Fibermark, Inc.,
    2006 WL 723495 (Bankr. D. Vt. Mar. 11, 2006) .............................................. 66

In re Filene's Basement, Inc.,
    239 B.R. 850 (Bankr. D. Mass. 1999 .......................................................... 64, 71

In re First Jersey Sec., Inc.,
  180 F.3d 504 (3d Cir. 1999) ................................................................................ 28, 51

In re Fresh Choice, LLC,
  2014 WL 929018 (Bankr. N.D. Cal. March 10, 2014) ........................................ 66

In re GenOn Energy, Inc.,
  (Bankr. S.D. Tex., No. 17-33695) ................................................................. passim

In re Git-N-Go Inc.,
  321 B.R. 54 (Bankr. N.D. Okla. 2004) .............................................................. 45, 63

In re Gluth Brothers Construction, Inc.,
  459 B.R. 351 (Bankr. N.D. Ill. 2011) ................................................................ 68, 80

In re Granite Partners, L.P.,
  219 B.R. 22 (Bankr. S.D.N.Y. 1998) ................................................... 63, 68, 71, 72

In re Granite Sheet Metal Works, Inc.,
  159 B.R. 840, 845 (Bankr. S.D. Ill. 1993) ............................................................ 80

In re Gulf Coast Orthopedic Center,
  265 B.R. 318 (Bankr. M.D. Fla. 2001) .................................................................. 67

In re Haldeman Pipe & Supply Co.,
  417 F.2d 1302 (9th Cir. 1969) ............................................................................... 69

In re Harold & Williams Dev. Co.,
  977 F.2d 906 (4th Cir. 1992) ................................................................................. 67

In re Hinesley Family Ltd. P'ship No. 1,
  2012 WL 113821 (Bankr. D. Mont. 2012) ............................................................ 42

In re HML Enterprises, LLC,
  2016 WL 5939737 (Bankr. E.D. Tex. Oct. 12, 2016) ............................................ 63

In re Humble Place Joint Venture,
  936 F.2d 814 (5th Cir. 1991) ................................................................................. 27

In re Huntco Inc.,
  288 B.R. 229 (Bankr. E.D. Mo. 2002) .................................................................. 67

In re Hutch Holdings, Inc.,
  532 B.R. 866 (Bankr. S.D. Ga. 2015) ................................................................ 64, 66

In re Hydrocarbon Chemicals, Inc.,
  411 F.2d 203 (3d Cir. 1969) ................................................................................ 134

In re Interwest Bus. Equip., Inc.,
  23 F.3d 311 (10th Cir. 1994) ............................................................................... 138

In re Keller Fin. Services of Florida, Inc.,
  243 B.R. 806 (Bankr. M.D. Fla. 1999) .................................................................. 68

In re Knight-Celotex, LLC,
  695 F.3d 714 (7th Cir. 2012) ................................................................................. 68

In re Lee Way Holding,
    100 B.R. 950 (Bankr. S.D. Ohio 1989)..................................................... 134

In re Lee,
    94 B.R. 172 (Bankr. C.D. Cal. 1988).......................................................... 80

In re Leslie Fay Cos.,
    175 B.R. 525 (Bankr. S.D.N.Y. 1994)................................................... passim

In re Lewis Rd., LLC,
    2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011) .................................. 44, 68, 69

In re Lewis Road,
    2011 WL 6140747 (Bankr. E.D. Va. 2011).............................................. 66, 69, 71

In re LKM Indus., Inc.,
    252 B.R. 589 (Bankr. D. Mass. 2000) ........................................................ 28

In re Love,
    163 B.R. 164 (Bankr. D. Mont. 1993) ........................................................ 80

In re LPN Healthcare Facility Inc.,
    498 B.R. 196 (Bankr. S.D. Ohio 2013)........................................................ 72

In re LTHM Houston-Operations, LLC,
    No. 14-33899, 2014 WL 5449737 (Bankr. S.D. Tex. Oct. 24, 2014).................... 138

In re Magnum Hunter Resources Corp.,
    (D. Del., No. 15-12533) ........................................................................ 24

In re Mangum,
    147 B.R. 875 (Bankr. E.D. Va. 1992)........................................................ 134

In re Marine Outlet, Inc.,
    135 B.R. 154 (Bankr. M.D. Fla. 1991) ........................................................ 64

In re Marion Carefree Ltd. P'ship,
    171 B.R. 584 (Bankr. N.D. Ohio 1994) ........................................................ 63

In re Martin,
    817 F.2d 175 (1st Cir. 1987 .......................................................... 45, 65, 68

In re Marvel Entm't,
    140 F.3d 463 (3d Cir. 1998)..................................................................... 51

In re Matco Elec. Grp, Inc.,
    383 B.R. 848 (Bankr. N.D.N.Y. 2008) ........................................................ 64

In re McConville,
    110 F.3d 47 (9th Cir. 1997 ...................................................................... 32

In re Michigan General Corp.,
    78 B.R. 479 (Bankr. N.D. Tex. 1987).......................................................... 65

In re Middleton Arms Ltd. P'ship,
    934 F.2d 723 (6th Cir. 1991) ................................................................... 28

In re Midway Indus. Contractors, Inc.,
    272 B.R. 651 (N.D. Ill. 2001) ............................................................... 71

In re Midway Motor Sales,
    355 B.R. 26 (Bankr. N.D. Ohio 2006) ............................................. 45, 46

In re Miners Oil Co.,
    502 B.R. 285 (Bankr. W.D. Va. 2013) ........................................ 68, 70, 72

In re Mitchell,
    497 B.R. 788 (Bankr. E.D.N.C. 2013) ................................................... 70

In re MPM Silicones, LLC
    (S.D.N.Y., No. 14-22503) ...................................................................... 24

In re New Stream Secured Capital, Inc.
    (D. Del., No. 11-10753, filed Mar. 13, 2011) ...................................... 25

In re Paige,
    685 F.3d 1160 (10th Cir. 2012) ........................................................... 138

In re Pillowtex, Inc.,
    304 F.3d 246 (3d Cir. 2002 ............................................................. 27, 45

In re Plaza Hotel Corp.,
    123 B.R. 466 (B.A.P. 9th Cir. 1990) ..................................................... 66

In re Prudent Holding Corp.,
    153 B.R. 629 (Bankr. E.D.N.Y. 1993 ................................................... 135

In re Quality Beverage Co., Inc.,
    216 B.R. 592 (Bankr. S.D. Tex. 1995) .................................................. 28

In re Raggie,
    389 B.R. 309 (Bankr. E.D.N.Y. 2008) ................................................... 78

In re Rio Valley Motors Co., LLC,
    2007 WL 2492685 (Bankr. D.N.M. 2007) ............................................ 42

In re Roberts
    46 B.R. 815 (Bankr. D. Utah 1987) ...................................................... 72

In re Rogers-Pyatt Shellac Co.,
    51 F.2d 988 (2nd Cir. 1931) .................................................................. 72

In re Running Horse, L.L.C.,
    371 B.R. 446 (Bankr. E.D. Cal. 2007) ................................................. 67

In re Rusty Jones,
    134 B.R. 321 (Bankr. N.D. Ill. 1991) .................................................... 72

In re Sandpoint Cattle Co., LLC,
    556 B.R. 408 (Bankr. D. Neb. 2016) ..................................................... 67

In re Saturley,
    131 B.R. 509 (Bankr. D. Me. 1991) ...................................................... 64

In re Schupbach Investments, LLC,
521 B.R. 449 (B.A.P. 10th Cir. 2014) ................................................................... 134

In re Seadrill Ltd.
(S.D. Tex., No. 17-60079) ................................................................... 23, 24

In re Smith,
103 B.R. 392 (Bankr. N.D.N.Y. 1988) ................................................................... 78, 134

In re Southmark Corp.,
181 B.R. 291 (Bankr. N.D. Tex. 1995) ................................................................... 72, 73, 134

In re Sundance Self Storage-El Dorado LP,
482 B.R. 613 (Bankr. E.D. Cal. 2012) ................................................................... 65

In re SunEdison, Inc.
(Bankr. S.D.N.Y. No. 16-10992) ................................................................... passim

In re Sutera,
157 B.R. 519 (Bankr. D. Conn. 1993) ................................................................... 78

In re Teknek, LLC,
354 B.R. 181 (Bankr. N.D. Ill. 2006) ................................................................... 77

In re Tinley Plaza Associates, L.P.,
142 B.R. 272 (Bankr. N.D. Ill. 1992) ................................................................... 79

In re Trust America Serv. Corp.,
175 B.R. 413 (Bankr. M.D. Fla. 1994) ................................................................... 73

In re United Cos. Fin. Corp.,
241 B.R. 521 (Bankr. D. Del. 1999) ................................................................... 74, 75, 76

In re Watson,
94 B.R. 111 (Bankr. S.D. Ohio 1988 ................................................................... 47, 65

In re Wheatfield Bus. Park LLC,
286 B.R. 412 (Bankr. C.D. Cal. 2002) ................................................................... 80

In re Wilferth,
57 B.R. 693 (Bankr. D.N.M. 1986) ................................................................... 78

In re Woodcraft Studios, Inc.,
464 B.R. 1 (N.D. Cal. 2011), aff'd sub nom. Kun v. Mansdorf,
558 F. App'x 755 (9th Cir. 2014) ................................................................... 80

In re Woodworkers Warehouse, Inc.,
303 B.R. 740 (Bankr. D. Del. 2004) ................................................................... 28

Interwest Business Equipment, Inc. v. U.S. Trustee (In re Interwest Business Equipment, Inc.),
23 F.3d 311 (10th Cir. 1994) ................................................................... 63

KLG Gates LLP v. Brown,
506 B.R. 177 (E.D.N.Y. 2014) ................................................................... 70

Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),
134 F.3d 831 (7th Cir. 1998) ................................................................... 32, 44, 63, 138

x

Law v. Siegel,
 134 S. Ct. 1188 (2014) .......................................................................................... 79

Meinhard v. Salmon,
 249 N.Y. 458, 164 N.E. 545 (1928)............................................................ 135, 142

Morton v. Mancari,
 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).......................................... 79

Neben & Starrett Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.),
 63 F.3d 877 (9th Cir. 1995) ...................................................................... 66, 67, 69

Pavelic & LeFlore v. Marvel Entm't Grp.,
 493 U.S. 120 (1989).............................................................................................. 78

Quarles and Brady LLP v. U.S. Trustee (In re Jennings),
 199 F. App'x 845 (11th Cir. 2006) ....................................................................... 64

Rome v. Braunstein,
 19 F.3d 54 (1st Cir. 1994)...................................... 32, 44, 45, 69, 135, 138

Rubin v. United States,
 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).......................................... 78

SEC v. Capital Gains Research Bureau, Inc.,
 375 U.S. 180 (1963).............................................................................................. 31

SEC v. Chenery Corp.,
 318 U.S. 80 (1943 ............................................................................................... 135

Seminole Nation v. United States,
 316 U.S. 286 (1942)............................................................................................ 135

U.S. Trustee v. Price Waterhouse,
 19 F.3d 138 (3d Cir. 1994)................................................................................... 28

United States v. Gellene,
 182 F.3d 578 (7th Cir. 1999) ......................................................................... 47, 64

Walker v. Armco Steel Corp.,
 446 U.S. 740, S.Ct. 1978, 64 L.Ed.2d 659 (1980)............................................... 78

Woods v. City Nat. Bank & Tr. Co. of Chicago,
 312 U.S. 262 (1941)............................................................................................ 135

## Statutes

11 U.S.C. § 101(14) ........................................................................... passim

11 U.S.C. § 105 ......................................................................................... 79

11 U.S.C. § 107 ......................................................................................... 79

11 U.S.C. § 1129(b)(2) .............................................................................. 32

11 U.S.C. § 327 ................................................................................. passim

11 U.S.C. § 327(a) ................................................................................. passim

11 U.S.C. § 327(c) ................................................................................. 33

11 U.S.C. § 504 ..................................................................................... 75

11 U.S.C. § 547(b) ................................................................... 50, 93, 113

11 U.S.C. § 547(c)(2) ............................................................................. 50

15 U.S.C. § 80b-6 .................................................................................. 31

26 U.S.C. § 6058 ............................................................................. 16, 21

28 U.S.C. § 1746 ............................................................................. passim

28 U.S.C. § 2075 ............................................................................. 77, 78

29 U.S.C. § 1024 ............................................................................. 16, 21

29 U.S.C. § 1025(a)(2)(B)(i) ............................................................ 16, 21

29 U.S.C. § 1365 ............................................................................. 16, 21

## Other Authorities

2 Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2013) .................................... 79

Collier on Bankruptcy ¶ 327.03 (1985) ...................................................... 45

Collier on Bankruptcy, ¶ 2014.03 (15th ed. 1994) ....................................... 91

## Rules

Fed. R. Bankr. P. 2014 ...................................................................... passim

L.B.R. Rule 2014–1 .............................................................................. 80

TO THE HON. DAVID R. JONES, CHIEF UNITED STATES BANKRUPTCY JUDGE:

Mar-Bow Value Partners, LLC ("Mar-Bow"), a creditor, submits this objection to the Debtors' application for approval of the employment of McKinsey Restructuring and Transformation Services U.S., LLC ("McKinsey RTS") as a professional.

## I.      Summary of Argument

1.       The Debtors' application for approval to employ McKinsey RTS must be denied for the reasons that follow.[1]

2.       **McKinsey is one firm.**

   a.   Rule 2014 has the force of law.  Because McKinsey is one firm, Rule 2014 requires McKinsey RTS to disclose all of McKinsey's connections, including those of the McKinsey Investment Office.  Disclosure of MIO's equity interests in the Debtors and in interested parties, both direct and indirect, is crucial because those equity interests are *per se* disqualifying under 11 U.S.C. §§ 327(a) and 101(14).

   b.   McKinsey and McKinsey RTS know that, which is why they refuse to disclose those connections, feebly claiming that MIO and McKinsey RTS are "separate."

   c.   But McKinsey RTS's attempt to demonstrate that MIO and McKinsey RTS are separate fails both factually and legally.  McKinsey is one firm.

   d.   If Kirkland & Ellis LLP were to create a fictional fence around its bankruptcy department and call it "Kirkland & Ellis RTS LLP," Rule 2014 would surely apply to both.  If Jones Day were to form the "Jones Day Investment Office LLC"

---

[1] Mar-Bow is a creditor and therefore has standing to assert this objection under 11 U.S.C. § 1109(b).  Mar-Bow owns $1,500,000 face value of Westmoreland Coal Co. 144A Bonds.  Mar-Bow is also an equity security holder in 13,500 shares of Westmoreland's MLP affiliate.

within its organization to serve the investment and retirement needs of its partners and employees, Rule 2014 would surely apply to both.  Professionals like McKinsey and McKinsey RTS cannot so easily manipulate Rule 2014.

3. ***McKinsey RTS is not qualified to serve as a professional for the Debtors because McKinsey, its partners and its employees hold multiple equity interests in the Debtors and in interested parties, and because it is not disinterested.***

   a. McKinsey, its partners and its employees hold disqualifying equity interests in the Debtors through their investments in MIO.

   b. They may well also hold disqualifying equity interests in members of the Ad Hoc Group who will likely acquire the Debtors' most productive mines through the Debtors' plan.

   c. McKinsey, its partners and its employees also hold disqualifying equity interests in other interested parties.

   d. McKinsey RTS's liability for preferences of $1,565,000 is a disqualifying interest that is adverse to the estate.

The Court's denial of the Debtors' application for approval to employ McKinsey RTS is therefore mandated under 11 U.S.C. § 327 and is critically necessary to preserve both the integrity of the bankruptcy process in this case and the confidence of the parties and the public.

4. ***McKinsey RTS is not qualified to serve as a professional for the Debtors because McKinsey represents multiple interests that are adverse to the Debtors' bankruptcy estates.***

   a. McKinsey RTS may well have client connections with members of the Ad Hoc Group.

b.  McKinsey RTS has multiple client connections across a broad spectrum of creditor class with whom it will interact while serving the Debtors and who will be financially affected by its work.

For these reasons as well, the Court's denial of the Debtors' application for approval to employ McKinsey RTS is equally critically necessary to preserve both the integrity of the bankruptcy process in this case and the confidence of the parties and the public.

5.  ***McKinsey RTS's disclosure declaration violates Bankruptcy Rule 2014 because it is admittedly incomplete.***

6.  ***McKinsey RTS's declaration violates Bankruptcy Rule 2014 because it conceals at least 84 connections.***

a.  McKinsey RTS's declaration unlawfully conceals at least ten equity interests in the Debtors.

b.  It unlawfully conceals at least seven equity interests in interested parties.

c.  It unlawfully conceals multiple connections to interested parties.

d.  McKinsey RTS's unlawful concealment of the MIO's connections is particularly egregious and unlawful.

7.  ***McKinsey RTS's declaration violates the case law on a professional's disclosure obligations under Rule 2014.***

8.  ***McKinsey RTS unlawfully disavows in its engagement agreement that it is a fiduciary and the Debtors agreed to that.***

a.  This unlawful agreement violates the fiduciary obligations of both McKinsey RTS and the Debtors.

9.      *The engagement agreement between the Debtors and McKinsey RTS was not negotiated "at arm's-length and in good faith," as McKinsey RTS asserts, because Kirkland & Ellis represents both the Debtors and McKinsey RTS.*

     a.  In addition, Kirkland & Ellis's conflict of interest in representing both the Debtors and McKinsey RTS prohibits it from representing the Debtors on this application.

10.     *McKinsey RTS's disclosure declaration violates 28 U.S.C. § 1746 because it is not based on the personal knowledge of the declarant, Mark Hojnacki.*

11.     *McKinsey and McKinsey RTS have never disclosed all of their connections in any of their previous chapter 11 cases and McKinsey RTS will never disclose all of its connections in this case.  As a result, the Debtors will never be able to meet their burden to prove that McKinsey RTS is qualified to serve as a professional under 11 U.S.C. § 327.*

     a.  This case is only the latest case in McKinsey's long and sad history of knowingly concealing its disqualifying conflicts of interest in its Chapter 11 cases.

     b.  Either McKinsey RTS or its parent, McKinsey & Company U.S. ("McKinsey"), has served as a professional for Chapter 11 debtors in thirteen previous cases.  In those cases, McKinsey and McKinsey RTS filed a total of 39 disclosure declarations.  Each of those 39 disclosure declarations concealed multiple connections and was false.

     c.  As the United States Trustee concluded in both the *ANR* case and in the *SunEdison* case, McKinsey RTS's declarations "give the appearance of compliance without actually complying with Bankruptcy Rule 2014."[2]

---

[2] *In re Alpha Natural Resources Inc.* (Bankr. E.D. Va. No. 15-33896), Motion of the United States Trustee to Compel, Dkt. 2308, filed May 3, 2016, at p. 11; *In re SunEdison, Inc.* (Bankr. S.D.N.Y. No. 16-10992), Objection of the United States Trustee to Debtors' Application for Order Authorizing the

4

d.  In several of their previous cases and specifically in McKinsey RTS's last three cases – *ANR*,[3] *SunEdison*[4] and *GenOn*,[5] the connections that it intentionally concealed were actual and disqualifying conflicts of interest under 11 U.S.C. § 327.  Nevertheless, by fraudulently concealing these disqualifying connections from the courts, the U.S. Trustee and the interested parties in all of those cases, and by lying about those connections, McKinsey and McKinsey RTS were able to obtain, and then retain, their respective employment in those cases.

e.  Among the cases in which McKinsey RTS successfully concealed its disqualifying conflicts of interest is *GenOn*, filed in this district and assigned to this Court.  In the *GenOn* case:

- McKinsey RTS investigated GenOn's multimillion-dollar fraudulent transfer claims against its own *undisclosed client*, NRG, the Debtors' parent company.

- McKinsey RTS assisted GenOn in obtaining confirmation of a plan of reorganization that impacted dozens of its own *undisclosed clients* who were GenOn's creditors.

- McKinsey RTS assisted GenOn in making business decisions that impacted the commercial interests of its other *undisclosed clients* who are GenOn's creditors.

- McKinsey RTS held a disqualifying interest adverse to the *GenOn* bankruptcy estate because it was liable to the estate on a $4.5 million preference claim while fraudulently representing to the U.S. Trustee and the court that it held no interest adverse to the estate.

---

Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC, Dkt. 265, filed May 12, 2016, at p. 9.

[3] *In re Alpha Natural Resources, Inc.*, E.D. Va., No. 15-33896; filed Aug. 3, 2015 ("*ANR*").

[4] *In re SunEdison, Inc*, S.D.N.Y., No. 16-10992; filed Apr. 21, 2016 ("*SunEdison*").

[5] *In re GenOn Energy, Inc.*, S.D. Tex., No. 17-33695; filed June 14, 2017 ("*GenOn*").

f.  McKinsey RTS also fraudulently concealed disqualifying conflicts of interest in the *SunEdison* Chapter 11 case.

g.  McKinsey RTS also fraudulently concealed its disqualifying conflicts of interest in the *ANR* case.  One of those concealed equity investment connections netted McKinsey an illegal $50 million profit.

12.     For any and all of these reasons, the Debtors' application for court approval to employ McKinsey RTS must be denied.

## II.   McKinsey Is One Firm: MIO's Connections Are McKinsey RTS's Connections.

> *"We are a global management consulting firm that serves a broad mix of private, public and social sector institutions."*
>
> www.mckinsey.com/about-us/overview

13.   To preview, this part demonstrates why the Court must reject McKinsey RTS's claim that it and MIO are separate and therefore Rule 2014 does not apply to MIO connections. McKinsey RTS is wrong to conceal MIO's connections because:

- McKinsey is one firm.

- Neither McKinsey RTS nor MIO has any identity or existence separate from McKinsey.

- The partners that own and manage McKinsey own and manage all of its affiliates, including both MIO and McKinsey RTS.

- McKinsey RTS can only perform its consulting services by "borrowing" the employees of its affiliates in the McKinsey organization.

- MIO can only perform its investment services for McKinsey by "borrowing" McKinsey partners for its board.

- MIO invests in McKinsey RTS clients.

- MIO invests in interested parties in McKinsey RTS's bankruptcy cases.

- One such secret MIO investment a first lien lender in the *ANR* case resulted in a concealed and illegal profit to *McKinsey* of $50 million.

- The MIO Board and the MIO staff have full access to everything that McKinsey RTS does in its bankruptcy cases and to the results of its activities.

- McKinsey RTS's partners and employees have access to substantial information about MIO's investments.

- McKinsey RTS partners and employees discuss their own investments with MIO staff, including their investments in clients of McKinsey RTS and in the interested parties in its bankruptcy cases.

- The net profit that MIO makes from its fees on its operations is *McKinsey's* profit.

- The net profit that McKinsey RTS makes from its engagements is *McKinsey's* profit.

- MIO regularly trolls for investments in the very market segment that McKinsey RTS trolls for work – the distressed investment segment.

14.   Each of these facts is readily demonstrated below.

**A.     McKinsey & Company, Inc.**

15.   The website of McKinsey & Company, Inc. ("McKinsey") proclaims that it is a global management consulting firm.

16.   McKinsey has 30,000 employees working in more than 126 cities in 65 countries worldwide.  It has revenues of $10 billion per year.[6]

17.   McKinsey operates through numerous subsidiaries.  One subsidiary is McKinsey RTS, which is a direct wholly-owned subsidiary of McKinsey & Company, Inc. United States, which, in turn, is a direct wholly-owned subsidiary of McKinsey Holdings, Inc., which, in turn, is a direct wholly-owned subsidiary of McKinsey & Company, Inc.

18.   Another subsidiary is MIO Partners, Inc. ("MIO").   It is also wholly-owned subsidiary of McKinsey & Company, Inc.  MIO creates value for the McKinsey organization by providing highly profitable investment and retirement opportunities to the partners and employees of the McKinsey organization.

19.   The McKinsey organization is one integrated firm, as the succeeding paragraphs will demonstrate.  McKinsey is not a holding company whose subsidiaries are distinct silos of mission, management, operations and profits.

---

[6] www.forbes.com/companies/mckinsey-company/

20.     The senior partners that own and manage McKinsey own and manage all of its affiliates, including both MIO and McKinsey RTS.  McKinsey's 560 senior partners recently elected a new global managing partner to manage *all* of its affiliates in its global operations, including both MIO and McKinsey RTS.  Effectively, McKinsey's board of directors is its 31-member Shareholders Council.  Because McKinsey owns all or its affiliates, including both MIO and McKinsey RTS, the Shareholders Council presumably has the power and responsibility to set policy for *all* of its affiliates in its global operations, including both MIO and McKinsey RTS.

21.     Because McKinsey is one firm, McKinsey partners serve the clients of both McKinsey RTS and MIO, as discussed below.

### B.     McKinsey RTS

22.     McKinsey established McKinsey RTS in 2010 for only one discernable purpose – to continue to pursue the lucrative bankruptcy consulting market without having to disclose McKinsey's connections.  Client confidentiality it strong component of the McKinsey brand.

23.     However, because McKinsey is still one integrated firm and markets itself as such, McKinsey RTS has no identity or existence that is separate from McKinsey.

24.     McKinsey RTS can only perform the services that its bankruptcy clients have engaged it to perform by "borrowing" the employees of its affiliates in the McKinsey organization.   McKinsey RTS's service for Westmoreland Coal in this case follows that necessary staffing practice.  That's how McKinsey RTS works.

25.     McKinsey RTS admits this in its disclosure declaration in this case:

> 3. The "Service Team," as used in this Declaration, includes (a) the directors, officers and employees of McKinsey RTS US, and (b) certain consultants borrowed from affiliates of McKinsey RTS US for the purpose of serving the Debtors in these chapter 11 cases.

> 4. Members of the Service Team are employed by McKinsey RTS US and McKinsey & Company, Inc. United States and other affiliates that provide consulting services.
>
> * * *
>
> 7. In addition, when relevant to a particular engagement, McKinsey RTS US utilizes the expertise of colleagues in the Electric Power and Natural Gas ("EPNG") and Basic Materials industry practices.[7]

26.    McKinsey RTS's declaration does not, however, disclose the identities of the "borrowed" employees.

27.    Moreover, McKinsey RTS's "Service Team" is not fixed at the beginning of an engagement.[8] It changes from time to time.

28.    In addition to McKinsey RTS's need to borrow staff from its affiliates, other factors demonstrate that McKinsey RTS has no identity or existence that is separate from McKinsey:

- <u>Management</u>: McKinsey RTS is managed by the same managing partner and Shareholders Council as McKinsey and its affiliates.

---

[7] Dkt. 452, p. 36 of 194, ¶¶ 3-4; p. 37-8 of 194, ¶ 7 (footnotes omitted).

[8] A footnote in the Debtors' application contains this curious paragraph:
> Although McKinsey RTS does not anticipate using external advisors during these chapter 11 cases, in the event that it becomes necessary to use external advisors, McKinsey RTS will not charge a markup to the Debtors with respect to amounts billed by such external advisors. Such amounts shall be treated as a reimbursable expense in these chapter 11 cases. Moreover, any external advisors who are employed in connection with work performed by McKinsey RTS will be subject to conflict checks and disclosures in accordance with the requirements of the Bankruptcy Code.

Dkt. 452, p. 7 of 194, n.5.
    However, nothing in either the engagement letter or McKinsey RTS's declaration echoes these representations.  Indeed, the statements in this paragraph appear to contravene the need that McKinsey RTS has expressed to borrow staff from its affiliates.  In any event, the meaning and intention of the representations is ambiguous – does "external advisors" mean advisers external to McKinsey or external to McKinsey RTS?  Regardless, because McKinsey RTS has not adopted or ratified this paragraph, it will not be addressed in this objection.

- <u>Legal support</u>:  Alison Proshan, Associate General Counsel at McKinsey & Company, performs conflict checks for McKinsey RTS's chapter 11 engagements and provides other substantial legal services for McKinsey RTS.

- <u>Office space</u>: McKinsey RTS shares office locations with its affiliates.

- <u>Marketing support</u>: McKinsey RTS is fully dependent on the McKinsey brand and marketing for business generation.

- <u>Information technology support</u>: McKinsey RTS utilizes McKinsey's information technology systems.

- <u>Human resources support</u>: McKinsey RTS utilizes McKinsey's human resources and employee recruitment capabilities.

- <u>Accounting and tax support</u>: McKinsey RTS has no independent financial accounting system.

- <u>MIO</u>: Partners and employees of McKinsey RTS have the opportunity to invest their assets in MIO.

29.     McKinsey RTS is, therefore, not a distinct free-standing entity whose sole connection to its affiliates is vertically through common McKinsey ownership.  McKinsey RTS cannot carry out its business on its own.  It can only carry out its business in conjunction with the entire McKinsey organization.

30.     *Everyone* both inside and outside of McKinsey has access to substantial information about McKinsey RTS's activities in its bankruptcy cases and the results of those activities.  This includes MIO staff.  This information is available through publicly accessible court records of McKinsey RTS's cases – in the applications for approval of its employment, in McKinsey RTS's Rule 2014 disclosure declarations (assuming its full compliance with Rule 2014), in its fee applications, and in other court papers.  All of this information is readily available through multiple sources on the Internet.

31.     *Importantly, despite the access that everyone associated with MIO has about McKinsey RTS's activities, McKinsey never represents to the Court that to maintain its asserted*

*"separation," MIO staff will not access that public information or that it will not invest in the*
*Debtors, the interested parties, or the Debtors' suppliers, customers or competitors.*

### C.   McKinsey Investment Office

32.     MIO Partners, Inc. and its sister company MIO Partners (EU) Limited are
collectively known as the McKinsey Investment Office ("MIO").  Like McKinsey RTS, they are
wholly-owned indirect subsidiaries of McKinsey & Company, Inc.

33.     MIO manages assets for (i) certain pension plans sponsored by McKinsey
("Plans") in which certain current and former McKinsey employees participate ("Participants"),
and (ii) privately offered investment vehicles ("Funds") in which McKinsey partners, former
partners and their immediate family members ("Investors") can invest.

34.     MIO has approximately $25 billion in assets under management.  Of that amount,
approximately $17 billion are investment assets and $8 billion are retirement assets.

35.     MIO is registered with the Securities and Exchange Commission as an investment
adviser.  As an investment adviser, MIO has fiduciary obligations to the Plans and the Funds.

36.     MIO employs more than 150 personnel.

37.     MIO personnel are Participants in some of the Plans and are permitted to invest in
the Funds.

### 1.   MIO Management

38.     MIO is overseen by a board of directors (the "MIO Board").  Prior to November
1, 2017, all members of the MIO Board were current or former McKinsey partners.  As of
November 1, 2017, the MIO Board had ten current or former McKinsey partners, and two
directors who were not current or former McKinsey partners.  As of August 31, 2018, the MIO

Board has nine current or former McKinsey partners and two directors who are not current or former McKinsey partners.

39.     Jon Garcia has been the president of McKinsey RTS since its founding in 2010. He served on the MIO Board from December 8, 2006 through June 9, 2017 and was on its Audit Committee and Investment Committee.

40.     Vik Malhotra is currently on the MIO board, and is (1) the head of McKinsey's practice in the Americas and (2) one of the co-heads of its energy, private equity and investment banking practices.  Presumably, as a result of those two positions, Mr. Malhotra works with coal companies, perhaps including Westmoreland Coal.

41.     The MIO Board oversees MIO's investments, *including investments in McKinsey clients and in interested parties in this case*.

### 2.     MIO Investments

42.     MIO assets come from (1) the partners and employees of McKinsey for their pension plans; (2) the partners and employees of McKinsey for their investments; (3) alumni of McKinsey for their investments; and (4) McKinsey itself.  Because MIO is a captive investment operation, McKinsey likely parks its excess cash – likely $1-2 billion - with MIO to invest in short-term investment vehicles.  The MIO's returns on those investments are McKinsey's profits that are distributed to McKinsey's partners, including the leaders of McKinsey RTS.

43.     The MIO Plans and Funds typically invest in:

a.   limited partnership interests or interests in other limited liability vehicles established and operated by asset managers that are neither owned nor controlled directly or indirectly by MIO or McKinsey ("Fund Investments");

b.   investment vehicles established, controlled and operated by MIO ("MIO Investment Vehicles"), investment discretion over which is retained by MIO or granted to one or more Third Party Managers.

13

44.     The McKinsey Master Retirement Trust ("MMRT") appointed MIO to manage McKinsey's pension and investment programs and the assets held by the MMRT.  As noted, the MMRT has about $8 billion in assets under management.

45.     MIO's flagship *direct* investment vehicle is the Compass Special Situations Fund. As discussed in Part II.C.2. below, it was through this fund that MIO, and therefore McKinsey, made a $50 million profit on an investment in a creditor in the *ANR* bankruptcy case in which McKinsey RTS was retained.  This fund has been very valuable to its investors and to McKinsey. Through 2016, the Compass fund earned hundreds of millions of dollars for McKinsey partners and alumni, making money in 24 out of the past 25 years — a period that includes the dotcom bust and the global financial crisis of 2008-2009.

46.     MIO has no policy prohibiting investments in McKinsey clients or in the interested parties in McKinsey RTS's bankruptcy cases, including the debtors, creditors, competitors, customers and suppliers.  As a result, MIO does invest in those parties.  *McKinsey RTS has unlawfully concealed these MIO investments in this case and in its other bankruptcy cases and those investments are overseen by the McKinsey partners on the MIO Board.*

### 3.     Information Available About MIO Investments

47.     MIO provides people outside of MIO access to substantial information about MIO's investments.  In varying degrees, this information is available to the MIO Board; to the MIO Investment Committee; to the public on the Labor Department website; to the public on the SEC website.  McKinsey RTS consultants and staff have access to much of it.

48.     The information that the MIO makes available to its board members was disclosed in declarations submitted by Casey Lipscomb and Jon Garcia in the *ANR* case.[9]  Mr. Lipscomb has been the General Counsel and Secretary of MIO Partner, Inc. for 13 years.  As noted above, Jon Garcia has been the president of McKinsey RTS since its founding in 2010 and served on the MIO Board from 2006 to 2017.  He also served on its Investment Committee and its Audit Committee.

49.     According to Mr. Garcia, MIO Board members are provided "lists of MIO's third party fund managers."[10]  And the MIO Board approves "*fund-level* allocation and redemption decisions made by MIO's professional staff."[11]  The MIO Board has discussions when "an investment posed a specific issue – for example, an investment in a particular fund that brought MIO close to a preestablished risk threshold[.]"[12]  They discuss "whether or not to invest with a new third-party fund manager."[13]

50.     According to Mr. Lipscomb, "Through its oversight and supervisory functions or other board activities, members of the MIO Board members may become aware of MIO Direct Investments, the identities of Third Party Managers with whom money has been invested, and

---

[9] In *ANR*, McKinsey RTS submitted these declarations:
   Dkt. 4151 - Mr. Garcia's declaration, filed Sept. 12, 2018 (Exhibit 1)
   Dkt. 4152 - Mr. Lipscomb's declaration, filed Sept. 12, 2018 (Exhibit 2)
   Dkt. 4159 - Mr. Garcia' supplemental declaration, filed Nov. 9, 2018 (Exhibit 3)
   Dkt. 4160 - Mr. Lipsomb's supplemental declaration, filed Nov. 9, 2018 (Exhibit 4).

[10] Exhibit 1, p. 2, ¶ 5.

[11] Exhibit 3, p. 2, ¶ 4 (emphasis added); *see also* Exhibit 4, p. 4. ¶ 6.

[12] *Id*.

[13] *Id*. at p. 2, ¶ 5.

individual investments made by such Third Party Managers."[14]  On a quarterly basis, they review "materials prepared by the MIO staff."[15]  Presumably, all of this information includes *information about MIO investments in McKinsey clients, including the Debtors and in interested parties in this case*.

51.    MIO also periodically delivers substantial information to its investors, including the McKinsey RTS Service Team, as required by law[16] and for advertising and marketing.

52.    McKinsey personnel, including McKinsey RTS people, discuss their own investments with MIO staff.  These discussions likely include any investments in interested parties in McKinsey RTS's bankruptcy cases.

53.    As required by law,[17] MIO publicly files an annual report of its investments, called "Forms 5500," on behalf of the MMRT on a website maintained by the United States

---

[14] Exhibit 2, p. 3, ¶11.

[15] Exhibit 4, p. 4. ¶ 6.

[16] ERISA requires MIO to provide its beneficiaries – McKinsey's partners, employees and alumni – an annual pension benefit statement disclosing significant information, including "the value of each investment to which assets in the individual account have been allocated[.]"   29 U.S.C. § 1025(a)(2)(B)(i).

[17] 26 U.S.C. § 6058 and 29 U.S.C. §§ 1024 and 1365.

Department of Labor.[18]   Substantial information about all of the investments of the MMRT is available to the public and to all 30,000 McKinsey partners and employees, including the partners and employees of McKinsey RTS and those of its affiliates who work on McKinsey RTS bankruptcy matters.  *These MMRT Forms 5500 disclose numerous MIO direct and indirect investments in large numbers of interested parties in McKinsey RTS's bankruptcy cases.*

54.     Mr. Lipscomb also identified a broad and impressive range of information that MIO makes available to its investors, including investors on the Service Team.[19]

- MIO provides historical performance of the investment options available in the Plans.[20]

- MIO provides the appreciation or depreciation of their account balances based on the performance of the investment options they have selected.[21]

- State Street Global Advisors, a MIO investment option, provides information to Participants that identifies the top ten holdings in its funds.[22]

- Investors may request offering and subscription materials for the Investable Compass Funds, another MIO investment option, in which they wish to invest.[23]

---

[18] To access this information, go to the Labor Department search page:
    https://www.efast.dol.gov/portal/app/disseminate?execution=e1s1
Type "McKinsey" into the "Plan Name" search box, then click on the "Search" button.  A list of the MIO's Master Retirement Trust Forms 5500 then appears:

| Plan Year | Received |
|---|---|
| 2009 | 10-14-2010 |
| 2010 | 10-13-2011 |
| 2011 | 10-11-2012 |
| 2012 | 10-15-2013 |
| 2013 | 10-08-2014 |
| 2014 | 10-02-2015 |
| 2015 | 09-29-2016 |
| 2016 | 10-11-2017 |

The forms can then be readily downloaded.
[19] Exhibit 4.

[20] *Id.* at p. 7, ¶ 16.

[21] *Id.*

[22] *Id.*

- MIO provides an Investor in an Investable Compass Fund with several categories of performance-related information:[24]

  o Periodic reports regarding the performance of the Funds, as well as the appreciation or diminution of their personal investment balances;[25]

  o Annual financial statements, identifying any MIO Direct Investments or allocations to Third-Party Managers that exceed 5% of the assets of the Investable Compass Fund;[26] and

  o Periodic newsletters, prepared by the MIO staff, about each Fund and its performance, which occasionally identified portfolio companies that were already sold by a private equity fund in which the Compass Private Investment Fund had invested.[27]

55.     Beyond that, MIO's mission, like that of every investment adviser, is to maximize profits for its owner (McKinsey) and to maximize the returns for its investors.  The way that MIO fulfills that mission is by constantly selling itself and its investment opportunities to its market of investors - McKinsey partners, employees and alumni.  And MIO sells itself by providing those investors, including those associated with McKinsey RTS, with a steady stream of information about its returns on its investments and about its profitable acquisitions and redemptions.  As discussed in greater detail in Part II.C.3. below, this substantially undermines McKinsey RTS's claim of a separation between itself and MIO

### D.     McKinsey Is One Firm.

56.     McKinsey, McKinsey RTS and MIO are not separate firms.  McKinsey is one firm.  Bankruptcy Rule 2014, therefore, requires McKinsey RTS to disclose not only its own

---

[23] *Id.* at p. 8, ¶ 17.

[24] *Id.* at p. 8, ¶ 18.

[25] *Id.* at p. 8, ¶ 19.

[26] *Id.* at p. 8, ¶ 20.

[27] *Id.* at p. 9, ¶ 22.

connections, but also its affiliates' connections, including the MIO's connections.  The arbitrary fictional fences that McKinsey constructs around its business functions do not control the scope and breadth of Rule 2014.  This part explains why McKinsey is one firm.

57.     McKinsey's partners own and manage McKinsey and its affiliates.  The mission of McKinsey partners that manage MIO is to maximize the value of MIO *for the benefit of the McKinsey* because McKinsey is one firm.

58.     Neither McKinsey RTS nor MIO can function without its affiliates.  MIO exists only to serve McKinsey and its affiliates.  McKinsey RTS requires its affiliates' support.  The very first sentence of McKinsey RTS's declaration, signed by Mark W. Hojnacki, demonstrates how McKinsey organizes itself as one firm: "I am a Practice Leader in the professional services firm of McKinsey Recovery & Transformation Services U.S., LLC ….  I am also a partner at McKinsey & Company, Inc."[28]

59.     The profit that MIO makes from its fees on its operations is *McKinsey's* profit. MIO's precise annual fees are unknown but the standard in the industry is between a 1% and 2% of the value of assets under management plus between 10% and 20% of the gain in value. Because MIO's assets under management are $25 billion, its annual fees for that would likely be between $250 million and $500 million.  If MIO's returns on investment are (a conservative) 10% per year, its return on investment is $2.5 billion per year.  Its annual fees on that would be between $250 million and $500 million.  MIO's total annual fees are therefore likely between $500 million and $1 billion per year.  The net profit from those fees does not stay with MIO; it is *McKinsey's* profit.

---

[28] Dkt. 452, p. 35 of 194, ¶ 1

19

60.     Since 2001, McKinsey and McKinsey RTS have been paid $140,809,985 in fees from its bankruptcy debtor clients, including pre-petition and post-petition fees.  The profit that McKinsey RTS makes from its bankruptcy engagements and its other engagements is *McKinsey's* profit.

61.     Under applicable Generally Accepted Accounting Principles[29] and Internal Revenue Service rules,[30] McKinsey likely consolidates its subsidiaries' financial reporting up to its parent holding company, issues consolidated financial statements for the McKinsey organization as a whole, and files consolidated tax returns for the McKinsey organization as a whole.

62.     MIO provides a substantial and valuable service to the McKinsey organization, including McKinsey RTS.  MIO is the means by which McKinsey provides investment opportunities and retirement and pension services for McKinsey personnel *on account of their work for the McKinsey organization*.  MIO adds substantial value not only to its investors but also to the McKinsey organization, including McKinsey RTS, by providing highly enhanced financial incentives to its partners and employees.

63.     Nothing stops people associated with McKinsey RTS from accessing the substantial information about the MIO's investments that MIO makes available to them.  And nothing stops the MIO staff and management from accessing the substantial information about McKinsey RTS that is available to them.

64.     Whether any of that happens may be challenging to prove.  But, no one – not the parties, not the U.S. Trustee and certainly not this Court - should have to investigate it.  It is

---

[29] FASB 810-10-25-1, available at https://asc.fasb.org/imageRoot/92/63493892.pdf.

[30] *See* www.irs.gov/instructions/i1120so.

enough that 11 U.S.C. § 327 itself astutely recognizes the financial incentive to do to.  That is why Rule 2014 requires *McKinsey* to disclose its connections, including MIO's connections and 11 U.S.C. § 327 itself requires McKinsey RTS's disqualification where, as here, through MIO, it holds or represents an interest adverse to the estate, even without proof that McKinsey people actually access the information that is available to them.

65.     MIO's website asserts, "It makes investments essentially on a 'blind trust' basis, with MIO investors having no access to information about the underlying holdings in the third-party funds."[31]  McKinsey made this same claim in the *SunEdison* case[32] and in the *ANR* case.[33] ***But it is a false claim.***  A "blind trust" is: "A trust in which the beneficiaries have no knowledge of the holdings or management of the trust by the trustees."[34]  The MIO is not a blind trust or even "essentially" a blind trust.  Indeed, the investment operation of MIO, which constitutes roughly two-thirds of its assets, is not a trust at all.  The retirement investment operation is a trust, but it is governed by ERISA and is subject to ERISA's reporting requirements,[35] which are wholly inconsistent with a blind trust.  As noted in Part II.C.3. above, the investors in MIO on both the investment side and the retirement side are provided significant information about its holdings and those investors determine for themselves which investment options within MIO

---

[31] www.miopartners.com

[32] Amended Declaration of Mark W. Hojnacki, *SunEdison*, Dkt. 484, filed June 6, 2016, p. 27 of 87, ¶ 67.

[33] Third Supplemental Declaration of Kevin Carmody, *ANR*, Dkt. 2464, filed May 19, 2016, pp. 8-9, ¶ 20.  McKinsey has not yet made this claim in this case, perhaps in recognition of how false and deceptive it is.

[34] Legal Information Institute, WEX Legal Dictionary, available at:

www.law.cornell.edu/wex/blind_trust

[35] 29 U.S.C. §§ 1025(a)(2)(B)(i), 1024 and 1365; *see also* 26 U.S.C. § 6058

best suit them.  Yet despite these plain and undeniable facts, MIO's perpetuates this gross distortion that it is "essentially a blind trust."  And MIO makes that representation not only to its investors, but also to the public, to the U.S. Trustee Program, and to bankruptcy courts and interested parties in its bankruptcy cases.  This dangerous misrepresentation also substantially undermines and destroys the credibility of everything that McKinsey RTS asserts in this Court about MIO.

66.     McKinsey RTS's engagement agreement with the Debtors also proves beyond doubt that McKinsey is one firm.  The indemnification paragraph of this agreement applies to *all of McKinsey and everyone associated with it*:

> In order to induce McKinsey RTS to provide the Services to the Client, the Client hereby agree (i) to indemnify, hold harmless and defend McKinsey RTS, and its past, present and future affiliates, and each of their respective directors, officers, managers, shareholders, partners, members, employees, agents, representatives, advisors and controlling persons….[36]

67.     McKinsey RTS's declaration echoes this scope of protection,[37] as does the Debtors' application.[38]  This scope of protection would be approved in the Debtors' proposed order.[39]

68.     One further point bolts the door on McKinsey's claim the MIO and McKinsey RTS are separate and vaporizes the key.  *MIO regularly trolls for investments in the very market segment that McKinsey RTS trolls for work  – the distressed investment segment.*

---

[36] Dkt. 452, p. 28-30 of 194, ¶ 8(a).  This sentence is not reproduced in full here because it goes on for 338 words.  The indemnification paragraph in the agreement goes on for two full pages, single spaced.

[37] *Id*. at p. 47 of 194, ¶ 29.

[38] *Id*. at pp. 8-9 of 194, ¶ 21.

[39] *Id*. at pp. 19-20 of 194, ¶ 10.

69.     MIO's most recent SEC Form ADV, filed in September 2018, states that part of MIO's investment strategy is: "Distressed Investing. This strategy typically involves purchasing securities of companies in or near bankruptcy, liquidation or reorganization and sometimes selling stock of the same companies short."[40]

70.     MIO has made investments in at least seven bankruptcy cases.  The specific MIO funds involved in these investments have been the Compass TSMA, Compass ESMA, Compass Offshore HTV PCC LTC, Compass HTV LLC, Compass CSS High Yield LLC.[41]   MIO's distressed investing is also made through a third-party manager, Aristeia Capital.[42]

71.     These seven cases are:

    a.   *In re Seadrill Ltd.*[43] - The Compass TSMA and Compass ESMA funds appear as 5% or more shareholders in Seadrill's SEC filings.[44]   They also appear on a

---

[40] This document is available at:

    https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_*ID*=494983

The quoted entry is on page 12 of the brochure.

[41] Compass TSMA appears on the MIO's SEC Form ADV filed in 2014-2017.  They also appear on the most recent SEC Form ADV Sept. 10, 2018, pp. 108 and 110 of pdf, found on the SEC website at:

    adviserinfo.sec.gov/IAPD/content/ViewForm/crd_iapd_stream_pdf.aspx?ORG_PK=108637

Compass ESMA appears in McKinsey DOL Forms 5500 for 2013-2017, available on the United States Department of Labor website at:

    www.efast.dol.gov/portal/app/disseminate?execution=e1s2#

Compass Offshore HTV PCC LTC appears in McKinsey DOL Forms 5500 for 2009-2017, available on the United States Department of Labor website.

Compass HTV LLC appears on the MIO's SEC Form ADV's filed in 2012-2017.  It also appears on the most recent SEC Form ADV, Sept. 10, 2018, p. 27 of pdf.

[42] Aristeia Capital appears on the MIO's SEC Form ADV filed in 2014-2017.  It also appears on the most recent SEC Form ADV Sept. 10, 2018, pp. 108 and 110 of pdf.

[43] *In re Seadrill Ltd.* (S.D. Tex., No. 17-60079, filed Sept. 21, 2017).

23

service list in the bankruptcy case.[45]   Aristeia appears on Interested Parties Lists as a bondholder.[46]

b.   *In re Magnum Hunter Resources*[47] - Compass ESMA and Compass TSMA, along with Aristeia, appear in a supplement to the debtor's plan.[48]

c.   *In re Caesars Entertainment Operating Co.*[49] - Compass ESMA, Compass TSMA, and Compass Offshore HTV PCC LTD appear on Interested Party Lists.[50]

d.   *In re Endeavour Operating Corp.*[51] - An SEC EX-99 Settlement Agreement shows Compass Offshore HTV PCC and Compass HTV LLC as term loan lenders and identifies Aristeia and Whitebox as lenders.[52]

e.   *In re MPM Silicones LLC*[53] - The chapter 11 plan identified Compass TSMA, Compass ESMA and Aristeia as lenders.[54]   Compass TSMA, Compass ESMA and Aristeia then became a 3.51% shareholder of MPM Holdings, the successor to

---

[44] Seadrill's SEC F-1/A, filed July 18, 2018, p. 31, available at:

www.sec.gov/Archives/edgar/data/1737706/000119312518220681/0001193125-18-220681-index.htm

[45] *Seadrill* Dkt. 1168, pp. 108-9.

[46] *Westmoreland* Dkt. 192-2, Application to Employ Kirkland & Ellis, p. 37.

Compass TSMA, ESMA, and Aristeia Capital, LLC appear in Seadrill's SEC F-1/A filed 7/18/2018 as "Beneficial Owners of 5% or More of Our Common Shares", p. 31, found here:

www.sec.gov/Archives/edgar/data/1737706/000119312518220681/0001193125-18-220681-index.htm

[47] *In re Magnum Hunter Resources* Corp., (D. Del., No. 15-12533, filed Dec. 15, 2015).

[48] Fourth Amended Supplement to the Third Amended Joint Plan of Reorganization, Dkt. 1231, pp. 76 and 96.

[49] *In re Caesars Entertainment Operating Co.* (N.D. Ill., No. 15-01145, filed Jan. 15, 2015).

[50] *Caesars* Dkt. 2528-5, Application to Employ Jones Day, p. 6.

[51] *In re Endeavour Operating Corp.* (D. Del., No. 14-121308, filed Oct 10, 2014).

[52] Endeavour Operating Corp. SEC 8-K, ex99.2, exhibit 2, Aug. 3, 2015, available at:

www.sec.gov/Archives/edgar/data/1112412/000129993315001190/0001299933-15-001190-index.htm

[53] *In re MPM Silicones, LLC* (S.D.N.Y., No. 14-22503, filed April 13, 2014).

[54] *MPM* Dkt. 943, Amended Plan, p. 72.

MPM Silicones.[55]  This appears to be similar to Whitebox's interest in *ANR* and then in ANR's successor Contura.

    f.   *In re New Stream Secured Capital, Inc.*[56] - MIO and its private funds were the DIP Lenders and a party to the Plan Support Agreement.[57]  They also purchased estate assets. [58]  The MIO funds are SSALT Fund Limited; Compass Special Situations Fund LLC; Compass COSS Master Limited; and Special Situations Fund LP.[59]

    g.   *In re Commonwealth of Puerto Rico*[60] - MIO also has investments in Puerto Rico bonds through Compass and Aristeia.[61]  At the same time, McKinsey is also serving as a consultant and debt restructuring advisor to the Puerto Rico Oversight Board.[62]

**E.**    **McKinsey RTS's Attempt to Demonstrate That MIO Is Separate Utterly Fails on the Facts.**

72.    McKinsey RTS devotes four paragraphs of its declaration valiantly arguing that the separation between MIO and McKinsey RTS justifies concealing MIO's connections.[63]  But there is no separation, either factually or legally.

73.    McKinsey RTS's declaration asserts that "MIO Partners is operated separately and distinctly from McKinsey's consulting services."[64]  But this broad statement grossly

---

[55] MPM Holdings SEC S-1, Amendment No. 2, filed Oct. 31, 2017.

[56] *In re New Stream Secured Capital, Inc.* (D. Del., No. 11-10753, filed Mar. 13, 2011).

[57] *New Stream* Dkt. 4, Disclosure Statement, pp. 45, 73-77, 137, 191, 227 and 698 of 836.

[58] *Id.*

[59] *Id.*

[60] *In re Commonwealth of Puerto Rico*, (D.P.R., No. 17-03283, filed July 3, 2017).

[61] MIO made these investments through Compass CSS High Yield LLC (Claim No. 18578), Compass ESMA and Aristeia (Claim Nos. 32025, 22063), and Compass TSMA and Aristeia (Claim No. 38948).

[62] *See* First Interim Fee Application of McKinsey & Company, Inc. Washington D.C., Puerto Rico Dkt. 2073, filed Dec. 15, 2017.

[63] Dkt. 452, pp. 52-53 of 194, ¶¶ 36-39

oversimplifies and conceals how McKinsey and MIO really work.  As McKinsey RTS admits, "members of the Board of Directors of MIO Partners have oversight responsibilities with respect to the Plans and the Funds."[65]   What McKinsey RTS's declaration in this case fails to acknowledge to this Court is that because those MIO Board members are McKinsey partners, *MIO operations are managed and overseen by McKinsey partners*, and those McKinsey partners manage MIO with the duty to maximize the value of MIO for the benefit of the McKinsey because McKinsey is one firm.

74.    Recognizing this weakness in its position, McKinsey RTS tries to regain ground by asserting that "the Board of MIO Partners has delegated responsibility for making investment decisions on behalf of the Plans and the Funds to the professional staff of MIO Partners."  But again this broad statement grossly oversimplifies and conceals how McKinsey and MIO really work.  According to Mr. Lipscomb, "On a quarterly basis, consistent with their fiduciary duties to the Funds managed by MIO, the Investment Committee of the MIO Board reviews a list of redemption and allocation decisions made by MIO's professional investment staff."[66]   Mr. Lipscomb then added, "Through its oversight and supervisory functions or other board activities, members of the MIO Board may become aware of MIO Direct Investments, the identities of Third Party Managers with whom money has been invested, and individual investments made by such Third Party Managers."[67]

---

[64] *Id*. at p. 52 of 194, ¶ 37.

[65] *Id*. at p. 52 of 194, ¶ 38.

[66] Exhibit 4, p. 4, ¶6.  Actually, Mr. Lipscomb's first declaration in *ANR* echoed McKinsey RTS's declaration in this case: "[T]he MIO Board delegates responsibility for making investment decisions on behalf of the Plans and the Funds, and engaging and supervising Third Party Managers, to MIO's professional staff."  Exhibit 2, p. 3, ¶ 9.  However, when the U.S. Trustee questioned this broad assertion, Mr. Lipscomb "clarified" it in his supplemental declaration, as quoted in the text.

[67] Exhibit 4, at p. 3, ¶ 11.

75.     The MIO that Mr. Lipscomb described in the *ANR* case is not nearly as separate as the MIO that Mr. Hojnacki described in this case.   Deciding between these conflicting witnesses is easy:  Mr. Lipscomb has been the General Counsel and Secretary of MIO for 13 years;[68] McKinsey RTS's declarant, Mr. Hojnacki, is (likely) an investor with MIO.  Regardless, Mr. Hojnacki is unlikely to have personal knowledge of these assertions about MIO in his declaration.

76.     McKinsey RTS's attempt to demonstrate that MIO is separate, therefore, utterly fails on the facts.

### F.     McKinsey RTS's Attempt to Demonstrate That MIO Is Separate Also Utterly Fails on the Law.

77.     McKinsey RTS's pathetic efforts to demonstrate a separation between MIO and McKinsey RTS also fail on the law, because it cannot overcome the absolute mandate of disqualification that it faces under 11 U.S.C. § 327.

78.     *First*, nothing in 11 U.S.C. § 327 authorizes a bankruptcy court to approve, in its discretion, the employment of a professional that holds an interest adverse to the estate just because the court is satisfied that in the professional's organization, the particular professionals serving the debtor are separate from the managers of the adverse interest.   Under 11 U.S.C. § 327(a), the disqualification of the professional with an actual conflict of interest is mandatory, not discretionary.[69]  Congress could have allowed for such discretion in subsection (a) of Section 327, as it did in subsections (b), (c), (d) and (e), but it did not.

---

[68] Exhibit 2, p. 1, ¶ 1.

[69] *See, e.g.*, *In re Humble Place Joint Venture*, 936 F.2d 814, 818–19 (5th Cir. 1991); *In re Pillowtex, Inc.*, 304 F.3d 246, 254 (3d Cir. 2002) ("Although a bankruptcy court enjoys considerable discretion in evaluating whether professionals suffer from conflicts, that discretion is not limitless.   A

79.     McKinsey RTS has never cited any cases holding that a court has the discretion to do what McKinsey RTS asks in this case.   There are no such cases.   Its position is without precedent.   The case law is uniformly to the contrary.[70]   "In summary, § 327(a) mandates disqualification when there is an actual conflict of interest[.]"   *In re First Jersey Sec., Inc.*, 180 F.3d 504, 509 (3d Cir. 1999).

80.     *Second*, it is clear why Congress allowed no such discretion for an actual conflict of interest – the stakes are too high.   The integrity of the Court's process and the public's confidence in it are both too important and too readily risked and lost.   Fair process and the perception of it are as much about eliminating questions as they are about getting answers. McKinsey RTS plainly felt a strong need in this case to even attempt to answer some of the questions that its organizational structure and business model raise under 11 U.S.C. § 327.   That attempt failed.   And there are many more questions.   But 11 U.S.C. § 327 says that the interested parties in this case should not have had to ask any questions, let alone worry about McKinsey RTS's answers.

81.     Ultimately, McKinsey RTS asks this Court to accept an incalculable risk to the integrity of the judicial process.   It also asks the parties to accept the incalculable risk that McKinsey's work as a fiduciary for them will not be affected by its multiple connections.   Both of those asks are based upon a unanimous and anonymous assurance from each of McKinsey's 30,000 employees in over 127 cities in over 65 countries around the world.   It is the assurance

---

bankruptcy court does not enjoy the discretion to bypass the requirements of the Bankruptcy Code."); *In re First Jersey Sec., Inc.*, 180 F.3d 504, 509 (3d Cir. 1999); *U.S. Trustee v. Price Waterhouse*, 19 F.3d 138 (3d Cir. 1994); *In re Middleton Arms Ltd. P'ship*, 934 F.2d 723 (6th Cir. 1991); *In re Quality Beverage Co., Inc.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995); *In re Woodworkers Warehouse, Inc.*, 303 B.R. 740, 742 (Bankr. D. Del. 2004);   *In re LKM Indus., Inc.*, 252 B.R. 589, 592 (Bankr. D. Mass. 2000).

[70] *Id.*

that they will respect the separation between McKinsey RTS and MIO that McKinsey RTS asserts in this Court – a separation that is it asserts is sufficiently robust to protect the Court and its integrity from human temptation and frailty.  That assurance defies reality, even McKinsey's reality.[71]

82.     And the source of this assurance – McKinsey RTS – highlights its emptiness.  *If McKinsey RTS is truly separate from MIO, then McKinsey RTS cannot speak for MIO in assuring this Court that its separation from MIO protects the precious values that 11 U.S.C. § 327 was enacted to protect.*

83.     In the insight and wisdom of 11 U.S.C. § 327, McKinsey is one firm and McKinsey RTS and MIO are not separate.

84.     ***Rule 2014 therefore requires McKinsey RTS to disclose all of McKinsey's connections, including those of MIO.***

85.     ***Because MIO and McKinsey RTS are not separate, every MIO connection to the Debtors and to the Debtors' creditors, customers, competitors or suppliers means that McKinsey, its partners and its employees hold an interest that is adverse to the estate that is a disqualifying under 11 U.S.C. § 327.***

86.     McKinsey RTS has intentionally concealed MIO's holdings of equity interests in those parties.  Some of those MIO connections are identified in Parts III.B. and III.C. below. ***McKinsey's concealment of MIO's connections is a fraud on this Court that threatens the***

---

[71] McKinsey's own reality undermines its assurance to the Court that its people will respect this alleged separation between MIO and McKinsey RTS.  That reality includes several recent difficulties that a few of its people have caused both McKinsey itself and others in: (1) South Africa; (2) Saudi Arabia; (3) the United States (for insider trading); (4) Puerto Rico; and (5) the *ANR* case (for its illegal $50 million profit).

*integrity of the Court's process and that demands this Court's denial of the Debtors'*

*application.*

**III.     McKinsey RTS Is Not Qualified to Serve as a Professional for the Debtors Because It Holds and Represents Multiple Interests That Are Adverse to the Debtors' Bankruptcy Estates and Because It Is Not Disinterested.**

87.     11 U.S.C. § 327 provides:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

88.     11 U.S.C. § 101(14) provides:

The term "disinterested person" means a person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

89.     Accordingly, to obtain this Court's approval of McKinsey RTS's employment under 11 U.S.C. § 327(a), the Debtors must prove that McKinsey RTS does not hold or represent an interest adverse to the Debtors' estates and that McKinsey RTS is "disinterested" under 11 U.S.C. § 101(14).

90.     The Debtors' application for approval to employ McKinsey RTS should be denied because McKinsey RTS holds and represents interests adverse to the Debtors' bankruptcy estates and because it is not disinterested.

A.    **The Respective Fiduciary Obligations of McKinsey RTS and MIO Irreconcilably Conflict.**

91.    As Mr. Garcia and Mr. Lipscomb admit in their declarations in the *ANR* case, MIO has fiduciary obligations to its investors.  Mr. Lipsomb's declaration states, "As an investment adviser, MIO has fiduciary obligations towards the Plans and the Funds."[72]  Mr. Garcia's supplemental declaration states, "Because the MIO Board delegated responsibility for making investments to MIO's professional staff, we reviewed those investments at a high level, *to exercise our fiduciary responsibilities.*"[73]

92.    As an investment advisor, MIO is bound to the fiduciary standards established in the Investment Advisers Act of 1940.[74]  MIO's fiduciary duties as an investment adviser are similar to McKinsey RTS's fiduciary duties as a bankruptcy professional.  Each must place its clients' interests above its own.  And each owes its clients a duty of loyalty, a duty of care, and a duty to act in the best interest of its clients.[75]

---

[72] Exhibit 2, p. 2, ¶ 4; *see also* Exhibit 4, p. 4, ¶ 6.

[73] Exhibit 3, p. 2, ¶ 4 (emphasis added).

[74] 15 U.S.C. § 80b-1 through 15 U.S.C. § 80b-21.

[75] For the duties of an investment advisor, *see, e.g.*, 15 U.S.C. § 80b-6; *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) (describing in detail an investment adviser's fiduciary duties under the Investment Advisers Act).  The Securities Exchange Commission states:

> As an investment adviser, you are a "fiduciary" to your advisory clients. This means that you have a fundamental obligation to act in the best interests of your clients and to provide investment advice in your clients' best interests. You owe your clients a duty of undivided loyalty and utmost good faith. You should not engage in any activity in conflict with the interest of any client, and you should take steps reasonably necessary to fulfill your obligations. … You must eliminate, or at least disclose, all conflicts of interest that might incline you — consciously or unconsciously — to render advice that is not disinterested. If you do not avoid a conflict of interest that could impact the impartiality of your advice, you must make full and frank disclosure of the conflict. You cannot use your clients' assets for your own benefit or the benefit of other clients, at least without client consent.

93.    On this point, Mr. Lipscomb loses all credibility with this statement in his declaration in *ANR*: "The MIO Board is not responsible for making investment decisions on behalf of the Plans or the Funds."[76]  The MIO Board's fiduciary duties under law clearly make it fully responsible for those decisions.  Once again, we witness a McKinsey affiliate unlawfully reject its fiduciary responsibilities.[77]

94.    McKinsey's insurmountable problem is that it owns, manages and profits from both MIO and McKinsey RTS, and, as 11 U.S.C. § 327 so astutely recognizes, McKinsey's fiduciary obligations to its investors clash directly and repeatedly with its fiduciary obligations to its bankruptcy clients.

95.    In every Chapter 11 case, the absolute priority rule of 11 U.S.C. § 1129(b)(2) means that when a bankruptcy estate is insolvent, as it almost always is, the creditors of the estate must be paid in full before the equity holders can recover anything.  Therefore, those interests always directly clash (unless the estate is solvent).

96.    As a result, when MIO is managing an equity or debt investment in a chapter 11 debtor that employs McKinsey RTS as a professional, the interests of those MIO investors directly conflict with the interests of the McKinsey RTS bankruptcy estate client.  That is

---

www.sec.gov/divisions/investment/advoverview.htm

        For the fiduciary duties of a bankruptcy professional, *see, e.g.*, *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) ("undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities"); *In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999) (same); *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998) (same); *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 436 (6th Cir. 2004) ("forbearance of all opportunities to advance self-interest"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 984 (3d Cir. 1998) (same); *In re McConville*, 110 F.3d 47, 50 (9th Cir. 1997) (duty of care and loyalty); *In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 900 (8th Cir. 2007) (same).

        [76] Exhibit 2, p. 3, ¶ 9.

        [77] See Part VIII, below.

precisely why 11 U.S.C. § 327 explicitly prohibits McKinsey RTS from serving a Chapter 11 debtor when its partners and employees hold an equity interest in the debtor.

97.     The same outcome results when MIO holds either a distressed debt investment or an equity interest or investment in a creditor, supplier, competitor or customer of a Chapter 11 debtor that McKinsey RTS serves.  That is so because in our free market economy, the interests of any organization that is in business to make a profit directly conflict with the interests of its creditors, suppliers, competitors and customers.  11 U.S.C. § 327 therefore explicitly prohibits McKinsey and McKinsey RTS from serving a chapter 11 debtor when their partners and employees hold an equity interest in any of the debtor's creditors, suppliers, competitors and customers.[78]

## B.     McKinsey and Its Partners and Employees Assigned to Assist the Debtors Hold Disqualifying Interests *in the Debtors Themselves*.

98.     McKinsey, its partners and its employees hold indirect equity interests in the Debtors through the following ten undisclosed MIO investments:

---

[78] 11 U.S.C. § 327(c) does not help McKinsey.  It states:

> In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

At stake here is MIO's *ownership* interest in a creditor, not its "employment by or representation of a creditor[.]"  *Id.*  For the same reason, 11 U.S.C. § 1107(b) does not help McKinsey.  That section provides:

> Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

At stake here is MIO's ownership interest in the Debtors, not McKinsey's "employment by or representation of the debtor before the commencement of the case."

- Barclays PLC
- Blackrock Advisors LLC
- Blackrock Fund Advisors
- BlackRock Inc.
- Blackrock Institutional Trust
- Blackrock Investment Management LLC
- Citadel Advisors LLC
- Pacific Investment Management Co.
- SSGA Funds Management Inc.
- State Street Corp.

99.    It is highly likely that McKinsey additional concealed investments in other shareholders of the Debtors, for two reasons.  First, many other shareholders in which MIO has invested likely hold a less than a 5% interest in the Debtors.  Second, the list in the preceding paragraph only includes MIO's investments of its retirement assets (which are disclosed on its publicly available Labor Department Forms 5500), of which MIO has about $8 billion in assets.  The MIO's equity holdings in its additional $17 billion in investment assets are not publicly accessible but do likely include additional equity holdings in shareholders of the Debtors.

100.    McKinsey RTS deliberately concealed these and all of its MIO connections in its declaration.  Indeed, it admits, "McKinsey RTS US has not asked MIO Partners to search for connections to the Potential Parties in Interest."[79]

101.    Under 11 U.S.C. §§ 327(a) and 101(14), each such connection disqualifies McKinsey RTS from serving as a professional for the Debtors, because through each such connection, McKinsey and its partners and employees holds an interest adverse to the estate.

102.    It does not matter that the equity interest that McKinsey, its partners and its employees hold is an indirect interest.  11 U.S.C. § 101(14) expressly prohibits service by a

---

[79] Dkt. 452, p. 53 of 194, ¶40.

professional that has "an interest materially adverse to the interest … of any class of creditors …, by reason of any direct *or indirect* relationship to, connection with, or interest in, the debtor[.]"

**C.  McKinsey and Its Partners and Employees Assigned to Assist the Debtors Hold Disqualifying Interests *in Interested Parties*.**

103.  McKinsey RTS has unlawfully concealed at least seven investments in interested parties that McKinsey partners and employees, including those of McKinsey RTS, hold through MIO.  MIO has investments in the following seven *undisclosed interested parties*:

- Bank-Lender-Administrative Agents
  1. Barclays Bank PLC
  2. Blackrock Capital Investment Corp.
  3. PIMCO Funds[80]
  4. State Street Corp.
  5. Whitebox Advisors LLC

- Contract Counterparties
  6. Blackrock Kelso Capital Corp.
  7. Cerberus Business Finance LLC

104.  It is highly likely that McKinsey RTS has also concealed additional investments in other interested parties for the reasons identified in paragraph 99.

---

[80] MIO's DOL Forms 5500 simply identify "PIMCO Funds" as an investment.  That generic disclosure could refer to any or all of 28 PIMCO entities that are interested parties.  To give MIO the benefit of the doubt, this connection is counted as 1 rather than 28.  The PIMCO names on the interested parties list are Pacific Investment Management Co., Pacific Investment Management Co. LLC, Pacific Investment Management Co., Employees' Retire , PIMCO , PIMCO Bermuda Trust II, PIMCO Bermuda Trust II: Pimco Bermuda Income Fund (M), PIMCO Cayman Trust, PIMCO Corporate & Income Opportunity, PIMCO Corporate & Income Strategy, PIMCO Corporate & Income Strategy Fund, PIMCO Dynamic Credit And Mortgage Income Fund, PIMCO Flexible Credit Income Fund, PIMCO Funds, PIMCO Funds Ireland PLC, PIMCO Funds: Global Investors Series PLC Income Fund, PIMCO Funds: PIMCO Income F6nd, PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund, PIMCO Funds: PIMCO Long-Term Credit Fund, PIMCO Global Credit Opportunities, PIMCO Global Income Opportunities Fund, PIMCO Global Stocksplus & Income Fund, PIMCO High Income Fund, PIMCO Income Fund, PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II, PIMCO Investment G, PIMCO Loan Interests & Credit, PIMCO Monthly Income Fund (Canada) , PIMCO Senior Floating.

105.    The MIO's investment in any such creditor, customer or competitor is "an interest adverse to the estate" because those parties are adverse to these bankruptcy estates.  Under 11 U.S.C. § 327(a), therefore, any MIO investment in a creditor, a customer or a competitor disqualifies McKinsey RTS from employment by the Debtors.

**D.      McKinsey RTS Represents at Least 237 Connections That Are "Interests Adverse to the Estate."**

106.    McKinsey RTS's declaration discloses 153 connections across most categories of interested parties.[81]   In addition, Mar-Bow has discovered that McKinsey RTS has concealed another 84 connections, also across most categories of interested parties.  Thus, McKinsey RTS has at least 237 connections to interested parties, and likely many more.  The combined list of categories of interested parties that are McKinsey RTS connections is impressive:

- 5% or More Shareholders
- Bank-Lender-Administrative Agents
- Bankruptcy Professionals
- Contract Counterparties
- Customers
- HR Benefits
- Insurance
- Other Significant Creditors
- Significant Competitors
- Sureties
- Top 50 Creditors
- Utilities
- Vendors

107.    The only categories of interested parties in which McKinsey does not have client connections are:  Directors & Officers, Bankruptcy Judges, Bondholders-Indentured Trustee,

---

[81] *Id.* at pp. 55-63 of 194; ¶¶ 47-71.

Governmental/Regulatory Agencies, Landlords, Litigation, Ordinary Course Professionals, Taxing Authorities, U.S. Trustee Office and Unions.

108.    To determine whether McKinsey RTS is disqualified by this massive number of 304 connections to interested parties across these significant categories of interested parties, it is crucial to examine McKinsey RTS's scope of services.  The Debtors' application states:

> 10. In connection with the Debtors' restructuring, McKinsey RTS is providing advisory services related to performance improvement opportunities in the Debtors' business. More specifically, as requested by the Debtors and agreed to by McKinsey RTS, the services (the "Services") include the following:
>
> a. Operational Improvement Planning – Assisting the Debtors with identifying and planning detailed initiatives to support improvements in operating performance in mining operations, corporate functions and commercial agreement;
>
> b. Operational Support – Providing the Debtors with hands-on support to implement the detailed initiatives to support operational improvements;
>
> c. Business Plan – Supporting the Debtors and their Restructuring Advisor, Alvarez & Marsal North America, LLC, with the incorporating the operational improvement plans into the Debtors' business plan, disclosure statement and plans of reorganization;
>
> d. Constituent Management – Assisting in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents and provide related ad hoc support to the management team on matters related to the operational improvement plans; and
>
> e. Other Operational Services - As appropriate, assisting the Debtors with other matters as may be requested by the Debtors and that are mutually agreed upon between McKinsey RTS and the Debtors.[82]

---

[82] Dkt. 452, p. 5 of 194, ¶ 10.

109.    Subparagraph 10a states that McKinsey RTS will support initiatives to improve "commercial agreements."  These commercial agreements are likely the Debtors' contracts with its contract counterparties, customers, utilities and vendors.  But in those categories, McKinsey RTS has multiple clients and will be dealing with them for the purpose of improving the Debtors' operations.  McKinsey RTS will thus be working with its Debtor clients to seek concessions and give -backs from its non-debtor clients.  This is the very essence of an actual conflict of interest.

110.    Subparagraph 10c states that McKinsey RTS will assist the Debtors in formulating their plan and disclosure statement, which directly adversely impacts every one of its creditor clients.  This is a second actual conflict of interest for McKinsey RTS.

111.    Subparagraph 10d states that McKinsey RTS will attend meetings with stakeholders and constituents on the Debtors' behalf to provide information about the Debtors' "operational plans."  In these meetings, McKinsey RTS will come face to face with its own clients.  This is yet a third actual conflict of interest.

112.    Subparagraph 10e opens the door for McKinsey RTS to perform any services in the case for the Debtors.  It is therefore impossible at this point to evaluate what conflicts of interest might result from such services.

113.    What McKinsey RTS conceals when it so cavalierly assures the Court that "McKinsey RTS US does not hold an adverse interest to the Debtors' estates, and that McKinsey RTS US is a "disinterested person" is that its obligations to the Debtors directly conflict with its obligations to these interested parties who are its clients.  On one side, to these Debtors, as a matter of bankruptcy law, McKinsey (not just McKinsey RTS) owes a fiduciary duty of loyalty – a duty to give 100% of its effort and its brand to protect and enhance the Debtors' bankruptcy

estates, without regard for its own interests or those of any other client.  Bankruptcy law tolerates

no exception to or compromise of this duty.  It is absolute.  On the other side, to McKinsey's

other clients who are interested parties, it owes precisely the same duties to the same absolute

degree.  Although McKinsey likely owes those duties to these clients as matter of contract rather

than law, those duties are just as important to those clients.

114.    So, when McKinsey RTS participates in or supports a negotiation or renegotiation

of the Debtors' "commercial agreement" with another client, or when McKinsey RTS helps the

Debtors craft and pursue a plan of reorganization that impairs or eliminates its other clients'

claims, or even when it merely prepares "diligence materials" or participates in a "diligence

session" with any of its clients who are stakeholders and constituents, *it simply cannot faithfully*

*execute its duty of 100% loyalty to each side.*   In any of those circumstances, intolerable

questions will naturally and reasonably arise as whether McKinsey RTS's service for the Debtors

has been affected even to the slightest degree by its felt duties to its other clients.  As the court

held in *In re BH & P Inc*., 949 F.2d 1300, 1308 (3d Cir. 1991) the requirement that a professional be

"disinterested" excludes any "interest or relationship that would even faintly color the

independence and impartial attitude required by the Code."

115.    McKinsey RTS's engagement letter with the Debtors actually recognizes this

issue: "To avoid situations of potential conflict, McKinsey RTS will not assign consultants, who

are providing the Services and who receive Confidential Information, to a competitively

sensitive project for a significant period -of time (typically two years) following an assignment

for the Client."   But the Court and the interested parties cannot trust McKinsey RTS to fulfill this

obligation.  As demonstrated in Part VII.D.5. below, in the *ANR* case, two McKinsey partners

served both ANR and its largest customer, United States Steel in negotiation of coal pricing.

116.    These McKinsey RTS connections are therefore disqualifying conflicts of interest under 11 U.S.C. § 327.

**D.      McKinsey RTS's Connections to Interested Parties Who Provide Services to MIO Are Disqualifying.**

117.    Among McKinsey RTS's concealed connections are interested parties who provide services to MIO.  They include MIO Fund Custodians, who hold MIO cash, and MIO Prime Brokers, who execute securities transactions for MIO.  These relationships are crucial to MIO and to McKinsey because of MIO's status as a fiduciary for its investors and because of the very large sums of money involved.  As a result, it is highly unlikely that McKinsey RTS would ever take or recommend any action adverse to them.  As a result of each of them, therefore, McKinsey RTS is not disinterested.

118.    The MIO Fund Custodians who are interested parties include:

1.   Citicorp USA Inc
2.   Citigroup Inc
3.   Credit Suisse AG
4.   Credit Suisse Group AG
5.   Morgan Stanley
6.   Morgan Stanley & Co. LLC
7.   Morgan Stanley Smith Barney LLC
8.   Northern Trust Co.
9.   Northern Trust Corp.
10. SG Americas Securities LLC
11. UBS
12. UBS AG
13. UBS Group AG

119.    The MIO Prime Brokers who are interested parties include:

1.   Credit Suisse AG
2.   Credit Suisse Group AG
3.   Morgan Stanley
4.   Morgan Stanley & Co. LLC
5.   Morgan Stanley Smith Barney LLC

120.    Because McKinsey RTS is not disinterested due to these connections, the Debtors' application must be denied.

**E.    McKinsey RTS's Connections to the Debtors' Competitors Are Disqualifying.**

121.    McKinsey RTS admits that one of its clients is a significant competitor of the Debtor - Peabody Energy Corp.  In fact, Peabody is the largest producer of coal in the United States with 156,728 short tons of production in 2017.[83]  Westmoreland Coal ranks 9th with 25, 053 short tons of production in 2017.

122.    In fact, McKinsey RTS has served another competitor, Contura Energy, which was formed to purchase the prime assets of ANR in its bankruptcy, and which recently merged back with reorganized ANR.  In addition, MIO has an equity ownership interest in Contura.  It ranks 16th in coal production with 10,449 short tons produced in 2017.  *McKinsey RTS unlawfully concealed these connections in its declaration.*

123.    McKinsey RTS also refused to disclose the identities of many more of its clients who are the Debtors' competitors.  For example, without identifying any clients, McKinsey RTS stated that its clients include competitors of the Debtors.[84]  Indeed, McKinsey boasts that it has done 2,045 projects in the electric power and natural gas industry and served "*70% of the 40 largest players and utilities in the sector.*"[85]  It also boasts that it has done "1,000 studies in the mining industry over the last five years and *serves the majority of the world's top major*

---

[83] These rankings and production numbers are from the U.S. Energy Information Administration Annual Coal Report 2017, available at:

www.eia.gov/coal/annual/pdf/table10.pdf

[84] Dkt. 452, p. 63-4 of 194, ¶ 72-74.

[85] Dkt. 452. p. 38 of 194, ¶ 7 (emphasis added).

*diversified mining companies and many of the leading specialist mining companies (including many of the top coal producers).*"[86]

124.    McKinsey RTS's service for the Debtors' competitors creates an irreconcilable conflict of interest and breach of its fiduciary duty of undivided loyalty.  As a result of McKinsey RTS's service for the Debtors' competitors, it is not "disinterested," as 11 U.S.C. § 327(a) requires.  In *In re Rio Valley Motors Co., LLC*, 2007 WL 2492685, at *3 (Bankr. D.N.M. 2007), the court observed that a professional with a connection to a competitor of the debtor "might end up with conflicting loyalties[.]"[87]

125.    When McKinsey RTS and its affiliates provide business consulting services to both the Debtors and their competitors, this is the essence of "an active competition between two interests, in which one interest can only be served at the expense of the other." *BH & P, Inc.*, 103 B.R. at 563.  Each competing interest employs *McKinsey* because of the competitive advantage that it perceives will result in the marketplace.  And, of course, McKinsey itself promotes that perception.  Its service to competing interests is therefore a disqualifying conflict of interest.  It may be acceptable outside of bankruptcy, but when McKinsey RTS is employed by a debtor in a chapter 11 case, it is a fiduciary that must pledge its full loyalty, *and that of its affiliates*, to the debtor's bankruptcy estate.

126.    McKinsey RTS attempts to justify its qualification to serve despite its conflict of interest.  That attempt fails.  McKinsey's Rule 2014 declarations states, ". . . to the best of my knowledge, such services are unrelated to the Debtors and these chapter 11 cases . . . and specifically do not focus on direct commercial relationships or transactions between such

---

[86] Dkt. 452. p. 38 of 194, ¶ 8 (emphasis added).

[87] *See also In re Hinesley Family Ltd. P'ship No. 1*, 2012 WL 113821 (Bankr. D. Mont. 2012).

companies and the Debtors."[88]  McKinsey also states the following regarding its services for the Debtors and their competitors: "As noted, McKinsey RTS and its affiliates have a long-standing policy of serving competing companies and do so in a manner that protects the confidentiality of each client's information.  In fact, McKinsey RTS's expertise which the Debtors desire to utilize for the purposes described herein derives from McKinsey RTS's and its affiliates' broad-based service in many different aspects of the industry and business sector in which the Debtors operate."[89]

127.    These statements reflect two defenses – that its service to the Debtors' competitors do focus on a direct commercial relationship and that it protects the confidentiality of each client's information.  Both assertions are highly questionable as a matter of McKinsey's commercial reality and McKinsey's business practices.

128.    But even if both of these statements were true, they are irrelevant.  As noted, both McKinsey and its clients who are the Debtors' competitors intend that the services that McKinsey provides to the Debtors' competitors will give those competitors an advantage over their competitors, including the Debtors.  And when employing McKinsey, the Debtors expect the same advantage.  In these circumstances, it does not matter that McKinsey's services "do not focus on direct commercial relationships or transactions between such companies and the Debtors."  Nor does it matter that McKinsey "protects the confidentiality of each client's information."

129.    Where the very purpose of the employment is business advice, serving competitors is an actual conflict of interest.  Outside of bankruptcy, informed competitors may

---

[88] Dkt. 452, p. 63 of 194, ¶ 72.

[89] *Id*., at p. 64 of 452, ¶ 74.

choose to employ McKinsey and its affiliate regardless of any actual conflict of interest.  But in a chapter 11 case, 11 U.S.C. § 327 prohibits that choice.

### F.    McKinsey RTS Is Not "Disinterested."

130.    In assessing whether a professional is disinterested under 11 U.S.C. § 101(14), courts consider multiple factors.  Under these any and all of these standards, McKinsey RTS is not "disinterested":

    a)  Does the professional possess or assert for a client any economic interest that would tend to lessen the value of the bankruptcy estate or create either an actual or potential dispute in which the estate would be a rival claimant?[90]

    *Yes.  McKinsey RTS's client relationships with interested parties obligate it to assert their economic interests that tend to lessen the value of the bankruptcy estate and create either an actual or potential dispute in which the estate would be a rival claimant.*

    b)  Does the professional possess a predisposition under the circumstances to be biased against the estate?[91]

    *Yes.  McKinsey RTS's duties to its clients who are interested parties **requires** it to be biased against the estate.*

    c)  Does the professional have some interest or relationship that would even faintly color the independence and impartial attitude required by the Bankruptcy Code?[92]

    *Yes.  McKinsey RTS's relationships with its clients who are interested parties **more than** faintly color the independence and impartial attitude required by the Bankruptcy Code.*

    d)  Is it likely that the professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest?[93]

---

[90] *See, e.g.*, *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012); *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008); *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998).

[91] *See, e.g.*, *Am. Int'l Refinery*, 676 F.3d at 461; *AFI Holding*, 530 F.3d at 845; *Crivello*, 134 F.3d at 835.

[92] *See, e.g., Crivello*, 134 F.3d at 835; *Rome*, 19 F.3d at 58 n.1 (1st Cir. 1994); *In re Lewis Rd., LLC*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. Dec. 9, 2011).

> *Yes.  McKinsey RTS's services, as set forth in the Debtors' application will constantly place it in a position permitting it to favor one interest over an impermissibly conflicting interest.*

e) Is the professional serving the debtors with divided loyalty and providing tainted advice and assistance?[94]

> *Yes.  As a result of its conflicting legal obligations to the Debtors and to its other clients who are interested parties, McKinsey RTS's loyalty is divided, and it cannot give untainted advice and assistance.*

f) Does any competing interest of the professional create either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors - an incentive sufficient to place those parties at more than acceptable risk - or the reasonable perception of one?[95]

> *Yes.  McKinsey RTS's obligations to its clients who are interested parties constantly creates a meaningful incentive to act contrary to the best interests of the estate and to place those parties at more than acceptable risk, and reasonable perception of such a risk.*

131. McKinsey and McKinsey RTS fail every one of these court-approved considerations for determining whether a professional is disinterested under 11 U.S.C. § 101(14). *And it fails them as to both its disclosed connections and its undisclosed connections.*

132. In *In re Midway Motor Sales*, 355 B.R. 26 (Bankr. N.D. Ohio 2006), the court summarized the disinterestedness standard:

---

[93] *In re Pillowtex, Inc.,* 304 F.3d 246, 251 (3d Cir. 2002); *In re Git-N-Go Inc.*, 321 B.R. 54, 58-59 (Bankr. N.D. Okla. 2004) ("[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate."); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (an actual conflict exists if there is "an active competition between two interests, in which one interest can only be served at the expense of the other.")

[94] *See, e.g.*, *Rome*, 19 F.3d at 58; *In re Arlan's Dept. Stores, Inc.*, 615 F.2d 925, 936-37 (2d Cir. 1979); *In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *aff'd in pertinent part*, 119 B.R. 35 (D.N.J. 1990) ("As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case."); *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D. Colo. 1990) (quoting COLLIER ON BANKRUPTCY ¶ 327.03 (1985)).

[95] *Rome*, 19 F.3d at 58; *In re Martin*, 817 F.2d 175, 179 (1st Cir. 1987).

In determining whether a professional has or represents an "adverse interest," one court observed: "[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate." *In re The Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). An actual conflict exists if there is "an active competition between two interests, in which one interest can only be served at the expense of the other." *In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *aff'd in pertinent part*, 119 B.R. 35 (D.N.J. 1990). "As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case." *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D. Colo. 1990).

133.    Applying *Midway Motor Sales* to McKinsey's connections in this case:

- It is plausible that the representation of another interest may cause McKinsey to act differently than it would without that other representation.

- There is an active competition between the interests held by the Debtors and the interests held by McKinsey's other clients, in which one interest can only be served at the expense of the other.

- McKinsey does have a conflicting interest which might affect the performance of its services or which might impair the high degree of impartiality and detached judgment expected of it during the administration of a case.

134.    The Debtors' application must therefore be denied.


**G.      Media Reporting of McKinsey RTS's Failure to Disclose its Connections and of Its Disqualifying Conflicts of Interest Are Likely Already Eroding Public Confidence in the Integrity of the Bankruptcy Cases in Which It Serves.**

135.    As noted in Part VI.B. above, this Court's strict enforcement of Rule 2014 and 11 U.S.C. § 327 is critical to maintain the integrity of the bankruptcy case and the public's confidence in it.

46

136.    "The courts are absolutely uniform as to one command: the bankruptcy court must —no matter how unpleasant a task it may be—ensure the integrity of the bankruptcy process.  The interests of maintaining public confidence in the bankruptcy system must prevail." *In re Watson*, 94 B.R. 111, 117 (Bankr. S.D. Ohio 1988).

137.    "This requirement goes to the heart of the integrity of the administration of the bankruptcy estate."  *United States v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999).

138.    Unfortunately, the media has already published substantial and credible reporting on McKinsey RTS's concealment of its connections in its bankruptcy cases and especially on its disqualifying conflicts of interest:

- "Bankruptcy Watchdogs Say McKinsey Disclosures are Inadequate" The Wall Street Journal, May 17, 2016[96]

- "McKinsey's secret $5bn fund in spotlight; Questions raised over conflicts of interest at consultancy's internal investment arm" www.ft.com, June 5, 2016.[97]

- "Secretive McKinsey investment arm fuels conflict of interest fears," Financial Times, June 6, 2016.[98]

- "Why McKinsey should invest more in the open" www.ft.com, June 6, 2016.[99]

- "Inside McKinsey's private hedge fund" www.ft.com, June 6, 2016.[100]

- "Judge Orders McKinsey to Disclose Confidential Client Roster" The Wall Street Journal, June 29, 2016[101]

---

[96] Exhibit 5.

[97] Exhibit 6

[98] Exhibit 7

[99] Exhibit 8

[100] Exhibit 9

[101] Exhibit 10

- "McKinsey Is Big in Bankruptcy-and Highly Secretive" The Wall Street Journal, April 27, 2018[102]

- "McKinsey's Investments Weren't Disclosed in Bankruptcy Cases" The Wall Street Journal June 19, 2018[103]

- McKinsey Advises Puerto Rico on Debt, It may Profit on the Outcome", New York Times, Sept. 26, 2018[104]

139.    Even Congress itself is expressing concern about McKinsey RTS's failure to comply with Rule 2014 in Chapter 11 cases.  On July 17, 2018 Representative Andy Biggs, a member of the House Judiciary Committee, sent a letter to Clifford J. White III, the Director of the U.S. Trustee Program.  Rep. Biggs' letter quoted from the Wall Street Journal article that reported on McKinsey RTS and inquired, "Can you explain the disparity of disclosures between McKinsey RTS and the other 45 bankruptcy professionals?"[105]

140.    After Director White's response, Rep. Biggs sent a second letter to Director White dated September 26, 2018, stating:

> Although your letter has cleared up a few issues, I remain concerned about enforcement of the Rule 2014 disclosure process as demonstrated by the recent allegations concerning McKinsey RTS. I have also taken note of the fact that your office has sought to reopen the Alpha Natural Resources matter in the Eastern District of Virginia based on new information that you have received regarding McKinsey's potential failure to disclose conflicts of interest.
>
> * * *
>
> You stated that "professionals may be excused from publicly filing mandatory disclosures only if the bankruptcy court grants a motion

---

[102] Exhibit 11

[103] Exhibit 12

[104] Exhibit 13

[105] Exhibit 14

to seal documents under 11 U.S.C. § 107 or similar authority.' But it appears from news reports and court records that McKinsey's practice is not to file such a motion, but simply disclosing connections as "confidential clients". *McKinsey has publicly stated that it has a "long-standing policy" to protect clients' identities. In the context of the bankruptcy rules, this practice would seem to destroy the legitimate purpose of Rule 2014.* Indeed, in a court filing, the USTP stated that "McKinsey's private contractual agreements do not and cannot supersede the ethics and disclosure requirements of the Bankruptcy Code and Rules."[106]

141.    It is this Court's responsibility, perhaps its most important responsibility, to stop and reverse any potential source or erosion of public confidence in the integrity of the bankruptcy process.   McKinsey RTS's concurrent obligations to the Debtors and to its other clients who are interested parties in this case creates that real potential.   Accordingly, the Debtors' application must be denied.

### H.    McKinsey RTS Also Holds an Interest Adverse to the Estate Because It Is Liable for Avoidable Preferences Totaling $1,565,000.

142.    McKinsey RTS's declaration discloses that the Prepetition Agreement between the Debtors and McKinsey RTS provided that the Debtors would pay McKinsey RTS US $325,000 per week for its services.[107]   This commenced on July 17, 2018.[108]

143.    McKinsey RTS's declaration also discloses that on August 1, 2108, the Debtors paid $1,500,000 to McKinsey RTS for a "Fee Advance,"[109] but that label is not fully accurate. On September 17, 2018, McKinsey used that payment from the Debtors to pay itself $325,000

---

[106] Exbibit 15 (emphasis added).

[107] Dkt. 452, p. 45 of 194, ¶22.

[108] The Prepetition Agreement is not included in the Debtors' application.   The post-petition agreement, which is included, states that the Prepetition Agreement was dated July 17, 2018.  Dkt. 452, p. 24 of 194.

[109] Dkt. 452, p. 46 of 194, ¶24.

for previous services for the week ending July 27, 2018.[110]  That payment of $325,000 was therefore on account of an antecedent debt and a preference under 11 U.S.C. § 547(b). McKinsey RTS is clearly liable to the estate for that preference payment.  It was not a payment in the ordinary course under 11 U.S.C. § 547(c)(2).

144.    McKinsey RTS is also liable for a second, much larger preference payment.  On October 5, 2018, just 4 days before the Debtors filed their petitions, the Debtors paid it $1,300,000 on account of an antecedent debt of $1,240,000.[111]  This payment was based on an invoice dated September 21, 2018, again for a "Fee Advance."[112]  However, that label was not accurate, because McKinsey RTS did not use the payment as a fee advance.  Instead, it applied this payment to its outstanding claim of $1,240,000.[113]  Under 11 U.S.C. § 547(b), McKinsey RTS is clearly liable to the estate for this $1,240,000 preference payment.  It was not a payment in the ordinary course under 11 U.S.C. § 547(c)(2).  Interestingly, McKinsey does admit this liability but apparently has not yet paid it as of the date of its declaration, November 8, 2018, which was 30 days after the petition was filed.[114]  Nothing in McKinsey RTS's declaration, however, suggests that it recognizes the first preference payment of $325,000 on September 17, 2018.

145.    The total of these two preferences payments for which McKinsey RTS is liable is $1,565,000.

---

[110] *Id*.

[111] *Id*.

[112] *Id*.

[113] *Id*.

[114] *Id*. at p. 46 or 194, n. 6.

146.     McKinsey RTS therefore holds an interest adverse to the estate and under 11 U.S.C. § 327(a) is not qualified to serve as a professional for the Debtors.  In *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3d Cir. 1999), the U.S. Trustee objected to retention of the counsel proposed by the debtor on the ground that counsel had received a preferential payment, constituting an interest adverse to the estate.   The Third Circuit reversed the approval of counsel's retention by both the bankruptcy court and the district court, stating, "Where there is an actual conflict of interest ... disqualification is mandatory."  *Id*. at 509 (citing *In re Marvel Entertainment*, 140 F.3d 463, 476 (3d Cir. 1998).  The court then held, "A preferential transfer to [debtor's counsel] would constitute an actual conflict of interest between counsel and the debtor, and would require the firm's disqualification."  *Id*. (emphasis in original).

147.     Moreover, the Debtors are not permitted to waive the conflict resulting from their preference payment to McKinsey RTS.  *In re Am. Energy Trading, Inc.*, 291 B.R. 154, 158 (Bankr. W.D. Mo. 2003) ("The adverse interest and disinterested person limitations set forth in § 327 governing the employment of professionals cannot be excused by waiver.").

148.     But McKinsey RTS's disclosures regarding its prepetition arrangements with the Debtors raise serious red flags of suspicious activity.   McKinsey RTS states, "On or about September 17, 2018, the parties entered into an oral agreement (the "Oral Agreement") to increase the weekly compensation payable to McKinsey RTS US to $480,000 based upon additional services related to a bottom-up planning analysis that McKinsey RTS agreed to provide."[115]

149.     An "oral agreement" like this is certainly not in the ordinary course in the business management consulting industry.   Likewise, McKinsey RTS's irregular invoicing of

---

[115] *Id*. at p. 45 of 194, ¶22.

this increased amount was not ordinary course; it billed for all three weeks of this increased amount on the same day – October 3, 2018, just 6 days before the petition.[116]  And nor was the Debtors' irregular payment of this increased amount in the ordinary course; it paid all three invoices as part of its $1,300,000 "Fee Advance" payment of October 5, 2015, which McKinsey RTS had billed on September 21, 2018.[117]

150.    McKinsey RTS's fee practices with Westmoreland Coal echo its fraudulent fee practices that were uncovered in the *SunEdison* case, discussed in Part VII.C.2., below.  Mr. Hojnacki was McKinsey RTS's "Practice Leader" in the *SunEdison* case, as he is in this case.

151.    The legitimacy of this dramatic 48% increase in McKinsey RTS's fees just before bankruptcy needs to be investigated, as does the highly unusual circumstances surrounding McKinsey's invoicing of it and the Debtors' payment of it.

152.    Perhaps more significantly, McKinsey RTS's narrative in its declaration clearly states that their relationship commenced on July 17, 2018, just within the 90-day preference period.  This seems highly and suspiciously unlikely.  Kirkland & Ellis represented the Debtors during the beginning in May 2, 2017.[118]  Jones Day commenced its services on August 1, 2017.[119]  Alverez & Marsal commenced work on February 14, 2018.[120]  Lazard commenced its

---

[116] *Id*. at p. 46 of 194, ¶24.

[117] *Id*.

[118] Debtors' Application to Employ Kirkland & Ellis, Dkt. 227, filed Oct. 22, 2018, p. 9 of 166, ¶ 20.

[119] WMKP Debtors' Application to Employ Jones Day, Dkt. 214, filed Oct. 19, 2018, p. 8 of 104, ¶ 14.

[120] Debtors' Application to Employ Alverez & Marsal, Dkt. 210, filed Oct. 18, 2018, p. 4 of 64, ¶ 7.

services on August 1, 2017.[121]   The Debtors' retentions of these insolvency professionals as much as a year and a half before the petition date raises the question whether McKinsey (a client of both Kirkland & Ellis and Jones Day) was also retained in that time period, and was then replaced by McKinsey RTS 90 days before the petition date.   This too must be investigated and fully disclosed.

153.   In any event, because McKinsey RTS received preference payments totaling $1,565,000 and has not paid that back to the estate, McKinsey RTS holds an interest that is adverse to the estate and is not qualified to serve as a professional for the Debtors.

## IV.   McKinsey RTS's Declaration Unlawfully Concealed a Shocking 84 Connections, at Least.

154.   Bankruptcy Rule 2014(a) provides:

> (a) An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to §327, §1103, or §1114 of the Code shall be made only on application of the trustee or committee.…   *The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.*

(Emphasis added.)

155.   McKinsey RTS's declaration violates Rule 2014 and to a shocking extent. McKinsey RTS's declaration does not set forth all of its "connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, [and] the United States trustee[.]"   Its declaration unlawfully conceals at least 84 connections.   Accordingly, the Debtors' application must be denied.

---

[121] WMKP Debtors' Application to Employ Lazard, Dkt. 216, filed Oct. 19, 2018, p. 32 of 66.

156. McKinsey RTS's declaration violates Rule 2014 in another egregious way. The Debtors' plan proposes a sale of its prime assets to the Ad Hoc Group.[122] And McKinsey RTS has already supported "the Debtors in discussions with the *ad hoc* group of the Debtors' first lien creditors and the *ad ho*c group of the secured term lenders of Westmoreland Resource Partners LP[.]"[123]

A. **McKinsey RTS's Declaration Unlawfully Conceals At Least *Ten* MIO Investment Connections *to the Debtors*.**

157. McKinsey RTS has unlawfully concealed at least ten investments in the Debtors that McKinsey and its partners and its employees, including those of McKinsey RTS, hold through MIO. MIO has investments in the following *ten undisclosed "5% or more shareholders" of the Debtors*:

1. Barclays PLC
2. Blackrock Advisors LLC
3. Blackrock Fund Advisors
4. BlackRock Inc.
5. Blackrock Institutional Trust
6. Blackrock Investment Management LLC
7. Citadel Advisors LLC
8. Pacific Investment Management Co.
9. SSGA Funds Management Inc.
10. State Street Corp.

158. It is highly likely that McKinsey RTS has additional concealed investments in the Debtors for the reasons identified in paragraph 99.

---

[122] Dkt. 294, filed Oct. 25, 2018.

[123] Dkt. 452, p. 40 of 194, ¶ 11.

159.    As addressed in Part III. above, under 11 U.S.C. §§ 327 and 101(14), the equity interests that McKinsey's partners and employees indirectly hold in the Debtors themselves disqualify McKinsey RTS is from serving as a professional for the Debtors.

### B.    McKinsey RTS's Declaration Unlawfully Conceals at Least *Seven* MIO Investment Connections *to Interested Parties*.

160.    McKinsey RTS has unlawfully concealed at least seven investments in interested parties that McKinsey partners and employees, including those of McKinsey RTS, hold through MIO.  MIO has investments in the following seven *undisclosed interested parties*:

- Bank-Lender-Administrative Agents
    8.   Barclays Bank PLC
    9.   Blackrock Capital Investment Corp.
    10. PIMCO Funds[124]
    11. State Street Corp.
    12. Whitebox Advisors LLC

- Contract Counterparties
    13. Blackrock Kelso Capital Corp.
    14. Cerberus Business Finance LLC

161.    It is highly likely that McKinsey RTS has additional concealed investments in other interested parties for the reasons identified in paragraph 99.

---

[124] MIO's DOL Forms 5500 simply identify "PIMCO Funds" as an investment.  That generic disclosure could refer to any or all of 28 PIMCO entities that are interested parties.  To give MIO the benefit of the doubt, this connection is counted as 1 rather than 28.  The PIMCO names on the interested parties list are Pacific Investment Management Co., Pacific Investment Management Co. LLC, Pacific Investment Management Co., Employees' Retire , PIMCO , PIMCO Bermuda Trust II, PIMCO Bermuda Trust II: Pimco Bermuda Income Fund (M), PIMCO Cayman Trust, PIMCO Corporate & Income Opportunity, PIMCO Corporate & Income Strategy, PIMCO Corporate & Income Strategy Fund, PIMCO Dynamic Credit And Mortgage Income Fund, PIMCO Flexible Credit Income Fund, PIMCO Funds, PIMCO Funds Ireland PLC, PIMCO Funds: Global Investors Series PLC Income Fund, PIMCO Funds: PIMCO Income F6nd, PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund, PIMCO Funds: PIMCO Long-Term Credit Fund, PIMCO Global Credit Opportunities, PIMCO Global Income Opportunities Fund, PIMCO Global Stocksplus & Income Fund, PIMCO High Income Fund, PIMCO Income Fund, PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II, PIMCO Investment G, PIMCO Loan Interests & Credit, PIMCO Monthly Income Fund (Canada) , PIMCO Senior Floating.

162.     The MIO's investment in any such creditor, customer or competitor is "an interest adverse to the estate" because those parties are adverse to these bankruptcy estates.  Under 11 U.S.C. § 327(a), therefore, any MIO investment in a creditor, a customer or a competitor disqualifies McKinsey RTS from employment by the Debtors.

### C.     McKinsey RTS's Declaration Unlawfully Conceals a Total of at Least 84 Connections.

163.     McKinsey RTS's declaration conceals at least 84 connections.   This is a shockingly high number of concealed connections, even for McKinsey RTS.

| Row | Entity | Category | Known McKinsey Connection Name | Type of Connection |
|---|---|---|---|---|
| 1 | AEP Generation Resources Inc. | Contract Counterparties | AEP River Operations | Client |
| 2 | AIG Insurance Co. of Canada | Insurance | AIG Specialty Insurance, American International Reinsurance (AIG) | Client |
| 3 | Allianz Global Investors of America LP | 5% or More Shareholders | Allianz Global, Allianz SE | Client |
| 4 | Allianz of America | 5% or More Shareholders | Allianz Global, Allianz SE | Client |
| 5 | Allianz SE | 5% or More Shareholders | Allianz Global, Allianz SE | Client |
| 6 | American International Group | 5% or More Shareholders | AIG Specialty Insurance, American International Reinsurance (AIG) | Client |
| 7 | American International Group Inc. | 5% or More Shareholders | AIG Specialty Insurance, American International Reinsurance (AIG) | Client |
| 8 | AON PLC | HR Benefits | AON Risk Services Central | Other |
| 9 | Aon Reed Stenhouse | Vendors | AON Risk Services Central | Other |
| 10 | Apollo Management Holdings LP | 5% or More Shareholders | Apollo Credit, Apollo Global Management | Client |
| 11 | Bank of America Corp. | 5% or More Shareholders | Bank of America | Client |
| 12 | Barclays PLC | 5% or More Shareholders | Barclays Bank PLC | MIO Investments, MIO Funds |
| 13 | Blackrock Advisors LLC | 5% or More Shareholders | BlackRock | MIO Investments |
| 14 | Blackrock Capital Investment Corp. | Bank-Lender-Administrative Agents | BlackRock | MIO Investments |
| 15 | Blackrock Fund Advisors | 5% or More Shareholders | BlackRock | MIO Investments |

| 16 | BlackRock Inc. | 5% or More Shareholders | BlackRock | MIO Investments |
| 17 | Blackrock Institutional Trust | 5% or More Shareholders | BlackRock | MIO Investments |
| 18 | Blackrock Investment Management LLC | 5% or More Shareholders | BlackRock | MIO Investments |
| 19 | Blackrock Kelso Capital Corp. | Contract Counterparties | BlackRock | MIO Investments |
| 20 | BNP Paribas | 5% or More Shareholders | BNP Paribas Securities, BNP Paribas | Client, MIO Fund ADVISOR |
| 21 | BNP Paribas Arbitrage SA | 5% or More Shareholders | BNP Paribas Securities, BNP Paribas | Client, MIO Fund ADVISOR |
| 22 | BP Canada Energy Group | Contract Counterparties | BP Corp NA, BP Energy | Client |
| 23 | Cerberus Business Finance LLC | Contract Counterparties | Cerberus Capital Management | MIO Investments, MIO Service Provider |
| 24 | Citadel Advisors LLC | 5% or More Shareholders | Citadel - Various funds | MIO Investments |
| 25 | Citicorp USA Inc. | Contract Counterparties | Citigroup Global Markets; Citibank | Client; MIO Fund Custodian |
| 26 | Citigroup Inc. | 5% or More Shareholders | Citigroup Global Markets; Citibank | Client; MIO Fund Custodian |
| 27 | Credit Suisse AG | 5% or More Shareholders | Credit Suisse | MIO Fund Custodian and Prime Broker |
| 28 | Credit Suisse Group AG | 5% or More Shareholders | Credit Suisse | MIO Fund Custodian and Prime Broker |
| 29 | Deutsche Asset Management | 5% or More Shareholders | Deutsche Bank | Client |
| 30 | Deutsche Bank AG | 5% or More Shareholders | Deutsche Bank | Client |
| 31 | Deutsche Bank Securities USA LLC | Bank-Lender-Administrative Agents | Deutsche Bank | Client |
| 32 | Goldman Sachs Group Inc. | 5% or More Shareholders | Goldman Sachs | Client |
| 33 | JP Morgan Asset Management Japan | 5% or More Shareholders | JPMorganChase | Client |

| 34 | JPMorgan Chase & Co. | 5% or More Shareholders | JPMorganChase | Client |
| 35 | Morgan Stanley | 5% or More Shareholders | Morgan Stanley & Co., Morgan Stanley Capital | MIO Fund Custodian and Prime Broker |
| 36 | Morgan Stanley & Co. LLC | 5% or More Shareholders | Morgan Stanley & Co., Morgan Stanley Capital | MIO Fund Custodian and Prime Broker |
| 37 | Morgan Stanley Smith Barney LLC | 5% or More Shareholders | Morgan Stanley & Co., Morgan Stanley Capital | MIO Fund Custodian and Prime Broker |
| 38 | National Union Fire Insurance Co. of Pittsburgh | Insurance | National Union Fire Insurance | Client |
| 39 | Northern Trust Co. | 5% or More Shareholders | Northern Trust (Guernsey) Limited | MIO Fund Custodian |
| 40 | Northern Trust Corp. | 5% or More Shareholders | Northern Trust (Guernsey) Limited | MIO Fund Custodian |
| 41 | Pacific Investment Management Co. | 5% or More Shareholders | PIMCO funds | MIO Investments |
| 42 | Pacific Investment Management Co. | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 43 | Pacific Investment Management Co. LLC | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 44 | Pacific Investment Management Co., Employees' Retire | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 45 | Peabody Energy Corp. | Significant Competitors | Peabody Energy, Peabody Coal | Client |
| 46 | Pension Benefit Guaranty Corp. | Top 50 Creditors | PBGC (Pension Benefit Guarantee Corporation) | Client |
| 47 | PIMCO | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 48 | PIMCO Bermuda Trust II | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 49 | PIMCO Bermuda Trust II: Pimco Bermuda Income Fund (M) | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 50 | PIMCO Cayman Trust | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |

| 51 | PIMCO Corporate & Income Opportunity | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 52 | PIMCO Corporate & Income Strategy | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 53 | PIMCO Corporate & Income Strategy Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 54 | PIMCO Dynamic Credit And Mortgage Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 55 | PIMCO Flexible Credit Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 56 | PIMCO Funds | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 57 | PIMCO Funds Ireland PLC | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 58 | PIMCO Funds: Global Investors Series PLC Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 59 | PIMCO Funds: PIMCO Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 60 | PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 61 | PIMCO Funds: PIMCO Long-Term Credit Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 61 | PIMCO Global Credit Opportunities | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 63 | PIMCO Global Income Opportunities Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 64 | PIMCO Global Stocksplus & Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 65 | PIMCO High Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 66 | PIMCO Income Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 67 | PIMCO Income Strategy Fund | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |

| | | | | |
|---|---|---|---|---|
| 68 | PIMCO Income Strategy Fund II | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 69 | PIMCO Investment G | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 70 | PIMCO Loan Interests & Credit | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 71 | PIMCO Monthly Income Fund (Canada) | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 72 | PIMCO Senior Floating | Bank-Lender-Administrative Agents | PIMCO funds | MIO Investments |
| 73 | SG Americas Securities LLC | 5% or More Shareholders | SG Americas Securities LLC | MIO Fund Custodian |
| 74 | SSGA Funds Management Inc. | 5% or More Shareholders | SSgA Funds Management; State Street Corporation | Client, MIO Investments |
| 75 | State Street Corp. | 5% or More Shareholders | SSgA Funds Management; State Street Corporation | Client, MIO Investments |
| 76 | State Street Corp. | Bank-Lender-Administrative Agents | SSgA Funds Management; State Street Corporation | Client, MIO Investments |
| 77 | UBS | 5% or More Shareholders | UBS Financial Services, UBS; UBS Securities | Client, MIO Fund Custodian |
| 78 | UBS | Bank-Lender-Administrative Agents | UBS Financial Services, UBS; UBS Securities | Client, MIO Fund Custodian |
| 79 | UBS AG | Bank-Lender-Administrative Agents | UBS Financial Services, UBS; UBS Securities | Client, MIO Fund Custodian |
| 80 | UBS Group AG | 5% or More Shareholders | UBS Financial Services, UBS; UBS Securities | Client, MIO Fund Custodian |
| 81 | Vanguard Group | 5% or More Shareholders | Vanguard Group | Client |
| 81 | Vanguard Group Inc. | 5% or More Shareholders | Vanguard Group | Client |
| 82 | Vanguard Group Ireland Ltd. | 5% or More Shareholders | Vanguard Group | Client |
| 83 | Vanguard Investments UK Ltd. | 5% or More Shareholders | Vanguard Group | Client |
| 84 | Whitebox Advisors LLC | Bank-Lender-Administrative Agents | Whitebox Advisors | MIO Investments |

164.    These entities are known to be McKinsey RTS connections from the declarations that McKinsey RTS submitted in its previous Chapter 11 cases and from other publicly available sources.

165.    Because of the size and scope of McKinsey's consulting services, it is likely that it has a significant number of investment and client connections that it has failed to disclose.

166.    McKinsey RTS's failure to disclose its *known* client connections strongly suggests that McKinsey RTS deliberately intended to conceal them.

## V.    McKinsey RTS Admits That Because It Used an Incomplete Interested Parties List, Its Investigation of Its Connections Is Incomplete; Therefore, Its Declaration Likely Does Not Disclose All of Its Connections.

167.    Rule 2014 requires McKinsey RTS to disclose all of its connections, not some of them.  Because McKinsey is one firm, as demonstrated in Part I, McKinsey RTS is required to disclose all of McKinsey's connections, not some of them.

168.    McKinsey RTS admits that its investigation of its connections is not complete and therefore its disclosure of its connections is not complete.[125]  This resulted from its use of a incomplete Interested Parties List.[126]  It says it needs more time and will submit a supplemental declaration to identify any additional connections by the hearing date.[127]

---

[125] Dkt. 452, pp. 48-49 of 194, ¶ 31.

[126] *Id.*

[127] *Id.* at p. 49 of 194, ¶ 31.  In a footnote, McKinsey also states, "McKinsey RTS US did not search approximately 150 Vendors with a spend of as low as $1,000 during this time period, and intends to do so and provide any applicable search results in a supplement to this Declaration."  *Id.* at n. 8.

169.     The Debtors retained McKinsey RTS on July 17, 2018.[128]   McKinsey RTS submitted its disclosure declaration on November 8, 2018.   McKinsey RTS therefore had 114 days, almost 4 months, to complete its investigation of its connections.   It failed, even though it knew on July 17, 2018 that Westmoreland Coal was headed for bankruptcy.   That's why the Debtors retained it.

170.     McKinsey RTS attempts to fault Debtors' counsel, Kirkland & Ellis, for its failure to comply with Rule 2014.[129]   But McKinsey RTS's attack on Kirkland & Ellis (its own law firm!) is wildly inappropriate and undermines the credibility of its entire declaration.   McKinsey RTS is solely responsible for the completeness of the Rule 2014 declaration that it submitted *under penalty of perjury*.   28 U.S.C. § 1746.   *It* failed, not Kirkland & Ellis.

171.     McKinsey RTS's offer to submit a supplemental declaration prior to the hearing date to identify any additional connections will not give this Court, the U.S. Trustee and the parties a sufficient opportunity to review whether its newly-disclosed connections are disqualifying under 11 U.S.C. § 327.

172.     McKinsey RTS represented to the Court that it "does not hold an adverse interest to the Debtors' estates, and that McKinsey RTS US is a 'disinterested person,' as that term is defined in section 101(14) of the Bankruptcy Code."[130]   However, without a complete investigation of its connections, McKinsey RTS cannot truthfully make that representation.   It is, therefore, a false representation and it undermines the credibility of McKinsey's RTS's entire declaration.

---

[128] *Id*. at p. 24 of 194.

[129] Id. at pp. 48-49 of 194, ¶ 31.

[130] *Id*. at p. 69 of 194. ¶ 82.

173. Rule 2014 requires the Debtors to submit an application that is accompanied by McKinsey RTS's disclosure of all of its connections, not just some of them. Because the Debtors' application does not comply with Rule 2014, and admittedly so, it must be denied.

## VI. McKinsey RTS's Declaration Violates the Case Law on a Professional's Disclosure Obligations Under Rule 2014.

### A. This Court Has an Independent Duty to Determine Whether McKinsey RTS's Disclosure Declaration Complies with Rule 2014.

174. As the Tenth Circuit stated in *Interwest Business Equipment, Inc. v. U.S. Trustee* (*In re Interwest Business Equipment, Inc.*), 23 F.3d 311, 317 (10th Cir. 1994), "A bankruptcy court has the authority and the responsibility to only approve employment of professionals who meet the minimum requirements set forth in § 327(a), independent of objections."[131]

175. In fulfilling this important responsibility under 11 U.S.C. § 327 and Rule 2014, the Court must rely on McKinsey RTS to self-report its connections and its conflicts. "Bankruptcy courts have neither the resources nor the time to investigate the veracity of the information submitted … and to root out the existence of undisclosed conflicts of interest." *Kravit, Gass & Weber, S.C. v. Michel* (*In re Crivello*), 134 F.3d 831, 839 (7th Cir. 1998); *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (the court should not have to "rummage through files or conduct independent fact finding investigations" to determine whether a professional should be disqualified).

---

[131] *See also In re HML Enterprises, LLC*, 2016 WL 5939737, at *6 (Bankr. E.D. Tex. Oct. 12, 2016) ("Notwithstanding the lack of any objection, the Court has an independent duty to inquire into the qualifications of counsel for debtor in possession under § 327(a); *In re Boot Hill Biofuels, LLC*, 2009 WL 982192, at *2 (Bankr. D. Kan. Mar. 27, 2009); *In re Git-N-Go, Inc.*, 321 B.R. 54, 59 (Bankr. N.D. Okla. 2004); *In re Marion Carefree Ltd. P'ship*, 171 B.R. 584, 589 (Bankr. N.D. Ohio 1994).

176.    "Bankruptcy courts are not obligated to hunt around and ferret through thousands of pages in search of the basic disclosures required by Rule 2014."  *Quarles and Brady LLP v. U.S. Trustee* (*In re Jennings*), 199 F. App'x 845, 848 (11th Cir. 2006).[132]

177.    As the court stated in *In re Matco Elec. Grp, Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008):

> Fed. R. Bankr. P. 2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure.[133]

178.    Similarly, in *In re Marine Outlet, Inc.*, 135 B.R. 154, 156 (Bankr. M.D. Fla. 1991), the court stated:

> There is no duty placed on the United States Trustee or on creditors to search the record for the existence, vel non, of a conflict of interest of a professional sought to be employed. On the contrary, there is a definite affirmative duty placed on a professional to disclose his or her connection with parties whose interest is or may be antagonistic or opposite to the interest of the general estate[.]

**B.     This Court's Strict Enforcement of Bankruptcy Rule 2014 and 11 U.S.C. § 327 Is Critical to Maintain the Integrity of This Bankruptcy Case and the Public's Confidence.**

179.    The Seventh Circuit made this essential point in *United States v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) (emphasis added):

---

[132] *See also In re Hutch Holdings, Inc.*, 532 B.R. 866, 880 (Bankr. S.D. Ga. 2015); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) (courts have no obligation to "seek out conflicts of interest not disclosed" by debtors and professionals); *In re BH & P, Inc.*, 119 B.R. 35, 44 (Bankr. D.N.J. 1990) ("It is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest.").

[133] *See also In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999) ("[C]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient.") (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)).

> [T]his procedure is designed to ensure that a "disinterested person" is chosen to represent the debtor. *This requirement goes to the heart of the integrity of the administration of the bankruptcy estate.* The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate.

180.    The court in *In re Watson*, 94 B.R. 111, 117 (Bankr. S.D. Ohio 1988), concisely explained the reasons why the court has independent duty to assure compliance with Rule 2014 and Section 327: "The courts are absolutely uniform as to one command: the bankruptcy court must —no matter how unpleasant a task it may be—ensure the integrity of the bankruptcy process.  The interests of maintaining public confidence in the bankruptcy system must prevail."

181.    In *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987), the court stated that the bankruptcy court has a "fundamental responsibility to monitor the integrity of the proceedings before it.  In light of the duty explicitly imposed on the bankruptcy court by § 327—a duty which demands that the court root out impermissible conflicts of interest between attorney and client."[134]

182.    Finally, the requirement to disclose connections is also designed to ensure public confidence in the integrity of the bankruptcy process.  *In re Sundance Self Storage-El Dorado LP*, 482 B.R. 613, 625 (Bankr. E.D. Cal. 2012); *In re Michigan General Corp.*, 78 B.R. 479, 484 (Bankr. N.D. Tex. 1987).

---

[134]  *See also* COLLIER ON BANKRUPTCY, § 327.03 at 327–20 (15th ed. 1988) ("As a general principle, professional persons employed by the [debtor in possession] should be free of any conflicting interest which might in the view of the trustee or the bankruptcy court impair the high degree of impartiality and detached judgment expected of them during the administration of a case.").

## C.       Rule 2014 Is the Tool That Enables the Court to Enforce Section 327.

183.    "The verified statement required by Rule 2014 and the statement concerning conflicts in the application for employment pursuant to § 327 are intended to fully inform the court of the qualification of the proposed professional and maintain the integrity of the bankruptcy court." *In re Plaza Hotel Corp.*, 123 B.R. 466 (B.A.P. 9th Cir. 1990).

184.    "Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).[135]

185.    Rule 2014(a) enables the Court and the parties to determine whether a professional (1) possesses or asserts for a client any economic interest that would tend to lessen the value of the bankruptcy estate or create either an actual or potential dispute in which the estate would be a rival claimant, or (2) possesses or has a predisposition under the circumstances to be biased against the estate.  *In re Lewis Road*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. 2011).

186.    The disclosure requirement of Rule 2014 is therefore the cornerstone of the professional retention process.  *In re Enron Corp.*, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. 2002).

---

[135] *see also In re Hutch Holdings, Inc.*, 532 B.R. 866, 880 (Bankr. S.D. Ga. 2015) ("Bankruptcy Rule 2014 is exceptionally broad and implements the appointment of professionals under § 327 of the Bankruptcy Code by 'provid[ing] a mechanism for ensuring the disinterestedness of such professionals.'") (quoting *In re Fibermark, Inc.*, 2006 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006)); *In re Fresh Choice, LLC*, 2014 WL 929018, at *5 (Bankr. N.D. Cal. March 10, 2014) ("The purpose of Rule 2014 is to '[assist] the court in ensuring that [a professional] has no conflicts of interest and is disinterested, as required by 11 U.S.C. § 327(a).'") (quoting *Neben & Starrett Inc. v. Chartwell Fin. Corp.* (*In re Park-Helena Corp.*), 63 F.3d 877, 881 (9th Cir. 1995)).

D.     **The Debtors and McKinsey RTS Bear the Burden of Proof.**

187.    The evidence that Mar-Bow submits in this objection overwhelmingly establishes that McKinsey's declaration violates its disclosure obligations under Rule 2014(a) and that McKinsey is not qualified to serve as a professional for the Debtors under 11 U.S.C. § 327.

188.    It must be emphasized, however, that Mar-Bow bears no burden under law to show that McKinsey RTS has violated Rule 2104(a).  Rather, Rule 2014 places the burden on the Debtors to show that McKinsey RTS is qualified under 11 U.S.C. § 327(a) and Rule 2014 places the burden on McKinsey RTS to fully and accurately disclose its connections.  *In re Sandpoint Cattle Co., LLC*, 556 B.R. 408, 420 (Bankr. D. Neb. 2016) ("The selected attorney has the burden of establishing he or she is qualified under section 327(a) to represent the debtor in possession through its disclosure under Rule 2014(a) and accompanying affidavits.") (citing *In re Huntco Inc.*, 288 B.R. 229, 232 (Bankr. E.D. Mo. 2002)).[136]

189.    The Debtors and McKinsey RTS have not met their burdens under Rule 2014.

E.     **Rule 2014 Requires Not Just Disclosure of Interests That "Are Adverse" or Even "Might Be Adverse" to the Estate; It Mandates Disclosure of "All Connections."**

190.    In *In re Gulf Coast Orthopedic Center*, 265 B.R. 318, 323 (Bankr. M.D. Fla. 2001), the court emphasized the requirement to disclose all connections:

---

[136] *See also In re Caesars Entm't Operating Co.*, 561 B.R. 420, 431 (Bankr. N.D. Ill. 2015) ("The burden of proving that section 327(a) has been satisfied rests with the applicant seeking to retain a professional, as does the initial burden of going forward at any hearing.") (citing *In re Big Mac Marine, Inc.*, 326 B.R. 150, 154 (8th Cir. BAP 2005); and *In re Running Horse, L.L.C.*, 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007)); *APJL Consulting, LLC v. Treasures, Inc.* (*In re Treasures, Inc.*), 2015 WL 925957, at *17 (B.A.P. 9th Cir. Mar. 3, 2015) ("The disclosure provisions of Rule 2014 are strictly applied with the burden on the applicant to come forward and make full, candid, and complete disclosure.') (citing *Neben & Starrett, Inc. v. Chartwell Fin. Corp.* (*In re Park–Helena Corp.*), 63 F.3d 877, 881 (9th Cir. 1995); *In re Harold & Williams Dev. Co.*, 977 F.2d 906, 910 (4th Cir. 1992).

> "Under [Rule 2014] the applicant and the professional must disclose all connections, not merely those which rise to the level of conflict. *Halbert v. Yousif*, 225 B.R. 336 (E.D. Mich. 1998); *In re Keller Financial Services of Florida, Inc.*, 243 B.R. 806 (Bankr. M.D. Fla. 1999); *In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998). These disclosure requirements are not discretionary and the duty of the professional to disclose all connections with the Debtor, Debtor–in–Possession, insiders, creditors or parties of interest is a must[.]"

191.    A professional seeking employment by a bankruptcy estate and the resulting benefits "has a responsibility to leave no reasonable stone unturned" when investigating and disclosing potential connections under Rule 2014.  *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987).

192.    Any "close or debatable issue ought to be resolved in favor of disclosure."  *In re Miners Oil Co.*, 502 B.R. 285, 302 (Bankr. W.D. Va. 2013) (quotation marks and citation omitted).

193.    Contrary to McKinsey RTS's belief, Rule 2104 deliberately takes the decision-making authority about what constitutes an adverse interest away from self-screening professionals and places it squarely on the courts, with the assistance of the U.S. Trustee and interested parties.  In *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012), the Fifth Circuit stated, "The disclosure requirements of Rule 2014(a) are broader than the rules governing disqualification, and an applicant must disclose all connections regardless of whether they are sufficient to rise to the level of a disqualifying interest under Section 327(a)."  (Emphasis added.)  *See also In re Knight-Celotex*, *LLC*, 695 F.3d 714, 722 (7th Cir. 2012) (noting that "connections" that must be disclosed pursuant to Rule 2014(a) as "considerably broader" than the disclosures required for section 327(a)) (citing *In re Gluth Brothers Construction, Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011).

194.    In *Lewis Road*, the court stated:

68

> The duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of *its duty to assure the attorney's eligibility for employment under section 327(a)* and to make an informed decision on whether the engagement is in the best interest of the estate.

2011 WL 6140747, at *8, (quoting *In re eToys, Inc.,* 331 B.R. 176, 189 (Bankr. N.D. Del. 2005)) (emphasis added).

195.    Essentially, McKinsey RTS is saying "trust me, I know what is relevant." McKinsey RTS has thus impermissibly arrogated to itself the determination that its connections are permissible.  But this is contrary to the extensive and uniform case law interpreting Rule 2014.  *See, e.g.*, *Park-Helena*, 63 F.3d at 881-82 ("General Order 44 [the precursor to Rule 2014] does not give the attorney the right to withhold information because it is not apparent to him that there is a conflict.") (citing *In re Haldeman Pipe & Supply Co.*, 417 F.2d 1302, 1304 (9th Cir. 1969)); *Rome v. Braunstein*, 19 F.3d at 59 ("decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment").

## F.    McKinsey RTS Did Not Identify All of Its Connections with All Interested Parties in Sufficient Detail for the Court to Fulfill Its Responsibility.

196.    In *Lewis Road*, the court analyzed disclosures that did not identify all connections by name and then held them "woefully inadequate." *Id.* at *9, 12.  The debtor's application stated only that proposed counsel had "connections with a creditor" and that the "potential conflict of interest has been waived," but it did not provide any other detail.  *Id*. at *1-2.  The court held that this disclosure was insufficient to satisfy the requirements of Rule 2014 due to its lack of detail.  *Id*. at *12.

197.    Other bankruptcy courts have also noted the duty of a professional seeking employment in a Chapter 11 case to disclose sufficient detail concerning pre-filing connections with parties in interest that the Court and the United States Trustee are fully informed as to the relevant circumstances surrounding such connections.  In *In re Mitchell*, 497 B.R. 788 (Bankr. E.D.N.C. 2013), the court denied all compensation to a firm representing a Chapter 11 debtor due to its failure to disclose that it also represented the 50% owner of a limited partnership to which the Chapter 11 debtor client had transferred property of significant value shortly before her petition filing.  The court noted:

> [E]ven if the firm was unsure about whether the joint representation was permissible, at a minimum [it] certainly had an obligation to disclose the potential conflict and to bring the issue to the court's attention.  [Its] failure to make that required disclosure meant that the court reviewed the employment application on incomplete information and the misleading statement that the firm did not have a conflict and was disinterested.

*Id*. at 793.

198.    The Court must have sufficient information to understand the magnitude of all of a professional's connections and potential conflicts.  *See, e.g.*, *Am. Int'l Refinery*, 676 F.3d at 465-66 (retainer source and attorney's role in prepetition debtor transactions); *KLG Gates LLP v. Brown*, 506 B.R. 177, 195 (E.D.N.Y. 2014) (application listed numerous creditor clients but did not disclose that lead counsel personally represented large creditors in recent bankruptcy cases or that creditor waivers were limited); *Miners Oil Co.*, 502 B.R. at 307-08 (disclosure about connection to debtor's principal was insufficient to disclose intertwined business affairs, impact of corporate filing on individual's divorce, extent of debt owed to principal and his other companies).

199.    McKinsey RTS's disclosures of its connections must be detailed and explicit enough for the Court and the other parties to "gauge whether [McKinsey RTS] is not

disinterested or holds an adverse interest."  In *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 662 (N.D. Ill. 2001), the court held:

> The disclosure in the Rule 2014 Affidavit must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest. *See In re Granite Partners, L.P.*, 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998). Persons to be employed "must disclose all facts that bear on ... disinterestedness, and cannot usurp the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not. The existence of an arguable conflict must be disclosed if only to be explained away." *Id.* at 35 (internal citations omitted). Disqualification is justified for lack of adequate disclosure in the Rule 2014 Affidavit, even if it turns out that the professional is in fact disinterested. *In re Filene's Basement, Inc.*, 239 B.R. 845, 848 (Bankr. D. Mass. 1999).[137]

200.   Bankruptcy case precedent is uniform and unequivocal.  Disclosure declarations like the declaration that McKinsey RTS filed in this case have repeatedly been held insufficient under Rule 2014.  *See, e.g.*, *Leslie Fay Cos.*, 175 B.R. at 530 (affidavit that "disclosed generally that Weil Gotshal represented entities that were 'claimants of the Debtors in matters totally unrelated to the Debtors' cases but failed to identify current client that was a large creditor, was insufficient); *In re Granite Partners, L.P.*, 219 B.R. 22, 28 (Bankr. S.D.N.Y. 1998) (firm sanctioned for disclosures that did not identify client relationships).

201.   "[T]he professional must disclose to the court and the parties in interest all facts which might bear on the professional's qualification for retention[.]"  *In re Rusty Jones*, 134 B.R.

---

[137] *See also Lewis Road*, 2011 WL 6140747 at *8 (disclosures made pursuant to Rule 2014 "must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest").

321, 342 (Bankr. N.D. Ill. 1991); *In re Churchfield Mgmt. & Inv. Corp.*, 100 B.R. 389, 393 (Bankr. N.D. Ill. 1989).[138]

202.    McKinsey's decision to inquire only about "direct commercial relationships"[139] is precisely such a usurpation.  If Rule 2014 "is to have vitality and the evils against which it is aimed are to be eliminated, it should be enforced literally, with statements detailing connections both "explicit and complete."  *In re Roberts*, 46 B.R. at 839 (citing *In re Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 933 (2nd Cir. 1979), quoting *In re Rogers-Pyatt Shellac Co.*, 51 F.2d 988 (2nd Cir. 1931)).

203.    Similarly, in *Granite Partners*, 219 B.R. at 28-29, the court sanctioned the Willkie Farr law firm because its Rule 2014 disclosures said that the firm "had 'client relationships' with various (unidentified) creditors and broker-dealers, but the affidavit did not disclose what this meant."   In fact, the firm had five open matters for one of the primary litigation targets, Merrill Lynch, when the affidavit was filed, and in the next 2½ years, opened some 400 more, generating millions of dollars of fees.

204.    In *In re Southmark Corp.*, 181 B.R. 291, 293 (Bankr. N.D. Tex. 1995), Coopers & Lybrand's Rule 2014 affidavit disclosed that it had provided accounting and consulting services

---

[138] S*ee also In re LPN Healthcare Facility Inc.*, 498 B.R. 196, 200 (Bankr. S.D. Ohio 2013) (vacating an order approving employment of accounting firm due to the firm's failure to disclose as a "connection" the fact that it also was providing accounting services to individuals and entities involved with the debtor-in-possession); *In re Miners Oil Co., Inc.*, 502 B.R. 285, 304-5 (Bankr. W.D. Va. 2013) (Fees reduced for violation of Rule 2014; noting that published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their professionals, whose employment is sought to be approved, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action; because the objective of requiring disclosure is not so much to protect against prejudice to a debtor's bankruptcy estate, but to ensure undivided loyalty and untainted advice from professionals, lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice).

[139] Dkt. 452, ¶¶ 34, 35, 72, 73 and 79.

for Drexel on unrelated matters.  But it did not disclose its auditing work or that Drexel paid

Coopers $18.5 million in fees during the past 2½ years.  Nor did it disclose that Drexel had been

the debtor's investment banker and advisor, that the debtor owed $1 billion on high risk bond

claims, and that prepetition, Drexel had pled guilty and entered a consent decree with the SEC

for securities claims.  *Id*. at 295-96.

### G.   Rule 2014 Requires McKinsey RTS to Search for and Disclose the Connections of All of Its Affiliates.

205.   As established in Part I above, McKinsey is one firm.  In *In re Trust America*

*Service Corp.*, 175 B.R. 413, 420 (Bankr. M.D. Fla. 1994), the court held that Coopers and

Lybrand's conflict search must encompass all departments and locations, *not only those doing*

*the work on the case*.

206.   In part, McKinsey RTS recognizes this by performing a degree of searching in

"affiliates."  But McKinsey RTS also asks the Court to condone the fictional fence that it places

around its bankruptcy practice and to condone its searching for connections only in the

McKinsey RTS database.  McKinsey makes that request even though McKinsey is one firm and

much of McKinsey's work for the Debtors is done by professionals who are outside of that

fence.

### H.   Effectively, McKinsey RTS Enters into Subcontracts with Its Affiliates; Rule 2014 Requires the Debtors to File a Separate Application for Each Such Affiliate.

207.   As noted in paragraph II.B. above, McKinsey RTS must "borrow" consultants

that are employed by its affiliates in order to fulfill its obligations to the Debtors.[140]

---

[140] Dkt. 452, p. 2, ¶ 4.

208.    However, when a professional enters into a subcontract with an affiliate to perform services for a chapter 11 debtor, that affiliate must also be the subject of a separate application for approval of its employment under Rule 2014, and therefore that affiliate must separately disclose its connections.  The leading case on this is in *In re United Cos. Fin. Corp.*, 241 B.R. 521 (Bankr. D. Del. 1999).  In that case, the debtor filed an application to employ E&Y as its accountants.  With some changes in the terms of the employment (not relevant here), the court approved the application.   In the course of the opinion, however, Judge Walrath, the presiding judge, found:

> As noted, it became apparent only at the hearing that E & Y is not currently performing all of the services for which its retention application sought approval. At the initial hearing on October 15, Mr. Miller testified that all the financial advisory services are now being performed by [Ernst & Young Restructuring LLC].   Mr. Miller testified that E & Y would act as subcontractor under the E & Y retention."

*Id*. at 528 (footnote omitted).  Judge Walrath continued, "At the continued hearing on October 28, however, after discussions with counsel for the Debtors, Mr. Miller testified that EYR would file an application for retention."  *Id*. (footnote omitted).   Judge Walrath then commented, "EYR's action in filing a separate retention application is wise.  *It is clear that the requirement in section 327(a) that Court approval be obtained before the debtor employs any professional (including an accountant or financial advisor) mandates a separate application for approval of EYR*."  *Id*. (emphasis added).

209.    In a footnote, Judge Walrath further explained that Rule 2014(b) mandates this conclusion:

> The requirements of section 327 are further elucidated by Rule 2014(b) which provides that only partners, members or associates of partnerships or corporations which are hired as attorneys or accountants for the debtor can perform services or be employed by the debtor without the necessity for a separate application. The

> implication is clear that an entity that is not a partner or associate of E & Y cannot be employed by the Debtors (through E & Y) except by separate application.

*Id*. at n.6.  Judge Walrath then continued:

> Parties may not avoid the requirements of section 327(a) by entering into such "subcontracting" arrangements which E & Y originally contemplated with respect to the EYR personnel. Such a subcontracting arrangement, if approved would eviscerate the protections of section 327(a) and allow a third party (rather than the debtor or the Court) to determine who should render professional services for the estate.

> Since EYR, and its personnel, cannot be employed by the Debtors without a separate application, there will not be any illegal fee sharing in this case. Notwithstanding any arrangement which E & Y may have with EYR, the Court will not approve any compensation to E & Y for any services rendered by EYR personnel between October 1 and the time EYR's application for retention is filed and approved by this Court.

210.   The "illegal fee sharing" issue to which Judge Walrath referred arises under 11 U.S.C. § 504, which provides, in pertinent part:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share—

> > (1) any such compensation or reimbursement with another person; or

> > (2) any compensation or reimbursement received by another person under such sections.

> (b)

> > (1) A member, partner, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 503(b)(4) of this title with another member, partner, or regular associate in such association, corporation, or partnership, and may share in any compensation or reimbursement received under such sections by another member, partner, or regular associate in such association, corporation, or partnership.

211.    The court in *In re ACandS, Inc.*, 297 B.R. 395, 404 (Bankr. D. Del. 2003), relied on *United Companies* to reach the same result on similar facts.  In that case, the debtor filed a motion for retroactive approval its employment of Kenesis, a claims administration firm.  At the hearings on the motion, it came out that this professional had actually subcontracted most of the work to a subsidiary, The Clearinghouse, without having obtaining court approval under § 327.  After quoting the holding in *United Companies*, the court stated, "Obviously, the same principle applies to Kenesis' subcontracting arrangement with its own subsidiary, The Clearinghouse, LLC."  *Id.* at 404.  The court continued, "Although Kenesis attempts to downplay the separate existence of The Clearinghouse, LLC as 'simply an operating subsidiary which is basically a cost center' (Tr. 40), it is a separate entity which requires a separate retention application in order to avoid 'any illegal fee sharing in this case.'"  *Id.* (quoting *United Companies*).[141]

212.    The implications of this requirement of Rule 2014 are clear for the Debtors, McKinsey and Company, and McKinsey RTS.  The Debtors seek this Court's approval to employ McKinsey RTS.  However, McKinsey RTS has subcontracted a good portion its work to McKinsey and Company and to other affiliates within the McKinsey organization.  Under *United Companies* and *ACandS*, each of these McKinsey RTS affiliates must be the subject of a separate employment application, which must include the affiliate's required disclosures of its connections under Rule 2014.

213.    McKinsey has totally ignored this requirement.  Because McKinsey RTS cannot perform its obligations without the support of its affiliates, and because the Debtors have not

---

[141] *United Companies* was also cited with approval in *In re Borders Grp., Inc.*, 456 B.R. 195, 209 (Bankr. S.D.N.Y. 2011), although the facts in that case were dissimilar.

sought court approval to retain any affiliates of McKinsey RTS, the Debtors' application for approval to retain McKinsey RTS must be denied.

### I. Bankruptcy Rule 2014 Is Absolute in Its Requirement for the Full *Public* Disclosure of McKinsey RTS's Connections.

214.    Bankruptcy Rule 2014 states, in pertinent part:

> An order approving the employment of … other professionals pursuant to § 327 … of the Code shall be made only on application of the trustee or committee. *The application shall be filed …. The application shall be accompanied by a verified statement* of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

Rule 2014(a), Fed.R.Bankr.P. (emphasis added).

215.    Rule 2014 unconditionally requires a professional to disclose its connections in a verified statement attached to the debtor's application for approval of the professional's employment. The rule further requires that the debtor's application "shall be filed." The rule authorizes no alternatives, conditions or exceptions to this absolute requirement. McKinsey RTS must, therefore, *publicly* disclose all of its connections, including those of McKinsey, its affiliates and MIO.

216.    "The Bankruptcy Rules were promulgated by the Supreme Court pursuant to authority granted by Congress in 28 U.S.C. § 2075. As such, the Rules have the force of law." *In re Teknek, LLC*, 354 B.R. 181, 191 (Bankr. N.D. Ill. 2006) (citing *In re Brooks Fashion Stores*, 124 B.R. 436, 440 (Bankr. S.D.N.Y. 1991)).[142]

---

[142] *See also In re Chapman*, 265 B.R. 796, 809 (Bankr. N.D. Ill. 2001); *In re Barton*, 249 B.R. 561, 564 (Bankr. E.D. Wash. 2000); *In re Bailey*, 151 B.R. 28, 33 (Bankr. N.D.N.Y. 1993).

217.    The Supreme Court has stated, "We give the Federal Rules of Civil Procedure their plain meaning, *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750, n. 9, 100 S.Ct. 1978, 1985 n. 9, 64 L.Ed.2d 659 (1980), and generally with them as with a statute, '[w]hen we find the terms ... unambiguous, judicial inquiry is complete,' *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)." *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123, (1989).

218.    "Judicial inquiry must therefore begin with the text of the rule." *In re Raggie*, 389 B.R. 309, 312 (Bankr. E.D.N.Y. 2008).

219.    Nothing in the Bankruptcy Rule 2014 permits a court to authorize McKinsey RTS to withhold its connections from *public* disclosure under any circumstances.  Specifically, the rule has no exception that would protect McKinsey's business interests or its business model. Rule 2014 has no exceptions of any kind, not even for McKinsey, McKinsey RTS or MIO.

220.    Bankruptcy courts are "bound to follow without exception the rules promulgated by the United States Supreme Court, unless the procedural rule is inconsistent with 28 U.S.C. § 2075."[143]  *In re Wilferth*, 57 B.R. 693, 694 (Bankr. D.N.M. 1986) (emphasis added).  *See also In re Smith*, 103 B.R. 392, 394 (Bankr. N.D.N.Y. 1988).

221.    "Congress intended that the Federal Rules of Bankruptcy Procedure be applicable in full, and without exception, to all provisions of the Bankruptcy Code[.]"  *In re Sutera*, 157 B.R. 519, 523 (Bankr. D. Conn. 1993).

---

[143] 28 U.S.C.A. § 2075 states, "The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11."

222.     Neither the Debtors nor McKinsey RTS has cited or invoked any rule that gives a court the authority to withhold McKinsey's connections from full public disclosure.  No such rule exists.[144]

223.     Nor can McKinsey rely upon 11 U.S.C § 105 in asking this Court to withhold its connections from public disclosure, although it has not done so.  That use of Section 105 would directly contravene Bankruptcy Rule 2014, which as noted above, has the force of law.  As the Supreme Court reaffirmed in *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014):

> It is hornbook law that Section 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere.  See *Morton v. Mancari*, 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 206–208, 52 S.Ct. 322, 76 L.Ed. 704 (1932).

224.     As a result, "[t]he requirements of Rule 2014(a) are not discretionary."  *In re Tinley Plaza Associates, L.P.*, 142 B.R. 272, 278 (Bankr. N.D. Ill. 1992).

225.     Under Rule 2014, the parties' interest in the public disclosure of McKinsey RTS's connections overrides any interest it may have in concealing them for its own business reasons. "The purpose of Rule 2014 is to assure that both the court *and the parties in interest* receive full disclosure of all actual or potential conflicts that might affect the professional's representation of a trustee, committee or debtor in possession."  *In re Wheatfield Bus. Park LLC*, 286 B.R. 412,

---

[144] McKinsey has never asked a court for relief 11 U.S.C. § 107 to excuse it from the public disclosure obligations of Rule 2014.

419 (Bankr. C.D. Cal. 2002) (emphasis added).[145]   For that reason, "the professional must disclose to the court *and the parties in interest* all facts which might bear on the professional's qualification for retention under § 327(a) both at the time of the original application and on an ongoing basis[.]"   *In re Diamond Mortgage Corp. of Ill.*, 135 B.R. 78, 89 (Bankr. N.D. Ill. 1990) (emphasis added).

226.   Accordingly, McKinsey RTS must disclose its connections not only to the Court and but also to all parties in interest.   The Court must give effect to the plain meaning of Bankruptcy Rule 2014.

227.   Other professionals comply with the public disclosure requirements of Bankruptcy Rule 2014.   They endure whatever business disadvantage results, if indeed there is any.   McKinsey RTS is not entitled to any special consideration.   There can be no "McKinsey exception" to Bankruptcy Rule 2014, including its requirement for full public disclosure of McKinsey RTS's disclosure declaration.

228.   In any event, McKinsey RTS has not alleged, let alone established by competent evidence, that it will suffer any business harm if the Court orders the public disclosure of its connections that Rule 2014 requires.

---

[145] *See also In re Love*, 163 B.R. 164, 167 (Bankr. D. Mont. 1993) ("[The] purpose of Rule 2014(a) is to permit the court *and parties in interest* to determine whether certain legal connections disqualify the applicant[.]") (citing *In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 845 (Bankr. S.D. Ill. 1993)) (emphasis added); *In re Bruno*, 327 B.R. 104, 110 (Bankr. E.D.N.Y. 2005) ("To enable *parties in interest*, and the Court, to determine whether an attorney has a conflict of interest, Bankruptcy Rule 2014 and Local Bankruptcy Rule 2014–1 require an attorney whom the trustee seeks to employ *to file an affidavit* …") (emphasis added); *In re Begun*, 162 B.R. 168, 177 (Bankr. N.D. Ill. 1993); *In re Woodcraft Studios, Inc.*, 464 B.R. 1, 8 (N.D. Cal. 2011), *aff'd sub nom. Kun v. Mansdorf*, 558 F. App'x 755 (9th Cir. 2014); *In re EWC, Inc.*, 138 B.R. 276, 281 (Bankr. W.D. Okla. 1992) ("The court *and interested parties* are then informed and the professional does not run the risk of serving the estate pro bono.") (emphasis added); *In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal. 1988); *In re Gluth Bros. Const., Inc.*, 459 B.R. 351, 364 (Bankr. N.D. Ill. 2011).

229.     To varying degrees, every bankruptcy professional has contractual and ethical obligations of confidentiality to their clients.  Indeed, the professionals that arguably have the strongest claim to client confidentiality are attorneys, not restructuring advisors like McKinsey RTS.   Attorneys  must  diligently  protect  their  clients'  confidences  and  the  attorney-client privilege.  Nevertheless, attorneys do comply with Bankruptcy Rule 2014.  On the other hand, McKinsey's clients have no legally recognized privilege that requires legal protection.

230.     McKinsey and McKinsey RTS are not special in that regard.  Its contracts cannot protect it from the requirements of Bankruptcy Rule 2014 any more than other professionals' contracts do.   If the contractual confidentiality obligations of professionals could preempt Bankruptcy Rule 2014, the rule would be eviscerated.

231.     The point that slams the door on this issue for McKinsey RTS is this: McKinsey RTS's standard engagement letter with its clients allows disclosure of client information related to the engagement "*as required by law*."  McKinsey RTS's engagement letter in with the Debtors in this case illustrates the point:

> In connection with the Engagement, McKinsey RTS may furnish the Client with information, advice, reports, analyses, presentations or such other materials (the "Deliverables"). The Client understands and agrees that any such Deliverables are furnished or presented solely for the Client's internal use and benefit (limited to management and the Board) and may not be furnished or conveyed in whole or in part to any person or entity other than as described in this Section 6 without McKinsey RTS's prior written consent *or as required by law*.[146]

---

[146] Dkt. 452, p. 27 of 194, ¶ 6 (emphasis added).

**VII. The Debtors Will Never Be Able to Meet Their Burden to Prove That McKinsey RTS Is Qualified to Serve as A Professional.**

232.    It may be tempting to grant McKinsey RTS another opportunity to attempt to submit a complete disclosure of its connections.  That temptation must be resisted.  First, there is already a sufficient record to establish that the Debtors cannot meet their burden to prove that McKinsey RTS is qualified to serve as a professional under 11 U.S.C. § 327.

233.    Second, as demonstrated below, the Debtors will never be able to meet that burden because McKinsey will never comply with Rule 2014.  It never has.

234.    Third, it is in the best interests of the estate to resolve this matter a promptly as possible so that plan confirmation is not delayed for the Debtors to obtain a replacement for McKinsey RTS.

**A. McKinsey and McKinsey RTS have never disclosed all of their connections in any of their previous thirteen bankruptcy cases.**

235.    McKinsey and McKinsey RTS have never disclosed all of their connections in any of their previous thirteen bankruptcy cases, despite having submitted 39 disclosure declarations in those cases.

236.    In the thirteen previous cases in which McKinsey and McKinsey RTS were retained, their disclosure declarations admitted to having many disclosable connections but then they just refused to identify them, frivolously claiming obligations of confidentiality.  These are the cases:

1. In re Hayes Lemmerz International, Inc.; D. Del.; No. 01-11490; filed December 5, 2001
2. In re UAL Corp.; N.D. Ill.; No. 02-48191; filed December 9, 2002
3. In re Mirant Corp.; N.D. Tex.; No. 03-46590; filed July 14, 2003
4. In re Lyondell Chemical Co.; S.D.N.Y.; No. 09-10023; filed January 6, 2009
5. In re Harry & David Holdings, Inc.; D. Del.; No. 11-10884; filed March 28, 2011
6. In re AMR Corp.; S.D.N.Y.; No. 11-15463; filed November 29, 2011

7.  In re AMF Bowling Worldwide, Inc.; E.D. Va.; No. 12-36495; filed November 13, 2012
8.  In re Edison Mission Energy; N.D. Ill.; No. 12-49219; filed December 17, 2012
9.  In re NII Holdings, Inc.; S.D.N.Y.; No. 14-12611; filed September 15, 2014
10. In re The Standard Register Co.; D. Del.; No. 15-10541; filed March 12, 2015
11. In re Alpha Natural Resources, Inc.; E.D. Va.; No. 15-33896; filed August 3, 2015
12. In re SunEdison, Inc.; S.D.N.Y; No. 16-10992; filed April 21, 2016
13. In re GenOn Energy, Inc.; S.D.N.Y.; No. 17-33695; filed June 14, 2017

237.  McKinsey and McKinsey RTS have a demonstrable history of concealing its connections in its cases since 2001.

238.  McKinsey's history of concealing and lying about its connections has now become more ominous and dangerous than merely failing to disclose its connections.  In its more recent cases, *ANR*, *SunEdison* and *GenOn*, McKinsey RTS has knowingly submitted numerous false declarations under the penalty of perjury and has committed other frauds, all for the purpose of obtaining and retaining lucrative employment in bankruptcy cases despite its disqualifying connections, as illustrated in the discussions of the *GenOn*, *SunEdison* and *ANR* cases below.

239.  All of this makes it impossible for the Debtors to meet their burden of proving that McKinsey RTS has disclosed all of its connections, as Rule 2014 requires, and that it does not hold or represent an interest adverse to the estate and is disinterested, as 11 U.S.C. § 327 requires.

**B.  *GenOn*, Which Was Filed in This District and Assigned to This Court, Is Among the Cases in Which McKinsey RTS Fraudulently but Successfully Concealed Its Disqualifying Conflicts of Interest.**

240.  GenOn Energy Inc. filed for bankruptcy in this Court on June 14, 2017. McKinsey RTS submitted four disclosure declarations in the *GenOn* bankruptcy:

- An initial declaration, filed on June 23, 2017;[147]

- A First Supplemental Declaration, filed on July 13, 2017;[148]

- A Second Supplemental Declaration, filed on September 15, 2017;[149] and

- A Third Supplemental Declaration, filed on February 7, 2018.[150]

241.   McKinsey RTS submitted its first two Rule 2014 declarations in *GenOn* before the court authorized its employment.  On July 13, 2017, relying on these declarations, this Court authorized *GenOn* to employ McKinsey RTS as its restructuring advisor.[151]

242.   In an order entered on April 9, 2018, this Court approved McKinsey's final fee and expense request in the amount of $16,042,791.57.[152]

243.   In *GenOn*, if McKinsey had fully and honestly complied with Rule 2014, it would have been disqualified.

244.   Instead, McKinsey RTS committed multiple frauds on this Court to obtain, and then maintain, its employment as a professional and a fiduciary for the *GenOn* estate.[153]

245.   As detailed below, McKinsey RTS's frauds on this Court in *GenOn* include:

a.     Submitting false declarations that unlawfully concealed that NRG Energy, GenOn's parent company, against whom McKinsey RTS was investigating a

---

[147] *GenOn* Dkt. 123-2.

[148] *GenOn* Dkt. 221.

[149] *GenOn* Dkt. 771.

[150] *GenOn* Dkt. 1429.

[151] *GenOn* Dkt. 231.

[152] *GenOn* Dkt. 1568.

[153] The Court should be aware that on October 15, 2016, Mar-Bow, by counsel, sent a letter to Clifford J. White III, Director, Executive Office for United States Trustees, advising him of McKinsey RTS's frauds in the *GenOn* and *SunEdison* cases.

multi-million dollar claim for GenOn and with whom McKinsey RTS was negotiating GenOn's separation, was also a current or former McKinsey client;

b.      Submitting false declarations that unlawfully concealed the depth of McKinsey's connections to GenOn's parent company, NRG Energy, and to the entities whose transactions and bankruptcies created GenOn;

c.      Submitting a declaration that falsely represented that McKinsey RTS was disinterested after it received preference payments totaling $4,512,000, which gave rise to a disqualifying interest adverse to the bankruptcy estate; and

d.      Submitting false declarations that unlawfully concealed and falsely denied McKinsey's disqualifying connections to multiple other interested parties.

1.      **McKinsey Fraudulently Concealed that NRG Energy Was a McKinsey Client While It Was Investigating GenOn's Substantial Claims Against NRG Energy.**

246.    McKinsey's disclosure declarations in *GenOn* fraudulently concealed that when McKinsey was investigating GenOn's potential multimillion-dollar fraudulent transfer claims against NRG Energy, McKinsey was investigating its own longstanding client.

247.    The declaration of Mark C. McFarland, GenOn's CEO,[154] stated that in March 2016, an ad hoc group of noteholders of GenOn Unsecured Senior Notes and GenOn Americas Generation Unsecured Senior Notes (the "Noteholder Group") began a conversation with GenOn regarding potential claims for fraudulent transfer, breach of fiduciary duty, and other claims that GenOn might hold against NRG Energy and current and former GenOn directors and officers, among others.

248.    GenOn, with assistance from McKinsey RTS and AlixPartners, began identifying and evaluating these potential claims.  GenOn's potential claims concerned contracts between

---

[154] Declaration of Mark A. McFarland in Support of Chapter 11 Petitions and First Day Motions, *GenOn* Dkt. 19, filed June 14, 2017, pp. 18-19, ¶¶ 41-43.

GenOn and NRG Energy, certain sales of GenOn power plants to NRG Energy's affiliates and third parties, and certain development projects between GenOn and NRG Energy.

249.    In June 2016, GenOn's attorneys, Kirkland and Ellis, (not GenOn itself) directly retained both McKinsey RTS and AlixPartners to investigate GenOn's potential claims against NRG Energy arising from the same factual circumstances as the Noteholders' claims.  That investigation continued through GenOn's Chapter 11 bankruptcy case, which was filed a year later in June 2017.  McKinsey RTS's post-petition fee statements reflect that, as part its investigation, McKinsey RTS conferred with GenOn noteholders about the potential claims, requested and reviewed thousands of documents from NRG Energy, and interviewed numerous NRG Energy and GenOn representatives.

250.    In the same month (June 2016) that GenOn retained McKinsey RTS to investigate NRG Energy, McKinsey filed an amended declaration, not in the *GenOn* case, but in the *SunEdison* case, disclosing that NRG Energy was a McKinsey client.[155]  McKinsey RTS, therefore, fraudulently concealed that very same connection throughout the course of the *GenOn* case.

251.    The GenOn Noteholder Group ultimately filed a lawsuit against NRG Energy and GenOn in Delaware state court on December 13, 2016.  On April 30, 2017, the Noteholder Group filed an Amended Complaint adding as defendants NRG Yield (an NRG subsidiary), and eight current or former GenOn directors and officers (the "GenOn Individual Defendants").

252.    The GenOn Noteholders' Amended Complaint alleged: (i) NRG Energy had been overcharging GenOn under a Shared Services Agreement since its execution; and (ii) GenOn did not receive reasonably equivalent value from NRG Yield for GenOn's July 22, 2013 sale of the

---

[155] *SunEdison* Dkt. 484, filed June 6, 2016, p. 19, ¶ 38.

Marsh Landing generating station (a newly developed power plant).  The Noteholder Group further alleged that (iii) the GenOn Individual Defendants breached their fiduciary duties by allowing GenOn's purported overpayments under the Shared Services Agreement and by allowing NRG Energy to pursue new business opportunities at GenOn's Canal and Mandalay power plant sites; and (iv) NRG Energy aided and abetted those breaches.

253.    By this time, McKinsey was simultaneously representing both NRG and GenOn.

254.    Ultimately, GenOn settled its fraudulent transfer claims against NRG Energy. The money derived from that settlement formed a substantial part of GenOn's Chapter 11 plan and was relied upon by this Court, the U.S. Trustee, and GenOn's other creditors, **none of whom were aware of McKinsey RTS's egregious conflict of interest involving NRG Energy.**

255.    Despite this clear conflict, McKinsey RTS's initial declaration in *GenOn*, dated June 23, 2017, disclosed only that McKinsey serves or has served "various parties listed" on the Interested Parties List in *GenOn* as "NRG Affiliates" (of which there were over 900).  Thus, McKinsey RTS fraudulently concealed the specific and crucial fact that, although McKinsey RTS was in the process of investigating NRG Energy on behalf of GenOn, McKinsey then had a client relationship with NRG Energy itself.

256.    On July 13, 2017, McKinsey RTS filed its First Supplemental Declaration in *GenOn*, in which McKinsey again fraudulently concealed its connection to NRG Energy.[156] McKinsey made only an innocuous and, frankly, incomprehensible disclosure that a member of McKinsey RTS "assisted in maintaining a chart, which includes publicly available information

---

[156] *GenOn* Dkt. 221.

concerning asset sales to NRG Energy, or one of its affiliates for a client that is not on the list of Potential Parties in Interest."[157]

257.    Because NRG Energy, whom McKinsey RTS was investigating for GenOn, was also a significant McKinsey client, McKinsey "represent[ed] an interest adverse to the estate," in violation of 11 U.S.C. § 327(a).  McKinsey's connection with NRG Energy created an actual, present, ongoing conflict of interest that required disclosure and disqualification of McKinsey RTS in the *GenOn* case.  Nevertheless, McKinsey fraudulently concealed this actual conflict.

> **2.    McKinsey Fraudulently Concealed That NRG Energy Was a McKinsey Client While It Was Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy.**

258.    At the same time that McKinsey was serving GenOn's parent company, NRG Energy, McKinsey RTS was acting as a fiduciary for GenOn in negotiating GenOn's separation from NRG Energy as part of the bankruptcy process.

259.    McKinsey RTS's final fee application in the *GenOn* case, filed on March 16, 2018, states that McKinsey RTS spent 7,595.8 hours and billed $4,049,978.00 in fees for a task it called "separation activity."[158]  This was by far the greatest amount billed for any of McKinsey RTS's tasks in *GenOn*.

260.    Billing descriptions of "separation activity" included: "Held weekly meetings and planning sessions with the parent company's functional leads and GenOn leads to advance transition and separation efforts."  In other words, McKinsey RTS was negotiating the separation of its fiduciary client, GenOn, from McKinsey's consulting client, NRG Energy, with whom it

---

[157] *Id.*, p. 5, ¶ 13.

[158] *GenOn* Dkt. 1516, p. 7; *Id.*, pp 16-17, ¶ 29; GenOn Dkt. 221, Exhibit E to the filed paper.

was incentivized to preserve its client relationship.  This was in direct conflict with McKinsey RTS's fiduciary obligation to assure that GenOn was able to negotiate the most favorable terms possible for the benefit of its creditors.

> **3.    McKinsey Fraudulently Concealed Asset Sales Conflicts, the Depth of Its Connections to NRG in Several Chapter 11 Cases, and its Prior Involvement in the Transactions and Bankruptcies that Created GenOn.**

261.    McKinsey also fraudulently concealed the facts surrounding the history of McKinsey and McKinsey RTS representing NRG Energy through various mergers and acquisitions in the energy sector, including in transactions involving the formation of GenOn. This too allowed McKinsey to simultaneously profit from its fiduciary relationship with GenOn and receive bankruptcy fees, while also acting to benefit its long-standing client, NRG Energy.

262.    Prior to the formation of GenOn, NRG Energy had acquired substantial assets from at least three other Chapter 11 bankruptcy estates for which McKinsey and McKinsey RTS also served as a fiduciary and did not disclose its relation to NRG, the buyer of those debtors' assets.  The power and energy companies in which McKinsey or McKinsey RTS had served as a fiduciary in three separate Chapter 11 bankruptcy cases were *Mirant*, *Edison Mission Energy*, and *SunEdison*.[159]

263.    Specifically:

a.    NRG Energy purchased most of the assets of Edison Mission Energy in the latter's 2012 bankruptcy while McKinsey RTS served as a fiduciary for Edison Mission Energy and while McKinsey concealed that NRG was also a McKinsey client;

---

[159] The facts stated in this section were gleaned from the court filings in the bankruptcy cases discussed.

b.     In 2012, NRG Energy purchased GenOn, which had been created in 2010 in a merger between former McKinsey bankruptcy client Mirant and RRI Energy, Inc. (formerly Reliant Energy, Inc.); and

c.     During SunEdison's 2016 bankruptcy, NRG Energy purchased at least three of SunEdison's non-debtor affiliates while McKinsey RTS served as a fiduciary for SunEdison and while McKinsey concealed that NRG was also a McKinsey client.

264.    Of the entities that participated in these transactions, at least five were current or former McKinsey clients: Mirant, NRG Energy, GenOn, Edison Mission Energy, and SunEdison.  In *GenOn*, however, McKinsey concealed its connections to all of those parties and all the transactions.

265.    Rule 2014 required McKinsey RTS to fully disclose McKinsey's role in those transactions because this disclosure was critical to a full understanding of McKinsey RTS's connection to NRG as well as to GenOn itself, and any role that McKinsey and McKinsey RTS may have played in GenOn's insolvency.

266.    Here, the connections of McKinsey and McKinsey RTS to GenOn began years before GenOn retained McKinsey RTS to assist with GenOn's insolvency and bankruptcy.  That connection began with McKinsey's deep involvement in the transactions that led to GenOn's creation.  McKinsey RTS's employment by GenOn for GenOn's bankruptcy case is only the latest phase of this longstanding connection.  Instead of disclosing the history of its multiple connections to GenOn both inside and outside of several chapter 11 cases, however, McKinsey fraudulently concealed all of it.

267.    To enable McKinsey RTS to obtain bankruptcy employment in *GenOn*, it also concealed the extent to which it was involved in advising the web of entities connected to GenOn and NRG Energy.  For example, when NRG Energy purchased assets from McKinsey RTS Chapter 11 client Edison Mission Energy, NRG was advised by multiple advisors that are

themselves McKinsey clients or advisors.  Meanwhile, Edison Mission Energy, the seller was also advised by JPMorgan Chase, which is a McKinsey client, and by Kirkland & Ellis, which is a McKinsey service provider.  Of all these professionals, McKinsey RTS disclosed only JPMorgan Chase as a McKinsey connection in *GenOn*.

268.    McKinsey RTS fraudulently concealed all of these connections from the parties and this Court in *GenOn*.  Yet they were disqualifying connections because they reveal a pattern of McKinsey's clients receiving one another's assets, while the fiduciaries, McKinsey and McKinsey RTS, improperly stood in the middle and made money on all sides.

269.    McKinsey has a history of recommending that its undisclosed clients purchase either insolvent entities for which McKinsey or McKinsey RTS serves as a court-approved fiduciary or their assets.  This history strongly suggests that the GenOn court likely would have found that McKinsey RTS's employment was not in the best interest of *GenOn*'s bankruptcy estate,[160] if not an actual, direct, and currently undisclosed conflict.  McKinsey appears to be trafficking in the assets of its Chapter 11 clients when acting as a fiduciary in multiple Chapter 11 cases.

### 4.    McKinsey Received Avoidable Preference Payments from GenOn in Order to Avoid Disqualification as a Creditor.

270.    Had McKinsey RTS made complete and truthful disclosures in *GenOn*, it also would have been disqualified either as a creditor of GenOn or due to its preference liability to

---

[160] To approve the employment of a professional, the bankruptcy court must find not only that the professional is disinterested, but also that the employment is in the best interest of the estate.  *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 258 (Bankr. E.D. Va. 20160 (citing *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (citing 8 L. King, COLLIER ON BANKRUPTCY, ¶ 2014.03 (15th ed. 1994)).

GenOn.   Before GenOn filed for bankruptcy, using McKinsey RTS's insider status and information, it ensured that GenOn paid the debts owed to it ahead of other creditors.   Then, to further avoid disqualification, McKinsey falsely stated that these payments were ordinary course payments to avoid preference liability.   But clearly, they were not.

271.   McKinsey RTS received avoidable preferences totaling $4,512,000 in the ninety days before the GenOn petition date.[161]   Thus, McKinsey RTS held "an interest adverse to the estate," and was not qualified for employment as a professional under Section 327(a).   McKinsey did not disclose this to this Court.

272.   GenOn's application to employ McKinsey RTS (not McKinsey RTS's disclosure declaration) stated that "[d]uring the ninety days prior to the commencement of the Chapter 11 cases, the debtors paid McKinsey RTS a total of $6,012,000 (inclusive of reimbursable expenses) incurred in providing services to the debtors in contemplation of, and in connection with, prepetition restructuring activities[.]"[162]

273.   More specifically, GenOn (not McKinsey RTS) disclosed these five payments to McKinsey RTS totaling $4,512,000 within the ninety days before its bankruptcy filing on June 14, 2017:[163]

> a.   $510,000 on April 25, 2017 (for an invoice dated January 15, 2017);
>
> b.   $510,000 on June 5, 2017 (for an invoice dated January 30, 2017);
>
> c.   $900,000 on June 9, 2017 (for an invoice dated June 2, 2017);
>
> d.   $900,000 on June 12, 2017 (for an invoice dated June 5, 2017); and

---

[161] Application to Employ McKinsey, *GenOn* Dkt. 123, pp. 13-14, ¶¶ 30-32.

[162] *Id.*

[163] *Id.*

e.      $1,692,000 on June 13, 2017 (for an invoice dated June 12, 2017).

274.    As a result of those concealed payments, McKinsey RTS was not listed as a prepetition creditor in GenOn's bankruptcy schedules.  However, none of these payments were made pursuant to "ordinary course" business terms, as required to avoid preference liability under 11 U.S.C. § 547(c)(2).

275.    The first two payments were late, having been made more than three and a half months after invoices were issued, while the last three invoices were issued and paid just days before the bankruptcy filing - much quicker than the ordinary course for McKinsey RTS and GenOn.

276.    The third payment was made seven days after the invoice was issued and just five days before the bankruptcy filing.  The fourth payment was made seven days after the invoice was issued and just two days before the bankruptcy filing.  And the fifth and final payment was made the day after the invoice was issued and the day before the bankruptcy filing.  Each payment was arranged through McKinsey's insider status and was a voidable preference payment under 11 U.S.C. § 547(b).

277.    As developed in Part III.H. above, these preference payments created "an interest adverse to the estate" that disqualified McKinsey RTS under 11 U.S.C. § 327.  In McKinsey RTS's rush to obtain these prepetition payments as an insider and to avoid disqualification as a prepetition creditor, it merely transformed the payments into preference payments, which are also disqualifying.

278.     McKinsey RTS's declaration to this Court in *GenOn* falsely stated: "McKinsey RTS is a 'disinterested person.'"[164]  This was an intentionally false statement.  McKinsey RTS knowingly arranged and then collected preference payments from GenOn on the eve of its bankruptcy in order to jettison its status as an unsecured creditor.  Further, McKinsey RTS did not advise the U.S. Trustee or the bankruptcy court that it had been paid millions of dollars in preference payments.  Whether McKinsey RTS was a creditor or a preference recipient, it would have been disqualified because it held an interest adverse to the estate under 11 U.S.C. § 327.

279.     Accordingly, McKinsey's description of these payments in its disclosure declaration was materially false and its affirmative statement that it was disinterested was an intentionally false statement that worked a fraud on this Court.

### 5.     McKinsey's Declarations in *GenOn* Fraudulently Concealed Numerous Connections, Including Connections to GenOn's Creditors and Competitors.

280.     McKinsey RTS's various delayed and incomplete declarations in *GenOn* ultimately disclosed approximately 85 connections to interested parties.  However, McKinsey RTS continued to conceal many other connections.  As in this case, McKinsey RTS's initial declaration in *GenOn* stated that it was disinterested because the services it provided to clients who were interested parties "specifically do not focus on direct commercial relationships or transactions between such companies and the debtors."[165]

---

[164] Declaration of Kevin M. Carmody, *GenOn* Dkt. 1232-2, filed June 23, 2017, p. 26 of 102, ¶ 68.

[165] *GenOn* Dkt. 123-2, p. 19, ¶ 58; *see also*, *Id.*, pp. 21-22, ¶ 61.

281.    Rule 2014, however, does not limit disclosure requirements to connections that are "direct commercial relationships or transactions between such companies and the debtors." Rather, the law mandates that all connections must be disclosed.

282.    As a result of McKinsey's repeated fraudulent concealments of multiple connections in *GenOn*, its disclosure declarations include numerous false or materially misleading statements.

283.    For instance, McKinsey's initial declaration in *GenOn*, dated June 23, 2017, falsely states that McKinsey had no connections to the following nine categories of interested parties:

- Bank and Indenture Trustees;
- DIP Lenders;
- Government-Regulatory Agencies;
- Insurers;
- Joint Venture Parties;
- Litigation Parties;
- Noteholders;
- Surety Bonds; and
- Taxing Authorities.

284.    In its initial declaration, McKinsey RTS disclosed a handful of its client connections in certain other categories of interested parties: twelve Contractual Counterparties; four Significant Vendors; three Utility Providers; three Shippers; two Significant Customers; two Professionals; one Lienholder; one Beneficiary of Letter of Credit; and one Largest Unsecured Creditor.[166]   McKinsey further disclosed that three law firms listed as Professionals in *GenOn* were also service providers to McKinsey.[167]

---

[166] *GenOn* Dkt. 123-2, pp. 13-19, ¶¶ 30-57.

[167] *Id.*, p. 24, ¶ 66.

285.    As in this case, McKinsey stated that it had no further connections, despite having "conducted a global database search of the Potential Parties in Interest" in *GenOn* prior to its bankruptcy engagement.[168]   McKinsey further stated that it had "searched its global client database, which covers clients of all its consulting affiliates, to determine the existence of any client service provided by McKinsey RTS US or affiliates within the last two years to Potential Parties in Interest."[169]

286.    As in this case, however, McKinsey RTS also admitted that its search was incomplete and defective because it did not include its non-consulting affiliates - specifically, MIO.

287.    Based on the proven extreme and obvious deficiencies in McKinsey's disclosures, both as discussed above and as listed below, McKinsey's statements are demonstrably false.

288.    As in this case, McKinsey further created the false impression that it had conducted a diligent, thorough, and exhaustive search of its potential connections.  It did that by reassuring this Court that in addition to searching a "global database," McKinsey had also written to both "members of McKinsey RTS"[170] and to "partners at its affiliates worldwide that provide consulting services."[171]   The plain deficiency here is that McKinsey unlawfully carved out MIO and all other McKinsey non-"consulting" affiliates from the scope of its search and did not disclose the many connections that would have resulted.

---

[168] *Id.*, p. 11, ¶ 26.

[169] *Id.*, p. 12, ¶ 27.

[170] *Id.*, p. 11, ¶ 27.

[171] *Id.*, p. 12, ¶ 27.

289.    The count of McKinsey RTS's now-known client and investment connections that it knowingly concealed in the *GenOn* case exceeds 50, including:

| Entity | Interested Party Roles(s) (in *GenOn*) | McKinsey Connection(s) |
|---|---|---|
| AEP Energy Partners Inc. | Significant Customer | Client and/or Subsidiary of Client (American Electric Power Co.) |
| American Alternative Insurance Corporation | Insurer | Client and/or Subsidiary of Client (MunichRe) |
| Aspen American Insurance Company | Surety Bonds | Client |
| Aspen Specialty Insurance Company | Insurer | Client |
| Australia and New Zealand Banking Group Ltd. | Litigation Party | Client |
| BlackRock | Banks and Indenture Trustees | Investment (MIO) |
| BlackRock Fund Advisors | Major Equity Holder; Noteholder | Investment (MIO) |
| Citigroup Global Markets Inc. | DIP Lender; Noteholder; Contractual Counterparty | Client |
| Commonwealth of Pennsylvania | Contractual Counterparty | Client |
| Davis Polk & Wardwell LLP | Professional | Service Provider |
| Dominion Cove Point LNG LP | Beneficiary of Letter of Credit; Contractual Counterparty; Shipper | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (Dominion Resources, Inc.) |
| Dominion Energy Generation Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (Dominion Resources, Inc.) |
| Dominion Energy Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (Dominion Resources, Inc.) |
| Dominion Transmission, Inc. | Beneficiary of Letter of Credit; Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (Dominion Resources, Inc.) |

| | | |
|---|---|---|
| Intesa San Paolo, f/k/a Banca Intesa | Litigation Party | Client |
| iShares $ High Yield Corporate Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares 0-5 Year High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Core Total USD Bond Market ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond CHF Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond GBP Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield ex Oil & Gas | Noteholder | Investment (MIO) (BlackRock) |
| iShares U.S. High Yield Bond Index ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares USD Short Duration High Yield | Noteholder | Investment (MIO) (BlackRock) |
| Kirkland & Ellis LLP | Professional | Service Provider |
| KPMG LLP | Professional | Service Provider |
| McGuire Woods LLP | Contractual Counterparty | Service Provider |
| Moody's Investors Services Inc. | Contractual Counterparty | Service Provider |
| Onex Inc. | Contractual Counterparty | Client |
| Oregon Public Utility Commission | Government-Regulatory Agency | Affiliate of Client (State of Oregon) |
| Pennsylvania Bureau of Waste Management | Government-Regulatory Agency | Affiliate of Client (Commonwealth of Pennsylvania) |
| Pennsylvania Department of Revenue | Government-Regulatory Agency | Affiliate of Client (Commonwealth of Pennsylvania) |

| | | |
|---|---|---|
| Progress Rail Leasing Corp. | Noteholder; Contractual Counterparty | Client and/or Affiliate of Client (Caterpillar Financial Services) |
| Royal Bank of Scotland | Litigation Party | Client and/or Parent of Client (Ulster Bank) |
| Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank NV | Litigation Party | Client and/or Affiliate of Client (Ulster Bank) |
| Siemens Demag Delaval | Significant Vendor | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| Siemens Energy Inc. | Largest Unsecured Creditors; Contractual Counterparty | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| Siemens Industry Inc. | Significant Vendor | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| Siemens Power Generation Inc. | Contractual Counterparty | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| Siemens Westinghouse | Contractual Counterparty | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| Southern California Edison Company | Beneficiary of Letter of Credit; Significant Customer; Contractual Counterparty; Utility Provider | Client |

| Standard & Poor's Rating Services | Contractual Counterparty | Service Provider; Employee Relationship |
| State of West Virginia | Taxing Authority | Client |
| State Street Bank and Trust Company | Bank and Indenture Trustees; Contractual Counterparty | Client and/or Affiliate of Client (State Street Global Advisors) |
| State Street Bank and Trust Company of CT, N.A. | Contractual Counterparty; Landlord | Client and/or Affiliate of Client (State Street Global Advisors) |
| State Street Global Advisors | Noteholder | Client |
| Thyssenkrupp Elevator Corp. | Contractual Counterparty | Client and/or Subsidiary of Client (Thyssenkrupp AG) |
| UBS Warburg LLC | Contractual Counterparty | Client and/or Subsidiary and/or Affiliate of Clients (UBS; UBS Financial Services, Inc.; UBS Stamford Branch TRS) |
| United States Attorney's Office (Department of Justice) | Contractual Counterparty | Client |
| United States Trust Company of NY | Contractual Counterparty | Client and/or Subsidiary of Client (Bank of America) |
| Wells Fargo Bank, N.A. | Contractual Counterparty; Banks and Indenture Trustees | Client |

290.    As in this case, these undisclosed McKinsey RTS investment and client connections in *GenOn* would have disqualified it from employment as a bankruptcy professional under 11 U.S.C. § 327.

291.    Notably, as indicated both above and in McKinsey's belated disclosures, dozens of McKinsey clients were among the creditors, just as in McKinsey RTS's other cases and in this case.

292.    For example, on February 7, 2018, McKinsey RTS filed its fourth disclosure declaration in *GenOn*.  McKinsey filed this declaration *after* plan confirmation and *after* the case had effectively ended, but while McKinsey RTS was administering GenOn's claims review process, deciding which creditors, *including McKinsey RTS's own clients*, would be paid and

how much, deciding which claims to object to, and continuing to perform claims management work on the estate's behalf.  In that declaration, McKinsey RTS finally disclosed its relationship with two large GenOn creditors who are also McKinsey clients - Bank of America N.A. and Merrill Lynch.  Both companies were on the Interested Parties List docketed more than seven months earlier, on June 23, 2017.

293.   McKinsey RTS's concealment of its client connections throughout the case and its extreme delay in disclosing these connections until after the plan had been confirmed, and while also deciding the value and payments of its undisclosed clients' claims, is consistent with its pattern of withholding and then incrementally and belatedly disclosing critical information.  It does that in order to evade disqualification by waiting until it is too late for U.S. Trustee or the court to act on McKinsey RTS's violations of Rule 2014.

294.   The services that McKinsey RTS provided for GenOn, whether prepetition, during the case, or post-confirmation, directly and adversely impact McKinsey's own clients who are also creditors of GenOn.

295.   McKinsey RTS's scope of services in the *GenOn* bankruptcy, as described in GenOn's June 23, 2017 application to employ McKinsey RTS, requires McKinsey RTS to "provide strategic advice and develop relevant analyses to support the overall restructuring process[.]"[172]  McKinsey RTS was also obligated, in cooperation with others, to "develop and prepare a Chapter 11 plan of reorganization[.]"[173]

296.   Due to McKinsey RTS's many undisclosed and concealed conflicts of interests, it was not possible for McKinsey RTS to carry out these services in an impartial manner.  Every

---

[172] *GenOn* Dkt. 123, p. 8, ¶ 14 b.

[173] *Id.*, p. 8, ¶ 14 c.

one of McKinsey's numerous clients who was a GenOn creditor were adversely impacted by the "restructuring process" in GenOn's plan of reorganization.  At the same time, McKinsey RTS is obligated as the debtor's fiduciary to prepare that plan of reorganization with full loyalty to GenOn.

297.    Additionally, McKinsey RTS's fiduciary and contractual obligations to GenOn include "assist[ing] the debtors in managing the Chapter 11 bankruptcy process, including managing outside stakeholders[.]"[174]  Again, this is a task that McKinsey RTS cannot perform with full loyalty to the bankruptcy estate.  Among the outside stakeholders that McKinsey RTS is thereby committed to "managing" are McKinsey's own undisclosed clients.

298.    As in this case, McKinsey RTS was also charged with "assist[ing] in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend[ing] diligence sessions and working meetings with various stakeholders and constituents[.]"[175]  In other words, although McKinsey RTS was obligated to serve as a fiduciary for GenOn, it was in meetings with McKinsey's own undisclosed clients who are indisputably adverse to the *GenOn* bankruptcy estate, with significant financial interests in the balance.

299.    And, in perhaps the ultimate undisclosed conflict of interest, McKinsey RTS was committed to "provide testimony" against its own undisclosed client connections in adversarial litigation.[176]  This obligation meant that McKinsey RTS might have had to choose between using or withholding confidential information gained from McKinsey's other clients that may be useful or relevant to the bankruptcy estate.  If McKinsey decides that it is obligated to withhold

---

[174] *Id.*, p. 8, ¶ 14 d.

[175] *Id.*, p. 8, ¶ 14 e.

[176] *Id.*, p. 8, ¶ 14 g.

confidential information that it obtained from its other clients that it could otherwise use for GenOn's benefit, it would be violating its fiduciary duty to GenOn.  McKinsey never brought any of this to the attention of this Court.

300.    As a bankruptcy adviser and court-approved fiduciary, McKinsey RTS is legally obligated to assist GenOn in the bankruptcy reorganization process, the goal of which is a negotiated (or imposed) plan to reduce or eliminate the debts that GenOn owed to McKinsey's undisclosed clients and investments.  In these circumstances, McKinsey's undisclosed client and investment relationships with numerous creditors of the estate were disqualifying.

### C.    In *In re SunEdison*, McKinsey RTS Also Obtained and Retained Employment by Unlawfully Concealing Its Disqualifying Conflicts of Interest.

301.    SunEdison, Inc. filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York on April 21, 2016 and retained McKinsey RTS as its restructuring advisor.

302.    In *SunEdison*, McKinsey RTS submitted five disclosure declarations:

- An initial declaration, filed on May 5, 2016;[177]

- An Amended Declaration, filed on June 6, 2016;[178]

- A First Supplemental Declaration, filed on June 14, 2016;[179]

- A Second Supplemental Declaration, filed on December 21, 2016;[180] and

- A Third Supplemental Declaration, filed on March 20, 2017.[181]

---

[177] *SunEdison* Dkt. 202.

[178] *SunEdison* Dkt. 484.

[179] *SunEdison* Dkt. 586.

[180] *SunEdison* Dkt. 1958.

303.   McKinsey RTS's final application for fees and expenses in the amount of $15,023,689.31 was approved by an order entered on April 12, 2018.[182]

304.   As in *GenOn*, McKinsey RTS revealed its connections to significant interested parties only belatedly, after its role in the bankruptcy proceedings was deeply entrenched. McKinsey RTS's pattern of filing multiple amended declarations that disclosed connections that should have been disclosed *ab initio* is further evidence of its deliberate scheme to conceal its connections while only appearing to comply with its disclosure obligations.

305.   As in *GenOn*, had McKinsey RTS fully and honestly complied with Rule 2014, it would have been disqualified in *SunEdison*.  Instead, McKinsey RTS committed multiple frauds on the *SunEdison* court to obtain, and then maintain, its employment as a professional and a fiduciary for SunEdison.

306.   As detailed below, McKinsey RTS's frauds on the court in the *SunEdison* case include:

a.   McKinsey RTS submitted declarations that fraudulently concealed and falsely denied many of its known connections, including the connections of the MIO with interested parties such as BlackRock, which was a SunEdison creditor.

b.   McKinsey RTS orchestrated a series of improper and deceptive pre-petition transfers from the debtor and non-debtor affiliates totaling at least $10 million to avoid disqualification and evade preference liability.

c.   McKinsey RTS submitted a declaration that unlawfully concealed a likely disqualifying "business arrangement" between McKinsey and the former CEO of SunEdison.

---

[181] *SunEdison* Dkt. 2614.

[182] *SunEdison* Dkt. 5043.

307.   Indeed, Mr. Hojnacki, who signed McKinsey RTS's declaration in this *Westmoreland Coal* case, also signed McKinsey TRS's five fraudulent declarations in *SunEdison*.  That experience severely undermines the credibility of his declaration in this case.

### 1.   McKinsey Fraudulently Concealed Its Connections in *SunEdison*.

308.   At the outset of the *SunEdison* case, as in *GenOn*, McKinsey RTS and Mr. Hojnacki unlawfully concealed numerous known connections to interested parties.  Although McKinsey RTS and Mr. Hojnacki supplemented its disclosures four times, for a total of five declarations, dozens of McKinsey connections to interested parties ultimately remained undisclosed.

309.   In its initial disclosure declaration in *SunEdison*, dated May 5, 2016, McKinsey RTS and Mr. Hojnacki identified only 23 of its multiple known connections.[183]

310.   On May 12, 2016, the U.S. Trustee filed an objection to McKinsey RTS's retention in *SunEdison* on the basis that its disclosure declarations were incomplete and inadequate under Rule 2014.[184]  As in the *ANR* case, the U.S. Trustee stated that McKinsey's disclosure declarations "gave the appearance of compliance without actually complying with Bankruptcy Rule 2014."[185]

---

[183] *See SunEdison* Dkt. 202, pp. 13-18, ¶¶ 27-54.

[184] *SunEdison* Dkt. 265.

[185] *Id.*, p. 9.

311.    In response to the U.S. Trustee's objection, on June 6, 2016, McKinsey RTS and Mr. Hojnacki filed a second declaration, disclosing an additional eighteen connections to interested parties.[186]   However, many connections still remained undisclosed.

312.    On August 5, 2016, in the *ANR* case, the U.S. Trustee filed a statement that in *SunEdison*, McKinsey RTS had "disclosed the identity of *every* connection before its retention was approved."[187]   But McKinsey grossly misled the U.S. Trustee into making this incorrect statement.  In fact, McKinsey RTS was still unlawfully concealing from the U.S. Trustee and the court many of McKinsey's now-known connections in *SunEdison*.

313.    In making this incorrect statement to the *ANR* court, the U.S. Trustee relied in good faith on McKinsey RTS's knowingly false statements, made as a fiduciary, that it had disclosed all of its connections in *SunEdison*.  By falsely representing to the U.S. Trustee that McKinsey RTS had fully disclosed "*every* connection" in *SunEdison*, McKinsey perpetrated a fraud on two separate bankruptcy courts, as well as the Department of Justice.

314.    McKinsey RTS has never addressed or corrected the false statement that the U.S. Trustee made in direct reliance on McKinsey RTS's false representation that it had disclosed *every* one of its connections in *SunEdison*.

315.    On December 21, 2016, McKinsey RTS and Mr. Hojnacki filed a second supplemental disclosure declaration identifying seventeen more connections in the *SunEdison* case.[188]

---

[186] *SunEdison* Dkt. 484.

[187] Statement of the Recommendation of the United States Trustee on Public Disclosures by McKinsey RTS, *SunEdison* Dkt. 3222, filed Aug. 5, 2016, p. 5 of 40 (emphasis in original).

[188] *SunEdison* Dkt. 1958.

316.     On March 20, 2017, about 11 months after the filing date, McKinsey RTS and Mr. Hojnacki filed a third supplemental disclosure in *SunEdison*, which was its fifth and final disclosure declaration.  In it, McKinsey RTS disclosed two more connections by name, both of whom were on the original interested parties list.[189]  However, McKinsey RTS has continued to unlawfully conceal many connections that it ultimately never disclosed in *SunEdison*.

317.     In May and August of 2016, McKinsey was forced by actions of the U.S. Trustee in the *ANR* case to disclose two dozen previously undisclosed connections, which McKinsey RTS then unlawfully concealed in *SunEdison*.[190]  Those cases were pending concurrently, and these McKinsey RTS connections appeared on the Interested Parties Lists in both cases.

318.     These facts demonstrate that McKinsey RTS and Mr. Hojnacki knowingly concealed McKinsey RTS's connections in *SunEdison*.  These facts also demonstrate that McKinsey RTS's illegal scheme included concealing connections that it believed were likely to lead to disqualification but revealing the same connection in cases in which it believed that disclosure posed no danger of disqualification.

319.     McKinsey RTS and Mr. Hojnacki concealed over forty connections throughout the *SunEdison* case, including both McKinsey clients as well as MIO investments related to the Debtors and their creditors.  These 40 concealed connections are:

| Entity | Interested Party Role(s) (in *SunEdison*) | McKinsey Connection(s) |
|---|---|---|
| Allianz SE | Convertible Note Holder | Client and/or Affiliate of Client (Allianz Global US) |

---

[189] *SunEdison* Dkt. 2614.

[190] Third Supplemental Declaration of Kevin Carmody, *ANR* Dkt. 2464, filed May 19, 2016; Declaration of Kevin Carmody in Respect of Recommendation of United States Trustee, *ANR* Dkt. 3223, filed Aug. 5, 2016.

| Aon Risk Services Central | Vendor | Affiliate of Aon Consulting, a Service Provider to MIO |
|---|---|---|
| Banco Popular | Depository Bank | Client |
| Bank of America Merrill Lynch (US) | Institutional Shareholders > 1% | Client and/or Subsidiary of Client (Bank of America) |
| BlackRock, Inc. | Second Lien Lender | Investment (MIO) |
| BlackRock Financial Management | Convertible Note Holder | Investment (MIO) |
| BlackRock Institutional Trust Company, N.A. | Institutional Shareholders > 1% | Investment (MIO) |
| BP Solar International, Inc. | "2002 List" | Client and/or subsidiary of client (BP PLC) |
| Calpine Corporation | Bidder | Employee Relationship |
| Cerberus | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners VI, L.P. | Second Lien Lender | Investment (MIO) |
| Citibank | Customer; Depository Bank | Client and/or Affiliate of Client (Citigroup Global Markets, Inc.) |
| Citigroup Global Markets Inc. | Second Lien Holder | Client |
| Citigroup, Inc. | Convertible Note Holder; Second Lien Lender | Client and/or Parent of Client (Citigroup Global Markets, Inc.) |
| Davis Polk & Wardwell LLP | "2002 List" | Service Provider |
| Duke Energy Corporation | Competitor | Client |
| Enphase Energy | Vendor | Client |
| Gamesa Renewable Private Ltd. | Vendor | Client and/or Affiliate of Clients (Siemens Financial Services and Siemens Industry Pace Global); Affiliate of Service Provider (Siemens Industry Pace Global) |

| GE Energy, LLC | Bidder | Client and/or affiliate of clients (General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services) |
|---|---|---|
| General Electric Capital Corp. | "Uniform Commercial Code List" | Client and/or affiliate of clients (General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services) |
| General Electric Co. | Vendor | Client and/or parent or affiliate of clients (General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services) |
| Illinois Department of Revenue | Significant Vendor; Taxing Authority | Client |
| Internal Revenue Service | Government bodies | Client |
| Jones Day LLP | "2002 List" | Service Provider |
| K Special Opportunity Fund L.P. | Second Lien Lender | Investment (MIO) (Blackrock) |
| Longroad Energy Partners LLC / BlackRock Infrastructure | Bidder | Investment (MIO) (Blackrock) |
| Lotte Fine Chemical Co., Ltd. | "2002 List" | Client |
| Managed Account Advisors LLC | Convertible Note Holder | Client and/or Subsidiary of Client (Bank of America) |
| Moody's Investors Services Inc. | "2002 List" | Service Provider |
| Norton Rose Fulbright US LLP | "2002 List" | Service Provider |

| Oregon Department of Revenue | Taxing Authority | Affiliate of Client (State of Oregon) |
|---|---|---|
| Pennsylvania Bureau of Corporation Taxes | Taxing Authority | Affiliate of Client (Commonwealth of Pennsylvania) |
| Siemens Corp. | Bidder; Vendor | Client and/or Parent of Clients (Siemens Industry Pace Global and Siemens Financial Services); Parent of Service Provider (Siemens Industry Pace Global) |
| Siemens Energy Inc. | Vendor | Client and/or Affiliate of Clients (Siemens Industry Pace Global and Siemens Financial Services); Affiliate of Service Provider (Siemens Industry Pace Global) |
| State of Oregon Construction Contractors Board | Government body | Affiliate of Client (State of Oregon) |
| State Street Global Advisors (US) | Institutional Shareholders > 1% | Client |
| Strategic Value Partners | 2nd Lien Lender | MIO (Investment) |
| U.S. Attorney's Office (Department of Justice) | Government body | Client |
| U.S. Customs and Border Protection | Government body | Client |
| UBS Securities LLC | Institutional Shareholders > 1% | Client and/or Subsidiary and Affiliate of Clients (UBS; UBS Financial Services, Inc.; UBS Stamford Branch TRS) |
| Whitebox Advisors | Creditor in Dkts. 3171, 3172, 3174, filed May 19, 2017 | Investment (MIO) |

320.   McKinsey RTS knew of all 40 of these connections when it filed each of its declarations in *SunEdison*. Its concealment of the connections was, therefore, intentional and unlawful.

321.   McKinsey RTS and Mr. Hojnacki submitted four amended and supplemental disclosure declarations in *SunEdison* and gave repeated assurances to the U.S. Trustee and the

court that it would supplement its declarations if it became aware of any relationship or other information that requires disclosure.[191]  McKinsey RTS nonetheless intentionally and unlawfully concealed its connections to many interested parties.

322.    Moreover, the inconsistency of McKinsey RTS's disclosures among different bit concurrent bankruptcy proceedings indicates that McKinsey RTS had a deliberate policy to conceal connections that posed a conflict.  At a bare minimum, it shows that all of McKinsey RTS's disclosures were false.

323.    Further, of the connections that McKinsey RTS finally disclosed in *SunEdison*, many were not disclosed until eight or even ten months into the case, including the following connections:

| Entity | Interested Party Role(s) (*SunEdison*) | McKinsey Connection |
|---|---|---|
| E.On SE | Bidder | Client |
| UC Berkeley | Customer | Employee Relationship |
| Wells Fargo & Company | First Lien Lender; Depository Bank; Letter of Credit Issuer; Convertible Note Holder | Client |
| Wells Fargo Bank | Convertible Note Holder | Client |
| Wells Fargo Securities | Convertible Note Holder | Client |

324.    As in *GenOn*, *ANR* and this case, the scope of McKinsey RTS's services in *SunEdison* makes these undisclosed connections disqualifying.   McKinsey RTS's initial declaration, filed May 5, 2016 in the *SunEdison* case discloses this expansive scope of services:[192]

---

[191] *See, e.g.*, *SunEdison* Dkt. 484, p. 24 ¶ 62; *Id*., p. 25. ¶ 63; *Id*., p. 28, ¶ 68; *Id*., p. 31, ¶ 74.

[192] *SunEdison* Dkt. 202, pp. 6-7, ¶ 11 (emphasis added).

McKinsey RTS will perform *a broad range of services* during these Chapter 11 Cases, including, without limitation, the following:

a. *supporting the development of a strategic business plan* with the Company's Chief Restructuring Officer and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;

b. assisting the Company's Chief Restructuring Officer and Chief Financial Officers with matters related to *financial planning and analysis*, as requested;

c. assisting in developing a short-term cash flow forecasting process and *implementing cash management strategies*, tactics, and processes and working with the Company's treasury department and other professionals and *coordinating the activities of the representatives of other constituencies* in the cash management process;

* . * . * .

f. providing *strategic advice to support the overall restructuring process*;

g. in cooperation with the Company's officers, investment bankers and other engaged professionals and counsel, *developing and preparing a Chapter 11 plan of reorganization*;

h. assisting the Company in managing its bankruptcy process including *managing outside stakeholders* and their professionals;

i. assisting with the evaluation of certain *near term operational cost reduction and value enhancement opportunities* (e.g., SG&A, fixed costs and procurement);

j. planning and executing the Company's business support functions re organization and *cost reduction goals*;

k. working with the Company's counsel ("Counsel") on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

l. assisting the Company with *developing a detailed communications plan*;

* * *

n. *providing testimony and other litigation support* as requested by Counsel in connection with matters upon which McKinsey RTS is providing Services[.]

325.    As McKinsey RTS itself notes, this is "a broad range of services."[193]   However, these services are fraught with actual conflicts of interest presented in almost every category of service.   Whether McKinsey's services were in relation to SunEdison's new business plan, its cash management strategies, its Chapter 11 plan, its cost reduction strategies, or testimony and litigation support—all of which McKinsey RTS committed to provide for SunEdison—**any service that McKinsey RTS provided to SunEdison would directly and financially affect every one of its client and investment connections**.   And that is true regardless of whether McKinsey's services for its concealed connections were on matters "unrelated to the debtors."

326.    11 U.S.C. § 327 prohibits McKinsey RTS from imposing on the *SunEdison* bankruptcy estate the conflicts, questions, and concerns that arise because McKinsey RTS has so many client and investment connections across such a wide scope of estate constituents. McKinsey RTS knew that it was not disinterested and had interests adverse to the estate. McKinsey RTS also knew that therefore it was not qualified to serve in the *SunEdison* case as a bankruptcy professional and fiduciary.   Yet, McKinsey sought and obtained employment nonetheless, by concealing its conflicts and by falsely declaring that it was disinterested.

### 2.    McKinsey Unlawfully Concealed Fraudulent Pre-Petition Payments That It Orchestrated from SunEdison Affiliates Using Its Insider Status and Information.

327.    McKinsey RTS's fraudulent Rule 2014 filings in *SunEdison* also concealed its orchestration of a series of complex and improper pre-petition transfers from non-debtor affiliates of SunEdison totaling over $10 million to evade disqualification and to hide its preference liability under 11 U.S.C. § 547(b).

---

[193] *Id.*, p. 6, ¶ 11.

328.   In the ninety days before SunEdison filed for bankruptcy, SunEdison paid McKinsey RTS a total of $6,250,965 for its prepetition services.[194]   Thus, when SunEdison filed for Chapter 11 relief, McKinsey RTS faced (a) a potential loss of over $6 million because of its liability to SunEdison for these preference payments; and (b) disqualification from the SunEdison case because that liability was clearly an interest adverse to the bankruptcy estate under Bankruptcy Code Section 327(a).

329.   In addition to that fraud, McKinsey RTS used its insider information and status to orchestrate a complex series of fraudulent transactions over many months.   The purpose of those transactions was to evade disqualification.   McKinsey RTS accomplished this by completely rearranging the nature of other debts that SunEdison owed to McKinsey RTS and then falsely re-invoicing and collecting that debt from four non-debtor affiliates of SunEdison: Granite Mountain Holdings, LLC; Iron Springs Holdings, LLC; Comanche Solar PV, LLC; and Four Brothers Solar, LLC (collectively, the "Non-Debtor Affiliates").   McKinsey RTS's cover-up of these sham transactions enabled McKinsey RTS to secure and retain its employment in the *SunEdison* case when it should have been disqualified.

330.   Specifically, Mar-Bow has caused to be prepared a detailed forensic analysis derived from McKinsey RTS's First Supplemental Declaration in *SunEdison*,[195] SunEdison's application to employ McKinsey RTS,[196] and a separate report from FTI Consulting that was commissioned by SunEdison's board of directors regarding the company's internal operations

---

[194] *Id.*, p. 10, ¶ 20.

[195] *SunEdison* Dkt. 586, p. 3, ¶ 5.

[196] Debtors' Application to Employ McKinsey RTS, *SunEdison* Dkt. 202, filed May 5, 2016, p. 12, ¶ 23.

and financial controls.   That analysis reveals that McKinsey RTS retroactively and falsely re-invoiced work that was actually done for SunEdison as work done for the Non-Debtor Affiliates. And it did that with no proper corporate authority or approval by SunEdison or its non-debtor affiliates.

331.   Relying on this artifice, McKinsey RTS falsely represented to the *SunEdison* court that it did not owe a preference to the estate and was not an estate creditor.   Absent the series of fraudulent transactions that McKinsey orchestrated, McKinsey RTS would have been disqualified for holding an interest adverse to the estate.   In short, McKinsey designed and committed a series of complex financial frauds to wrongfully secure and retain McKinsey RTS's lucrative consultancy assignment in the *SunEdison* bankruptcy.

332.   More specifically, McKinsey (through McKinsey RTS) had sent invoices to SunEdison for the months of September to December 2015.   The services covered by those invoices were provided pursuant to a services agreement between SunEdison and McKinsey RTS which did not involve the Non-Debtor Affiliates.   In approximately late December 2015 or early January 2016, McKinsey RTS still had not been paid for those services.

333.   Because SunEdison was insolvent, which was inside information that McKinsey clearly knew, McKinsey and SunEdison conspired that McKinsey RTS would recall its earlier invoices to SunEdison and issue new but false invoices to the Non-Debtor Affiliates, who would then satisfy the outstanding balances even though none of them had hired McKinsey RTS and thus had no legal liability to, or contractual privity with, McKinsey RTS.

334.   In yet other instances in early 2016, SunEdison, which was cash-strapped, actually had paid several of McKinsey RTS's invoices.   In those instances, McKinsey RTS also issued multiple false invoices to the Non-Debtor Affiliates.   Then the Non-Debtor Affiliates

made payments on the false, re-issued invoices, even though they were not liable for McKinsey RTS's fees and had no contract with McKinsey RTS.  At that point, having been paid twice (once by SunEdison and once by the Non-Debtor Affiliates), McKinsey RTS returned SunEdison's original payments in what is known financially as a "round trip" scheme.

335.    Because the Non-Debtor Affiliates were not Chapter 11 debtors, they had no legal ability to claim a return of the payments as preferences or fraudulent transfers to McKinsey RTS. Through this means, McKinsey fraudulently re-characterized the obvious and disqualifying preference payments from SunEdison as payments from the Non-Debtor Affiliates, and McKinsey again fraudulently laundered disqualifying preference payments from SunEdison into "clean" payments from the Non-Debtor Affiliates.

336.    McKinsey RTS's complex invoicing fraud scheme in *SunEdison* occurred from approximately September 2015 until April 2016.  All told, detailed forensic analysis discloses $10,645,166.78 of improper "round-trip" and retroactively "re-invoiced" transactions involving SunEdison and the Non-Debtor Affiliates during that period.

337.    When McKinsey orchestrated the "re-invoiced" and "round trip" payments with SunEdison's Non-Debtor Affiliates, McKinsey possessed and used insider knowledge that SunEdison was severely insolvent and suffering from an extreme liquidity shortage.  McKinsey used its insider information and knowledge to realize a gain and an advantage over SunEdison's other creditors in the amount of $10,645,166.78.   Functionally, SunEdison's payments to McKinsey RTS, through the fraudulent use of the Non-Debtor Affiliates' funds, were fraudulent transfers and backdoor preference payments.

338.    McKinsey RTS covered-up this ongoing complex fraud scheme in its initial disclosures and then continued its deception by falsely representing in McKinsey RTS's First

Supplemental Declaration in *SunEdison* that the "round trip" payments were, in fact, owed by the Non-Debtor Affiliates in the first instance and McKinsey RTS's services had been legally provided to the Non-Debtor Affiliates.  In reality, however, this was all revisionist history to cover up McKinsey's repeated financial manipulations and to conceal the preference and the disqualifying interest that it created.

339.    Although McKinsey RTS's disclosure declarations admitted to a September 2015 engagement agreement between McKinsey RTS and SunEdison, McKinsey failed to provide a copy of that document or any necessary detailed facts regarding McKinsey RTS's original billings to SunEdison, such as the true nature of the services that McKinsey RTS had provided.

340.    McKinsey RTS's declarations also failed to explain how its services could have been for the Non-Debtor Affiliates when they were originally provided to and paid for by SunEdison pursuant to a contract between McKinsey RTS and SunEdison, and no contract between McKinsey RTS and the Non-Debtor Affiliates existed.  And McKinsey withheld any explanation or disclosure about its relationships and transactions with SunEd and its affiliates before September 2015.

341.    A McKinsey employee, in an internal email, admitted that McKinsey's re-invoicing and round-trip payment scheme through SunEdison's Non-Debtor Affiliates was improper, and noted that significant resistance should be expected from the Non-Debtor Affiliates' Project Managers.

342.    Further, in connection with the *SunEdison* bankruptcy, in an independent report to the Audit Committee of the Board of Directors of SunEdison, investigators flagged these payments as irregular and highly questionable, as referenced in the employee email described above.

343.     If the payment of McKinsey RTS's fees by SunEdison's Non-Debtor Affiliates were legitimate, as McKinsey RTS represented to the court and the U.S. Trustee, presumably McKinsey RTS would have come forward with evidence that independent officers, board, or shareholder members of the Non-Debtor Affiliates had approved the payments.  It never did so.

344.     As a result of McKinsey's fraudulent financial scheme and its concealment thereof, McKinsey's liability to the *SunEdison* estate is as much as $22,255,246.76.   This liability was an undisclosed interest adverse to the *SunEdison* bankruptcy estate and is disqualifying under Section 327 of the Bankruptcy Code.

345.     McKinsey RTS's multiple representations to the bankruptcy court and the U.S. Trustee that it did not hold an interest adverse to the estate were false.  Had McKinsey fully disclosed the extent of its involvement, McKinsey RTS would have been disqualified from employment in *SunEdison*.  It also likely would have been ordered to return to the *SunEdison* estate all funds derived from its scheme for distribution to other creditors.

> ### 3.     McKinsey Unlawfully Concealed Pertinent Facts Regarding Its "Business Arrangement" with SunEdison's Former CEO.

346.     The *SunEdison* bankruptcy court authorized McKinsey RTS's employment on June 23, 2016.  In its initial disclosure declaration to obtain that employment, filed on May 5, 2016, McKinsey RTS made the following inadequate and misleading disclosure: "One member of McKinsey RTS serving the debtors has known the Debtor's CEO, Ahmad Chatila, from past professional relationships prior to 2009."[197]

---

[197] Hojnacki Declaration, *SunEdison* Dkt 202, p. 13, ¶ 27.

347. This minimal disclosure regarding Mr. Chatila conceals the identity of the "[o]ne member of McKinsey RTS serving the debtors[.]"  The unnamed "member of McKinsey RTS" was, in fact, Robert Sternfels.   McKinsey's indirect admission regarding Mr. Sternfels involvement in *SunEdison*, while concealing Mr. Sternfels' name and the true nature of his relationship with Mr. Chatila, raises serious questions as to why McKinsey RTS would conceal Mr. Sternfels' identity and the attendant details, and whether there was anything disqualifying about the relationship.  Mr. Sternfels is one of the most senior global executives of McKinsey & Co. and McKinsey RTS.

348. Moreover, subsequent events gave rise to two very troubling questions.  Did Mr. Chatila, while CEO of SunEdison, cause SunEdison to retain McKinsey RTS on the premise that Mr. Sternfels would assist Mr. Chatila in obtaining new employment, should he be fired from the insolvent SunEdison?  And was that assistance a quid pro quo for Mr. Chatila's assistance in engineering the "re-invoiced" and "round-trip" payments for McKinsey's benefit, as discussed in Part VII.C.2 above.

349. Nine months after SunEdison filed for bankruptcy, on March 20, 2017, McKinsey RTS made a second cryptic disclosure regarding Mr. Chatila.  McKinsey RTS's Third Supplemental Disclosure Declaration revealed in vague terms that McKinsey had entered into an unidentified and unexplained "business arrangement" with Mr. Chatila.[198]  McKinsey RTS's disclosure, however, provided no other details from which the bankruptcy court, the U.S. Trustee, or the interested parties could ascertain whether McKinsey's unspecified "business arrangement" with Mr. Chatila was disqualifying.

---

[198] *SunEdison* Dkt. 2614, p. 4, ¶ 7.

350.     Mr. Chatila is a longtime personal friend of Mr. Sternfels, who was instrumental in Mr. Chatila's elevation to CEO of SunEdison.  Shortly after McKinsey RTS succeeded in its scheme to retain its fraudulently obtained prepetition preference payments from SunEdison (discussed above) and as it became clear that Mr. Chatila would likely be forced out of SunEdison, Mr. Sternfels told his colleagues at McKinsey that they needed to help his friend Mr. Chatila find another position after he left SunEdison.

351.     When McKinsey RTS revealed McKinsey's "business arrangement" with Mr. Chatila on March 20, 2017, its disclosure declaration unlawfully concealed the following pertinent facts:

    a.  The identity of the "entity for which Ahmad Chatila is a senior officer" and the nature of its business;

    b.  Chatila's position and responsibilities with that entity;

    c.  The nature of the "business arrangement";

    d.  Who financed and owns the "business arrangement";

    e.  The identity of the "affiliate of McKinsey RTS US";

    f.  When the "business arrangement" was entered into;

    g.  Why McKinsey RTS delayed disclosing the "business arrangement" until March 20, 2017;

    h.  Whether any McKinsey personnel who were assigned to serve SunEdison were also assigned to work on the "business arrangement";

    i.  The manner in which Chatila personally benefited from the "business arrangement" (including any compensation or other benefits that Chatila received as a result of the arrangement);

    j.  Who was involved in the discussions and negotiations leading to the "business arrangement";

    k.  Whether the "business arrangement" involved any parties in the *SunEdison* case;

    l.  Whether the "business arrangement" involved any competitors of SunEdison;

m. Whether the "business arrangement" involved any creditors or investors of SunEdison;

n. Whether the "business arrangement" involved Chatila's use of any confidential information of the debtors;

o. Whether the "business arrangement" involved use by McKinsey of any information, confidential or otherwise, that McKinsey RTS had obtained from SunEdison; and

p. Whether McKinsey's 100% owned and controlled affiliate, the MIO or one of its affiliates or connections financed the "business arrangement."

352.  As discussed below, McKinsey RTS's unlawful concealment of these pertinent facts was likely a part of its scheme to hide, obfuscate, withhold information, evade disqualification, and enable McKinsey RTS to remain a fiduciary in *SunEdison* and thereby improperly collect millions of dollars in bankruptcy fees.

353.  McKinsey RTS attempted to minimize the potential conflict created by this "business arrangement," stating simply in its Third Supplemental Declaration in *SunEdison* that "[a]n affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison, Inc. with an entity for which Ahmad Chatila is a senior officer."[199]

354.  The entity with which McKinsey entered into its "business arrangement" with Mr. Chatila is likely FTC Solar, Inc., of which Mr. Chatila is one of four founding directors.  A thorough review of public records so suggests.

355.  FTC Solar was incorporated in Delaware on January 3, 2017 and, shortly thereafter, on January 30, 2017, it purchased approximately $35 million worth of SunEdison's assets for a mere $6 million.  That asset purchase was from the *SunEdison* bankruptcy estate

---

[199] *Id.*

while McKinsey RTS was acting as a court-approved fiduciary. McKinsey RTS made no additional disclosures then or since about its connections, if any, to FTC Solar.

356. David Springer was the SunEdison executive who approved the "re-invoicing" and "round-trip" payments scheme (see above) in conjunction with McKinsey executive Matthew Parsons. Mr. Springer now serves as the CEO of FTC Solar.[200] If McKinsey entered into its "business arrangement" with Mr. Chatila in connection with FTC Solar, then McKinsey RTS's statement to the bankruptcy court and the U.S. Trustee that this arrangement was "unrelated to SunEdison" was materially false. If McKinsey did, in fact, have any connection with FTC Solar, then McKinsey RTS's failure to disclose this relationship despite FTC Solar's purchase of the assets of McKinsey's fiduciary client represented yet another egregious and disqualifying conflict of interest.

### D. In *ANR*, McKinsey RTS Also Committed Multiple Frauds on the Court.

#### 1. McKinsey RTS Unlawfully Concealed a MIO Investment in a First Lien Lender That Illegally Profited McKinsey by Over $50 Million.

357. Contura was the entity that, on behalf of ANR's First Lien Lenders, acquired ANR's most valuable assets pursuant to the plan of reorganization. It was incorporated in the State of Delaware on June 10, 2016, specifically to acquire and operate ANR's core coal operations as part of ANR's restructuring. On July 26, 2016, Contura acquired certain ANR assets, including ongoing coal mining operations, and began coal mining operations on the same day. That date, July 26, 2016, coincided with ANR's emergence from Chapter 11 bankruptcy protection.

---

[200] *See* www.ftcsolar.com/about/ (last accessed Oct. 8, 2018).

358. In furtherance of ANR's bankruptcy restructuring, Whitebox purchased enough First Lender Lien claims to receive 11% of the original shares of the newly formed Contura. The price of Contura's shares, which traded at $16.88 on August 18, 2016, increased to $71.00 per share on December 30, 2016, a mere four months later. This represented an increase of 321%.

359. The McKinsey Master Retirement Trust, administered by the MIO, owned a $110 million interest in Whitebox, which owned an 11.1% interest in Contura. McKinsey's investment in Whitebox increased in value by $50,488,357 as a result of its interest in Contura between its first trading date in mid-2016 and the end of 2016.

360. McKinsey's duty of loyalty to the *ANR* estate absolutely prohibited it from any personal profit such as it enjoyed here.

361. Throughout the *ANR* case, McKinsey unlawfully concealed its disqualifying connections with Whitebox and the First Lien Lender claims that resulted in Whitebox acquiring Contura shares under the plan. At the inception of the case, ANR included Whitebox on the interested parties list as a secured creditor, and by the time the plan took effect, it was one of the largest First Lien Lenders. That position enabled Whitebox to acquire over 11% of the Contura common stock through ANR's plan.

362. On July 7, 2016, when McKinsey partner Kevin Carmody provided critical feasibility and liquidation testimony supporting confirmation of the plan – a plan that ultimately profited McKinsey by over $50 million and which placed these assets out of the reach of other creditors – no interested party knew of this immensely profitable McKinsey connection.

363. But McKinsey and Carmody did know it. In his deposition on August 16, 2016, a month after confirmation, Carmody was asked to identify the first lien lenders and he identified Whitebox.

364.    Mr. Carmody and McKinsey violated their fiduciary obligations to the Court and their disclosure obligations under Rule 2014 when they concealed from the Court at confirmation their knowledge that Whitebox was a first lien creditor; that as a result, Whitebox would acquire a valuable equity position in Contura; and that the MIO had a $110 million investment in Whitebox and therefore a financial stake in Contura.  Those violations were a fraud on the *ANR* Court.

365.    McKinsey violated Rule 2014, and knowingly so, when it failed to disclose its known connection with Whitebox and Whitebox's known status as a First Lien Lender as of the time of plan confirmation proceedings.

366.    Crucially, if McKinsey had timely disclosed its known connection to Whitebox, then McKinsey's connection to the First Lien Lender claims that resulted in Contura shares under the plan through Whitebox would also have come light.   Those disclosures would necessarily have resulted in McKinsey's disqualification under 11 U.S.C. § 327.   McKinsey knew that too.

367.    McKinsey has also concealed its connection to Whitebox in five other bankruptcy cases: *UAL Corp.* in 2002, *AMR Corp.* in 2011; *Edison Mission Energy* in 2012, *NII Holdings Inc.* in 2014; and *SunEdison* in 2016.  And it has concealed it again in this *Westmoreland Coal* case.

          **2.**      **McKinsey RTS Unlawfully Concealed MIO Investments in at Least Four Entities That Were Major Equity Holders in *ANR*.**

368.    During the case, McKinsey's partners and employees had investments through the MIO in several entities that were major equity holders in *ANR*:

- Hudson Bay Capital Management
- Nomura Securities Co., Ltd.

- SSgA Funds Management, Inc.; and
- UBS Financial Services, Inc.

369. McKinsey RTS concealed these investments from the Court, knowing that they were disqualifying under 11 U.S.C. § 327.

### 3. McKinsey Likely Invested Directly in ANR through Compass.

370. It appears that in 2010, Compass held an equity interest in Massey Energy. In 2011, ANR purchased Massey and the shareholders of Massey were given stock in ANR. Thus, it appears that in 2011, McKinsey itself likely directly owned an equity interest in ANR.

371. McKinsey RTS has unlawfully concealed its connection with ANR through Compass.

### 4. McKinsey May Have Also Held Equity Interests in ANR and Contura through Its Investments in Blackrock, a McKinsey Client.

372. ANR identified Blackrock Advisors in its interested parties list as a "Major Equity Holder" (and as a "Major Unsecured Noteholder").

373. Although McKinsey's Forms 5500 do not show an investment in Blackrock Advisors, its forms do disclose that it had investments of $600 million in two other Blackrock investment funds - BlackRock Russell 3000 Non-Lending Fund; and Blackrock TIPS.

374. These Forms 5500 only disclose the investments of the MIO's retirement fund assets. They do not disclose the investments of its other $17 billion in assets. Therefore, McKinsey may have invested its other assets in Blackrock Advisors or in other Blackrock investment funds that did invest in ANR.

375.     According to a report obtained from Standard & Poor's, Blackrock Latin America Investment Trust acquired 27,987 shares of Contura by June 2016 as plan confirmation was approaching in the *ANR* case.

376.     ANR never disclosed that Blackrock Latin America Investment Trust was a first lien lender.

377.     It is unclear how Blackrock Latin America Investment Trust obtained this valuable original issue stock or how it became the first or among the first to obtain this position. It is also unclear whether Blackrock's good fortune in acquiring that Contura stock had anything to do with the MIO's $600 million investment in Blackrock or Blackrock's status as a client of McKinsey.

378.     What is certain is that McKinsey client Blackrock profited from Contura when Contura's market value increased substantially after it acquired ANR's most valuable assets, just as both McKinsey and Whitebox profited from their Contura investment, as discussed in Part VII.D.1 above.

379.     In addition, an investment in an Appalachian coal company does not appear to be a target investment for an investment fund called "Blackrock Latin America Investment Trust."

   **5.      Two McKinsey Partners Simultaneously Served Both ANR and United States Steel, Major Customer, on Coal Pricing Issues.**

380.     McKinsey RTS concealed that United States Steel was a client at the time of the filing.  It waited to disclose this connection until its fifth disclosure declaration, which was filed after confirmation.

381.     Two McKinsey RTS consultants held leadership positions on the ANR engagement, Rajesh Krishnan, Senior Vice President, and Richard Sellschop, Practice Leader.

382.     Throughout the case, McKinsey unlawfully concealed that Krishnan and Sellschop billed ANR almost $2 million in fees, while at the same time, they were serving ANR's largest customer, United States Steel, on a cost reduction project, including reducing the costs of coal supplied by ANR.

383.     This egregious conflict of interest should have disqualified McKinsey RTS from serving ANR because McKinsey was representing an interest adverse to ANR in violation of 11 U.S.C. § 327(a).  But it did not, because McKinsey RTS did not disclose it.

### 6.     McKinsey Unlawfully Concealed at Least 31 MIO Connections in *ANR*.

384.     The *ANR* court explicitly ordered McKinsey to disclose its connections and the MIO's connections (with certain limited exceptions).  By obtaining and reviewing MIO's SEC Forms ADV and Labor Department Forms 5500, and with the expenditure of substantial resources, Mar-Bow has discovered that in just the *ANR* case, the MIO has at least 31 connections, all of which McKinsey concealed.  Therefore, McKinsey's partners and employees, including those assigned to the *ANR* case, may have had a financial stake in or commercial connection with every one of these *ANR* interested parties:

| | |
|---|---|
| Allianz Global US | Secured Term Loan Lenders |
| Banc of America Leasing & Capital | Parties to Material Unexpired Leases |
| Bank of America | Depository and Disbursement Banks; Revolving Facility Lenders; Secured Term Loan Lenders; Debtors' Professionals, Consultants and Service Providers |
| Bank of the West | Parties to Material Unexpired Leases |
| Barclays Bank PLC | Revolving Facility Lenders; Secured Term Loan Lenders |
| BlackRock Advisors LLC | Major Unsecured Noteholders; Major Equity Holders |
| Citadel Advisors, LLC | Parties to Joint Ventures |
| Citigroup Global Markets | Revolving Facility Lenders |
| City National Bank of West Virginia | Parties to Joint Ventures |

| | |
|---|---|
| Fidelity Investments | Secured Term Loan Lenders |
| Fidelity Management & Research | Major Unsecured Noteholders |
| Goldman Sachs Bank USA | Revolving Facility Lenders |
| Hudson Bay Capital Management | Major Equity Holders; |
| | Major Unsecured Noteholders |
| Ironshore Specialty Insurance Co. | Insurers, Insurance Brokers and |
| | Third-Party Administrators |
| J.P. Morgan Securities LLC | Major Unsecured Noteholders |
| JPMorgan Chase | Depository and Disbursement Banks |
| JPMorgan Chase Bank, N.A. | Revolving Facility Lenders; |
| Secured Term Loan Lenders | |
| Liberty Mutual Insurance Co. | Beneficiaries of Letters of Credit; |
| | Material Sureties |
| Liberty Mutual Insurance Europe, Ltd. | Insurers, Insurance Brokers and |
| | Third-Party Administrators |
| Morgan Stanley | Secured Term Loan Lenders; |
| | Depository and Disbursement Banks |
| Morgan Stanley Senior Funding, Inc. | Revolving Facility Lenders |
| NGP Energy Capital Management | Major Unsecured Noteholders |
| Nomura Corporate Research and Asset | Major Unsecured Noteholders |
| Nomura Securities Co., Ltd. | Major Equity Holders |
| SG Americas Securities LLC | Major Unsecured Noteholders |
| SSgA Funds Management, Inc. | Major Equity Holders |
| State Street Global Advisors | Major Unsecured Noteholders |
| UBS | Depository and Disbursement Banks |
| UBS Financial Services, Inc. | Major Equity Holders |
| UBS Stamford Branch TRS | Revolving Facility Lenders |
| Wilmington Trust Company | Current Bond Trustees |

### 7.  McKinsey, Royal Bank of Canada and ANR

385.    McKinsey partner Toos Daruvala is the Co-Executive Director of the MIO and has worked for McKinsey for 33 years.  Since 2015, he has also served on the Board of Directors of the Royal Bank of Canada, which, through its entity RBC Global Asset Management, Inc. is a Major Equity Holder in *ANR*.  McKinsey concealed this connection throughout the *ANR* case.

### 8.  McKinsey Still Conceals at Least 10 Additional Connections That Rule 2014 Required It to Disclose.

386.    To this day, McKinsey still conceals at least 10 connections in addition to all the above, including the 31 concealed MIO connections.  This concealment of at least 41

connections is despite the facts that (a) McKinsey filed five disclosure declarations from the beginning of the *ANR* case to the end, (b) McKinsey induced the United States Trustee to settle its Motion to Compel, (c) McKinsey was ordered by the court to disclose its connections when the court granted Mar-Bow's Motion to Compel, and (d) McKinsey received the United States Trustee's August 2016 Court Ordered Recommendations for McKinsey to disclose all connections.

387.    The Court, the United States Trustee and the interested parties have no way to know whether McKinsey's relationships with these connections (and the other 31 connections identified in Part VI above) resulted in disqualifying conflicts of interest, like its undisclosed connection with United States Steel did, described in Part V, above.

388.    Most of these are client connections:

| | |
|---|---|
| Dominion Transmission | Beneficiaries of Letters of Credit |
| Duke Energy/Progress | Major Customers |
| NRG Power Marketing LLC | Major Customers |
| Old Dominion Power Company | Significant Utility Providers |
| Wells Fargo | Depository and Disbursement Banks |
| Illinois Environmental Protection | Gov-Regulatory Agency |
| Pennsylvania Department of EP | Permitting/Licensing Authorities, Environmental Regulatory Agencies and Reclamation Bonding Entities |
| Prudential Insurance | Secured Term Loan Lenders |
| RBS Greenwich Capital | Revolving Facility Lenders |
| US Environmental Protection Agency | Debtors' Largest Unsecured Creditors |

389.    Mar-Bow has filed a motion in *ANR* to bring these frauds to the court's attention so that the court can determine an appropriate remedy.  Mar-Bow's papers cited several cases holding that its conduct in *ANR* would constitute a fraud on the court.  McKinsey has cited no case law holding that the kind of repeated, intentional wrongdoing that McKinsey committed does not constitute a fraud on the court.

390.    It is important to note here that the U.S. Trustee has joined in Mar-Bow's motion to reopen the case for further investigation.  It is also important to note that McKinsey RTS's response to the motion does not deny any of the core facts on which the motion is based:

- McKinsey RTS admitted that it never disclosed its known connection to Whitebox.

- McKinsey RTS admitted that Whitebox was a first lien lender.

- McKinsey RTS admitted that Kevin Carmody, who signed McKinsey's five disclosure declarations in this case, knew that Whitebox had become a first lien lender that would acquire ANR's assets through Contura.

- McKinsey RTS admitted that through the MIO, its partners and employees held interests in Whitebox.

- McKinsey RTS did not deny that MIO realized a profit of over $50 million on its investment in Contura.

- McKinsey RTS did not deny that McKinsey's partners and employees had investments in four entities that were major equity holders in *ANR*

- McKinsey never admitted that Compass is a MIO managed, in-house fund as Mar-Bow asserted, though the truth of it is now clear.

- McKinsey never denied that Compass owned an equity interest in ANR.

- McKinsey's opposition never denies that Mr. Krishnan and Mr. Sellschop were assisting United States Steel in reducing its coal prices, including its coal prices with ANR, at the same that they were assisting ANR with its financial performance.

The message from the *ANR* case is that unless this Court in this *Westmoreland Coal* promptly stops McKinsey RTS in its tracks in this case, it may be headed for the same train wreck that McKinsey caused in the *ANR* case.

**E.**     **McKinsey RTS's Misrepresentations to the United States Trustee Program in the *ANR* Case Caused the Program to Make False Representations to the Courts in That Case and in the *SunEdison* Case.**

391.     McKinsey RTS misled the United States Trustee Program at least four times in the *ANR* case, with unfortunate consequences in the resulting statements that the Program made to that court and to the *SunEdison* court.

392.     On May 19, 2016, the U.S. Trustee entered into a stipulation[201] resolving its motion to compel McKinsey RTS to disclose its connections.[202]  That stipulation was based on McKinsey RTS's third supplemental declaration of the same date, May 19, 2016, disclosing some connections.[203]  However, at that point, contrary to its representations to the Program, McKinsey RTS had not fully disclosed all of its connections.  In fact, McKinsey RTS later disclosed yet more connections, but, more importantly, never disclosed all of its connections.

393.     Relying in good faith on McKinsey RTS's representation that its May 19, 2016 disclosure declaration was complete, the Program made this unfortunate statement to the court:

> With the additional public disclosures and substantial responses to the U.S. Trustee's requests for information, the U.S. Trustee determined that McKinsey RTS satisfied the disinterested and conflict standards for retention and that she would not further prosecute the motion to compel.[204]

394.     What made that statement to the *ANR* court – "that McKinsey RTS satisfied the disinterested and conflict standards for retention" - especially unfortunate was McKinsey RTS's concealment from the Program of these disqualifying connections:

---

[201] *ANR* Dkt. 2474.

[202] *ANR* Dkt. 2308.

[203] *ANR* Dkt. 2464

[204] *ANR* Dkt. 3222, filed Aug. 5, 2016, p. 2 of 40.

a. Its equity interests in ANR itself, both through Whitebox, which it knew was a creditor, and though Compass, which was McKinsey's own investment fund in the MIO;

b. Its equity interest in Contura through the MIO, on which it profited by over $50 million; and

c. Its client connection with United States Steel, which it represented in negotiating lower coal prices from ANR while at the same time and with the same employees, it assisted ANR in enhancing its profitability.

395. Had McKinsey RTS not concealed these blatant conflicts of interest, the Program surely would not have stated to the *ANR* court that "McKinsey RTS satisfied the disinterested and conflict standards for retention."

396. After the stipulation between the U.S. Trustee and McKinsey RTS, Mar-Bow filed a motion to compel,[205] which the *ANR* court granted.[206]  The U.S. Trustee then filed its Recommendation regarding public disclosure,[207] and McKinsey filed yet another declaration on August 5, 2015,[208] disclosing more previously undisclosed connections.  However, after filing five disclosures over a year's time, last two of which were compelled by court orders over McKinsey's objection, McKinsey still concealed multiple connections.

397. Nevertheless, relying again in good faith on McKinsey's misrepresentation that its August 5, 2016 disclosure declaration was complete, the Program made this second unfortunate statement to the Court: "The disclosures made to date, with the additional disclosures recommended here, will satisfy Rule 2014."[209]

---

[205] *ANR* Dkt. 2603, filed June 6, 2016.

[206] *ANR* Dkt. 2895, entered July 1, 2016.

[207] *ANR* Dkt. 3222, filed Aug. 5, 2016.

[208] *ANR* Dkt. 3223 filed Aug. 5, 2016.

[209] *ANR* Dkt. 3222, p. 4 of 40.

398.    In the *SunEdison* case, the U.S. Trustee filed an objection[210] to the deficiencies in McKinsey RTS's initial disclosure declaration.[211]  McKinsey then filed an amended declaration in *SunEdison* disclosing additional connections.[212]  The Program then withdrew its objection, implying to the court, that McKinsey RTS was then in compliance with Rule 2014.[213]

399.    But McKinsey's representation to the Program that its disclosure of its connections in its amended disclosure declaration in *SunEdison* was complete was false.  As in *ANR*, McKinsey RTS subsequently disclosed many additional connections and, more importantly, never disclosed every connection.  Once again, relying in good faith on McKinsey's misrepresentation that its June 6, 2016 disclosure declaration in *SunEdison* was complete, the Program made this third unfortunate statement to the *ANR* court: "[In *SunEdison*,] McKinsey RTS ultimately disclosed the identity of *every* connection before its retention was approved."[214]

400.    It must be emphasized that the reliance that the United States Trustees Program placed on McKinsey's misrepresentations on multiple occasions in making these statements to the courts was always in good faith.  It was McKinsey RTS's false statements that caused these humiliations, and those false statements demonstrate that McKinsey RTS will do anything to conceal its disqualifying connections in this case.

---

[210] *SunEdison* Dkt. 265, filed May 12, 2016.

[211] *SunEdison* Dkt. 202, filed May 5, 2016.

[212] *SunEdison* Dkt. 484, filed June 6, 2016.

[213] The Debtors' attorney filed a certificate stating, "The undersigned counsel further certifies that the objection to the Application filed by the United States Trustee on May 12, 2016 (Docket No. 265) has been resolved[.]"  *SunEdison* Dkt. 634, filed June 22, 2016, p. 2.

[214] *ANR* Dkt. 3222, p. 5 of 40 (emphasis in original).

401.    To conclude this presentation of McKinsey RTS's frauds in the *ANR*, *SunEdison*

and *GenOn* cases, a review of the purposes of 11 U.S.C. § 327 and Rule 2014 is appropriate.  As

discussed in Part VI.B. above, the case law holds that what is at stake in deciding whether to

approve the employment of a proposed professional is the integrity of the Court's process.  The

case law also holds, however, that the Court should also consider the integrity of the proposed

professional.  *In re Arkansas Co.*, 798 F.2d 645, 648 (3d Cir. 1986) (citing *In re Hydrocarbon*

*Chemicals, Inc.*, 411 F.2d 203, 205 (3d Cir. 1969)); *In re Schupbach Investments, LLC*, 521 B.R.

449 (B.A.P. 10th Cir. 2014); *In re Smith*, 524 B.R. 689, 697 (Bankr. S.D. Tex. 2015); *In re Am.*

*Bus. Fin. Servs., Inc.*, 457 B.R. 314, 321 (Bankr. D. Del. 2011).  It is submitted that McKinsey

RTS's record of conduct in these cases and its earlier cases makes it nearly impossible for the

Debtors to meet their burden on this issue.

## VIII.   In Its Engagement Agreement, McKinsey RTS Unlawfully Disavows That It Is a Fiduciary in This Case and the Debtors Agreed.

402.    The Fifth Circuit has held, "A sine qua non in restructuring the debtor-creditor

relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-

possession and other court-appointed professionals, who are responsible for managing the

debtor's estate in the best interest of creditors."  *In re Southmark Corp.*, 163 F.3d 925, 931 (5th

Cir. 1999).[215]

403.    As a fiduciary, McKinsey RTS owes its full loyalty to the Debtors' estates.  The

requirements of section 327 "serve the important policy of ensuring that all professionals

---

[215] *See also In re Mangum*, 147 B.R. 875 (Bankr. E.D. Va. 1992) (obligations of professionals employed by the estate are "necessarily fiduciary" and if fiduciary duties are unfulfilled, "the bankruptcy process appears to creditors and the public to be tainted by self-interest, abuse of the bankruptcy process, or even fraud"); *In re Lee Way Holding*, 100 B.R. 950, 956 (Bankr. S.D. Ohio 1989) ("The "requirement of full disclosure arises from the fiduciary obligation that [a professional] ultimately employed in a bankruptcy proceeding owes to the court.").

appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance." *Rome*, 19 F.3d at 58.[216]

404.   As the New York Court of Appeal profoundly stated in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.):

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer*, 243 N. Y. 439, 444, 154 N. E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.[217]

405.   Under *Meinhard*, while McKinsey RTS's conduct in simultaneously serving clients with competing interests – competitors, suppliers, customers, creditors – may be permitted outside of bankruptcy, this conduct is forbidden when, as in this Chapter 11 case, McKinsey RTS is "bound by fiduciary ties."  In this case, it is "held to something stricter than the morals of the market place."  McKinsey RTS's standard of behavior is "[n]ot honesty alone, but the punctilio of an honor the most sensitive[.]"  And this Court's attitude must be one of "uncompromising rigidity … when petitioned to undermine the rule of undivided loyalty by the

---

[216] Similarly, in *In re Prudent Holding Corp.*, 153 B.R. 629, 631 (Bankr. E.D.N.Y. 1993), the court observed that Rule 2014 and Section 327(a) are "prophylactic provision[s] designed to insure that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in bankruptcy is not compromised or eroded."  *See also In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999); *In re Leslie Fay Cos.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994).

[217] The United States Supreme Court has quoted and cited this *Meinhard* holding with approval. *See SEC v. Chenery Corp.*, 318 U.S. 80, 97 (1943); *Woods v. City Nat. Bank & Tr. Co. of Chicago*, 312 U.S. 262 (1941); *Seminole Nation v. United States*, 316 U.S. 286, 297, n. 12 (1942).

'disintegrating erosion' of particular exceptions," as McKinsey RTS so arrogantly asserts in this case.

406.    Unlawfully, McKinsey RTS's engagement agreement states that it is not a fiduciary:[218]

> Nothing in this Agreement is intended to create, nor shall be deemed or construed to create, a fiduciary or agency relationship between McKinsey RTS and the Client, or its Board of Directors. More specifically, for purposes of this Agreement, neither McKinsey RTS, its affiliates, nor any individual consultant providing services to the Client shall be acting as an officer, director, manager, trustee, or in any other agency or fiduciary capacity. Notwithstanding McKinsey RTS's provision of the Services described in Section 1, none of Mc Kinsey RTS, its affiliates, nor any individual consultant providing services to the Client shall be (i) deemed a fiduciary; or (ii) be required to perform any tasks, actions or functions, and shall not be required to assume any roles, assignments or capacities, that (in any such case) could give rise to fiduciary status to McKinsey RTS, its affiliates or any Indemnified Party with respect of the Client.

407.    By this agreement, McKinsey RTS utterly disavows its legal status as a fiduciary for the Debtors' bankruptcy estates.  Under the uniform case law discussed above, this disavowal is unlawful.  McKinsey RTS has never cited a case supporting its position that it is not a fiduciary in its bankruptcy cases; there is none.

408.    Indeed, in *ANR*, after considering McKinsey RTS's vigorous argument of its position, Judge Huennekens rejected it outright, holding, "Section 327 talks about professionals. McKinsey's a professional. . . .  They're a fiduciary."[219]

409.    Despite this holding in *ANR*, McKinsey RTS unlawfully continued in both *SunEdison* and *GenOn*, and now again in this case, to disavow that it is a fiduciary.[220]

---

[218] Dkt 452, pp. 31-32 of 194, ¶ 11.

[219] Transcript of hearing, June 28, 2016, page 158, lines 11-13.

410.    Because as a matter of law McKinsey RTS is a fiduciary, it cannot evade the responsibilities of a fiduciary by disavowing them in its engagement letter.  A party cannot by contract evade its legally imposed obligations.  Therefore, this provision in McKinsey RTS's agreement with the Debtors violates its fiduciary duties.  It is also sufficient grounds by itself to deny the Debtors' motion to approve McKinsey RTS as a professional in the case.

411.    Indeed, for similar reasons, the Debtors' agreement to McKinsey RTS's disavowal is also unlawful.  The Debtors are also fiduciaries and therefore have no authority to release McKinsey from its legal obligations as a fiduciary.  This too is sufficient grounds by itself to deny the Debtors' motion to approve McKinsey RTS as a professional in the case.

## IX.    The Engagement Agreement Between the Debtors and McKinsey RTS Was Not Negotiated "at Arm's-Length and in Good Faith," as McKinsey RTS and the Debtors Assert.

412.    McKinsey RTS's declaration assures, "The Engagement Letter was negotiated between the Debtors and McKinsey RTS at arm's-length and in good faith[.]"[221]

413.    In their application, signed by Kirkland & Ellis, the Debtors make the same assurance.[222]

414.    They are false assurances, if only because Kirkland & Ellis represents both the Debtors and McKinsey RTS.[223]  Its representation of both parties to the agreement could not have resulted in negotiations "at arm's-length and in good faith."

---

[220] In *SunEdison*, the parties' agreement is dated April 21, 2016, which was about 2 months before Judge Huennekens ruling in the *ANR* case.  Dkt. 202, filed May 5, 2016, p. 86 of 89, ¶ 10.  McKinsey did not, however, revoke that part of the agreement after Judge Huennekens ruling.

In *GenOn*, the parties' agreement is dated June 14, 2017, almost a year after Judge Huennekens' ruling.  Dkt. 123-1, filed June 23, 2017, p. 13 of 15, ¶ 9.

On this point, the language of all four agreements is identical.

[221] Dkt. 452, p. 41 of 194, ¶ 13.

[222] Dkt. 452, p. 4-5 of 194, ¶ 9.

415.    Kirkland & Ellis's representation of McKinsey RTS is a relationship that might "even faintly color the independence and impartial attitude required by the Bankruptcy Code." *Crivello*, 134 F.3d at 835; *Rome*, 19 F.3d at 58 n.1; *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991); *In re Paige*, 685 F.3d 1160, 1180 (10th Cir. 2012); *In re LTHM Houston-Operations, LLC*, No. 14-33899, 2014 WL 5449737, at *2 (Bankr. S.D. Tex. Oct. 24, 2014).   And its representation of both parties to the engagement agreement gave it "divided loyalties."  See, e.g., *Crivello*, 134 F.3d at 836; *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 441 (6th Cir. 2004); *In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 316 (10th Cir. 1994); *Rome*, 19 F.3d at 58; *In re Arlan's Dept. Stores, Inc.*, 615 F.2d 925, 936-37 (2d Cir. 1979).

416.    For the same reason, Kirkland & Ellis's conflict of interest in representing both the Debtors and McKinsey RTS prohibits it from representing the Debtors on this application.[224]

417.    The Debtors' application must, therefore, be denied.

## X.    McKinsey RTS's Rule 2014 Declaration Violates 28 U.S.C. § 1746.

418.    28 U.S.C. § 1746 provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the

---

[223] Kirkland & Ellis's representation of McKinsey RTS is disclosed in its declaration in this case. Dkt. 227, p. 87.  Kirkland & Ellis's declaration also disclosed that its current clients include McKinsey & Company, Inc.; McKinsey Company, Inc. United States; McKinsey GmbH & Co. KG; McKinsey Recovery & Transformation Services Australia Co.; McKinsey Recovery & Transformation Services Canada Co.; McKinsey Recovery & Transformation Services France, Co; and McKinsey Recovery & Transformation Services UK Limited.  *Id.*

[224] After discovering this conflict of interest in the declarations that Kirkland & Ellis and Jones Day filed in this case, counsel for Mar-Bow emailed a letter to them dated November 2, 2018.  That letter respectfully requested the firms' "careful reflection on whether it is ethically appropriate for your firms to represent the Debtors in matters relating to McKinsey RTS."  Mar-Bow did that in an attempt to avoid raising this issue here, to expedite the Court's consideration of this employment application and to avoid unnecessary delays in the resolution of the Debtors' chapter 11 case.

same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

\*\*\*

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature).

419.    Mark W. Hojnacki signed McKinsey's Rule 2014 declaration on behalf of McKinsey RTS.[225]   Mr. Hojnacki is a Practice Leader of McKinsey RTS and a partner at McKinsey.

420.    However, Mr. Hojnacki's declaration does not comply with 28 U.S.C. § 1746.

421.    Mr. Hojnacki's declaration equivocates on the extent to which he or others performed the investigation into McKinsey RTS's connections.  He states, "Except as otherwise noted, the statements set forth herein are **based on my employment position and diligence undertaken by McKinsey's legal department** or myself or professionals reporting to me, and if called and sworn as a witness, I would testify competently thereto."[226]  (Emphasis added.)

422.    To whatever extent that his knowledge is based on hearsay reports form others, Mr. Hojnacki was in no position to "declare under penalty of perjury" that the statements in his

---

[225] Dkt. 452, p. 35 of 194, ¶ 1.

[226] *Id.*, p. 36 of 194, ¶ 2.

disclosure declarations in this case were "true and correct," as 28 U.S.C. § 1746 requires for a verified statement.

423.    For the parts of the investigation that others performed, it appears that Mr. Hojnacki prefaced his statements in his declaration with either "to the best of my knowledge and belief" or "to the best of my knowledge."[227]   Mr. Hojnacki so limited the vast majority of his statements in the declaration.

424.    This circumvention of the requirements of 28 U.S.C. § 1746 and Rule 2014 is improper and cannot be condoned.

425.    Rule 2014 does permit the *applicant* to identify the professional's connections "to the best of the Applicant's knowledge."   The applicable part of the rule states:

> The application shall state the specific facts showing . . . *to the best of the applicant's knowledge*, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

426.    The permission in Rule 2014 for the applicant to identify the professional's connections "to the best of the Applicant's knowledge" makes sense because the applicant is unlikely to have first-hand knowledge of the professional's connections.

427.    In stark contrast, Rule 2014 requires an unqualified disclosure from the professional:

> The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

---

[227] *Id.*, ¶¶ 21, 33, 35, 42, 46 (referring to 47), 49, 52, 54, 57, 60, 61, 62, 63, 65, 66, 67, 68, 69, 72, 75, 77, 80.

428.    This language permits the professional no qualification at all, let alone one like "to the best of my knowledge."  The standard for the applicant to disclose all connections is intentionally strict.

429.    28 U.S.C. § 1746 is similarly strict in its requirement that the declarant state that the declaration is "true and correct."  Like Rule 2014, it does not permit any qualifications or disclaimers.  It does not permit, "To the best of my knowledge."

430.    Mr. Hojnacki's patent attempt to circumvent Rule 2014 and Section 1746 must be rejected.  His declaration must be stricken, and the motion denied.

## XI.    Conclusion

431.    McKinsey is one firm.

432.    McKinsey RTS is not qualified to serve as a professional for this bankruptcy estate.  It holds numerous interests in the Debtors and numerous interests that are adverse to the estate.  It also represents numerous interests in parties that are adverse to the estate, including creditors, suppliers, customers and competitors.

433.    McKinsey RTS's declaration unlawfully conceals at least 84 connections, including equity interests in the Debtors and in interested parties and McKinsey client connections across virtually all significant classes of creditors.

434.    McKinsey likely also has disqualifying connections to the members of the Ad Hoc Group who will likely acquire the Debtors' prime assets through their plan of reorganization.  The Debtors' concealment of its members' identities is therefore particularly egregious.  Mar-Bow will shortly file an objection the Debtors' disclosure statement on this ground.

435.    Together, the Debtors' application to employ McKinsey RTS and McKinsey RTS's declaration are an encyclopedic treatise on how to violate Rule 2014 and 11 U.S.C. § 327.

Granting the application would only reinforce that unlawful behavior.  But too much is at stake – the integrity of this Court's process and the public confidence in it.

436.    McKinsey has never complied with Rule 2014.  It never will.  A second opportunity would be a futile waste of time that the Debtors' estate literally cannot afford.

437.    The Debtors' burden here is to demonstrate that McKinsey (not just McKinsey RTS) can be trusted to accept its role as a *fiduciary* and to act like a *fiduciary*; to act with "Not honesty alone, but the punctilio of an honor the most sensitive";[228] to act with unbounded and unconditional loyalty to this bankruptcy estate and to this Court; and to leave "no stone unturned" in an enthusiastic search for and disclosure of every fact that this Court would need to assure itself, the interested parties and the public that it is safe to trust McKinsey with the integrity of the Court's process.

438.    The Debtors, however, will never be able to meet that burden.  McKinsey's history of repeated frauds and especially its history of multiple frauds in its last three cases, *ANR*, *SunEdison* and *GenOn*, creates a chasm too deep, too wide and too dangerous for the Debtors to bridge.

439.    Mar-Bow petitions the Court to heed Justice Cardozo's sage advice: "As to this there has developed a tradition that is unbending and inveterate.  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."[229]

440.    *"Everyone's job is important, but no one is indispensable."*  Even McKinsey.

---

[228] *Meinhard*, 249 N.Y. at 464, 164 N.E. at 546.

[229] *Id.*

WHEREFORE, Mar-Bow respectfully requests that this Court deny the Debtors'
Application to Employ McKinsey RTS and for such other and further relief as may be justified.

November 29, 2018                          Respectfully submitted,

                                           DIAMOND McCARTHY LLP


                                           By:  /s/ Allan B. Diamond
                                           Allan B. Diamond (SDTX 12310)
                                           adiamond@diamondmccarthy.com
                                           Christopher R. Murray (SDTX 1305742)
                                           cmurray@diamondmccarthy.com
                                           Charles M. Rubio (SDTX 2108915)
                                           crubio@diamondmccarthy.com
                                           909 Fannin, Suite 3700
                                           Houston, TX 77010
                                           Telephone:  713-333-5100
                                           Facsimile:  713-333-5199


                                           STEVEN RHODES CONSULTING, LLC


                                           By:  /s/ Steven Rhodes
                                           Steven Rhodes (*pro hac vice*)
                                           rhodessw@comcast.net
                                           1610 Arborview Blvd.
                                           Ann Arbor, MI 48103
                                           Telephone:  734-646-5406


                                            /s/ Daniel L. Lemisch
                                           Daniel L. Lemisch (*pro hac vice*)
                                           dlemisch@lakeviewcapitalinc.com
                                           Lakeview Capital, Inc.
                                           151 S. Old Woodward Ave., Suite 400
                                           Birmingham, MI 48009
                                           Telephone:  248-554-4900

LAW OFFICE OF SHELDON S. TOLL PLLC


*/s/ Sheldon S. Toll*
Sheldon S. Toll (*pro hac vice*)
sst@lawtoll.com
29580 Northwestern Hwy., Suite 1000
Southfield, MI 48034
Telephone:  248-797-9111

*Attorneys for Mar-Bow Value Partners, LLC*

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that undersigned counsel conferred by telephone with Stephen Hessler, counsel for the Debtors on November 28, 2018, regarding the foregoing objection.  Mr. Hessler advised that the Debtors would not withdraw the McKinsey RTS application and the parties were unable to resolve the objection.


_/s/ Steven Rhodes_


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2018, I cause the foregoing pleading to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.


_/s/ Christopher R. Murray_


145