## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
12/19/2018

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 354** |

## ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO

Upon the motion (the "Motion")[2] of Westmoreland Coal Company and its debtor affiliates, other than the WMLP Debtors, as debtors and debtors in possession (collectively, the "WLB Debtors"), for entry of an order (this "Order"), pursuant to sections 105, 363, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020, and Bankruptcy Local Rules 2002-1 and 3016-1, approving (a) the adequacy of the Disclosure Statement, (b) the Solicitation and Voting Procedures, (c) the Voting Record Date, (d) the form and manner of the

---

[1] Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Plan. The terms "WLB Debtors" and "WMLP Debtors" shall have the meanings ascribed to them in the First Day Declaration.

Solicitation Packages and the materials contained therein, (e) the Plan Supplement Notice, (f) the Non-Voting Status Notices, (g) the form of Assumption Notices and Rejection Notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan, (h) the Voting and Tabulation Procedures, (i) the Confirmation Hearing Notice, and (j) certain dates and deadlines related thereto, all as more fully set forth in the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the WLB Debtors' estates, their creditors, and other parties in interest; and this Court having found that the WLB Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

2.      Notwithstanding anything to the contrary herein, the entry of this Order and the relief granted hereby is without prejudice to the rights of any party to object or respond to the Sale Transaction, the Plan, the Stalking Horse Purchase Agreement, or any other document or

instrument contemplated by any of the foregoing, and all such rights are reserved and preserved in all respects.

## I.     Approval of the Disclosure Statement.

3.     The Disclosure Statement, substantially in the form attached hereto as **Schedule 1**, is approved as providing holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

4.     The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article IX of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II.     Approval of the Solicitation and Voting Procedures.

5.     The WLB Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures, substantially in the form attached hereto as **Schedule 2**, which are hereby approved in their entirety.

## III.     Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

### A.     Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

6.     The following dates are hereby established (subject to modification as necessary, with the reasonable consent of the Required Consenting Stakeholders and subject to the RSA and

the orders approving the WLB Debtors' postpetition financing facility) with respect to solicitation of votes on the Plan and confirmation of the Plan (all times prevailing Central Time):[3]

| Event | Date |
|---|---|
| Voting Record Date | **December 13, 2018** |
| Solicitation Deadline | **Five (5) business days after entry of the Disclosure Statement Order** |
| Publication Deadline | **December 21, 2018** |
| Voting Deadline | **January 25, 2019, at 4:00 p.m.** |
| Deadline to File Voting Report | **One week prior to the Confirmation Hearing** |
| Deadline to File Confirmation Brief and Confirmation Objection Reply/Statements in Support of Confirmation | **Two (2) business days prior to the Confirmation Hearing, at 12:00 p.m.** |

**B.    Approval of the Administrative Claims Bar Date.**

7.    *Initial and Supplemental Administrative Claims Bar Date*:  Except as otherwise provided in the Plan or by a final order entered by the Bankruptcy Court, the deadline for all requests for payment of Administrative Claims that arise on or prior to January 4, 2019 shall be the Voting Deadline (the "Initial Administrative Claims Bar Date").  With respect to any Administrative Claims that arise after January 4, 2019, the deadline to file such requests shall be 30 days after the Plan Effective Date (the "Supplemental Administrative Claims Bar Date").

8.    *Professional Fee Claims Bar Date*:  With respect to Professional Fee Claims, the deadline for all requests for payment of such claims is 30 days after the Plan Effective Date.

9.    *Governmental Administrative Claims Bar Date*:  With respect to any request for payment of Administrative Claims arising on or prior to January 4, 2019 submitted by

---

3    The dates established in this Order are in addition to the dates set forth in the Bidding Procedures and Scheduling Motion, as modified after discussions with creditors.

Governmental Units, the deadline for all such requests shall be February 7, 2019, subject to any requests for additional time for good cause shown.

10.    *WMLP Debtors' Administrative Claims*:  Notwithstanding anything to the contrary provided in the Plan or this Order, the WMLP Debtors shall not be required to file any requests for payment of Administrative Claims; *provided* that on or prior to the Initial Administrative Claims Bar Date, the WMLP Debtors shall consult with the WLB Debtors and the Required Consenting Stakeholders regarding any Administrative Claims held by the WMLP Debtors that would have otherwise been due by the Initial Administrative Claims Bar Date.

11.    *MLP Secured Parties' Administrative Claims*:  Notwithstanding anything to the contrary provided in this Order, the Plan or the Cash Collateral Order, the MLP Secured Parties (as defined in the Cash Collateral Order) shall not be required to file any requests for payment of Administrative Claims (if any) arising out of the MLP Secured Obligations (as defined in the Cash Collateral Order) or the Adequate Protection Obligations (as defined in the Cash Collateral Order), but for the avoidance of doubt, the MLP Secured Parties must file any requests for payment of any other Administrative Claims pursuant to the applicable provisions of the Plan.

12.    *Failure to File Administrative Claims*:  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the WLB Debtors or their property, and such Administrative Claims will be deemed discharged as of the Plan Effective Date.[4]   For the avoidance of doubt, solely to the extent Cure

---

[4]      The Plan anticipates that Debtor Westmoreland Coal Company will continue to exist until the Post-Closing Reconciliation Date, but the remaining WLB Debtors may dissolve prior to the Post-Closing Reconciliation Date. For the avoidance of doubt, any Administrative Claim asserted against a WLB Debtor seeking payment for a

Costs are not paid on the Plan Effective Date, the counterparty to such Executory Contract and Unexpired Lease must file its Administrative Claim on or prior to the Supplemental Administrative Claims Bar Date, and such Administrative Claim shall be asserted only with respect to and in the amount of such unpaid Cure Costs.

**C.** **Approval of the Form of and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

13. The forms of the following documents to be included in the Solicitation Packages are hereby approved:

a. an appropriate form of Ballot substantially in the forms attached hereto as **Schedules 3A**, **3B**, **3C**, and **3D**, respectively;[5]

b. the Cover Letter substantially in the form attached hereto as **Schedule 7**;

c. the Confirmation Hearing Notice substantially in the form attached hereto as **Schedule 8**; and

d. a letter from the Committee (the "Committee Letter") setting forth the Committee's views on the Plan, substantially in the form attached hereto as **Schedule 12**.

14. The Solicitation Packages provide the holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

---

period after the dissolution of such WLB Debtor shall have the applicable portion of such Administrative Claim automatically disallowed and expunged without further order of the Court.

[5] The WLB Debtors will use commercially reasonable efforts to ensure that any holder of a Claim who has filed duplicate Claims against the WLB Debtors (whether against the same or multiple WLB Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class.

15.     The WLB Debtors shall distribute Solicitation Packages to all holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

16.     The WLB Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to holders of Claims entitled to vote on the Plan in electronic format (i.e., on a CD-ROM or flash drive).  The Ballots as well as the Cover Letter, the Committee Letter, the Confirmation Hearing Notice and the Committee Letter will **only** be provided in paper form.  The Committee Letter shall be placed immediately following the Cover Letter in each Solicitation Package.  On or before the Solicitation Deadline, the WLB Debtors shall provide (a) complete Solicitation Packages to the U.S. Trustee and (b) the Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

17.     Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the WLB Debtors' expense).

18.     The Notice and Claims Agent is authorized to assist the WLB Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against the WLB Debtors, (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Package, and all other related documents and matters related thereto, including the procedures and requirements for voting to

accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

19.     All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot, (b) overnight delivery, or (c) personal delivery, so that the Ballots are *actually received* by the Notice and Claims Agent no later than the Voting Deadline as set forth in the applicable Ballot. Beneficial Holders must properly execute, complete, and deliver Beneficial Holder Ballots to their respective Nominee in sufficient time so that the Nominees may verify, tabulate, and include such Beneficial Holder Ballots in a Master Ballot and return the Master Ballots, so that they are *actually received* by the Notice and Claims Agent no later than the Voting Deadline.

### D.     Approval of the Confirmation Hearing Notice.

20.     The Confirmation Hearing Notice, substantially in the form attached hereto as **Schedule 8**, shall be filed by the WLB Debtors and served upon parties in interest in the chapter 11 cases within five business days after the entry of this Order, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.  The WLB Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) one time by the Publication Deadline on **December 21, 2018** (or as soon as reasonably practicable thereafter), in the *The New York Times* (national edition) and the *Houston Chronicle*.

### E.     Approval of Notice of Filing of the Plan Supplement.

21.     The WLB Debtors are authorized to send notice of the filing of the Plan Supplement, which will be filed and served at least seven (7) days prior to the Voting Deadline, substantially in the form attached hereto as **Schedule 9**, on the date the Plan Supplement is filed pursuant to the terms of the Plan, or as soon as practicable thereafter.

### F.     Approval of the Form of Notices to Non-Voting Classes.

22.     Except to the extent the WLB Debtors determine otherwise, the WLB Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2 | Unimpaired—Presumed to Accept | Will receive a Non-Voting Status Notice, substantially in the forms attached to the Order as **Schedules 4**, **4A**, **8**, and **12**, in lieu of a Solicitation Package. |
| 7, 8 | Impaired—Deemed to Reject | Will receive a Non-Voting Status Notice, substantially in the forms attached to the Order as **Schedules 5**, **5A**, **8**, and **12** in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the WLB Debtors are not entitled to vote the disputed portion of their Claim.  As such, holders of such Claims will receive a notice, substantially in the forms attached to the Order as **Schedules 6**, **6A**, **8**, and **12** (which notice shall be served together with such objection). |

23.     On or before the Solicitation Deadline, the Notice and Claims Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, set forth above, who are not entitled to vote on the Plan.  The WLB Debtors will not provide the holders of Class 5 (Intercompany Claims) or

Class 6 (Intercompany Interests) with a Solicitation Package or any other type of notice in connection with solicitation.

24.     The WLB Debtors are not required to mail Solicitation Packages or other solicitation materials to the following:  (a) holders of Claims that have already been paid in full during the chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, or (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable. Contemporaneously with the filing of the Voting Report, the WLB Debtors shall file a report listing the names of all parties to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

25.     Contemporaneously with the filing of the Voting Report, the WLB Debtors shall file a report (the "Release Report") listing the names of all parties who opted out of the Plan's proposed releases.  To the extent there is any ambiguity with respect to whether a Holder of a Claim and/or Interest has opted out of the releases, the WLB Debtors shall make note of this ambiguity in the Release Report and the status of any resolution with respect thereto.

**G.     Approval of Notices to Contract and Lease Counterparties.**

26.     The WLB Debtors are authorized to mail a Supplemental Assumption Notice or Rejection Notice of any Executory Contracts or Unexpired Leases (and any corresponding Cure Costs), substantially in the forms attached hereto as **Schedule 10** and **Schedule 11**, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.

**H.     Approval of the Procedures for Filing Objections to the Plan.**

27.     Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order and the Bidding Procedures

Order.  Additionally, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***:  (a) be in writing, (b) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Confirmation Hearing Notice.

**IV.    Miscellaneous.**

28.     The WLB Debtors reserve the right, subject to the reasonable consent of the Required Consenting Stakeholders, to modify the Plan without further order of the Court in accordance with Article XII of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

29.     The rights of all parties in interest (including the Committee) to object to the releases contained in the Plan, including on the grounds that such releases are nonconsensual or were not adequately noticed, are fully reserved.

30.     Nothing in this Order shall be construed as a waiver of the right of the WLB Debtors or any other party in interest, as applicable, to object to a proof of claim at any time.

31.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

33.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

34.    The WLB Debtors and the Notice and Claims Agent are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

35.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Signed:  December 18, 2018.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Schedule 1

**Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

</div>

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

<div align="center">

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

</div>

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:       ptomasco@jw.com
       efreeman@jw.com
       mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local Counsel to the Debtors*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:       james.sprayregen@kirkland.com
       michael.slade@kirkland.com
       gregory.pesce@kirkland.com

*Counsel to the WLB Debtors*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:       edward.sassower@kirkland.com
       stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:       (713) 836-3600
Email:       anna.rotman@kirkland.com

---

[1]   Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

THE WLB DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES.[2]  THE WLB DEBTORS CONSIST OF THE FOLLOWING ENTITIES: ABSALOKA COAL, LLC; BASIN RESOURCES, INC.; BUCKINGHAM COAL COMPANY, LLC; DAKOTA WESTMORELAND CORPORATION; HAYSTACK COAL COMPANY; SAN JUAN COAL COMPANY; SAN JUAN TRANSPORTATION COMPANY; TEXAS WESTMORELAND COAL COMPANY; WCC LAND HOLDING COMPANY, INC.; WEI-ROANOKE VALLEY, INC.; WESTERN ENERGY COMPANY; WESTMORELAND COAL COMPANY; WESTMORELAND COAL COMPANY ASSET CORP.; WESTMORELAND COAL SALES COMPANY, INC.; WESTMORELAND ENERGY SERVICES NEW YORK, INC.; WESTMORELAND ENERGY, LLC; WESTMORELAND ENERGY SERVICES, INC.; WESTMORELAND MINING LLC; WESTMORELAND NORTH CAROLINA POWER LLC; WESTMORELAND PARTNERS; WESTMORELAND POWER, INC.; WESTMORELAND RESOURCES, INC; WESTMORELAND-ROANOKE VALLEY, LP; WESTMORELAND SAN JUAN, LLC; WESTMORELAND SAN JUAN HOLDINGS, INC.;  WESTMORELAND SAVAGE CORP.; WESTMORELAND TEXAS JEWETT COAL COMPANY; AND WRI PARTNERS, INC.[3]

THE PLAN ACCOMPANYING THIS DISCLOSURE STATEMENT DOES NOT ADDRESS CLAIMS AGAINST, AND INTERESTS IN, THE WMLP DEBTORS.  AS A RESULT, HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE WMLP DEBTORS ARE NOT ENTITLED TO VOTE ON THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS.  THE WMLP DEBTORS CONSIST OF THE FOLLOWING ENTITIES: WESTMORELAND RESOURCES GP, LLC;  WESTMORELAND RESOURCE PARTNERS, LP; WESTMORELAND KEMMERER, LLC; OXFORD MINING COMPANY, LLC; HARRISON RESOURCES, LLC; OXFORD MINING COMPANY-KENTUCKY, LLC; DARON COAL COMPANY, LLC; OXFORD CONESVILLE, LLC, AND WESTMORELAND KEMMERER FEE COAL HOLDINGS, LLC.

NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE WLB DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE WLB DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), dated December 14, 2018, and attached hereto as **Exhibit A**.

[3]  The WLB Debtors' non-debtor affiliates include Prairie Mines & Royalty ULC, WCC Holding B.V., Westmoreland Canada, LLC, Westmoreland Canada Holdings Inc., Westmoreland Canadian Investments, LP, and Westmoreland Risk Management, Inc.

DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE WLB DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE WLB DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT MAY BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL OR STATE LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER FEDERAL AND STATE SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL OR STATE SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE WLB DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE WLB DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE WLB DEBTORS' BUSINESSES.  WHILE THE WLB DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE WLB DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE WLB DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE WLB DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE WLB DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE WLB DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE WLB DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.   INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE WLB DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE WLB DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE WLB DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE WLB DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE PLAN EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

Page

**ARTICLE I. INTRODUCTION**.................................................................................................................1
    A.     The Plan .................................................................................................................2
    B.     The Plan Structure.................................................................................................2
    C.     The Sale Transaction.............................................................................................4

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**.................5
    A.     What is Chapter 11?...............................................................................................5
    B.     Why are the WLB Debtors sending me this Disclosure Statement? .........................6
    C.     Am I entitled to vote on the Plan?............................................................................6
    D.     What will I receive from the WLB Debtors if the Plan is Consummated? ....................6
    E.     How will I know if my Executory Contract or Unexpired Lease is Assumed or Rejected? ............7
    F.     What is the Process for Objecting to Assumption or Rejection of an Executory Contract
         or Unexpired Lease? ..............................................................................................8
    G.     What will I receive from the WLB Debtors if I hold an Allowed Administrative Claim or
         an Allowed Priority Tax Claim? ..............................................................................8
    H.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
         Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and
         "Consummation?".................................................................................................8
    I.     What are the sources of cash and other consideration required to fund the Plan? ..........9
    J.     Who Supports the Plan?.........................................................................................9
    K.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ............9
    L.     Am I Releasing Claims under the Plan?....................................................................9
    M.     What Consideration am I Receiving in Exchange for Releasing my Claims under the
         Plan?.....................................................................................................................9
    N.     What is the deadline to vote on the Plan? ..............................................................10
    O.     How will I know when the Auction occurs? ............................................................10
    P.     How do I vote for or against the Plan?....................................................................10
    Q.     Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
         Confirmation Hearing set to occur? ......................................................................10
    R.     What is the purpose of the Confirmation Hearing?..................................................10
    S.     What is the effect of the Plan on the WLB Debtors' ongoing business? .....................10
    T.     What is the Effect of the Plan on the WLB Debtors' Asset Retirement Obligations Under
         Environmental Laws? ...........................................................................................11
    U.     Does the Plan affect the Claims against or the Interests in the WMLP Debtors? ..........11
    V.     Who do I contact if I have additional questions with respect to this Disclosure Statement
         or the Plan? .........................................................................................................11
    W.     Do the WLB Debtors recommend voting in favor of the Plan? .................................11
    X.     Does the Official Committee of Unsecured Creditors recommend voting in favor of the
         Plan?...................................................................................................................11

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES**............12
    A.     Corporate History.................................................................................................12
    B.     Prepetition Capital Structure.................................................................................15
    C.     WMLP Debtors and Shared Services Agreement ...................................................21

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES**.................................................22
    A.     Adverse Market Conditions ..................................................................................22
    B.     Acquisition and Expansion Efforts ........................................................................23
    C.     Coal Industry Liabilities........................................................................................23
    D.     The Debtors' Proactive Approach to Addressing Liquidity Constraints....................23

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES**......................................................26

A.     First Day Pleadings and Other Case Matters ............................................................26
B.     Employment and Compensation of Advisors...........................................................27
C.     Appointment of the Official Committee of Unsecured Creditors .....................................28
D.     Investigation by Official Committee of Unsecured Creditors............................................28
E.     Summary of Claims Process, Bar Date and Claims Filed ............................................29
F.     Exclusivity ..................................................................................30
G.     Extension of Assumption Period Under Section 365(d)(4) of the Bankruptcy Code.....................30
H.     Extension of Removal Period.................................................................30
I.     Supplemental Retention Program .............................................................30
J.     Postpetition Marketing, Bidding, and Auction Process .............................................30
K.     Section 1113 and 1114 Process ..............................................................30

**ARTICLE VI. SUMMARY OF THE PLAN.................................................................33**
A.     General Settlement of Claims and Interests ....................................................33
B.     Proposed Creditor Recoveries.................................................................33
C.     The Sale Transaction........................................................................34
D.     Restructuring Transactions ..................................................................36
E.     EIP Pool ..................................................................................36
F.     The Plan Administrator ......................................................................37
G.     The Liquidating Trust ......................................................................37
H.     The Post-Closing Reconciliation Date ..........................................................38
I.     Corporate Action ...........................................................................39
J.     Recoveries to Certain Holders of Claims and Interests.............................................39
K.     Release, Injunction, and Related Provisions ....................................................39
L.     Insurance Policies ..........................................................................44

**ARTICLE VII. VOTING AND CONFIRMATION ...........................................................44**
A.     *Classes Entitled to Vote on the Plan* ..........................................................44
B.     *Votes Required for Acceptance by a Class*......................................................45
C.     *Certain Factors to Be Considered Prior to Voting* ...............................................45
D.     *Classes Not Entitled to Vote on the Plan* ......................................................45
E.     *Solicitation Procedures*.....................................................................46
F.     *Voting Procedures*.........................................................................47
G.     *Confirmation Objection Deadline* .............................................................48
H.     Confirmation Hearing .......................................................................48
I.     Confirmation Standards ......................................................................49
J.     Acceptance by Impaired Classes ..............................................................51
K.     Confirmation Without Acceptance by All Impaired Classes ........................................52

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.............................53**
A.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims
       Under the Plan.............................................................................53
B.     Certain Bankruptcy Law Considerations........................................................55
C.     Risk Factors Relating to Purchaser Stock Issued Under the Plan. ...................................58
D.     Regulatory Approval and Related Bonding and Collateral Requirements.............................59
E.     Disclosure Statement Disclaimer ..............................................................61
F.     Liquidation Under Chapter 7. .................................................................62

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ......................62**
A.     Certain U.S. Federal Income Tax Consequences of the Plan to the WLB Debtors and the
       Purchaser.................................................................................63
B.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 First Lien
       Secured Claims and Class 4 General Unsecured Claims ...........................................67
C.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 First
       Lien Secured Claims and Class 4 General Unsecured Claims .......................................73
D.     Information Reporting and Withholding..........................................................76

**ARTICLE X. CERTAIN SECURITIES LAW MATTERS**................................................................**77**
    A.    1145 Securities.....................................................................................................77
    B.    4(a)(2) Securities................................................................................................78

**ARTICLE XI. RECOMMENDATIONS OF THE WLB DEBTORS AND THE COMMITTEE** ....................**79**

**EXHIBITS**

**EXHIBIT A**      Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates

**EXHIBIT B**      Stalking Horse Purchase Agreement

**EXHIBIT C**      Restructuring Support Agreement

# ARTICLE I.
## INTRODUCTION[4]

The WLB Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the WLB Debtors in connection with the solicitation of votes to accept or reject the Plan.[5]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the WLB Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION. THE PLAN AND THE TRANSACTIONS EFFECTUATED THEREIN ARE SUPPORTED BY THE CONSENTING STAKEHOLDERS[6] OF THE WLB DEBTORS.**

**EACH OF THE WLB DEBTORS' BOARDS OF DIRECTORS OR SOLE MEMBER HAS APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE WLB DEBTORS' ESTATES.  AS SUCH, THE WLB DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "BALLOT") SO AS TO BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE WLB DEBTORS WILL SEEK THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON FEBRUARY 13, 2019, AT 10:00 A.M., PREVAILING CENTRAL TIME.**

**THE WLB DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE WLB DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  ACCORDINGLY, THE WLB DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE WLB DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS WAS APPOINTED BY THE UNITED STATES TRUSTEE TO ADVOCATE FOR THE INTERESTS OF ALL UNSECURED CREDITORS.  THE COMMITTEE BELIEVES THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN DO NOT COMPLY WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE AND UNFAIRLY BENEFIT HOLDERS OF PURPORTED "FIRST LIEN SECURED CLAIMS" AT THE EXPENSE OF UNSECURED CREDITORS.  THE COMMITTEE BELIEVES THAT THE PLAN WILL NOT BE CONFIRMED AND IS NOT IN YOUR BEST INTEREST.  ACCORDINGLY, THE COMMITTEE STRONGLY URGES YOU TO VOTE TO REJECT THE PLAN.**

---

[4]  If the Plan is not confirmed or the Plan Effective Date does not occur, the WLB Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Plan Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the WLB Debtors, and the WLB Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[5]  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[6]  "Consenting Stakeholders" means any Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that (a) hold DIP Facility Claims, Credit Agreement Claims, or First Lien Note Claims and (b) are or become party to the RSA, in each case, solely in their respective capacities as such.

A.    *The Plan*

As more fully described below, the WLB Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the WLB Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Transferred Assets to the Purchaser, whose bid for the Transferred Assets will be selected as the highest or otherwise best bid at the WLB Debtors' Auction.  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the WLB Debtors' Estates that is or becomes available for distribution, in each case, generally in accordance with the priorities established by the Bankruptcy Code.  The WLB Debtors believe that the Plan accomplishes this objective and is in the best interest of the WLB Debtors' Estates, and therefore the WLB Debtors seek to confirm the Plan.

Generally speaking, the Plan:

(a) provides for the full and final resolution of all funded debt obligations;

(b) provides for 100 percent recoveries for Holders of Allowed Administrative Claims, Priority Tax Claims, DIP Facility Claims, Professional Fee Claims, Other Priority Claims and Other Secured Claims;

(c) provides for the distribution of the General Unsecured Claims Amount to Allowed Holders of General Unsecured Claims, which is currently valued at zero;[7]

(d) provides for consummation of the Sale Transaction;

(e) grants releases to insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of and lenders to the WLB Debtors; and

(f) designates a Plan Administrator to (i) wind down the WLB Debtors' businesses and affairs; and (ii) pay and reconcile Claims as provided therein; and (iii) administer the Plan in an effective and efficient manner.

The WLB Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.  Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

B.    *The Plan Structure*

The Plan proposes to fund creditor recoveries from Cash on hand, the Purchaser Stock, debt issued by the Purchaser or any of its subsidiaries, the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan.  As set forth in more detail in **Article IV.D** below, following an extensive prepetition financing process and series of negotiations with the initial Consenting Stakeholders, on October 9, 2018, the WLB Debtors and the initial Consenting Stakeholders executed the RSA, which contemplates the Sale Transaction.  Although the WLB Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the WLB Debtors' assets are submitted in accordance with the Bidding Procedures, the Stalking Horse Purchase Agreement represents a floor

---

[7]    The WLB Debtors do not currently anticipate that there will be any unencumbered assets to fund the General Unsecured Claims Amount, and to be distributed to the Holders of General Unsecured Claims.

bid for the sale of the WLB Debtors' assets. The WLB Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the WLB Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the Plan Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code);

- Other Secured Claims will be treated in such a manner that they are Unimpaired;

- DIP Facility Claims will either be:

  o (i) if the Stalking Horse Purchaser is the Successful Bidder, assumed by the Stalking Horse Purchaser on the Plan Effective Date; or

  o (ii) if the Stalking Horse Purchaser is not the Successful Bidder, paid in full in Cash on the Plan Effective Date.

- Holders of First Lien Secured Claims will receive either:

  o (i) in the event the Stalking Horse Purchaser is the Successful Bidder, their *pro rata* share of (x) the Purchaser Stock and (if applicable) all debt issued or assumed (excluding any amounts assumed related to the DIP Facility) by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all other proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims and are not Transferred Assets (such non-Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors); or

  o (ii) in the event the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not consummated, payment in full in Cash on the Plan Effective Date.

- Holders of General Unsecured Claims, **including First Lien Deficiency Claims**, against each of the WLB Debtors will receive their *pro rata* share of the General Unsecured Claims Amount (*provided* that no distribution shall be made on account of a General Unsecured Claim if the amount of that distribution is less than $1,000); and

- existing Interests in the WLB Debtors will be cancelled without any distribution to the Holders of such Interests.

**It is currently expected that each Holder of a General Unsecured Claim is likely to receive no distribution under the Plan because the WLB Debtors do not anticipate there will be any unencumbered assets available to fund the General Unsecured Claims Amount. It is possible that prior to the Confirmation Hearing, the WLB Debtors may amend the Plan, and that such amendment may increase the General Unsecured Claims Amount. In such a scenario, the WLB Debtors will not resolicit votes on the Plan because such an amendment would not adversely change the treatment of General Unsecured Claims, as it would increase the value distributable to Holders of Allowed General Unsecured Claims.**

The WLB Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) to vote to accept the Plan.

C.      *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the WLB Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Restructuring Support Agreement dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders (as may be modified, amended, or supplemented from time to time in accordance with the terms thereof, the "RSA").[8] and the Plan.  Generally, the Sale Transaction contemplates that:

   (a)      the WLB Debtors shall, among other things, transfer the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets and all Transferred Causes of Action held by the WLB Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

   (b)      the Purchaser shall issue, or cause to be issued, the Purchaser Stock for eventual distribution to the Holders of Allowed First Lien Secured Claims (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), as applicable;

   (c)      Cash proceeds (if any) of any Non-Core Asset Sale that are received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan; and

   (d)      the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

The Core Assets are generally comprised of the following assets and interests:

   (a)      100 percent of the equity interests in the Entities comprising the Company's Canadian business;

   (b)      the assets, business, and operation of the San Juan mine;

   (c)      the assets, business, and operation of the Rosebud "Colstrip" mine;

   (d)      the assets, business, and operation of the Absaloka mine;

   (e)       the assets, business, and operation of the Haystack mine;

   (f)      certain contracts, leases, and other rights and other written obligations of the San Juan, Absaloka, Haystack, and Rosebud "Colstrip"  mines; and

   (g)      certain assets related to the overhead function of the aforementioned mines and businesses.

The Non-Core Assets are generally comprised of the following assets:

---

[8]      A copy of the RSA is attached hereto as **Exhibit C**.

(a)     the assets, business, and operation of the Beulah mine;

(b)     the assets, business, and operation of the Buckingham mine;

(c)     the assets, business, and operation of the Jewett mine;

(d)     the assets, business, and operation of the Savage mine; and

(e)     the contracts, leases and other written obligations of the aforementioned mines.

For the avoidance of doubt, any Successful Bidder for all of the Core Assets, including the Stalking Horse Bidder, shall take all Non-Core Assets that remain unpurchased as of the Plan Effective Date.  In addition to the Core Assets and any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale, the Transferred Assets include any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date, other than (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan.  An Avoidance Action is related to a Core Asset or Non-Core Asset if the challenged transfer was made by or to the WLB Debtor that sold such Core Asset or Non-Core Asset; *provided*, however, that the Plan Supplement shall include schedules of (x) all Transferred Causes of Action and (y) all Retained Causes of Action.

A further description of the Core Assets, Non-Core Assets, Causes of Action, and their respective dispositions pursuant to the Sale Transaction can be found in the Stalking Horse Asset Purchase Agreement, attached hereto as **Exhibit B**.

In connection with the Sale Transaction, the Purchaser and the Purchaser Advisors will enter into a series of consulting agreement(s), pursuant to which each applicable Purchaser Advisor shall, from the Plan Effective Date through the first anniversary of the Plan Effective Date, provide transition and advisory services and assistance to the Purchaser as reasonably requested from time to time by the board of directors of the Purchaser, and in exchange for such services, the Purchaser shall compensate the Purchaser Advisors as set forth in the Plan Supplement. The Advisory Services Agreements shall be Filed as part of the Plan Supplement and shall be acceptable to each applicable Purchaser Advisor and the Purchaser.

**ARTICLE II.**
**QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**

A.     *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      *Why are the WLB Debtors sending me this Disclosure Statement?*

The WLB Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the WLB Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a sale of the WLB Debtors' assets to the Purchaser, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the WLB Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.      *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

1.      *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.      *What will I receive from the WLB Debtors if the Plan is Consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the WLB Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Allowed Amount (In Millions) | Anticipated Recovery |
|-------|---------------|----------------------------------------|----------------------|
| 1 | Other Priority Claims | $0 | 100% |

6

| Class | Claim/Interest | Estimated Allowed Amount (In Millions) | Anticipated Recovery |
|---|---|---|---|
| 2 | Other Secured Claims[9] | $11.9 | 100% |
| 3 | First Lien Secured Claims | $390-670[10] | Up to 100% |
| 4 | General Unsecured Claims | $740-930[11] | 0% |
| 5 | Intercompany Claims | N/A | 0% or 100% |
| 6 | Intercompany Interests | N/A | 0% or 100% |
| 7 | Section 510(b) Claims | N/A | 0% |
| 8 | WCC Interests | N/A | 0% |

E.     *How will I know if my Executory Contract or Unexpired Lease is Assumed or Rejected?*

Shortly after the approval of the WLB Debtors' Disclosure Statement, the WLB Debtors will file the preliminary Assumed Contracts and Leases List, which will list all Executory Contracts and Unexpired Leases that are expected to be assumed or assumed and assigned to the Purchaser, as well as the proposed Cure Costs. A revised version of the Assumed Contracts and Leases List will be included in the Plan Supplement.  All Executory Contracts and Unexpired Leases that are not included in the final Assumed Contracts and Leases List shall be automatically rejected as of the Plan Effective Date, subject to certain exceptions set forth in the Plan.  Further, the WLB Debtors expressly reserve the right to (a) add and/or remove any Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List and reject such Executory Contract or Unexpired Lease, pursuant to the terms of the Plan, up until the Plan Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease, all subject to the consent of the Purchaser.

Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the WLB Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days after the effective date of the rejection of such Executory Contract or Unexpired Lease; *provided* that the WMLP Debtors shall not be required to file any such Proofs of Claim relating to the rejection of Executory Contracts or Unexpired Leases. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 14 days after service of the WLB Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

---

[9]     The projected amount of Allowed Other Secured Claims set forth herein assumes that the value of the collateral securing such obligations is sufficient in amount to satisfy such Allowed Other Secured Claims in full.

[10]    Holders of First Lien Secured Claims will receive 100% of their Allowed Secured Claims as of the Plan Effective Date in the form of the total value of their collateral as of the Plan Effective Date.  This value includes at least the amount of such parties' credit bid for the WLB Debtors' assets ($390,125,429.40) and may be increased based on other dispositions of their collateral on or prior to the Plan Effective Date, up to the total amount of the Allowed First Lien Claims, including the proceeds of any Non-Core Asset Sale.

[11]    The Estimated Allowed Amount for the General Unsecured Claims is inclusive of all outstanding amounts related to the First Lien Deficiency Claims. There is a range for the Estimated Allowed Amount for the General Unsecured Claims because there are various contingencies that will determine the final amount of General Unsecured Claims, including potential contract rejection claims.

F.  *What is the Process for Objecting to Assumption or Rejection of an Executory Contract or Unexpired Lease?[12]*

If you object to proposed Cure Costs or a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease that appears on the preliminary Assumed Contracts and Leases List, your objection must be Filed, served, and **actually received by the WLB Debtors not later than January 10, 2019 at 4:00 p.m., prevailing Central Time**, as set forth in the Bidding Procedures Order; *provided*, however, that the WLB Debtors may serve a supplemental notice of proposed assumption at any time prior to the Plan Effective Date, and the applicable counterparty shall have 14 days following the date of service of such supplemental notice to file its objection.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or cure amount will be deemed to have assented to such assumption.  Counterparties to such Executory Contracts or Unexpired Leases shall also have until the Confirmation Hearing to object to the assumption or assumption and assignment of any such Executory Contracts or Unexpired Leases on the basis of uncured defaults incurred after service of this notice.

If you object to the proposed rejection of any Executory Contract or Unexpired Lease, your objection must be filed with the Bankruptcy Court and served and **actually received no later than 14 days following the date of service of the notice of rejection, at 4:00 p.m., prevailing Central Time**.  Further, the WLB Debtors expressly reserve the right to serve a supplemental notice of rejection at any time prior to the Plan Effective Date.

As part of the Solicitation Packages and/or Non-Voting Status Notices to be distributed to all Holders of Claims and Interests pursuant to the Disclosure Statement Order, the WLB Debtors will include in the *Notice of Rejection of Executory Contracts and Unexpired Leases* a specific statement that if certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

> **The Colstrip Co-Owners (as defined in the DIP Order) believe the Plan is unconfirmable on the basis that, among other things, the Plan improperly proposes to allow the WLB Debtors to make a final decision on whether to assume or reject executory contracts and unexpired leases until immediately prior to the Plan Effective Date, and it is expected that the Colstrip Co-Owners will object to the Plan on that basis.  All rights of all parties with respect to such argument are reserved.**

G.  *What will I receive from the WLB Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims, DIP Facility Claims, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

H.  *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the

---

[12]  Capitalized terms in this section shall have the meanings ascribed to them in the Bidding Procedures Order.

"Plan Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  "Consummation" means the occurrence of the Plan Effective Date.

I.       *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration:  (i) Cash on hand; (ii) the Purchaser Stock; (iii) debt issued (or assumed) by Purchaser or any of its subsidiaries; (iv) the Sale Transaction Proceeds (if any); (v) the Non-Core Asset Sale Proceeds (if any); (vi) the General Unsecured Claims Amount (if available); (vii) the WLB Debtors' rights under the Sale Transaction Documentation; (viii) payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation; (ix) payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code; and (x) all Causes of Action that are not Transferred Causes of Action or are otherwise not previously settled, released, or exculpated under the Plan, if any.

J.       *Who Supports the Plan?*

The Plan is supported by the WLB Debtors and the Consenting Stakeholders.  The Plan is opposed by the Committee.

K.       *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan provides for releases and exculpation of the WLB Debtors and other parties in interest as set forth in <u>Article IX</u> of the Plan, including the Consenting Stakeholders and their respective Affiliates and representatives.  In addition to the releases in favor of those parties and the other Released Parties, there is an injunction against bringing claims and causes of action that were released against the Released Parties and Exculpated Parties.

L.       *Am I Releasing Claims under the Plan?*

The Plan provides that all holders of Claims that (i) vote to accept the Plan, (ii) abstain from voting on the Plan and do not opt out of the releases in Article IX of the Plan, (iii) vote to reject the Plan and do not opt out of the releases in Article IX of the Plan, (iv) are presumed to accept and do not opt out of the releases in the Article IX of the Plan, or (v) are deemed to reject and who do not opt out of the releases in the Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the WLB Debtors (the "<u>WLB Debtor Releases</u>") and the Released Parties (the "<u>Third Party Releases</u>").

The "Released Parties" include, among other things, all insiders of the WLB Debtors, including their current and former officers and directors, and all substantial prepetition lenders to the WLB Debtors, including their current and former shareholders, officers, and directors.

M.       *What Consideration am I Receiving in Exchange for Releasing my Claims under the Plan?*

The consideration for releasing Claims under the Plan is the mutual releases provided by Released Parties to all other Released Parties.  The WLB Debtors believe that this constitutes sufficient exchange of consideration in accordance with recent chapter 11 cases.

**THE COMMITTEE BELIEVES THAT THESE MUTUAL RELEASES HAVE LITTLE TO NO REAL VALUE FOR THE VAST MAJORITY OF HOLDERS OF GENERAL UNSECURED CLAIMS.**

**THE WLB DEBTORS DISAGREE AND WILL SEEK TO DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE CONSIDERATION BEING PROVIDED BY RELEASED PARTIES TO THE DEBTORS AND OTHER RELEASING PARTIES IS ACCEPTABLE AND CONSISTENT WITH PAST PRECEDENT.  Accordingly, the WLB Debtors believe that the releases under Article IX of the Plan are consistent with applicable law and that the Bankruptcy Court should approve such releases.**

N.      *What is the deadline to vote on the Plan?*

The Voting Deadline is **January 25, 2019, at 4:00 p.m., prevailing Central Time**; or if the Auction occurs after January 22, 2019, the Voting Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction).

O.      *How will I know when the Auction occurs?*

The Auction is currently scheduled to occur on **January 22, 2019, at 10:00 a.m., prevailing Eastern Time**, and may be rescheduled by the WLB Debtors (with the consent of the Required Consenting Stakeholders) by filing a notice on the docket.  The Auction will will be held at the offices of counsel to the WLB Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

P.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in **Article VII.F.2** of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Q.      *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **February 13, 2019, at 10:00 a.m., prevailing Central Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

The WLB Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *The New York Times* (national edition) and the *Houston Chronicle* to provide notification to those persons who may not receive notice by mail.  The WLB Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the WLB Debtors may choose.

R.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan (including any Successful Bids (as defined in the Bidding Procedures)) must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **January 25, 2019, at 4:00 p.m., prevailing Central Time**; *provided* that if the Auction occurs after January 22, 2019, the deadline for objections to the conduct of the Auction or selection of the Successful Bid(s) or Back-Up Bid(s) shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction.

S.      *What is the effect of the Plan on the WLB Debtors' ongoing business?*

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the WLB Debtors' assets will be transferred to the Purchaser, except for any Non-Core Assets sold to third parties.

T.       *What is the Effect of the Plan on the WLB Debtors' Asset Retirement Obligations Under Environmental Laws?*

Following the Plan Effective Date, all asset retirement obligations (including reclamation and similar obligations) of the WLB Debtors shall be assumed by the Purchaser (as set forth in the Purchase Agreement) or the purchasers under a Non-Core Asset Sale.

U.       *Does the Plan affect the Claims against or the Interests in the WMLP Debtors?*

The Plan is not proposed by the WMLP Debtors and does not restructure the funded indebtedness of the WMLP Debtors.

V.       *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the WLB Debtors' Notice and Claims Agent, Donlin, Recano & Company, Inc.:

> *By Hand Delivery or Overnight Mail at*:
>
> Donlin, Recano & Company, Inc.
> Re: Westmoreland Coal Company, et al.
> 6201 15th Avenue, Brooklyn, New York 11219
>
> *By electronic mail at*:
> westmorelandinfo@donlinrecano.com
>
> *By telephone at*:
> (800) 499-8519 (U.S. and Canada)
> (212) 771-1128 (International)

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the WLB Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the WLB Debtors' Notice and Claims Agent at www.donlinrecano.com/westmoreland (free of charge) or the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov (for a fee).

W.       *Do the WLB Debtors recommend voting in favor of the Plan?*

Yes.  The WLB Debtors believe the Plan provides for a larger distribution to the WLB Debtors' creditors than would otherwise result from any other available alternative.  The WLB Debtors believe the Plan, which contemplates a sale of substantially all of the WLB Debtors' assets (other than Non-Core Assets sold to third parties) to the Purchaser, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.  As noted above, the Consenting Stakeholders support confirmation of the Plan.

X.       *Does the Official Committee of Unsecured Creditors recommend voting in favor of the Plan?*

No.  The Committee believes that the Plan substantially understates the actual value of the WLB Debtors' unencumbered assets and provides Holders of purported "First Lien Secured Claims" with a recovery that is far in excess of what they are legally entitled to receive.  The Committee believes that the Plan contemplates an abbreviated and unfair foreclosure process for the sole benefit of secured creditors and which provides Holders of General Unsecured Claims with no actual benefit.  As noted above, the Committee strongly urges you to vote to reject the Plan.

# ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

A.    *Corporate History*

1.    *Formation and Business*

The WLB Debtors, the WMLP Debtors, and their non-Debtor affiliates (collectively, the "Company") began mining in Westmoreland County, Pennsylvania in 1854 as a Pennsylvania corporation.  In 1910, the Company incorporated in Delaware and focused on coal operations in Pennsylvania and the Appalachian Basin.  The Company has since grown into the sixth largest North American coal producer, maintaining domestic coal operations in Montana, Wyoming, North Dakota, Texas, New Mexico, and Ohio, and Canadian coal operations in Alberta and Saskatchewan.  The Company's headquarters is in Englewood, Colorado.

Today, the Company produces and sells thermal coal primarily to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers.  The WLB Debtors market their coal primarily to large electric utilities with coal-fired, base-load-scrubbed power plants under long-term coal sales contracts.  The WLB Debtors focus on acquiring thermal coal reserves that they can efficiently mine with their large-scale equipment.

The Company classifies its business into six segments: Coal - U.S., Coal - Canada, Coal - WMLP, Power, Heritage and Corporate.  The principal operating segments for Company are the Coal - U.S., Coal - Canada, and Coal - WMLP segments.  During the fourth quarter of 2017, the Company sold all of the assets that comprised the Power operating segment and terminated all related power agreements.  The Company's two non-operating segments are Heritage and Corporate.  The Heritage segment primarily includes the costs of benefits the Company provides to former mining operation employees, and the Corporate segment consists primarily of corporate administrative expenses and business development expenses.  In addition, the Corporate segment contains the Company's captive insurance company, Westmoreland Risk Management Inc., a non-Debtor in these chapter 11 cases, and through which the Company has elected to retain some of its operating risks related to captive insurance.

2.    *Mining Operations*

The WLB Debtors are comprised of entities that own and operate the Coal - U.S. segment. The WLB Debtors' reserves and operations are well positioned to serve their primary markets in the Midwest and Rocky Mountain regions of the United States.  The WLB Debtors' operating assets are comprised of eight wholly owned mines located in Montana, North Dakota, Texas, Ohio, Wyoming, and New Mexico.  Seven of those mines are active, while one mine is completing the reclamation phase of its respective mine life.

The WLB Debtors control approximately 318 million tons of proven and probable coal reserves.  During the year ended December 31, 2017, the WLB Debtors produced approximately 19 million tons of coal.  The WLB Debtors' mines include:

- Absaloka Mine.  The Absaloka mine is a 10,427 acre permitted, single-pit surface mine complex located near Hardin, Montana and the Crow Indian Reservation.  Some coal reserves are leased from the Crow Tribe of Indians, while others are leased from private parties.  The Absaloka mine was expressly developed to supply Powder River Basin coal to a group of Midwestern utilities, including Xcel Energy's Sherburne County Station near Minneapolis, Minnesota.  Over the years, it has also sold coal to several other upper Midwest utilities and Montana utilities.  Coal is shipped via a 38-mile rail spur to the main line of the Burlington Northern Santa Fe Railroad near Hysham, Montana.  As of December 31, 2017, there were approximately 27.5 million tons of proven and probable reserves at the Absaloka mine.

- Beulah Mine.  The Beulah mine is a 9,000-acre surface mine complex located 75 miles northwest of Bismarck, North Dakota. It currently produces lignite from one active pit.  As of December 31, 2017, there was approximately 5 million tons of proven and probable reserves at the Beulah mine.

- Buckingham Mine.  The Buckingham mine is an underground, room-and-pillar mine located in Southeast Ohio. It currently operates three (3) mining units within over 8,500 acres of permitted

12

coal reserves, with an operation capacity of 1.2 million tons per year. Buckingham's coal is washed in a state-of-the-art preparation plant on-site and shipped by rail to Unit 4 of the Conesville Electrical Generating Station operated by American Electric Power.  As of December 31, 2017, there were approximately 16.3 million tons of proven and probable reserves at the Buckingham mine.

- <u>Haystack Mine</u>.  The WLB Debtors acquired the Haystack mine and its associated coal reserves in January 2017.  The Haystack Mine, which is not in active production, is capable of producing sub-bituminous coal from the Adaville Geologic Formation and is located 20 miles northeast of Evanston in Southwestern Wyoming.  As of December 31, 2017, there were approximately 12.8 million tons of proven and probable reserves at the Haystack mine.

- <u>Jewett Mine</u>.  The Jewett mine is a 35,000-acre surface mine complex located between Dallas and Houston.  It supplied lignite coal under a supply contract to the adjacent two-unit Limestone Electric Generating Station owned by NRG Texas ("<u>NRG</u>").  Beginning in 2017, the Jewett mine entered the reclamation phase of its mine life where NRG is required to reimburse the WLB Debtors for agreed upon base reclamation costs during final reclamation plus a variable percentage management fee.

- <u>Rosebud "Colstrip" Mine</u>.  The Colstrip mine is a 25,000-acre surface mine complex located in the northern Powder River Basin in Colstrip, Montana, near the Northern Cheyenne Indian Reservation.  Rosebud is a large operation with three active pits and supplies almost all of its current production to the four-unit 2,100 megawatt Colstrip Power Station that is adjacent to the mine and was specifically designed to burn Colstrip coal.  As of December 31, 2017, there were approximately 241 million tons of proven and probable reserves at the Colstrip mine.

- <u>San Juan Mine</u>.  The San Juan mine was acquired on January 31, 2016 from BHP Billiton and supplies the requirements of the San Juan Generating Station operated by Public Service Company of New Mexico. The customer is located within close proximity to the mine and coal deliveries are provided via off-road mine trucks and conveyor belt.  As of December 31, 2017, there were approximately 11.4 million tons of proven and probable reserves at the San Juan mine.

- <u>Savage Mine</u>.  The Savage mine is an 874-acre strategically-placed single pit surface mine located on the Montana-North Dakota border. The Savage mine has a full-requirements contract with the 57 megawatt Lewis & Clark Station which utilizes emission control technologies and is owned by Montana Dakota Utilities, and a longstanding annual supply relationship with a sugar beet refinery near Sidney, Montana.  As of December 31, 2017, there were approximately 3.7 million tons of proven and probable reserves at the Savage mine.

3.  *Management*

The Debtors' current management team is composed of highly capable professionals with substantial industry experience. Information regarding Westmoreland Coal Company's executive officers is as follows:

| Name | Position |
|---|---|
| **Michael G. Hutchinson** | Interim Chief Executive Officer |
| **Gary A. Kohn** | Chief Financial Officer |
| **Jennifer S. Grafton** | Chief Administrative Officer & Chief Legal Officer |
| **Jeffrey S. Stein** | Chief Restructuring Officer |

*Michael G. Hutchinson.* Michael G. Hutchinson currently serves as Interim Chief Executive Officer of Westmoreland Coal Company. He was appointed as interim Chief Executive Officer in November 2017, and has served on its board of directors since 2012 and as chairman of the Audit Committee. Mr. Hutchinson retired from Deloitte & Touche in July 2012 after a career spanning nearly 35 years, leading its Denver Energy and Natural Resources Practice for the last 15 years while, at the same time, managing the Audit and Enterprise Risk Management practice of the Denver office. Mr. Hutchinson serves on the board of directors of ONE Gas, Inc., a publicly traded natural gas utility, and as its audit committee chairman.

*Gary A. Kohn.* Gary A. Kohn currently serves as the Chief Financial Officer of Westmoreland Coal Company. He joined Westmoreland Coal Company as Vice President of Investor Relations in April 2016, and was named Chief Financial Officer in November 2016. In addition to his investor relations focus, he has served in senior leadership positions across multiple functional areas including finance, treasury and strategy for publicly-held companies including First Data, Western Union, Ciber and Intrepid Potash. On December 6, 2018, Mr. Kohn notified Westmoreland Coal Company that he was resigning from his position, effective as of January 4, 2019.

*Jennifer S. Grafton.* Jennifer S. Grafton currently serves as Chief Administrative Officer and Chief Legal Officer of Westmoreland Coal Company. She joined Westmoreland Coal Company in December 2008 as Associate General Counsel and was promoted to General Counsel and Secretary in February 2011. Ms. Grafton focuses her practice on U.S. Securities Exchange and Commission ("SEC") compliance, corporate governance, Board management, risk management and employment/labor relations.

*Jeffrey S. Stein.* Jeffrey S. Stein currently serves as Chief Restructuring Officer of Westmoreland Coal Company. He was appointed as Chief Investment Officer in August 2017 and as Chief Restructuring Officer in April 2018, and has served on the board of directors for Westmoreland Coal Company since August 2016. Mr. Stein is Founder and Managing Partner of Stein Advisors LLC, a financial advisory firm that provides consulting services to institutional investors. Mr. Stein currently serves as Chairman of the Board of Ambac Financial Group, Inc. (NASDAQ: AMBC), MLR Petroleum LLC, and Granite Ridge Holdings, LLC.

4. *Customers*

Each of the Company's operating segments focuses on niche coal markets where the Company is able to take advantage of customer proximity and strategically located rail or truck transportation. The Coal - U.S. segment sells a substantial amount of the coal that they produce to power generation facilities. The majority of the Debtors' mines are in very close proximity to the customers' property, with economical delivery methods that include, in several cases, conveyor belt delivery systems linked to the customers' facilities. The close proximity of their mines and coal reserves to their customers reduces transportation costs and provides the WLB Debtors with a significant competitive advantage with respect to retention of those customers. The WLB Debtors typically enter into long-term, cost protected supply contracts with their customers. The WLB Debtors' current coal sales contracts have a weighted average remaining term of approximately six years.

5. *Competition*

The North American coal industry is intensely competitive. In addition to competition from other coal producers, the WLB Debtors compete with producers of alternative fuels used for electrical power generation, such as nuclear energy, natural gas, hydropower, petroleum, solar, and wind. Costs and other factors such as safety, environmental, and regulatory considerations related to alternative fuels affect the overall demand for coal as a fuel. Political dynamics in the United States have additionally resulted in a reduction of the market demand for coal-based energy solutions.

The majority of the WLB Debtors' mines focus on coal markets where the WLB Debtors may take advantage of long-term coal contracts with neighboring power plants. These mines give the WLB Debtors a competitive advantage based on three factors:

- the WLB Debtors are among the most economic suppliers to their principal customers as a result of transportation advantages over their competitors;

14

- nearly all of the power plants that the WLB Debtors supply were specifically designed to use the WLB Debtors' coal; and

- the plants to which the WLB Debtors supply are among the lowest cost producers of electric power in their respective regions and are among the cleaner producers of power from solid fossil fuels.

6. *Employees*

Between their mining operations and home office, the WLB Debtors employ approximately 1,732 individuals on a full- or part-time basis. These employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives. As of the Petition Date, the WLB Debtors are party to seven active collective bargaining agreements (the "CBAs"), all of which are set to expire between 2019 and 2021.

The WLB Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans. The WLB Debtors also contribute to plans governed by the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. § 9701 et seq. (the "Coal Act"). Like other coal companies, the WLB Debtors also incur costs and make award payments in accordance with the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 901–45 (the "Black Lung Act").

Separately, the WLB Debtors are subject to other workers' compensation laws in the states in which they operate or used to operate. The WLB Debtors maintain workers' compensation coverage through third-party insurance providers or state-mandated workers' compensation funds. The WLB Debtors may be required to contribute additional premiums in the future depending on the number and amount of claims.

B. *Prepetition Capital Structure*

1. *The WLB Debtors' Prepetition Capital Structure*

Westmoreland Coal Company is the direct or indirect parent of each of the other WLB Debtors. The WLB Debtors are organized in the states of Colorado, Delaware, Montana, New York, Ohio, Texas, and Virginia. As described in greater detail below, as of the Petition Date, the principal amount of the WLB Debtors' consolidated funded debt obligations totaled approximately $760 million in the aggregate under the Bridge Loan Facility (as defined below), WLB Term Loan Facility (as defined below), and WLB Senior Secured Notes (as defined below).

(a) Bridge Loan Facility

Debtors Westmoreland Coal Company and Westmoreland San Juan Holdings, Inc., and non-Debtor Prairie Mines & Royalty ULC are borrowers under a bridge loan facility (the "Bridge Loan Facility") pursuant to a credit agreement, dated as of May 21, 2018. As of the Petition Date, $90 million in principal amount was outstanding under the Bridge Loan Facility. The Bridge Loan Facility is secured by a first-lien security interest in substantially all of the Company's U.S. and Canadian assets, including the equity interests of Westmoreland Canadian Investments, LP ("WCI"), the holding company for the Company's Canadian business. This first lien collateral package is inclusive of substantially all of WLB's Canadian assets and WLB's U.S. assets, including all assets and equity of Westmoreland San Juan, LLC ("Westmoreland San Juan"), a wholly owned subsidiary of Westmoreland Coal Company, and its subsidiaries.

**The estimated percentage recovery provided by the Plan to Holders of Claims arising under the Bridge Loan Facility (which are treated as DIP Facility Claims under the Plan) is approximately 100%.**

(b) WLB Term Loan Facility

Debtor Westmoreland Coal Company is the borrower under a secured term loan facility (the "WLB Term Loan Facility") pursuant to a credit agreement, dated as of December 16, 2014. As of the Petition Date, approximately $320 million in principal amount was outstanding under the WLB Term Loan Facility. The WLB Term Loan Facility is secured by a first-lien security interest, junior and subordinate in all purposes and respects to the liens securing the

Bridge Loan Facility and *pari passu* in all respects to the liens securing the WLB Senior Secured Notes, on substantially all of the WLB Debtors' U.S. assets (including a lien on 100 percent of the equity interests in WCI).

**The estimated percentage recovery provided by the Plan to the Holders of First Lien Secured Claims arising under the WLB Term Loan Facility is approximately 100%. The estimated percentage recovery provided by the Plan to the Holders of First Lien Deficiency Claims (which are treated as General Unsecured Claims under the Plan) arising under the WLB Term Loan Facility is expected to be 0%.**

(c)     WLB Senior Secured Notes

Debtor Westmoreland Coal Company issued $350 million aggregate principal amount of 8.75% senior secured notes due 2022 (the "WLB Senior Secured Notes") under an indenture, dated as of December 16, 2014. As of the Petition Date, there is $350 million in principal amount of WLB Senior Secured Notes outstanding. The WLB Senior Secured Notes are secured by a first-lien security interest, junior and subordinate in all purposes and respects to the liens securing the Bridge Loan Facility and *pari passu* in all respects to the liens securing the WLB Term Loan Facility, on substantially all of the WLB Debtors' U.S. assets (including a lien on 100 percent of the equity interests in WCI).

**The estimated percentage recovery provided by the Plan to the Holders of First Lien Secured Claims arising under the WLB Senior Secured Notes is approximately 100%. The estimated percentage recovery provided by the Plan to the Holders of First Lien Deficiency Claims (which are treated as General Unsecured Claims under the Plan) arising under the WLB Senior Secured Notes is expected to be 0%.**

(d)     WLB's Common Stock

Westmoreland Coal Company is a publicly-held company that was previously listed on the NASDAQ Global Market ("NASDAQ"). It formerly traded on the NASDAQ, under the symbol "WLB," until April 25, 2018. Westmoreland Coal Company now trades on the OTC Markets platform under the symbol "WLBAQ." For most of the six months prior to the Petition Date, Westmoreland Coal Company's common stock has traded over-the-counter at prices ranging between $0.07 and $0.41 per share. As of August 2, 2018, Westmoreland Coal Company had 18,788,532 outstanding shares of common stock, with $0.01 par value per share.

**The estimated percentage recovery provided by the Plan to the Holders of the WLB's common stock (which are treated as WCC Interests under the Plan) is expected to be 0%.**

2.   *General Unsecured Claims Pool and Significant Claims Thereunder*

As detailed in **Article II.D** of the Disclosure Statement, the General Unsecured Claims pool is approximately $740 million to $930 million. The following chart summarizes the current amounts outstanding for certain subcategories within the General Unsecured Claims pool as of October 31, 2018.[13]

| General Unsecured Claims Category | Estimated Claims Amount (in millions) |
|---|---|
| First Lien Deficiency Claims | $342.6 |
| Postretirement Medical Benefits | $334.5 |
| Pension Obligations[14] | $41.7 |

---

[13]   The numbers in the below chart are a conservative approximation as of October 31, 2018. The WLB Debtors continue to review the General Unsecured Claims pool and the various subcategories thereunder, and all parties reserve all rights with respect to such amounts.

[14]   This amount is inclusive of only outstanding amounts owed under the Westmoreland Retirement Plan (as defined below) and Beulah Savage Plan (as defined below). If the Elkol-Sorenson Plan (as defied below) is terminated, PBGC will assert that the WLB Debtors are jointly and

| Prepetition Trade | $23.0 |
| Black Lung | $21.8 |

3.  *Other Non-Financial Obligations*

Like other coal companies, the WLB Debtors have contractual and statutory obligations relating to their current and retired employees, as well as asset retirement and reclamation obligations.

(a)      Pension Plan Obligations

The WLB Debtors have ongoing pension obligations related to their domestic operations, consisting of one multiemployer pension plan and multiple defined benefit pension plans.  Specifically, the WLB Debtors contribute to a multiemployer pension plan, the Central Pension Fund of the Operating Engineers (the "Central Pension Fund"), on behalf of employee groups at the Colstrip, Absaloka, and Savage mines that are represented by the International Union of Operating Engineers ("IUOE").  The minimum funding contributions for 2018 are $4,702,660.14 for the Central Pension Fund.

The WLB Debtors also provide defined benefit pension plans to qualified full-time employees pursuant to CBAs (collectively, the "Defined Benefit Pension Plans").  The Defined Benefit Pension Plans offer retirement benefits to employees and provide a fixed level of benefits upon retirement.  In general, the level of benefits a retiree will receive is determined by certain formulas that consider factors such as years of service and the employee's maximum salary averaged over a continuous five-year period of employment.  The WLB Debtors' funding policy is to annually contribute the minimum amount prescribed, as specified by applicable regulations.

Certain of the Defined Benefit Pension Plans on behalf of hourly employees at the Beulah and Savage mines (the "Beulah Savage Plan"), as well as salaried employees at those mines, employees at the San Juan mines, and some of the WLB Debtors' employees at their corporate headquarters (the "Westmoreland Retirement Plan"), are frozen to new participation, *i.e.*, these pension plans are no longer accepting new participants.  As of January 2018, the Defined Benefit Pension Plans were underfunded (the liabilities and obligations to pay pensions under the Defined Benefit Pension Plans exceeded the asset value in the investment portfolio that has accumulated for the purpose to fund required payments) by approximately $29 million.  If the Defined Benefit Pension Plans were to terminate, the termination liability is estimated to be approximately $77.3 million.

The specific pension plans that are currently contemplated for assumption and assignment under the Sale Transaction to the Purchaser are the Westmoreland Retirement Plan and Beulah Savage Plan, unless the Beulah Savage Plan is assumed by a third party in connection with the sale of the Beulah and/or Savage mines, in which case the Beulah Savage Plan would be assigned to such third party purchaser.  The Defined Benefit Pension Plans are insured by Pension Benefit Guaranty Corporation ("PBGC"), and are covered under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA").

**The obligations under the Westmoreland Retirement Plan and the Beulah Savage Plan are to be assumed by the Successful Bidder(s) in connection with the Sale Transaction.**  In the event that a purchaser acquires the Beulah and Savage mines via a Non-Core Asset Sale, the Beulah Savage Plan will be treated pursuant to the terms of the purchase agreement.  The Cash Collateral Order contemplates that any sale of the WMLP Debtors' assets will be free and clear of, among other things, any pension obligations, which would include the obligations under the Westmoreland Elkol-Sorenson Mine Pension Plan (the "Elkol-Sorenson Plan").  If the Elkol-Sorenson Plan is terminated, PBGC will assert that the WLB Debtors are jointly and severally liable for, among other things, the

_____

severally liable for, among other things, the Elkol-Sorenson Plan's unfunded benefit liabilities of approximately $27.8 million.  All parties reserve all rights with respect to such assertion.

plan's unfunded benefit liabilities of approximately $27.8 million, and the WLB Debtors and their lenders reserve all rights with respect to such assertion.

To the extent not assumed by the Stalking Horse Bidder (or any other applicable purchaser), the Elkol-Sorenson Plan will remain with the applicable Debtors.  If the Elkol-Sorenson Plan terminates and is underfunded, termination liabilities will arise under Title IV of ERISA.  Regardless of whether the pension plan terminates, pension plan participants will continue be eligible for benefits in accordance with the pension plan's provisions; if the pension plan is terminated, participants' benefits are insured by PBGC in accordance with Title IV of ERISA.

(b)      Labor Contracts and Legacy Labor Liabilities

As of October 31, 2018, the WLB Debtors estimate the present value of their labor contract and legacy labor obligations (the "Labor Liabilities") to be approximately $334.5 million.   The Labor Liabilities are comprised of amounts owed under and attributable to the WLB Debtors' active collective bargaining agreements, expired or non-active CBAs, and statutorily mandated obligations.

The WLB Debtors are signatories to seven collective bargaining agreements (the "Existing CBAs") with the UMWA and local union branches of the IUOE (collectively, the "CBA Counterparties").  The WLB Debtors' obligations under the Existing CBAs are approximately $119.6 million.  Approximately $212.5 million of the Labor Liabilities are attributable to the cost of heritage benefits (the "Heritage Costs"), which are benefits provided to the WLB Debtors' former mining operation employees. The Heritage Costs consist of payments for medical benefits, workers' compensation benefits, black lung benefits and combined benefit fund premiums for coverage plans for UMWA retirees required by statute.  Approximately $118 million of the Heritage Costs are derived from the WLB Debtors' obligations under expired or non-active CBAs, while approximately $95 million are obligations attributable and stemming from the Coal Act.  These obligations are described in further detail in **Article V.K** of this Disclosure Statement.

The following chart summarizes the number of active union employees and retirees under each of the above obligations:

| Obligation | Number of Active Union Employees | Number of Retirees |
|---|---|---|
| Kemmerer - CBA | 242 | 68 |
| Dakota Westmoreland Corp. - CBA | 12 | 40 |
| Western Energy Company - CBA | 287 | N/A |
| Westmoreland Savage Corporation - CBA | 11 | N/A |
| Westmoreland Resources, Inc. - CBA | 125 | N/A |
| San Juan Coal Company (Underground Mining) - CBA | 116 | N/A |
| San Juan Coal Company (Surface Mining) - CBA | 78 | 2 |
| Heritage Costs  - Contractual Obligations | N/A | 412 |
| Heritage Costs - Coal Act Obligations | N/A | 674 |

In addition, the WLB Debtors are responsible for obligations arising under the Black Lung Act.  Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis (black lung disease) and their dependents may file disability claims with the Department of Labor (the "DOL"), which then investigates the claims and assigns liability

to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "Black Lung Act Claims").

Black Lung Act Claims include claims for the payment of disability benefit awards to workers who suffer from black lung disease. The WLB Debtors historically have paid for legal fees, expenses, and awards owed to claimants out of Cash, following which such claims and expenses have been debited against the liability. If a responsible coal operator fails to pay a benefit award, the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant. In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral or to obtain insurance for its payment obligations. A coal operator's directors and officers may also be held personally liable for unpaid benefits.

As of December 31, 2017, the WLB Debtors estimate that there are approximately $18.2 million in Black Lung Act obligations.

**The estimated percentage recovery provided by the Plan to Holders of prepetition Black Lung Act Claims (which are treated as General Unsecured Claims under the Plan) is expected to be 0%, although individuals holding Black Lung Act Claims may be able to recover from the DOL.**

(c)      Other Post-Employment Benefits

The WLB Debtors provide various other post-employment benefits ("OPEB"), primarily focused on postretirement healthcare, such as medical insurance, life insurance, and related benefits for certain of their former employees and, in some instances, their spouses and dependents. Benefits, eligibility, and cost-sharing provisions vary by plan documents and the underlying collective bargaining agreements.

The WLB Debtors are obligated to pay health benefits for certain retired coal miners pursuant to existing individual employer retiree health plans as well as payment of per-beneficiary premiums to the United Mine Workers of America ("UMWA") Combined Benefit Fund (the "UMWA Combined Benefit Fund"). The UMWA Combined Benefit Fund is a multiemployer health plan. The UMWA Combined Benefit Fund is designed to pay health care benefits to the UMWA workers who retired prior to 1976 and their dependents. The WLB Debtors make monthly premium payments into the UMWA Combined Benefit Fund. These payments are based on the number of the WLB Debtors' UMWA employees who retired prior to 1976, and the WLB Debtors' pro-rata assigned share of UMWA retirees whose companies are no longer in business. In 2017, the WLB Debtors paid $1.4 million to the UMWA Combined Benefit Fund, and expected payments for 2018 are approximately $1.3 million. In addition to UMWA workers who retired prior to 1976 and their dependents, the WLB Debtors also provide certain of the benefits under the UMWA Combined Benefit Fund to qualified full-time employees.

Additionally, the WLB Debtors sponsor 401(k) saving plans for U.S. employees and provide contributions to employee savings plans at their Canadian operations to assist employees in providing for their future retirement needs. In May 2016, the WLB Debtors discontinued matching employees' 401(k) contributions with common shares of Westmoreland Coal Company stock and elected instead to match with cash contributions. The WLB Debtors' expense for the year ended December 31, 2017 was $9.9 million, consisting entirely of cash contributions.

Finally, the WLB Debtors maintain a supplemental benefit pension plan (the "SERP") for former executives pursuant to employment or severance agreements. The SERP is an unfunded non-qualified deferred compensation plan, which provides benefits to certain employees beyond the maximum limits imposed by the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code. The WLB Debtors do not expect to add new participants to their SERP program, and intend to discontinue the SERP program.

As detailed in Article V.K of this Disclosure Statement, there are ongoing negotiations regarding potential modifications to Retiree Benefits, including OPEB Claims.

**The estimated percentage recovery provided by the Plan to the Holders of OPEB Claims (which are treated as General Unsecured Claims under the Plan) is expected to be 0%.**

(d)    Asset Retirement Obligations

Like other coal companies, the WLB Debtors have asset retirement obligations, including reclamation obligations. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act ("SMCRA") as well as certain state laws and any applicable Canadian laws.

The WLB Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both surface and underground mines in accordance with applicable reclamation laws in the U.S., as defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate.

---

**THE CONFLICTS COMMITTEE OF WESTMORELAND RESOURCE PARTNERS, GP, LLC ("WMGP") AND THE SECURED LENDERS TO THE WMLP DEBTORS ASSERT THE FOLLOWING:**

**The WLB Debtors' asset retirement obligations and liabilities of approximately $474.5 million includes roughly $46 million related to the WMLP Debtors' mines (the "WMLP ARO") for which WLB is jointly and severally liable under SMCRA and its state analogues  SMCRA and related state statutes impose liability on mine "operators" and provide that an operator is jointly and severally liable with the permittee and any other operator of a given mine for obligations arising thereunder.  WLB operates the WMLP Debtors' mines, and thus is jointly and severally liable for the WMLP ARO.  In the absence of a consensual resolution of the WMLP ARO in connection with the Chapter 11 Cases, the obligation to pay a portion or the entirety of the WMLP ARO may constitute Administrative Claims against the WLB estates that would need to be paid in full in order for the Plan to be confirmed.**

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) DISPUTE THE ABOVE STATEMENT.  The WMLP estates (on behalf of themselves and their respective creditors) and the WLB Debtors (on behalf of themselves and their respective creditors) reserve their respective rights against one another with respect to the WMLP ARO.**

---

**First Surety Corporation ("FSC") and Westchester Fire Insurance Company ("Westchester) assert that neither the Disclosure Statement nor the Plan provide a path for resolution of reclamation obligations for the WLB Debtors in the event that the Sale Transaction contemplated by the Plan does not close.  FSC and Westchester further assert that the disposition of the Core Assets and Non-Core Assets under the Sale Transaction without a related plan for the WMLP mining assets and related WMLP reclamation obligations may result in the impermissible abandonment of mines and related environmental obligations or result in the administrative insolvency of the WLB Debtors, which would preclude confirmation of the Plan in this case. If, for instance, the proposed sales of the WLB mines in the Sale Transaction and/or any as yet undisclosed sales of the WMLP mines do not close, the mining assets and related reclamation obligations could fall to the Liquidating Trust under the Plan, which may not have sufficient cash to fund all reclamation obligations with respect to the mining assets comprising that trust.  FSC and Westchester assert that neither the WMLP Debtors nor the WLB Debtors has provided sufficient information relative to such obligations to allow any party to determine whether and to what extent the Liquidating Trust will be funded, and how the WLB Debtors plan to perform and satisfy their reclamation/environmental obligations so as to avoid the impermissible default under the WMLP mining permits.**

The Sureties further assert that Article VI.G.2. of the Plan improperly treats the Existing Surety Bonds as insurance policies by requiring Holders of any Allowed Claim against the WLB Debtors to pursue remedies under such Surety Bonds prior to receiving a distribution under the Plan.  Pursuing remedies under the Existing Surety Bonds would require a default under the permits relating to such Existing Surety Bonds, which default would presume a failure by the WLB Debtors to perform their reclamation and/or environmental obligations relating to such permits.  Any such failure would preclude the WLB Debtors, their officers, directors, affiliates or subsidiaries, and any assignees or purchasers, from operating any other mines or other permits to be transferred under the Plan.  By including this provision in the Plan, the WLB Debtors have offered a Plan that is not feasible and is thus not confirmable.

The WLB Debtors (on behalf of themselves and their respective creditors) dispute the Sureties' assertions in the preceding two paragraphs and the WLB Debtors and the Sureties reserve their respective rights against one another with respect to the issues identified in the preceding two paragraphs.

All of the WLB Debtors' asset retirement obligations will be assumed by the Successful Bidder(s), or the purchaser(s) (in the case of a Non-Core Asset Sale) in accordance with the terms of the applicable purchase agreement.

(e)     Workers' Compensation Program Obligations

The WLB Debtors and their affiliates are insured under numerous state workers' compensation programs for payments to injured workers.  Certain of these workers' compensation programs are self-insured, while others are insured through third-parties.  Those obligations include programs in Colorado, Kentucky, Montana, New Mexico, North Dakota, Ohio, Texas, Virginia, West Virginia, and Wyoming.  As of October 31, 2018, the total amount of the WLB Debtors' outstanding workers' compensation obligations was approximately $4.1 million.  The Stalking Horse Bidder (or any other applicable purchaser) shall assume the workers' compensation programs and obligations thereunder for the respective assets and mining operations purchased for employees transferred to the Stalking Horse Bidder (or any other applicable purchaser), and shall continue to make payments to such claimants under the respective workers' compensation programs.

Although the Plan currently contemplates the assumption of the WLB Debtors' workers' compensation program obligations, to the extent such obligations are not assumed by the Stalking Horse Bidder (or any other applicable purchaser), the Plan treats workers' compensation program obligations as General Unsecured Claims.  The estimated percentage recovery provided by the Plan to Holders of Allowed General Unsecured Claims is expected to be 0%.

C.     *WMLP Debtors and Shared Services Agreement*

WMLP Debtor Westmoreland Resource Partners, LP ("WMLP") is a publicly-traded master limited partnership that was previously listed on the New York Stock Exchange (the "NYSE"). It formerly traded on the NYSE, under the symbol "WMLP," until October 9, 2018.  WMLP now trades on the OTC Markets platform under the symbol "WMLPQ." WLB Debtor Westmoreland Coal Company holds a 94 percent limited partner ownership interest in WMLP and 100 percent of the equity interests of WMGP, which, in turn, owns 0.164 percent of WMLP.

The board of directors of WMGP includes a conflicts committee (the "Conflicts Committee") to address potential conflicts of interest between WMLP and WMGP, as circumstances warrant.  The Conflicts Committee consists solely of independent directors and has separate legal and financial advisors from WMGP and the other WLB Debtors.

WMLP and WMGP (but not Westmoreland Coal Company or any other WLB Debtor) are parties to that certain administrative and operational services agreement, dated as of January 1, 2015 (as amended, restated, modified and supplemented from time to time in accordance with the terms thereof, the "Shared Services Agreement"). Under the Shared Services Agreement, Westmoreland Coal Company (through WMGP) provides services (including personnel) to WMLP and Westmoreland Coal Company is ultimately reimbursed for related costs incurred on WMLP's behalf.  The services provided by Westmoreland Coal Company (through WMGP) include, among other things, operating services, engineering services, and general and administrative services, including but not limited to

21

legal, accounting, treasury, insurance administration and claims processing, risk management, health, safety and environmental, information technology, human resources, credit, payroll, internal audit, taxes, and engineering services.  Where costs are specifically incurred on behalf of one of WMLP's affiliates, those costs are billed directly to WMLP, and are allocated to WMLP in a variety of methods when the cost or service applies equally to all employees.  Additionally, the Shared Services Agreement provides for an annual fixed fee (the "Fixed Fee") to ultimately reimburse Westmoreland Coal Company for executive officers and other employees who devote less than a majority of their time to WMLP.  For the year ended December 31, 2017, WMLP reimbursed Westmoreland Coal Company approximately $64.5 million for expenses, in the aggregate, for the services provided to WMLP primarily related to employee costs.  WMLP also paid approximately $2.2 million to Westmoreland Coal Company on account of the Fixed Fee, consisting of $0.8 million for executive services and $1.4 million for corporate and other costs.  As of the Petition Date, Westmoreland Coal Company (through WMGP) continues to provide services to WMLP.

Under the RSA, the WLB Debtors and the Consenting Stakeholders agreed "to engage in good faith discussions with WMLP and its secured creditors regarding the terms of any transition services or similar arrangements with respect to the shared services provided by [the WLB Debtors] to WMLP in the event a chapter 11 plan with respect to WMLP does not become effective on or before the Plan Effective Date."

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.      *Adverse Market Conditions*

Coal mining businesses across the U.S. and around the world are feeling pressure as a result of a variety of macroeconomic factors, and the fate of many of these companies is yet to be determined.  Access to capital is the lifeblood of coal mining companies.  With increasing leverage because of the constant need for capital and rising cost of capital in the industry, operating in the current environment has been—and likely will remain—challenging.  In addition to capital, there are several requirements to maintain a coal mining business, including an inventory of economic sites to mine, a consistent mining program to offset the natural declines in production that occur almost immediately, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers and operators of coal-fired power plants.

World coal production in 2016 witnessed its largest decline in absolute terms since recordkeeping of such first began in 1971.  A key factor in the declining demand for coal, and corresponding reduction in production, is the availability of inexpensive natural gas.  This historically low natural gas pricing has made it difficult for any coal basin to compete.  Unfortunately, it is a trend that experts expect to continue in the near future.  The U.S. Energy Information Administration predicts that coal production will continue to decline throughout 2018, due to lower expected global demand for U.S. coal exports (down 17 percent in 2018 and an another expected five percent in 2019) and lower forecasts of coal use in the electric power sector (down five percent in 2018).

Moreover, coal's share of the U.S. energy market and prices for thermal and metallurgical coal have begun to recover, but the effects of past decline continue to impact the industry today.  The recovering economic environment, lack of growth in energy demand generally, and a number of scheduled coal-fired plant retirements have precipitated this decline.

Lastly, the regulatory environment has also contributed to the WLB Debtors' current financial situation.  Federal and state regulatory authorities impose obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality.  Stricter enforcement of existing laws and the promulgation of new regulations have made it more costly for companies to use coal as an energy source.  Despite recent rollbacks of some of these burdensome regulations, the costs of decades of compliance have further contributed to the WLB Debtors' financial difficulties.  Other regulations, such as those governing mining and reclamation, have imposed even more direct costs on the coal industry.  For example, the Alberta provincial government in Canada plans to eliminate all coal-fired power plants by 2030 due, in part, to political opposition in Canada to coal-based energy sources.  Similar political dynamics in the United States have resulted in a reduction of the market demand for coal-based energy solutions.

B.     *Acquisition and Expansion Efforts*

Determined to continue their growth into one of the largest and most recognized coal operations today, the Company undertook significant acquisition and expansion efforts beginning in the early 2000s. In 2006, the Company became the sole owner of two coal-fired power-generating units in Weldon, North Carolina with a total capacity of approximately 230 megawatts (collectively, "ROVA"). In 2011, the Company purchased its Kemmerer mine from Chevron Mining Inc. for approximately $179 million in addition to approximately $14 million in working capital. In 2014, the Company purchased the Canadian coal operations of Sherritt International Corporation ("Sherritt") for approximately $312 million in cash and the assumption of Sherritt's capital leases valued at approximately $153 million. The Sherritt acquisition included substantially all of the assets and operations that now make up the Debtors' non-Debtor Canadian business. In late 2014 and early 2015, the Company completed its acquisition of Buckingham Coal Co. for $34 million and Oxford Resource Partners for $30 million. Roughly one year later, in February 2016, the Company acquired its San Juan operations for approximately $127 million.

These series of acquisitions within a relatively short timeframe nearly tripled the Company's debt obligations. However, the Company encountered challenges integrating its acquisitions into their business enterprise and realizing the synergies with their other assets. Additionally, coal sales and revenue did not rise proportionately, leaving the Company significantly overleveraged. A continued decline in the coal sector only exacerbated the Company's liquidity concerns. During the fourth quarter of 2015, Westmoreland Coal Company determined that the long-lived assets at ROVA were impaired due to the continued decline in forecasted electricity prices. The carrying value of the ROVA assets were fully written off to zero as a result of an impairment charge of approximately $133.1 million to the Debtors' balance sheet. Westmoreland Coal Company then terminated its power purchase contracts associated with ROVA and formally disposed of the ROVA facilities in 2017. The sale generated $5 million of cash receipts, plus the accelerated receipt of a net amount of $12 million from terminating the power purchase contracts. Westmoreland Coal Company retained approximately $2.7 million of reclamation liabilities related to offsite ash storage under the terms of the sale.

C.     *Coal Industry Liabilities*

Under the Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977, as amended in 1981, each coal mine operator must pay federal black lung benefits to eligible current and former employee claimants and also make payments to a trust fund for the payment of benefits and medical expenses to eligible claimants who last worked in the coal industry prior to January 1, 1973. As of December 31, 2017 and 2016, the WLB Debtors' black lung benefit obligations were $18.2 million and $17.6 million, respectively. With the implementation of the Patient Protection and Affordable Care Act in 2010 and the amendment of federal black lung regulations, the number of claimants who are awarded federal black lung benefits has increased and will likely continue to increase, as will the amounts of those awards. In addition to the WLB Debtors' black lung benefit obligations, the WLB Debtors incur on an annual basis $12 million in healthcare costs attributable to their UMWA employees.

When coupled with the external pricing pressure, increased regulation, political opposition to coal in the United States and Canada, and other costs associated with the WLB Debtors' businesses, these liabilities have hindered the WLB Debtors' ability to operate competitively in the current market environment.

D.     *The Debtors' Proactive Approach to Addressing Liquidity Constraints*

In 2016, the Debtors undertook a rigorous process to evaluate possible alternatives to deleverage their capital structure. On August 16, 2017, Mr. Jeffrey Stein, a then-independent director, was appointed by the Board of Directors of Westmoreland Coal Company as Chief Investment Officer to help lead shareholder value initiatives. On April 27, 2018, Mr. Stein was appointed by the Board of Directors of Westmoreland Coal Company as Chief Restructuring Officer to evaluate restructuring and refinancing alternatives regarding Westmoreland Coal Company and its subsidiaries to help lead their restructuring efforts.

In 2017, the Debtors retained Kirkland & Ellis LLP as legal advisor. In 2018, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor. The WLB Debtors also engaged Centerview Partners LLC ("Centerview") as their financial advisor and investment banker.

The efforts of the Debtors and their advisors to identify a viable restructuring path forward undertook heightened significance in early 2018 for two reasons. First, WMLP received an audit opinion with respect to the fiscal year ending December 31, 2017, which caused an event of default under WMLP's prepetition secured term loan facility (the "WMLP Term Loan Facility"), as of March 31, 2018. To address this matter, WMLP, Westmoreland Coal Company, and each lender under the WMLP Term Loan Facility entered into a forbearance and waiver agreement pursuant to which Westmoreland Coal Company and WMLP agreed to pursue a sale process with respect to WMLP's assets in accordance with an agreed-upon protocol. Second, Westmoreland Coal Company and its advisors determined that it would exhaust all of its remaining liquidity by May 31, 2018, a determination that led Westmoreland Coal Company to consider a number of potential financing alternatives to address its liquidity challenges. Those alternatives included considering the feasibility of raising new debt and/or amending the terms of the WLB Debtors' existing asset-based revolving loan facility (the "CIBC ABL Facility") to obtain access to incremental liquidity. At the same time, the Debtors began to focus on preparing for a potential chapter 11 filing.

In April 2018, Centerview began contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the WLB Debtors with sufficient liquidity to stabilize operations, protect its supply chain, satisfy surety collateral requirements, and position the WLB Debtors for a successful comprehensive restructuring process.

Centerview initially solicited proposals for DIP financing from eight potential lenders, including the WLB Debtors' existing secured creditors, large commercial banks, and other sophisticated alternative investment institutions. Of the eight potential lenders that were contacted, seven executed non-disclosure agreements, or had similar agreements already in place, and were offered access to diligence materials. The WLB Debtors' management and advisors engaged in numerous discussions with these potential lenders. Following a period of initial diligence, Centerview requested that interested parties submit non-binding term sheets for a $110 million DIP financing by April 13, 2018. The WLB Debtors received five separate proposals, including proposals from CIBC Bank USC ("CIBC"), who served as the administrative agent under the CIBC ABL Facility, the ad hoc group of certain lenders under the WLB Term Loan Facility and holders of the WLB Senior Secured Notes (the "Ad Hoc Group"),[15] and three third-party lenders. Ultimately, however, no third party who Centerview contacted was willing and/or able to provide a fully underwritten proposal of sufficient size due to, among other factors, the WLB Debtors' financial position, highly leveraged capital structure, and the severely distressed coal sector in which the WLB Debtors operate.

As a consequence, the WLB Debtors and their advisors focused their efforts on negotiations with the WLB Debtors' two existing lenders who submitted proposals, CIBC and the Ad Hoc Group. CIBC's initial proposal was for a face amount $110 million ABL / term loan structure on terms that would not prime the liens of the WLB Debtors' existing lenders. Despite the $110 million "headline" amount, the borrowing base formula contained in the proposed ABL component and CIBC's actual targeted commitment amount meaningfully reduced the actual, committed dollar amount of financing that would have been available. Indeed, on a net basis, CIBC's initial proposal only provided a modest increase in liquidity to the WLB Debtors.

The Ad Hoc Group's initial proposal contemplated: (a) providing the WLB Debtors with a $70 million prepetition bridge loan facility backstopped by the Ad Hoc Group, with the ability to convert the facility into debtor-in-possession financing upon a chapter 11 filing; (b) the continuation and expansion of the borrowing base under the existing CIBC ABL Facility; (c) a four-month debt service payment forbearance with respect to the WLB Term Loan Facility and WLB Senior Secured Notes in order to permit negotiations with the Ad Hoc Group regarding a consensual, holistic restructuring; and (d) the refinancing in full in cash of approximately $50.6 million in outstanding principal amount under the secured term loan facility (the "WSJ Term Loan Facility") held by

---

[15] The *Verified Statement of Kramer Levin Naftalis & Frankel LLP And Porter Hedges LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019A* [Docket No. 496] provides a list of the members of the Ad Hoc Group. The Ad Hoc Group Members include, in their various capacities as investment advisors, sub-advisors or managers of funds or discretionary accounts that hold (with such investment invsisors, sub-advsiros and managers acting on behalf of such holders), as applicable:  Aviva Investors, Barclays Bank PLC, Cross Sound Management, LLC, J.H. Lane Partners Master Fund, LP, Marathon Asset Management, LP, MSD Partners, LP, Oaktree Capital Management, L.P., Pascal Fund, Ltd., Renato Frischmann Bromfman, Pacific Investment Management Company LLC, Redwood Capital Management, LLC, Serengeti Asset Management, LP, Stonehill Institutional Partners, L.P., Stonehill Master Fund Ltd., Ivy Investment Management Company, Wolverine Flagship Fund Trading Limited, York Capital Management Global Advisors, LLC, and ZAIS Group.

Westmoreland San Juan, releasing its collateral to secure the new proposed facility and the prepetition Term Loan Facility and WLB Senior Secured Notes.

The Ad Hoc Group's proposal offered several key benefits to the WLB Debtors: (a) a material increase in liquidity that was not subject to borrowing base fluctuations (as would be the case under the CIBC proposal); (b) additional runway to remain out of chapter 11 and seek to negotiate a consensual, holistic restructuring with the Ad Hoc Group; and (c) a forbearance with respect to roughly $23 million in debt service payments that were scheduled to become payable during June and July 2018.

**The principal issue associated with the Ad Hoc Group's proposal was that it required the WLB Debtors to grant a second-lien security interest on substantially all of their unencumbered assets, including 35 percent of the equity interests in WCI, to the existing holders of the WLB Senior Secured Notes and lenders under the WLB Term Loan Facility, in exchange for the consensual priming under the bridge loan facility of all liens previously held by such parties and a forbearance. In addition, the initial proposal contemplated less than favorable economics in terms of the proposed interest rate, make whole amounts, and other fees.**

Because none of the proposals provided sufficient liquidity, the WLB Debtors and their advisors determined to reach out to six additional potential third-party lenders to solicit interest in providing incremental liquidity to the WLB Debtors either in the form of a comprehensive DIP financing package or as an add-on to CIBC's initial proposal. Of those contacted, four potential lenders executed non-disclosure agreements and were offered access to diligence materials. Ultimately, none of these additional potential lenders were willing to provide financing that provided the WLB Debtors with sufficient liquidity, either on a comprehensive or incremental basis.

Concurrently with approaching additional third-party potential lenders, the WLB Debtors and Centerview continued discussions with both CIBC and the Ad Hoc Group in an effort to improve their respective proposals. The WLB Debtors and Centerview also pushed back on all significant economic and non-economic provisions of the proposed financing. These efforts culminated in a proposal by the WLB Debtors to both CIBC and the Ad Hoc Group that contemplated a combined $110 million facility, with both prepetition bridge loan and postpetition DIP financing components. The proposal included a total of $75 million in liquidity to be provided under the CIBC ABL Facility and a new $35 million term loan facility backstopped by the Ad Hoc Group. Consistent with the WLB Debtors' desire to negotiate the terms of a consensual restructuring prior to the WLB Debtors filing chapter 11 cases, the WLB Debtors sought a debt service payment forbearance with respect to the WLB Secured Term Loan Facility and WLB Senior Secured Notes and proposed to use the proceeds of the combined proposal to remain outside of chapter 11 for roughly four months to permit the parties to negotiate a comprehensive, consensual restructuring transaction.

In response to the WLB Debtors' proposal, on May 11, 2018, the Ad Hoc Group presented a revised proposal that contemplated a $110 million delayed draw bridge loan facility, with an initial draw of $90 million and an additional $20 million available on a delayed draw basis. This proposal presented a number of additional benefits to the WLB Debtors. First, while the revised proposal continued to provide for the cross-collateralization of the WLB Term Loan Facility and the WLB Secured Notes, the WLB Debtors were able to gain access to a full $110 million in financing and the benefit of time to negotiate a pre-arranged, consensual chapter 11 filing. Second, the WLB Debtors were able to use a portion of the initial proceeds to refinance in full in cash the CIBC ABL Facility and the WSJ Term Loan Facility. This allowed the WLB Debtors to release the collateral securing the CIBC ABL Facility and WSJ Term Loan Facility, and in turn use that collateral to create a more robust collateral package to secure the proposed bridge loan facility. Finally, a refinancing of the WSJ Term Loan Facility allowed the WLB Debtors to access a sizeable cash balance that was restricted under the terms of the WSJ Term Loan Facility. This in turn provided the WLB Debtors with additional liquidity that otherwise would have been unavailable to the WLB Debtors.

In response to the Ad Hoc Group's revised proposal, in an effort to preserve the CIBC relationship, the WLB Debtors requested that the Ad Hoc Group allocate $30 million in term loan commitments to CIBC and engage CIBC as the administrative agent under the facility. While the Ad Hoc Group agreed to this request, CIBC ultimately declined the opportunity to participate. In the absence of any actionable counterproposal that provided sufficient liquidity to the WLB Debtors, the WLB Debtors determined that the proposed bridge loan facility was the best feasible alternative available to the WLB Debtors. On May 21, 2018, the WLB Debtors entered into the Bridge Loan Facility.

The Bridge Loan Facility created significant runway for the WLB Debtors to engage with the Ad Hoc Group regarding a holistic, consensual restructuring proposal. These productive discussions culminated in the parties' entry into the RSA on October 9, 2018.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.    *First Day Pleadings and Other Case Matters*

On the Petition Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the WLB Debtors under chapter 11 of the Bankruptcy Code, the WLB Debtors also filed a number of first day motions and applications (collectively, the "First Day Pleadings") with the Bankruptcy Court. On October 9, 10, and 11, and November 15, 2018, the Bankruptcy Court entered orders granting interim and final relief, respectively, to, among other things: (a) prevent interruptions to the WLB Debtors' businesses; (b) ease the strain on the WLB Debtors' relationships with certain essential constituents; (c) allow the WLB Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (d) allow the WLB Debtors to have access to postpetition financing and cash collateral (each, a "First Day Order").

1.    *Administrative Motions*

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the WLB Debtors filed First Day Pleadings seeking orders authorizing the joint administration of the WLB Debtors' and WMLP Debtors' Chapter 11 Cases, and establishing certain notice, case management and administrative procedures.

2.    *Operational Relief*

The WLB Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief. The relief granted enabled the WLB Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things, orders authorizing the WLB Debtors:

- to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- to pay certain prepetition taxes and fees;

- to fulfill and honor all customer obligations the WLB Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new, and/or terminate any customer practices and incur customer obligations as the WLB Debtors deem appropriate;

- to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

- to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

- to make payment on account of prepetition Claims of certain shippers, lienholders, and 503(b)(9) claimants;

- to establish procedures to protect the WLB Debtors' Estates against the possible loss of valuable tax benefits;

- to establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances; and

- to continue making payments to their surety bond providers in accordance with their prepetition bonding arrangements with their respective state authorities.

3.  *Debtor-In-Possession Financing*

The WLB Debtors filed a motion seeking authority for the WLB Debtors to enter into a postpetition financing agreement and utilize the cash collateral of their secured lender constituents during the Chapter 11 Cases in accordance with the terms of the DIP Facility. The DIP Facility provides the WLB Debtors with $20 million in incremental liquidity.  In addition to providing the WLB Debtors with incremental liquidity, the DIP Facility provides the WLB Debtors with access to the use of the Cash Collateral on a consensual basis, and will allow the WLB Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of their WLB Debtors' Estates for the benefit of all stakeholders.  The DIP Facility also refinances the $90 million in obligations outstanding under the Bridge Loan.  The refinancing of the amounts outstanding under the Bridge Loan is a material component of, and a condition, to both the DIP Facility and RSA.

4.  *Automatic Stay*

The filing of the WLB Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the WLB Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the WLB Debtors, and both the commencement and the continuation of prepetition litigation against the WLB Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Plan Effective Date of the Plan.

B.  *Employment and Compensation of Advisors*

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed the following applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ certain advisors:  (a) on the Petition Date, the Debtors filed an application to retain Donlin, Recano & Company, Inc., as Notice and Claims Agent to the Debtors; (b) on October 22, 2018, the Debtors filed an application to retain Kirkland & Ellis LLP as counsel to the Debtors; (c) on November 8, 2018, the Debtors filed an application to retain Jackson Walker LLP as co-counsel to the Debtors; (d) on October 18, 2018, the WLB Debtors filed an application to retain Centerview as investment banker and financial advisor to the WLB Debtors; (e) on October 18, 2018, the Debtors filed an application to retain A&M as restructuring advisor to the Debtors; (f) on November 8, 2018, the Debtors filed an application to retain Venable LLP as special labor and employee benefit counsel to the Debtors and (g) on November 8, 2018, the WLB Debtors filed an application to retain McKinsey Restructuring & Transformation Services U.S., LLC ("McKinsey") for the purpose of identifying areas of performance improvement in the Debtors' mining operations (e.g., revenue drivers for each business and cost structures), and developing infrastructure to support such performance improvement initiatives to enhance the Debtors' mining operations and reduce costs.  Further, the Debtors filed motions seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.

On November 14, 2018 and November 15, 2018, the Bankruptcy Court entered orders approving the retention applications of A&M, Centerview, and Kirkland & Ellis LLP.  On November 28, 2018, the Bankruptcy Court entered orders approving the retention applications of Jackson Walker LLP and Venable LLP.

On November 29, 2018, Mar-Bow Value Partners, LLC, a creditor of the Debtors, filed an objection (the "McKinsey Objection") to the retention application of McKinsey.  The Debtors reserve all their rights with respect to the arguments raised in the McKinsey Objection.

C.     *Appointment of the Official Committee of Unsecured Creditors*

On October 18, 2018, the United States Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 206], notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently composed of the following members: Ohio Machinery Co., Wheeler Machinery Co., Nelson Brothers Mining Services, LLC, Tractor & Equipment Co., Consol Mining Company LLC, PBGC, and the UMWA. On November 19, 2018, the Committee filed an application for Morrison & Foerster LLP ("Morrison") as its legal counsel and Jefferies Group LLC ("Jefferies") and Berkeley Research Group, LLC ("Berkeley") as its investment banker and financial advisor, respectively. On November 28, 2018, the Bankruptcy Court entered an order approving the application for Morrison. On December 5, 2018, the Bankruptcy Court entered orders approving the applications for Jefferies and Berkeley.

Since the formation of the Committee, the WLB Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases, and the Committee has been an active participant in these Chapter 11 Cases. The WLB Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the WLB Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the WLB Debtors' businesses. The Committee has participated actively with the WLB Debtors' management and professional advisors in reviewing the WLB Debtors' business plans and operations.

D.     *Investigation by Official Committee of Unsecured Creditors*

Pursuant to the DIP Order, the Committee has until January 7, 2019 to commence a challenge to the prepetition liens (the "Prepetition Liens") of the Holders of First Lien Claims (the "First Lien Claimants"). Promptly after the appointment of the Committee, its advisors undertook an investigation of those liens. The lien investigation remains ongoing and the Committee believes it likely will reveal material avoidance claims. In the event such claims are identified, the Committee intends to file a motion seeking standing to prosecute those claims on behalf of the WLB Debtors' Estates. In addition, the Committee has identified several categories of assets of uncertain value that are excluded from the scope of the First Lien Claimants' Prepetition Liens and are therefore unencumbered, including certain tax attributes and interests in certain owned and leased real estate. The Committee is presently working with its advisors to quantify the value of those assets, which the Committee believes must be distributed to Holders of General Unsecured Claims under the Plan.

In addition, the Committee is investigating potential claims arising in connection with various prepetition transactions entered into by the WLB Debtors, including, but not limited to: (a) the WLB Debtors' entry into the Bridge Loan and the related granting of liens on property that was not previously collateral of the WLB Debtors' secured lenders (including 35% of the equity in of Westmoreland Canadian Investments, LP, the holding company for the WLB Debtors' Canadian business); (b) the WLB Debtors' May 2018 entry into forbearance agreements with the First Lien Claimants and the related granting of additional liens on property that was not previously collateral of the First Lien Claimants and guarantees by previously non-obligated subsidiaries; (c) various intercompany transactions among the WLB Debtors, and between the WLB Debtors on the one hand, and the WMLP Debtors on the other; (d) the 2011 acquisition of the Kemmerer mine from Chevron Mining, Inc., and subsequent contribution of that mine to the WMLP Debtors; (e) the December 2013 acquisition of the operations of Sherritt International Corporation; (f) the January 2015 acquisition of Buckingham Coal Company; (g) the January 2016 acquisition of San Juan Coal Company and San Juan Transportation Company; (h) the August 2017 disposition of two coal-fired power-generating units in Weldon, North Carolina; and (i) any other material acquisitions and dispositions by the WLB Debtors that are identified by the Committee (together, the "Prepetition Transactions").

On November 16, 2018, the Committee issued its first request for discovery pursuant to Rule 2004 to the WLB Debtors [Docket No. 525]. On November 19, 2018, the Committee issued its first request for discovery pursuant to Rule 2004 to the First Lien Claimants [Docket Nos. 552, 552]. On November 20, 2018, the Committee issued its second request for discovery pursuant to Rule 2004 to the WLB Debtors [Docket No. 563]. These discovery requests seek information connection with the Committee's prepetition lien investigation, as well as its investigation of the Prepetition Transactions. The advisors to the Committee have reviewed, and are continuing to analyze, the documents produced to date by the WLB Debtors and First Lien Claimants in response to those discovery requests.

Although its investigation regarding the Prepetition Transactions is still ongoing, the Committee has identified a number of potential avoidance actions and other claims and defenses related to the Prepetition Transactions, which are the subject of its investigation. The Committee believes that the proceeds of one or more these claims will provide a meaningful source of potential value available for distribution to holders of General Unsecured Claims. However, discovery on these claims is still in process and it is too early for the Committee to either substantiate or eliminate such claims.

---

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) DISPUTE THE COMMITTEE'S ASSERTIONS IN THIS SECTION V.D. THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) ARE NOT AWARE OF ANY UNENCUMBERED ASSETS AND DO NOT BELIEVE THERE ARE ANY VALID CAUSES OF ACTIONS IN CONNECTION WITH THE PREPETITION TRANSACTIONS. The Committee and the WLB Debtors (on behalf of themselves and their respective creditors) reserve their respective rights against one another with respect to the possible causes of action described by the Committee.**

---

E.     *Summary of Claims Process, Bar Date and Claims Filed*

On November 8, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at http://www.donlinrecano.com/westmoreland).

On November 15, 2018, the Bankruptcy Court entered the Bar Date Order, which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' Chapter 11 Cases is **December 10, 2018 at 5:00 p.m., prevailing Central Time** (the "Bar Date"); and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is **April 8, 2019, at 5:00 p.m., prevailing Central Time**. The Bar Date Notice was published in *USA Today* (national edition), *Financial Times* (global edition), and any such other local publications on November 14, 2018, and copies were served on all Holders of Claims appearing in the Debtors' Schedules of Assets and Liabilities.

The deadline for all requests for payment of Administrative Claims (other than Professional Fee Claims) that arise on or prior to January 4, 2019 shall be the Voting Deadline (the "Initial Administrative Claims Bar Date"); *provided* that with respect to any request for payment of Administrative Claims arising on or prior to January 4, 2019 submitted by Governmental Units, the deadline for all such requests shall be February 7, 2019, subject to any requests for additional time for good cause shown. With respect to any Administrative Claims (other than Professional Fee Claims) that arise after January 4, 2019, the deadline to file such requests shall be 30 days after the Plan Effective Date (the "Supplemental Administrative Claims Bar Date"). For the avoidance of doubt, solely to the extent Cure Costs are not paid on the Plan Effective Date, the counterparty to such Executory Contract and Unexpired Lease must file its Administrative Claim on or prior to the Supplemental Administrative Claims Bar Date, and such Administrative Claim shall be asserted only with respect to and in the amount of such unpaid Cure Costs. With respect to Professional Fee Claims, the deadline for all requests for payment of such claims is 30 days after the Plan Effective Date.

Notwithstanding anything to the contrary provided in the Plan or this Disclosure Statement, the WMLP Debtors shall not be required to file any requests for payment of Administrative Claims; provided that on or prior to the Initial Administrative Claims Bar Date, the WMLP Debtors shall consult with the WLB Debtors and the Required Consenting Stakeholders regarding any Administrative Claims held by the WMLP Debtors that would have otherwise been due by the Initial Administrative Claims Bar Date. Notwithstanding anything to the contrary provided in the Plan or the Cash Collateral Order, the MLP Secured Parties (as defined in the Cash Collateral Order) shall not be required to file any requests for payment of Administrative Claims (if any) arising out of the MLP Secured Obligations (as defined in the Cash Collateral Order) or the Adequate Protection Obligations (as defined in the Cash Collateral Order), but for the avoidance of doubt, the MLP Secured Parties must file any requests for payment of any other Administrative Claims pursuant to the applicable provisions of the Plan.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the WLB Debtors, their Estates, the Purchaser, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Plan Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

F.      *Exclusivity*

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause." On October 25, 2018, the WLB Debtors' filed their Plan. Without further order of the Bankruptcy Court, the WLB Debtors' exclusivity period to file a chapter 11 plan will expire on February 6, 2019, which is 120 days after the WLB Debtors filed for relief under chapter 11 of the Bankruptcy Code.

G.      *Extension of Assumption Period Under Section 365(d)(4) of the Bankruptcy Code*

On November 21, 2018, the Debtors filed a motion to extend the time period within which the Debtors must assume or reject unexpired leases of nonresidential real property by an additional 90 days, through May 7, 2019, without prejudice to the Debtors' right to seek further extensions.

H.      *Extension of Removal Period*

On November 21, 2018, the Debtors filed a motion requesting the enlargement of the period within which the Debtors may remove actions by an additional 120 days, through May 7, 2019, without prejudice to the Debtors' right to seek further extensions.

I.      *Supplemental Retention Program*

The Debtors seek to implement the Supplemental Retention Program for the purpose of retaining those non-insider employees that are essential to the Debtors' operations and maximizing the value of the Debtors' estates for the benefit of all stakeholders. The Supplemental Retention Program includes severance payments (which shall be in an amount not to exceed the sum of the applicable employee's (a) base salary and (b) the amount provided to such employee under the Non-Insider Retention Plan Order, in each case for one year on an annualized basis) to the following employees: Adam Bricker, Shane Gant, John Jutlia, Dondi Kratzenstein, Jeffrey Kukura, Elizabeth Martinez, Scott Sturm, and Donald Swartz.

J.      *Postpetition Marketing, Bidding, and Auction Process*

On October 18, 2018, the WLB Debtors filed the Bidding Procedures Motion, which, among other things established (a) dates and deadlines for the submission of bids and the auction of substantially all assets of the WLB Debtors except for any Non-Core Assets sold (or subject to a binding purchase agreement entered into) prior to the Auction, and (b) requirements for bids to be "Qualified Bids" that will be considered at the Auction. Pursuant to the order approving the Bidding Procedures Motion, the final bid deadline for the Core Assets is **January 15, 2019 at 4:00 p.m., prevailing Central Time**. On **January 22, 2019, at 10:00 a.m., prevailing Eastern Time**, the WLB Debtors will hold an auction for all or substantially all of their assets.

K.      *Section 1113 and 1114 Process*

The reduction of the WLB Debtors' legacy labor liabilities continues to be a crucial and necessary step towards the WLB Debtors' successful emergence from chapter 11. Both the DIP Order and Cash Collateral Order

contemplate the filing and obtaining of an order authorizing the Debtors to reject the Existing CBAs and modify the retiree benefits pursuant to sections 1113 and 1114 of the Bankruptcy Code, respectively, or, in the alternative, obtain approval of the settlements with the UMWA and IUOE with respect to consensual modifications to the Existing CBAs and Heritage Costs that are acceptable to the MLP Required Lenders (as defined in the Cash Collateral Order) and the DIP Lenders, as applicable. The Existing CBAs, together with the Heritage Costs, represent costly and burdensome obligations to UMWA- and IUOE-represented employees and retirees. Since as early as March 21, 2018, the WLB Debtors have discussed with various CBA Counterparties the possibility of entering into new agreements that would result in consensual modifications to their Existing CBAs and to the WLB Debtors' retiree healthcare obligations under the Existing CBAs (and together with the Heritage Costs, the "Retiree Benefits"). Specifically, prepetition, the WLB Debtors put forth four proposals over the course of five months (spanning from March 2018 through July 2018), in the hopes of coming to a consensual arrangement that would reduce the burden of the WLB Debtors' Labor Liabilities, including the OPEB obligations. In addition, post-petition, the WLB Debtors have engaged with the CBA Counterparties and have sent proposals to the UMWA and IUOE (as discussed below). Simultaneous with these negotiations, the WLB Debtors identified and/or secured hundreds of thousands of dollars in other savings, including by identifying certain unprofitable contracts for rejection or renegotiation, increasing efficiency, and selling nonstrategic assets.

Despite these best efforts, the WLB Debtors and their financial advisors concluded that, in light of the drop in coal demand and prices, increasingly adverse regulatory compliance requirements and unsustainable UMWA and IUOE wage, benefit, and retiree healthcare costs, these cost-saving measures alone would not enable the WLB Debtors to survive in the short-term or compete in the long-term. On September 6, 2018, the WLB Debtors, in anticipation of these Chapter 11 Cases, sent a letter (the "September 6 Letter") to the UMWA informing it of (i) the WLB Debtors' contemplated chapter 11 filing, (ii) the WLB Debtors' proposed modification of their obligations related to the Retiree Benefits, and (iii) the proposed medical coverage constructs that the WLB Debtors could implement to continue to provide modified coverage to those UMWA- and IUOE-represented employees and retirees. The WLB Debtors also requested that the UMWA consider representing the Coal Act retirees in the negotiations process, so as to allow the WLB Debtors to begin negotiations with the UMWA on behalf of all retirees, which in turn would provide all parties with as much time as possible to obtain a consensual resolution regarding modification of the Retiree Benefits.

The UMWA responded to the September 6 Letter with a letter on September 14, 2018 (the "September 14 Letter"), and stated that (i) any conversations related to modification of the Retiree Benefits were premature, as the WLB Debtors had not yet filed for chapter 11, and (ii) any effort to eliminate retiree health care benefits would result in the immediate halting of work at the Kemmerer mine. The UMWA did not directly respond to the WLB Debtors' request that the UMWA represent the Coal Act retirees.

On September 21, 2018, in response to the September 14 Letter, the WLB Debtors sent a letter (the "September 21 Letter") to the UMWA requesting that it reconsider its position with respect to both refraining from negotiations regarding the Retiree Benefits until the chapter 11 filing and representing the Coal Act retirees. No formal reply was ever provided by the UMWA to the WLB Debtors in response to the September 21 Letter.

On October 23, 2018, the WLB Debtors sent a letter (the "October 23 Letter") with their proposals pursuant to sections 1113 and 1114 of the Bankruptcy Code to the UMWA. The October 23 Letter contained proposals related to the CBAs for the Kemmerer mine and Beulah mine, and certain other Retiree Benefits. The October 23 Letter also requested that the UMWA provide bargaining dates as soon as possible.

Since the Petition Date, the Debtors have actively engaged with both the IUOE and the UMWA in an attempt to negotiate consensual modifications to certain Existing CBAs. The Debtors met with the IUOE on October 18, 2018, October 19, 2018, October 30, 2018, October 31, 2018, November 27, 2018, November 28, 2018, November 29, 2018, December 5, 2018, December 6, 2019, and December 7, 2018. The Debtors met with the UMWA on November 7, 2018, December 4, 2018, and December 12, 2018.

In addition to the foregoing, the Debtors sought to execute protective orders with the IUOE and UMWA in order to facilitate the provision of data and documents, worked to respond to multiple requests for documents, and have exchanged additional proposals with both unions regarding potential CBA modifications. The Debtors' negotiation and document production efforts are ongoing.

On October 23, 2018, the UMWA Combined Benefit Fund, and the United Mine Workers of America 1992 Benefit Plan (the "1992 Plan," and together with the UMWA Combined Benefit Fund, the "Coal Act Funds") filed an objection to the motion for entry of the DIP Order.  On October 25, 2018, the UMWA filed an objection to the motion for entry of the final DIP Order.  On November 6, 2018, the UMWA filed an objection to the motion for entry of the Bar Date Order.  On November 15, 2018, the Bankruptcy Court overruled the Coal Act Funds' objection and the UMWA's objection to the final DIP Order.  In addition, following a series of discussions and agreement between the UMWA and the Debtors regarding the providing of additional notice and communication to the UMWA employees and retirees regarding the Bar Date and describing such employees' and retirees' rights to file a claim in the chapter 11 cases, the Bankruptcy Court also entered the Bar Date Order.

On October 23, 2018, the Coal Act Funds filed a motion seeking appointment of an official retiree committee pursuant to section 1114(b) of the Bankruptcy Code, and initiated an adversary proceeding against all of the Debtors seeking a declaratory judgment from the Bankruptcy Court declaring that Debtors' Coal Act obligations are not subject to modification or elimination under section 1114 of the Bankruptcy Code.  On November 16, 2018, the Bankruptcy Court entered an order directing the appointment of a committee of retired persons solely to represent those employees covered by the Coal Act pursuant to section 1114(b) of the Bankruptcy Code.  To date, the membership of any retiree committee has not yet been identified.

On November 12, 2018, the Debtors filed a motion for judgement on the pleadings in response to the adversary proceeding, arguing that it is settled law that the Bankruptcy Code allows a bankruptcy court to modify a debtor's Coal Act obligations under section 1114 of the Bankruptcy Code when the specified prerequisites are met, and allows a debtor to sell assets free and clear of Coal Act liabilities under section 363 of the Bankruptcy Code.

The WMLP Debtors assert that:

> The WMLP Debtors are not jointly or severally liable for any liabilities related to the Coal Act Funds.  On November 27, 2018, the Coal Act Funds filed a response to the Debtors' motion for judgment on the pleadings.  In support of their response, a declaration was filed by Dale R. Stover, the Director of Finance and General Services of the UMWA Health and Retirement Funds (the "Stover Declaration"), which states with specificity the Debtors who are liable for the premiums under the Coal Act.  According to the Stover Declaration, the Debtors liable for obligations and amounts owed to the Coal Act Funds include, but may not be limited to, Westmoreland Coal Company, Westmoreland Resources, Inc., Westmoreland Energy, LLC, and Westmoreland Coal Sales Company, Inc.  The Stover Declaration, however, makes clear that the WMLP Debtors are not jointly or severally liable for any liabilities related to the Coal Act Funds.

On November 29, 2018, the Bankruptcy Court took under advisement the competing motions for judgment on the pleadings filed by the Debtors and the Coal Act Funds in relation to the Coal Act Funds' adversary complaint, and requested that the parties to confer on whether they can agree to support certification for direct appeal to the Fifth Circuit Court of Appeals once the Bankruptcy Court issues its decision.  On December 5, 2018, the parties notified the Bankruptcy Court that they are in agreement that any decision of the Bankruptcy Court in relation to the Coal Act Funds' adversary complaint may be certified for direct appeal to the U.S. Court of Appeals for the Fifth Circuit.  As of the date hereof, the Bankruptcy Court has not issued any decision on the motions for judgment on the pleadings.

## ARTICLE VI.
## SUMMARY OF THE PLAN

**THIS ARTICLE VI IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS ARTICLE VI AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

The Plan provides for the sale of all or substantially all of the WLB Debtors' assets through the Sale Transaction. The key terms of the Plan are as follows:

A.     *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the WLB Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.     *Proposed Creditor Recoveries*

The Plan proposes to fund creditor recoveries from Cash on hand, the Purchaser Stock, debt issued or assumed by the Purchaser or any of its subsidiaries, the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan. As set forth in more detail in **Article IV.D** below, following an extensive prepetition financing process and series of negotiations with the Consenting Stakeholders, on October 9, 2018, the WLB Debtors and the Consenting Stakeholders executed the RSA, which contemplates the Sale Transaction. Although the WLB Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the WLB Debtors' assets are submitted in accordance with the Bidding Procedures, the Stalking Horse Purchase Agreement, represents a floor bid for the sale of the WLB Debtors' assets. The WLB Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the WLB Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the Plan Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code);

- Other Secured Claims will be treated in such a manner that they are Unimpaired;

- DIP Facility Claims will either:

  - (i) if the Stalking Horse Purchaser is the Successful Bidder, be assumed by the Successful Bidder on the Plan Effective Date; or

  - (ii) if the Stalking Horse Purchaser is not the Successful Bidder, each DIP Facility Claim shall be paid in full in Cash on the Plan Effective Date.

- Holders of First Lien Secured Claims will receive either:

  - (i) in the event the Stalking Horse Purchaser is the Successful Bidder, their *pro rata* share, based on the Allowed amount of their Credit Agreement Claims or First Lien Notes Claims, as applicable, of (x) the Purchaser Stock and (if applicable) all debt issued or assumed (excluding any amounts assumed related to the DIP Facility) by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all other proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims and are not Transferred Assets (such non-Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors); or

  - (ii) in the event the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not consummated, payment in full in Cash on the Plan Effective Date.

- Holders of General Unsecured Claims, **including First Lien Deficiency Claims**, against each of the WLB Debtors will receive their *pro rata* share of the General Unsecured Claims Amount (*provided* that no distribution shall be made on account of a General Unsecured Claim if the amount of that distribution is less than $1,000); and

- existing Interests in the WLB Debtors will be cancelled without any distribution to the Holders of such Interests.

**It is currently expected that each Holder of a General Unsecured Claim is likely to receive no distribution under the Plan because the WLB Debtors do not anticipate there will be any unencumbered assets available to fund the General Unsecured Claims Amount. It is possible that prior to the Confirmation Hearing, the WLB Debtors may amend the Plan, and that such amendment may increase the General Unsecured Claims Amount. In such a scenario, the WLB Debtors will not resolicit votes on the Plan because such an amendment would not adversely change the treatment of General Unsecured Claims, as it would increase the value distributable to Holders of Allowed General Unsecured Claims.**

The WLB Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) to vote to accept the Plan.

C.     *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the WLB Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Restructuring Support Agreement dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders

(as may be modified, amended, or supplemented from time to time in accordance with the terms thereof, the "RSA").[16] and the Plan.  Generally, the Sale Transaction contemplates that:

(a)     the WLB Debtors shall, among other things, transfer the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets and all Transferred Causes of Action held by the WLB Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) pursuant to sections 363, 365, and/or and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)     the Purchaser shall issue, or cause to be issued, the Purchaser Stock for eventual distribution to the Holders of Allowed First Lien Secured Claims (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), as applicable;

(c)     Cash proceeds (if any) of any Non-Core Asset Sale that are received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan; and

(d)     the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

The Core Assets are generally comprised of the following assets and interests:

(a)     100 percent of the equity interests in the Entities comprising the Company's Canadian business;

(b)     the assets, business, and operation of the San Juan mine;

(c)     the assets, business, and operation of the Rosebud "Colstrip" mine;

(d)     the assets, business, and operation of the Absaloka mine;

(e)      the assets, business, and operation of the Haystack mine;

(f)     certain contracts, leases, and other rights and other written obligations of the San Juan, Absaloka, Haystack, and Rosebud "Colstrip"  mines; and

(g)     certain assets related to the overhead function of the aforementioned mines and businesses.

The Non-Core Assets are generally comprised of the following assets:

---

[16]     A copy of the RSA is attached as Exhibit C hereto.

    (a)       the assets, business, and operation of the Beulah mine;

    (b)       the assets, business, and operation of the Buckingham mine;

    (c)       the assets, business, and operation of the Jewett mine;

    (d)       the assets, business, and operation of the Savage mine; and

    (e)       the contracts, leases and other written obligations of the aforementioned mines.

For the avoidance of doubt, any Successful Bidder for all of the Core Assets, including the Stalking Horse Bidder, shall take all Non-Core Assets that remain unpurchased as of the Plan Effective Date. In addition to the Core Assets and any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale, the Transferred Assets include any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date, other than (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan. An Avoidance Action is related to a Core Asset or Non-Core Asset if the challenged transfer was made by or to the WLB Debtor that sold such Core Asset or Non-Core Asset; *provided*, however, that the Plan Supplement shall include schedules of (x) all Transferred Causes of Action and (y) all Retained Causes of Action.

A further description of the Core Assets, Non-Core Assets, Causes of Action, and their respective dispositions pursuant to the Sale Transaction can be found in the Stalking Horse Asset Purchase Agreement, attached hereto as **Exhibit B**.

D.    *Restructuring Transactions*

On the Plan Effective Date or as soon as reasonably practicable thereafter, the WLB Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions"), including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the Purchaser's adoption of the terms and conditions of the distribution of the EIP Pool; (6) issuance of the Purchaser Stock and any debt issued or assumed by the Purchaser, each as set forth in the Plan and consistent with the Description of Transaction Steps; (7) any transaction described in the Description of Transaction Steps; and (8) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation. To the extent the Description of Transaction Steps conflicts with the Plan itself, the Plan controls.

E.    *EIP Pool*

The EIP Pool is a pool of stock-based awards, in the form of options, appreciation rights, profit interests, or similar securities, as applicable, representing between 5 and 10 percent of the aggregate amount of Purchaser Stock, determined on a fully diluted and fully distributed basis, which will be reserved for distribution to certain participating employees of the Purchaser pursuant to the Employee Incentive Plan. Following the Plan Effective Date, the initial board of directors of the Purchaser shall, in its sole discretion, adopt and implement the Employee Incentive Plan, which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

F.      *The Plan Administrator*

On and after the Plan Effective Date, the Plan Administrator shall act for the WLB Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the WLB Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the WLB Debtors, and shall succeed to the powers of the WLB Debtors' managers, directors, and officers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the WLB Debtors' Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

Among other things, the Plan Administrator shall be responsible for:  (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount and the General Unsecured Claims Amount; (3) making distributions from the Wind-Down Amount and the General Unsecured Claims Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the WLB Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the WLB Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the WLB Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the WLB Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator's post-Plan Effective Date compensation shall be set forth in the Plan Supplement and paid by the WLB Debtors.  The Plan Administrator has not yet been selected, and shall be disclosed in the Plan Supplement.  The WLB Debtors and the Required Consenting Stakeholders shall, in consultation with the Committee, select the Plan Administrator.

**THE COMMITTEE BELIEVES THAT, ONCE IT HAS COMPLETED ITS INVESTIGATION, IT WILL BE ABLE TO DEMONSTRATE THAT THE PLAN FAILS TO PROVIDE HOLDERS OF GENERAL UNSECURED CLAIMS WITH THE DISTRIBUTIONS TO WHICH THEY ARE LEGALLY ENTITLED. If the Committee succeeds in obtaining a meaningful recovery for Holders of General Unsecured Claims, then the Committee believes that it should have additional oversight over the activities of the Plan Administrator to ensure that the rights of Holders of General Unsecured Claims are not prejudiced in connection with the administration of the Plan.**

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) DISPUTE THE PRECEDING PARAGRAPH.  The Committee and the WLB Debtors (on behalf of themselves and their respective creditors) reserve their respective rights against one another with respect to the Committee's proposed oversight over the Plan Administrator.**

G.      *The Liquidating Trust*

On the Post-Closing Reconciliation Date or an earlier date, the Liquidating Trust will be formed to implement the Wind-Down, including the liquidation of the Liquidating Trust Assets, for the period after the creation of the Liquidating Trust.  The Liquidating Trust will be funded through the Wind-Down Amount, and it is not currently anticipated that there shall be any surcharge of the General Unsecured Claims Amount to fund the costs and expenses of the Liquidating Trust or the trustee of the Liquidating Trust.  All remaining liabilities and obligations of the WLB

Debtors not assumed by the Purchaser or discharged by the Plan shall be transferred to the Liquidating Trust and funded by the Wind-Down Amount.

The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the WLB Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor in interest to the WLB Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed First Lien Secured Claims on a *pro rata* basis as set forth in the Liquidating Trust Agreement.

The Plan Administrator shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the WLB Debtors and the Plan Administrator as set forth in the Plan and applicable non-bankruptcy law, and the Plan Administrator shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement. On and after the Post-Closing Reconciliation Date or the earlier date on which the Liquidating Trust is formed, all references to the WLB Debtors in the Plan shall be deemed references to the Liquidating Trust, and all references to the Plan Administrator shall be deemed references to the Plan Administrator in his role as trustee of the Liquidating Trust (except for references to the WLB Debtors or the Plan Administrator in Article IV.R of the Plan).

**THE COMMITTEE BELIEVES THAT, ONCE IT HAS COMPLETED ITS INVESTIGATION, IT WILL BE ABLE TO DEMONSTRATE THAT THE PLAN FAILS TO PROVIDE HOLDERS OF GENERAL UNSECURED CLAIMS WITH THE DISTRIBUTIONS TO WHICH THEY ARE LEGALLY ENTITLED. If the Committee succeeds in obtaining a meaningful recovery for Holders of General Unsecured Claims, then the Committee believes that the Plan should be amended to require that the trustee of the Liquidating Trust (which will be working for the benefit of Holders of General Unsecured Claims) be selected by the Committee.**

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) DISPUTE THE PRECEDING PARAGRAPH. The WLB Debtors (on behalf of themselves and their respective creditors) reserve their respective and exclusive rights with respect to the selection of the trustee of the Liquidating Trust.**

H.    *The Post-Closing Reconciliation Date*

On the Post-Closing Reconciliation Date or an earlier date, (i) certain remaining Claims shall automatically be canceled, released, and extinguished, and will be of no further force or effect, and (ii) the Liquidating Trust Assets shall automatically be transferred to the Liquidating Trust, in each case without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, however, that for the avoidance of doubt, neither the WCC Interests nor the WMLP Interests shall be transferred to the Liquidating Trust. On the Post-Closing Reconciliation Date, the WCC Interests and the WMLP Interests shall automatically be canceled, released, and extinguished, and will be of no further force or effect without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Until the occurrence of the Post-Closing Reconciliation Date, Westmoreland Coal Company shall retain its rights, powers, and duties as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code, to the fullest extent necessary to implement the foregoing cancellation of the WCC Interests and treatment of certain remaining Claims, as more fully set forth in the Description of Transaction Steps.

I.    *Corporate Action*

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the WLB Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the WLB Debtors, the Plan Administrator, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the WLB Debtors, including the creation of the Purchaser, the consummation of the Sale Transaction, and the issuance of Purchaser Stock in accordance with the Plan and the Sale Transaction Documentation, and any corporate action required by the WLB Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the WLB Debtors or the WLB Debtors' Estates; *provided*, however, that for the avoidance of doubt, the Purchaser may be formed by a person or entity other than the WLB Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the WLB Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation. The directors, managers, and officers of the WLB Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion to implement the provisions of Article IV.K of the Plan.

J.    *Recoveries to Certain Holders of Claims and Interests*

The recoveries to holders of Claims and Interests are described in **Article IV.D** of this Disclosure Statement, entitled "What will I receive from the WLB Debtors if the Plan is consummated?"

K.    *Release, Injunction, and Related Provisions*

The Plan contains certain releases, as described in **Article II.K** of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

The Plan provides that all holders of Claims that (i) vote to accept the Plan, (ii) abstain from voting on the Plan and do not opt out of the releases in Article IX of the Plan, (iii) vote to reject the Plan and do not opt out of the releases in Article IX of the Plan, (iv) are presumed to accept and do not opt out of the releases in the Article IX of the Plan, or (v) are deemed to reject and who do not opt out of the releases in the Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the WLB Debtor Releases and the Third Party Releases. Each such holder will receive notice and a release form with which such holder shall have the opportunity to opt out of being a Releasing Party.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not opt out to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX.C of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the WLB Debtors and the Released Parties. By opting out of the releases set forth in Article IX.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article IX.C of the Plan if you otherwise would be a Released Party thereunder. The releases are an integral element of the Plan.**

Following the Voting Deadline, the WLB Debtors shall file a report (the "Release Report") listing the names of all parties who opted out of the releases. To the extent there is any ambiguity with respect to whether a Holder of a Claim and/or Interest has opted out of the releases, the WLB Debtors shall make note of this ambiguity in the Release Report and the status of resolution with respect thereto.

**The Committee believes that many of the releases and exculpations provided by the Plan are impermissible and unconfirmable. The Committee intends to object to the approval of those releases and exculpations at the Confirmation Hearing.**

The SEC believes that many of the releases and exculpations provided by the Plan are impermissible and unconfirmable.  Specifically, the SEC objects to the Third Party Releases because its position is that such releases fail to meet two requirements for a non-debtor third party release: (1) separate and valuable consideration from each Released Party; and, (2) affirmative consent by each Releasing Party.

It is the WLB Debtors' position that the consideration for the Third Party Releases and the mechanism by which Holders of Claims and Interests who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent with recent chapter 11 cases.  First, the consideration for the Third Party Releases is the mutual releases provided by Released Parties to all other Released Parties.  For example, public investors or shareholders who consent to the Third Party Releases would be released from any potential claims or causes of action that arose in connection with the events leading up to the WLB Debtors' chapter 11 cases.  The WLB Debtors do not currently believe that the claims being released against or by investors or shareholders have any value.  Second, all impaired Holders of Claims and Interests, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package (as defined herein) which will include materials allowing such holders to affirmatively consent to the Third Party Releases by choosing not to opt out via a form that can either be mailed, emailed, or hand-delivered to the Debtors' Notice and Claims Agent.  The opt-out mechanism and the consideration for the Third Party Releases is consistent with recent chapter 11 plans confirmed in the Southern District of Texas.  *See, e.g.*, *In re Cobalt Energy, Inc.*, No. 17-36709 (MI) (S.D. Tex. April 5, 2018); *GenOn Energy, Inc.*, No. 17-33695 (DRJ) (S.D. Tex. Dec. 12, 2017); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016); *In re Goodrich Petroleum Corp.*, No. 16-31974 (MI) (Bankr. S.D. Tex. Sept. 28, 2016); *In re SandRidge Energy*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016).

The release, exculpation, injunction, and discharge provisions that are contained in <u>Article IX</u> of the Plan are copied in pertinent part below.

1. *Release of Liens*

Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than the mortgages, deeds of trust, Liens, pledges or other security interests in place or to be issued for the DIP Facility if assumed by the Purchaser) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the WLB Debtors and their successors and assigns or (ii) the Purchaser (and if applicable, any third party purchasing the Non-Core Assets), in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the WLB Debtors.  In addition, the First Lien Notes Trustee and Credit Agreement Agent shall execute and deliver all documents reasonably requested by the WLB Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the WLB Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

2. *Releases by the WLB Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the WLB Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the WLB Debtors, that the WLB Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a WLB Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' capital structure, the assertion or enforcement of rights and remedies against the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or

any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the WLB Debtors and after notice and opportunity for hearing; and (6) a bar to any of the WLB Debtors asserting any claim released by the releases herein against any of the Released Parties.

3.  *Releases by Holders of Claims and Interests*

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and

reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

4. *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

5. *Injunction*

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the WLB Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

6. *The Definitions of "Released Parties" and "Releasing Parties"*

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current

and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such:  (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (ii) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

7.  *Discharge*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including Black Lung Claims and any Intercompany Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the WLB Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the WLB Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

**THE U.S. TRUSTEE BELIEVES THAT THE PLAN'S PROPOSED DISCHARGE IS INCONSISTENT WITH THE REQUIREMENTS OF SECTION 1141(D)(3) OF THE BANKRUPTCY CODE AND APPLICABLE LAW.**

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR CREDITORS) DISPUTE THE PRECEDING STATEMENT.  All parties' rights are reserved with respect to the proposed discharge under the Plan.**

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

L.    *Insurance Policies*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, the Sale Transaction Documentation, the Sale Transaction Term Sheet, the Non-Core Asset Sale Documents, any bar date notice or claim objection, or any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (i) all Chubb/WLB D&O Policies shall be assumed in their entirety by the WLB Debtors, and the WLB Debtors shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the WLB Debtors under such Chubb/WLB D&O Policies, without the need or requirement for the Chubb Companies to file a Proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of or permit or otherwise effect a sale, an assignment or any other transfer of the Chubb Insurance Contracts  and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Chubb Insurance Contracts without the express written consent of the Chubb Companies; and (iii) on the Plan Effective Date, the WLB/Chubb Contracts shall (a) be transferred to the Purchaser if the WLB Debtors, the Purchaser and the Chubb Companies agree to such assignment in writing through the execution of an assumption and assignment agreement by and between the WLB Debtors, the Purchaser, and the Chubb Companies, in form and substance satisfactory to each of the parties, which may provide, among other things, that the WLB Debtors are authorized to assume and assign the WLB/Chubb Contracts to the Purchaser, in which case the Purchaser shall assume and shall be liable for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under the relevant WLB/Chubb Contracts being assumed (for the avoidance of doubt, all rights and defenses are preserved regarding whether the WLB Debtors can assume and assign the WLB/Chubb Contracts); or (b) be assumed or rejected by the WLB Debtors in accordance with the applicable provisions of the Plan (for the avoidance of doubt, all rights and defenses are preserved for the Chubb Companies to contest such assumption or rejection); *provided*, however, to the extent the WLB Debtors assume such WLB/Chubb Contracts the WLB Debtors shall assume the WLB/Chubb Contracts in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code, and the WLB Debtors shall remain liable for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such WLB/Chubb Contracts without the need or requirement for the Chubb Companies to file a Proof of Claim, Administrative Claim or objection to any cure amount

## ARTICLE VII.
## VOTING AND CONFIRMATION

On December [18], 2018, the Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.    *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 3 | First Lien Secured Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the WLB Debtors, or the Notice and Claims Agent on behalf of the WLB Debtors, otherwise provide to you.

B.    *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.    *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the WLB Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the WLB Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the WLB Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.    *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Reject) |
| 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

E.     *Solicitation Procedures*

       1.     *Notice and Claims Agent*

       The WLB Debtors retained Donlin Recano & Company, Inc. ("Donlin Recano") to act, among other things, as the notice and claims agent (the "Notice and Claims Agent") in connection with the solicitation of votes to accept or reject the Plan.

       2.     *Solicitation Package*

       Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of **December 13, 2018** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, or appropriate notices and applicable release forms for those parties that are not entitled to vote on the Plan, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

       3.     *Distribution of the Solicitation Package and Plan Supplement*

       The WLB Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before **the date that is five (5) business days after entry of the Disclosure Statement Order**, which will be at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m., prevailing Central Time on January 25, 2019).

       The Solicitation Package (except for the Ballots) may also be obtained: (a) from Donlin Recano by (i) visiting http://www.donlinrecano.com/westmoreland;  (ii) writing to Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; or (b) for a fee via PACER at https://ecf.txsb.uscourts.gov.

       At least 7 days prior to the Voting Deadline, the WLB Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at http://www.donlinrecano.com/westmoreland.  The WLB Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Donlin Recano by (i) calling the Debtors' restructuring hotline at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International); (ii) visiting the Debtors' restructuring website at:  http://www.donlinrecano.com/westmoreland; (iii) writing to Donlin, Recano &

Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; or (b) for a fee via PACER at https://ecf.txsb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice.  The WLB Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.      *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3 or 4—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided.  If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all of the WLB Debtors' solicitation and voting procedures shall apply to all of the WLB Debtors' creditors and other parties in interest.

1.      *Voting Deadline*

The Voting Deadline is **January 25, 2019, at 4:00 p.m., prevailing Central Time**.  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

2.      *Voting Instructions*

As described above, the Debtors have retained Donlin Recano to serve as the Notice and Claims Agent for purposes of the Plan.  Donlin Recano is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** | |
|---|---|
| To be counted, all Ballots must be **actually received** by Donlin Recano by the Voting Deadline, which is **January 25, 2019, at 4:00 p.m., prevailing Central Time**, at the following address: | |
| **If by First Class Mail, Ballots must be sent to:** | **If by Hand Delivery or Overnight Mail, Ballots must be sent to:** |
| Donlin, Recano & Company, Inc. **Re: Westmoreland Coal Company, et al.** Attn: Voting Department PO Box 192016 Blythebourne Station Brooklyn, NY 11219 | Donlin, Recano & Company, Inc. **Re: Westmoreland Coal Company, et al.** Attn: Voting Department 6201 15th Ave Brooklyn, NY 11219 |
| **If by Email, scanned Ballots must be sent to:** | |
| WestmorelandVote@donlinrecano.com | |

47

> If you have any questions on the procedure for voting on the Plan, please call the
> Debtors' restructuring hotline maintained by Donlin Recano at:
> (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International).

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually received** by Donlin Recano no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the WLB Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.     *Ballots Not Counted*

No Ballot will be counted if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the WLB Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

G.     *Confirmation Objection Deadline*

Parties must object to Confirmation of the Plan by **January 25, 2019, at 4:00 p.m., prevailing Central Time** (the "Confirmation Objection Deadline"). All objections to the Plan must be filed with the Bankruptcy Court and served on the WLB Debtors and certain other parties in interest so that they are **actually received** on or before the Confirmation Objection Deadline.

H.     *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for **February 13, 2019, at 10:00 a.m., prevailing Central Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures. Any objection to the Plan must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth in this Disclosure Statement no later than the Confirmation Objection Deadline. Unless an objection to the Plan is timely served and

48

filed, it may not be considered by the Bankruptcy Court.

I.       *Confirmation Standards*

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The WLB Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the WLB Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The WLB Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the WLB Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the WLB Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The WLB Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

1.   *Best Interests of Creditors Test—Liquidation Analysis*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Plan Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Plan Effective Date, at least equal to the value of the recovery that each such Class member would receive if the WLB Debtors were liquidated under chapter 7 beginning on the Plan Effective Date.

The WLB Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the WLB Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the WLB Debtors' remaining assets.  Although a chapter 7 liquidation would achieve the same goal, the WLB Debtors believe that the Plan provides a greater recovery to holders of First Lien Secured Claims and Allowed General Unsecured Claims than would a chapter 7 liquidation.  Liquidating the WLB Debtors' Estates under the Plan likely provides holders of First Lien Secured Claims and Allowed General Unsecured Claims with a larger, more timely recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Plan Effective Date would provide less recovery for creditors than the Plan.  The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the WLB Debtors' business (or the Company) that the WLB Debtors had when they proposed to sell their assets pursuant to the Plan.  Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly technical nature of the WLB Debtors' assets and the time delay associated with the chapter 7 trustee's learning curve for these assets.  In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the WLB Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the WLB Debtors' Estates.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the WLB Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the WLB Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.  Moreover, the conversion to chapter 7 would also require

50

entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7.  See Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the WLB Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the WLB Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the WLB Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2.   *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring.  The Plan provides for the sale of the WLB Debtors' businesses.  Accordingly, the WLB Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the WLB Debtors.

J.   *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.  Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.  Holders of Claims in Classes 5 and 6 will be deemed either impaired or unimpaired, and Claims and Interests in Classes 7 and 8 will receive no distribution under the Plan and are, therefore, presumed deemed to have rejected the Plan.

Claims in Classes 3 and 4 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below.  As stated above, Classes of Claims will have accepted the Plan if the Plan is

51

accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.     *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the WLB Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the WLB Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.     *No Unfair Discrimination*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The WLB Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The WLB Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2.     *Fair and Equitable Test*

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the WLB Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a)     *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Plan Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)     *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either:  (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the Plan Effective Date of the plan, equal to the allowed amount of such claim;

or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

        (c)     *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either: (i) each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Plan Effective Date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive or retain any property under the plan on account of such junior interest.

## ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the WLB Debtors' business or the Plan and its implementation.

A.     *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.*

    1.    *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the WLB Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

---

    2.    *Asset Retirement Obligations of the WMLP Debtors.*

**THE CONFLICTS COMMITTEE OF WMGP AND THE SECURED LENDERS TO THE WMLP DEBTORS ASSERT THE FOLLOWING:**

**The WLB Debtors' asset retirement obligations and liabilities of approximately $474.5 million includes roughly $46 million related to the WMLP Debtors' mines (the "WMLP ARO") for which WLB is jointly and severally liable under SMCRA and its state analogues  SMCRA and related state statutes impose liability on mine "operators" and provide that an operator is jointly and severally liable with the permittee and any other operator of a given mine for obligations arising thereunder. WLB operates the WMLP Debtors' mines, and thus is jointly and severally liable for the WMLP ARO. In the absence of a consensual resolution of the WMLP ARO in connection with the Chapter 11 Cases, the obligation to pay a portion or the entirety of the WMLP ARO may constitute Administrative Claims against the WLB estates that would need to be paid in full in order for the Plan to be confirmed.**

**THE WLB DEBTORS (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE CREDITORS) DISPUTE THE ABOVE STATEMENT. The WMLP estates (on behalf of themselves and their respective creditors) and the WLB Debtors (on behalf of themselves and their respective creditors) reserve their respective rights against one another with respect to the WMLP ARO. To the extent the parties engage in litigation with respect to this issue, it may increase the administrative expenses of the WLB Debtors, thereby reducing recoveries to all creditors.**

---

3. *Failure to Modify Obligations under the Existing CBAs and Retiree Benefits.*

To the extent that the WLB Debtors are unable to obtain the requested relief under section 1113 and 1114 of the Bankruptcy Code, or obtain a consensual resolution regarding the modification of the Existing CBAs and the Retiree Benefits, the WLB Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the WLB Debtors' ability to confirm and consummate the Plan.

4. *Employee Attrition*

There can be no guarantee that the WLB Debtors will be able to retain their leadership through the pendency of these chapter 11 cases, which in turn could negatively affect the WLB Debtors' business operations. For example, both Gary A. Kohn and Sheldon N. de Jager submitted resignations from their respective positions with Westmoreland Coal Company effective January 4, 2019 and January 11, 2019, respectively.

5. *The WLB Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the WLB Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the WLB Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the WLB Debtors' ability to confirm and consummate the Plan.

6. *If the Funded Liability Cap or Other Payment Thresholds in the Sale Transaction are Exceeded, the Plan May Not Be Confirmed.*

The Sale Transaction Documentation shall include the amount of the Funded Liability Cap, the Wind-Down Amount, the Wind-Down Budget and certain other payment thresholds relating to the liabilities that shall be assumed or paid by the Purchaser. To the extent it appears that the Funded Liability Cap, the Wind-Down Amount, the Wind-Down Budget or other payment thresholds may be exceeded, the WLB Debtors and/or the Purchaser may determine not to proceed with the Plan or the Sale Transaction, and parties may terminate their support, financial or otherwise, for the Plan.

7. *The WLB Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The WLB Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the WLB Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the WLB Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a *pro rata* basis, the WLB Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

8. *The WLB Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

Although the WLB Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the WLB Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the WLB Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

9. *Certain Tax Implications of the WLB Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review **Article IX** of this Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the Chapter 11 Cases.

B.     *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

1. *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The WLB Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the WLB Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the WLB Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2. *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the WLB Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the WLB Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3. *The WLB Debtors May Not Be Able to Secure Confirmation of the Plan.*

The WLB Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  According to the Plan, there are various documents that must be in form and substance acceptable to the WLB Debtors, the Required Consenting Stakeholders, and/or the Purchaser, and there are certain funding amounts that must also be agreed to by these parties prior to Confirmation.  If agreement cannot be reached on these documents or these funding amounts, Confirmation of the Plan may not occur.  Further, if the requisite acceptances are not received, the WLB Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the WLB Debtors, or otherwise, that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no

assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the WLB Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The WLB Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.   *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5.   *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The WLB Debtors believe that the Plan satisfies these requirements and the WLB Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6.   *Risk of Non-Occurrence of the Plan Effective Date.*

Although the WLB Debtors believe that the Plan Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Plan Effective Date will, in fact, occur.

7.   *Compliance with the DIP Facility.*

The DIP Facility is scheduled to mature on May 21, 2019 (the "DIP Maturity Date"). There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the WLB Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the WLB Debtors' liquidity and earnings. There can be no assurance that the WLB Debtors will be able to comply with these covenants. If the WLB Debtors fail to comply with such covenants and terms, the WLB Debtors would be required to obtain waivers or forbearance from the lenders under the DIP Facility and, if such waivers or forbearance are not obtained, there could be a material adverse effect on the WLB Debtors' financial condition and the WLB Debtors may not be able to consummate the Plan.

8. *Applicable Securities Laws May Restrict Issuance of or Distribution of the Purchaser Stock.*

The Plan provides that, to the maximum extent allowable, to the extent the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser in connection with the Sale Transaction Documentation will be issued pursuant to and subject to the exemption from registration set forth in section 1145 of the Bankruptcy Code and will therefore be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities. The exemption does not apply to a Holder that is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

These Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemptions provided by sections 1145(b)(1) and 1145(c) of the Bankruptcy Code, unless the Holder is an "affiliate" of the Purchaser within the meaning of Rule 144 under the Securities Act.

In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. To the extent any Entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.

9. *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

10. *The WLB Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Professional Compensation Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

11. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article IX of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

12. *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the WLB Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the WLB Debtors from consummating the Plan. For example, the Stalking Horse Bidder (or other successful Purchaser) must be able to provide approximately $400 million in financial assurance to support the transfer of the WLB Debtors' mining permits to the Purchaser. Any purchaser of the WLB Debtors' mining operations will be required to provide significant information and appropriate collateral to the third-party sureties in order to obtain required financial assurance in order to operate the WLB Debtors' respective mining operations in accordance with applicable state environmental and reclamation requirements.

A failure to satisfy any of the closing conditions of the Sale Transaction may prevent the Sale Transaction from being consummated, which may lead to the Chapter 11 Cases being converted to cases under chapter 7 or dismissed.

C.     *Risk Factors Relating to Purchaser Stock Issued Under the Plan.*

1.     *Purchaser Stock May Lack Liquidity*

There is currently no market for the Purchaser Stock, and such a market may not develop because, among other things, Purchaser is under no obligation to list any of its securities on any national exchange.  Therefore, there can be no assurance as to the liquidity of the Purchaser Stock at any time after the Plan Effective Date.  If an active trading market does not develop or is not sustained, holders of the Purchaser Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value depending upon many factors including, without limitation, general market or economic conditions, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Purchaser.  Accordingly, holders of the Purchaser Stock may bear certain risks associated with holding securities for an indefinite period of time.

2.     *Dilution*

Future equity financings or other equity issuances by Purchaser could also have a dilutive effect on and adversely affect the value of the Purchaser Stock issued to the holders of First Lien Secured Claims on the Plan Effective Date.  The amount and dilutive effect of the foregoing could be material.

3.     *The Trading Price for the Shares of Purchaser Stock May Be Depressed Following the Plan Effective Date.*

Assuming that the Plan Effective Date occurs, shares of Purchaser Stock will be issued to Holders of certain Classes of Claims if the Stalking Horse Purchaser is the Successful Bidder. Following the Plan Effective Date, shares of Purchaser Stock may be sold to satisfy withholding tax requirements. In addition, Holders of Claims that receive shares of Purchaser Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of Purchaser Stock available for trading could cause the trading price for the shares of Purchaser Stock to be depressed, particularly in the absence of an established trading market for the Purchaser Stock.

4.     *Certain Holders of Purchaser Stock May Be Restricted in their Ability to Transfer or Sell their Securities*

To the extent that shares of the Purchaser Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act or applicable state securities laws.  Resales by holders of Claims who receive Purchaser Stock pursuant to the Plan that are deemed to be "underwriters," as defined in section 1145(b) of the Bankruptcy Code,  including holders who are deemed to be "affiliates" of the Purchaser within the meaning of Rule 144 under the Securities Act, would only be permitted without registration if they are able to comply with an exemption from registration under applicable federal and state securities laws, including Rule 144 under the Securities Act.  The Purchaser Stock may not initially be registered under the Securities Act or any state securities laws, and the WLB Debtors make no representation regarding the right of any holder of Purchaser Stock to freely resell the Purchaser Stock.  *See* **Article X** to this Disclosure Statement, entitled "Certain Securities Law Matters."

5.     *Restricted Securities Issued Pursuant to the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies*

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, including shares issued to holders who may be deemed "underwriters" within the meaning of Section 1145(b) of the Bankruptcy Code, such securities will be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act and applicable state

securities laws.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act and applicable state securities laws, including Rule 144 under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  While the WLB Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of restricted securities will qualify for an exemption from registration under Rule 144.  In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Under applicable SEC guidance, securities issued under the Plan to holders who are deemed to be "affiliates" of the Purchaser, within the meaning of Rule 144 under the Securities Act, will also be subject to resale restrictions under the Securities Act, but will not be deemed to be "restricted securities."  Resale restrictions are discussed in more detail in **Article X** to this Disclosure Statement, entitled "Certain Securities Law Matters."

D.      *Regulatory Approval and Related Bonding and Collateral Requirements*

**Certain commercial surety companies have issued commercial surety bonds on behalf of the Debtors (collectively, the "Sureties" and each, individually, a "Surety") with respect to assets and other contractual obligations that may be sought to be transferred to a prospective purchaser (collectively, the "Existing Surety Bonds" and, each individually, an "Existing Surety Bond").  Certain of the Sureties intend to object to confirmation of the Plan if the Plan or Confirmation Order does not include the following language.  All parties reserve all rights with respect to the following language:**

**To the extent that any of the Existing Surety Bonds relate to any of the Assets sold, which include, without limitation, mining permits, surface and underground mining leases, and mine related facilities and other contractual obligations related thereto, such Existing Surety Bonds shall be replaced by the applicable purchaser (collectively, the "Replacement Surety Bonds" and, each individually, a "Replacement Surety Bond").  Applications for the transfer of mining permits from the WLB Debtors to a purchaser, as required by applicable law, will be made no later than thirty (30) days following the Plan Effective Date, and Replacement Surety Bonds shall be timely submitted as required by the applicable obligee in accordance with applicable permit transfer and bonding regulations.**

**Certain of the Debtors and their affiliates entered into certain indemnity agreements and/or related agreements with the Sureties (collectively, the "Existing Indemnity Agreements" and, each, an "Existing Indemnity Agreement").  Until the Existing Surety Bonds are replaced and released and all payment and performance obligations under or related to the Existing Surety Bonds and Existing Indemnity Agreements are satisfied, neither the WLB Debtors nor any of their affiliates that are party to such Existing Indemnity Agreement shall be released from the obligations that exist under the Surety Bonds or the Existing Indemnity Agreements, including, without limitation, the payment of all premiums and loss adjustment expenses on the Existing Surety Bonds as those amounts become due prior to the Plan Effective Date.**

**Upon the selection of the Successful Bidder(s), to the extent that the WLB Debtors and a Successful Bidder determine that the closing of the Sale to the Successful Bidder may occur prior to the transfer of any of the WLB Debtors' existing mining permits that are being transferred to such Successful Bidder, the WLB Debtors and the Successful Bidder will consult with the Sureties at the relevant mine(s) being acquired by such Successful Bidder regarding entering into an agreement that would allow the Successful Bidder to conduct business at such mine(s) under the WLB Debtors' existing mining permits, pending the transfer of the relevant mining permits to the Successful Bidder.  The Sureties have indicated that they will require each such Successful Bidder to enter into an agreement with the applicable surety provider in form and substance**

satisfactory to such Surety in its discretion, which agreements shall provide, among other things, that the Successful Bidder (a) assumes all obligations relating to the mine(s) with respect to the pending permit transfers, (b) assumes all obligations under the Existing Surety Bonds relating to the permits to be transferred, (c) indemnifies the WLB Debtors and the Sureties from and against any and all claims, liability, loss or default that occurs at the mine(s) with the pending permit transfers while the permit transfers are pending, and (c) agrees to such other terms and provisions as may be required by such Sureties and such Successful Bidder in their sole and absolute discretion, including, without limitation, terms requiring the Successful Bidder to post collateral for such surety providers' Existing Surety Bonds relating to such permits pending transfer.

Additionally, First Surety Corporation ("FSC") and Westchester Fire Insurance Company ("Westchester") assert that the Plan is not feasible and cannot be confirmed to the extent it and any Sale Transaction expressly or implicitly provide either that (a) the Sureties have consented to the substitution of the named principal(s) on the Existing Surety Bonds, or (b) the Existing Surety Bonds issued assure payment or performance of obligations, operations or activities of parties other than the principals named in such Existing Surety Bonds.

FSC asserts that the Coal Bond Reclamation Agreements executed by certain of the WLB Debtors imposes an express trust on all funds generated under or in connection with any permit relating to FSC's bonds and as such any funds generated by the disposition of any such assets must be dedicated to the payment and performance of all obligations relating to such permits. Moreover, any purchaser of such assets acquires the assets subject to the terms and provisions of said express trust.

Furthermore, notwithstanding any provision of the Stalking Horse Purchase Agreement (or any other purchase agreement), the Plan, and/or Confirmation Order, all collateral on which the applicable Surety had a perfected lien as of the Plan Effective Date, all collateral held by a Surety, and all letters of credit and proceeds from drawn letters of credit issued to the Sureties as security for the Debtors' obligations under the Existing Surety Bonds (collectively, the "Surety Collateral") shall remain in place to secure all payment and performance obligations of the Debtors under the Existing Surety Bonds and under the Existing Indemnity Agreements until such Existing Surety Bonds are released, and all payment and performance obligations under the Existing Indemnity Agreements are satisfied and paid in full.

In addition, the discharge or release of any Claim under the Plan or any confirmation order shall not release, discharge, preclude or enjoin the Sureties from enforcing any obligation of the WLB Debtors to the Sureties with respect to any Existing Surety Bonds, Existing Indemnity Agreements, related agreements, and obligations under the common law of suretyship. Furthermore, all Surety Collateral held by the Sureties shall remain in place to secure all payment and performance obligations of the WLB Debtors under any Existing Surety Bonds, Existing Indemnity Agreements, and related agreements, and nothing in the Plan shall be deemed to alter, limit or modify the Sureties' rights in and to any Surety Collateral or other collateral, including, without limitation, the right to use such Surety Collateral, or other collateral or to draw upon any letter of credit. Notwithstanding any other provisions of the Plan or other agreements between the WLB Debtors and the Purchaser (or any purchaser pursuant to a Non-Core Asset Sale), nothing in the discharge, injunction and release provisions of the Plan, shall be deemed to apply to the Sureties' collateral rights, nor shall such provisions be interpreted to bar, impair, prevent or otherwise limit the Sureties from exercising their valid rights under or with respect to any Existing Surety Bonds, Existing Indemnity Agreements, related agreements, letters of credit, pledged deposit accounts, or applicable law, including SMCRA or the common law of suretyship.

For the avoidance of doubt, nothing under the Sale Transaction nor in the Stalking Horse Purchase Agreement (or any other purchase agreement), the Plan, and/or Confirmation Order shall be interpreted to alter, diminish or enlarge the rights or obligations of the Sureties, nor shall any of the foregoing be deemed to enjoin the Sureties from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties, including, without limitation, any of the Sureties' indemnitors, insurers, or otherwise under any surety bonds, any indemnity agreements, coal bond reclamation agreements, or applicable law.

> **As noted above, the WLB Debtors (on behalf of themselves and their respective creditors) dispute certain of the Sureties' assertions and reserve all rights with respect to the issues identified.**

E.      *Disclosure Statement Disclaimer*

1.      *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the WLB Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the WLB Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the WLB Debtors believe that such financial information fairly reflects the financial condition of the WLB Debtors, the WLB Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

2.      *Information Contained in this Disclosure Statement Is for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

4.      *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the WLB Debtors.

5.      *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the WLB Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the WLB Debtors, the Consenting Stakeholders, Holders of Allowed Claims, or any other parties in interest.

6.      *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The WLB Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Plan Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.  *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the WLB Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the WLB Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8.  *Information Was Provided by the WLB Debtors and Was Relied Upon by the WLB Debtors' Advisors.*

The WLB Debtors' advisors have relied upon information provided by the WLB Debtors in connection with the preparation of this Disclosure Statement.  Although the WLB Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9.  *Potential Exists for Inaccuracies, and the WLB Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the WLB Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the WLB Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the WLB Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the WLB Debtors may subsequently update the information in this Disclosure Statement, the WLB Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.  *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or relating to the WLB Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the WLB Debtors.

F.  *Liquidation Under Chapter 7.*

If no chapter 11 plan can be confirmed, the WLB Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the WLB Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the WLB Debtors' liquidation analysis is set forth in **Article VII.I.1** of this Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

## ARTICLE IX.
## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the WLB Debtors, the Purchaser, and to certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.

No opinion of counsel has been obtained and the WLB Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the WLB Debtors or to certain Holders of Claims or Interests in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the WLB Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the Purchaser Stock or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that Holders of Claims hold only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary also assumes that the various debt and other arrangements to which the WLB Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.      *Certain U.S. Federal Income Tax Consequences of the Plan to the WLB Debtors and the Purchaser*

     1.    *In General*

The Plan provides that, if the Stalking Horse Purchaser is the Successful Bidder, the Sale Transaction may be structured as either (a) a taxable disposition of the Transferred Assets (a "Taxable Transaction") or (b) a disposition of the Transferred Assets in a tax-free reorganization pursuant to sections 368(a)(1)(G) and 354 of the IRC (a "Tax-Free Reorganization").  As will be described in further detail in the Description of Transaction Steps, either structure provides that (a) relevant assets are transferred by the WLB Debtors to Purchaser; (b) following the Plan Effective Date, Westmoreland Coal Company (and potentially certain of its subsidiaries) remains in chapter 11 until the Post-Closing Reconciliation Date; (c) on either the Post-Closing Reconciliation Date or an earlier date, any of the

WLB Debtors' remaining assets that were not transferred to Purchaser are transferred to one or more liquidating entities or, in the case of the WMLP Interests owned by the WLB Debtors as of the Petition Date, cancelled (and for the avoidance of doubt, such WMLP Interests shall be retained by the WLB Debtors until the Post-Closing Reconciliation Date); and (d) Westmoreland Coal Company and any of its subsidiaries that remained in chapter 11 following the Plan Effective Date shall commence liquidation.

2.   *Effects of Sale Transaction on Tax Attributes of WLB Debtors*

The tax consequences of the implementation of the Plan to Purchaser will differ depending on whether the Sale Transaction is structured as a Taxable Transaction or Tax-Free Reorganization.  The WLB Debtors have not yet determined how the Sale Transaction will be structured, whether in whole or in part.  Such decision will depend on, among other things, in a Tax-Free Reorganization the amount of tax attributes available to be transferred to Purchaser, applicable limitations on the use of such tax attributes after the transfer and the amount of the reduction in such tax attributes by excluded COD Income (defined below).

(a)   *Recognition of Gain or Loss and Tax Basis of Assets Acquired by Purchaser*

(i)   *Taxable Transaction*

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the WLB Debtors would recognize gain or loss upon a transfer of all or a portion of their assets in an amount equal to the difference between the aggregate fair market value of the assets transferred by the WLB Debtors and the WLB Debtors' aggregate tax basis in such assets.  Such gain or loss would be reduced by the amount of such WLB Debtors' available net operating losses ("NOLs"), NOL carryforwards and any other available tax attributes, and the reduced amount of gain or loss would be recognized by the WLB Debtors (and the liability for which will constitute an Administrative Claim).  The WLB Debtors have NOLs and expect that such NOLs are sufficient to offset any gain resulting from a Taxable Transaction.

In a Taxable Transaction, Purchaser will take a fair market value basis in the acquired assets.  As a general matter, the WLB Debtors currently anticipate that in a Taxable Transaction, Purchaser will not acquire any stock of any U.S. subsidiary of Westmoreland Coal Company and, as a result, the tax basis of the assets of Westmoreland Coal Company's subsidiaries would not be expected to transfer to Purchaser in a Taxable Transaction.

(ii)   *Tax-Free Reorganization*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, the WLB Debtors are not expected to recognize any gain or loss for federal income tax purposes.  Purchaser should have carryover tax basis in any assets acquired pursuant to such transaction, subject to reduction due to COD Income, as described below.  Furthermore, pursuant to a Tax-Free Reorganization, the WLB Debtors are not expected to recognize gain upon the distribution of Purchaser Stock to Holders of Allowed First Lien Secured Claims.

(b)   *Preservation of Tax Attributes and Cancellation of Indebtedness Income*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the debtor issued, and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the satisfaction.

Pursuant to section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL

carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (where the reduction is subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.[17]  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC, though it has not been determined whether the WLB Debtors will make this election.  The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined and any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Pursuant thereto, the tax attributes of each debtor member of an affiliated group of corporations that is excluding COD Income are first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

The aggregate tax basis of the WLB Debtors in their assets (determined on an entity-by-entity basis, and in the case of an affiliated group of corporations, subject to the look-through rule described above) is not required to be reduced below the amount indebtedness (determined on an entity-by-entity basis) that the corresponding Purchaser will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The WLB Debtors expect to realize significant COD Income as a result of the consummation of the Plan.  In addition, because WMLP is a partnership for U.S. federal income tax purposes, any eventual transaction with respect to the WMLP is expected to cause additional COD Income to be allocated to Westmoreland Coal Company.  The exact amount of any COD Income that will be realized by the WLB Debtors will not be determinable until after the consummation of the Plan.

The implications of these rules, and the more general question of whether Purchaser will succeed to any of the WLB Debtors' tax attributes, depends on whether the Sale Transaction is consummated as a Taxable Transaction or a Tax-Free Reorganization.

(i)      *Taxable Transaction*

In the event the transactions undertaken pursuant to the Plan are consummated as a Taxable Transaction and Purchaser is not treated as acquiring the stock of any entity that is taxed as a corporation for U.S. federal income tax purposes, the rules related to COD Income, worthless stock deductions and section 382 of the IRC (as described below) will generally be irrelevant, Purchaser will acquire all such assets with an aggregate tax basis equal to their aggregate fair market value (as determined under applicable tax rules), and Purchaser will not inherit any of the NOLs or other tax attributes of the WLB Debtors.

(ii)     *Tax-Free Reorganization*

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser will succeed to some or all of the tax attributes of the WLB Debtors, depending upon, among other things; (a) whether certain tax attributes attributable to Westmoreland Coal Company's subsidiaries can be transferred to Westmoreland Coal Company prior to the consummation of the Plan; and (b) whether the equity of any of Westmoreland Coal

---

[17]   Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act (the "Tax Cut and Jobs Act"), interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions.  It is unclear whether interest deductions that are deferred under section 163(j) are subject to reduction under section 108.

Company's subsidiaries are transferred to Purchaser.  However, such tax attributes will be subject to reduction for COD Income according to the rules described above.

    (c)  *Limitation of NOL Carryforwards and Other Tax Attributes Under Sections 382 and 383 of the IRC*

    After giving effect to the reduction in tax attributes from excluded COD Income, to the extent that the transactions undertaken pursuant to the Plan are structured as a Tax-Free Reorganization, Purchaser's ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

    (i)  *General Sections 382 and 383 Annual Limitations*

    Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs, certain recognized built-in losses if the corporation has an overall "net unrealized built in loss" as determined pursuant to IRS Notice 2003-65 and other tax attributes (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  This discussion refers to the limitation determined under sections 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, or approximately 2.43 percent for ownership changes occurring in November 2018).  If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65, the Section 382 Limitation may be increased to the extent that Purchaser recognizes certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65).  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

    As noted above, sections 382 and 383 should only be relevant in a Tax-Free Reorganization pursuant to which Purchaser succeeds to some or all of the WLB Debtors' tax attributes.  The application of the rules related to "net unrealized built-in gains" and "net unrealized built-in losses" are subject to some uncertainty in situations like the one presented here, where the surviving company in an acquisitive "G" reorganization acquires some, but not all, of the transferor company's assets.

    (ii)  *Special Bankruptcy Exceptions*

    An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Plan Effective Date of the plan of reorganization, and during the part of the taxable year prior to and including the Plan Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses are eliminated in their entirety.

    If as of the Plan Effective Date the WLB Debtors expect to qualify for the 382(l)(5) Exception and not elect out of its application, the certificate of incorporation of the Purchaser would likely include certain restrictions on transfers with respect to the Purchaser Stock to minimize the likelihood of a subsequent "ownership change" and thus protect the value of its available tax attributes. If these restrictions are sought, subject to certain exceptions and potential thresholds, the certificate of incorporation of the Purchaser generally may restrict (i) any person or entity

from accumulating 4.75% or more of any class of stock of the Purchaser through secondary acquisitions, and, if a person already owns 4.75% or more of such stock, from acquiring additional stock, and (ii) any person or entity that owns 4.75% or more of the Purchaser Stock from disposing of all or portion of such stock, subject to certain exceptions. The restrictions would further provide that any attempted transfer of Purchaser Stock in violation of the restrictions described above will be prohibited and void ab initio.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").   When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy, along with certain integrated transactions.   This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The WLB Debtors have not determined whether Purchaser will be eligible for the 382(l)(5) Exception and, if eligible, whether Purchaser will decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Purchaser's ability to use of any Pre-Change Losses after the Plan Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Plan Effective Date.

B.     *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims*

1.     *General Considerations*

In general, the U.S. federal income tax treatment of Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction or (b) a Tax-Free Reorganization.  The U.S. federal income tax consequences to U.S. Holders of such Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long term capital gain if the Holder held

its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

2.  *Consequences to Holders of First Lien Secured Claims*

The treatment of Holders of First Lien Secured Claims will vary depending upon whether the Stalking Horse Purchaser is the Successful Bidder.  If the Stalking Horse Purchaser is the Successful Bidder then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 3 First Lien Secured Claims, each Holder thereof will receive its *pro rata* share of: (a) Purchaser Stock, (b) debt issued or assumed by Purchaser or a Purchaser subsidiary (the "Purchaser Debt") and (c) Cash.  If the Stalking Horse Purchaser is not the Successful Bidder, Holders of such Claims will receive Cash.

(a)  *Treatment of Holders of First Lien Secured Claims If the Sale Transaction Is Structured as a Tax-Free Reorganization and such Claims Are Treated as Securities*

If (a) the Sale Transaction is structured as a Tax-Free Reorganization[18] and (b) the First Lien Secured Claims are treated as securities, then the exchange of such Claims should be a partial tax-free exchange pursuant to section 354 of the IRC.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("OID")), and subject to the rules relating to market discount, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange, which should be equal to (i) the sum of (A) any Cash received and (B) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration, minus (ii) the U.S. Holder's adjusted basis, if any, in the Claim; and (b) the sum of (i) any Cash received and (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration that constitutes "other property" that is not permitted to be received under sections 354 and 356 of the IRC without recognition of gain.

With respect to non-Cash consideration that is treated as a "stock or security" of Purchaser, such U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to (a) the tax basis of the Claim surrendered, less (b) the Cash and "other property" received plus (c) gain recognized (if any).  The holding period for such non-Cash consideration should include the holding period for the exchanged Claims.

With respect to non-Cash consideration that is not treated as a "stock or security" of Purchaser, U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of accrued but untaxed interest (or OID), and subject to the rules relating to market discount, equal to the property's fair market value

---

18  The Sale Transaction can only be structured as a Tax-Free Reorganization if the Stalking Horse Purchaser is the Successful Bidder.

(or issue price, in the case of debt instruments) as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such property.

>    (b)    *Treatment of Holders of First Lien Secured Claims If The Sale Transaction Is Structured as a Taxable Transaction or such Claims Are Not Treated as Securities*

If (a) the Sale Transaction is structured as a Taxable Transaction or (b) the First Lien Secured Claims are not treated as securities, then the exchange of such Claims should be treated as a taxable exchange pursuant to section 1001 of the IRC.

A U.S. Holder of a First Lien Secured Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of (i) any Cash received, (ii) the fair market value (or issue price, in the case of debt instruments) of any non-Cash consideration, minus (b) the Holder's adjusted tax basis in its First Lien Secured Claim.

Such U.S. Holder should obtain a tax basis in the non-Cash consideration received, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID), and subject to the rules relating to market discount, equal to the consideration's fair market value (or issue price, in the case of debt instruments) as of the date such consideration is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

>    3.    *Consequences to Holders of General Unsecured Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 4 General Unsecured Claims, each Holder thereof will receive its *pro rata* share of Cash.

A U.S. Holder of a General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of any Cash received, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

>    4.    *Accrued Interest (and OID)*

To the extent that any amount received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the WLB Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Claim will be attributable to accrued interest on the debt constituting the surrendered Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims are

urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

    5.    *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered Claims that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debt instruments but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

Section 451 of the IRC (as discussed above) generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

    6.    *Certain Potential Issues Regarding the Purchaser Debt*

        (a)    Cash Interest

Cash Interest on the Purchaser Debt will be includable by a U.S. Holder as ordinary interest income at the time it accrues or is received in accordance with such holder's regular method of accounting for U.S. federal income tax purposes.

        (b)    Issue Price

The consideration received by U.S. Holders of surrendered Claims, which may include some combination of Purchaser Stock, Purchaser Debt, and Cash, collectively, would likely be treated as an investment unit issued in exchange for the surrendered Claims to the extent any Purchaser Debt is received on account of such Claims. In such case, the issue price of the Purchaser Debt will depend, in part, on the issue price of the investment unit, and the respective fair market values of the elements of consideration that compose the investment unit. The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument. As a result, the

issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established securities market. In general, a debt instrument will be treated as traded on an established securities market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property. Whether the investment unit should be considered "publicly traded" may not be known until after the Plan Effective Date.

If the investment unit is considered to be traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit on the date the Purchaser Debt is issued. The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded. If the investment unit is not publicly traded on an established market, but the surrendered Claims are publicly traded on an established market, the issue price of the investment unit may then be determined by reference to the fair market value of the surrendered Claims on the date the investment unit is issued. If neither the investment unit nor the surrendered Claims are publicly traded on an established market, then the issue price of the Purchaser Debt would generally be determined under section 1273(b)(4) or 1274 of the IRC, as applicable. Assuming either the investment unit or the surrendered Claims are publicly traded, the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the Purchaser Debt.

An issuer's allocation of the issue price of an investment unit is binding on all Holders of the investment unit unless a Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

The surrendered Claims and the investment unit comprising the consideration received in exchange therefor, may be traded on an established securities market for the purposes described above even if no trade actually occurs and there are merely firm or indicative quotes with respect to such surrendered Claims or investment unit.

As discussed above, a debt instrument, such as the Purchaser Debt, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually. The terms of any Purchaser Debt have not yet been determined; to the extent not all the interest on the Purchaser Debt is unconditionally payable in cash at least annually, the Purchaser Debt may be considered to be issued with OID. Moreover, the Purchaser Debt could be treated as issued with OID to the extent the allocation rules described above result in the Purchaser Debt having an issue price that is less than their stated redemption price at maturity.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a Holder or the property surrendered under the Plan are traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Plan Effective Date. In general, a debt instrument (or the stock or securities exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems or (iii) certain qualifying non-U.S. securities exchanges, (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is

neither so traded nor issued for stock or securities so traded would be its stated principal amount (*provided* that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

<div align="center">(c) <em>Acquisition Premium or Amortizable Bond Premium on Purchaser Debt</em></div>

If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the Purchaser Debt is greater than the issue price of such debt but less than the stated principal amount of such debt, such Purchaser Debt will have an "acquisition premium." Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the applicable Purchaser Debt for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. Alternatively, if a U.S. Holder's initial tax basis in Purchaser Debt exceeds its stated principal amount, the U.S. Holder will be considered to have acquired the Purchaser Debt with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of the Purchaser Debt on a constant yield method as an offset to stated interest when includible in income under such Holder's regular accounting method. If a U.S. Holder elects to amortize bond premium, such Holder must reduce its tax basis in the Purchaser Debt by the amount of the premium used to offset stated interest. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the Purchaser Debt. If, pursuant to the rules described above, a U.S. Holder's initial tax basis in the Purchaser Debt is less than the issue price of such debt, *see* **Article IX.B.5** to this Disclosure Statement, entitled "Market Discount."

<div align="center"><em>7. Dividends on Purchaser Stock</em></div>

Any distributions made on account of the Purchaser Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Purchaser as determined under U.S. federal income tax principles. Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

<div align="center"><em>8. Sale, Redemption, or Repurchase of Non-Cash Consideration.</em></div>

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of non-Cash consideration received pursuant to the Plan. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the Holder held the applicable non-Cash consideration for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. Under the recapture rules of section 108(e)(7) of the Code, a U.S. Holder may be required to treat gain recognized on such dispositions of the Purchaser Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for Purchaser Stock.

For a description of certain limitations on the deductibility of capital losses, see the section entitled "Limitation on Use of Capital Losses" below.

<div align="center"><em>9. Limitations on Use of Capital Losses.</em></div>

<div align="center">72</div>

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

10. *Medicare Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

C.      *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims*

The following discussion includes only certain U.S. federal income tax consequences to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

1. *Gain Recognition*

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2. *Interest Payments; Accrued but Untaxed Interest.*

Payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to

payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest) or Purchaser, with respect to the debt received under the Plan (in the case of interest payments with respect thereto);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the WLB Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interested described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent), the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.   *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other disposition (including a cash redemption) of its *pro rata* share of the non-Cash consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- in the case of the sale of Purchaser Stock, Purchaser is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that

is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Purchaser Stock under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the Purchaser Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, *provided* that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market.  In the event Purchaser Stock is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.  At this time, and based on the WLB Debtors' current expectation regarding the relative value of Purchaser's investment in Canada compared to the value of Purchaser's U.S. assets, the WLB Debtors do not anticipate that Purchaser will be a USRPHC for U.S. federal income tax purposes on the Plan Effective Date. However, the WLB Debtors cannot provide a guarantee of that result, nor can the WLB Debtors guarantee that Purchaser will not become a USRPHC in the future.

4. *Dividends on Purchaser Stock*

Any distributions made with respect to Purchaser Stock will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares.  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange).  Except as described below, dividends paid with respect to Purchaser Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Purchaser Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from

tax under an applicable income tax treaty).  Distributions to a Non-U.S. Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed above).

  5. *FATCA.*

    Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of Purchaser Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include Purchaser Stock and the Claims).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

    As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occur after December 31, 2018.  Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of the Claims or the Purchaser Stock.

D. *Information Reporting and Withholding*

    The WLB Debtors, Purchaser, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the  form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

    In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

    **THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE X.
## CERTAIN SECURITIES LAW MATTERS

The WLB Debtors believe that the Purchaser Stock to be issued pursuant to the Plan, if the Stalking Horse Purchaser is the Successful Bidder, are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The WLB Debtors further believe that the offer, issuance, and initial distribution of the Purchaser Stock pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

On the Post-Closing Reconciliation Date, the existing WCC Interests will be canceled, released, and extinguished, and will be of no further force or effect. At or prior to the confirmation of the Plan, the WLB Debtors will file with the SEC a Form 15 for the purposes of terminating the registration and all reporting of obligations related thereto required by the SEC with respect to the WCC Interests in compliance with the various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law.

A.      *1145 Securities*

1.      *Issuance*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act (the "1145 Securities") and state securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

The WLB Debtors submit that, if the Stalking Horse Purchaser is the Successful Bidder, all Purchaser Stock issued pursuant to the Plan will be issued principally in exchange for the corresponding Allowed First Lien Secured Claims. Accordingly, the issuance of the Purchaser Stock satisfies all the requirements of section 1145(a)(1) of the Bankruptcy Code and is therefore exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described below). Recipients of any Purchaser Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

The exemption from registration of section 1145(a)(1) of the Bankruptcy Code is not available for holders that are deemed "underwriters" under section 1145(b)(1) of the Bankruptcy Code. An "underwriter" is defined as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. Under section 2(a)(11), the term "issuer" includes "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." Accordingly, "affiliates" of an issuer may be deemed to be "underwriters" for purposes of section 1145(b). The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be an "underwriter" for these purposes.

2.      *Subsequent Transfers*

Resales of 1145 Securities will generally be exempt from registration under the Securities Act and applicable state securities laws. Holders deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code, including

persons deemed to be "affiliates" within the meaning of Rule 144 under the Securities Act, may only resell Purchaser Stock pursuant to registration, or an exemption from registration, under applicable federal and state securities law.

The securities of the Purchaser received by Persons deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code, other than securities received by "affiliates," will be deemed to be "restricted securities," as defined in Rule 144 under the Securities Act.  Under applicable SEC guidance, securities issued under the Plan to holders who are deemed to be "affiliates" of the Purchaser will be subject to resale restrictions under the Securities Act, but will not be deemed to be "restricted securities." Holders of Purchaser Stock who are deemed to be "underwriters" may be entitled to resell their Purchaser Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if, in the case of "restricted securities," the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter," including whether such Person is an "affiliate" of the Purchaser, with respect to the Purchaser Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the WLB Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Purchaser Stock and, in turn, whether any Person may freely resell Purchaser Stock.  The WLB Debtors recommend that potential recipients of Purchaser Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state securities laws.

B.      *4(a)(2) Securities*

1.   *Issuance*

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

To the extent any entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act (the "4(a)(2) Securities") and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.  The WLB Debtors submit that the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  The 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

2.   *Subsequent Transfers*

The 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.  The third-party holder of the Purchaser Stock will not be permitted to offer, sell, or otherwise transfer their 4(a)(2) Securities except pursuant to a registration statement or an available exemption from registration.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer

78

if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  It is the WLB Debtors' expectation that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of one percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations.  Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The WLB Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Plan Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

All 4(a)(2) Securities will be issued in certificated or book-entry form and will bear a restrictive legend. Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

Any Persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE WLB DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE WLB DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## ARTICLE XI.
## RECOMMENDATIONS OF THE WLB DEBTORS AND THE COMMITTEE

**In the opinion of the WLB Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.** In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.

**Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

---

**The Committee believes that the Plan cannot be confirmed by the Bankruptcy Court. Put simply, the Plan is an attempt by Holders of purported "First Lien Secured Claims" to improve their recoveries at the expense of general unsecured creditors.** Among other things, the Plan undervalues the WLB Debtors' unencumbered assets, ignores the fact that liens on certain assets purportedly securing First Lien Secured Claims are likely avoidable, and forces third parties (such as yourself) to release claims against insiders of the WLB Debtors and the Consenting Stakeholders without receiving fair and reasonable compensation. **Accordingly, the Committee urges you to object to Confirmation of the Plan and to vote to reject the Plan**.

---

[*Balance of Page Intentionally Left Blank*]

Respectfully submitted,

Dated:  December 18, 2018

WESTMORELAND COAL COMPANY
on behalf of itself and all other WLB Debtors

/s/ *Michael G. Hutchinson*

Name: Michael G. Hutchinson
Title: Chief Executive Officer
Company: Westmoreland Coal Company

**Exhibit A**

**Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates**

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF WESTMORELAND**
**COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:        (713) 752-4221
Email:             ptomasco@jw.com
                        efreeman@jw.com
                        mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local Counsel to the Debtors*

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200
Email:             james.sprayregen@kirkland.com
                        michael.slade@kirkland.com
                        gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors-in-Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900
Email:             edward.sassower@kirkland.com
                        stephen.hessler@kirkland.com

- and -

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:       (713) 836-3600
Email:             anna.rotman@kirkland.com

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

## TABLE OF CONTENTS

## CONTENTS

INTRODUCTION ..................................................................................................................4

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**...............................................................................................**4**
A.      Defined Terms. ...................................................................................................4
B.      Rules of Interpretation. .....................................................................................18
C.      Computation of Time. .......................................................................................19
D.      Governing Law. .................................................................................................19
E.      Reference to Monetary Figures. ........................................................................19
F.      Controlling Document. ......................................................................................19

**ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS** ..........................................................**19**
A.      Administrative Claims. ......................................................................................19
B.      Professional Compensation. ..............................................................................20
C.      Priority Tax Claims. ..........................................................................................21
D.      DIP Facility Claims. ..........................................................................................22
E.      U.S. Trustee. ......................................................................................................22
F.      Costs and Expenses of the Prepetition Secured Parties, the DIP Lenders, and the DIP Agent. ...................22

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**...........................**22**
A.      Summary of Classification. ...............................................................................22
B.      Treatment of Claims and Interests.....................................................................23
C.      Special Provision Governing Unimpaired Claims. ...........................................26
D.      Elimination of Vacant Classes. .........................................................................26
E.      Voting Classes; Presumed Acceptance by Non-Voting Classes. ......................26
F.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code...............................26
G.      Subordinated Claims. ........................................................................................26

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ...........................................................**27**
A.      General Settlement of Claims.............................................................................27
B.      Sources of Plan Consideration. .........................................................................27
C.      Sale Transaction. ...............................................................................................27
D.      Vesting of Assets. ..............................................................................................29
E.      Employee Incentive Plan...................................................................................29
F.      Wind-Down Amount. ........................................................................................29
G.      Funded Liabilities. .............................................................................................30
H.      The General Unsecured Claims Amount. ..........................................................30
I.      Wind-Down. ......................................................................................................30
J.      Plan Administrator. ...........................................................................................30
K.      Cancellation of Notes, Instruments, Certificates, and Other Documents. ........30
L.      Corporate Action. ..............................................................................................31
M.      Dissolution of the Boards of the WLB Debtors. ...............................................31
N.      Release of Liens. ...............................................................................................32
O.      Effectuating Documents; Further Transactions. ...............................................32
P.      Exemption from Certain Taxes and Fees. .........................................................32
Q.      Causes of Action. ..............................................................................................32
R.      [Reserved] .........................................................................................................33
S.      The Liquidating Trust........................................................................................33
T.      The Post-Closing Reconciliation Date ..............................................................33
U.      Closing the Chapter 11 Cases. ..........................................................................34

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................**34**
A.        Assumption and Rejection of Executory Contracts and Unexpired Leases. .......................................34
B.        Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......................................35
C.        Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....................................35
D.        D&O Policies. ..................................................................................................................................36
E.        Chubb Policies. ...............................................................................................................................36
F.        Modifications, Amendments, Supplements, Restatements, or Other Agreements. ..........................36
G.        Reservation of Rights. .....................................................................................................................37
H.        Nonoccurrence of Plan Effective Date. ...........................................................................................37

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** .............................................................**37**
A.        Timing and Calculation of Amounts to Be Distributed. ..................................................................37
B.        Rights and Powers of the Plan Administrator. ................................................................................37
C.        Delivery of Distributions and Undeliverable or Unclaimed Distributions. .....................................38
D.        Compliance with Tax Requirements/Allocations. ...........................................................................39
E.        Allocation of Plan Distributions Between Principal and Interest. ....................................................40
F.        Setoffs and Recoupment. .................................................................................................................40
G.        Claims Paid or Payable by Third Parties. ........................................................................................40
H.        Indefeasible Distributions. ...............................................................................................................41
I.        Exemption from Securities Laws. ....................................................................................................41

**ARTICLE VII THE PLAN ADMINISTRATOR** .....................................................................................**41**
A.        The Plan Administrator. ...................................................................................................................41
B.        Wind-Down. .....................................................................................................................................42
C.        Exculpation; Indemnification; Insurance; Liability Limitation. .......................................................43
D.        Tax Returns. .....................................................................................................................................43
E.        Dissolution of the WLB Debtors. ....................................................................................................43

**ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
          DISPUTED CLAIMS** ............................................................................................................**43**
A.        Allowance of Claims and Interests. .................................................................................................43
B.        Claims and Interests Administration Responsibilities. ....................................................................44
C.        Estimation of Claims and Interests. .................................................................................................44
D.        Adjustment to Claims or Interests without Objection. .....................................................................44
E.        Time to File Objections to Claims. ..................................................................................................45
F.        Disallowance of Claims. ..................................................................................................................45
G.        Amendments to Claims. ...................................................................................................................45
H.        No Distributions Pending Allowance. ..............................................................................................45
I.        Distributions After Allowance. ........................................................................................................45
J.        Undeliverable Distribution Reserve. ................................................................................................45
K.        Single Satisfaction of Claims. ..........................................................................................................46

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**46**
A.        Settlement, Compromise, and Release of Claims and Interests. ......................................................46
B.        Discharge of Claims and Termination of Interests. .........................................................................47
C.        Release of Liens. ..............................................................................................................................47
D.        Releases by the WLB Debtors. ........................................................................................................47
E.        Releases by Holders of Claims and Interests. ..................................................................................48
F.        Exculpation. .....................................................................................................................................49
G.        Injunction. ........................................................................................................................................49
H.        Recoupment. ....................................................................................................................................49
I.        Subordination Rights. ......................................................................................................................50
J.        Reimbursement or Contribution. .....................................................................................................50
K.        Reservation of Governmental Units. ...............................................................................................50

**ARTICLE X EFFECT OF CONFIRMATION OF THE PLAN** ...............................................................**51**

A.      Jurisdiction and Venue .................................................................................................. 51
B.      Order Approving the Disclosure Statement .................................................................... 51
C.      Voting Report ................................................................................................................. 51
D.      Judicial Notice ............................................................................................................... 51
E.      Transmittal and Mailing of Materials; Notice ............................................................... 52
F.      Solicitation ..................................................................................................................... 52
G.      Burden of Proof .............................................................................................................. 52
H.      Bankruptcy Rule 3016(a) Compliance .......................................................................... 52
I.      Compliance with the Requirements of Section 1129 of the Bankruptcy Code ............. 52
J.      Securities Under the Plan ............................................................................................... 57
K.      Releases and Discharges ................................................................................................ 57
L.      Release and Retention of Causes of Action ................................................................... 58
M.      Approval of Purchase Agreement and Other Documents and Agreements .................... 58
N.      Confirmation Hearing Exhibits ...................................................................................... 58
O.      Objections to Confirmation of the Plan ......................................................................... 58
P.      Exemption from Transfer Taxes with Respect to the Sale Transaction ......................... 58
Q.      Good Faith Purchaser Status .......................................................................................... 58
R.      Sale Free and Clear ........................................................................................................ 59
S.      Retention of Jurisdiction ................................................................................................ 59
T.      Plan Supplement ............................................................................................................. 59

**ARTICLE XI CONDITIONS PRECEDENT TO CONFIRMATION,  THE PLAN EFFECTIVE
        DATE, AND THE POST-CLOSING RECONCILIATION DATE ................................. 59**
A.      Conditions Precedent to Confirmation. .......................................................................... 59
B.      Conditions Precedent to the Plan Effective Date ........................................................... 59
C.      Conditions Precedent to the Post-Closing Reconciliation Date ..................................... 60
D.      Waiver of Conditions. .................................................................................................... 60
E.      Substantial Consummation. ............................................................................................ 60
F.      Effect of Non-Occurrence of Conditions to the Plan Effective Date ............................. 61

**ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............ 61**
A.      Modification and Amendments. ..................................................................................... 61
B.      Effect of Confirmation on Modifications. ...................................................................... 61
C.      Revocation or Withdrawal of the Plan. .......................................................................... 61

**ARTICLE XIII RETENTION OF JURISDICTION ................................................................... 61**

**ARTICLE XIV MISCELLANEOUS PROVISIONS ................................................................... 63**
A.      Immediate Binding Effect. ............................................................................................. 63
B.      Additional Documents. ................................................................................................... 64
C.      Payment of Statutory Fees. ............................................................................................ 64
D.      Dissolution of Statutory Committees. ............................................................................ 64
E.      Reservation of Rights. .................................................................................................... 64
F.      Successors and Assigns. ................................................................................................. 64
G.      Service of Documents. .................................................................................................... 64
H.      Enforcement of Confirmation Order. ............................................................................. 65
I.      Term of Injunctions or Stays. ........................................................................................ 65
J.      Compensation and Benefits Programs. ........................................................................... 66
K.      Entire Agreement. .......................................................................................................... 66
L.      Exhibits. ......................................................................................................................... 66
M.      Nonseverability of Plan Provisions. ............................................................................... 66
N.      Votes Solicited in Good Faith. ....................................................................................... 66
O.      Waiver. ........................................................................................................................... 67

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in Article I.A.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each WLB Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The WLB Debtors seek to consummate the Restructuring Transactions commencing on the Plan Effective Date.  Each WLB Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each WLB Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the WLB Debtors.  Reference is made to the Disclosure Statement for a discussion of the WLB Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      **Defined Terms.**

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Administrative Claim*" means a Claim against any of the WLB Debtors for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates; (b) Allowed Professional Fee Claims; (c) DIP Facility Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.      "*Advisory Services Agreements*" means the consulting agreement(s), by and between the Purchaser Advisors and the Purchaser, pursuant to which each applicable Purchaser Advisor shall, from the Plan Effective Date through the first anniversary of the Plan Effective Date, provide transition and advisory services and assistance to the Purchaser as reasonably requested from time to time by the board of directors of the Purchaser, and in exchange for such services, the Purchaser shall compensate the Purchaser Advisors as set forth in the Plan Supplement.  The Advisory Services Agreements shall be Filed as part of the Plan Supplement and shall be acceptable to each applicable Purchaser Advisor and the Purchaser.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

4.      "*Allowed*" means, with respect to any Claim against any of the WLB Debtors, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the WLB Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, the Bar Date Order, or pursuant to a Final Order); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable WLB Debtor.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever

absent entry of a Final Order allowing such late-filed Claim.  "*Allow*" and "*Allowing*" shall have correlative meanings.

5.       "*Assigned Contracts and Leases*" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the WLB Debtors to the Purchaser pursuant to the Plan, as set forth in the Plan Supplement.

6.       "*Assumed Contracts and Leases List*" means the list of those Executory Contracts and Unexpired Leases to be assumed by the WLB Debtors or assumed and assigned by the WLB Debtors to the Purchaser (*i.e.*, the Assigned Contracts and Leases) pursuant to the Plan, as set forth in the Plan Supplement, which (with respect to the Assigned Contracts and Leases) shall be in form and substance reasonably acceptable to the Successful Bidder, subject to amendment by the WLB Debtors with the consent of the Successful Bidder (with respect to the Assigned Contracts and Leases) from time to time in accordance with the Sale Transaction Documentation and this Plan.

7.       "*Assumed Liabilities*" has the meaning set forth in the Sale Transaction Documentation.

8.       "*Auction*" has the meaning set forth in the Bidding Procedures Order.

9.       "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the WLB Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

10.      "*Ballot*" means the form of ballot approved by the Bankruptcy Court and distributed to Holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

11.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

12.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

13.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

14.      "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 524], as such order may be amended, supplemented, or modified from time to time.

15.      "*Bidding Procedures*" means the bidding procedures attached as **Exhibit 2** to the Bidding Procedures Order, as such bidding procedures may be amended from time to time in accordance with its terms.

16.      "*Bidding Procedures Order*" means the *Order (I) Authorizing Westmoreland Coal Company and Certain Debtor Affiliates to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures with Respect to Substantially All Assets, (III) Approving Contract Assumption and Assignment Procedures, (IV) Scheduling Bid Deadlines and an Auction, (V) Scheduling Hearings and Objection Deadlines with Respect to the Disclosure Statement and Plan Confirmation, and (VI) Approving the Form and Manner of Notice Thereof* [Docket No. 519], as such order may be amended, supplemented, or modified from time to time.

17.      "*Black Lung Benefits Act*" means the Black Lung Benefits Act, 30 U.S.C. §§ 901, *et seq.*, as it may be amended.

18.     "*Black Lung Benefits*" means, collectively, the health and disability benefits payable to beneficiaries under the Black Lung Benefits Act.

19.     "*Black Lung Claims*" means any Claims against any of the WLB Debtors for Black Lung Benefits arising on or prior to the Petition Date.

20.     "*Bridge Loan*" means that certain Fourth Amendment to the Credit Agreement dated as of May 21, 2018, by and among Westmoreland Coal Company, Prairie Mines & Royalty ULC, and Westmoreland San Juan, LLC, as borrowers, the guarantors party thereto, certain lenders party thereto, and the Bridge Loan Agent.

21.     "*Bridge Loan Agent*" means Wilmington Savings Fund Society, FSB, in its capacities as administrative and collateral agent under the Bridge Loan.

22.     "*Bridge Loan Claim*" means any Claim against any of the WLB Debtors on account of the Bridge Loan.

23.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

24.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

25.     "*Cash Collateral Order*" means the *Final Order (I) Authorizing the MLP Debtors to Use Cash Collateral (II) Granting Certain Protection to Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 521].

26.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Cause of Action*" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

27.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court pursuant to the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 71], as such order may be amended, supplemented, or modified from time to time.

28.     "*Chubb Companies*" means, collectively, the Federal Insurance Company together with its affiliates and successors.

29.     "*Chubb Insurance Contracts*" means all insurance policies issued by the Chubb Companies at any time to (or which provide coverage to) any of the Debtors (or their predecessors), including, to the extent applicable, the WLB Debtors, and all agreements, documents or instruments relating thereto.

30.     "*Chubb/WLB D&O Policies*" means all D&O Policies issued by the Chubb Companies to a WLB Debtor as a first named insured.  For the avoidance of doubt, the Chubb/WLB D&O Policies are a subset of the Chubb Insurance Contracts.

31.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

32.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

33.     "*Claims Register*" means the official register of Claims against the WLB Debtors maintained by the Clerk of the Bankruptcy Court.

34.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

35.     "*Collateral*" means any property or interest in property of the Estate of any WLB Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

36.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 206], as may be reconstituted from time to time.

37.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the WLB Debtors seek entry of the Confirmation Order.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

41.     "*Consenting Stakeholders*" means any Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that (a) hold DIP Facility Claims, Credit Agreement Claims, or First Lien Note Claims and (b) are or become party to the RSA, in each case, solely in their respective capacities as such.

42.     "*Consummation*" or "*Consummated*" means the occurrence of the Plan Effective Date.

43.     "*Core Assets*" means those assets, including the Purchased US Assets and Purchased Equity Interests (each as defined in the Stalking Horse Purchase Agreement), as described in Article I.C of the Disclosure Statement.

44.     "*Credit Agreement*" means that certain Credit Agreement, dated as of December 16, 2014, by and among Westmoreland Coal Company, as borrower, the guarantors party thereto, the Credit Agreement Agent, and the other lender parties thereto, as may be amended (including pursuant to that certain Sixth Amendment, Resignation, Waiver, Consent and Appointment Agreement entered into as of October 31, 2018 (the "Sixth Amendment")), restated, or otherwise supplemented from time to time.

45.     "*Credit Agreement Agent*" means Ankura Trust Company, LLC (as successor in interest to Wilmington Savings Fund Society, FSB (as successor in interest to Bank of Montreal)), in its capacities as administrative and collateral agent under the Credit Agreement, or any of its predecessors or successors, including the successor pursuant to the Sixth Amendment.

46.     "*Credit Agreement Claim*" means any Claim against any of the WLB Debtors on account of the Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

47.     "*Cure Costs*" means, except to the extent otherwise provided in the Stalking Horse Purchase Agreement, the amount necessary to cure all monetary defaults under the Assigned Contracts and Leases pursuant to section 365(b) of the Bankruptcy Code.

48.     "*Cure Notice*" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by the WLB Debtors under the Plan pursuant to sections 365 or 1123 of the Bankruptcy Code, as applicable, which notice shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Costs to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related dispute.

49.     "*D&O Policies*" means all insurance policies (including without limitation any "tail policy," run-off endorsement or Chubb/WLB D&O Policies) that have been issued at any time to any of the WLB Debtors as a first named insured providing directors', members', trustees', officers', or managers' liability coverage.

50.     "*Debtors*" means, collectively, the WLB Debtors and the WMLP Debtors.

51.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

52.     "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacities as administrative and collateral agent under the DIP Facility.

53.     "*DIP Facility*" has the meaning set forth in the DIP Order.

54.     "*DIP Facility Claims*" means any Claim against any of the WLB Debtors arising under the DIP Facility (as such term is defined in the DIP Order) or the DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

55.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

56.     "*DIP Order*" means the *Final Order (I) Authorizing Westmoreland Coal Company and Certain of Its Affiliates to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 520], as such order may be amended, supplemented, or modified from time to time.

57.     "*Disclosure Statement*" means the *Disclosure Statement to the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates*, dated as of [●] [Docket No. [●]], as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

58.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures with respect to the Plan [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time.

59.     "*Disputed*" means a Claim or an Interest or any portion thereof, in each case against any of the WLB Debtors:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a WLB Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

60.     "*Distribution Record Date*" means, other than with respect to those First Lien Notes deposited with DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed

Interests in the WLB Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is agreed to by the WLB Debtors and the Required Consenting Stakeholders or designated in a Final Order.  The Distribution Record Date shall not apply to any First Lien Notes deposited with DTC, the Holders of which shall receive a distribution in accordance with Article VI.C.4 of the Plan and, as applicable, the customary procedures of DTC.

61.     "*DTC*" means the Depository Trust Company.

62.     "*EIP Pool*" means a pool of stock-based awards, in the form of options, appreciation rights, profit interests, or similar securities, as applicable, representing between 5 and 10 percent of the aggregate amount of Purchaser Stock, determined on a fully diluted and fully distributed basis, which shall be reserved for distribution to certain participating employees of the Purchaser pursuant to the Employee Incentive Plan.

63.     "*Employee Incentive Plan*" means an incentive plan for certain participating employees of the Purchaser to be established and implemented by the initial board of directors of the Purchaser following the Plan Effective Date and which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

64.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

65.     "*Estate*" means the estate of any WLB Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable WLB Debtor's Chapter 11 Case.

66.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the WLB Debtors; (b) the Consenting Stakeholders; (c) the Successful Bidder; (d) the DIP Lenders; (e) the DIP Agent; (f) the Holders of First Lien Claims; (g) the First Lien Notes Trustee; (h) the Credit Agreement Agent; (i) the Bridge Loan Agent; (j) the Holders of the Bridge Loan Claims; (k) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (l) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

67.     "*Executory Contract*" means a contract to which one or more of the WLB Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

68.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

69.     "*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified or amended, that is not stayed, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

70.     "*First Lien Claims*" means the Credit Agreement Claims and First Lien Notes Claims, which as of the Petition Date shall be deemed Allowed, with the Credit Agreement Claims being Allowed in the principal amount of $319,773,165.17, and the First Lien Notes Claims being Allowed in the principal amount of $350,000,000.00, *plus*, for each of the Credit Agreement Claims and the First Lien Notes Claims, accrued and unpaid interest, *plus* fees and other expenses due under the Credit Agreement and the First Lien Notes Indenture, as applicable.

71.   "*First Lien Deficiency Claim*" means the unsecured portion of any First Lien Claim to the extent that the value of the Collateral securing such First Lien Claim is less than the amount of the interest of such First Lien Claim in such Collateral as determined in accordance with section 506 of the Bankruptcy Code.  The Allowed amount of the First Lien Deficiency Claims, in the aggregate, shall be calculated as the Allowed amount of the First Lien Claims _minus_ the Allowed amount of the First Lien Secured Claims.

72.   "*First Lien Notes*" means the 8.750% senior secured notes, due January 21, 2022, issued by Westmoreland Coal Company.

73.   "*First Lien Notes Claim*" means any Claim against any of the WLB Debtors on account of the First Lien Notes and the First Lien Notes Indenture, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

74.   "*First Lien Notes Indenture*" means that certain indenture, dated as of December 16, 2014, by and among Westmoreland Coal Company, as issuer, the guarantors party thereto, and the First Lien Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

75.   "*First Lien Notes Trustee*" means U.S. Bank National Association, in its capacity as indenture trustee and collateral trustee under the First Lien Notes Indenture.

76.   "*First Lien Secured Claim*" means the Secured portion of any First Lien Claim, to the extent of the value of the Collateral securing such First Lien Claim as determined in accordance with section 506 of the Bankruptcy Code.  The Allowed amount of the First Lien Secured Claims, in the aggregate, shall be calculated as the total amount of the credit bid provided for in the Stalking Horse Purchase Agreement _plus_ the aggregate amount of any Non-Core Asset Sale Proceeds _plus_ the assets (or proceeds thereof) that (a) constitute Collateral securing the First Lien Claims and (b) are not Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors.

77.   "*Funded Liabilities*" means, collectively, subject to the Funded Liability Cap, (a) any Allowed Claims related to the Transferred Assets, including Priority Claims related to the Transferred Assets, and (b) any tax liability that is an Administrative Claim that is asserted and Allowed, and in the case of such Claims described in both clauses (a) and (b), only to the extent the assumption or payment of the Allowed amount of each such Claim is required under section 1129(a)(9) of the Bankruptcy Code in order to obtain entry of the Confirmation Order; *provided* that the Funded Liabilities shall take into account any payments made or to be made by third parties, including insurers and sureties, in accordance with Article VI.G of the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, Funded Liabilities shall not include unsecured (i) Claims (including General Unsecured Claims), (ii) obligations, or (iii) liabilities of the WLB Debtors, including liabilities arising under retiree medical benefit plans, the Black Lung Benefits Act, or the Federal Coal Mine Health and Safety Act of 1969 that are excluded liabilities under the Sale Transaction Documentation.

78.   "*Funded Liability Cap*" means such fixed amount in respect of the Funded Liabilities, which shall be mutually agreed by the Purchaser and the WLB Debtors prior to the commencement of the Confirmation Hearing, and which shall reflect and include a fixed amount in respect of estimated tax liabilities that are or will be Allowed Administrative Claims.

79.   "*General Unsecured Claim*" means any unsecured Claim (including any First Lien Deficiency Claims or Black Lung Claims) against any of the WLB Debtors that is not:  (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Facility Claim; (d) a First Lien Secured Claim; (e) an Intercompany Claim; (f) a Section 510(b) Claim; (g) an Other Priority Claim; (h) an Other Secured Claim; (i) a Priority Tax Claim; (j) a Professional Fee Claim; or (k) a Secured Tax Claim.

80.   "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

81.   "*General Unsecured Claims Amount*" means an amount of Cash equal to the liquidation value of any assets of the WLB Debtors not subject to a lien and available for distribution after giving effect to the treatment

of, or distribution on account of, all Allowed (a) First Lien Secured Claims, (b) Administrative Claims (including Professional Fee Claims), (c) Priority Tax Claims, (d) Other Priority Claims, and (e) Other Secured Claims, as such liquidation value shall be agreed upon by the WLB Debtors and the Required Consenting Stakeholders prior to the entry of the Disclosure Statement Order.

82.     "*Holder*" means an Entity holding a Claim against or Interest in a WLB Debtor, as applicable.

83.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

84.     "*Initial Administrative Claims Bar Date*" means the Voting Deadline, which is the deadline by when all requests for payment of Administrative Claims that arise on or prior to January 4, 2019 must be Filed and served on the WLB Debtors.

85.     "*Initial Distribution Date*" means the date on which the WLB Debtors or the Plan Administrator make initial distributions to Holders of Allowed Claims pursuant to the Plan.

86.     "*Insider Incentive Plan*" means the Debtors' key employee incentive plan for insiders (as such term is defined in section 101(31) of the Bankruptcy Code), the terms of which shall be set forth in the Plan Supplement (to the extent such terms are not disclosed in a motion Filed by the WLB Debtors with the Bankruptcy Court prior to the filing of the Plan Supplement).

87.     "*Insider Incentive Plan Order*" means any order of the Bankruptcy Court approving a motion by the Debtors seeking approval of the Insider Incentive Plan.

88.     "*Intercompany Claim*" means any Claim against a WLB Debtor held by another WLB Debtor or an Affiliate of a WLB Debtor other than a WMLP Debtor.

89.     "*Intercompany Interest*" means any Interest in one WLB Debtor held by another WLB Debtor or an Affiliate of a WLB Debtor, and, for the avoidance of doubt, shall not include any WMLP Interest or any Interest held by a WLB Debtor in the Purchaser.

90.     "*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any WLB Debtor, including options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any WLB Debtor (whether or not arising under or in connection with any employment agreement).

91.     "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 495], as such order may be amended, supplemented, or modified from time to time.

92.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

93.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

94.     "*Liquidating Trust*" means that certain trust to be created on the Post-Closing Reconciliation Date or an earlier date, as described in <u>Article IVS</u>.

95.     "*Liquidating Trust Agreement*" means the agreement to be executed as of the Post-Closing Reconciliation Date or an earlier date, establishing the Liquidating Trust pursuant to this Plan, substantially in the form Filed with the Plan Supplement.

96.     "*Liquidating Trust Assets*" means all remaining Retained Assets (with the exception of the WMLP Interests) as of the Post-Closing Reconciliation Date or an earlier date, and all other assets of the WLB Debtors that have not been sold, transferred, or abandoned prior to the Post-Closing Reconciliation Date (with the exception of the WMLP Interests).

97.     "*Non-Core Assets*" means those assets as described in Article I.C of the Disclosure Statement.

98.     "*Non-Core Asset Marketing Process*" has the meaning set forth in the Bidding Procedures.

99.     "*Non-Core Asset Sale*" means, collectively, one or more sales of some or all of the Non-Core Assets.

100.    "*Non-Core Asset Sale Documents*" means the documents setting forth the definitive terms of the Non-Core Asset Sale.

101.    "*Non-Core Asset Sale Proceed*s" means any net Cash or net Cash equivalents that are proceeds from the Non-Core Asset Sale.

102.    "*Non-Insider Retention Plan Order*" means any order of the Bankruptcy Court approving a motion by the Debtors seeking approval of a key employee retention plan for employees that are not insiders (as such term is defined in section 101(31) of the Bankruptcy Code).

103.    "*Notice and Claims Agent*" means Donlin, Recano & Company, Inc., the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases [Docket No. 96].

104.    "*Ordinary Course Professional*" means an Entity (other than a Professional) retained and compensated by the WLB Debtors in accordance with the Ordinary Course Professionals Order.

105.    "*Ordinary Course Professionals Order*" means the *Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 522], as such order may be amended, supplemented, or modified from time to time.

106.    "*Other Priority Claim*" means any Claim against any of the WLB Debtors other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

107.    "*Other Secured Claim*" means any Secured Claim against any of the WLB Debtors, other than a DIP Facility Claim, a Credit Agreement Claim, or a First Lien Note Claim.

108.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

109.    "*Petition Date*" means October 9, 2018, the date on which the Chapter 11 Cases were commenced.

110.    "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

111.    "*Plan Administrator*" means an individual that shall be the representative of the WLB Debtors on and after the Plan Effective Date and shall have the rights, powers, and duties set forth in this Plan.  The identity and compensation of the Plan Administrator shall be agreed to by the WLB Debtors and the Required Consenting Stakeholders and shall be set forth in the Plan Supplement.

112.    "*Plan Administrator Agreement*" means that certain agreement entered into no later than the Plan Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan.

113.    "*Plan Effective Date*" means, with respect to the Plan and any applicable WLB Debtors, the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Plan Effective Date set forth in Article XIB of the Plan have been satisfied or waived in accordance with Article XID of the Plan.

114.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders and the Successful Bidder (to the extent the Stalking Horse Purchaser is not the Successful Bidder and to the extent related to the Sale Transaction), substantially final forms of which shall be Filed at least 7 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, including:  (a) the Assumed Contracts and Leases List; (b) the identity of the Plan Administrator and the compensation of the Plan Administrator; (c) the amount of the General Unsecured Claims Amount (which amount shall be disclosed prior to the entry of the Disclosure Statement Order); (d) the Wind-Down Budget; (e) the Description of Transaction Steps; (f) the Purchaser Documentation; (g) the Liquidating Trust Agreement; (h) those Transferred Causes of Action that shall be transferred to the Purchaser pursuant to the Sale Transaction; (i) the Retained Causes of Action; (j) the Plan Administrator Agreement; (k) the Advisory Services Agreements, including the compensation thereunder; and (l) the terms of the Insider Incentive Plan (to the extent the terms thereof are not disclosed in a motion Filed by the WLB Debtors with the Bankruptcy Court prior to the filing of the Plan Supplement); *provided* that, through the Plan Effective Date, the Plan Supplement, and the exhibits thereto may be amended or modified in accordance with the Plan and the RSA.

115.    "*Plan Term Sheet*" means that certain term sheet setting forth the terms of the Plan attached as Exhibit A to the RSA.

116.    "*Post-Closing Reconciliation Date*" means the date not earlier than the Plan Effective Date, on which all conditions precedent to the occurrence of the Post-Closing Reconciliation Date to be set forth in the Description of Transaction Steps and Article XIC of the Plan (and, to the extent not in conflict with Article XIC of the Plan, the Description of Transaction Steps) have been satisfied or waived in accordance with Article XID of the Plan.

117.    "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

118.    "*Priority Tax Claim*" means any Claim against the WLB Debtors of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

119.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

120.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

121.    "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

122. "*Professional Fee Escrow Account*" means an account funded by the WLB Debtors with Cash as soon as possible after Confirmation and not later than the Plan Effective Date in an amount equal to the Professional Fee Escrow Amount.

123. "*Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the WLB Debtors prior to and as of the Confirmation Date, which estimates Professionals shall, in consultation with the advisors to the Required Consenting Stakeholders, deliver to the WLB Debtors as set forth in Article IIB of the Plan.

124. "*Proof of Claim*" means a proof of Claim Filed against any of the WLB Debtors in the Chapter 11 Cases.

125. "*Purchaser*" means (a) a newly-formed Delaware limited liability company or (b) other entity, including a newly-formed subsidiary of the WLB Debtors, as selected by the Successful Bidder and set forth in the Description of Transaction Steps.

126. "*Purchaser Advisors*" means, collectively, Jennifer Grafton, Scott Henry, Joseph Micheletti, and any other individuals identified by Purchaser on or prior to January 31, 2019.

127. "*Purchaser Documentation*" means any and all documentation, filings, forms, and other administrative or ministerial actions relating thereto, that are reasonably necessary or desirable with respect to the formation of Purchaser and to effectuate the Sale Transaction, which Purchaser Documentation shall be in form and substance acceptable to the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), and the organizational documents of Purchaser shall be in form reasonably acceptable to the WLB Debtors (it being understood that the WLB Debtors shall not have an approval right in any form over the equity and governance terms of the Purchaser, which shall be determined in the sole discretion of the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder).

128. "*Purchaser Stock*" means the new common shares or limited liability company units, which may be in the form of common units, as applicable, in the Purchaser to be issued pursuant to the Plan, as set forth in the Description of Transaction Steps.

129. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

130. "*Released Parties*" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

131.    "*Releasing Parties*" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (ii) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

132.    "*Required Consenting Stakeholders*" has the meaning set forth in the RSA.

133.    "*Restructuring Transactions*" means the transactions described in <u>Article IV</u>.

134.    "*Retained Assets*" means: (a) prior to the Post-Closing Reconciliation Date, the WMLP Interests owned by the WLB Debtors as of the Petition Date (and, for the avoidance of doubt, such WMLP Interests shall be retained by the WLB Debtors until the Post-Closing Reconciliation Date), (b) the General Unsecured Claims Amount, (c) the Wind-Down Amount, (d) the D&O Policies, (e) the Retained Causes of Action, and (f) the Excluded Assets (as defined in the Sale Transaction Documentation) under the Sale Transaction Documentation. For the avoidance of doubt, the Retained Assets shall not include: (x) the Transferred Assets; (y) any Causes of Action or Avoidance Actions released or transferred pursuant to the Plan; or (z) the Professional Fee Escrow Account.

135.    "*Retained Causes of Action*" means those Causes of Action that shall vest in the WLB Debtors on the Plan Effective Date, which shall be set forth in the Plan Supplement, and for the avoidance of doubt, Retained Causes of Action shall not include any of the Transferred Causes of Action or any Causes of Action that are settled, released, or exculpated under the Plan.

136.    "*RSA*" means that certain Restructuring Support Agreement, dated as of October 9, 2018, by and among the WLB Debtors and the Consenting Stakeholders, including all exhibits and attachments thereto, as may be amended, restated, amended and restated, modified, or supplemented from time to time in accordance with the terms thereof, which is attached to the Disclosure Statement as <u>Exhibit C</u>.

137.    "*Sale Transaction*" means the transfer of the Transferred Assets to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to section 1123 of the Bankruptcy Code on the terms and conditions set forth in the Sale Transaction Documentation.

138.    "*Sale Transaction Documentation*" means one or more asset purchase agreements or purchase and sale agreements and related documents, pursuant to which the WLB Debtors will effectuate the Sale Transaction.

139.    "*Sale Transaction Proceed*s" means any Cash or Cash equivalents that are proceeds from the Sale Transaction (if any, in the event the Stalking Horse Purchaser consummates the Sale Transaction).

140. "*Sale Transaction Term Sheet*" means that certain term sheet setting forth the terms of the Sale Transaction attached as Exhibit B to the RSA.

141. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs to be Filed by the WLB Debtors pursuant to section 521 of the Bankruptcy Code.

142. "*Section 510(b) Claims*" means any Claim against any of the WLB Debtors subject to subordination under section 510(b) of the Bankruptcy Code.

143. "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

144. "*Secured Tax Claim*" means any Secured Claim against any of the WLB Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

145. "*Securities Act*" means the U.S. Securities Act of 1933.

146. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

147. "*Stalking Horse Purchaser*" means the newly-formed Delaware limited liability Entity or other form of Entity or Entities as selected by the Required Consenting Stakeholders to serve as the Buyer (as defined in the Stalking Horse Purchase Agreement) under the Stalking Horse Purchase Agreement.

148. "*Stalking Horse Purchase Agreement*" means that certain Purchase and Sale Agreement between the WLB Debtors and the Stalking Horse Purchaser that is attached to the Disclosure Statement as Exhibit B.

149. "*Subsequent Distribution Date*" means a date following the Initial Distribution Date on which the Plan Administrator in its reasonable discretion elects to make distributions to Holders of certain Allowed Claims pursuant to the Plan.

150. "*Successful Bidder*" means the Entity, which Entity may be the Stalking Horse Purchaser, whose bid for some or all of the Core Assets and, if applicable, the Transferred Non-Core Assets, is selected by the WLB Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures.

151. "*Supplemental Administrative Claims Bar Date*" means the date that is 30 days after the Plan Effective Date, which is the deadline by which all requests for Administrative Claims that arise after January 4, 2019 must be Filed and served on the WLB Debtors.

152. "*Supplemental Retention Program*" means the WLB Debtors' non-insider employee retention program, including any severance payments (which shall be in an amount not to exceed the sum of the applicable employee's (a) base salary and (b) the amount provided to such employee under the Non-Insider Retention Plan Order, in each case for one year on an annualized basis), with respect to Adam Bricker, Shane Gant, John Jutlia, Dondi Kratzenstein, Jeffrey Kukura, Elizabeth Martinez, Scott Sturm, and Donald Swartz.

153. "*Sureties*" means those providers of the WLB Debtors' surety and bonding obligations, as that term is defined and used in the *Final Order Approving Continuation of Surety Bond Program* [Docket No. 514].

154. "*Transferred Assets*" means the Core Assets, the Transferred Non-Core Assets, and the Transferred Causes of Action.

16

155.    "*Transferred Causes of Action*" means any and all Causes of Action (including certain Avoidance Actions) held by the WLB Debtors as of the Plan Effective Date; *provided* that Transferred Causes of Action shall not include (i) Avoidance Actions not related to the Core Assets or Transferred Non-Core Assets; (ii) Causes of Action related solely to Non-Core Assets sold to third parties other than the Purchaser or an Entity designated by the Purchaser; (iii) certain Causes of Action to be mutually agreed upon by the WLB Debtors and (a) the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or (b) the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder); or (iv) Causes of Action that are settled, released, or exculpated under the Plan.  For the avoidance of doubt, Transferred Causes of Action shall include the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow, any Claims against or Interests in the WLB Debtors that constitute Assumed Liabilities or Funded Liabilities.

156.    "*Transferred Non-Core Assets*" means any Non-Core Assets that are not sold or transferred by the WLB Debtors pursuant to a Non-Core Asset Sale prior to the Plan Effective Date.

157.    "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the WLB Debtors of an intent to accept a particular distribution; (c) responded to the WLB Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

158.    "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIIIJ.

159.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the WLB Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

160.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

161.    "*U.S. Person*" has the meaning given to such term in rule 902 promulgated under the Securities Act.

162.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

163.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

164.    "*Voting Deadline*" means 4:00 p.m. (prevailing Central Time) on January 25, 2019; or if the Auction occurs after January 22, 2019, the Voting Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction).

165.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Notice and Claims Agent.

166.    "*Wages Order*" means the *Final Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefits Programs* [Docket No. 516], as such order may be amended, supplemented, or modified from time to time.

167.    "*WCC Interests*" means the Interests in Westmoreland Coal Company outstanding immediately prior to the Plan Effective Date.

168.    "*Wind Down*" means the wind down and dissolution of the WLB Debtors' Estates as set forth in Article VIIB.

169.    "*Wind-Down Amount*" means Cash in an amount, calculated in accordance with the Stalking Horse Purchase Agreement, and to be determined by the WLB Debtors and acceptable to the Required Consenting Stakeholders, which amount shall be retained by the WLB Debtors in accordance with the terms of the Stalking Horse Purchase Agreement and used by the Plan Administrator to fund (a) the payment of Allowed Priority Claims under the Plan and (b) the Wind Down in accordance with the Wind-Down Budget.

170.    "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be agreed to by the Required Consenting Stakeholders and the WLB Debtors.  The Wind-Down Budget, a copy of which shall be Filed with the Plan Supplement, shall include line item estimates for, among other things, post-Plan Effective Date Professional fees and U.S. Trustee Fees, and will be financed by the Wind-Down Amount.

171.    "*WLB/Chubb Contracts*" means the Chubb Insurance Contracts issued to a WLB Debtor as a first named insured, exclusive of the Chubb/WLB D&O Policies.

172.    "*WLB Debtors*" means, collectively, Absaloka Coal, LLC, Basin Resources, Inc., Buckingham Coal Company, LLC, Dakota Westmoreland Corporation, Haystack Coal Company, San Juan Coal Company, San Juan Transportation Company, Texas Westmoreland Coal Company, WCC Land Holding Company, Inc., WEI-Roanoke Valley, Inc., Western Energy Company, Westmoreland Coal Company, Westmoreland Coal Company Asset Corp., Westmoreland Coal Sales Company, Inc., Westmoreland Energy Services New York, Inc., Westmoreland Energy Services, Inc., Westmoreland Energy, LLC, Westmoreland Mining LLC, Westmoreland North Carolina Power LLC, Westmoreland Partners, Westmoreland Power, Inc., Westmoreland Resources Inc., Westmoreland San Juan Holdings, Inc., Westmoreland San Juan, LLC, Westmoreland Savage Corporation, Westmoreland Texas Jewett Coal Company, Westmoreland-Roanoke Valley, LP, and WRI Partners, Inc., and for the avoidance of doubt, does not include any of the WMLP Debtors.

173.    "*WMLP Debtors*" means, collectively, Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP, Westmoreland Kemmerer, LLC, Oxford Mining Company, LLC, Harrison Resources, LLC, Oxford Mining Company-Kentucky, LLC, Daron Coal Company, LLC, Oxford Conesville, LLC, and Westmoreland Kemmerer Fee Coal Holdings, LLC.

174.    "*WMLP Interests*" means the Interests in Westmoreland Resource Partners, LP outstanding immediately prior to the Plan Effective Date.

175.    "*WMLP Plan Effective Date*" means the earlier of (a) the effective date of a chapter 11 plan of the WMLP Debtors confirmed by the Bankruptcy Court pursuant to which the WMLP Debtors are dissolved or reorganized and (b) the date on which there is a final resolution or dismissal of all claims against the WMLP Debtors as approved by the Bankruptcy Court.

## B.    Rules of Interpretation.

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in

the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (11) any immaterial effectuating provisions may be interpreted by the WLB Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party.

## C.    Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable after the Plan Effective Date.

## D.    Governing Law.

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## E.    Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

## F.    Controlling Document.

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan, the Disclosure Statement, the Plan Supplement, and the Sale Transaction Documentation, the Sale Transaction Documentation shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

<div align="center">

**ARTICLE II**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE**
**CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims set forth in <u>Article III</u> of the Plan.

## A.    Administrative Claims.

Except with respect to Professional Fee Claims, DIP Facility Claims, or as otherwise set forth herein, subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the WLB Debtors or the Plan Administrator, agree to less favorable treatment or such Holder has been paid by any applicable WLB Debtor prior to the Plan Effective Date, the WLB Debtors or the Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business; or (y) on the later of (i) the Plan Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution;

*provided* that any Allowed Administrative Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the WLB Debtors.

Except as otherwise provided by Article II.A or by a Final Order entered by the Bankruptcy Court (including the Bar Date Order) on or prior to the Initial Administrative Claims Bar Date or Supplemental Administrative Claims Bar Date, as applicable, unless previously Filed, requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims) must be Filed and served on the WLB Debtors by the Initial Administrative Claims Bar Date and Supplemental Administrative Claims Bar Date, as applicable; *provided* that with respect to any request for payment of Administrative Claims arising on or prior to January 4, 2019 submitted by Governmental Units, the deadline for all such requests shall be February 7, 2019, subject to any requests for additional time for good cause shown.  For the avoidance of doubt, solely to the extent Cure Costs are not paid on the Plan Effective Date, the counterparty to such Executory Contract and Unexpired Lease must file its Administrative Claim on or prior to the Supplemental Administrative Claims Bar Date, and such Administrative Claim shall be asserted only with respect to and in the amount of such unpaid Cure Costs. With respect to Professional Fee Claims, the deadline for all requests for payment of such claims shall be 30 days after the Plan Effective Date.

Notwithstanding anything to the contrary provided in this Plan, the WMLP Debtors shall not be required to file any requests for payment of Administrative Claims; *provided* that on or prior to the Initial Administrative Claims Bar Date, the WMLP Debtors shall consult with the WLB Debtors and the Required Consenting Stakeholders regarding any Administrative Claims held by the WMLP Debtors that would have otherwise been due by the Initial Administrative Claims Bar Date.  Notwithstanding anything to the contrary provided in this Plan or the Cash Collateral Order, the MLP Secured Parties (as defined in the Cash Collateral Order) shall not be required to file any requests for payment of Administrative Claims (if any) arising out of the MLP Secured Obligations (as defined in the Cash Collateral Order) or the Adequate Protection Obligations (as defined in the Cash Collateral Order), but for the avoidance of doubt, the MLP Secured Parties must file any requests for payment of any other Administrative Claims pursuant to the applicable provisions of this Plan.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the WLB Debtors, their Estates, the Purchaser, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Plan Effective Date.  For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

**B.      Professional Compensation.**

**1.      Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 30 days after the Plan Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

**2.      Professional Fee Escrow Amount.**

As soon as possible after Confirmation and not later than the Plan Effective Date, the WLB Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the WLB Debtors' Estates.   The amount of Professional Fee Claims owing to the

Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the WLB Debtors and used solely in accordance with the Wind-Down Budget.

### 3.   Estimation of Fees and Expenses.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date and shall deliver such estimate to the WLB Debtors by the earlier of (a) five Business Days after the Confirmation Date and (b) two Business Days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the WLB Debtors may estimate the unbilled fees and expenses of such Professional.

### 4.   Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the WLB Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the WLB Debtors or the Plan Administrator. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the WLB Debtors and the Plan Administrator may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that (i) to the extent such amounts are unpaid as of the Plan Effective Date, they shall be paid from the Wind-Down Amount in accordance with the Wind-Down Budget; and (ii) the WLB Debtors must provide the Consenting Stakeholders with advance notice and copies of invoices before making any such payments of fees and expenses.

### 5.   Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the WLB Debtors and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

## C.   Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the WLB Debtors or the Plan Administrator, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the WLB Debtors or the Plan Administrator, as applicable, and subject to the consent of the Required Consenting Stakeholders, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the WLB Debtors.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

D.      **DIP Facility Claims.**

All DIP Facility Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon, and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the DIP Order.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, (a) if the Stalking Horse Purchaser is the Successful Bidder, the DIP Facility and the Allowed DIP Facility Claims shall be assumed by the Successful Bidder on the Plan Effective Date and shall continue in force until the obligations under the DIP Facility are indefeasibly paid in full in Cash in accordance with the terms of the documents governing the DIP Facility, and (b) if the Stalking Horse Purchaser is not the Successful Bidder, each Allowed DIP Facility Claim shall be paid in full in Cash on the Plan Effective Date.  If the Successful Bidder assumes the DIP Facility, all Liens and security interests granted by the WLB Debtors to secure the obligations under the DIP Facility shall continue to secure the Collateral under the DIP Facility as transferred pursuant to the Sale Transaction, but such Liens and security interests shall be of no further force and effect with respect to the assets of the WLB Debtors or the Retained Assets without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  If the Allowed DIP Facility Claims are paid in full in Cash, then except as otherwise provided herein, all Liens and security interests granted by the WLB Debtors to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect with respect to the assets of the WLB Debtors or the Retained Assets without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  For the avoidance of doubt, the Plan Effective Date will only occur once the Allowed DIP Facility Claims are satisfied as provided in this paragraph.

E.      **U.S. Trustee.**

The WLB Debtors or the Plan Administrator, as applicable, shall timely pay all U.S. Trustee Fees for each quarter under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the WLB Debtors' businesses, until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the WLB Debtors shall file with the Bankruptcy Court quarterly operating reports in a form reasonably acceptable to the U.S. Trustee.

F.      **Costs and Expenses of the Prepetition Secured Parties, the DIP Lenders, and the DIP Agent.**

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable to the Prepetition Secured Parties (as defined in the DIP Order), the DIP Lenders, or the DIP Agent pursuant to the DIP Order shall constitute Allowed Administrative Claims and shall be paid on a current basis in full in Cash on the Plan Effective Date, or to the extent accrued after the Plan Effective Date, on a current basis in full in Cash as invoiced.  Nothing herein shall require the Prepetition Secured Parties, the DIP Lenders, the DIP Agent, or their respective professionals, to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to the payment of such Allowed Administrative Claims.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      **Summary of Classification.**

This Plan constitutes a separate chapter 11 plan for each WLB Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular WLB Debtor are placed in Classes for each of the WLB Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the WLB Debtors have not classified Administrative Claims, Priority Tax Claims, DIP Facility Claims, and Professional Fee Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to

the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Plan Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 6 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | WCC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.      Treatment of Claims and Interests.**

Except to the extent that the WLB Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, with the consent of the Required Consenting Stakeholders, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the WLB Debtors and the consent of the Required Consenting Stakeholders (not to be unreasonably withheld).

    **1.      Class 1—Other Priority Claims.**

        (a)      *Classification*:  Class 1 consists of all Other Priority Claims.

        (b)      *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

        (c)      *Voting*: Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

    **2.      Class 2—Other Secured Claims.**

        (a)      *Classification*:  Class 2 consists of all Other Secured Claims, including all Secured Tax Claims.

        (b)      *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the election of the WLB Debtors (which election shall be subject to the consent of the Required Consenting Stakeholders):

(i)      payment in full in Cash of such Allowed Other Secured Claim;

(ii)     the Collateral securing such Allowed Other Secured Claim;

(iii)    Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

(iv)     such other treatment rendering such Allowed Other Secured Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

**3.    Class 3—First Lien Secured Claims.**

(a)    *Classification*:  Class 3 consists of all First Lien Secured Claims.

(b)    *Allowance*:  The First Lien Secured Claims shall be Allowed in the amount of the Secured portion of the Allowed amount of the First Lien Claims in the aggregate (as set forth in Article VIII.A.2 of the Plan).

(c)    *Treatment*:  Each Holder of an Allowed First Lien Secured Claim will receive either:

(i)      in the event the Stalking Horse Purchaser is the Successful Bidder, its Pro Rata share of (x) the Purchaser Stock and (if applicable) all debt issued by the Purchaser or any of its direct or indirect subsidiaries, as set forth in the Description of Transaction Steps; (y) the Non-Core Asset Sale Proceeds; and (z) all other proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims and are not Transferred Assets (such non-Transferred Assets, including, for the avoidance of doubt, the WLB Debtors' Interests in the WMLP Debtors); or

(ii)     in the event the Stalking Horse Purchaser is not the Successful Bidder or the Sale Transaction is not consummated, payment in full in Cash on the Plan Effective Date.

(d)    *Voting*:  Class 3 is Impaired under the Plan.  Each Holder of an Allowed First Lien Secured Claim is entitled to vote to accept or reject the Plan.

**4.    Class 4—General Unsecured Claims.**

(a)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment*:  Each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the General Unsecured Claims Amount as provided in Article IVH.

(c)    *Voting*:  Class 4 is Impaired.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**5.    Class 5—Intercompany Claims.**

(a)    *Classification*:  Class 5 consists of all Intercompany Claims.

(b)  *Treatment*:  Each Intercompany Claim will, at the election of the WLB Debtors (with such election being subject to the consent of the Required Consenting Stakeholders), be:

    (i)  Reinstated; or

    (ii)  canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)  *Voting*:  Class 5 is either:

    (i)  Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

    (ii)  Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Claims in Class 5 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Claim in Class 5 will not be entitled to vote to accept or reject the Plan.

**6.  Class 6—Intercompany Interests.**

(a)  *Classification*:  Class 6 consists of all Intercompany Interests.

(b)  *Treatment*:  Intercompany Interests will, at the election of the WLB Debtors (with such election being subject to the consent of the Required Consenting Stakeholders), be:

    (i)  Reinstated; or

    (ii)  canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)  *Voting*:  Class 6 is either:

    (i)  Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

    (ii)  Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Interests in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Interest in Class 6 will not be entitled to vote to accept or reject the Plan.

**7.  Class 7—Section 510(b) Claims.**

(a)  *Classification:*  Class 7 consists of all Section 510(b) Claims.

(b)  *Treatment:*  Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

(c)     *Voting:*  Class 7 is Impaired and not receiving any distribution under the Plan.  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**8.     Class 8—WCC Interests.**

(a)     *Classification:*  Class 8 consists of all WCC Interests.

(b)     *Treatment*:  ***On the Post-Closing Reconciliation Date***, WCC Interests will be canceled, released, and extinguished, and will be of no further force or effect.  Each Holder of a WCC Interest will not receive any distribution on account of such Interest.

(c)     *Voting*:  Class 8 is Impaired and not receiving any distribution under the Plan.  Each Holder of a WCC Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**C.     Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the WLB Debtors or the Successful Bidder, as applicable, with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**D.     Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.     Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Acceptance of the Plan by either Class 3 or 4 will satisfy section 1129(a)(10) of the Bankruptcy Code. The WLB Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The WLB Debtors reserve the right to modify the Plan in accordance with Article XII to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.     Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the WLB Debtors reserve the right to re-classify any Allowed Claim (except for any First Lien Claims or DIP Facility Claims) or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the WLB Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**B.     Sources of Plan Consideration.**

Cash on hand, the Purchaser Stock, debt issued (or assumed) by the Purchaser or any of its subsidiaries (as set forth in the Description of Transaction Steps), the Sale Transaction Proceeds (if any), the Non-Core Asset Sale Proceeds (if any), the General Unsecured Claims Amount, the Wind-Down Amount, the WLB Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the WLB Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the WLB Debtors and the Purchaser, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the WLB Debtors.

**C.     Sale Transaction.**

**1.     Sale Transactions.**

(a)     **The Transferred Assets**.

Following the Confirmation Date, the WLB Debtors shall be authorized to consummate the Sale Transaction to the Successful Bidder pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

Subject to the terms of the Sale Transaction Documentation, on the Plan Effective Date, the WLB Debtors shall consummate the Sale Transaction by, among other things, transferring the Transferred Assets, comprised of the Core Assets, any Transferred Non-Core Assets, and all Transferred Causes of Action held by the WLB Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan and the Confirmation Order. Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction Documentation and the Plan, and any documents in connection herewith and therewith, shall be deemed authorized and approved without any requirement of further act or action by the WLB Debtors, the WLB Debtors' shareholders or boards of directors, or any other Entity or Person. The WLB Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by, the Sale Transaction Documentation and this Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

The transactions contemplated by the Sale Transaction Documentation and this Plan are undertaken by the WLB Debtors and the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the transactions contemplated thereunder and hereunder shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease to the Successful Bidder). The Successful Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

If the Stalking Horse Purchaser is the Successful Bidder, the Sale Transaction may be structured either as a taxable transaction or a reorganization under section 368(a)(1)(G) (a "G Reorganization") of the Internal Revenue Code, as set forth in the Description of Transaction Steps.

(b)     **The Non-Core Asset Marketing Process.**

In accordance with the Bidding Procedures Order, and independent from the contemplated Sale Transaction, the WLB Debtors have marketed the Non-Core Assets for sale pursuant to the Non-Core Asset Marketing Process. To the extent a third party has agreed, prior to the Plan Effective Date, to acquire a Non-Core Asset, such Non-Core Asset will not be a Transferred Asset and will not be included in the Sale Transaction. However, any Non-Core Asset that a third party has not agreed to acquire by the Plan Effective Date will be a Transferred Asset transferred to the Purchaser pursuant to the Sale Transaction. Cash proceeds (if any) of any Non-Core Asset Sale received prior to the Plan Effective Date shall be used to make payments or distributions pursuant to the Plan.

2.     **Purchaser Stock.**

On the Plan Effective Date, Purchaser is authorized to issue or cause to be issued and shall issue the Purchaser Stock consistent with the Description of Transaction Steps for eventual distribution to the Holders of Allowed First Lien Claims (if the Stalking Horse Purchaser is the Successful Bidder) in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. The Purchaser Stock shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the Purchaser Stock issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued. Other than as contemplated through the issuance of Purchaser Stock pursuant to this Plan, the Sale Transaction, and the Employee Incentive Plan, there shall exist on the Effective Date no nonvoting equity securities in the Purchaser.

3.     **Restructuring Transactions.**

Upon the entry of the Confirmation Order, the WLB Debtors, the Plan Administrator, and the Purchaser are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the Purchaser's establishment of the EIP Pool; (6) issuance of the Purchaser Stock and any debt issued or assumed by the Purchaser, each as set forth in the Plan and consistent with the Description of Transaction Steps; (7) any transaction described in the Description of Transaction Steps; and (8) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction

described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 4. Payment of Cure Costs and Other Amounts.

On the Plan Effective Date, the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and this Plan. The WLB Debtors (a) shall not have any obligation to make any payment or other distribution on account of any Cure Costs, and (b) shall have the obligation to pay the Purchaser for any amounts that are accrued as of the closing under the Sale Transaction Documentation prorated per diem as of such closing not yet due and payable with respect to any Executory Contracts or Unexpired Leases that are assumed by the WLB Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and this Plan.

### 5. Purchaser Consent Rights

Until such time as the Purchaser is formed and the Purchaser Documentation necessary for the Purchaser to take actions is finalized, all consent, consultation and other rights afforded to the Purchaser in the Plan shall be deemed granted to and controlled by the Required Consenting Stakeholders.

## D.    Vesting of Assets.

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Plan Effective Date: (a) the Transferred Assets shall be preserved and shall vest in the Purchaser, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Retained Assets shall vest in the WLB Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances. For the avoidance of doubt, all Transferred Causes of Action shall be transferred to the Purchaser on the Plan Effective Date, and the Retained Causes of Action shall vest in the WLB Debtors on the Plan Effective Date (and for the avoidance of doubt, any Causes of Action associated only with Non-Core Assets sold to a third party may be transferred to such third party by the WLB Debtors as provided in the documentation for such Non-Core Asset Sales).

On and after the Plan Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the WLB Debtors may operate their businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, following the Plan Effective Date, the Purchaser may operate its businesses and use, acquire, or dispose of property, including the Transferred Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## E.    Employee Incentive Plan

Following the Plan Effective Date, the initial board of directors of the Purchaser shall, in its sole discretion, adopt and implement the Employee Incentive Plan, which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

## F.    Wind-Down Amount.

On or prior to the Plan Effective Date, the WLB Debtors shall retain the Wind-Down Amount in accordance with the terms of the Stalking Horse Purchase Agreement, with such amount to be agreed upon by the Purchaser, the Required Consenting Stakeholders, and the WLB Debtors no later than five (5) Business Days prior to the Plan Effective Date.

G.      **Funded Liabilities.**

At the option of the Purchaser (such option to be exercised as set forth in the Sale Transaction Documentation), the Funded Liabilities shall either (1) be assumed by the Purchaser (or an affiliate thereof as designated by Purchaser) and thereby become Assumed Liabilities, or (2) not be assumed by the Purchaser, in which case the Wind-Down Amount shall be adjusted such that additional Cash is retained by the WLB Debtors on the Plan Effective Date to satisfy the amount of the Funded Liabilities; *provided* that in no event shall the amount of the Funded Liabilities be in excess of the Funded Liability Cap.  The Funded Liabilities shall take into account any payments made or to be made by third parties, including insurers and sureties, in accordance with Article VIG of the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, Purchaser and its affiliates shall have no obligation to assume or otherwise pay for unsecured (i) Claims (including General Unsecured Claims), (ii) obligations, or (iii) liabilities of the WLB Debtors, including liabilities arising under retiree medical benefit plans, the Black Lung Benefits Act or the Federal Coal Mine Health and Safety Act of 1969.

H.      **The General Unsecured Claims Amount**

The General Unsecured Claims Amount shall be used to make distributions on account of Allowed General Unsecured Claims on a Pro Rata basis as set forth in Article III.B.4.  If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount attributable to such Disallowed Claim shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan.

I.      **Wind-Down.**

On and after the Plan Effective Date, in accordance with the Wind-Down Budget, the WLB Debtors shall (1) continue in existence for purposes of (a) winding down the WLB Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the Purchaser as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the Sale Transaction Documentation (including with respect to the transfer of permits to the Purchaser as contemplated therein), and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate as set forth in the Plan.

J.      **Plan Administrator.**

On and after the Plan Effective Date, the Plan Administrator shall act for the WLB Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the WLB Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the WLB Debtors, and shall succeed to the powers of the WLB Debtors' managers, directors, and officers.  From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the WLB Debtors as further described in Article VII.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

K.      **Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any WLB Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the WLB Debtors or any warrants, options, or other securities exercisable for, or convertible into, debt, equity, ownership, or profits interests in the WLB Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the WLB Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the WLB Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other

instruments or documents evidencing or creating any indebtedness or obligation of the WLB Debtors shall be fully released, settled, and compromised; *provided*, however, that notwithstanding anything to the contrary contained herein, any indenture or agreement that governs the rights of the DIP Agent, the Credit Agreement Agent, the Bridge Loan Agent, or the First Lien Notes Trustee shall continue in effect to allow each of them, as applicable, to (A) enforce its rights, Claims, and interests (and those of any predecessor or successor thereto) vis-à-vis any parties other than the WLB Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims, as applicable, in accordance with the terms of such agreements, (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims, as applicable, including any rights to priority of payment and/or to exercise charging liens, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Credit Agreement Agent, the Bridge Loan Agent, the First Lien Notes Trustee or Holders of DIP Facility Claims, Credit Agreement Claims, Bridge Loan Claims and First Lien Notes Claims under the Plan, as applicable; *provided further, however*, to the extent the DIP Facility and the Allowed DIP Facility Claims are assumed by the Successful Bidder, nothing herein shall affect the enforceability of the rights, Claims and interests of the DIP Agent against such Successful Bidder under the agreements relating to the DIP Facility.

**L.      Corporate Action.**

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the WLB Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the WLB Debtors, the Plan Administrator, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the WLB Debtors, including the creation of the Purchaser, the consummation of the Sale Transaction, and the issuance of Purchaser Stock in accordance with the Plan and the Sale Transaction Documentation, and any corporate action required by the WLB Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the WLB Debtors or the WLB Debtors' Estates; *provided, however*, that for the avoidance of doubt, the Purchaser may be formed by a person or entity other than the WLB Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the WLB Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation.  The directors, managers, and officers of the WLB Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of this Article IVL.

The authorizations and approvals contemplated by this Article IV .L shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

**M.      Dissolution of the Boards of the WLB Debtors.**

As of the Plan Effective Date, the existing boards of directors or managers, as applicable, of the WLB Debtors shall be dissolved without any further action required on the part of the WLB Debtors or the WLB Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any WLB Debtor shall be dismissed without any further action required on the part of any such WLB Debtor, the equity holders of the WLB Debtors, the officers, directors, or managers, as applicable, of the WLB Debtors, or the members of any WLB Debtor.

As of the Plan Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the WLB Debtors with respect to their affairs other than matters substantially related to the transactions described in Article IVC.1-2 of the Plan.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the

WLB Debtors, and shall:  (a) file a certificate of dissolution for any of the WLB Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the WLB Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the WLB Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the WLB Debtors or their Estates for any tax incurred during the administration of such WLB Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the WLB Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the WLB Debtors or any of their affiliates.

**N.      Release of Liens.**

Except as otherwise expressly provided herein, on the Plan Effective Date, all Liens on any property of any WLB Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any WLB Debtors shall automatically be discharged and released.

**O.      Effectuating Documents; Further Transactions.**

The WLB Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**P.      Exemption from Certain Taxes and Fees.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction or the Sale Transaction Documentation or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the WLB Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Q.      Causes of Action.**

As of the Plan Effective Date, the WLB Debtors shall assign and transfer to the Purchaser all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation on the Plan Effective Date.  The Transferred Causes of Action shall be set forth and described in the Plan Supplement, the description of which shall be subject to the consent of the Required Consenting Stakeholders (if the Stalking Horse Purchaser is the Successful Bidder) or the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder).  The Retained Causes of Action shall vest in the WLB Debtors on the Plan Effective Date (and for the avoidance of doubt, any Causes of Action associated only with Non-Core Assets sold to a third party may be transferred to such third party by the WLB Debtors as provided in the documentation for such Non-Core Asset Sales).

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Purchaser or the WLB

Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**R.**      **[Reserved]**

**S.**      **The Liquidating Trust**

On the Post-Closing Reconciliation Date or an earlier date, the Liquidating Trust will be formed to implement the Wind Down, including the liquidation of the Liquidating Trust Assets, for the period after the creation of the Liquidating Trust.  The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the WLB Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.  For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.  Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust.  The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.  The Liquidating Trust will not be deemed a successor in interest to the WLB Debtors.  Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed First Lien Claims on a Pro Rata basis as set forth in the Liquidating Trust Agreement.

The Plan Administrator shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the WLB Debtors and the Plan Administrator as set forth in this Plan and applicable non-bankruptcy law, and the Plan Administrator shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement.  On and after the Post-Closing Reconciliation Date or the earlier date on which the Liquidating Trust is formed, all references to the WLB Debtors in this Plan shall be deemed references to the Liquidating Trust, and all references to the Plan Administrator shall be deemed references to the Plan Administrator in his role as trustee of the Liquidating Trust (except for references to the WLB Debtors or the Plan Administrator in this Article IVS).

**T.**      **The Post-Closing Reconciliation Date**

On the Post-Closing Reconciliation Date or an earlier date, (i) certain remaining Claims shall automatically be canceled, released, and extinguished, and will be of no further force or effect, and (ii) the Liquidating Trust Assets shall automatically be transferred to the Liquidating Trust, in each case without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, however, that for the avoidance of doubt, neither the WCC Interests nor the WMLP Interests shall be transferred to the Liquidating Trust.  On the Post-Closing Reconciliation Date, the WCC Interests and the WMLP Interests shall automatically be canceled, released, and extinguished, and will be of no further force or effect without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Until the occurrence of the Post-Closing Reconciliation Date, Westmoreland Coal Company shall retain its rights, powers, and duties as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code, to the fullest extent necessary to implement the foregoing cancellation of the WCC Interests and treatment of certain remaining Claims, as more fully set forth in the Description of Transaction Steps.

Additional details about the Post-Closing Reconciliation Date shall be set forth in the Description of Transaction Steps.  To the extent the Description of Transaction Steps conflicts with the Plan itself, the Plan shall control.

U.      **Closing the Chapter 11 Cases.**

Upon the occurrence of the Plan Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases of the WLB Debtors except for the Chapter 11 Case of Westmoreland Coal Company, and all contested matters relating to each of the WLB Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Westmoreland Coal Company.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, and the Post-Closing Reconciliation Date has occurred, the Plan Administrator shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the WLB Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Plan Effective Date, the WLB Debtors shall assume and assign to Purchaser, as part of the Sale Transaction, the Executory Contracts and Unexpired Leases that are required to be assigned to Purchaser pursuant to the Sale Transaction Documentation.  Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected on the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the WLB Debtors or assumed by the WLB Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Purchaser Documentation; *provided* that, notwithstanding anything to the contrary in the Plan, to the extent any (x) real property leases or related contracts (including royalty agreements and third-party conveyances) and (y) contracts for the purchase, sale, transportation or reclamation of coal, in the case of both (x) and (y), relating to the mines included in the Core Assets and Transferred Non-Core Assets to which any of the WLB Debtors is a party as of the Plan Effective Date are deemed to be, and treated as though they are, Executory Contracts or Unexpired Leases, such leases or contracts shall automatically be deemed assumed and assigned to the Purchaser on the Plan Effective Date.   Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Sale Transaction Documentation and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan or Sale Transaction Documentation are effective as of the Plan Effective Date.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date.

If certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

For the avoidance of doubt, notwithstanding anything to the contrary in this Plan, no collective bargaining agreement with any union is an Executory Contract subject to assumption or rejection under the Plan (for the avoidance of doubt, the WLB Debtors reserve all rights to seek relief with respect to such collective bargaining agreements pursuant to sections 1113 and 1114 of the Bankruptcy Code).

34

B.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the WLB Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days after the effective date of the rejection of such Executory Contract or Unexpired Lease; *provided* that the WMLP Debtors shall not be required to file any such Proofs of Claim relating to the rejection of Executory Contracts or Unexpired Leases.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 14 days after service of the WLB Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim.  Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the WLB Debtors, the WLB Debtors' Estates, or the property for any of the foregoing without the need for any objection by the WLB Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the WLB Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate WLB Debtor, except as otherwise provided by order of the Bankruptcy Court.

C.    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed by the WLB Debtors as set forth in Article V.A, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Costs in Cash on or about the Plan Effective Date, subject to the limitations described below and set forth in the Sale Transaction Documentation and Article IV.C herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the Cure Costs, (2) the ability of the Successful Bidder or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Unless otherwise provided by an order of the Bankruptcy Court or in the Sale Transaction Documentation, at least 14 days before January 10, 2019, the WLB Debtors shall cause Cure Notices of proposed assumption to be sent to applicable counterparties and any objection by such counterparty to the proposed Cure Costs or a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease must be Filed, served, and actually received by the WLB Debtors not later than January 10, 2019 at 4:00 p.m. (prevailing Central Time) as set forth in the Bidding Procedures Order; *provided*, however, that the WLB Debtors may serve a supplemental notice of proposed assumption at any time prior to the Plan Effective Date, and the applicable counterparty shall have 14 days following the date of service of such supplemental notice to file its objection.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or cure amount will be deemed to have assented to such assumption.

In any case, if the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the WLB Debtors or, with respect to the Assigned Contracts and Leases, the Successful Bidder (in accordance with the Sale Transaction Documentation) will have the right to remove such Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Plan Effective Date.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time before the date that the WLB Debtors assume such Executory Contract or Unexpired Lease.  **All liabilities reflected in the Schedules and any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.

**D.     D&O Policies.**

The D&O Policies shall be assumed by the WLB Debtors on behalf of the applicable WLB Debtor effective as of the Plan Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such D&O Policy previously was rejected by the WLB Debtors or the WLB Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Plan Effective Date, and nothing shall alter, modify, or amend, affect or impair the terms and conditions of (or the coverage provided by) any of the D&O Policies including the coverage for defense and indemnity under any of the D&O Policies which shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

**E.     Chubb Policies.**

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, the Sale Transaction Documentation, the Sale Transaction Term Sheet, the Non-Core Asset Sale Documents, any bar date notice or claim objection, or any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, or requires a party to opt out of any releases): (i) all Chubb/WLB D&O Policies shall be assumed in their entirety by the WLB Debtors, and the WLB Debtors shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the WLB Debtors under such Chubb/WLB D&O Policies, without the need or requirement for the Chubb Companies to file a Proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of or permit or otherwise effect a sale, an assignment or any other transfer of the Chubb Insurance Contracts and/or any rights, benefits, claims, rights to payments, or recoveries under or relating to the Chubb Insurance Contracts without the express written consent of the Chubb Companies; and (iii) on the Plan Effective Date, the WLB/Chubb Contracts shall (a) be transferred to the Purchaser if the WLB Debtors, the Purchaser and the Chubb Companies agree to such assignment in writing through the execution of an assumption and assignment agreement by and between the WLB Debtors, the Purchaser, and the Chubb Companies, in form and substance satisfactory to each of the parties, which may provide, among other things, that the WLB Debtors are authorized to assume and assign the WLB/Chubb Contracts to the Purchaser, in which case the Purchaser shall assume and shall be liable for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under the relevant WLB/Chubb Contracts being assumed (for the avoidance of doubt, all rights and defenses are preserved regarding whether the WLB Debtors can assume and assign the WLB/Chubb Contracts); or (b) be assumed or rejected by the WLB Debtors in accordance with the applicable provisions of the Plan (for the avoidance of doubt, all rights and defenses are preserved for the Chubb Companies to contest such assumption or rejection); *provided*, however, to the extent the WLB Debtors assume such WLB/Chubb Contracts the WLB Debtors shall assume the WLB/Chubb Contracts in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code, and the WLB Debtors shall remain liable for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such WLB/Chubb Contracts without the need or requirement for the Chubb Companies to file a Proof of Claim, Administrative Claim or objection to any cure amount.

**F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the WLB Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

**G.       Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contracts and Leases List, nor anything contained in the Plan or Sale Transaction Documentation, shall constitute an admission by the WLB Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any WLB Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the WLB Debtors or the Plan Administrator, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**H.       Nonoccurrence of Plan Effective Date.**

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.       Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the WLB Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the WLB Debtors or the Plan Administrator on behalf of the WLB Debtors, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**B.       Rights and Powers of the Plan Administrator.**

**1.       Powers of the WLB Debtors and the Plan Administrator.**

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter by the WLB Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the WLB Debtors or the Plan Administrator, as applicable.

On and after the Plan Effective Date, the Plan Administrator and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof.

The WLB Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Plan Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the WLB Debtors.

### 2.     Fees of Plan Administrator and Expenses Incurred On or After the Plan Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash by the WLB Debtors if such amounts relate to any actions taken hereunder.

### C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1.     Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and the WLB Debtors, the Plan Administrator, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The Distribution Record Date shall not apply to the First Lien Notes Trustee with respect to beneficial holders of the First Lien Notes Claims.

### 2.     Delivery of Distributions on DIP Facility Claims.

Notwithstanding any provision of the Plan to the contrary, to the extent the Stalking Horse Purchaser is not the Successful Bidder, all distributions on account of Allowed DIP Facility Claims shall be governed by the documents governing the DIP Facility and such distribution shall be deemed completed when made to the DIP Facility Agent, which shall be deemed the Holder of their respective portion of the Allowed DIP Facility Claims for purposes of distributions to be made hereunder. The DIP Facility Agent shall hold or direct such distributions for the benefit of their respective Holders of Allowed DIP Facility Claims. As soon as practicable following compliance with the requirements set forth in this Article VI, the DIP Facility Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of DIP Facility Claims.

### 3.     Delivery of Distributions on Credit Agreement Claims.

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed Credit Agreement Claims shall be governed by the Credit Agreement and shall be deemed completed when made to the Credit Agreement Agent, which shall be deemed the Holder of their respective portion of the Allowed Credit Agreement Claims for purposes of distributions to be made hereunder. The Credit Agreement Agent shall hold or direct such distributions for the benefit of their respective Holders of Allowed Credit Agreement Claims. As soon as practicable following compliance with the requirements set forth in this Article VI, the Credit Agreement Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of Credit Agreement Claims.

### 4.     Delivery of Distributions on First Lien Notes Claims.

Notwithstanding any provision of the Plan to the contrary, all distributions to Holders of Allowed First Lien Notes Claims shall be deemed completed when made to the First Lien Notes Trustee. The First Lien Notes Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with beneficial holders of First Lien Notes Claims to the extent consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the rights of the First Lien Notes Trustee to assert its charging lien under the First Lien Notes Indenture against such distributions. Distributions to be made to beneficial

holders of First Lien Notes Claims may be eligible to be distributed through the facilities of DTC and as provided for under the First Lien Notes Indenture.

     **5.**    **Delivery of Distributions in General.**

        (a)    Payments and Distributions on Disputed Claims.

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator, be deemed to have been made by the Plan Administrator on the Plan Effective Date unless the Plan Administrator and the Holder of such Claim agree otherwise.

        (b)    Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the WLB Debtors or the Plan Administrator, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

        (c)    Distributions.

On and after the Plan Effective Date, the WLB Debtors shall make the distributions required to be made on account of Allowed Claims under the Plan.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the WLB Debtors in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed. Subject to Article VI.E, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

     **6.**    **Minimum;** *De Minimis* **Distributions.**

No Cash payment of less than $1,000, in the reasonable discretion of the Plan Administrator, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

     **7.**    **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the WLB Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

     **8.**    **Manner of Payment Pursuant to the Plan.**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator.

**D.**     **Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Plan Administrator shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall

comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate.  The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

**E.**     **Allocation of Plan Distributions Between Principal and Interest.**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

**F.**     **Setoffs and Recoupment.**

Except as otherwise expressly provided herein, the WLB Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the WLB Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the WLB Debtors of any such Claim it may have against the Holder of such Claim.

**G.**     **Claims Paid or Payable by Third Parties.**

**1.**     **Claims Paid by Third Parties.**

The WLB Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a WLB Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a WLB Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the WLB Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the WLB Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

**2.**     **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the WLB Debtors' insurance policies (including the Chubb Insurance Contracts), surety agreements, other non-WLB Debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all remedies with respect to such insurance policy (including the Chubb Insurance Contracts), surety agreement, other non-WLB Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the WLB Debtors' insurers (including the Chubb Companies), sureties, or non-WLB Debtor-payors pays or satisfies in full or in part a Claim (if and to the extent finally adjudicated by a court of competent jurisdiction or otherwise settled), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

     **3.**    **Applicability of Insurance Policies.**

     Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the WLB Debtor's insurance policies with respect to such policies(including the Chubb Insurance Contracts and the D&O Policies), nor shall anything contained herein (a) constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any Insurer.

**H.**     **Indefeasible Distributions.**

     Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

**I.**     **Exemption from Securities Laws.**

     To the extent the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser in connection with the Purchaser Documentation or the assumption of the DIP Facility Claims to Holders of Allowed First Lien Claims or DIP Facility Claims (as applicable), shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. These Securities are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "affiliate" of the Purchaser within the meaning of Rule 144 under the Securities Act. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. To the extent any Entity other than the Stalking Horse Purchaser is the Successful Bidder, the issuance of and the distribution under the Plan of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be under section 4(a)(2) of the Securities Act and such Purchaser Stock and any debt Securities issued or assumed by the Purchaser will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act.

**ARTICLE VII**
**THE PLAN ADMINISTRATOR**

**A.**     **The Plan Administrator.**

     The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Wind-Down Amount and the General Unsecured Claims Amount, and wind down the businesses and affairs of the WLB Debtors, including: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount and the General Unsecured Claims Amount; (3) making distributions from the Wind-Down Amount and the General Unsecured Claims Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the WLB Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the WLB Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the WLB Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the WLB Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

     The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim

successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the WLB Debtors in the Plan Administrator Agreement shall be terminated.

### 1.  Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

### 2.  Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the WLB Debtors upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business by the WLB Debtors and shall not be subject to the approval of the Bankruptcy Court.

### 3.  Compensation of the Plan Administrator.

The Plan Administrator's post-Plan Effective Date compensation, the amount and terms of which are subject to the consent of the Required Consenting Stakeholders, will be set forth in the Plan Supplement and paid by the WLB Debtors.

### 4.  Plan Administrator Expenses.

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the WLB Debtors on or after the Plan Effective Date, or in any manner connected, incidental or related thereto, in effecting distributions from the WLB Debtors thereunder (including the reimbursement of reasonable expenses) shall be paid by the Liquidating Trust as they are incurred without the need for Bankruptcy Court approval.

### B.     Wind-Down.

On and after the Plan Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the WLB Debtors' Estates.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall:  (1) cause the WLB Debtors to comply with, and abide by, the terms of the Sale Transaction Documentation and any other documents contemplated thereby; (2) take any actions necessary to wind down the WLB Debtors' Estates; *provided* that the WLB Debtors shall not be dissolved until the satisfaction of the conditions precedent to such dissolution in Article VIIE; (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Plan Effective Date, except as set forth herein, the WLB Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the WLB Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to this Plan all Interests (except, prior to the Post-Closing Reconciliation Date, the WCC Interests), and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date.

The filing of the final monthly operating report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

C.    **Exculpation; Indemnification; Insurance; Liability Limitation.**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the WLB Debtors.  The Plan Administrator may obtain, at the expense of the WLB Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the WLB Debtors.  The Plan Administrator may rely upon written information previously generated by the WLB Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the WLB Debtors.

D.    **Tax Returns.**

After the Plan Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the WLB Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such WLB Debtor or its Estate for any tax incurred during the administration of such WLB Debtor's Chapter 11 Case, as determined under applicable tax laws.

E.    **Dissolution of the WLB Debtors.**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Post-Closing Reconciliation Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the WLB Debtors' Chapter 11 Cases, the WLB Debtors shall be deemed to be dissolved without any further action by the WLB Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the WLB Debtors is formed or any other jurisdiction.  The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the WLB Debtors in and withdraw the WLB Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the WLB Debtors' dissolution on or after the Post-Closing Reconciliation Date, the WLB Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the WLB Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement), such Cash or other property shall be immediately allocated and distributed to the Holders of Allowed First Lien Claims.

<div align="center">

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

</div>

A.    **Allowance of Claims and Interests.**

1.    **General.**

On and after the Plan Effective Date, the WLB Debtors shall have and shall retain any and all rights and defenses that the WLB Debtors had with respect to any Claim or Interest immediately before the Plan Effective Date, and, with respect to any Claims or Interests that constitute Funded Liabilities or Assumed Liabilities, the Successful Bidder shall have and retain any and all rights, defenses, and other Transferred Causes of Action that the WLB Debtors had with respect to such Claims or Interests immediately before the Plan Effective Date.  Except as

<div align="center">43</div>

expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the WLB Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

### 2.    Allowance of First Lien Claims.

The First Lien Claims shall be deemed Allowed as of the Petition Date, with the Credit Agreement Claims being Allowed in the principal amount of $319,773,165.17, and the First Lien Notes Claims being Allowed in the principal amount of $350,000,000.00, plus, for each of the Credit Agreement Claims and the First Lien Notes Claims, accrued and unpaid interest, plus fees and other expenses due under the Credit Agreement and the First Lien Notes Indenture, as applicable.

### B.    Claims and Interests Administration Responsibilities.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Plan Effective Date, the WLB Debtors, by order of the Bankruptcy Court, shall have the sole authority, in consultation with the Consenting Stakeholders with regard to all Claims: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### C.    Estimation of Claims and Interests.

As of the Plan Effective Date, the WLB Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### D.    Adjustment to Claims or Interests without Objection.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**E.      Time to File Objections to Claims.**

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Plan Effective Date and (2) such other period of limitation as may be specifically fixed by the WLB Debtors or by a Final Order for objecting to such claims.

**F.      Disallowance of Claims.**

Other than with respect to Claims Allowed under the Plan, to the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall automatically be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the WLB Debtors by that Entity have been turned over or paid to the WLB Debtors or the Plan Administrator.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**G.      Amendments to Claims.**

On or after the Plan Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the WLB Debtors or the Plan Administrator, as applicable, and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action.

**H.      No Distributions Pending Allowance.**

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VIII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

**I.      Distributions After Allowance.**

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

**J.      Undeliverable Distribution Reserve.**

**1.      Deposits.**

If a distribution under the Plan to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed or is an Undeliverable Distribution, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.C.7.

### 2. Disclaimer.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Holder of a Claim, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notices of unclaimed distributions.

### 3. Distribution from Reserve.

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an unclaimed or undeliverable distribution (*provided* that satisfaction occurs within the time limits set forth in Article VI.C.7), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the unclaimed or undeliverable distribution attributable to such Claim, including the interest that has accrued on such unclaimed or undeliverable distribution while in the Undeliverable Distribution Reserve, to such Holder.

For the avoidance of doubt, in accordance with Article VI.C.7 of the Plan, in the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the WLB Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### K. Single Satisfaction of Claims.

Holders of Allowed Claims may assert such Claims against the WLB Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the WLB Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

### ARTICLE IX
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Settlement, Compromise, and Release of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the WLB Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the WLB Debtors and their Estates and Causes of Action against other Entities.

B.      **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including Black Lung Claims and any Intercompany Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the WLB Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the WLB Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

C.      **Release of Liens.**

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than the mortgages, deeds of trust, Liens, pledges or other security interests in place or to be issued for the DIP Facility if assumed by the Purchaser) shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the WLB Debtors and their successors and assigns or (ii) the Purchaser (and if applicable, any third party purchasing the Non-Core Assets), in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the WLB Debtors.  In addition, the First Lien Notes Trustee and Credit Agreement Agent shall execute and deliver all documents reasonably requested by the WLB Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the WLB Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

D.      **Releases by the WLB Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the WLB Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the WLB Debtors, that the WLB Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a WLB Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' capital structure, the assertion or enforcement of rights and remedies against the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities**

47

pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action (including, for each, Avoidance Actions), such parties shall remain Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the WLB Debtors and after notice and opportunity for hearing; and (6) a bar to any of the WLB Debtors asserting any claim released by the releases herein against any of the Released Parties.

E.      **Releases by Holders of Claims and Interests.**

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

F.      **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

G.      **Injunction.**

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the WLB Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

H.      **Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the WLB Debtors, unless such Holder actually has performed such recoupment and provided

notice thereof in writing to the WLB Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**I.      Subordination Rights.**

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**J.      Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

**K.      Reservation of Governmental Units.[2]**

As to Governmental Units, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the WLB Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar Governmental Units from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to a Governmental Unit that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to a Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of a Governmental Unit against any of the WLB Debtors; or (d) any liability of the WLB Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-WLB Debtor, including any Released Parties and/or Exculpated Parties, from any liability to a Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin a Governmental Unit from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

---

[2]     The language in this section is under continuing review in all respects by all parties, and all parties' rights with respect thereto are reserved.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the WLB Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## ARTICLE X
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the following findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

**A.      Jurisdiction and Venue**

On the Petition Date, the WLB Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The WLB Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.  Venue in the Southern District of Texas was proper as of the Petition Date and continues to be proper.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

**B.      Order Approving the Disclosure Statement**

On December [18], 2018, the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 and (b) approved certain procedures and documents for soliciting and tabulating votes with respect to the Plan.

**C.      Voting Report**

Prior to the Confirmation Hearing, the Claims and Notice Agent filed the Voting Report.  All procedures used to distribute solicitation materials to the applicable Holders of Claims and Interests and to tabulate the Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.  Pursuant to sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class entitled to vote on the Plan has voted to accept the Plan.

**D.      Judicial Notice**

The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents Filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases (including the Confirmation Hearing). Resolutions of any objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All entries on the docket of the Chapter 11 Cases shall constitute the record before the Bankruptcy Court for purposes of the Confirmation Hearing.

E.      **Transmittal and Mailing of Materials; Notice**

Due, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, and the release and exculpation provisions set forth in Article IX of the Plan, along with all deadlines for voting on or objecting to the Plan, has been given to (1) all known Holders of Claims and Interests; (2) parties that requested notice in accordance with Bankruptcy Rule 2002; (3) all parties to Unexpired Leases and Executory Contracts, and (4) all taxing authorities listed on the Schedules or in the Claims Register, in compliance with Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Disclosure Statement Order and the Bidding Procedures Order, and such transmittal and service were appropriate, adequate, and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and other dates, deadlines, and hearings described in the Disclosure Statement Order and the Bidding Procedures Order was given in compliance with the Bankruptcy Rules and such order, and no other or further notice is or shall be required.

F.      **Solicitation**

Votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations.  The WLB Debtors and their respective directors, managers, officers, employees, agents, affiliates, representatives, attorneys, and advisors, as applicable, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Disclosure Statement Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article IX of the Plan.  The WLB Debtors and the Released Parties solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of the Purchaser Stock and any debt Securities issued or assumed by the Purchaser that were offered or sold under the Plan, and, pursuant to section 1125(e) of the Bankruptcy Code, no Released Party is or shall be liable on account of such solicitation or participation for violation of any applicable law, rule, or regulation governing solicitation of acceptance of a chapter 11 plan or the offer, issuance, sale, or purchase of such Securities.

G.      **Burden of Proof**

The WLB Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.  The Bankruptcy Court also finds that the WLB Debtors have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

H.      **Bankruptcy Rule 3016(a) Compliance**

The Plan is dated and identifies the proponents thereof, thereby satisfying Bankruptcy Rule 3016(a).

I.      **Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

The Plan complies with all requirements of section 1129 of the Bankruptcy Code as follows:

1.      **Section 1129(a)(1)–Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1121, 1122, 1123, and 1125 of the Bankruptcy Code.

(a)      Standing

Each of the WLB Debtors has standing to file a plan and the WLB Debtors, therefore, have satisfied section 1121 of the Bankruptcy Code.

(b)       Proper Classification

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, <u>Article III</u> of the Plan designates Classes of Claims and Interests, other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, which are not required to be classified.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

(c)       Specification of Unimpaired Classes

Pursuant to section 1123(a)(2) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies all Classes of Claims and Interests that are not Impaired.

(d)       Specification of Treatment of Impaired Classes

Pursuant to section 1123(a)(3) of the Bankruptcy Code, <u>Article III</u> of the Plan specifies the treatment of all Classes of Claims and Interests that are Impaired.

(e)       No Discrimination

Pursuant to section 1123(a)(4) of the Bankruptcy Code, <u>Article III</u> of the Plan provides the same treatment for each Claim or Interest within a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to less favorable treatment with respect to such Claim or Interest, as applicable.

(f)       Plan Implementation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Immediately upon the Plan Effective Date, sufficient Cash and other consideration provided under the Plan will be available to make all payments required to be made on the Plan Effective Date pursuant to the terms of the Plan.  Moreover, <u>Article IV</u> and various other provisions of the Plan specifically provide adequate means for the Plan's implementation.

(g)       Voting Power of Equity Securities; Selection of Officer, Director, or Trustee under the Plan

The Purchaser Documentation complies with sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code

(h)       Impairment/Unimpairment of Classes of Claims and Equity Interests

Pursuant to section 1123(b)(1) of the Bankruptcy Code, (i) Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired under the Plan, (ii) Class 3 (First Lien Claims), Class 4 (General Unsecured Claims), Class 8 (Section 510(b) Claims), and Class 9 (WCC Interests) are Impaired under the Plan, and (iii) Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the election of the WLB Debtors or the Plan Administrator (with such election being subject to the consent of the Required Consenting Stakeholders).

(i)       Assumption and Rejection of Executory Contracts and Unexpired Leases

In accordance with section 1123(b)(2) of the Bankruptcy Code, pursuant to <u>Article VA</u> of the Plan, as of the Plan Effective Date, all Executory Contracts and Unexpired Leases listed on the Assumed Contracts and Leases List will be deemed:  (A) assumed by the applicable WLB Debtor in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; and (B) if so indicated on the Assumed Contracts and Leases List, assigned to the other party identified as the assignee for each assumed Executory Contract and Unexpired Lease.  Pursuant to <u>Article VA</u> of the Plan, each WLB Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or

Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the WLB Debtors or assumed by the WLB Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Purchaser Documentation. The WLB Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases listed on the Assumed Contracts and Leases List pursuant to Article V of the Plan governing assumption and rejection of executory contracts and unexpired leases satisfies the requirements of section 365(b) of the Bankruptcy Code and, accordingly, the requirements of section 1123(b)(2) of the Bankruptcy Code.

The WLB Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases under the terms of the Plan. Each pre- or post-Confirmation rejection, assumption, or assumption and assignment of an Executory Contract or Unexpired Lease pursuant to Article V of the Plan will be legal, valid and binding upon the applicable WLB Debtor and all other parties to such Executory Contract or Unexpired Lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the Executory Contracts and Unexpired Leases to be rejected, assumed, or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

(j)      Settlement of Claims and Causes of Action

All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the WLB Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

In reaching an ultimate decision on substantive fairness, the Court considered the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

(k)      Cure of Defaults

Article V of the Plan provides for the satisfaction of default claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. The Cure Costs identified in the Assumed Contracts and Leases List and any amendments thereto, as applicable, represent the amount, if any, that the WLB Debtors or the Purchaser, as applicable, propose to pay in full and complete satisfaction of such default claims. Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V of the Plan, and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the WLB Debtors or the Purchaser, as applicable, will cure, or provide adequate assurance that the WLB Debtors or the Purchaser, as applicable, will promptly cure, defaults with Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

(l)        Other Appropriate Provisions

The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including without limitation, provisions for (i) distributions to holders of Claims and Interests, (ii) objections to Claims, (iii) procedures for resolving disputed, contingent, and unliquidated claims, (iv) cure amounts, (v) procedures governing cure disputes, and (vi) indemnification obligations.

## 2.   Section 1129(a)(2)–Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code

The WLB Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.  In particular, the WLB Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.  Furthermore, the solicitation of acceptances or rejections of the Plan was (i) pursuant to the Disclosure Statement Order; (ii) in compliance with all applicable laws, rules, and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code. Accordingly, the WLB Debtors and their respective directors, officers, employees, agents, affiliates, and Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

## 3.   Section 1129(a)(3)–Proposal of Plan in Good Faith

The WLB Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the WLB Debtors to reorganize.

## 4.   Section 1129(a)(4)–Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made for services or for costs in connection with the Chapter 11 Cases or the Plan are approved.  The fees and expenses incurred by Professionals retained by the WLB Debtors or the Committee shall be payable according to the orders approving such Professionals' retentions, the Interim Compensation Order, other applicable Bankruptcy Court orders, or as otherwise provided in the Plan.  In addition, the fees of the Prepetition Secured Parties and the DIP Agent shall be paid as provided for in the Plan and the DIP Order.

## 5.   Section 1129(a)(5)–Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy

Pursuant to section 1129(a)(5) of the Bankruptcy Code, information concerning the person proposed to serve as the Plan Administrator and his or her compensation upon Consummation of the Plan has been fully disclosed (in the Plan Supplement) to the extent available, and the appointment to, or continuance in, such office of such person is consistent with the interests of Holders of Claims and Interests and with public policy.

## 6.   Section 1129(a)(6)–Approval of Rate Changes

Section 1129(a)(6) of the Bankruptcy Code is not applicable because the Plan does not provide for rate changes by any of the WLB Debtors.

## 7.   Section 1129(a)(7)–Best Interests of Creditors and Interest Holders

The liquidation analysis included in the Disclosure Statement, and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, is reasonable.

The methodology used and assumptions made in such liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable.  With respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has accepted the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Plan Effective Date, that is not less than the amount such Holder would receive if the WLB Debtors were liquidated under chapter 7 of the Bankruptcy Code.

**8.   Section 1129(a)(8)–Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class**

Certain Classes of Claims and Interests are Unimpaired and are deemed conclusively to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, at least one Impaired Class that was entitled to vote has voted to accept the Plan.  Because the Plan provides that the certain Classes of Claims and Interests will be Impaired and because no distributions shall be made to Holders in such Classes, such Holders are deemed conclusively to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**9.   Section 1129(a)(9)–Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

The treatment of Administrative Claims, Professional Fee Claims, DIP Facility Claims, Other Priority Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**10.   Section 1129(a)(10)–Acceptance by at Least One Impaired Class**

At least one Impaired Class has voted to accept the Plan.   Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

**11.   Section 1129(a)(11)–Feasibility of the Plan**

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the WLB Debtors or any successor to the WLB Debtors under the Plan, except as such liquidation is proposed in the Plan.  Furthermore, the WLB Debtors will have adequate assets to satisfy their respective obligations under the Plan.  Entry of the Confirmation Order shall be a judicial finding that based on the information available to date, the WLB Debtors do not believe there are Administrative Claims from any party that are materially inconsistent with the Funded Liability Cap.

**12.   Section 1129(a)(12)–Payment of Bankruptcy Fees**

Article XIVC of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a) in accordance with section 1129(a)(12) of the Bankruptcy Code.

**13.   Section 1129(a)(13)–Retiree Benefits**

The Plan provides for the treatment of all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code.

**14.   Section 1129(a)(14)–Domestic Support Obligations**

The WLB Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligations, and therefore, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

### 15.  Section 1129(a)(15)–The WLB Debtors Are Not Individuals

The WLB Debtors are not individuals, and therefore, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

### 16.  Section 1129(a)(16)–No Applicable Nonbankruptcy Law Regarding Transfers

Each of the WLB Debtors that is a corporation is a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

### 17.  Section 1129(b)–Confirmation of Plan Over Rejection of Impaired Classes

The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to the Classes presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or that have actually rejected the Plan (if any).  To determine whether a plan is "fair and equitable" with respect to a class of claims, section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides in pertinent part that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."   To determine whether a plan is "fair and equitable" with respect to a class of interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." There are no classes junior to the deemed (or actual) rejecting classes of claims or interests that will receive any distribution under the Plan.  The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

### 18.  Section 1129(c)–Confirmation of Only One Plan With Respect to the WLB Debtors

The Plan is the only plan that has been filed in these Chapter 11 Cases with respect to the WLB Debtors. Accordingly, the Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.

### 19.  Section 1129(d)–Principal Purpose Not Avoidance of Taxes

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### 20.  Section 1129(e)–Small Business Case

Section 1129(e) is inapplicable because these Chapter 11 Cases do not qualify as small business cases thereunder.

**J.     Securities Under the Plan**

Pursuant to the Plan, and without further corporate or other action, the Purchaser Stock and any debt issued or assumed by the Purchaser will be issued by the Purchaser on the Plan Effective Date subject to the terms of the Plan.

**K.     Releases and Discharges**

The releases and discharges of Claims and Causes of Action described in the Plan, including releases by the WLB Debtors and by Holders of Claims, constitute good faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan:  (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral

element of the transactions incorporated into the Plan; (d) confers material benefit on, and is in the best interests of, the WLB Debtors, their estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the WLB Debtors; (f) is consistent with sections 105, 1123, 1129, and all other applicable provisions of the Bankruptcy Code; (g) given and made after due notice and opportunity for hearing; and (h), without limiting the foregoing, with respect to the releases and injunctions in Article IX of the Plan, are (i) essential elements of the Sale Transaction and Plan, (ii) terms and conditions without which the Consenting Stakeholders would not have entered into the RSA and the Purchaser would not have entered into the Sale Transaction Documentation, (iii) narrowly tailored, and (iv) in consideration of the substantial financial contribution of the Purchaser under the Plan.  Furthermore, the injunction set forth in Article IX is an essential component of the Plan, the fruit of long-term negotiations and achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the Chapter 11 Cases.

**L.    Release and Retention of Causes of Action**

It is in the best interests of Holders of Claims and Interests that the provisions in Article IVQ of the Plan be approved.

**M.    Approval of Purchase Agreement and Other Documents and Agreements**

All documents and agreements necessary to implement the Plan, including the Sale Transaction Documentation, are essential elements of the Plan, are necessary to consummate the Plan and the Sale Transaction, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the WLB Debtors, the Estates, and Holders of Claims and Interests.  The WLB Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.   The terms and conditions of such documents and agreements have been negotiated in good faith, at arm's-length, are fair and reasonable, and are hereby reaffirmed and approved, and subject to the occurrence of the Plan Effective Date and execution and delivery in accordance with their respective terms, shall be in full force and effect and valid, binding, and enforceable in accordance with their respective terms, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, or other action under applicable law, regulation, or rule.

**N.    Confirmation Hearing Exhibits**

All of the exhibits presented at the Confirmation Hearing have been properly received into evidence and are a part of the record before the Bankruptcy Court.

**O.    Objections to Confirmation of the Plan**

Any and all objections to Confirmation have been withdrawn, settled, overruled, or otherwise resolved.

**P.    Exemption from Transfer Taxes with Respect to the Sale Transaction**

The Sale Transaction constitutes a sale or transfer under a plan confirmed under section 1129 of the Bankruptcy Code and, accordingly, the Sale Transaction shall not be subject to any tax under any law imposing a stamp tax or similar tax, including any real or personal property transfer tax, pursuant to section 1146(a) of the Bankruptcy Code.

**Q.    Good Faith Purchaser Status**

The Purchaser is a good faith purchaser for the purposes of section 363(m) of the Bankruptcy Code and entitled to the benefits thereof in relation to the Sale Transaction.

**R.      Sale Free and Clear**

All assets and rights sold by the WLB Debtors under the Sale Transaction Documentation are transferred, conveyed, and assigned to the Purchaser free and clear of all Liens, Claims, encumbrances, and interests pursuant to sections 363(f), 1123(a)(5), and 1141(c) of the Bankruptcy Code.

**S.      Retention of Jurisdiction**

The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XIII of the Plan and section 1142 of the Bankruptcy Code.

**T.      Plan Supplement**

The WLB Debtors filed the Plan Supplement, which includes the following documents:  (1) the Assumed Contracts and Leases List; (2) the identity of the Plan Administrator and the compensation of the Plan Administrator; (3) the General Unsecured Claims Amount; (4) the Wind-Down Budget; (5) the Description of Transaction Steps; (6) the Purchaser Documentation; (7) the Liquidating Trust Agreement; (8) those Transferred Causes of Action that shall be transferred to the Purchaser pursuant to the Sale Transaction Documentation; (9) the Retained Causes of Action; (10) the Plan Administrator Agreement; (11) the Advisory Services Agreements, including the compensation thereunder; and (12) the terms of the Insider Incentive Plan (to the extent such terms were not disclosed in a motion Filed by the WLB Debtors with the Bankruptcy Court prior to the filing of the Plan Supplement); *provided* that the Description of Transaction Steps is subject to modification until the Plan Effective Date.  All such documents comply with the terms of the Plan, and the filing and notice of such documents was adequate, proper and in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

<div align="center">

**ARTICLE XI**
**CONDITIONS PRECEDENT TO CONFIRMATION,**
**THE PLAN EFFECTIVE DATE, AND THE POST-CLOSING RECONCILIATION DATE**

</div>

**A.      Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:  (1) the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order; and (2) the Sale Transaction Documentation shall not have been terminated in accordance with its terms.

**B.      Conditions Precedent to the Plan Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order; *provided* that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.      the occurrence of the Closing (as such term is defined and described in the Sale Transaction Documentation);

3.      the RSA shall not have terminated and remain in full force and effect;

4.      the General Unsecured Claims Amount (if any) shall have been funded;

5.      the Disclosure Statement Order and the Confirmation Order shall have been entered and shall not have been stayed, modified, or vacated on appeal;

6.      the WLB Debtors have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

7.      the establishment of a Professional Fee Escrow Account funded in the amount of estimated accrued but unpaid Professional fees incurred by the legal counsel and other advisors to the WLB Debtors and any statutory committees during the Chapter 11 Cases;

8.      the Purchaser (or an Affiliate thereof) has paid the Wind-Down Amount to the WLB Debtors in accordance with, and as limited by, the terms of the Sale Transaction Documentation;

9.      all schedules, documents, supplements and exhibits to the Plan shall be, in form and substance, in accordance with the terms of the RSA;

10.      all fees and expenses of the Bridge Loan Agent, the Credit Agreement Agent, the DIP Agent, the First Lien Notes Trustee and the Consenting Stakeholders payable pursuant to the DIP Order shall have been paid in full; and

11.      any and all requisite governmental, regulatory and third-party approvals and consents shall have been obtained.

On the Plan Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**C.      Conditions Precedent to the Post-Closing Reconciliation Date**

It shall be a condition to the occurrence of the Post-Closing Reconciliation Date that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the earlier to occur of (i) one day after the WMLP Plan Effective Date and (ii) if the Sale Transaction is structured as a G Reorganization, the date that is two years after the Closing of the Sale Transaction; and

2.      the Plan Effective Date shall have occurred.

**D.      Waiver of Conditions.**

The conditions to Consummation of the Plan set forth in <u>Article XI.B</u> and the conditions to the Post-Closing Reconciliation Date set forth in <u>Article XI.C</u> may be waived by the WLB Debtors; *provided* that (x) the conditions set forth in <u>Article XI.B.1</u>, <u>Article XI.B.2</u>, <u>Article XI.B.3</u>, <u>Article XI.B.4</u>, and <u>Article XI.B</u>.9 may not be waived without the consent of the Required Consenting Stakeholders, (y) the condition set forth in <u>Article XI.B.10</u> may not be waived without the consent of the parties named therein and (z) the WLB Debtors shall consult with the Conflicts Committee of the board of directors of Westmoreland Resource Partners GP, LLC at least five business days prior to waiving the conditions to the Post-Closing Reconciliation Date.

**E.      Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

F.      **Effect of Non-Occurrence of Conditions to the Plan Effective Date.**

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the WLB Debtors; (2) prejudice in any manner the rights of the WLB Debtors, the WLB Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the WLB Debtors, the WLB Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE XII
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      **Modification and Amendments.**

Subject to the limitations contained in the Plan, the RSA, and the Sale Transaction Documentation, the WLB Debtors, with the consent (not to be unreasonably withheld) of the Required Consenting Stakeholders and the Successful Bidder, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the RSA, and the Sale Transaction Documentation, the WLB Debtors, with the consent (not to be unreasonably withheld) of the Required Consenting Stakeholders and the Successful Bidder, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the WLB Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.

B.      **Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of the Plan.**

Subject to the terms of the RSA and the Sale Transaction Documentation, the WLB Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any WLB Debtor or all WLB Debtors, prior to the Confirmation Date.  If the WLB Debtors revoke or withdraw the Plan with respect to any WLB Debtor, or if Confirmation or Consummation does not occur with respect to any WLB Debtor, then:  (1) the Plan with respect to such WLB Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such WLB Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such WLB Debtor, and any document or agreement executed pursuant to the Plan with respect to such WLB Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such WLB Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the WLB Debtors, the WLB Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the WLB Debtors, the WLB Debtors' Estates, or any other Entity.

## ARTICLE XIII
### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a WLB Debtor is party or with respect to which a WLB Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the WLB Debtors amending, modifying, or supplementing, after the Plan Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Assumed Contracts and Leases List or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a WLB Debtor that may be pending on the Plan Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1 of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      Determine any other matters that may arise in connection with or relate to the Plan, the Transaction Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.      Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      Hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.      Hear and determine all disputes involving the existence, nature, or scope of the WLB Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Plan Effective Date;

24.      Enforce all orders previously entered by the Bankruptcy Court;

25.      To resolve any disputes arising under the Sale Transaction Documentation or other documents related to the Sale Transaction;

26.      Hear any other matter not inconsistent with the Bankruptcy Code; and

27.      Enter an order concluding or closing the Chapter 11 Cases.


## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect.**

Subject to Article VIII of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the WLB Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-WLB Debtor parties to Executory Contracts and Unexpired Leases with the WLB Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.      Additional Documents.**

On or before the Plan Effective Date, the WLB Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The WLB Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees.**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the WLB Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**D.      Dissolution of Statutory Committees.**

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Plan Effective Date.

**E.      Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the WLB Debtors or any WLB Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the WLB Debtors or any WLB Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

**F.      Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**G.      Service of Documents.**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the WLB Debtors shall be served on:

    **1.      the WLB Debtors:**

        Westmoreland Coal Company
        9540 South Maroon Circle, Suite 300
        Englewood, Colorado 80112
        Attention: Jennifer Grafton, Chief Legal Officer and Chief Administrative Officer
        Email address: jgrafton@westmoreland.com

        with copies to:

        Kirkland & Ellis LLP
        300 North LaSalle Street
        Chicago, Illinois 60654

Attention:  Gregory Pesce
Email addresses: gregory.pesce@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Stephen E. Hessler, P.C.
Email addresses: stephen.hessler@kirkland.com

2.   the Consenting Stakeholders:

Consenting Stakeholder Notice Parties (as defined in the RSA) listed on **Schedule 3** to the RSA.

with copies to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention:  Thomas Moers Mayer and Stephen Zide
Email addresses: tmayer@kramerlevin.com; szide@kramerlevin.com

3.   the Committee:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attention:  Lorenzo Marinuzzi and Todd Goren
Email addresses: lmarinuzzi@mofo.com; tgoren@mofo.com

After the Plan Effective Date, the WLB Debtors shall have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Plan Effective Date, the WLB Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**H.      Enforcement of Confirmation Order.**

On and after the Plan Effective Date, the WLB Debtors, the Plan Administrator, and the Successful Bidder, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement and the Sale Transaction Documentation).

**I.      Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order (including the injunction set forth in Article IX.G) shall remain in full force and effect in accordance with their terms.

J.        **Compensation and Benefits Programs.**

On the Plan Effective Date or as soon as practicable thereafter, the WLB Debtors shall pay all compensation and benefit obligations under any present compensation, benefit, or incentive programs, including any programs approved pursuant to the Wages Order, the Supplemental Retention Program, the Insider Incentive Plan (if any), the Insider Incentive Plan Order (if any), and the Non-Insider Retention Plan Order (if any), other than any compensation, benefit, and incentive obligations assumed by the Purchaser pursuant to the Sale Transaction Documentation.  Immediately upon the occurrence of the Plan Effective Date, employee participants in the programs approved pursuant to any Insider Incentive Plan Order or Non-Insider Retention Plan Order shall be entitled to an award under such programs based on performance during the period between January 1, 2018 and the Plan Effective Date, to be paid by the WLB Debtors on the occurrence of the Plan Effective Date.  On and after the Plan Effective Date, the Plan Administrator shall have the authority to direct disbursements of the awards and allocations of such disbursements to be determined by the WLB Debtors' existing independent directors, subject to and in accordance with any present compensation, benefit, or incentive programs expressly approved pursuant to a prior Court order, including the Wages Order, the Insider Incentive Plan Order (if any), or the Non-Insider Retention Plan Order (if any).

On the Plan Effective Date, the Purchaser shall enter into the Advisory Services Agreements.

K.        **Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, the Sale Transaction Documentation, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.        **Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the WLB Debtors' counsel at the address above or by downloading such exhibits and documents from the WLB Debtors' restructuring website at http://www.donlinrecano.com/westmoreland or the Bankruptcy Court's website at www.txsb.uscourts.gov/bankruptcy.

M.        **Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the WLB Debtors (with the consent of the Required Consenting Stakeholders), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided, further*, that any such alteration or interpretation shall be acceptable to the WLB Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the WLB Debtors; and (3) nonseverable and mutually dependent.

N.        **Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the WLB Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the WLB Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under

the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**O.      Waiver.**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the WLB Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted,

Dated:  December 18, 2018                          WESTMORELAND COAL COMPANY
                                                                       on behalf of itself and all other WLB Debtors


                                                                       */s/ Michael G. Hutchinson*
                                                                       Name: Michael G. Hutchinson
                                                                       Title: Chief Executive Officer
                                                                       Company: Westmoreland Coal Company

**Exhibit B**

**Stalking Horse Purchase Agreement**

**PURCHASE AND SALE AGREEMENT**[1]


**dated as of**


**[●], 2019**


**among**


**[BUYER],**


**WESTMORELAND COAL COMPANY,**


**THE SUBSIDIARIES OF WESTMORELAND COAL COMPANY LISTED ON SCHEDULE A HERETO**


and


**WESTMORELAND COAL COMPANY,**
AS SELLERS' REPRESENTATIVE

---

[1]   This document has been prepared solely to facilitate discussions of a possible transaction among the parties identified herein. It is not intended, and will not be deemed, to constitute an offer or agreement, or to create legally binding or enforceable obligations, of any type or nature. No such offer, agreement or obligations shall be made or created among the parties identified herein except pursuant to a written agreement executed and delivered by such parties.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS**................................................................................1
    Section 1.01   Definitions...................................................................1
    Section 1.02   Other Definitional and Interpretative Provisions......................20

**ARTICLE 2 PURCHASE AND SALE** ....................................................................**20**
    Section 2.01   Purchase and Sale of Purchased US Assets ...........................20
    Section 2.02   Purchase and Sale of Purchased Equity Interests .....................25
    Section 2.03   Excluded Assets ...........................................................25
    Section 2.04   Assumed Liabilities ......................................................28
    Section 2.05   Excluded Liabilities ......................................................30
    Section 2.06   Assignment of Assumed Contracts and Rights; Cure Amounts ...............33
    Section 2.07   Purchase Price; Allocation of Purchase Price; Apportionment ...............36
    Section 2.08   Coal Inventory ............................................................37
    Section 2.09   Closing ...................................................................38
    Section 2.10   Delivery of Transferred Assets and Procedure at Closing........................38
    Section 2.11   Buyer's Deliveries at Closing ...........................................40
    Section 2.12   Withholding ..............................................................41
    Section 2.13   Simultaneous Transactions ................................................41
    Section 2.14   Supplemental Assignments ................................................41
    Section 2.15   Designated Buyers ........................................................42
    Section 2.16   Payments by Buyer ........................................................42
    Section 2.17   Treatment of Single-Employer Pension Plans ..............................43
    Section 2.18   Determination of Certain Amounts for Closing...........................43

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS**................**45**
    Section 3.01   Corporate Existence and Power .........................................45
    Section 3.02   Corporate Authorization ..................................................46
    Section 3.03   Governmental Authorization .............................................46
    Section 3.04   Noncontravention.........................................................46
    Section 3.05   Capitalization ............................................................47
    Section 3.06   Owned Real Property .....................................................48
    Section 3.07   Assumed Leases and Leased Real Property................................49
    Section 3.08   Licenses and Permits .....................................................51
    Section 3.09   Environmental Matters....................................................52
    Section 3.10   Title to the Transferred Assets ...........................................53
    Section 3.11   Contracts ................................................................54
    Section 3.12   Financial Statements .....................................................56
    Section 3.13   Periodic Reports .........................................................56
    Section 3.14   Ordinary Course of Business .............................................56
    Section 3.15   Buildings and Improvements .............................................57
    Section 3.16   Insurance ................................................................57
    Section 3.17   Litigation, Investigations and Claims ....................................57
    Section 3.18   Laws and Regulations ....................................................58

Section 3.19    Tax Matters ....................................................................................58
Section 3.20    Intellectual Property.......................................................................60
Section 3.21    Finders' Fees...................................................................................61
Section 3.22    FCPA Matters .................................................................................61
Section 3.23    Cure Costs .......................................................................................61
Section 3.24    Related Party Transactions ............................................................61
Section 3.25    Health and Safety ...........................................................................61
Section 3.26    Bank Accounts; Powers of Attorney...............................................62
Section 3.27    Mining Financial Assurances.........................................................62
Section 3.28    Coal Act; Black Lung Benefits Act ................................................62
Section 3.29    Canadian Benefit Plans ..................................................................63
Section 3.30    U.S. Benefit Plans ..........................................................................64
Section 3.31    Canadian Insolvency Proceedings ..................................................64
Section 3.32    Absence of Undisclosed Liabilities ................................................65

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................65**
Section 4.01    Corporate Existence and Power .....................................................65
Section 4.02    Corporate Authorization.................................................................65
Section 4.03    Governmental Authorization ..........................................................65
Section 4.04    Noncontravention............................................................................66
Section 4.05    Adequate Assurances Regarding Assumed Contracts .............................66
Section 4.06    Litigation.........................................................................................66
Section 4.07    Finders' Fees...................................................................................66
Section 4.08    Assurances Regarding Permits .......................................................66
Section 4.09    Assurances Regarding Bonding......................................................67
Section 4.10    Inspections; No Other Representations...........................................67
Section 4.11    No Other Representations or Warranties of Buyer .................................67

**ARTICLE 5 COVENANTS OF THE SELLERS .............................................................68**
Section 5.01    Conduct of the Aggregate Purchased Business .................................68
Section 5.02    No Changes in Business..................................................................69
Section 5.03    Access to Information......................................................................72
Section 5.04    Records of Purchased Business ......................................................73
Section 5.05    Release; Acknowledgements ...........................................................73
Section 5.06    Bankruptcy Process.........................................................................74
Section 5.07    Additional Bankruptcy Matters.......................................................75
Section 5.08    Insurance .........................................................................................76
Section 5.09    Title Policies ...................................................................................76
Section 5.10    Indemnity Agreements.....................................................................76
Section 5.11    Affiliate Arrangements....................................................................76
Section 5.12    WRMI ..............................................................................................77

**ARTICLE 6 COVENANTS OF BUYER...........................................................................77**
Section 6.01    Access ..............................................................................................77
Section 6.02    Bankruptcy Actions .........................................................................77
Section 6.03    Avoidance Actions ...........................................................................78
Section 6.04    Credit Bid........................................................................................78

Section 6.05    Confidentiality ............................................................................78
Section 6.06    Payment of Cure Costs...................................................................78

**ARTICLE 7 COVENANTS OF BUYER AND THE SELLERS.............................................78**
Section 7.01    Further Assurance ..........................................................................78
Section 7.02    Certain Filings................................................................................80
Section 7.03    Transferred Permit/License and Surety Bond Matters.............................80
Section 7.04    Public Announcements ...................................................................82
Section 7.05    WARN Act......................................................................................82
Section 7.06    Notification of Certain Events ........................................................83
Section 7.07    Bankruptcy Court Approval.............................................................83
Section 7.08    Confidentiality ...............................................................................83
Section 7.09    Certain Payments or Instruments Received from Third Parties.................84
Section 7.10    Consents and Approvals ..................................................................85
Section 7.11    Winding Down................................................................................85
Section 7.12    Transaction Documents ..................................................................85
Section 7.13    Cooperation Regarding Licenses and Worker's Compensation ...............85

**ARTICLE 8 TAX MATTERS .............................................................................86**
Section 8.01    Tax Cooperation; Responsibility for Taxes; FIRPTA ...........................86

**ARTICLE 9 EMPLOYEE MATTERS.......................................................................87**
Section 9.01    Representations and Warranties.......................................................87
Section 9.02    Covenants......................................................................................88
Section 9.03    No Third Party Beneficiaries ...........................................................90

**ARTICLE 10 CONDITIONS TO CLOSING ...........................................................91**
Section 10.01   Conditions to Obligations of Buyer and the Sellers..............................91
Section 10.02   Conditions to Obligation of Buyer.....................................................91
Section 10.03   Conditions to Obligation of the Sellers..............................................94
Section 10.04   Frustration of Closing Conditions......................................................95

**ARTICLE 11 TERMINATION..............................................................................95**
Section 11.01   Grounds for Termination ................................................................95
Section 11.02   Effect of Termination......................................................................97

**ARTICLE 12 MISCELLANEOUS ........................................................................97**
Section 12.01   Notices...........................................................................................97
Section 12.02   Survival..........................................................................................99
Section 12.03   Amendments and Waivers ...............................................................99
Section 12.04   Expenses ........................................................................................99
Section 12.05   Successors and Assigns..................................................................100
Section 12.06   Governing Law..............................................................................100
Section 12.07   Jurisdiction....................................................................................100
Section 12.08   WAIVER OF JURY TRIAL.............................................................100
Section 12.09   Counterparts; Effectiveness; Third Party Beneficiaries.........................101
Section 12.10   Entire Agreement ..........................................................................101

iii

Section 12.11  Bulk Sales Laws.....................................................................................101
Section 12.12  Severability ...........................................................................................101
Section 12.13  Disclosure Schedules ............................................................................101
Section 12.14  Specific Performance ............................................................................102
Section 12.15  Sellers' Representative..........................................................................102
Section 12.16  Non-Recourse .......................................................................................103
Section 12.17  Actions by Buyer ..................................................................................103

**SCHEDULES**

| | |
|---|---|
| Schedule A | Subsidiaries of Westmoreland |
| Schedule 1.01(a) | Canadian Indebtedness |
| Schedule 1.01(b)(i) | Knowledge of Buyer |
| Schedule 1.01(b)(ii) | Knowledge of Seller |
| Schedule 1.01(c) | Minimum Accounts Receivable |
| Schedule 1.01(d) | Minimum Coal Inventory |
| Schedule 1.01(e) | Permitted Encumbrances |
| Schedule 1.01(f) | Retained US Benefit Plans |
| Schedule 1.01(g) | Scheduled Bonding |
| Schedule 2.01(f) | Assumed Contracts |
| Schedule 2.01(h) | Transferred Permits/Licenses |
| Schedule 2.01(k) | Purchased US Intellectual Property |
| Schedule 2.01(l) | Transferred Causes of Action |
| Schedule 2.01(p) | Overhead Assets |
| Schedule 2.01(q) | Purchased US Assets |
| Schedule 2.03(c) | Director and Officer Insurance Policies |
| Schedule 2.03(g) | Avoidance Actions |
| Schedule 2.03(i) | Specifically Excluded Assets |
| Schedule 2.03(j) | Excluded Leases |
| Schedule 2.03(k) | Excluded Contracts |
| Schedule 2.04(j) | Excluded Royalties and Taxes |
| Schedule 2.04(k) | Excluded Wages and Benefits |
| Schedule 2.04(l) | Excluded Accounts Payable |
| Schedule 2.07(b) | Allocation Statement Principles |
| Schedule 2.08(b) | Daily Average Coal Production |
| Schedule 3.01(b) | Acquired Entity Organizational Documents |
| Schedule 3.03 | Sellers Governmental Authorization |
| Schedule 3.04 | Sellers Noncontravention |
| Schedule 3.05 | Subsidiaries of the Canadian Sellers |
| Schedule 3.06(a)(i) | US Owned Real Property |
| Schedule 3.06(a)(ii) | Acquired Entities Owned Real Property |
| Schedule 3.06(d) | Owned Real Property Notices |
| Schedule 3.06(g) | Restrictions on Right of Transfer in Owned Real Property |
| Schedule 3.06(h) | Condemnation Proceedings |
| Schedule 3.073.07(a)(i) | US Leases |
| Schedule 3.073.07(a)(ii) | Canada Leases |
| Schedule 3.073.07(a)(iii) | Lease Applications |
| Schedule 3.07(b)(i) | Prepaid Royalties and Un-recouped Minimum Royalties |
| Schedule 3.07(b)(ii) | Material Defaults of Assumed Leases |
| Schedule 3.07(c) | Restrictions on Right of Transfer in Assumed Leases |
| Schedule 3.07(d) | Leased Real Property Notices |
| Schedule 3.08(a) | Transferred US Permits/Licenses |
| Schedule 3.08(b) | Canada Permits/Licenses |
| Schedule 3.08(c) | Challenges to Transferred Permits/Licenses and Canada Permits/License |

| | |
|---|---|
| Schedule 3.08(d) | Overlapping Transferred Permits/Licenses |
| Schedule 3.09(a) | Environmental Matters |
| Schedule 3.09(c) | Additional Environmental Matters |
| Schedule 3.11 | Material Contracts |
| Schedule 3.12 | Financial Statements |
| Schedule 3.14 | Ordinary Course of Business Exceptions |
| Schedule 3.15 | Buildings and Improvements Violations |
| Schedule 3.16 | Insurance Policies |
| Schedule 3.17(a) | Litigation, Investigations and Claims |
| Schedule 3.18 | Laws and Regulations |
| Schedule 3.19 | Tax Matters |
| Schedule 3.20(a) | Acquired Canada Intellectual Property |
| Schedule 3.20(b) | Violations of Intellectual Property Rights |
| Schedule 3.24 | Related Party Transactions |
| Schedule 3.25 | Health and Safety |
| Schedule 3.26 | Bank Accounts; Powers of Attorney |
| Schedule 3.27 | Mining Financial Assurances |
| Schedule 3.29(a) | Canadian Benefit Plans |
| Schedule 3.29(i) | Canadian Benefit Plans Exceeding Required Coverage |
| Schedule 3.30 | US Benefit Plans |
| Schedule 3.32 | Other Liabilities |
| Schedule 4.03 | Buyer Government Authorization |
| Schedule 4.04 | Buyer Noncontravention |
| Schedule 5.02 | No Changes in Business |
| Schedule 5.11(a) | Affiliate Arrangements |
| Schedule 7.13 | Material Licenses |
| Schedule 9.01(a) | Business Employees |
| Schedule 9.01(b) | Certain Labor Matters |
| Schedule 9.01(c) | Certain Employment Matters |
| Schedule 9.01(c) | Certain Employment Matters |
| Schedule 9.01(d) | Warn Act Violations |
| Schedule 10.02(j)(i) | Certain Assigned Contracts and Leases |
| Schedule 10.02(j)(ii) | Certain Contracts and Leases Requiring Third Party Consents |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Absaloka Complex |
| Exhibit B | Colstrip Complex |
| Exhibit C | Haystack Complex |
| Exhibit D | San Juan Complex |
| Exhibit E | Canadian Complexes |
| Exhibit F | Non-Core Mine Complexes |
| Exhibit G | Confirmation Order |

## PURCHASE AND SALE AGREEMENT[2]

PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of [●], 2019 (the "**Effective Date**"), by and among [BUYER], a Delaware limited liability company ("**Buyer**"), Westmoreland Coal Company, a Delaware corporation ("**Westmoreland**"), the Subsidiaries (as hereinafter defined) of Westmoreland set forth on Schedule A (collectively, the "**WLB Subsidiaries**", and together with Westmoreland, the "**Sellers**") and Westmoreland, as Sellers' Representative ("**Sellers' Representative**"). The Sellers, Buyer (and any Designated Buyers (as hereinafter defined)), and Sellers' Representative are referred to herein individually as a "**Party**" and collectively as the "**Parties**".

### W I T N E S S E T H :

WHEREAS, Westmoreland and its Subsidiaries conduct a business that mines, processes, markets and sells coal through mining complexes located in the United States and Canada;

WHEREAS, on October 9, 2018 (the "**Petition Date**"), Westmoreland and certain of its direct and indirect Subsidiaries (collectively, the "**WLB Debtors**") filed voluntary petitions for relief, commencing cases under chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**");

WHEREAS, Buyer and/or the Designated Buyers desire to purchase certain assets and assume certain liabilities of the Sellers, and the Sellers desire to sell certain assets and transfer certain liabilities of the Sellers, upon the terms and subject to the conditions hereinafter set forth;

WHEREAS, upon the terms and conditions set forth herein, the Parties intend to effectuate the transactions contemplated by this Agreement (the "**Transaction**") pursuant to a plan of reorganization of the Sellers under chapter 11 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and the Sellers' ability to consummate the Transaction are subject, among other things, to the entry of the Confirmation Order (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
#### DEFINITIONS

Section 1.01   *Definitions*. As used herein, the following terms have the following meanings:

---

[2]   **Note to Draft:** This Agreement remains subject to negotiation and finalization of the Disclosure Schedules in all respects.

"**Absaloka Complex**" means the mining complex commonly referred to as "Absaloka" located primarily in Big Horn County, Montana as set forth on the map attached as <u>Exhibit A</u>.

"**Acquired Entities**" means the Canadian Targets and their respective direct and indirect Subsidiaries.

"**Acquired Entity Organizational Documents**" means, with respect to each Acquired Entity, the Governance Documents of such Acquired Entity.

"**Action**" means any claim, action, cause of action, demand, lawsuit, investigation, arbitration, formal inquiry, audit, citation, summons, subpoena, notice of violation, proceeding or litigation, whether civil, criminal, administrative, regulatory, at law, in equity or otherwise.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Aggregate Purchased Business**" means, collectively, the Purchased US Business and the Purchased Canada Business.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction (involving any one or more Debtors or Non-Debtors (each, as defined in the Restructuring Support Agreement) or the debt, equity, or other interests in any one or more Debtors or Non-Debtors) other than the Restructuring Transaction (as defined in the Restructuring Support Agreement).

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, territorial or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling, reporting or licensing requirement or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is in effect on or prior to the Closing Date (or during the Interim Period, if applicable) and binding upon or applicable to such Person or any of its assets, Liabilities or business, in each case, as amended, unless expressly specified otherwise.

"**Auditor**" means a nationally recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Buyer and Sellers' Representative.

"**Avoidance Action**" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the WLB Debtors (as defined in the Plan) arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

2

"**AVS**" means the Applicant Violator System established by the Office of Surface Mining, Department of the Interior, pursuant to the Federal Surface Mining, Control and Reclamation Act.

"**Bankruptcy Case**" means the cases, as jointly administered, commenced by certain Sellers under chapter 11 of the Bankruptcy Code, styled *In re: Westmoreland Coal Company, et al.*, Case No. 18-35672 and pending before the Bankruptcy Court.

"**Bankruptcy Code**" means title 11 of the United States Code, sections 101, *et seq*.

"**Bidding Procedures**" means the Bidding Procedures (as defined in the Bidding Procedures Order) approved by the Bidding Procedures Order, together with such changes therein, if any, as shall have been made in accordance with the Bidding Procedures Order.

"**Bidding Procedures Order**" means that certain order entered by the Bankruptcy Court on November 15, 2018 [Docket No. 519], approving the Bidding Procedures, as such order may be amended, supplemented or modified from time to time.

"**Black Lung Benefits Act**" means the Black Lung Benefits Act, title 30 of the United States Code, sections 901, *et seq.*, the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643 and the Black Lung Consolidation of Administrative Responsibility Act, Pub. L. No. 107-275, 116 Stat. 1925.

"**Black Lung Liabilities**" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Benefits Act, any similar state or local law, and occupational pneumoconiosis, silicosis or other lung disease liabilities and benefits arising under Applicable Law.

"**Bridge Loan Agreement**" means the Terms of Bridge Loans dated as of May 21, 2018, as set forth on Exhibit L to the Prepetition Credit Agreement by and among Westmoreland Coal Company, Prairie Mines & Royalty ULC, and Westmoreland San Juan, LLC, as borrowers, the guarantors party thereto, certain lenders party thereto, and the Bridge Loan Agent (as defined in the Plan).

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Buyer Disclosure Schedule**" means the disclosure schedule, dated as of the date hereof, that has been provided by Buyer to the Sellers on the date hereof.

"**Canada Acquired Leased Real Property**" means, collectively, the Canada Leases and the Canada Leased Real Property.

"**Canada Leased Real Property**" means all real property and other rights leased or subleased by any of the Acquired Entities pursuant to the Canada Leases, as tenant, subtenant or otherwise, as applicable, together with all buildings and other structures, facilities or

3

improvements located thereon, all fixtures attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"**Canada Leases**" means the real property leases and subleases to which any of the Acquired Entities is a party, including those listed or required to be listed on <u>Schedule 3.07(a)(ii)</u>, together with any and all underground and surface coal reserves, mineral rights, mining rights, surface rights, rights of way, easements, fixtures and improvements set forth in such leases and subleases.

"**Canada Owned Real Property**" means that real property that is owned by any of the Acquired Entities, including as listed or required to be listed on <u>Schedule 3.06(a)(ii)</u>, together with all of such Acquired Entities' right, title and interest in and to the following, as it relates to such real property: (i) all buildings, structures and improvements located on such real property, (ii) all improvements, fixtures, mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, or apparatus affixed to such real property and equipment located therein, (iii) all rights of way, easements, if any, in or upon such real property and all other rights and appurtenances belonging or in any way pertaining to such real property (including the right, title and interest of such Acquired Entity in and to any development rights, air rights, coal reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property), (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property and (v) any Canada Leases affecting such real property owned by such Acquired Entity, subject to any consents as may be required.

"**Canada Pension Plan**" means the pension plan known as the Canada Pension Plan set out in R.S.C. 1985, c C-8.

"**Canada Real Property**" means the Canada Owned Real Property and the Canada Acquired Leased Real Property.

"**Canadian Benefit Plans**" means all employee benefit plans, agreements and arrangements (whether oral or written, formal or informal, funded or unfunded) maintained for, available to or otherwise relating to any employees or former employees of an Acquired Entity or in respect of which the Acquired Entity is obligated to contribute or in any way liable, whether or not insured and whether or not subject to any Applicable Law, including bonus, deferred compensation, incentive compensation, share purchase, share appreciation, share option, severance and termination pay, hospitalization, health and other medical benefits, life and other insurance, dental, vision, legal, long-term and short-term disability, salary continuation, vacation, supplemental unemployment benefits, education assistance, profit-sharing, mortgage assistance, employee loan, employee assistance and pension, retirement and supplemental retirement plans, programs and agreements (including any defined benefit or defined contribution Pension Plan and any group registered retirement savings plan), except that the term "Canadian Benefit Plans" shall not include any statutory plans with which an Acquired Entity is required to comply, including the Canada Pension Plan, Quebec Pension Plan and plans administered pursuant to applicable provincial health tax, workers' compensation and workers' safety and employment insurance legislation.

"**Canadian Complexes**" means the mining complexes owned or operated by the Acquired Entities, including all Operating Areas associated therewith, as set forth on the maps attached as <u>Exhibit E</u>.

"**Canadian Indebtedness**" means the Sellers' interest as a creditor in Indebtedness related to the Purchased Canada Business as set forth on <u>Schedule 1.01(a)</u>, as such Indebtedness may be restructured prior to Closing as directed by Buyer.

"**Canadian Seller**" means Westmoreland.

"**Canadian Targets**" means Westmoreland Canada and WCGP.

"**CBA**" means each collective bargaining agreement related to the Aggregate Purchased Business or any Business Employee or to which Westmoreland or any of its Subsidiaries is otherwise party or bound, including those set forth on <u>Schedule 9.01(a)</u>.

"**Closing Available Cash**" means, as of a particular date, an amount equal to (a) the amount of unrestricted cash and cash equivalents of the Sellers and their Subsidiaries (excluding Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP and their respective Subsidiaries) as of such date, plus (b) the amount available to be drawn under the DIP Facility as of such date.

"**Closing Date**" means the date of the Closing.

"**Coal Benefits Act**" means the Coal Industry Retiree Health Benefit Act, as amended.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Colstrip Complex**" means the mining complex commonly referred to as "Colstrip" located primarily in Rosebud County, Montana as set forth on the map attached as <u>Exhibit B</u>.

"**Competition Act (Canada)**" means the *Competition Act*, R.S.C., 1985, c. C-34.

"**Complex**" means the Mining Complexes.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code consistent with the terms of the Restructuring Support Agreement and mutually acceptable to Buyer and Sellers' Representative.

"**Consenting Stakeholders**" means holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold (with such investment advisors, sub-advisors and managers acting on behalf of such holders) claims on account of the DIP Facility, Prepetition Credit Agreement or Prepetition First Lien Notes that have, solely in their capacities as holders of the foregoing claims, executed and delivered counterpart signature pages or joinders to the Restructuring Support Agreement.

"**Contract**" means any note, bond, mortgage, indenture, agreement, lease, sublease, license, sublicense, contract, trust, instrument, arrangement, guarantee, purchase order or other commitment, obligation or understanding, whether oral or written, that is legally binding.

"**Contracts Assignment and Assumption Agreements**" means the Assignment and Assumption Agreements for the Assumed Contracts, substantially in a form to be mutually agreed between the Parties in accordance with Section 7.12.

"**Cure Notice**" has the meaning ascribed to such term in the Bidding Procedures.

"**Data Room**" means the Sellers' virtual data room established at https://wwwna.dfsvenue.com in connection with the Transaction.

"**DIP Budget**" means the Approved Budget, as such term is used in the DIP Facility.

"**DIP Facility**" means, the postpetition credit facility contemplated by the Terms of Super Priority Debtor-In-Possession Loans, dated as of October 9, 2018, among Westmoreland, Prairie Mines & Royalty ULC and Westmoreland San Juan, LLC, which refinances, pursuant to section 364(d) of the Bankruptcy Code, the obligations under the Bridge Loan Agreement into a senior secured superpriority non-amortizing debtor-in-possession loan facility in an aggregate principal amount of up to $110,000,000 (as amended, supplemented or modified from time to time).

"**DIP Order**" means that certain order entered by the Bankruptcy Court on November 15, 2018 [Docket No. 520], authorizing the WLB Debtors to enter into the DIP Facility, as such order may be amended, supplemented, or modified, from time to time.

"**Disclosure Schedule**" means the disclosure schedule, dated the date hereof, regarding this Agreement that has been provided by the Sellers to Buyer on the date hereof, as may be amended in accordance with the terms of this Agreement.

"**Encumbrance**" means any title defect, mortgage, lien, judgment, pledge, charge, security interest, hypothecation (in Quebec, a hypothec), bailment (in the nature of a pledge or for purposes of security), deed of trust, statutory deemed trust for Taxes arising under the tax laws of Canada, grant of a power to confess judgment, conditional sales and title retention agreement (including any lease or license in the nature thereof), claim (whether or not made, known or contingent), easement, encroachment, right of way, charge, condition, option, right of first refusal or last negotiation, offer or refusal, equitable interest, mechanics' and other similar liens, restriction or encumbrance of any kind.

"**Environmental Law**" means any Applicable Law relating to: (i) the pollution, protection or reclamation of the environment, (ii) acid mine drainage or (iii) any spill, emission, release or disposal into the environment of, or human exposure to, any Hazardous Material.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" of any entity means any entity that, together with such entity, would be treated as a single employer under Section 414 of the Code.

6

"**Expense Reimbursement**" means an amount equal to the reasonable out-of-pocket, documented third party costs, fees and expenses of Buyer, each Designated Buyer, the lenders under the Bridge Loan Agreement, the First Lien Lenders and each of their respective Affiliates (including reasonable costs, fees and expenses for legal, financial advisory, accounting, engineering, environmental and other services and all filing fees, court costs and other regulatory fees and expenses) related to the negotiation, preparation and execution of this Agreement, the Transaction Documents and the consummation of the Transaction.

"**First Lien Lenders**" means the unaffiliated group of holders of claims on account of (i) the Prepetition Credit Agreement and (ii) Prepetition First Lien Notes.

"**Fraud**" means the knowing and intentional misrepresentation of material facts by a Person with respect to (i) the making of any representation or warranty set forth herein or in any Transaction Document, (ii) the making of the covenants or agreements in this Agreement or in any Transaction Document, or (iii) the certifications set forth in the certificates delivered pursuant to this Agreement, in each case which satisfies all of the elements of common law fraud under the laws of the State of Delaware.

"**Fundamental Representations**" means the representations and warranties set forth in Section 3.01, Section 3.02, Section 3.03, Section 3.04(i), Section 3.05, Section 3.18, Section 3.21, Section 4.01, Section 4.02, Section 4.03, Section 4.04(i) and Section 4.07.

"**Funded Liability Cap**" means such fixed amount of Funded Liabilities (which amount shall not include the Specified Assumed Liabilities) that shall be mutually agreed by Buyer and Westmoreland in accordance with Section 2.18.

"**GAAP**" means generally accepted accounting principles in the United States or Canada, as applicable, consistently applied.

"**General Assignments and Bills of Sales**" means the General Assignments and Bills of Sales for the Purchased US Assets, in a form to be mutually agreed between the Parties in accordance with Section 7.12.

"**Governance Document**" means, with respect to any Person, (a) the articles of incorporation, amalgamation or organization, certificates of formation and by-laws, the limited partnership agreement, the partnership agreement, the unlimited liability company agreement or the limited liability company agreement, or such other organizational documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person and that establish the legal personality of such Person and (b) any voting trust, shareholder agreement, voting agreement, pledge agreement, buy-sell agreement, right of first refusal, preemptive right or proxy or other agreement, right, instrument or understanding with respect to any purchase, sale, issuance, transfer, registration, repurchase, redemption or voting of such equity interests, or any other similar governing document with respect to such Person.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state, local, provincial, territorial, regional, municipal, special purpose, or other governmental or quasi-governmental authority or regulatory body, court, tribunal, arbitrating body, governmental

7

department, commission, board, officer, self-regulating authority, Taxing Authority, bureau or agency, as well as any other instrumentality or entity designated to act for or on behalf of any of the foregoing.

"**Haystack Complex**" means the mining complex commonly referred to as "Haystack" located primarily in Uinta County, Wyoming as set forth on the map attached as <u>Exhibit C</u>.

"**Hazardous Material**" means any toxic, radioactive, ignitable, corrosive or reactive pollutant, contaminant, substance, waste or material that in each case is regulated under any Environmental Law due to its hazardous, toxic, dangerous or deleterious properties or characteristics.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Income Tax Act**" means the Income Tax Act (Canada), as amended.

"**Indebtedness**" means, with respect to any Person, (i) all indebtedness for borrowed money, (ii) all indebtedness evidenced by notes, bonds, mortgage loans, term loans, debentures or other similar instruments, (iii) all obligations for the deferred purchase price of property or services (including any obligations relating to any earn-out or bonus payments) or for purchase money indebtedness, (iv) all obligations under capitalized leases, (v) all guarantees or other commitments by which such Person assures a creditor against loss (including contingent reimbursement obligations regarding letters of credit) with respect to Indebtedness of another Person, (vi) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property, (vii) all obligations under derivatives, commodity swap agreements, commodity cap agreements, interest rate cap agreements, interest rate swap agreements, foreign currency exchange agreements, hedging arrangements and other similar agreements, (viii) all guaranties (whether direct or indirect, joint or several or contingent or otherwise) of any of the foregoing, (ix) any obligation of such Person properly classified as indebtedness or debt under GAAP, (x) any negative balances in bank accounts and (xi) all outstanding due and unpaid prepayment premiums, if any, and the principal and accrued interest, fees and expenses related to any of the items set forth in clauses (i) through (x).

"**Insolvency Law**" means the Bankruptcy Code, the *Bankruptcy and Insolvency Act* (Canada*)*, the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada), any provision of any statute governing the existence of any artificial legal person permitting that legal person to propose an arrangement with respect to any class of its creditors or any other like, equivalent or analogous legislation of any jurisdiction, domestic or foreign.

"**Insolvency Proceedings**" means, with respect to any Person, any proceeding contemplated by any application, petition, assignment, filing of notice or other means, whether voluntary or involuntary, under any Insolvency Law seeking any moratorium, reorganization, adjustment, composition, proposal, compromise, arrangement, administration or other like or similar relief in respect of any or all of the obligations of such Person, seeking the winding up, liquidation or dissolution of such person or all or any part of its property, seeking any judgment or order of a Governmental Authority declaring, finding or adjudging such person insolvent or

bankrupt, seeking the appointment (provisional, interim or permanent) of any receiver or resulting, by operation of law, in the bankruptcy of such Person.

"**Intellectual Property Right**" means any trademark, service mark, trade name, trade dress, logo, domain name or URL, mask work, invention, patent, trade secret, industrial design or other right in any proprietary business information (including data bases and data collections, pricing and cost information, business and marketing plans, and customer and supplier lists), copyright, right of publicity, know-how (including manufacturing and production processes and techniques, and research and development information), or any other intellectual property or similar proprietary industrial right of any kind or nature anywhere in the world (including any such rights in software), and including (i) any issuances, registrations or applications for registration of any of the foregoing, (ii) all goodwill associated with any of the foregoing, and (iii) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"**IP Assignment Agreements**" means the Intellectual Property Assignment and Transfer Agreements with respect to the Intellectual Property Rights included in the Purchased US Assets, in a form to be mutually and reasonably agreed between the Parties in accordance with Section 7.12.

"**Knowledge**" means (i) with respect to Buyer, the actual knowledge of any of the individuals listed on Schedule 1.01(b)(i), after reasonable inquiry and (ii) with respect to any Seller or Acquired Entity, the actual knowledge of the individuals listed on Schedule 1.01(b)(ii), after reasonable inquiry.

"**Lease Assignment and Assumption Agreements**" means the Lease Assignment and Assumption Agreements for the Assumed Leases and US Purchased Leased Real Property owned by the Sellers, in a form to be mutually agreed between the Parties in accordance with Section 7.12.

"**Leased Real Property**" means, collectively, the US Leased Real Property and the Canada Leased Real Property.

"**Leases**" means, collectively, the US Leases and the Canada Leases.

"**Liabilities**" means all existing or future liabilities, debts, obligations, duties or adverse claims of any Person of every type and trade, whether matured or unmatured, fixed or contingent, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, direct or indirect, or otherwise in respect of any and all matters or events, including those arising under Applicable Law, or imposed by any court or arbitrator of any kind, and those arising in connection with coal or other products sold, Contracts, Leases, commitments or undertakings, including all liabilities arising out of or related to the sponsorship of, the responsibility for, contributions to, or any liability in connection with any employee plan maintained or contributed to by any such Person. Without limiting the foregoing, Liabilities shall include any continuation coverage (including any penalties, excise taxes or interest resulting from the failure to provide continuation coverage) required by Applicable Law due to qualifying events, including continuing coverage for any of the employees of a Person terminated prior to

the Closing Date or whose employment is terminated in connection with the Transaction, or who were not hired by Buyer or a Designated Buyer in connection with the Transaction, whether or not said Liabilities are reflected on the books of such Person.

"**Loss(es)**" means all losses, Liabilities, adverse claims, obligations, levies, charges, damages, deficiencies, expenses, debts, settlements, actions or causes of action, suits, proceedings, demands, assessments, interest, awards, penalties, fines, Taxes, costs and expenses of whatever kind (including reasonable attorneys' and other professionals' fees, interest, court costs, expert witness fees, transcript costs and other expenses of litigation, costs of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers) and judgments (at law or in equity) of any nature.

"**Material Adverse Effect**" means any change, development, condition, occurrence, circumstance, fact or effect that, individually or in the aggregate, (x) has had or would reasonably be expected to have, individually or in the aggregate with all other changes, developments, conditions, occurrences, circumstances, facts or effects, a material adverse effect on the condition (financial or otherwise), assets, liabilities, properties, business or results of operations of the Aggregate Purchased Business taken as a whole, or (y) does, or would reasonably be expected to, prevent or materially impair the ability of Sellers to consummate the Transaction excluding, with respect to clause (x) above, any change, development, condition, occurrence, circumstance or effect resulting from (A) changes in GAAP or changes in the regulatory accounting requirements applicable to the coal mining industry after the date hereof, (B) changes in financial or securities markets or general economic or political conditions in the United States, Canada or any other country, (C) changes (including changes of Applicable Law after the date hereof) in general conditions in the coal mining industry, (D) acts of war, sabotage or terrorism or natural disasters, (E) the announcement of the transactions contemplated by this Agreement or the Transaction Documents (provided that this clause (E) shall not apply to any representation or warranty that, by its terms, speaks specifically of the consequences arising out of the execution or performance of this Agreement or any of the Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby), (F) any reasonably anticipated effects of any specific action taken (or omitted to be taken) at the written request of Buyer, (G) any failure by the Sellers or the Aggregate Purchased Business to meet any projections or forecasts for any period occurring on or after the date hereof (provided that this clause (G) shall not prevent a determination that any event, circumstance, effect or change underlying such failure to meet projections or forecasts has resulted in a Material Adverse Effect), (H) any reasonably anticipated effects of the filing of the Bankruptcy Case or (I) any specific action taken by Westmoreland or any of its Subsidiaries that is expressly required to be taken pursuant to this Agreement, in each case of clauses (A), (B), (C) and (D) to the extent the Aggregate Purchased Business is not materially disproportionately affected thereby as compared with other participants in the coal mining industry.

"**Minimum Accounts Receivable**" means, with respect to a Mining Complex other than the Non-Core Mine Complexes, the amount of Accounts Receivable set forth on Schedule 1.01(c).

"**Minimum Closing Cash**" means an amount of Closing Available Cash to be agreed by Buyer and Westmoreland in accordance with Section 2.18.

"**Minimum Coal Inventory**" means with respect to a Mining Complex other than the Non-Core Mine Complexes, the amount of coal inventory set forth on Schedule 1.01(d).

"**Mining Complexes**" means, collectively, the Canadian Complexes and the US Mining Complexes.

"**MSHA**" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq.

"**NAFTA Claim**" means that certain claim filed with the Office of the Deputy Attorney General of Canada on November 19, 2018 by Westmoreland on its own behalf and on behalf of its Canadian Subsidiary Prairie Mines & Royalty ULC against the Government of Canada pursuant to chapter 11 of the North American Free Trade Agreement (as such claim may be amended).

"**New Working Capital Facility**" means an asset-based or cash flow revolving credit facility, or amended DIP Facility, to be entered into by the lenders thereunder and Buyer or its Affiliate on terms satisfactory to Buyer on or about the Closing Date.

"**Non-Acquired Entities**" means Westmoreland, together with its direct and indirect Subsidiaries and Affiliates, other than the Acquired Entities.

"**Non-Core Assets**" means Westmoreland's and its Subsidiaries' interest in each of the Non-Core Mine Complexes and all assets related thereto, including all Contracts, supply agreements, joint venture agreements, operating and joint operating agreements, leases, and other written obligations.

"**Non-Core Mine Complexes**" means the mining complexes set forth on Exhibit F.

"**OSHA**" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 et. seq.

"**Outside Date**" means the earlier of (1) the Plan Effective Date, and (2) March 31, 2019. The Outside Date may not be extended without the consent of all Consenting Stakeholders; *provided* that, if the Confirmation Order is entered on or prior to March 31, 2019, the Outside Date may be extended through April 30, 2019 with the consent of the Consenting Stakeholders holding at least sixty five percent (65%) of the aggregate outstanding principal amount of the DIP Facility, the Prepetition First Lien Notes, and the Prepetition Credit Agreement, taken together; *provided further*, that any extension of the Outside Date under the Restructuring Support Agreement shall be deemed an extension of the Outside Date for purposes of this Agreement.

"**Owned Real Property**" means, collectively, the US Owned Real Property and the Canada Owned Real Property.

"**PBGC**" means Pension Benefit Guaranty Corporation.

"**Pension Plan**" means each of the Canadian Benefit Plans that is a "registered pension plan" as that term is defined in Subsection 248(1) of the Income Tax Act.

"**Permit Transfer Agreements**" means the Permit Transfer Agreements with respect to the Transferred Permits/Licenses dated as of the Closing Date between the applicable Sellers and Buyer in a form to be mutually agreed between the Parties in accordance with Section 7.12.

"**Permitted Encumbrance**" means (i) Encumbrances that constitute Assumed Liabilities, (ii) statutory liens for Taxes (including real estate Taxes) and assessments that are not yet due and payable or the nonpayment of which is permitted by the Bankruptcy Code, (iii) (x) with respect to the Purchased US Assets and the Purchased US Business, to the extent, in each instance any of the following constitute statutory liens which are senior in priority to the liens of the First Lien Lenders, landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's or repairmen's statutory liens, or other similar statutory liens imposed by Applicable Law, that, in each case, arise in the ordinary course of business that is not yet delinquent or that is being contested in good faith by appropriate procedures and (y) with respect to the assets, Contracts, leases and properties of the Acquired Entities and the Purchased Canada Business, landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's or repairmen's statutory liens, or other similar statutory liens imposed by Applicable Law, that, in each case, arise in the ordinary course of business that is not yet delinquent or that is being contested in good faith by appropriate procedures, (iv) easements, covenants, conditions, restrictions and other similar Encumbrances on real property (a) that are listed on any survey delivered to Buyer prior to the date of this Agreement or (b) that arise in the ordinary course of business and that do not (together with all other Encumbrances affecting the real property in question) materially detract from the value of the affected Purchased Real Property and do not materially interfere with the present use of such Purchased Real Property, (v) the leasehold estate or any sublease, license, or rights of occupancy in any Owned Real Property where a Seller or Acquired Entity is lessor and the lease is set forth on the Disclosure Schedule, (vi) local, county, state, provincial and federal laws, ordinances or governmental regulations including Environmental Laws and regulations, local building and fire codes, and zoning, conservation, or other land use regulations now or hereafter in effect relating to any Purchased Real Property, (vii) Encumbrances created by Buyer, a Designated Buyer, or their respective successors and assigns or otherwise expressly consented to by Buyer or Designated Buyer in writing in accordance with the terms of this Agreement, and (viii) those Encumbrances listed on Schedule 1.01(c).

"**Person**" means an individual, corporation, partnership, limited partnership, limited liability company, unlimited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Plan**" means the joint chapter 11 plan of reorganization filed by Westmoreland and certain of its direct and indirect Subsidiaries in the Bankruptcy Case.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

12

"**Pre-Closing Tax Period**" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences on or before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Prepetition Credit Agreement**" means that certain Credit Agreement, dated December 16, 2014, between Westmoreland, as borrower, and Ankura Trust Company, LLC (as successor-in-interest to Wilmington Savings Fund Society, FSB), as Agent (as the same may be and has been amended, amended and restated, supplemented, waived and/or otherwise modified from time to time).

"**Prepetition First Lien Notes**" means the eight and three-fourths percent (8.750%) senior secured notes, due January 21, 2022, issued by Westmoreland.

"**Prepetition First Lien Notes Trustee**" means U.S. Bank National Association, as trustee and notes collateral agent under the indenture governing the Prepetition First Lien Notes.

"**Prepetition Lenders**" means the lenders under or in connection with the Prepetition Credit Agreement.

"**Prepetition Term Loan Agent**" means Ankura Trust Company, LLC (as successor-in interest to Wilmington Savings Fund Society, FSB), as Agent under the Prepetition Credit Agreement.

"**Purchased Canada Business**" means the business and operations of the Acquired Entities (wherever the business, operations and assets are situated or conducted), related to (i) the mining, processing, preparation, selling and shipping of coal and related operations, (ii) the mineral development drilling, exploration and related operations and (iii) the selling, marketing, purchasing and blending of coal and related operations.

"**Purchased Equity Interests**" means one hundred percent (100%) of the equity interests in each Canadian Target.

"**Purchased Leased Real Property**" means, collectively, the US Purchased Leased Real Property and the Canada Acquired Leased Real Property.

"**Purchased Real Property**" means, collectively, the US Purchased Real Property and the Canada Real Property.

"**Purchased US Business**" means the business, operations and ownership of the Sellers (wherever the business, operations and assets are situated or conducted) related to (i) the mining, processing, preparation, selling and shipping of coal and related operations conducted with regards to the US Mining Complexes, (ii) the mineral development drilling, exploration and related operations conducted with regards to the US Mining Complexes and (iii) the selling, marketing, purchasing and blending of coal and related operations, in each case with regards to the US Mining Complexes, including all operations of the Sellers located at Westmoreland's Englewood, Colorado headquarters.

13

"**Quebec Pension Plan**" means the pension plan known as the Quebec Pension Plan set out under RSQ c. R-9.

"**Related Persons**" means related persons as that term is defined in section 9701(c)(2) of the Coal Benefits Act.

"**Representatives**" means, with respect to any Person, its officers, directors, employees, counsel, accountants, advisors, agents, consultants, stockholders, partners, principals, members, managers, controlling persons and other representatives of such Person.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of October 9, 2018, by and among Westmoreland and its Subsidiaries party thereto and the Consenting Stakeholders (as the same may be and has been amended, amended and restated, supplemented, waived and/or otherwise modified from time to time).

"**Retained US Benefit Plans**" means (i) the Westmoreland Supplemental Executive Retirement Plan, (ii) all benefit plans, arrangements or agreements provided to post-termination or post-retirement medical, dental, life or other welfare benefits (whether or not a US Benefit Plan), (iii) except as set forth in Section 2.17, any US Benefit Plan subject to Title IV of ERISA and (iv) any other US Benefit Plans set forth on Schedule 1.01(d).

"**Royalties**" means royalties payable under US Leases or royalty agreements related to the Purchased US Business and Purchased US Assets in connection with the operation of the Purchased US Business and Purchased US Assets, including all federal, private, production, and other royalties payable.

"**San Juan Complex**" means the mining complex commonly referred to as "San Juan" located primarily in San Juan County, New Mexico as set forth on the map attached as Exhibit D.

"**Scheduled Bonding**" means all bonding requirements as set forth on Schedule 1.01(e).

"**SEC**" means the U.S. Securities and Exchange Commission.

"**SEC Documents**" means Westmoreland's periodic reports on Form 8-K, Form 10-Q and Form 10-K filed with or furnished to the SEC.

"**Specified Assumed Liabilities**" means the Liabilities to be assumed by Buyer or a Designated Buyer pursuant to Section 2.04(j), Section 2.04(k) and Section 2.04(l).

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more other Subsidiaries of such Person or a combination thereof, or (ii) if a limited liability company, partnership, limited partnership, unlimited liability company, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly

14

or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof, except in each case (other than as expressly provided herein to the contrary) none of Westmoreland Resources GP, LLC or Westmoreland Resource Partners, LP, or their respective Subsidiaries, shall be included in the definition of Subsidiary hereunder.

"**Tax**" means any and all federal, state, provincial, local, foreign and other taxes, levies, fees, imposts, duties, and similar governmental charges (including any interest, fines, assessments, reassessments, penalties, deficiency assessments or additions to tax imposed in connection therewith or with respect thereto) including (a) taxes imposed on, or measured by, net income, gross income, franchise, profits or gross receipts and (b) ad valorem, value added, capital gains, sales, goods and services, harmonized sales, use, real or personal property (tangible and intangible), capital stock, capital, license, branch, payroll, withholding, employment, social security (or similar), unemployment, disability, occupational, excise, compensation, utility, severance, escheat, production, excise, stamp, registration, occupation, premium, windfall profits, excess profits, fuel, gas import, environmental, transfer and gains, lease, service, service use, alternative or add on minimum, and estimated taxes, customs duties and premiums for employment insurance, Canada Pension Plan or provincial pension plans.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means any Governmental Authority having or purporting to exercise jurisdiction with respect to any Tax.

"**Ton**" means two thousand (2,000) pounds.

"**Transaction Documents**" means, collectively, the Contracts Assignment and Assumption Agreements, the General Assignments and Bills of Sales, the IP Assignment Agreements, the Lease Assignment and Assumption Agreements, the Permit Transfer Agreements, the Transition Services Agreement, the New Working Capital Facility, and each other document, agreement or instrument executed and delivered in connection herewith or therewith.

"**Transferred Action**" means, any claim, action, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, franchise, lawsuit, investigation, arbitration, formal inquiry, audit, citation, summons, subpoena, notice of violation, proceeding or litigation, whether civil, criminal, administrative, regulatory, at law, in equity or otherwise, of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "**Transferred Action**" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross

negligence; (c) the right to object to Claims or Interests (each as defined in the Plan); (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

"**Transferred Assets**" means, collectively, the Purchased US Assets and the Purchased Equity Interests.

"**Transferred US Benefit Plan**" means each US Benefit Plan that is sponsored or maintained by the Sellers and their Subsidiaries (other than the Acquired Entities) other than the Retained US Benefit Plans.

"**Transition Services Agreement**" means the Transition Services Agreement dated as of the Closing Date between Westmoreland and Buyer, in a form as may be mutually agreed between the Parties in accordance with Section 7.12.

"**UMWA**" means the United Mine Workers of America.

"**US Benefit Plan**" means any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise), including any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, in each case, (x) that is sponsored, maintained or contributed to by Sellers and (y) under which any current or former officer, director, employee or consultant (or their respective beneficiaries) of Sellers and their Subsidiaries (other than the Acquired Entities) has any present or future right to benefits.

"**US Leased Real Property**" means all real property and other rights leased or subleased by any Seller pursuant to the US Leases, as tenant, subtenant or otherwise, as applicable, together with all buildings and other structures, facilities or improvements located thereon, all fixtures attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"**US Leases**" means all real property leases and subleases to which any Seller is party and used by any Seller in the operation of the Purchased US Business, including as listed or required to be listed on Schedule 3.07(a)(i) (as such schedule may be modified pursuant to Section 2.06(d)), together with any and all underground and surface coal reserves, mineral rights, mining rights, surface rights, rights of way, easements, fixtures and improvements set forth in such leases and subleases.

16

"**US Mining Complexes**" means, collectively, the Absaloka Complex, the Colstrip Complex, the Haystack Complex, the San Juan Complex and the Non-Core Mine Complexes included in the Transferred Non-Core Assets, if any, pursuant to the last paragraph of Section 2.03, including all Operating Areas associated therewith.

"**US Owned Real Property**" means that real property that is owned by a Seller and used or held for use in the operation of the Purchased US Business, including as listed or required to be listed on Schedule 3.06(a)(i), together with all of such Seller's right, title and interest in and to the following, as it relates to such real property: (i) all buildings, structures and improvements located on such real property, (ii) all improvements, fixtures, mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, or apparatus affixed to such real property and equipment located therein, (iii) all rights of way, easements, if any, in or upon such real property and all other rights and appurtenances belonging or in any way pertaining to such real property (including the right, title and interest of such Seller in and to any development rights, air rights, coal reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property), (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property and (v) any US Leases affecting such real property owned by such Seller, subject to any consents as may be required.

"**US Purchased Real Property**" means the US Owned Real Property and the US Purchased Leased Real Property.

"**WCBV**" means WCC Holding B.V., a Netherlands private limited company.

"**WCGP**" means Westmoreland Canada, LLC, a Delaware limited liability company.

"**WCHI**" means Westmoreland Canada Holdings Inc., an Alberta corporation.

"**Westmoreland 401(k) Plan**" means the Westmoreland Coal Company and Subsidiaries Employees' Savings Plan.

"**Westmoreland Canada**" means Westmoreland Canadian Investments, LP, a Quebec limited partnership.

"**Wind-Down Amount**" means the aggregate encumbered and unencumbered cash and cash equivalents (whether restricted or unrestricted) of Westmoreland and its Subsidiaries (other than the Acquired Entities and Westmoreland Resources GP, LLC and Westmoreland Resource Partners, LP, and their direct and indirect Subsidiaries) in an amount to be determined in accordance with Section 2.18, as may be modified prior to Closing in accordance with the Plan.

"**Wind-Down Budget**" has the meaning set forth in the Plan.

"**Workers' Compensation Liabilities**" means any Liabilities or benefit obligations related to workers' compensation claims and benefits arising under Applicable Law.

17

(a)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| *Accounts Receivable* | 2.01(d) |
| *Acquired Canada Intellectual Property* | 3.20(a) |
| *Addition/Rejection Deadline* | 2.06(d) |
| *Aggregate Funded Liability Amount* | 2.18(a) |
| *Agreement* | Preamble |
| *Allocation* | 2.07(b) |
| *Allocation Statement* | 2.07(b) |
| *Assumed Contracts* | 2.01(f) |
| *Assumed Leases* | 2.01(b) |
| *Assumed Liabilities* | 2.04 |
| *B&S Pension Plan* | 2.17 |
| *Bank Account* | 3.26 |
| *Bankruptcy Court* | Recitals |
| *Business Employees* | 9.01(a) |
| *Business Records* | 5.04 |
| *Buyer's Closing Deliverables* | 2.11 |
| *Buyer* | Preamble |
| *Buyer 401(k) Plan* | 9.02(e) |
| *Buyer Confidentiality Agreement* | 6.05 |
| *Buyer Plan* | 9.02(c)(i) |
| *Canada Business Employees* | 9.01(a) |
| *Canada Insurance Policies* | 3.16 |
| *Canada Licenses* | 3.08(b) |
| *Canada Permits* | 3.08(b) |
| *Canada Permits/Licenses* | 3.08(b) |
| *Cash Funded Amount* | 2.18(a)(i) |
| *Closing* | 2.09 |
| *Coal Act* | 2.05(c) |
| *Credit Bid Amount* | 2.07(a)(i) |
| *Cure Costs* | 2.06(a) |
| *Delaware Courts* | 12.07 |
| *Designated Buyer* | 2.15 |
| *Disclosure Statement* | 5.06(a) |
| *Disclosure Statement Order* | 5.06(a) |
| *e-mail* | 12.01 |
| *Effective Date* | Preamble |
| *Excluded Assets* | 2.03 |
| *Excluded Contracts* | 2.03(k) |
| *Excluded Leases* | 2.03(j) |
| *Excluded Liabilities* | 2.05 |
| *FCPA* | 3.22 |

| Term | Section |
|---|---|
| *Financial Statements* | 3.12 |
| *Funded Liabilities* | 2.05 |
| *G Reorganization* | 8.01(f) |
| *Included Cash* | 2.01(g) |
| *Insurance Policies* | 3.16 |
| *Interim Period* | 7.03(a)(ii) |
| *Inventory Inspector* | 2.08(a) |
| *Latest Balance Sheet Date* | 3.12(b) |
| *Licenses* | 3.08(b) |
| *Litigation* | 3.17(a) |
| *Material Contract* | 3.11(a) |
| *Minimum Coal Inventory Condition* | 10.02 |
| *Mining Financial Assurances* | 3.27(a) |
| *Non-Core Asset Notice* | 2.03 |
| *Non-Offered US Employees* | 9.02(a) |
| *Non-Party Affiliates* | 12.16 |
| *Offered US Employees* | 9.02(a) |
| *Operating Areas* | 2.01(c) |
| *Overhead Assets* | 2.01(g) |
| *Overlapping Permit Property* | 7.03(e) |
| *Overlapping Transferred Permits/Licenses* | 3.08(d) |
| *Party* | Preamble |
| *Permits* | 3.08(b) |
| *Petition Date* | Recitals |
| *Purchase Price* | 2.07(a) |
| *Purchased US Assets* | 2.01 |
| *Purchased US Intellectual Property* | 2.01(l) |
| *Reference Date* | 3.13 |
| *Related Party* | 0 |
| *Removed Contract* | 2.06(c) |
| *Seller Consolidated Group* | 2.01(v) |
| *Sellers* | Preamble |
| *Sellers' Closing Deliverables* | 2.10 |
| *Sellers' Representative* | Preamble |
| *Specifically Excluded Assets* | 2.03(i) |
| *Subject Subsequent Non-Core Assets* | 2.03 |
| *Subsequent Non-Core Notice* | 2.03 |
| *Transaction* | Recitals |
| *Transfer Taxes* | 8.01(b) |
| *Transferred Causes of Action* | 2.01(l) |
| *Transferred Employees* | 9.02(a) |
| *Transferred Non-Core Assets* | 2.03 |
| *Transferred Permits/Licenses* | 2.01(h) |

| Term | Section |
|------|---------|
| *Transferred US Insurance Policies* | 2.01(m) |
| *US Business Employees* | 9.01(a) |
| *US Insurance Policies* | 3.16 |
| *US Licenses* | 3.08(a) |
| *US Permits* | 3.08(b) |
| *WARN Act* | 7.05 |
| *Westmoreland* | Preamble |
| *WLB Debtors* | Preamble |
| *WLB Subsidiaries* | Preamble |
| *WRMI* | 10.02(t) |

Section 1.02  ***Other Definitional and Interpretative Provisions***. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract in this Agreement are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. References to "$" or "Dollars" herein shall be to United States Dollars. References to documents or information having been previously delivered, furnished or made available to Buyer shall mean that the relevant documents or information were uploaded to the Data Room in a folder accessible by Buyer prior to the date of this Agreement and maintained in the Data Room as of the date of this Agreement. References to "ordinary course of business" shall be deemed to be followed by the words "consistent with past practice".

## ARTICLE 2
### PURCHASE AND SALE

Section 2.01  ***Purchase and Sale of Purchased US Assets***. Upon the terms and subject to the conditions of this Agreement, Buyer agrees, and agrees to cause the relevant Designated

Buyers, to purchase from the Sellers, and the Sellers agree to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer, or the relevant Designated Buyers, at the Closing, free and clear of all Encumbrances, other than Permitted Encumbrances, all of the Sellers' right, title and interest in, to and under the Purchased US Business and all of the Sellers' assets, properties, leases, rights, interests, Contracts and claims (in each case, other than the Excluded Assets), wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used or held for use in or relating to the Purchased US Business, and whether or not reflected on the books and records of Sellers, as the same shall exist immediately prior to the Closing, including the following (the "**Purchased US Assets**"):

(a) the US Owned Real Property;

(b) (i) the US Leases (including all prepaid royalties and un-recouped minimum royalties thereunder), other than the Excluded Leases, (ii) the US Leased Real Property (other than the US Leased Real Property subject to the Excluded Leases) and (iii) such other US Leases entered into by a Seller in the ordinary course of business after the date hereof as permitted pursuant to Section 5.01 and Section 5.02, including as may be added to Schedule 3.07(a)(i) by Buyer pursuant to Section 2.06(d) (clauses (i), (ii) and (iii) collectively, the "**US Purchased Leased Real Property**" and clauses (i) and (iii), collectively, the "**Assumed Leases**"); *provided* that notwithstanding the foregoing, the Assumed Leases are being transferred subject to the terms and conditions contained therein to the extent required by Section 365 of the Bankruptcy Code;

(c) all equipment, fixed assets and other tangible assets (including all mobile mining equipment, parts, supplies, tires and components) owned by any Seller (wherever situated) and all other equipment, fixed assets and tangible assets located at the Sellers' loadouts, preparation plants, active mining areas, reclamation areas, and coal storage areas (such loadouts, plants and areas, the "**Operating Areas**"), including vehicles, rolling stock, supplies, spare parts, tools, furniture and office equipment, in each case that are owned and used or held for use in the conduct of the Purchased US Business by the Sellers, and all of the Sellers' rights under warranties, guarantees, indemnities, licenses, and all similar rights against third parties (whether express or implied) with respect to the equipment, fixed assets and tangible assets referenced in this clause (c), but excluding the Specifically Excluded Assets;

(d) all accounts receivable, notes, chattel paper, negotiable instruments, receivables (whether current or non-current) and other current assets (subject to Section 2.03(a)) of the Sellers related to the Purchased US Business (the "**Accounts Receivable**");

(e) all coal inventory located on, or mined or extracted from, the US Purchased Real Property;

(f) all right, title and interest of the Sellers' now or hereafter existing, in, to and under (i) the Contracts listed on Schedule 2.01(f), including all Transferred US Insurance Policies and any renewals or replacements thereof as set forth in Section 2.01(m) and all Contracts with customers of the Purchased US Business (including all Contracts for the sale of coal by the US Mining Complexes) whether or not listed on Schedule 2.01(f) (as such schedule may be modified

21

pursuant to Section 2.06(d)), (ii) such other Contracts entered into by a Seller in the ordinary course of business after the date hereof as permitted pursuant to Section 5.01 and Section 5.02 and used or held for use in connection with the conduct of the Purchased US Business and added to Schedule 2.01(f) pursuant to Section 2.06; and (iii) all Contracts with customers of the Purchased US Business (including all Contracts for the sale of coal by the US Mining Complexes) entered into in the ordinary course of business after the date hereof as permitted pursuant to Section 5.01 and Section 5.02 (whether or not added to Schedule 2.01(f) pursuant to Section 2.06) (clauses (i), (ii) and (iii), collectively, the "**Assumed Contracts**"); *provided* that any collective bargaining agreements set forth on Schedule 2.01(f) shall be deemed an Assumed Contract only in the event the conditions set forth in Sections 10.02(o) and 10.02(p) are satisfied at Closing; provided, further, that notwithstanding the foregoing, the Assumed Contracts are being transferred subject to the terms and conditions contained therein to the extent required by Section 365 of the Bankruptcy Code;

(g)     subject to Section 2.03(a), all encumbered and unencumbered cash and cash equivalents (whether restricted or unrestricted) in excess of the Wind-Down Amount (the "**Included Cash**"), deposits (including security deposits for rent, electricity, telephone, other utilities or otherwise), refunds, overpayments, and all prepaid or deferred charges and expenses, including *ad valorem* taxes, leases and rentals, in each case to the extent held, provided or paid in connection with the Purchased US Business (but excluding any deposits or prepaid or deferred charges and expenses to the extent relating to any Excluded Asset or any Excluded Liability); *provided* that any cash which is cash collateral of the First Lien Lenders in excess of the Wind-Down Amount will be a Purchased US Asset solely to the extent Buyer is the First Lien Lenders or their designees, and if Buyer is not the First Lien Lenders or their designees, such cash collateral of the First Lien Lenders will be an Excluded Asset and distributed to the First Lien Lenders in accordance with the Plan;

(h)     subject to Section 7.03, (i) all of the mining permits and other permits used or held for use by the Sellers in the operation of the Purchased US Business and Purchased US Assets, including all pending applications for additional permits, renewals of existing permits or amendments to existing permits, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Purchased US Business and Purchased US Assets (collectively, the "**US Permits**") and (ii) all of the licenses, franchises, certificates, consents, authorizations, approvals, orders, and concessions, in each case used or held for use by the Sellers in the operation of the Purchased US Business, including all pending applications for additional licenses, renewals of existing licenses, or amendments to existing licenses, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Purchased US Business and the Purchased US Assets (collectively, the "**US Licenses**"), including the US Permits and the US Licenses set forth on Schedule 2.01(h) (collectively, the "**Transferred Permits/Licenses**"); *provided* that notwithstanding the foregoing, the Transferred Permits/Licenses are being transferred subject to the terms and conditions contained therein to the extent required by Section 365 of the Bankruptcy Code;

(i)     all rights of the Sellers to use haul roads, utility easements and other rights of way and easements used or held for use in the operation of the Purchased US Business;

22

(j)      all books, records, files, correspondence (whether in original or photostatic form), personnel files (to the extent relating to Transferred Employees and permitted by law, provided Sellers shall be permitted to retain copies thereof), invoices, market research, customers, distributors and suppliers lists, social media information, promotional materials and other papers, whether in hard copy or computer format, in each case to the extent related to the Purchased US Assets or the Purchased US Business, including any information relating to any Tax imposed on the Purchased US Assets or the Purchased US Business;

(k)      all Intellectual Property Rights used or held for use in connection with the conduct of the Purchased US Business (collectively, the "**Purchased US Intellectual Property**"), including: (i) the trademarks, trade names, service marks, domain names, patents and copyrights (including any issuances, registrations or applications for registration of any of the foregoing) set forth in Schedule 2.01(k), (ii) to the extent not included in Section 2.01(f) above, all rights granted from third parties relating to any Intellectual Property Rights used or held for use in connection with the conduct of the Purchased US Business and (iii) all computer programs;

(l)      subject to Section 6.03, all Transferred Actions, rights of recovery, off-set and subrogation set forth on Schedule 2.01(l), in each case against third Persons available to any of the Sellers or their estates (collectively, the "**Transferred Causes of Action**"), including the NAFTA Claim; *provided* that Transferred Causes of Action shall not include (i) Avoidance Actions not related to the Transferred Assets, (ii) causes of action related solely to Non-Core Assets not sold to Buyer or Designated Buyer, (iii) certain causes of action to be mutually agreed upon by the WLB Debtors and Buyer; or (iv) causes of action that are settled, released, or exculpated under the Plan; *provided*, *further*, that all Avoidance Actions and any other causes of action against any of the Sellers, the holders of the First Lien Claims, the Credit Agreement Agent, the First Lien Notes Trustee, the DIP Lenders, the DIP Agent, the Bridge Lenders and the Bridge Agent (each, as defined in the Plan), and the directors, officers, managers, employees, shareholders, members and advisors thereof shall have been released in accordance with the DIP Order and the Plan;

(m)      subject to Section 2.03(c), all US Insurance Policies (the "**Transferred US Insurance Policies**"), including all insurance proceeds, reserves, benefits or claims of any Seller under the Transferred US Insurance Policies and all property and casualty insurance proceeds in respect of the Transferred US Insurance Policies and proceeds received or receivable in connection with product liability insurance policies included in the Transferred US Insurance Policies;

(n)      all goodwill relating to the Purchased US Business;

(o)      all demands, reimbursements and rights of whatever nature, to the extent related to the Purchased US Assets or any Assumed Liability (including rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment or components thereof (whether express or implied), or arising from the breach by third parties of their obligations under the Assumed Contracts);

(p)     all assets, properties and rights that are owned, held or used in connection with the operations of the Sellers located at Westmoreland's Englewood, Colorado headquarters, including the assets set forth on Schedule 2.01(p) (collectively, the "**Overhead Assets**");

(q)     the assets set forth on Schedule 2.01(q) (for the avoidance of doubt, the assets set forth on Schedule 2.01(q) shall be considered Purchased US Assets);

(r)     all rights of Sellers under non-disclosure, or confidentiality, non-compete or non-solicitation agreements to the extent related to the Purchased US Business;

(s)     all condemnation awards received or receivable in connection with the taking of any asset that is included in the Purchased US Assets or would have been included in the Purchased US Assets but for such taking;

(t)     all intercompany receivables from Westmoreland or its Subsidiaries (other than the Acquired Entities) relating to the Purchased US Business to the extent such intercompany receivables are not cancelled or otherwise terminated at Closing pursuant to the Plan;

(u)     all sales and use Tax certificates of, as well as all exemption certificates collected for sales and use Tax purposes by, Westmoreland and its Subsidiaries (other than the Acquired Entities) related to the Purchased US Business;

(v)     all Tax assets (other than any prepaid Taxes) and net operating losses of the Sellers (and the U.S. federal consolidated tax group, or any equivalent state or local group of which any Seller is a member or a disregarded entity of a member (the "**Seller Consolidated Group**")) and the Acquired Entities, except to the extent they cannot be transferred to Buyer pursuant to applicable Tax law; *provided*, *however*, that nothing about this paragraph shall be interpreted as preventing any Seller or Acquired Entity from using any Tax assets or net operating losses that would otherwise be acquired by Buyer, or requiring compensation from any Seller or Acquired Entity to the Buyer as a result of such use, including the use of any such Tax asset or net operating losses following the Closing as a result of the continuation of the consolidated tax year of any Seller (or the Seller Consolidated Group) following the Closing, to the extent permitted by law and necessary to minimize or eliminate administrative Tax liabilities;

(w)     the Canadian Indebtedness;

(x)     subject to Section 2.17 with respect to the B&S Pension Plan, the Transferred US Benefit Plans, including all assets of such plans; and

(y)     any and all Actions or counterclaims relating to any of the foregoing Purchased US Assets and any Assumed Liabilities.

It is the intention of the Parties that Buyer or the relevant Designated Buyers acquire, lease or sublease all assets, properties and rights of Sellers or their Affiliates necessary for the operation of the Purchased US Business as presently conducted, including all mining, processing, loading, transporting, marketing, and selling of coal and all reclamation activities, but excluding the Excluded Assets. Subject to Section 2.06(c), if, after the Closing and prior to the completion of the liquidation and dissolution of the applicable Seller, it is discovered that any

assets, properties or rights of Sellers or their Affiliates (other than the Acquired Entities), including rights under Contracts and fractional real property interests, owned, leased or subleased by the Sellers or any of their Affiliates (other than the Acquired Entities), other than the Specifically Excluded Assets, were not included in the Purchased US Assets to be sold to Buyer or the relevant Designated Buyers, and such assets, properties or rights are needed by Buyer in the operation of the Purchased US Business as conducted as of the Closing Date, including all mining, processing, loading, transporting, marketing and selling of coal and all reclamation activities, then the Sellers shall assign, convey, lease or sublease, as applicable, such assets, properties or rights to Buyer or the relevant Designated Buyers, in each case upon the reasonable request of Buyer and to the extent permitted by Applicable Law; *provided*, *however*, this obligation shall not include the assignment, conveyance, lease or sublease of any Excluded Asset other than any Contracts or US Leases that the Parties may mutually agree were omitted from Schedule 2.01(f) or Schedule 3.07(a)(i) in error. Additionally, if after the Closing and prior the completion of the liquidation and dissolution of the applicable Seller, Buyer identifies any books or records included in the Purchased US Assets but that were not delivered to Buyer pursuant to Section 2.10, Sellers will deliver such books and records to Buyer, to the extent such books and records are in Sellers possession or control, or provide instructions to any applicable third party to deliver such books and records to Buyer as directed by Buyer.

Section 2.02   ***Purchase and Sale of Purchased Equity Interests***.

(a)   Upon the terms and subject to the conditions of this Agreement, at the Closing, the Canadian Seller shall sell, convey, assign, transfer and deliver to Buyer or the relevant Designated Buyer, and Buyer or the relevant Designated Buyer shall purchase and acquire from the Canadian Seller all of the Canadian Seller's right, title and interest in and to the Purchased Equity Interests, free and clear of all Encumbrances, other than restrictions on transfer arising under applicable US federal and state securities laws.

(b)   For the avoidance of doubt, the Purchased Equity Interests shall not be deemed a Purchased US Asset and upon the consummation of the purchase and sale of the Purchased Equity Interests, Buyer or the relevant Designated Buyer shall assume control of all of the assets and Liabilities of the Acquired Entities.

Section 2.03   ***Excluded Assets***. Notwithstanding anything herein to the contrary, Buyer expressly understands and agrees that the following assets and properties of the Sellers and their respective Affiliates (other than the Acquired Entities) (the "**Excluded Assets**") shall be excluded from the Purchased US Assets (and for the avoidance of doubt, all assets, properties (including Canada Real Property), rights, interests, Contracts, leases (including Canada Leases), claims, licenses, permits, receivables, books, records, files and papers of the Acquired Entities shall not be considered Excluded Assets):

(a)   subject to the proviso in Section 2.01(g), all cash and cash equivalents up to the Wind-Down Amount and restricted cash held by the Sellers in respect of reclamation and similar Liabilities arising under applicable Environmental Laws (including applicable mining safety laws or requirements) in respect of Non-Core Mine Complexes that are Excluded Assets at Closing and which obligations are Excluded Liabilities;

(b)      all permits and licenses not included in Transferred Permits/Licenses;

(c)      all director and officer insurance policies of the Sellers, including those set forth on Schedule 2.03(c) and all proceeds, reserves, benefits or claims thereunder;

(d)      all books, records, files and papers, whether in hard copy or computer format, prepared in connection with this Agreement, the Bankruptcy Case, or the transactions contemplated hereby, and all personnel files (except as set forth in Section 2.01(j)) and minute books (and similar corporate records) of the Sellers and their Affiliates (excluding the Acquired Entities);

(e)      all rights of the Sellers arising under this Agreement or the Transaction;

(f)      all Tax assets (other than any prepaid Taxes) and net operating losses of the Sellers that cannot be transferred to Buyer pursuant to applicable Tax law;

(g)      except as set forth in Section 2.01(l) and subject to Section 6.03, all causes of action (including Avoidance Actions) of Sellers or their Affiliates set forth on Schedule 2.03(g) and proceeds thereof; *provided* that all Avoidance Actions and any other causes of action against any of the Sellers, the holders of the First Lien Claims, the Credit Agreement Agent, the First Lien Notes Trustee, the DIP Lenders, the DIP Agent, the Bridge Lenders and the Bridge Agent, and the directors, officers, managers, employees, shareholders, members and advisors thereof shall have been released in accordance with the DIP Order and the Plan;

(h)      all capital stock or other equity interests in the Subsidiaries of Westmoreland other than the capital stock or other equity interests of the Acquired Entities, including, for the avoidance of doubt, the equity interests in Westmoreland Resources GP, LLC and Westmoreland Resource Partners, LP and their Subsidiaries;

(i)      the assets, properties and rights set forth on Schedule 2.03(i) (the "**Specifically Excluded Assets**");

(j)      except as set forth in Section 2.01(b), all Leases (including all prepaid royalties and un-recouped minimum royalties thereunder), including those set forth on Schedule 2.03(j) (collectively, the "**Excluded Leases**"), and the US Leased Real Property subject to the Excluded Leases;

(k)      all right, title and interest of the Sellers and their Affiliates (other than the Acquired Entities) now or hereafter existing, in, to and under all Contracts, including the Contracts set forth on Schedule 2.03(k),[3] other than (i) the Assumed Leases, (ii) the Assumed Contracts (including Contracts comprising Overhead Assets) and (iii) any contractual rights included in the Purchased US Intellectual Property (collectively, the "**Excluded Contracts**") (for

---

[3]    **Note to Draft**: Schedule to include the Indian Coal Production Tax Credit Agreement with Crow Tribe, as amended.

the avoidance of doubt, US Benefit Plans and operational permits and licenses are not addressed in this Section 2.03(k));

(l)     subject to Section 2.17 with respect to the B&S Pension Plan, the Retained US Benefit Plans, including all other US Benefit Plans that are not Transferred US Benefit Plans, including all assets of such plans; and

(m)     all assets and properties of the Sellers or any of their Affiliates (other than the Acquired Entities) that are not owned, held or used in the conduct of the Purchased US Business, including, for the avoidance of doubt, the Non-Core Assets (except to the extent any Non-Core Assets are included as Purchased US Assets pursuant to the paragraph below) and Westmoreland's interest in and the business operated and assets held by Westmoreland Resources GP, LLC, Westmoreland Resources Partners, LP and their respective Subsidiaries, including the Specifically Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, if any asset or property is specifically identified as a Purchased US Asset in any of Sections 2.01(a) through 2.01(y), a corresponding schedule or otherwise, such asset or property will be deemed for purposes of this Agreement to be used or held for use (primarily or otherwise) in the conduct of the Purchased US Business and therefore will be a Purchased US Asset.  Buyer acknowledges that Westmoreland has marketed its assets, including the Non-Core Mine Complexes and their related Non-Core Assets, for sale to third parties prior to the Petition Date and will continue such marketing efforts following the Petition Date pursuant to the Bidding Procedures. Buyer further acknowledges that, notwithstanding anything in this Agreement to the contrary, in the event the Non-Core Mine Complexes and their related Non-Core Assets are not sold to third parties, Buyer shall acquire such Non-Core Mine Complexes and their related Non-Core Assets pursuant to the terms and conditions set forth in this paragraph. If, upon conclusion of the auction contemplated by the Bidding Procedures, Westmoreland determines, in its sole discretion, that a third party has not agreed to acquire, or subsequently fails to consummate an acquisition of, any Non-Core Mine Complex pursuant to section 363 of the Bankruptcy Code, Westmoreland shall deliver written notice (a "**Non-Core Asset Notice**") to Buyer identifying the Non-Core Mine Complex and related Non-Core Assets that will be included as Purchased US Assets pursuant to this Agreement (the "**Transferred Non-Core Assets**"). If Sellers deliver a Non-Core Asset Notice to Buyer within three (3) Business Days of the conclusion of such auction, the Non-Core Mine Complex and related Non-Core Assets included in such notice shall be included as Purchased US Assets and transferred to Buyer at the Closing. In the event Sellers deliver a Non-Core Asset Notice to Buyer after such three (3) Business Day period (such Non-Core Asset Notice, a "**Subsequent Non-Core Asset Notice**" and the Non-Core Mine Complex and related Non-Core Assets that are the subject of such Subsequent Non-Core Asset Notice, the "**Subject Subsequent Non-Core Assets**"), Buyer shall nonetheless remain obligated to purchase the Subject Subsequent Non-Core Assets identified in the Subsequent Non-Core Asset Notice and such acquisition shall be on the same terms and subject to the same conditions as with respect to any Transferred Non-Core Assets acquired by Buyer at the Closing; *provided* that, unless otherwise determined by Buyer, the transfer of such Subject Subsequent Non-Core Assets to Buyer shall occur following the Closing (in respect of the sale of the Absaloka Complex, the Colstrip Complex, the Haystack Complex and the San Juan Complex) and the Closing shall not be conditioned upon the transfer or inclusion of such Subject Subsequent Non-Core Assets at such

time.  If, following the Closing, any Non-Core Mine Complex and related Non-Core Assets have not been either transferred to a third party or included in the Purchased US Assets at Closing pursuant to a Non-Core Asset Notice, the applicable Sellers and Buyer shall enter into a mutually acceptable transition services agreement to provide for the continued operation of such Non-Core Mine Complex and related Non-Core Assets until such time as such assets are transferred to Buyer.  All assets, properties, leases, rights, interests, Contracts, claims, Liabilities, employees, permits, licenses, books and records of and relating to a Non-Core Mine Complex included in the Purchased US Assets (whether included at the Closing or subsequent thereto) pursuant to the foregoing shall be consistent with the treatment of the assets, properties, leases, rights, interests, Contracts, claims, Liabilities, employees, permits, licenses books and records of and relating to the Absaloka Complex, the Colstrip Complex, the Haystack Complex and the San Juan Complex in this Agreement as of the date hereof (it being understood and agreed that, notwithstanding anything to the contrary contained herein, the only Liabilities to be assumed in respect of the Transferred Non-Core Assets will be the same types of Liabilities included in the Assumed Liabilities with respect to the Absaloka Complex, the Colstrip Complex, the Haystack Complex and the San Juan Complex as provided for hereunder as of the date hereof), in each case, in a manner reasonably acceptable to the Parties, and upon such notice as set forth above, (i) the Disclosure Schedules shall be updated in form reasonably acceptable to the Parties as necessary to reflect the addition of such Transferred Non-Core Assets as Purchased US Assets and retention by the Sellers of related Liabilities consistent with the foregoing and (ii) Sellers shall be deemed to make all of the representations and warranties of the Sellers contained herein in respect of the Transferred Non-Core Assets.

Section 2.04    *Assumed Liabilities*. Except for the Liabilities specifically assumed by Buyer or the relevant Designated Buyers in this <u>Section 2.04</u>, Buyer and the Designated Buyers shall not, and at the Closing will not, assume or agree to be responsible for and will not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the Transaction, to have assumed, or to have agreed to pay, satisfy, discharge or perform in respect of, any Sellers' or any of its Affiliates' or any other Person's (including Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP, and their respective Subsidiaries), Liabilities, whether or not arising out of or relating to the ownership and operation of the Purchased US Assets or the Purchased US Business. Upon the terms and subject to the conditions of this Agreement, effective at the time of the Closing, Buyer shall, or shall cause the relevant Designated Buyers to, assume, become obligated for, and agree to pay and perform when due, only the following Liabilities (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)    all Liabilities of the applicable Sellers arising under the Assumed Leases and the Assumed Contracts to the extent actually assigned to Buyer or a relevant Designated Buyer and arising exclusively after the Closing Date and not on account of a breach by Sellers or their Affiliates occurring prior to the Closing;

(b)    all Cure Costs, which, for the avoidance of doubt, are to be paid in accordance with the Plan;

(c)    those Funded Liabilities elected by Buyer to be assumed at Closing and not treated as an Excluded Liability pursuant to <u>Section 2.05</u> and <u>Section 2.18</u>;

(d)      to the extent not satisfied in connection with the Plan, all liabilities arising out of, or relating to the DIP Facility; *provided* that obligations senior to the DIP Facility will be treated in accordance with Article 3 the Plan;

(e)      all reclamation and similar Liabilities arising under applicable Environmental Laws (including applicable environmental and mining safety laws or requirements) in respect of the US Mining Complexes comprising the Purchased US Business and the Purchased US Assets;

(f)      except as provided in <u>Section 7.03</u>, all Liabilities of any kind or character (including Liabilities arising out of or relating to Environmental Laws, OSHA, MSHA and/or the Transferred Permits/Licenses) in each case solely to the extent first resulting from or first arising out of or in connection with Buyer's or the relevant Designated Buyer's use, operation, possession or ownership of or interest in the Purchased US Assets and/or Purchased US Business, in each case, after the Closing Date (including during the Interim Period, if any);

(g)      any and all Liabilities relating to employee health and safety, including claims for injury, sickness, disease or death, of any Transferred Employee, in each case solely to the extent first arising out of an event or injurious exposure that occurs after the Closing Date (including during the Interim Period, if any);

(h)      all Workers' Compensation Liabilities arising out of any occupational injury to, or injurious exposure of, any Transferred Employee occurring following the Closing Date;

(i)      subject to <u>Section 2.17</u> with respect to the B&S Pension Plan, all Liabilities arising under the Transferred US Benefit Plans;

(j)      except as set forth on <u>Schedule 2.04(j)</u>, subject to all defenses of the Sellers and their Subsidiaries (other than the Acquired Entities) and all parties in interest arising under Applicable Law and only to the extent they would constitute Funded Liabilities, all Royalties and Taxes, including severance and production Taxes, arising or accrued after the Petition Date (but accrued as of the Closing Date) in connection with the Purchased US Business;

(k)      except as set forth on <u>Schedule 2.04(k)</u>, and only to the extent they would constitute Funded Liabilities, all ordinary course wages and benefits of Transferred Employees arising after the Petition Date through the Closing Date; and

(l)      except as set forth on <u>Schedule 2.04(l)</u>, subject to all defenses of the Sellers and their Subsidiaries (other than the Acquired Entities) and all parties in interest arising under Applicable Law and only to the extent they would constitute Funded Liabilities, all accounts payable arising after the Petition Date through the Closing Date in connection with the Purchased US Business.

The Parties acknowledge and agree that Buyer's or Designated Buyer's, as applicable, acquisition of the equity of Canadian Targets (and as a result, the indirect acquisition of their Subsidiaries) will be subject to all existing Liabilities of such Acquired Entities, including the Canadian Indebtedness (but such Liabilities shall not be Assumed Liabilities and shall not be affirmatively assumed by Buyer or any Designated Buyer and shall remain Liabilities of the applicable Acquired Entity).

Section 2.05   **Excluded Liabilities**. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer and/or the relevant Designated Buyers are assuming only the Assumed Liabilities and are not assuming any other Liability of the Non-Acquired Entities or any other Person of whatever nature, whether presently in existence or arising hereafter and whether or not related to the Purchased US Assets or the Purchased US Business. All such other Liabilities (all such Liabilities not being assumed being herein referred to as the "**Excluded Liabilities**") shall be retained by and remain Liabilities of the applicable Non-Acquired Entity or such other Person, as applicable. The Excluded Liabilities shall include the following:

(a)     except as set forth in Section 2.04(j), all Liabilities (i) for Taxes of any Non-Acquired Entity or any of their equityholders for any Tax period (including any Liability of any Non-Acquired Entity for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise) or (ii) Taxes arising from or attributable to the ownership of the Purchased US Assets or the operation of the Purchased US Business for any Tax period (or portion thereof) ending on or prior to the Closing Date.

(b)     except as set forth in Section 2.04(d), any Liability of the Non-Acquired Entities under any Indebtedness, including Indebtedness owed by any Non-Acquired Entity to any direct or indirect Affiliate of such Non-Acquired Entity;

(c)     except to the extent the basis for which first arises for Transferred Employees following the Closing Date (including during any Interim Period), all Liabilities and Workers' Compensation Liabilities arising under the Black Lung Benefits Act or the Federal Coal Mine Health and Safety Act of 1969 ("**Coal Act**"), including with respect to Transferred Employees and current and former employees of the Non-Acquired Entities who worked or who were employed at the US Mining Complexes comprising the Purchased US Assets, including any such Black Lung Benefit Act and Coal Act Liabilities and Workers' Compensation Liabilities of the Non-Acquired Entities or any of their respective predecessors;

(d)     any Liability with respect to the expenses incurred by the Sellers and their Affiliates in connection with this Agreement, the Transaction Documents and the consummation of the Transaction; *provided* that any amounts required to be paid by Sellers in connection with this Agreement, the Transaction Documents and the consummation of the Transaction will be deemed approved and included in the DIP Budget;

(e)     any Liability to the extent relating to or arising out of an Excluded Asset, including any Liabilities under Excluded Contracts and Excluded Leases;

(f)     any Liabilities of any Non-Acquired Entity relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders prior to the Closing Date that (subject to the last sentence of Section 7.01(a)) are not validly and effectively assigned to Buyer and/or the relevant Designated Buyers pursuant to this Agreement;

(g)     other than the Assumed Liabilities pursuant to Section 2.04(e), any Liabilities arising out of, in respect of or in connection with the failure by any Non-Acquired Entity to

30

comply with any Applicable Law or judgment or order of any Governmental Authority on or prior to the Closing Date, including any monetary fines or penalties arising from or relating to acts or omissions occurring on or prior to the Closing Date under Environmental Laws;

(h)     other than the Assumed Liabilities pursuant to Section 2.04(a), any liability under the Assumed Contracts and the Assumed Leases arising out of or relating to events, breaches or defaults thereunder occurring on or prior to the Closing Date;

(i)     any Liability with respect to any coal sales, or other goods sold or any service provided by the Non-Acquired Entities, including any such Liability or obligation (i) pursuant to any express or implied representation, warranty, agreement, coal specification undertaking or guarantee made by any Non-Acquired Entity, or alleged to have been made by any Non-Acquired Entity, (ii) imposed or asserted to be imposed by operation of Applicable Law or (iii) pursuant to any doctrine of product liability;

(j)     other than the Assumed Liabilities pursuant to Section 2.04(b), Section 2.04(d), Section 2.04(e), Section 2.04(f), Section 2.04(i), Section 2.04(j), Section 2.04(k) and Section 2.04(l), (x) any Liability with respect to any Action to the extent arising out of or relating to the operation of the Purchased US Business or pertaining to the Purchased US Assets, in each case on or prior to the Closing Date and (y) any Liability resulting from or arising out of or in connection with the operation, possession or ownership of or interest in the Purchased US Assets and/or Purchased US Business, in each case, on or prior to the Closing Date;

(k)     other than Assumed Liabilities pursuant to Section 2.04(k), any Liability (whether arising before, on or after Closing) with respect to any employee or former employee of any Non-Acquired Entity (or any individual who applied for employment with any Non-Acquired Entity) who is not a Transferred Employee, including any US Business Employee who does not become a Transferred Employee at the Closing and all Liabilities with respect to Sellers' termination of any US Business Employees on or prior to the Closing Date;

(l)     other than the Assumed Liabilities pursuant to Section 2.04(k), any Liability that relates to any Transferred Employee arising out of or relating to events occurring on or prior to the Closing Date, including (i) any and all claims relating to employee health and safety, including claims for injury, sickness, disease or death, of any Transferred Employee, to the extent first arising out of an event or injurious exposure that occurs on or prior to the Closing Date, (ii) all Workers' Compensation Liabilities arising out of any occupational injury or injurious exposure occurring on or prior to the Closing Date, (iii) all Liabilities with respect to Sellers' termination of Offered US Employees who become Transferred Employees on the Closing Date in accordance with Section 9.02, and (iv) all grievances, arbitrations, claims, demands or charges of any nature whatsoever in respect of Transferred Employees, whether known as of Closing or not yet made as of Closing by any employees, bargaining agents, or Governmental Authorities, which result from or arise out of any event occurring on or prior to the Closing Date;

(m)     other than Liabilities that are Assumed Liabilities under Section 2.04(k), any Liabilities (whether arising before, on or after the Closing Date) with respect to any employee or former employee, including any Transferred Employee (or their respective Representatives) of

any Non-Acquired Entity, or any of their respective predecessors based on any action or inaction occurring prior to or on the Closing Date, including payroll, vacation, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans or arrangements or benefits or other compensation of any kind to any employee, and obligations of any kind including any Liability pursuant to the WARN Act;

(n)      other than as set forth in Section 2.04(j), Section 2.04(k), and Section 2.04(l) and except to the extent they constitute Cure Costs, all trade accounts payable, all pre-Petition Date trade payables, all accrued operating expenses, all pre-Petition Date Royalties and Taxes, all pre-Petition Date wages and benefits of Transferred Employees and other current Liabilities of the Non-Acquired Entities related to the Purchased US Business and Purchased US Assets;

(o)      any Liability arising under, relating to or with respect to (i) the Retained US Benefit Plans and all other US Benefit Plans that are not Transferred US Benefit Plans, including any Liability of a Non-Acquired Entity arising under, relating to or with respect to, any employee benefit plan (including US Benefit Plans), policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by any Non-Acquired Entity or any ERISA Affiliate, or with respect to which any Non-Acquired Entity or any ERISA Affiliate has any Liability, including with respect to any post-retirement welfare benefits, single-employer pension plan, or underfunded pension liability to any employee benefit plan, the Pension Benefit Guaranty Corporation, IRS or Department of Labor or otherwise, including any Liability under any employment, collective bargaining agreement or arrangement, severance, retention or termination agreement or arrangement with any employee, consultant or contractor (or its Representatives) of any Non-Acquired Entity or (ii) any multi-employer plan or multi-employer pension plan (including any withdrawal liability) of any Non-Acquired Entity or its respective ERISA Affiliates;

(p)      any Liability arising from, based upon, or with respect to the Coal Benefits Act, including, but not limited to a Non-Acquired Entity's and its Related Persons' Liabilities under the Coal Benefits Act (A) arising under or with respect to the UMWA Combined Benefit Fund, UMWA 1992 Benefit Plan, or any plan maintained under Section 9711 of the Coal Benefits Act; or (B) based upon a Non-Acquired Entity's or its Related Persons' status as a "signatory operator," "last signatory operator," "assigned operator," "related person," "successor," "successor in interest," or similar status under the Coal Benefits Act;

(q)      other than Assumed Liabilities pursuant to Section 2.04(e) and Section 2.04(f), any Liabilities pursuant to Environmental Law arising from or related to any use, transportation, release, treatment, storage or disposal of, or human exposure to, Hazardous Materials at any location not included in the Purchased US Assets and any violations pursuant to Environmental Laws at any location not included in the Purchased US Assets;

(r)      other than Liabilities that are Assumed Liabilities under Section 2.04(l) and Section 2.04(g), any Liability under any employment, severance, retention or termination agreement or arrangement with any employee, consultant or contractor (or its Representatives) of a Non-Acquired Entity;

(s)      any Liability under any collective bargaining agreement, unless such collective bargaining agreement is assumed by Buyer or a Designated Buyer as an Assumed Contract pursuant to Section 2.01 and then only to the extent of Assumed Liabilities as set forth in Section 2.04(a); *provided* that, for the sake of clarity, any withdrawal liability for a multi-employer pension plan that is incurred on or prior to the Closing Date or on account of the Transaction shall be an Excluded Liability; and

(t)      all Liabilities to the extent arising out of the operation or conduct by a Non-Acquired Entity of any business other than the Aggregate Purchased Business, including any Non-Core Mine Complexes not included in the Purchased US Assets as Transferred Non-Core Assets pursuant to the last paragraph of Section 2.03.

Notwithstanding anything to the contrary contained herein (a) any allowed claims (as defined in Section 101(5) of the Bankruptcy Code) related to the Transferred Assets, including priority claims related to the Transferred Assets, and (b) any allowed administrative expense tax liability under the Bankruptcy Code, in each case in clauses (a) and (b) above, only to the extent the assumption or payment of which is required under Section 1129(a)(9) of the Bankruptcy Code in order to obtain entry of the Confirmation Order (the "**Funded Liabilities**") shall, at the option of Buyer, either (i) be assumed by Buyer or a Designated Buyer and become Assumed Liabilities under Section 2.04(c) or (ii) continue to be treated as Excluded Liabilities and satisfied in accordance with Section 2.07(a)(ii); *provided* that in no event shall the amount of Funded Liabilities be in excess of the Funded Liability Cap (which Funded Liability Cap amount shall reflect and include a mutually agreed fixed amount in respect of estimated administrative expense tax liabilities that are or may be allowed as of or following the Closing); *provided*, *further*, that the Parties agree as of the Effective Date that the Specified Assumed Liabilities shall be Assumed Liabilities and included in Section 2.04.  The Funded Liabilities shall take into account any payments made or to be made by third parties, including insurers and sureties. The Parties shall use their respective commercially reasonable efforts to reject and challenge any claims related to the Transferred Assets, including priority claims related to the Transferred Assets, in each case that is asserted after the applicable bar date for such claim. For the avoidance of doubt, and notwithstanding anything to the contrary herein, (i) except as expressly set forth in Sections 2.01(f) and 2.04(a) in respect of CBAs expressly assumed by Buyer or Section 2.04(i) in respect of Transferred US Benefit Plans, or as otherwise expressly agreed in writing by Buyer after the Effective Date, Buyer and any Designated Buyer and their respective Affiliates, as applicable, shall have no obligation to assume or otherwise pay for, and shall not be deemed to have assumed or agreed to pay for, unsecured claims, obligations or Liabilities of the Non-Acquired Entities, including Liabilities arising under retiree medical benefit plans, the Black Lung Benefits Act, the Coal Act, single or multi-employer pension plan or collective bargaining agreements and (ii) if treated as Excluded Liabilities under this paragraph, in no event shall Buyer be responsible to fund any amount to Sellers or their Affiliates following the Closing in respect of Funded Liabilities.

Section 2.06    *Assignment of Assumed Contracts and Rights; Cure Amounts*. (a) The Sellers shall transfer and assign or cause to be transferred and assigned all Assumed Contracts and Assumed Leases to Buyer or the relevant Designated Buyers, as applicable, and Buyer shall, or shall cause the relevant Designated Buyers to, assume all Assumed Contracts and Assumed Leases from the Sellers, as of the Closing Date pursuant to Section 365 of the Bankruptcy Code

and the Confirmation Order. Buyer shall, and shall cause the relevant Designated Buyers to, comply with all requirements of Section 365 of the Bankruptcy Code necessary to permit such assignment and/or assumption. In connection with such assignment and/or assumption, Buyer shall cure all defaults under such Assumed Contracts and Assumed Leases to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**") in accordance with the Plan; *provided* that, any amount of Cure Costs that are disputed as of Closing, or are determined after Closing to be required, shall be paid by Buyer within a reasonable amount of time after such dispute or determination is finally resolved or made and in any event within the amount of time required by the Bankruptcy Court. The Sellers' good faith estimate of the Cure Costs for each Assumed Contract are set forth opposite the name of each Assumed Contract set forth on Schedule 2.01(f) and for each Assumed Lease are set forth opposite the name of each Assumed Lease set forth on Schedule 3.07(a)(i).

(b)     The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, the Sellers shall assign or cause to be assigned to Buyer, or the relevant Designated Buyers, as applicable, the Assumed Contracts and the Assumed Leases, each of which shall be identified by the name or appropriate description and date of the Assumed Contract (if available) and the Assumed Lease, the other party to the Assumed Contract and the Assumed Lease and the address of such party for notice purposes, all included on an exhibit attached to either a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assumed Contracts and Assumed Leases. Such exhibit shall also set forth the Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assumed Contracts and the Assumed Leases as determined by the Sellers based on the Sellers' books and records or as otherwise determined by the Bankruptcy Court.

(c)     Notwithstanding anything herein to the contrary, to the extent the assignment of any Assumed Contract, Assumed Lease or Transferred Permit/License is, after giving effect to Sections 363 and 365 of the Bankruptcy Code, not permitted by law or not permitted without the consent of another Person, and such restriction cannot be effectively overridden, canceled or otherwise rendered unenforceable by the Confirmation Order or other order of the Bankruptcy Court, then this Agreement shall not constitute an agreement to assign or transfer the same (each a "**Removed Contract**"), and, provided the Sellers and Buyer are otherwise in compliance with this Section 2.06(c), neither the Sellers nor Buyer shall be permitted to terminate this Agreement on the basis of the existence of a Removed Contract. Subject to Section 7.01, the Sellers and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) and once obtained, such Removed Contract will be assigned and assumed as though it were an Assumed Lease, Assumed Contract or Transferred Permit/License, as applicable. These commercially reasonable efforts shall not require any material payment or other material consideration from any Seller, Sellers' Affiliate, Buyer or any Designated Buyer (other than the Cure Costs, which shall be the responsibility of Buyer), and any such consent shall contain terms and conditions reasonably acceptable to the Parties. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant Removed Contract. If any such consent shall not be obtained, the Sellers and Buyer shall, subject to any approval of the Bankruptcy Court that may be required, use commercially reasonable efforts for a reasonable period of time following the Closing, or until such earlier time as the Sellers liquidate or otherwise cease operations, to provide to Buyer or the relevant Designated Buyer, as applicable, the benefits

34

thereunder and Buyer or the relevant Designated Buyer shall be responsible for all obligations thereunder; *provided*, *however*, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Removed Contract, from and after Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Removed Contract to the same extent as if such Removed Contract had been assigned or transferred at Closing; *provided*, *further*, that in no event shall Buyer or any Designated Buyer be obligated to accept any material amendment to the terms of any Removed Contract or any additional material conditions with respect to any Removed Contract and Sellers shall not extend or renew such Removed Contract without Buyer's prior written consent.  These commercially reasonable efforts (i) may include, to the extent reasonably practicable and does not materially interfere with the Bankruptcy Cases, the use of a customary back-to-back agreement among the applicable Sellers and Buyer or Designated Buyer and (ii) shall not require any material payment or other material consideration from any Seller, Sellers' Affiliate, Buyer or Designated Buyer or any (other than the Cure Costs or any payments which may be required pursuant to the terms and conditions of such Removed Contract, which shall be the responsibility of Buyer). Buyer shall reimburse, indemnify, and hold harmless the Sellers and their respective Affiliates from any Liabilities arising under any Removed Contract for which the Sellers provide the benefits under such Removed Contract to Buyer pursuant to this <u>Section 2.06(c)</u> and the Sellers shall indemnify Buyer and its Affiliates from any loss or liability arising from Sellers' failure to use commercially reasonable efforts to provide Buyer or the relevant Designated Buyer the benefits under any Removed Contract in accordance with this <u>Section 2.06(c)</u>.

(d)      Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time in its discretion at any time prior to the earlier of (x) the date that is ten (10) Business Days prior to the Closing Date or (y) the date on which the Bankruptcy Court would require a determination to assume or reject such Contract or US Lease, amend or revise <u>Schedule 3.07(a)(i)</u>, <u>Schedule 2.01(f)</u>, <u>Schedule 2.01(q)</u>, <u>Schedule 2.03(i)</u>, <u>Schedule 2.03(j)</u>, <u>Schedule 2.03(k)</u> or <u>Schedule 2.01(h)</u> (the "**Addition/Rejection Deadline**") in order to (i) add any US Lease (or, in the case of <u>Schedule 2.03(j)</u> and <u>Schedule 2.03(k)</u>, remove any US Lease or Assumed Contract), equipment, fixed asset or other tangible asset, US Permit, US License or Contract, as applicable, to such Schedules; *provided* that such US Lease, equipment, fixed asset or other tangible asset, US Permit, US License or Contract is owned, used or held for use by Sellers in connection with the Purchased US Business, or (ii) eliminate any US Lease, equipment, fixed asset or other tangible asset, US Permit, US License or Contract, as applicable, from such Schedules. Automatically upon the deletion of any US Lease from <u>Schedule 2.03(j)</u> or Contract from <u>Schedule 2.03(k)</u> or the addition of any US Lease, equipment, fixed asset or other tangible asset, US Permit, US License or Contract to <u>Schedule 3.07(a)(i)</u>, <u>Schedule 2.01(f)</u>, <u>Schedule 2.01(q)</u> or <u>Schedule 2.01(h)</u>, as applicable, by Buyer in accordance with the previous sentence, such US Lease shall be an Assumed Lease, such Contract shall be an Assumed Contract, such equipment, fixed asset or other tangible asset shall be a Purchased US Asset and such US Permit or US License shall be a Transferred Permit/License, as applicable, for all purposes of this Agreement. Automatically upon the addition of any US Lease to <u>Schedule 2.03(j)</u>, Contract to <u>Schedule 2.03(k)</u> or US Permit, US License, equipment, fixed asset or other tangible asset to <u>Schedule 2.03(i)</u>, or the deletion of any US Permit, US License or Contract from <u>Schedule 3.07(a)(i)</u>, <u>Schedule 2.01(f)</u>, or <u>Schedule 2.01(h)</u> by Buyer in accordance with the first sentence of this <u>Section 2.06(d)</u>, such US Lease shall be an Excluded Lease, such Contract shall be an Excluded Contract, such equipment, fixed asset or other tangible asset shall

be an Excluded Asset and such Transferred Permit/License shall no longer be a Transferred Permit/License for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer or any Designated Buyer or be the obligation, liability, or responsibility of Buyer or any Designated Buyer other than to the extent such Liabilities constitute Funded Liabilities. If any US Lease is added to the list of Assumed Leases or any Contract is added to the list of Assumed Contracts, then the Sellers shall take commercially reasonable steps to cause such US Lease or such Contract, as the case may be, to be assumed and assigned to Buyer or a relevant Designated Buyer as promptly as practicable at or following the Closing (subject to any required approvals of the Bankruptcy Court). Notwithstanding anything in this Agreement to the contrary, if any amendment or revision to the Disclosure Schedules as contemplated by this Section requires an amendment to Schedule A, the Parties and the applicable Subsidiary of Westmoreland will execute such an amendment making such Subsidiary a WLB Subsidiary for all purposes under this Agreement.

(e)     Sellers will notify Buyer no less than [●] Business Days prior to the Addition/Rejection Deadline of all Contracts and leases entered into by Sellers between the date hereof and such date that Buyer may include as Assumed Contracts and Assumed Leases pursuant to clause (d) above. No less than [●] Business Days prior to Closing, Sellers shall update Schedule 2.01(f) and Schedule 3.07(a)(i), as applicable to reflect Contracts and US Leases entered into as permitted by Section 5.01 and Section 5.02, subject to Buyer's right to remove any such Contracts and US Leases by the Addition/Rejection Deadline (if the Bankruptcy Court would require a determination to assume or reject such Contract or US Lease).

Section 2.07   *Purchase Price; Allocation of Purchase Price; Apportionment*.

(a)     On the terms and subject to the conditions set forth in this Agreement, Buyer shall, on its own behalf and as agent for the relevant Designated Buyers, as consideration for the Transferred Assets, in addition to the assumption by Buyer of the Assumed Liabilities:

(i)     at the Closing, release the Sellers that are borrowers or guarantors under the Prepetition Credit Agreement and/or Prepetition First Lien Notes in an aggregate amount equal to $390,125,429.40 (the "**Credit Bid Amount**") under Section 363(k) of the Bankruptcy Code as the same may be increased by Buyer in its sole discretion at any time during the auction contemplated by the Bidding Procedures; and

(ii)     at the Closing, pay to the Sellers an amount of cash or otherwise effectuate an adjustment of the Wind-Down Amount, to the extent necessary to satisfy Buyer's obligations with respect to the Funded Liabilities retained by Sellers as Excluded Liabilities and the Cash Funded Amount in respect thereof;

(collectively, the "**Purchase Price**"). The Credit Bid Amount, shall be effected as provided in Section 2.11(a). For the avoidance of doubt, there shall be no increase in the Purchase Price on account of the Transferred Non-Core Assets, other than as may be required to satisfy Buyer's or Designated Buyer's obligations with respect to Funded Liabilities.

(b)     To the extent necessary to comply with Applicable Law, and on a timing sufficient to comply with any Applicable Law, Buyer shall deliver to Sellers' Representative a

statement (the "**Allocation Statement**") allocating the Purchase Price (plus Assumed Liabilities, to the extent properly taken into account under Section 1060 of the Code) among the Transferred Assets in accordance with Section 1060 of the Code and the U.S. Treasury regulations thereunder (and any similar provision of state, local or non-U.S. law, as appropriate) and the principles set forth on Schedule 2.07(b), as of the Closing Date (the "**Allocation**"). The Allocation Statement shall (i) state the aggregate amount of consideration allocable to each US Mining Complex and the Acquired Entities and (ii) organize the Transferred Assets by Mining Complex. The Allocation shall be considered final and binding on the Parties unless, within thirty (30) days after the delivery of the Allocation Statement, Sellers' Representative notifies Buyer in writing that the Sellers have any good faith objections to the Allocation set forth in the Allocation Statement and the writing sets forth in reasonable detail (i) the basis for such objection, and (ii) the Sellers' proposed corrections to the Allocation Statement. If Sellers' Representative makes such a timely objection, Buyer and Sellers' Representative shall work in good faith to resolve such dispute within twenty (20) days from the date Sellers' Representative delivers the objection to Buyer. In the event that Buyer and Sellers' Representative are unable to resolve such dispute within the twenty (20) day period, the issue(s) in dispute will be submitted to the Auditor for resolution. The determination of the Auditor shall be set forth in a written notice delivered no later than thirty (30) days after the issue(s) in dispute have been submitted to the Auditor, to Buyer and Sellers' Representative by the Auditor and will be final, binding and conclusive on the Parties. Buyer, on the one hand, and the Sellers, on the other hand, shall each bear fifty percent (50%) of the fees and expenses of the Auditor for such determination. Buyer and the Sellers will use commercially reasonable efforts to cause the Auditor to render its decision as promptly as practicable, including by promptly complying with all reasonable requests by the Auditor for information, books, records and similar items. In the event of any adjustments to the Purchase Price, the Parties shall cooperate to adjust the Allocation in accordance with the principles of this Section 2.07(b). This Section 2.07(b) and Section 2.07(c) shall not apply to any Transferred Asset the basis of which is determined under Section 362 of the Code.

(c)     If there is a final Allocation Statement, the Sellers, Buyer and the Designated Buyers agree to (i) be bound by the Allocation (as determined pursuant to clause (b) above) for purposes of determining Taxes and (ii) act in accordance with the Allocation in the preparation, filing and audit of any Tax Return (including filing Form 8594 with their U.S. federal income Tax Returns for the taxable year that includes the Closing Date) and not take any position contrary to the Allocation Statement; *provided*, *however*, that nothing contained herein shall prevent Buyer, any Designated Buyer or the Sellers from settling any proposed deficiency or adjustment by any Taxing Authority based upon or arising out of the Allocation, and neither Buyer nor any Designated Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Taxing Authority challenging such Allocation.

Section 2.08     *Coal Inventory*.

(a)     For purposes of calculating the coal inventory at the Mining Complexes (other than the Non-Core Mine Complexes) included in the Aggregate Purchased Business as of the Closing Date for purposes of determining satisfaction of the Minimum Coal Inventory Condition, the Parties shall jointly engage a reputable and nationally recognized third-party engineer or engineering firm that is knowledgeable in determining coal inventory and mutually

37

acceptable to the Parties (the "**Inventory Inspector**") to determine the coal inventory as of the Closing Date by conducting a visual flight inspection at such locations no more than five (5) Business Days prior to the Closing Date, a report of which shall be delivered to the Parties immediately thereafter.

(b)     The volume of coal inventory at the Mining Complexes (other than the Non-Core Mine Complexes) included in the Aggregate Purchased Business as of the Closing Date for purposes of determining satisfaction of the Minimum Coal Inventory Condition shall be an amount (in Tons) equal to (x) the amount (in Tons) of coal inventory, in the aggregate, determined by the Inventory Inspector and included in the report delivered to the Parties, *minus* (y) the aggregate amount (in Tons) of all coal inventory actually shipped to third parties (or where title otherwise passes) during the period beginning immediately following the Inventory Inspector's determination of the coal inventory until the close of business on the day prior to the Closing Date *plus* (z) an amount (in Tons) equal to the product of (A) the daily average coal production tonnage for such Mining Complex (other than the Non-Core Mine Complexes) as set forth on Schedule 2.08(b) and (B) the number of days between the date of the Inventory Inspector's inspection and the Closing Date.

(c)     The Inventory Inspector's determinations of the amount of coal inventory as of the date of the visual flight inspection shall be final and binding on the Parties absent manifest error in which event the Parties will mutually agree, prior to the Closing Date, to an adjustment to such amount of coal inventory. Sellers shall bear one hundred percent (100%) of the fees and expenses of the Inventory Inspector, provided that Buyer shall reimburse Sellers for one hundred percent (100%) of such fees and expenses at Closing through either payment of cash to Sellers or increase in the Credit Bid Amount.

Section 2.09     *Closing*. The closing (the "**Closing**") of the purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Kirkland & Ellis LLP, 609 Main Street, 47th Floor, Houston, Texas 77002, on a Business Day which shall be mutually agreed by the Parties, which shall be no later than five (5) Business Days after satisfaction (or, to the extent permissible, waiver by the Party or Parties entitled to their benefit) of the conditions set forth in Article 10 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing), or at such other time or place as Buyer and the Sellers may agree.

Section 2.10     *Delivery of Transferred Assets and Procedure at Closing*. At the Closing, the Sellers shall deliver to Buyer and/or the relevant Designated Buyers the following (collectively, the "**Sellers' Closing Deliverables**"):

(a)     the Included Cash, by wire transfer in United States dollars to an account designated by written notice from Buyer to Sellers or, to the extent feasible, by transfer of bank accounts of Sellers to Buyer;

(b)     the General Assignments and Bills of Sale for the Purchased US Assets duly executed by the applicable Sellers;

(c)      certificates representing the Purchased Equity Interests (and with respect to the membership interests of WCGP, an assignment of membership interest in form and substance reasonably acceptable to Buyer, duly executed by Westmoreland), together with duly executed stock transfers or other instrument of assignment acceptable to the Buyer and all applicable stock transfer tax stamps affixed thereto solely to the extent such items remain necessary in light of Section 1146 of the Bankruptcy Code, duly executed by the applicable Sellers, together with certificates representing the partnership interests of Westmoreland Canada held by WCGP and the capital stock of WCHI held by WCBV (all of which shall remain in place);

(d)      the Lease Assignment and Assumption Agreements for the Assumed Leases and US Purchased Leased Real Property duly executed by the applicable Sellers;

(e)      the Contracts Assignment and Assumption Agreements for the Assumed Contracts duly executed by the applicable Sellers;

(f)      a special warranty or limited warranty deed (or similar deed to convey title with warranties limited only to grantor's acts in a particular jurisdiction where the US Owned Real Property is located) to the US Owned Real Property in recordable form, duly executed by the applicable Sellers in form and substance reasonably acceptable to Buyer;

(g)      all documents of title and instruments of conveyance (duly executed by the applicable Sellers) necessary to transfer record and/or beneficial ownership to Buyer and/or the relevant Designated Buyers of all automobiles, trucks and trailers owned by the Sellers (and any other Purchased US Assets owned by the Sellers which require execution, endorsement and/or delivery of a document in order to vest record or beneficial ownership thereof in Buyer and/or the relevant Designated Buyers) that are included in the Purchased US Assets, each in form and substance reasonably acceptable to Buyer;

(h)      the Permit Transfer Agreements duly executed by the applicable Sellers;

(i)      the IP Assignment Agreements duly executed by the applicable Sellers;

(j)      if applicable, the Transition Services Agreement duly executed by the applicable Sellers;

(k)      by reasonable advance notice, such other deeds, endorsements, assignments and other instruments (duly executed by the applicable Sellers) as are reasonably necessary to vest in Buyer and/or the relevant Designated Buyers good and marketable title to the Purchased US Assets free and clear of all Encumbrances other than Permitted Encumbrances, except for special or limited warranty of title as to the US Owned Real Property;

(l)      a certificate, dated the Closing Date and signed by an authorized officer of Westmoreland pursuant to Section 10.02(c) hereof in form and substance reasonably acceptable to Buyer;

(m)      a copy of the Confirmation Order entered by the Bankruptcy Court;

(n)     to the extent not located at facilities included in the Purchased US Assets and in the possession or control of Sellers or their Affiliates, original execution copies of all Assumed Contracts and Assumed Leases and all other books and records included in the Purchased US Assets;

(o)     to the extent not located at facilities owned or used by the Acquired Entities and in the possession or control by Sellers or their Affiliates, original execution copies of all Contracts of the Acquired Entities and the Canada Leases and all other books, records, minute books and stock ledgers of the Acquired Entities;

(p)     any consent required pursuant to Section 10.02(j)(ii);

(q)     transfer Tax forms for US Purchased Real Property, where applicable, prepared by Sellers and required to be executed by the transferor, in form and substance reasonably acceptable to Buyer, solely to the extent such items remain necessary in light of Section 1146 of the Bankruptcy Code;

(r)     letters of resignation from each director (or manager) and officer of each Acquired Entity, effective as of the Closing and in form and substance reasonably acceptable to Buyer;

(s)     evidence in form and substance reasonably acceptable to Buyer that all restrictions on transfer arising under the Canadian Targets' Governance Documents and other Encumbrances on the Purchased Equity Interests to be removed as of Closing as set forth in Section 3.05 have been removed or released; and

(t)     all other documents required to be delivered by the Sellers on or prior to the Closing Date pursuant to this Agreement.

Section 2.11   ***Buyer's Deliveries at Closing***. At the Closing, Buyer and/or the relevant Designated Buyers shall deliver to the Sellers the following (collectively, the "**Buyer's Closing Deliverables**"):

(a)     a payoff letter, release letter or other similar document in form and substance reasonably acceptable to Sellers' Representative, duly executed by the applicable Parties, effecting the release of the Credit Bid Amount;

(b)     to the extent applicable, an amount of cash as contemplated by Section 2.07(a)(ii);

(c)     the General Assignments and Bills of Sale for the Purchased US Assets duly executed by Buyer and/or the relevant Designated Buyers;

(d)     the Lease Assignment and Assumption Agreements to Buyer for the Assumed Leases and US Purchased Leased Real Property duly executed by Buyer and/or the relevant Designated Buyers;

(e)     the Contracts Assignment and Assumption Agreements for the Assumed Contracts duly executed by Buyer and/or the relevant Designated Buyers;

(f)      the Permit Transfer Agreements duly executed by Buyer and/or the relevant Designated Buyers;

(g)      the IP Assignment Agreements duly executed by Buyer and/or the relevant Designated Buyers;

(h)      if applicable, the Transition Services Agreement, duly executed by Buyer and/or the relevant Designated Buyers;

(i)      copies of all binding commitments received from sureties regarding the Scheduled Bonding, together with a list of outstanding commitments from sureties not yet received by Buyer as of the Closing Date;

(j)      a certificate, dated the Closing Date and signed by an authorized officer of Buyer pursuant to Section 10.03(c) hereof in form and substance reasonably acceptable to Sellers' Representative; and

(k)      all other documents required to be delivered by Buyer and/or the relevant Designated Buyers on or prior to the Closing Date pursuant to this Agreement.

Section 2.12   *Withholding*. The Sellers, Buyer or the Designated Buyers, as applicable, shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as the Sellers, Buyer or the Designated Buyers are required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so deducted and withheld and paid over to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. If the Sellers, Buyer or the Designated Buyers determine that any deduction or withholding is required in respect of any amount otherwise payable pursuant to this Agreement, then the Sellers, Buyer or the Designated Buyers, as applicable, shall provide written notice to the Person to receive such payment at least five (5) Business Days prior to the date on which such payment is to be made, and the Sellers, Buyer or the Designated Buyers, as applicable, shall provide such Person the opportunity within such five (5) Business Day period to provide forms or other evidence that would exempt such payment from deduction or withholding. After consultation with Sellers pursuant to the immediately preceding sentence, should Buyer or the Designated Buyers be required by law to deduct or withhold any amount from the consideration otherwise payable pursuant to this Agreement, Sellers shall pay to Buyer or the Designated Buyers, as applicable, a sum in cash equal to the amount so required to be deducted or withheld. In no circumstance shall the consultation requirement restrict the Sellers, Buyer or the Designated Buyers from deducting or withholding any amount as required by law.

Section 2.13   *Simultaneous Transactions*. All actions taken and transactions consummated at the Closing shall be deemed to have occurred simultaneously, and no such transaction shall be considered consummated unless all are consummated.

Section 2.14   *Supplemental Assignments*. As reasonably requested by a Party in order to effectuate the Transaction, each Party shall (or cause its Affiliates to) also execute and deliver at (and after) the Closing without additional consideration such other assignments, bills of sale,

certificates of title and other documents or instruments, and shall take such other commercially reasonable actions, as are necessary or appropriate, to transfer the Transferred Assets to Buyer and/or the relevant Designated Buyers and otherwise implement and make effective the Transaction.

Section 2.15    ***Designated Buyers***. Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this <u>Section 2.15</u>, one or more Affiliates to (i) purchase specified Transferred Assets (including specified Assumed Contracts and Assumed Leases), (ii) assume specified Assumed Liabilities, and/or (iii) employ certain Transferred Employees on and after the Closing Date (any such Subsidiary of Buyer that shall be properly designated by Buyer in accordance with this clause, a "**Designated Buyer**"); it being understood and agreed, however, that any such right of Buyer to designate a Designated Buyer is conditioned upon (a) such Designated Buyer executing and delivering to each Seller a counterpart to this Agreement, (b) such Designated Buyer being able to perform the applicable covenants under this Agreement, including <u>Section 2.06</u> and <u>Article 9</u> (and make the same representations and warranties as Buyer has made in <u>Section 4.05</u>, <u>Section 4.08</u>, and <u>Section 4.09</u> to the extent relating to the relevant portion of the Purchased US Business or the Purchased US Assets being acquired by such Designated Buyer), and demonstrate satisfaction of the applicable requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the applicable Assumed Contracts and the Assumed Leases, (c) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had Buyer purchased the Transferred Assets, assumed the Assumed Liabilities and/or employed the Transferred Employees, and which Liability is (i) not fully reimbursed by or on behalf of Buyer prior to or at the Closing or (ii) a Liability for which Buyer or the applicable Designated Buyer agrees, at its election, to provide an indemnity reasonably acceptable to Seller, and (d) such designation not reasonably being expected to materially delay, prevent or hinder the consummation of the transactions contemplated by this Agreement. No such designation shall relieve Buyer of any of its obligations hereunder. Any breach hereof by a Designated Buyer shall be deemed a breach by Buyer. The above designation shall be made by Buyer by way of a written notice to be delivered to Sellers' Representative as soon as reasonably practicable after the date hereof and in no event later than the fifth (5th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Buyer(s) and shall indicate which Transferred Assets, Assumed Liabilities and Transferred Employees that Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder. Notwithstanding the foregoing, Buyer may designate a Designated Buyer to acquire the Purchased Equity Interests solely upon written notice to Sellers' Representative as soon as reasonably practicable after the date hereof and in no event no less than the fifth (5th) day prior to the Closing Date.

Section 2.16    ***Payments by Buyer***. Notwithstanding anything in this Agreement to the contrary, in any circumstances where Buyer or any Designated Buyer is required to make any payment to any Seller or any of its Affiliates under either this Agreement or in respect of any claim relating to this Agreement or the Transaction, other than under <u>Section 2.07(a)(ii)</u>, such payment may, in Buyer's or the applicable Designated Buyer's sole discretion, be made in the form of a release by Buyer or its equity holders in favor of the Sellers that are borrowers or guarantors under the Prepetition Credit Agreement and/or Prepetition First Lien Notes in an

aggregate amount equal to the amount of such payment. In such a case, Buyer shall deliver to Sellers a payoff letter, release letter or other similar documents evidencing such release.

Section 2.17   *Treatment of Single-Employer Pension Plans*. Notwithstanding anything else in this Agreement to the contrary, at the Closing, Buyer and/or the relevant Designated Buyer will assume (i) the Westmoreland Retirement Plan and all assets and Liabilities of such plan and (ii) the Beulah and Savage Mines Hourly Employees' Pension Plan (the "**B&S Pension Plan**") and all assets and Liabilities of the B&S Pension Plan (which shall be treated as Purchased US Assets and Assumed Liabilities hereunder, as applicable); provided that Buyer and/or the relevant Designated Buyer will not assume the B&S Pension Plan and all assets and Liabilities of the B&S Pension Plan (and the B&S Pension Plan and all such assets and Liabilities related thereto will be treated as Excluded Assets and Excluded Liabilities hereunder) if (x) the Non-Core Mine Complexes who have employees that participate in the B&S Pension Plan are acquired by one or more third party purchaser(s) as contemplated by the last paragraph of Section 2.03 and (y) in connection with any such Non-Core Mine Complex purchase, the B&S Pension Plan is assumed by such third party purchaser(s).  In the event the B&S Pension Plan is assumed by one or more third party purchaser(s) in accordance with the above, neither Buyer nor the Designated Buyers are assuming Liability of any nature with respect to the B&S Pension Plan, including any underfunded pension Liability or any Liability to the PBGC, IRS, Department of Labor or otherwise (all of which shall be Excluded Liabilities hereunder).  Except as expressly provided for in this Section 2.17, neither Buyer nor the relevant Designated Buyers are assuming Liability for any benefit plan maintained or sponsored by the Seller, Non-Acquired Entities or their ERISA Affiliates which is subject to Title IV of ERISA or related Liabilities of any Non-Acquired Entity or its respective ERISA Affiliates.  After the Closing, the Buyer or relevant Designated Buyers shall amend the Westmoreland Retirement Plan and the B&S Pension Plan (if not assumed by a third party purchase on the terms above) to reflect their assumption of those pension plans.

Section 2.18   *Determination of Certain Amounts for Closing.*

(a)   Other than with respect to amounts related to Taxes, which good faith estimates shall be provided as soon as reasonably practicable once sufficient information is available, but in any event prior to the commencement of the hearing to approve the Confirmation Order, on or before January 4, 2019, Sellers shall deliver to Buyer:

(i)   a proposed schedule setting forth each category of estimated claims and expenses projected in good faith to constitute a Funded Liability under the last paragraph of Section 2.05 (whether or not retained by Sellers as an Excluded Liability or assumed by Buyer as an Assumed Liability pursuant to the last paragraph of Section 2.05, but which shall exclude Specified Assumed Liabilities), including the good faith projected dollar amount necessary to satisfy such category of Funded Liability (the "**Aggregate Funded Liability Amount**") as of the end of the week ending March 1, 2019;

(ii)   proposed Funded Liability Cap;

(iii)   projected Closing Available Cash as of the end of the week ending March 1, 2019; and

(iv)     proposed Wind-Down Budget.

(b)     On or before January 9, 2019, Buyer shall deliver to Sellers a schedule setting forth the Funded Liabilities (other than the Specified Assumed Liabilities) Buyer has elected, pursuant to the last paragraph of Section 2.05, to (i) assume as Assumed Liabilities and (ii) continue to treat as Excluded Liabilities.

(c)     Other than with respect to Taxes, on or before January 11, 2019, Sellers shall deliver to Buyer proposed schedules prepared in good faith and setting forth the following, together with supporting documentation used in the creation of such proposed schedule:

(i)     updated cash flow projections showing projected unrestricted cash and cash equivalents of the Sellers and their Subsidiaries (excluding Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP and their respective Subsidiaries) through March 30, 2019, based upon an assumed Closing the week ending March 1, 2019;

(ii)     unrestricted cash and cash equivalents of the Sellers and their Subsidiaries projected to be available as of the end of the week ending March 1, 2019 after deducting the projected dollar amount necessary to satisfy the Funded Liabilities that Buyer elects to treat as Excluded Liabilities pursuant to Section 2.18(b) (such dollar amount, the "**Cash Funded Amount**");

(iii)     proposed Minimum Closing Cash; and

(iv)     proposed Wind-Down Amount.

(d)     Other than with respect to Taxes, the Parties shall reach agreement on the Aggregate Funded Liability Amount and Cash Funded Amount (including each category of claims and expenses that constitutes a Funded Liability), Minimum Closing Cash, Wind-Down Budget and Wind-Down Amount on or before the filing of the Plan Supplement. Additionally, the Parties shall mutually agree on the Funded Liability Cap and Tax amounts included in the Funded Liabilities prior to the commencement of the hearing to approve the Confirmation Order (and Sellers shall update the items as agreed in the prior sentence in good faith following the filing of the Plan Supplement but prior to the commencement of the hearing to approve the Confirmation Order for purposes of the Parties agreeing to the Funded Liability Cap and such Tax amounts included in Funded Liabilities). Failure of the Parties to reach such agreement on the Funded Liability Cap and Tax amount by such time shall give rise to a termination right of Buyer and Sellers pursuant to Section 11.01(n).

(e)     Following agreement of the Parties in respect of the Aggregate Funded Liability Amount and Cash Funded Amount (including each category of claims and expenses that constitutes a Funded Liability), Minimum Closing Cash, Wind-Down Budget and Wind-Down Amount as set forth in Section 2.18(d), Sellers shall in good faith update their projections of such items and amounts (based on an updated assumed Closing Date) no less than every two (2) weeks (including, with respect to Taxes, following the entry of the Confirmation Order) for review by Buyer (which items and amounts shall be acceptable to Buyer and Seller).  Failure of the Parties to reach agreement on each update to each such item and amount within one (1) week

of receipt by Buyer shall give rise to a termination right of Buyer and Sellers pursuant to Section 11.01(n).

(f)     No less than five (5) Business Days prior to the Closing Date, Sellers shall deliver to Buyer Sellers' final update of the Aggregate Funded Liability Amount and Cash Funded Amount (including each category of claims and expenses that constitutes a Funded Liability (including Tax amounts)), Minimum Closing Cash, Wind-Down Budget and Wind-Down Amount (based on the then expected Closing Date), certified by an executive officer of Westmoreland, for review by Buyer (which items and amounts shall be acceptable to Buyer and Seller).  Failure of the Parties to reach agreement on each update to each such item and amount prior to the Closing Date shall give rise to a termination right of Buyer and Sellers pursuant to Section 11.01(n).

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as expressly set forth in the Disclosure Schedules and subject to Section 12.13, and (b) as disclosed in the SEC Documents publicly filed or furnished since January 1, 2016 through the Effective Date (but excluding any disclosures set forth in any risk factors section, any disclosures in any section relating to "forward-looking statements" and any other disclosures to the extent they are predictions or forward-looking in nature), in each case, to the extent the relevance of such disclosure to a particular representation and warranty set forth in this Article 3 is apparent on its face; provided, that in no event shall any disclosure in any such SEC Document qualify or limit the Fundamental Representations, each Seller represents and warrants, on a joint and several basis with the other Sellers, to Buyer, as of the date of this Agreement and as of the Closing Date, that:

Section 3.01     *Corporate Existence and Power*.

(a)     Such Seller is a corporation, limited partnership or limited liability company, as applicable, duly incorporated or duly formed, as applicable, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation, as applicable, and has all corporate or limited liability company powers and all governmental licenses, authorizations, qualifications, permits, consents and approvals required to carry on the Aggregate Purchased Business as currently conducted by such Seller, except for those licenses, authorizations, qualifications, permits, consents and approvals the absence of which would not have a Material Adverse Effect.

(b)     The Acquired Entities are limited partnerships, limited liability companies, private limited companies, corporations, and unlimited liability corporations duly formed, validly existing and in good standing under the laws of the jurisdiction of their respective formation, as set forth on Schedule A, and have the power and authority to own and operate the Purchased Canada Business owned or operated by the Acquired Entities and their other assets and properties, and to otherwise conduct the Purchased Canada Business, in each case, as currently conducted in all material respects. The Acquired Entities are qualified or licensed to do business and are in good standing in the jurisdictions in which the conduct of their respective business or locations of their assets and properties makes such qualification necessary, except where failure

45

to be so qualified or be in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Schedule 3.01(b) sets forth a true and complete list of all Acquired Entity Organizational Documents. True and complete copies of each such Acquired Entity Organizational Document, in each case as amended and in effect on the date of this Agreement, previously have been made available to Buyer.

Section 3.02    *Corporate Authorization*. The execution, delivery and performance by such Seller of this Agreement and each Transaction Document and the consummation of the Transaction are within such Sellers' corporate, limited partnership or limited liability company, as applicable, powers and have been duly authorized by all necessary corporate, limited partnership or limited liability company, as applicable, action on the part of such Seller. Subject to the entry of the Confirmation Order, this Agreement constitutes, and the Transaction Documents to which such Seller is a party, when executed and delivered by such Seller will constitute, the valid and binding obligations of such Seller enforceable against such Seller in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and general principles of equity that restrict the availability of equitable remedies.

Section 3.03    *Governmental Authorization*. The execution, delivery and performance by such Seller of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby require no filing, application or registration with, or consent, authorization or approval of or other action by or in respect of, any Governmental Authority other than (i) compliance with any applicable requirements of the HSR Act, the Competition Act (Canada), the Investment Canada Act (Canada) or similar foreign Applicable Law[4], (ii) the Bankruptcy Court, (iii) the transfer or reissuance of the Transferred Permits/Licenses as contemplated by Section 7.03, and (iv) as set forth on Schedule 3.03, and (v) any such filing, application, registration, consent, authorization, approval or other action as to which the failure to make or obtain would not reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities or materially delay or impair the Transaction.

Section 3.04    *Noncontravention*. Except as set forth on Schedule 3.04, after giving effect to the Confirmation Order, the execution, delivery and performance by such Seller of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any terms, conditions or provisions in the Governance Documents of such Seller or the Canadian Targets, (ii) assuming compliance with the matters referred to in Section 3.03, conflict with or violate any term or provision of Applicable Law, (iii) require any consent or other action by any Person under or constitute (with due notice or lapse of time or both) a default (or give rise to any right of termination, right of first refusal or similar right, cancellation or acceleration of any obligation) under any Assumed Contract, Assumed Lease, Canada Lease, Insurance Policy, Contract of an Acquired Entity or any other Contract of any Seller or any of their Affiliates or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon any of

---

[4]    **Note to Draft**: Applicability of US/Canadian anti-trust filings remains under review.

the Transferred Assets or assets and properties of the Acquired Entities under any agreement to which any Seller, any of its Affiliates (including the Acquired Entities) or its or their properties may be bound, with such exceptions, in the case of clauses (ii), (iii) and (iv), as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.05    ***Capitalization***.

(a)     The Purchased Equity Interests constitute all of the issued and outstanding equity interests of the Canadian Targets.

(b)     Schedule 3.05 sets forth a true and complete list of the Subsidiaries of the Canadian Seller, listing for each such Subsidiary its name, type of entity, the jurisdiction of its incorporation or organization, its authorized capital stock or other equity interests, the number and type of its issued and outstanding shares of capital stock or other equity interests and the current ownership of such shares or other equity interests. Other than the entities listed thereon, there are no Subsidiaries of the Canadian Seller. Other than the respective capital stock or other equity interests of its Subsidiary as set forth on Schedule 3.05, no Acquired Entity owns, directly or indirectly, any capital stock or any membership, ownership equity, profits, voting or other interest in, or control, directly or indirectly, of any Person, has any direct or indirect equity or ownership interest in any business or has any ongoing obligation to purchase any shares of capital stock or any membership, ownership, or equity interest with respect any Person.

(c)     The capital stock and other equity interests of the Acquired Entities are duly authorized, validly issued, fully paid and non-assessable. The Canadian Seller owns and has good and valid title to one hundred percent (100%) of the Purchased Equity Interests and each Acquired Entity owns and has good and valid title to one hundred percent (100%) of the capital stock or other equity interest of its respective direct Subsidiaries, if any, in each case, beneficially and of record, free and clear of all Encumbrances, whether arising prior to or subsequent to the Petition Date, other than (i) Encumbrances or restrictions on transfer imposed under the applicable Acquired Entity Organizational Documents that will be complied with at or prior to the Closing Date, (ii) restrictions on transfer with regards to the Purchased Equity Interests arising under applicable US federal and state securities laws, (iii) Encumbrances created by Buyer, a Designated Buyer or their respective successors or assigns, and (iv) such other Encumbrances as will be discharged in full prior to or at the Closing or in connection with the Bankruptcy Case.  All of the capital stock or other equity interests of the Acquired Entities were issued in compliance with Applicable Laws. None of the capital stock or other equity interests of the Acquired Entities were issued in violation of any Contract to which the Canadian Seller or the Acquired Entities are a party or are subject to or in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar right. Upon delivery of the Purchased Equity Interests as provided in Section 2.02, Buyer will acquire good and valid title to all of the Purchased Equity Interests, free and clear of any Encumbrances (other than restrictions on transfer arising under applicable US federal or state securities laws). Immediately following the Closing, each Acquired Entity will have good and valid title in and to all of the capital stock or other equity interests of its respective direct Subsidiaries, if any, free and clear of all Encumbrances other than Permitted Encumbrances and restrictions on subsequent transfer imposed under the applicable Acquired Entity Organizational Documents.

(d)     There are no preemptive or other authorized rights, restricted units, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, call rights, commitments, subscriptions or agreements of any character (whether or not conditional), under which an Acquired Entity is or may become obligated to issue, deliver or sell, or giving any Person any right to subscribe for or acquire, or dispose of, any shares of capital stock or other equity interests, or any securities or obligations exercisable or exchangeable for or convertible into any shares of capital stock or other equity interests of the Acquired Entities, other than Buyer's rights under this Agreement, and except for the Acquired Entity Organizational Documents, the capital stock or other equity interests of the Acquired Entities are not subject to any agreement described in clause (b) of the definition of Governance Document. There are no outstanding or authorized capital stock or other equity interest appreciation, phantom equity, profit participation or other equity based compensation or similar rights with respect to the Acquired Entities.

(e)     There are no outstanding obligations (contingent or otherwise) of the Canadian Seller or any Acquired Entity to repurchase, redeem or otherwise acquire any capital stock or other equity interests of the Acquired Entities.

(f)     None of the capital stock or other equity interests of the Acquired Entities, other than the stock of WCHI and partnership interests of Westmoreland Canada, have been issued in certificated form.

(g)     The capital stock or other equity interests of each of the Acquired Entities were issued, to the extent applicable, in accordance with exemptions from the prospectus and registration requirements of applicable Canadian securities laws and there are no restrictions on the transfer of the capital stock or other equity interests of any of the Acquired Entities under such laws.

(h)     WCGP has no Liabilities other than Liabilities incurred in its capacity as the general partner of Westmoreland Canada.

Section 3.06   ***Owned Real Property***.

(a)     Schedule 3.06(a)(i) sets forth a list of all or substantially all real property owned by Sellers and used or held for use in connection with the US Mining Complexes and Schedule 3.06(a)(ii) sets forth an accurate and complete list of all real property owned by the Acquired Entities, together with, for each such Owned Real Property, the identity of the fee owner, the legal description of the property and filing location. True and complete copies of the following have been made available to Buyer prior to the date hereof: (i) all material deeds, title insurance policies, title insurance commitments, title reports, title opinions, title abstracts, maps and surveys relating to the Purchased Real Property in each case that such Seller or Acquired Entity has in its possession, and (ii) all documents evidencing recorded and unrecorded Encumbrances upon the Purchased Real Property that such Seller or Acquired Entity has in its possession. The information set forth on Schedule 3.06(a)(i) and Schedule 3.06(a)(ii) is accurate and complete in all material respects.

(b)      Subject to the standard warranty limitations as set forth in a special or limited warranty deed, the Sellers and the Acquired Entities, as applicable, have good and marketable title to the Owned Real Property, free and clear of all Encumbrances, except Permitted Encumbrances.

(c)      The Sellers have, or at the Closing will have, the right to sell, transfer and convey the US Owned Real Property to Buyer and/or the relevant Designated Buyers.

(d)      The Sellers and the Acquired Entities, as applicable, have obtained all material easements and rights of way, required to use and operate the Owned Real Property in all material respects in the manner in which the Owned Real Property is currently being used and operated in connection with the Aggregate Purchased Business. Except as set forth on Schedule 3.06(d), no Seller or Acquired Entity has since January 1, 2016, received written notice of any intention on the part of an issuing authority to cancel, suspend or modify any material approvals, licenses or permits relating to the Owned Real Property, and no Seller or Acquired Entity has received such a notice prior to such date that has not been resolved in all material respects.

(e)      No Seller or Acquired Entity has since January 1, 2016 received written notice of any proposed special assessment that would reasonably be expected to materially and adversely affect the Owned Real Property.

(f)      No Seller or Acquired Entity, as applicable, is party to an agreement leasing, licensing or otherwise granting any Person the right to use or occupy the Owned Real Property, including any subtenants, which lease, license or grant is currently in effect or granted a security interest in the Owned Real Property which security interest is currently in effect (other than Permitted Encumbrances), and the Owned Real Property is not made available for use by any third party.

(g)      Except as set forth in Schedule 3.06(g), there are no outstanding options, rights of first offer or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

(h)      Except as set forth on Schedule 3.06(h), there are not pending or, to the Knowledge of Sellers, threatened condemnation proceedings related to any of the Owned Real Property.

Section 3.07   ***Assumed Leases and Leased Real Property***.

(a)      Schedule 3.07(a)(i) contains a list of (x) all or substantially all the real property leases and subleases to which any Seller is party and used by any Seller in the operation of the Purchased US Business, together with, for each applicable US Leased Real Property, the identity of the lessor and lessee parties and the legal description of the property and (y) recording information for the US Leases that have been recorded, and, to the Knowledge of the Sellers, the US Leases have not been amended or modified, assigned or subleased except as set forth on Schedule 3.07(a)(i). Schedule 3.07(a)(ii) contains a list of (x) all or substantially all real property leases and subleases to which any Acquired Entity is a party, together with, for each applicable Canada Leased Real Property, the identity of the lessor and lessee parties and legal description of the property and (y) recording information for the Canada Leases that have been recorded, and,

to the Knowledge of the Sellers, the Canada Leases have not been amended or modified, assigned or subleased except as set forth on Schedule 3.07(a)(ii).  Schedule 3.07(a)(iii) contains a true and complete list of each application by a Seller or any of its Affiliates (including the Acquired Entities) for a lease from a Governmental Authority that is in progress and that is intended to be used or held for use in connection with the Aggregate Purchased Business. The information set forth on Schedule 3.07(a)(i) and Schedule 3.07(a)(ii) is accurate and complete in all material respects.

(b)     Schedule 3.07(b)(i) contains a true and complete list in all material respects of all prepaid royalties and un-recouped minimum royalties for each Assumed Lease and Canada Lease as of December 31, 2018. A true and complete copy of each Assumed Lease and Canada Lease in the Sellers' or Acquired Entities' possession or control, including all material amendments and exhibits, has been made available to Buyer prior to the date of this Agreement. Sellers have a valid leasehold interest in the property that is the subject of each Assumed Lease in all material respects. Each of the Assumed Leases and Canada Leases is in full force and effect and constitutes a valid and binding obligation of each applicable Seller and Acquired Entity and, to the Sellers' Knowledge, the other parties thereto. The leasehold estate created by each Assumed Lease and Canada Lease is free and clear of all Encumbrances created by, through or under the applicable Seller and Acquired Entity other than Permitted Encumbrances. Except as disclosed in Schedule 3.07(b)(ii), there are no material defaults, breaches or uncured violations by any Seller or Acquired Entity under any of the Assumed Leases and Canada Leases, including any lost coal events, and, to the Knowledge of Sellers, no event has occurred that (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a material default, breach or uncured violation by any Seller or Acquired Entity under any Assumed Lease or Canada Lease, including any lost coal events, except for any such defaults or breaches that would be cured through payment of the Cure Costs or arising solely as a consequence of the Bankruptcy Case. Except as disclosed in Schedule 3.07(b)(ii), there are no material defaults, breaches or uncured violations by the Sellers or an Acquired Entity or, to the Knowledge of Sellers, any other party thereto, or any events, which with notice, the passage of time or both, would constitute such material defaults, breaches or violations by any other party under any of the Assumed Leases or Canada Leases, except for any such defaults or breaches that would be cured through payment of the Cure Costs or arising solely as a consequence of the Bankruptcy Case. There are no existing disputes raised by any Seller or Acquired Entity or, to the Knowledge of Sellers, any other party to any of the Assumed Leases or Canada Leases that are expected to result in a claim of material default or breach or termination thereof, except for any such defaults or breaches that would be cured through payment of the Cure Costs. Each applicable Seller or Acquired Entity has paid all rent, royalties, and other payments due and payable under each Assumed Lease and Canada Lease, as applicable, and has otherwise complied in all material respects with the Assumed Leases and Canada Leases, as applicable, and such Seller or Acquired Entity has not subleased, assigned or otherwise granted to any Person the right to use or occupy any such Purchased Leased Real Property or any portion thereof, except for any such non-payments that would be cured through payment of the Cure Costs. Since January 1, 2016, except as disclosed in Schedule 3.07(b)(ii), neither Sellers nor any Acquired Entity has received any notice in writing, and has no Knowledge, that any lessor or landlord will cancel, terminate, or fail to perform its obligations under the Assumed Leases and Canada Leases.

50

(c)      Except as disclosed in Schedule 3.07(c), there are no outstanding options or rights of first offer or rights of first refusal to purchase or sublease any of the Sellers' or Acquired Entities' interest in the Assumed Leases or Canada Leases, as applicable, or any interest therein.

(d)      The Sellers and Acquired Entities, as applicable, have obtained all material easements and rights of way, including proofs of dedication, required to use and operate the Purchased Leased Real Property in all material respects in the manner in which the Purchased Leased Real Property is currently being used and operated. Except as set forth on Schedule 3.07(d), since January 1, 2016, no Seller or Acquired Entity has received written notice from any Governmental Authority stating an intention to cancel, suspend or modify any material approvals relating to the Purchased Leased Real Property, and no such notice has been received prior to such date that is not resolved in all material respects.

Section 3.08    *Licenses and Permits*.

(a)      Set forth on Schedule 3.08(a) is a complete list of: (i) all mining permits and other material US Permits, together with a description of the permitted property or facility, and (ii) all of the material US Licenses, as amended, supplemented and modified through the Effective Date.

(b)      Set forth on Schedule 3.08(b) is a complete list of: (i) all of the mining permits and other material permits used or held for use by the Acquired Entities in the operation of the Purchased Canada Business, together with a description of the permitted property or facility, together with a true and complete list of all pending applications for additional permits, renewals of existing permits or amendments to existing permits, which have been submitted to any Governmental Authority or other entity by any Acquired Entity applicable to the operation of the Purchased Canada Business (all such permits being herein referred to as the "**Canada Permits**" and together with the US Permits, collectively the "**Permits**"); and (ii) all of the material licenses, franchises, certificates, consents, authorizations, approvals, orders, and concessions, in each case currently used or held for use by the Acquired Entities and necessary for the current conduct of the Purchased Canada Business, together with a true and complete list of all pending applications for additional licenses, renewals of existing licenses, or amendments to existing licenses, which have been submitted to any Governmental Authority or other entity by any Acquired Entity applicable to the operation of the Purchased Canada Business (herein referred to as the "**Canada Licenses**" and together with the US Licenses, collectively, the "**Licenses**"), as amended, supplemented and modified through the Effective Date. The Canada Permits and the Canada Licenses are herein referred to collectively as the "**Canada Permits/Licenses**".

(c)      The Transferred Permits/Licenses and the Canada Permits/Licenses constitute all of the material governmental approvals, clearances, registrations, consents, and authorizations necessary for the operation of and the conduct of the Purchased US Business and the Purchased US Assets by Sellers and the Purchased Canada Business by the Acquired Entities in substantially the same manner as presently conducted, and all of the Transferred Permits/Licenses and the Canada Permits/Licenses are final, unappealed, valid, in good standing and in full force and effect, except where the failure to be final, unappealed, valid, in good standing and in full force and effect would not be material to the Aggregate Purchased Business or the Acquired Entities. The Sellers are in material compliance with the Transferred

51

Permits/Licenses and the Acquired Entities are in material compliance with the Canada Permits/Licenses. Except as set forth on <u>Schedule 3.08(c)</u>, no suspension, revocation, challenge, or cancellation of any of the Transferred Permits/Licenses or Canada Permits/Licenses is pending or in effect or, to the Knowledge of Sellers, threatened, except with respect to regular periodic expirations and renewals thereof, which renewals no Seller has reasonable cause to believe will not be granted. No Seller or Acquired Entity has had any Transferred Permits/Licenses or Canada Permits/Licenses, as applicable, or any applications therefor, appealed, denied, revoked, restricted or suspended (which such appeal, denial, revocation, restriction or suspension is in effect on the date hereof), and no Seller or Acquired Entity is currently a party to any proceedings involving the appeal, denial, revocation, restriction or suspension of any Transferred Permits/Licenses or Canada Permits/Licenses or any of the privileges granted thereunder. No Seller, Acquired Entity, or any Affiliate of such Seller or Acquired Entity, nor any officer or director thereof is permit blocked on the AVS (or any other applicable foreign, state or provincial equivalent database or system) by any Governmental Authority, except with respect to permit blocks arising from immaterial violations of Applicable Laws that would not reasonably be expected to entail more than *de minimis* cost or period of time to cure.

(d)    Except as set forth on <u>Schedule 3.08(d)</u>, there are no Transferred Permits/Licenses that encompass or pertain to or would be reasonably expected to impose liability on Buyer or any Designated Buyer for any Excluded Asset or Excluded Liability or any acreage or operations other than the Purchased US Assets (collectively "**Overlapping Transferred Permits/Licenses**").

Section 3.09    *Environmental Matters*.

(a)    Except as set forth on <u>Schedule 3.09(a)</u>:  (i) no unresolved written notice, order, request for information, complaint or penalty has been received by any Seller or Acquired Entity with respect to the compliance of the Aggregate Purchased Business, the Acquired Entities or the Transferred Assets with any Environmental Laws or liability under any Environmental Laws, and there are no Actions pending or, to the Knowledge of Sellers, threatened in writing, in each case, that allege a violation by or liability of the Aggregate Purchased Business, the Acquired Entities or the Transferred Assets under any Environmental Law, except in each case as would not reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities; and (ii) the Aggregate Purchased Business, the Acquired Entities and the Transferred Assets are and, since January 1, 2016, have been in compliance in all material respects with all applicable Environmental Laws.

(b)    No Seller, Acquired Entity or any of their Affiliates, or, to the Knowledge of Sellers, no other Person has released, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials in quantities and concentrations requiring notification of governmental entities or remediation pursuant to Environmental Law on or beneath the Purchased US Assets or Canada Real Property or from the Purchased US Assets or Canada Real Property into the environment, except in each case that would not reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities.

(c)     Without in any way limiting the generality of the foregoing, (i) other than as may contain substances in *de minimis* quantities or as otherwise not regulated by Environmental Law, all underground storage tanks and above ground storage tanks used by the Acquired Entities or by Sellers in connection with the Transferred Assets or the Aggregate Purchased Business, and the capacity and contents of such tanks, located on any Purchased US Asset or Canada Real Property are specifically identified on Schedule 3.09(c), (ii) other than as contained substances in *de minimis* quantities or as otherwise not regulated by Environmental Law, all former underground storage tanks used by the Acquired Entities or by Sellers in connection with the Purchased US Assets or Canada Real Property or the Aggregate Purchased Business have been removed from or closed in place at the Purchased US Assets or Canada Real Property in material compliance with Applicable Law and those removed or closed in place since January 1, 2014, are listed on Schedule 3.09(c), (iii) all PCBs or items containing PCBs in regulated amounts used or stored on any Purchased US Assets or Canada Real Property are identified on Schedule 3.09(c) and (iv) with respect to the Purchased US Assets and Canada Real Property, there are no underground injection wells, radioactive materials or septic tanks or waste disposal pits in which any Hazardous Materials have been discharged or disposed, in each case of (i) - (iv) other than in compliance in all material respects with all Environmental Laws.

Section 3.10     ***Title to the Transferred Assets***.

(a)     The Sellers have good and marketable title in and to or a valid leasehold interest in, all Purchased US Assets (other than the real property and leased property addressed in Section 3.06 and Section 3.07, respectively), free and clear of Encumbrances other than Permitted Encumbrances. Subject to the terms of the Confirmation Order and Applicable Law, upon consummation of the Transaction, including the transfer or reissuance of the Transferred Permits/Licenses as contemplated by Section 7.03, Buyer and/or the relevant Designated Buyers will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased US Assets, free and clear of all Encumbrances, except for Permitted Encumbrances. To the Knowledge of Sellers, there are no material unrecorded Encumbrances relating to the Purchased Real Property other than Permitted Encumbrances.  All material equipment and tangible assets included in the Purchased US Assets are capable of being used in the conduct of the Purchased US Business in a manner historically operated without the present need for repair or replacement except in the ordinary course of business.

(b)     The Acquired Entities have good and marketable title in and to, or a valid leasehold interest in, all of the properties, equipment, fixed assets and other tangible and intangible assets owned, leased or licensed by the Acquired Entities free and clear of all Encumbrances, except for Permitted Encumbrances. All material equipment and tangible assets of the Acquired Entities are capable of being used in the conduct of Purchased Canada Business in a manner historically operated without the present need for repair or replacement except in the ordinary course of business. No Person other than the Acquired Entities owns any property or assets material to the Purchased Canada Business except for the Canada Leased Real Property and the personal property leased by the Acquired Entities.

(c)     Except for the rights and/or services to be provided under the Permit Transfer Agreements (if applicable), the Purchased US Assets constitute all of the material tangible and intangible assets, rights and properties of, or used by, the Sellers necessary to operate the

Purchased US Business and Purchased US Assets, including all mining, processing, loading, transporting, marketing and selling of coal and all reclamation activities, in the same manner as presently conducted by the Sellers. The Acquired Entities, in all material respects, own or hold a valid leasehold interest or license in all material assets of every kind and description (real and personal, tangible and intangible) necessary to enable the Acquired Entities to continue to conduct the Purchased Canada Business as owned by Buyer or a Designated Buyer upon the Closing in the same manner as the Purchased Canada Business is presently operated by the Acquired Entities.

Section 3.11   *Contracts*.

(a)      Except as set forth on <u>Schedule 3.11</u> (which Schedule shall be organized by Mining Complex) and excluding Contracts that have been rejected in connection with the Bankruptcy Case prior to the date hereof, no Seller or any Acquired Entity is a party to or bound by any of the following Contracts with respect to the Aggregate Purchased Business (each, a "**Material Contract**"):

(i)      any Contract for capital expenditures or the acquisition or construction of fixed assets which requires annual payments in excess of $875,000 or aggregate payments in excess of $2,750,000;

(ii)      any Contract materially prohibiting or materially restricting the ability of the Sellers or Acquired Entities to conduct their businesses, to compete in any line of business or to engage in any business or operate in any geographical area or materially prohibiting or materially limiting the ability of any Person to compete with the Sellers, Acquired Entities or the Aggregate Purchased Business;

(iii)      any Contract (or group of contracts relating to the same site) requiring annual payments or expenditures in excess of $1,000,000 and relating to cleanup, abatement, remediation or similar actions in connection with environmental Liabilities arising out of contamination by Hazardous Materials;

(iv)      any Contract or commitment providing for an interest rate, currency or commodity swap, derivative, hedge, forward purchase or sale or other transaction similar in nature or effect or relating to any off balance sheet financing;

(v)      any Contract under which any of the Sellers or Acquired Entities are (i) lessees of, or hold or use, any machinery, equipment, vehicle or other tangible personal property owned by a third Person, or (ii) lessors of any tangible personal property owned by or used in the Aggregate Purchased Business, in each case which requires annual payments in excess of $450,000 or aggregate payments in excess of $1,350,000;

(vi)      any Contract to mine, process, store, load or transport coal;

(vii)      any Contract for the sale of coal;

(viii)      any Contract guaranteeing any Indebtedness of any Seller, Acquired Entity or any other Person;

(ix)     any Contract with any Related Party;

(x)     any Contract (including consent decrees, consent orders and similar agreements) with any Governmental Authority;

(xi)     any Contract under which any Seller or Acquired Entity has made any advance, loan, extension of credit or capital contribution to, or other investment in, a Person with respect to the Aggregate Purchased Business (other than extensions of trade credit in the ordinary course of business), in any such case which, individually, is in excess of $450,000;

(xii)     any Contract for the sale of any material asset of the Aggregate Purchased Business (other than sales of coal in the ordinary course of business);

(xiii)     any Contract pursuant to which any Seller or Acquired Entity (A) obtains the right to use, or a covenant not to be sued under, any Intellectual Property Right material to the conduct of the Aggregate Purchased Business (excluding licenses for commercial off the shelf computer software that are generally available on nondiscriminatory pricing terms and which have an aggregate acquisition cost of $175,000 or less) or (B) grants the right to use, or a covenant not to be sued under, any material Intellectual Property Right included in the Purchased US Assets or assets of the Acquired Entities;

(xiv)     any other Contract to which any Seller or Acquired Entity is a party or by or to which such Seller or Acquired Entity or any of the Purchased US Assets or the Aggregate Purchased Business is bound or subject that requires aggregate payments, or right of payment, to any single Person in excess of $1,000,000 that cannot be terminated on not more than thirty (30) days' notice without payment of any penalty;

(xv)     any CBA; or

(xvi)     any other Contract that is material to the Aggregate Purchased Business or was not entered into in the ordinary course of business.

(b)     Sellers have made available to Buyer true and complete copies of each Material Contract.  Each Material Contract constitutes a valid and binding agreement of such Seller or Acquired Entity, and, to the Knowledge of Sellers, the other party thereto, and is in full force and effect. There are no material defaults, breaches or uncured violations by a Seller or Acquired Entity, as applicable, or, to the Knowledge of the Sellers, the other parties thereto, that are reasonably likely to lead to the termination of any Material Contract, except for any such defaults or breaches that will be cured upon payment of the Cure Costs or arising as a consequence of the Bankruptcy Case. There are no events, that with notice, the passage of time or both, would constitute any such material default, breach or uncured violation by a Seller or Acquired Entity, as applicable, or to the Knowledge of Sellers, the other parties thereto, that would be reasonably likely to lead to termination under any Material Contract, except for any such defaults or breaches that would be cured upon payment of the Cure Costs or arising as a consequence of the Bankruptcy Case. No Seller or Acquired Entity has received any written notice that any of the other parties to the Material Contracts will cancel, terminate or fail to perform such Party's

obligations under any of the Material Contracts, except where such cancellation, termination or failure to perform would not reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities.

Section 3.12  *Financial Statements*.  Schedule 3.12 sets forth a true and complete copy (or a description, in the case of documents that are publically filed in the SEC Documents) of the following financial statements (collectively, the "**Financial Statements**"), each of which has been prepared in accordance with GAAP consistently applied throughout the periods involved (except as indicated in any notes thereto) and the books and records of Westmoreland and its Subsidiaries and present fairly, in all material respects, the financial position and results of operations of Westmoreland and its Subsidiaries for the periods specified therein, subject to normal immaterial year-end adjustments:

(a)  the audited consolidated balance sheets of Westmoreland and its Subsidiaries as of December 31, 2017 and December 31, 2016, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the years ended on such dates; and

(b)  the unaudited consolidated balance sheet of Westmoreland and its Subsidiaries and the related unaudited consolidated statements of operations and cash flows for the [●] month period ending [●] (the "**Latest Balance Sheet Date**").[5]

The Acquired Entities maintain books and records in all material respects in accordance with Applicable Law and reasonable business practices and which accurately reflect, in all material respects, all of the material transactions of the Acquired Entities.

Section 3.13  *Periodic Reports*.  Westmoreland has filed with or furnished to the SEC all filings required to be made by Westmoreland since January 1, 2016 through the Effective Date. The SEC Documents, including any audited or unaudited Financial Statement and any notes thereto or schedules included therein filed with the SEC, at the time filed (except to the extent corrected by a subsequent filing with the SEC) (a) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading and (b) complied in all material respects with the applicable requirements of the Securities Exchange Act of 1934 (as amended) and Securities Act of 1933 (as amended), as the case may be.

Section 3.14  *Ordinary Course of Business*.  Except as set forth on Schedule 3.14 or as expressly contemplated by this Agreement, and other than in connection with, or in anticipation of, the Bankruptcy Case, since December 31, 2017 (the "**Reference Date**") through the Effective Date, (x) the Sellers and the Acquired Entities have conducted the Aggregate Purchased Business in the ordinary course of business in all material respects, (y) there has not been any change, event, set of circumstances or facts that have had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (z) except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, none of the Sellers nor any of the Acquired Entities has taken any action since the Reference Date and

---

[5]    **Note to Draft:** To reflect most recent available unaudited financials.

prior to the Effective Date that, if taken during the period from the Effective Date through the Closing without Buyer's consent would constitute a breach of Section 5.01 or Section 5.02.

Section 3.15   *Buildings and Improvements*. Since January 1, 2016, except as set forth on Schedule 3.15 and except as would not reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities, no Seller or any of its Subsidiaries has received written notice or, to the Knowledge of the Sellers, oral notification (that has not been resolved or abandoned) which states that a Seller or any of its Subsidiaries is, with respect to the Aggregate Purchased Business, in violation of any applicable building, zoning, subdivision, platting, fire, insurance, safety, health or similar Applicable Laws, ordinances or regulations in respect of its inventories, supplies, plants or structures, Purchased Real Property or the operation of any of the foregoing.

Section 3.16   *Insurance*. Schedule 3.16 sets forth a list of (i) all insurance policies maintained by the Sellers for the benefit of the Purchased US Assets and Purchased US Business (all such policies listed or required to be listed on Schedule 3.16, the "**US Insurance Policies**") and (ii) all insurance policies maintained by the Acquired Entities (all such policies listed or required to be listed on Schedule 3.16, the "**Canada Insurance Policies**", and together with the US Insurance Policies, collectively, the "**Insurance Policies**"). The Sellers have heretofore made available to Buyer true and complete copies of the Insurance Policies. There are no material claims related to the Aggregate Purchased Business, the Acquired Entities, the Transferred Assets or the Assumed Liabilities pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights that would reasonably be expected to have a Material Adverse Effect. No Seller or Acquired Entity has received any written notice of cancellation of, a material premium increase with respect to, or material alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid in full or, if not yet due, accrued in the Financial Statements. All such Insurance Policies are in full force and effect and enforceable in accordance with their terms. No Seller or Acquired Entity is in default under, or has otherwise failed to comply with, any material provision contained in any such Insurance Policy.

Section 3.17   *Litigation, Investigations and Claims*.

(a)   (i) Schedule 3.17(a) sets forth a true, complete and correct list of all existing and pending, and to the Knowledge of Sellers, threatened, Actions against or by any Seller (or any of its Affiliates) or an Acquired Entity or in respect of the Transferred Assets, the Transferred US Benefit Plans or the assets of any of the trusts under such plans (other than routine claims for benefits), the Canadian Benefit Plans or the associated funding arrangements, or the operation of the Aggregate Purchased Business (collectively "**Litigation**"), including the Official Committee of Unsecured Creditors' investigation efforts as permitted by the DIP Order, any Actions challenging the validity or renewal of any Transferred Permits/Licenses or Canada Permits/Licenses, that would reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities and (ii) except for any order entered by the Bankruptcy Court, none of the Sellers or the Acquired Entities is subject to any order in respect of the Transferred Assets, the Acquired Entities or the operation of the Aggregate Purchased Business which would reasonably be expected to be material to the Aggregate Purchased Business or the Acquired

Entities or materially delay or impair the Transaction. There is no Litigation pending or, to the Knowledge of the Sellers, threatened, relating to the equity or ownership of the Acquired Entities.

(b)     No Seller (or Subsidiary of such Seller) is, or since January 1, 2016 has been, in default in respect of any order, writ, injunction, decree or process of any arbitrator or Governmental Authority, which default would reasonably be expected, individually or in the aggregate, be material to the Aggregate Purchased Business or the Acquired Entities or to materially delay or impair the Transaction.

Section 3.18   *Laws and Regulations*. (a) The Acquired Entities are, and since January 1, 2016, the Acquired Entities have been, and (b) the Sellers and their Subsidiaries are operating and conducting, and since January 1, 2016, the Sellers and their Subsidiaries have operated and conducted the Aggregate Purchased Business, in each case, in compliance in all material respects with all Applicable Laws, Transferred Permits/Licenses and Canada Permits/Licenses except as explicitly disclosed in Schedule 3.18. Except as set forth on Schedule 3.18, since January 1, 2016, no Seller (or any Affiliate of such Seller, including the Acquired Entities) has received (i) any written notification from any Governmental Authority (x) asserting that a Seller (or an Affiliate of such Seller, including the Acquired Entities) is, or the Aggregate Purchased Business is being operated, in violation of any Applicable Laws which such Governmental Authority enforces or (y) threatening to revoke, suspend or modify any Transferred Permits/Licenses or Canada Permits/Licenses or (ii) any written notice from any Governmental Authority stating any Transferred Permits/Licenses or Canada Permits/Licenses held or being sought, amended or renewed will be denied by the applicable Governmental Authority.

Section 3.19   *Tax Matters*. Except as set forth in the corresponding subsection of Schedule 3.19:

(a)     With respect to the Aggregate Purchased Business and the Transferred Assets, the Sellers and the Acquired Entities have timely filed or caused to be filed all material Tax Returns required to have been filed by the Sellers and the Acquired Entities with respect to, by or for the Sellers and Acquired Entities, the Aggregate Purchased Business or the Transferred Assets for all periods prior to the Closing except for those Tax Returns for which the filing date (including any applicable extensions) has not yet passed.

(b)     All such Tax Returns are correct and complete in all material respects. Sellers and the Acquired Entities have timely paid all material Taxes.

(c)     There are no material unpaid Taxes due and owing by Sellers or the Acquired Entities that are or could reasonably be expected to become an Encumbrance (other than a Permitted Encumbrance) on the Purchased US Assets or the assets or properties of the Acquired Entities.

(d)     Sellers and Acquired Entities have collected or withheld all amounts required to be collected or withheld by Sellers and Acquired Entities for all material Taxes or assessments, and all such amounts have been timely paid to the appropriate Taxing Authority.

(e)       No written claim has been made by any Taxing Authority in a jurisdiction where the Sellers or the Acquired Entities do not file Tax Returns with respect to the Aggregate Purchased Business or the Transferred Assets that the Sellers or the Acquired Entities are or may be subject to taxation by that jurisdiction with respect to the Aggregate Purchased Business or the Transferred Assets. With respect to Tax periods that are currently open, the Sellers or the Acquired Entities have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to Taxes which relate to the Transferred Assets or the Aggregate Purchased Business.

(f)       There is no material dispute or claim concerning any Tax liability of the Sellers or Acquired Entities claimed or raised by any Taxing Authority in writing.

(g)       None of the Sellers or the Acquired Entities are party to or bound by any material Tax indemnity agreement, Tax sharing agreement or have any material obligation to pay the Taxes of another person under any such agreement or as a transferee, successor or otherwise, in each case, other than any agreement the primary purpose of which is not the allocation of Taxes.

(h)       There are no powers of attorney currently outstanding with respect to material Tax matters relating to the Sellers or the Acquired Entities.

(i)       Neither the Sellers nor the Acquired Entities have participated in a "listed transaction" as described in Treasury Regulations Section 1.6011-4(b)(2).

(j)       In the past five (5) years, (i) none of the Sellers or the Acquired Entities have entered into a material closing agreement or similar agreement with a Taxing Authority, nor (ii) have the Sellers or the Acquired Entities requested or received any Tax rulings from any Taxing Authority.

(k)       None of Buyer or the Acquired Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Tax period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a Tax period ending on or prior to the Closing Date under Section 481(a) of the Code (or any corresponding or similar provision of state, local or non-U.S. law); (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. law) entered into on or prior to the Closing Date; (iii) deferred intercompany gain or any excess loss account described in Treasury Regulation under Section 1502 of the Code (or any corresponding or similar provision of state, local or non-U.S. law); (iv) installment sale or "open transaction" disposition made prior to the Closing Date; (v) prepaid amount received on or prior to the Closing Date; (vi) election under Section 108(i) of the Code (or any corresponding or similar provision of state, local or non-U.S. law); or (vii) use of an improper method of accounting for a Tax period on or prior to the Closing Date.

(l)       To the extent required under Applicable Law, each Acquired Entity is registered under Part IX of the *Excise Tax Act* (Canada).  Each Acquired Entity has timely collected, paid and remitted to the appropriate Taxing Authority when required by Applicable Law to do so, all amounts required to be collected, deemed to have been collected by it or that should have been collected or paid on account of all material Taxes under Part IX of the *Excise Tax Act* (Canada)

and, where applicable, under any similar provincial or other jurisdictions' value-added or sales tax law.

(m)     There are no circumstances existing which could result in the application of section 160 of the Income Tax Act in any material respect to any Acquired Entity.

(n)     There are no circumstances which exist and would result in, or which have existed and resulted in, any of Sections 78 or 79 of the Income Tax Act applying to any Acquired Entity in any material respect.

(o)     For all material transactions between an Acquired Entity and any non-resident Person with whom the Acquired Entity was not dealing at arm's length, each Acquired Entity has made or obtained records or documents that meet the requirements of paragraphs 247(4)(a) to (c) of the Income Tax Act (Canada) in all material respects.

(p)     None of the Acquired Entities is or has been engaged in a trade or business, has or had a permanent establishment (within the meaning of an applicable Tax treaty), or otherwise is or was a resident for Tax purposes in a country other than the country of its formation.

Notwithstanding anything to the contrary, no representations or warranties are made by the Sellers as to any matters relating to Taxes except as solely set forth in this Section 3.19.

Section 3.20   *Intellectual Property*.

(a)     Schedule 2.01(k) fully and accurately identifies all of the Purchased US Intellectual Property. Schedule 3.20(a) fully and accurately identifies all Intellectual Property Rights used or held for use by the Acquired Entities, including all trademarks, trade names, service marks, domain names, patents and copyrights (including any issuances, registrations or applications for registration of any of the foregoing) (collectively, the "**Acquired Canada Intellectual Property**"). Each applicable Seller validly owns, is validly licensed under, or otherwise has legal right to use the Purchased US Intellectual Property. The rights of the Sellers in the Purchased US Intellectual Property are valid and in good standing, are owned (or the licenses thereunder are held) free and clear of all Encumbrances (other than Permitted Encumbrances), and will not be adversely and materially affected by the Transaction. Each applicable Acquired Entity validly owns, is validly licensed under, or otherwise has legal right to use the Acquired Canada Intellectual Property. The rights of the Acquired Entities in the Acquired Canada Intellectual Property are valid and in good standing, are owned (or the licenses thereunder are held) free and clear of all Encumbrances (other than Permitted Encumbrances), and will not be adversely and materially affected by the Transaction.

(b)     Except as set forth on Schedule 3.20(b), and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the conduct of the Aggregate Purchased Business does not, and since January 1, 2016, has not, infringe, misappropriate, misuse or otherwise violate the Intellectual Property Rights of any Person. There is no Action pending against or, to the Knowledge of the Sellers, threatened in writing against, any Seller or any Subsidiary (i) alleging that any Seller or any Subsidiary has infringed, misappropriated, misused or otherwise violated any Intellectual Property Right of any Person in connection with the conduct of the Aggregate Purchased Business, or (ii) challenging or seeking

to deny, revoke or limit any Sellers' or Subsidiary's rights in any of the Purchased US Intellectual Property or Acquired Canada Intellectual Property. To the Knowledge of the Sellers, no Person is infringing, misappropriating, misusing or otherwise violating the rights of Sellers and their Subsidiaries in the Purchased US Intellectual Property or Acquired Canada Intellectual Property in any material respect (or has done so at any time since January 31, 2016).

Section 3.21   *Finders' Fees*. Except for Centerview Partners LLC, whose fees and expenses will be paid by the Sellers, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Sellers who might be entitled to any fee or commission in connection with the Transaction.

Section 3.22   *FCPA Matters*. In connection with the operation of the Aggregate Purchased Business, no Seller or any Subsidiary of such Seller or, to the Knowledge of the Sellers, any director, officer, agent, employee or Affiliate of the Sellers or any of their Affiliates, has taken any action, directly or indirectly, with respect to the Aggregate Purchased Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 (the "**FCPA**"). The Sellers, their Subsidiaries and, to the Knowledge of the Sellers, their Affiliates have conducted the Aggregate Purchased Business in material compliance with the FCPA and maintain procedures which are reasonably expected to ensure compliance therewith.

Section 3.23   *Cure Costs*. Schedule 2.01(f) and Schedule 3.08(a)(i) set forth Sellers' good faith estimate of the Cure Costs as of the Effective Date.

Section 3.24   *Related Party Transactions*. Except as set forth on Schedule 3.24, no current or, to the Knowledge of Sellers, former, director, officer, employee, Affiliate or Representative of Sellers or the Acquired Entities (a "**Related Party**") (a) owns (directly or indirectly) any property, assets, interests and rights, tangible or intangible, that is a Transferred Asset or asset or property of an Acquired Entity or that is otherwise material to the conduct of the Aggregate Purchased Business as currently conducted, (b) except pursuant to any benefit plan, is a party to or the beneficiary of any Contract with the Acquired Entities, the Aggregate Purchased Business or that is included in the Purchased US Assets or (c) has received any loans from or is otherwise a debtor of, or made any loans to or is otherwise a creditor of, any Seller or Acquired Entity.

Section 3.25   *Health and Safety*. Since January 1, 2016, except for fully paid, discharged and settled citations and notices of violation issued by MSHA or other Governmental Authorities, the Sellers and the Acquired Entities have conducted their respective businesses and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable.  There are no Actions pending or, to the Knowledge of Sellers, threatened, by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller or any of the Acquired Entities pursuant to MSHA or OSHA.  No Seller or Acquired Entity owes any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and except as set forth on Schedule 3.25, since January 1, 2016, there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA.

Section 3.26    **Bank Accounts; Powers of Attorney**. Schedule 3.26 sets forth a true and complete list of: (a) the name of each bank, trust company or other financial institution and stock or other broker with which each Acquired Entity has an account, credit line or safe deposit box or vault (each, a "**Bank Account**"); (b) the names of all Persons authorized to draw thereon or to have access to any safe deposit box or vault; (c) the purpose of each such Bank Account; and (d) the names of all Persons authorized by proxies, powers of attorney or other like instrument to act on behalf of the Acquired Entities.

Section 3.27    **Mining Financial Assurances**.

(a)    Schedule 3.27 sets forth a list of all performance bonds and surety bonds maintained by Sellers and the Acquired Entities and approved by the appropriate Governmental Authority, and (i) required under Applicable Law for reclamation of land, water or other natural resources, (ii) required pursuant to any Applicable Law to mitigate any actual or potential environmental impact of such mines, or (iii) otherwise obtained in the ordinary course of business (collectively, "**Mining Financial Assurances**"). To the Knowledge of Sellers, the Mining Financial Assurances constitute all of the performance bonds and surety bonds required to be maintained by Sellers and the Acquired Entities in the operation of the Aggregate Purchased Business under Applicable Law.

Section 3.28    **Coal Act; Black Lung Benefits Act**.

(a)    (i) Sellers, the Acquired Entities (to the extent applicable) and their respective Related Persons are in compliance in all material respects with the Coal Act (and similar applicable laws of Canada) and any regulations promulgated thereunder, except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and (ii) none of Sellers, the Acquired Entities or their respective Related Persons has any Liability under the Coal Act (and similar applicable laws of Canada), except as disclosed in the Financial Statements or which would not, individually or in the aggregate, reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities, or with respect to premiums or other material payments required thereunder which have been paid when due, or which liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

(b)    (i) Sellers and the Acquired Entities (to the extent applicable) are in compliance in all material respects with the Black Lung Benefits Act (and similar applicable laws of Canada), except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and (ii) Sellers and the Acquired Entities have not incurred any Black Lung Liability or similar Liability, except as disclosed in the Financial Statements or which would not, individually or in the aggregate, reasonably be expected to be material to the Aggregate Purchased Business or the Acquired Entities, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Benefits Act Liability or similar Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

62

Section 3.29   *Canadian Benefit Plans*.

(a)   *List of Canadian Benefit Plans*. Schedule 3.29(a) contains a true and complete list of all Canadian Benefit Plans.

(b)   *Vesting*. Neither the execution and delivery of this Agreement, the observance and performance by the Parties of their obligations under this Agreement nor the completion of the Transaction will, in and of itself, accelerate the time of vesting or payment, require any funding or securing of benefits, or increase the rights or entitlements under any Canadian Benefit Plan of any employee or former employee of an Acquired Entity.

(c)   *Canadian Benefit Plan Participation and Obligations*. There are no participating employers with respect to any Canadian Benefit Plan other than Acquired Entities. No Acquired Entity has any obligations under any Canadian Benefit Plan to provide benefits to any person who is not an employee or former employee of that Acquired Entity.

(d)   *Registration and Compliance*. Each Canadian Benefit Plan is, and has since its establishment been, duly registered where required or permitted by Applicable Law. Each Canadian Benefit Plan has been funded and administered in compliance in all material respects with, and is in good standing under, Applicable Law and the terms of the Canadian Benefit Plan and any associated funding arrangement. All assets held in any funding arrangement associated with a Canadian Benefit Plan have been held, invested and otherwise dealt with in compliance in all material respects with Applicable Law and the terms of the Canadian Benefit Plan and the associated funding arrangement.

(e)   *Pension Plan Filings*. Buyer has been provided with true and complete copies of the most recently completed actuarial report prepared in respect of each Pension Plan that has been filed with and accepted for filing by any applicable Governmental Authority.

(f)   *Financial Information*. The financial statements or financial information related to each Canadian Benefit Plan that have been provided to Buyer are complete and accurate in all material respects for the periods indicated therein. There have been no material changes in any Canadian Benefit Plan that are not reflected in the actuarial reports related to the Canadian Benefit Plan that have been provided to Buyer.

(g)   *Compliance of Pension Plans*. With respect to each of the Pension Plans:

(i)   no Pension Plan is a "multi-employer pension plan" (or equivalent) as defined under the provisions of any Applicable Law;

(ii)   nothing has occurred which may result in the revocation of the registration of the Pension Plan under the Income Tax Act or any applicable federal or provincial pension legislation;

(iii)   all contributions required in order for such Pension Plan to comply with the minimum funding standards imposed by Applicable Law have been made, all employee contributions to the Pension Plan (if any) have been properly withheld and fully paid into the funding arrangement for the Pension Plan, and the "defined benefit

63

provision" (as that term is defined in the Income Tax Act) of the Pension Plan is fully funded on a "going concern" and "solvency" basis as determined in accordance with the actuarial assumptions and methods used in the most recent actuarial report filed with (and accepted for filing by) the applicable Governmental Authority;

(iv)    any application of surplus assets of the Pension Plan to offset required employer contributions to such Pension Plan, any payment of expenses and any withdrawal or transfer of assets from a Pension Plan was permitted by Applicable Law and the terms of the Pension Plan and the associated funding arrangement;

(v)    to the Knowledge of Sellers, no circumstances have occurred that would require a wind up or termination, whether in whole or in part, or that would permit a Governmental Authority to require the replacement of the administrator of the Pension Plan pursuant to Applicable Law; and

(vi)    all amounts that have been paid by any Acquired Entity under the provisions of the Pension Plan are deductible for income tax purposes.

(h)    *Funding of Canadian Benefit Plans*. With respect to each Canadian Benefit Plan (other than a Pension Plan) not funded through an insurance policy, the Acquired Entity has made appropriate provision for all of the Acquired Entity's liability thereunder in the Financial Statements. With respect to each Canadian Benefit Plan, all employee contributions (if any) have been fully paid into the funding arrangement for the Canadian Benefit Plan.

(i)    *Extent of Benefits*. Except as indicated in <u>Schedule 3.29(i)</u>, no Canadian Benefit Plan provides benefits, including death or medical benefits (whether or not insured), with respect to employees or former employees of the Acquired Entity beyond retirement or other termination of service, other than (i) coverage required by Applicable Law, or (ii) death or retirement benefits under any Pension Plan.

Section 3.30    ***U.S. Benefit Plans***.  <u>Schedule 3.30</u> contains a true and complete list of each US Benefit Plan.  Each US Benefit Plan has been operated, administered, and maintained in accordance with its terms and substantial compliance with Applicable Law.  Each US Benefit Plan that is intended to be qualified under Section 401(a) of the Code is the subject of a favorable determination or opinion letter from the Internal Revenue Service as to its tax-qualified status, no such determination letter has been revoked and, to the Knowledge of the Seller, no facts or circumstances have occurred or exist that could reasonably be expected to give rise to disqualification or loss of tax-exempt status of such US Benefit Plan or related trust. Each US Benefit Plan that constitutes in any part a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) subject to Section 409A of the Code is in good faith compliance with Section 409A of the Code and has been operated in compliance with, Section 409A of the Code.  No US Benefit Plan contains an obligation (current or otherwise) to pay, reimburse, gross up, or otherwise indemnify any employee for any taxes, penalties or interest imposed under Section 409A or Section 4999 of the Code.

Section 3.31    ***Canadian Insolvency Proceedings***.  No Insolvency Proceedings have been instituted by or against any Acquired Entity.

Section 3.32 *Absence of Undisclosed Liabilities*. The Acquired Entities have no material Liabilities of any nature whatsoever and whether or not required to be accrued on the Financial Statements and no matter, fact, circumstance or event has occurred which will give rise to any Liabilities after the Closing Date of any nature whatsoever, except for, in either case, (i) Liabilities reflected or reserved against in the Financial Statements, (ii) Liabilities incurred after the Latest Balance Sheet Date which Liabilities are in the ordinary course of the Purchased Canada Business and which are not material to the Acquired Entities, (iii) Liabilities arising or resulting from an existing Contract, except to the extent that such Liabilities arose or resulted from a breach or default under such Contract by the Acquired Entities and (iv) as set forth on Schedule 3.32.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Buyer Disclosure Schedule and subject to Section 12.13, Buyer represents and warrants to the Sellers, as of the date of this Agreement and as of the Closing Date, that:

Section 4.01 *Corporate Existence and Power*. Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all limited liability company powers and all material governmental licenses, authorizations, qualifications, permits, consents and approvals required to carry on its business as conducted on the date hereof except for those licenses, authorizations, qualifications, permits, contracts and approvals the absence of which would not, individually or in the aggregate, reasonably be expected to materially delay or impair the Transaction.

Section 4.02 *Corporate Authorization*. The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents and the consummation of any of the transactions contemplated hereby and thereby are within the limited liability company powers of Buyer and have been duly authorized by all necessary limited liability company action on the part of Buyer. Subject to the entry of the Confirmation Order, assuming compliance with the matters set forth in Section 4.03, this Agreement constitutes, and the Transaction Documents to which Buyer is a party, when executed and delivered by Buyer will constitute, the valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and general principles of equity that restrict the availability of equitable remedies. Buyer has the requisite approval and authority of the Prepetition Lenders to execute, deliver and perform this Agreement and the Transaction Documents and consummate any of the transactions contemplated hereby and thereby, including effectuating the release of the Credit Bid Amount as contemplated herein and as contemplated by Section 2.16.

Section 4.03 *Governmental Authorization*. Assuming the accuracy of the representations and warranties in Article 3, the execution, delivery and performance by Buyer of this Agreement and each of the Transaction Documents and the consummation of any of the transactions contemplated hereby and thereby require no material filing, application or registration with, or consent, authorization or approval of or other action by or in respect of any

65

Governmental Authority or third party other than (i) compliance with any applicable requirements of the HSR Act, the Competition Act (Canada), the Investment Canada Act (Canada) or similar foreign Applicable Law[6], (ii) the Bankruptcy Court, (iii) the transfer or reissuance of the Transferred Permits/Licenses as contemplated by <u>Section 7.03,</u> and (iv) as set forth in <u>Schedule 4.03</u>.

Section 4.04   ***Noncontravention***. Except as set forth on <u>Schedule 4.04</u>, the execution, delivery and performance by Buyer of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby do not and will not (i) conflict with or violate any terms, conditions or provisions in the Governance Documents of Buyer, (ii) assuming compliance with the matters referred to in <u>Section 4.03</u>, conflict with or violate any term or provision of Applicable Law or (iii) constitute (with due notice or lapse of time or both) a default (or give rise to any right of termination, right of first refusal or similar right, cancellation or acceleration of any right or obligation) under any Contract binding upon Buyer, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to materially delay the ability of Buyer to consummate the Transaction and, in each case, after giving effect to the Confirmation Order.

Section 4.05   ***Adequate Assurances Regarding Assumed Contracts***. As of the Closing, Buyer and/or each relevant Designated Buyer, as applicable, will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases. To the Knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer or any Designated Buyer not to qualify as a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

Section 4.06   ***Litigation***. As of the date hereof, there is no Action pending against, or to the Knowledge of Buyer threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transaction or that would materially impair Buyer's ability to effect the Closing.

Section 4.07   ***Finders' Fees***. Except for FTI Consulting, Inc., whose fees will be paid by Buyer, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the Transaction.

Section 4.08   ***Assurances Regarding Permits***. As of the Closing, Buyer and/or the relevant Designated Buyers, as applicable, (i) will, subject to <u>Section 7.03</u>, be eligible to take transfer of, or obtain a replacement for, the Transferred Permits/Licenses, (ii) will, subject to <u>Section 7.03</u>, be eligible to act as a contract operator of the Transferred Permits/Licenses during the Interim Period, (iii) will not be listed on the AVS (or any applicable foreign, state or provincial equivalent system or database), and/or (iv) will not have been denied any application for any mining license, mining permit or other governmental authorization by any Governmental

---

[6] **Note to Draft**: Applicability of US/Canadian anti-trust filings remains under review.

Authority due to application of the AVS (or any applicable foreign, state or provincial equivalent system or database), other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of permits as contemplated by <u>Section 7.03</u>.

Section 4.09   ***Assurances Regarding Bonding***. As of the Closing and subject to <u>Section 7.03</u>, Buyer and/or the relevant Designated Buyers, as applicable, will have available credit capacity sufficient to post all bonds or other collateral (including cash, certificates of deposit and/or letters of credit) as may be required from time to time by any Governmental Authority to facilitate the transfer of the Transferred Permits/Licenses. For the avoidance of doubt, Buyer's obligations to complete the Transaction are not dependent upon or conditioned on receipt of financing.

Section 4.10   ***Inspections; No Other Representations***. Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Transferred Assets as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed reasonably necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer will undertake prior to Closing such further investigation and request such additional documents and information as it deems necessary. Without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to the Sellers, except as expressly set forth in this Agreement or in any certificate delivered by Sellers in connection with the Closing, Buyer acknowledges and agrees that the Transferred Assets are sold "as is, where is" and Buyer agrees to accept the Transferred Assets and the Aggregate Purchased Business in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations of warranties of any nature made by or on behalf of or imputed to the Sellers, except as expressly set forth in this Agreement or in any certificate delivered by Sellers in connection with the Closing. Without limiting the generality of the foregoing, Buyer acknowledges that the Sellers make no representation or warranty with respect to (i) any projections, estimates or budgets delivered to or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Aggregate Purchased Business or the future business and operations of the Aggregate Purchased Business or (ii) any other information or documents made available to Buyer or its counsel, accountants or advisors with respect to the Aggregate Purchased Business, except as expressly set forth in this Agreement or in any certificate delivered by Sellers in connection with the Closing. Nothing in this <u>Section 4.10</u> shall be construed to mean that Buyer is not entitled to rely on Sellers' representations, warranties and covenants set forth in this Agreement or in any certificate delivered by Sellers in connection with the Closing (whether or not so captioned or denominated) or shall limit any right of any party in the case of Fraud.

Section 4.11   ***No Other Representations or Warranties of Buyer***. Except for the representations and warranties contained in this Agreement and in any certificate delivered by Buyer in connection with the Closing, neither Buyer nor any Designated Buyer makes any express or implied representation or warranty of any kind or nature, and Buyer and each Designated Buyer hereby disclaims any such representation and warranty with respect to this

Agreement, its subject matter (including any matter with respect to Buyer or a Designated Buyer) or the Transaction. Nothing in this <u>Section 4.11</u> shall be construed to mean that the Sellers are not entitled to rely on Buyer's and Designated Buyer's representations, warranties and covenants set forth in this Agreement or in any certificate delivered by Buyer or Designated Buyer in connection with the Closing (whether or not so captioned or denominated) or shall limit any right of any party in the case of Fraud.

<div align="center">

**ARTICLE 5**

**COVENANTS OF THE SELLERS**

</div>

Section 5.01   ***Conduct of the Aggregate Purchased Business***. Except as expressly permitted by this Agreement or as consented to by Buyer in writing and to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case (*provided* that the Sellers shall (x) not, without the prior written consent of Buyer, seek any order of the Bankruptcy Court requiring them to refrain from taking any action described in this <u>Section 5.01</u> and (y) use their commercially reasonable efforts to oppose any motion or other request seeking such an order of the Bankruptcy Court) or other Applicable Law, from the date hereof through the Closing, the Sellers shall, and shall cause their Subsidiaries (including the Acquired Entities) to (1) conduct the Aggregate Purchased Business in the ordinary course of business consistent with past practice other than *de minimis* deviations and (2) do, and cause the Acquired Entities to do, the following:

(a)      use commercially reasonable efforts to maintain the Purchased US Assets and the assets and properties of the Acquired Entities in as good working order and condition as at present, ordinary wear and tear excepted;

(b)      not introduce any material new method of management, operation or accounting;

(c)      use commercially reasonable efforts to keep in full force and effect the Insurance Policies or other substantially equivalent insurance coverage without being in default or failing to give any notice or present any claim thereunder;

(d)      use commercially reasonable efforts to keep available the services of the present employees of the Aggregate Purchased Business;

(e)      use commercially reasonable efforts to maintain and preserve their business organizations intact and maintain in all material respects their present relationships with third parties having business dealings with the Aggregate Purchased Business;

(f)      use commercially reasonable efforts to maintain all Transferred Permits/Licenses and Canada Permits/Licenses in full force and effect;

(g)      maintain their books, accounts and records in the ordinary course of business; and

(h)      not modify in any material respect its now existing credit, collection or payment policies, procedures or practices, including payment of post-Petition Date trade payables, collection of accounts receivable after the Petition Date, accelerating collections of receivables

<div align="center">68</div>

or failing to pay or delaying payment of payables or Taxes (except, with respect to Taxes, Taxes permitted not to be paid pursuant to applicable bankruptcy law) in a manner inconsistent with its now existing practices.

For the avoidance of doubt, the pendency of the Bankruptcy Case and the effects thereof shall in no way be deemed a breach of this Section 5.01.

Section 5.02  **No Changes in Business**. Without limiting the generality of Section 5.01, from the date of this Agreement through the Closing, except as set forth in Schedule 5.02, as expressly permitted by this Agreement or as consented to by Buyer in writing (which consent shall not be unreasonably withheld, conditioned or delayed with respect to Sections 5.02(b) and (w)) and to the extent not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, any orders entered by the Bankruptcy Court in the Bankruptcy Case (*provided* the Sellers shall (x) not, without the prior written consent of Buyer, seek any order of the Bankruptcy Court compelling them to take any action described in this Section 5.02 and (y) use their commercially reasonable efforts to oppose any motion or other request seeking such an order of the Bankruptcy Court) or other Applicable Law, the Sellers shall not, and shall not permit any of their Affiliates to, with respect to the Aggregate Purchased Business and the Acquired Entities:

(a)     (i) reject, pursuant to Section 365 of the Bankruptcy Code, any Assumed Contract or Assumed Lease or (ii) fail to maintain any Contract of an Acquired Entity or Canada Lease materially in accordance with its terms;

(b)     subject to Section 5.02(m) in respect of Affiliates, enter into, amend, extend the term of, terminate or knowingly waive any right under or incur or agree to incur any Liability under (i) any revenue generating Contract that is or would be an Assumed Contract or Contract of an Acquired Entity with a term of six (6) months or more, (ii) any shared services agreement with Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP or their respective Subsidiaries, (iii) any coal sales agreement with a value of $100,000 or more that extends beyond December 31, 2018 without first providing five (5) Business Days' notice to Buyer and consulting with Buyer on such agreement and (iv) any capital, operating or real property lease in respect of the Purchased US Business or Acquired Entities with annual rent payments of $500,000 or more;

(c)     grant a participation or security interest in, mortgage, pledge or otherwise encumber or subject to an Encumbrance (other than a Permitted Encumbrance) any Transferred Asset or asset or property of an Acquired Entity;

(d)     remove any Transferred Asset or asset or property of an Acquired Entity from any Complex or other location of the Aggregate Purchased Business such that the Transferred Asset or asset or property of an Acquired Entity is no longer located within any Complex or property of the Aggregate Purchased Business or Acquired Entity, except for sales of coal inventory in the ordinary course of business;

(e)     acquire for the Aggregate Purchased Business or the Acquired Entities (by merger, consolidation or acquisition of stock or assets, inbound license or otherwise) any interest

69

in any Person or other business organization or division thereof or other material assets or properties;

(f)    (i) incur any Indebtedness or assume, guarantee or endorse the obligations of any Person, in each case other than Indebtedness or assumptions, guarantees or endorsements of obligations of any Person that do not constitute Assumed Liabilities and will not be Liabilities of any Acquired Entity or (ii) forgive or cancel any debts owed to, or claims of, an Acquired Entity;

(g)    waive, release, assign, settle or compromise any material rights or claims that constitute Transferred Assets or assets or properties of the Acquired Entities, or commence, settle or compromise any litigation or arbitration in excess of $250,000 that constitute Transferred Assets or otherwise involve the Acquired Entities or the Aggregate Purchased Business;

(h)    enter into any Contract which materially restricts the ability of the Aggregate Purchased Business to engage in any business in any geographic area or channel of distribution;

(i)    sell, lease, license (as licensor), assign, dispose of, allow to lapse, or transfer any material tangible or intangible property or contract right in each case that is a Transferred Asset or assets or properties of the Acquired Entities, except (i) the sale of coal inventory in the ordinary course of business and (ii) in accordance with the terms and conditions of the Bidding Procedures;

(j)    sell, assign, lease (including lease or sublease) or otherwise transfer or dispose of any of the Transferred Assets or assets or properties of the Acquired Entities, except (i) the sale of coal inventory in the ordinary course of business and (ii) in accordance with the terms and conditions of the Bidding Procedures;

(k)    make loans or advances to, guarantees for the benefit of, or any investments in, any Person other than to the extent such loans, advances guarantees or investments would not, if Closing occurs, constitute Transferred Assets, Assumed Liabilities or assets, properties or Liabilities of any Acquired Entity, as the case may be; *provided, however*, that notwithstanding anything in this Agreement to the contrary, movements of cash among the Sellers and their Subsidiaries, including, for the avoidance of doubt, the Acquired Entities, whether as capital contributions or pursuant to intercompany arrangements otherwise in accordance with this Agreement, shall not be limited or prohibited by this paragraph;

(l)    except as required by Section 5.01(h), make, change or revoke any Tax election, settle or compromise any Liability for Taxes, file any amended Tax Return, or enter into any agreement with respect to Taxes, in each case to the extent such action would materially and adversely affect the Transferred Assets or the assets or properties of the Acquired Entities, or subject Buyer or any of its Affiliates to any material Tax liability, after the Closing Date; *provided*, *however*, that nothing about this paragraph shall be interpreted as preventing any Seller or Acquired Entity from using any Tax assets or net operating losses that would otherwise be acquired by Buyer, including the use of any such Tax asset or net operating losses following the Closing as a result of the continuation of the consolidated tax year of any Seller (or the Seller Consolidated Group) following the Closing, to the extent permitted by law and necessary to

minimize or eliminate administrative Tax liabilities; *provided further, however*, that Seller shall not take actions outside the ordinary course of business that would be reasonably anticipated to result in a material increase in administrative Tax liabilities;

(m)     other than in the ordinary course of business on market arms'-length terms, enter into or materially amend any Contract or commitment, or enter into any other transaction, directly or indirectly, with any Affiliate that constitutes a Contract, lease or Liability of an Acquired Entity or, if Closing occurs, would constitute an Assumed Contract or Assumed Lease or would give rise to an Assumed Liability;

(n)     enter into, or approve, in writing, any zoning, land use or development restriction relating to the Owned Real Property;

(o)     except as required by Applicable Law, enter into, extend or renew any collective bargaining agreement or other labor agreement with any union or other labor organization and if required by Applicable Law, in consultation with Buyer;

(p)     amend any Acquired Entity Organizational Document;

(q)     issue, deliver, authorize, pledge, transfer, encumber, dispose of, sell or agree or commit to issue (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any capital stock of any class or any other equity securities or equity equivalents, including subscriptions, rights, warrants or options of an Acquired Entity;

(r)     split, subdivide, combine, reclassify, repurchase or redeem any of an Acquired Entity's capital stock or other equity interests or declare, set aside or pay any dividends or other distributions in respect of an Acquired Entity's capital stock or other equity interests (in cash, equity or otherwise);

(s)     enter into any agreement with regards to, or otherwise consummate any merger, consolidation, liquidation or business combination involving the Acquired Entities;

(t)     effect any change in any of its methods of accounting, except as may be required by GAAP or Applicable Law;

(u)     hire, terminate or promote an employee of the Aggregate Purchased Business or Acquired Entities other than in the ordinary course of business or as contemplated in this Agreement or the Restructuring Support Agreement;

(v)     except as expressly permitted under the Restructuring Support Agreement (i) increase any compensation or benefits for any officer, director, employee or other service provider of an Acquired Entity or any US Business Employee, other than such increases in compensation that are required by Applicable Law, existing Contract, or existing US Benefit Plan or Canadian Benefit Plan, as of the date hereof or for employees and service providers other than officers and directors, in the ordinary course of business, (ii) adopt, announce, grant, enter into or terminate any severance, retirement, retention, change in control, bonus or termination pay or any similar payments or any arrangement that would, if adopted or entered into, constitute

71

a US Benefit Plan or Canadian Benefit Plan or (iii) modify or amend any US Benefit Plan that is a Transferred US Benefit Plan or otherwise to be assumed under <u>Section 2.17</u> or any Canadian Benefit Plan in a manner that would increase the Liabilities, costs or benefits thereunder;

     (w)    make any capital expenditures or commitment thereof in respect of the Acquired Entities or the Purchased US Business in excess of the amounts set forth in the then approved budget pursuant to the DIP Facility or fail to make any capital expenditures set forth in the Acquired Entities' then approved budget pursuant to the DIP Facility;

     (x)    adopt or enter into a plan of complete or partial liquidation or authorize or undertake any dissolution, restructuring or recapitalization of the Acquired Entities or merge or consolidate the Acquired Entities into any other Person; or

     (y)    agree or commit to do any of the foregoing.

For the avoidance of doubt, any action permitted to be taken under the DIP Facility or Prepetition Credit Agreement shall in no way be deemed a breach of this <u>Section 5.02</u>.

     Section 5.03   ***Access to Information***. From the Effective Date until the Closing Date, the Sellers will (and will cause their Affiliates to) (i) give Buyer, its counsel, financial advisors, auditors and other authorized Representatives reasonable access upon reasonable notice to the Purchased Real Property, offices, preparation plants, mine workings and other facilities and properties of the Aggregate Purchased Business and Transferred Assets and the books and records of the Sellers and Acquired Entities relating to the Aggregate Purchased Business and Transferred Assets and of the Acquired Entities, (ii) furnish to Buyer, its counsel, financial advisors, auditors and other authorized Representatives, at Buyer's sole expense (if Buyer is not the First Lien Lenders or their designee), copies of such financial and operating data and other information relating to the Aggregate Purchased Business, Transferred Assets and Acquired Entities as such Persons may reasonably request and (iii) instruct the employees, counsel and financial advisors of the Sellers and their Affiliates to cooperate with Buyer in its investigation of the Aggregate Purchased Business, Transferred Assets and Acquired Entities, in each case, except to the extent relating to any dispute among the Parties arising under this Agreement or any Transaction Document prior to the Closing Date; *provided* that nothing herein will obligate Sellers to take or permit any actions that would result in any waiver of attorney-client privilege or violate any Applicable Law or the terms of any Contract to which the Sellers or any of their Affiliates is a party or to which any assets of Sellers or any of their Affiliates are subject or subject Sellers or any of their Affiliates to risk of liability; and *provided, further*, that the Sellers shall request, but shall not be required to obtain, a waiver of any such confidentiality obligations upon Buyer's reasonable prior written request and that the Parties will use their respective commercially reasonable efforts to obtain the necessary consents or develop an alternative solution so as to not result in the waiver of such privilege or violation of such Applicable Law or Contract. Any disclosure by the Sellers, its employees or Representatives pursuant to this <u>Section 5.03</u> will not constitute any enlargement or additional representation or warranty of any Seller beyond those specifically set forth in this Agreement.  Any investigation by Buyer or its authorized Representatives pursuant to this <u>Section 5.03</u> shall not be deemed to modify any representation or warranty of any Seller or rights of Buyer hereunder and shall be subject to restrictions under Applicable Law and conducted during regular business hours and in such

manner as not to interfere unreasonably with the conduct of the business of the Sellers or Acquired Entities. Notwithstanding the foregoing, Buyer shall not (A) have access to personnel records of the Sellers or the Acquired Entities relating to individual performance or evaluation records, medical histories or other information which in Sellers' good faith opinion violates Applicable Law, (B) have any access or investigation to the extent it relates to the negotiation of this Agreement or the Transaction, or (C) without the prior written consent of the Sellers' Representative (not to be unreasonably withheld, conditioned or delayed so long as Buyer has a reasonable and good faith belief that material environmental conditions warranting the following types of investigations are present), conduct or cause to be conducted any sampling, testing or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Aggregate Purchased Business, the Transferred Assets or Acquired Entities. During any visits to any offices, facilities or other properties of Sellers or any of their Affiliates permitted by this <u>Section 5.03</u>, Buyer shall comply, and shall cause its Representatives to comply, in all material respects, with all applicable safety, health, security and confidentiality rules applicable to the premises being visited.

Without limiting the generality of the foregoing, Buyer and the Sellers shall, beginning immediately upon the Effective Date and continuing until Closing, conduct a reasonable joint pre-closing review to confirm the existence and location of the equipment, fixed assets and other tangible assets included in the Purchased US Assets and assets of the Acquired Entities; *provided* that such pre-closing review shall not interfere unreasonably with the conduct of the business of the Sellers and the Acquired Entities.

Section 5.04   ***Records of Purchased Business***. Until the date upon which the Sellers complete their wind down or otherwise liquidate, the Sellers and their Subsidiaries shall maintain at their corporate and administrative offices originals or copies of all accounting, environmental, Tax, and black lung data relating to the Aggregate Purchased Business, to the extent not transferred to Buyer or the relevant Designated Buyers as Purchased US Assets in accordance with this Agreement or not otherwise held by the Acquired Entities as of the Closing or not otherwise delivered to Buyer or a Designated Buyer at or prior to Closing in accordance with this Agreement (collectively the "**Business Records**"). During such period, Buyer and each Designated Buyer shall have the right upon reasonable notice to the applicable Seller (i) to inspect and review the Business Records during regular business hours at the corporate and administrative offices such Seller or such Seller's Subsidiaries and (ii) at Buyer's or such Designated Buyer's sole expense, to make copies of the Business Records; *provided* that any such access by Buyer and Designated Buyers shall not unreasonably interfere with the conduct of the business of Sellers and their Subsidiaries; *provided*, *further*, that the Sellers shall provide Buyer a reasonable opportunity to take possession of all Business Records in the possession of the Sellers prior to wind down.

Section 5.05   ***Release; Acknowledgements***.

(a)      Notwithstanding anything to the contrary contained herein, effective as of the Closing, (i) each Seller (individually and on behalf of its Affiliates) hereby releases and forever discharges Buyer, each Designated Buyer, the Bridge Loan Agent, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee, the lenders under the Bridge Loan Agreement, the First Lien Lenders and each of their respective Affiliates (including the Acquired Entities)

and their respective successors and assigns and all officers, directors, partners, members, equityholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, Liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Person had, has, or may have in the future (x) to the extent relating to the Excluded Assets or the Excluded Liabilities or the status of any of the foregoing as a lender (or respective agent) to the Sellers and their Affiliates prior to the Closing and (y) in respect of the Acquired Entities, relating to or in respect of any period prior to Closing against the Acquired Entities and related released Persons and (ii) Buyer (individually and on behalf of its Affiliates (including the Acquired Entities)) hereby releases and forever discharges each Seller and each of their respective Affiliates (other than the Acquired Entities) and their respective successors and assigns and all officers, directors, partners, members, equityholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, Liabilities, damages, expenses and/or Losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Person had, has or may have in the future (x) to the extent relating to the Transferred Assets or the Assumed Liabilities and (y) in respect of the Acquired Entities, relating to or in respect of any period prior to Closing against the Sellers and their Affiliates and related released Persons; *provided* that nothing in this Agreement (including this <u>Section 5.05</u>) shall (A) constitute a release of any Person arising from conduct of such Person that is determined by a final order of a court of competent jurisdiction to have constituted fraud, willful breach, knowing and intentional misrepresentation or criminal act by such Person, (B) be construed to release any Person from any of its contractual obligations under this Agreement, the Transaction Documents (including any other document, instrument or agreement delivered pursuant hereto or thereto) or any Assumed Contract or other agreement between such Person and Buyer and its Affiliates (including the Acquired Entities) included in the Purchased US Business or with an Acquired Entity, including its obligations in respect of the Transferred Assets, Assumed Liabilities, Excluded Assets, Excluded Liabilities and Liabilities of an Acquired Entity, each of which shall remain fully effective and enforceable from and after the Closing Date and (C) constitute a release by Buyer or any of its Affiliates of any claims that Buyer or any of its Affiliates have in the Bankruptcy Case except for the release of the Credit Bid Amount and any release that may occur pursuant to <u>Section 2.16</u>.

(b)     Subject to <u>Section 2.15</u>, the Sellers acknowledge that Buyer (and any Designated Buyer as provided herein) is the sole Person bound by, or liable with respect to, the Liabilities of Buyer under this Agreement, and that no Affiliate of Buyer (except any Designated Buyer as provided herein) or any current or former equityholder, member, officer director, employee, agent, Representative, advisor or consultant of Buyer shall be bound by, or liable with respect to, any aspect of this Agreement or the Transaction.

Section 5.06   ***Bankruptcy Process***.

(a)     Sellers shall (i) use commercially reasonable efforts to obtain entry of the Bidding Procedures Order and an order of the Bankruptcy Court (the "**Disclosure Statement Order**") approving the disclosure statement related to the Plan (the "**Disclosure Statement**") (which Disclosure Statement and Disclosure Statement Order may not contain any provisions which are

inconsistent in any material respect with this Agreement), (ii) promptly commence solicitation on the Plan upon entry of the Disclosure Statement Order, and (iii) use commercially reasonable efforts to (A) facilitate the solicitation, confirmation and consummation of the Plan and the Transaction, (B) obtain entry of the Confirmation Order and (C) consummate the Plan, in each case, in accordance with the Milestones (as defined in the Restructuring Support Agreement) as the same may be extended in accordance with the Restructuring Support Agreement.

(b)     In the event that the entry of, as applicable, the Bidding Procedures Order, the Disclosure Statement Order, the Confirmation Order or any other order reasonably necessary in connection with the Transaction is appealed or petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto, the Sellers agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Buyer agrees to cooperate in such efforts.

(c)     Sellers and Buyer acknowledge that this Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of competing bids. Notwithstanding anything to the contrary contained herein, from and after the date hereof until the date that the auction contemplated by the Bidding Procedures Order is declared closed in accordance with the Bidding Procedures, Sellers are permitted to cause their respective Representatives and Affiliates to (a) consider, respond to, and facilitate Alternative Restructuring Proposals, (b) provide access to non-public information concerning the Sellers to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity, (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals, (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals, and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Seller (including any Consenting Stakeholder), any other party in interest in the Bankruptcy Case (including any official committee and the United States Trustee), or any other entity regarding the Transaction or Alternative Restructuring Proposals; *provided*, *however*, that notwithstanding anything to the contrary herein, if the Sellers receive a proposal or expression of interest (orally or in writing) from a third party regarding an Alternative Restructuring Proposal, the Sellers shall provide counsel to Buyer with such proposal for an Alternative Restructuring Proposal within one (1) Business Day, including the identity of the party or parties making such proposal or expression of interest.

Section 5.07   *Additional Bankruptcy Matters*.

(a)     From and after the date of this Agreement and until the Closing Date, at least five (5) Business Days prior to the filing thereof, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any and all pleadings, motions, notices, statements, applications, schedules, reports, and other papers to be filed or submitted by the Sellers in connection with or related to this Agreement for Buyer's prior review. The Sellers shall make reasonable efforts to consult and cooperate with Buyer regarding (i) any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers, (ii) any discovery taken in connection with the seeking entry of the Confirmation Order (including any depositions) and (iii) any hearing relating to the Confirmation Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)     Sellers acknowledge and agree, and the Confirmation Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Encumbrances of, against or created by the Sellers or their bankruptcy estates, shall be fully released from and with respect to the Transferred Assets, which shall be transferred to Buyer and/or the relevant Designated Buyers free and clear of all Liabilities and Encumbrances except for (i) with regards to the Purchased US Assets, Assumed Liabilities and Permitted Encumbrances and (ii) with regards to the Purchased Equity Interests, restrictions on transfer that may be imposed by applicable U.S. federal or state securities laws.

Section 5.08   *Insurance*. Sellers shall use commercially reasonable efforts, after the Closing, to (i) enable Buyer and its Affiliates to file, notice and otherwise continue to pursue (or, at the direction and expense of Buyer, shall file, notice and continue to pursue) any claims on behalf of the Aggregate Purchased Business or the Transferred Assets under any third party insurance policy of any Seller covering the Aggregate Purchased Business or any Transferred Asset and assets related thereto for events occurring prior to the Closing, (ii) enable Buyer and its Affiliates to recover proceeds under the terms thereof, and (iii) amend all applicable Canada Insurance Policies to list Buyer or a Designated Buyer as the policy holder (to the extent an Acquired Entity is not the policyholder).

Section 5.09   *Title Policies*. Sellers shall provide any such instruments, affidavits, and other documents reasonably required or reasonably requested by Buyer or any title insurance company necessary for Buyer to obtain title policies in form, substance and amounts on terms consistent with this Agreement and reasonably acceptable to Buyer with respect to each US Purchased Real Property.  For the avoidance of doubt, such obligations shall not include (i) the undertaking of any obligation by Sellers after the Closing, including the provision of any indemnity or (ii) the making of any representation beyond the scope of those contained in this Agreement.

Section 5.10   *Indemnity Agreements*. Between the date hereof and the Closing Date, the Sellers will use commercially reasonable efforts to assist Buyer in obtaining (i) revised indemnity agreements and (ii) revised surety agreements, in each case between the holders of any surety bonds or other financial assurances required in connection with the Transferred Permits/Licenses and Buyer that limit the indemnification required by Buyer to Liabilities related to the Absaloka Complex, the Colstrip Complex, the Haystack Complex, the San Juan Complex, Canadian Complexes and, if applicable, the Non-Core Mine Complexes included in the Transferred Non-Core Assets.

Section 5.11   *Affiliate Arrangements*. Prior to the Closing Date, Sellers shall (a) terminate, effective as of the Closing, (i) the Contracts between the Acquired Entities and the Sellers and their Affiliates (other than an Acquired Entity) as set forth on Schedule 5.11(a) and (ii) any other similar Affiliate contract entered into between the Effective Date and the Closing Date in accordance with Section 5.01 and Section 5.02 as may be identified by Buyer, in each case with no further Liability to any party thereto, pursuant to a termination agreement in form and substance reasonably satisfactory to Buyer and (b) settle all inter-company payables and receivables between the Acquired Entities, on the one hand, and the Sellers and their Affiliates (excluding the Acquired Entities), on the other hand.

Section 5.12   *WRMI*. Westmoreland shall, and shall cause WRMI to, reasonably cooperate with Buyer in pursuing any discussions with, or relief from, the Montana Insurance Department as may be necessary or expedient in order to effectuate the arrangements contemplated by Section 10.02(u).

## ARTICLE 6
### COVENANTS OF BUYER

Section 6.01   *Access*. On and after the Closing Date, to the extent permitted by Applicable Law, Buyer will, and will cause each Designated Buyer to, (i) not dispose of or destroy any files, books, records and other materials related to the Aggregate Purchased Business received by Buyer or Designated Buyers pursuant to this Agreement for a period of six (6) years after the Closing Date and (ii) afford to the Sellers and their agents and Representatives reasonable access to its properties, books, records, employees and auditors to the extent necessary to permit the Sellers to determine any matter relating to its rights and obligations hereunder (except to the extent relating to any dispute among the Parties arising under this Agreement or any Transaction Document) or to any period ending on or before the Closing Date or for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, and Sellers (including any such trust or successors) and any of its (or its trusts or successors) Representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials at such Seller's expense; *provided* that any such access by the Sellers shall not unreasonably interfere with the conduct of the business of Buyer or the Designated Buyers; *provided*, *further*, that the scope of any such access shall be limited to the Aggregate Purchased Business and the Transferred Assets.

Section 6.02   *Bankruptcy Actions*. Buyer acknowledges that it must provide adequate assurance of future performance under the Assumed Contracts and the Assumed Leases and agrees that it shall, and shall cause its Affiliates to, cooperate with the Sellers in connection with furnishing information or documents to satisfy the requirements of section 365(f)(2)(B) of the Bankruptcy Code.  In furtherance of the foregoing, Buyer shall take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as providing non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's representatives available to testify before the Bankruptcy Court. Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Courts' entry of, as applicable, the Bidding Procedures Order, the Disclosure Statement Order, the Confirmation Order and/or any other order reasonably necessary in connection with the Transaction as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court. In the event that the entry of, as applicable, the Bidding Procedures Order, the Disclosure Statement Order, the Confirmation Order or any other order reasonably necessary in connection with the Transaction is appealed, Buyer shall use commercially reasonable efforts to cooperate with Sellers in the defense of such appeal.

Section 6.03   ***Avoidance Actions***. Prior to the Closing, Buyer and Seller may supplement or amend Schedule 2.01(l) and Schedule 2.03(g), in each case in accordance with the Plan.

Section 6.04   ***Credit Bid***.

(a)   Subject to the terms and conditions of this Agreement, Buyer shall take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to obtain from the First Lien Lenders on or before Closing sufficient cash and claims under the Prepetition Credit Agreement and/or Prepetition First Lien Notes to satisfy the Purchase Price, fund the Wind-Down Amount and effect the release of the Credit Bid Amount.

(b)   Buyer shall, upon satisfaction of such conditions and all of the conditions precedent under Section 10.01, 10.02 and 10.03 (except those conditions that by their nature are to be satisfied at Closing, *provided* such conditions are satisfied at Closing), effect the release of the Credit Bid Amount at or prior to Closing.

Section 6.05   ***Confidentiality***. Buyer acknowledges that the information and access provided to it pursuant to Article 5 shall be subject to the terms and conditions of the Confidentiality Agreement, dated as of [●], 201[8], between Westmoreland and [●] (the "**Buyer Confidentiality Agreement**"). If, for any reason, the Transaction is not consummated, the Buyer Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms.

Section 6.06   ***Payment of Cure Costs***. Buyer shall, in accordance with the Plan, pay in full in cash an amount (which may be paid through use of Included Cash to the extent Buyer is the First Lien Lenders or their designees) equal to the aggregate amount of all Cure Costs (which amount may be offset against Included Cash), *provided* that to the extent any counterparty to an Assumed Contract or Assumed Lease asserts a higher Cure Cost than set forth in Schedule 2.01(f) or Schedule 3.07(a)(i), as applicable, Buyer shall pay such higher Cure Cost unless otherwise ordered by the Bankruptcy Court or Buyer may remove such Assumed Contract or Assumed Lease from such Schedule and treat it as an Excluded Asset and Excluded Liability pursuant to Section 2.06(d).

## ARTICLE 7
### COVENANTS OF BUYER AND THE SELLERS

Section 7.01   ***Further Assurance***.

(a)   Except as otherwise provided herein and subject to the terms and conditions of this Agreement (including Section 7.03(b)), the Bankruptcy Code and any orders of the Bankruptcy Court, the Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the Transaction, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtaining and maintaining all approvals, consents, registrations, Permits, authorizations and other confirmations required to be obtained or

78

notices required to be delivered to or from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the Transaction, in each case, after giving effect to the Confirmation Order, and (iii) holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Aggregate Purchased Business. The Sellers and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to use commercially reasonably efforts to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transaction, to vest in Buyer and/or the relevant Designated Buyers good title to the Transferred Assets, and to assure and evidence the assumption by Buyer and/or the relevant Designated Buyers of the Assumed Liabilities.

(b)     In furtherance and not in limitation of the foregoing, but subject to Section 7.01(c), to the extent applicable, each of Buyer and the Sellers shall make an appropriate filing of a Notification and Report Form pursuant to the HSR Act and similar filings pursuant to the Competition Act (Canada) with respect to the Transaction as promptly as practicable and in any event within five (5) Business Days of the conclusion of the auction contemplated by the Bidding Procedures Order, seeking early termination of the applicable waiting period under the HSR Act. Each of Buyer and the Sellers shall supply as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act or Competition Act (Canada), as applicable, and shall use commercially reasonable efforts to take all other actions necessary or desirable to cause the expiration or termination of the applicable waiting period under the HSR Act as soon as practicable, if applicable.

(c)     Notwithstanding anything in this Agreement to the contrary, "commercially reasonable efforts" for purposes of this Agreement shall in no event or circumstance require (1) Buyer or its Affiliates to (i) execute any settlements, undertakings, consent decrees, stipulations or other agreements, (ii) sell, divest, hold separate or otherwise convey any particular assets or categories of assets or businesses of Buyer and its Affiliates, (iii) agree to sell, divest, hold separate or otherwise convey any particular assets or categories of assets or businesses contemporaneously with or subsequent to the Closing, (iv) otherwise take or commit to take actions that after the Closing Date would limit the freedom of action of Buyer or its Affiliates to retain or operate the Aggregate Purchased Business, (v) defend through litigation on the merits any claim asserted in court by any Person, or (vi) subject to Section 7.01(e), make to any Person any material payment with respect to obtaining any approvals, consents, registrations, permits, authorizations and other confirmations or (2) Sellers or their Affiliates to take or commit to take any action or execute any settlements, undertakings, consent decrees, stipulations or other agreements that would limit their ability to sell Westmoreland Resources GP, LLC, Westmoreland Resources Partners, LP and/or their Subsidiaries or assets.

(d)     No Party shall agree (or permit any of their respective Affiliates to agree) to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry relating to the consummation of the Transaction unless it consults with the other Parties in advance (to the extent reasonably practicable to do so) and, to the extent permitted by such Governmental Authority and any Applicable Law, gives the other Parties and their outside counsel the opportunity to attend and participate at such meeting.

(e)     The fees and expenses for all filings under the HSR Act and Competition Act (Canada), as applicable, and any other necessary filings or submissions to any Governmental Authority pursuant to this Section 7.01 shall be borne in full by Sellers; *provided* that if Buyer is not the First Lien Lenders or their designees, Buyer shall reimburse Sellers for all such fees and expenses at the Closing.

Section 7.02     *Certain Filings*. The Sellers and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with or notice to, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the Transaction and (ii) in taking such actions or making any such filings or notices, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03     *Transferred Permit/License and Surety Bond Matters*.

(a)     (i) As promptly as commercially reasonably possible after the Effective Date, but in no event later than January 31, 2019, Buyer shall properly file all applications, except for any applications which may not be filed prior to Buyer being party to a fully executed surety agreement, required to transfer the Transferred Permits/Licenses from the Sellers to Buyer and or the relevant Designated Buyers, as applicable, with the appropriate Governmental Authority; and

(ii)     Buyer and/or the relevant Designated Buyer, as applicable, shall use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary under Applicable Law to put in place with the appropriate Governmental Authority as promptly as commercially reasonably possible after the Effective Date (except for filings which may not be made prior to Buyer being party to a fully executed surety agreement), the transfer of the Transferred Permits/Licenses from the Sellers to Buyer and/or the relevant Designated Buyer, including providing the financial assurances necessary therefor.  The Sellers agree to reasonably, diligently provide, at Buyer's sole cost and expense (if Buyer is not the First Lien Lenders or their designee), any cooperation required to bring about the transfer of the Transferred Permits/Licenses.  From and after the Effective Date, Buyer and/or the relevant Designated Buyers, as applicable, shall diligently pursue the transfer of the Transferred Permits/Licenses to Buyer, and/or the relevant Designated Buyer.  In the event all necessary approvals of Governmental Authorities for the transfer of the Transferred Permits/Licenses to Buyer or the relevant Designated Buyer have not been obtained prior to the Closing Date and Buyer elects to proceed with Closing (pursuant to Section 10.02(m) or otherwise) subject to operating the Purchased US Business during the Interim Period in accordance with this Section 7.03 and the Permit Transfer Agreements, then (i) after Closing, Buyer and/or the relevant Designated Buyer, as applicable, shall operate under the Transferred Permits/Licenses as the designated owner and/or operator in accordance with the terms and conditions contained in the Permit Transfer Agreements and (ii) to the extent allowed by and in accordance with Applicable Laws and the terms and conditions of the Permit Transfer Agreements, the Sellers grant Buyer and/or the relevant Designated Buyers its right, if any, to conduct, at the sole cost and expense of Buyer and/or the relevant Designated Buyer, mining operations following

the Closing Date on the US Purchased Real Property under the Transferred Permits/Licenses as the designated owner and/or operator until such time as they are transferred to Buyer and/or the relevant Designated Buyer (the "**Interim Period**"). Buyer shall indemnify the Sellers and the Sellers' Affiliates for all activities or omissions of Buyer or the Designated Buyers, as applicable, on the US Purchased Real Property during the Interim Period.  The Sellers and/or their Affiliates shall have (and Buyer grants and the Designated Buyers, if any, shall grant) all rights of entry onto the US Purchased Real Property reasonably necessary for the Sellers and/or their Affiliates to maintain the Transferred Permits/Licenses prior to transfer thereof, to the extent Buyer fails to take necessary actions with respect thereto and Sellers and/or their Affiliates shall comply and cause their Representatives to comply, in all material respects, with all applicable safety, health, security, and confidentiality rules applicable to the premises being visited.

(b)      During the Interim Period, Buyer, at all times prior to the transfer of the Transferred Permits/Licenses to Buyer, shall:

(i)      comply in all material respects with all Applicable Law governing, and all conditions and requirements of, or pertaining to, any such Transferred Permits/Licenses; and

(ii)      be solely responsible for all incidents of violation, non-compliance, and similar occurrences related to the Transferred Permits/Licenses that arise during the Interim Period.  Buyer shall, and will procure that any Designated Buyer shall, promptly deliver to the Sellers written notice of any such incidents, violations or occurrences, which the Sellers and their Affiliates shall have the right, but not the obligation, to cure in the event Buyer or any Designated Buyer, as applicable, fails to cure (including right of entry onto the applicable US Purchased Real Property), and Buyer shall promptly reimburse the Sellers for the reasonable costs of any such cure.

(c)      Notwithstanding anything in this Agreement to the contrary, but nevertheless subject to the provisions of this Section 7.03(c):

(i)      during the Interim Period, absent the occurrence of an incident of violation, noncompliance or similar occurrence for which Buyer or a Designated Buyer, as applicable, is responsible pursuant to Section 7.03(b), the Sellers shall remain responsible, at their sole cost and expense, for maintaining any surety bonds or other financial assurances required in connection with the Transferred Permits/Licenses; and

(ii)      Buyer shall indemnify and hold harmless all Sellers and their Affiliates for any Liabilities incurred with respect to such bonds or other financial assurances resulting from the actions or omissions of Buyer or Designated Buyer, as applicable, while operating under the Transferred Permits/Licenses during the Interim Period. Notwithstanding the foregoing, to the extent Buyer operates under any Transferred Permits/Licenses during the Interim Period prior to the transfer of such to Buyer or a Designated Buyer, Buyer shall, at its sole cost and expense, (x) until such time as Buyer has posted replacement surety bonds or other financial assurances, pay or reimburse the

81

Sellers (promptly upon receipt of notice from the Sellers' Representative, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or other financial assurances, and (y) post any addition to the principal amount of any such surety bond or other financial assurance required by any Governmental Authority after the Closing Date as a result of any action taken by Buyer or a Designated Buyer, as applicable, with respect to the Purchased US Assets. Notwithstanding anything herein to the contrary, Buyer shall have the ability to negotiate or challenge the principal amounts of any such surety bonds or other financial assurances required by any Governmental Authority; *provided* that, Buyer shall take reasonable steps during its negotiation or challenge so as not to negatively impact Sellers or their Affiliates.

(d)     Until such time as the Transferred Permits/Licenses are transferred to Buyer or a Designated Buyer, as applicable, the Sellers shall make all commercially reasonable efforts to prevent the denial of, or be made subject to denial of, any application for any mining license, permit or other governmental authorization by any Governmental Authority due to application of the AVS or any similar applicable foreign, state or provincial system.

(e)     Notwithstanding anything herein to the contrary, if any of the Transferred Permits/Licenses encompasses or pertains to or would impose liability on Buyer or any Designated Buyer for any Excluded Asset or Excluded Liability or any acreage or operations other than the Purchased US Assets (collectively, "**Overlapping Permit Property**"), Sellers and Buyer or Designated Buyers (as the case may be), as their interests appear, shall cooperate and use commercially reasonable efforts in the filing of all applications with the appropriate Governmental Authority required to divide Overlapping Transferred Permits/Licenses between the Purchased US Assets, on the one hand, and the Overlapping Permit Property, on the other hand, so that all Overlapping Permit Property is excluded from the Transferred Permits/Licenses.

(f)     Any permits or licenses of Sellers or their Subsidiaries that are related to the Purchased US Business and are reasonably determined by Buyer or any Designated Buyer to be necessary for the operation of the Purchased US Business or the Purchased US Assets shall to such extent, at the election of Buyer, constitute Transferred Permits/Licenses under this Agreement and be subject to this Section 7.03 to the extent such permits and licenses are transferable.

Section 7.04    ***Public Announcements***. Except as may be necessary in connection with the Bankruptcy Case or as required by Applicable Law, each Party agrees to obtain each other Party's prior written consent before issuing any press release or making any public statement with respect to this Agreement or the Transaction and, except for any press releases and public statements the making of which may be required by Applicable Law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation; *provided* that the First Lien Lenders may make such disclosures as necessary to their investors or as required by any regulatory review process.

Section 7.05    ***WARN Act***. The Sellers shall be responsible for any notices required to be given under, and subject to the last paragraph of Section 2.05 in respect of Funded Liabilities,

any Liabilities arising under, the Worker Adjustment and Retraining Notification Act (or any similar state or local law, the "**WARN Act**") relating to any acts or omissions on or prior to the Closing, including as a result of the Transaction. Buyer shall be responsible for any notices required to be given under and shall otherwise be responsible for all Liabilities arising under the WARN Act relating to any acts or omissions subsequent to the Closing Date.

Section 7.06   *Notification of Certain Events*. Each Party shall promptly notify the other Parties of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a material violation or breach of this Agreement by such Party (or a breach of any representation or warranty of such Party contained in this Agreement) or prevent any condition in Article 10 from being satisfied by the Closing Date. During the period prior to the Closing Date, each Party will promptly advise the other Parties in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement and the Transaction Documents. A Party's receipt of information pursuant to this Section 7.06 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the other Parties in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

Section 7.07   *Bankruptcy Court Approval*. Each of the Sellers and Buyer acknowledge that this Agreement and the Transaction are subject to Bankruptcy Court approval. The Sellers and Buyer shall each cooperate with each other in seeking entry of the Confirmation Order. Buyer agrees that it will, at Buyer's own cost (but subject to reimbursement in accordance with Section 12.04), promptly take all actions that are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Confirmation Order, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's representatives available to testify before the Bankruptcy Court.

Section 7.08   *Confidentiality*. From and after the Closing, Buyer and the Designated Buyers, on the one hand, and the Sellers, on the other hand, shall, and shall cause their respective Affiliates and its and their respective Representatives to, maintain in confidence any written, oral or other information relating to the other Party's businesses following the Closing (including, with respect to the Sellers' confidentiality obligations hereunder following the Closing, information relating to the Aggregate Purchased Business and/or the Transferred Assets and/or Assumed Liabilities and/or the Acquired Entities, and with respect to Buyer's confidentiality obligations hereunder following the Closing, the Excluded Assets and Excluded Liabilities) or obtained from another Party or its Affiliates or its or their respective Representatives, except that the foregoing requirements of this Section 7.08 shall not apply to the extent that (i) any such information is or becomes generally available to the public other than (A) in the case of Buyer, as a result of disclosure by the Sellers or any of their Affiliates or any of its or their respective Representatives in violation of this Agreement and (B) in the case of the Sellers, as a result of disclosure by Buyer, Designated Buyers, or its or their Affiliates or any of its or their respective Representatives in violation of this Agreement, (ii) any such information is required by Applicable Law or a Governmental Authority to be disclosed (including in connection with the Bankruptcy Case or any report, statement, testimony or other submission to such Governmental Authority), (iii) any such information is reasonably necessary to be disclosed in connection with

any Action or in any dispute with respect to this Agreement (including in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding) or (iv) any such information was or becomes available to such Party on a non-confidential basis and from a source (other than a Party to this Agreement or any Affiliate of such Party or any of its or their respective Representatives) that is not bound by a confidentiality obligation with respect to such information; *provided* that, the fact that any information relating to the Aggregate Purchased Business and/or the Transferred Assets and/or Assumed Liabilities and/or the Acquired Entities, was in the possession of Sellers or relating to the Excluded Assets or Excluded Liabilities was in the possession of Buyers or their respective Affiliates or Representatives, prior to Closing shall not be a basis for any of them to rely on this clause (iv). If a Party or any of its Affiliates or its or their respective Representatives becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any such information, such Party shall, or shall cause such Affiliate or Representative to, provide the other Parties with prompt prior written notice of such requirement (including any report, statement, testimony or other submission to such Governmental Authority) to the extent legally permissible and, to the extent reasonably practicable cooperate with such other Parties, at the requesting Party's sole expense, to obtain a protective order or similar remedy to cause such information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege; *provided* that, in the event that such protective order or other similar remedy is not obtained, such Party shall, or shall cause such Affiliate or Representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause its Affiliate or Representative (as applicable) to, exercise its commercially reasonable efforts, at the requesting Party's sole expense, to obtain assurance that confidential treatment will be accorded such disclosed information. Each of the Parties shall instruct its Affiliates and its or their respective Representatives having access to such information of such obligation of confidentiality and shall be responsible for any breach of the terms of this Section 7.08 by any of its Affiliates or its or their respective Representatives.

Section 7.09   ***Certain Payments or Instruments Received from Third Parties***.

(a)      To the extent that, after the Closing Date, (a) Buyer and/or any Designated Buyer receives any payment or instrument that is for the account of a Seller according to the terms of this Agreement or any Transaction Document or relates primarily to a Non-Core Mine Complex that is not sold to the Buyer pursuant to this Agreement, Buyer shall, and shall cause the Designated Buyers to, promptly deliver such amount or instrument to the relevant Seller, or (b) any of the Sellers or any of their Affiliates receives any payment or instrument that is for the account of Buyer, the Acquired Entities or any of the Designated Buyers according to the terms of this Agreement or any Transaction Document, is included in the Purchased US Assets or otherwise relates primarily to the Aggregate Purchased Business, the Sellers shall, and shall cause their Affiliates to, promptly deliver such amount or instrument to Buyer, the Acquired Entities or the relevant Designated Buyer, as applicable; *provided* that if this Agreement does not provide for whose account a payment or instrument referenced in this sentence is to be and such item relates to both the Aggregate Purchased Business and the business of a Non-Core Mine Complex that was not sold to Buyer pursuant to this Agreement, such item shall be apportioned between the two on the basis of the extent to which it relates to each. All amounts due and

payable under this <u>Section 7.09</u> shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party. Any payments received under this <u>Section 7.09</u> by the applicable Party will be treated by the other Party as being received by the applicable Party in its capacity as an agent for the other Party solely for U.S. federal income tax purposes.

(b)      As of the Closing Date, Sellers hereby authorize Buyer and the Designated Buyers to open any and all mail addressed to Sellers and their Affiliates relating to the Purchased US Business and delivered to the offices or facilities of the Purchased US Business or otherwise to Buyer or a Designated Buyer if received on or after the Closing Date, and hereby appoint Buyer and the Designated Buyers their attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer or the Designated Buyers after the Closing Date with respect to the accounts receivable included in the Purchased US Assets, for Buyer's and the Designated Buyer's own account.

Section 7.10   ***Consents and Approvals***. Subject to <u>Section 7.01</u>, the Parties shall use commercially reasonable efforts, as set forth in this Agreement, to secure all approvals, authorizations, consents, Transferred Permits/Licenses, orders, Licenses, assignments, releases, and/or waivers, if any, that are necessary to effect the transactions contemplated by this Agreement and the Transaction Documents, including any consents necessary under Contracts of the Acquired Entities, Canada Permits/Licenses and Canada Leases. Without limiting <u>Section 7.01(c)</u>, such commercially reasonable efforts shall not require any material payment or other consideration from the Parties (other than (i) as contemplated by <u>Section 2.06(c)</u> <u>Section 7.03</u>, (ii) the Cure Costs, and (iii) the Transfer Taxes).

Section 7.11   ***Winding Down***. The Parties acknowledge and agree that, subject to the terms and conditions of the Plan, this Agreement and the Transaction Documents, including the post-Closing obligations of the Sellers under this Agreement and the Transaction Documents, after Closing, each Seller may take all steps it deems necessary or desirable in its sole discretion to commence and administer the wind down of its affairs in a prompt and efficient manner as contemplated by the Plan (provided that in no event shall such wind down be completed until the end of the Interim Period, if applicable).

Section 7.12   ***Transaction Documents***. The Parties shall negotiate in good faith, prior to Closing, the terms of the Transaction Documents (other than the New Working Capital Facility), and in each case such terms shall be in a form (i) customary for transactions of the type contemplated by this Agreement and (ii) reasonably satisfactory to Buyer and Sellers' Representative in their respective discretion.

Section 7.13   ***Cooperation Regarding Licenses and Worker's Compensation***. From the Effective Date through the Closing, the Sellers and Buyer shall reasonably cooperate with one another and use commercially reasonable efforts to cause Buyer or, if applicable, the Designated Buyers, to obtain by the Closing Date (i) all material US Permits and US Licenses listed on <u>Schedule 7.13</u> and (ii) coverage for Workers' Compensation Liabilities. In furtherance of the foregoing, Buyer, as soon as reasonably practicable but in no event later than January 31, 2019,

shall provide Sellers with a list of the names of Buyer's senior management and a description of Buyer's corporate structure, in each case, to the extent necessary in connection with such licensing process.

# ARTICLE 8
## TAX MATTERS

Section 8.01   *Tax Cooperation; Responsibility for Taxes; FIRPTA*.

(a)   Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Aggregate Purchased Business, the Transferred Assets, the Assumed Liabilities and the Acquired Entities (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer shall retain all books and records with respect to Taxes pertaining to the Transferred Assets, the Acquired Entities and the Assumed Liabilities for any Pre-Closing Tax Period for a period of at least six (6) years following the Closing Date. The Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Transferred Assets, the Assumed Liabilities, the Acquired Entities or the Aggregate Purchased Business. The Sellers shall use commercially reasonable efforts to provide Buyer with such information that is in any of the Seller's possession and is reasonably requested by Buyer to identify the jurisdictions in which Tax Returns are required to be filed, or Taxes are required to be paid, and the types of Tax Returns required to be filed, in each case with respect to the Aggregate Purchased Business, the Acquired Entities or the Transferred Assets.

(b)   All excise, sales, use, value added, registration, stamp, recording, documentary, conveyancing, franchise, property, real property transfer, personal property, transfer and similar Taxes, levies, charges and fees incurred in connection with the Transaction (collectively, "**Transfer Taxes**") shall be borne by Sellers, subject to Buyer's or Designated Buyer's, as applicable, obligations with respect to Funded Liabilities. Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by Applicable Law. Buyer and the Sellers shall cooperate in reducing any such Transfer Taxes (and any other Tax cost) to the extent possible, including by providing each other with any appropriate resale exemption certifications and other similar documentation or by restructuring the form of all (or part) of the transactions contemplated by this Agreement and the Transaction Documents; *provided* that such restructuring is not reasonably expected to materially delay, prevent or hinder the consummation of the Transaction.

(c)   The Party with the primary legal obligation for the reporting and payment of any Transfer Taxes shall file any Tax Returns and other documentation that must be filed in connection with such Transfer Taxes, and shall use its reasonable best efforts to provide such Tax Returns to the other Party at least ten (10) Business Days prior to the date such Tax Returns are due to be filed. If required by Applicable Law, the Parties will, and will cause their respective Affiliates to, join in the execution of any such Tax Returns or other documentation.

(d)     On or before the Closing Date, each Seller shall deliver to Buyer a statement, signed under penalties of perjury and dated no more than thirty (30) days prior to the Closing Date, that satisfies the requirements of Treasury Regulation Section 1.1445-2(b)(2) and confirms that each Seller (or its regarded owner, if Seller is an entity disregarded as separate from its owner) is not a "foreign person" as defined in Section 1445 of the Code.

(e)     Buyer and Sellers acknowledge and agree that the interests in the Acquired Entities are not believed to be "taxable Canadian property" to the Sellers within the meaning of the Income Tax Act (Canada), and if either Buyer or Sellers determine that such belief is incorrect prior to the Closing, or if Buyer and Sellers otherwise agree, appropriate steps will be taken to either (i) comply with requirements applicable to taxable Canadian property, or (ii) modify this Agreement to provide for a disposition of the Purchased Canada Business through a disposition of the equity interest of WCHI by WCBV and not a disposition of the equity interests in Westmoreland Canada and WCGP.

(f)     Buyer and Sellers agree that, at the sole discretion of Buyer, the Transaction will be structured as a reorganization within the meaning of Section 368(a)(1)(G) of the Code (the "**G Reorganization**").  Sellers will cooperate with Buyer in structuring the Transaction so that it qualifies as a G Reorganization and, to the extent not inconsistent with the Plan or this Agreement, undertaking commercially reasonable additional steps to maximize the Tax attributes that Buyer will acquire as set forth in <u>Section 2.01(v)</u>, including effecting the transactions to occur at Closing pursuant to <u>Article 2</u>in a manner consistent with a G Reorganization.

## ARTICLE 9
### EMPLOYEE MATTERS

Section 9.01     ***Representations and Warranties***. Except as set forth in <u>Schedule 9.01</u>, each Seller represents and warrants, on a joint and several basis with the other Sellers, to Buyer, as of the date of this Agreement and as of the Closing Date that:

(a)     <u>Schedule 9.01(a)</u> contains a complete and accurate list of those employees of (i) the Sellers providing services to the Purchased US Business as of the date hereof, including employees' work location, union or non-union status, status as exempt or non-exempt under the provisions of the Fair Labor Standards Act and other Applicable Law, title, start date and base wage rate or salary (the "**US Business Employees**") and (ii) the Acquired Entities, including employees' work location, union or non-union status, title, start date and base wage rate or salary (the "**Canada Business Employees**" and together with the US Business Employees, the "**Business Employees**"). Except as set forth on <u>Schedule 9.01(a)</u>,[7] no collective bargaining agreement is currently in effect with respect to any Business Employee or the Aggregate Purchased Business or to which Westmoreland or any of its Subsidiaries is otherwise party or bound.  Each employee providing services to the Purchased Canada Business is employed by an Acquired Entity. The Sellers shall update <u>Schedule 9.01(a)</u> on no less than a [●] basis between

---

[7]     **Note to Draft:** Schedule to include the Western Coal Wage Agreement of 2012 between Westmoreland Kemmerer, Inc. and United Mine Workers of America International Union, regarding the Kemmerer Mine in Lincoln County, Wyoming, as assigned to Westmoreland pursuant to Assignment and Assumption Agreement dated as of August 1, 2015.

the date hereof and the Closing Date (and on the Closing Date) to reflect changes in employees on account of terminations or hiring in accordance with this Agreement.

(b)     Except as set forth on Schedule 9.01(b), (i) to the Knowledge of Sellers, there are no union organizing activities, or (ii) any pending petitions for recognition of, a labor union or association as the exclusive bargaining agent for, any group or groups of Business Employees. Except as set forth on Schedule 9.01(b), there are no labor union strikes, material work stoppages, material work slowdowns or Sellers lockouts nor of any threats thereof, by or with respect to any of the Business Employees.

(c)     Except as set forth on Schedule 9.01(c), with respect to the Acquired Entities and the Aggregate Purchased Business, there exist: (i) no charges pending before a governmental administrative agency involving alleged violations of any anti-discrimination law, wage payment law, employment laws, labor relations laws or occupational safety and health law; (ii) no pending or, to the Knowledge of Sellers, threatened, Litigation arising out of employment-related federal, state, provincial or local laws, including laws regarding discrimination, wage payments, labor relations or occupational safety and health; and (iii) no pending, or to the Knowledge of Sellers, threatened grievances, arbitrations or other CBA disputes.

(d)     Except as set forth on Schedule 9.01(d), within the twelve (12) months prior to the date hereof, no Seller or Acquired Entity has failed to comply with the requirements of the WARN Act or comparable provincial or local law in connection with any plant closing or mass layoff of individuals employed at the Aggregate Purchased Business. The Sellers have heretofore made available to Buyer a true and complete list of employee layoffs, by location, implemented by the Sellers or the Acquired Entities in the 90-day period preceding the Closing Date at any location employing any individuals employed by the Acquired Entities or the Aggregate Purchased Business.

Section 9.02   *Covenants*.

(a)     Sellers shall provide to Buyer such information and assistance as is reasonably required or as Buyer may reasonably request to enable Buyer to identify those US Business Employees that are and are not required for the operation of the Purchased US Business on and after the Closing Date in a manner consistent with past practice. Buyer, as soon as reasonably practicable after the Effective Date, but no later than January 31, 2019, shall provide the Sellers with a list of those US Business Employees to whom it desires not to offer employment as of the Closing (such list may be updated from time to time by Buyer until [●] Business Days prior to the Closing) (the US Business Employees so listed, the "**Non-Offered US Employees**"). Prior to the Closing Date, Buyer or a Designated Buyer shall make offers of employment to all US Business Employees as of the Closing Date, other than the Non-Offered US Employees ("**Offered US Employees**"). As of the Closing Date, the Sellers shall terminate the employment of each Offered US Employee and shall cooperate with, and use their commercially reasonable efforts to assist, Buyer with Buyer's hiring of such Offered US Employees. Those Offered US Employees who accept Buyer's offer of employment and commence working for Buyer or a Designated Buyer on the Closing Date (or upon return to work within fourteen (14) days after the Closing Date from approved vacation or within one hundred and eighty (180) days after the

Closing Date from approved leave (including disability leave)) shall hereafter be referred to as "**Transferred Employees**".

(b)      Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment for the non-union Offered US Employees. Buyer shall determine which US Business Employees, if any, not to offer employment to commence after the Closing, in its sole discretion. For any US Business Employees who are represented by a union, offers of employment by Buyer or a Designated Buyer shall be in accordance with the CBA adopted by Buyer. Only US Business Employees who are offered and then accept such offer of employment with Buyer or a Designated Buyer based on the initial terms and conditions set by Buyer or the relevant CBA adopted by Buyer will become Transferred Employees after the Closing Date. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer or its Affiliates any obligation to retain any Transferred Employee or Canada Business Employee in its employment. All offers of employment shall be subject to, among other things, background checks, compliance review, and review of status of an employee's registration, as determined by Buyer in its sole discretion.

(c)      (i) Sellers shall use their commercially reasonable efforts to assist Buyer in identifying and establishing, those employee benefit plans and administrative arrangements that are required or appropriate for the operation of the Aggregate Purchased Business on and after the Closing Date in a manner consistent with past practice. Buyer and Sellers shall cooperate and Buyer shall take all reasonable actions as are necessary or appropriate to adopt or otherwise become the sponsor of, and to maintain, such plans (the "**Buyer Plans**") and to provide that the Transferred Employees shall be entitled to participate in such plans from and after the Closing Date (subject to any waiting periods or eligibility requirements that are substantially similar to those under a comparable plan offered by Sellers to such Transferred Employees prior to the Closing Date).

(ii)      Buyer will cause the Buyer Plans to take into account for purposes of eligibility and vesting thereunder, but not with respect to accrual of benefits other than in the case of severance and vacation, service by the Transferred Employees with the Sellers prior to the Closing as if such service were with Buyer to the same extent such service was credited under a comparable benefit plan of the Sellers prior to the Closing (except to the extent it would result in the duplication of benefits), in each case to the extent permitted under Applicable Law and the terms of the applicable Buyer Plan. In addition, with respect to each Buyer Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA), Buyer shall, or shall cause an Affiliate of Buyer sponsoring or maintaining such Buyer Plan, to (A) cause there to be waived any pre-existing condition exclusions, actively at work requirements, insurability requirements or other eligibility limitations, and (B) give effect, in determining any deductible, co-insurance and maximum out-of-pocket limitations, to claims incurred and amounts paid by, and amounts reimbursed to, the Transferred Employees and their dependents under an employee plan prior to the Closing, in each case to the extent provided under a comparable benefit plan of the Sellers prior to the Closing and in each case to the extent permitted under Applicable Law and the terms of the applicable Buyer Plan.

(iii)     Following the Closing Date, to the extent permitted by applicable policies of Buyer (including any caps or limits on accrued and unused paid time off thereunder), Buyer will allow Transferred Employees to use all accrued and unused paid time off to which such Transferred Employee is entitled under the applicable policies of the Sellers immediately prior to the Closing Date to the extent reflected on the Financial Statements. The Sellers shall provide Buyer with a record of such accrued paid time off for each Transferred Employee.

(d)     With respect to Transferred Employees, Buyer and the Sellers shall use the alternative procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

(e)     To the extent that the Transferred US Benefit Plans do not include the Westmoreland 401(k) Plan, effective as of the Closing Date or any subsequent date reasonably requested by Buyer (but not later than sixty (60) days following the Closing Date), Transferred Employees shall be eligible to effect a "direct rollover" (as described in Section 401(a)(31) of the Code) of their account balances (including participant loans) under the Westmoreland 401(k) Plan to one or more defined contribution plans maintained by Buyer or its Affiliates (collectively, the "**Buyer 401(k) Plan**") in the form of cash and participant loan notes. Sellers and Buyer shall use commercially reasonable efforts to permit such direct rollovers as soon as practicable after the Closing Date, including Buyer providing evidence to Sellers reasonably satisfactory to Sellers of the qualified status of the Buyer 401(k) Plan and of the ability of the Buyer 401(k) Plan to accept direct rollovers, and to ensure that no outstanding participant loans default prior to the sixtieth (60th) day following the Closing Date, including, without limitation, amending the Buyer 401(k) Plan to allow for direct rollovers and continued payment of outstanding participant loans.

(f)     Nothing in this Section 9.02 is intended to require Buyer to continue employment for any period of time or on any specific terms or conditions of any Transferred Employee after the Closing. Nothing contained in this Agreement shall be construed as an amendment or modification of any employee benefit plan of the Sellers or Buyer or as an obligation to effect the transfers described in Section 9.02(e).

Section 9.03   *No Third Party Beneficiaries*. Without limiting the generality of Section 12.09, the provisions of this Article 9 are included for the sole benefit of the Sellers and Buyer and nothing herein, whether express or implied, shall create any third party beneficiary or other rights in any other Person, including in any current or former employee, independent contractor or other service provider (including any beneficiary or dependent thereof) of the Sellers in respect of continued employment (or resumed employment) with Buyer or any of its Affiliates or the Aggregate Purchased Business and no provision of this Article 9 shall create any rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any employee plan, Buyer Plan or any plan or arrangement that may be established by Buyer or any of its Affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of the Sellers, Buyer or any of their respective Affiliates.

## ARTICLE 10
### CONDITIONS TO CLOSING

Section 10.01 ***Conditions to Obligations of Buyer and the Sellers***. The obligations of Buyer (and any Designated Buyer) and the Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     Any applicable waiting period under the HSR Act and/or Competition Act (Canada), relating to the Transaction shall have expired or been terminated.

(b)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order, writ, judgment, injunction, decree stipulation, determination or award which is in effect and has the effect of making the Transaction illegal, otherwise restraining or prohibiting consummation of the Transaction or causing the Transaction to be rescinded following completion thereof or delaying the consummation of the Transaction beyond the Outside Date.

Section 10.02 ***Conditions to Obligation of Buyer***. The obligation of Buyer (and any Designated Buyer) to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     Each Seller and its Affiliates shall have performed or complied with, in each case, in all material respects, all of its obligations hereunder and under the Restructuring Support Agreement and Confirmation Order, in each case required to be performed by it on or prior to the Closing Date.

(b)     Representations and Warranties.

(i)     Each of the Fundamental Representations of the Sellers contained in this Agreement shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(ii)     Each of the representations and warranties of the Sellers contained in this Agreement (without giving effect to any qualification as to materiality, Material Adverse Effect or words of similar import included therein), other than Fundamental Representations of the Sellers, shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct (without giving effect to any qualifications as to materiality, Material Adverse Effect or words of similar import included therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Buyer shall have received a certificate signed by an authorized officer of Westmoreland certifying the satisfaction of the conditions set forth in clauses (a), (b), and (d) of this Section 10.02.

91

(d)      Since the Effective Date, there shall not have occurred any Material Adverse Effect.

(e)      Buyer shall have received evidence in form and substance reasonably acceptable to Buyer that each of the Mining Complexes (other than any Non-Core Mine Complexes included in the US Mining Complexes) are being delivered at Closing with at least the (i) Minimum Accounts Receivable and (ii) Minimum Coal Inventory (the "**Minimum Coal Inventory Condition**"); *provided* that, for purposes of the Minimum Coal Inventory Condition and the calculation of the components thereof for Closing, Minimum Accounts Receivable and Minimum Coal Inventory will be calculated on an aggregate US Mining Complex (excluding any Non-Core Mine Complexes) and aggregate Canadian Complex basis and not on an individual Mining Complex basis.

(f)      No Event of Default (as defined in the DIP Facility) shall have occurred and be continuing thereunder which (i) gives the Secured Creditors (as defined in the DIP Facility) a termination right, (ii) as a result of which, the obligations under the DIP Facility have been accelerated and are immediately due and payable and (iii) has not been waived or cured.

(g)      Buyer shall have received lien releases and termination statements with respect to all Encumbrances on the Purchased US Assets other than Permitted Encumbrances.

(h)      The Confirmation Order shall (i) vest in Buyer and any Designated Buyer good and valid title to each US Purchased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances), (ii) otherwise be in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to Buyer, (iii) have been entered by the Bankruptcy Court and be in full force and effect, (iv) not be subject to a stay or subject to any appeal, (v) not have been modified or amended without the written consent of the Parties and (vi) not have been reversed or vacated.

(i)      Each Seller shall not be in material breach of the Confirmation Order, which breach remains uncured as of the Closing Date.

(j)      (i) Each of the Assumed Contracts and Assumed Leases set forth on Schedule 10.02(j)(i) (x) will have been duly assigned to Buyer or a Designated Buyer and (y) that require novation will have been novated to Buyer or a Designated Buyer, and (ii) with respect to each of the Contracts of an Acquired Entity or Canada Lease set forth on Schedule 10.02(j)(ii), all necessary third party consents or approvals in respect of any applicable change of control provisions therein shall have been obtained.

(k)      The objection deadline shall have passed for all counterparties to Assumed Contracts and Assumed Leases to object to the assumption and/or assignment of such Assumed Contracts and Assumed Leases, including with respect to the Cure Costs contained in their respective Cure Notice.

(l)      Arrangements satisfactory to Buyer shall be in place regarding the regulatory bonding and security arrangements required with regards to the Acquired Entities and in

connection with the transfer of Purchased US Assets, including with respect to the Transferred Permits/Licenses as contemplated herein.

(m)     Buyer shall have obtained approval from each Governmental Authority necessary or appropriate to operate the Aggregate Purchased Business, including (i) to the extent necessary to obtain such approval from the applicable Governmental Authority (including all US Permits and US Licenses listed on Schedule 7.13), the applicable Seller and Buyer shall have entered into settlements with such Governmental Authority reasonably satisfactory to Buyer and Sellers' Representative with respect to permit transfers, bonding requirements and regulatory compliance, (ii) Buyer or the applicable Designated Buyer shall have (or concurrently upon consummation of the Closing shall acquire) all permits and licenses necessary to operate the Aggregate Purchased Business in all material respects after Closing, whether through the transfer of the Transferred Permits/Licenses to Buyer or the applicable Designated Buyer at the Closing or issuance of new US Permits and US Licenses to Buyer or the applicable Designated Buyer as of the Closing; and (iii) each Acquired Entity shall continue to have at Closing all Canada Permits/Licenses in full force and effect as necessary to continue to operate the Purchased Canada Business in all material respects after Closing; *provided* that if the foregoing condition is satisfied prior to or concurrently upon consummation of the Closing except for clause (ii) with respect to the transfer of the Transferred Permits/Licenses to or issuance of new US Permits and US Licenses to Buyer or the relevant Designated Buyer, then Buyer may, in its sole discretion, elect to waive the foregoing condition with respect to the transfer of the Transferred Permits/Licenses or the issuance of the new US Permits and US Licenses at the Closing and operate the Purchased US Business during the Interim Period (to the extent permitted by Applicable Law or an appropriate Governmental Authority) pursuant to the provisions of Section 7.03 and the Permit Transfer Agreements until such time as such Transferred Permits/Licenses are so transferred to or new US Permits and new US Licenses are so issued to Buyer or the relevant Designated Buyer during the Interim Period pursuant to Section 7.03 and the Permit Transfer Agreements.

(n)     None of the Acquired Entities nor any officer or director thereof shall have been entered into and remain in the AVS or any similar applicable foreign, state or provincial system, unless resolved by way of settlements with the applicable Governmental Authority on or prior to Closing, in form reasonably acceptable to Buyer.

(o)     The UMWA shall have agreed to waive/remove the successor clause in the UMWA CBAs, or the Bankruptcy Court shall have granted a motion filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA CBAs, in each case, other than in respect of the CBAs included in the Assumed Contracts.

(p)     The Bankruptcy Court shall have granted motions filed by the applicable Seller (i) pursuant to Section 1113 of the Bankruptcy Code terminating and/or modifying the CBAs as requested by Buyer and (ii) pursuant to Section 1114 of the Bankruptcy Code modifying retiree benefits as requested by Buyer.

(q)     Sellers shall have delivered to Buyer or a Designated Buyer, as applicable, the Sellers' Closing Deliverables.

93

(r)     Buyer shall have obtained the revised indemnity agreements and surety agreements contemplated by Section 5.10.

(s)     Buyer shall have received evidence, in form and substance reasonably acceptable to Buyer, that Sellers and their Subsidiaries (other than Westmoreland Resources GP, LLC, Westmoreland Resources Partners. LP and their respective Subsidiaries) shall have Closing Available Cash as of the Closing Date equal to or greater than the Minimum Closing Cash.

(t)     Buyer shall have received a certificate in form and substance reasonably satisfactory to Buyer and signed by an authorized officer of Westmoreland certifying that, since the Effective Date, the Sellers and their Subsidiaries (including the Acquired Entities) have operated the Aggregate Purchased Business (a) in the ordinary course of business consistent with past practice other than *de minimis* deviations and (b) in compliance with the DIP Budget and the Confirmation Order.

(u)     Westmoreland and Westmoreland Risk Management, Inc. ("**WRMI**") shall have entered into a stock or asset purchase agreement with Buyer or its Affiliate on terms substantially similar to this Agreement (as applicable) with respect to the sale of all the issued and outstanding stock or all or substantially all of the assets of WRMI to Buyer or its Affiliates, together with an interim arrangement pursuant to which WRMI continues to provide insurance to such purchaser between the Closing Date and the date of closing under such WRMI purchase agreement.

The foregoing conditions of this Section 10.02 are for the sole benefit of Buyer and may be waived by Buyer (except with respect to Section 10.02(n)), in whole or in part, at any time and from time to time in the sole discretion of Buyer. The failure by Buyer at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 10.03 **Conditions to Obligation of the Sellers**. The obligation of the Sellers to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)     Buyer shall have performed or complied with, in each case, in all material respects, all of its obligations hereunder and under the Restructuring Support Agreement and the Confirmation Order, in each case required to be performed by it on or prior to the Closing Date.

(b)     Representations and Warranties.

(i)     Each of the Fundamental Representations of Buyer contained in this Agreement shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(ii)     Each of the representations and warranties of Buyer contained in this Agreement (without giving effect to any qualification as to materiality, material adverse effect or words of similar import included therein), other than Fundamental Representations of Buyer, shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date, as if made at and as of such date

94

(except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date) except where the failure to be so true and correct (without giving effect to any qualifications as to materiality included therein) would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to timely effect the Closing or consummate the Transaction.

(c)      The Sellers shall have received a certificate signed by an authorized officer of Buyer certifying the satisfaction of the conditions set forth in the foregoing clauses (a) and (b).

(d)      The Cure Costs shall have been paid by, or on behalf of, Buyer (or otherwise reserved) in accordance with this Agreement and an order of the Bankruptcy Court reasonably acceptable to Sellers' Representative.

(e)      The Confirmation Order, in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to Sellers shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not be subject to a stay or subject to any appeal, shall not have been modified or amended without the written consent of the Parties and shall not have been reversed or vacated.

(f)      Each Buyer or Designated Buyer, as applicable, shall not be in material breach of the Confirmation Order, which breach remains uncured as of the Closing Date.

(g)      Buyer or the Designated Buyer, as applicable, has delivered to Sellers the Buyer's Closing Deliverables;

(h)      Subject to Section 7.03 and Buyer's waiver rights in Section 10.02(m), Buyer shall have obtained approval from each Governmental Authority necessary or appropriate to operate the Aggregate Purchased Business.

The foregoing conditions of this Section 10.03 are for the sole benefit of the Sellers and may be waived by the Sellers, in whole or in part, at any time and from time to time in the sole discretion of the Sellers. The failure by the Sellers at any time to exercise any of its rights hereunder shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 10.04  **Frustration of Closing Conditions**. No Party may rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse such Party's obligation to effect the Closing if such failure was caused by such Party's breach of this Agreement.

## ARTICLE 11
### TERMINATION

Section 11.01  **Grounds for Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)      by mutual written agreement of the Sellers and Buyer;

(b)      by either the Sellers or Buyer if the Closing shall not have been consummated on or before the Outside Date; *provided, however*, that at the time of such termination, the Party seeking to terminate shall not be in material breach of its obligations under or any representation or warranty made in, this Agreement, such that any condition to Closing of the other Party would not be satisfied, including such first Party's obligation to consummate the Closing on the terms and subject to the conditions set forth herein;

(c)      by either the Sellers or Buyer if consummation of the Transaction would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(d)      by the Sellers if (i) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of Buyer set forth in this Agreement, the Restructuring Support Agreement, or the Confirmation Order shall have occurred that would cause any of Sellers' conditions to Closing not to be satisfied and (ii) such condition is incapable of being cured or, if curable, is not cured by Buyer by the earlier of (A) within ten (10) Business Days after the giving of written notice of such breach or failure and (B) the Outside Date; *provided*, that at the time of such termination, the Sellers shall not be in material breach of their obligations under this Agreement, the Restructuring Support Agreement, or Confirmation Order;

(e)      by Buyer if (i) a breach of any representation or warranty or failure to perform any covenant or agreement on the part of the Sellers set forth in this Agreement, the Restructuring Support Agreement, or the Confirmation Order shall have occurred that would cause any of Buyer's conditions to Closing not to be satisfied and (ii) such condition is incapable of being cured or, if curable, is not cured by the Sellers by the earlier of (A) within ten (10) Business Days after the giving of written notice of such breach or failure and (B) the Outside Date; *provided*, that at the time of such termination, Buyer shall not be in material breach of its obligations under this Agreement, the Restructuring Support Agreement, or Confirmation Order;

(f)      by Buyer if Sellers shall have entered into any material agreement, including any definitive purchase agreement in furtherance of an Alternative Restructuring Proposal other than as contemplated in the Bidding Procedures;

(g)      by Buyer upon the appointment of a trustee or other examiner (except a fee examiner) pursuant to Section 1104 of the Bankruptcy Code;

(h)      by Buyer upon (x) the failure to satisfy each Milestone (as defined in the Restructuring Support Agreement) set forth in the Restructuring Support Agreement (unless waived pursuant to the terms thereof), (y) any declaration of an Event of Default (as defined in the DIP Facility) under the DIP Facility that is not waived, cured or determined by the Bankruptcy Court not to be an Event of Default or (z) the termination of the Restructuring Support Agreement in accordance with its terms;

(i)      by Buyer or Sellers upon the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code;

(j)      by Buyer or Sellers if, at the end of the auction contemplated by the Bidding Procedures, Buyer's bid is not determined to be the (x) Successful Bid (as defined in the Bidding

Procedures) or (y) the Next Best Bid (as defined in the Bidding Procedures) with respect to any Transferred Assets other than the Non-Core Assets and, if Buyer is the Next Best Bid, upon the closing of a sale transaction with the Successful Bidder (as defined in the Bidding Procedures);

(k)     by Buyer upon the permanent denial of any approval required under Section 10.01(a) or any other material approval required from a Governmental Authority to operate the Aggregate Purchased Business;

(l)     by Sellers upon the permanent denial of any approval required under Section 10.01(a);

(m)     by Buyer or Sellers if a court of competent jurisdiction or other Governmental Authority has issued an order or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the Closing and such order or action has become final and non-appealable;

(n)     by Buyer or Sellers if the Parties fail to reach agreement on the items set forth in (i) Section 2.18(d) in respect of the Funded Liability Cap and Tax amounts included in Funded Liabilities prior to the commencement of the hearing to approve the Confirmation Order or (ii) Section 2.18(e) or Section 2.18(f) as provided in such Section by the date set forth therein;

(o)     by Buyer if, after the date hereof, a Material Adverse Effect occurs and is continuing; or

(p)     by Sellers, upon the termination of the Restructuring Support Agreement in accordance with its terms.

The Party desiring to terminate this Agreement pursuant to Section 11.01 shall give notice of such termination to the other Parties.

Section 11.02  **Effect of Termination**. If this Agreement is terminated as permitted by Section 11.01, such termination shall be without liability of any Party or any of its Affiliates (or any equityholder, member, director, manager, officer, employee, agent, consultant or representative of such Party) to the Parties to this Agreement; *provided* that if such termination shall result from Fraud or willful breach by a Party, such Party shall be fully liable for any and all Losses incurred or suffered by the other Parties as a result of such Fraud. The provisions of Sections 1.01, 6.05, and 7.04, this Section 11.02 and Article 12 shall survive any termination hereof pursuant to Section 11.01.  Without limiting the foregoing, the Parties acknowledge and agree that except in the case of Fraud or willful breach by a Party, the sole remedy of a Party for breach of any representation or warranty by another Party shall be the right of termination pursuant to, and subject to the terms of this Article 11.

## ARTICLE 12
### MISCELLANEOUS

Section 12.01  **Notices**. All notices, requests and other communications to any Party shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission) and shall be given,

if to Buyer, to:

     Kramer Levin Naftalis & Frankel LLP
     1177 Avenue of the Americas
     New York, New York 10036
     Attention: Thomas Moers Mayer and Stephen Zide
     E-mail: tmayer@kramerlevin.com and szide@kramerlevin.com

if to the Sellers or to Sellers' Representative, to:

     Westmoreland Coal Company
     9540 South Maroon Circle, Suite 300
     Englewood, Colorado 80112
     Attention: Jennifer Grafton, Chief Legal Officer and Chief Administrative Officer
     E-mail: jgrafton@westmoreland.com

with a copy to:

     Kirkland & Ellis LLP
     609 Main Street, 47th Floor
     Houston, Texas 77002
     Attention: Shubi Arora, P.C. and Kim Hicks
     E-mail: shubi.arora@kirkland.com and kim.hicks@kirkland.com

     -and-

     Kirkland & Ellis LLP
     901 Main Street, 54th Floor
     Dallas, Texas 75202
     Attention: Dilen Kumar
     E-mail: dilen.kumar@kirkland.com

     -and-

     Kirkland & Ellis LLP
     300 North LaSalle Street
     Chicago, Illinois 60654
     Attention: Gregory Pesce
     E-mail: gregory.pesce@kirkland.com

     -and-

     Kirkland & Ellis LLP
     601 Lexington Avenue
     New York, New York 10022
     Attention: Stephen E. Hessler, P.C.
     E-mail: stephen.hessler@kirkland.com

or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other Parties. All notices and other communications given in accordance with the provisions of this Agreement shall be deemed to have been given and received when delivered by hand or transmitted by facsimile (with confirmation of transmission) or email, three (3) Business Days after the same are sent by certified or registered mail, postage prepaid, return receipt requested or one (1) Business Day after the same are sent by a national overnight courier service, with acknowledgement of receipt.

Section 12.02  *Survival*. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificates delivered hereunder, shall not survive the Closing, except for the Closing and pre-Closing covenants and obligations with respect to (x) the obligations of the Sellers to transfer, or to bring about the transfer, to Buyer and/or the relevant Designated Buyers of title to, and ownership of, the Transferred Assets and the Acquired Entities and the obligation of Buyer to assume the Assumed Liabilities and (y) the Excluded Liabilities and Excluded Assets. Notwithstanding anything herein to the contrary, nothing in this Agreement shall limit any rights of any Party in the case of Fraud.

Section 12.03  *Amendments and Waivers*.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Buyer and the Sellers' Representative, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 12.04  *Expenses*. Subject to the terms of the Bidding Procedures Order, the Sellers shall pay to Buyer the Expense Reimbursement, by wire transfer of immediately available funds upon the consummation of the Closing. Except as otherwise provided herein (including the previous sentence), all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense. Nothing contained herein shall limit or eliminate the obligations of Westmoreland and its Subsidiaries under the DIP Order to pay and/or reimburse in full the fees and expenses of the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition Notes Trustee, the Prepetition Noteholders, the Bridge Loan Administrative Agent, the Bridge Lenders, the DIP Agent, and the DIP Lenders, each as set forth and defined in the DIP Order.  Sellers will use commercially reasonable efforts to include any amounts required to be paid by Sellers or their Affiliates in connection with this Agreement and the consummation of the Transaction in the DIP Budget; *provided*, *however*, that notwithstanding the foregoing, such amounts will be deemed approved and included in the DIP

99

Budget and the Sellers or their Affiliates shall be authorized to make such payments unless Buyer waives Sellers requirement to make such payment under this Agreement.

Section 12.05  **Successors and Assigns**. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; *provided* that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party (except in the event of any successors of Sellers in connection with the Bankruptcy Case). Notwithstanding the foregoing sentence Buyer shall have the right to assign to any one or more of its Affiliates any of its rights or obligations under this Agreement, the Transaction Documents or any other document or instrument, in whole or in part; *provided* that no assignment hereunder shall relieve Buyer of its obligations under this Agreement, the Transaction Documents or any other such document or instrument and Buyer shall cause such assignees to perform such obligations on behalf of Buyer in accordance with the terms of this Agreement, the Transaction Documents or such other document or instrument, as applicable.

Section 12.06  **Governing Law**. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the Transaction, shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state to the extent such principles or rules would require or permit the application of laws of another jurisdiction.

Section 12.07  **Jurisdiction**. To the fullest extent permitted by Applicable Law, the Parties (a) agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transaction shall be brought (i) in the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Case and (ii) in the Chancery Court of the State of Delaware (or, if the Delaware Chancery Court shall be unavailable, any other court of the State of Delaware or, in the case of claims to which the federal courts have exclusive subject matter jurisdiction, any federal court of the United States sitting in the State of Delaware) (the "**Delaware Courts**"), if brought after entry of such final decree closing the Bankruptcy Case, and shall not be brought, in each case, in any other state or federal court in the United States, (b) agree to submit to the exclusive jurisdiction of the Bankruptcy Court or the Delaware Courts, as applicable, pursuant to the preceding clauses (a)(i) and (a)(ii), for purposes of all suits, actions or proceedings arising out of, or in connection with this Agreement or the Transaction Documents or the transactions contemplated hereby and thereby, (c) waive and agree not to assert any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.01 shall be deemed effective service of process on such Party.

Section 12.08  **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.09 **_Counterparts; Effectiveness; Third Party Beneficiaries_**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable. Subject to entry of the Confirmation Order, this Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Parties. Until and unless each Party has received a counterpart hereof signed by the other Parties, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, or Liabilities hereunder upon any Person other than the Parties, the Designated Buyers and their respective successors and assigns; _provided_ that the Non-Party Affiliates are express third party beneficiaries of <u>Section 12.16</u>.

Section 12.10 **_Entire Agreement_**. This Agreement, the Transaction Documents, the Buyer Confidentiality Agreement and the Seller Confidentiality Agreement constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and understandings, both oral and written, among the Parties with respect to the subject matter hereof and thereof. The Buyer Confidentiality Agreement shall remain in full force and effect until the Closing, at which point it shall automatically terminate.

Section 12.11 **_Bulk Sales Laws_**. Buyer and the Sellers each hereby waive compliance by the Sellers with the provisions of the "bulk sales," "bulk transfer" or similar laws of any state.

Section 12.12 **_Severability_**. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 12.13 **_Disclosure Schedules_**. The Sellers and Buyer, as applicable, have set forth information on the Disclosure Schedule and Buyer Disclosure Schedule, as applicable, in a section thereof that corresponds to the section of this Agreement to which it relates. A matter set forth in one section of a Disclosure Schedule or Buyer Disclosure Schedule, as applicable, need not be set forth in any other section so long as its relevance to such other section of the Disclosure Schedule or Buyer Disclosure Schedule, as applicable, would be reasonably apparent on the face of the information disclosed therein to a Person with no independent knowledge of the relevant subject matter. The Parties acknowledge and agree that (i) the Disclosure Schedules and Buyer Disclosure Schedule to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer or the Sellers, as applicable, and (ii) the disclosure by the Sellers or Buyer, as applicable, of any matter in the Disclosure

Schedules and Buyer Disclosure Schedule shall not be deemed to constitute an acknowledgment by the Sellers or Buyer, as applicable, that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

Section 12.14 *Specific Performance*. The Parties acknowledge and agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur if the Parties do not perform any provision of this Agreement in accordance with the terms hereof, or otherwise breach any such provision, and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each Party agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

Section 12.15 *Sellers' Representative*.

(a)     Each Seller irrevocably designates Sellers' Representative as its representative and attorney-in-fact with full power and authority, including power of substitution, acting in the name of and on behalf of such Seller, for all purposes under this Agreement, including receipt of disclosures, granting and/or executing consents or waivers, receiving notices, settling disputes with respect to indemnification claims and the calculation of the Purchase Price and all allocations and agreeing to and executing amendments and/or modifications to this Agreement or terminating this Agreement.

(b)     By executing this Agreement under the heading of "Sellers' Representative," Westmoreland hereby (i) accepts its appointment and authorization to act as Sellers' Representative as attorney-in-fact and agent on behalf of the Sellers in accordance with the terms of this Agreement and (ii) agrees to perform its obligations under, and otherwise comply with, this Section 12.15.

(c)     In the performance of its duties hereunder, Sellers' Representative shall be entitled to rely upon any document or instrument reasonably believed by it to be genuine and accurate. Sellers' Representative may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so. In the absence of proven willful misconduct, (i) Sellers' Representative shall not be liable to the Sellers with respect to its performance of the functions specified in this Agreement, and (ii) no Seller shall commence, prosecute or maintain any actions or proceedings against Sellers' Representative with respect to its performance of the functions specified in this Agreement. In determining the occurrence of any fact, event or contingency, Sellers' Representative may request from any of the Sellers such reasonable additional evidence as Sellers' Representative in its sole discretion may deem necessary, and may at any time inquire of and consult with others, including any of the Sellers, and shall not be liable to any Seller for any damages resulting from any delay in acting hereunder pending receipt and examination of additional evidence requested.

102

(d)      Buyer shall have the right to rely solely upon all actions taken or omitted to be taken by Sellers' Representative, all of which actions or omissions shall be legally binding upon the Sellers.  Buyer shall be entitled to rely exclusively upon the communications of the Sellers' Representative relating to the foregoing as the communications of the Sellers.  Buyer (i) need not be concerned with the authority of the Sellers' Representative to act on behalf of all Sellers hereunder, and (ii) shall not be held liable or accountable in any manner for any act or omission of the Sellers' Representative in such capacity.

(e)      Each Seller agrees to cause its Affiliates to comply with their respective obligations under this Agreement.

Section 12.16  ***Non-Recourse***. All claims or causes of action (whether in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Persons that are expressly identified as Parties (*i.e.*, the Sellers, Sellers' Representative or Buyer and/or any Designated Buyers). No Person who is not a named Party to this Agreement, including any past, present or future direct or indirect director, officer, employee, incorporator, member, manager, partner, equityholder, creditor, Affiliate, agent, attorney or other representative of any named Party to this Agreement or any of their Affiliates (such Persons, collectively, "**Non-Party Affiliates**"), shall have any Liability (whether in contract or in tort or otherwise, or based upon any theory that seeks to impose Liability of an entity Party against its owners or Affiliates) for any obligations or Liabilities arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution, and each Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.

Section 12.17  ***Actions by Buyer***. For all purposes of this Agreement, between the date hereof and the Closing, consent rights of Buyer set forth herein will be exercised by the Required Consenting Stakeholders (as defined in the Restructuring Support Agreement) acting on behalf of Buyer, and following the Closing, by Buyer.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**[BUYER]**

By:_____
Name:
Title:

**WESTMORELAND COAL COMPANY**, in its capacity as Seller and Sellers' Representative

By:_____
Name:
Title:

**Exhibit C**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**" or the "**RSA**")[1] is made and entered into as of October 9, 2018 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (ii) of this preamble, collectively, the "**Parties**"):

i.    Westmoreland Coal Company, a company incorporated under the laws of Delaware, and each of its directly or indirectly held subsidiaries listed on **Schedule 1** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders, which, as provided on **Schedule 1**, includes both entities that will be commencing voluntary cases under chapter 11 of the Bankruptcy Code (the "**Debtors**") and entities that do not intend to commence voluntary cases under chapter 11 of the Bankruptcy Code (the "**Non-Debtors**", and together with the Debtors, the "**Company**"); and

ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold (with such investment advisors, subs-advisors and managers acting on behalf of such holders) DIP Facility Claims, Prepetition Bridge Loan Claims, Prepetition Credit Agreement Claims or Prepetition First Lien Note Claims that have, solely in their capacities as holders of the foregoing claims, executed and delivered counterpart signature pages to this Agreement or a Joinder Agreement to counsel to the Company (the entities in this clause (ii), collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain transactions with respect to the Company's capital structure on the terms set forth in this Agreement and as specified in the term sheets attached as **Exhibit A** hereto (the "**Plan Term Sheet**") and **Exhibit B** hereto (the "**Sale**

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

**Transaction Term Sheet**" and, such transactions as described in this Agreement, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Company intends to implement the Restructuring Transactions through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, collectively, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**   *Definitions and Interpretation.*

1.01.   Definitions.  The following terms shall have the following definitions:

"**1113/1114 Motion**" means a motion or motions, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders, under section 1113 of the Bankruptcy Code for rejection of certain of the Debtors' collective bargaining agreements and under section 1114 of the Bankruptcy Code for modification of certain of the Debtors' retiree benefits.

"**1113/1114 Order**" means an order entered by the Bankruptcy Court approving the 1113/1114 Motion.

"**Affiliate**" has the meaning set forth in the Plan Term Sheet.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Prepetition Bridge Loan, DIP Facility and/or the Prepetition Credit Agreement, including any successors thereto, in each of their respective capacities as such.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees, in each of their respective capacities as such.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Plan Term Sheet and the Sale Transaction Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

2

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction (involving any one or more Debtors or Non-Debtors or the debt, equity, or other interests in any one or more Debtors or Non-Debtors) to a non-affiliate third party that that one or more of the Company's applicable Board of Directors, Board of Managers, or similar governing body determines in good faith and following consultation with counsel is a bona fide committed proposal that represents higher or otherwise better economic recovery to the Company's stakeholders than the Restructuring Transactions taken as a whole.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court presiding over the Chapter 11 Cases.

"**Bidding Procedures Motion**" means a motion, which shall be in form and substance reasonably acceptable to the Required Consenting Stakeholders, to approve (i) the bidding procedures for the Core Assets.

"**Bidding Procedures Order**" means an order entered by the Bankruptcy Court approving the bidding procedures as set forth in the Bidding Procedures Motion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" has the meaning set forth in the Plan Term Sheet.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Closing Date Transferred Assets**" means, collectively, the Core Assets and the Transferred Non-Core Assets.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Debtor, including the DIP Facility Claims and the Prepetition First Lien Claims, which, for the avoidance of doubt, shall not include any Claim against or Equity Interest in WMLP.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

3

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned from time to time.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consummation**" has the meaning set forth in the Plan Term Sheet.

"**Core Assets**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**DIP Credit Agreement**" means the credit agreement (as it may be amended, restated, supplemented, or otherwise modified from time to time), dated October 9, 2018, between Westmoreland Coal Company, Prairie Mines & Royalty ULC, and Westmoreland San Juan, LLC, as borrowers, and Wilmington Savings Fund Society, FSB, as administrative agent, which governs the DIP Facility and is attached as **Exhibit C** hereto.

"**DIP Facility**" means the postpetition credit facility contemplated by the *$110,000,000 Senior Secured Debtor-In-Possession Loan Credit Agreement* to be entered into as of the Petition Date, which agreement will refinance, pursuant to section 364(d) of the Bankruptcy Code, the obligations under the Bridge Loan Agreement into a senior secured superpriority non-amortizing debtor-in-possession loan facility in an aggregate principal amount of up to $110,000,000.

"**DIP Facility Claim**" means any Claim on account of the DIP Facility.

"**DIP Lenders**" means the lenders from time to time party to the DIP Facility.

"**DIP Motion**" means the motion seeking approval of the interim and final orders authorizing the Debtors to enter into, grant the liens, and take other steps contemplated by the DIP Facility.

"**DIP Order**" means, collectively, the interim and final orders authorizing the Debtors to enter into, grant the liens, and take other steps contemplated by the DIP Facility.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order to be entered by the Bankruptcy Court approving the Disclosure Statement and solicitation materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code.

"**EIP Pool**" has the meaning set forth in the Plan Term Sheet.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Estate**" has the meaning set forth in the Plan Term Sheet.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor or Non-Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits of any Debtor or Non-Debtor (in each case whether or not arising under or in connection with any employment agreement).

"**Excluded Assets**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Exculpated Party**" has the meaning set forth in the Plan Term Sheet.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Debtors determine are necessary or desirable to file.

"**First Lien Lenders**" means the unaffiliated group of (i) holders of the Prepetition Credit Agreement Claims and (ii) holders of the Prepetition First Lien Notes.

"**Interest**" has the meaning set forth in the Plan Term Sheet.

"**Joinder Agreement**" means an executed form of the joinder agreement providing, among other things, that a joining party is bound by the terms of this Agreement and substantially in the form attached hereto as **Schedule 4**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in the Plan Term Sheet.

"**Non-Core Asset Sale**" means a sale or a series of sales of any of the Company's Non-Core Assets (as such term is defined in the Sale Transaction Term Sheet).

"**Non-Core Asset Sale Definitive Documents**" means any purchase and sale agreement or such other definitive documents related to a Non-Core Asset Sale, including any Non-Core Asset Sale Procedures Motion (if any), any Non-Core Asset Sale Motion and any Non-Core Asset Sale Order.

"**Non-Core Asset Sale Procedures Motion**" means a motion to approve procedures for sale(s) of Non-Core Assets.

"**Non-Core Asset Sale Motion**" means a motion to approve a Non-Core Asset Sale pursuant to section 363 of the Bankruptcy Code except to the extent any such Non-Core Asset Sale is effectuated pursuant to the Plan.

"**Non-Core Asset Sale Order**" means an order (which may be the Confirmation Order) approving the relief requested under any Non-Core Asset Sale Motion.

"**Non-Core Assets**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Outside Date**" has the meaning set forth in Section 13.04.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Debtors commences a Chapter 11 Case, as applicable.

"**Plan**" means the joint chapter 11 plan filed by the Debtors under the Bankruptcy Code that embodies the Restructuring Transactions, which chapter 11 plan shall be consistent in all material respects with this Agreement and otherwise acceptable to the Required Consenting Stakeholders and the Company.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" has the meaning set forth in the Plan Term Sheet.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Prepetition Bridge Loan**" means that certain Fourth Amendment to the Prepetition Credit Agreement dated as of May 21, 2018, by and among the Company, certain lenders party thereto and Wilmington Savings Fund Society, FSB as administrative agent.

"**Prepetition Bridge Loan Claim**" means any Claim on account of the Prepetition Bridge Loan.

"**Prepetition Credit Agreement**" means that certain Credit Agreement (as amended), dated December 16, 2014, between the Company, as borrower, and Wilmington Savings Fund Society, FSB (as successor-in-interest to Bank of Montreal), as Agent.

"**Prepetition Credit Agreement Claims**" means loans outstanding under the Prepetition Credit Agreement.

"**Prepetition Term Loan Agent**" means Wilmington Savings Fund Society, FSB (as successor-in-interest to Bank of Montreal), as Agent under the Prepetition Credit Agreement.

"**Prepetition First Lien Claim**" means a claim on account of the Prepetition Credit Agreement or Prepetition First Lien Notes.

"**Prepetition First Lien Notes**" means the 8.750% senior secured notes, due January 21, 2022, issued by the Company.

"**Prepetition First Lien Notes Trustee**" means U.S. Bank National Association, as trustee and notes collateral agent under the indenture governing the Prepetition First Lien Notes.

"**Proof of Claim**" has the meaning set forth in the Plan Term Sheet.

"**Purchaser**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Released Party**" has the meaning set forth in the Plan Term Sheet.

"**Releasing Parties**" has the meaning set forth in the Plan Term Sheet.

"**Required Consenting Stakeholders**" means, as of the relevant date, Consenting Stakeholders holding at least 50.01% of the aggregate outstanding principal amount of the Prepetition Bridge Loan, the Prepetition First Lien Notes, and the Prepetition Credit Agreement Claims, taken together, that are held by Consenting Stakeholders.

"**Restricted Period**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Sale Transaction Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means the Disclosure Statement and other solicitation materials in respect of the Plan.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, or 13.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transferred Non-Core Assets**" has the meaning set forth in the Sale Transaction Term Sheet.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Prepetition First Lien Notes, in each of their respective capacities as such.

"**WMLP**" means, collectively, Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP, and its direct and indirect subsidiaries.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 15.11 other than counsel to the Company.

**Section 2.**     ***Effectiveness of this Agreement.***   This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     the Company shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties:

(i)     holders of greater than 50% of the aggregate outstanding principal amount of the Prepetition Bridge Loan;

(ii)     holders of greater than 50% of the aggregate outstanding principal amount of Prepetition First Lien Notes; and

(iii)     holders of greater than 50% of the aggregate outstanding principal amount of the Prepetition Credit Agreement Claims.

(c)     counsel to the Company shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 15.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in Section 2(a) have occurred.

**Section 3.**     ***Definitive Documents.***

3.01.   The Definitive Documents governing the Restructuring Transactions shall consist of the following:  (a) the Definitive Agreements (as defined in the Sale Transaction Term Sheet); (b) the Plan; (c) the Confirmation Order; (d) the Disclosure Statement and other Solicitation Materials; (e) the Disclosure Statement Order; (f) the DIP Motion, the DIP Order, and the DIP Credit Agreement; (g) the First Day Pleadings; (h) the Bidding Procedures Motion; (i) the Bidding Procedures Order; (j) the Non-Core Asset Sale Definitive Documents (k) the Plan Supplement; (l) the 1113/1114 Motion; (m) the 1113/1114 Order; (n) all documents memorializing the terms of the EIP Pool; (o) all documents governing any employee bonus, incentive, retention and benefit plans (other than the Westmoreland Coal Company 2018 Key Employee Incentive Plan and the Westmoreland Coal Company 2018 Key Employee Retention Plan, except to the extent either such plan is modified after the date of the Prepetition Bridge

Loan); and (p) any other material motions, applications, pleadings or other documents the Company files with the Bankruptcy Court.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date, and any amendments, modifications or supplements to such Definitive Documents, shall be in form and substance reasonably acceptable to the Company and the Required Consenting Stakeholders.

**Section 4.**      *Operational Observer.*  The Required Consenting Stakeholders shall identify an operational observer (the "Operational Observer") who shall be granted reasonable access during normal business hours to the Company's executive and management-level personnel and mining facilities in order to monitor and assist with, upon reasonable prior notice to the Company's Chief Executive Officer or Chief Operating Officer, on the terms determined by the Company's Chief Executive Officer or Chief Operating Officer (with such terms not to be unreasonable), the Company's day-to-day operations, including, but not limited to, negotiations and discussions regarding the Company's customer contracts and collective bargaining agreements, employment decisions to be made by the Company and the implementation of cost savings measures and the retention of other consultants to assist in that process, through (i) if the Purchaser is the Successful Bidder (as defined in the Bidding Procedures Order) for any of the Core Assets, the Plan Effective Date, or (ii) if the Purchaser is not the Successful Bidder for any of the Core Assets, the date of the Auction (as defined in the Bidding Procedures Order); provided that, nothing herein shall alter any provisions of any confidentiality agreements between the Operational Observer and the Company.  The Operational Observer shall be retained by or on behalf of the Consenting Stakeholders and Operational Observer's actual and documented fees and out-of-pocket expenses shall be paid for by the Company.  For the avoidance of doubt, the Operational Observer will not have any authority or control over any aspect of the Company or its business including, but not limited to, day-to-day operations, the Chapter 11 Cases or any Restructuring Transaction.

**Section 5.**      *Commitments of the Consenting Stakeholders.*

5.01.   General Commitments, Forbearances, and Waivers.

(a)      During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders;

(iii)    use commercially reasonably efforts to give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; and

(iv)    use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, except as provided in this Agreement, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement that it shall not directly or indirectly, and shall not direct any other person to:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any restructuring other than the Restructuring Transactions;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(iv)    exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims or Interests against the Debtors; or

(v)     object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of its assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.03.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

11

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above.

**Section 6.**      ***Additional Provisions Regarding the Consenting Stakeholders' Commitments.***

6.01.   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a) affect the ability of any Consenting Stakeholder to consult with (i) any other Consenting Stakeholder; (ii) the Company; (iii) any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); or (iv) other bidders or potential purchasers of the Company's assets or equity, <u>provided</u> that, before disclosing confidential information to such third parties, the applicable Consenting Stakeholders must identify to the Company (x) such third party and (y) the confidential information proposed to be shared with such third party, and such third party must sign or have signed a confidentiality agreement in form and substance reasonably acceptable to the Company;

(b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or

(c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

6.02.   <u>Consenting Stakeholders' Fiduciary Duties</u>.  It is understood and agreed that none of the Consenting Stakeholders has a duty of trust or confidence in any form with any other Consenting Stakeholder, the Debtors, the Debtors' direct and indirect subsidiaries and affiliates, or any of their other creditors or stakeholders, and, except as expressly provided in this Agreement, there are no agreements, commitments or undertakings by, among or between any of them.  It is understood and agreed that any Consenting Stakeholder may trade its debt or equity securities of the Debtors and their affiliates, as applicable, without the consent of any of the Debtors or any other Consenting Stakeholder, subject to applicable securities laws, the terms of such debt and equity securities and the terms of this Agreement.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

**Section 7.**      ***Commitments of the Company.***

7.01.   <u>Affirmative Commitments</u>.   Except as set forth in Section 8, during the Agreement Effective Period, the Company agrees to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the pursuit and consummation of the Sale in accordance with the Sale Transaction Term Sheet, and the pursuit and consummation of the Non-Core Asset Sales;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment and implement the Restructuring Transactions;

(c)      comply with the milestones set forth on **Schedule 2** to this Agreement (the "**Milestones**");

(d)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(e)      obtain the consent of the Required Consenting Stakeholders before extending or renewing (or permitting to be extended or renewed) the term of any collective bargaining agreement to which any Debtors or Non-Debtors, as applicable, are party or that is included in the Sale absent the Company's ability to terminate such collective bargaining agreement prior to the Plan Effective Date;

(f) obtain the consent of the Required Consenting Stakeholders before assuming, rejecting, entering into, amending, restating, supplementing, modifying, terminating, replacing, assigning, renewing or otherwise extending the term of (i) any revenue-generating contract that has, or if entered into by the Company would have, a term that is six (6) months or longer. or (ii) any shared service agreement or other similar arrangement with respect to WMLP and its operations;

(g)      obtain the consent of the Required Consenting Stakeholders before making any payments under any employee bonus, incentive, retention or benefit plans (other than the Westmoreland Coal Company 2018 Key Employee Incentive Plan and the Westmoreland Coal Company 2018 Key Employee Retention Plan;

(h)      obtain the consent of the Required Consenting Stakeholders (not to be unreasonably withheld) before (i) filing any Non-Core Asset Sale Procedures Motion (if any), (ii) filing any Non-Core Asset Sale Motions (if any) or proposed Non-Core Asset Sale Orders (if any) or (iii) consummating any Non-Core Asset Sales (if any), the terms of which shall be reasonably acceptable to the Required Consenting Stakeholders;

(i)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(j)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(k)      use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 7.02; and

(l)      negotiate in good faith with the Consenting Stakeholders the restructuring or other disposition of WMLP and not support any such restructuring or other disposition of WMLP that

negatively impacts the Restructuring Transactions (including, but not limited to, any restructuring or disposition of WMLP that would leave liabilities at any of the Debtors the payment of which is required under section 1129(a)(9) of the Bankruptcy Code in order to receive entry of the Confirmation Order, or with respect to any non-Debtors, that must be satisfied in full in cash by the Debtors or the Purchaser); and

(m)     provide counsel to the Consenting Stakeholders with copies of any Definitive Documents or other material pleadings to be filed in the Bankruptcy Court at least five (5) Business Days, to the extent practicable, prior to filing such pleading.

7.02.   <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Debtors and Non-Debtors shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.     *Additional Provisions Regarding Company's Commitments.***

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or the board of directors, board of managers, or similar governing body of the Company, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to Section 8.01 shall not be deemed to constitute a breach of this Agreement; provided, however, that the Company shall provide the Consenting Stakeholders with notice of any such action or inaction within two (2) Business Days of such action or inaction.

8.02.   Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.01 and through the date of the Auction (as such term shall be defined in the Bidding Procedures Order), the Company and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning the Company  to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries,

proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; provided, however, notwithstanding anything to the contrary herein, if the Company receives a proposal or expression of interest (orally or in writing) from a third party regarding an Alternative Restructuring Proposal, the Company shall (i) provide counsel to the Consenting Stakeholders with such Alternative Restructuring Proposal within one (1) Business Day, including the identity of the party or parties making such proposal or expression of interest.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Transfer of Interests and Securities.*

9.01.    During the Restricted Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to counsel to the Company, at or before the time of the proposed Transfer, a Joinder Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company at or before the time of the proposed Transfer (any such transfer that complies with these requirements, a "**Permitted Transfer**").

9.02.    Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company or

counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company within five (5) Business Days of such acquisition.

9.04.    Section 9 shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Debtor and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Joinder Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 9.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in Section 9, the restrictions on Transfer set forth in Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.**    *Representations and Warranties of Consenting Stakeholders.*  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement (or with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty and covenant):

(a)      it is either (i) the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in,  with respect to those signatories to this Agreement as of October 9, 2018, a letter from the Ad Hoc Group's counsel delivered to the Company, or a Joinder Agreement, as applicable (as may be updated pursuant to Section 9); or (ii) has sole investment or voting discretion with respect to the principal amount of the Company Claims/Interests set forth in such letter or such Joinder

16

Agreement and has the power and authority to bind beneficial owner(s) of such Company Claims/Interests to the terms of this Agreement;

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)     solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.     *Mutual Representations, Warranties, and Covenants*.**   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Reserved.*

**Section 13.**      *Termination Events.*

13.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company of a written notice in accordance with Section 15.11 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Debtor or Non-Debtor of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or remains uncured for five (5) Business Days following the delivery of a written notice in accordance with Section 15.11 hereof detailing any such breach;

(b)      the Company's acceptance of an Alternative Restructuring Proposal, including but not limited to filing with the Bankruptcy Court, or publicly announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Restructuring Transactions;

(c)      the failure to comply with any of the Milestones set forth on **<u>Schedule 2</u>** to this Agreement;

(d)      the Company's exercise of its right under Section 8.01 of this Agreement, in a manner that is otherwise inconsistent with the terms of this Agreement, to take any action or to refrain from taking any action that would be inconsistent with applicable Law or its fiduciary obligations under applicable Law;

(e)      the failure to obtain entry of the interim or final DIP Order substantially on the terms set forth in the proposed form of DIP Order attached as **<u>Exhibit 1</u>** annexed to the DIP Credit Agreement (attached as **<u>Exhibit C</u>** hereto), except to the extent such interim or final DIP Order is modified with the consent of the Required Consenting Lenders;

(f)      the occurrence of an "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Facility that has not been waived or timely cured in accordance therewith;

(g)      the termination of the authority to use cash collateral obtained under the DIP Order;

(h)      the Company's (i) amendment or modification of, or filing of a pleading with the Bankruptcy Court seeking authority to amend or modify, any of the Definitive Documents, in a manner that is inconsistent with this Agreement, or which is otherwise in a form or substance not reasonably satisfactory to the Required Consenting Stakeholders, or (ii) publicly announcing, disclosing, or otherwise publicizing its intention to take any such acts, whether independently or in conjunction with another party;

(i)     the reversal, stay, dismissal, vacation, reconsideration, modification or amendment of the order of the Bankruptcy Court approving the Disclosure Statement or the Confirmation Order after it is entered in a manner that is not reasonably acceptable to the Required Consenting Stakeholders;

(j)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) denies approval of any material term or condition of the Restructuring Transactions or enjoins, restricts or renders impossible or impracticable the consummation of a material portion of the Restructuring Transactions, and (ii) remains in effect for five (5) Business Days after such terminating Consenting  Stakeholders transmit a written notice in accordance with Section 15.11 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(k)     the entry of an order by the Bankruptcy Court denying confirmation of the Plan; or

(l)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Debtor, or (iii) rejecting this Agreement.

13.02.  Debtor Termination Events.  Any Debtor may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.11 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)     the board of directors, board of managers, or such similar governing body of any Debtor determines, in good faith, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would constitute a breach of its fiduciary duties under applicable Law, or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Debtor transmits a written notice in accordance with Section 15.11 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Debtor that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

19

(d)     the reversal, stay, dismissal, vacation, reconsideration, modification or amendment of the order of the Bankruptcy Court approving the Disclosure Statement or the Confirmation Order after it is entered in a manner that is not reasonably acceptable to the Required Consenting Stakeholders; or

(e)     the Bankruptcy Court enters an order denying confirmation of the Plan.

13.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Debtor.

13.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the earlier of (1) the Plan Effective Date, and (2) March 31, 2019 (the "<u>Outside Date</u>").  The Outside Date may not be extended without the consent of all Consenting Stakeholders; <u>provided</u> that, if the Confirmation Order is entered on or prior to March 31, 2019, the Outside Date may be extended through April 30, 2019 with the consent of the Consenting Stakeholders holding at least 65% of the aggregate outstanding principal amount of the Prepetition Bridge Loan or DIP Facility (as applicable) the Prepetition First Lien Notes, and the Prepetition Credit Agreement Claims, taken together.

13.05.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided</u>, <u>however</u>, any Consenting Stakeholder withdrawing or changing its vote pursuant to Section 13.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Debtor or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under Section 13.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this

Agreement, except a termination pursuant to Section 13.02(b) or Section 13.02(e).  Nothing in Section 13.05 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 13.02(b).

**Section 14.**     *Amendments and Waivers.*

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with Section 14.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by each Debtor and the Required Consenting Stakeholders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with Section 14 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**     *Miscellaneous.*

15.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09.  <u>Survival</u>. Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 12 shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.11.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Debtor, to:

Westmoreland Coal Company
9540 South Maroon Circle, Suite 300
Englewood, Colorado 80112
Attention:  Jennifer Grafton, Chief Legal Officer and Chief Administrative Officer
E-mail address:  jgrafton@westmoreland.com

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Gregory Pesce
E-mail address: gregory.pesce@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Stephen E. Hessler, P.C.
E-mail address:  stephen.hessler@kirkland.com

(b)     if to Consenting Stakeholders, to:

[Consenting Stakeholder Notice Parties listed on **Schedule 3** attached hereto.]

with copies to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention:  Thomas Moers Mayer and Stephen Zide
Email address:  tmayer@kramerlevin.com and szide@kramerlevin.com

Any notice given by delivery, mail, or courier shall be effective when received.

23

15.12.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company.

15.13.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.16.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.19.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.  For the

avoidance of doubt, no Consenting Stakeholder has entered into this agreement on account of any Claims against, or Equity Interests in, WMLP it may hold (directly or through discretionary accounts that it manages or advises).

15.20.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company's Signature Page to
the Restructuring Support Agreement**

**WESTMORELAND COAL COMPANY**
ABSALOKA COAL, LLC
BASIN RESOURCES, INC.
BUCKINGHAM COAL COMPANY, LLC
DAKOTA WESTMORELAND CORPORATION
HAYSTACK COAL COMPANY
PRAIRIE MINES & ROYALTY ULC
SAN JUAN COAL COMPANY
SAN JUAN TRANSPORTATION COMPANY
TEXAS WESTMORELAND COAL COMPANY
WCC HOLDING B.V.
WCC LAND HOLDING COMPANY, INC.
WEI-ROANOKE VALLEY, INC.
WESTERN ENERGY COMPANY
WESTMORELAND CANADA HOLDINGS INC.
WESTMORELAND CANADA, LLC
WESTMORELAND CANADIAN INVESTMENTS, LP
WESTMORELAND COAL COMPANY ASSET CORP.
WESTMORELAND COAL SALES COMPANY, INC.
WESTMORELAND ENERGY, LLC
WESTMORELAND ENERGY SERVICES, INC.
WESTMORELAND ENERGY SERVICES NEW YORK, INC.
WESTMORELAND MINING LLC
WESTMORELAND NORTH CAROLINA POWER LLC
WESTMORELAND PARTNERS
WESTMORELAND POWER, INC.
WESTMORELAND RESOURCES, INC.
WESTMORELAND RISK MANAGEMENT, INC.
WESTMORELAND-ROANOKE VALLEY, LP
WESTMORELAND SAN JUAN, LLC
WESTMORELAND SAN JUAN HOLDINGS, INC.
WESTMORELAND SAVAGE CORP.
WESTMORELAND TEXAS JEWETT COAL COMPANY
WRI PARTNERS, INC.

By: _____

Name: Michael G. Hutchinson

Authorized Signatory

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____
Name:
Title:

**Schedule 1**

**Entities**

*Debtors*

ABSALOKA COAL, LLC
BASIN RESOURCES, INC.
BUCKINGHAM COAL COMPANY, LLC
DAKOTA WESTMORELAND CORPORATION
HAYSTACK COAL COMPANY

SAN JUAN COAL COMPANY
SAN JUAN TRANSPORTATION COMPANY
TEXAS WESTMORELAND COAL COMPANY

WCC LAND HOLDING COMPANY, INC.
WEI-ROANOKE VALLEY, INC.
WESTERN ENERGY COMPANY

WESTMORELAND COAL COMPANY
WESTMORELAND COAL COMPANY ASSET CORP.
WESTMORELAND COAL SALES COMPANY, INC.
WESTMORELAND ENERGY SERVICES NEW YORK, INC.
WESTMORELAND ENERGY, LLC
WESTMORELAND ENERGY SERVICES, INC.
WESTMORELAND MINING LLC
WESTMORELAND NORTH CAROLINA POWER LLC
WESTMORELAND PARTNERS
WESTMORELAND POWER, INC.
WESTMORELAND RESOURCES, INC.
WESTMORELAND-ROANOKE VALLEY, LP
WESTMORELAND SAN JUAN, LLC
WESTMORELAND SAN JUAN HOLDINGS, INC.
WESTMORELAND SAVAGE CORP.
WESTMORELAND TEXAS JEWETT COAL COMPANY
WRI PARTNERS, INC.

*Non-Debtors*

PRAIRIE MINES & ROYALTY ULC
WCC HOLDING B.V.
WESTMORELAND CANADA HOLDINGS INC.
WESTMORELAND CANADA, LLC
WESTMORELAND CANADIAN INVESTMENTS, LP
WESTMORELAND RISK MANAGEMENT, INC.

**<u>Schedule 2</u>**

**Milestones**

*Execution Version*

**Westmoreland Coal Company:**
**Milestones Under The DIP Credit Agreement, DIP Order, and Restructuring Support Agreement[1]**

| MILESTONE | DATE |
|---|---|
| Petition Date | • **October 9, 2018** |
| DIP Motion | • No later than **October 10, 2018**, the Debtors shall file with the Bankruptcy Court the DIP Motion. |
| Interim DIP Order | • No later than **October 12, 2018**, the Bankruptcy Court shall enter the interim DIP order. |
| Bidding Procedures Motion, Non-Core Assets Sale Procedures Motion, Plan, and Disclosure Statement | • No later than **October 18, 2018**, the Debtors shall file with the Bankruptcy Court a Bidding Procedures Motion, and the Non-Core Assets Sale Procedures Motion. |
| Plan and Disclosure Statement | • No later than **October 25, 2018**, the Debtors shall file with the Bankruptcy Court the Plan and Disclosure Statement and motion to approve the Disclosure Statement and related solicitation materials. |
| 1113/1114 Motion | • No later than **November 8, 2018**, the Debtors shall (x) have reached an agreement with the applicable authorized representatives of the employees and the retirees regarding modifications to the Debtors' collective bargaining agreements and retiree benefits or, (y) absent such agreement, filed the 1113/1114 Motion (that is reasonably acceptable to the Required Consenting Stakeholders). |
| Final DIP Order | • No later than **November 8, 2018**, the Bankruptcy Court shall enter the final DIP Order. |
| Bidding Procedures Order | • No later than **November 15, 2018**, the Bankruptcy Court shall enter the Bidding Procedures Order and an order approving the Non-Core Assets Sale Procedures Motion. |
| Disclosure Statement Order | • No later than **December 13, 2018**, the Bankruptcy Court shall enter an order approving the adequacy of the Disclosure Statement. |

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Restructuring Support Agreement.

- 1 -

*Execution Version*

| MILESTONE | DATE |
|---|---|
| 1113/1114 Order | • In the event the 1113/1114 Motion is filed, then no later than **January 10, 2019**, the Bankruptcy Court shall enter the 1113/1114 Order. |
| Bid Deadline | • No later than **January 15, 2019**, the bid deadline under the Bidding Procedures Order shall occur. |
| Auction | • No later than **January 22, 2019**, the Debtors shall commence an auction in connection with the Sale process for the Core Assets. |
| Confirmation Order | • No later than **February 14, 2019** the Bankruptcy Court shall enter the Confirmation Order and approve the sale of the Core Assets. |
| Plan Effective Date | • No later than **February 28, 2019,** the confirmed Plan shall have become effective including any sale transaction for the Closing Date Transferred Assets (including, for the avoidance of doubt, any Transferred Non-Core Assets). |

## <u>Schedule 3</u>

**Consenting Stakeholder Notice Parties**

<u>**Schedule 4**</u>

**Form of Joinder Agreement**

**FORM OF JOINDER AGREEMENT FOR CONSENTING STAKEHOLDERS**

      This Joinder Agreement to the Restructuring Support Agreement, dated as of October 9, 2018, (as amended, supplemented or otherwise modified from time to time, the "<u>Agreement</u>"), by and among Westmoreland Coal Company (the "<u>Company</u>") and each of its directly or indirectly held subsidiaries and the Consenting Stakeholders, is executed and delivered by _____ (the "<u>Joining Party</u>") as of _____. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

      1. <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same as been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a "<u>Consenting Stakeholder</u>" and a "<u>Party</u>" for all purposes under the Agreement and with respect to any and all claims held by such Joining Party.

      2. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of the Claims held by the Joining Party, the Joining Party hereby makes each of the representations and warranties of the Consenting Stakeholders set forth in Sections 10 and 11 of the Agreement to each other Party to the Agreement.

      3. <u>Governing Law</u>. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

## Exhibit A

**Plan Term Sheet**

*Execution Version*

---

<u>EXHIBIT A</u> TO RESTRUCTURING SUPPORT AGREEMENT

PLAN TERM SHEET

**October 9, 2018**

THIS PLAN TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

---

This term sheet (including the annexes attached hereto, the "**Plan Term Sheet**")[1] sets forth the principal terms of the proposed restructuring of the Debtors, to be effectuated through a chapter 11 plan (the "**Plan**").  This Plan Term Sheet does not purport to set forth all the terms and conditions of the Restructuring Transactions, which will be set forth in the Plan and the other Definitive Documents in accordance with the RSA.  For the avoidance of doubt, it is not contemplated that any subsidiary of the Company that is formed under the laws of Canada will commence a proceeding to effectuate the transactions contemplated by the Plan Term Sheet.

| **Restructuring Summary** |
|---|
| **Sale of the Core Assets and Transfer of the Transferred Non-Core Assets** | On the Plan Effective Date, after the Debtors have conducted an auction for the Core Assets, the Debtors and the Purchaser (or, in the event the Purchaser does not win the Auction, the Successful Bidder) shall consummate the Sale of the Core Assets.  Pursuant to the Sale of the Core Assets and the Transferred Non-Core Assets (together with the Core Assets, the "**Closing Date Transferred Assets**"), the Debtors shall transfer the Closing Date Transferred Assets to the Purchaser (or, in the event the Purchaser does not win the Auction, the Successful Bidder), free and clear of the Excluded Liabilities, in each case, in a manner consistent with, and as described in, the term sheet attached as **Exhibit B** to the RSA (the "**Sale Transaction Term Sheet**"). |
| **Marketing Process for Non-Core Assets** | Prior to and following the Petition Date, the Debtors will market the Non-Core Assets for sale in accordance with the terms and conditions of the RSA. |
| **Sale of Non-Core Assets**[2] | In the event that the Debtors do not directly or indirectly transfer any Non-Core Assets to a third party acquirer on or before the Plan Effective Date in a manner consistent with the RSA, then, on the Plan Effective Date, the Debtors shall transfer any such Transferred Non-Core Assets to |

---

[1]   Capitalized terms used but not defined in this Plan Term Sheet shall have the meanings ascribed to such terms in the Restructuring Support Agreement, dated as of October 9, 2018 (the "**RSA**"), to which this Plan Term Sheet is attached as **Exhibit A** or, if not defined in the RSA, the Sale Transaction Term Sheet attached thereto as **Exhibit B**.

[2]   The Sale Transaction Term Sheet shall govern the terms of any sale or disposition of the Non-Core Assets and the treatment of the Excluded Liabilities.

| | |
|---|---|
| | the Purchaser (or, in the event the Purchaser does not win the Auction, the Successful Bidder) free and clear of any Excluded Liabilities in each case, in a manner consistent with, and as described in, the Sale Transaction Term Sheet. The Excluded Liabilities will be treated in accordance with the terms of the Sale Transaction Term Sheet. |
| | For the avoidance of doubt, if a Non-Core Asset is acquired by a third party, the Purchaser (or, in the event the Purchaser does not win the Auction, the Successful Bidder) shall not assume or otherwise be responsible for and the Consenting Stakeholders will not provide any funding with respect to the reclamation obligations associated with such Non-Core Assets, which shall be assumed by the third party acquirer thereof. |
| **DIP Facility and Cash Collateral** | After the Petition Date, the Debtors will enter into the DIP Facility, which shall refinance the Debtors' obligations under the Prepetition Bridge Loan. |
| | The Consenting Stakeholders shall consent to the use of the Debtors' cash collateral on the terms set forth in the proposed form of interim DIP Order attached as **Exhibit 1** annexed to **Exhibit C** to the RSA. |
| **WMLP Disposition** | For the avoidance of doubt, the Company's direct and indirect Equity Interests in WMLP will not be transferred to the Purchaser.  WMLP will market its assets to potential third-party bidders for a Sale pursuant to a chapter 11 plan proposed by WMLP in connection with separate chapter 11 cases commenced by WMLP.  As set forth in the RSA, the Debtors must negotiate in good faith with the Consenting Stakeholders the restructuring or other disposition of WMLP and not support any such restructuring or other disposition of WMLP that negatively impacts the Restructuring Transactions (including, but not limited to, any restructuring or disposition of WMLP that would leave liabilities at any of the Debtors or Non-Debtors).  The Company's direct and indirect Equity Interests in WMLP are expected to be cancelled in connection with the disposition of WMLP's assets (the "**WMLP Interest Cancellation**"). |
| | For the avoidance of doubt, neither the Consenting Stakeholders nor the Purchaser shall be responsible for any reclamation obligations associated with WMLP or its assets. |
| | Following the Petition Date, the Company and the Consenting Stakeholders shall engage in good faith discussions with WMLP and its secured creditors regarding the terms of any transition services or similar arrangements with respect to the shared services provided by the Company to WMLP in the event a chapter 11 plan with respect to WMLP does not become effective on or before the Plan Effective Date. |
| **Claims Administrator** | Following the Plan Effective Date, the Company shall appoint a claims administrator to administer claims asserted against the Debtors and oversee the wind-down of the estate and any assets remaining in the estate after the Plan Effective Date (the "**Claims Administrator**").  The identity, role and compensation of the Claims Administrator shall be set forth in a plan supplement to be filed before the Plan Effective Date (the "**Plan Supplement**") and shall be acceptable to the Required Consenting |

2

| | Stakeholders. |
|---|---|
| **Proposed Treatment of Claims and Interests Under the Plan** ||
| On the Plan Effective Date, each holder of an allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed Claim or Interest, except to the extent different treatment is agreed to by the applicable parties. ||
| **DIP Facility Claims** | The DIP Facility shall either: (a) be assumed by the Purchaser in connection with the Plan Effective Date and shall continue in force until the obligations under the DIP Facility are indefeasibly paid in full in cash in accordance with the DIP Facility; or (b) paid in full in cash on the Plan Effective Date. |
| **Administrative, Priority Tax, Other Priority Claims, and Other Secured Claims** | (a) *Administrative Expense Claims:* Except to the extent a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive cash equal to the full unpaid amount of such Allowed Administrative Expense claim, which payments shall be made in the ordinary course of business or on the later of the Plan Effective Date and the date on which such claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter). |
| | (b) *Priority Tax Claims:* Except to the extent a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each holder of an Allowed Priority Tax Claim shall receive, at the Debtors' option and subject to the consent of the Required Consenting Stakeholders, either (i) cash equal to the Allowed amount of such claim on the later of the Plan Effective Date and the date such claim becomes an Allowed claim (or as soon as reasonably practicable thereafter) or (ii) through equal annual installment payments in cash, of a total value equal to the allowed amount of such claim, over a period ending not later than five (5) years after the Petition Date. |
| | (c) *Other Priority Claims:* Except to the extent a holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive cash equal to the Allowed amount of such claim on the later of the Plan Effective Date and the date on which such claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter). |
| | (d) *Other Secured Claims:* Except to the extent that a holder of Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Allowed Other Secured Claim will (i) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) receive cash in an amount equal to such Allowed Other Secured Claim as determined in accordance with section 506(a) of the Bankruptcy Code, or (iii) receive the collateral securing its Allowed Other Secured Claim on the later of the Plan Effective Date |

| | |
|---|---|
| | and the date such Other Secured Claim becomes Allowed (or as soon as reasonably practicable thereafter), in each case as determined by the Debtors and consented to by the Required Consenting Stakeholders. |
| **Prepetition First Lien Claims** | Each holder of a Claim on account of the Prepetition Credit Agreement or the Prepetition First Lien Notes (a "**Prepetition First Lien Claim**"), will receive on account of such Claim: |
| | (a) If the Sale is consummated with the Purchaser, its pro rata share of (i) the equity interests of the Purchaser and (if applicable) debt issued by the Purchaser, (ii) the cash proceeds (if any) of the Excluded Assets (including, for the avoidance of doubt, any Non-Core Assets sold to third parties), (iii) to the extent of any remaining secured portion of the Prepetition First Lien Claim, all proceeds of the Debtors' assets that constitute collateral of the holders of Prepetition First Lien Claims, including but not limited to the Debtors' Equity Interests in WMLP, and (iv) to the extent of any general unsecured deficiency claim, the distribution to Allowed General Unsecured Claims under the Plan; or |
| | (b) If the Sale is not consummated with the Purchaser, (i) payment in full in cash or (ii) an amount otherwise agreed upon by the Debtors and the Required Consenting Stakeholders. |
| | Any unpaid fees and expenses of the Prepetition Term Loan Agent or Prepetition First Lien Notes Trustee will be paid in full in cash on the Plan Effective Date. |
| **General Unsecured Claims** | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each holder thereof shall receive its pro rata share of cash equal to, as agreed upon by the Debtors and the Required Consenting Stakeholders, the liquidation value of any assets of the Debtors not subject to a lien and available for distribution after giving effect to the treatment of, or distribution on account of, all Prepetition First Lien Claims, allowed administrative, professional fee, priority tax, other priority claims or other secured claims. |
| **Intercompany Claims** | All Claims held by a Debtor or affiliate thereof in any other Debtor or affiliate (an "**Intercompany Claim**") will be, at the option of the Required Consenting Stakeholders and the Company, either (a) reinstated or (b) cancelled without any distribution on account of such Intercompany Claims. |
| **Intercompany Interests** | All Equity Interests held by a Debtor in any other Debtor will be, at the option of the Required Consenting Stakeholders and the Company, either (a) reinstated or (b) cancelled without any distribution on account of such Equity Interests. |
| **Section 510(b) Claims** | Any Claims arising under section 510(b) of the Bankruptcy Code shall be discharged without any distribution. |
| **Equity Interests in Westmoreland** | The Equity Interests in Westmoreland Coal Company shall be cancelled |

| | |
|---|---|
| **Coal Company** | on the Post-Closing Reconciliation Date (as defined below) without any distribution on account of such Equity Interest. |
| **Miscellaneous Provisions** | |
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the following additional conditions precedent:<br><br>• the occurrence of the Closing as described in the Sale Transaction Term Sheet;<br><br>• the RSA shall not have been terminated and remain in full force and effect;<br><br>• the orders approving the Disclosure Statement and the Plan shall have been entered and such orders shall not have been stayed, modified, or vacated on appeal;<br><br>• establishment of a professional fee escrow account funded in the amount of estimated accrued but unpaid professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees during the Chapter 11 Cases;<br><br>• all schedules, documents, supplements and exhibits to the Plan shall be, in form and substance, in accordance with the terms of the RSA; and<br><br>• any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained. |
| **Executory Contracts and Unexpired Leases** | To the extent necessary in connection with the Plan, the Debtors shall seek to assume pursuant to, *inter alia*, section 365 of the Bankruptcy Code, those executory contracts and unexpired leases that may be mutually agreed upon by the Debtors and the Required Consenting Stakeholders and set forth on a schedule to be included in the Plan Supplement (the "Assumption Schedule"). As of and subject to the occurrence of the Plan Effective Date, all executory contracts and unexpired leases to which the Debtors are party shall be deemed rejected unless such executory contract or unexpired lease (a) was previously assumed or rejected pursuant to a final order of the Bankruptcy Court, (b) is specifically listed on the Assumption Schedule or (c) is the subject of a separate motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code. The Debtors shall use commercially reasonable efforts to provide the Required Consenting Stakeholders and their advisors with all reasonable information needed to analyze a decision to assume or reject an executory contract or unexpired lease, and the Debtors shall not make any such decision without first obtaining the consent of the Required Consenting Stakeholders, such consent not to be unreasonably withheld. |
| **Post-Plan Effective Date Consulting Arrangements** | On or before January 31, 2019, the Purchaser (or, in the event that the Purchaser does not win the Auction, the Successful Bidder), shall notify each of Joseph Micheletti, Gary Kohn, Jennifer Grafton, Sheldon de Jager, and Scott Henry (the "Consultants") whether it will enter into an agreement with such Consultant that will commence on the Plan Effective Date (collectively, the "Advisory Services Agreements") for transition |

5

| | |
|---|---|
| | and advisory services and assistance to the Purchaser (or, in the event that the Purchaser does not win the Auction, the Successful Bidder). The terms and conditions of each Advisory Service Agreement (if any) shall be mutually acceptable to such Consultant and the Required Consenting Stakeholders. |
| **Purchaser Stock** | Except as otherwise noted, it is the intent of the parties that any "securities" as defined in section 2(a)(1) of the Securities Act of 1933 issued under the Plan, except with respect to any entity that is an underwriter, shall be exempt from registration under U.S. federal and state securities laws pursuant to section 1145 of the Bankruptcy Code, provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration. |
| **Purchaser Corporate Governance Matters** | All corporate governance matters related to the Purchaser, including but not limited to the appointment of members of the Purchaser's board of directors and the definitive documents governing all corporate governance matters, will be determined by the Required Consenting Stakeholders in their sole discretion. |
| **Cancellation of Notes, Interests, Instruments, Certificates and Other Documents** | Unless otherwise provided herein, on the Plan Effective Date, all notes, instruments, certificates, and any other documents evidencing Claims or Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be deemed satisfied in full and discharged except, without limitation, any indemnification obligations owed by the Debtors to the Consenting Stakeholders under any instrument that includes the DIP Order, which shall survive the Plan Effective Date; provided that, solely in the event restructuring transactions with respect to WMLP have not been finalized as of the Plan Effective Date, the Company will remain in chapter 11 and the Equity Interests in the Company and, if necessary, a portion of the Prepetition First Lien Claims will not be cancelled until such time as the restructuring transactions with respect to WMLP have been determined. |
| **CBAs, Labor Matters and OPEB Liabilities** | The Company must obtain the consent of the Required Consenting Stakeholders before assuming, renewing or extending the term of any Collective Bargaining Agreement ("CBA"). To the extent the Debtors fail to reach an agreement with applicable authorized representatives of their employees and retirees regarding modifications to the Debtors' CBAs and retiree benefits that is acceptable to the Required Consenting Stakeholders, the Debtors must file the 1113/1114 Motion in accordance with the terms of the RSA and DIP Credit Agreement. <br><br> The Purchaser does not accept or assume any CBAs between the Company and its employees, and expressly declines to be bound by or accept the terms of any such CBAs. Other than any CBAs and retiree benefits explicitly assumed under the Purchase and Sale Agreement, the Purchaser is not and shall not be bound by and does not accept or adopt any wage rates, employee benefits, employee policies or any other terms and conditions of employment. |
| **Employee Matters** | Except as otherwise set forth herein, pursuant to the RSA, the continuation of the Debtors' wages, compensation, incentive, retention, and benefits programs according to existing terms and practices, including executive compensation programs, and any motions in the Bankruptcy Court for approval of such programs, shall be subject to the consent of the |

| | |
|---|---|
| | Required Consenting Stakeholders (other than the Westmoreland Coal Company 2018 Key Employee Incentive Plan and the Westmoreland Coal Company 2018 Key Employee Retention Plan, except to the extent either such plan is modified after the date of the Prepetition Bridge Loan); provided that, no later than January 31, 2019, the Purchaser shall indicate to each of the non-insider employees identified on the schedule attached hereto as **Exhibit 2** whether it intends to extend full-time employment offers as of the Plan Effective Date to such non-insider employees. |
| | There shall be no modifications made to the terms of, including the amounts to be paid under, any of the programs listed in the foregoing paragraph or other bonus plans (including but not limited to the Westmoreland Coal Company 2018 Key Employee Incentive Plan and the Westmoreland Coal Company 2018 Key Employee Retention Plan) in effect on the Petition Date, without the consent of the Required Consenting Stakeholders.  Except as otherwise set forth herein, the Company may not renew, extend or implement any new bonus or incentive programs or increase any employee salaries without the consent of the Required Consenting Stakeholders. |
| | Solely upon and subject to any applicable Court approval and the DIP Order, the Company may implement (a) a cash-based retention plan for non-insider employees and (b) a cash-based incentive plan for insider employees, in each case for the period of January 1, 2019 through the Plan Effective Date (the "2019 Key Employee Retention Plan" and the "2019 Key Employee Incentive Plan"), in amounts and allocations which are substantially consistent with the Westmoreland Coal Company 2018 Key Employee Retention Plan and the Westmoreland Coal Company 2018 Key Employee Incentive Plan, respectively.  The 2019 Key Employee Retention Plan and 2019 Key Employee Incentive Plan shall be subject to diligence by the Required Consenting Stakeholders, and to documentation and the development of metrics which shall be subject to the reasonable consent of the Required Consenting Stakeholders. |
| **Post-Plan Effective Date Employee Incentive Plan** | On the Plan Effective Date, Purchaser will reserve exclusively for participating employees (such reserve, the "EIP Pool") a pool of shares of common stock or limited liability company Interests of Purchaser representing no less than 5% and up to 10% of Purchaser's common stock or limited liability interests in the form of options, appreciation rights, profit interests, or similar securities, as applicable, determined on a fully diluted and fully distributed basis (i.e., assuming conversion of all outstanding convertible securities and full distribution of the EIP Pool and all securities contemplated by the Plan).  The terms and conditions for any initial awards shall be determined by the board of directors of the Purchaser. |
| **Indemnification Obligations** | The Debtors' indemnification obligations in place as of the Petition Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the directors, officers, or employees (including the chief restructuring officer of the Debtors) that are employed by, or serving on the board of directors or like |

| | |
|---|---|
| | body of, any of the Debtors on the Plan Effective Date, shall be assumed by Purchaser pursuant to the Plan; provided, however, the Purchaser shall not assume or be responsible for the satisfaction of indemnification obligations or liabilities associated with any of the Excluded Assets (including Non-Core Assets that do not constitute Transferred Non-Core Assets) or WMLP. |
| **Debtor Releases, Third-Party Releases, and Exculpation** | The exculpation provisions, the Debtor releases, and the "third-party" releases to be included in the Plan will be as set forth in **Exhibit 1** hereto in all material respects.  To the extent there is an ability to "opt out," the Consenting Stakeholders will, pursuant to the RSA, agree not to "opt out" of the "third-party" releases. |
| **Documentation** | The Parties shall negotiate the Definitive Documents in good faith.  Any and all documentation necessary to effectuate the Restructuring, including the Definitive Documents, shall be in form and substance consistent with this Plan Term Sheet and the RSA and otherwise reasonably satisfactory to those Parties who are party to such documentation or otherwise have consent rights specified in this Plan Term Sheet or the RSA. |
| **Reservation of Rights** | Nothing herein is an admission of any kind. If the Restructuring is not consummated for any reason, all parties reserve any and all of their respective rights. |
| **Governing Law** | The governing law for all applicable documentation shall be New York law. |
| **Post-Closing Reconciliation Date** | If, as of the date of the Plan Effective Date, (a) all of the assets of the Company have not been disposed of to the Purchaser, a third party, or an entity or trust established for the purpose of liquidating such assets; and/or (b) the WMLP Interest Cancellation has not occurred, then the Company shall remain in chapter 11 following the Plan Effective Date until such events occur (such subsequent date, the "**Post-Closing Reconciliation Date**").  The Company shall use its best efforts to minimize the amount of time between the Plan Effective Date and the Post-Closing Reconciliation Date. |

## **Exhibit 1**

### **Debtor Releases, Third-Party Releases, and Exculpation**

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Causes of Action**" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

"**Claim**" means any claim against the Debtors, as defined in section 101(5) of the Bankruptcy Code.

"**Confirmation**" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Estate**" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"**Exculpated Party**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Consenting Stakeholders; (c) Purchaser; (d) the DIP Lenders; (e) Agent under the DIP Facility; (f) the holders of Prepetition First Lien Claims; (g) the Prepetition Term Loan Agent; (h) the Prepetition First Lien Notes Trustee; (i)  with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (j) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**Interest**" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

"**Lien**" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"**Released Party**" means, collectively, and in each case in its capacity as such: (a) Purchaser; (b) each Consenting Stakeholder; (c) each Agent/Trustee; (d) the DIP Lenders; (e) the Agent under the DIP Facility; (f) each current and former Affiliate of each Entity in clause (a) through (e); (f) with respect to each Entity in clause (a) through (e) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (g) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"**Releasing Parties**" means, collectively, and in each case in its capacity as such: (a) Purchaser; (b) each Consenting Stakeholder; (c) all holders of Claims and Interests that are deemed to accept the Plan; (d) all holders of Claims and Interests who vote to accept the Plan; (e) all holders in voting Classes who abstain from voting on the Plan and who do not object to the Plan; (f) all holders of Equity Interests; (g) each current and former Affiliate of each Entity in clause (a) through (f); (h) with respect to each Entity in clause (a) through (g) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (i) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**Releases by the Debtors**.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between

or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Prepetition Financing Documents, the Asset Purchase Agreement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Releases by Holders of Claims and Interests**. As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Prepetition Financing Documents, the Asset Purchase Agreement or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Exculpation.** Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Prepetition Financing Documents, the Asset Purchase Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,

including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Discharge of Claims and Termination of Interests.** Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any intercompany claims resolved or compromised after the Plan Effective Date by the Company), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

**Injunction.** Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such

Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## Exhibit 2

| Employee Name | Employee Title | Date of Agreement |
|---|---|---|
| Bricker, Adam | VP - Global Information Technology | December 1, 2017 |
| Doucette, Timothy | VP - Canadian Operations | December 21, 2017 |
| Furlong, James | VP - Global Safety | December 1, 2017 |
| Gant, Shane | Sr. Director, MLP Operations, Contract Mining and Continuous Improvement | December 1, 2017 |
| Jutila, John | VP - Equipment Asset Management | December 1, 2017 |
| Kratzenstein, Dondi | VP - Strategic Sourcing | December 1, 2017 |
| Kukura, Jeffrey | VP - Engineering and Underground Mining | December 1, 2017 |
| Martinez, Elizabeth | VP - Global HR | April 1, 2018 |
| Sturm, Scott | VP - Global Sales & Marketing | December 1, 2017 |
| Swartz, Donald | VP - Business Development | December 1, 2017 |

## Exhibit B

### Sale Transaction Term Sheet

## Exhibit B to Restructuring Support Agreement ("RSA")

### Sale Transaction Term Sheet

THIS TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE EXECUTION OF DEFINITIVE AGREEMENTS ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES.

The proposed assets to be sold are to be comprised of (A) the business and operations of the Company's Canadian mines (the "Canada Business"), through either the sale or other disposition of (i) 100% of the Company's limited partnership equity interests in, and Westmoreland Canada LLC's ("WCGP") general partnership equity interests in, Westmoreland Canadian Investments, LP ("Westmoreland Canada") or (ii) 100% of WCC Holding, B.V.'s ("WCBV") shares in Westmoreland Canada Holdings, Inc. ("WCHI"), (B) the business and operations of the Company's San Juan mines (the "San Juan Business") through a sale or other disposition of substantially all of the assets of San Juan Coal Company ("San Juan Coal") and San Juan Transportation Company ("San Juan Transportation" and, together with San Juan Coal and such other subsidiaries of the Company owning assets relating to the San Juan Business, collectively, the "San Juan Sellers"), (C) the business and operations of the Company's Colstrip mine (the "Colstrip Business", and, together with the Canada Business and the San Juan Business, collectively, the "Business") through a sale or other disposition of substantially all of the assets of Western Energy Company (together with such other subsidiaries of the Company owning assets related to the Colstrip Business, collectively, the "Colstrip Seller"), and (D) a sale or other disposition of certain identified contracts and other assets of the Company and certain of its other direct or indirect subsidiaries (the Company, together with such subsidiaries, collectively, the "Overhead Sellers"), in each case, as applicable, and that relate to the overhead function and operations of the Business or otherwise identified in the Purchase and Sale Agreement (as defined below) (the "Overhead Function").

It is contemplated that the acquisition of the Canada Business will be structured such that one or more entities composing the Canada Business will be the obligor on indebtedness (which may be intercompany indebtedness or indebtedness owed to the First Lien Lenders) through a structure to be determined by the First Lien Lenders (the "Canadian Indebtedness").  Furthermore, treatment of the acquisition of the Business as taxable or non-taxable with carryover of tax attributes (net of COD) for U.S. income tax purposes shall be determined by the First Lien Lenders following the execution of the RSA. Prior to the execution of the Purchase and Sale Agreement, the First Lien Lenders may determine to include the equity or assets of Westmoreland Risk Management, Inc. as Overhead Function and Core Assets (as defined below) in the transaction.

Capitalized terms not defined herein shall have the respective meaning set forth in the RSA. References herein to "including" mean "including, without limitation".

### Transaction Overview

| | |
|---|---|
| **Sellers** | The Company, WCGP (to the extent of a sale of Westmoreland Canada), WCBV (to the extent of a sale of WCHI), the San Juan Sellers, the Colstrip Seller, the Overhead Sellers and any other subsidiary of the Company which transfers Transferred Non-Core |

*Execution Version*

Assets (as defined below), as applicable (collectively, the "Sellers").

| | |
|---|---|
| **Purchaser** | A newly-formed Delaware limited liability company (such company or other form of entity, as selected by the First Lien Lenders, "Purchaser"). Following the date of the RSA, the First Lien Lenders may determine to designate a newly-formed subsidiary of the Company (which subsidiary will be a Debtor in the Chapter 11 Cases) to serve as the Purchaser in order to permit the transactions contemplated by this Term Sheet to be structured as an acquisitive "G" reorganization transaction. The parties acknowledge that any such newly-formed subsidiary shall have no liabilities and shall conduct no business prior to the Closing (as defined below), in each case, except with respect to actions in connection with the transactions contemplated by this Term Sheet. |

The Purchase and Sale Agreement and the related Confirmation Order shall permit Purchaser to assign its rights and obligations in whole or in part to one or more of its affiliates.

Immediately following the Closing, Purchaser will be owned, directly or indirectly, pro rata by the First Lien Lenders based on their respective Prepetition First Lien Claims as of the Closing.

The capital structure of Purchaser and all organizational documents related to Purchaser shall be in form and substance acceptable to the First Lien Lenders and to the extent such organizational documents are to be filed with the Bankruptcy Court by the Company as part of a Plan Supplement, such organizational documents will be in form reasonably acceptable to the Company (it being understood that the Company shall not have an approval right in any form over the equity and governance terms of Purchaser as the First Lien Lenders may agree).

| | |
|---|---|
| **New Working Capital Facility** | In connection with the Closing, Purchaser will enter into a new working capital facility (the "NWC Facility") to be potentially funded by capital invested by the First Lien Lenders and/or one or more financial institutions in order to assure Purchaser has adequate working capital available following Closing, in an amount and on terms to be determined by the First Lien Lenders, and, to the extent such documents relating to the NWC Facility are to be filed with the Bankruptcy Court by the Company as part of a Plan Supplement, such documents will be in form reasonably acceptable to the Company (it being understood that the Company shall not have an approval right in any form over the terms of the NWC Facility as the First Lien Lenders may agree). Purchaser shall demonstrate it has the financial ability to consummate the Sale (as defined below) and comply with sections 365 and/or 1123 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts to be assumed in the Sale. For the avoidance of doubt, a portion of such facility may be incurred as part of the Canadian Indebtedness. |

| | |
|---|---|
| **Sale** | This Term Sheet describes a proposed sale by Sellers of all of their right, title, and interest in, to, and under the Transferred Assets (as defined below) to Purchaser, free and clear of any and all pledges, options, charges, liabilities, liens, claims, encumbrances, or interests except the Assumed Liabilities (as defined below), and the assumption by Purchaser of the Assumed Liabilities, pursuant to Sections 105, 363 and 1123 of the Bankruptcy Code, which sale may be structured, in the determination of the First Lien Lenders as either (i) a sale of the Transferred Assets by the Sellers to Purchaser or (ii) a contribution of the Transferred Assets by the Sellers to Purchaser, followed by the distribution of the equity interests in Purchaser from the Company or another direct or indirect subsidiary of the Company to the First Lien Lenders in satisfaction of their respective First Lien Claims as of the Closing (collectively, the "<u>Sale</u>"). |

Sellers and Purchaser shall consummate the Sale (the "<u>Closing</u>") pursuant to the Plan promptly after the conditions set forth in the Purchase and Sale Agreement have been satisfied or waived pursuant to the Purchase and Sale Agreement, it being understood that such date of Closing (the "<u>Closing Date</u>") shall occur on the Plan Effective Date.

**Purchase Price**  The aggregate consideration for the Core Assets shall consist of the following (collectively, the "<u>Purchase Price</u>"): (i) pursuant to Sections 1123 and 1124 of the Bankruptcy Code, a credit bid of certain debt owed by the Company to the First Lien Lenders in an amount to be determined by the First Lien Lenders and reflected in the Purchase and Sale Agreement in respect of their respective Prepetition First Lien Claims; (ii) assumption of the Assumed Liabilities (including all Cure Costs related to Assumed Contracts) (each of the foregoing, as defined below); and (iii) the payment of an amount in cash as may be necessary to satisfy Funded Liabilities (as defined below) at Closing to the extent the Non-Acquired Entities (as defined below) other than WMLP (as defined below) do not have sufficient cash on hand after giving effect to the adjustment to the WCC Cash Threshold (as defined below) contemplated below in respect of Funded Liabilities.

For the avoidance of doubt, to the extent Transferred Non-Core Assets are included in the Sale as set forth below, there shall be no increase to the Purchase Price in respect of such Transferred Non-Core Assets.

**Core Assets**  "<u>Core Assets</u>" shall include: (i) either (A) 100% of the Company's limited partnership equity interests in Westmoreland Canada and 100% of WCGP's general partnership equity interests in Westmoreland Canada or (B) 100% of WCBV's shares in WCHI, as determined by the First Lien Lenders following the execution of the RSA; (ii) substantially all of the assets owned by the San Juan Sellers and used in the San Juan Business as specifically identified in the Purchase and Sale Agreement, including the San Juan Assumed Contracts (as defined below); (iii) substantially all of the assets owned by the Colstrip Seller and used in the Colstrip Business as specifically identified in the Purchase and Sale Agreement, including the Colstrip

Assumed Contracts (as defined below); (iv) certain additional assets of the Overhead Sellers that relate to the Overhead Function, as specifically identified in the Purchase and Sale Agreement, including all encumbered cash and cash equivalents (whether restricted or unrestricted) of the Company and, if applicable, the other Overhead Sellers in excess of the WCC Cash Threshold, but excluding restricted cash in respect of reclamation obligations which are Excluded Liabilities (the "Overhead Assets"), including the Overhead Assumed Contracts (as defined below); (v) all commercial tort claims and claims that may constitute commercial tort claims (known and unknown); and (vi) all of the rights and claims of any Seller against any contractual counterparty to the Core Assets for preference or avoidance actions available to Sellers under the Bankruptcy Code, of whatever kind or nature, including those set forth in Sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, against any contractual counterparty to the Core Assets asserting claims against any of Sellers, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

The "WCC Cash Threshold" means aggregate encumbered and unencumbered cash and cash equivalents (whether restricted or unrestricted) of the Company and, if applicable, its subsidiaries other than Westmoreland Resources GP, LLC, Westmoreland Resource Partners, LP, and their direct and indirect subsidiaries (collectively, "WMLP"), as of the close of business on the business day prior to the Closing Date in an amount to be agreed by the Parties (taking into account the Funded Liabilities as contemplated below) and reflected in the Purchase and Sale Agreement.

Westmoreland Canada and its subsidiaries, or WCHI and its subsidiaries, as the case may be, are referred to herein as the "Acquired Entities". The Company, together with its direct and indirect subsidiaries (including the other Sellers), other than the Acquired Entities, are referred to herein as the "Non-Acquired Entities".

**Assumed Contracts / Excluded Contracts**

"Overhead Assumed Contracts" shall include certain contracts of the Overhead Sellers relating to the Overhead Function, in each case as set forth on a schedule to the Purchase and Sale Agreement (the "Overhead Assumed Contracts Schedule").

"San Juan Assumed Contracts" shall include all of the contracts, supply agreements, joint venture agreements, operating and joint operating agreements, leases, and other written obligations of the San Juan Sellers relating to the San Juan Business, as set forth on a schedule to the Purchase and Sale Agreement (the "San Juan Assumed Contracts Schedule").

"Colstrip Assumed Contracts" shall include all of the contracts, supply agreements, joint venture agreements, operating and joint operating agreements, leases, and other written obligations of the Colstrip Seller

relating to the Colstrip Business, as set forth on a schedule to the Purchase and Sale Agreement (the "Colstrip Assumed Contracts Schedule", and together with the Overhead Assumed Contracts Schedule and the San Juan Assumed Contracts Schedule, collectively, the "Assumed Contracts Schedules").

The Overhead Assumed Contracts, the San Juan Assumed Contracts, the Colstrip Assumed Contracts and, if applicable, the Non-Core Mine Assumed Contracts (as defined below) are referred to herein collectively as the "Assumed Contracts".

Purchaser shall have the right to amend the Assumed Contracts Schedules at any time prior to the date that is ten (10) business days prior to the Closing, except to the extent an earlier date for the finalization of the Assumed Contracts Schedules is required by the Bankruptcy Court, in order to remove an Assumed Contract from, or add any contract or other written obligation to, such Assumed Contracts Schedules.

Purchaser shall not assume or have any liability with respect to any contract of a Non-Acquired Entity other than the Assumed Contracts (any such contract, an "Excluded Contract"). For the avoidance of doubt, all collective bargaining agreements ("CBAs") to which a Non-Acquired Entity is bound or a party shall be Excluded Contracts, other than CBAs of the San Juan Sellers and the Colstrip Seller in respect of the mine complexes comprising the San Juan Business and Colstrip Business (and any Seller in respect of the Non-Core Mines (as defined below) included in the Transferred Non-Core Assets, if applicable), each of which will be an Assumed Contract subject to certain modifications being made to such CBAs prior to Closing pursuant to the 1113/1114 Order in form acceptable to Purchaser.

Purchaser shall, on or prior to the Closing or at such later date when disputed Cure Costs are determined by the Bankruptcy Court, pay in full in cash all Cure Costs; provided that in the event a counterparty to an Assumed Contract is successful in any challenge in the Chapter 11 Cases to the Cure Costs in respect of such Assumed Contract, Purchaser may remove such Assumed Contract from the Assumed Contracts Schedules as contemplated above.

**Excluded Assets**          The Transferred Assets shall not include the following, among other assets which may be identified by Purchaser in due diligence and prior to the execution of Definitive Agreements (as defined below) (which may include, for the avoidance of doubt, any portion of the Business to the extent Purchaser determines following the date of the RSA and prior to the execution of Definitive Agreements not to acquire any of the Canada Business, Colstrip Business or San Juan Business): (i) all assets of the Non-Acquired Entities that are not Transferred Assets; (ii) contracts, leases and other obligations of the Non-Acquired Entities that are not Assumed Contracts and (iii) equity securities of, or ownership in, the direct or indirect subsidiaries of the Company

(including the Company's direct and indirect equity interests in WMLP) other than the Acquired Entities (collectively, the "Excluded Assets").

**Assumed Liabilities / Excluded Liabilities**

"Assumed Liabilities" shall include only the following liabilities: (i) reclamation and similar obligations arising under applicable environmental or mining safety laws or requirements of the San Juan Sellers and the Colstrip Seller in respect of the mine complexes comprising the San Juan Business and Colstrip Business included in the Core Assets; (ii) all liabilities arising under the Assumed Contracts to the extent arising exclusively after the Closing Date and not on account of a breach occurring prior to the Closing; provided that the cure amounts owing under the Assumed Contracts pursuant to section 365(b) shall be an Assumed Liability (such cure amounts, the "Cure Costs"); and (iii) the Non-Core Liabilities (as defined below), if applicable.

The parties acknowledge and agree that Purchaser's acquisition of the equity of Westmoreland Canada or WCHI, as the case may be (and as a result, the indirect acquisition of its subsidiaries) will be subject to all existing liabilities of such Acquired Entities (but such liabilities shall not be affirmatively assumed by Purchaser from such Acquired Entities).

Liens senior to the liens under the Prepetition Bridge Loan, including for the avoidance of doubt, those granted pursuant to the DIP Credit Agreement shall be assumed by Purchaser in connection with the Closing and shall continue in force until the obligations thereunder have been satisfied in full in accordance with the terms of the DIP Credit Agreement.

All pre-petition and post-petition liabilities of the Non-Acquired Entities, other than Assumed Liabilities, shall be "Excluded Liabilities", including without limitation:

- All claims or liabilities or other obligations (whether arising before, on or after the Closing Date) with respect to the employees of the Non-Acquired Entities or former employees, or both (or their respective representatives) of the Non-Acquired Entities or any predecessor of any Non-Acquired Entity (including any Employee of Purchaser (as defined below)) based on any action or inaction occurring prior to or on the Closing Date, including payroll, vacation, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans or arrangements or benefits or other compensation of any kind to any employee, and obligations of any kind including any liability pursuant to the WARN Act;

6

*Execution Version*

- Any liability (whether arising before, on, or after the Closing Date) with respect to any employee of the Non-Acquired Entities or former employee of the Non-Acquired Entities who does not become an Employee of Purchaser, and any liability arising before the Closing with respect to any Employees of Purchaser. All employees of the Company and its subsidiaries relating to the San Juan Business, the Colstrip Business, the Overhead Function and the Non-Core Mines included in the Transferred Non-Core Assets, if applicable, who are hired by Purchaser as contemplated below shall be referred to herein as "Employees of Purchaser";

- Except to the extent the basis for which first arises following the Plan Effective Date on account of employment activities of Employees of Purchaser at the mine complexes included in the Transferred Assets following the Plan Effective Date, all liabilities and workers' compensation liabilities arising under the Black Lung Benefits Act ("Black Lung Act") or the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), including with respect to Employees of Purchaser and current and former employees of the Non-Acquired Entities who worked or who were employed at the mining complexes comprising the Transferred Assets, including, but not limited to, any such Black Lung Act and Coal Act liabilities and workers' compensation liabilities of the Non-Acquired Entities or any of their respective predecessors;

- All pre-petition trade payables that are not Cure Costs;

- All liabilities and obligations in respect of the retained businesses of the Non-Acquired Entities, including, without limitation, the mine complexes of the Non-Acquired Entities other than the mine complexes comprising the Transferred Assets;

- Any liability or other obligations arising under, relating to or with respect to any employee benefit plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by the Non-Acquired Entities or any trade or business that together with the Non-Acquired Entities is treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended (the "Code") or for purposes of the Employee Retirement Income Security Act of 1974 ("ERISA Affiliate"), or with respect to which a Non-Acquired Entity or any ERISA Affiliate has any liability, including with respect to any post-retirement welfare benefits, single-employer pension plan, or underfunded pension liability of any employee benefit plan, the Pension Benefit Guaranty Corporation, the Internal Revenue Service or Department of Labor or otherwise, including without limitation any liability or other obligations under any employment, collective bargaining agreement or arrangement, severance, retention or termination agreement or arrangement with any employee, consultant or contractor (or its representatives) of the Non-Acquired Entities;

*Execution Version*

- Any liability or other obligations arising under, relating to or with respect to any multi-employer pension plan (including any withdrawal liability) that the Non-Acquired Entities contribute to or have or had any obligation to contribute to;

- Any liability or other obligations arising under, relating to or with respect to any multi-employer plan or multi-employer pension plan of the Non-Acquired Entities and their ERISA Affiliates, including, but not limited to withdrawal liability;

- Any monetary fines or penalties arising from or relating to acts or omissions occurring prior to the Plan Effective Date under environmental laws; and

- All other liabilities and obligations (whether arising before, on or after the Closing Date) of a Non-Acquired Entity of any kind or nature.

**Non-Core Assets**   Purchaser acknowledges that the Company will market separately all or substantially all of the assets of the Non-Acquired Entities (other than the Core Assets) used in the business and operations of each of the Company's mine complexes identified on Schedule A hereto (each such mine, a "Non-Core Mine", and all such assets of a Non-Core Mine, including all contracts, supply agreements, joint venture agreements, operating and joint operating agreements, leases, and other written obligations of the applicable Non-Acquired Entity relating to such Non-Core Mine, as identified in the applicable proposed purchase agreement in respect of such Non-Core Mine, the "Non-Core Mine Assumed Contracts", and collectively, the "Non-Core Mine Assets"), for sale to third parties pursuant to the Non-Core Asset Sale Process Motion.  The parties further acknowledge that upon the conclusion of the sale process for each Non-Core Mine pursuant to the Non-Core Asset Sale Process Motion, to the extent a third party has not agreed to acquire a Non-Core Mine under Section 363 of the Bankruptcy Code, the Sellers shall transfer such Non-Core Mine and the Non-Core Mine Assets related thereto under the Purchase and Sale Agreement at the Closing to either Purchaser or an affiliate thereof designated by Purchaser (such Non-Core Assets, the "Transferred Non-Core Assets", and, together with the Core Assets, collectively, the "Transferred Assets"). All liabilities of the Sellers in respect of such Non-Core Mine and Transferred Non-Core Assets shall continue to be deemed Excluded Liabilities except that Purchaser or such affiliate thereof shall assume (i) reclamation and similar obligations arising under applicable environmental or mining safety laws or requirements of the applicable Seller in respect of the mine complexes included in the Transferred Non-Core Assets and (ii) all liabilities arising under the applicable Non-Core Mine Assumed Contracts included in the Transferred Non-Core Assets to the extent arising exclusively after the Closing Date and not on account of a breach occurring prior to the Closing (collectively, the "Non-Core Liabilities").

The Company will have the right to disqualify any bid submitted for

the Core Assets that does not also agree to purchase the Non-Core Mine Assets and assume the Non-Core Liabilities, including reclamation and similar obligations arising under applicable environmental or mining safety laws or requirements related to the Non-Core Mines, unless there is an agreement with such bidder or the Required Consenting Stakeholders regarding the funding of such liabilities.

|  |  |
|---|---|
| **Funded Liabilities** | Notwithstanding anything to the contrary contained herein, (a) any claims related to the Transferred Assets asserted as of the applicable bar date for such claim and (b) any administrative expense tax liability under the Bankruptcy Code the amount of which is estimated (but subject to later finalization) as of the Plan Effective Date but may be asserted after the Plan Effective Date, in each case, where the assumption or payment of the allowed amount of each such claim is required under Section 1129(a)(9) of the Bankruptcy Code in order to receive entry of the Confirmation Order (collectively, the "<u>Funded Liabilities</u>") shall, at the option of Purchaser, either (i) be assumed by Purchaser or an affiliate thereof as designated by Purchaser and become Assumed Liabilities or (ii) continue to be treated as Excluded Liabilities except that the WCC Cash Threshold shall be adjusted such that additional cash is retained by the Company at Closing to satisfy the amount of the Funded Liabilities; <u>provided</u> that in no event shall the amount of the Funded Liabilities be in excess of an amount to be mutually agreed by the parties prior to the Confirmation Hearing. |
|  | For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, Purchaser and its affiliates shall have no obligation to assume or otherwise pay for unsecured claims, obligations or liabilities of the Non-Acquired Entities, including liabilities arising under retiree medical benefit plans, the Black Lung Act or the Coal Act. |
| **Sellers Representations and Warranties in Purchase and Sale Agreement** | Sellers will make representations and warranties concerning: organization, subsidiaries, power and authority, noncontravention and consents, financial statements, capitalization (including in respect of Acquired Entities), good faith estimate of Cure Costs as of the signing date, related party transactions, regulatory approvals, litigation, material contracts, compliance with laws, licenses and permits, environmental matters, labor, employee and pension/benefits matters, health and safety matters, insurance, real property, title to assets, intellectual property, taxes, absence of certain changes and no liability to brokers, and such other matters as Purchaser may reasonably request based on its due diligence review prior to the execution of Definitive Agreements. |
| **Purchaser Representations and Warranties in Purchase and Sale Agreement** | Purchaser will make representations and warranties concerning: organization, power and authority, government authorization, noncontravention and consents, adequate assurance (as of Closing) regarding assumed contracts, transferred permits and licenses and bonding, capability to effectuate the credit release in payment of the |

9

*Execution Version*

Purchase Price, inspection / no other representations, and no liability to brokers, and such other matters as the Company may reasonably request prior to the execution of Definitive Documents.

**Covenants**

Purchaser and Sellers will be subject to customary covenants and other covenants to be mutually agreed in the Purchase and Sale Agreement, including with respect to conduct of business prior to the Closing (including in respect of cash management practices), cooperation, access, notification, efforts to obtain regulatory approvals and to obtain the transfer of permits and the replacement of associated bonding, and the satisfaction of applicable closing conditions. Such covenants will be included in the DIP Credit Agreement and the RSA to the extent possible and appropriate.

**Tax Cooperation**

Sellers and Purchaser shall cooperate in good faith to structure the Sale and related transactions in a tax efficient manner for Purchaser and Sellers. Any administrative or priority federal, state, local, or foreign tax claims, including transfer taxes (if any), withholding taxes (if any), income, severance, or similar tax, shall be an obligation of the Sellers.

**Regulatory Approvals**

Regulatory approvals may be required in connection with the Sale, including to the extent applicable, under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, the Canadian Competition Act and in Montana and New Mexico (and any other state in which a Non-Core Mine included in the Transferred Non-Core Assets is located, if applicable) approval of the transfer of mining permits (the "Regulatory Approvals"). Purchaser and Sellers shall use commercially reasonable efforts to obtain the Regulatory Approvals. Notwithstanding the foregoing, "commercially reasonable efforts" will not be deemed to require the execution of any settlements, the sale, divestiture or separation of any particular business or asset, or the commitment to take any actions that would limit the ability of Purchaser to operate the Transferred Assets.

**Purchase Price Allocation**

To the extent necessary to comply with applicable law, within 45 days after the Closing Date, Purchaser shall deliver to Sellers a schedule (the "Allocation Schedule") allocating the Purchase Price and any other items that are treated as additional purchase price for tax purposes among the Core Assets; provided that such Allocation Schedule shall be consistent with the principles to be attached as an exhibit to the Purchase and Sale Agreement.  The Allocation Schedule shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (or any similar provision of state, local, or non-U.S. law).

**Closing Conditions**

The Purchase and Sale Agreement shall contain the following conditions to the obligation of Purchaser and Seller to consummate the Sale on the Plan Effective Date:

- No injunctions or final other order or similar ruling or

determination of any governmental authority preventing or delaying the consummation of the Sale.

The Purchase and Sale Agreement shall contain the following conditions to the obligation of Purchaser to consummate the Sale on the Plan Effective Date:

- Entry of the Confirmation Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to the First Lien Lenders and Purchaser and such Confirmation Order not being subject to any stay or appeal, and Sellers shall not be in breach of the Confirmation Order, which material breach remains uncured;

- Purchaser shall have obtained all Regulatory Approvals required or appropriate to operate the Business and any Non-Core Mines included in the Transferred Non-Core Assets, if applicable, including, to the extent necessary to obtain any Regulatory Approval from the applicable State or federal regulators, the Sellers and Purchaser having entered into settlements with such regulators reasonably satisfactory to Purchaser with respect to permit transfers, bonding requirements and regulatory compliance with respect to the Transferred Assets.

- No Event of Default as defined in the DIP Credit Agreement shall have occurred thereunder which (i) gives the secured parties thereunder a termination right, (ii) as a result of which, such secured parties shall have accelerated the repayment obligations of the Company and (iii) has not been waived;

- Lien releases and termination statements with respect to all liens (other than permitted liens) on the Transferred Assets; provided that lien releases shall not be required with respect to liens that are released by the Confirmation Order;

- Accuracy of Sellers' representations and warranties on the Closing Date, except where such inaccuracies would not have a material adverse effect on the Sale (except with respect to typical fundamental representations of the Sellers which shall be subject to a "true and correct" standard);

- Sellers' compliance, in all material respects, with their respective covenants;

- Each of the mining complexes comprising a part of the Canadian Business, San Juan Business, Colstrip Business and the business of each Non-Core Mine included in the Transferred Assets, as applicable, will be delivered with at least the amount of (x) accounts receivable, (y) inventory and (z) operating cash, in each case, as set forth opposite the name of such complex on a schedule to be agreed;

- The objection deadline shall have passed for all counterparties to Assumed Contracts to object to assignment and assumption by Purchaser, including with respect to the Cure Costs contained in

the notices sent to such counterparties and set forth in the Purchase and Sale Agreement;

- All "Material Contracts" (i.e., those identified on an agreed schedule to the Purchase and Sale Agreement, which may be a subset of Assumed Contracts and contracts of the Acquired Entities) (i) will have been assigned to, and assumed by, Purchaser or, to the extent required, will have been novated to Purchaser or (ii) with respect to Material Contracts of an Acquired Entity, any necessary third party consents or approvals in respect of the contemplated change in control of such Acquired Entity shall have been obtained;

- The Employment Agreements (as defined below) shall each be in full force and effect as of the Closing;

- None of the Acquired Entities shall have been entered into and remain in the Applicant/Violator System, unless resolved by way of settlements with applicable State and federal regulators or otherwise, in form reasonably acceptable to Purchaser;

- Arrangements reasonably satisfactory to Purchaser shall be in place regarding Purchaser's securing of permit transfers and bonding and security arrangements with respect to the Acquired Entities and the Transferred Assets;

- The Bankruptcy Court shall have determined that Sellers can sell the Transferred Assets free and clear of the successor clause in the UMWA CBAs, the UMWA shall have agreed to waive/remove the successor clause in the UMWA CBAs, or the Bankruptcy Court shall have granted a motion filed by the applicable Seller pursuant to 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA CBAs, in each case, other than in respect of the CBAs included in the Assumed Contracts;

- The Bankruptcy court shall have granted motions filed by the applicable Seller (i) pursuant to section 1113 of the Bankruptcy Code terminating and/or modifying CBAs in connection with the Transferred Assets as requested by Purchaser and (ii) pursuant to section 1114 of the Bankruptcy Code modifying retiree benefits in connection with the Transferred Assets as requested by the Purchaser; and

- Since the execution of the Purchase and Sale Agreement, no material adverse effect on the Transferred Assets or the Business (including any Non-Core Mines included in the Transferred Non-Core Assets, if applicable), shall have occurred.

The Purchase and Sale Agreement shall contain the following conditions to the obligations of the Seller to consummate the Sale on the Plan Effective Date:

- Accuracy of Purchaser's representations and warranties on the Closing Date, except where such inaccuracies would not have a material adverse effect on the Sale (except with respect to typical

fundamental representations of Purchaser which shall be subject to a "true and correct" standard);

- Purchaser's compliance, in all material respects, with its respective covenants;

- Entry of the Confirmation Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably satisfactory to Sellers and such Confirmation Order not being subject to any stay or appeal, and Purchaser shall not be in breach of the Confirmation Order, which material breach remains uncured; and

- Purchaser shall have obtained all Regulatory Approvals required or appropriate to operate the Business (including any Non-Core Mines included in the Transferred Non-Core Assets, if applicable).

| | |
|---|---|
| **Termination** | The Purchase and Sale Agreement will contain customary termination provisions, including: |

(i) by agreement of each of Sellers and Purchaser;

(ii) if the Closing does not occur on or prior to the Outside Date;

(iii) by notice from Purchaser:

(1) upon a material breach by Sellers of covenants of the Purchase and Sale Agreement, RSA or the Confirmation Order, which breach (a) would cause any of Purchaser's conditions to the Closing not to be satisfied; <u>provided</u> that Purchaser is not itself then in material breach and (b) has not been cured within ten (10) business days;

(2) upon any of Sellers entering into any material agreement, including any definitive purchase agreement, in furtherance of or with respect to a successful bid for the Core Assets (pursuant to the Bidding Procedures Order) with any party other than Purchaser;

(3) upon the dismissal or conversion of any of the Chapter 11 Cases;

(4) upon the appointment of a trustee or examiner with expanded powers;

(5) upon failure to meet Milestones (unless waived pursuant to the RSA);

(6) upon permanent denial of required Regulatory Approvals; or

(7) upon any declaration of an Event of Default under the DIP Credit Agreement that is not waived, cured or determined by the Bankruptcy Court not to be an Event of Default;

(iv) by written notice from Sellers upon a material breach by Purchaser of any representation, warranty, covenant or agreement in the Purchase and Sale Agreement or the Confirmation Order, which breach (a)

would cause any of Sellers' conditions to the Closing not to be satisfied; <u>provided</u> that none of Sellers is itself then in material breach and (b) has not been cured within ten (10) business days; or

(v) at the written election of either Sellers or Purchaser:

(1) if, at the end of the Auction (as such term shall be defined in the Bidding Procedures Order), Purchaser is not determined by Sellers to be the Successful Bidder (as such term shall be defined in the Bidding Procedures Order) or the Next Best Bidder (as such term shall be defined in the Bidding Procedures Order) and, if Purchaser is the Next Best Bidder, upon closing a sale transaction with the Successful Bidder; or

(2) if a court of competent jurisdiction or other governmental authority has issued an order or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the Closing under the Purchase and Sale Agreement and such order or action has become final and non-appealable.

| | |
|---|---|
| **Releases** | The Purchase and Sale Agreement shall contain a full mutual release, to be effective upon the Plan Effective Date, between and among Sellers, Purchaser, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee, the First Lien Lenders and each of their respective affiliates, representatives, advisors and agents with respect to the transaction contemplated thereby and, with respect to the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee, the First Lien Lenders and each of their respective affiliates, any liabilities arising out of their status as a lender (or respective agent) to the Company and its subsidiaries prior to the Closing. |
| **Labor Matters** | It is anticipated that certain individuals identified by Purchaser and referenced in the schedules to the Purchase and Sale Agreement (the "<u>Key Employees</u>") shall enter into employment agreements with Purchaser (the "<u>Employment Agreements</u>") on terms mutually acceptable to Purchaser and the Key Employees, which Employment Agreements shall be effective upon the Closing. |

It is anticipated that Purchaser shall make offers of employment to employees and other personnel of the Company and its subsidiaries relating to the Colstrip Business, the San Juan Business, Overhead Function and any Non-Core Mines included in the Transferred Non-Core Assets, if applicable, to be identified by Purchaser, including employees providing services in respect of the Canada Business to the extent not already employed by an Acquired Entity. Prior to the Closing Date, Purchaser shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment for the non-union Employees of Purchaser. Purchaser shall determine which employees of Sellers, if any, to offer employment after the Closing, in its sole discretion. For any employees who are represented by a union, such offers of employment shall be in accordance with the CBA adopted by Purchaser. Only employees of

Sellers who are offered and then accept such offer of employment with Purchaser based on the initial terms and conditions set by Purchaser or the relevant CBA adopted by the Purchaser will become an Employee of Purchaser after the Closing Date. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Purchaser any obligation to retain any Employee of Purchaser in its employment.

All offers of employment shall be subject to, among other things, background checks, compliance review, and review of status of an employee's registration.

**CBAs**

The Purchase and Sale Agreement shall provide that Sellers shall obtain the consent of Purchaser before extending or renewing (or permitting to be extended or renewed) the term of any CBA of an Acquired Entity or that is included in Assumed Contracts absent Sellers' ability to terminate such CBA prior to the Closing Date.

**Definitive Agreements and Due Diligence**

The Purchase and Sale Agreement and such other definitive agreements for the acquisition of the Transferred Assets as the parties mutually agree upon (collectively, the "Definitive Agreements") shall memorialize this Term Sheet and contain such representations, warranties, covenants, conditions, and indemnities as set forth herein and as otherwise may be acceptable to the parties. Notwithstanding anything else to the contrary, all references to "Purchase and Sale Agreement" herein may refer to an agreement providing for the sale of the Transferred Assets to Purchaser, the contribution of the Transferred Assets to Purchaser, or otherwise, as applicable.

**Transition Services Agreement**

The parties will agree on a mutually acceptable Transition Services Agreement at a reasonable price to be determined.

**Schedule A**

**Non-Core Mines**

| **Mine Name** | **Mine Owner** |
|---|---|
| Buckingham | Buckingham Coal Company, LLC |
| Savage | Westmoreland Savage Corporation |
| WRI/Absaloka | Westmoreland Resources, Inc. |
| Beulah | Dakota Westmoreland Corporation |
| Jewett | Texas Westmoreland Coal Company |
| Haystack | Haystack Coal Company |

## Schedule 2

**Form of Solicitation and Voting Procedures**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT** on [●], 2018, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing Westmoreland Coal Company and certain of its affiliates, other than the WMLP Debtors, as debtors and debtors in possession (collectively, the "WLB Debtors"),[2] to solicit votes on the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"); (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

### A.    The Voting Record Date.

The Court has established **December 13, 2018**, as the record date for purposes of determining which holders of Claims in Class 3 (First Lien Secured Claims) and Class 4 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date"). Accordingly, only Holders of First Lien Secured Claims and General Unsecured Claims as of such date are entitled to vote on the Plan.

---

[1]    Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]    Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order.

**B.     The Voting Deadline.**

The Court has established **January 25, 2019, at 4:00 p.m., prevailing Central Time, or three (3) days following the Auction, if the Auction occurs after January 22, 2019,** as the voting deadline (the "Voting Deadline") for the Plan.  The WLB Debtors may extend the Voting Deadline, with the reasonable consent of the Required Consenting Stakeholders and subject to the RSA and the orders approving the WLB Debtors' postpetition financing facility, without further order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (the "Ballots")[3] must be properly executed, completed, and delivered by:  (1) first class mail (using the reply envelope provided in the Solicitation Package or otherwise); (2) overnight courier; (3) personal delivery; or (4) via electronic mail so that they are ***actually received*** by the Notice and Claims Agent, in any case, no later than the Voting Deadline.  The Ballots will clearly indicate the appropriate return address, or, in the case of Beneficial Holder Ballots, such Beneficial Holders (as defined herein) will be instructed to comply with the return instructions provided by the Nominee (as defined herein).

**C.     Form, Content, and Manner of Notices.**

**1.     The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.     a copy of these Solicitation and Voting Procedures;

b.     the approved Disclosure Statement annexed as **Schedule 1** to the Disclosure Statement Order (and exhibits thereto, including the Plan);

c.     the applicable form of Ballot, in substantially the forms of the Ballots annexed as **Schedules 3A**, **3B**, **3C**, and **3D** to the Disclosure Statement Order, as applicable;

d.     a cover letter, in substantially the form annexed as **Schedule 7** to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

e.     the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By Westmoreland Coal Company and Certain Debtor Affiliates and Related Voting and Objection Deadlines*, in substantially the form annexed as **Schedule 8** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

---

3     For the avoidance of doubt, the defined term Ballots includes the First Lien Claim ballots, the First Lien Claim nominee ballots (the "Master Ballots"), the First Lien Claim beneficial noteholder ballots (the "Beneficial Holder Ballots"), and the General Unsecured Claims ballots (the "General Unsecured Ballots").

2

      f.      a letter from the Committee, in substantially the form annexed as **Schedule 12** to the Disclosure Statement Order, setting forth the Committee's views on the Plan;

      g.      a pre-addressed, postage pre-paid reply envelope; and

      h.      any other materials the Court has approved as part of the Solicitation Package.

### 2. <u>Distribution of the Solicitation Package</u>.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation and Voting Procedures) in electronic format (i.e., CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format, but would prefer paper format may contact Donlin, Recano & Company, Inc. (the "<u>Notice and Claims Agent</u>") by: (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International); (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland; (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the WLB Debtors' expense).

The WLB Debtors shall serve or cause to be served all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the WLB Debtors shall mail or cause to be mailed the Solicitation Package to all holders of Claims in the Voting Classes who are entitled to vote as described in <u>Section D</u> below, on or before five business days after the entry of the Disclosure Statement Order.[4]

To avoid duplication, the WLB Debtors will use commercially reasonable efforts to ensure that any holder of a Claim who has filed or purchased duplicative Claims against a WLB Debtor (whether against the same or multiple WLB Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that WLB Debtor.

### 3. <u>Resolution of Disputed Claims for Voting Purposes; Resolution Event</u>.

      a.      Absent a further order of the Court, the holder of a Claim that is in a Voting Class and is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

---

[4]   Beneficial Holder Ballots will be distributed to Nominees approximately seven (7) days after the initial solicitation mailing in accordance with customary solicitation procedures.

b.      If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to seven (7) days before the Voting Deadline:

(i) the WLB Debtors shall cause the applicable holder to be served with a Disputed Claim Notice, substantially in the form annexed as **Schedule 6** to the Disclosure Statement Order (which notice shall be served together with such objection); such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the third-party releases set forth in Article IX.E of the Plan (the "Third Party Releases");

(ii) the WLB Debtors shall cause the applicable holder to be served with an *Opt Out Form for Disputed Claim Holders*, substantially in the form annexed as **Schedule 6A** to the Disclosure Statement Order; and

(iii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.      If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court less than seven (7) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.      A "Resolution Event" means the occurrence of one or more of the following events no later than two (2) business days prior to the Voting Deadline:

    i.      an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

    ii.      an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

    iii.      a stipulation or other agreement is executed between the holder of such Claim and the WLB Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

    iv.      the pending objection is voluntarily withdrawn by the objecting party.

e.      No later than one (1) business day following the occurrence of a Resolution Event, the WLB Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the

4

relevant holder to the extent such holder has not already received a Solicitation Package containing a Ballot.

**4.   Non-Voting Status Notices and Committee Letter for Unimpaired Classes and Classes Deemed to Reject the Plan.**

Certain holders of Claims that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Schedule 4** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots) , as well as how they may opt out of the Third Party Releases provided by the Plan.  The holders of such Claims will also receive an *Opt-Out Form for Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Schedule 4A** to the Disclosure Statement Order.  The holders of such Claims and Interests will also receive the *Confirmation Hearing Notice*, substantially in the form annexed as **Schedule 8** to the Disclosure Statement Order, and the *Committee Letter*, substantially in the form annexed as **Schedule 12** to the Disclosure Statement Order.

Certain holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan*, substantially in the form annexed as **Schedule 5** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the Third Party Releases provided by the Plan.  The holders of such Claims and Interests will also receive an *Opt-Out Form for Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan*, substantially in the form annexed as **Schedule 5A** to the Disclosure Statement Order.  In addition, holders of Claims and Interests in the classes deemed to reject the Plan will also receive the Disclosure Statement (together with the Plan attached as **Exhibit A** thereto).  The holders of such Claims and Interests will also receive the *Confirmation Hearing Notice*, substantially in the form annexed as **Schedule 8** to the Disclosure Statement Order, and the *Committee Letter*, substantially in the form annexed as **Schedule 12** to the Disclosure Statement Order.

**5.   Notices in Respect of Executory Contracts and Unexpired Leases.**

Counterparties to Executory Contracts and Unexpired Leases that receive a supplemental notice of assumption or notice of rejection, substantially in the forms attached as **Schedule 10** and **Schedule 11** to the Disclosure Statement Order, respectively, may file an objection to the WLB Debtors' proposed assumption, assumption and assignment, rejection, and/or cure cost, as applicable, as set forth in such documents.  Such objections must be ***actually received*** as set forth in the notice of assumption or notice of rejection.

D.  **Voting and Tabulation Procedures.**

1.  **Holders of Claims Entitled to Vote.**

Only the following holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a.  Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date, and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least seven days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

b.  Holders of Claims who, pursuant to the Bar Date Order, are exempt from any requirement to file a Proof(s) of Claim on or before the applicable Bar Date or have filed a single, master proof of claim by the relevant Bar Date with respect to all claims under an applicable facility, loan document, or indenture;

c.  Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be allowed to vote only in the amounts set forth in Section D.2(d) of these Solicitation and Voting Procedures;

d.  Holders whose Claims arise (i) pursuant to an agreement or settlement with the WLB Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the WLB Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

e.  Holders of any Disputed Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018;

f.  the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date;

6

g.    any holders of Claims who have filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the WLB Debtors have objected to such duplicate Claims; and

h.    holders of Claims filed in an amount of $0.00 are not entitled to vote.

## 2.    **Establishing Claim Amounts for Voting Purposes.**

**Class 3 Claims**.  The Claims amount of Class 3 Claims based on First Lien Secured Claims of lenders under the WLB Debtors' prepetition term loan facility due 2020 (the "<u>WLB Term Loan Facility</u>") for voting purposes only will be established through the administrative agent under the WLB Term Loan Facility in the amount of the applicable positions held as of the Voting Record Date, by such lender as evidenced by the records of the administrative agent of the WLB Term Loan Facility.  The Claims amount of Class 3 Claims based on First Lien Secured Claims of holders of the WLB Debtors' 8.75% senior secured notes due 2022 (the "<u>WLB Senior Secured Notes</u>") who are directly registered and Beneficial Holders[5] for voting purposes only will be established through the indenture trustee or applicable Nominees, as the case may be, in the amount of the applicable positions held as of the Voting Record Date, by such registered holder as evidenced by records of the indenture trustee or by the applicable Nominees holding First Lien Claims as evidenced by the securities position report(s) from The Depository Trust Company.

**Class 4 Claims**.  The Claims amount of Class 4 Claims based on General Unsecured Claims (including the First Lien Deficiency Claims) for voting purposes only will be established based on the amount of the applicable positions held by such Class 4 Claim holder as of the Voting Record Date, as evidenced by (a) the WLB Debtors' applicable books and records, and (b) the claims register maintained in the chapter 11 cases.

**Allocation of First Lien Claims Into Class 3 Claims and Class 4 Claims**.  The Notice and Claims Agent shall allocate the claim amount of First Lien Claims on each applicable Ballot into the Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims in accordance with the applicable provisions of the Plan.

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the WLB Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.    the Claim amount (i) settled and/or agreed upon by the WLB Debtors, as reflected in a document filed with the Court, including the Plan, (ii) set forth

---

[5]    A "<u>Beneficial Holder</u>" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to court order or otherwise, as reflected in the records maintained by the Nominees holding through an indenture trustee or as evidenced by the securities position report from the Depository Trust Company.

in an order of the Court, or (iii) set forth in a document executed by the WLB Debtors pursuant to authority granted by the Court;

b.     the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event pursuant to these Solicitation and Voting Procedures;

c.     the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided*, however, that any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the WLB Debtors and/or the Notice and Claims Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim, which Claim will be Allowed for voting purposes only in the liquidated amount; *provided further*, *however*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

d.     the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided*, however, that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00; and

e.     in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3.**     <u>**Voting and Ballot Tabulation Procedures.**</u>

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the WLB Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a.     except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the WLB Debtors), the

WLB Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

b.　the Notice and Claims Agent will file with the Court by no later than one week before the Confirmation Hearing, a voting report (the "Voting Report").  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Solicitation and Voting Procedures or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged (collectively, in each case, the "Irregular Ballots").  The Voting Report shall indicate the WLB Debtors' decision with regard to each Irregular Ballot;

c.　the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the executed Ballot;

d.　an executed Ballot is required to be submitted by the Entity submitting such Ballot (except with respect to Master Ballots submitted by Nominees). Delivery of a Ballot to the Notice and Claims Agent by facsimile or any electronic means other than as expressly approved by the Disclosure Statement Order or these Solicitation and Voting Procedures will not be valid;[6]

e.　no Ballot should be sent to the WLB Debtors, the WLB Debtors' agents (other than the Notice and Claims Agent), or the WLB Debtors' financial or legal advisors, and, if so sent, will not be counted;

f.　if multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

g.　Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable WLB Debtor may, in its discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

---

[6]　For the avoidance of doubt, a Ballot may be submitted via electronic mail to the Notice and Claims Agent at WestmorelandVote@donlinrecano.com.  For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

h.      a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims must indicate such capacity when signing;

i.      the WLB Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

j.      neither the WLB Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

k.      unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

l.      in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

m.      subject to any order of the Court, the WLB Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the WLB Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

n.      if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

o.      if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

p.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature; (v) any Ballot not marked to

10

accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

q.      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the WLB Debtors;

r.      the WLB Debtors are authorized to enter into stipulations with the holder of any Claim agreeing to the amount of a Claim for voting purposes; and

s.      where any portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other solicitation and voting procedures set forth herein), and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (a) a Ballot, (b) a group of Ballots within a Voting Class received from a single creditor, or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted.

**4.      Master Ballot Voting and Tabulation Procedures.**

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to holders of First Lien Secured Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"):

a.      the Notice and Claims Agent shall distribute or cause to be distributed the appropriate number of copies of the Beneficial Holder Ballots to each Beneficial Holder of a First Lien Claim as of the Voting Record Date;

b.      Nominees identified by the Notice and Claims Agent as Entities through which Beneficial Holders hold their Claims will be provided with (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a Master Ballot;

c.      any Nominee that is a holder of record with respect to a First Lien Claim shall vote on behalf of Beneficial Holders of such Claims by: (i) immediately, and in any event within five (5) Business Days after its receipt of the Solicitation Packages, and distributing the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Notice and Claims Agent to all such Beneficial Holders;[7] (ii) providing such

---

[7]  Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee.  Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with

Beneficial Holders with a return address to send the completed Beneficial Holder Ballots; (iii) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot; and (iv) transmitting the Master Ballot to the Notice and Claims Agent on or before the Voting Deadline;

d.      any Beneficial Holder holding a First Lien Claim as a record holder in its own name shall vote on the Plan by completing and signing a Ballot and returning it directly to the Notice and Claims Agent on or before the Voting Deadline;

e.      any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Notice and Claims Agent a Beneficial Holder Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Notice and Claims Agent.   Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one year after the Plan Effective Date;

f.      if a Beneficial Holder holds a First Lien Claim through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of First Lien Claim that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

g.      if a Beneficial Holder holds a portion of First Lien Claims through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in Section B herein to vote the portion held in its own name and the procedures described in Section D.4 herein to vote the portion held by the Nominee(s);

h.      votes cast by Beneficial Holders through Nominees will be applied to the applicable positions of First Lien Claims held by such Nominees, as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from the Depository Trust Company.  Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

i.      if conflicting votes or "over-votes" are submitted by a Nominee pursuant to a Master Ballot, the WLB Debtors will use reasonable efforts to reconcile

---

their customary practices.  If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder.

discrepancies with the Nominees.  If over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the WLB Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in Class 3 and Class 4;

j.      for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the amount of its Claims in Class 3 and Class 4, although any amounts may be adjusted by the Notice and Claims Agent to reflect the amount of the Claim actually voted, including prepetition interest;

k.      a single Nominee may complete and deliver to the Notice and Claims Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot.  Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly; and

l.      the WLB Debtors will, upon written request, reimburse Nominees for customary mailing and handling expenses incurred by them in forwarding the Beneficial Holder Ballot and other enclosed materials to the Beneficial Holders for which they are the Nominee.  No fees or commissions or other remuneration will be payable to any broker, dealer, or other person for soliciting Beneficial Holder Ballot with respect to the Plan.

## E.      Amendments to the Plan and Solicitation and Voting Procedures.

The WLB Debtors reserve the right, in consultation with counsel to the Consenting Stakeholders, to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

*      *      *      *      *

13

**<u>Schedule 3A</u>**

**Form of First Lien Claim Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO**
**ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 3 HOLDERS OF FIRST LIEN SECURED CLAIMS**
**CLASS 4 HOLDERS OF GENERAL UNSECURED CLAIMS (FIRST LIEN DEFICIENCY CLAIMS)**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The WLB Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2018 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "First Lien Claim Ballot") because you are a Holder of a First Lien Claim as of December 13, 2018 (the "Voting Record Date"). As a result, you are entitled to vote on behalf of both your Class 3 First Lien Secured Claim and your Class 4 General Unsecured Claim (First Lien Deficiency Claim).

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this First Lien Claim Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Donlin,

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

Recano Company, Inc. (the "Notice and Claims Agent") at no charge by:  (i) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (ii) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland,  (iii) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (iv) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

This First Lien Claim Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this First Lien Claim Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claims have been placed in Class 3 First Lien Secured Claims, and Class 4 General Unsecured Claims (First Lien Deficiency Claims), respectively, under the Plan.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of Class 3 First Lien Secured Claim and a Class 4 General Unsecured Claim (First Lien Deficiency Claim) in the following *aggregate* unpaid amount:

$\$\underline{\hspace{3cm}}$

**Item 2.  Vote on Plan.**

The holder of the Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims (First Lien Deficiency Claims) against the WLB Debtors, the aggregate amount of which is set forth in Item 1, votes to (please check one):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3**.  **Important information regarding the Third Party Releases.**

**As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article IX.E of the Plan set forth below.**

**If you elect to opt out of the releases set forth in Article IX.E of the Plan, you will forego the benefit of obtaining the releases set forth in Article IX.D of the Plan if you are a Released Party in connection therewith.**

**You may elect to opt out of the releases contained in Article IX.E of the Plan *only if* you check the box below and (a) submit the ballot but abstain from voting to accept or reject the Plan or (b) vote to reject the Plan.  If you (a) vote to accept the Plan, (b) fail to submit a ballot by the voting deadline, (c) submit the ballot but abstain from voting to accept or reject the Plan without checking the box below, or (d) vote to reject the Plan without checking the box below, in each case you will be deemed to consent to the releases set forth in Article IX.E of the Plan.**

**The Holder of a Class 3 First Lien Secured Claim and Class 4 General Unsecured Claim (First Lien Deficiency Claims) identified in Item 1 elects to:**

| ☐ **OPT OUT of the Third Party Releases** |
|---|

**Article IX.E of the Plan contains the following Third Party Releases:** As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*        \*        \*

Under the Plan, "**Released Parties**" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "**Releasing Parties**" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and

**Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.**

**Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.**

<u>Item 4</u>.  **Certifications.**

By signing this First Lien Claim Ballot, the undersigned certifies to the Bankruptcy Court and the WLB Debtors:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the First Lien Secured Claims and General Unsecured Claims (First Lien Deficiency Claims) being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the First Lien Secured Claims and General Unsecured Claims (First Lien Deficiency Claims) being voted;

(b) that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all First Lien Claims; and

(d) that no other First Lien Claim Ballots with respect to the amount of the First Lien Secured Claims and General Unsecured Claims (First Lien Deficiency Claims) identified in Item 1 have been cast or, if any other First Lien Claim Ballots have been cast with respect to such First Lien Secured Claims and General Unsecured Claims (First Lien Deficiency Claims), then any such earlier First Lien Claim Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS FIRST LIEN CLAIM BALLOT AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
|---|---|
| Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.,**<br>Attn: Voting Department<br>PO Box 192016 Blythebourne Station<br>Brooklyn, NY 11219 | Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.,**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |

2.      **Via electronic mail service to:**

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Ballot" in the subject line.

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS FIRST LIEN CLAIM BALLOT **ON OR BEFORE JANUARY 25, 2019, AT 4:00 P.M., PREVAILING
CENTRAL TIME,** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED
BY THIS FIRST LIEN CLAIM BALLOT MAY BE COUNTED TOWARD CONFIRMATION
OF THE PLAN ONLY IN THE DISCRETION OF THE WLB DEBTORS.

---

---

| **Class 3 — First Lien Secured Claims; Class 4 — General Unsecured Claims (First Lien Deficiency Claims)** |
|---|

## INSTRUCTIONS FOR COMPLETING THIS FIRST LIEN CLAIM BALLOT

1. The WLB Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the First Lien Claim Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the First Lien Claim Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS FIRST LIEN CLAIM BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your First Lien Claim Ballot is counted, you must either: (a) complete and submit this hard copy First Lien Claim Ballot or (b) email a scanned copy First Lien Claim Ballot in PDF format to Notice and Claims Agent at WestmorelandVote@donlinrecano.com.[2] Ballots will not be accepted by facsimile or other electronic means other than electronic mail.

4. The First Lien Claim Ballot ***must*** be returned to the Notice and Claims Agent so as to be ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is January 25, 2019, at 4:00 p.m.**, prevailing Central Time.

5. If the First Lien Claim Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the WLB Debtors. Additionally, **the following First Lien Claim Ballots will *not* be counted**:

   (a) any First Lien Claim Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

   (b) any First Lien Claim Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;

   (c) any First Lien Claim Ballot sent by facsimile or any electronic means other than electronic mail;

   (d) any unsigned First Lien Claim Ballot;

   (e) any First Lien Claim Ballot that does not contain an original *signature; provided*, however, that any First Lien Claim Ballot submitted via electronic mail shall be deemed to contain an original signature;

   (f) any First Lien Claim Ballot not marked to accept or reject the Plan; and

   (g) any First Lien Claim Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

6. The method of delivery of First Lien Claim Ballots to the Notice and Claims Agent is at the election and risk of each Holder of a Class 3 First Lien Secured Claim and Class 4 General Unsecured Claim (First Lien Deficiency Claim). Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent ***actually receives*** the originally executed First Lien Claim Ballots. In all cases, holders should allow sufficient time to assure timely delivery.

7. If multiple First Lien Claim Ballots are received from the same holder of a First Lien Secured Claim and General Unsecured Claim (First Lien Deficiency Claim) with respect to the same First Lien Secured Claim and General

---

[2] For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

Unsecured Claim (First Lien Deficiency Claim) prior to the Voting Deadline, the latest, timely received, and properly completed First Lien Claim Ballot will supersede and revoke any earlier received First Lien Claim Ballots.

8.  The First Lien Claim Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date the First Lien Claim Ballot**.  You should indicate that you are signing a First Lien Claim Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the WLB Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the First Lien Claim Ballot.

10. Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot you receive.

### PLEASE RETURN YOUR FIRST LIEN CLAIM BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS FIRST LIEN CLAIM BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (800) 499-8519 (U.S. AND CANADA) OR
(212) 771-1128 (INTERNATIONAL) OR EMAIL WESTMORELANDINFO@DONLINRECANO.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS FIRST LIEN CLAIM BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS JANUARY 25, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE WLB DEBTORS.**

---

## <u>Schedule 3B</u>

**Form of Master Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**MASTER BALLOT FOR VOTING TO**
**ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 3 HOLDERS OF FIRST LIEN SECURED CLAIMS**
**CLASS 4 HOLDERS OF GENERAL UNSECURED CLAIMS (FIRST LIEN DEFICIENCY CLAIMS)**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS**
**CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT**
**MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE**
***ACTUALLY RECEIVED***
**BY THE NOTICE AND CLAIMS AGENT BY JANUARY 25, 2019, AT 4:00 P.M., PREVAILING**
**CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The WLB Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2018 (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1]  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained from the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of a First Lien Claim as of December 13, 2018 (the "Voting Record Date"). As a result, you are entitled to vote on behalf of such Beneficial Holder's Class 3 First Lien Secured Claim and a Class 4 General Unsecured Claim (First Lien Deficiency Claim).

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders' Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims (First Lien Deficiency Claims) (collectively, the "First Lien Claims"), to transmit to the Notice and Claims Agent (as defined below) the votes of such Beneficial Holders in respect of their First Lien Claims to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Donlin, Recano Company, Inc. (the "Notice and Claims Agent") at no charge by: (i) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (ii) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland,  (iii) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (iv) westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF FIRST LIEN CLAIMS SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE FIRST LIEN CLAIMS.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot (as defined herein), and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Notice and Claims Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1. Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

---

[2]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022, or as (b) as evidenced by the securities position report from Depository Trust Company as of the Voting Record Date.

[CUSIP]

2

□  Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate amount of the First Lien Claims listed in Item 2 below, and is the record holder of such bonds, or

□  Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the aggregate amount of First Lien Claims listed in Item 2 below, or

□  Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the aggregate amount of First Lien Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the First Lien Claims described in Item 2.

**Item 2.  First Lien Claims Vote on Plan AND <u>Item 3.</u> Releases**

The undersigned transmits the following votes of Beneficial Holders of First Lien Claims and certifies that the following Beneficial Holders of First Lien Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "<u>Beneficial Holder Ballots</u>") casting such votes.

Indicate in the appropriate column below the ***aggregate*** amount voted for each account (***do not*** separate out amounts into their respective Classes) or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's First Lien Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Holder of First Lien Claims | Amount Held as of Voting Record Date | <u>Item 2</u><br><br>Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | <u>Item 3</u><br><br><u>Check the box below if the Beneficial Holder checked the box in Item 3 of their Ballot</u> |
|---|---|---|---|---|---|
| | | Accept the Plan | or | Reject the Plan | Opt Out of the Third Party Releases |
| 1 | $ | □ | | □ | □ |
| 2 | $ | □ | | □ | □ |
| 3 | $ | □ | | □ | □ |
| 4 | $ | □ | | □ | □ |
| 5 | $ | □ | | □ | □ |
| 6 | $ | □ | | □ | □ |
| **TOTALS** | $ | | | | |

**<u>Article IX.E of the Plan contains the following Third Party Releases</u>:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or**

[CUSIP]

3

collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

<div align="center">*     *     *</div>

Under the Plan, "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "Releasing Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f)

[CUSIP]

**each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.**

**Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.**

<div align="center">*          *          *</div>

**Item 4.** **Other First Lien Claim Ballots Submitted by Beneficial Holders.** The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | Account Number | Name of Registered Holder or Nominee | Amount of other First Lien Claims | CUSIP of other First Lien Claims Voted |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 5.** **Certifications.**

Upon execution of this Master Ballot, the undersigned certifies:

    (a)    it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the First Lien Claims listed in Item 2 above;

    (b)    it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

    (c)    it is the registered holder of all First Lien Claims listed in Item 2 above being voted, or

    (d)    it has been authorized by each Beneficial Holder of First Lien Claims listed in Item 2 above to vote on the Plan;

[CUSIP]

(e)   no other Master Ballots with respect to the same First Lien Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

(f)   it has properly disclosed:  (a) the number of Beneficial Holders of First Lien Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the First Lien Claims owned, as the case may be, by each Beneficial Holder of First Lien Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of First Lien Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of First Lien Claims' certification as to other First Lien Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of First Lien Claims; and

(g)   it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of First Lien Claims (whether properly completed or defective) for at least one (1) year after the Plan Effective Date and disclose all such information to the Bankruptcy Court or the WLB Debtors, if so ordered.

| | |
|---|---|
| Name of Nominee: | _____ |
| | (Print or Type) |
| Participant Number: | _____ |
| | (Print or Type) |
| Name of Proxy Holder or Agent for Nominee (if applicable): | _____ |
| | (Print or Type) |
| | _____ |
| Signature: | _____ |
| Name of Signatory: | _____ |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

[CUSIP]

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

| <u>If by First Class Mail:</u> | <u>If by Hand Delivery or Overnight Mail:</u> |
|---|---|
| Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.,**<br>Attn: Voting Department<br>PO Box 192016 Blythebourne Station<br>Brooklyn, NY 11219 | Donlin, Recano & Company, Inc.<br>**Re: Westmoreland Coal Company, et al.,**<br>Attn: Voting Department<br>6201 15th Ave<br>Brooklyn, NY 11219 |

2.      **Via electronic mail service to:**

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Master Ballot" in the subject line.

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS MASTER BALLOT **ON OR BEFORE JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL
TIME**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED
BY THIS MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION
OF THE PLAN ONLY IN THE DISCRETION OF THE WLB DEBTORS.

---

[CUSIP]

| Class 3 — First Lien Secured Claims; Class 4 — General Unsecured Claims (First Lien Deficiency Claims) |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The WLB Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon the holders if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of First Lien Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a First Lien Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Notice and Claims Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **January 25, 2019, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Notice and Claims Agent.

4. If you are transmitting the votes of any Beneficial Holder of First Lien Claims other than yourself, you may either:

   (a) "Pre-validate" the individual Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the First Lien Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Notice and Claims Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their Depository Trust Company participant number; indicating the account number of the Beneficial Holder and the amount of the First Lien Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Notice and Claims Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Plan Effective Date; OR

   (b) Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the First Lien Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Notice and Claims Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Notice and Claims Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Notice and Claims Agent so that the Master Ballot is *actually received* by the Notice and Claims Agent on or before the Voting Deadline.

[CUSIP]

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Notice and Claims Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Plan Effective Date.  You may be ordered to produce the Beneficial Holder Ballots to the WLB Debtors or the Bankruptcy Court.

6. The Master Ballot ***must*** be returned to the Notice and Claims Agent so as to be ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline.  **The Voting Deadline is January 25, 2019, at 4:00 p.m.**, prevailing Central Time.

7. If a Master Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the WLB Debtors.  Additionally, **the following Master Ballots will *not* be counted**:

   (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
   (b) any Master Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;
   (c) any Master Ballot sent by facsimile or any electronic means other than electronic mail;
   (d) any unsigned Master Ballot;
   (e) any Master Ballot that does not contain an original *signature; provided*, however, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;
   (f) any Master Ballot not marked to accept or reject the Plan; and
   (g) any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8. The method of delivery of Master Ballots to the Notice and Claims Agent is at the election and risk of each Nominee of First Lien Claims.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent ***actually receives*** the originally executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9. If a Beneficial Holder or Nominee holds a Claim in a voting class against multiple WLB Debtors, a vote on their Ballot will apply to all WLB Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that voting class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the WLB Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any of the First Lien Claims and you wish to vote such First Lien Claims, you may return a Beneficial Holder Ballot or Master Ballot for such First Lien Claims and you must vote your entire First Lien Claims to either accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders that partially rejects and partially accepts the Plan will not be counted.

[CUSIP]

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided*, however, that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

    (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the First Lien Claims as of the Voting Record Date, as evidenced by the record and depository listings.

    (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the First Lien Claims held by such Nominee;

    (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Notice and Claims Agent will attempt to reconcile discrepancies with the Nominee;

    (d) To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Notice and Claims Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in First Lien Claims; and

    (e) For purposes of tabulating votes, each holder holding through a particular account will be deemed to have voted the amount relating to its holding in that particular account, although the Notice and Claims Agent may be asked to adjust such amount to reflect the claim amount.

**<u>PLEASE RETURN YOUR MASTER BALLOT PROMPTLY</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (800) 499-8519 (U.S. AND CANADA) OR
(212) 771-1128 (INTERNATIONAL) OR EMAIL WESTMORELANDINFO@DONLINRECANO.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS JANUARY 25, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE WLB DEBTORS.**

---

[CUSIP]

## **Schedule 3C**

**Form of Beneficial Holder Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**BENEFICIAL HOLDER BALLOT FOR VOTING**
**TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 3 BENEFICIAL HOLDERS OF FIRST LIEN SECURED CLAIMS**
**CLASS 4 BENEFICIAL HOLDERS OF GENERAL UNSECURED CLAIMS (FIRST LIEN DEFICIENCY CLAIMS)**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY JANUARY 25, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"). IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

The WLB Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2018 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

You are receiving this ballot for Beneficial Holders[2] (the "Beneficial Holder Ballot") because you are a Beneficial Holder of a First Lien Claim as of December 13, 2018 (the "Voting Record Date"). As a result, you have a right to vote to accept or reject the Plan on behalf of both your Class 3 First Lien Secured Claim and your Class 4 General Unsecured Claim (First Lien Deficiency Claim) (collectively, the "First Lien Claims"). You can cast your vote through this Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of First Lien Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Donlin, Recano Company, Inc. (the "Notice and Claims Agent") at no charge by: (i) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (ii) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (iii) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (iv) westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent **immediately** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been bifurcated and placed in Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims (First Lien Deficiency Claims), under the Plan.

In order for your vote to count, your Nominee must receive this Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Notice and Claims Agent on or before the Voting Deadline, which is January 25, 2019, at 4:00 p.m., prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1.** **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 3 First Lien Secured Claims and Class 4 General Unsecured Claims (First Lien Deficiency Claims) in the following **aggregate** unpaid amount (insert total unpaid amount in box below and **do not** separate out amounts by their respective Classes, unless otherwise completed by your Nominee):



$_____

---

2    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022, or (b) as evidenced by the securities position report from Depository Trust Company as of the Voting Record Date.

[CUSIP]

**Item 2.  Vote on Plan.**

The Beneficial Holder of the Class 3 First Lien Secured Claim and a Class 4 General Unsecured Claim (First Lien Deficiency Claim) against the WLB Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

<u>**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above**</u>.

**Item 3.  Important information regarding the Third Party Releases.**

As a "<u>**Releasing Party**</u>" under the Plan, you are deemed to provide the releases contained in <u>Article IX.E</u> of the Plan set forth below.

If you elect to opt out of the releases set forth in <u>Article IX.E</u> of the Plan, you will forego the benefit of obtaining the releases set forth in <u>Article IX.D</u> of the Plan if you are a Released Party in connection therewith.

You may elect to opt out of the release contained in <u>Article IX.E</u> of the Plan *only if* you check the box below and (a) submit the ballot but abstain from voting to accept or reject the Plan or (b) vote to reject the Plan.  If you (a) vote to accept the Plan, (b) fail to submit a ballot by the voting deadline, (c) submit the ballot but abstain from voting to accept or reject the Plan without checking the box below, or (d) vote to reject the Plan without checking the box below, in each case you will be deemed to consent to the releases set forth in <u>Article IX.E</u> of the Plan.

<u>**The Holder of Class 3 First Lien Secured Claim and a Class 4 General Unsecured Claim (First Lien Deficiency Claim) identified in Item 1 elects to**</u>:

| ☐   **OPT OUT of the Third Party Releases** |
|---|

<u>**Article IX.E of the Plan contains the following provision**</u>:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

[CUSIP]

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

<p style="text-align:center">*        *        *</p>

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

<u>Item 4</u>.  **Other Beneficial Holder Ballots Submitted.**  By returning this Beneficial Holder Ballot, the Holder of the Class 3 First Lien Secured Claims and a Class 4 General Unsecured Claims (First Lien Deficiency Claims) identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for the Class 3

<p style="text-align:right">[CUSIP]</p>

First Lien Secured Claim and a Class 4 General Unsecured Claim (First Lien Deficiency Claim) owned by such holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the holder indicate the same vote to accept or reject the Plan that the holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

<div align="center">

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
FIRST LIEN CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

</div>

| Account Number | Name of Registered Holder or Nominee | Amount of Other First Lien Claims | CUSIP of Other First Lien Claims |
|---|---|---|---|
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |

<u>**Item 5**</u>.  **Certifications.**

By signing this Beneficial Holder Ballot, the undersigned certifies:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the holder of the First Lien Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the First Lien Claims being voted;

(b) that the Entity (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all First Lien Claims; and

(d) that no other Beneficial Holder Ballots with respect to the amount of the First Lien Claims identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such First Lien Claims, then any such earlier Beneficial Holder Ballots are hereby revoked.

Name of Holder: _____

(Print or Type)

Signature: _____

Name of Signatory: _____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone Number: _____

Email: _____

Date Completed: _____

[CUSIP]

**PLEASE COMPLETE, SIGN, AND DATE THIS BENEFICIAL HOLDER BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS YOUR VOTE **ON OR BEFORE JANUARY 25, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE WLB DEBTORS.

---

[CUSIP]

| Class 3 — First Lien Secured Claims; Class 4 — General Unsecured Claims (First Lien Deficiency Claims) |
|---|

## INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT

1.  The WLB Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Beneficial Holder Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

    (a)  To ensure that your vote is counted, you must submit your Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is *actually received* by the Notice and Claims Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Beneficial Holder Ballot; and (c) sign and return the Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Notice and Claims Agent is **January 25, 2019, at 4:00 p.m.**, prevailing Central Time. Your completed Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Notice and Claims Agent on or before the Voting Deadline.

3.  **The following Beneficial Holder Ballots submitted to your Nominee will *not* be counted:**

    (a)  any Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
    (b)  any Beneficial Holder Ballot sent to the WLB Debtors, the WLB Debtors' agents, any indenture trustee, or the WLB Debtors' financial or legal advisors;
    (c)  any Beneficial Holder Ballot sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;
    (d)  any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (e)  any Beneficial Holder Ballot cast by an Entity that does not hold a First Lien Claim;
    (f)  any unsigned Beneficial Holder Ballot;
    (g)  any Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan.
    (h)  any non-original Beneficial Holder Ballot; and/or
    (i)  any Beneficial Holder Ballot not marked to accept or reject the Plan or any Beneficial Holder Ballot marked both to accept and reject the Plan.

4.  If your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the WLB Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee. No Beneficial Holder Ballot should be sent to any of the WLB Debtors, the WLB Debtors' agents, the WLB Debtors' financial or legal advisors, and if so sent will not be counted.

5.  If you deliver multiple Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballots.

6.  You must vote all of your Claims within Class 3 *and* Class 4 either to accept or reject the Plan and may **not** split your vote. Further, if a holder has multiple Claims within Class 3 and/or Class 4, the WLB Debtors may, in their discretion, aggregate the Claims of any particular holder with multiple Claims within Class 3 and/or Class 4 for the purpose of counting votes.

[CUSIP]

7. This Beneficial Holder Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

8. **Please be sure to sign and date your Beneficial Holder Ballot**.  If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the WLB Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Beneficial Holder Ballot.

9. Each ballot votes ***only*** your Claims indicated on that ballot, so please complete and return each ballot that you receive.

10. The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the WLB Debtors nor the Notice and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

<u>**PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (800) 499-8519 (U.S. AND CANADA) OR
(212) 771-1128 (INTERNATIONAL) OR EMAIL WESTMORELANDINFO@DONLINRECANO.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THE BENEFICIAL
HOLDER BALLOT FILED ON YOUR BEHALF ON OR BEFORE JANUARY 25, 2019, AT 4:00 P.M.,
PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE
TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD
CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE WLB DEBTORS.**

---

[CUSIP]

## Schedule 3D

**Form of Class 4 Ballot**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**BALLOT FOR VOTING TO**
**ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 4 BALLOT FOR HOLDERS OF GENERAL UNSECURED CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS**
> **CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT**
> **MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE**
> ***ACTUALLY RECEIVED***
> **BY THE NOTICE AND CLAIMS AGENT BY JANUARY 25, 2019, AT 4:00 P.M., PREVAILING**
> **CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The WLB Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2018 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 4 ballot (this "Class 4 GUC Ballot") because you are a holder of a Class 4 General Unsecured Claim ("Class 4 GUC Claim") as of December 13, 2018 (the "Voting Record Date"). Class 4 GUC Claims (including any First Lien Deficiency Claims) include any unsecured Claim against a WLB Debtor that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Facility Claim; (d) a First Lien Secured Claim; (e) an Intercompany Claim; (f) a Section 510(b) Claim; (g) an Other Priority Claim; (h) an Other Secured Claim; (i) a Priority Tax Claim; (j) a Professional Fee Claim; or (k) a Secured Tax Claim. Accordingly, you have a right to vote to accept or reject the Plan.

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4 GUC Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Donlin, Recano Company, Inc. (the "Notice and Claims Agent") at no charge by:  (i) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (ii) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland,  (iii) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (iv) emailing  westmorelandinfo@donlinrecano.com  and  requesting  paper  copies  of  the  corresponding  materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

This Class 4 GUC Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 4 GUC Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 4, General Unsecured Claims, under the Plan.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of Class 4 General Unsecured Claim in the following aggregate unpaid amount:

| $_____ |
| --- |

**Item 2.  Vote on Plan.**

The holder of the Class 4 General Unsecured Claim against the WLB Debtors set forth in Item 1 votes to (please check one):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
| --- | --- |

**Item 3.  Important information regarding the Third Party Releases.**

**As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article IX.E of the Plan set forth below.**

**If you elect to opt out of the releases set forth in Article IX.E of the Plan, you will forego the benefit of obtaining the releases set forth in Article IX.D of the Plan if you are a Released Party in connection therewith.**

**You may elect to opt out of the release contained in Article IX.E of the Plan *only if* you check the box below and (a) submit the ballot but abstain from voting to accept or reject the Plan or (b) vote to reject the Plan.  If you (a) vote to accept the Plan, (b) fail to submit a ballot by the voting deadline, (c) submit the ballot but abstain from voting to accept or reject the Plan without checking the box below, or (d) vote to reject the Plan without checking the box below, in each case you will be deemed to consent to the releases set forth in Article IX.E of the Plan.**

**The Holder of Class 4 General Unsecured Claims identified in Item 1 elects to:**

| ☐ **OPT OUT of the Third Party Releases** |
| --- |

2

**Article IX.E of the Plan contains the following provision:** As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

<div align="center">*     *     *</div>

Under the Plan, "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

<div align="center">3</div>

**Under the Plan, "Releasing Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.**

**Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.**

## Item 4. Certifications.

By signing this Class 4 GUC Ballot, the undersigned certifies:

    (a)   that, as of the Voting Record Date, either:  (i) the Entity is the holder of the General Unsecured Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the General Unsecured Claims being voted;

    (b)   that the Entity (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

    (c)   that the Entity has cast the same vote with respect to all General Unsecured Claims in a single Class; and

    (d)   that no other Class 4 GUC Ballots with respect to the amount of the General Unsecured Claims identified in Item 1 have been cast or, if any other Class 4 GUC Ballots have been cast with respect to such General Unsecured Claims, then any such earlier Class 4 GUC Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| | _____ |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS CLASS 4 GUC BALLOT AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

| **If by First Class Mail:** | **If by Hand Delivery or Overnight Mail:** |
|---|---|
| Donlin, Recano & Company, Inc. **Re: Westmoreland Coal Company, et al.,** Attn: Voting Department PO Box 192016 Blythebourne Station Brooklyn, NY 11219 | Donlin, Recano & Company, Inc. **Re: Westmoreland Coal Company, et al.,** Attn: Voting Department 6201 15th Ave Brooklyn, NY 11219 |

2.      **Via electronic mail service to:**

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Ballot" in the subject line.

> IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 GUC BALLOT **ON OR BEFORE JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 4 GUC BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE WLB DEBTORS.

| Class 4 —General Unsecured Claims |
| --- |

## INSTRUCTIONS FOR COMPLETING THIS CLASS 4 GUC BALLOT

1.  The WLB Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 4 GUC Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4 GUC Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS CLASS 4 GUC BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 4 GUC Ballot is counted, you must either: (a) complete and submit this hard copy Class 4 GUC Ballot or (b) email a scanned copy Class 4 GUC Ballot to Notice and Claims Agent.  Ballots will not be accepted by facsimile or other electronic means other than electronic mail.

4.  The Class 4 GUC Ballot **must** be returned to the Notice and Claims Agent so as to be ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline.  **The Voting Deadline is January 25, 2019, at 4:00 p.m.**, prevailing Central Time.

5.  If the Class 4 GUC Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the WLB Debtors.  Additionally, **the following Class 4 GUC Ballots will *not* be counted**:

    (a)  any Class 4 GUC Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (b)  any Class 4 GUC Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;
    (c)  any Class 4 GUC Ballot sent by facsimile or any electronic means other than electronic mail to WestmorelandVote@DonlinRecano.com with a reference to "Westmoreland Ballot" in the subject line;
    (d)  any unsigned Class 4 GUC Ballot;
    (e)  any Class 4 GUC Ballot that does not contain an original *signature; provided*, however, that any Class 4 GUC Ballot submitted via electronic mail shall be deemed to contain an original signature;[2]
    (f)  any Class 4 GUC Ballot not marked to accept or reject the Plan; and
    (g)  any Class 4 GUC Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

6.  The method of delivery of Class 4 GUC Ballots to the Notice and Claims Agent is at the election and risk of each holder of a Class 4 Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent ***actually receives*** the originally executed Class 4 GUC Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

---

[2]   For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

7.  If multiple Class 4 GUC Ballots are received from the same Holder of a General Unsecured Claim with respect to the same General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 4 GUC Ballot will supersede and revoke any earlier received Class 4 GUC Ballots.

8.  The Class 4 GUC Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date the Class 4 GUC Ballot**.  You should indicate that you are signing a Class 4 GUC Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the WLB Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 GUC Ballot.

10. Each ballot votes ***only*** your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE RETURN YOUR CLASS 4 GUC BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 GUC BALLOT,**
**THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (800) 499-8519 (U.S. AND CANADA) OR**
**(212) 771-1128 (INTERNATIONAL) OR EMAIL WESTMORELANDINFO@DONLINRECANO.COM.**

</div>

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 GUC BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS JANUARY 25, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE WLB DEBTORS.**

---

## Schedule 4

**Form of Non-Impaired Non-Voting Status Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF NON-VOTING**
**STATUS TO HOLDERS OF UNIMPAIRED CLAIMS**
**CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN**

        **PLEASE TAKE NOTICE THAT** on [●], 2018, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing Westmoreland Coal Company and its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates*  (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

        **PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, ***you are not entitled to vote on the Plan***.  Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the WLB Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are ***not*** entitled to vote on the Plan.

---

[1]    Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **January 25, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan **must**:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Donlin, Recano Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

> ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. PURSUANT TO THE PLAN YOU ARE PRESUMED TO ACCEPT THE PLAN AND THEREFORE **ARE DEEMED TO HAVE CONSENTED** TO THE RELEASES SET FORTH IN ARTICLE IX.E.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Article IX.E of the Plan contains the following provision:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the**

distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*       \*       \*

Under the Plan, "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Houston, Texas
[_____], 2018

/s/

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            ptomasco@jw.com
                      efreeman@jw.com
                      mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            james.sprayregen@kirkland.com
                      michael.slade@kirkland.com
                      gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            edward.sassower@kirkland.com
                      stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Email:            anna.rotman@kirkland.com

**<u>Schedule 4A</u>**

**Opt-Out Form for Holders of Unimpaired Claims**
**<u>Conclusively Presumed to Accept the Plan</u>**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1.** **Important information regarding the Third Party Releases.**

**As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article IX.E of the Plan set forth below.**

**If you elect to opt out of the releases set forth in Article IX.E of the Plan, you will forego the benefit of obtaining the releases set forth in Article IX.D of the Plan if you are a Released Party in connection therewith.**

**Optional Release Election.  You may elect to opt out of the release contained in Article IX.E of the Plan only if you check the box below:**

> ☐ **OPT OUT of the Third Party Releases**

**Article IX.E of the Plan contains the following provision:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

<center>*       *       *</center>

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

All Holders of Claims and Interests that are not in Voting Classes that do not elect to opt out of the provisions contained in <u>Article IX.C</u> of the Plan using the enclosed opt out form, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all claims and causes of action against the WLB Debtors and the Released Parties.  By objecting to or electing to opt out of the releases set forth in <u>Article IX.C</u> of the Plan you will forgo the benefit of obtaining the releases set forth in <u>Article IX.C</u> of the Plan if you otherwise would be a Released Party thereunder.

<u>Item 2</u>.  **Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the WLB Debtors that:

    (a) as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(b)   the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Unimpaired Claims Conclusively Presumed to Accept the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)   the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d)   no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

Donlin, Recano & Company, Inc.,
Re: Westmoreland Coal Company, et al.,
6201 15th Avenue, Brooklyn, New York 11219

2.      **Via electronic mail service to:**

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Opt-out Form" in the subject line.

THE VOTING DEADLINE IS **JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST *ACTUALLY RECEIVE* YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

## Schedule 5

**Form of Impaired Non-Voting Status Notice**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## NOTICE OF NON-VOTING
## STATUS TO HOLDERS OF IMPAIRED CLAIMS
## AND EQUITY INTERESTS DEEMED TO REJECT THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2018, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, ***you are not entitled to vote on the Plan***.  Specifically, under the terms of the Plan, as a holder of a Claim or Interest (as currently asserted against the WLB Debtors) that is receiving no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

---

[1] Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **January 25, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Donlin, Recano Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE WLB DEBTORS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE WLB DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

---

**Article IX.E of the Plan contains the following provision:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in**

any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

                              *       *       *

Under the Plan, "Released Parties" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors,

partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such:  (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Houston, Texas
[_____], 2018

/s/

| | |
|---|---|
| Patricia B. Tomasco (Bar No. 01797600) | Edward O. Sassower, P.C. |
| Elizabeth C. Freeman (Bar No. 24009222) | Stephen E. Hessler, P.C. (admitted *pro hac vice*) |
| Matthew D. Cavenaugh (Bar No. 24062656) | **KIRKLAND & ELLIS LLP** |
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 1401 McKinney Street, Suite 1900 | 601 Lexington Avenue |
| Houston, Texas 77010 | New York, New York 10022 |

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:        ptomasco@jw.com
        efreeman@jw.com
        mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        james.sprayregen@kirkland.com
        michael.slade@kirkland.com
        gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        edward.sassower@kirkland.com
        stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:        (713) 836-3600
Email:        anna.rotman@kirkland.com

## Schedule 5A

## Opt-Out Form for Holders of Impaired Claims and Interests Deemed to Reject the Plan

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1. Important information regarding the Third Party Releases.**

**As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article IX.E of the Plan set forth below.**

**If you elect to opt out of the releases set forth in Article IX.E of the Plan, you will forego the benefit of obtaining the releases set forth in Article IX.D of the Plan if you are a Released Party in connection therewith.**

**Optional Release Election.  You may elect to opt out of the release contained in Article IX.E of the Plan only if you check the box below:**

> ☐ **OPT OUT of the Third Party Releases**

**Article IX.E of the Plan contains the following provision:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

<div align="center">*       *       *</div>

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

All Holders of Claims and Interests that are not in Voting Classes that do not elect to opt out of the provisions contained in <u>Article IX.C</u> of the Plan using the enclosed opt out form, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the WLB Debtors and the Released Parties.  By objecting to or electing to opt out of the releases set forth in <u>Article IX.C</u> of the Plan you will forgo the benefit of obtaining the releases set forth in <u>Article IX.C</u> of the Plan if you otherwise would be a Released Party thereunder.

<u>Item 2</u>.  **Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the WLB Debtors that:

(e)   as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(f)   the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(g)   the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(h)   no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

3.    **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

Donlin, Recano & Company, Inc.,
Re: Westmoreland Coal Company, et al.,
6201 15th Avenue, Brooklyn, New York 11219

4.    **Via electronic mail service to:**

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Opt-out Form" in the subject line.

THE VOTING DEADLINE IS **JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

## Schedule 6

**Form of Notice to Disputed Claim Holders**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) |
| | ) Case No. 18-35672 (DRJ) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**NOTICE OF NON-VOTING**
**STATUS WITH RESPECT TO DISPUTED CLAIMS**

      **PLEASE TAKE NOTICE THAT** on [●], 2018, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

      **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim that is subject to a pending objection by the WLB Debtors.  **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before January 23, 2019 (the date that is two business days before the Voting Deadline)** (each, a "Resolution Event"):

      1.     an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2.      an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3.      a stipulation or other agreement is executed between the holder of such Claim and the WLB Debtors temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

4.      the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package, except ballots, may be obtained at no charge from Donlin, Recano & Company, Inc., the notice and claims agent retained by the WLB Debtors in these chapter 11 cases (the "Notice and Claims Agent") by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs, then no later than one business day thereafter, the Notice and Claims Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Notice and Claims Agent no later than the Voting Deadline, which is on **January 25, 2019, at 4:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Notice and Claims Agent in accordance with the instructions provided above.

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE WLB DEBTORS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE WLB DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Houston, Texas
[_____], 2018

/s/
_____

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          ptomasco@jw.com
                efreeman@jw.com
                mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                michael.slade@kirkland.com
                gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Email:          anna.rotman@kirkland.com

**Schedule 6A**

**Opt-Out Form for Disputed Claims Holders**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim that is subject to a pending objection by the WLB Debtors.  You are not entitled to vote any disputed portion of your Claim on the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1.** **Important information regarding the Third Party Releases.**

**As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article IX.E of the Plan set forth below.**

**If you elect to opt out of the releases set forth in Article IX.E of the Plan, you will forego the benefit of obtaining the releases set forth in Article IX.D of the Plan if you are a Released Party in connection therewith.**

**Optional release election. You may elect to opt out of the release contained in Article IX.E of the Plan only if you check the box below:**

<div style="border:2px solid black; text-align:center; padding:6px;">

☐ **OPT OUT of the Third Party Releases**

</div>

**Article IX.E of the Plan contains the following provision:  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

<p style="text-align:center;">*      *      *</p>

Under the Plan, "<u>Released Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d) the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

Under the Plan, "<u>Releasing Parties</u>" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

All Holders of Claims and Interests that are not in Voting Classes that do not elect to opt out of the provisions contained in <u>Article IX.C</u> of the Plan using the enclosed opt out form, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all claims and causes of action against the WLB Debtors and the Released Parties.  By objecting to or electing to opt out of the releases set forth in <u>Article IX.C</u> of the Plan you will forgo the benefit of obtaining the releases set forth in <u>Article IX.C</u> of the Plan if you otherwise would be a Released Party thereunder.

<u>Item 2</u>.  **Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the WLB Debtors that:

  (a)   as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(b)   the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status with Respect to Disputed Claims* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)   the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d)   no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      In the envelope provided via first class mail, overnight courier, or hand delivery to:

Donlin, Recano & Company, Inc.,
Re: Westmoreland Coal Company, et al.,
6201 15th Avenue, Brooklyn, New York 11219

2.      Via electronic mail service to:

WestmorelandVote@donlinrecano.com
with a reference to "Westmoreland Opt-out Form" in the subject line.

THE VOTING DEADLINE IS **JANUARY 25, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

## Schedule 7

**Form of Cover Letter**



**_____, 2018**

Via First Class Mail

**RE**:     **In re Westmoreland Coal Company,** *et al.*,
            **Chapter 11 Case No. 18-35672 (DRJ) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on October 9, 2018.

You have received this letter and the enclosed materials because you are entitled to vote on the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan").[2]  On [●], 2018, the Court entered an order (the "Disclosure Statement Order"):  (a) authorizing the WLB Debtors to solicit acceptances for the Plan, (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Package"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO
> VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER
> CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO
> NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]   Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

    a.  a copy of the Solicitation and Voting Procedures;

    b.  a ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

    c.  this letter;

    d.  the Disclosure Statement, as approved by the Bankruptcy Court (and exhibits thereto, including the Plan);

    e.  the Disclosure Statement Order (excluding the exhibits thereto, except the Solicitation and Voting Procedures);

    f.  the notice of the hearing to consider confirmation of the Plan; and

    g.  any other materials the Court has approved as part of the Solicitation Package.

Westmoreland Coal Company (on behalf of itself and each of the other WLB Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan.  The WLB Debtors believe that the acceptance of the Plan is in the best interests of their estates, holders of Claims, and all other parties in interest.  Moreover, the WLB Debtors believe that any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the chapter 11 cases.

> **THE WLB DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN.  BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME ON JANUARY 25, 2019.**

The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions, however, please feel free to contact Donlin, Recano & Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at:

https://ecf.txsb.uscourts.gov.  Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

Sincerely,

_____
Westmoreland Coal Company on its own behalf and for each of the WLB Debtors

## **Schedule 8**

**Form of Confirmation Hearing Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) |
|  | ) Case No. 18-35672 (DRJ) |
| Debtors. | ) |
|  | ) (Jointly Administered) |
|  | ) |

**NOTICE OF HEARING TO CONSIDER**
**CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY**
**THE WESTMORELAND COAL COMPANY AND CERTAIN OF ITS**
**DEBTOR AFFILIATES AND RELATED VOTING AND OBJECTION DEADLINES**

    **PLEASE TAKE NOTICE THAT** on [●], the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable Judge David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

---

[1]    Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

> **PLEASE BE ADVISED**:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE WLB DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING CLAIMANTS OF WMLP DEBTORS

The Plan is not proposed by the WMLP Debtors and does not restructure the funded indebtedness of the WMLP Debtors.  To the extent you have a claim against a WMLP Debtor, such claim will not be affected, modified, enlarged, released or discharged by the WLB Debtors' Plan or any provisions thereunder or any confirmation order entered approving the Plan.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **December 13, 2018,** which is the date for determining which holders of Claims in Classes 3 and 4 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is on **January 25, 2019, at 4:00 p.m.,** prevailing Central Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you *must*:  (a) follow the instructions carefully; (b) complete *all* of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the WLB Debtors' notice and claims agent, Donlin, Recano & Company, Inc. (the "Notice and Claims Agent") on or before the Voting Deadline.  *A failure to follow such instructions may disqualify your vote*.

## CRITICAL INFORMATION REGARDING
## THE ADMINISTRATIVE CLAIMS BAR DATE

Except as otherwise provided in the Plan or by a final order entered by the Bankruptcy Court, **the deadline for all requests for payment of Administrative Claims that arise on or prior to January 4, 2019** shall be the Voting Deadline (the "Initial Administrative Claims Bar Date").  With respect to any Administrative Claims that arise after January 4, 2019, the deadline to file such requests shall be 30 days after the Plan Effective Date (the "Supplemental Administrative Claims Bar Date").

With respect to Professional Fee Claims, **the deadline for all requests for payment of such claims is 30 days after the Plan Effective Date**.

With respect to any request for payment of Administrative Claims arising on or prior to January 4, 2019 submitted by Governmental Units, **the deadline for all such requests shall be February 7, 2019, subject to any requests for additional time for good cause shown**.

Notwithstanding anything to the contrary provided in the Plan, the WMLP Debtors shall not be required to file any requests for payment of Administrative Claims; *provided* that on or prior to the Initial Administrative Claims Bar Date, the WMLP Debtors shall consult with the

WLB Debtors and the Required Consenting Stakeholders regarding any Administrative Claims held by the WMLP Debtors that would have otherwise been due by the Initial Administrative Claims Bar Date.  Notwithstanding anything to the contrary provided in the Plan or the Cash Collateral Order, the MLP Secured Parties (as defined in the Cash Collateral Order) shall not be required to file any requests for payment of Administrative Claims arising out of the MLP Secured Obligations (as defined in the Cash Collateral Order) or the Adequate Protection Obligations (as defined in the Cash Collateral Order), but for the avoidance of doubt, the MLP Secured Parties must file any requests for payment of any other Administrative Claims pursuant to the applicable provisions of the Plan.

Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Initial Administrative Claims Bar Date or the Supplemental Administrative Claims Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the WLB Debtors or their property, and such Administrative Claims will be deemed discharged as of the Plan Effective Date. For the avoidance of doubt, solely to the extent Cure Costs are not paid on the Plan Effective Date, the counterparty to such Executory Contract and Unexpired Lease must file its Administrative Claim on or prior to the Supplemental Administrative Claims Bar Date, and solely with respect to and in the amount of such unpaid Cure Costs.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

Any objections, if any, to the Plan **must**:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the court (contemporaneously with a proof of service), so that it may be **actually received** by the following parties, prior to **January 25, 2019, at 4:00 p.m.** (prevailing Central Time) (the "Confirmation Objection Deadline"); *provided* that if the Auction occurs after January 22, 2019, the Confirmation Objection Deadline shall be automatically extended through 4:00 p.m. (prevailing Central Time) on the date that is three (3) days following the Auction.

| Counsel to the WLB Debtors | The United States Trustee |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.: Stephen E. Hessler, P.C.<br>(stephen.hessler@kirkland.com)<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: Gregory F. Pesce<br>(gregory.pesce@kirkland.com) and<br>Timothy R. Bow (timothy.bow@kirkland.com) | Office of the United States Trustee<br>for the Southern District of Texas<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002<br>Attn.: Stephen Statham |

| Counsel to the Ad Hoc Group | Counsel to the Official Committee of Unsecured Creditors |
|---|---|
| Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 Attn.:  Thomas Moers Mayer (tmayer@kramerlevin.com) and Stephen D. Zide (szide@kramerlevin.com) | Morrison & Foerster LLP 250 West 55th Street New York, NY 10019 Telephone: (212) 468-8000 Facsimile: (212) 468-7900 Attn:  Lorenzo Marinuzzi, Esq. (lmarinuzzi@mofo.com) Todd M. Goren, Esq. (tgoren@mofo.com) Jennifer L. Marines, Esq. (jmarines@mofo.com) |

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

## RELEASES, EXCULPATIONS, AND INJUNCTIONS

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Relevant Definitions**

"*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the WLB Debtors; (b) the Consenting Stakeholders; (c) the Successful Bidder; (d) the DIP Lenders; (e) the DIP Agent; (f) the Holders of First Lien Claims; (g) the First Lien Notes Trustee; (h) the Credit Agreement Agent; (i) the Bridge Loan Agent; (j) the Holders of the Bridge Loan Claims; (k) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (l) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Released Parties*" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) the Stalking Horse Purchaser; (c) each Consenting Stakeholder; (d)

4

the Holders of First Lien Claims; (e) the Holders of Bridge Loan Claims; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Credit Agreement Agent; (i) the DIP Agent; (j) the First Lien Notes Trustee; (k) each current and former Affiliate of each Entity in clause (a) through (j); (l) with respect to each Entity in clause (a) through (k), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (m) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders (unless an equity holder has opted out of being a Releasing Party, in which case such equity holder shall not be a Released Party), subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Released Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"***Releasing Parties***" means, collectively, and in each case, in their respective capacities as such: (a) the Successful Bidder; (b) each Consenting Stakeholder; (c) all Holders of Claims and Interests that are presumed to accept the Plan and who do not opt out of the releases in the Plan; (d) all Holders of Claims and Interests who vote to accept the Plan; (e) all Holders of Claims or Interests that (i) abstain from voting on the Plan and who do not opt out of the releases in the Plan, (ii) vote to reject the Plan and who do not opt out of the releases in the Plan, or (iii) are deemed to reject the Plan and who do not opt out of the releases in the Plan; (f) each current and former Affiliate of each Entity in clause (a) through (e); (g) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (h) with respect to each WLB Debtor, each such WLB Debtor's current and former equity holders, subsidiaries (other than the WMLP Debtors), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Notwithstanding the above, the definition of "Releasing Parties" shall specifically exclude, in their respective capacities as such, (a) the WMLP Debtors, (b) their current and former lenders (and agents under any lending facility), and (c) each of the foregoing's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

**WLB DEBTOR RELEASE.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is**

deemed released and discharged by the WLB Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the WLB Debtors, that the WLB Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a WLB Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' capital structure, the assertion or enforcement of rights and remedies against the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the WLB Debtors asserting any claim released by the releases herein against any of the Released Parties.

**THIRD PARTY RELEASES**.  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each WLB Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the WLB Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the WLB Debtors, the WLB Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a WLB Debtor and another WLB Debtor, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, or the Plan,

6

the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in <u>Article IX.E</u> of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in <u>Article IX.E</u> of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the WLB Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

**EXCULPATION.**  Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the chapter 11 cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the filing of the chapter 11 cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages, or ultra vires acts as determined by a Final Order.

**INJUNCTION**. **Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the WLB Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties):  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article IX.G</u> of the Plan.**

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM), please feel free to contact the WLB Debtors' Notice and Claims Agent, by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.  Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies

of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**.  The WLB Debtors will file the Plan Supplement (as defined in the Plan) at least 7 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and will serve notice on all holders of Claims entitled to vote on the Plan, which will:  (a) inform parties that the WLB Debtors filed the Plan Supplement, (b) list the information contained in the Plan Supplement, and (c) explain how parties may obtain copies of the Plan Supplement.

---

**BINDING NATURE OF THE PLAN**:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Houston, Texas
[_____], 2018

/s/

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          ptomasco@jw.com
                efreeman@jw.com
                mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                michael.slade@kirkland.com
                gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Email:          anna.rotman@kirkland.com

## Schedule 9

**Form of Plan Supplement Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on [●], United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (e) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the WLB Debtors filed the Plan Supplement with the Court on [●] [Docket No. [●]].  The Plan Supplement contains the following documents (each as defined in the Plan):  (a) the Assumed Contracts and Leases List; (b) the identity of the Plan Administrator and the compensation of the Plan Administrator; (c) the amount of the General Unsecured Claims Amount (which amount shall be disclosed prior to the entry of the Disclosure Statement Order); (d) the Wind-Down Budget; (e) the Description of Transaction Steps; (f) the Purchaser Documentation; (g) the terms and conditions of the distribution of the EIP Pool; (h) the Liquidating Trust Agreement; and (i) those Causes of Action that shall be transferred to the Purchaser pursuant to the Sale Transaction; *provided* that the Description of Transaction Steps is subject to modification until the Plan Effective Date.

---

[1]  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]  Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **January 25, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service).

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Donlin, Recano & Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Houston, Texas
[_____], 2018

/s/
_____

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         ptomasco@jw.com
               efreeman@jw.com
               mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               michael.slade@kirkland.com
               gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         edward.sassower@kirkland.com
               stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Email:         anna.rotman@kirkland.com

## **Schedule 10**

**Form of Supplemental Notice of Assumption of Executory Contracts and Unexpired Leases**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**SUPPLEMENTAL NOTICE OF (A) EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES TO**
**BE ASSUMED OR ASSUMED AND ASSIGNED BY**
**WESTMORELAND COAL COMPANY AND CERTAIN OF ITS**
**DEBTOR AFFILIATES PURSUANT TO THE PLAN, (B) CURE COSTS,**
**IF ANY, AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on [●], the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018, the WLB Debtors filed the initial Assumed Contracts and Leases List (the "Preliminary Assumed Contracts and Leases List").

**PLEASE TAKE FURTHER NOTICE THAT** the WLB Debtors filed the Plan Supplement with the Court on [●] [Docket No. [●]].  The Plan Supplement contains the Assumed Contracts and Leases List, which is a revised list of Executory Contracts and Unexpired Leases

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

that are to be assumed and assigned by the WLB Debtors to the Purchaser pursuant to the Plan. The determination to assume or assume and assign the agreements identified on the Assumed Contracts and Leases List is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice (this "Supplemental Notice") because (i) you are party to a contract that has been added to the Assumed Contracts and Leases List after the filing of the Preliminary Assumed Contracts and Leases List, and/or (ii) the Cure Costs for your respective contract(s) have been modified by the WLB Debtors since the filing of the Assumed Contracts and Leases List. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the WLB Debtors are proposing to (a) assume, or (b) assume and assign the Executory Contracts and Unexpired Leases listed in **Exhibit A** attached hereto and to which you are a party to, at the Cure Costs listed therein, in connection with the Sale Transaction.[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under Executory Contracts and Unexpired Leases at the time of assumption or assumption and assignment. Accordingly, the WLB Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in **Exhibit A**. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the WLB Debtors believe that there is no Cure Cost outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** if (i) the WLB Debtors discover contracts inadvertently omitted from the Assumed Contracts and Leases List, or (ii) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, the WLB Debtors may, in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the WLB Debtors and the Successful Bidder, at any time before the closing of the Sale:  (a) supplement the Assumed Contracts and Leases List with previously omitted Assigned Contracts (as defined below); (b) remove an Assigned Contract from the list of contracts ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contract.

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contracts and Leases List, nor anything contained in the Plan or each WLB Debtor's schedule of assets and liabilities, shall constitute an admission by the WLB Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption or assumption and assignment, that any WLB Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the WLB Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Plan Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption or assumption and assignment of any Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE THAT** in the event that the WLB Debtors exercise any of the rights reserved above, the WLB Debtors shall promptly serve an additional supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Contract Counterparty, and its attorney, if known, at the last known address available to the WLB Debtors.  Each supplemental notice shall include the same information with respect to listed Assigned Contracts as is included in this Supplemental Notice, and you will have 14 days following the date of service of such notice to file an objection.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified above will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in Cash on the Plan Effective Date on as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute, however, payment of the Cure Cost would be made following the entry of a final order(s) resolving the dispute and approving the assumption or assumption and assignment.  If an objection to the proposed assumption, assumption and assignment, or related Cure Cost is sustained by the Court, however, the WLB Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.

**PLEASE TAKE FURTHER NOTICE THAT** if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any of these Executory Contracts or Unexpired Leases ("Assigned Contract") that are attached to this Supplemental Notice, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Costs or a proposed assignment to the Successful Bidder of any Assigned Contract, be filed with the Court and served and **actually received no later than 14 days following the date of service of this Supplemental Notice, as applicable**, in each case, by the following parties (the "Notice Parties"):  (a)  counsel for the WLB Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.:  Gregory F. Pesce and Timothy R. Bow; (b) counsel to the ad hoc group of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn.:  Thomas Moers Mayer and Stephen D. Zide; (c) counsel to the Official Committee of Unsecured Creditors, Morrison & Foerster LLP, 250 West 55th Street New York, NY 10019, Attn:  Lorenzo Marinuzzi, Esq., Todd M. Goren, Esq., and Jennifer L. Marines, Esq.; and (d) Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn.:  Stephen Statham.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at  10:00 a.m.**, prevailing Central Time, before the Honorable David R. Jones, in the United

States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** counterparties to such Executory Contracts or Unexpired Leases shall have until the Confirmation Hearing to object to the assumption or assumption and assignment of any such Executory Contracts or Unexpired Leases on the basis of uncured defaults incurred after service of this notice.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption or assumption and assignment of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related cure or adequate assurances proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO THE PROPOSED ASSUMPTION, ASSUMPTION AND ASSIGNMENT, OR CURE COST WILL BE DEEMED TO HAVE ASSENTED TO SUCH (A) ASSUMPTION OR ASSUMPTION AND ASSIGNMENT, AND (B) CURE COST.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED OR ASSUMED AND ASSIGNED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE WLB DEBTORS ASSUME OR ASSUME AND ASSIGN SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED OR ASSUMED AND ASSIGNED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Donlin, Recano & Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Houston, Texas
[_____], 2018

/s/ _____

<table>
<tr><td>

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:     (713) 752-4221
Email:          ptomasco@jw.com
                    efreeman@jw.com
                    mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    michael.slade@kirkland.com
                    gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

</td><td>

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                    stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Email:          anna.rotman@kirkland.com

</td></tr>
</table>

## Exhibit A

**Schedule of Contracts and Leases and Proposed Cure Costs**

| WLB Debtor | Counterparty | Description of Assumed or Assumed and Assigned Contracts or Leases | Cure Cost |
|---|---|---|---|
|  |  |  |  |

## Schedule 11

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
|  | ) |  |
| WLB Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE REGARDING
## EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES TO BE REJECTED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Westmoreland Coal Company and certain of its affiliated debtors and debtors in possession (collectively, the "WLB Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018, the WLB Debtors filed the initial Assumed Contracts and Leases List (the "Preliminary Assumed Contracts and Leases List").

**PLEASE TAKE FURTHER NOTICE THAT** the WLB Debtors filed the Plan Supplement with the Court on [●] [Docket No. [●]]. The Plan Supplement contains the Assumed Contracts and Leases List, which is a revised list of Executory Contracts and Unexpired Leases that are to be assumed and assigned by the WLB Debtors to the Purchaser pursuant to the Plan.

---

[1]   Due to the large number of debtors in these chapter 11 cases, which are being jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

The determination to assume or assume and assign the agreements identified on the Assumed Contracts and Leases List is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Plan, all Executory Contracts and Unexpired Leases that are not being assumed in connection with the Sale Transaction are automatically rejected as of the Plan Effective Date. The determination to reject those Executory Contracts and Unexpired Leases that are not on the Assumed Contracts and Leases List is subject to revision.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE WLB DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

---

**PLEASE TAKE FURTHER NOTICE** that the WLB Debtors are proposing to reject the Executory Contracts and Unexpired Leases listed in **Exhibit A** attached hereto, which decision is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of of Claim based on the rejection of the WLB Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the WLB Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days after the effective date of the rejection of such Executory Contract or Unexpired Lease; *provided* that the WMLP Debtors shall not be required to file any such Proofs of Claim relating to the rejection of Executory Contracts or Unexpired Leases. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the WLB Debtors, their estates, the Plan Administrator, and/or the Purchaser, or property of the foregoing parties, without the need for any objection by the WLB Debtors, their estates, the Plan Administrator, and/or the Purchaser and without the need for any further notice to, or action, order, or approval of the Court.**

**PLEASE TAKE FURTHER NOTICE THAT** an objection to the proposed rejection of any Executory Contract or Unexpired Lease must be filed with the Court and served and **actually received no later than 14 days following the date of service of this notice of rejection**. Any such objection *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local

---

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contract and Leases List nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any WLB Debtor or Plan Administrator has any liability thereunder. Further, the WLB Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List and reject such Executory Contract or Unexpired Lease, pursuant to the terms of the Plan, up until the Plan Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the proposed rejection of such Executory Contract or Unexpired Lease; and (d) be filed with the Court (contemporaneously with a proof of service) so as to be **actually received no later than 14 days following the date of service of this notice of rejection** by the Court and the following parties: (a)  counsel for the WLB Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.:  Gregory F. Pesce and Timothy R. Bow; (b) counsel to the ad hoc group of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn.:  Thomas Moers Mayer and Stephen D. Zide; (c) counsel to the Official Committee of Unsecured Creditors, Morrison & Foerster LLP, 250 West 55th Street New York, NY 10019, Attn:  Lorenzo Marinuzzi, Esq., Todd M. Goren, Esq., and Jennifer L. Marines, Esq.; and (d) Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn.:  Stephen Statham.

**PLEASE TAKE FURTHER NOTICE THAT** if (i) the WLB Debtors discover contracts inadvertently omitted from the Assumed Contracts and Leases List, or (ii) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, the WLB Debtors may, in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the WLB Debtors and the Successful Bidder, at any time before the closing of the Sale:  (a) supplement the Assumed Contracts and Leases List with previously omitted Assigned Contracts (as defined below); (b) remove an Assigned Contract from the list of contracts ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contract.

**PLEASE TAKE FURTHER NOTICE THAT** the Confirmation Order will serve as a determination that any counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases of such counterparty that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **February 13, 2019, at  10:00 a.m.,** prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact

3

Donlin, Recano & Company, Inc., the notice and claims agent retained by the WLB Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (800) 499-8519 (U.S. and Canada) or (212) 771-1128 (International), (b) visiting the WLB Debtors' restructuring website at: http://www.donlinrecano.com/westmoreland, (c) writing to the Notice and Claims Agent at Donlin, Recano & Company, Inc., Re: Westmoreland Coal Company, et al., 6201 15th Avenue, Brooklyn, New York 11219; and/or (d) emailing westmorelandinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Houston, Texas
[_____], 2018

*/s/*

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           ptomasco@jw.com
                    efreeman@jw.com
                    mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors and Local
Counsel to the Debtors and Debtors in Possession*

- and -

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                    michael.slade@kirkland.com
                    gregory.pesce@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           edward.sassower@kirkland.com
                    stephen.hessler@kirkland.com

- and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Email:           anna.rotman@kirkland.com

## Exhibit A

**Schedule of Contracts and Leases To Be Rejected**

| WLB Debtor | Counterparty | Description of Rejected Contracts or Leases |
|---|---|---|
|  |  |  |

## <u>Schedule 12</u>

**Form of Committee Letter**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**of Westmoreland Coal Company, *et al.***

Chapter 11 Case No. 18-35672 (DRJ)
In the United States Bankruptcy Court
for the Southern District of Texas

c/o Morrison & Foerster LLP
250 West 55th Street
New York, NY 10023
WestmorelandUCC@mofo.com

**To:     Holders of General Unsecured Claims**

The Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee to represent the interests of all unsecured creditors in the chapter 11 bankruptcy cases of Westmoreland Coal Company and its debtor subsidiaries (the "Debtors"). We write to advise you of the Committee's position regarding the *Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (the "Plan") filed by the WLB Debtors.[1] The Plan is described in, and is attached as an exhibit to, the accompanying *Disclosure Statement for Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates* (the "Disclosure Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

**The Committee strongly urges all unsecured creditors to vote to <u>REJECT</u> the Plan and to <u>OPT OUT</u> of the third-party releases set forth in Article IX.E of the Plan.** Detailed instructions regarding how to vote on the Plan and opt out of the third-party releases are contained on your ballot (the "Ballot"), which is enclosed in the same package as this letter. In order to vote on the Plan or opt out of the third-party releases, you must return your Ballot so that it is actually received by the Notice & Claims Agent on or before January 25, 2019 at 4:00 p.m., prevailing Central Time (the "Voting Deadline").[2]

The Committee believes that you should vote to reject the Plan (and the Plan cannot be approved by the Bankruptcy Court) for the following reasons:

- **The Plan provides you with no recovery.** Under the Bankruptcy Code, unsecured creditors are entitled to receive a *pro rata* share of the value of estate claims and unencumbered assets after priority and administrative claims are paid in full. The Committee's advisors are currently investigating a number of prepetition transactions

---

[1]   The term "WLB Debtors" does not include Westmoreland Resource Partners GP, LLC or Westmoreland Resource Partners, LP and its subsidiaries.

[2]   Please note, if the Auction occurs after January 22, 2019, the Voting Deadline will be automatically extended through 4:00 p.m., prevailing Central Time, on the date that is three (3) days following the Auction.

between the WLB Debtors and their lenders.  The Committee's advisors are also investigating the extent to which the WLB Debtors' assets are unencumbered. Although these investigations remain ongoing, the Committee has already identified potential causes of action relating to, among other things, the WLB Debtors' entry into the Bridge Loan Facility in May 2018, and the potential for unencumbered value in the form of tax attributes and interests in certain owned and leased real estate.  The Committee expects that its investigations will demonstrate that unsecured creditors, who presently are receiving no recovery under the Plan, are legally entitled to a distribution.[3]

- **The Plan prejudges the outcome of the Committee's investigations that are expected to form the basis for your recovery.**  The Bankruptcy Court provided the Committee until January 7, 2019 to complete its investigations.[4]  Nevertheless, as noted above, the WLB Debtors have already determined that unsecured creditors are not entitled to any recovery.[5]  Moreover, should the Committee's investigations prove otherwise, the WLB Debtors must obtain lender consent in order to modify unsecured creditor distributions.[6]  Accordingly, the WLB Debtors have essentially prejudged the outcome of the Committee's investigations by committing themselves to a Plan that provides unsecured creditors with nothing.

- **The Plan improperly seeks to release claims that you may hold against the WLB Debtors' lenders and insiders.**  Under applicable Fifth Circuit law, a chapter 11 plan cannot release third party claims unless the third party consents and the release is given in exchange for meaningful consideration.  The Plan fails in both respects.  *First*, the Plan does not seek actual consent.  Instead, the Plan *deems* third parties to have consented to the releases if they vote to accept the Plan, or vote to reject (or abstain from voting on) the Plan but fail to return an "opt out" form.  The Committee does not believe that "deemed consent" is sufficient or justified under the circumstances of these

---

[3]   Relatedly, the Committee believes that the current *de minimis* distribution threshold of $1,000 is unreasonably high and will have the consequence of depriving a large number of creditors of their Plan distributions.  The Committee will seek to have the threshold reduced to a reasonable threshold that will hopefully permit distributions to actually be made to unsecured creditors.

[4]   The Committee reserves the right to seek an extension of its investigation period to the extent that the WLB Debtors and their lenders fail to cooperate (including by failing to providing complete and timely responses to the Committee's discovery requests).

[5]   The WLB Debtors likewise have stipulated to the validity of the lenders' liens and the amount of the lenders' prepetition claims in connection with entry of the Bankruptcy Court order approving their debtor-in-possession financing.  *See* Docket No. 520.

[6]   The "General Unsecured Claims Amount" is the term used in the Plan to describe the amount of the distribution made to unsecured creditors under the Plan.  In Article VI.B of the Disclosure Statement, the WLB Debtors suggest that they "may amend the Plan" to "increase the General Unsecured Claims Amount" in response to the Committee's investigations.  However, Article I.A.81 of the Plan provides that the definition of General Unsecured Claims Amount cannot be modified without the consent of the WLB Debtors' lenders.

chapter 11 cases.  *Second*, the Plan does not provide any real consideration in exchange for the releases.  In the Disclosure Statement, the WLB Debtors suggest that the "mutual release" offered by lenders and insiders constitutes sufficient consideration. This consideration is illusory.  The vast majority of unsecured creditors have no liability whatsoever to any lender or insider of the WLB Debtors and should ascribe no value to the mutual releases.

- **The trustee of the Liquidating Trust will be appointed without any consent from unsecured creditors.**  Under the Plan, the trustee of the Liquidating Trust is tasked with, among other things, implementing the Plan, liquidating the WLB Debtors' remaining assets, negotiating and filing objections to proofs of claim, and making distributions to general unsecured creditors.  The Plan currently provides that the trustee of the Liquidating Trust will be selected by WLB Debtors and their lenders. However, if unsecured creditors are entitled to a distribution, the trustee of the Liquidating Trust will be working primarily for their benefit.  Accordingly, the Committee believes that it should select the trustee.

- **The Plan contains a host of other problems that may render it unconfirmable.**  In addition to the issues identified above, the Committee believes that the Plan contains numerous other flaws that it hopes to address either through negotiation or by filing an objection to confirmation of the Plan.

*For these reasons, among others, the Committee urges Holders of General Unsecured Claims to vote to <u>REJECT</u> the Plan and <u>OPT OUT</u> of the third-party releases contained therein.*

Notwithstanding the significant problems with the Plan identified in this letter, the Committee will continue to negotiate with the WLB Debtors, their lenders, and other interested parties (including the Pension Benefit Guaranty Corporation, the United Mine Workers of America, and any retiree committee appointed in these chapter 11 cases) to reach a consensual plan that maximizes value and treats all stakeholders fairly.  The Committee remains hopeful that these negotiations will obviate the need for wasteful and time-consuming litigation regarding confirmation of the Plan and will benefit all stakeholders by expediting the WLB Debtors' emergence from chapter 11.

The foregoing description is not intended as a substitute for the Disclosure Statement. Creditors should read the Disclosure Statement and the Plan in their entirety, and then make their own respective independent decision as to whether the Plan is acceptable.

The WLB Debtors have provided you with a Ballot with which to vote to accept or reject the Plan.  In order to have your vote counted, you must complete and return the Ballot in accordance with the procedures set forth on the Ballot.  **<u>PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT TO THE NOTICE & CLAIMS AGENT</u>**.

Should you have any questions about this letter, the Plan, the Disclosure Statement, your Ballot, or the voting procedures, please contact Morrison & Foerster LLP by sending an email to WestmorelandUCC@mofo.com.

Very truly yours,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WESTMORELAND COAL COMPANY, *ET AL.*