IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
IN RE:                          § CASE NO. 18-35672-H2-11
                                § HOUSTON, TEXAS
WESTMORELAND COAL COMPANY,      § TUESDAY,
                                § DECEMBER 18, 2018
            DEBTORS.            § 2:10 P.M. TO 6:05 P.M.
```

MOTION HEARING

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                        SEE NEXT PAGE

COURTROOM DEPUTY/ERO:               S. SHELBY

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

| | |
|---|---|
| FOR WESTMORELAND COAL COMPANY: | KIRKLAND & ELLIS, LLP<br>Gregory F. Pesce, Esq.<br>300 N. LaSalle<br>Chicago, Illinois 60654 |
| | KIRKLAND & ELLIS, LLP<br>Stephen E. Hessler, Esq.<br>601 Lexington Avenue<br>New York, New York 10022 |
| | KIRKLAND & ELLIS, LLP<br>Anna G. Rotman, Esq.<br>609 Main Street<br>Houston, Texas 77002 |
| | JACKSON WALKER, LLP<br>Patricia Baron Tomasco, Esq.<br>1401 McKinney Street, Ste. 1900<br>Houston, Texas 77002 |
| FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: | COLE SCHOTZ, PC<br>Michael D. Warner, Esq.<br>301 Commerce Street, Suite 1700<br>Fort Worth, Texas 76102 |
| | MORRISON FOERSTER, LLP<br>Lorenzo Marinuzzi, Esq.<br>Todd M. Goren, Esq.<br>250 West 55th Street<br>New York, New York 10019 |
| FOR UNITED MINE WORKERS OF AMERICA: | RUMBERGER KIRK & CALDWELL<br>R. Scott Williams, Esq.<br>2001 Park Place N, Suite 1300<br>Birmingham, Alabama 35203 |
| FOR MAR-BOW VALUE PARTNERS, LLC: | STEVEN RHODES CONSULTING, LLC<br>Steven Rhodes, Esq.<br>1610 Arborview Road<br>Ann Arbor, Michigan 48103 |
| | DIAMOND McCARTHY, LLP<br>Allan B. Diamond, Esq.<br>909 Fannin Street, 37th Floor<br>Houston, Texas 77010 |

<u>APPEARANCES (CONTINUED)</u>

```
FOR THE MLP AD HOC GROUP:        JONES WALKER, LLP
                                 Elizabeth Futrell, Esq.
                                 201 St. Charles Avenue
                                 Suite 5100
                                 New Orleans, Louisiana 70170

                                 SCHULTE ROTH & ZABEL, LLP
                                 Kristine Manoukian, Esq.
                                 919 Third Avenue
                                 New York, New York 10022

FOR THE DEPARTMENT OF THE        Department of Justice
INTERIOR AND ENVIRONMENTAL       Alan S. Tenenbaum, Esq.
PROTECTION AGENCY:               950 Pennsylvania Avenue, NW
                                 Washington, DC 20530

FOR CATERPILLAR FINANCIAL        ROSS BANKS MAY CRON & CAVIN, PC
SERVICES CORPORATION:            John S. Mayer, Esq.
                                 7700 San Felipe Street
                                 Suite 550
                                 Houston, Texas 77063

FOR THE UNITES STATES            US SECURITIES AND EXCHANGE
SECURITIES AND EXCHANGE            COMMISSION
COMMISSION:                      Sonia Chae, Esq.
                                 175 W. Jackson Blvd., Ste. 1450
                                 Chicago, Illinois 60604

FOR THE WMLP DEBTORS AND         JONES DAY
THE CONFLICTS COMMITTEE OF       Heather Lennox, Esq.
THE WESTMORELAND RESOURCES       Oliver S. Zeltner, Esq.
GP, LLC BOARD OF DIRECTORS:      901 Lakeside Avenue
                                 Cleveland, Ohio 44114

FOR WESTCHESTER FIRE             MANIER HEROD, PC
INSURANCE COMPANY AND            Michael E. Collins, Esq.
FIRST SURETY CORPORATION:        1201 Demonbreun Street
                                 Suite 900
                                 Nashville, Tennessee 37203

FOR THE LENDERS AND AD HOC       PORTER HEDGES, LLP
NOTEHOLDERS:                     John F. Higgins, IV, Esq.
                                 1000 Main Street, Suite 3600
                                 Houston, Texas 77002
```

<u>APPEARANCES (CONTINUED)</u>

|                                    |                                    |
|------------------------------------|------------------------------------|
|                                    | KRAMER LEVIN NAFTALIS & FRANKEL    |
|                                    | Stephen D. Zide, Esq.             |
|                                    | 1177 Avenue of the Americas       |
|                                    | New York, New York 10036          |
| FOR LEXON INSURANCE                | LOCKE LORD, LLP                   |
| COMPANY, INC.:                     | Philip G. Eisenberg, Esq.         |
|                                    | 600 Travis Street, Suite 3400     |
|                                    | Houston, Texas 77002              |
| FOR THE UNITED STATES              | DEPARTMENT OF JUSTICE             |
| TRUSTEE:                           | Hector Duran, Jr., Esq.           |
|                                    | 515 Rusk Avenue                   |
|                                    | Suite 3516                        |
|                                    | Houston, Texas 77002              |
| FOR McKINSEY RECOVERY &            | ZACK A. CLEMENT, PLLC             |
| TRANSFORMATION SERVICES            | Zack A. Clement, Esq.             |
| US, LLC:                           | 3753 Drummond Street              |
|                                    | Houston, Texas 77025              |
|                                    | SELENDY & GAY, PLLC               |
|                                    | Christine H. Chung, Esq.          |
|                                    | Faith Gay, Esq.                   |
|                                    | Josh Margolin, Esq.               |
|                                    | Erica Iverson, Esq.               |
|                                    | 1290 Avenue of the Americas       |
|                                    | New York, New York 10104          |
|                                    | HOGAN LOVELLS US, LLP             |
|                                    | Peter Ivanick, Esq.               |
|                                    | 875 Third Avenue                  |
|                                    | New York, New York 10022          |
|                                    | HOGAN LOVELLS US, LLP             |
|                                    | Bruce Oakley, Esq.                |
|                                    | 609 Main Street, Suite 4200       |
|                                    | Houston, Texas 77002              |
| FOR TRAVELERS CASUALTY             | STITES & HARBISON, PLLC           |
| AND SURETY COMPANY OF              | Elizabeth Thompson, Esq.          |
| AMERICA:                           | W. Blaine Early, III, Esq.        |
|                                    | 250 W. Maine Street               |
|                                    | Suite 2300                        |
|                                    | Lexington, Kentucky 40507         |

APPEARANCES (CONTINUED)

FOR THE INTERNATIONAL                HAYWARD & ASSOCIATES, PLLC
UNION OF OPERATING                   Melissa S. Hayward, Esq.
ENGINEERS, LOCAL 583,                10501 N. Central Expressway
AFL-CIO:                             Suite 106
                                     Dallas, Texas 75231


FOR THE TRUSTEES OF THE              MORGAN LEWIS & BOCKIUS, LLP
UNITED MINE WORKERS OF               Matthew Ziegler, Esq.
AMERICA 1992 BENEFIT PLAN:           101 Park Avenue
                                     New York, New York 10178

6

<u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> | VOIR <u>DIRE</u> |
|---|---|---|---|---|---|
| ROBERT A. CAMPAGNA, JR. | | | | | |
| By Ms. Rotman | 41 | . | . | . | . |
| By Mr. Duran | . | 46 | . | . | . |
| | | | | | |
| ZACHARY PAUL GEORGESON | | | | | |
| By Ms. Rotman | 48 | . | . | . | . |

| EXHIBITS: | <u>Marked</u> | <u>Offered</u> | <u>Admitted</u> |
|---|---|---|---|
| (None offered.) | | | |

...

1          HOUSTON, TEXAS; TUESDAY, DECEMBER 18, 2018; 2:10 P.M.

2                  THE COURT:  All right.  Let me go to the

3     Westmoreland main case we have, it's Case Number 18-35672.

4     Why don't we take all appearances for all matters?  If you're

5     appearing for a specific matter, if you would just identify

6     that when you make your appearance.

7                  Mr. Pesce?

8                  MR. PESCE:  Sure.  So on behalf of the Debtors here

9     with our co-counsel, Patty Tomasco from Jackson Walker, as

10    well as Steve Hessler, Anna Rotman and -- from Kirkland &

11    Ellis, and we have Jennifer Grafton who's the Chief

12    Administrative Officer and General Counsel of Westmoreland in

13    the courtroom today.

14                 THE COURT:  All right.  Thank you.  Good afternoon,

15    folks.

16                 Mr. Warner?

17                 MR. WARNER:  Good afternoon, Your Honor.  Michael

18    Warner, Cole Schotz, Lorenzo Marinuzzi and Todd Goren of the

19    Morrison Foerster firm on behalf of the Committee.

20                 THE COURT:  All right.  Thank you.  Good afternoon,

21    gentlemen.

22                 MR. WILLIAMS:  Your Honor, Scott Williams with the

23    Rumberger Kirk & Caldwell firm here on behalf of the United

24    Mine Workers of America.

25                 THE COURT:  Thank you, Mr. Williams.  Good

1    afternoon.

2            MR. WILLIAMS:  Good afternoon, Your Honor.

3            MR. RHODES:  Good afternoon, Your Honor.  I'm Steve

4    Rhodes and I'm here on behalf of Mar-Bow Value Partners on our

5    objection to the Debtors' application to employ McKinsey RTS.

6            THE COURT:  Got it.  Thank you, Mr. Rhodes.

7            MR. DIAMOND:  Good afternoon, Your Honor.  Allan

8    Diamond with Diamond McCarthy also here on behalf of Mar-Bow

9    Value Partners in connection with that same objection.

10           THE COURT:  Thank you, Mr. Diamond.

11           MS. FUTRELL:  Elizabeth Futrell and that's Kristine

12   Manoukian back there, for the MLP Ad Hoc Group.

13           THE COURT:  All right.  Thank you.  Good afternoon.

14           MS. CHAE:  Good afternoon, Your Honor.  Sonia Chae

15   for the Securities and Exchange Commission.

16           THE COURT:  Thank you, Ms. Chae.  Good afternoon.

17           MR. MAYER:  Good afternoon, Your Honor.  John Mayer,

18   M-A-Y-E-R, I'm appearing for Caterpillar Financial.  I'm here

19   only on the Disclosure Statement.

20           THE COURT:  I got it.  Thank you, Mr. Mayer.

21           MR. TENENBAUM:  Good afternoon, Your Honor.  Alan

22   Tenenbaum from the Department of Justice for the United States

23   on behalf of the DOI and EPA, the Disclosure Statement

24   rendering.

25           THE COURT:  Good to see you in person.

```
1              MR. TENENBAUM:  Good to see you.  Well --
2              THE COURT:  It's been a long time.
3              MR. TENENBAUM:  Thank you.  Good to see you.
4              MS. LENNOX:  Good morning, Your Honor.  Heather
5    Lennox of Jones Day.  I'm here with my colleague Oliver
6    Zeltner.  We are counsel to the Westmoreland Resources GP
7    Conflicts Committee and conflicts counsel to the MLP Debtors.
8              THE COURT:  Thank you, Ms. Lennox.  Good afternoon.
9              MS. LENNOX:  Thank you.
10             MR. COLLINS:  Good afternoon, Your Honor.  Michael
11   Collins from Manier & Herod on behalf of Westchester Fire
12   Insurance Company and First Surety.  Thank you.
13             THE COURT:  Thank you, Mr. Collins.  Good afternoon.
14             Mr. Higgins?
15             MR. HIGGINS:  Good afternoon, Your Honor.  John
16   Higgins on behalf of certain term loan lenders, bridge loan
17   lenders, senior secured notes and the DIP lenders.
18             THE COURT:  All right.  Thank you.  Good afternoon.
19             MR. HIGGINS:  Thank you, Your Honor.  With me is
20   Steven Zide from Kramer Levin.
21             THE COURT:  Good afternoon.
22             MR. ZIDE:  From Kramer Levin.
23             THE COURT:  Good afternoon, sir.
24             MR. ZIDE:  How you doing?
25             MR. EISENBERG:  Good afternoon, Your Honor.  Philip
```

1          Eisenberg --

2                    THE COURT:  Mr. Eisenberg.

3                    MR. EISENBERG:   -- with Locke Lord on behalf of

4     Lexon Insurance Company.  And with me in court today is

5     Mr. Lee Woodard with the Harris Beach firm of Syracuse, New

6     York.

7                    THE COURT:  All right.  Thank you.  Good afternoon,

8     gentlemen.

9                    Mr. Duran?

10                   MR. DURAN:  Good afternoon, Your Honor.  This is

11    Hector Duran with the Department of Justice on behalf of the

12    US Trustee.

13                   THE COURT:  Thank you.

14                   And, Mr. Clement, I'm sorry.

15                   MR. CLEMENT:  Good afternoon, Your Honor.  For

16    McKinsey Recovery and Transportation Services, better known as

17    McKinsey RTS, Zack Clement, from Selendy & Gay Christine Chung

18    and Faith Gay, who are both here with me.  Also from Selendy &

19    Gay, Josh Margolin, Erica Iverson.  From Hogan Lovells Peter

20    Ivanick and Bruce Oakley.

21                   THE COURT:  Thank you.  Good afternoon, folks.

22                   Anyone else in the courtroom?

23              (No audible response.)

24                   THE COURT:  Are there any parties on the telephone

25    who wish to make an appearance.  And folks, I'll note there

1    are currently 66 people who are dialed in, so I'll try this

2    without exercising the hand raising feature, but let's just

3    take a shot and see if it'll work.  Anybody who wishes to make

4    an appearance who is on the telephone.

5            MS. THOMPSON:  Liz Thompson and Blaine Early from

6    Stites & Harbison for Travelers Casualty and Surety Company of

7    America.

8            THE COURT:  All right.  Thank you.  Good afternoon.

9            Anyone else?

10           MS. HAYWARD:  Melissa Hayward on behalf of the

11   International Union of Operating Engineers, Local 953, AFL-

12   CIO.

13           THE COURT:  Thank you, Ms. Hayward.  Good afternoon.

14           Anyone else?

15           MS. HAYWARD:  Good afternoon.

16       (No audible response.)

17           THE COURT:  All right.  Mr. Pesce?

18           MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

19   Kirkland & Ellis on behalf of the Debtors for the Record.

20           THE COURT:  Before I forget let me do this, just

21   because inevitably we will get --

22           MR. PESCE:  Sure.

23           THE COURT:   -- an interruption.

24           Folks on the telephone, now there are 67 folks who

25   are dialed in, I'm going to activate the hand raising feature,

1    so I will mute all of your lines.  If you wish to speak, use

2    the star five on your telephone.  I'll try and make sure that

3    I see it and give you an opportunity to speak.

4              All right.  Sorry for the interruption.

5              MR. PESCE:  Than you, Your Honor.  We have a

6    presentation that's being broadcast on the join.me website.

7              THE COURT:  Oh.

8              MR. PESCE:  So if we could impose on you to turn

9    that on, that would be great.

10             THE COURT:  Certainly.  Folks on the telephone, if

11   you would like to follow along with the presentation, I will

12   activate the join.me link.  If you'll go to join.me, the

13   password is judgejones, you'll be able to follow the video

14   presentation and obviously you can hear on the phone line.

15             Give me just a second.

16             MR. PESCE:  Sure.

17        (Pause in the proceedings.)

18             THE COURT:  All right.  So my -- are you doing

19   this -- you're doing this remotely or are you hardwired in?

20             UNIDENTIFIED SPEAKER:  Remotely.

21             THE COURT:  Remotely.  All right.  I am -- who am I

22   looking for in terms of --

23             UNIDENTIFIED SPEAKER:  Westmoreland Debtors.

24             THE COURT:  Westmoreland Debtors.

25        (Pause in the proceedings.)

13

1          THE COURT:  I have no idea if it's the same 67

2     people, but that shows a lot of interest.

3          (Laughter.)

4          THE COURT:  All right.  You're up and running.

5          MR. PESCE:  Thank you, Your Honor.

6          So the Agenda for today is as follows, we had

7     several uncontested matters which we thank the Court for

8     entering earlier today before the hearing.  In terms of the

9     matters that are going to be presented today, we have two

10    contested motions, one is our non-insider key employee

11    retention motion and then we have our Disclosure Statement for

12    the WLB parent level Debtors, and then we would propose having

13    the status conference regarding the McKinsey RTS retention

14    application at the end of the hearing so that we can hopefully

15    get the other relief entered and get the solicitation started

16    sooner rather than later.  If that works for Your Honor.

17         THE COURT:  Does anybody have an objection to that?

18         (No audible response.)

19         THE COURT:  All right.

20         MR. PESCE:  Okay.  So I'd like to start off the

21    hearing with just a quick update regarding the progress since

22    the second-day hearing.  In the last several weeks the WLB

23    Debtors, as well as our subsidiary WMLP Debtors, have

24    continued to make tremendous progress in their reorganization.

25    As you can see from today's hearing, the WLB Debtors have

1    reached the point where they're prepared to seek approval of

2    their Disclosure Statement and commence solicitation for our

3    Chapter 11 plan.  That plan is already supported by 90 percent

4    of the senior secured creditors who are only funded debt

5    stakeholders.

6          Since the appointment of the Creditors Committee on

7    October 10, we've also engaged with them in dialogue and we're

8    pleased to report, as you'll see during the presentation of

9    the Disclosure Statement hearing, that all disclosure related

10   matters regarding the Disclosure Statement from the Committee

11   have been resolved.  Mr. Marinuzzi I think will give some

12   commentary about his investigation in a little bit.

13         Suffice it to say there are still significant issues

14   between the Debtors, the senior secured lenders and the

15   Committee regarding what will happen with unsecured creditors.

16   But those conversations have been ongoing and productive to

17   date.  And as you'll see from the plan itself, a few minor

18   confirmation related issues have been clarified to hopefully

19   narrow the scope of any Committee related possible objection.

20         In connection with the plan process we've also been

21   continuing our parent level marketing process.  We have a bid

22   deadline of January 15 and we're proposing to have the

23   auction -- we plan to have the auction on January 22, a week

24   later.  Down at the MLP, and I should point out that Heather

25   Lennox of the Jones Day law firm and her colleague Oliver

1    Zeltner are here on behalf of the Conflicts Committee for that

2    silo, has been conducting the sale process.  They currently

3    have a bid deadline of December 28.  There's a few third-party

4    bids as well as discussions among different members of the

5    capital structure regarding internal solutions to the MLP

6    matters.

7         The real focus though at both, particularly the

8    parent level and the MLP level over the last several weeks

9    though has been with respect to labor and benefits matters.

10   And given the impending December 27 milestone, the status

11   conference that we just had scheduled and the other work

12   that's going on behind the scenes, we wanted to let you know

13   why there's more of an update on some other matters.  And it's

14   frankly because we've just been committing so much of our time

15   to the labor and benefits matters at Westmoreland.

16        In that vein I'm happy to start out the presentation

17   by noting that as Your Honor will recall, we have two labor

18   unions.  We have the United Mine Workers, they have a contract

19   with respect to an asset in Wyoming called Kimmerer, and they

20   have a contract with respect to an asset out west called

21   Beulah.  The other union that we have is the IUOE.  They're

22   representative is -- their counsel is on the phone today.  The

23   IUOE represents essentially the International Union of

24   Operating Engineers and they represent certain of our

25   employees at our San Juan, New Mexico operations.

1          Following a dozen in-person meetings in San Juan and
2     around there the Debtors have reached an agreement with the
3     leadership of that union and the two subsets of that union
4     regarding a new labor contract.  The IUOE union is split into
5     two halves, there's a group of surface miners and a group of
6     underground miners, so you might hear us refer to them as
7     surface or underground.
8          Specifically the Debtors, the secured lenders, the
9     stalking horse purchaser of the San Juan assets and the IUOE
10    leadership have reached an agreement.  That agreement is
11    actually being voted on today, and we will find out around
12    seven o'clock Central Time whether or not it has passed.  We
13    cautiously optimistic that with the support of the leadership
14    of the union that we will be able to report that that has
15    passed and that we'll then be seeking approval of consensual
16    1113 motion.
17         THE COURT:  When you get confirmation of the outcome
18    of that vote, can I ask you just to file a very short
19    notice --
20         MR. PESCE:  Sure.
21         THE COURT:   -- not only so that I can see, but
22    anyone else who is looking at the docket can see the status as
23    well.
24         MR. PESCE:  Yes.
25         THE COURT:  Thanks.

1        MR. PESCE:  Absolutely.

2        The IUOE also represents some coal miners -- or, I'm

3    sorry, some represented employees at our coal strip operations

4    which are in Montana.  We've reached an agreement in principle

5    to extend that agreement by one year.  That extension,

6    however, still has not been presented to the membership and is

7    still being assessed by our senior secured lenders because it

8    interacts with various commercial negotiations in the area.

9        If we can reach an agreement on the coal strip

10    contract, and which we're hopeful to do, we'll be also filing

11    a motion with respect to that relatively soon.

12        The other union that we have is the United Mine

13    Workers, which we call the UMWA.  As I mentioned, they have

14    employees at the Kemmerer Mine in Wyoming, in the Beulah mine.

15    They also -- they are -- certain retirees were also previously

16    UMWA affiliated before they retired.  These discussions have

17    been particularly complicated because as we discussed at the

18    first-day hearing, for reasons that -- due to a long history.

19    The labor contract itself is actually at the parent entity,

20    the asset is actually at the subsidiary, and all the employees

21    are at the parent.

22        So the parent is a party to the agreement basically

23    seconds the unionized employees down to the asset and then is

24    reimbursed by the asset for the costs associated with that.

25    So while the parent has absolutely no interest in the Kemmerer

1           asset as it stands today as an equity owner, it is the

2           employer of all these people and party to the contract.

3                   As a result this has required pretty extensive

4           coordination with the Conflicts Committee represented by

5           Ms. Lennox.  And the MLP lenders which are represented by

6           Ms. Manoukian who's in the courtroom today, as well as

7           coordination with the parent level lenders because they are

8           the party that is effectively being called upon to fund any

9           type of settlement with the retirees that are also associated

10          with the UMWA.

11                  We're hopeful that we'll reach an agreement with the

12          UMWA to -- without having to raise these issues in a contested

13          manner before the Court.  We're scheduled again to meet with

14          the UMWA again this week, following our December 12 meeting

15          which we just had, and we're hopeful that we continue to make

16          progress.  Depending on that progress we may ask our lenders

17          to move back the deadline to facilitate that, but that's still

18          several steps away and we are working towards the December 27

19          milestone.

20                  So before moving on to the retire -- more specifics

21          on the retirees' issues, I'll pause there for a second to see

22          if there's any questions.

23                  THE COURT:  Is there anything that I can do or not

24          do which helps those discussions to continue along unaffected

25          by outside influence?

1           MR. PESCE:  Perhaps, and that actually --

2           THE COURT:  Well, will you let me know --

3           MR. PESCE:  -- actually relates --

4           THE COURT:  -- when that --

5           MR. PESCE:  I'm actually going to tell you right now

6    what it is.

7           THE COURT:  All right.

8           MR. PESCE:  So the final thing that we have, or the

9    second to the last thing we have on the labor and retiree

10   update is that intertwined with the UMWA negotiations is the

11   status of the retiree obligations that we have.  And that's

12   relevant because we have operations -- we had foreign

13   operations in North Carolina and Virginia which we sold, but

14   we retained the retiree liability.  We also have a retiree

15   liability for the Kemmerer facility, and those obligations

16   were basically negotiated at a time when the UMWA was

17   representing those employees.

18           As we discussed at the hearing a few weeks ago, the

19   UMWA has decided not to represent the UMWA affiliated retirees

20   in this matter.  As a result, we were compelled to seek the

21   appointment of a retiree Committee.  Notwithstanding

22   Mr. Duran's extensive efforts and our outreach --

23           THE COURT:  Yeah, you have --

24           MR. PESCE:  -- we've not been able to find any

25   person who's been willing to serve on that Committee to date.

1    We are currently assessing internal whether -- and this is an

2    issue of first impression not only for this Court and this

3    Circuit, but nationwide where there's never actually been a

4    retiree Committee that's been failed to form -- we're

5    assessing what we are going to do.  The reason for the lack of

6    interest, we have received -- actually to clarify, we actually

7    have received responses from retirees.  They've told us that

8    since their benefits are fully backstopped by the federal

9    government they have no interest in, one, serving on that

10   Committee, or hearing anything else about Westmoreland.

11          In light of that we're assessing two different

12   options.  The first option which we are discussing with the --

13   both of these were discussed with the United States Trustee,

14   is perhaps seeking relief from the Court to waive the

15   requirement to engage with the designated representative.  As

16   an alternative we're also discussing with local counsel and

17   the US Trustee's office the idea of having perhaps a guardian

18   ad litem appointed, an independent fiduciary who could either

19   serve as a Committee of one or a separate fiduciary to

20   represent the interests of those workers.

21          We don't really think this is a huge burden because,

22   as we've mentioned, the federal works -- the federal

23   government is going to be picking up these obligations if

24   we're successful in terminating them.  But to ensure that we

25   don't have a foot fault in that process which is intensely

1   real to the reorganization, we're talking about these issues

2   and hopefully going to find resolution with the United States

3   Trustee about how to proceed.  But one way or the other I

4   think we will probably come before Your Honor again unless you

5   have, you know, specific thoughts on how else we could proceed

6   to try to resolve this lack of interest from our Coal Act

7   retirees.

8                   THE COURT:  No, I got it.

9             Mr. Duran, where -- did I -- where are you?  Do you

10  have thoughts about this?  And I appreciate your open

11  mindedness about this.  So what do you think?

12                  MR. DURAN:  I'm going to discuss with some of our

13  other offices, other offices where coal companies have filed

14  bankruptcies, Chapter 11 bankruptcy cases, and determine

15  whether or not they've ever had this kind of problem where you

16  can't set up a retiree Committee because there's an

17  unwillingness to serve.  It's been broached, this idea of an

18  ad litem, and it's something that I want to run past my

19  client, see if that's something that's been done before, and

20  see how likely it is a solution to the problem that we can get

21  behind.

22                  THE COURT:  So let me -- if I can put two cents in

23  here, again, I'm going to be open minded about this.  I

24  certainly understand the argument that you can't possibly --

25  you can't possibly required to meet a statutory element where

1     it's frustrated by no act of your own.  I mean if there isn't

2     anyone, there isn't anyone.  And I certainly get that.  To the

3     extent that I have a preference, I would much rather see

4     someone appointed, whether you call them an ad litem or an

5     independent fiduciary or some --

6              MR. DURAN:  Right.

7              THE COURT:  -- sort of professional that is under

8     my umbrella, and I can think of three or four ways to get

9     there, you can call them whatever you want.  I would much

10    prefer that to making a finding that we should just ignore it

11    because nobody's interested in serving, simply because I think

12    that we can monitor the process better by finding someone

13    who's independent, someone who can raise issues that need to

14    be raised.  And, you know, I'm happy if -- I'm happy to give

15    guidance where I'm asked to do so.  But I would much prefer

16    the -- I would much prefer the discussion than simply being

17    asked to say, Well, if I'm invited therefore --

18             MR. DURAN:  Sure.

19             THE COURT:  Yeah, let's just, let's ignore that

20    provision.  So but again, if it comes to that, I'm certainly

21    going to listen to it.  I understand it.  I mean you can't --

22    if you can't find anybody, you can't find anybody.  And I know

23    that you will have done everything you can do to find people

24    willing to serve.  So, if that makes any difference to you,

25    that's my thought --

1         MR. DURAN:  It does.

2         THE COURT:   -- but again, I will be extremely

3    flexible about the process.

4         MR. DURAN:  Well, I'm hoping to have more talks with

5    Debtors' counsel --

6         THE COURT:  Sure.

7         MR. DURAN:   -- about what they have in mind, a

8    specific proposal that maybe we can have some input on and --

9         THE COURT:  But honestly, I would think as opposed

10   to a Committee of one probably -- I mean, again, just the

11   expense is going to be relatively nominal if that's the

12   concern.  I would much rather have a collective voice of folks

13   who have different backgrounds, different issues, whether

14   it's, you know, I always like odd numbers because then you can

15   see the voting process work, but, you know, a group of three,

16   again, because I don't think the expense is going to be

17   terribly burdensome to anybody.  And I would much rather hear

18   the collective voices of three people who are really smart in

19   particular areas in which I am not particularly skilled.

20   That, you know, that's going to help me do a better job.  So

21   again, to the extent --

22        MR. DURAN:  Sure.

23        THE COURT:   -- that that matters, those are my

24   thoughts.

25        Yes, sir?

1          MR. ZIEGLER:  Your Honor, Matthew Ziegler again for

2     the Coal Act funds.

3          THE COURT:  Yes, sir.

4          MR. ZIEGLER:  This was originally our motion to

5     appoint the retiree Committee and I think we could be quite

6     valuable in helping to find membership.  I recognize there are

7     some challenges to that.

8          THE COURT:  Sure.

9          MR. ZIEGLER:  I'm not questioning the veracity of

10    any of what Mr. Duran said --

11         THE COURT:  I got that.  Well, I would love your

12    participation and I would love your help.  I'm perfectly happy

13    to spend some time figuring how to draft you onto that

14    Committee if that's --

15         MR. ZIEGLER:  Your Honor, we would be all ears.

16         THE COURT:  Right.  I didn't mean -- I didn't mean

17    me, I meant you.

18       (Laughter.)

19         MR. ZIEGLER:  I did want to, however, note that

20    characterization was made that --

21         THE COURT:  Sure.

22         MR. ZIEGLER:   -- retirees can't be found simply

23    because they have confidence that their benefits will be maxed

24    out.  The retirees that we have contacted on an informal basis

25    about this, they tend to be quite elderly, they tend not to

1    live in the area, and they tend --

2              THE COURT:  Oh, I get that.

3              MR. ZIEGLER:  -- you know, so --

4              THE COURT:  They've got better things to do with

5    their lives.

6              MR. ZIEGLER:  -- just wanted to --

7              THE COURT:  I totally get that.

8              MR. ZIEGLER:  -- provide a little help.

9              THE COURT:  I would very much appreciate your

10   involvement.  If you have, you know, if you have the ability

11   to reach out, I would ask that once you go through whatever

12   protective mechanisms you are required to follow, if you could

13   communicate that to Mr. Duran, that would be much appreciated.

14             MR. ZIEGLER:  We'll certainly do so, Your Honor.

15   And --

16             THE COURT:  And even if you get to -- let me just

17   finish one thought -- even if you get to the point where I

18   can't get any actual retirees, but you're willing to give

19   Mr. Duran the names of some folks who are skilled in the area

20   that you respect, that can't hurt.

21             MR. ZIEGLER:  Right.  I'm sure we could come up with

22   some names.

23             THE COURT:  Terrific.

24             MR. DURAN:  And to give credit where credit is due,

25   the Coal Act funds have recommended some people, and these are

26

1       directors, one from the combined benefit fund, another one

2       from the 1992 benefit plan.  I don't know if those would work.

3       It's certainly something we can broach with Debtors' counsel

4       and see if that works.  The United Mine Workers have also

5       recommended somebody, and I understand that's a retiree but

6       not a Coal Act retiree.  So that one may be a little bit more

7       problematic.  But I'm certainly willing to talk to anybody --

8                   THE COURT:  Okay.

9                   MR. DURAN:   -- about this issue.

10                  THE COURT:  All right.

11                  MR. PESCE:  Well, we'll talk to the US Trustee and

12      the Coal Act funds.  But we wanted to raise this as something

13      that might land in your lap soon,

14                  THE COURT:  No, I got it, and I -- my view of that

15      is, is that sooner rather than later is probably --

16                  MR. PESCE:  Yeah.

17                  THE COURT:   -- better.  Do you have any sense of

18      your timing?  That's a collective question.

19                  MR. PESCE:  As far as the Debtors are concerned, I

20      can't speak for the other two, I think we're going to try to

21      take action some time this week.

22                  THE COURT:  Okay.  Do you -- Mr. Duran, I assume at

23      sort of end of the week are you gone next week?

24                  MR. DURAN:  I leave Sunday.

25                  THE COURT:  You leave Sunday.

1          MR. DURAN:  Yeah.

2          THE COURT:  Okay.  So there's your --

3          MR. PESCE:  Yeah, we have the milestone of the 27th

4     and then with the Christmas holiday we want to at least try to

5     figure out what we're going to do.

6          THE COURT:  No, I got that.  Just so everyone knows

7     where everyone --

8          MR. PESCE:  Right.

9          THE COURT:   -- is or not --

10          MR. PESCE:  Yeah, exactly.

11          THE COURT:   -- going to be.

12          MR. PESCE:  Right.

13          THE COURT:  All right.  Mr. Ziegler, do you ever

14     take vacation?

15          MR. ZIEGLER:  Rarely, Your Honor.

16          THE COURT:  Rarely.  All right.

17        (Laughter.)

18          THE COURT:  So you're available all the way through

19     the end of the year?

20          MR. ZIEGLER:  I am.

21          THE COURT:  All right.  Terrific.

22          MR. ZIEGLER:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. PESCE:  So with that, Your Honor, I would turn

25     to the two contested matters that we have.  Notwithstanding

1      how they were listed on the Agenda I was going to start with

2      the valued employee promotion and then go to the Disclosure

3      Statement.

4                    THE COURT:  Sure.

5                    MR. PESCE:  So we filed a witness and exhibit list

6      on Friday at noon.  That witness and exhibit list included --

7      or it identified Bob Campagna as the Senior Managing Director

8      with Alvarez & Marsal, and Zach Georgeson who's with Willis

9      Towers Watson as our witnesses.  Declarations were also

10     included in that packet, and as was an expert report from

11     Mr. Georgeson.

12                    There are two formal objections that were filed on

13     the docket, both from our labor unions.  One was from the

14     UMWA, one was from the IUOE.  Mr. Campagna and Mr. Georgeson

15     are in the courtroom today and I would respectfully request

16     that we submit their declarations into evidence subject to the

17     rights of parties to cross-examine them.  If parties are going

18     to cross-examine them, though, we'd like to just know that up

19     front if possible just so we can -- we might put them up for a

20     quick direct if that's the case, but --

21                    THE COURT:  No, fair enough.  Well, I certainly want

22     to give everyone an opportunity --

23                    MR. PESCE:  Yeah.

24                    THE COURT:   -- to give me the equivalent of an

25     opening, if you will, before we start.  So you've read the

1    objections.

2              MR. PESCE:  Yeah.

3              THE COURT:  So can you give anyone any comfort as to

4    what actions are being taken with respect to the rank and

5    file?  The way I read the objection, and again, I'm not trying

6    to put words in anyone's mouth, but there wasn't a lot of

7    specificity with respect to the plan other than you didn't

8    include me and you didn't talk me.  I mean it was an objection

9    of not being included versus an objection, at least as I read

10   it, to the specifics of the proposal.

11             MR. PESCE:  Yeah, so I'll assume everyone's kind of

12   seen the economics here, and the points that were raised in

13   the objections I think I would make a couple of points.

14             THE COURT:  Sure.

15             MR. PESCE:  And first, in terms of the engagement

16   that we've had with our stakeholders has been quite

17   significant.  And as it goes to the labor unions in

18   particular, we've been -- we've -- as you probably saw on the

19   docket, we have two protective orders that we filed.  We have

20   been endeavoring to provide the information to the IUOE for

21   about a month.  We sent it to them earlier this week.  I

22   believe it was at least offered, I don't know if it was

23   actually shared with the mine workers.

24             And this topic, as you can imagine, came up in the

25   context of the labor union discussions.  And the objections

1    raised an interesting and at first blush sort of appealing

2    argument which is, well, why not have the labor unions.  The

3    simple fact is that this was effectively already part of the

4    discussion with both of our labor unions.

5              As a matter of federal labor law we are unable to

6    unilaterally provide a bonus to unionized employees.  It is a

7    matter that is subject to bargaining under the National Labor

8    Relations Act.  As a result, wage increases including bonuses

9    are something that are bargained for.  For example, over the

10   summer our contract with the United Mine Workers was set to

11   expire.  In exchange for extending that contract we bargained

12   for -- or they bargained for and obtained at our -- with our

13   agreement, a two dollar per hour wage increase effectively.

14   We could have bargained for a bonus or a spot bonus or a

15   Christmas bonus, but they chose to bargain for that.

16             In the context of the IUOE negotiations, wages have

17   also been a subject for negotiation, and no one has raised,

18   other than complaints about the curve, the idea of that.  So

19   simply put, we're sort of legally prohibited from folding them

20   into this.  And we had a separate procedure which we -- I

21   talked about for, you know, 10 minutes just now about all

22   those discussions where this could have been brought up, and

23   it hasn't.  Other things have been brought up that are very

24   valuable to those unions, just not bonuses.

25             THE COURT:  All right.  So let me ask you with

1       respect to the program that you're proposing, and I understand

2       the need to retain talent and you've heard me in multiple

3       cases talk about employees as the most valuable resource that

4       a company can ever have.  I believe in that, I grew up in

5       that, I mean it's something that's near and dear to me.

6              So I get the retention issue and I get the fear

7       issue and folks are going to take care of themselves and take

8       care of their families first, as they should.  I get that.  So

9       I understand the reason for it, and you can't have a flow of

10      institutional knowledge go out the door --

11             MR. PESCE:  Right.

12             THE COURT:   -- without there being a significant

13      consequence to value.  I get that.

14             The way I read it is the motion actually seeks

15      approval of the program sort of until this gets done.  Is that

16      a fair assumption, or a fair statement?

17             MR. PESCE:  Yeah, that's correct, it's -- I think we

18      set up for each quarter that we're in bankruptcy.

19             THE COURT:  Right.  Would the Debtors have any

20      objection to taking this sort of on a quarter-by-quarter basis

21      so that I can see this sort of play out, or is there a reason

22      that you need the unlimited in length approach?

23             MR. PESCE:  I think we'll be fine with that subject

24      to one --

25             THE COURT:  I'm going to give you a chance to talk

1    to -- there are a lot of frowns at your table, so you probably

2    want to converse.

3         (Laughter.)

4              THE COURT:  If I'm missing something, I want to

5    understand it, and if you even need a chance to talk to

6    counsel, because the last thing that --

7              MR. PESCE:  Yeah.

8              THE COURT:  -- I have experience in is running a

9    coal company.

10             MR. PESCE:  Right.

11             THE COURT:  So if I'm missing something, I want

12   to --

13             MR. PESCE:  Sure.

14             THE COURT:  -- understand it.  It would be a whole

15   lot easier for me if, again, this early, and again, not

16   knowing what's going to happen, it would be easier to me

17   effectively to do an interim order say through the first

18   quarter with the understanding that we would take it back up

19   again in March.  If that causes heartburn or it isn't going to

20   provide the level of security that --

21             MR. PESCE:  Sure.

22             THE COURT:  -- the company thinks it needs to

23   retain these folks, I want to know that.  I don't want anyone

24   to think that I'm trying to shortcut the process.  What I'm

25   effectively trying to do is to get three more months of being

1       able to look at this case and understand where we're headed

2       before --

3               MR. PESCE:  Sure.

4               THE COURT:  -- I make a permanent decision.  And if

5       I need to make a permanent decision today, I will.  You know,

6       I'll listen to your presentation, I don't know what questions

7       I'm going to ask.

8               MR. PESCE:  Yeah.

9               THE COURT:  My guess is I'll probably ask a couple.

10              MR. PESCE:  Right.  I think that's -- I would just

11      maybe ask if I could speak with Mr. Grafton, who's here, she's

12      their general counsel and --

13              THE COURT:  Oh, I'll give you --

14              MR. PESCE:  -- have HR, you talk to her and --

15              THE COURT:  -- I'll give you some time.  Let me

16      hear from everybody else --

17              MR. PESCE:  Yeah.  Sure.

18              THE COURT:  -- and then we'll figure out where

19      we're going.  And again, I want you folks to I mean tell me if

20      you think I'm just wrong and I'm not accurately assessing a

21      particular issue.  I expect you all to tell me, I mean

22      that's -- I don't want to make a decision on bad information.

23              MR. PESCE:  Yeah, I think to your question would we

24      be willing to come back at a date and time, that that's

25      probably right.  I think we need to talk internally about what

1    date that is so that it isn't kind of every few months.

2              THE COURT:  Okay.  But again, I'm not trying to make

3    this more --

4              MR. PESCE:  Yeah.

5              THE COURT:  -- complicated.

6              MR. PESCE:  Yeah.

7              THE COURT:  And I'm perfectly happy, you know, I'm

8    perfectly happy to look at this in a different way as to

9    say --

10             MR. PESCE:  Sure.

11             THE COURT:  -- okay, you know, the program goes

12   forward and everyone has the right to come in an establish

13   cause based upon the chain --

14             MR. PESCE:  Right.

15             THE COURT:  -- of circumstances to terminate.  I

16   mean it makes perfect sense to me.  I'm just trying to -- and

17   again, I haven't heard from either one of the two objectors,

18   and I don't know if it's a, you know, you're not paying

19   attention to me so I'm going to make life miserable.  I

20   understand that approach sometimes.

21             MR. PESCE:  Sure.

22             THE COURT:  Or if there's a real concern or -- you

23   know, I'm certainly going to hear from them, but I would feel

24   better about there being a mechanism to re-evaluate where we

25   are.  And I've got competing concerns and I --

1          MR. PESCE:  Sure.

2          THE COURT:  -- you've heard me say this before so

3     I'm not really talking to you, is I want certainty in the

4     hands of employees.  And mind you, that's different for me

5     than labor.  I want employees to feel comfortable that folks

6     in a suit or not in a coal miner's uniform --

7          MR. PESCE:  Sure.

8          THE COURT:  -- are going to effect their take home

9     pay.

10         MR. PESCE:  Right.

11         THE COURT:  I want them to know that when they get

12    that check for a day's work, they don't ever have to look back

13    over their shoulder.  So --

14         MR. PESCE:  Right.

15         THE COURT:  -- that is something that you know is

16    really important to me.

17         MR. PESCE:  Yeah.

18         THE COURT:  But on the other hand you're asking to

19    do an awful lot based upon some things I really haven't seen

20    develop yet, and it's not that I don't think that they will,

21    but the way I read what you're asking me to do is I will never

22    get another chance to look back at this decision.

23         MR. PESCE:  Yeah, that's a fair point.  So maybe we

24    could -- if I could go through like any other questions, or

25    there's a few other kind of clarifying things that I'd like to

1    point out, but then I -- if the others are going to speak, I
2    can go talk to the general counsel.
3            THE COURT:  Yeah, why don't we do this.  So let me
4    hear from everybody, and if we need to take -- you have my
5    undivided attention through the rest of the day and --
6            MR. PESCE:  Okay.
7            THE COURT:   -- so, and you're telling me the
8    Disclosure Statement's going to be really short anyway, and so
9    we just have --
10           MR. PESCE:  Fingers crossed --
11           THE COURT:   -- the McKinsey issue.  Got it.  Okay.
12           MR. PESCE:  Yeah.
13           THE COURT:  Let me ask, is there anyone else who
14   wishes to give me the equivalent of opening arguments or
15   comments with respect to the employee retention motion?
16           Mr. Williams?
17           MR. WILLIAMS:  Well, Your Honor, thank you.  I'd
18   like to reserve some more time to -- for a more fulsome
19   presentation, but in the motion I have some initial thoughts.
20           THE COURT:  Sure.
21           MR. WILLIAMS:  A couple of things.  I went back --
22   like I didn't stand up before in the previous discussion where
23   there was this discussion about the 1114 Committee.  The
24   Debtors kind of makes an off-handed reference like, Well, the
25   UMWA should really be stepping up to handle this.  That's not

1    the case.

2              THE COURT:  Yeah, I didn't hear that.  If you heard

3    that, maybe --

4              MR. WILLIAMS:  Maybe it was just my perception of

5    their promise.

6              THE COURT:  If it matters to you, I did not hear it

7    that way.

8              MR. WILLIAMS:  Understood, Your Honor.  It's just

9    they're different fiduciary duties and that's important.

10              THE COURT:  I totally understand.

11              MR. WILLIAMS:  Thank you, Judge.

12              As to the initial matter, Your Honor, I'm caught a

13    little off guard because I -- this notion of, well, we legally

14    couldn't do this, is a new one to me.  I've not heard that

15    yet.  And there -- I will admit, and there was a correct

16    interpretation through all ongoing discussions with the United

17    Mine Workers.  And there have been logistical problems because

18    of conflicts counsel and everything else that have made it a

19    little bit more difficult than maybe what everybody

20    anticipated when we were here last.

21              THE COURT:  Sure.

22              MR. WILLIAMS:  That being said, there is work being

23    done.  That being said, I also hear reports that there's

24    discussions and I never heard of anyone saying they're worried

25    about retention or safety issues, and we want to give the

1   union a bonus as part of our KERP program.  So this notion

2   that, Oh, we can't do that.  Oh, yeah, they could, it's just

3   that they haven't raised it and they're now pleading that

4   there's some legal barrier that they never brought to our

5   attention.  Actually it's just a false flag candidly, Your

6   Honor.

7               THE COURT:  Okay.

8               MR. WILLIAMS:  That being said, I have a more

9   fulsome presentation but I -- and at some point I'd like to

10  bring the Court's attention to a couple of things --

11              THE COURT:  Of course.

12              MR. WILLIAMS:   -- in my argument, but that's all I

13  had unless the Court has questions.

14              THE COURT:  So let me ask you this, does a interim

15  approach subject to a further hearing, change your view about

16  this at all, or is it a if we're not getting anything, no one

17  else should get anything still is sort of where you are?

18              MR. WILLIAMS:  Your Honor, I think it's fair to say

19  that the notion of an interim doesn't solve that problem.

20              THE COURT:  Okay.  Fair enough.  I got it.  Thank

21  you.

22              MR. WILLIAMS:  Thank you, Judge.

23              THE COURT:  Anyone else wish to be heard, or give me

24  an opening remark?  Come on, you don't need to raise your

25  hand, just come on up, Mr. Duran.

1          MR. DURAN:  Your Honor, my client requested
2     documents of the Debtors and they were produced.  Whether the
3     testimony of the two declarants, Mr. Georgeson and
4     Mr. Campagna, is proffered or if the declarations are admitted
5     into evidence, I'll have about five, six, possibly seven
6     questions to ask.  It's the Debtors' burden to show and so --
7          THE COURT:  Okay.
8          MR. DURAN:  -- that's about all --
9          THE COURT:  I got it.
10         MR. DURAN:  -- I'll have.
11         THE COURT:  Mr. Williams, I should have asked you --
12         Well, Mr. Duran, while you're at the podium, do you
13    have -- and for the folks in the courtroom, I don't permit
14    proffers or declarations if there are any objections.  I was
15    raised an old trial lawyer and I just believe in the concept
16    of the adversarial system.  I will accept it if everyone
17    agrees.  So, Mr. Duran, do you have an objection to either
18    proffers or declarations being submitted?
19         MR. DURAN:  I do not, Your Honor.
20         THE COURT:  All right.  Mr. Williams, same question
21    for you?
22         MR. WILLIAMS:  Your Honor, for you purposes today I,
23    and just for today, I don't have that.  I'd like to reserve my
24    right to potentially ask questions --
25         THE COURT:  Of course.

1          MR. WILLIAMS:   -- until after I hear the proffers.

2          THE COURT:  All subject to your right to cross-

3    examine.

4          MR. WILLIAMS:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          The gentlemen in the back, you wish to be heard?

7          MR. ZIDE:  Stephen Zide from Kramer Levin on behalf

8    of the first lien lenders.

9          THE COURT:  Yes, sir.

10          MR. ZIDE:  Just very briefly, so we're the first

11    lien lenders of the Westmoreland parent company estates.  To

12    the extent payments are going to be made to these employees,

13    it's coming out of our cash collateral.  We're -- obviously

14    we're focused on this process and we vetted the program, we

15    were supportive of the program.  We think it's reasonable, we

16    think it's necessary, we wholeheartedly agree with you that

17    these employees need to be motivated and engaged as we go

18    through the sale process.  And for that reason we support the

19    relief requested.

20          THE COURT:  All right.  Thank you.

21          Anyone else wish to be heard?

22       (No audible response.)

23          THE COURT:  All right.  Mr. Pesce, it seems to me

24    that you can proceed by either submitting the declarations,

25    which means you count upon me to read the portions that you

1    really want me to focus on, or you can do a proffer, or you

2    can do Q&A, however you'd like to proceed.

3              MR. PESCE:  I think since they're going to be

4    subject to cross-examination, and it sounds like there's more

5    fundamental issues with the union, we will put Mr. Campagna

6    and Mr. Georgeson up for a brief direct and cross-examination

7    by my colleague, Mr. Rotman.

8              THE COURT:  Okay.

9              MR. PESCE:  And I will then confer my client

10   regarding the proposal you made.

11             THE COURT:  I don't know that --

12             MR. PESCE:  I think --

13             THE COURT:  Well, I mean I certainly want you to

14   talk about it.  It seems to me to be a lot less important than

15   I thought it was, so --

16             MR. PESCE:  Yeah, I think we have concern coming

17   back here every whatever interval to have the same fight, so

18   if we're going to put the witnesses on, I think we would

19   prefer just to have it approved, you know, as it's

20   been budgeted --

21             THE COURT:  I'm perfectly happy for you say, Nope,

22   it says filed.  So I'll try to make the decision I can.

23             MR. PESCE:  All right.  So --

24             THE COURT:  All right.  Ms. Rotman, who is your

25   first witness?

1        MS. ROTMAN:  We'd like to call Bob Campagna first.

2        THE COURT:  All right.  Mr. Campagna, if you would

3    come forward, please, sir.  It's the old-fashioned way.  If

4    you'd raise your right hand, sir.

5        (Witness is sworn.)

6        THE COURT:  All right.  Thank you, sir.  And if I

7    could ask you if you'll just make sure that microphone is

8    directly in front of you, it's directional, and I want to make

9    sure the folks on the telephone can hear.

10        Ms. Rotman, whenever you're ready.

11        MS. ROTMAN:  Thank you, Your Honor.

12        DIRECT EXAMINATION OF ROBERT A. CAMPAGNA, JR.

13    BY MS. ROTMAN:

14    Q    Can you please state your name for the Record?

15    A    Yes, Robert A. Campagna, Jr.

16    Q    Where are you employed?

17    A    Alvarez & Marsal.

18    Q    How long have you been with Alvarez & Marsal?

19    A    I've been with A&M for 15 years.

20    Q    What's your title currently?

21    A    I'm Managing Director and Co-Head of the Eastern Region

22    restructuring practice.

23    Q    How many years have you worked with distressed companies?

24    A    For over 20.

25    Q    When was A&M retained by the Debtors?

1   A    We were retained in mid-February 2018.

2   Q    And what was the scope of the retention?

3   A    Financial advisor to the company, assessing liquidity,

4   assisting them with business plans, and all matters related to

5   their restructuring and negotiating of credit agreements.

6   Q    Are you familiar with the Debtors' non-insider employee

7   compensation program prior to filing for Chapter 11?

8   A    Yes, I am.

9   Q    How would you describe that program?

10  A    That program had three components, a base salary feature,

11  it had an annual incentive program, cash pay annual incentive

12  program feature, and it had a stock-based compensation

13  feature.  So the three pieces work together.

14  Q    Were unionized employees included in that program, which

15  I understand is called the annual payment program.  Is that

16  correct?

17  A    That's the correct name for it, and, no, they were not

18  included in that program.

19  Q    Do you know why not?

20  A    Again, as Mr. Pesce had indicated earlier, they were

21  subject to collective bargaining agreements and have folks

22  representing them in those bargaining discussions and they

23  bargain for the wages as part of that process.

24  Q    Now let's talk about the proposed program, the valued

25  employee program.  How would you describe the proposed valued

ROBERT A. CAMPAGNA, JR. - DIRECT BY MS. ROTMAN                44

1   employee program versus the Debtors' annual payment program

2   that was in place prior to filing these Chapter 11 cases?

3   A     The programs are similar in the dollars offered, and the

4   heads that are covered by the program.  It has -- I think the

5   stock-based compensation has no value in this situation so

6   it's more of a cash-based program.  But again, the overall

7   words, targets, and estimated payouts are roughly equivalent

8   to the company's pre-petition programs.

9   Q    And now if we can turn briefly, can you describe the

10  impact from the Debtors' restructuring efforts on employee

11  retention over the last six months for example?

12  A     Sure.  So before we arrived I think we were aware that

13  the company had been experiencing a marginal increase in

14  turnover leading up to, again, that February 2018 time frame

15  when we were engaged.  That continued certainly with this

16  ongoing retention issues over the initial months of the case,

17  and then those retention issues increased once we filed --

18  once we obtained our bridge financing in early May, and today

19  it just increased -- continued to increase.

20  Q    And the retention issues that you had are with respect to

21  the employees that were a part of the annual payment program?

22  A     Largely, yes.  It's all -- overall employees, but, yes,

23  focused on that group in particular significant increases in

24  the number heads that have departed.

25  Q    How many of those employees have resigned since WLB

1    entered into bridge financial facility, which was June 1,

2    2018?

3    A    From that date until the filing, the company lost 100

4    employees.  Since the filing date, again, that -- the rate of

5    the defections has increased.  There's been an additional 38

6    folks who have left the company from filing date through

7    December 5, and even since December 5 when we cut that

8    measurement off, I know of a handful of others, significant

9    employees who have also resigned from the company.

10   Q    What's the impact on the company of those key employees

11   resigning?

12   A    It causes -- it's just a value loss and a value drain.

13   These are employees who have been with us for a period of time

14   and they have certain significant knowledge, historical

15   knowledge that's really irreplaceable.  So it's very difficult

16   to obtain new talent to begin with, and then to obtain new

17   talent who has that historical knowledge basis is virtually

18   impossible.  Very fast track time running here for the

19   restructuring, the sale process, emergence, and closing, all

20   that anticipated certainly for the first quarter, really by

21   February 28.  We just really can't afford to lose more of

22   these types of employees.

23   Q    What is the business goal that the Debtors hope to

24   achieve through approval of the valued employee program?

25   A    Decrease the rate in which these valued employees are

1    departing.

2    Q    Do any of the employees who are part of the valued

3    employee program report to the Board?

4    A    No, they do not.

5    Q    Do any of them report to the CEO?

6    A    They do not.

7    Q    Do any of them control any of the Debtors?

8    A    They do not.

9    Q    Do any of them have any responsibilities that result in

10   being treated as an insider for purposes of the Bankruptcy

11   Code?

12   A    Not that I'm aware of.

13   Q    Okay.  Thank you.

14        MS. ROTMAN:  I'll pass the witness.

15        THE COURT:  All right.  Thank you.

16        Anyone wish to cross-examine Mr. Campagna?

17   Mr. Duran?

18        CROSS-EXAMINATION OF ROBERT A. CAMPAGNA, JR.

19   BY MR. DURAN:

20   Q    Mr. Campagna, just a few questions.  How many employees

21   does this valued employee program apply to?

22   A    243 employees of the Debtors.

23   Q    And what percentage of the total number of the employees

24   of the Debtors does that represent?

25   A    It's like 15 percent of the Debtors.

ROBERT A. CAMPAGNA, JR. - CROSS BY MR. DURAN                47

1   Q    And how would you characterize the participants in this
2   KERP, I mean are they mid-level management, how would you
3   describe them?
4   A    Mostly mid-level to slightly above mid-level management.
5   Q    Okay.  And the US Trustee requested information and
6   documents about this valued employee program?
7   A    Correct.
8   Q    All right.  And the Debtors produced that information?
9   A    I believe we did.
10  Q    All right.  And do any of the KERP participants have any
11  control over the entire enterprise?
12  A    No, they do not.
13          MR. DURAN:  Pass the witness, Your Honor.
14          THE COURT:  All right.  Thank you.
15          Anyone else wish to cross-examine Mr. Campagna?
16      (No audible response.)
17          THE COURT:  All right.  Any redirect?
18          MS. ROTMAN:  No, Your Honor.
19          THE COURT:  All right.  Mr. Campagna, thank you for
20  your testimony.  You can step down.
21          THE WITNESS:  Thank you.
22      (Witness steps down.)
23          MS. ROTMAN:  And now we'll call Jack -- Zach
24  Georgeson, please.
25          THE COURT:  All right.  Mr. Georgeson, can you

1       please come forward.  Can you raise your right hand, please,

2       sir?

3              (Witness is sworn.)

4                    THE COURT:  Please have a seat.  Thank you.

5                    Whenever you're ready.

6                    MS. ROTMAN:  Thank you.

7                    DIRECT EXAMINATION OF ZACHARY PAUL GEORGESON

8       BY MS. ROTMAN:

9       Q    Good afternoon.  Can you please state your name?

10      A    Zachary Paul Georgeson.

11      Q    Where are you employed?

12      A    Willis Towers Watson.

13      Q    How long have you been with Willis Towers Watson?

14      A    For 10 years, since 2008.

15      Q    What's your title?

16      A    Senior Consulting Director.

17      Q    And what are the tasks that you undertake at Willis

18      Towers Watson --

19      A    Predominantly --

20      Q     -- if you can describe your responsibilities.

21      A     -- advising the Compensation Committee, senior

22      management teams, as it pertains to a variety of executive

23      compensation matters, including a variety of restructuring

24      matters.

25      Q    When was Willis Towers retained by the Debtors?

1    A    February 2018.

2    Q    And what was Willis Towers engaged to do?

3    A    Engaged to work with the Debtors' other advisors with

4    respect to the design, the review, the reasonableness

5    assessment as it relates to a variety of pre- and post-

6    petition compensation programs.

7    Q    What materials have the Debtors provided you in

8    connection with your review of the Debtors' compensation

9    programs?

10   A    It's a couple of key files.  One is just an Excel file

11   that documented the opportunities, the salaries, the names and

12   titles, et cetera as it relates to the proposed participants,

13   and then, two, just what I would characterize as a plan

14   document that summarizes the key provisions related to the

15   program.

16   Q    And so then what sources did you rely on to evaluate the

17   reasonableness of the proposed program?

18   A    Three primary sources I'd say my interviewed.  One is

19   what I would describe as an executive energy survey that

20   provided market benchmarks for similar roles and positions;

21   two, similar nature but more of a middle management energy

22   survey that was utilized to assess the opportunities under the

23   plan; and then three, as is noted in my declaration, we

24   reviewed the pleadings as it relates to 16 other non-insider

25   programs that have been reviewed and approved by the courts.

ZACHARY PAUL GEORGESON - DIRECT BY MS. ROTMAN                    50

1    Q    And in this energy survey did it include other coal

2    companies?

3    A    Yes.

4    Q    How did you go about evaluating the cost of the proposed

5    plan?

6    A    Really related to the third group that I mentioned, my

7    team and I really got into four key pieces of analysis.

8    Number one, we reviewed the overall aggregate cost of the

9    plans on an annualized basis at each of the 16 companies that

10   we reviewed; two, that same number we also reviewed as a

11   percentage of the company's pre-petition revenue; three,

12   relatedly we look at the average cost of the plan from a

13   participant's perspective on an annualized basis; and then

14   four, just the overall disclosure number of participants that

15   would have been included in an approved non-exempt program.

16   Q    Okay.  So now let's talk about your analysis.  Where is

17   the Debtors' proposed valued employee program positioned in

18   the market in terms of annualized total cost?  That was one of

19   the things you looked at?

20   A    Sure.  The annualized total cost of this plan would be

21   approximately 7 percent above market median of the 16 cases

22   that I reviewed.

23   Q    How about with respect to its positioning for the

24   annualized cost per participant?

25   A    That basis would be similarly positioned down the fairway

1    approximately 3 percent below the median of average annualized

2    cost of other non-incentive plans.

3    Q    But how about with respect to the annualized cost as a

4    percent of revenue, how does the proposed valued employee

5    program measure up against what you saw in the market?

6    A    I'd say similar in the sense that it's right at market

7    median.  The answer would be, I recall, 20.29 percentage

8    points below market median on that particular vision.

9    Q    And then with respect to the total number of participants

10   how does it compare to market?

11   A    The same theme, approximate to market median, on that

12   measure I recall it's 5 percent, the number of participants is

13   5 percent above the 50th percentile of the other cases that I

14   reviewed.

15   A    In the other cases that you reviewed did you see any

16   KERPs that included union employees?

17   A    I did not.

18   Q    And when you evaluate the overall reasonableness of the

19   plan, or the proposed plan, what was your conclusion based on

20   the survey, the market surveys?

21   A    I'd say two conclusions, one, the overall design and

22   concept of it, and the necessity of it are consistent with

23   respect to the cases I reviewed.  And also just my experience

24   generally in the post-petition matters; and two, the reasons I

25   mentioned, the cost, the other measures themselves on a

ZACHARY PAUL GEORGESON - DIRECT BY MS. ROTMAN                    52

1       quantitative basis were very consistent and typical related to

2       the other plans that I looked at; and three, I would add,

3       although not asked, the actual opportunities themselves, when

4       we look at other energy companies on an individual basis what

5       positions at or near the 25th percentile on average, so also

6       on that basis I lead to the conclusion of reasonableness.

7       Q    Thank you.

8             MS. ROTMAN:  I have no further questions.  I'll pass

9       the witness.

10            THE COURT:  All right.  Thank you.

11            Let's take the same order.  Mr. Duran, any

12      questions?

13            MR. DURAN:  None from me, Your Honor.

14            THE COURT:  All right.  Mr. Williams, did you have

15      any questions?

16            MR. WILLIAMS:  Nothing, Your Honor.

17            THE COURT:  Anyone else?

18          (No audible response.)

19            THE COURT:  All right.  Thank you, sir.  You can

20      step down.

21          (Witness steps down.)

22            THE COURT:  Mr. Pesce?

23            MR. PESCE:  Thank you, Your Honor.  So I guess

24      before proceeding were there any other questions you had for

25      us based on that?

1          THE COURT:  I got it.

2          Mr. Williams, did you intend on offering the

3   evidence or you just wanted the opportunity to make argument?

4          MR. WILLIAMS:  Your Honor, I believe all the

5   evidence I would offer are part of the Record, are publicly

6   available documents, and so I don't anticipate calling any

7   witnesses.

8          THE COURT:  Okay.

9          MR. WILLIAMS:  But there may be evidence I would

10  direct the Court towards.

11         THE COURT:  And are you  going to do that in the

12  context of your closing --

13         MR. WILLIAMS:  Of a presentation, Your Honor.

14         THE COURT:  Of your presentation.

15         MR. PESCE:  Not to be a stickler, Your Honor, I

16  don't believe a witness or exhibit list was filed on Friday by

17  noon.  So we're not aware of the evidence, other than what was

18  in the pleading he filed, the statements in his pleading.

19         THE COURT:  All right.

20         MR. WILLIAMS:  Your Honor, I will -- they don't have

21  to be admitted into evidence, the Court can take judicial

22  notice of my arguments and the things I --

23         THE COURT:  All right.

24         MR. WILLIAMS:   -- direct you to.

25         THE COURT:  So you're going to give me closing.  Is

1      that --

2              MR. WILLIAMS:  I will give you closing.  Well, I

3      would make an observation I think is interesting --

4              THE COURT:  Please.

5              MR. WILLIAMS:   -- and I would bring to the Court's

6      attention at this point, as I read the pleadings of the

7      Debtors, they are asserting business judgment rule of the

8      Debtors, but they haven't offered anybody from the Debtor to

9      assert that this is in the best interest of the Debtors.

10     They've got their two hired guns that are outside folks, but

11     nothing from the Debtors to make that observation.

12             THE COURT:  All right.  I'll let you clean it up in

13     your closing.  All right.

14             MR. PESCE:  Yeah, I'd like the chance to respond to

15     that particular point because I think there's very --

16             THE COURT:  Well, let me just deal with this in a

17     way that makes me feel comfortable.  So, Mr Pesce, do you

18     intend on offering any additional evidence?

19             MR. PESCE:  No, Your Honor.

20             THE COURT:  And Mr. Williams has said that he's

21     going to just limit his presentation to closing argument.

22             Mr. Duran, did you wish to call any witnesses or

23     offer any additional evidence?

24             MR. DURAN:  No, Your Honor.

25             THE COURT:  All right.  Does anyone else wish to

1       offer any evidence?

2               (No audible response.)

3                   THE COURT:  All right.  We'll close the evidence,

4       Mr. Pesce.

5                   MR. PESCE:  Thank you.

6                   THE COURT:  Would you like to make closing?

7                   MR. PESCE:  Yes, sir.

8                   THE COURT:  Please proceed.

9                   MR. PESCE:  So it was interesting, I was trying to

10      figure out while sitting here how to bring up this point, but

11      the UMWA's counsel brought it up quite well for us.  You know,

12      in recent weeks the Debtors' attrition crisis has reached such

13      a pinnacle that the two most logical people at the Debtors who

14      would have been offered on behalf of the Debtors to testify in

15      this matter have resigned.  Those are our CFO, Gary Kohn, and

16      our Deputy CFO and Treasurer, Sheldon DeAuger (phonetic).

17                  The contrition crisis that th Debtors is facing --

18      are facing right now is truly impacting the business.  In the

19      post-petition period through December 5 nearly 40 more people

20      have resigned, and since December 5 we're still tallying the

21      number of total resignations, but a dozen or more have also

22      given notice and plan to resign after the start of the year.

23                  In response to this crisis which we've identified

24      for many months, which we thought would peak around January 4

25      when the -- a claw back under -- of a prior bonus program

1    would expire, we developed this program.  I think the evidence

2    shows that, one, on behalf of the Debtors Mr. Campagna, who's

3    effectively running on a day-to-day basis the financial and

4    business planning for the company at the direction of

5    management, shows it is necessary to have the program.

6            The program's consistent with the prior practices of

7    the company, and management, as indicated by Mr. Campagna's

8    testimony, worked with Towers -- Willis Towers Watson to come

9    up with a reasonable program that in the scheme of this case

10   is reasonable.  By evidence of the size of the awards and the

11   total pool here which is roughly $1.4 million per quarter, in

12   a company that has on an aggregate basis over $1 billion of

13   funded indebtedness.

14           And to respond to a few of the other points, I think

15   importantly in many of these -- in KERP, you know, it's a

16   difficult balancing act, because on one hand it's criticized

17   because it's too small, other times it's too large, it's, you

18   know, it's like a fairy tale in terms of, you know, too hot,

19   too cold.  So we tried striking the right balance here, about

20   roughly 15 percent of the employee pool is part of the

21   program.  We think that's the right number.

22           And we think by virtue of the fact that we are

23   engaged with our discussions with our unions that the unions

24   are very forceful, self-interested advocates for their

25   members, as they should be and must be.  They haven't brought

1    up a bonus pool program in the context of those discussions,

2    we've never had a bonus pool program effecting represented

3    employees, yet we've always had a bonus program for mid-level

4    and senior mid-level management.

5           So the history supports this, the circumstances

6    support it.  And as the evidence and expert report from

7    Mr. Georgeson, which has not been refuted or contradicted by

8    anyone here, the amounts are very reasonable and frankly below

9    market -- below the market median level.  So in light of all

10   that we would ask that the Court would approve the program.

11          We do take seriously the Court's concern that

12   perhaps this could lead to the wrong message for employees and

13   have us come back.  During the break we discussed that

14   internally, and while we're sympathetic to the Court's points

15   about it, I think we also would like to avoid a need to have a

16   further attrition read by people questioning whether or not

17   they're going to be out of a bonus on April 1 or July 1, what

18   have you.  And because as it seems the matters discussed here

19   wouldn't resolve both unions' objections, we would ask to have

20   the program approved subject of course to our DIP financing

21   cash collateral order.

22          So if the funding disappears, the program will

23   disappear, but that will be an elegant solution to having us

24   come back and have another contested hearing perhaps in three

25   or six or however months or weeks it takes.

58

1          So with that we would, you know, obviously entertain

2    or answer any questions the Court has.  But we would ask that

3    the program be approved and that we can communicate that to

4    our employees.

5          THE COURT:  Got it.  Thank you.

6          MR. PESCE:  Thank you, Your Honor.

7          THE COURT:  Mr. Duran, do you want to go next?

8          MR. DURAN:  Your Honor, I don't have any closing.

9    My client didn't file an objection.  I just wanted to make

10   sure that the Debtors met their burden to show that the valued

11   employee program didn't implicate Section 503(c) of the

12   Bankruptcy Code.

13         THE COURT:  You satisfied that requirement's been

14   met?

15         MR. DURAN:  I am, Your Honor.

16         THE COURT:  All right.  Thank you.

17         Mr. Williams?

18         MR. WILLIAMS:  Thank you, Your Honor.  I like to

19   take just a moment because I wasn't sure where the Court was

20   headed.  This morning I tried to follow your lead.  Could I

21   take a moment of personal privilege and make a couple of

22   introductions, because there are some folks from the United

23   Mine Workers who've traveled a long way.  I'm not calling them

24   as witnesses, but I want to put a name to a face --

25         THE COURT:  Of course.

1              MR. WILLIAMS:   -- for the Court's purposes.

2              THE COURT:  And I like their T-shirts too.

3         (Laughter.)

4              MR. WILLIAMS:  Somebody asked me whether they

5    brought me one, and I said they didn't.

6              THE COURT:  Yeah, that's -- you need to either up

7    your billing rate or do something --

8              MR. WILLIAMS:  I understand.

9              THE COURT:   -- because I need to buy one of those.

10             MR. WILLIAMS:  We are, for purposes of the Court's

11   knowledge --

12             THE COURT:  Yes, sir.

13             MR. WILLIAMS:   -- the Kimmerer Mine is in southwest

14   Wyoming.

15             THE COURT:  Okay.

16             MR. WILLIAMS:  And actually a couple of folks live

17   in Utah, it's in that corner.  And the Beulah Mine is in the

18   dead middle of North Dakota, it's not close to anything.  But

19   a couple of those folks are here.

20             THE COURT: All right.

21             MR. WILLIAMS:  So if you'll give me just a moment,

22   I'll appreciate it, I'll just take a brief amount of the

23   Court's time.

24             THE COURT:  Sure.

25             MR. WILLIAMS:  First of all Martin Argyle (phonetic)

1    is here.  He has worked with Kimmerer for 45 years and is the

2    mind community chairman and president of the local.

3              THE COURT:  Got it.  It's a pleasure to meet you,

4    sir.

5              MR. WILLIAMS:  Mr. Clint Bowen (phonetic) is a

6    operator at Kimmerer.  He is currently vice president of the

7    Local 1307.

8              THE COURT:  Mr. Bowen, good afternoon, sir.

9              MR. WILLIAMS:  Mr. Ed Grummage (phonetic) has worked

10   at Kimmerer for 39 years and has held a number of leadership

11   positions at the mine -- the local.

12             THE COURT:  Mr. Grummage, good afternoon, sir.

13             MR. WILLIAMS:  Mr. Colin Pace (phonetic) has worked

14   at various positions at Kimmerer for 14 years, is currently

15   the recording secretary of Local 1307.

16             THE COURT:  So he's the youngster compared to --

17        (Laughter.)

18             THE COURT:  Good afternoon, sir.

19             MR. PACE:  Good afternoon.

20             MR. WILLIAMS:  Your Honor, two folks from Beulah

21   have made their way here.  Mr. Jim Wagoner (phonetic) who

22   worked at the Beulah Mine for 37-1/2 years and retired earlier

23   this year.

24             THE COURT:  Mr. Wagoner, good afternoon.  I want you

25   to -- this is as cold as it gets here.

1        (Laughter.)

2              MR. WILLIAMS:  And, Your Honor, Mr. Deal Barrow

3    (phonetic), who worked at the Beulah Mine for 38-1/2 years,

4    retiring in 2015.  He served in a number of capacities

5    including as the president of the local Beulah UMWA.

6              THE COURT:  Got it.  Thank you.  Good afternoon,

7    sir.

8              MR. WILLIAMS:  Well, thank you for that moment of --

9              THE COURT:  Certainly.

10              MR. WILLIAMS:  -- personal privilege --

11              THE COURT:  I enjoy it.

12              MR. WILLIAMS:  -- to introduce those folks.

13              Really, these are the folks, as opposed to folks who

14    want to get a bonus here, these are the folks who take a

15    shower after work as opposed to before work.  They simply

16    believe they should be treated fairly.  We believe this

17    retention program doesn't treat them fairly.

18              THE COURT:  Help me understand that, because that's

19    the part -- and I wasn't in any way trying to be disrespectful

20    when I made a prior comment.  If it came across that way, I do

21    apologize.  I don't see how what's being proposed affects your

22    constituency at all.  It doesn't stop them from bringing up

23    issues, it doesn't stop them from making demands, it doesn't

24    stop them from doing anything.  And that's what I'm puzzled

25    by.  I mean not that I'm going to bring it up, but I struggle

1    with what is your, you know, what is your real standing here,

2    you know, what is it that really bothers you, the fact that

3    you didn't get one too, or is there something more?

4              MR. WILLIAMS:  Your Honor, I think it's a couple of

5    things, if I --

6              THE COURT:  All right.

7              MR. WILLIAMS:  -- can continue.  It's fundamentally

8    unfair.  The notion that -- what the Debtors and the lenders

9    have put in front of this Court are, get rid of all these

10   people and reject all the retirement obligations, reject the

11   collective bargaining agreements.

12             THE COURT:  What do you mean get rid of all these

13   people?  Who's --

14             MR. WILLIAMS:  Get -- fire all the employees, make

15   sure there's not a collective bargaining agreement at these

16   two sites, make sure that there isn't an ongoing relationship,

17   taking -- make sure that their pensioners and retiree

18   healthcare benefits for both UMWA and the Coal Act folks, they

19   don't get any money.  What's interesting here --

20             THE COURT:  Right.  But what has that got to do with

21   what is a very modest, quite honestly given what I see on a

22   routine basis, a very modest we need to stop the bleeding so

23   that we are able to achieve some value.  The parties that are

24   paying for it are the parties who quite honestly are trying to

25   realize, I would say a return but that's not going to be right

1        because they're not -- they're going to lose money.  I mean --

2                MR. WILLIAMS:  I don't know whether they are or not

3        and I don't know whether they even got those loans in good

4        faith, I'll leave that to the UCC to argue --

5                THE COURT:  Well, but I have to --

6                MR. WILLIAMS:   -- and take those positions.

7                THE COURT:  -- assume that until somebody says

8        something different.

9                MR. WILLIAMS:  Understood, Your Honor.  Let me say

10       that as I noted in my papers, the senior executives of this

11       company got $10 million before it filed.

12               THE COURT:  Now that's something that the

13       Committee's probably interested in.

14               MR. WILLIAMS:  I'm certain they are.  The fact that

15       Kirkland & Ellis, who I have an enormous amount of respect

16       for, I've practiced with those folks my entire career, got

17       retained a year ago to start working on this.  This isn't

18       anything new.  Their stated goals, okay, are attrition and

19       safety.  Okay.  How do you not address a quarter of your

20       workforce, and if you include the operating engineers, a third

21       of your workforce, if those are your stated goals.  A question

22       I didn't hear was that what is the attrition rate of the

23       miners.

24               THE COURT:  Right.  Why didn't you ask that?

25               MR. WILLIAMS:  Because, Your Honor, I think it's

1    their burden to prove the case.

2              THE COURT:  Well, I mean quite frankly the

3    attrition, I mean they dealt with the attrition of their

4    target group, which I agree is their burden, but it would have

5    been an interesting fact for me to have known.

6              MR. WILLIAMS:  I won't dispute that, Your Honor, and

7    maybe I should have.  But --

8              THE COURT:  I'm just curious.  I mean I haven't

9    quite yet figured out where you're going yet.

10             MR. WILLIAMS:  And I understand, Your Honor.  It

11   is -- there are a couple of things.  One is, as I pointed out

12   already, there's a false flag.  There was a big reference made

13   in closing argument by the Debtor that, Hey, there are cases

14   out there that say this is okay.  There are also cases out

15   there that are driving and if I knew this was going to be an

16   argument where the union was included as part of the KERP.

17             THE COURT:  All right.  Listen, I -- that argument

18   sort of on both sides went in one ear and out the other.  I

19   mean I -- to me that's not part of my evaluation of what's

20   been proposed.  I mean the Debtor gets to propose what it

21   thinks it needs to get to the end of the day, if you will, and

22   be able to confirm a plan or consummate a sale.  And I'm still

23   struggling, and I'm -- again, you've only been in front of me

24   a couple of times, but you know I tend to talk and when I'm

25   talking I'm trying -- I don't just talk for the sake of

1          talking, I'm trying to send you --

2                    MR. WILLIAMS:  I try and listen, Your Honor.

3                    THE COURT:   -- or deliver a message.   And I got

4          it, and I appreciate the respect that you show me.  But I'm

5          having trouble understanding how this impacts your

6          constituency other than it is, and again, no disrespect

7          intended, it's sort of the I'll simply throw up every road

8          block I possibly can to every single thing that I can in an

9          effort that at some point I'll become such a huge pain that

10         they will pay attention to me.  And I get it, I -- more than

11         once in my career I have taken that approach, and there's some

12         folks in this room who know that I was fairly decent at it.

13                   But with respect to the issue that I've got, and,

14         you know, I look at it, you know, what does the Debtor have to

15         show.  The Debtor has to show -- they have to articulate a

16         sound business purpose.  I get it.  I mean I've seen enough of

17         these to understand what happens to people who have a skill

18         set that can -- that is mobile.  I get it.  And I also have

19         seen companies that when the middle ranks get depleted, there

20         is nothing left because the decision makers and policy makers,

21         and no disrespect intended to those folks, but most of those

22         folks have long since forgotten how to actually implement it.

23                   It's the folks who are in the middle that actually

24         get the stuff done.  And I get wanting to maintain that asset

25         because, again, as I've said a million times, maybe not a

1     million but certainly a lot, employees are the -- they're the

2     life blood.  It doesn't matter what you sell or what you did

3     or what you created, if you don't have those folks, you don't

4     have anything.  And so I understand wanting to preserve that.

5          And I'm struggling -- I agree, if your constituency

6     doesn't operate the cranes, which I'd like to do actually,

7     and, you know, doesn't mine the coal, nothing happens.  And at

8     some point there has to be a discussion with your group, or I

9     would think there has to be a discussion.  But that's

10    independent of these folks.

11         And I'm having trouble -- you want to build this

12    huge, okay, you know, these senior executives got 10 million

13    bucks or whatever it was.  The Committee has already raised

14    that issue and they're going to look at that, and if there is

15    an avoidance action there, I have no doubt, given the fact

16    that I know the lawyers, there will be a discussion about that

17    at the appropriate time.

18         You know, they have a stated purpose of trying to,

19    you know, either thin the union out or take away some

20    benefits, it's not a desire to hurt those people, it's a

21    desire to increase the value of the underlying asset.  We all

22    know that.  I mean does it have a human impact?  Absolutely it

23    has a human impact.  But it's not that there's anybody there

24    who has some vendetta against an individual.  They're trying

25    to maximize the value of an asset.   Simply like your

1    constituency is trying to maximize their value.  I get all of

2    that.

3            I just don't see how this factors in.  And again,

4    I've talked way too much and for way too long.  That's the

5    problem I'm having, I don't see the relationship.

6            MR. WILLIAMS:  Your Honor, could I address a couple

7    of things and then --

8            THE COURT:  Take as long as you want.

9            MS. WILLIAMS:   -- try and wrap up.

10           THE COURT:  Sure.

11           MR. WILLIAMS:  First of all, I want to be cautious

12   because I don't know if the Court had the impression that I

13   had been the one who's been trying to put a stick in the

14   spokes of the wheel of this case.

15           THE COURT:  I like that analogy better.  I got it.

16           MR. WILLIAMS:  Here we -- I haven't and you will see

17   that when we get to the Disclosure Statement there are a

18   couple of items that I have left.  I have not objected to

19   other things, the Court has continued to enter orders and

20   we've tried to cooperate and work with the parties.  I even

21   acknowledged that in the first part of my presentation today.

22           THE COURT:  Sure.

23           MR. WILLIAMS:  So I don't want there to be a view

24   that we're objecting just to create problems and do that.  We

25   believe this is a fundamental fairness issue.

1              THE COURT:  Okay.

2              MR. WILLIAMS:  It's an inappropriate exercise of the

3    Debtors' business judgment --

4              THE COURT:  Okay.

5              MR. WILLIAMS:   -- to favor some people and

6    explicitly exclude others when their stated purposes are

7    retention issues and safety.  And when they exclude the United

8    Mine Workers, and by -- in addition to the operating

9    engineers, they're taking -- they're excluding a third of

10   their workforce.  That's not fair.  I don't believe it's an

11   appropriate use of the Debtors' business judgment.  And at the

12   end for the day, the Court may disagree with me, but that's

13   the position I'm arguing.

14             THE COURT:  No, I got it.  I got it.  I just, you

15   know --

16             MR. WILLIAMS:  So I want to tell the Court I

17   understand that we deal in big figures in lots of these cases,

18   and candidly my client's claim bills on are file at Number

19   226.  It's for a quarter of a billion dollars, of which the

20   Debtors are proposing to pay zero.  And the reality is, I sure

21   would like $1.5 million going to some retiree widows in West

22   Virginia as opposed to some mid-level employees who have a

23   job, continue to have a job.

24             The Debtors own question, and asked, if the Court

25   were to go to DRC and look at the DRC website, it has a whole

1    system of frequently asked questions.  And it talks about

2    employees, it says this, and I'm going to quote verbatim what

3    the Debtor has put on its website, it says, For our valued

4    employees, it is important to note that the day-to-day

5    operations continue as usual, including regular payment of

6    wages and receipt of benefits without change or interruption.

7    We anticipate no staff reductions as a result of the

8    restructuring announcement.  We continue to execute against

9    the same goals, prioritizing a safe and healthy work

10   environment and all mine development plans will remain in

11   place.

12          You sit there an go, If that's what they're saying

13   is important, that we want to protect the safety with the

14   benefit plans that are out there, and candidly this is an

15   employee benefit plan, I can't imagine, you know, did the slow

16   down charge, there's just a little bit of small

17   (indiscernible) --

18          THE COURT:  I got them.

19          MR. WILLIAMS:   -- would look at that list of

20   employees and say, what paper cut those folks might get, when

21   the gentlemen behind me are operating machines that weigh as

22   much as this building and dwarf it.  So I sit there and go, I

23   don't have a lot of sympathy.  And if your stated purpose is

24   for the safety and retention, why aren't you treating us

25   fairly.  I don't believe it's fundamentally in the best

1    interest of this Court to approve an agreement where it

2    excludes a third of the workforce unilaterally, and it's

3    simply discriminatory.

4              Well, I don't have better arguments.  It's a simple

5    argument, I believe it's a powerful argument.

6              THE COURT:  I got it.

7              MR. WILLIAMS:  And with that, unless the Court has

8    any other questions, I'll be happy to answer them.

9              THE COURT:  I don't.  Thank you.

10             MR. WILLIAMS:  Thank you, Judge.

11             THE COURT:  All right.  Mr. Pesce, I'll give you a

12    couple of minutes to wrap up if you wish.

13             MR. PESCE:  We don't have anything further except I

14    think just one clarification that I want to make based on some

15    of the statements of the union counsel.  We are in bargaining

16    sessions and trying to work out a resolution.  We don't have

17    plans though to terminate or fire or lay off employees or

18    close any of our mines.  So I don't want that to be

19    unaddressed.  I think the Record though otherwise is complete

20    and we respectfully ask the Court to grant the motion.

21             THE COURT:  All right.  And I have before me the

22    Debtors' motion for entry of an order authorizing and

23    approving the Debtors' proposed valued employee program.  It

24    is the instrument at Docket 584.  Based upon the Record that I

25    have, I am going to find that the Debtors have articulated a

1    rational business person -- purpose, excuse me, for the

2    program.  Again, and no disrespect intended to Mr. Williams, I

3    get it, he's arguing the best argument he's got, but every

4    employee benefit plan always discriminates against someone.

5    It always does.  I have never ever seen a retention program

6    that applied to everyone.  So you could make that argument in

7    every single retention program that's out there.

8         I don't think that this crosses any line for me.

9    Again, as I said before, I'll repeat it, these folks are

10   important to the continuation of the business.  That doesn't

11   mean that the folks who are represented who are union

12   employees aren't valuable and need to be addressed.  It simply

13   says that today I'm asked to approve the Debtors' request to

14   address this subset of the employees.

15        I think the program is appropriate, I don't think it

16   in any way crosses any boundaries for me.  The party that is

17   going to pay for it is in support of it.  I do not find that

18   503 has been implicated in any shape, way, form or fashion.  I

19   will approve the benefit program as proposed.

20        Let's see, I have the order that was attached

21   originally to 584.  Is that still the appropriate order?

22             MR. PESCE:  Yes, sir.

23             THE COURT:  All right.  I will get that signed and

24   on the docket today.

25             MR. PESCE:  Thank you.

1          THE COURT:  All right.  What's next?

2          MR. PESCE:  So the final two things today are the

3     Disclosure Statement, which I think should be quicker than the

4     KERP, and then we have the status conference.

5          THE COURT:  Okay.

6          MR. PESCE:  So for the Disclosure Statement, this is

7     for the parent Debtors, following -- okay -- following the

8     filing of the Disclosure Statement motion and the Disclosure

9     Statement, we had discussions with a very wide array of

10    individuals involved in the case.  I would particularly like

11    to thank Mr. Marinuzzi and Todd Goren from Morrison Foerster

12    who represent the Committee.  They had some of the most

13    extensive observations and comments to the Disclosure

14    Statement which we were able to incorporate.

15         One of the members of the Committee, the Pension

16    Benefit Guarantee Corporation, also had various changes that

17    we were able to accommodate.  Several sureties also we were

18    able to accommodate them.  The Mar-Bow investment fund asked

19    us to include the members of the Ad Hoc Committee, which were

20    identified in the Rule 2019 disclosure.  We did that.  Chubb

21    Insurance Company, various state tax authorities, the DIP

22    lenders had some changes.  The MLP term lenders, the GP

23    Conflicts Board, various instrumentalities of the United

24    States government, including the EPA, and Mr. Tenenbaum's

25    here, DOJ otherwise in the Interior Department, and our coal

1    stip owners in Montana.

2          At this time there's four unresolved options.  As we

3    said in our reply, we think they're all disclosure related

4    objections have been resolved either through consensual

5    modifications or other disclosures we've made.

6          I respectfully submit that the four remaining

7    objections, which one is from the MWA, one's from Mr. Duran

8    the United States Trustee, the Securities and Exchange

9    Commission, and Caterpillar Financial which is the counter

10   party so like basically an equipment lease.  Those all raised

11   confirmation related objections.

12         We have sought to accommodate them with possible --

13   we've added a disclosure saying that they reserve their rights

14   and nothing is really jeopardizing that.

15         So with that I'm happy to either go through any

16   particular parts of the disclosure statement.  Otherwise I

17   think it would be helpful if we can just -- we can turn to the

18   objection and then we can kind of go through those and -- well

19   really whatever Your Honor thinks is appropriate.

20         THE COURT:  Fair enough.  Let me say this for

21   everyone because I do have some folks who haven't appeared in

22   front of me before.

23         Today -- at least it's my view that today is

24   independent of a confirmation hearing.  And a failure to raise

25   any objection today does not in anyway alter your ability to

1          raise any objection under Section 1123 or 1129 at the time of

2          confirmation.

3                  So, I have always operated that way.  I believe

4          that's what the code says.  So to the extent that you were

5          worried that you had to make a placeholder, if you will, you

6          do not.  Even the parties that have agreed to the disclosure

7          statement or who have not raised an objection, all issues

8          again regarding 1123 or 1129 remain on the table and live for

9          a confirmation hearing.

10                 All right, so Mr. Mayer -- Mr. Mayer got up first.

11         Mr. Mayer, let me hear from you because I read your.  It

12         seemed to me -- it seemed to me that yours really was a

13         confirmation objection.  Do you disagree with that?

14                 MR. MAYER:  Well let me say this.  First of all, may

15         I ask first request an indulgent on courtroom decorum?

16                 THE COURT:  Sure.

17                 MR. MAYER:  We have so many lawyers here from the

18         Debtors and the lenders that I haven't been able to find a

19         seat at the table.  While I'm not addressing the Court during

20         this hearing, may I have Court's indulgence to be able to

21         stand at the side since I can't seem to be able to find a

22         chair?

23                 THE COURT:  Well you can do one better.  There's,

24         you know, welcome to take a chair or sort of -- they'll find a

25         place for you on the bench.  You shouldn't have to stand.

1          I don't -- I think that chair over there works just

2     fine.  I think what happened is somebody turned it over and a

3     wheel fell out.  So I went over and put the wheel back in, so

4     but I think it's just fine.

5          MR. MAYER:  Your Honor, by way of short background.

6     Caterpillar Financial, my client, has unexpired leases and a

7     couple of secured notes on 29 units of Caterpillar equipment.

8          THE COURT:  Right.

9          MR. MAYER:  These are large machines.  Some of these

10    are like 10 times the size of a normal highway truck.  Total

11    debt is about $23 million.

12         THE COURT:  I think we should do an on-site

13    inspection and the Judge should get to drive.

14         MR. MAYER:  Well, when I first looked into this case

15    I tried to find where in the schedules there was any mention

16    of this equipment.  And I failed to find it.

17         THE COURT:  So you couldn't find either on A or on

18    G?

19         MR. MAYER:  Not at all.

20         THE COURT:  Or on B, sorry?

21         MR. MAYER:  They mentioned Caterpillar, but there's

22    no discussion of --

23         THE COURT:  Okay.

24         MR. MAYER:  Now I have two basic objections to the

25    disclosure statement.  The first one is a technical one that

1      disclosure statement must contain a description of the Debtors

2      assets and the Debtors debts.  And this disclosure statement

3      is basically silent.

4                  THE COURT:  Okay.

5                  MR. MAYER:  The response I got from the Debtors was

6      well we did file schedules and the schedules should supply

7      that information.

8                  Well in fact, they don't.  Each of the Debtor's

9      schedules has a preliminary statement which says that a fixed

10     asset list are not included in these schedules.  You can

11     obtain them by requesting them.

12                 I requested those fixed asset schedules for the five

13     cases that I'm concerned with.  Hadn't got them.

14                 THE COURT:  Okay.

15                 MR. MAYER:  Now that's a technical objection.  The

16     same goes for debts.  Most of the Debtor's debts and most of

17     the schedules are stated as undetermined, contingent,

18     unliquidated, disputed.

19                 THE COURT:  All right, can I just sort of cut to the

20     chase on this.  So you want something that says that there are

21     17 leases that are with the following Debtor's, blah, blah,

22     blah?

23                 MR. MAYER:  That really goes to my second objection

24     is that Caterpillar can't determine from the disclosure

25     statement, the Plan, what it's likely to get.

1           And I think that -- two suggestions that I have.

2           THE COURT:  So, why not?

3           MR. MAYER:  Well, the --

4           THE COURT:  Because don't you first --

5           MR. MAYER:  -- first I don't know for sure if the

6   Debtor agrees with our characterization if they're contract or

7   leases?  I don't have that information.

8           THE COURT:  But you could -- I mean that's not a

9   disclosure statement issue.  That's a motion to compel

10  assumption or rejection and then you'll draw out the financing

11  argument if it exists, right?

12          MR. MAYER:  Well what I request -- what I think

13  ought to be done -- since it's not in the schedules, it's not

14  in the disclosure statement --

15          THE COURT:  So you're saying the leases themselves

16  aren't on schedule -- on any Schedule G that you've seen?

17          MR. MAYER:  Well there's Caterpillar address, that's

18  it.  And so I don't know.

19          Now I furnished with my proofs of claims copies of

20  all the category documents.  I have them here if it's

21  necessary to put them in the record.

22          THE COURT:  So can I ask a couple of questions?  So

23  I assume that Caterpillar's -- that the Caterpillar leases are

24  all have a lease number, correct?

25          MR. MAYER:  Yes.

1          THE COURT:  Are the lease numbers reflected on any

2     Schedule G or just Caterpillar?

3          MR. MAYER:  There are a few, but not all of them.

4          THE COURT:  All right.

5          MR. MAYER:  What I would request --

6          THE COURT:  Sure.

7          MR. MAYER:  -- is that either the disclosure

8     statement or some other document that's either filed on the

9     Court or put on a website somewhere there ought to be a

10    preliminary non-binding list of the unexpired equipment leases

11    which maybe assumed as part of this thing.

12         THE COURT:  Okay, so let me first ask, Mr. Pesce, is

13    it possible to identify the Caterpillar leases?  Have we

14    gotten that far along?  Do we know that they exist?   Do we

15    know they don't exist?

16         MR. PESCE:  Yes, Your Honor.  So we are in the

17    process of filing a list of contracts we intend to assume

18    subject to the right of the ultimate buyer to reject them.

19         My understanding is that list was shared with

20    Mr. Mayer.  And as far as we're aware, that's the list of the

21    equipment leases.  I'm happy to speak with Counsel afterwards

22    if he thinks that list is insufficient.

23         THE COURT:  Right.

24         MR. PESCE:  We can update it or something.

25         THE COURT:  So let me just ask.  Mr. Meyer, you've

1    seen -- first of --

2            MR. MAYER:  I have seen a preliminary, non-binding

3    list and I've been given different information about which

4    contracts will be assumed and which are not.

5            THE COURT:  But I don't think -- I don't think

6    you're going to find out in the disclosure statement what's

7    going to be assumed and what's not.

8            MR. MAYER:  What I would like to ask is if that list

9    or a similar list could either be included in the disclosure

10   statement or otherwise filed with the Court and made part of

11   the Court's record.

12           THE COURT:  It's a very valid request.  Mr. -- it

13   seems to me this ought to be relatively easy to do.

14           MR. PESCE:  Yes, it's -- if it hasn't been filed

15   already, it's going to be filed at the end of this week.

16           THE COURT:  So, let me ask, Mr. Mayer, would you be

17   satisfied if there was a stipulation between your client and

18   the Debtors that says here are the list of known Caterpillar

19   leases signed and approved by me.  Would that resolve your

20   issues?

21           MR. MAYER:  I think so.  Twenty-three of our

22   contracts are leases, six are secured notes, and all 29 of

23   them were in the list.

24           THE COURT:  Okay.  So why don't we -- I mean, is

25   there any reason we couldn't do -- you have to do that

1        eventually anyway.  Any reason why you couldn't put together a

2        stipulation between the Debtors and Caterpillar as to we're

3        aware of the following leases.  We're aware of the following

4        financing agreements and just reference them by number?

5                MR. PESCE:  Yeah, I think that's what we're -- we're

6        already plan to do that, so.

7                THE COURT:  Okay, well then it ought to be easy,

8        right?

9                MR. PESCE:  Yeah.  So if you want a stipulation, we

10       can attach that list.

11               THE COURT:  Any reason that we couldn't do that,

12       file it separately that way you don't have to go through 800

13       pages of documents.  You can say that's mine at docket number

14       1585?

15               MR. MAYER:  That would satisfy my objection, Your

16       Honor.

17               THE COURT:  Okay.

18               MR. PESCE:  And just to be clear, we're not going to

19       be --

20               THE COURT:  You're not making call list of what

21       you're going to do with it.  You're just saying, --

22               MR. PESCE:  Yeah, okay.

23               THE COURT:  -- it's a stipulation as to the

24       following contracts and secured financing.

25               MR. PESCE:  Yes.

1           THE COURT:  And you might even put, you know,

2     lease/financing agreement.

3           MR. PESCE:  Right.

4           THE COURT:  You know, counter party, so you know

5     which Debtor and a number if there is one.

6           MR. PESCE:  We'd be happy to do that.

7           THE COURT:  All right.  That seems to be --

8           MR. MAYER:  I furnished that information to them, if

9     they'll put that in the list that would satisfy my objection.

10          THE COURT:  Okay.

11          MR. PESCE:  Wonderful.

12          THE COURT:  Terrific.

13          MR. PESCE:  All right, thank you sir.

14          THE COURT:  All right, so we'll get that done say --

15    given all they've got on their plate, two weeks sound like a

16    reasonable time period?

17          MR. MAYER:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MR. PESCE:  Thank you very much.  That resolves

20    that.

21          THE COURT:  All right.  So let me -- Mr. Duran, let

22    me hear from you as to where you are on this issue.

23          MR. DURAN:  Your Honor, the United States Trustee

24    raised three objections.

25          First was the balance and the non-impaired,

1      non-voting status notice where inconsistent with the
2      definition of releasing party.  The Debtor's have cured that
3      one --
4                  THE COURT:  Okay.
5                  MR. DURAN:  -- with the revisions. Second was needed
6      to find out what consideration there was and the legal
7      justification for the broad release exculpation provisions.
8                  THE COURT:  Okay.
9                  MR. DURAN:  There's -- have included in the
10     revisions to the disclosure statement the consideration.
11     There's mutual releases -- the third party release for the
12     releases by the WLB.
13                 THE COURT:  So it's disclosed.  It may or may not be
14     enough.  But it's disclosed.
15                 MR. DURAN:  Right.  Consideration is.  I'm not sure
16     the legal justification is and then I raised the third issue
17     which was a discharge under Section 1141.  And all I wanted
18     there was the legal justification.
19                 I'm not sure that there's been anything added to it.
20     I think I know what the argument is.
21                 THE COURT:  So help me understand that.  Do you
22     think that the disclosure statement ought to contain a
23     business justification for a plan discharge?  Maybe I'm
24     misunderstanding what you're --
25                 MR. DURAN:  Right.  As I understand, this is a

1        liquidating plan.  And under Section 1141(d) --

2                    THE COURT:  I get it.  They may not be entitled to

3        one.

4                    MR. DURAN:  Right.

5                    THE COURT:  All right.

6                    MR. DURAN:  I think they're maintaining that they do

7        get a discharge.  And I think the responses that the discharge

8        is consistent with applicable law.

9                    THE COURT:  Okay.

10                    MR. DURAN:  And I think that's response.  I may just

11        be relegated to a confirmation issue on that very issue.

12                    THE COURT:  I certainly think you have a

13        confirmation issue.  Is there -- would it resolve your

14        objection if the sentence were added to the disclosure

15        statement that simply said the US Trustee does not believe

16        that the discharge is available under 11 USC Section 1141?

17                    MR. DURAN:  (D)(3).  I think that would be fine.

18                    THE COURT:  Any objection to putting that in there?

19                    MR. PESCE:  No, Your Honor.

20                    THE COURT:  All right, so we'll get that inserted,

21        because I agree with you.  It's just a statement of the law.

22        I got it.

23                    MR. DURAN:  Sure.

24                    THE COURT:  So if that sentence goes in that would

25        resolve your disclosure statement objections with all rights

1      reserved with respect to confirmation?

2                MR. DURAN:  I believe so.

3                THE COURT:  Okay.

4                MR. DURAN:  Just with that reservation of rights.

5                THE COURT:  Got it.  Thank you.

6           All right, may I hear from the SEC?

7                MS. CHASE:  Good afternoon, Your Honor, Sonia Chase

8      for the Securities and Exchange Commission.  We did have

9      discussion with Debtor's Counsel regarding our disclosure

10     concerns.

11               They were, as a result of the revisions to the

12     disclosure statement, substantially narrowed.  However, I do

13     want to point out that we still believe that the disclosure is

14     inadequate with respect to consideration for the releases.

15               Mr. Duran mentioned that yes the disclosure

16     statement has been revised to indicate that the Debtors

17     believe that consideration for those third party releases are

18     in the form of a neutral releases.

19               However, in our mind without the releasing parties

20     not knowing what kinds of claims could be released against

21     them through the mutual releases.

22               THE COURT:  So say that again.  Without the

23     releasing parties knowing what types of claims would be

24     released -- I thought they're getting full release?

25               MS. CHASE:  Well, they're getting mutual releases

1     but of what.  What kind of claims against -- let's use public
2     shareholders, that's obviously what our interest is in this
3     case.

4            Public shareholders are both releasing parties and
5     they're also released parties through the mutual releases.

6            THE COURT:  Right.

7            MS. CHASE:  So at most the disclosure statement now
8     indicates that with respect to public shareholders if they
9     decide not to opt out of the third party releases, --

10           THE COURT:  Right.

11           MS. CHASE:  -- they also will be released from
12    claims against them for claims that the severe general
13    statement, the disclosure statement that arose that may
14    have -- potential claims that arose from events leading up to
15    the Chapter 11 case.

16           THE COURT:  I got it.  So if someone offers you a
17    release, before you accept it, you want to know what exactly
18    is being released?

19           MS. CHASE:  In order for the shareholder in this
20    case to make an informed decision as to what the purported
21    benefit of being themselves a released party.

22           THE COURT:  So, if they've done something, they
23    wouldn't know what they've done; is that right?

24           MS. CHASE:  You know, Your Honor, I think that even
25    if they're able to understand the nature of these mutual

1    releases, your average retail investor is going to be hard

2    pressed to know or even guess what kinds of claims against

3    them these released parties such as the officers, home

4    officers and directors, the Debtor's professionals, what kind

5    of claims they have against public shareholders --

6         THE COURT:  I got it.

7         MS. CHASE:  -- that therefore informs their decision

8    as to whether there is an actual mutual release here that will

9    cause them to not opt out of those releases.

10        THE COURT:  I got it.  Okay.

11        MS. CHASE:  So that is our very narrow disclosure

12   issue.  And I appreciate Your Honor's comments regarding the

13   merits of the release and exculpation provisions being

14   appropriately considered at confirmation.  We certainly

15   understand that.

16        However, we raised our objection at the disclosure

17   stage because we are requesting that Your Honor consider

18   requiring shareholders and creditors to be given the

19   opportunity to affirmatively consent to those third party

20   releases through an opt-in mechanism.

21        THE COURT:  Right.  My understanding, at least my

22   circuit which grades my homework, has said that it opt-out is

23   just perfectly fine, right?

24        MS. CHASE:  I don't believe there are any published

25   decisions.  I believe that, for example, in the disclosure

1          statement the Debtor's refer to a string cite of cases that do

2          occur in the Southern District of Texas.  We are generally

3          aware of those cases, I personally was involved in the

4          *Sandwhich* (phonetic) matter.

5                    However, I will say I don't think those cases are

6          president with respect to Your Honor's decision in this case.

7          I also feel that those cases just based upon that string cite

8          of cases, we can't know what distinguishing facts and

9          circumstances might have been involved in those cases that

10         lead up to an opt-out being decided as -- accepted as

11         appropriate consent to a non-debtor's third party release.

12                   I can say just from the get-go that GenOn and South

13         Cause Holdings were not public companies.  They did not

14         involve public investors who were impacted by third party

15         releases.  And I can tell you in Sandridge (phonetic) the

16         public shareholders in that case who were deemed to reject,

17         who got nothing and were not able to vote on that plan were

18         expressly carved out as releasing parties in Sandridge.

19                   THE COURT:  Got it.  All right.

20                   MS. CHASE:  So that is why we're requesting -- I am

21         fully prepared to argue in favor of an opt-in mechanism

22         constituting appropriate and necessary consent to third party

23         release is the Judge -- if Your Honor is so inclined.

24                   THE COURT:  All right.  I'm going to give you the

25         opportunity to make the argument, so I'm going to listen to

1          you.  Absolutely.  If you did your homework -- as I know that

2          you did -- you know that many years ago I was the biggest

3          advocate of the opt-in release.

4                    MS. CHASE:  I actually was not aware of that, Your

5          Honor.  I'm happy to hear that.

6                    THE COURT:  I know longer get to make arguments.

7                    MS. CHASE:  Would you like me to --

8                    THE COURT:  Well, I want to hear from you.  I'm just

9          trying to survey the room, if you will to try to figure out

10         what I've got to deal with.

11                   MS. CHASE:  Understood.

12                   THE COURT:  So we will -- you will certainly have

13         the opportunity.

14                   MS. CHASE:  Thank you, Your Honor.

15                   THE COURT:  Thank you.  All right, Mr. Williams?

16                   MR. WILLIAMS:  Thank you, Your Honor.  Two -- in the

17         spirit of indulging, the Debtors have done most of what I

18         asked.  Most of the things I've put in my objection, they've

19         addressed adequately.

20                   THE COURT:  Okay.

21                   MR. WILLIAMS:  I can't fight those.

22                   THE COURT:  What's left?

23                   MR. WILLIAMS:  There are two issues.

24                   THE COURT:  Okay.

25                   MR. WILLIAMS:  One I think is easy.  Mr. Pesce and I

1   have talked about it.  This is the proposed disclosure

2   statement.  I couldn't find a definition in it.  And it

3   creates an issue that I think we can easily resolve.

4              THE COURT:  Okay.

5              MR. WILLIAMS:  And that is there's these triggering

6   dates regarding the executory contracts.  Since collective

7   bargaining agreements are executory contracts, our executory

8   contracts need to be specifically excluded from the mechanism

9   that they're address because we've got 1113, 1114 to handle

10  those.

11             THE COURT:  Okay.

12             MR. WILLIAMS:  I think it's definition problem that

13  is easily addressed.  Mr. Pesce said he would say something on

14  the record.  But I would like to either be pointed to

15  something in here that says the definition is right and that

16  we're excluding them for purposes of the triggering events for

17  executory contracts.  That's my preference.

18             Either show me where it is or add it in.

19             THE COURT:  All right.  Okay, I got it.  What's the

20  second thing?

21             MR. WILLIAMS:  This is the harder one, Your Honor,

22  and this is the one that you may tell me Mr. Williams, why

23  don't you come back at the time of confirmation.

24             But I need to make an argument.  It's not my

25  believe.  Excuse me, it is my believe.

1          THE COURT:  That's not a good way to start an

2     argument.

3          MR. WILLIAMS:  I know.  It's 4:00 o'clock, we've

4     been here a couple of hours.  It is my believe that you cannot

5     have adequate information for my client to make an informed

6     business judgment.

7          If the notion is, hey we're going to do an auction,

8     we may or may not sell certain assets.  We may or may not

9     accept or reject your collective bargaining agreement.  And

10     we're going to hold that out until the end.

11          I don't think I can make an informed decision about

12     whether that's a good plan until I know who that one body is.

13     And we may get there at some point, but I don't think it's

14     fair at the disclosure statement stage and this is a chicken

15     and the egg issue.  I understand that.

16          THE COURT:  Sure.

17          MR. WILLIAMS:  But I don't believe that you can

18     provide adequate information if there's this grand unknown

19     about how this one third -- actually my clients are one third

20     of the constituency is going to be treated in their CBI.

21          THE COURT:  Got it.  So you think -- this is a

22     question and artfully given.  So you believe that in order to

23     have an adequate disclosure statement in a sale plan, the

24     ultimate purchaser has to be known before the disclosure

25     statement goes out?  Is that the argument?

1          MR. WILLIAMS:  If they're going to be seeking to

2     modify the collective bargaining agreement and they reserve

3     all their rights to do so under this proposal.

4          THE COURT:  I got it.  Okay.

5          MR. WILLIAMS:  The other executory contracts they're

6     going to be handled in advance, but not mine.

7          THE COURT:  They don't know whose -- they don't

8     know, you know, they don't know who they're going to the dance

9     with yet, right?

10          MR. WILLIAMS:  And that's exactly the problem.  How

11     can I make an informed decision in my client's best interest

12     if I don't know who I'm dancing with?

13          THE COURT:  I got it.

14          MR. WILLIAMS:  Thank you, Your Honor.

15          THE COURT:  All right, thank you.  All right,

16     Mr. Pesce?

17          MR. PESCE:  Thank you, Your Honor.  So if I may just

18     take a moment.  I think my partner Steve Hessler spoke to the

19     SEC about the disclosure issue and does that work or is there

20     something more that --

21          MS. CHASE:  Just to clarify, Mr. --

22          THE COURT:  Can I get you in front of a microphone

23     so everyone can -- I'm so sorry.

24          MS. CHASE:  Oh no, that's fine.

25          THE COURT:  Careful.

1          MS. CHASE:  Yes, I just did have a conversation with

2     Mr. Hessler who proposed that for purposes of our disclosure

3     regarding claims against shareholders, that the disclosure

4     statement would simply indicate that the Debtor's don't

5     believe that those claims against releasing parties against

6     shareholders actually have any value.  But they are being

7     released nevertheless, is that my -- is that correct?

8          MR. PESCE:  Yes.

9          THE COURT:  So let me -- I just want to make sure we

10    think through this.  So let's assume that there is a claim

11    against a public shareholder and the Debtor has now put in

12    their disclosure statement says we think it has no value.  I

13    approve that disclosure statement, it's relied upon.  Then

14    isn't Undergold and Stallion and all -- because I'm the one

15    who lost that case, so I remember it greatly.

16          Aren't you then now bound and that claim would then

17    be taken away perhaps from a Committee or some post-litigation

18    trust vehicle, if you will, because of that issue?

19          I will tell you that answer is yes.  Because I lost

20    that issue.

21          MR. PESCE:  Yes, but it's -- I don't think it makes

22    much of a difference because these are subordinated security

23    claims which were subordinated to a recovery on account of the

24    equity.

25          THE COURT:  No, but I thought we were talking about

1      the Debtor's claims against the shareholders.  That's what I

2      thought she was worried about.

3              MS. CHASE:  No and actually what I'm worried about,

4      actually, is I'm not actually -- we're not -- we're talking

5      about consideration that's being provided by released parties

6      who are non-debtor third parties.  So, the disclosure

7      statement doesn't even indicate whether what they're talking

8      about.

9              THE COURT:  So you're worried about the claims that

10     third parties may have that they don't yet know about?

11             MS. CHASE:  That -- exactly.  I mean, --

12             THE COURT:  Okay.  I misunderstood your argument.

13             MS. CHASE:  That is the purpose of the mutual --

14             THE COURT:  I totally misunderstood.

15             MS. CHASE:  Our position being that --

16             THE COURT:  So what you're saying is that your

17     objection is resolved if there's a statement that says that

18     the Debtors don't believe that any of these third parties who

19     may hold claims, have claims of any value?

20             MS. CHASE:  Against -- yes --

21             THE COURT:  Against the Debtors?

22             MS. CHASE:  -- against the releasing parties as part

23     of the mutual release.

24             THE COURT:  I got it.  Then I get it at that point.

25     I totally misunderstood.

1           MS. CHASE:  I'm actually not that concerned about

2   the Debtors claims against public shareholders simply because

3   I think that they -- it's property of the estate.  Those are

4   estate claims.

5           THE COURT:  I know.  But if they were to say that

6   they have no value and somebody got a copy of that and relied

7   on it by either voting or not voting --

8           MS. CHASE:  Right.

9           THE COURT:  -- I think at that point the claim is

10  gone.

11          MS. CHASE:  I think that would be -- I'm not sure

12  they would have agreed to that so.

13          THE COURT:  Got it.

14          MR. PESCE:  I think we are willing to agree to

15  the --

16          THE COURT:  I don't know why you wouldn't.  I mean,

17  that's what you would go around telling everybody anyway.

18          MR. PESCE:  Right.  So I think with that, and then

19  we -- obviously all rights are reserved for confirmation on

20  the opt-in versus opt-out.  We disagree, but, you know, we can

21  take it --

22          THE COURT:  I mean, I'm going to let her make her

23  argument today if she wants to make it.

24          MR. PESCE:  Okay.

25          THE COURT:  Because I mean --

1          MS. CHASE:  When it's an appropriate -- it's the

2     appropriate time to make the argument if we were going to

3     opt-in?

4          THE COURT:  I'm going to let you make it -- I'm

5     going to let you make it at both instances because it's

6     somewhat of a gating issue.  I mean, I'm sure you now the hill

7     that you're about to climb, but I'm certainly willing to let

8     you try.

9          MS. CHASE:  We're aware of it.

10          THE COURT:  Okay.

11          MS. CHASE:  Thought I'd give it the college try.

12          THE COURT:  Fair enough.  Okay.

13          MR. PESCE:  All right, that's fine.

14          THE COURT:  So, with respect to -- with respect to

15     that, so you're going to give me -- you're going to give me

16     very short presentation or give me a short direct with a

17     witness says I've read it, I think it's true and accurate.

18     Jones, you should approve it?

19          MR. PESCE:  Sorry, this is for the opt-in versus

20     opt-out?

21          THE COURT:  No just for the disclosure statement

22     issue.  I want their record.

23          MR. PESCE:  Yes, we have a witness for that.

24          THE COURT:  I thought we'd take the opt-in, opt-out

25     just as part of, if you will, at closing.  Because you're not

1    going to offer any evidence with respect to that, right?

2          MS. CHASE:  No, Your Honor.  That'll be fine.

3          THE COURT:  Okay.

4          MR. PESCE:  So in the interest of the record, what

5    we would propose doing is having our witness from earlier,

6    Mr. Campagna who is basically the arms and legs preparing it,

7    will do a proffer if nobody objects of him standing next to me

8    subject to the right of cross-examination if somebody would

9    like to do that.  And that would be the basis, you know,

10   business justification for us on the disclosure statement if

11   that works for Your Honor.

12         THE COURT:  Fair enough.  Or Mr. Capagna, where are

13   you?  Come on up to the podium.

14         Committee I didn't mean to ignore you.

15         MR. MARINUZZI:  Your Honor, I don't know if you'd

16   like us to address this as part of closing or you'd like my

17   remarks before the presentation of evidence.  I'll agree if

18   Your Honor would like to proceed.

19         THE COURT:  I assume that -- I mean, I took it that

20   you have for purposes of today, all of your issues are

21   resolved, right?

22         MR. MARINUZZI:  That's correct, Your Honor.  But I

23   brought my soap box and I need to advise the Court of the

24   status of our investigation.

25         THE COURT:  No, and I want that.  So let's go ahead

1      and proceed.  If I could, let's perhaps try -- if you have no
2      objection -- can I try this a different way?
3                      MR. MARINUZZI:  Sure.
4                      THE COURT:  All right.  Mr. Campagna, just come on
5      up to the podium, raise your right hand.  Just right there.
6           (Witness sworn.)
7                      THE COURT:  All right, Mr. Campagna, state your name
8      for the Record, please.
9                      THE WITNESS:  Robert A. Campagna.
10                     THE COURT:  Mr. Campagna, have you been involved in
11     the preparation of the Debtor's disclosure statement?
12                     THE WITNESS:  I have.
13                     THE COURT:  Have you read it?
14                     THE WITNESS:  I have, yes.
15                     THE COURT:  Have you had a chance to work with all
16     the professionals who gave input into that disclosure
17     statement?
18                     THE WITNESS:  Yes, I have.
19                     THE COURT:  Have you -- any issues that you have,
20     were they satisfactorily resolved?
21                     THE WITNESS:  They were all satisfactorily resolved.
22                     THE COURT:  In your professional opinion, does the
23     disclosure statement provide an honest accurate picture of the
24     Debtor, it's affairs and what it proposes to do in the Plan?
25                     THE WITNESS:  Yes, it does.

1          THE COURT:  Anyone wish to cross-examine

2     Mr. Campagna on the disclosure statement?

3          (No audible answer.)

4          THE COURT:  All right, thank you sir.

5          THE WITNESS:  Thank you.

6          MR. PESCE:  So in terms of the closing argument

7     regarding the opt-in opt-out releases.  Is that the only issue

8     that --

9          THE COURT:  Well, you've still got -- you've still

10    got the mine workers.

11         MR. PESCE:  Oh and the mine, yes.  Right.  So if it

12    pleases the Court, I can address both of those at this point.

13         THE COURT:  Sure.

14         MR. PESCE:  The Debtor, as to the mine workers we

15    respectfully urge the Court to overrule that objection.

16         We, as a fundamental matter, this isn't a -- this

17    isn't a true sale case in the sense that we have bidding

18    procedure with no stalking horse and we're not really sure

19    what the outcome is.

20         We have an RSA with 90 percent of our senior secured

21    lenders.  They're going to credit bid for the assets.  They're

22    the presumptive buyer of all of the assets unless somebody

23    else shows up at the auction.  And on that basis, I think

24    there is sufficient disclosure regarding who the buyer is

25    going to be.

1          As a matter that Mr. Marinuzzi might talk about, in

2     terms of what that means for unsecured creditors.  Whether the

3     stalking horse buyer is the ultimate buyer or another person

4     or business comes forward, that won't really have any bearing

5     on who -- on the unsecured creditors who are entitled to vote

6     on the Plan.

7          And the reason is that subject to the outcome of

8     their investigation, it's the Debtor's belief that all of the

9     assets are encumbered and all of the value will go to the

10     senior secured creditors.

11          We're working with the Committee to try to find

12     consensual resolution to the Committee's issues.  But as it

13     stands, whether the stalking horse wins or whether somebody

14     else wins, that won't make a difference for the unsecured

15     creditors in this case.

16          As to the disclosure regarding the stalking horse

17     bidder, it is extremely robust.  We've identified at one of

18     the other interested parties in this case has request all of

19     the names of the ad hoc Committee that is back-stopping that

20     bid.

21          We've provided pretty extensive disclosure regarding

22     which assets they intend to -- which assets they are

23     requiring, the nature of the bidding process, the nature of

24     the sale process, and we respectfully submit that that

25     provides more than adequate information for somebody to decide

1    whether or not they want to vote for a plan that contemplates

2    effectively a sale.

3            To the extent the objection is raised in questions

4    about whether a sale gets treated one way versus a

5    reorganization, we also respectfully disagree.

6            Regardless of the specific mechanical steps that

7    take to get from here to the effective date of the Chapter 11

8    plan -- whether it's an asset sale or a reorganization for tax

9    purposes or something else, at the end of the day the Debtor's

10   assets are going to be transferred as a going concern in their

11   current state to presumably the stalking horse bidder unless

12   somebody shows up at the auction.

13           And for that reason, that doesn't change the need

14   for us to restructure.  We can't sustain our debt.  And it

15   doesn't change the proceeding that we hope to avoid but which

16   the UMWA very well may be a party to which is the 1113, 1114

17   trial that's coming up.

18           Whether it's a reorganization, a sale or something

19   else out of door number three at the end of the day we're

20   trying to deleverage the business and we may need to do so

21   through that proceeding involving the UMWA.

22           So for all of these reasons, we think that the plan

23   provides an adequate disclosure of what the proposed treatment

24   is.  We provide a description of what the process to get there

25   is and to the extent there's disagreements by the UMWA

1    regarding what happens to unsecured creditors of which the

2    Union may be, but its members are not, we don't think that

3    really has a bearing on the disclosure statement approval at

4    this point.

5          And I'd note that, you know, we've been in dialogue

6    since the second day hearing with Mr. Williams about a bunch

7    of issues.  You know, we haven't been able to reach a

8    resolution, but we did try to put pen to paper without any

9    pride or authorship here on disclosures that we hoped would

10   have resolved his issues.

11         And we respectfully submit that 11 the changes taken

12   together do resolve the adequate disclosure issue raised by

13   the UMWA.

14         Likewise, we ask the Court to overrule any

15   suggestion that the opt-out release in the Chapter 11 plan is

16   impermissible.

17         Contrary to what you might learn in first year

18   contracts law in law school -- and this is well said by

19   Judge Drain (phonetic) during the recent Cimbao (phonetic)

20   bankruptcy.  Chapter 11 is not about enforcing contracts, it's

21   about breaking them and it's about having a collective

22   proceeding that provides the appropriate procedural safeguards

23   for doing that.

24         That's exactly what our Chapter 11 plan does.  We've

25   provided, as Mr. Williams noted, 800 pages of disclosure,

1    purchase agreement, Chapter 11 plan, disclosure statement, et

2    cetera, that provides everybody who's part of this process and

3    has appropriate standing and a role to play in this process,

4    the rights to get information and then make an informed

5    judgment about the plan.

6            That includes voting on it.  It also includes the

7    decision to opt-out if they so wish of the release.  We don't

8    think like a standard contract or purchase agreement the

9    Bankruptcy Code contemplates expressed consent to the

10   releases.

11           And while the binding authority on this issue

12   nationwide is somewhat spotty, including in Texas, I think the

13   overwhelming consensus of the circuit courts that have ruled

14   on the matter, the district courts to have, you know,

15   persuasive authority and other Bankruptcy Courts including

16   cases decided involving, in this district, including CMJ,

17   Cobalt, Ultra Petroleum and the list goes on and one, opt-out

18   mechanisms were approved because of the procedural safeguards

19   that were put in place.

20           So while we are willing to take a risk in the sense

21   that someone could show up at confirmation and have an opt-out

22   objection, we do sympathize with having it heard here.  We

23   think that at the disclosure statement stage and the plan

24   confirmation stage regardless of where it is, it doesn't hold

25   water.  And we urge the Court to overrule that without

1    prejudice, of course, to the SEC to raise any issues including

2    that on February 13th.

3            Unless, Your Honor, has any questions, we'd ask that

4    the Court approve the disclosure statement today and let us

5    commence this solicitation.

6            THE COURT:  All right.

7            MR. PESCE:  Thank you, Your Honor.

8            THE COURT:  Ms. Chase, do you want to come next?

9            MS. CHASE:  Your Honor, I'll be very brief.  Our

10   arguments were fully set forth in our disclosure rejection.

11           But just to recap our view, the commissions view is

12   that releases are only consensual when affected parties are

13   given the opportunity to affirmatively grant the releases.

14           Separate and apart from voting on the plan and by

15   making a specific election on a ballot or non-voting notice to

16   opt-in to the release.

17           Here, as you well know, the opt-out mechanism is

18   being provided.  So in our view that mechanism does not afford

19   creditors and shareholders the opportunity to affirmatively

20   consent to the releases.

21           Fifth Circuit hasn't explicitly determined what

22   actually constitutes consent to a non-debtor third party

23   release.  In our brief, we do refer to a couple of cases

24   outside of this jurisdiction.  The Chasey (phonetic) case from

25   the Southern District of New York Bankruptcy Court and *Arimel*

1   *Development* (phonetic) which was also Bankruptcy Court in New

2   Jersey.

3           We discuss those cases simply as cases that we found

4   to be instructive, hopefully persuasive, on the issue of

5   consent to third party releases.

6           Those courts and other courts have recognized that

7   the determination of what constitutes consent to release is

8   governed by contract principals.  And very briefly again,

9   obviously Your Honor is well aware of contract principals

10  under Texas law.  But a general tenant of contract is that

11  silence and inaction generally are not sufficient to

12  constitute an acceptance of the contract.

13          This is because parties to a binding contract must

14  have a meeting of the minds and each must communicate their

15  consent to the terms of the agreement.  So it also follows

16  that the mere failure to object to a unilateral action also

17  doesn't constitute consent to that action.

18          Generally acceptance to a contract can only be

19  implied by affirmative actions.  So in our view, Texas law

20  supports the position that a failure to opt-out is not

21  sufficient consent to the third party release.

22          THE COURT:  So let me ask you this.  If your view of

23  the world were correct, so Debtor files a plan.  Debtor sends

24  it out.  Creditor takes no action.  Plan gets confirmed.  Plan

25  is binding on that creditor, right?

1          MS. CHASE:  Yes, that's correct, Your Honor.

2          THE COURT:  And a plan is a contract, correct?

3          MS. CHASE:  However, I think --

4          THE COURT:  These are my questions.  I listened you,

5     you're now going to listen to me.  Plan is a contract, right?

6          MS. CHASE:  Actually I might disagree with you

7     there.

8          THE COURT:  I'll tell you that the Texas Supreme

9     Court as well as the Fifth Circuit disagrees with you.  The

10    Plan is a contract.  You can take a plan and go to State Court

11    and sue for breach of contract if you don't get what you want.

12    That's just unquestioned.

13         So if you assume that to be true, how does your

14    argument hold any water?

15         MS. CHASE:  I believe, Your Honor, that actually

16    confirmation of a plan results as -- through operation of law

17    as opposed to contractual agreement between two parties.

18         THE COURT:  So you believe that when the Texas

19    Supreme Court says that you can go to State Court and sue for

20    breach of contract on a confirmed plan, that they're wrong?

21         MS. CHASE:  No, I'm not saying that.

22         THE COURT:  Okay.  Fair enough.  Thank you.

23         MS. CHASE:  Am I dead in the water here?  Should I

24    continue?

25         THE COURT:  You're dead.  You're done.  Thank you,

1       ma'am.  I appreciate the argument.  It's just not one that --
2       we've been through this argument for four years now.  And I
3       have walked through all of the Fifth Circuit president.  You
4       just don't get there.
5              I agree that some courts have said to the contrary.
6       I will respectfully disagree.  It just doesn't work.  I
7       appreciate it.  It's not practical and it's also not required.
8       I gave you your day, you'll have it again at confirmation.
9              MS. CHASE:  I'll try again at confirmation, Your
10      Honor.
11             THE COURT:  Thank you.
12             MS. CHASE:  Thank you.
13             THE COURT:  All right, I want to give -- I didn't
14      mean to ignore the Committee.  And Mr. Williams, I'm just
15      saving you for last so you can address everybody.
16             MR. MARINUZZI:  Good afternoon, Your Honor.  For the
17      Record, Morrison Forester on behalf of the Official Committee
18      of Unsecured Creditors.
19             THE COURT:  Yes, sir.
20             MR. MARINUZZI:  Your Honor, the Committee filed a
21      response and as Mr. Pesce noted at the onset of this
22      particular hearing, we've agreed with the Debtors that their
23      inclusion of inserts that we've drafted for them would satisfy
24      the Committee's objection to the disclosure statement.
25             So we're very pleased that the Debtors have been

1      extremely cooperative with the Committee in getting those

2      inserts in the disclosure statement.

3              We've also provided for purposes of the distribution

4      of the packages to voting creditors, a draft of a letter.  The

5      letter was filed earlier today on the docket and it's a letter

6      that sometimes we file letters that urge creditors to support

7      the plan.  In this case, it's just the opposite.  It's a

8      letter urging unsecured creditors to vote against the plan and

9      to opt-out of the releases.

10             It's not a surprise.  This is a plan that as

11     currently filed, provides a zero recovery for unsecured

12     creditors.

13             THE COURT:  I had not seen your letter.  I want to

14     see your letter.

15             MR. MARINUZZI:  I have copies here, Your Honor.

16             THE COURT:  I'm looking -- I just -- you said it was

17     on the docket.  If you know the number, I'll just pull it up

18     and read it.

19             MR. MARINUZZI:  So the Debtor's filed it earlier

20     today.  It was part of the revised disclosure statement.  I

21     don't have the docket number handy.

22             THE COURT:  Oh, so it's attached to --

23             MR. MARINUZZI:  It's attached and it's page --

24             THE COURT:  I misunderstood.  Okay.

25             MR. MARINUZZI:  -- 465 of the claim. I can hand it

1    up if Your Honor would like to see it.

2            THE COURT:  If you have a copy, that would save me

3    some time.  Thank you.

4        (Pause in the proceeding.)

5            THE COURT:  You should given a copy of the letter to

6    the SEC, they could have stood up and said hey this letter

7    says it's true.

8            MR. MARINUZZI:  Would you like a copy of the letter?

9            THE COURT:  She's got it now.  I see the

10   confirmation argument now.  Got it.  I'm just joking.

11           All right, so that's your letter.  The Debtor is

12   going to include in the mail out package?

13           MR. MARINUZZI:  They are, they will.

14           THE COURT:  Got it.

15           MR. MARINUZZI:  And so, Your Honor, we're grateful

16   for that.  But I just want to provide an update to the Court

17   since I was last here on November 15th.

18           THE COURT:  Sure.

19           MR. MARINUZZI:  As I said then the Committee was

20   going to be conducting an investigation.  And we had a

21   challenge deadline that's January 7th, just 20 days from now

22   separated with Christmas and New Years.  So that's not a lot

23   of time.

24           We're pursuing down two paths.  So there's the

25   investigation and there's a settlement discussion because

1      you've got to have both if you're going to be affective

2      Committee.

3              THE COURT:  Agreed.

4              MR. MARINUZZI:  And for the investigation what the

5      Committee is looking at are the usual perfection things.  So

6      are they properly perfected.  Do they have liens on all the

7      assets?  And the Debtors position, the disclosure statement is

8      the secured creditors have liens on everything.

9              THE COURT:  Right.  And I assume to make

10     Mr. Williams happy, you're looking at the pre-petition

11     transfers to management?

12             MR. MARINUZZI:  Correct.

13             THE COURT:  Got it.

14             MR. MARINUZZI:  And so there's the assets and

15     perfection.  Then there are the affirmative claims --

16     avoidance action claims, things that we identify in the insert

17     to the disclosure statement and in the letter.

18             The Committee has taken discovery from the Debtors

19     and there's data room that's been available to us once we came

20     into existence.

21             I had a disagreement on the date.  We were retained

22     on October the 22nd.  So not October 10th.  The Committee had

23     been formed earlier, but they didn't have professionals for

24     quite some time.

25             And we've served discovery on the WLB lenders and

1      they've provided their first production last week.  And we

2      expect to receive more from them later this week.  But there's

3      not a lot of time to go.  And in particular we focus on the

4      leases because the leases are extremely important.

5              In a coal case, not surprisingly, the most valuable

6      assets a coal company has is it's real estate, that's where

7      they mine the coal.  Some of it is owned.  Most of it, in our

8      experience, is leased.

9              And here with respect to the WMLP Debtors, the

10     leases that they're a party to, the data room includes a list

11     and it's 365 leases that have been identified.  We've received

12     zero.  Not a single a lease.

13             So from our perspective, we're unable to verify

14     whether those leases include any provisions which we've seen

15     in several coal cases that say you cannot pledge this asset or

16     grant a lien against this lease to a secured creditor.

17             Why is that important?  Because the loan documents

18     the pre-petition loan documents on both the WLB and the WMLP

19     side expressly say you do not have a lien on any asset where

20     if we assign that lien to you, it's a breach of a contract.

21             THE COURT:  Right.

22             MR. MARINUZZI:  We can't verify whether there are

23     liens on 365 leases.

24             THE COURT:  Got it.

25             MR. MARINUZZI:  On the WLB side -- which is the --

1              THE COURT:  Can I ask just one question?  Because

2    again, I acknowledge I haven't seen a lot of coal mine leases

3    in my lifetime.

4              Do the provisions that -- the anti-assignment

5    provision or the anti-pledges provisions do they invalidate

6    the lease if you do it or are the silent or is there some

7    magic language that you typically see?  I don't even know if

8    there's a form lease for a coal mine.

9              MR. MARINUZZI:  So there's two issues.  There's --

10   let's put aside the pre-petition loan agreement that says you

11   don't get a lien on it.  You have to granting language to have

12   a lien.

13             THE COURT:  Agreed.

14             MR. MARINUZZI:  Well, it's a question of state law.

15   So depending upon the State where the lease is found and the

16   law that governs.  It's either void of issue or the

17   landlord/lessor has the ability to void the transfer of the

18   lien.

19             Here you have a loan agreement that says, we the

20   Debtors are giving you the lenders a lien on assets.  But

21   we're agreeing you don't get a lien on a contract that says if

22   we give you a lien, it's a breach of contract.

23             THE COURT:  I got it.

24             MR. MARINUZZI:  So if the lease says you can't grant

25   a lien, they don't have a lease.  And it --

1          THE COURT:  They don't have a lien.  Not that they

2     don't have a lease.

3          MR. MARINUZZI:  They don't have a lien on the lease,

4     right.

5          And so for the Debtors to say that the lenders have

6     all of the assets and they're fully encumbered, we haven't

7     seen the leases, we don't know that to be true.

8          On the WLB side, until last Thursday, we had see 11

9     of 344 leases.  We got another 240 on Thursday from Counsel

10     for the lenders.

11          So we're looking at them.  We're still missing 93.

12     So by in large, we're missing a majority of the leases to

13     which the Debtors are a party.

14          THE COURT:  All right.

15          MR. MARINUZZI:  We're trying to get through all that

16     by the 7th.  It doesn't give us a lot of time.

17          THE COURT:  all right.  And with respect to those 93

18     leases, is that they're on their way, we can't find them.

19     What have you been told?  You may have been told none.

20          MR. MARINUZZI:  People are looking for them.  We're

21     trying to find them. So hopefully we'll have them.  The point

22     is when I stood here on November 15th, I said all these states

23     work for the Committee.  The sooner I get cooperation, access

24     to documents, et cetera.

25          We're pretty close to the challenge deadline and we

1    still haven't seen a majority of the leases.  We'll work hard,

2    as we have been, to try to get through all this.  But when we

3    said we agree as a Committee, we said these dates it was

4    because we expected to see these documents and not so close to

5    the challenge deadline.

6              THE COURT:  I got it.

7              MR. MARINUZZI:  So (indiscernible) because the

8    Committee does two things.  It investigates and it tries to

9    settle.  That's the second track.  And so what are we doing

10   about that?

11             We're have a meeting at some point this week with

12   the company.  We really want to identify what the claims are

13   that we have to solve for.  There's a lot of claims to be

14   determined.  We don't know the extent of it.

15             And we've been through this drill enough times to

16   know that there are things that are important to call miners,

17   co-operators going forward.  One is a union contract.

18             And I was surprised to hear for the first time here

19   that there's a ratification vote going out tonight for the

20   IUOE on a new labor contract.  Which is tremendous news, it's

21   great. And we can only hope that the same happens with the

22   UMWA and we urge, as I did the last time I was here, the UMWA,

23   the lenders and the company to sit down and hammer this out

24   because the result that they achieve is better than anything

25   that Your Honor could impose, with all respect.

1          THE COURT:  Right.  Got it.

2          MR. MARINUZZI:  We've got the PBGC.  And we know

3     that if we stumble, the WLB plan, those plans get us sued.  So

4     let's solve for the plan at the WMLP entity, but there's a

5     negotiation and discussions trying to identify ways to solve

6     that.  That's what the Committee has to do as well.

7          Trade.  Nobody wants to own a coal mine and have

8     it's trade be unhappy and the vendors who are doing business

9     and supporting it being unhappy.  So hopefully there's some

10    way to have some discussion on a possible settlement.

11         Same with black lung, same with (indiscernible)

12    trying to figure out how to build a consensus around those

13    claims.  But you have to know what the claims are in order to

14    have that discussion.  So that's happening a little bit later

15    this week.

16         So long story short, we're moving as quickly as we

17    can.  These dates are coming at us as fast as they are.  We

18    may be in front of the Court again asking for some relief from

19    some of these dates.  We hope not.  We just wanted to preview

20    for the Court so the Court knows where we are.

21         THE COURT:  No, I got it.  And as always, the more

22    you communicate with Mr. Alonzo, just to tell him where you

23    are, the better I'm able to plan.

24         So if you would just communicate as you know things

25    to him, hey we might be looking for dates on this, this and

1    this then he can start looking and he can try and be as

2    responsive as we can possible be.

3              MR. MARINUZZI:  Thank you.

4              THE COURT:  All right, thank you.  Anyone else?  All

5    right, Mr. Williams?

6              MR. WILLIAMS:  Your Honor, I'm only concerned about

7    one thing because I thought the easy issue that I brought

8    before the Court regarding the executive (indiscernible)

9    tracks and the UMWA collective bargaining agreement.  They're

10   Counsel said that they would (indiscernible) that they're in

11   agreement with me that they should be excluded from those

12   provisions.  I never heard that.

13             THE COURT:  Okay, well let's just -- maybe there's a

14   lot going on.  Was that just an oversight?

15             MR. PESCE:  You know I apologize.  We don't view the

16   UMWA contract as a EC, executory contract and we are going to

17   do what we need to do before the -- by the 27th.

18             THE COURT:  So let me ask, are you going have to

19   tweak?  Was it last disclosure statement 789, right?

20             MR. PESCE:  I don't think it's necessary although we

21   can take a look at it.  I think under the *Bill Disco* case

22   which prompted the approval of sectional 1113, it's not really

23   an executory contract subject to assumption or rejection under

24   365 and 1123 of the Code, which is what Article 5 of the Plan

25   governs.

1          THE COURT:  I got all that.

2          MR. PESCE:  We can clarify it, though, for sure.

3          THE COURT:  Can I make a suggestion?

4          MR. PESCE:  Yes, sir.

5          THE COURT:  Because you need to start finding

6     reasons to have Mr. Williams sit down.

7          MR. PESCE:  Yeah happy to --

8          THE COURT:  As opposed to forcing him to get up on

9     everything.  Just tell him that you'll stick some language

10    into the order approving the disclosure statement to make it

11    clear that they're carved out.  And that you are confident

12    that you can talk Jones into signing the modified order.

13         MR. PESCE:  If will Mr. Williams -- if I can --

14         MR. WILLIAMS:  I'm certain that's the case, Your

15    Honor, because I know from what I heard I believe the United

16    States Trustee already has some language that's going to be

17    inserted a couple of minor --

18         THE COURT:  That's why I asked.  I thought that

19    there was going to be another tweak.  You don't think there

20    is?

21         MR. PESCE:  So it's the plan and disclosure

22    statement, I think we're going to make a tweak for the SEC.

23    We're going to do our stipulation with Mr. Mayer and we'll put

24    a sentence in the plan that says we -- the collective

25    bargaining agreement is an executory contract for the purpose.

1    So those are the three changes.

2              THE COURT:  So I don't think you really need it in

3    the disclosure statement if you've got it in the Plan.  Do you

4    agree with that?

5              MR. WILLIAMS:  I agree with that, Your Honor.

6              MR. PESCE:  Okay, so we'll do that.

7              THE COURT:  So do that.

8              MR. PESCE:  We will do that, yep.

9              THE COURT:  Fair enough.  Does that make you happy

10    on that issue?

11              MR. WILLIAMS:  On that issue, absolutely, Your

12    Honor.

13              THE COURT:  Fair enough.  All right.  So do you want

14    to argue to me about the remainder?

15              MR. WILLIAMS:  No, I think you've (indiscernible)

16    argument better than I do, Your Honor.

17              THE COURT:  Well, I doubt that because you're an

18    awfully smart guy.  I think I got it.

19              So let me do this.  I've had a chance to read what

20    was filed at 789.  And I'll accept the record that was made

21    here today and I'll accept the modifications that were

22    announced on the record.

23              Again, the standard is adequate information.  And

24    again, under the statute, adequate information means

25    information of a kind and in sufficient detail and as far as

1    is reasonably practical in light of the nature and history of

2    the Debtor and the condition of the Debtor's books and records

3    including a discussion of the potential material, federal tax

4    consequences of the plan to the Debtor and any successor to

5    the Debtor.

6           And a hypothetical investor typical of the holders

7    of claims or interest in the case that would enable such a

8    hypothetical investor of the relevant class to make an

9    informed judgment about the plan.

10          But that adequate information need not include such

11   information about any other possible or proposed plan and in

12   determining whether a disclosure statement provides adequate

13   information, the Court shall consider the complexity of the

14   case, the benefit of additional information of creditors and

15   other parties and interest and the cost of providing

16   additional information.

17          I have seen a lot of disclosure statements in my

18   going on 30 years.  I cannot imagine a document that is more

19   complete than the one that is on file.  I don't think that any

20   arguments have been waived.

21          I certainly get the argument that you're

22   constituency would like to know what happens.  I have always

23   believed that adequate information does not imply crystal

24   ball.  And I do think that number one, that your constituency

25   is represented to such a degree the likes of which I've never

1    seen before.  And that's a compliment to you.

2          You see the world and you're watching the pieces

3    move around and you're making decisions as things move.  I get

4    that.  It's -- and that's a compliment to you.  They hired the

5    right guy is probably a more practical statement.  And I

6    appreciate that because good lawyers make my job easier.

7          But with respect to the disclosure statement, again,

8    I'm going to find that it contains adequate information.  I am

9    going approve it, again reserving all confirmation objections

10   and all other issues that we have.

11         What I would like Mr. Pesce, once you figure out

12   what tweaks you're going to make, I would like a conforming

13   copy filed so that I know what goes out.  Because I will look

14   at this again when we get closer to confirmation.

15         What did you -- you've got an order that I saw got

16   uploaded at 819.  Is it your believe with what's occurred

17   today that you need to take a new look at that?  Do you think

18   it works? What's your thought?

19         MR. PESCE:  I think the order itself works.  I think

20   we'll need to update two of the Exhibits which are the Plan

21   and the Disclosure Statements.

22         So, if it works for the Court, maybe what I propose

23   is we can amend the -- if we could get the order entered

24   today, instead of having the two documents attached we can

25   refer that they'll be filed under the Court's docket or

1    something.  That may expedite it.

2           Otherwise, we can send you everything together, you

3    know, this evening once we sign off with the SEC, et cetera.

4    So whatever the Court prefers, we can do either.

5           THE COURT:  So when do you think you're going to get

6    that done?

7           MR. PESCE:  I would say in the next probably --

8    hopefully the next hour or two.

9           THE COURT:  All right, so if I commit to you,

10   it's -- I'm flying tonight because I have Laredo docket in the

11   morning.  So I think my flight's at 9:30.  So I'm going to be

12   around the courthouse until then.

13          If you don't get it done until then, then you know

14   how to contact Mr. Alonzo and I can sign it from Laredo.  And

15   as soon as you find him and tell him that it's been uploaded

16   and you're confident that it's correct, and it's conforming, I

17   will sign it and we can go forward.

18          What I worry about doing is if I pop up this order,

19   you know, this is my anti-Isgur campaign.  If I start

20   modifying that order and start, you know, saying not attached

21   is schedule 1, but to be filed, inevitably we will miss one.

22   And then there'll be a conflict in the order.

23          And I would rather for -- number one if it's going

24   to be wrong, I want it to be your fault not mine.  And number

25   two, I want you to have the opportunity to have your team and

1    calm eyes sit in your office and have two or three people look

2    at it and say all right this is right.

3              MR. PESCE:  Honestly if we can just enter it

4    tomorrow morning or something during the day it's not the end

5    of the world.  So we'll try to get this to you as soon as we

6    can.

7              THE COURT:  All right.  We're going to be around, so

8    if you'll just get it down and again I will accept that you're

9    going to make the changes that you've committed to make.  I'll

10   tell everyone I don't know that you're going to get to see it

11   again.  Although I would -- if I were you, I would send the

12   language to Mr. Williams just find out where he's going to be

13   and send him that sentence and tell him what paragraph it's

14   going to be in.  I'd do the same for the SEC.

15             MR. PESCE:  We'll work that out before we leave, I

16   think.

17             THE COURT:  Fair enough.  All right, so get that

18   done and then I'll, you know, I'll sign the order and we'll

19   proceed forward to the next step.

20             MR. PESCE:  All right.

21             MR. WILLIAMS:  Thank you, Your Honor.

22             THE COURT:  All right.  Thank you.  Mr. Pesce?

23             MR. PESCE:  I think with that we're up to the status

24   conference which I'm going to hand the podium over to my

25   partner Mr. Hessler, when it's appropriate for us to stand.

122

1          THE COURT:  Fair enough.  Let me ask for folks,
2     we -- the remaining issue is the status conference with
3     respect to the Marbell (phonetic) McKinsey dispute that has
4     developed.
5          If you do not care about that or wish to go or catch
6     a plane or you've just had enough for the day.  Why don't I do
7     this.  Why don't I -- why don't we take three minutes to let
8     the courtroom clear and I'll come back out and we'll proceed
9     ahead with the status conference, all right?
10          All right thank you.  We'll be adjourned.
11          THE CLERK:  All rise.
12          (Recess taken from 4:26 p.m. to 4:35 p.m.)
13                         AFTER RECESS
14          THE CLERK:  All rise.
15          THE COURT:  All right, thank you.  Please be seated.
16          All right, the final matter is the status conference
17     in the Mackenzie Marbell dispute.  Mr. Hessler do you want to
18     tell me where we think we are just to start?
19          Everybody is going to get a chance, but.
20          MR. HESSLER:  Understood.  I understand Mr. Pesce at
21     the end of that sort of was passing it over to me.  I think
22     what he meant to say to the extent the Debtors need to make
23     comments on this, I'll be handling it.
24          But given that it is the Marbell --
25          THE COURT:  No, I got it.  I would like, again, and

1    I meant what I said in the order that I issued, this is not
2    going to get in the way of the process proceeding forward.
3              Do you have any views as to what ought to occur and
4    the timing of whatever procedure it is we implement ought to
5    occur?
6              MR. HESSLER:  Here's how I would answer that.  We
7    very much appreciate, concur with and strongly support the
8    statement that was in your order that we are on a timeline
9    towards confirmation.  It's a tight timeline.  It's a very
10   carefully calibrated to facilitate a successful reorganization
11   and we don't want any of this jeopardize that timeline.
12             Your Honor, to the extent that the Debtors filed a
13   retention application for McKinsey, we obviously want that
14   application to be approved and that would necessarily mean we
15   would like the objection to be overruled.
16             THE COURT:  Right.
17             MR. HESSLER:  That being said, as I think you're
18   going to hear pretty shortly, hear from the folks on both
19   sides of that, there's a lot going on that goes way beyond
20   Westmoreland Coal.  And we don't want to -- the Debtors do not
21   want to get drawn into that.
22             THE COURT:  Right.
23             MR. HESSLER:  So with regard to timing, I actually
24   do not know the very latest as to -- with discovery and what
25   the --

1          THE COURT:  So you're not tied into the discussions

2     at all?

3          MR. HESSLER:  We are, Your Honor.  I don't mean to

4     say that, but in terms of what may have happened in the last

5     couple hours, I just -- that I don't know.

6          We have adjourned the retention application to the

7     next hearing.  I think it's January 26th.  I can confirm that

8     shortly.

9          To the extent the retention can be approved sooner

10    than that, we would be supportive of that also.  McKinsey is

11    doing very important work on behalf of the estate.  It's

12    integral to the confirmation process and it's supported not

13    just by the company but it's supported by the creditors.

14         And so as soon as possible that we can have clarity

15    and certainty on that, that we think would be helpful to the

16    Debtors.  I think it would be helpful to the process.  I think

17    it would be helpful to the sale process also.

18         However, we're reluctant to wade into what is, you

19    know, clearly a fight that goes way beyond what's happening in

20    this case.

21         THE COURT:  Right.

22         MR. HESSLER:  And so if those parties have other

23    thoughts about discovery and timing and things like that, you

24    know, we are and I will be today representing vigorously the

25    protection of this case and moving forward.  But as soon as we

1       wade into that fight, we're getting into something that goes

2       way beyond, you know, like I said, where we need to be

3       involved.

4                    THE COURT:  All right.  Got it.  Thank you.

5                    MR. HESSLER:  Thank you, Your Honor.

6                    THE COURT:  Let me just make the circle.

7                    Mr. Clement do you want to go next?

8                    MR. CLEMENT:  Your Honor, Ms. Chung will be handling

9       the hearing.

10                   THE COURT:  Okay.

11                   MR. CLEMENT:  But I frankly wanted to be sure I got

12      here to the podium to be sure she had the place to say that we

13      think we can moot out virtually all the US Trustee objection.

14                   I'll let her describe --

15                   THE COURT:  Well I read what was filed.  And I got

16      it.  I think waving the $96,000 is probably one of the smarter

17      things that I've seen done lately.  I think that takes away an

18      awful lot.

19                   What I'm really trying to do, I mean, this is going

20      to be, I'm assuming, a hearing that is not going to be done in

21      an hour; is that --

22                   MR. CLEMENT:  The employment hearing?

23                   THE COURT:  Uh-huh.  Or do think that it is going to

24      be an hour?

25                   MR. CLEMENT:  Your Honor, I want to transition as

1       soon as I can to let Ms. Chung do this, but.

2              THE COURT:  Well, I'm happy to let her do it right

3       now.  I didn't mean to engage.

4              MR. CLEMENT:  I was saying a sentence or two, Your

5       Honor.

6              THE COURT:  All right.

7              MR. CLEMENT:  We will put on evidence that we should

8       be employed.

9              THE COURT:  Okay.  And you're ready to do that now?

10             MR. CLEMENT:  We've already told them who are three

11      witnesses are and they can take depositions.

12             THE COURT:  I saw that as well.

13             MR. CLEMENT:  We've done searches that are plenty

14      good under ordinary standards.

15             THE COURT:  Okay.

16             MR. CLEMENT:  They want new standards that are

17      higher which if applied nationwide would run all sort of

18      professionals out of the business.

19             THE COURT:  Okay.  So are you ready to have your

20      hearing?

21             MR. CLEMENT:  Today?

22             THE COURT:  No, not today.  But I mean, are you

23      ready to have your hearing --

24             MR. CLEMENT:  Absolutely.

25             THE COURT:  -- relatively quickly?

1          MR. CLEMENT:  We want that hearing on the 28th.

2          THE COURT:  Okay.

3          MR. CLEMENT:  My point is, we put on three

4    witnesses.  They testify about what we did here.  We've

5    already heard from our opponents in writing repeatedly.  They

6    want to talk about what we did all around the country in other

7    cases and claim a pattern of fraud.

8          THE COURT:  Right.

9          MR. CLEMENT:  The last I heard, when people claimed

10   fraud in this Court, they better have something to back it up.

11   And so, Your Honor, we can see a very simple trial to get us

12   hired on the 28th.  Depending upon how much of the fraud story

13   we have to listen to -- or you have to listen to, it might be,

14   instead of a two or three hour trial, an eight our trial.

15         But Your Honor, our mind set is, whatever it needs

16   to be, can we please get it over with on January 28th?

17         THE COURT:  Okay.  And just before I forget, who is

18   your principal here today?

19         MR. CLEMENT:  Your Honor, I'll let Ms. Chung

20   describe them, but we have people of really high seniority

21   within the company.

22         THE COURT:  I didn't mean to bring the whole

23   company.  I just asked for one.

24         MR. CLEMENT:  Well we brought a whole lot of high

25   management.

1          THE COURT:  Okay.  Great.

2          MR. CLEMENT:  And I will say one last thing, Your

3     Honor, which is a repeat of what I said earlier, there's more

4     than waiving the 96,000 --

5          THE COURT:  I read it.  I just --

6          MR. CLEMENT:  -- that we can do -- are going to

7     announce now that we can do to end the U.S. Trustee's

8     objection by any fair terms.  After that, we'll deal with

9     whatever Mar-Bow wishes to raise.

10          I am now going to turn it over to Ms. Chung and let

11     her describe to you what it is we're prepared to do.

12          THE COURT:  All right.  Thank you.

13          Ms. Chung.

14          MS. CHUNG:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.

16          MS. CHUNG:  Christine Chung from Selendy and Gay.

17     We represent McKinsey Recovery and Transformation Services

18     RTS.

19          THE COURT:  All right.

20          MS. CHUNG:  As the first point of order, I will

21     introduce the corporate folks who are here today, Your Honor.

22          So starting at the extreme left, next to Mr. Pesce

23     is Mark Hojnacki, and he is the declarant in this case of the

24     Rule 2014 declaration.  He's also one of the leaders of the

25     team that's doing the work on the ground.

1              THE COURT:  Got it.  Good afternoon.

2              MS. CHUNG:  Sitting next to him is Rock Khanna

3     (phonetic).  He is from McKinsey.  He's a senior partner of

4     McKinsey, and together with Gary Pinkus who's sitting next to

5     him.

6              THE COURT:  Mr. Pinkus, good afternoon.

7              MR. PINKUS:  Good afternoon, Your Honor.

8              MS. CHUNG:  Mr. Pinkus is the Chairman of McKinsey

9     North America and he's also a long-time board member of

10    McKinsey.

11             THE COURT:  All right.

12             So let me ask this.  Of the three, and I don't --

13    I'm not in any way trying to rank you at all.  But at some

14    points, I may very well have a conversation with the two

15    principals.  I just want to know who I'm talking to because I

16    won't talk to all three, but I will talk to one.  Who is your

17    designee today?

18             MS. CHUNG:  Mr. Pinkus, Your Honor.

19             THE COURT:  All right.  Fair enough.

20             I don't know what he did, but I assume that he'll

21    deal with you later for volunteering him.

22             All right.  So go ahead.

23             MS. CHUNG:  So Your Honor, we do have a proposal to

24    keep us on schedule and maybe even based on what happened on

25    Friday night with the Trustee's objection.  And I'll explain

1    what I mean by that.  Something that could bring us in sooner

2    than scheduled, sooner than January 28th.

3              So here is, I think, as Your Honor has recognized

4    that you've said that you've absorbed what happened between --

5    on the U.S. Trustee objections.  And we think that we have

6    cleared away most of those items.  I'm not going to tick

7    through them because Your Honor seems familiar with them.

8              We have one issue which we want to raise to the

9    Court which is a client which is a significant percentage of

10   RTS's revenues.

11             THE COURT:  Right.  No, I got that.

12             MS. CHUNG:  So there's that issue.

13             And then -- that in our view, even following the

14   structure of the U.S. Trustee's objection, their point four

15   were these items, and we think that those are basically

16   resolved.  And if there's anything that Mr. Duran wants us to

17   address further, or that the Court wants to address further,

18   we can do that.

19             THE COURT:  All right.

20             So let's assume that Mr. Duran is totally happy.  I

21   mean, that doesn't really get you anywhere does it?

22             MS. CHUNG:  Your Honor, here's why we think it

23   might.

24             THE COURT:  Okay.

25             MS. CHUNG:  So point five of the Trustee's objection

1     is where they sort of pivot and say the Court should decide on

2     the Trustee's objections.  If we go to point five, then it

3     really gets complicated, you're going to need a lot of

4     detailed fact-finding, and you are in a place where you were

5     examining more broadly.  This Court will be examining more

6     broadly.

7                 What the U.S. Trustee now concedes is practices like

8     disclosing the connections of your affiliates that not --

9     that's not just a practice of McKinsey, that's a practice of a

10    lot of large professionals who apply to be retaining by

11    debtors in this Court and other courts in the country.

12                And secondly, that even though the Court is being

13    asked to decide McKinsey's matter that whatever ruling the

14    Court makes would have broad implications for other

15    professionals who make up applications like that.  So --

16                THE COURT:  No.  I got it.  Everything I do goes

17    always beyond the courtroom --

18                MS. CHUNG:  That's --

19                THE COURT:  -- in ways I don't even contemplate

20    sometimes.  I got that.

21                MS. CHUNG:  That's right, Your Honor.

22                So in that section, first of all, what's happening

23    is now he's boot strapped to Mar-Bow's objection and we're

24    really talking about the allegations of fraud, etcetera.

25                THE COURT:  Right.

1            MS. CHUNG:  And our view of that, having engaged in

2      the meet and confer, and Your Honor as -- since Your Honor

3      issued your order, there's been a lot of activity.  We've

4      exchanged discovery requests and -- not responses, discovery

5      requests, and certain matters have crystalized.

6            And basically, where I'm headed, Your Honor, is I do

7      think that some of the issues end up being more legal than

8      factual.  I'm not saying that the factual issues are gone.

9      And I've heard Your Honor to say and you've heard Mr. Clement

10     say, we're willing to bring our witnesses.

11            So -- but I do think that in some ways, the issues

12     have been narrowed, and that's part of why we feel that if we

13     can get a fair discovery process, we can be here and put on

14     witnesses and move this whole thing forward so that the

15     debtors can get what they need to get done done, and the

16     bankruptcy process can move forward in a way that's good for

17     everybody.

18            THE COURT:  All right.

19            MS. CHUNG:  So one thing that I think has happened

20     and there, of course, there are aspects of the Trustee's

21     objection that we disagree with.  But I think it has

22     crystalized that we really are talking now about a

23     disagreement in the Rule and the interpretation of the Rule.

24            Basically, what has happened is what -- that the

25     legal issues are disclosures of affiliate connections which,

1      as Your Honor may -- and we prepared to show some of them here
2      today, but even other professionals who have applied in this
3      case do not disclose the connections of their affiliates.  It
4      has to do with whether or not the corporate forum is being
5      observed properly.  In terms of investment affiliates, whether
6      or not the information wall is good enough.
7               And then, so what Mar-Bow's position turns out to be
8      is you must disclose all connections and affiliates, you --
9      without regard to corporate forum, you must disclose all
10     connections of investment affiliates without regard to
11     information walls.  And based on the meet and confer we had
12     yesterday, what they're claiming is -- and this is really the
13     basis of their allegations of fraud.  This is why I think the
14     allegations of fraud are completely unfounded.  That the
15     look-back period is infinite, that the look-back period must
16     be every period in time.
17              And that, again, is something that most of the
18     people who apply in this Court apply a look-back period.  We
19     apply one of two years.  Other people who have applied in this
20     case, apply one -- of one year.  AlixPartners itself applies
21     one of five years.  But the discovery requests and everything
22     that we learned yesterday in the meet and confer is if you
23     served somebody 10 years ago, that is just as relevant to your
24     disinterestedness as anything that you might be doing today.
25     And that is, as a legal matter Your Honor, not correct.  We

1     are beyond a vanishing point there.

2               THE COURT:  Right.

3               MS. CHUNG:  So one of our arguments here is -- maybe

4     I should -- is that we should go to -- if we resolve the

5     Trustee's objections, and these were the only objections that

6     the Trustee had with us before Friday night, that really

7     should be -- we can bring our witnesses to prove up our

8     declaration, but we have done -- we have satisfied what we

9     believe is the correct interpretation of the law.  We have

10    fully complied with what, until Friday night, even the U.S.

11    Trustee agreed with us, would have been adequate under the

12    law.

13              What we're faced with instead, and what we think may

14    delay the proceedings here, is that based on the discovery

15    requests, they're being completely consistent Your Honor.

16    Mar-Bow's being totally consistent -- consistent with their

17    view that there is no look-back period.  They have asked us

18    for names of our clients who are also on the Westmoreland

19    interested parties list back forever.  There's no time limit.

20              THE COURT:  And you mean no limitation on the

21    look-back period.

22              MS. CHUNG:  There's no limitation.

23              THE COURT:  Okay.

24              MS. CHUNG:  Same thing, MIO Investments -- and Your

25    Honor has read enough to know MIO is our -- basically, our

1    pension affiliate -- pension and investment plan affiliate,

2    separately maintained.  The separation is described in

3    Mr. Hojnacki's declaration.  They're saying all of his

4    investments must be turned over now because we regard all of

5    them to be disqualifying.

6           So every connection in time without regard to these

7    barriers must be disclosed and every one of them is

8    disqualifying.  I don't think that that is a misstatement of

9    Mar-Bow's position and I don't think you'll hear anything

10   different from Mr. Rhodes today.

11          THE COURT:  Okay.

12          MS. CHUNG:  And so we really are -- let me -- I

13   don't want to understate the threat.  If that's what we're

14   looking -- this is why the U.S. Trustee is saying this could

15   take forever.  It would have to be very detailed, it could go

16   on *ad infinitum*.  But we think that that's an incorrect

17   interpretation of law.  And in terms of -- I know that

18   everybody is saying, well you know, what about all these

19   allegations of fraud?  We laid out in our preliminary

20   opposition why these claims of fraud are based on false

21   assumptions.  If you assume that the look-back period is

22   infinite, then of course you can go back and compare our

23   disclosure statements to one another -- the Rule 2014

24   declarations -- and say well you disclosed it one place but

25   not another.

1          And in fact, in a case before Your Honor, the *GenOn*
2     case, you know, one of the allegations that's made in their
3     150 pages of objections, I'll just pluck this example out --
4     is that we served a client, ENERGY (phonetic), at the same
5     time as GenOn, and that's a super serious allegation.  But the
6     place it's coming from is we disclosed ENERGY in a *SunEd*
7     bankruptcy case in which we were serving the debtor and we
8     applied it to your look-back period.
9          And by the time GenOn came on, the two-year
10    look-back did not capture the client, ENERGY, anymore.
11         And from that, Mar-Bow is saying we knowingly
12    concealed ENERGY as a client because all of these ideas that
13    we have fraudulently concealed anything is based on something
14    that, again, I think we can easily demonstrate is wrong if
15    they would bring forth their methodology.  We haven't seen
16    that.  It's an allegation of fraud based on no substantiation
17    of either method or work papers or anything like that.
18              THE COURT:  Right.
19              MS. CHUNG:  And so I do think that the Trustee's
20    objection crystalized that what really people considered to be
21    lawful, including those who follow the same practices we do,
22    is what Mr. Duran was wanting us to fix before Thursday night.
23    And I don't want -- we have very cordial relations with the
24    Office of the U.S. Trustee here, Your Honor.  We really did.
25              And we reached out on things like when Your Honor

1    issued the order asking the Trustee to issue a report or think
2    of ways to deal with this dispute.  We reached out to see if
3    there was a way to get a hearing from him.  And unfortunately,
4    on Friday, what happened is we didn't get that hearing.  We
5    got the objection to our -- including to our disinterestedness
6    without having a chance to meet with them.  And then also,
7    they have expanded their view of what's objectionable in our
8    view to include Mar-Bow's allegations.
9            But importantly, there's no additional
10   substantiation to anything that Mar-Bow says.  It's just about
11   what we believe are falsely based accusations of fraud.  And
12   now where we find ourselves, so we can get to the question
13   that Your Honor has.  Discovery becomes very important here
14   because if -- and to give it the crispest.  It's label day, so
15   just give the crispest statement of it.
16           What's being asked for in discovery, and I can point
17   out the interrogatories, requests, and RFPs if Your Honor
18   would like, but they basically want to redo the connections
19   check.  So they've asked for the clients and the investments
20   and all the -- which would basically assume that we did the --
21   that we prepared our declaration and did the connections check
22   in bad faith.
23           And first of all, we don't think that's a fair
24   process, and we've cited the law saying you can't just obtain
25   substantiation for assertion through the process of discovery.

1    That's the thing that all lawyers call a fishing expedition in

2    a very legal technical term.  It's a fishing expedition.  And

3    that would leave us in a position as someone who does not come

4    and ask to be engaged that often, but we do in big important

5    cases, that every time somebody raises their hand and says I

6    object to you, we're opening our file cabinets to them,

7    including a -- incredibly sensitive client information.

8          They have asked for the names of the clients, the

9    work that they do because they want to try to judge

10   relatedness on their own or second guess our judgments on

11   relatedness, and then they want to basically recreate the

12   entire connections check which is a huge process that takes

13   weeks.  It's very extensive questions to every partner in the

14   firm, all 2000 of them; every employee in the firm, all 25,000

15   of them, 30,000 of them.  That, Your Honor can hear is that

16   can't happen in what we're doing now.  And we don't think that

17   that's appropriate.

18         I was very interested in what Your Honor said

19   earlier, I don't believe in declarations.  If Mr. Hojnacki had

20   not done a declaration, we would just bring him here and put

21   him on the stand and he would describe the search.  One of the

22   other witnesses we're planning to bring is the one who

23   conducted the search.  She's a lawyer.  She's in the in-house

24   legal department.  And then we have a third witness who is

25   going to address essentially, from the RTS side, why it is

1       that he doesn't know anything about what happens in MIO, and

2       neither does any other consultant who's on the consulting side

3       of McKinsey, and why that wall is good enough that we should

4       be allowed like many other professionals who have investment

5       affiliates not to disclose what's beyond the wall.

6               So we just have -- this is a very -- usually

7       discovery conferences are very long and lengthy and could go

8       through every -- but in a nutshell, Your Honor, that's what's

9       happening.  We're being asked for everything in perpetuity

10      about our clients, about our investments.  And while we are

11      prepared to engage in discovery, I think there's one -- I

12      think -- I can offer Your Honor two routes.

13              One route is, we resolve the Trustee disputes and

14      then I guess an issue for Your Honor is is that what factual

15      things do we have left after that.  I think it's certainly one

16      view of the world is everybody seems to think that was what

17      was legally required before this possibility that we're

18      changing the rules broadly across the bankruptcy industry.

19              Secondly, of course, we can bring -- and we might

20      bring our witnesses in that instance anyway.  We're prepared

21      to bring our witnesses and show that we did a good faith

22      search and a diligent one and one that is ample to establish

23      our disinterestedness and the lack of any material adverse

24      interests in the estate.

25              THE COURT:  Okay.

1          MS. CHUNG:  But we want to do that without the idea

2     that their speculation that we engaged in bad faith means that

3     we open our -- we have to open our file cabinets now.  And in

4     very real terms, just because I know that Your Honor will want

5     to know sort of where this goes, there are going to be large

6     blocks of things that we do not agree to give them.

7          For example, MIO Investments, if we establish

8     separation, which is an obvious gate issue, then they should

9     not be able to sort of get a win out of a box by getting all

10    that information from us.

11         And the same thing, maybe even moreso, with client

12    identities and the client work.  Obviously, hugely

13    proprietary.  We do our search around RTS and the team serving

14    the member -- the debtors and their view is well you have to

15    disregard the RTS forum -- corporate forum and go to the rest

16    of the company.  And if we are forced to give over all the

17    information about all of that client service, that is kind of,

18    I mean, Your Honor can hear why that leads to a dead end for

19    us.

20         So what we are willing to give them is separation

21    information.  We're willing to give them the policies, the

22    witness.  We're willing to give them information around the

23    connections check, although I would, again, looking forward, a

24    lot of that information -- we can show how it happens and that

25    it was good faith through our witness mainly.  Many of the

1    documents are going to be privileged because it was done
2    through the legal department, not the factual information, but
3    the things that are -- and the other thing about that is, if
4    they really want to redo the check, they could only do it by
5    getting client information that is confidential.  So I'm not
6    sure in the end that that is a pathway forward that works very
7    well.

8         We would really have to bring a witness to satisfy
9    Your Honor that we did it in good faith and it ended up in the
10   right place.

11        THE COURT:  Right.  So I get the concept of bringing
12   your witness or witnesses.  And let me go back.  I didn't say
13   I don't believe -- or if I said it, I didn't mean it -- that I
14   don't believe in affidavits and declarations.  I find them to
15   be papers drafted by lawyers, and I get to the truth when I
16   hear people on the stand.  That's -- I've been -- over 30
17   years, I've been lied to by some great people.  I mean, they
18   can tell a story better than anything I could ever create.

19        And I've just found that the truth comes out when
20   you have to get up on the stand under oath and testify.
21   That's all I meant by that.  I also -- you have to understand,
22   I did not grow up in a corporate practice.  I grew up in a
23   litigation practice.  And so that's just where I'm comfortable
24   and it's where -- you know, it's where I feel the most in
25   control.  That's all I meant by that.

1          And, you know, parties have worked me over the

2     course of time that if there aren't objections, and again,

3     sometimes it's a, so long as I get to cross-examine, then I'm

4     fine, and I take them.  That's all I meant by that.

5          But let's go with your theory that you're going to

6     bring a witness or witnesses at some point to show me that the

7     search was diligent and in good faith and met the required

8     legal standards.  That's the ultimate hearing.  I got that.

9          How do we get from -- because right now, I don't

10    have anything on file.  You know, I -- you know, I asked you

11    all to meet to talk, discuss, try and figure out what the

12    problems are.  It's -- to my knowledge, I don't have a motion

13    to quash on file, I don't have a motion for a protective

14    order.  I haven't -- and let me give you just -- if I were in

15    the position of representing someone that I thought was unduly

16    accused of fraud, the first thing I would do would be to take

17    a deposition where I'd want to understand who it was who made

18    this allegation, this allegation, what -- you know, what

19    investigation they did, how did they met their obligations

20    under 9011, and go through the whole thing.

21          You know, that answers an awful lot of questions.  I

22    mean the way that this has been teed up is -- I don't see an

23    out for both sides at this point.  There is someone that is

24    going to incur a consequence in this.  As I've been very clear

25    I think in my judicial career, I very much don't appreciate

1    folks standing up in the courtroom, and it's the same thing in

2    filing a pleading, that accuses someone of committing a crime.

3         As I've said in another case, I've said if you've

4    got it, I want to see it because if I see it, the remedy I

5    will impose will be far harsher than anything you can ever

6    imagine because I don't like being led -- or mislead.  And

7    transparency and honesty is something I just fundamentally

8    believe in.  But if it's being done for a tactical reason and

9    if there's no basis to it, all of the enthusiasm that I have

10   for truth and justice and transparency all gets channeled back

11   the other way.

12        And I will tell you this, no one in my eight years

13   on the bench has seen the limits of my enthusiasm at this

14   point.  I have been, at least in my mind, fairly reserved.

15   There are some lawyers who would probably disagree and I'll

16   take that criticism.  But this is teed up as something where

17   there is a horrible consequence to someone, and I don't know

18   enough yet to know who's right and who's wrong.

19        All I know is that there are some very substantial

20   allegations that are being made, they are vigorously disputed.

21   I'll reiterate so Mr. Hessler's heart stops palpitating that

22   I'm not going to slow down this process, at all.  If we need

23   to segregate this out and deal with this, you know, there has

24   to be an airing of this issue given what's been done.

25        Now I'll be very up front.  I didn't like the

1    Trustee's response.  It's not what I wanted.  But he knows

2    that because he's known me for 30 years.  But he got told that

3    he had to do it a particular way.  I already know that.  You

4    know, I want a process that will leave everyone in the

5    courtroom and everyone who's not in the courtroom -- they can

6    disagree with my ultimate decision.  That I do not care about.

7    I do try to get it right.  And the thing that I want more than

8    anything is that the process is transparent.  That's what I

9    want.  I say it in every case.

10           And what I'm trying to figure out is -- so we're

11   sitting here today, you think that you've seen a bunch of

12   incredibly unreasonable discovery requests, that we've got a

13   hearing set for and a desire to have this all heard by

14   January 28th?  The 28th.  How do we get from today to there so

15   that we can have a fair open hearing with the result being

16   whatever it is?  And I'm going to ask the same question of

17   your opposing counsel.  But in your mind, how do we get there?

18           MS. CHUNG:  Okay.  So first of all, Your Honor, we

19   are entirely comfortable with the truth seeking process in

20   this Court.

21           THE COURT:  Okay.

22           MS. CHUNG:  Secondly, I think -- let me be

23   (indiscernible) about it, maybe.  I think the correct legal

24   answer is --

25           THE COURT:  Okay.

1          MS. CHUNG:  -- we should bring our witnesses and put

2     on our *prima facie* case.  We have the burden.  That's what

3     Mar-Bow says.  That could even be done without discovery.  We

4     could have -- basically, we bring our witnesses, we give them

5     our exhibits, we put on our *prima facie*.  And the reason why I

6     think that that's right is because they -- until they

7     establish some plausibility -- that's actually the language of

8     the case law, the Fifth Circuit, they should not be entitled

9     to get discovery.

10          What's happening now is, they're putting words on a

11    page saying things like, presumably, so and so worked for

12    Peabody.  Or we think that it must be the case that

13    information about MIO Investments made it over to the

14    consultants.  And then when I flip open the RFP, low and

15    behold, it says, please turn over the information about

16    whether this person worked for Peabody.

17          THE COURT:  Right.

18          MS. CHUNG:  And that's -- that is the definition of

19    a fishing expedition.

20          THE COURT:  So why don't you go take the deposition

21    of the person who participated in the preparation of the

22    document?

23          MS. CHUNG:  And Your Honor, we have -- we are going

24    to depose.  They have made the agreement that they will

25    produce Jay Alix.  I don't know if he's the person who's done

1    the analysis that produces this allegation of fraud or not.

2    That -- it may turn out that that was done by lawyers or other

3    things which would make it difficult, but we're going to try,

4    Your Honor.

5              THE COURT:  Okay.

6              MS. CHUNG:  But I -- but in terms of expedition,

7    Your Honor, I want to be --

8              THE COURT:  Well, wait a minute.  Let me -- let's

9    take a step back.  We're going to try.  You're not going to

10   try.  You're going to -- they're -- you know, somebody's

11   accused in a pleading, this has been done, of a professional,

12   especially for whom I have approved millions of dollars of

13   fees.  They've accused them of fraud.  There's going to be a

14   person that says, yes, I authorized this pleading.  I read it.

15   I believe it to be accurate based upon the following

16   investigative acts that I took to verify its truth and in

17   compliance with Rule 9011.

18              If that person doesn't exist, this turns into a very

19   ugly proceeding going in a way that probably most folks never

20   anticipated going.  So I assume -- because I do know some of

21   the lawyers involved, and they know me, and they know how I

22   react to this issue.  So I cannot believe that there hasn't

23   been a discussion about you've got to be really careful with

24   Jones.  If Jones believes he's been lied to, Jones becomes

25   very difficult to deal with which is a very true statement.

1            I think that, you know, the first thing that I think

2       you ought to be doing -- and, again, I'm not trying to tell

3       you how to do things.  You're far smarter than I, and, you

4       know, the fact that you're standing out there and I'm sitting

5       up here says you're far smarter than I.  Why wouldn't that be

6       number one?  Let's figure out what was the basis for the

7       things that got put in a pleading, and then we can have a much

8       more educated discussion about what documents need to be

9       delivered, what interrogatories need to be answered, what

10      requests for admissions, if there are any, need to be

11      answered.

12           MS. CHUNG:  We have made the request for that

13      information, and I agree with Your Honor that that should be

14      the sequence.

15           THE COURT:  Okay.

16           Now with respect to the informational requests that

17      you all have exchanged, this is a here's what we're going to

18      serve, or these have now been served, in your opinion.

19           MS. CHUNG:  They have been served, Your Honor.

20           THE COURT:  They have been served.

21           MS. CHUNG:  They've been exchanged.

22           I feel like I haven't answered your -- one of Your

23      Honor's other questions which is when you were saying you

24      don't -- the parties just exchanged on Friday, over the

25      weekend, and we had the meet and confer yesterday, so we're

1      probably not as crystalized as we would be --

2                 THE COURT:  I got it.

3                 MS. CHUNG:  -- when we ordinarily appear before Your

4      Honor.

5                 THE COURT:  You haven't thought through all of the

6      going down the decision tree.  I got it.

7                 MS. CHUNG:  And if Your Honor would find it helpful

8      if -- I realize that, you know, we're making these proposals

9      now just on the heels of a meet and confer.  We could make a

10     motion for a protective order, a proposal for a plan forward,

11     whatever is helpful to the Court.

12                THE COURT:  What -- here's my view.  So again, I'm a

13     big rule follower.  So if there have been discovery requests

14     that have been propounded in accordance with the rules, and

15     you believe they're objectionable, that has to be taken up,

16     and I can do it on an emergency basis.

17                MS. CHUNG:  Okay.

18                THE COURT:  I will tell everybody, I firmly believe

19     in Rule 37.  But the only way those get addressed is through a

20     motion because that is the transparency and the due process

21     that I just absolutely require.  And I'm happy to take those

22     up, again, on an accelerated basis if that needs to be done.

23                Again, I'm just looking for how do we get from today

24     to January 28th.

25                MS. CHUNG:  Your Honor, if we can -- or even before

1    having exchanged our own responses and objections, so Your

2    Honor, what we could do is accelerate that process and make a

3    motion that you're describing.

4                    THE COURT:  And -- fair enough.

5              So let me take a step back because, again, you don't

6    know me, and I know you're doing intel gathering because every

7    smart lawyer does.  I don't mind the fight.  The fight doesn't

8    bother me at all.  I don't normally say, hey you folks need to

9    meet and confer.  I don't normally do that.  Again, because I

10   grew up a litigator.  I don't like talking to people.  I got

11   it.

12             I did it because of the ramifications of the outcome

13   of this hearing.  This just has the potential -- this has the

14   potential to affect careers, maybe even end careers.  And I

15   wanted to make sure that everybody understood that before we

16   go down this path which is why I wanted everybody to talk.

17   It's why I wanted a principal here because I haven't yet --

18   you know, I haven't yet started down my, you should fear the

19   unknown speech yet.  And I know both principals are going to

20   be very sophisticated, they're hardened, but if they're not

21   thinking through this, they should, because this has just got

22   some huge ramifications to it because it brings into play

23   everything that I took an oath to protect.

24             So that's why the folks are here.  Again, I don't --

25   before you -- you know, before you file a motion -- I mean, I

1    want you to follow the rules.  If the rules say you should

2    meet and confer, I want you to meet and confer.  If there's no

3    requirement, it's an issue of professionalism.  I would think

4    you would send an email that says, hey, if you don't do -- if

5    we can't reach an agreement on this by, you know -- I'm making

6    this up -- by, I'll say five o'clock today since that was 10

7    minutes ago, you know, then here's what I'm going to do.

8         You litigate this case.  I -- as I said before, I

9    can't remember which hearing it was, I don't shy away from

10   anything.  I will resolve the problems that are presented, but

11   they have to be presented in the right way.  We have to follow

12   the rules, due process has to be satisfied, transparency has

13   to occur.  Because I want, you know, one of the 67 people on

14   the telephone who isn't here and who may not be a lawyer to be

15   able to understand what it is that we're trying to address.

16        MS. CHUNG:  So we appreciate the Court's attention

17   to this.  We also are here to take it extremely diligently.

18   We will follow the rules as we always do.  And --

19        THE COURT:  Okay.  So --

20        MS. CHUNG:  -- we have not had any issue of meeting

21   and conferring.  Our disagreements are actually quite

22   principled.

23        THE COURT:  No.  Fair enough.

24        So just, again, let's assume that you have a -- you

25   had a blank chalkboard and you controlled the chalk, what

1    would the process look like in your mind?

2              MS. CHUNG:  I think the process might be, Your

3    Honor, that we bring the witnesses with their exhibits even

4    sooner than January 28th.  If through hearing that, Your

5    Honor, but -- and we will examine their witnesses on their

6    allegations.  If through -- and then there's sort of a

7    gateway.

8              THE COURT:  Okay.

9              MS. CHUNG:  If there's some aspect of the

10   declaration that we presented or our disinterestedness that

11   the Court believes there should be discovery on, that there

12   should be further inquiry of, then I think we're walking

13   through that door and we're probably doing file discovery of

14   some sort.

15             THE COURT:  So let me ask you a question.  So just

16   trying to think through that process.  So you put up your

17   three witnesses and I assume that you're going to agree to

18   have them deposed before they would testify.

19             MS. CHUNG:  Yes, Your Honor.

20             THE COURT:  And I assume that there would be some

21   limited discovery in terms of document production, that sort

22   of thing --

23             MS. CHUNG:  Yes.

24             THE COURT:  -- before you did that.

25             MS. CHUNG:  We would produce the things we intend to

1       rely on and =- it would basically be -- I don't want to

2       overstate it Your Honor.  It would be our exhibits.

3                THE COURT:  I got it.  But here's where I was going.

4                First of all, you're never going to -- you know,

5       you're never going to rely on a document that works against

6       you.  And so how do I deal with the due process aspect that in

7       order to proceed with a hearing that there is -- there are all

8       of these other things that need to occur for due process to be

9       met.  So that I think -- you know, that's problematic for me

10      in terms of a hearing.

11              But if you said the first thing we want to do before

12      Christmas is depose the person who is responsible for making

13      these allegations and then we want to file an appropriate

14      motion which can be all sorts of things.  Again, because I

15      don't know -- all I know is I've got a pleading which is

16      incredibly inflammatory and is problematic for me.

17            I have to get to the bottom of this.  I have to.

18      Before this is said and done, I've got to come to the

19      conclusion that I've gotten to the truth and that the

20      integrity of this process is intact.  I have to do that.

21           MS. CHUNG:  I think that's the right sequence, Your

22      Honor.  And I think that will also expose that the differences

23      between the parties are the ones that I was describing

24      earlier.

25             THE COURT:  If it turns out to be just a pure legal

1      issue about what the applicable standards is, I got that, and

2      that's -- I agree with you when you said that you think that's

3      legal argument.  I totally agree with you.  But that's not

4      what's currently filed.  This isn't a, we think that they made

5      a mistake because they applied the wrong legal standard.  The

6      allegation is, they know what the legal standard is and they

7      hid it from you and that you committed all sorts of heinous

8      acts.  I mean, that's where it stands right now.

9             If it changes to where we just disagree as to what

10     the fundamental legal standard is and we want to have an

11     argument and brief over what the applicable legal standard is,

12     that's an entirely different issue.  But it would seem to me

13     that given what you have, we need to solve the issue as to --

14     because the lawyers can't do -- I hope the lawyers can't do

15     this by themselves.  They had to have instruction from your

16     client, the client had to approve it, the client had to read

17     it, and you know, I've also found out in eight years that that

18     doesn't always happened.

19            But it seems to me that we need to understand where

20     that's from, and that may lead to some sort of motion.  Again,

21     keeping with notions of due process and the federal rules that

22     would then drive where we go.

23            MS. CHUNG:  So Your Honor, I can be very precise

24     about that.  We've already asked for and they've already

25     agreed to produce Mr. Alix.  They could do that before the

1    holidays.

2              THE COURT:  All right.  And is Mr. Alix the person

3    who participated in the drafting of the pleading, Mr. Rhodes?

4              MR. RHODES:  He is, Your Honor.

5              THE COURT:  All right.

6              MS. CHUNG:  And we have also requested the documents

7    and work papers that would substantiate what their allegations

8    are in their objection, and so if that would be the -- that

9    would logically be together with Mr. Alix's deposition.

10             THE COURT:  So can I propose something just a little

11   different?  And again, I'm not trying to -- if you all have

12   worked out a process that -- you have worked out a process,

13   then maybe I should be quiet.  I have a process in my mind,

14   but I -- again, I stopped being a lawyer a long time ago, so

15   I'll be quiet.  So --

16             Mr. Rhodes is shaking his head that you all have

17   agreed to how you want to proceed.

18             MR. RHODES:  Well I -- it's an agreement in part,

19   Your Honor.  I wouldn't say it covers all of the issues.

20             THE COURT:  Can I just get you closer to a

21   microphone so the folks on the --

22             MR. RHODES:  I'm sorry.

23             THE COURT:  -- telephone can hear?

24             MR. RHODES:  I would say we have agreed in principle

25   on certain aspects of the process, but there is one major

1          piece of it which Ms. Chung is addressing that we have not

2          agreed upon.  And so when it's my turn, I'll give you our

3          perspective on that.

4                    THE COURT:  Okay.  Fair enough.  Thank you.

5                    All right.  So this all gets to the how far we look

6          back issue, right?

7                    MS. CHUNG:  Well I'm not sure what else he's going

8          to address, but I think to crystalize where our proposal is,

9          Your Honor, we will --

10                   THE COURT:  So let me ask you this, if I could, and

11         I'm sorry for interrupting.  So if you deposed Mr. Alix and --

12         ignore for a second that he's right or wrong.  I understand

13         that you believe that he's just inherently wrong in everything

14         that he's raising.  But let's assume that Mr. Alix gives

15         testimony that says I did the following things, a, b, c, and

16         d.  And from a, b, c, and d, I concluded that there was indeed

17         a basis for asserting that fraud had occurred.  Do you agree

18         at that point that discovery just expanded?

19                   MS. CHUNG:  Your Honor is assuming that the analysis

20         is correct or incorrect?

21                   THE COURT:  Neither.  That it is colorable.  So he's

22         a -- you know, a reasonable person who could conclude by

23         looking at a, b, c, and d that in fact something inappropriate

24         had occurred.

25                   MS. CHUNG:  Then discovery will have expanded, and

1    Your -- I'm very confident, Your Honor, that that's not going

2    to be where we are.

3             THE COURT:  I got that.  I was trying to avoid you

4    having to do that.  This is me trying to just understand --

5    and quite frankly, it's me trying to understand you.  That --

6    that's -- I'm just trying to see your thought process.

7             All right.  And if you take the deposition and it

8    was -- not that Mr. Alix would ever say this, but he says,

9    yeah, I just don't like McKinsey, there isn't any basis for

10   it, I've just got more money than they do and I'm going to

11   grind them into the ground because I want a competitive

12   advantage.  I'm just making that up.  I have no --

13            MS. CHUNG:  You're giving me objectives, Your Honor.

14            THE COURT:  I have no basis for saying that.

15            At that point, I -- then it's -- I would assume that

16   then you would take that transcript and there would be an

17   emergency pleading asking for limiting type relief.

18            MS. CHUNG:  Exactly, Your Honor.

19            THE COURT:  Okay.  That actually makes some sense to

20   me.  All right.

21            MS. CHUNG:  Thank you.

22            THE COURT:  We may come back again.

23            All right.  Mr. Rhodes?

24            MR. RHODES:  Good afternoon, Your Honor.

25            THE COURT:  Good afternoon.

1          MR. RHODES:  Let me begin, please, by introducing my

2     client.  This is Mr. Jay Alix.  He is the principal of Mar-Bow

3     Value Partners, the objecting party here.

4          MR. ALIX:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.  And I'm sorry to bring

6     you here, but you understand why you are here, right?

7          MR. ALIX:  I like Texas, Your Honor.

8          THE COURT:  All right.  Fair enough.

9          MR. RHODES:  I'd like to begin, Your Honor, by

10    identifying what we think is the issue at stake here.  It is

11    simply an issue of whether McKinsey RTS is qualified for

12    employment in this case.  Does it hold an interest that's

13    adverse to the estate?  Does it represent interests that are

14    adverse to the estate?  Is it disinterested?  Has it complied

15    with Rule 2014?  Can the debtors meet their burden on this?

16         And as Your Honor pointed at, at the base of all of

17    this is this fundamental question.  Does McKinsey's employment

18    in this case pose a threat to the integrity of the Court's

19    processes?  Now we're not here today to argue the merits and

20    we're not going to.  But of course, we have to dip into that

21    to discuss the scope of discovery a little bit here.

22         THE COURT:  Okay.

23         MR. RHODES:  So -- and we're going to ask your help

24    in guiding us on what's the scope of discovery here.

25         Before I do that, I want to suggest to the Court

1    that the issue of McKinsey's disclosures under Rule 2014 is

2    frankly a secondary issue.  We think the important issue here

3    is the 327 issue.  Are they qualified to serve?  Do they have

4    these connections that are disqualifying?

5         We have substantial evidence that they do have such

6    disqualifying connections, and we're happy to share it at the

7    appropriate time with the Court and, of course, with counsel

8    for McKinsey and the debtors here.  But what this case is not

9    about, at least not directly, is what everyone else discloses

10   and what other disqualifying connections others may have.

11        Might there be an impact from Your Honor's ultimate

12   decision in this case on what happens with other professionals

13   in other cases?  Possibly.

14        THE COURT:  Sure.

15        MR. RHODES:  That's the way the law develops.  But

16   we're not here looking at the disclosure declarations and the

17   qualifications of any other professional in this case other

18   than McKinsey.

19        Similarly, Your Honor, we're not here to examine the

20   disclosure practices of AlixPartners which is the firm that

21   Mr. Alix gave birth to and developed into a substantial

22   competitor of McKinsey.  We want to be singularly focused here

23   on McKinsey.

24        Now having said that, we want to join in the course

25   here of everyone, including Your Honor, who insists that these

1    proceedings not impact confirmation.  It is not our intent to

2    impact confirmation.  We want to get this resolved as promptly

3    as possible, and we have developed a partial agreement with

4    McKinsey's lawyers on how to accomplish that.

5            I had thought coming into this hearing that what

6    McKinsey was going to ask for was a bifurcated proceeding.

7    This is what they floated to us in our meet and confer.

8            THE COURT:  Okay.

9            MR. RHODES:  The bifurcation was first, we examine

10   how strong is the wall, the wall between RTS and MIO.  And if

11   Your Honor decides it's not strong, or not strong enough to

12   protect the interests that Section 327 is designed to protect,

13   then we'll have a second period of discovery and a second

14   trial on whether they are disqualified or not.

15           THE COURT:  So you're saying --

16           MR. RHODES:  And --

17           THE COURT:  -- if I -- and I'm sorry for

18   interrupting.  If I --

19           MR. RHODES:  So they proposed, but we indicated our

20   opposition to it.

21           THE COURT:  Got it.

22           So if I determined that the wall wasn't strong

23   enough, to use your vernacular, at that point wouldn't the

24   disqualification issue already be resolved?

25           MR. RHODES:  Precisely.

1          THE COURT:  Okay.

2          MR. RHODES:  And that's why the bifurcation that was

3     presented to us just doesn't work.

4          Now I want to -- the witnesses that Ms. Chung talked

5     about bringing in.

6          THE COURT:  Right.

7          MR. RHODES:  She didn't quite say this, but what

8     she's talking about is these witnesses talking about the wall.

9     That's -- they're going to try to justify to Your Honor why

10    they don't search for connections at MIO, and their

11    justification for that is the strength of this wall.

12         THE COURT:  I got it.

13         MR. RHODES:  They argue this wall despite the fact,

14    Your Honor, that they hold out to the world that they are one

15    firm, that their ethics guidelines published on the internet

16    say that they govern themselves as one firm, and you saw the

17    whole list of reasons why in our objection.  We have come to

18    the conclusion that McKinsey is one firm.

19         Now it's been alleged here -- facts that we didn't

20    know before we dipped our toe into this case -- which was that

21    other professionals than McKinsey have in house investment

22    operations.  Again, we don't know anything about that, we

23    don't want to focus on that, we don't even want to know about

24    that.  Your Honor may want to know about that, the U.S.

25    Trustee may want to know about that, but we're focused on

1    McKinsey.  McKinsey is an in-house captive investment

2    operation.

3            We will show at a hearing, Your Honor, that the wall

4    is not solid.  Information flows in both directions.

5            THE COURT:  Okay.

6            MR. RHODES:  Or at least it's available in both

7    directions.  Anyone at MIO can see what McKinsey RTS is doing

8    just by looking in the public docket of this case.  It can see

9    the results of its work by looking at the motions and the plan

10   and the disclosures statement.  They can look at its actual

11   work by looking at its disclosure declarations its engagement

12   letter and ultimately its fee applications which describes

13   minute-by-minute what they are doing in this case.  All public

14   information.

15           In the other direction, everyone at RTS can see a

16   good portion, not everything, but a good portion of what the

17   MIO is doing, it's on the Department of Labor website, it's on

18   the SEC website.  But most importantly, Your Honor, when we

19   talk about MIO Investments, that's a bit of a misnomer,

20   actually it's a huge misnomer, because those investments that

21   MIO makes are really the investments of the employees and the

22   partners.  It's their investment money, it's their retirement

23   money.  They give that money to McKinsey, they designate which

24   of the many investment options MIO offers that they want their

25   money to go into.  They make that decision based on

1    information that MIO gives back to the Investors.  And after

2    they make their investments the law requires, not to mention

3    good practice, that MIO provide information back to the

4    Investors about those investments.  Where's the money?  How

5    did it do in the last quarter?  What's it worth?  Et cetera,

6    etcetera.  So this wall, we think, Your Honor will find is not

7    strong.

8              But there's one more point here, Your Honor, that we

9    think closes the door on this argument frankly.  It's simply

10   this, Section 327 says, that "If the professional person"

11   which means not just the entity but the people working on the

12   project --

13             THE COURT:  Right.

14             MR. RHODES:  -- "have an investment interest in a

15   party in interest or in the debtors, they're not qualified."

16   That's what Section 327 says, and I don't think anyone can

17   disagree with that.  If that's so -- if that's so, it must be

18   the law -- it must be the law that the professional is

19   obligated to disclose that connection.  It must be.

20             And if we're looking for a way to shortcut the issue

21   of whether McKinsey RTS is required to disclose to this court

22   the investment connections of the McKinsey people in the

23   interested parties in this case that has got to be the answer

24   as a matter of law.  327, Your Honor, and for that matter Rule

25   2014 is smart enough to know -- it's smart enough to know that

1          people are people and sometimes they do things with
2          information and they get information that they shouldn't do.
3          McKinsey is a fiduciary, Your Honor.  They cannot have the
4          kinds of interest that Section 327 prohibits here.
5                    Creditors and indeed the debtor itself, should not
6          have to even ask the question about whether that wall is
7          strong enough, because when you do that you're trusting the
8          people who have erected that wall, you're trusting them with
9          the integrity of the Court's process, and Section 327 is
10         smarter, smarter than that.
11                   THE COURT:  So, let me ask you a question --
12                   MR. RHODES:  So -- okay.  Yeah.
13                   THE COURT:  -- if I could at this point.
14                   What you've described to me thus far is perhaps a
15         fundamental understanding of how the statute works, what's
16         required, maybe that it may reflect a disagreement over the
17         strength of a particular protection that's been put in place.
18         None of that -- that may result in -- it may result in a
19         finding of interest in this, it may result in finding of -- or
20         just say disqualification.
21                   MR. RHODES:  That's what we seek.
22                   THE COURT:  But that's a far cry from accusing
23         someone of committing a crime.  And that's what Im struggling
24         with.
25                   If this were -- if this were just a simple 327, 2014

1    issue this is a whole different issue for me.  I make that
2    call every day.  I get very few of these where it says, no
3    it's something more than that.  There's a professional trying
4    to seek money from a bankruptcy estate and their doing it in
5    such a way as to rise to the level of fraud.
6              MR. RHODES:  Okay.  So let --
7              THE COURT:  So if you touch on that --
8              MR. RHODES:  Let's talk about -- let's talk about
9    fraud.
10             THE COURT:  Okay.
11             MR. RHODES:  Okay.  Whether there's crime involved
12   here or not, that's above my paygrade and we didn't use the
13   word crime we used the word fraud, so let's talk about that.
14             THE COURT:  No.  But the way that you phrased it you
15   clearly implicated certain sections of Title 18 applicable to
16   bankruptcy cases and I know that you know those provisions and
17   I mean it puts them square right in the middle of those
18   provisions.
19             MR. RHODES:  Possibly, but let's talk about fraud.
20             THE COURT:  Okay.
21             MR. RHODES:  Okay.  And in fact, Your Honor, let's
22   talk about fraud in connection with the declaration that was
23   just filed.
24             THE COURT:  Okay.
25             MR. RHODES:  We only had a few hours to look at it,

1   we haven't been able to take a deep dive into it, but in our
2   brief review we found seven problems.
3              THE COURT:  Okay.  And not every problem is a fraud,
4   right?
5              MR. RHODES:  No.  But hang on to that question.
6              THE COURT:  Okay.
7              MR. RHODES:  Let's start at the top, in our amended
8   objection we listed 205 connections that McKinsey did not
9   disclose.
10             THE COURT:  Okay.
11             MR. RHODES:  Okay?
12             They come back with a new declaration.  How many of
13  those 205 did they declare?  Twelve.  Twelve, from our list.
14  Now they added 32 all together, because some of them we didn't
15  know about before.  But, in that declaration, there are still
16  somewhere between 150 and 193 connections still not disclosed.
17  And they've told you why they think that is, this two year
18  look back thing, which, you know, we can talk about in detail
19  in a moment.
20             THE COURT:  Right.
21             MR. RHODES:  But that doesn't work either, Your
22  Honor.  Why?  Because within the two year period Mr. Haginaki
23  (phonetic) who signed the declaration in this case, signed the
24  declaration in the Sun Edison case within the two years
25  disclosing three connections in that case which are on the

1       interested parties list in this case not disclosed.

2                  THE COURT:  All right.  But you do agree that there

3       are, there are circumstances in which that could be entirely

4       accurate right?  Because, if the declaration had a two year

5       look back from a point in time sooner than this declaration,

6       there is a series of events that could occur where that could

7       all be absolutely true.

8                  MR. RHODES:  We could construct a hypothetical world

9       in which that was true and --

10                 THE COURT:  I can do that in my mind, that's easy.

11                 MR. RHODES:  Yeah.  Yeah.  Okay.

12                 But what we don't have from Mr. Haginaki or McKinsey

13      at all is whether that's true or not.

14                 THE COURT:  Okay.

15                 MR. RHODES:  We just don't have it.

16                 THE COURT:  Okay.

17                 MR. RHODES:  We don't have it.

18                 Number two -- well and beyond that I would say what

19      we almost always get from McKinsey is -- well I was going to

20      say a name.  Most of the time you get a name, sometimes you

21      don't get a name.  We never get any information about what the

22      nature of the connection is.

23                 THE COURT:  Let's say -- when you say you get a name

24      you just get, you know, ABC partnership, but it doesn't tell -

25      - you don't get an explanation of the relationship.

1          MR. RHODES:  You know, we get an assurance that

2     there's no direct commercial relationship.

3          THE COURT:  Right.

4          MR. RHODES:  By the way, that's a phrase they made

5     up, it's not in the statute, and it's not in the rule.

6          THE COURT:  I got it.

7          MR. RHODES:  And we don't frankly know what it

8     means, but that's the phrase they use.  Beyond that -- before

9     I go beyond that.  We have this pattern, Your Honor, in case

10    after case after case in which McKinsey discloses little or

11    nothing, the US Trustee comes in and says you need to disclose

12    more, they disclose a little bit more, and then maybe they

13    disclose a little bit more, but in case after case after case,

14    they've never disclosed all of their connections.

15         THE COURT:  So it's your position they disclose just

16    enough to get the objection to go away and then they move on.

17         MR. RHODES:  Yeah.

18         THE COURT:  Okay.

19         MR. RHODES:  And so now we're beginning to think

20    about fraud, Your Honor.  We're beginning to think that they

21    are hiding the connections that are disqualifying.  A & R, a

22    perfect example of this, Your Honor.

23         THE COURT:  Right.

24         MR. RHODES:  They knew --

25         THE COURT:  Could I ask you just a question?

1          MR. RHODES:  Yeah.

2          THE COURT:  So it would seem to me that given --

3    this is just hypothetical.  It would seem to me to have been a

4    wiser course of action to have alleged the disinterest in

5    this, allege the conflict, whatever it might be, taken your

6    discovery and then seen what -- whether or not you can make

7    out a case of fraud.  I mean -- and maybe you've done that.

8    But I will just tell you, I've not yet heard you get there.

9    I've heard you say, we suspect, we think, we're concerned

10   that.

11         You know, if I were to make an allegation of fraud

12   about Stephen Rhodes based upon things I believed, or things -

13   - a pattern that I can see, you would be fairly offended by

14   that, I assume, I would hope you would, because your

15   reputation is such that I couldn't believe you would ever

16   accept that.  And I would just think that before an

17   inflammatory pleading got filed like the one that got filed,

18   the conflict was enough to get my attention.

19         MR. RHODES:  All right.  So two responses.

20         THE COURT:  Sure.

21         MR. RHODES:  First of all, the allegation that you

22   hypothetically are making against me of fraud, if it's the

23   first time I've done what you have accused me of, yes.  That

24   would be a real problem.

25         THE COURT:  Okay.  You're saying just because this

1    has happened before and --

2              MR. RHODES:  The U.S. Trustee has banged on McKinsey

3    six times in three cases and they're still getting the same

4    response from them.

5              THE COURT:  All right.

6              MR. RHODES:  At what point, Your Honor, does it

7    cross the line from innocent disagreement about how to

8    interpret the statute to an intentional act on their part to

9    hide disqualifying connections.  And that, Your Honor, from

10   our perspective, is what the whole discussion about MIO is

11   about.

12             THE COURT:  No.  I --

13             MR. RHODES:  They told you here today --

14             THE COURT:  I got it.  But why would --

15             MR. RHODES:  -- as they did to us on the phone.  If

16   Your Honor says McKinsey is one firm and they've got to

17   disclose their connections through the MIO they're done.

18   They're done.  They will never disclose their disqualifying

19   connections.  That's a problem, Your Honor.

20             All we ask for -- all we ask for is that McKinsey

21   follow the law.  That's all we have asked for.

22             And my second response.  I know how inflammatory the

23   objection is.  I know.  It had to be, Your Honor, because in

24   the first piece of it I wanted Your Honor to see that this

25   case is not just about the failure to disclose, it's about the

1    failure to disclose disqualifying interests.  That's what I

2    started with.

3              THE COURT:  Okay.

4              MR. RHODES:  I raised the MIO issue out of the box.

5    Later on in the objection, when I talked about Genon and Sun

6    Edison and A & R, I did that to prove to Your Honor that

7    McKinsey will never comply with Rule 2014 and they've admitted

8    it here today.  They will not disclose their disqualifying

9    connections.  They'd rather abandon this debtor.        Now I

10   want to turn to one other matter here, Your Honor.  Your Honor

11   suggested what amounts to not a bifurcation -- I'm going to

12   make up a word here -- a trifurcation.  We start by cross-

13   examining Mr. Alex on the grounds for his inflammatory

14   allegations of fraud against McKinsey.  I know, Your Honor, is

15   committed to regular process, that is not regular process, it

16   just isn't.

17             THE COURT:  Of course, the pleading wasn't a regular

18   pleading.

19             MR. RHODES:  It alleged that McKinsey is not

20   qualified to serve in this case.  Is that unusual?

21             THE COURT:  It alleges a lot of other things as

22   well.

23             MR. RHODES:  Is that unusual?  Yes.  It's extremely

24   unusual.

25             THE COURT:  I know that you're not being used to

1     being talked over and neither am, I would remember that.

2              MR. RHODES:  Thank you, Your Honor.  I will

3     remember.

4              Where was I?  So it's -- it's the debtor's burden to

5     prove --

6              THE COURT:  Agreed.

7              MR. RHODES:  -- that they're qualified with, of

8     course, the help of McKinsey.  We think from our perspective

9     that Your Honor should be as concerned about the fraud in

10    Mr. Haginaki's declaration as you are about the improprieties

11    or the inflammatory nature of Mr. Alex's complaint.

12             THE COURT:  I am.  Having heard what you said I had

13    a tack on to my earlier suggestion.

14             MR. RHODES:  Okay.

15             THE COURT:  It seems to me there are two gating

16    depos that ought to occur.  And it would -- those two depos,

17    assuming that we have competent people asking the questions,

18    are going to very much drive where I go.

19             But again I also, and quite frankly those are the

20    two people that probably ought to go first, because again were

21    going to get back to this.  The harder you all push all of

22    this the more you ensure that someone doesn't survive this.

23             MR. RHODES:  Right.

24             THE COURT:  And I don't mean that literally,

25    obviously, I mean.  But there's a cost to reputation, there's

1    a financial cost, there is a -- you just become to problematic

2    to deal with cost.

3                    MR. RHODES:  Right.

4                    THE COURT:  And I don't ever want to see that with

5    anyone, but there are some lawyers in this room who know that

6    I will absolutely go there if I get pushed.  And I just want

7    to make sure that people understand what they're signing up

8    for.

9                    MR. RHODES:  We were so advised.

10                   THE COURT:  Okay.  Fair enough.

11                   MR. RHODES:  We were.  But let me drop a footnote

12   here, if I may, Your Honor?

13                   THE COURT:  Please.

14                   MR. RHODES:  If the past is a prologue and we have

15   every reason to believe it is here, Mr. Haginaki likely had

16   very little to do with the searches that McKinsey performed.

17                   THE COURT: Okay.

18                   MR. RHODES:  In fact, I think it was admitted here

19   today by Ms. Chung that it was done through the legal

20   department.  That creates issues of course.  We hope Your

21   Honor will conclude --

22                   THE COURT:  I'm sure it does for me.

23                   MR. RHODES:  Okay.  Then, then --

24                   THE COURT:  That's the Sword and Shield argument,

25   then.  You don't get to do both.

1          MR. RHODES:  Right.  Okay.

2          THE COURT:  I also know that,, that's in the

3     capacity as a lawyer but that's another day, another argument.

4          MR. RHODES:  So we're not sure that disposing

5     Mr. Haginaki by itself will deal with the issues that we've

6     been talking about, we'd also like to take the deposition of

7     the woman in the legal department whose name escapes me for

8     the moment.

9          UNIDENTIFIED FEMALE:  Lori Bash.

10         MR. RHODES:  Yes.  Lori Bash who may actually have

11    done the actual searches involved.

12         THE COURT:  Well, let me tell you why I picked

13    Mr. Haginaki, and I apologize if I got that wrong.  As sort of

14    a threshold, you've told me that his latest affidavit contains

15    numerous problems.

16          First of all, the fact that it changed is a problem.

17    And it would seem to me that why he did what he did, who he

18    relied on, what investigation he did, all becomes sort of a

19    threshold issue for me in terms of trying to figure out -- if

20    you all can't do it -- try to figure out where we go in

21    discovery.  I am not going to open this up and say we are

22    going to go back to the beginning of time and come forward

23    until I get a good understanding of where we're heading.

24          I think that with the changes to the rules that is

25    incumbent upon me to try to figure out that process which is

1    reasonable.  And, you know, I can't think of a better way, you

2    know, you've heard it three or four times today, I really

3    dislike declarations, because again they're written by the

4    lawyers who may want to be witnesses but are too afraid to

5    take the oath and get on the stand.  And I don't mean anything

6    by that.

7            I do think in my mind that having a couple of sort

8    of threshold depositions, again I don't even think documents

9    are needed because again, if there's a pleading on file, you

10   know, as a lawyer not that I was the greatest at anything but

11   I've done this a hundred times where I've taken a complaint

12   and said all right, lets look at paragraph 1.  What is the

13   basis for that?  What did you do to investigate it?  How did

14   you come to a conclusion that this met your obligations under

15   Rule 9011.  Same issue with respect to a declaration.

16           It seemed to me that the outcome of those two

17   depositions would start to define, if you will, a path toward

18   what we're going to do in terms of how expansive discovery's

19   going to be, because I'll just tell everybody, I'm worried to

20   death that I made a mistake in Genon.  I hope I didn't  I

21   never want to intentionally make a mistake.  But I'm worried

22   that I did something wrong in Genon.  And if I did something

23   wrong, I'm going to fix it.  You know, I hope I didn't.  But

24   if I did, I will be the first to acknowledge that I made a

25   mistake.

1          But I need a process.  I mean, what I've heard you

2     all talk -- and again if you all can work this out between

3     yourselves, I'm perfectly fine with it.  And I'll go on

4     whatever timetable you all can agree to.  I mean, I want this

5     done sooner rather than later, but I want the process to be

6     accurate I want the issues to be vented.  Again, and it's not

7     going to get in the way of the Debtor proceeding along in

8     their case, but if you all can't agree, I don't know how else

9     to do it, other than to start infusing my own views as a

10    lawyer which I know I shouldn't do, but if I can't, you know,

11    if I can't get a process that I feel comfortable gets us

12    toward a quick resolution.  Then I don't see any alternative

13    but to say, go cross the issues that I think are threshold

14    issues and you can come back and file something and we can,

15    then have a further conversation after I've become a little

16    more eductated.  All I've done right now is read what's on the

17    docket.  You know, I've gone back and read, you know, what I

18    did in Genon, it doesn't mean anything to me, because it's all

19    based upon context that you tell me is incorrect, or may be

20    incorrect.

21         So I, you know -- it gives me an alternative, I

22    mean, give me a process that works or tell me that you don't

23    have one that's better than mine.

24         MR. RHODES:  I'm confident that our relationship

25    with the attorneys for McKinsey is such that we can do a meet

1    and confer, here in the next couple days and agree upon a

2    process that's consistent with how, Your Honor, thinks at

3    least the initial phase of this should play out.

4              Is that okay?

5              THE COURT:  And, again, I am perfectly happy for you

6    all to agree that Jones is just wrong and that there's a

7    better way to do it.  I would be thrilled to death if that's

8    the outcome.

9              Let me ask this.  One is -- I've lost it behind the

10   monitor -- is that acceptable to McKinsey to giving you --

11   having listened to what I've said, giving you all a couple

12   days to figure out if there's a consensus on how to go forward

13   and then perhaps getting back together right after first of

14   the year?  Does that make sense?

15             UNIDENTIFIED FEMALE:  Yes, Your Honor.  It does.

16             THE COURT:  Everybody got their phones, or if

17   somebody has -- I saw this the other day somebody actually

18   pulled out a paper calendar.  Ah.  She's got one.  All right.

19             So let's look at January.  And I -- obviously I

20   don't need a room full of people to do this.  Although I do

21   find I actually don't know where the two of you are located.

22   Where are you currently?

23             MR. RHODES:  I'm in Michigan.

24             THE COURT:  You're in Michigan.

25             And you are in?

1          UNIDENTIFIED FEMALE:  New York.

2          THE COURT:  New York.  I am coming to neither place

3    so we'll do it here.

4          Is there a way to get from New York, and or Michigan

5    so that it's a one day?  I hate to have you stay over night.

6    I mean, I want you to be with your families if I can possibly

7    get you back there.  Is there a time of day that will allow

8    you to take an early morning flight in and then take a late

9    night flight home?

10         MR. RHODES:  Early afternoon.

11         UNIDENTIFIED FEMALE:  That's right, Your Honor.

12         THE COURT:  So something like between 1:00 and 2:00

13   type thing?

14         MR. RHODES:  Yes.

15         THE COURT:  Okay.

16         Is 1:30 on the 2nd too soon?  And again, if I'm

17   interfering with coming back from a family vacation, I just

18   don't have a family, so I don't go anywhere, you know.

19         MR. RHODES:  I was planning to spend from this

20   Friday until December 1st with my four grandchildren, Your

21   Honor.

22         THE COURT:  Then you should uphold that obligation.

23         Mr. Higgins, and I just totally off topic, how long

24   do you estimate your Petro Quest hearing to take on the 3rd.

25         MR. HIGGINS:  No more than a couple hours.

1           THE COURT:  No more than a couple hours?

2           MR. HIGGINS:  At most.

3           THE COURT:  At most.  Okay.  Thank you.

4           Let me tell you what I'm willing to do.  There is

5     currently a Genon setting at 11:00.  I don't think it's

6     substantive.  How about we -- 11:30?

7           MR. RHODES:  On?

8           THE COURT:  The 3rd is what I was looking at.  Would

9     that work for everybody's travel.  You actually said early

10    afternoon.  How about noon.  Does that give you more time?

11          UNIDENTIFIED FEMALE:  That's fine.

12          THE COURT:  Does that work?

13          MR. RHODES:  Noon's fine.

14          THE COURT:  All right.  So we'll set a continued

15    scheduling/status conference for noon on January the 3rd 2019.

16    Again, I'll open up the phone lines.  I don't think -- now

17    obviously if the debtor -- if anybody wants to attend they're

18    certainly welcome to.  I will tell the representatives this

19    and I came out today inclined to make you attend every single

20    hearing.  And if it worked a hardship, I was just willing to

21    accept that.

22          You both are sophisticated people and I want you to

23    hear me again.  There is a scenario where one of the two of

24    you comes out of this with a consequence that is so severe it

25    won't have been worth it.  And I want to make sure, because

1    again if I'm going to do something I want to make sure that

2    people know that it's coming.  I simply want to make sure you

3    both understand that and you both appreciate where you are at

4    this point.

5              Mr. Alex, I'll start with you.

6              MR. ALEX:  Your Honor, I've been working on this

7    four-and-a-half years, I've prepared --

8              UNIDENTIFIED FEMALE:  -- microphone.

9              MR. ALEX:  Your Honor, J. Alex, I've been working on

10   this for four-and-a-half years.

11             THE COURT:  Okay.

12             MR. ALEX:  I'm prepared to come to every hearing and

13   gladly to do so.

14             THE COURT:  You're certainly welcome to, I just want

15   to make you under -- I just want you to understand -- I'll

16   just tell you, I'm still bothered one way or the other with

17   the severity of the pleading that got filed.  I mean if it's

18   true, it's just going to be a bad day for McKinsey.  If it

19   turns out not to have been founded in anything legitimate,

20   then what you saw me do in Mid-States is going to be just the

21   tip of the iceberg.  I just want to make sure everybody

22   understands that.

23             MR. ALEX:  Your Honor, everything in our pleading

24   I've read, and I agree with, I support it.  And it was

25   reported to the Justice Department in the last three years.

1           THE COURT:  Then, fair enough.

2           MR. Alex:  And to McKinsey.

3           THE COURT:  Okay.  Mr. Pinkus, you understand where

4      we are?

5           MR. PINKUS:  I do, Your Honor.  I would acknowledge

6      this is my first time in a courtroom like this, but I'm

7      confident in both our standing in the court and what we've

8      said.

9           THE COURT:  Fair enough.  I just, again, I know that

10     you both have other folks that you talk to and the reason I

11     ask you both here today is I want you to hear it from me.  I

12     didn't want it filtered through a lawyer, I didn't want it

13     filtered through an order or a transcript, I want you to hear

14     it from me.

15          We are going to vent this issue, because again I

16     have a responsibility to the process and that is where my

17     responsibility will be focused.  All right?

18          So, and again, I don't mean this to be an ominous

19     hearing, it's not.  I just want to make sure that you both

20     understand where this can go.  And once it starts, it's kind

21     of like, it's kind of like a big heavy ball rolling down hill,

22     once you finally get it going it's hard to stop sometimes.  I

23     apologize for the simplicity of the analogy, but you don't

24     want to be standing in front of the ball when it's coming down

25     hill.  All right?  All right.  So -

1          MR. RHODES:  Sorry.

2          THE COURT:  So a continued scheduling conference for

3     noon on the 3rd, you all will talk and see if there's either

4     you say, yeah what Jones said made sense, or no it doesn't and

5     here's what we think we ought to do which be fine with

6     me.

7          And I also want you to talk about, you know, how we

8     can get from what will then be Thursday the 3rd to, you know,

9     Monday the 28th if that's where we're going to stay.  Which is

10    again fine by me.  All right.

11         MR. RHODES:  May I just ask one procedural question

12    of Your Honor?

13         THE COURT:  Yes, sir.

14         MR. RHODES:  What would you like to receive from us

15    in advance of that resumed status conference?

16         THE COURT:  Fair enough.  And this will -- this will

17    probably be a bit unusual to you just in terms of how I

18    operate.  My Case Manager, who's Mr. Alonzo, who's the

19    gentleman right in front of you, Albert carries a Government

20    issued cell phone, his numbers posted on my website.  He

21    texts, twitters, all the other famous words better than most.

22    Once in a while, I call him at 2:00 or 3:00 o'clock in the

23    morning just to see if he'll answer and he actually does.

24    Although, I had to block my caller id because he'd know it was

25    me.

1          That was a long winded way of saying, if you would

2     just simply include him in an email chain that says, you know,

3     here's the agreement that we've reached, here's the

4     outstanding issue.  He is your way again -- with notice to

5     everyone -- he is your way of talking to me and helping me be

6     more responsive.  I encourage it, you know where the line is,

7     you know what not to cross over with a court staff member.

8     But he's there to help me be more responsive to what you all

9     need.  I encourage you to use it.

10          MR. RHODES:  Okay.  Is there any specific kind of

11     paper or pleading you'd like us to file after we do these

12     depositions if we do walk down that path.

13          THE COURT:  If we get -- if that's the path I want

14     to talk about it, you know, again, I'll hear from the -- I may

15     just want to read the depos.  You know, I'm then assuming

16     there's not any confidential or other sort of issues.  I'm

17     hoping it wont be that complicated, because again, hopefully,

18     it will be based upon two pleadings, at least in my mind,

19     filed with the Court.  But if there are issues, we just need

20     to talk through them.

21          MR. RHODES:  Okay.

22          UNIDENTIFIED FEMALE:  Your Honor, if I could?

23          THE COURT:  Of course.

24          UNIDENTIFIED FEMALE:  We just would like to answer

25     one thing, because again a serious thing was said at the

1      podium just now.

2                  THE COURT:  Okay.

3                  UNIDENTIFIED FEMALE:  I sure was sorry about that.

4      Including by Mr. Haginaki's last declaration --

5                  THE COURT:  Okay.  If it makes you feel any better,

6      if you haven't figured out I grew up an evidence guy.  And

7      nothing that you all have said today is evidence, because you

8      all can't be witnesses.

9                  If you need to make something -- make a statement on

10     the phone because you're worried about, you know, 360 or some

11     reporting agency picking it up and saying it went unanswered,

12     I'm happy for you to do so, I'm just telling you, this has

13     been a conversation between a judge and two lawyers today, and

14     it doesn't mean anything in terms of substance.  The only way

15     that it's going to mean something is, if I see a document or I

16     hear sworn testimony, that's the only way it's going to mean

17     something to me.

18                 UNIDENTIFIED FEMALE:  Okay.  I appreciate that, Your

19     Honor.  Thank you.

20                 THE COURT:  Sure.

21                 Mr. Duran, I haven't given you a chance to address

22     anything other than you heard me tell you that I was unhappy

23     with the response that was filed by the Trustee.  I certainly

24     didn't mean to embarrass you, and I certainly didn't mean

25     anything by it other than I really didn't like the response.

1    But I don't like a lot of things that get filed.

2            Anything you want to add to this, or anything you

3    think I ought to be looking at, or anything that your office

4    is going to continue to do?  For instance, do you want to be

5    plugged into this process?  Do you not care?  Do you have a

6    better process in mind?

7            MR. DURAN:  Well, at this point,, in time my client

8    doesn't intend to take any discovery.

9            THE COURT:  Okay.

10           MR. DURAN:  We anticipate some supplemental

11   declarations.

12           THE COURT:  Based on conversations that you have or

13   just based on experience?

14           MR. DURAN:  Based on this first supplemental --

15   first supplemental declaration and the pre-conference

16   admission --

17           THE COURT:  Okay.

18           MR. DURAN:   --that were filed.  And, I mean, we

19   don't foreclose the possibility of having to engage in

20   discovery depending on what gets disclosed.

21           THE COURT:  Would you like to be included on the

22   email exchanges as we aim toward --

23           MR. DURAN:  Yes.

24           THE COURT:  That's really where I was going.

25           So folks, if you would just make sure you include

1    Mr. Duran in the communications.

2              All right.  Anything else?

3              MR. DURAN:  I'm a little uncertain about where to

4    start.

5              THE COURT:  The beginning is always a good place.

6    Yeah.

7              MR. DURAN:  There was no problem with, in fact the

8    Court didn't write a response, that's fine.

9              THE COURT:  You knew I wasn't going to like it.

10             MR. DURAN:  Well, I'm not the client, so I have to

11   do what my client thinks.

12             THE COURT:  I think I said that.  I got it.

13             MR. DURAN:  All right.

14             And we've reviewed as best we can, the first

15   supplemental declaration and the pre-conference submission.  I

16   think it still raises issues.  I think the Court mentioned

17   that the waiver of the $96,000 pre-petition claim gets us

18   somewhere, but there are still some other objections that we

19   had raised, notably the incomplete conflicts check, and the

20   disclosure of the confidential client especially the one that

21   has 17.5 percent of the gross annual revenues.

22             THE COURT:  Right.

23             MR. DURAN:  of McKinsey.

24             THE COURT:  Well I assume that you all will work --

25   if it becomes an issue -- you all will work through that issue

1       in some sort of agreed form of order or something.  I got all

2       that.  I wasn't suggesting that the $96,000 fixed everything.

3       I just, that was an easy fix for a complicated issue that so

4       many people just ignore.  I got it.

5                MR. DURAN:  I guess our suggestion to the Court's

6       order was that the Court could just deny the application.

7                THE COURT:  But that's relatively -- unless McKinsey

8       says we'll just withdraw it, we don't want to be hired --

9                MR. DURAN:  Right.

10               THE COURT:  -- that's really unfair to McKinsey not

11      to give them their day in court.  I mean, I certainly would

12      never do that on a summary basis and it's just been teed up as

13      one of those fights that has to occur and that's perfectly

14      fine with me.  But, you know, I don't see that happening and

15      I'm not going to avoid the fight.  I'm just not going to do

16      that.

17               MR. DURAN:  I understand.

18               THE COURT:  Okay.

19               MR. DURAN:  Well, I can participate in this process,

20      my client can participate with any discovery issues --

21               THE COURT:  All right.  Well we'll make sure --

22               MR. DURAN:  -- moving forward to any supplemental

23      declaration.

24               THE COURT:  Sure.  We'll make sure that you get

25      included on the email exchange, and then to the extent that

1    you obviously don't have to do anything but at least you'll

2    know what's going on.  Fair enough?

3              MR. DURAN:  Fair enough.

4              THE COURT:  Okay.  Anything else?

5              MR. DURAN:  No, Your Honor.  I don't think so.

6              THE COURT:  Thank you.

7              Of course, Mr. Hessler, I didn't mean to ignore you.

8    I was honoring we really don't want to be drug in remark.

9              MR. HESSLER:  To that end.

10             THE COURT:  To that end.

11             MR. HESSLER:   I do want to just make sure that the

12   record is abundantly clear that the Debtors share the Court's

13   concern, and appreciate the Court's concern for transparency

14   and honesty.  And we hope that what goes forward here only

15   further bolsters that.  So, just, I do want the Record to be

16   very clear.

17             Building on the point you were just asking about

18   extent of involvement.  The parties thus far have been

19   entirely professionally courteous basis include us in their

20   discussions and so forth.  I would assume that the Court would

21   appreciate that we're going to calibrate the extent of our

22   involvement to make sure we know what's going on, but we do

23   not want to incur, not just as a distraction, but the cost of

24   the estate of like immense participation so --

25             THE COURT:  No.  I agree.  It's a balance, and again

1   I debated about whether or not to say anything about this but

2   since you brought it up I don't feel as bad about saying

3   something.  No.  I assume you've got to balance and monitor at

4   some point because there could develop a scenario where you

5   decide, because it is your motion.

6           MR. HESSLER:  Yes.

7           THE COURT:  There are a set of circumstances that

8   could result in the exercise of business judgement that says

9   in this case we're simply going to withdraw our application.

10  And while that may not solve all the issues, again the issue

11  between a 327 issue and something more may not resolve all of

12  them, but it may resolve it with the Debtor.  And at that

13  point, it's easy to take that proceeding into another place.

14          I got it.  So you do what you think is smart, I know

15  you will.  And if something changes where you feel like you

16  need to be heard then file something and let Mr. Alonzo know

17  and we'll take a note.

18          MR. HESSLER:  Absolutely.  As I was saying, I think

19  that we will be able to calibrate that involvement.  If we

20  need to come to you for either guidance or actual direction we

21  will of course not hesitate to do so.

22          And then just the final point to sort of dovetail

23  and bookend with where we began is we very sincerely

24  appreciate the Court's clarity to all stakeholders that while

25  this needs to be decided consistent with, you know, party's

1    rights that it's not going to derail confirmation.

2              THE COURT:  You got a lot of other hurdles you got

3    to cross, this needn't be one.

4              MR. HESSLER:  Thank you, Your Honor.

5              THE COURT:  All right.  Thank you.

6              All right.  Anything else that we need to address

7    this afternoon?

8              All right.  Then I wish all of you a happy holidays,

9    safe travels home.

10             We'll be adjourned.

11         (Proceedings were concluded at 6:05 p.m..)

12                         *  *  *  *  *

13             *I certify that the foregoing is a correct transcript*

14    *to the best of my ability due to the condition of the*

15    *electronic sound recording of the proceedings in the above-*

16    *entitled matter.*

17       */S./  MARY D. HENRY*

18    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21    *JTT TRANSCRIPT #59730*

22    *DATE FILED:  DECEMBER 20, 2018*

23

24

25