## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) Case No. 18-35672 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## WLB DEBTORS' MOTION FOR ENTRY OF AN ORDER
## APPROVING THE SALE OF THE BUCKINGHAM MINE TO
## CCU COAL AND CONSTRUCTION, LLC FREE AND CLEAR
## OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

**A HEARING WILL BE HELD ON THIS MATTER ON JANUARY 16, 2019, AT 8:00 A.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Westmoreland Coal Company and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "WLB Debtors")[2] respectfully submit the following in support of this motion (this "Motion"):

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] The term "WLB Debtors" does not include Westmoreland Resources, GP, LLC, Westmoreland Resource Partners, LP, or their subsidiaries (collectively, the "WMLP Debtors").

**Relief Requested**

1.      By this Motion, the WLB Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Sale Order"), approving the asset purchase agreement attached to the Sale Order as **Exhibit 1** (the "Purchase Agreement"),[3] which provides for the WLB Debtors' sale of the Buckingham Mine (as defined below) free and clear of liens, claims, encumbrances, and interests (the "Sale") to CCU Coal and Construction, LLC[4] (the "Buyer") and the option for the Oxford Acquirer[5] to transfer the Oxford Assets to Buyer on or prior to April 30, 2019, to the extent the Oxford Acquirer acquires the Oxford Assets.  In support of this Motion, the WLB Debtors respectfully submit the *Declaration of Steven Bremer In Support of the WLB Debtors' Motion for Entry of an Order Approving the Sale of the Buckingham Mine to CCU Coal and Construction, LLC Free and Clear of Liens, Claims, Encumbrances, and Interests*, attached hereto as **Exhibit B** (the "Bremer Declaration").

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of*

---

[3]   Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Purchase Agreement.  Prior to the hearing on this Motion, a revised Purchase Agreement will be filed with the Court that will be updated to include all schedules and exhibits thereto, and will be executed by the Buyer and the applicable WLB Debtors.

[4]   The Buyer has not yet been legally formed.  Once formed, it is envisioned that it will be a holding company wholly owned by Charles C. Ungurean, who was the founder and former CEO of Oxford Resource Partners, LP and its affiliates, which entities sold their assets to Westmoreland Resource Partners, LP and its subsidiaries in 2015.

[5]   As defined in the Purchase Agreement, the term "Oxford Acquirer" means the Successful Bidder (as defined in the Plan), an Affiliate thereof, or an entity designated by the WLB Debtors and the Successful Bidder (which, for the avoidance of doubt, may be a WLB Debtor entity to the extent such WLB Debtor entity is an entity being purchased by the Successful Bidder pursuant to the Plan).

*Texas*, dated May 24, 2012 (the "Amended Standing Order").  The WLB Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 363, and 365 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Bankruptcy Rules 2002 and 6004.

## Background

4.      Westmoreland Coal Company and its Debtor and non-Debtor affiliates operate the sixth-largest coal-mining enterprise in North America, including 19 coal mines in six states and Canada.  The Debtors primarily produce and sell thermal coal to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers.   Headquartered in Englewood, Colorado, the Debtors and their non-Debtor subsidiaries employ approximately 2,971 individuals.  The Debtors' revenue for the twelve-month period that ended August 31, 2018, totaled approximately $850 million.  As of the Petition Date (as defined herein), the Debtors' aggregate prepetition indebtedness totaled approximately $1.1 billion.

5.      On October 9, 2018 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On October 18, 2018, the United States Trustee for the Southern District of

Texas appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 206] (the "Committee").

6.     On November 15, 2018, the Court entered an order [Docket No. 519] (the "Bidding Procedures Order") approving bidding procedures with respect to the sale of substantially all of the WLB Debtors' assets.  The Bidding Procedures Order authorized the WLB Debtors to market their Non-Core Assets for sale (the "Non-Core Asset Marketing Process") separately from the Auction of the Core Assets.[6]  As described in the Bidding Procedures Motion, the Non-Core Asset Marketing Process began in August 2018, and it will continue through the date of the Auction. See Bremer Decl. ¶ 5.

7.     One of the Non-Core Assets is the "Buckingham Mine," which is an active thermal coal mine located in Perry County, Ohio.  See Bremer Decl. ¶ 6.  The Buckingham Mine is owned by Buckingham Coal Company, LLC, a WLB Debtor.  See id.  The Buckingham Mine conducts underground room and pillar mining operations and has a preparation plant in Corning, Ohio.  See id.  Approximately 170 employees are currently employed at the Buckingham Mine.  See id. The Buckingham Mine supplies coal to American Electric Power Company, Inc. ("AEP") under a long-term coal supply agreement that will expire as of December 31, 2019.  See id.

8.     This Motion seeks approval of a sale of the Buckingham Mine to the Buyer, including approval of the Purchase Agreement and the assignment of the assigned contracts and leases on the schedule of contracts and leases attached to the Sale Order as **Exhibit 2** (the "Assigned Contracts").[7]

---

[6]   Pursuant to the Bidding Procedures Order, to the extent any Non-Core Assets are not sold prior to the Auction, such Non-Core Assets will be included in the Auction.

[7]   For the avoidance of doubt, as provided in the Purchase Agreement, any Assigned Contracts may be removed from such schedule at any time prior to the closing of the Sale.  The listing is preliminary and inclusion of any contract or lease on the schedule is neither an assumption of nor an agreement to assume such contract or lease.

9.      This Motion further seeks approval of an option agreement pursuant to which the Oxford Acquirer can elect to sell the Oxford Assets (as defined herein) to the Buyer, in the event that the Oxford Acquirer obtains the Oxford Assets (the "Oxford Option").  As described in detail in the Purchase Agreement, any transaction pursuant to the Oxford Option must close on or before April 30, 2019.

10.      The "Oxford Assets" are currently owned by Oxford Mining Company, LLC (and its subsidiaries), an Ohio limited liability company, and a WMLP Debtor.  *See* Bremer Decl. ¶ 7. These assets comprise fifteen different coal mines located near each other in Ohio and Kentucky. *See id*.  Seven of the mines are active, and eight are in reclamation.  *See id*.  All fifteen mines would be transferred to the Buyer if the Oxford Option is exercised.  *See id*.  Approximately 286 employees are currently employed at the Oxford Assets.  *See id*.

11.      The Oxford Assets are subject to a separate ongoing sale process being conducted by the WMLP Debtors, which process is being overseen by the conflicts committee of Westmoreland Resources GP, LLC (the "WMLP Conflicts Committee").  *See* Bremer Decl. ¶ 8. For the avoidance of doubt, the Oxford Option contemplated by this Motion does not prohibit Buyer from participating in the WMLP Debtors' sale process for the Oxford Assets.  *See id*. The Oxford Option is only exercisable by the Oxford Acquirer to the extent such entity acquires the Oxford Assets; if Buyer (or any party other than the Oxford Acquirer) is ultimately successful in purchasing the Oxford Assets directly from the WMLP Debtors pursuant to that separate sale process, the Oxford Option would simply not be exercisable by the Oxford Acquirer.  *See id*.

12.      Pursuant to section 3.3 of the Purchase Agreement, the Oxford Option will be subject to and can only be exercised in accordance with the terms and conditions of an agreement substantially in the form that will be attached as an exhibit to the Purchase Agreement (the "Option

Agreement"). The form of the Option Agreement is still being finalized, but will be filed with the

Court in advance of the hearing on this Motion.

### Summary of Key Terms of the Purchase Agreement

| Term | Summary Description |
|---|---|
| **Purchased Assets** | The Buckingham Mine. |
| | The Buckingham Mine's operations must continue to operate as a going concern through the closing of the Sale with no material disruption and no disposition of any material assets before closing outside of the ordinary course of business. |
| **Purchase Price for the Buckingham Mine Assets** | $1 million cash to be paid by the Buyer. |
| **Option to Sell Oxford Assets** | If the Oxford Acquirer obtains the Oxford Assets from the WMLP Debtors, the Oxford Acquirer would have the option to sell the Oxford Assets to the Buyer, but such transaction must close on or prior to April 30, 2019. If the Oxford Option is exercised, the Oxford Acquirer would pay a total amount equal to the Option Transfer Price, as defined herein, to the Buyer, with $3 million of the cash component of the Option Transfer Price being paid to the Buyer at the closing of the Oxford Option transaction, and the remaining balance of the cash component of the Option Transfer Price being paid when the surety bonding is replaced. |
| | As used herein, the term "Option Transfer Price" means: (i) if the Oxford Option transaction closes on or before January 31, 2019, $16 million; (ii) if the Oxford Option transaction closes on or before February 28, 2019, $17 million; (iii) if the Oxford Option transaction closes on or before March 31, 2019, $18 million; and (iv) if the Oxford Option transaction closes on or before April 30, 2019, $20 million.  The Option Transfer Price can be paid in cash or through a combination of cash and bond collateral, at the option of the Oxford Acquirer. If it is paid through a combination of cash and bond collateral, the cash component must not be less than $10 million. |
| | Any transaction pursuant to the Oxford Option must close on or before April 30, 2019.  If that condition is not met, the Oxford Option will immediately expire. The option must be exercised by the Oxford Acquirer soon after the Oxford Acquirer obtains the rights to the Oxford Assets from the WMLP Debtors, and in no event later than 7 days from when the Oxford Acquirer obtains such rights. |
| | Any obligation of the Buyer to purchase the Oxford Assets pursuant to the Oxford Option would be subject to: (i) any material adverse changes that may have transpired with respect to the assets or any other aspect of the deal; as reasonably determined by the Buyer and (ii) evidence satisfactory to the Buyer that the Oxford Assets to be sold to the Buyer (a) include all material tangible assets set forth on a schedule attached to the Purchase Agreement, except normal wear and tear or disposal of any inventory included in such assets in the ordinary course of business and (b) will be free and clear of all liens, claims, interests and other encumbrances. |

6

| Term | Summary Description |
|------|---------------------|
| | Pending the exercise of the Oxford Option, the Oxford Acquirer will (i) take all action necessary or appropriate to preserve its coal mining leases pending the closing of the Oxford Option transaction; (ii) pay all mining royalties, including any advance royalties, coming due prior to the closing of the Oxford Option transaction; and (iii) ensure that no coal mining leases or related rights lapse or otherwise expire pending the closing of the Oxford Option transaction. |
| **Reclamation Liabilities Assumed by the Buyer** | The Buyer will assume all reclamation liabilities of the Buckingham Mine and, to the extent the Oxford Option is exercised, the Oxford Assets.  No liabilities other than reclamation liabilities would be assumed. |
| **Buyer Participation in WMLP Sale Process Allowed** | None of the transactions contemplated by the Sale would prevent the Buyer from separately participating in the sale process being run by the WMLP Debtors, including for the Oxford Assets.  The Oxford Option is only applicable to the extent that the Oxford Acquirer obtains the Oxford Assets. |
| **Closing of Sale of Buckingham Mine** | The closing of the Sale of the Buckingham Mine would take place on or prior to January 21, 2019. |

## Basis for Relief

I.    **The Proposed Sale is Fair and Consistent with the WLB Debtors' Reasonable Business Judgment**.

13.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to selling an estate's assets.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al.* (*In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

7

14.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–565 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

15.     Centerview Partners LLC ("Centerview"),[8] on behalf of the WLB Debtors, began marketing the Buckingham Mine as part of its Non-Core Asset Marketing Process starting in August 2018.  *See* Bremer Decl. ¶ 9.  Centerview reached out to a broad list of potential buyers consisting of 37 parties, including financial and strategic buyers.  *See id*.  Despite running a comprehensive marketing process, the Buyer's proposal was the only proposal that the WLB Debtors received to acquire the Buckingham Mine that offered both the assumption of significant reclamation liabilities and a cash payment to the WLB Debtors.  *See id*.  Importantly, since the coal supply agreement with AEP expires on December 31, 2019 and is not expected to be renewed or replaced, the principal value of the Buckingham Mine is driven by cash flows generated in 2019.  *See id*.  It is for this reason that the WLB Debtors believe the value of the Buckingham Mine to potential buyers will significantly decline throughout 2019.  *See id*.  In addition, since the Buyer will assume the Buckingham Mine's reclamation obligations, the WLB Debtors will avoid the significant costs to perform this reclamation work in the coming years.  *See id*.  Furthermore, since

---

[8]     On November 14, 2018, the Court entered the *Order Authorizing the Retention and Employment of Centerview Partners LLC as Financial Advisor and Investment Banker for the Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date* [Docket No. 494].

the Buyer has completed its due diligence and has long-standing experience with owning and operating coal mines in Ohio, including the Oxford Assets, the WLB Debtors believe that they will be able to expeditiously close the proposed sale. *See id.* For all the reasons listed above, the WLB Debtors have determined that the proposed sale of the Buckingham Mine to the Buyer represents the highest and best offer for these assets. *See id.*

16.     A core component of the Purchase Agreement is the Oxford Option. *See* Bremer Decl. ¶ 10. As described in detail in the Purchase Agreement, any transaction pursuant to the Oxford Option must close on or before April 30, 2019. *See id.* To the extent the Oxford Acquirer obtains the Oxford Assets from the WMLP Debtors, the Oxford Acquirer would have the option to sell the Oxford Assets to the Buyer, and if the Oxford Option is exercised, the Oxford Acquirer would pay the Option Transfer Price to the Buyer, with $3 million of this price being paid at the closing of the Oxford Option transaction, and the remaining balance when the surety bonding is replaced. *See id.* Given the potential synergies between the Buckingham Mine and the Oxford Assets, the WLB Debtors negotiated the Oxford Option with the Buyer in order to facilitate potential value-maximizing transactions in the future. *See id.* The Oxford Option provides flexibility for the Oxford Acquirer to put the Oxford Assets to the Buyer on the terms and conditions set forth in the Purchase Agreement. This preserves optionality for the Oxford Acquirer to (a) sell the Oxford Assets to Buyer, (b) negotiate a higher or otherwise better offer to sell the Oxford Assets to a third party purchaser, or (c) keep the Oxford Assets. *See id.* As explained above, the Oxford Option is only exercisable to the extent the Oxford Acquirer obtains the Oxford Assets, and does not prevent Buyer (or any party) from participating in the sale process for the Oxford A being overseen by the WMLP Conflicts Committee.

17.     Pursuant to the Sale Order, the WLB Debtors would be authorized to enter into the Purchase Agreement that includes the Oxford Option, however, in the unlikely event that the WLB

Debtors seek to *exercise* the Oxford Option prior to the Plan Effective Date, the WLB Debtors would file a separate motion and there must be a separate Court order authorizing such relief.

18.      Accordingly, for all of the foregoing reasons, the WLB Debtors believe that the Purchase Agreement maximizes the value received for the assets being sold and is consistent with the WLB Debtors' reasonable business judgment.  *See* Bremer Decl. ¶ 11.

## II.      The Proposed Private Sale is Appropriate under Bankruptcy Rule 6004

19.      Bankruptcy Rule 6004(f) permit a debtor to conduct a private sale pursuant to section 363.  Specifically, Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1). *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) (noting that "there is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction") (quoting *In re Woodscape L.P.*, 134 B.R. 165, 174 (Bankr. D. Md. 1991)); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *88 (Bankr. D. Del. Aug. 15, 2007) ("[s]ales of property rights outside the ordinary course of business may be by private sale or public auction."); *In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 (N.D. Ill. 1988) ("[s]ection 363(b) is not limited to sales involving competitive bidding.  Bankruptcy Rule 6004, which sets forth procedures for section 363(b) transfers, expressly provides for private sales.")

20.      Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del 1981); *In re Bakalis*, 220 B.R. 525, 531–532 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

21.     Accordingly, in light of Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists. *See In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"). Indeed, courts in this and other districts have approved private sales of estate property pursuant to section 363(b)(1) when there has been a valid business reason for not conducting an auction. *See, e.g., In re CJ Holding CO. et al.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 5, 2016) (order authorizing the private sale of inventory and machinery for approximately $17.5 million); *In re Ignite Restaurant Group, Inc., el at.*, No. 17-33550 (DRJ) (Bankr. S.D. Tex. Aug. 17, 2017) (approving the private sale of a license for approximately $650,000); *In re Forbes Energy Services LTD., et al.*, No. 17-20023 (DRJ) (Bankr. S.D. Tex. Feb. 10, 2017) (approving the private sale of equipment for approximately $660,000); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, No. 01-1139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of real estate, equipment, intellectual property, and licenses for $17.9 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).[9]

22.     The WLB Debtors submit that the proposed private Sale to the Buyer in accordance with the Purchase Agreement is appropriate in light of the facts and circumstances of these chapter

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

11 cases.  Specifically, the extensive marketing process conducted to date, including prepetition, and the low probability that a competing bidder will actually emerge with an offer higher or better than the offer detailed in the Purchase Agreement, do not justify the costs and risks associated with delay.  The Purchase Agreement requires the closing of the Sale no later than January 21, 2019.  The WLB Debtors and the Buyer agreed to this date since the coal supply agreement with AEP expires on December 31, 2019, and is not expected to be renewed or replaced.  Therefore, the principal value of the Buckingham Mine is driven by cash flows generated in 2019.

23.     As a result, the transaction with the Buyer allows the WLB Debtors to maximize the value received for the assets being sold, provides a significant benefit to the WLB Debtors' estates, and allows the WLB Debtors to find a party willing to take on all associated reclamation liabilities.  Because the WLB Debtors believe that the Buyer's offer is the highest and best offer, the WLB Debtors request that the Court approve the proposed private Sale of the Buckingham Mine and the option to sell the Oxford Assets (in the event that the Oxford Acquirer obtains the Oxford Assets) to the Buyer in accordance with the Purchase Agreement.

## III.    The Assumption and Assignment of the Assigned Contracts Should Be Approved.

### A.    The Assumption and Assignment of the Assigned Contracts Reflects the WLB Debtors' Reasonable Business Judgment.

24.     To facilitate and effectuate the Sale, the WLB Debtors are seeking authority to assume and assign the Assigned Contracts to the Buyer.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The WLB Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such

judgment.  *See, e.g.*, *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume unexpired lease); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard.").

25.     Here, the Assigned Contracts are necessary to run the Buckingham Mine and, as such, they are essential to inducing the highest or otherwise best offer for the WLB Debtors' assets. Accordingly, the WLB Debtors submit that the assumption and assignment of the Assigned Contracts should be approved as an exercise of their business judgment.

**B.      Defaults Under the Assigned Contracts Will Be Cured.**

26.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980). The WLB Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because all counterparties to the Assigned Contracts will receive

notice of this Motion and an opportunity to respond to the proposed cure costs.  In addition, the WLB Debtors are obligated to pay in full all cure costs applicable to the Assigned Contracts.[10]

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

27.     Similarly, the WLB Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

28.     The WLB Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Buyer will be satisfied.

### <u>Reservation of Rights</u>

29.     Nothing contained in this Motion or any actions taken by the WLB Debtors pursuant to relief granted in the Bidding Procedures Order is intended or should be construed as:

---

[10]    Pursuant to the Purchase Agreement, the WLB Debtors are obligated to pay all cure amounts, not the Buyer. When assigned to the Buyer, the Assigned Contracts will be completely current and all cure amounts will have been paid by the WLB Debtors.

(a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the WLB Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, except as expressly stated herein; or (f) a waiver or limitation of the WLB Debtors' rights under the Bankruptcy Code or any other applicable law.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

30.    To implement the foregoing successfully, the WLB Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the WLB Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

31.    The WLB Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Official Committee of Unsecured Creditors; (c) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (d) the ad hoc group of lenders under the WLB Debtors' prepetition term loan facility due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (e) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (f) the administrative agent under the WMLP Debtors' term loan facility due 2018; (g) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (h) the administrative agent under the WLB Debtors' debtor-in-possession financing facility; (i) the lenders under the WLB Debtors' debtor-in-possession financing facility; (j) any statutory committee appointed in these cases; (k) the United States Attorney's Office for the Southern

15

District of Texas; (l) the Internal Revenue Service; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) the offices of the attorneys general for the states in which the Debtors operate; (o) the Securities and Exchange Commission; (p) counsel to the Buyer; (q) all known holders of liens, encumbrances, and other claims secured by the Buckingham Mine and any other WLB Debtors' assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (s) any party that has requested notice pursuant to Bankruptcy Rule 2002. The WLB Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[The remainder of this page is intentionally left blank]*

WHEREFORE, the WLB Debtors respectfully request that the Court enter the Sale Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
December 21, 2018

/s/ Patricia B. Tomasco

| | |
|---|---|
| Patricia B. Tomasco (Bar No. 01797600) | James H.M. Sprayregen, P.C. |
| Elizabeth C. Freeman (Bar No. 24009222) | Michael B. Slade (Bar No. 24013521) |
| Matthew D. Cavenaugh (Bar No. 24062656) | Gregory F. Pesce (admitted *pro hac vice*) |
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| 1401 McKinney Street, Suite 1900 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Houston, Texas 77010 | 300 North LaSalle |

Patricia B. Tomasco (Bar No. 01797600)
Elizabeth C. Freeman (Bar No. 24009222)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     ptomasco@jw.com
          efreeman@jw.com
          mcavenaugh@jw.com

*Conflicts Counsel to the WLB Debtors*
*and Local Counsel to the Debtors*

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
          michael.slade@kirkland.com
          gregory.pesce@kirkland.com

-and-

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     edward.sassower@kirkland.com
          stephen.hessler@kirkland.com

-and-

Anna G. Rotman, P.C. (Bar No. 24046761)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Email:     anna.rotman@kirkland.com

*Counsel to the Debtors*

**<u>Certificate of Service</u>**

I certify that on December 21, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco

# Exhibit A

**Proposed Sale Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | Case No. 18-35672 (DRJ) |
| Debtors. | Jointly Administered |

## ORDER APPROVING THE SALE OF THE BUCKINGHAM MINE TO CCU COAL AND CONSTRUCTION, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

Upon the motion (the "Motion")[2] of Westmoreland Coal Company and certain of its affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases,[3] for entry of an order (this "Order"), approving the asset purchase agreement attached to the Motion as **Exhibit B** (the "Purchase Agreement"), which provides for (i) the WLB Debtors' sale of the Buckingham Mine free and clear of liens, claims, encumbrances and interests to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Sale") to CCU Coal and Construction, LLC (the "Buyer"), and (ii) the option for the Successful Bidder (as defined in the Plan), an affiliate thereof, or an entity designated by the WLB Debtors and the Successful Bidder

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement, as applicable.

[3] The relief granted in this order is solely limited to Westmoreland Coal Company and its Debtor affiliates, other than the WMLP Debtors (as defined herein) (collectively, the "WLB Debtors"). The "WMLP Debtors" means, collectively, Westmoreland Resource Partners GP, LLC, Westmoreland Resource Partners, LP, and their subsidiaries.

(which, for the avoidance of doubt, may be a WLB Debtor entity to the extent such WLB Debtor entity is an entity being purchased by the Successful Bidder pursuant to the Plan) (such entity, the "Oxford Acquirer") to sell the Oxford Assets to Buyer, to the extent the Oxford Acquirer obtains the Oxford Assets, on the terms set forth in the Oxford Agreement (the "Oxford Option"); such transaction pursuant to the Oxford Option must close on or before April 30, 2019; and the Court having reviewed any evidence in support of the Motion; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and any objections to the Motion having been withdrawn with prejudice or overruled on the merits at the Hearing; and good and sufficient notice of the Motion, the Sale, the Purchase Agreement and the Oxford Option having been given to all parties holding a lien or other interest encumbering the Buckingham Mine and/or the assets to be sold to Buyer under the Purchase Agreement, and to all other lienholders, creditors, parties in interest and stakeholders entitled to receive notice of the same; and no other or further notice being necessary under the circumstances; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted as set forth herein.

2.      The Purchase Agreement is hereby approved, and the WLB Debtors (and, for the avoidance of doubt, the Oxford Acquirer) are authorized to take any and all actions necessary or appropriate to consummate the Sale, including the Oxford Option; provided, however that if the WLB Debtors seek to exercise the Oxford Option prior to the Plan Effective Date, there must be a separate Court order authorizing such relief (for the avoidance of doubt, there shall be no such

requirement for the Successful Bidder or an Affiliate thereof to exercise the Oxford Option at any time).

3.     The WLB Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business free and clear of all liens, claims, interests and other encumbrances.

4.     The WLB Debtors have all necessary corporate power and authority to execute the Purchase Agreement and any and all documents, instruments, and agreements necessary or appropriate to consummate the transaction pursuant to the Purchase Agreement.

5.     Pursuant to section 363(f) of the Bankruptcy Code, except for the Assumed Liabilities and the Permitted Exceptions (as those terms are defined in the Purchase Agreement), the Sale of the Purchased Assets is free and clear of all liens, security interests, mortgages, deeds of trust, claims, debts, obligations, liabilities, damages, judgments, actions, causes of action, interests and other encumbrances of any kind or nature whatsoever, whether at law or in equity and whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or during the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Liens, Claims, and Interests").   Without limiting the generality of the foregoing, and for the avoidance of doubt, the Liens, Claims, and Interests include (and the Sale is free and clear of) all of the following to the fullest extent permitted by section 363(f) of the Bankruptcy Code and any other applicable laws: (i) all Liabilities, as defined in the Purchase Agreement; (ii) all claims that could have been asserted against any of the WLB Debtors in their respective bankruptcy cases;

(iii) all postpetition administrative claims incurred during the WLB Debtors' bankruptcy cases; (iv) all liabilities resulting from or arising out of the WLB Debtors' use, operation, possession or ownership of the Purchased Assets prior to closing; (v) all worker's compensation, pension, benefit and other employee related obligations; (vi) all Black Lung Liabilities (as defined in the Purchase Agreement) related to any employees or former employees who worked or who were employed at or in connection with any of the Purchased Assets, including without limitation, any such Black Lung Liabilities of the WLB Debtors or any of their subsidiaries or affiliates with respect to any of their predecessors; and (vii) any rights or claims based on theories of transferee or successor liability under any applicable law, whether arising before or after the commencement of these chapter 11 cases.

6.      This Order shall be effective as a determination that, as of the closing of the transactions pursuant to the Purchase Agreement, all Liens, Claims, and Interests (except for Permitted Exceptions and Assumed Liabilities), have been unconditionally released, discharged and terminated as to the Buyer and the Purchased Assets.  This Order is binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

7.      Upon closing, all creditors and any other holder of a Lien, Claim or Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien, Claim or Interest in the Purchased Assets (other than with respect to the Permitted Exceptions and Assumed Liabilities).  If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens, Claims or Interests against the Purchased Assets has not delivered to the WLB Debtors prior to the closing of the transactions pursuant to the Purchase Agreement, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Purchased Assets or otherwise, then with regard to the Purchased Assets: (1) the WLB Debtors are hereby authorized, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (2) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and Interests (except for Permitted Exceptions and Assumed Liabilities) against the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement, including, without limitation, recordation of this Order.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.  This Order shall be binding upon and shall govern the acts of all persons including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.  Notwithstanding and without limiting the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and Interests (except for Permitted Exceptions and Assumed Liabilities), shall be self-executing, and neither the WLB Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

8.      Following closing, no holder of any Lien, Claim or Interest in the Purchased Assets (except holders of Permitted Exceptions and Assumed Liabilities solely in accordance with applicable law) shall interfere with the Buyer's title to, or use and enjoyment of, the Purchased Assets based on, or related to, any such Lien, Claim or Interest, or based on any actions the WLB Debtors may take in these cases.

9.      The Buyer is not and shall not be deemed a "successor" to the WLB Debtors or their estates, or to have, *de facto* or otherwise, merged with or into the WLB Debtors or be a mere continuation or substantial continuation of the WLB Debtors or the enterprise of the WLB Debtors under any theory of law or equity as a result of any action taken in connection with the Purchase Agreements or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

10.      The Purchase Agreement, the Oxford Option, the Oxford Agreement, and all related documents, instruments and agreements were negotiated, proposed and entered into by the

Debtors and the Buyer at arm's length, without collusion, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Buyer is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  The Buyer is a good faith purchaser and entitled to all of the protections of section 363(m) of the Bankruptcy Code.

11.     Pursuant to sections 363(b)(1) and 365(a) of the Bankruptcy Code, the WLB Debtors are hereby authorized to assume and assign the Assigned Contracts.  The WLB Debtors are hereby authorized to take such actions as are reasonably necessary to implement and effectuate the terms of this Order and the Purchase Agreement.

12.     The Buyer has provided adequate assurance of its future performance under the Purchase Agreement and the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3), and 365(f)(2)(B) of the Bankruptcy Code.

13.     Nothing in this Order shall be deemed a waiver of any rights, remedies or defenses that any party has or may have under applicable bankruptcy and non-bankruptcy law, under any related agreements or any letters of credit relating thereto, or any rights, remedies or defenses of the WLB Debtors with respect thereto.

14.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

15.     The WLB Debtors (and, for the avoidance of doubt, the Oxford Acquirer) are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

16.     The requirements set forth in Bankruptcy Local Rule 9013-1 and the Complex Case Procedures are satisfied by the contents of the Motion.

17.     This Order shall be immediately effective and enforceable upon entry hereof.

18.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2019
Houston, Texas

_____

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Purchase Agreement**

**ASSET PURCHASE AGREEMENT**[1]

**among**

**BUCKINGHAM COAL COMPANY, LLC,**

**WESTMORELAND COAL COMPANY**

**and**

**CCU COAL AND CONSTRUCTION, LLC**[2]

**Dated as of [●], 2019**

---

[1]   **This document is not intended, and will not be deemed, to constitute an offer or agreement, or to create legally binding or enforceable obligations, of any type or nature on any party unless and until such agreement is executed and delivered by such parties.  Either party can choose not to proceed with the transactions under discussion at any time before then for any reason without any liability whatsoever to the other party.**

[2]   The purchaser entity has not yet been legally formed.  Once formed, it is envisioned that it will be a holding company wholly owned by Charles C. Ungurean.  There will likely be two subsidiaries formed as well: an operating company and a real estate holding company.  The Purchased Assets will be segregated at or following closing accordingly.

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................**2**
    1.1          Certain Definitions.........................................................................2
    1.2          Other Definitional and Interpretive Matters ................................9

**ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES**.........................................................................................**10**
    2.1          Purchase and Sale of Assets.........................................................10
    2.2          Excluded Assets ...........................................................................12
    2.3          Assumption of Liabilities.............................................................14
    2.4          Excluded Liabilities .....................................................................14
    2.5          Cure Costs ....................................................................................14
    2.6          Non-Assignment of Assets ..........................................................14
    2.7          Further Conveyances and Assumptions........................................15

**ARTICLE III CONSIDERATION AND OPTION** ...................................**15**
    3.1          Consideration ...............................................................................15
    3.2          Payment of Purchase Price...........................................................16
    3.3          Option ..........................................................................................16

**ARTICLE IV CLOSING AND TERMINATION** ....................................**17**
    4.1          Closing Date..................................................................................17
    4.2          Deliveries by the Buckingham Seller ..........................................18
    4.3          Deliveries by Purchaser ...............................................................18
    4.4          Termination of Agreement............................................................19
    4.5          Procedure Upon Termination........................................................20
    4.6          Effect of Termination....................................................................20

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUCKINGHAM SELLER**...........................................................................**20**
    5.1          Organization and Good Standing..................................................20
    5.2          Authorization of Agreement .........................................................20
    5.3          Governmental Consents................................................................21
    5.4          Title to Purchased Assets .............................................................21
    5.5          Validity of Purchased Contracts ..................................................21
    5.6          Litigation......................................................................................22
    5.7          Financial Advisors .......................................................................22
    5.8          Environmental Matters..................................................................22
    5.9          Taxes ............................................................................................23
    5.10        No Other Representations or Warranties; Schedules...................23

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER**.................**24**
    6.1          Organization and Good Standing..................................................24
    6.2          Authorization of Agreement .........................................................24

| | | |
|---|---|---|
| 6.3 | Conflicts; Consents of Third Parties | 24 |
| 6.4 | Litigation | 24 |
| 6.5 | Financial Advisors | 25 |
| 6.6 | Capability | 25 |
| 6.7 | Condition of the Purchased Assets | 25 |
| 6.8 | Exclusivity of Representations and Warranties | 25 |

**ARTICLE VII BANKRUPTCY COURT MATTERS** ........................................ **26**
| | | |
|---|---|---|
| 7.1 | Bankruptcy Court Filings | 26 |
| 7.2 | Sale Free and Clear | 26 |

**ARTICLE VIII COVENANTS** ........................................................................ **26**
| | | |
|---|---|---|
| 8.1 | Access to Information | 26 |
| 8.2 | Actions Pending the Closing | 26 |
| 8.3 | Consents | 27 |
| 8.4 | Further Assurances | 27 |
| 8.5 | Transferred Permit/License and Surety Bond Matters | 27 |
| 8.6 | Publicity | 29 |
| 8.7 | Confidentiality | 29 |
| 8.8 | Employee Matters | 29 |

**ARTICLE IX CONDITIONS TO CLOSING** ................................................... **29**
| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Obligations of Purchaser | 29 |
| 9.2 | Conditions Precedent to Obligations of the Buckingham Seller | 30 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and the Buckingham Seller | 31 |
| 9.4 | Frustration of Closing Conditions | 31 |

**ARTICLE X TAXES** ....................................................................................... **31**
| | | |
|---|---|---|
| 10.1 | Transfer Taxes | 31 |
| 10.2 | Purchase Price Allocation | 31 |
| 10.3 | Cooperation and Audits | 32 |

**ARTICLE XI MISCELLANEOUS** .................................................................. **32**
| | | |
|---|---|---|
| 11.1 | No Survival of Representations and Warranties | 32 |
| 11.2 | Expenses | 32 |
| 11.3 | Injunctive Relief | 33 |
| 11.4 | Submission to Jurisdiction; Consent to Service of Process | 33 |
| 11.5 | Waiver of Right to Trial by Jury | 34 |
| 11.6 | Entire Agreement; Amendments and Waivers | 34 |
| 11.7 | Governing Law | 34 |
| 11.8 | Notices | 34 |
| 11.9 | Severability | 35 |
| 11.10 | Assignment | 36 |
| 11.11 | Non-Recourse | 36 |
| 11.12 | Counterparts | 37 |

# ASSET PURCHASE AGREEMENT[3]

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [●], 2019, by and among CCU Coal and Construction, LLC, an Ohio limited liability company ("Purchaser"), Buckingham Coal Company, LLC, an Ohio limited liability company (the "Buckingham Seller"), and Westmoreland Coal Company, a Delaware corporation ("Westmoreland").

## RECITALS:

A.     The Buckingham Seller directly and indirectly mines, processes, markets and sells thermal coal from the mining complex commonly referred to as "Buckingham" located in the state of Ohio (the "Business"), as set forth on the map attached hereto as Schedule [●].

B.     The Buckingham Seller is a debtor and debtor in possession in connection with voluntary chapter 11 bankruptcy cases that were filed on October 9, 2018 (the "Petition Date") by the Buckingham Seller and affiliated debtors under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court" and such cases, the "Bankruptcy Case").   The Bankruptcy Case are being jointly administered for procedural purposes under Case No. 18-35672.

C.     The Buckingham Seller desires to sell to Purchaser the Purchased Assets and to assign to Purchaser the Assumed Liabilities, and Purchaser desires to purchase from the Buckingham Seller the Purchased Assets and to assume from the Buckingham Seller the Assumed Liabilities, in each case upon the terms and conditions set forth in this Agreement (such purchase, sale, assignment and assumption collectively, the "Sale").   As used in the preceding sentence, the capitalized terms "Purchased Assets" and "Assumed Liabilities" shall have the meanings assigned below.

D.     The Parties intend to consummate the Sale through and as part of the Bankruptcy Case.   Except for the Assumed Liabilities (defined below), the Sale will be free and clear of all liens, claims, debts, liabilities, interests, and other encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code and any other applicable law.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

---

[3]     Note to Draft: Appropriate adjustments to this draft will be made if the Transaction is to be structured as a simultaneous sign-and-close (i.e., deletion of closing conditions, termination, interim operating covenant and similar sections).

# ARTICLE I
## DEFINITIONS

1.1 <u>Certain Definitions</u>. For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this <u>Section 1.1</u> or in the other Sections of this Agreement identified in Section [_____]:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Assumed Cure Costs</u>" means, with respect to any Purchased Contract, the Cure Costs, if any, for such Purchased Contract.

"<u>Black Lung Benefits Act</u>" means the Black Lung Benefits Act, title 30 of the United States Code, sections 901 et seq., the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95- 239, 92 Stat. 95 (1978), the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643, and the Black Lung Consolidation of Administrative Responsibility Act, Pub. L. No. 107-275, 116 Stat. 1925.

"<u>Black Lung Liabilities</u>" means any Liability or benefit obligations related to black lung claims and benefits under the Black Lung Benefits Act, and occupational pneumoconiosis, silicosis or other lung disease liabilities and benefits arising under federal law.

"<u>Bond Agreement</u>" means that certain 2017 Coal Reclamation Bond Agreement, dated as of June 28, 2017, by and among Buckingham, WCC Land Holdings Company, Inc., Westmoreland and First Surety Corporation.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Contract</u>" means any contract, agreement, commitment, understanding, arrangement, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, sublicense, trust, guarantee, lease, purchase order or other legally binding agreement) whether written or oral.

"<u>Cure Costs</u>" means monetary amounts that must be paid and obligations that otherwise must be satisfied under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Purchased Contract, as agreed upon by the Parties or determined by the Bankruptcy Court.

"<u>Documents</u>" means all books, records, files, documents, invoices, inventory records, product specifications, cost and pricing information, business plans and quality control records

and manuals, in each case exclusively relating to any Purchased Asset, including all data and other information stored in any format or media, including on hard drives, hard copy or other media.

"Environmental Law" means any Law relating to (i) the pollution, protection or restoration of the environment, (ii) any spill, emission, release or disposal into the environment of, or human exposure to, any pollutant, contaminant or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or (iii) acid mine drainage, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq; Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§ 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651, et seq., and SMCRA, any applicable tribal, state or local law counterparts, as the same may be reauthorized or amended from time to time.

"Excluded Leases" means the real property leases and subleases of the Buckingham Seller and its Affiliates that are not Purchased Contracts, together with the rights to any and all underground and surface coal reserves, natural gas reserves, mineral rights, mining rights, surface rights, rights of way, easements, fixtures and improvements set forth in such leases and subleases.

"GAAP" means generally accepted accounting principles in the United States.

"General Assignments and Bills of Sales" means the General Assignments and Bills of Sales for the Purchased Assets, in substantially the form attached hereto as Exhibit A.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Intellectual Property Right" means any trademark, service mark, trade name, trade dress, logo, domain name or URL, mask work, invention, patent, trade secret or other right in any proprietary business information (including data bases and data collections, pricing and cost information, business and marketing plans, and customer and supplier lists), copyright, right of publicity, know-how (including manufacturing and production processes and techniques, and research and development information), or any other intellectual property or similar proprietary industrial right of any kind or nature anywhere in the world (including any such rights in software), and including (i) any issuances, registrations or applications for registration of any of the foregoing, (ii) all goodwill associated with any of the foregoing, and (iii) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

3

"IRS" means the Internal Revenue Service.

"Knowledge of the Buckingham Seller" or "the Buckingham Seller's Knowledge" means the actual knowledge, after reasonable inquiry, of those officers of the Buckingham Seller and Westmoreland that are identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree or common law requirement.

"Lease" or "Leases" means the real property leases and subleases listed on Schedule 1.1(b), together with the rights to any and all underground and surface coal reserves, natural gas reserves, mineral rights, mining rights, surface rights, rights of way, easements, fixtures and improvements set forth in such leases and subleases.

"Lease Assignment and Assumption Agreements" means the Lease Assignment and Assumption Agreements for the assumed Leases and Purchased Leased Real Property, in substantially the form attached hereto as Exhibit B.

"Leased Real Property" means all real property and other rights leased or subleased by the Buckingham Seller pursuant to a Lease.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Licenses" means the material licenses, qualifications, franchises, certificates, consents, authorizations, approvals, Orders, and concessions used or held for use by the Buckingham Seller in connection with the operation of the Business, and all pending applications for additional licenses, renewals of existing licenses, or amendments to existing licenses which have been submitted to any Governmental Body by the Buckingham Seller necessary for the operation of the Business.  A listing of all such Licenses is set forth in Schedule 1.1(c) hereto.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Mining" means the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and the Reclamation of lands used for such activities.

4

"Mining and Mining Safety Law" means all Laws relating to Mining and Mining safety, including (i) SMCRA (including its implementing regulations and any state analogs); (ii) MSHA; (iii) OSHA; (iv) acid and toxic mine drainage requirements; and (v) regulations relating to Mining operations and activities, including Reclamation.

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801 et. seq.

"Option Transfer Price" means: (i) if the closing of the Oxford Transaction occurs on or before January 31, 2019, $16,000,000; (ii) if the closing of the Oxford Transaction occurs after January 31, 2019, but on or before February 28, 2019, $17,000,000; (iii) if the closing of the Oxford Transaction occurs after February 28, 2019, but on or before March 31, 2019, $18,000,000; and (iv) if the closing of the Oxford Transaction occurs after March 31, 2019, but on or before April 30, 2019, $20,000,000. The Option Transfer Price can be paid in cash or through a combination of cash and bond collateral.  If it is paid through a combination of cash and bond collateral, the cash component must not be less than $10 million.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business.

"OSHA" means the Occupational and Safety Health Act of 1970, 29 U.S.C. §§ 652 et. seq.

"Owned Real Property" means that real property that is listed on Schedule 1.1(d), together with all of the Buckingham Seller's right, title and interest in and to the following, as it relates to the real property so listed and as used or held for use in the operation of the Business as conducted: (i) all buildings, structures and improvements located on such real property owned by such Buckingham Seller, (ii) all improvements, fixtures, mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, or apparatus affixed to such real property owned by such Buckingham Seller, (iii) all rights of way or easements, if any, in or upon or appurtenant to such real property owned by such Buckingham Seller and all other rights and appurtenances belonging or in any way pertaining to such real property owned by such Buckingham Seller (including the right, title and interest of such Buckingham Seller or such Affiliate in and to any coal reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property owned by such Buckingham Seller), and (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by such.

"Oxford Assets" means the assets constituting "Purchased Assets" under the Oxford Agreement.

"Party" or "Parties" means Purchaser, the Buckingham Seller and Westmoreland, as the case may be.

"Permit Transfer Agreements" means the Permit Transfer Agreements with respect to the Transferred Permits/Licenses, in substantially the form attached hereto as Exhibit C.

"Permits" means the mining permits, drilling permits and other permits held by the Buckingham Seller in the operation of the Business and Purchased Assets, and all pending applications for additional permits, renewals of existing permits or amendments to existing permits which have been submitted to any Governmental Body by the Buckingham Seller necessary for the operation of the Business.

"Permitted Exceptions" means (a) easements, covenants, conditions, restrictions and other similar encumbrances on real property that do not materially detract from the value of the affected Purchased Real Property and do not materially interfere with the present or intended use of such Purchased Real Property, (b) the leasehold estate or any sublease, license or rights of occupancy in any Owned Real Property where the Buckingham Seller is lessor, and (c) any other imperfections in title, charges, easements, restrictions, licenses and encumbrances that do not materially affect the use or transferability of the affected asset or property.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Plan" means the chapter 11 plan of Westmoreland and certain of its direct and indirect subsidiaries in the Bankruptcy Case.

"Purchased Real Property" means the Owned Real Property and the Leased Real Property.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other event, change, effect, condition, state of facts or occurrence, a material and adverse effect on the ability of Purchaser to consummate the Transactions or perform its obligations under this Agreement.

"Reclamation" means reclamation, revegetation, recontouring, abatement, control or prevention of adverse effects of mining activities.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Required Bonding" means the applicable reclamation bonds, letters of credit or other sources of collateral or financial assurance required for each Transferred Permit/License.

"Sale Order" means an Order entered by the Bankruptcy Court or other court of competent jurisdiction (a) that is not subject to a stay pending appeal, (b) that provides, at least, the following: (i) the Purchased Assets will be transferred to Purchaser free and clear of all Liens and all Liabilities of any kind or nature whatsoever, whether at law or in equity, including, without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable Law, whether arising before or after the commencement of the Bankruptcy Case, save and excepting only the Assumed Liabilities that are being expressly

6

assumed in this Agreement, (ii) Purchaser has acted in "good faith" within the meaning of and is entitled to the protections of section 363(m) of the Bankruptcy Code, (iii) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, and (iv) this Agreement and the Transactions may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by the Buckingham Seller or its estate or any chapter 7 or chapter 11 trustee of the Buckingham Seller or other Representative of its estate, and (c) that is otherwise in form and substance satisfactory to Purchaser.

"Seller Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions, states of facts or occurrences, a material adverse effect on (i) the Purchased Assets, considered as a whole, or (ii) the business, results of operations, condition (financial or otherwise) or assets of the Business, other than any event, change, effect, condition, state of facts or occurrence resulting from (a) any change in the United States or foreign economies or financial markets in general, (b) any change that generally affects the mining, processing, marketing, sale or use of thermal coal or other carbon based sources of energy or power, (c) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions (in each case including cyberterrorism), (d) any change in applicable Laws or accounting rules, (e) any actions taken or proposed to be taken by Purchaser or any of its Affiliates, (f) any effect resulting from the public announcement of this Agreement or the Bankruptcy Case, (g) the commencement, initiation, filing, or administration of any insolvency proceedings or cases of the Buckingham Seller or any of its Affiliates, and any effect resulting therefrom, (h) the sale or announcement of plans for a sale by the Buckingham Seller or any of its Affiliates of Excluded Assets to a third party, (i) any labor organizing efforts, strikes, or other employee-related disruption of operations in the Business, (j) any effect resulting from the commencement of the Bankruptcy Case or the Buckingham Seller's inability to pay certain obligations as a result of the commencement of the Bankruptcy Case, and (k) any failure of the Business or the Buckingham Seller to meet any projections or forecasts for any period occurring on or after the date hereof; provided, however, that with respect to clauses (a), (b), (c) and (d), such effects shall not be excluded from the definition of "Seller Material Adverse Effect" to the extent it has, or would reasonably be expected to have, a materially disproportionate adverse effect on the Business, taken as a whole, as compared to other similarly situated businesses.

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 et. seq.

"Subsidiary" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any Law or regulation relating to Taxes.

7

"Tax Return" means any return, declaration, report, estimate, information return or other document relating to Taxes (including any related or supporting estimate, election, schedule, statement or information and any attachment thereto or amendment thereof).

"Taxes" means all federal, state, local, provincial, municipal, foreign or other taxes, charges or other similar assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other similar governmental charges or assessments or deficiencies thereof and all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described herein.

"Title Exceptions"  means the (a) the Permitted Exceptions, (b) statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, (c) mechanics', carriers', workers', repairers', warehousemen's and similar Liens arising or incurred in the Ordinary Course of Business, (d) local, county, state and federal Laws, ordinances or governmental regulations including Environmental Laws and regulations, local building and fire codes, and zoning, conservation or other land use regulations now or hereafter in effect relating to any Purchased Real Property, and (e) Liens that will be released by the Sale Order.

"Transactions" means the transactions contemplated by this Agreement.

Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| 1L PSA | 2.1 |
| Agreement | Preamble |
| Allocation Notice of Objection | 10.2(a) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Buckingham Employees | 8.8 |
| Buckingham Seller | Preamble |
| Business | Recitals |
| Cash Amount | 3.1(a) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Confidentiality Agreement | 8.7 |
| Designated Purchaser | 11.10 |

8

| Term | Section |
|------|---------|
| Equipment and Fixed Assets | 2.1(b)(ii) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Allocation Statement | 10.2(a) |
| Interim Period | 8.5(c) |
| Necessary Consent | 2.6 |
| Option | 3.3(a) |
| Option Notice | 3.3(b) |
| Oxford Acquirer | 3.3(a) |
| Oxford Agreement | 3.3(a) |
| Oxford Transaction | 3.3(b) |
| Petition Date | Recitals |
| Proposed Allocation Statement | 10.2(a) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(v) |
| Purchased Leased Real Property | 2.1(b)(vi) |
| Purchaser | Preamble |
| Sale | Recitals |
| Termination Date | 4.4(a) |
| Transfer Taxes | 10.1(a) |
| Transferred Permits/Licenses | 2.1(b)(vii) |
| Westmoreland | Preamble |
| WMLP | 3.3(a) |

1.2    Other Definitional and Interpretive Matters. (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

Contracts. Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

Dollars. Any reference in this Agreement to $ will mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

010-8707-2185/7/AMERICAS

GAAP.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

Gender and Number.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

Headings.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Law.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

Parties.  References to any "Party" shall refer to Purchaser, Westmoreland and the Buckingham Seller, and references to the "Parties" shall refer to Purchaser, Westmoreland and the Buckingham Seller collectively; provided that, if the context requires, references to "Party" and "Parties" may be interpreted to refer to Purchaser, the Buckingham Seller or Westmoreland.

(b)     The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets. (a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from the Buckingham Seller, and the Buckingham Seller will sell, transfer, assign, convey and deliver to Purchaser, all of the Buckingham Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens and  Excluded Liabilities (other than those Liens created by Purchaser).

(b)     The term "Purchased Assets" means all assets, properties, rights, titles, and interests owned, leased, or held by the Buckingham Seller, including, without limitation, all of the following (in each case, as exclusively related to the Business and other than the Excluded Assets):

(i)     all right, title and interest in and to the Owned Real Property;

(ii)     all equipment, fixed assets and tangible assets (including all mobile mining equipment, parts, supplies and components) located on the Purchased Real Property, in each case that are owned and used or held for use exclusively in the conduct of the Business by the Buckingham Seller, and all of the Buckingham Seller's rights under warranties, indemnities, licenses and all similar rights against third parties with respect to the equipment, fixed assets and tangible assets referenced in this clause (iii) (to the extent such rights are assignable at no cost, expense or penalty to the Buckingham Seller or its Affiliates, or at Purchaser's election if Purchaser agrees to pay for such cost, expense or penalty), but excluding the Excluded Assets (collectively, the "Equipment and Fixed Assets").  A listing of all Equipment and Fixed Assets is set forth on Schedule 2.1(b);

(iii)     all coal inventory located on (or, to the extent in the possession of the Buckingham Seller at the Closing, mined or extracted from) the Purchased Real Property;

(iv)     all prepaid expenses, prepaid advance royalties, security deposits, rebates, notes, chattel paper, and negotiable instruments of the Buckingham Seller exclusively related to the Business (excluding any cash or restricted cash collateral, or any cash equivalents, securing surety bonds maintained by Buckingham Seller);

(v)     all rights to receive oil and gas royalties under any Purchased Contract payable following the Closing Date;

(vi)     all right, title and interest of the Buckingham Seller now or hereafter existing, in, to and under the Contracts listed on Schedule 2.1(b)(vi) including the Leases and Leased Real Property (collectively, the "Purchased Leased Real Property") that are unexpired as of the Closing Date and that have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by the Buckingham Seller (as such schedule may be modified pursuant to Section 2.6) (collectively, the "Purchased Contracts"), in each case as each such Contract may have been amended or otherwise modified prior to the date of (or as permitted in accordance with the terms of) this Agreement;

(vii)     the Permits and the Licenses set forth on Schedule 2.1(b)(vii) (together, the "Transferred Permits/Licenses");

(viii)     all rights of the Buckingham Seller to use haul roads, utility easements and other rights of way and easements used or held for use in the operation of the Business;

(ix)     all warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and

11

contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchased Contracts;

(x)     all insurance proceeds, reserves, benefits or claims of the Buckingham Seller under the insurance policies maintained by the Buckingham Seller for the benefit of the Purchased Assets and Business, to the extent relating to the Assumed Liabilities, the Purchased Assets or the Business;

(xi)     all goodwill associated with the Purchased Assets;

(xii)     all Documents (other than those described in Section 2.2(g));

(xiii)     all rights, claims, causes of action and credits owned by the Buckingham Seller to the extent exclusively relating to any Purchased Asset or Assumed Liability, including (A) any such item arising under any guarantee, warranty, indemnity, right of recovery, right of set-off or similar right in favor of the Buckingham Seller in respect of any Purchased Asset or Assumed Liability, and (B) any causes of action arising under chapter 5 of the Bankruptcy Code, exclusively relating to the Purchased Assets that are against or otherwise involving any counterparty to any Purchased Contract, other than rights of setoff and recoupment and other defenses to any claim (as defined in the Bankruptcy Code) asserted against the Buckingham Seller in the Bankruptcy Case; and

(xiv)     property Taxes that are prepaid on Purchased Assets.

For the avoidance of doubt, under no circumstance shall the Purchased Assets (i) subject to Section 2.03 of the 1L PSA, include or be included in any assets, properties, rights, titles, interests, Contracts, Leases, claims or securities to be sold under that certain Purchase and Sale Agreement, dated as of [●], by and among [●], Westmoreland, and certain of Westmoreland's subsidiaries party thereto (the "1L PSA"), or (ii) be included in the assets used in the business operations of Westmoreland and its Affiliates (other than the Buckingham Seller), all of which assets, properties, rights, titles, interests, Contracts, Leases, claims and securities as referenced in clauses (i) and (ii) being Excluded Assets.

2.2     Excluded Assets.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Buckingham Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all assets, properties and rights of the Buckingham Seller and its Affiliates other than the Purchased Assets, including:

(a)     all cash and cash equivalents;

(b)     all Intellectual Property Rights;

(c)     all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of the Buckingham Seller or its Affiliates in respect of an Excluded Asset or Excluded Liability;

12

(d)     rights of setoff and recoupment and other defenses to any claim (as defined in the Bankruptcy Code) asserted against the Buckingham Seller and its Affiliates in the Bankruptcy Case;

(e)     any shares of capital stock or other equity interest of the Buckingham Seller or its Affiliates or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of the Buckingham Seller or its Affiliates;

(f)     any Documents prepared in connection with this Agreement or the Transactions or exclusively relating to the Bankruptcy Case, any minute books, stock ledgers, corporate seals and stock certificates of the Buckingham Seller or its Affiliates, and other similar books and records that the Buckingham Seller or its Affiliates is required by Law to retain or that the Buckingham Seller or its Affiliates determines is necessary or advisable to retain, including Tax Returns and financial statements or that relate exclusively to the Excluded Assets, provided, however, that the Buckingham Seller (or any successor) or its Affiliates shall provide Purchaser with access to inspect and copy any of the foregoing on reasonable notice to the Buckingham Seller (or any successor) or its Affiliates to the extent that Purchaser requires such access for any reasonable business purpose relating to the Purchased Assets or the Transactions;

(g)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, except for those actions set forth in Section 2.1(b)(xiii)(B);

(h)     subject to section 365(f) and other applicable provisions of the Bankruptcy Code, any Purchased Contract for which applicable Law requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

(i)     all Tax assets (other than any prepaid Taxes described in Section 2.1(b)(xiv)) and net operating losses of the Buckingham Seller or its Affiliates (and the U.S. federal consolidated tax group), or any equivalent state or local group of which any of the Buckingham Seller or its Affiliates is a member or a disregarded entity of a member;

(j)     all refunds, credits and rebates of Taxes due to or from the Buckingham Seller or its Affiliates, including any refund, credit, or rebate attributable to any prepayment of Taxes made by the Buckingham Seller (including Taxes described in Section 2.1(b)(xiv));

(k)     all Contracts that are not Purchased Contracts or Excluded Leases;

(l)     assets of any "employee benefit plan" (within the meaning of Section 3(3) of ERISA) or other similar benefit plans, whether or not subject to ERISA, not assumed by Purchaser;

(m)     all accounts receivable, intercompany receivables, accrued and unbilled revenue, trade receivables, rebates, notes, chattel paper, and negotiable instruments of the Buckingham Seller and its Affiliates; and

(n)     all collateral securing surety bonds maintained by the Buckingham Seller.

13

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, pursuant to the Sale Order, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     all Liabilities of the Buckingham Seller to perform and satisfy all Reclamation and post-mining Liabilities of the Buckingham Seller, Business or the Purchased Assets.

2.4     Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed, and the Buckingham Seller will remain liable with respect to, all of the Excluded Liabilities.  "Excluded Liabilities" means any and all Liabilities of the Buckingham Seller except for the Assumed Liabilities that are being expressly assumed by Purchaser herein.  For the avoidance of doubt, the Excluded Liabilities include, without limitation: (a) all Liabilities resulting from or arising out of the Buckingham Seller's use, operation, possession or ownership of the Purchased Assets prior to the Closing; (b) all Liabilities that could have been asserted as a claim against the Buckingham Seller or any of the affiliated debtors in the Bankruptcy Case; (c) all post-petition administrative expenses incurred during the Bankruptcy Case; (d) all pre-Closing employee obligations; (e) all pre-Closing Black Lung Liabilities related to any employees or former employees of the Buckingham Seller or Westmoreland who worked or who were employed at or in connection with any of the Purchased Assets, including, without limitation, any such Black Lung Liabilities of the Buckingham Seller or any of its subsidiaries or affiliates with respect to any of their respective predecessors; and (f) all costs, fees and expenses of the Buckingham Seller incurred in connection with the Transactions, including costs, fees and expenses of the Buckingham Seller for legal, financial advisory, accounting and other services and all filing fees, court costs and other regulatory fees and expenses of the Buckingham Seller related to the negotiation, preparation and execution of this Agreement and the consummation of the Transactions.  For the avoidance of doubt, the only Liabilities being assumed by Purchaser are the Assumed Liabilities.

2.5     Cure Costs. At the Closing and pursuant to Section 365 of the Bankruptcy Code, the Buckingham Seller will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will take assignment of the Purchased Contracts.  All Assumed Cure Costs will be paid by the Buckingham Seller directly to the applicable counterparty, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, and not by Purchaser.

2.6     Non-Assignment of Assets. (a) Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and the Buckingham Seller and Purchaser will use their

14

respective reasonable best efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that the Buckingham Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, the Buckingham Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement and the Sale Order.  The requirement to obtain any Necessary Consent is subject in all respects to the provisions of section 363(f) and any other applicable provision of the Bankruptcy Code that may excuse the need for such Necessary Consent.

(a)     Subject to Section 2.6(a), if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) the Buckingham Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or the Buckingham Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(b)     Notwithstanding anything herein to the contrary, at any time prior to the Closing Date, Purchaser will be entitled, in its sole discretion, to remove any Contract from Schedule 2.1(b)(vi) for any reason by providing written notice thereof to the Buckingham Seller and any Contract so removed will be deemed to be an "Excluded Asset" for all purposes hereunder.

2.7     Further Conveyances and Assumptions. From time to time following the Closing, the Buckingham Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to the Buckingham Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; provided, that nothing in this Section 2.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

## ARTICLE III
## CONSIDERATION AND OPTION

3.1     Consideration. The aggregate consideration for the Purchased Assets (the "Purchase Price") will be:

(a)     $1,000,000 in cash (the "Cash Amount"); and

(b)     the assumption of the Assumed Liabilities.

     3.2   <u>Payment of Purchase Price</u>. At the Closing:

     (a)   Purchaser will pay to the Buckingham Seller, in immediately available funds to the account or accounts designated by the Buckingham Seller, an amount equal to the Cash Amount.

     (b)   Purchaser will assume the Assumed Liabilities pursuant to instruments delivered at the Closing as provided in <u>Section 4.3</u>.

     (c)   All payments of Purchase Price will be made free and clear of, and without any reduction in respect of, any withholding or similar Taxes.

     3.3   <u>Option</u>. (a)   Subject to (i) Purchaser's consummation of the Transaction as contemplated by this Agreement, (ii) the acquisition by the Successful Bidder (as defined in the Plan), an Affiliate or designee thereof, or an entity designated by the WLB Debtors (as defined in the Plan) and the Successful Bidder (which, for the avoidance of doubt, may be a WLB Debtor entity to the extent such WLB Debtor entity is an entity being purchased by the Successful Bidder pursuant to the Plan) (such entity, the "<u>Oxford Acquirer</u>") of the Oxford Assets from Westmoreland Resource Partners, LP and its Subsidiaries (collectively, "<u>WMLP</u>"), and (iii) the satisfaction of the conditions in clauses (b) and (c) below, the Oxford Acquirer shall have the option to sell the Oxford Assets, including all assets substantially related (including all collateral securing surety bonds maintained with respect to the Oxford Assets), and the assumption of certain Liabilities, thereto (hereinafter the "<u>Option</u>") to Purchaser pursuant to the terms and conditions of an agreement substantially in the form attached hereto as <u>Exhibit A</u>[4] (the "<u>Oxford Agreement</u>").

     (b)   The aggregate consideration for the Oxford Assets will consist of (i) an amount equal to the Option Transfer Price payable by the Oxford Acquirer to Purchaser (of which $3 million shall be paid at the closing of the Oxford Transaction and the remainder of the cash component of the Option Transfer Price will be paid upon the establishment by Purchaser of the requisite reclamation bonds, letters of credit or other sources of collateral or financial assurance required for each Transferred Permit/License (as defined in the Oxford Agreement and to be consistent with the definition of "Transferred Permit License" in this Agreement (but with respect to the Oxford Assets)) and (ii) the assumption of "Assumed Liabilities" (as defined in the Oxford Agreement and to be consistent with the definition of "Assumed Liabilities" in this Agreement (but with respect to the Oxford Assets)) by the Purchaser. The Oxford Acquirer must, as promptly as practicable, and in no event later than seven days, after the acquisition of the Oxford Assets by the Oxford Acquirer, exercise the Option in a signed, dated written instrument delivered to Purchaser with clear, unambiguous notice of the exercise of the Option (the "<u>Option Notice</u>"). The Oxford Acquirer and Purchaser shall, as promptly as practicable after delivery of the Option Notice, execute the Oxford Agreement and consummate the sale of the Oxford Assets pursuant to the terms and conditions of the Oxford Agreement.  In no event will the transaction for the purchase of the Oxford Assets (the "<u>Oxford Transaction</u>") actually close later than April 30, 2019, even if the Option Notice was timely given.

---

[4]   <u>Note to Draft</u>: The Oxford Agreement will be finalized prior to entry into this Agreement.

(c)     The obligation of Purchaser to purchase the Oxford Assets pursuant to this Agreement and the Oxford Agreement is subject to the fulfillment of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part):

(i)     Purchaser has received evidence reasonably satisfactory to Purchaser that the Oxford Assets (a) include all assets set forth on <u>Schedule 3.3(c)(i)</u>[5], subject to normal wear and tear or disposal of any inventory included in such assets in the ordinary course of business, and (b) will be free and clear of all Liens (other than Permitted Exceptions); and

(ii)     there has not occurred a "Seller Material Adverse Effect" (as defined in the Oxford Agreement and to be consistent with the definition of "Seller Material Adverse Effect" in this Agreement (but with respect to the Oxford Assets)) as reasonably determined by Purchaser.

(d)     For the avoidance of doubt, the Option provided for in this <u>Section 3.3</u> shall not preclude Purchaser from separately participating in any sale process conducted by WMLP for its assets, including with respect to the Oxford Assets.

(e)     Subject to the acquisition of the Oxford Assets by the Oxford Acquirer and thereafter, pending the exercise of the Option, the Oxford Acquirer shall (i) take all action necessary or appropriate to preserve, in all material respects, the Oxford Assets, including all coal mining leases in accordance with their terms; (ii) pay all mining royalties, including any advance royalties, due prior to the closing of the Oxford Transaction, and (iii) ensure that no material coal mining leases or related rights lapse or otherwise expire (except for expiration of leases in accordance with their terms).

(f)     Notwithstanding anything to the contrary in this Agreement, the Parties agree that the Oxford Acquirer is an express and intended third party beneficiary of this <u>Section 3.3</u> (and <u>Article XI</u> as it relates thereto) and shall have the right to enforce the terms hereof in all respects.

### ARTICLE IV
### CLOSING AND TERMINATION

4.1     <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 9.1, 9.2</u> and <u>9.3</u> hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "Closing") will take place remotely by the electronic exchange of documents and signatures in PDF format at 10:00 a.m. (Eastern time) on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may

---

[5]     <u>Note to Draft</u>: This schedule shall set forth material, tangible personal property required to operate the Oxford Assets as currently operated by its current owner.

designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2    Deliveries by the Buckingham Seller. At the Closing, the Buckingham Seller will deliver to Purchaser:

(a)    the General Assignments and Bills of Sale for the Purchased Assets, each duly executed by the Buckingham Seller;

(b)    the Lease Assignment and Assumption Agreements for the assumed Leases and Purchased Leased Real Property, each duly executed by the Buckingham Seller;

(c)    the Contracts Assignment and Assumption Agreements for the assumed Contracts, each duly executed by the Buckingham Seller;

(d)    special warranty or limited warranty deeds (or similar deeds to convey title with warranties limited only to grantor's acts in a particular jurisdiction where the Owned Real Property is located) to the Owned Real Property in recordable form, duly executed by the Buckingham Seller;

(e)    all documents of title and instruments of conveyance (duly executed by the Buckingham Seller) necessary to transfer record and/or beneficial ownership to Purchaser of all automobiles, trucks and trailers owned by the Buckingham Seller (and any other Purchased Assets owned by the Buckingham Seller which require execution, endorsement and/or delivery of a document in order to vest record or beneficial ownership thereof in Purchaser) which are included in the Purchased Assets;

(f)    the Permit Transfer Agreements duly executed by the Buckingham Seller;

(g)    the officers certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b);

(h)    all other deeds, endorsements, assignments, company seals, instruments of transfer and other instruments of conveyance reasonably requested by Purchaser or required to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser free and clear of all Liens (other than those released by the Sale Order, those created by Purchaser and Permitted Exceptions); and

(i)    a statement, signed under penalties of perjury and dated no more than 30 days prior to the Closing Date, that satisfies the requirements of Treasury Regulation Section 1.1445-2(b)(2) and confirms that WCC Land Holding Company, Inc. is not a "foreign person" as defined in Section 1445 of the Code.

4.3    Deliveries by Purchaser. At the Closing, Purchaser will deliver to the Buckingham Seller:

(a)    the consideration specified in Section 3.2(a) of this Agreement;

18

(b)      the General Assignments and Bills of Sale for the Purchased Assets, each duly executed by Purchaser;

(c)      the Lease Assignment and Assumption Agreements for the assumed Leases and Purchased Leased Real Property, each duly executed by Purchaser;

(d)      the Contracts Assignment and Assumption Agreements for the assumed Contracts, each duly executed by Purchaser;

(e)      the Permit Transfer Agreements, each duly executed by Purchaser;

(f)      evidence reasonably satisfactory to the Buckingham Seller that the Required Bonding has been established, or stands ready to be established upon the completion of the transactions contemplated by the Permit Transfer Agreements, including binding commitments from sureties sufficient to replace all existing reclamation and surety bonds of the Buckingham Seller related to the Transferred Permits/Licenses; and

(g)      the officers certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(h)      all such other documents, instruments and certificates, reasonably requested by the Buckingham Seller, to evidence the assumption by Purchaser of the Assumed Liabilities.

4.4      Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)      by Purchaser or the Buckingham Seller, if the Closing has not occurred by 5:00 p.m. Eastern time on January [21][6], 2019 (the "Termination Date"); provided, however, that if the Closing has not occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Buckingham Seller, then Purchaser or the Buckingham Seller, respectively, may not terminate this Agreement pursuant to this Section 4.4(a);

(b)      by mutual written consent of the Buckingham Seller and Purchaser;

(c)      by Purchaser, if the Buckingham Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would reasonably be expected to result in a failure of a condition set forth in Sections 9.1 or 9.3 and such breach has not been cured by the earlier of (i) 30 days after the giving of written notice by Purchaser to the Buckingham Seller of such breach and (ii) the Termination Date; provided, that Purchaser is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(d)      by the Buckingham Seller, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would

---

[6]      Note to Draft: To be discussed given hearing date on January 16, 2019.

19

reasonably be expected to result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured by the earlier of (i) 30 days after the giving of written notice by the Buckingham Seller to Purchaser of such breach and (ii) the Termination Date; provided, that the Buckingham Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(e)     by Purchaser or the Buckingham Seller if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and use their respective reasonable best efforts to pursue such appeal unless and until this Agreement is terminated pursuant to this Section 4.4; and

(f)     by Purchaser if the Bankruptcy Court enters a Sale Order that is not in form and substance acceptable to Purchaser, denies approval of the Transaction, or approves an alternate transaction for the Purchased Assets.

4.5     Procedure Upon Termination. In the event of termination pursuant to Section 4.4, the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or the Buckingham Seller.

4.6     Effect of Termination. In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, the Buckingham Seller or any of its Representatives; provided, however, that the provisions of Section 3.2, this Section 4.6 and Article XI (other than Section 11.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder, provided, further, that nothing in this Section 4.6 will be deemed to release any Party from Liability for any willful breach of this Agreement prior to termination.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUCKINGHAM SELLER

Except as set forth in the Disclosure Schedule, the Buckingham Seller represents and warrants to Purchaser that:

5.1     Organization and Good Standing. The Buckingham Seller is an entity duly organized, validly existing and in good standing under the Laws of the State of Ohio and, subject to any limitations that may be imposed on the Buckingham Seller resulting from or relating to the Bankruptcy Case, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2     Authorization of Agreement. Subject to entry of the Sale Order and such other authorization as may be required by the Bankruptcy Court, the Buckingham Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations

20

hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of the Buckingham Seller. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by the Buckingham Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of the Buckingham Seller enforceable against it in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Governmental Consents. Except to the extent rendered unnecessary through the entry of the Sale Order, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Buckingham Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which the Buckingham Seller is a party, the compliance by the Buckingham Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by the Buckingham Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except (a) for the entry of the Sale Order and (b) as would not reasonably be expected to have a Seller Material Adverse Effect.

5.4     Title to Purchased Assets. Subject to Section 2.6, and subject to the entry of the Sale Order, the Buckingham Seller owns the Purchased Assets that are tangible personal property free and clear of all Liens (other than Title Exceptions) and, at the Closing, Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Liens created by Purchaser) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5     Validity of Purchased Contracts. As of the date of this Agreement, each Purchased Contract is in full force and effect and is a valid and binding obligation of the Buckingham Seller and, to the Knowledge of the Buckingham Seller, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (c) the obligation to pay Cure Costs under Section 2.5. As of the date of this Agreement, to the Knowledge of the Buckingham Seller, the Buckingham Seller has not received any written notice of the intention of any third party to terminate any Purchased Contract. To the Knowledge of the Buckingham Seller, as of the date of this Agreement, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Purchased Contract or would cause the acceleration of any obligation of the Buckingham Seller or the creation of a Lien upon any Purchased Asset, except for such events

21

that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.6     Litigation. Except for Legal Proceedings that do not have, and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date of this Agreement, there are no Legal Proceedings pending or, to the Knowledge of the Buckingham Seller, threatened against the Buckingham Seller that involves or relates to any of the Transactions or affects any of the Purchased Assets.

5.7     Financial Advisors. Purchaser will not be liable for any obligation or Liability incurred by the Buckingham Seller or Westmoreland, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Transactions.

5.8     Environmental Matters. Except as would not reasonably be expected to be material to the Business or the Purchased Assets:

(a)     The Buckingham Seller's operation of the Business, and the Purchased Real Property related thereto, have complied during the previous three years and, as of the date of this Agreement, are in compliance with all applicable Environmental Laws;

(b)     The Buckingham Seller has not received any written notice, report or other information alleging any pending or threatened material violation, non-compliance, Liability or potential Liability under Environmental Laws with regard to any of the Purchased Real Property or the Business, or any prior business for which the Buckingham Seller has retained Liability under any Contract or Environmental Law, nor does the Buckingham Seller have any unresolved claims alleging any violations of Environmental Law;

(c)     No Legal Proceeding is pending or, to the Buckingham Seller's Knowledge, threatened under any Environmental Law or environmental provision of any Mining and Mining Safety Law against the Buckingham Seller or with respect to the Purchased Real Property or the Business, nor are there any Orders outstanding under any Environmental Law or environmental provision of any Mining and Mining Safety Law with respect to the Purchased Real Property or the Business; and

(d)     the Buckingham Seller (i) holds and is, and has been during the previous three years, in compliance with all Permits required under Environmental Law (each of which is in full force and effect and is not subject to appeal, except in such instances where the requirement to hold a Permit required under Environmental Law is being contested in good faith by the Buckingham Seller by appropriate proceedings diligently conducted) for any of its current operations or for the current ownership, operation or use of the Purchased Real Property, including all Permits required under Environmental Law for the coal mining-related operations of the Buckingham Seller or, to the extent currently required, any pending construction or expansion related thereto, (ii) has used reasonable best efforts to cause all contractors, lessees and other Persons occupying, operating or using the Purchased Real Property to comply with Environmental Law and obtain all necessary Permits required under Environmental Law, and (iii) has not received any written notice that the Permits required under Environmental Law will not be renewed.

5.9    <u>Taxes</u>.

Except (i) as set forth on <u>Schedule 5.9</u> or (ii) as would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect:

(a)    With respect to the Purchased Assets, the Buckingham Seller has filed or caused to be filed all Tax Returns required to have been filed by the Buckingham Seller with respect to, by or for the Buckingham Seller or the Purchased Assets for the period prior to the Closing except for those Tax Returns for which the filing date (including any applicable extensions) has not yet passed.

(b)    All such Tax Returns are correct and complete in all respects. Buckingham Seller has timely paid all Taxes.

(c)    There are no unpaid Taxes due and owing by Buckingham Seller that are or could reasonably be expected to become an encumbrance (other than a Title Exception) on the Purchased Assets.

(d)    No written claim has been made by any Tax Authority in a jurisdiction where the Buckingham Seller does not file Tax Returns with respect to the Purchased Assets that the Buckingham Seller is or may be subject to taxation by that jurisdiction with respect to the Purchased Assets. With respect to Tax periods that are currently open, the Buckingham Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to Taxes which relate to the Purchased Assets.

(e)    There is no dispute or claim concerning any Tax liability of the Buckingham Seller claimed or raised by any Tax Authority in writing.

5.10    <u>No Other Representations or Warranties; Schedules</u>. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Disclosure Schedules), neither the Buckingham Seller nor any other Person makes any other express or implied representation or warranty with respect to the Buckingham Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and the Buckingham Seller disclaims any other representations or warranties, whether made by the Buckingham Seller, any Affiliate thereof, or any of the Buckingham Seller's or its Affiliates' respective Representatives.    Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Disclosure Schedules), the Buckingham Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of the Buckingham Seller or any of its Affiliates).    The Buckingham Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof.    The disclosure of any matter or item in any Schedule

23

hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Buckingham Seller and Westmoreland that:

6.1     Organization and Good Standing. Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the state of its organization.

6.2     Authorization of Agreement. Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties. No consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of Transactions, the taking by Purchaser of any other action contemplated hereby or thereby, except for (a) the entry of the Sale Order and (b) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

6.4     Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.  Purchaser is not subject to any Order except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5    <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof that would or could be owed by or claimed against the Buckingham Seller, Westmoreland or any of the consideration to be paid hereunder.

6.6    <u>Capability</u>.

(a)    Purchaser has sufficient funds available to it in cash to pay or cause to be paid the Cash Amount and the fees and expenses required to be paid by Purchaser in connection with the Transactions, to effect the Transactions, and to establish and maintain the Required Bonding as of the Closing.  As of the date hereof and upon the consummation of the Transactions, (i) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) Purchaser will not be left with unreasonably small capital, (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (iv) the capital of Purchaser will not be impaired.

(b)    Purchaser is and will be capable of taking transfer of, or obtaining replacement or overlapping permits for, and of posting replacement Required Bonding with respect to, the Transferred Permits/Licenses, and none of Purchaser or its Affiliates have been denied, or are subject to denial of, any application for any mining license, permit or other authorization of a Governmental Body due to application of the Applicant Violator System established pursuant to the SMCRA (or any applicable state system).

6.7    <u>Condition of the Purchased Assets</u>. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that the Buckingham Seller and Westmoreland are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Buckingham Seller in <u>Article V</u> (as modified by the Disclosure Schedules), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and "as is" basis.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

6.8    <u>Exclusivity of Representations and Warranties</u>. Except for the representations and warranties contained in <u>Article V</u>, Purchaser agrees and acknowledges that none of the Buckingham Seller, Westmoreland nor any Person on behalf of the Buckingham Seller or Westmoreland makes any other express or implied representation or warranty with respect to the Buckingham Seller, Westmoreland, the Purchased Assets, the Assumed Liabilities or the Business or with respect to any other information provided or made available to Purchaser in connection with the Transactions, including information conveyed at management presentations, in a virtual data room or in due diligence sessions and, without limiting the foregoing, including any estimates, projections, predictions or other forward-looking information.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1     Bankruptcy Court Filings. The Buckingham Seller will pursue diligently the entry of the Sale Order, and Purchaser agrees that it will promptly take such actions as are reasonably requested by the Buckingham Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  The Buckingham Seller will use reasonable efforts to provide Purchaser notice in advance of filing with the Bankruptcy Court or any appellate court any motion, brief, notice, proposed Order, amendment, supplement or other pleading that the Buckingham Seller proposes to file in the Bankruptcy Court relating to the Transactions.

7.2     Sale Free and Clear.  Except for the Assumed Liabilities, the Sale shall be free and clear of all liens, claims, debts, obligations, encumbrances, interests, and other Liabilities to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

## ARTICLE VIII
## COVENANTS

8.1     Access to Information. From the date hereof through the Closing Date, Purchaser will be entitled for purposes of consummating the Transactions to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances so as not to disturb the operation of the Business and will be subject to restrictions under applicable Law.  The Buckingham Seller will direct and use its reasonable best efforts to cause its Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with the Buckingham Seller and its Representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require the Buckingham Seller to disclose information that would cause material competitive harm to the Buckingham Seller or would violate attorney-client privilege.  The Buckingham Seller will promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to the Purchased Assets and the Transactions.

8.2     Actions Pending the Closing. Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, (c) in the Ordinary Course of Business, or (d) with the prior written consent of Purchaser, during the period from the date hereof and through the Closing Date, the Buckingham Seller will: (i) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted, and continue to operate the Business as a going concern; (ii) take all action necessary or appropriate to preserve its coal mining leases in accordance with their terms; (iii) timely pay all mining royalties, including any advance royalties, coming due prior to the Closing; (iv) ensure that no coal mining leases or related rights lapse or otherwise expire (except for expiration of leases in accordance with their

26

terms); (v) not materially amend, modify, terminate, waive any rights under or create any Lien (other than a Lien that will not be transferred to Purchaser at the Closing or that does not materially and adversely affect the Purchased Assets, taken as a whole) with respect to, any of the Purchased Contracts; (vi) use reasonable best efforts to defend and protect the Purchased Assets from infringement or deterioration; (vii) comply with applicable material Laws with respect to the Purchased Assets, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect; (viii) not sell, assign, lease or otherwise transfer or dispose of any material asset or property constituent part of the Purchased Assets (except sales of coal inventory); and (ix) not enter into any agreement or commitment to take any action prohibited by this <u>Section 8.2</u>.

8.3     <u>Consents</u>. The Buckingham Seller and Purchaser will use their respective reasonable best efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Sections 2.6(a)(ii)</u> or <u>5.3</u> and the Necessary Consents; <u>provided</u>, <u>however</u>, that none of the Buckingham Seller or Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or proceedings to obtain any such consent or approval.

8.4     <u>Further Assurances</u>. Subject to the other provisions of this Agreement and any relevant Order of the Bankruptcy Court, each of Purchaser and the Buckingham Seller will use its reasonable best efforts to (a) take all actions necessary or appropriate to consummate the Transactions, (b) provide the other Parties with reasonable cooperation and take such actions as such other Parties may be reasonably request in connection with the consummation of the Transactions, (c) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions, and (d) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.  Without limiting the foregoing, each of Purchaser and the Buckingham Seller will use its reasonable best efforts to defend any Legal Proceedings which would prevent the condition to Closing described in <u>Section 9.3(a)</u> from being satisfied, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Body with respect thereto vacated or reversed, and will cooperate with each other in connection with the foregoing.

8.5     <u>Transferred Permit/License and Surety Bond Matters</u>.

(a)     To the extent permitted by Law, Purchaser shall prepare, at its sole cost and expense, all applications required to transfer the Transferred Permits/Licenses (which applications shall include the necessary applications, notices, forms and other documents to appoint Purchaser as the designated operator on the Transferred Permits/Licenses with the appropriate Governmental Body). The Buckingham Seller shall cooperate with and provide reasonable assistance to Purchaser in connection with such preparation and such applications shall be reasonably satisfactory to Purchaser. As promptly as practicable and in no event later than 10 days after the date hereof, Purchaser shall properly file all applications required to transfer the Transferred Permits/Licenses from the Buckingham Seller and its Affiliates to Purchaser with the appropriate Governmental Body (except for any applications which may not be filed prior to Purchaser being

27

party to a fully executed surety agreement). From and after the date hereof, Purchaser shall use its reasonable best efforts to pursue the transfer of the Transferred Permits/Licenses to Purchaser. The Buckingham Seller agrees to provide the cooperation reasonably requested by Purchaser to procure the transfer of the Transferred Permits/Licenses.

(b)     As of the date hereof, Purchaser shall have provided evidence to Buckingham Seller reasonably satisfactory to Buckingham Seller with respect to the ability of Purchaser to secure the Required Bonding necessary to transfer the Transferred Permits/Licenses from the Buckingham Seller and its Affiliates to Purchaser.  Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary under all Laws to put in place with the appropriate Governmental Body as promptly as commercially reasonably possible after the Closing (but no earlier than such time as the applicable Governmental Bodies have provided notice of intent to approve the transfer of the Transferred Permits/Licenses) the Required Bonding necessary to transfer the Transferred Permits/Licenses from the Buckingham Seller and its Affiliates to Purchaser. Purchaser shall be solely responsible for the establishment and maintenance of the Required Bonding, and will use its reasonable best efforts to take, or cause to be taken, such actions as are necessary to return to the Buckingham Seller any of the Buckingham Seller's property pledged or otherwise provided to secure the Transferred Permits/Licenses as promptly as practicable following the Closing.

(c)     To the extent permitted by applicable Law, from and after the Closing, Purchaser shall operate under the Transferred Permits/Licenses as the designated operator in accordance with the terms and conditions contained in the Permit Transfer Agreements. To the extent allowed by and in accordance with Law and the terms and conditions of the Permit Transfer Agreements, before and until the appropriate Governmental Body approves the transfer of the Transferred Permits/Licenses to Purchaser (the "Interim Period"), the Buckingham Seller grants Purchaser the right to conduct, at the sole cost and expense of Purchaser, mining operations following the Closing on the Purchased Real Property under the Transferred Permits/Licenses as the designated operator.  Purchaser and the Buckingham Seller will make such filings, applications, notices or deliver any other documents as necessary to give effect to the foregoing arrangement during the Interim Period.

(d)     During the Interim Period, Purchaser shall, and shall cause its Affiliates to: (i) maintain such Transferred Permit/License and comply with all Laws governing, and all conditions and requirements of, or pertaining to, any such Transferred Permits/Licenses (which shall include the performance of all actions required by applicable Laws and all conditions and requirements of the Transferred Permit/License); and (ii) be solely responsible (including all required remedial measures or abatement actions) for all incidents of violation, non-compliance, and similar occurrences related to the Transferred Permits/Licenses that arise from the actions of Purchaser and its Affiliates and their respective agents, Representatives and business relations while operating under such Transferred Permits/Licenses during the Interim Period.  Purchaser shall promptly deliver to the Buckingham Seller written notice of any such incidents or occurrences. In the event Purchaser fails to cure any such matters, the Buckingham Seller shall have the right, but not the obligation, to cure such matters (including right of entry onto the applicable Purchased Real Property). Purchaser shall promptly reimburse the Buckingham Seller for the reasonable costs of any such cure. The Buckingham Seller shall have (and Purchaser shall grant) all reasonable rights of entry onto the Purchased Real Property necessary for the

28

Buckingham Seller to maintain the Transferred Permits/Licenses in the event Purchaser fails to maintain the Transferred Permits/Licenses during the Interim Period.

(e)   The above notwithstanding, from and after the Closing, Purchaser shall remain liable for the Assumed Liabilities related to the Transferred Permits/Licenses even if any applicable Governmental Body fails to approve the transfers of any of the Transferred Permits/Licenses to Purchaser.

8.6   Publicity. Any press release or public announcement concerning this Agreement or the Transactions will be prepared solely by the Buckingham Seller or Westmoreland; provided, however, that the Buckingham Seller and/or Westmoreland will use its reasonable best efforts to consult with Purchaser with respect to the text thereof.  Purchaser will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the Buckingham Seller and Westmoreland, which approval may be withheld by them in their sole discretion, unless disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser will use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the Buckingham Seller and Westmoreland with respect to the text of any such required disclosure.

8.7   Confidentiality. Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement dated August 17, 2018 between the Buckingham Seller and Purchaser (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.8   Employee Matters.  Prior to the Closing Date, Purchaser or a Designated Purchaser shall make offers of employment to all employees of the Buckingham Seller (the "Buckingham Employees") as of the Closing Date. As of the Closing Date, the Buckingham Seller shall terminate the employment of each Buckingham Employee and shall cooperate with, and use its commercially reasonable efforts to assist, Purchaser with Purchaser's hiring (effective as of the Closing Date) of such Buckingham Employees. The Purchaser shall be responsible for all Liabilities under the WARN Act.

**ARTICLE IX**
**CONDITIONS TO CLOSING**

9.1   Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)   the representations and warranties of the Buckingham Seller contained in this Agreement (disregarding any "materiality" or "Seller Material Adverse Effect" qualifications

29

contained therein) shall be true and correct in all respects as of the Closing (except such representations and warranties that expressly address an earlier date, which such representations and warranties shall be true and correct as of such earlier date), except where the failure to be so true and correct has not had, and would not reasonably be expected to have, a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of the Buckingham Seller, dated the Closing Date, to the foregoing effect;

(b)     the Buckingham Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, including without limitation the Buckingham Seller's obligation to pay all Cure Costs for the Purchased Contracts, and Purchaser shall have received a certificate signed by an authorized officer of the Buckingham Seller, dated the Closing Date, to the forgoing effect;

(c)     All Purchased Contracts shall be current and approved by the Bankruptcy Court for assumption and assignment to Purchaser; and

(d)     the Buckingham Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

9.2     Conditions Precedent to Obligations of the Buckingham Seller. The obligations of the Buckingham Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Buckingham Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement (disregarding any "materiality" or "Purchaser Material Adverse Effect" qualifications contained therein) shall be true and correct in all respects as of the Closing (except such representations and warranties that expressly address an earlier date, which such representations and warranties shall be true and correct as of such earlier date), except where the failure to be so true and correct has not had, and would not reasonably be expected to have, a Purchaser Material Adverse Effect, and the Buckingham Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and the Buckingham Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     arrangements satisfactory to the Buckingham Seller shall be in place regarding the Required Bonding, and the Buckingham Seller shall be satisfied that there have been no adverse developments or occurrences that would reasonably be expected to be material and adverse in the context of the transfer of one or more Transferred Permits/Licenses;

(d)     Purchaser shall have delivered to the Buckingham Seller all of the items set forth in Section 4.3; and

30

(e)      the Bond Agreement is terminated and Purchaser has entered into a new agreement with First Surety Corporation (under which, for the avoidance of doubt, neither Westmoreland nor any of its Affiliates will be liable for the obligations of Purchaser) replacing the Bond Agreement.

9.3      <u>Conditions Precedent to Obligations of Purchaser and the Buckingham Seller</u>. The respective obligations of Purchaser and the Buckingham Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and the Buckingham Seller in whole or in part to the extent permitted by applicable Law):

(a)      there shall not be in effect any Order restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b)      the Bankruptcy Court shall have entered the Sale Order.

9.4      <u>Frustration of Closing Conditions</u>. No Party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## ARTICLE X
## TAXES

10.1      <u>Transfer Taxes</u>.

(a)      All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "<u>Transfer Taxes</u>") will be borne by [●][7] regardless of the Party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes. The Buckingham Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise use their respective reasonable best efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

10.2      <u>Purchase Price Allocation</u>.

(a)      As promptly as practicable after the Closing Date, but no later than 60 days thereafter, Purchaser will prepare and deliver to the Buckingham Seller an allocation schedule setting forth the amounts to be allocated among the Purchased Assets of the Buckingham Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the

---

[7]      <u>Note to Draft</u>: The Parties and their advisors are evaluating the Transfer Taxes that will be implicated by the Transactions and will determine responsibility for payment of such Transfer Taxes prior to execution of this Agreement and after such amount has been quantified, and this Agreement will be updated accordingly.

31

applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation Statement"). The Buckingham Seller will have 30 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections. If the Buckingham Seller fails to deliver an Allocation Notice of Objection in accordance with this Section 10.2(a) the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "Final Allocation Statement." If the Buckingham Seller submits an Allocation Notice of Objection, then for 20 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and the Buckingham Seller will use their reasonable best efforts to agree on the allocations. Failing such agreement within 20 Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and the Buckingham Seller, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive. The fees and expenses of such accounting firm will be apportioned between the Buckingham Seller and Purchaser equally.

(b)     The Buckingham Seller and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement. Neither the Buckingham Seller nor Purchaser will take any position (whether in audits, tax returns, or otherwise) that is inconsistent with the Final Allocation Statement unless required to do so by applicable Law.

10.3     Cooperation and Audits. Purchaser, its Affiliates and the Buckingham Seller will cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) arising from the Purchased Assets after the date hereof and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## ARTICLE XI
## MISCELLANEOUS

11.1     No Survival of Representations and Warranties. The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the Parties will have any Liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

11.2     Expenses. Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of the Buckingham Seller and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and

32

each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all proceedings incident thereto.

11.3    Injunctive Relief.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to enforce specifically the terms and provisions of this Agreement, including specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 11.3 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or the Buckingham Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or the Buckingham Seller, as applicable, under this Agreement all in accordance with the terms of this Section 11.3.

11.4    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 11.8 hereof; provided, however, that if the Bankruptcy Case has been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Legal Proceeding in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the

33

provisions of Section 11.8; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

11.5    Waiver of Right to Trial by Jury. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.6    Entire Agreement; Amendments and Waivers. This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.7    Governing Law. This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, and, where state Law is implicated, the Laws of the State of Delaware applicable to contracts made and performed in such State.

11.8    Notices. All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by email (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Buckingham Seller or Westmoreland, to:

Westmoreland Coal Company
9540 South Maroon Circle, Suite 300
Englewood, Colorado 80112
Attention: Jennifer Grafton, Chief Legal Officer and Chief
Administrative Officer
E-mail: jgrafton@westmoreland.com

with a copy (which will not constitute notice) to:

Kirkland & Ellis LLP
609 Main Street, 47th Floor
Houston, Texas 77002

34

Attention: Kim Hicks
E-mail: kim.hicks@kirkland.com

-and-

Kirkland & Ellis LLP
901 Main Street, 54th Floor
Dallas, Texas 75202
Attention: Dilen Kumar
E-mail: dilen.kumar@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention: Gregory Pesce
E-mail: gregory.pesce@kirkland.com

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Stephen E. Hessler, P.C.
E-mail: stephen.hessler@kirkland.com

If to Purchaser, to:

CCU Coal and Construction, LLC
15769 Watkins Road Marysville, Ohio 43040
Attention: Charles C. Ungurean
Email: cungurean@altoncoal.com

with a copy (which will not constitute notice) to:

Squire Patton Boggs (US) LLP
41 South High Street
2000 Huntington Center
Columbus, Ohio 43215
Attention: Donald W. Hughes and Elliot M. Smith
Email: Don.hughes@squirepb.com / Elliot.smith@squirepb.com

11.9    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being

35

enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.10   <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except as set forth in <u>Section 3.3(f)</u>, nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Buckingham Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 11.10, one or more Affiliates to (i) purchase the Purchased Assets and/or (ii) assume the Assumed Liabilities, on and after the Closing Date (any such Affiliate of Purchaser that shall be properly designated by Purchaser in accordance with this clause, a "Designated Purchaser"); it being understood and agreed, however, that any such right of Purchaser to designate a Designated Purchaser is conditioned upon (a) such Designated Purchaser executing and delivering to the Buckingham Seller a counterpart to this Agreement, (b) such Designated Purchaser being able to perform the applicable covenants under this Agreement (and make the same representations and warranties as Purchaser has made in Section 6.6, to the extent relating to the relevant portion of the Purchased Assets being acquired by such Designated Purchaser), and demonstrate satisfaction of the applicable requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the applicable assumed Contracts and the assumed Leases, (c) any such designation not creating any Liability (including any Liability relating to Taxes) for the Buckingham Seller or its Affiliates that would not have existed had Purchaser purchased the Purchased Assets and/or assumed the Assumed Liabilities, and which Liability is (i) not fully reimbursed by or on behalf of Purchaser prior to or at the Closing or (ii) a Liability for which Purchaser or the applicable Designated Purchaser agrees, at its election, to provide an indemnity reasonably acceptable to the Buckingham Seller, and (d) such designation not reasonably being expected to materially delay, prevent or hinder the consummation of the transactions contemplated by this Agreement. No such designation shall relieve Purchaser of any of its obligations hereunder. Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser. The above designation shall be made by Purchaser by way of a written notice to be delivered to the Buckingham Seller as soon as reasonably practicable after the date hereof and in no event later than the fifth (5th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Purchased Assets and Assumed Liabilities that Purchaser intends such Designated Purchaser(s) to purchase and/or assume, as applicable, hereunder.  Upon any such permitted assignment, the references in this Agreement to the Buckingham Seller or Purchaser will also apply to any such assignee unless the context otherwise requires. Notwithstanding the foregoing, the Buckingham Seller may assign some or all of its rights or delegate some or all of its obligations hereunder to successor entities (including any liquidating trust) pursuant to a chapter 11 plan confirmed by the Bankruptcy Court.

11.11   <u>Non-Recourse</u>.  No past, present or future director, officer, employee, incorporator, member, partner, equityholder, incorporator, manager, agent, attorney, Representative or Affiliate of the parties to this Agreement or any of their Affiliates will have any Liability for any obligations

36

or Liabilities of the Buckingham Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other party will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.12   Counterparts. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[Signature page follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date hereof.

<u>PURCHASER</u>:

CCU COAL AND CONSTRUCTION, LLC

By:_____
Name: _____
Title: _____


<u>THE BUCKINGHAM SELLER</u>:

BUCKINGHAM COAL COMPANY, LLC

By:_____
Name: _____
Title: _____


<u>WESTMORELAND</u>:

WESTMORELAND COAL COMPANY

By:_____
Name: _____
Title: _____

## **Exhibit 2**

**Assigned Contracts**

**Exhibit 2 - Assigned Contracts Schedule**

| Debtor(s) | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|---|---|---|---|
| Buckingham Coal Company, LLC | ALTHEIR'S OIL | Easement | $0.00 |
| Buckingham Coal Company, LLC | ALTIER OIL, INC. | Right of Way Agreement | $0.00 |
| Buckingham Coal Company, LLC | BANK OF MONTREAL | Open-end mortgage, assignment of rents and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |
| Buckingham Coal Company, LLC | BANK OF MONTREAL | Open-end mortgage, assignment of rents and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |
| Buckingham Coal Company, LLC | BANK OF MONTREAL | Open-end mortgage, assignment of rents, and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |
| Buckingham Coal Company, LLC | BURR OAK REGIONAL WATER DISTRICT | Easement for Water Line Purposes | $0.00 |
| Buckingham Coal Company, LLC | CAROLYN  & JAMES GRAHAM | Release of Dower | $0.00 |
| Buckingham Coal Company, LLC | CHARLENE C. CORE | Agreement | $0.00 |
| Buckingham Coal Company, LLC | CHARLES & KATHRYN E. OWEN | Affidavit of Facts Relating to Title | $0.00 |
| Buckingham Coal Company, LLC | DIRECTV | Commercial Customer Agreement | $135.41 |
| Buckingham Coal Company, LLC | DIRECTV | Commercial Customer Agreement | $142.81 |
| Buckingham Coal Company, LLC | DIVISION OF SURFACE WATER FREDERICK &ROCHELLE DILLON | Environmental Covenant dated 2/23/2012 | $0.00 |
| Buckingham Coal Company, LLC | EDWARD MARTIN | General Warranty Covenant | $0.00 |
| Buckingham Coal Company, LLC | ESTATE OF LUTHER F. WEAVER | Real Estate Purchase Contract | $0.00 |
| Buckingham Coal Company, LLC | GMS MINE REPAIR & MAINTENANCE, INC. | Independent Labor Services Contract | $0.00 |
| Buckingham Coal Company, LLC | GRAINGER INDUSTRIAL SUPPLY | KeepStock Secure VMI Dispensing/Storage Unit Service Agreement | $0.00 |
| Buckingham Coal Company, LLC | JAMES S. AND PEGGY RICHARDS | Right of First Refusal to Purchase Real Estate | $0.00 |
| Buckingham Coal Company, LLC | OHIO E.P.A. | Environmental Covenant Dated 7/23/2013 | $0.00 |
| Buckingham Coal Company, LLC | OHIO ENVIRONMENTAL PROTECTION AGENCY | Environmental Covenant dated 1/20/2016 | $0.00 |
| Buckingham Coal Company, LLC | OHIO ENVIRONMENTAL PROTECTION AGENCY | Environmental Covenant dated 4/5/2012 | $0.00 |
| Buckingham Coal Company, LLC | OHIO ENVIRONMENTAL PROTECTION AGENCY | Environmental Covenant dated 7/25/2013 | $0.00 |
| Buckingham Coal Company, LLC | OHIO ENVIRONMENTAL PROTECTION AGENCY DIVISION OF SURFACE WATER | Environmental Covenant dated 2/24/2012 | $0.00 |
| Buckingham Coal Company, LLC | OHIO EPA | Environmental Covenant Dated 11/23/2015 | $0.00 |
| Buckingham Coal Company, LLC | OHIO OIL GATHERING CORP. II | Right of Way Easement | $0.00 |
| Buckingham Coal Company, LLC | OHIO POWER CO. | Easement | $0.00 |
| Buckingham Coal Company, LLC | PEABODY DEVELOPEMENT COMPANY | Assignment of Easement | $0.00 |
| Buckingham Coal Company, LLC | PEABODY DEVELOPEMENT COMPANY KATHRYAN & CHARLES OWEN JR. | Assignment of Easement | $0.00 |
| Buckingham Coal Company, LLC | TIMLER VIRGINIA L ETAL | Easement Agreement | $0.00 |
| Buckingham Coal Company, LLC | U.S. BANK NATIONAL ASSOCIATION | Mortgage, assignment of rents and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |
| Buckingham Coal Company, LLC | U.S. BANK NATIONAL ASSOCIATION | Mortgage, assignment of rents and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |
| Buckingham Coal Company, LLC | U.S. BANK NATIONAL ASSOCIATION | Mortgage, assignment of rents and revenues, assignment of as-extracted collateral, security agreement, financing statement and fixture filing | $0.00 |

**<u>Exhibit B</u>**

**Bremer Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) | Case No. 18-35672 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF STEVEN BREMER**
**IN SUPPORT OF THE WLB DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER APPROVING THE SALE OF**
**THE BUCKINGHAM MINE TO CCU COAL AND CONSTRUCTION, LLC**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

I, Steven Bremer, hereby declare under penalty of perjury as follows:

1.      I am a Partner of Centerview Partners LLC ("Centerview") an investment banking firm which has its principal office at 31 West 52nd Street, New York, New York 10019.  I submit this declaration (the "Declaration") in support of the relief requested in the *WLB Debtors' Motion for Entry of an Order Approving the Sale of the Buckingham Mine to CCU Coal and Construction, LLC Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Motion")[2].

2.      Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief, or opinion; information that I have received from the WLB Debtors' employees or advisors and/or employees of Centerview working directly with

---

[1]     Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]     Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the Motion.

me or under my supervision, direction, or control; or from the WLB Debtors' records maintained in the ordinary course of their business.  As a professional retained by the WLB Debtors,[3] Centerview is charging for services provided in this matter, including certain fees for sale transactions, but I am not being specifically compensated for providing this Declaration or testimony.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the WLB Debtors

## Qualifications

3.      I am a Partner of Centerview in its Debt Advisory and Restructuring Group, which I joined in 2014.  Centerview is a full-service independent investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring, across a broad range of industries.  Centerview and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

4.      I personally have over 11 years of experience advising and executing financing and restructuring transactions and mergers and acquisitions.  My experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations.  Prior to joining Centerview, I was as a director at Millstein & Co. and a vice president at Miller Buckfire & Co. I graduated from the University of Virginia with a M.S. and B.S. in Systems Engineering and the University of Pennsylvania's Wharton School with a M.B.A

---

[3]     On November 14, 2018, the Bankruptcy Court entered the *Order Authorizing the Retention and Employment of Centerview Partners LLC as Financial Advisor and Investment Banker for the Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date* [Docket No. 494].

**The Proposed Sale**

5.      On November 15, 2018, the Court entered an order [Docket No. 519] (the "Bidding Procedures Order") approving bidding procedures with respect to the sale of substantially all of the WLB Debtors' assets.  The Bidding Procedures Order authorized the WLB Debtors to market their Non-Core Assets for sale (the "Non-Core Asset Marketing Process") separately from the Auction of the Core Assets.[4]  As described in the Bidding Procedures Motion, the Non-Core Asset Marketing Process began in August 2018, and it will continue through the date of the Auction.

6.      One of the Non-Core Assets is the "Buckingham Mine," which is an active thermal coal mine located in Perry County, Ohio.  The Buckingham Mine is owned by Buckingham Coal Company, LLC, a WLB Debtor.  The Buckingham Mine conducts underground room and pillar mining operations and has a preparation plant in Corning, Ohio.  Approximately 170 employees are currently employed at the Buckingham Mine.   The Buckingham Mine supplies coal to American Electric Power Company, Inc. ("AEP") under a long-term coal supply agreement that will expire as of December 31, 2019.

7.      The "Oxford Assets" are currently owned by Oxford Mining Company, LLC (and its subsidiaries), an Ohio limited liability company, and a WMLP Debtor.  These assets comprise fifteen different coal mines located near each other in Ohio and Kentucky.  Seven of the mines are active, and eight are in reclamation.  All fifteen mines would be transferred to the Buyer if the Oxford Option is exercised.  Approximately 286 employees are currently employed at the Oxford Assets.

---

[4]   Pursuant to the Bidding Procedures Order, to the extent any Non-Core Assets are not sold prior to the Auction, such Non-Core Assets will be included in the Auction.

8.     The Oxford Assets are subject to a separate ongoing sale process being conducted by the WMLP Debtors, which process is being overseen by the conflicts committee of Westmoreland Resources GP, LLC (the "WMLP Conflicts Committee").  For the avoidance of doubt, the Oxford Option contemplated by the Motion does not prohibit Buyer from participating in the WMLP Debtors' sale process for the Oxford Assets.  The Oxford Option is only exercisable by the Oxford Acquirer to the extent such entity acquires the Oxford Assets; if Buyer (or any party other than the Oxford Acquirer) is ultimately successful in purchasing the Oxford Assets directly from the WMLP Debtors pursuant to that separate sale process, the Oxford Option would simply not be exercisable by the Oxford Acquirer.

## The Proposed Private Sale Should Be Approved

9.     Centerview, on behalf of the WLB Debtors, began marketing the Buckingham Mine as part of its Non-Core Asset Marketing Process starting in August 2018.  Centerview reached out to a broad list of potential buyers consisting of 37 parties, including financial and strategic buyers. Despite running a comprehensive marketing process, the Buyer's proposal was the only proposal that the WLB Debtors received to acquire the Buckingham Mine that offered both the assumption of significant reclamation liabilities and a cash payment to the WLB Debtors.  Importantly, since the coal supply agreement with AEP expires on December 31, 2019 and is not expected to be renewed or replaced, the principal value of the Buckingham Mine is driven by cash flows generated in 2019.  It is for this reason that the WLB Debtors believe the value of the Buckingham Mine to potential buyers will significantly decline throughout 2019.  In addition, since the Buyer will assume the Buckingham Mine's reclamation obligations, the WLB Debtors will avoid the significant costs to perform this reclamation work in the coming years.  Furthermore, since the

4

Buyer has completed its due diligence and has long standing experience with owning and operating coal mines in Ohio, including the Oxford Assets, the WLB Debtors believe that they will be able to expeditiously close the proposed sale.  For all the reasons listed above, I believe that the proposed sale of the Buckingham Mine to the Buyer represents the highest and best offer for these assets.

10.    A core component of the Purchase Agreement is the Oxford Option.  As described in detail in the Purchase Agreement, any transaction pursuant to the Oxford Option must close on or before April 30, 2019.  To the extent the Oxford Acquirer obtains the Oxford Assets from the WMLP Debtors, the Oxford Acquirer would have the option to sell the Oxford Assets to the Buyer, and if the Oxford Option is exercised, the Oxford Acquirer would pay the Option Transfer Price to the Buyer, with $3 million of this price being paid at the closing of the Oxford Option transaction, and the remaining balance when the surety bonding is replaced.  Given the potential synergies between the Buckingham Mine and the Oxford Assets, the WLB Debtors negotiated the Oxford Option with the Buyer in order to facilitate potential value-maximizing transactions in the future.  The Oxford Option provides flexibility for the Oxford Acquirer to put the Oxford Assets to the Buyer on the terms and conditions set forth in the Purchase Agreement.  This preserves optionality for the Oxford Acquirer to (a) sell the Oxford Assets to Buyer, (b) negotiate a higher or otherwise better offer to sell the Oxford Assets to a third party purchaser, or (c) keep the Oxford Assets.  As explained above, the Oxford Option is only exercisable to the extent the Oxford Acquirer obtains the Oxford Assets, and does not prevent Buyer (or any party) from participating in the sale process for the Oxford Assets being overseen by the WMLP Conflicts Committee.

11.     Accordingly, for all of the foregoing reasons, I believe that the Purchase Agreement maximizes the value received for the assets being sold and is consistent with the WLB Debtors' reasonable business judgment.


[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  December 21, 2018                    /s/ *Steven Bremer*
                                                            Steven Bremer
                                                            Partner
                                                            Centerview Partners LLC