## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Westmoreland Coal Company, et al.,[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

**EXPEDITED MOTION OF WESTMORELAND RESOURCE PARTNERS, LP AND ITS SUBSIDIARIES FOR ENTRY OF (I) AN ORDER (A) ESTABLISHING BIDDING AND SALE PROCEDURES WITH RESPECT TO THE SALE OF THE KEMMERER MINE AND SUBSTANTIALLY ALL ASSETS RELATED THERETO, (B) AUTHORIZING THE ENTRY INTO A STALKING HORSE AGREEMENT AND THE PROVISION OF STALKING HORSE PROTECTIONS, (C) SCHEDULING AN AUCTION AND SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (D) GRANTING RELATED RELIEF; AND (II) AN ORDER APPROVING THE SALE OF SUCH ASSETS AND GRANTING RELATED RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EXPEDITED RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EXPEDITED BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**A HEARING WILL BE HELD ON THIS MATTER ON FEBRUARY 4, 2019, AT 9:00 A.M. (PREVAILING CENTRAL TIME) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**EXPEDITED RELIEF IS NEEDED ON OR BEFORE FEBRUARY 13, 2019.**

---

[1]     Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

## TABLE OF CONTENTS

**Page**

Background ......................................................................................................... 2

I.    The WMLP Debtors' Businesses and the Filing of These Cases ........................... 2

II.    The Sale Process and Related Items ................................................................. 3

    A.    The Proposed Sale Transaction and Marketing Process ........................... 3

    B.    The Need for an Expedited Notice and Sale Process ................................ 6

    C.    The Deadlines Contained in the Bidding Procedures Are Reasonable and Will Provide an Adequate Opportunity for Interested Parties to Formulate and Submit Bids ...................................... 7

    D.    The Bidding Procedures Are Reasonable and Will Allow the WMLP Debtors to Identify the Highest and Best Bid for the Kemmerer Assets ................................................................................ 8

Jurisdiction ....................................................................................................... 16

Basis for Relief Requested ................................................................................. 16

I.    The Granting of the Relief Contained in the Bidding Procedures Order is Appropriate ........................................................ 16

    A.    Approval of the Bidding Procedures Is Warranted Under Section 363 of the Bankruptcy Code ......................... 16

    B.    Ability to Select a Stalking Horse Bidder ................................................ 20

    C.    The Break-Up Fee and Expense Reimbursement Each Have a Sound Business Purpose and Should Be Approved ................... 21

    D.    The Assumption/Assignment Procedures Are Appropriate .................... 25

    E.    The Proposed Notice of the Sale Hearing is Adequate and Appropriate ....................................................... 28

II.    Granting the Relief Requested in the Sale Order is Appropriate ........................ 31

    A.    The Sale Transaction Is Warranted Under Section 363 of the Bankruptcy Code ............................................ 31

    B.    Other Factors Cited by Courts Also Weigh in Favor of Approving the Sale ................................................... 33

    C.    The Kemmerer Assets are Subject to Sale Free and Clear of All Liens and Encumbrances ...................................... 37

    D.    The Sale Transaction Has Been Proposed in Good Faith and Without Collusion ...................................... 39

    E.    Assumption and Assignment of the Assigned Contracts is Warranted .................................................... 41

**TABLE OF CONTENTS**
(continued)

**Page**

F.      Waiver of Bankruptcy Rules 6004(h) and 6006(d)...................................43

Notice ...........................................................................................................................43

No Prior Request............................................................................................................44

Westmoreland Resource Partners, LP ("WMLP") and WMLP's direct and indirect subsidiaries (collectively with WMLP, the "WMLP Debtors"), as debtors and debtors in possession in the above-captioned cases, hereby request, pursuant to sections 105, 363, 365 and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 5 and Exhibit C of the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures"), the entry of the following orders:

(a)     an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A:

(i)     approving proposed bidding and sale procedures attached as Annex 1 to the Bidding Procedures Order (the "Bidding Procedures") and related Bid Deadline (as defined below) in connection with the sale (the "Sale Transaction") of the mining properties and related assets owned by WMLP Debtor Westmoreland Kemmerer, LLC (a wholly-owned subsidiary of WMLP) and Westmoreland Kemmerer Fee Coal Holdings, LLC (collectively, the "Kemmerer Assets");

(ii)     authorizing the WMLP Debtors to enter into an asset purchase agreement (such agreement, an "Asset Purchase Agreement"), the proposed form of which is attached hereto as Exhibit B (the "Form APA"), with a potential bidder, including an Asset Purchase Agreement with a possible "stalking horse" bidder (such Asset Purchase Agreement, a "Stalking Horse Agreement" and, such bidder, a "Stalking Horse Bidder"), and to pay a customary break-up fee (the "Break-Up Fee") of no more than 2.5 percent of any cash consideration included in any Stalking Horse Agreement and an expense reimbursement (the "Expense Reimbursement Amount" and, together with the Break-Up Fee, the "Stalking Horse Protections") of no more than $500,000 to any Stalking Horse Bidder in connection therewith;

(iii)     approving the date, and form and manner of notice, of an auction of the Kemmerer Assets (the "Auction") and related Sale Hearing (as defined herein), including the form and manner of notice attached hereto as Exhibit C (the "Auction and Hearing Notice") and Exhibit D (the "Publication Notice");

  (iv) establishing procedures for the assumption and assignment of executory contracts and unexpired leases ("<u>Executory Contracts</u>") in connection with the Sale Transaction, including notice of proposed cure amounts (the "<u>Assignment Procedures</u>"), and approving the form and manner of notice of the proposed assumption and assignment of Executory Contracts in the form attached hereto as <u>Exhibit E</u> (the "<u>Assumption/Assignment Notice</u>"); and

  (v) granting certain related relief as described herein;

 (b) an order (the "<u>Sale Order</u>") attached hereto as <u>Exhibit F</u>:

  (i) authorizing the Sale Transaction, free and clear of all liens, claims and encumbrances, except for certain assumed liabilities;

  (ii) authorizing the WMLP Debtors' assumption and assignment to the successful  and/or assignment of certain Executory Contracts (if any) in connection with such Sale Transaction; and

  (iii) granting such other relief as is necessary or advisable related to the foregoing.

In support of this Motion, the WMLP Debtors will submit testimony and other evidence to the Court and respectfully represent as follows:

<u>**Background**</u>

**I. The WMLP Debtors' Businesses and the Filing of These Cases**

  1. Westmoreland Coal Company ("<u>WLB</u>"), the WMLP Debtors, the other Debtors (collectively, the "<u>Debtors</u>," excluding the WMLP Debtors, the "<u>WLB Debtors</u>") and the Debtors' non-debtor affiliates operate the sixth-largest coal-mining enterprise in North America, including 19 coal mines in six states and Canada.  The Debtors primarily produce and sell thermal coal to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers.  Headquartered in Englewood, Colorado, the Debtors and their non-debtor subsidiaries employ approximately 2,971 individuals. The Debtors' revenue for the twelve-month period that ended August 31, 2018, totaled

approximately $850 million.  As of the Petition Date, the Debtors' aggregate prepetition indebtedness totaled approximately $1.1 billion.

2.     On October 9, 2018 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On October 18, 2018, the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee") (Docket No. 206).

3.     A detailed description of the Debtors' businesses and the reasons for commencing the chapter 11 cases is set forth in the Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of Chapter 11 Petitions and First Day Pleadings (Docket No. 54) (the "First Day Declaration").

## II.     The Sale Process and Related Items

### A.     The Proposed Sale Transaction and Marketing Process

4.     Due to the challenging regulatory and economic conditions facing coal companies, the Debtors' businesses have faced a marked downturn over the past several years.  In 2016, the Debtors undertook a rigorous process to evaluate possible alternatives to deleverage their capital structure.

5.     Prior to the Petition Date, the WMLP Debtors engaged various professionals to assist in the exploration and analysis of strategic alternatives, including Lazard Freres & Co., LLC ("Lazard") as financial advisors.[2]  With their assistance, the WMLP Debtors

---

[2]     On November 14, 2018, the Court entered the *Order Authorizing the Retention and Employment of Lazard Freres & Co. LLC as Financial Advisor and Investment Banker for the Conflicts Committee of the*

developed and negotiated with WMLP's term loan lenders and WLB a sale protocol for the

WMLP Debtors' assets.  The Debtors finalized the protocol in June 2018.  Immediately

thereafter, the WMLP Debtors and Lazard began operating thereunder to locate a suitable buyer

for the Kemmerer Assets.

      6.      After completing the WMLP Debtors' business plan in late July 2018,

the WMLP Debtors began the process of soliciting interest from potential third party purchasers.

Lazard launched "Phase I" of the formal sale process on August 7, 2018.  At that time, Lazard

reached out to 29 potentially interested parties, consisting primarily of strategic coal mining

companies, as well as other buyers who expressed interest in considering the purchase of all or a

substantial portion of the WMLP Debtors' assets.  As part of "Phase I" of this process, 12 of

those parties contacted entered into non-disclosure agreements and were provided with a

confidential information memorandum, financial projections and access to an online data room

with substantial due diligence information.  Lazard received eight Phase I bids.  Thereafter,

in early October 2018, Lazard moved five bidders into "Phase II" for further evaluation of the

WMLP Debtors' assets, while also continuing to engage additional potentially interested buyers.

Of the five bidders moved into Phase II (and one additional bidder added later), three bidders

submitted bids to purchase all of the WMLP Debtors' assets; one bidder sought to purchase just

the assets of Oxford Mining Company LLC (the "Oxford Mining Assets"); and two bidders

sought contracts to operate certain of the mining properties.  By the completion of Phase II,

Lazard had contacted a total of 36 potentially interested parties.  Thereafter, Lazard received a

---

*Westmoreland Resources GP, LLC Board of Directors and for Westmoreland Resource Partners, LP and Its Subsidiaries Effective, as of the Petition Date* (Docket No. 492).

Although Lazard was retained to perform activities related to the sale process, they were originally retained by the Conflicts Committee in August 2017 to evaluation strategic alternatives for the WMLP Debtors.

credit bid from the MLP Secured Lenders (as defined in the Final Cash Collateral Order) only for the Kemmerer Assets.  To date, Lazard has contacted a total of 44 potentially interested parties, 23 of whom have executed non-disclosure agreements and received a confidential information memorandum, financial projections and access to an online data room with substantial due diligence information to obtain additional information about the WMLP Debtors' asset.  Four parties submitted bids for the Kemmerer Assets.  Of these four bidders, three continue to actively consider potentially purchasing the Kemmerer Assets.

7.      As a part of, and throughout, this marketing process, the WMLP Debtors and Lazard have responded (and will continue to respond) to interested parties' diligence requests, including numerous conversations with potential buyers regarding the potential sale of the WMLP Debtors' assets.  Such conversations included discussions with parties interested in a going-concern transaction as well as parties interested in a select subset of the WMLP Debtors' assets and liquidation-oriented transactions.

8.      The WMLP Debtors have been negotiating with multiple bidders for the Kemmerer Assets in parallel with the WMLP Debtors' negotiations for the sale of their Oxford Mining Assets.  The WMLP Debtors expect to complete the negotiations on the sale of the Kemmerer Assets and designate a stalking horse bidder in the near term (and no later than February 7, 2019).  Given the WMLP Debtors' expectation that they will finalize a stalking horse agreement in the near term, the WMLP Debtors have determined, in consultation with their professionals, that implementing the Bidding Procedures and providing a definite deadline for potential bids and an Auction is the best method to obtain bids for the Kemmerer Assets that will maximize the value of the WMLP Debtors' estates.

B.     **The Need for an Expedited Notice and Sale Process**

9.     The WMLP Debtors have filed this Motion (even without a definitive stalking horse agreement) on an expedited basis to ensure the WMLP Debtors are able to complete the sale of the Kemmerer Assets in a timely manner.  Among other items, the WMLP Debtors' consensual use of cash collateral is dependent upon the WMLP Debtors' meeting certain sale "milestones."[3]  These milestones include the WMLP Debtors (a) filing a motion to establish bidding procedures and approving the sale of certain assets by January 25, 2019; (b) obtaining entry of an order approving the bidding procedures by February 15, 2019; (c) holding an auction, if necessary, to sell the assets by March 7, 2019; (d) obtaining entry of an order approving the sale of the assets by March 11, 2019; and (e) closing the sale of the assets by March 15, 2019. See Final Cash Collateral Order (as amended), at ¶ 7(a).

10.     The WLB Debtors' confirmation schedule is another reason the WMLP Debtors decided to proceed with the sale of the Kemmerer Assets on an expedited timeline. A confirmation hearing on the WLB Debtors' plan is scheduled for February 13, 2019.  Although the WLB Debtors and the WMLP Debtors' bankruptcy cases are moving on separate tracks, the two sets of entities are interrelated in certain key respects; among other items, the WLB Debtors employ all of the employees who work at the WMLP Debtors' properties and generally maintain the back office systems on which the WMLP Debtors' business operates.  As such, if this Court confirms the WLB Debtors' plan and it goes effective, the purchaser of the WLB Debtors' assets will need to provide the WMLP Debtors with continued management and back

---

[3]     The "Final Cash Collateral Order" refers to the *Final Order (I) Authorizing the MLP Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Certain Protections to Prepetition Lenders Pursuant to 11 U.S.C. § 105, 361, 362, 363, and 507, (III) Modifying the Automatic Stay and (IV) Granting Related Relief*, entered by the Bankruptcy Court on November 15, 2018 (Docket No. 521), as amended by stipulation entered by the Bankruptcy Court on December 22, 2018 (Docket No. 877) and on January 15, 2019 (Docket No. 1042).

office support pending the closing of the sales of the Kemmerer Assets and the Oxford Mining

Assets.  The WMLP Debtors (and based upon information and belief, the WLB Debtors) believe

it is in their interests to (a) minimize the timeframe for which the WMLP Debtors' estates require

support from the purchaser of the WLB Debtors' assets and (b) to transition the WLB Debtors'

employees working at the WMLP Debtors' mines to a purchaser in an efficient and coordinated

fashion.

      **C.**     **The Deadlines Contained in the Bidding
Procedures Are Reasonable and Will Provide an Adequate
Opportunity for Interested Parties to Formulate and Submit Bids**

      11.     In formulating the procedures and time periods, the WMLP Debtors had

two principal objectives:  (a) providing adequate and appropriate notice to parties in interest and

to potential purchasers; and (b) efficiently selling the Kemmerer Assets.  The WMLP Debtors

believe the Bidding Procedures achieve both of these objectives under the facts and

circumstances of these cases.  Given the extensive marketing efforts the WMLP Debtors have

undertaken prior to the filing of this Motion (in fact, the WMLP Debtors' marketing of their

assets began several months prior to the filing of these chapter 11 cases), the WMLP Debtors

have already made substantial information regarding the Kemmerer Assets available to the likely

pool of potential purchasers.  Based upon these substantial marketing efforts, the WMLP Debtors

believe that any potential purchaser who may have an interest in bidding at the Auction already

has most, if not all, of the diligence and other information necessary to formulate a bid.

Furthermore, potential bidders will have access to additional updated information prepared by

the WMLP Debtors and their advisors and a substantial body of information, including financial

projections and an extensive data room, in addition to information gathered specifically based

upon the due diligence requests of several potential buyers.  Thus, the slightly truncated timeline

in the Bidding Procedures will prevent no party interested and capable of purchasing the

Kemmerer Assets from submitting a bid.

12.    The key dates the WMLP Debtors will utilize in connection with the Sale

Transaction are as follows:

| EVENT | DATE |
|---|---|
| Deadline to file Cure Schedule | February 7, 2019 |
| Stalking Horse Deadline | February 7, 2019 |
| Bid Deadline | February 15, 2019 |
| Auction Date | February 19, 2019 |
| Assignment and Cure Objection Deadline | February 21, 2019 |
| Objection Deadline | February 21, 2019 |
| Supplemental Objection Deadline | February 25, 2019 |
| Sale Hearing | February 28, 2019 |

**D.    The Bidding Procedures Are Reasonable and Will Allow the WMLP
Debtors to Identify the Highest and Best Bid for the Kemmerer Assets**

13.    The WMLP Debtors designed the Bidding Procedures to maximize value

for the WMLP Debtors' estates.  The WMLP Debtors believe the Bidding Procedures will enable

the WMLP Debtors to review, analyze and compare all bids received to determine which bid is

in the best interests of the WMLP Debtors' estates and creditors.  The Bidding Procedures

describe, among other things, the procedures for parties to access due diligence, the manner in

which bidders and bids become "qualified," the receipt and negotiation of bids received,

the conduct of any auction, the selection and approval of any ultimately successful bidder,

and the deadlines with respect to the foregoing Bidding Procedures.  The WMLP Debtors submit

that the Bidding Procedures afford the WMLP Debtors a sufficient opportunity to pursue a sale process that will maximize the value of their estates.

14. As described further below, the Bidding Procedures will permit the WMLP Debtors, as they deem necessary and appropriate in the prudent exercise of their business judgment (and in consultation with the Consultation Parties (as defined below)), to enter into one or more typical agreements with, and to grant certain typical Stalking Horse Protections to, a Stalking Horse Bidder.

15. The WMLP Debtors have structured the Bidding Procedures, and the expedited relief this Motion seeks, in a manner that complies with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules and Complex Case Procedures. Further, the Bidding Procedures are designed to allow the WMLP Debtors to efficiently consummate a Sale Transaction that maximizes value and provides an opportunity to preserve jobs and other commercial relationships. These Bidding Procedures provide this framework and will enable the WMLP Debtors to review, compare and determine which bids are in the best interests of their estates and their creditors. The WMLP Debtors respectfully submit that the Bidding Procedures are necessary to, and will assist them in and promote, their efforts to complete a sale of the Kemmerer Assets.

16. The following is a summary of the major components of the WMLP Debtors' proposed Bidding Procedures:[4]

---

[4] The summaries of the material terms of the Bidding Procedures set forth below are qualified in their entirety by the specific terms and conditions of the Bidding Procedures. To the extent there exists any inconsistency between these summaries and the Bidding Procedures, the Bidding Procedures shall govern.

Capitalized terms used but not defined herein are either defined later in this tale or have the meanings given to them in the Bidding Procedures.

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Participation Requirements** | The Bidding Procedures detail certain requirements to participate in the bidding process, including, among other things, the execution of a confidentiality agreement.  Each party meeting these requirements, set forth in full in the Bidding Procedures, has been or will be deemed a "Potential Bidder."  The WMLP Debtors have provided or will provide all such Potential Bidders access to the Data Room (as defined below) as well as an electronic copy of any Stalking Horse Agreement or the Form APA, as applicable. |
| **Due Diligence** | The WMLP Debtors have established a confidential electronic data room (the "Data Room") containing due diligence materials relating to the Kemmerer Assets.  Until the Bid Deadline, in addition to access to the Data Room, the WMLP Debtors will provide any Potential Bidder such due diligence access or additional information as the WMLP Debtors determine to be reasonable and appropriate in the circumstances.  A Potential Bidder's access to additional due diligence will cease if (a) the Potential Bidder does not become a Qualified Bidder by the Bid Deadline; or (b) after consultation with the Consultation Parties, the bidding process is terminated.  The "Consultation Parties" consist of the following:  (i) counsel or financial advisors to the Creditors' Committee and (ii) counsel or financial advisors to the MLP Secured Lenders. |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Stalking Horse Designation and Stalking Horse Deadline** | The WMLP Debtors shall have until February 7, 2019 (the "Stalking Horse Deadline") to designate a Potential Bidders as Stalking Horse Bidder and enter into a Stalking Horse Agreement therewith.  Promptly after entering into any Stalking Horse Agreement, the WMLP Debtors shall file such Stalking Horse Agreement with the Bankruptcy Court and serve a copy thereof by overnight mail on (a) all parties that have filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (b) any other parties that have been identified by the WMLP Debtors, in their discretion, as a party who should receive such notice. Upon and after the designation of a Stalking Horse Bidder, the WMLP Debtors will continue soliciting interest from and assisting Potential Bidders in all regards related to the Sale Transaction.  For the avoidance of doubt, if the WMLP Debtors do not designate a Stalking Horse Bidder prior to the Stalking Horse Deadline, potential bidders will be able to submit Qualified Bids (as defined below) prior to the Bid Deadline (as defined below). |
| **Stalking Horse Protections** | A Stalking Horse Agreement may include Stalking Horse Protections, including (a) the Break-Up Fee of no greater than 2.5 percent of cash consideration to be paid thereunder, (b) an Expense Reimbursement Amount of actual and reasonable third-party expenses incurred in connection with entering into the Stalking Horse Agreement not to exceed $500,000 and (c) establishment of minimum overbid increments for use at the Auction. |
| **Bid Deadline** | February 15, 2019 at 4:00 p.m. (prevailing Central Time) (the "Bid Deadline"). |

- 11 -

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Bid Requirements** | To be a "<u>Qualified Bid</u>" (and such Potential Bidder submitting such bid, a "<u>Qualified Bidder</u>") a bid must meet the requirements enumerated in the Bidding Procedures, including, among other things, the following:  (a) identifying the Executory Contracts to be purchased and providing evidence satisfactory to the WMLP Debtors of the Potential Bidder's ability to provide adequate assurance of future performance of such agreements; (b) written evidence of available cash, commitment for financing or such other evidence of ability to consummate the transaction contemplated by the Potential Bidder; (c) providing a mark-up of the form of asset purchase agreement and proposed sale order against either the Stalking Horse Agreement and proposed sale order (if any) or the Form APA and Sale Order, attached hereto; (d) for the purchase of any coal mining properties, contemplating the transfer of the relevant permits or obtaining overlapping permits and the replacement of the WMLP Debtors' financial assurance/reclamation surety bonds that are associated with such permits; (e) providing evidence of sufficient financial resources to consummate a Sale Transaction, including with respect to any financial assurance/reclamation surety bonds; and (f) providing for consideration that is higher or better than the consideration provided for by a Stalking Horse Agreement, if any, taking into account the Break-Up Fee and Expense Reimbursement Amount (if any).  Any bid made pursuant to a Stalking Horse Agreement (a "<u>Stalking Horse Bid</u>") is deemed a Qualified Bid for the Kemmerer Assets and such Stalking Horse Bidder, a Qualified Bidder. |
| **Bid Deposit** | Each Qualified Bidder is required to deposit with the WMLP Debtors a cash deposit equal to $2.5 million (any such deposit, a "<u>Good Faith Deposit</u>"). |
| **Determination of Qualified Bids** | The WMLP Debtors, in their discretion and after consultation with the Consultation Parties, will determine whether a bid received from a Potential Bidder for the Kemmerer Assets constitutes a Qualified Bid and whether a Potential Bidder that submits such a bid will be considered a Qualified Bidder. |

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Considerations in Comparing and Valuing Bids** | The Bidding Procedures detail certain bid information to be considered in comparing the value of proposed bids.  These considerations, fully detailed in the Bidding Procedures, will aid the WMLP Debtors in determining whether the terms of a particular bid for the Kemmerer Assets are materially more burdensome or conditional than the terms of another bid. These considerations are aimed at uncovering the bid that is highest and/or best based on the WMLP Debtors' unique circumstances. |
| **Auction** | If the WMLP Debtors receive at least two Qualified Bids (including any Stalking Horse Bid) for the Kemmerer Assets, the WMLP Debtors will conduct an Auction. |
| **Time, Place and Conduct of an Auction** | If necessary, an Auction will take place at the offices of conflicts counsel to the WMLP Debtors, Jones Day, 717 Texas Avenue, Suite 3300, Houston, Texas 77002-2712, at 9:00 a.m. (prevailing Central Time) on the auction date (i.e., February 19, 2019), or such other time and place as the WMLP Debtors, after consultation with the Consultation Parties, may determine.  If only one Qualified Bid (including any Stalking Horse Bid) for the Kemmerer Assets is received, the Auction for the Kemmerer Assets will be cancelled and the Qualified Bid received will be designated the Successful Bid (as defined below) for the Kemmerer Assets. |
| **Baseline Bids** | If more than one Qualified Bid (including any Stalking Horse Bid) is received and thus an Auction is necessary, the WMLP Debtors, after consultation with the Consultation Parties, will select what they determine to be the highest and/or best Qualified Bid (the "Baseline Bid") for the Kemmerer Assets to serve as the starting point at the Auction.  At least one day prior to the Auction, the WMLP Debtors will provide copies of the Baseline Bid to all Qualified Bidders. |
| **Rules of the Auction** | After consultation with the Consultation Parties, the WMLP Debtors may at any time adopt rules for the Auction that the WMLP Debtors reasonably determine to be appropriate to promote the goals of the bidding process, including one or more adjournments of the Auction.  The rules of the Auction will be announced on the record at the outset of the Auction. |

NAI-1506170930v8

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Bidding at an Auction** | At the Auction, participants will be permitted to increase their initial Qualified Bids and improve their terms; provided, that, any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply).  The WMLP Debtors will announce the bidding increments for bids (the "Minimum Overbid") and other auction rules at the outset of the Auction with respect to the Kemmerer Assets.  For the purpose of evaluating the value of the consideration provided by additional bids, the WMLP Debtors will take into account any Stalking Horse Protections that may be payable to a Stalking Horse Bidder under a Stalking Horse Agreement, if necessary. |
| | The WMLP Debtors will conduct the Auction on an open basis and shall not require any Qualified Bidders to submit their last and final bids on a "blind" basis. |
| **Designation of Successful Bid and Alternate Bid(s)** | After determining which Qualified Bids represent the best bids for the Kemmerer Assets in consultation with the Consultation Parties, the WMLP Debtors will designate such as the "Successful Bid" and the bidder as the "Successful Bidder."  As described in the Bidding Procedures, the WMLP Debtors may also determine, in their reasonable business judgment, after consultation with the Consultation Parties, which Qualified Bid is the next best bid for the Kemmerer Assets (the "Alternate Bid"). |
| **Acceptance of Successful Bids** | The WMLP Debtors will be deemed to have accepted a Successful Bid only when an asset purchase agreement has been executed and such bid has been approved by entry of the applicable Sale Order.  If a Successful Bidder does not close the applicable Sale Transaction contemplated by the applicable Successful Bid by the date agreed to by the WMLP Debtors and such Successful Bidder, then the WMLP Debtors will be authorized, but not required, to close with the party that submitted the Alternate Bid, pursuant to the applicable Sale Order. |
| **Successful Bid Notice** | Following the designation of a Successful Bid, the WMLP Debtors will file a notice of the Successful Bid, along with copies of the proposed asset purchase agreement and Sale Order, marked to show changes from the Stalking Horse Agreement and Sale Order or Form APA and Sale Order, as applicable (a "Successful Bid Notice"). |

- 14 -

| PROVISION | SUMMARY DESCRIPTION |
|---|---|
| **Sale Hearing and Objections** | Parties must (a) file any objections to the approval of the Sale Transaction no later than February 21, 2019, for all general objections to the Sale Transaction (i.e., the Objection Deadline (as defined below)); and (b) file any objection on or before February 25, 2019 solely for any issues specific to the Successful Bidder (including the revised form of Asset Purchase Agreement and proposed Sale Order).<br><br>At the hearing to approve the Sale Transaction (the "Sale Hearing"), the WMLP Debtors will seek the entry of the Sale Order approving, among other items, the sale of the Kemmerer Assets to the Successful Bidder pursuant to the terms and conditions set forth in the Successful Bid.  The Sale Hearing may be adjourned or rescheduled by the WMLP Debtors in their discretion (after consultation with the Consultation Parties) without notice or with limited and shortened notice to parties. |
| **Return of Good Faith Deposit** | The Good Faith Deposits will be held in escrow by the WMLP Debtors and while held in escrow will not become property of the WMLP Debtors' bankruptcy estates unless released from escrow pursuant to further order of the Court or upon a breach by a Successful Bidder of the Successful Bid agreement.  The WMLP Debtors will retain the Good Faith Deposit of the Successful Bidder until the closing of the Sale Transaction unless otherwise ordered by the Court.  The Good Faith Deposits of the other Qualified Bidders will be returned on the fifth business day following the entry of the Sale Order. At the closing of the Sale Transaction, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit against the cash purchase price. |

| Provision | Summary Description |
|---|---|
| **Right to Credit Bid of MLP Secured Lenders** | The MLP Secured Lenders shall be entitled to credit bid, subject to section 363(k) of the Bankruptcy Code, on a dollar-for-dollar basis (a) up to the full amount of the outstanding MLP Secured Obligations, (b) the Adequate Protection Obligations, including the Adequate Protection Superiority Claim (as such terms are defined in the Final Cash Collateral Order) and (c) any unpaid amounts due and owing under the Final Cash Collateral Order.  Any credit bid shall constitute a Qualified Bid (and, thus, the MLP Secured Lenders shall be considered Qualified Bidders) and shall be treated as the equivalent of a cash bid.

The MLP Secured Lenders may participate in the Auction and increase any credit bid in the same manner as the other Qualified Bidders in compliance with the Bidding Procedures. |
| **Modification of Bidding Procedures** | The WMLP Debtors may amend the Bidding Procedures or the bidding process at any time, and from time to time, in any manner that they determine in good faith will best promote the goals thereof, including extending or modifying any of the dates described therein or the information and material required from Qualified Bidders. |

### Jurisdiction

17.     The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Basis for Relief Requested

**I.     The Granting of the Relief Contained in the Bidding Procedures Order is Appropriate**

**A.     Approval of the Bidding Procedures Is Warranted Under Section 363 of the Bankruptcy Code**

18.     The WMLP Debtors believe that the proposed Bidding Procedures (including the proposed Bid Deadline) provide an appropriate framework for selling the Kemmerer Assets and will enable the WMLP Debtors to fully review, analyze and compare all

- 16 -

bids received to determine which bid is in the best interests of the WMLP Debtors' estates. Courts have recognized that employing a competitive bidding process is the best way to establish the value of an estate's assets.  See In re FPMC Austin Realty Partners, LP, 573 B.R. 679, 688 (Bankr. W.D. Tex. 2017) (noting that property is often sold in bankruptcy cases pursuant to an auction, because "an auction is usually the best way to encourage those bidders to increase the ultimate purchase price"); Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999) (stating, with respect to the disposition of estate assets in bankruptcy, that "the best way to determine value is exposure to a market") (citation omitted); see also Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) ("[S]ection 363(b) sale transaction does not require an auction procedure, … the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

19.     Section 363(b) of the Bankruptcy Code provides the necessary authority for a debtor to sell its assets, stating:  "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  While section 363(b) of the Bankruptcy Code contains no specific standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts in this District and elsewhere have required that the authorization of such use, sale or lease of property of the estate out of the ordinary course of business be based upon a valid "business justification."  See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (stating that to satisfy section 363(b) of the Bankruptcy Code, "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); see also In re

Gulf Coast Oil Corp., 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009) (observing that courts "universally refer to 'business justification', and 'business judgment'" in determining whether to approve asset sales under section 363(b) of the Bankruptcy Code); In re 9 Houston LLC, 578 B.R. 600, 610 (Bankr. S.D. Tex. 2017) ("[T]he debtor must articulate a sound business reason for the proposed sale and prove that the sale is in the best interest of the estate."); In re Deep Marine Holdings, Inc., No. 09-3913, 2010 WL 5125278, at *4 (Bankr. S.D. Tex. June 2, 2010) (approving sale because debtors exercised "sound business judgment" in entering into a sale transaction outside of the ordinary course of business); accord Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business).

20.     A sound business justification for the sale of a debtor's assets outside the ordinary course of business exists when a proposed sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See, e.g., Lionel, 722 F.2d at 1070.  Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing Paramount Commc'ns Inc. v. QVC Network Inc., 637 A.2d 34, 45 n.17 (Del. 1994)); accord Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company") (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)); <u>In re Johns Manville Corp.</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); <u>see also</u> <u>In re Idearc Inc.</u>, 423 B.R. 138, 162 (Bankr. N.D. Tex. 2009) (explaining that, "[i]n the absence of a showing of bad faith or an abuse of business discretion, "the court will not alter a debtor's business judgment, while analyzing a debtor's decision to assume/reject contracts).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be authorized under section 363(b)(1) of the Bankruptcy Code.

21.     The WMLP Debtors developed the Bidding Procedures in consultation with Lazard, their other Professionals and the WMLP Lenders (as defined in the Final Cash Collateral Order).  The  Bidding Procedures allow the WMLP Debtors and Lazard to continue to market the Kemmerer Assets, while providing the WMLP Debtors with appropriate flexibility, including the entry into a Stalking Horse Agreement prior to the Auction, to maximize the value the Kemmerer Assets within the time constraints of these cases described above.  After consultation with Lazard and their other professionals, the WMLP Debtors determined that the Bidding Procedures, together with the nearly six month sale process Lazard has conducted and will continue to conduct until the Bid Deadline, will provide an adequate opportunity for any parties capable and interested in purchasing the Kemmerer Assets to bid on them.  Because the WMLP Debtors intend to choose the highest or otherwise best offer for the Kemmerer Assets, the Bidding Procedures will help ensure that the WMLP Debtors' estates maximize the value of

the Kemmerer Assets.  Notably, the proposed Bidding Procedures will allow all stakeholders to openly determine which offer maximizes the value of the Kemmerer Assets.

22.     Similar procedures have been approved by this Court in other complex chapter 11 cases.  See, e.g., In re Cobalt Int'l Energy, Inc., No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (approving similar bidding procedures); In re EMAS CHIYODA Subsea Ltd., No. 17-31146 (MI) (Bankr. S.D. Tex. Apr. 24, 2017) (same); In re Vanguard Nat. Res., LLC, No. 17-30560 (MI) (Bankr. S.D. Tex. Apr. 13, 2017) (same); In re Sherwin Alumina Co., LLC, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Mar. 16, 2016) (same); In re Luca Int'l Grp., LLC, No. 15-34221 (DRJ) (Bankr. S.D. Tex. Feb. 1, 2016) (same); In re RAAM Global Energy Co., No. 15-35615 (MI) (Bankr. S.D. Tex. Dec. 2, 2015) (same); In re BPZ Res., Inc., No. 15-60016 (DRJ) (Bankr. S.D. Tex. June 12, 2015) (same).

23.     Accordingly, the WMLP Debtors submit approval of the Bidding Procedures is appropriate, and the WMLP Debtors should be authorized to sell the Kemmerer Assets in accordance therewith, subject to the Bankruptcy Court's review and approval of the specific terms of each Sale Transaction at the Sale Hearing.

**B.     Ability to Select a Stalking Horse Bidder**

24.     To incent potential bidders and thereby maximize the potential value of the Kemmerer Assets for the benefit of the WMLP Debtors' estates, the WMLP Debtors request that they be authorized, but not directed, to execute a Stalking Horse Agreement with a bidder (a "Stalking Horse Bidder") in connection with the proposed sale of the Kemmerer Assets, on or before the Stalking Horse Deadline.  The flexibility to execute a Stalking Horse Agreement and designate a stalking horse bid (a "Stalking Horse Bid") will provide the WMLP Debtors with an additional tool to ensure the sale process results in the best possible outcome for the WMLP Debtors and their estates.  Any such Stalking Horse Agreement will be a Qualified Bid and the

WMLP Debtors will provide notice of such Stalking Horse Bidder, Stalking Horse Agreement and Stalking Horse Bid as outlined in the Bidding Procedures.

### C. The Break-Up Fee and Expense Reimbursement Each Have a Sound Business Purpose and Should Be Approved

25.     To the extent the WMLP Debtors enter into a Stalking Horse Agreement, it is appropriate to provide the Stalking Horse Bidder with the proposed Stalking Horse Protections.  The anticipated Stalking Horse Protections would provide for a Break-Up Fee in the amount of 2.5 percent of the cash consideration to be provided under the Stalking Horse Agreement.  In addition, the WMLP Debtors would provide an expense reimbursement in an amount no greater than $500,000 for a Stalking Horse Bidder's reasonably and actually-incurred third party expenses in connection with executing the Stalking Horse Agreement.  A Stalking Horse Bidder would receive payment of the Stalking Horse Protections upon the consummation of a transaction other than with the Stalking Horse Bidder.  Based on market standards and communications with potential bidders regarding the Kemmerer Assets, the WMLP Debtors believe the Stalking Horse Protections will be necessary to induce any potential bidder to execute a Stalking Horse Agreement.  A Stalking Horse Agreement will benefit the estate by ensuring the WMLP Debtors will receive a minimum amount of consideration for the Kemmerer Assets, while, at the same, giving the WMLP Debtors an opportunity to increase the consideration that their estates will receive for those assets.  In  addition, the WMLP Debtors believe that a Stalking Horse Agreement may benefit the estate by establishing a baseline value for the Kemmerer Assets and potentially attract other potential buyers.

26.     As noted above, the WMLP Debtors intend to negotiate any Stalking Horse Agreement at arm's-length and in good faith and will enter into a Stalking Horse Agreement with a Stalking Horse Bidder only if the WMLP Debtors believe it will maximize the

value of the Kemmerer Assets.  Thus, the authorization for the WMLP Debtors to offer the Stalking Horse Protections to the Stalking Horse Bidder is justified.

27.     Approval of the Stalking Horse Protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of Stalking Horse Protections in the bankruptcy context.  Courts have identified at least two instances in which Stalking Horse Protections may benefit the estate.[5]  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (hereinafter, "O'Brien"); see also In re TriDimension Energy L.P., No. 10-33565, 2010 WL 5209233, at *2 (Bankr. N.D. Tex. Oct. 29, 2010) (noting that the proposed Stalking Horse Protections, which were necessary to induce a stalking horse bid, were "part of an extensive process undertaking by the Debtors and

---

[5]     To date, the Fifth Circuit does not appear to have conclusively adopted a test for determining whether Stalking Horse Protections are proper; however, several courts from within the various districts within Texas have tacitly approved the Third Circuit's O'Brien decision and related test, requiring the debtors to demonstrate that the Stalking Horse Protections are necessary to preserve the value of the estate. See, e.g., In re TriDimension Energy, L.P., No. 10-33565 (Bankr. N.D. Tex. Oct. 19, 2010 and Oct. 29, 2010) [Docket Nos. 365 (motion) and 399 (order)] (requesting and approving bid procedures including Stalking Horse Protections as being necessary to preserve the value of the estate by citing to O'Brien); In re CDX Gas, LLC, No. 08-37922 (Bankr. S.D. Tex. Apr. 21, 2009 and May 13, 2009) [Docket Nos. 503 (motion) and 568 (order), respectively] (same).

Other courts in the jurisdictions within Texas, representing the more recent trend, have tacitly approved the more lenient rules adopted by the Southern District of New York in Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), and have analyzed Stalking Horse Protections in the same manner as standard bid procedures under a "business judgment" standard. See, e.g., In re HBT JV, LLC, No. 17-40659 (Bankr. N.D. Tex. Feb. 20, 2017 and Mar. 17, 2017) [Docket Nos. 9 (motion) and 111 (order)] (requesting and approving Stalking Horse Protections as proper pursuant to the debtors' "business judgment," under which such provisions are "presumptively valid") In re Sears Methodist Ret. Sys., Inc., No. 14-32821 (Bankr. N.D. Tex. Nov. 24, 2014 and Dec. 24, 2014) [Docket Nos. (motion) 583 and 640 (order)] (same).

Although the precedent seems to be split, the O'Brien court espouses a more burdensome standard, and, thus, this Motion will assume such test applies.

their professionals to identify and negotiate a transaction that the Debtors believe to be the highest or best proposal for an acquisition of the Debtors' assets, in order to maximize the value realized for the benefit of the Debtors' estates…."). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. See O'Brien, 181 F.3d at 533.

28.     In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

(a)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)     whether the fee harms, rather than encourages, bidding;

(c)     the reasonableness of the break-up fee relative to the purchase price;

(d)     whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

(e)     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(f)     the correlation of the fee to a maximum of value of the debtor's estate;

(g)     the support of the principal secured creditors and creditors' committees of the break-up fee;

(h)     the benefits of the safeguards to the debtor's estate; and

(i)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

29.     The Stalking Horse Protections as proposed to be included in a Stalking Horse Agreement would fall squarely within the O'Brien factors. For example, such protections

- 23 -

would assist the WMLP Debtors in securing an adequate floor for the Kemmerer Assets and, thus, insist that competing bids be higher or otherwise better than the Stalking Horse Agreement and attract other potential buyers to bid for the Kemmerer Assets subject to the Stalking Horse Agreement – a clear benefit to the WMLP Debtors' estates.  See In re Redwine Res., Inc., No. 10-34041, 2010 WL 5209287, at *4 (Bankr. N.D. Tex. June 24, 2010) (noting that the Stalking Horse Protections provided the debtors "with an established minimum floor bid" for the assets).  Moreover, as noted above, the WMLP Debtors do not believe a potential third-party bidder would agree to act as a Stalking Horse Bidder without the Break-Up Fee and the Expense Reimbursement Amount.  See In re TriDimnesion Energy L.P., No. 10-33565, 2010 WL 5209233, at *2 (Bankr. N.D. Tex. Oct. 29, 2010) (approving a break-up fee and noting that the proposed break-up fee was "necessary to induce the Potential Buyer to serve as a 'stalking horse' bidder and to continue to pursue the transaction").  Without the ability to offer the Stalking Horse Protections, the WMLP Debtors may lose the opportunity to obtain the highest or best offer for the Kemmerer Assets and the associated downside protection that the existence of the Stalking Horse Bidder affords.

30.     In sum, the proposed Stalking Horse Protections are reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and the efforts that will be expended by any potential Stalking Horse Bidder.  The WMLP Debtors' ability to offer the Stalking Horse Protections, by potentially inducing the involvement of a Stalking Horse Bidder, enables them to ensure the sale of the  Kemmerer Assets at a price they believe to be fair, while, at the same time, providing them with the potential of even greater benefit to the estates.

31.     This and other courts have approved protections similar to the proposed Break-Up Fee and Expense Reimbursement Amount as reasonable and consistent with the type

- 24 -

and range of bidding protections typically approved, several of which also approved such protections with administrative expense status.  See, e.g., In re HBT JV, LLC, No. 17-40659 (Bankr. N.D. Tex. Mar. 17, 2017) [Docket No. 111] (approving Stalking Horse Protections, including the potential expense reimbursement and break-up fee of up to 3% of the purchase price, which were requested to constitute administrative expenses); In re Sears Methodist Ret. Sys., Inc., No. 14-32821 (SGJ) (Bankr. N.D. Tex. Dec. 24, 2014) [Docket No. 640] (approving a break-up fee of $1.2 million (i.e., 2.6% of stalking horse bid) and expense reimbursement of up to $100,000 in connection with sale of $42.5 million of assets, each with administrative expense status); In re TriDimension Energy L.P., No. 10-33565 (Bankr. N.D. Tex. Oct. 29, 2010) [Docket No. 399] (approving break-up fee or 2.6% of the purchase price as an administrative expense claim).

### D.    The Assumption/Assignment Procedures Are Appropriate

32.    The WMLP Debtors also seek authority to assume and assign Executory Contracts in accordance with the Assignment procedures (any such assumed and assigned Executory Contracts, the "Assigned Contracts") as part of a Sale Transaction.  No later than three business days after entry of the Bidding Procedures Order, the WMLP Debtors will file a schedule of cure obligations (the "Cure Schedule") for the Executory Contracts that the WMLP Debtors have identified as potential Assigned Contracts.  The Cure Schedule will include (a) a summary description of each Executory Contract that the WMLP Debtors may assume and thereafter assign to a potential buyer; and (b) the amount, if any, the WMLP Debtors believe necessary to cure defaults under such agreements pursuant to sections 365(b)(1) and 365(f)(2)(A) of the Bankruptcy Code (the "Cure Costs").  An Executory Contract's inclusion on the Cure Schedule means only that a successful bidder may include the contract as an Assigned Contract in an asset purchase agreement.  In addition, inclusion of any document in the Cure Schedule

- 25 -

does not constitute, and not be deemed to be, a determination or admission by the WMLP Debtors or any Successful Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.  The WMLP Debtors may amend or supplement the Cure Schedule as necessary.

33.     The WMLP Debtors will serve a copy of the Cure Schedule, together with the Assumption/Assignment Notice, on each of the nondebtor counterparties to the agreements listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Bankruptcy Court.  If the WMLP Debtors amend the Cure Schedule (e.g., to add additional Executory Contracts when/if the Asset Schedule is updated), the WMLP Debtors will serve a copy of the amended Cure Schedule, together with the Assumption/Assignment Notice, on each of the nondebtor counterparties to the agreements listed on the amended Cure Schedule by first class mail.  The WMLP Debtors propose that any objections to the Cure Costs set forth on the Cure Schedule, or the assumption and assignment of the Executory Contracts identified therein, must be in writing, filed with the Court, and be actually received by the Objection Notice Parties (as defined below) on or before February 21, 2019 (the "Assignment and Cure Objection Deadline").

34.     If the WMLP Debtors receive no timely objections to the Cure Costs, then the Cure Costs set forth in the Cure Schedule will be binding upon the nondebtor counterparties to any Executory Contract ultimately identified as an Assigned Contract for all purposes in these chapter 11 cases and will constitute a final determination of the total Cure Costs the WMLP Debtors or a Successful Bidder must pay in connection with the assumption and assignment of any Assigned Contracts (unless a portion of such costs are paid or satisfied in any manner,

in which case the Cure Costs will be reduced).  In addition, all nondebtor counterparties to the

potential Assigned Contracts will be forever (a) barred from objecting to the Cure Costs and

from asserting any additional cure or other amounts with respect to the Assigned Contracts

(and the WMLP Debtors and the Successful Bidder shall be entitled to rely solely upon the Cure

Costs set forth in the Cure Schedule); and (b) barred, estopped and permanently enjoined from

asserting or claiming against the WMLP Debtors, any Successful Bidder or their respective

property that any additional amounts are due or other defaults exist, that conditions to

assignment must be satisfied under such Assigned Contract or that there is any objection or

defense to the assumption and assignment of such Assigned Contract.

        35.     If a nondebtor counterparty to an Assigned Contract files an objection

asserting a cure amount higher than the proposed Cure Costs (a "Disputed Cure Amount"),

the following procedures will govern the resolution of such Disputed Cure Amount:  (a) to the

extent that the parties (including, if applicable, a Successful Bidder) are able to consensually

resolve the Disputed Cure Amount prior to the Sale Hearing, the WMLP Debtors will promptly

notify the Consultation Parties and the Bankruptcy Court; or (b) to the extent that the parties are

unable to consensually resolve the dispute prior to the Sale Hearing or any of the Consultation

Parties raises an objection, the amount to be paid under section 365 of the Bankruptcy Code with

respect to such Disputed Cure Amount will be determined at the Sale Hearing or on such other

date as may be fixed by the Court.  All other objections to the proposed assumption and

assignment of an Assigned Contract will be heard at the Sale Hearing.  The WMLP Debtors

intend to cooperate with counterparties to Assigned Contracts to attempt to reconcile any

differences with respect to a particular cure amount.

- 27 -

36.     Upon the selection of a Successful Bidder for any Asset, the WMLP Debtors will (a) file a Successful Bid Notice, which will identify the Successful Bidder, the proposed terms of sale and the relevant Executory Contracts to be purchased by the Successful Bidder and (b) post such notice on the Restructuring Website.  Counterparties objecting solely to the assignment of the Assigned Contracts to a Successful Bidder (including on the basis of adequate assurance of future performance as required by section 365(f)(2)(B) of the Bankruptcy Code) file such objections on or before February 25, 2019 (the "Supplemental Objection Deadline").

### E.     The Proposed Notice of the Sale Hearing is Adequate and Appropriate.

37.     Pursuant to Bankruptcy Rule 2002(a) and the Complex Case Procedures, the WMLP Debtors must provide their creditors with 21 days' notice of the Sale Hearing.  However, as detailed above, the WMLP Debtors are requesting expedited consideration of this Motion.   Nonetheless, the WMLP will be providing as much notice as possible under the circumstances, by mailing (via overnight or first class mail, depending on the party) the notice of the Sale Hearing 21 days prior to the Sale Hearing.   Under Bankruptcy Rule 2002(c), such notice must include the date, time and place of the potential Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in this Motion.  As noted above, the WMLP Debtors propose the following deadlines for objecting to the approval of the proposed Sale Transaction no later than (a) February 21, 2019 (the "Objection Deadline") for all objections to the potential Sale Transaction, the terms contained in this Motion and the proposed Sale Order and (b) February 25, 2019 for any issues specific to the Successful Bidder (including, specific issues relating to the identity of the Successful Bidder and alterations to the Sale Order).

38.     Within three business days after entry of the Bidding Procedures Order, the WMLP Debtors will serve the proposed Auction and Hearing Notice by overnight mail upon

the following parties or their counsel (collectively, the "Objection Notice Parties"):

(a) the Office of the United States Trustee for the Southern District of Texas; (b) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (c) the ad hoc group of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (d) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (e) the administrative agent under the WLB Debtors' bridge loan facility due 2019; (f) the administrative agent under the WMLP Debtors' term loan facility due 2018; (g) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (h) the administrative agent under the WLB Debtors' debtor-in-possession financing facility; (i) the lenders under the WLB Debtors' debtor-in-possession financing facility; (j) the Creditors' Committee and any other statutory committee appointed in these cases; (k) the United States Attorney's Office for the Southern District of Texas; (l) all taxing authorities having jurisdiction over any of the Kemmerer Assets, including the Internal Revenue Service; (m) the United States Environmental Protection Agency and similar state environmental agencies for states in which the WMLP Debtors conduct business; (n) the offices of the attorneys general for the states in which the WMLP Debtors operate; (o) the United States Securities and Exchange Commission; (p) the Stalking Horse Bidder (if any); (q) all sureties that have issued bonds relating to the Kemmerer Assets; (r) all parties that are known or reasonably believed to have expressed an interest in acquiring the Kemmerer Assets; (s) all parties that are known or reasonably believed by the WMLP Debtors to have asserted any lien, encumbrance, claim or other interest in the Kemmerer Assets; (t) governmental agencies that are known or reasonably believed by the WMLP Debtors to be an interested party with respect to any Sale Transactions; (u) nondebtor counterparties to the Assigned Contracts; (v) the Pension Benefit Guaranty

Corporation; (w) the United Mine Workers of America; (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (y) all other parties (if any) identified by the WMLP Debtors as having a particular interest in the Kemmerer Assets.  Further, within three days of the entry of the Bidding Procedures Order, the WMLP Debtors will serve all of the WMLP Debtors' remaining creditors via first class mail.

39.     The Auction and Hearing Notice will indicate that copies of this Motion and any future sale documents, if applicable (including the Bidding Procedures Order, the Form APA or Stalking Horse Agreement (as applicable), the form of Sale Order and any Successful Bid Notice), are available on the website of the WMLP Debtors' claims and noticing agent, at www.donlinrecano.com/westmoreland (the "Restructuring Website").  In addition, within five business days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, the WMLP Debtors will cause the Publication Notice to be (a) published for one day in the National Edition of USA Today; (b) the Kemmerer Gazette; (c) the Salt Lake Tribune; (d) the Denver Post; and (e) posted on the Restructuring Website (i.e., www.donlinrecano.com/westmoreland).

40.     As Bankruptcy Rule 2002(c) and the Complex Case Procedures require, the Auction and Hearing Notice will include (among other things) the following: (a) the proposed date, time and place of the Auction and the Sale Hearing; (b) information about the Kemmerer Assets, the sale process and the potential terms of sale (including the Form APA or Stalking Horse Agreement, as applicable); and (c) the Objection Deadline for filing any objections to the relief requested in this Motion.  The methods of notice described herein comply fully with Bankruptcy Rule 2002 and the Complex Case Procedures and constitute good and adequate notice of the proposed sale of the Kemmerer Assets.

II.     **Granting the Relief Requested in the Sale Order is Appropriate**

    A.     **The Sale Transaction Is Warranted**
           **Under Section 363 of the Bankruptcy Code**

        41.     Authorizing a sale of a debtor's assets pursuant to section 363 of the Bankruptcy Code is appropriate when a sound business justification exists for the proposed transaction.  See Cont'l Air Lines, 780 F.2d at 1226 (stating that for a debtor in possession "to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling or leasing the property outside the ordinary course of business"); 9 Houston, 578 B.R. at 610 (stating that, under Continental, to gain approval of a sale of assets outside the ordinary course of business, "the debtor must articulate a sound business reason for the proposed sale and prove that the sale is in the best interest of the estate") (citing Cont'l Air Lines, 780 F.2d at 1226).  When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Integrated Res., 147 B.R. at 656 (holding that the business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

        42.     Here, a sound business justification exists for the sale of the Kemmerer Assets.  The WMLP Debtors' use of cash collateral is dependent upon consummating a sale of the Kemmerer Assets no later than March 15, 2019.  The timeline associated with the Sale Transaction contemplates a closing prior to this date and ensures the consideration the WMLP Debtors will receive reflects the value associated with selling the Kemmerer Assets as a going concern.  Other than the proposed Sale Transaction, there is no potential structure that would allow the WMLP Debtors to capture the going concern value of the Kemmerer Assets.

43.    In addition, the Kemmerer Assets have been, and will be subject to, an open and competitive bidding process, thus ensuring the WMLP Debtors will receive the highest or otherwise best value for the Kemmerer Assets.  Consequently, any ultimately Successful Bid, after being subject to a "market check" in the form of further marketing and the Auction, if necessary, will constitute the highest or otherwise best offer for the Kemmerer Assets and will provide a greater recovery for the WMLP Debtors' estates than any known or practicably available alternative.  See, e.g., In re FPMC Austin Realty Partners, LP, 573 B.R. 679, 688 (Bankr. W.D. Tex. 2017) (noting that property is often sold in bankruptcy cases pursuant to an auction, because "an auction is usually the best way to encourage those bidders to increase the ultimate purchase price"); see also Trans World Airlines, 2001 WL 1820326, at *4 (stating that while a "section 363(b) sale transaction does not require an auction procedure, … the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

44.    Based upon marketing efforts to date and the structure of the Bidding Procedures, The WMLP Debtors submit that any Successful Bid will constitute the highest or otherwise best offer for the applicable Kemmerer Assets and will provide a greater recovery for the WMLP Debtors' estates than would be provided by any other available alternative.  As such, the WMLP Debtors' determination to sell the Kemmerer Assets in accordance with the terms of the Successful Bidders' Asset Purchase Agreement represents a valid and sound exercise of the WMLP Debtors' business judgment.[6]

---

[6]    As applicable, the WMLP Debtors will submit additional evidence at the Sale Hearing to support these conclusions.

**B.      Other Factors Cited by Courts Also Weigh in Favor of Approving the Sale**

45.      In <u>Continental</u>, the Fifth Circuit (quoting the Second Circuit's decision in <u>Lionel</u>) stated that, in determining whether an adequate business justification exists for a proposed sale under section 363(b) of the Bankruptcy Code, the bankruptcy court "should consider all salient factors pertaining to the proceeding," which factors, depending on the circumstances of the case, may include the following:  (a) "the proportionate value of the asset to the estate as a whole;" (b) "the amount of elapsed time since the filing;" (c) "the likelihood that a plan of reorganization will be proposed and confirmed in the near future;" (d) "the effect of the proposed disposition on future plans of reorganization;" (e) "the proceeds to be obtained from the disposition vis à-vis any appraisals of the property;" (f) "which of the alternatives of use, sale or lease the proposal envisions;" and (g) "whether the asset is increasing or decreasing in value" (collectively, the "<u>*Continental* Factors</u>").  Cont'l Air Lines, 780 F.2d at 1226 (quoting <u>Lionel</u>, 722 F.2d at 1071).

46.      In <u>Gulf Coast</u>, this Court articulated several additional "factors that a court can consider in determining whether to approve a § 363(b) sale prior to confirmation of a chapter 11 plan." <u>Gulf Coast</u>, 404 B.R. at 422.  The factors include:  (a) whether "there is evidence of a need for speed;" (b) whether the case is "sufficiently mature to assure due process;" (c) whether the proposed asset purchase agreement is "sufficiently straightforward to facilitate competitive bids" and whether the purchaser is the only potential interested party; (d) whether the assets have been "aggressively marketed in an active market;" (e) whether "the fiduciaries that control the debtor [are] truly disinterested;" (f) whether the proposed sale includes all of the debtor's assets or the debtor's "crown jewel;" (g) any "extraordinary protections" demanded by the purchaser; (h) "[h]ow burdensome [it would] be to propose the sale as part of confirmation of a chapter 11 plan;" (i) "[w]ho will benefit from the sale;" (j) whether "special adequate protection measures

necessary and possible;" and (k) whether the hearing was "a true adversary presentation" and whether "the integrity of the bankruptcy process [is] protected" (collectively, the "*Gulf Coast Factors*"). Id. at 423-27. The Gulf Coast opinion further stated that "[e]ach case is unique. There may be other factors that tip the balance or that overweigh the [*Gulf Coast* Factors]." Id. at 427.

   47. Most recently, in 9 Houston, this Court revisited the standard applicable to asset sales under section 363(b) of the Bankruptcy Code, applied those *Continental* Factors and *Gulf Coast* Factors it deemed relevant under the circumstances and articulated four additional factors, i.e., whether (a) the debtor "disclosed all of the terms of the proposed transaction;" (b) the objecting party can "defeat any plan of reorganization proposed by the Debtor that contains the provisions of the [proposed transaction];" (c) the parties negotiated at arm's-length; and (d) the purchaser "has been proceeding in good faith" (collectively, the "*9 Houston* Factors" and, collectively with the *Continental* Factors and the *Gulf Coast* Factors, the "Section 363(b) Sale Factors").

   48. Here, application of the relevant Section 363(b) Sale Factors overwhelmingly weighs in favor of approving the Sale Transactions:

- First, the Kemmerer Assets have been "aggressively marketed in an active market." See *Gulf Coast* Factor (d). As detailed above, the WMLP Debtors, in conjunction with Lazard, have conducted a robust marketing process that is designed to yield the highest and best bids that can be obtained for the Kemmerer Assets. See supra ¶¶ 4-8. Despite the macroeconomic challenges impacting the coal industry as a whole, the WMLP Debtors' marketing of the Kemmerer Assets—which was launched in August 2018 and has continued since the Petition Date—has resulted in 4 parties submitting a bid to purchase the Kemmerer Assets, of which 3 bidders remain in process. The WMLP Debtors and Lazard have actively and continually engaged in discussions with potential bidders regarding the Kemmerer Assets, provided diligence materials, arranged for site visits and provided other diligence information to facilitate potential bidders' consideration to purchase the Kemmerer Assets; these marketing efforts remain ongoing.

- <u>Second</u>, there is a "need for speed" justifying approval of the Sale Transactions prior to the confirmation of any chapter 11 plan. <u>See</u> *Gulf Coast* Factors (a), (h); *Continental* Factors (c), (g). Coal mines are depleting assets containing finite quantities of coal that are available for extraction and sale on a profitable basis. As such, at constant coal prices, coal mining operations tend to decline in value over time. Regardless of any given mine's operating status or profitability, the WMLP Debtors' consensual use of cash collateral is dependent upon the Sale Transaction closing in the near term. Courts within the Fifth Circuit have approved asset sales pursuant to section 363 of the Bankruptcy Code under analogous circumstances. <u>See</u>, <u>e.g.</u>, <u>In re Torch Offshore</u>, 327 B.R. 254, 258 (E.D. La. 2005) (affirming order approving sale of offshore oil vessels comprising substantially all of the debtor's assets under section 363(b) of the Bankruptcy Code; in applying the *Continental* Factors, stating that "[m]ost importantly, … maintaining the vessels was costing the debtor an exorbitant amount of money, and the condition of the vessels was deteriorating over time"); <u>In re Condere Corp.</u>, 228 B.R. 615, 623, 629 (Bankr. S.D. Miss. 1998) (approving sale of substantially all of tire manufacturer's assets under section 363(b) of the Bankruptcy Code where debtor lacked sufficient cash for capital expenditures necessary to improve the business' profitability and preserve its value as a going concern). The terms (including the relevant sale milestones) of the WMLP Debtors' cash collateral usage make selling the Kemmerer Assets under a chapter 11 plan difficult, if not impossible. <u>See</u> 9 <u>Houston</u>, 578 B.R. at 616 (determining that the costs and delays associated with selling assets under a plan as compared to conducting a section 363(b) sale justified the latter approach). As such, completing a sale under section 363(b) of the Bankruptcy Code is the only avenue for the WMLP Debtors to capture their going concern value.

- <u>Third</u>, these cases are "sufficiently mature to assure due process," and all terms of the Sale Transactions will be disclosed, pursuant to the Bidding Procedures, prior to the Hearing. <u>See</u> *Gulf Coast* Factor (b); *Continental* Factor (b); *9 Houston* Factor (a). Despite the exigencies, discussed above, requiring the WMLP Debtors to consummate a sale in the near term to maximize stakeholder value, the WMLP Debtors, in consultation with the WLB Debtors, have carefully planned the sale timeline and notice procedures proposed herein to ensure that parties in interest will have a full and fair opportunity to participate in the sale approval process. Moreover, as the <u>Gulf Coast</u> decision makes clear, courts analyze this factor primarily to guard against situations where "assets are sold immediately after the case is filed." <u>Gulf Coast</u>, 404 B.R. at 423 (explaining that "[i]t takes time for official committees … to organize and to engage counsel, for the committees to hire financial or other experts if necessary, for government regulatory agencies to mobilize to participate in cases …, and for other creditors and parties in interest to determine whether (and how) to participate in the case"). Because (a) these cases were commenced over three months ago, giving parties in interest ample time to retain counsel and participate in these cases, (b) the Creditors' Committee was formed, and retained both counsel and financial advisors, shortly after the Petition Date and (c) other parties in interest (including various governmental authorities) have received notice of – and, in many instances, actively participated in – these cases since the Petition Date, none of the due process concerns referenced in <u>Gulf Coast</u> are present here.

- 35 -

- **Fourth**, because the WMLP Debtors designed the bidding procedures to yield the highest or otherwise best bids for the Kemmerer Assets – including by seeking to establish a "floor" bid (*i.e.*, by a potential Stalking Horse Bid) and proposing to subject such bid to a further market test – the Sale Transaction will maximize value for the benefit of the WMLP Debtors' estates and all stakeholders.  *See Gulf Coast* Factors (c), (i).  Although the sale process remains ongoing, the WMLP Debtors' marketing efforts already have ensured that the purchaser is not "the only potential interested party," as evidenced by the 4 bids (3 of which remain active) the WMLP Debtors have received to date for the Kemmerer Assets.  *See* Gulf Coast, 404 B.R. at 424.  Moreover, the interest shown and diligence undertaken by multiple potential bidders in the Kemmerer Assets demonstrates that the concern underlying the *Gulf Coast* Factor regarding "who will benefit from the sale" is not implicated here.  *See id.* at 426 (explaining that courts should scrutinize transactions where "only one party (or a few parties selected by the 'loudest creditor') will benefit from the sale") (internal citation omitted).  Rather, both the Bidding Procedures themselves and the results of the WMLP Debtors' marketing efforts to date demonstrate that, prior to the consummation to any Sale Transactions, the Kemmerer Assets will be subjected to a true market test.

- **Fifth**, the fiduciaries in control of the WMLP Debtors are disinterested.  *See Gulf Coast* Factor (e).  The WMLP Debtors' sale process has been, and will continue to be, overseen and directed by the Conflicts Committee (the "Conflicts Committee") of the Board of Directors (the "WMGP Board") of Debtor Westmoreland Resources GP, LLC ("WMGP"), the general partner in WMLP.  The Conflicts Committee consists of four independent directors whose responsibilities are set forth in a charter adopted by the WMGP Board on February 18, 2015 (the "Conflicts Committee Charter"), as specifically authorized under the organizational documents of WMLP and WMGP.[7]  To further protect the integrity of the sale process and avoid any conflicts of interest in these chapter 11 cases, the Conflicts Committee has retained Jones Day as its counsel and as conflicts counsel to the WMLP Debtors, and Lazard as investment banker to the Conflicts Committee and the WMLP Debtors.[8]

- **Seventh**, as set forth below, and as will be shown by the WMLP Debtors at the Sale Hearing, the WMLP Debtors have undertaken, and will undertake, good faith, arm's-

---

[7]     For a detailed discussion of these provisions, see the *Application of the WMLP Debtors and the Conflicts Committee of the Westmoreland Resources GP, LLC Board of Directors, Pursuant to Sections 327(a) and 329(a) of the Bankruptcy Code, for an Order Authorizing the Retention and Employment of Jones Day as Counsel for the Conflicts Committee of the Westmoreland Resources GP, LLC Board of Directors and As Conflicts Counsel for Westmoreland Resource Partners, LP and Its Subsidiaries, Effective as of the Petition Date* (Docket No. 214), at ¶¶ 7-10.

[8]     See *Order, Pursuant to Sections 327(a) and 329(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Jones Day as Counsel for the Conflicts Committee of the Board of Directors of Westmoreland Resources GP, LLC and as Conflicts Counsel for Westmoreland Resource Partners, LP and Its Subsidiaries, Effective as of the Petition Date* (Docket No. 490); *Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Lazard Frères & Co. LLC as Investment Banker for the Conflicts Committee of the Board of Directors of Westmoreland Resources GP, LLC and for Westmoreland Resource Partners, LP and Its Subsidiaries, Effective as of the Petition Date* (Docket No. 492).

length negotiations with all bidders, including but not limited to any potential Stalking Horse Bidder.  See *9 Houston* Factors (c), (d).[9]

49.     Thus, application of the Section 363(b) Sale Factors to the specific facts of the WMLP Debtors' chapter 11 cases demonstrates that a sound business justification exists for the sale of the Kemmerer Assets, consistent with the guidance set forth by the Fifth Circuit in Continental.

**C.    The Kemmerer Assets are Subject to Sale
Free and Clear of All Liens and Encumbrances**

50.     The WMLP Debtors request approval to sell the Kemmerer Assets free and clear of any and all liens, claims, interests and encumbrances (except for Assumed Liabilities, as defined in the Successful Bidder's Asset Purchase Agreement) in accordance with section 363(f) of the Bankruptcy Code and the Complex Case Procedures.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

---

[9]     The WMLP Debtors submit that the remaining Section 363(b) Sale Factors (to the extent not subsumed within the factors addressed above) either are not directly relevant to the Sale Transactions or are undetermined as of the filing of this Motion.

NAI-1506170930v8

11 U.S.C. § 363(f); see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

51.     Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); see In re Trans World Airlines, Inc., 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

52.     The WMLP Debtors submit that the Sale Transaction will satisfy the requirements of section 363(f) of the Bankruptcy Code and the Complex Case Procedures. To the extent a party objects to Sale Transaction on the basis that it does hold a lien or encumbrance on the Kemmerer Assets, the WMLP Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims or that such lien is subject to a bona fide dispute.  In addition, to the extent the WMLP Debtors discover any party that may hold a lien on all, or a portion of, the Kemmerer Assets, the WMLP Debtors will provide such party with notice of, and an opportunity to object to, the Sale Transaction.  Absent objection, each such party will be deemed to have consented to the sale of the Kemmerer Assets.

53.     Accordingly, the WMLP Debtors believe that the Sale Transaction (i) will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (ii) should be approved free and clear of all liens, claims, interests and encumbrances

### D.    The Sale Transaction Has Been
###        Proposed in Good Faith and Without Collusion

54.    The WMLP Debtors have proposed the Sale Transactions in good faith.

The WMLP Debtors will negotiate the sale of the Kemmerer Assets at arm's-length, and in

accordance with the Bidding Procedures.  As such, the WMLP Debtors submit that any

Successful Bidder at the conclusion of the Auction (or otherwise pursuant to the Bidding

Procedures) should be entitled to the protections set forth in section 363(m) of the Bankruptcy

Code, which states:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

55.    Section 363(m) of the Bankruptcy Code thus protects a buyer of assets

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order approving the sale is reversed on appeal, provided that the buyer

purchased the assets in "good faith."  Gilchrist v. Westcott (In re Gilchrist), 891 F.2d 559, 560

(5th Cir. 1990) ("Section 363(m) patently protects, from later modification on appeal,

an authorized sale where the purchaser acted in good faith and the sale was not stayed pending

appeal."); Newco Energy v. Energytec, Inc. (In re Energytec, Inc.), 739 F.3d 215, 219

(5th Cir. 2013) ("By providing good faith purchasers with a final order and removing the risks of

endless litigation over ownership, Section 363(m) 'allows bidders to offer fair value for estate

property[,]' which 'greatly benefits both the debtor and its creditors.'") (quoting Hazelbaker v.

Hope Gas, Inc. (In re Rare Earth Minerals), 445 F.3d 359, 363 (4th Cir. 2006)).

56.     Although the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.  See In re TMT Procurement Corp., 764 F.3d 512, 519 (5th Cir. 2014) ("In the context of § 363(m), we have defined the term in two ways.  On the one hand, we have defined a 'good faith purchaser' as one who purchases the assets for value, in good faith, and without notice of adverse claims.  On the other hand, we have noted that the misconduct that would destroy a purchaser's good faith status ... involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (internal citations and quotation marks omitted); In re Hereford Biofuels, L.P., 466 B.R. 841, 860 (Bankr. N.D. Tex. 2012) (same); In re Camp Arrowhead, Ltd., 429 B.R. 546, 550 (W.D. Tex. 2010) (same).

57.     The WMLP Debtors submit that any Successful Bidder arising from the Auction (or otherwise pursuant to the Bidding Procedures) would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and any Successful Bidder's Asset Purchase Agreement thereof would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  First, all parties involved in any negotiations of an Asset Purchase Agreement will do so in good faith pursuant to the terms of the Bidding Procedures as approved by the Court, during which such parties will be represented by competent counsel of similar bargaining positions.  Second, the Bidding Procedures will eliminate any indication of "fraud [or] collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders " or similar conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of

- 40 -

the Bankruptcy Code.  <u>Finally</u>, the Conflicts Committee will evaluate and approve the any

Successful Bidder's offer after careful evaluation and with the assistance of both Jones Day and

Lazard as well as the Conflict Committee's professional advisors.  Accordingly, the WMLP

Debtors believe that any Successful Bidder and related Asset Purchase Agreement should be

entitled to the full protections of Section 363(m) of the Bankruptcy Code.[10]

> **E.  Assumption and Assignment of the Assigned Contracts is Warranted**

58.  Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an Executory Contract is

whether the debtor's reasonable business judgment supports assumption or rejection.  <u>Richmond</u>

<u>Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as

assumption … appears to enhance a debtor's estate, court approval of a debtor[]'s decision to

assume … should only be withheld if the debtor's judgment is clearly erroneous, too speculative,

or contrary to the provisions of the Bankruptcy Code.") (internal quotations omitted);

<u>GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.</u>, 331 B.R. 251, 255 (N.D. Tex. 2005)

(same).  "Further, a debtor-in-possession may assign an executory contract or an unexpired lease

of the debtor if it assumes the agreement in accordance with section 365(a), and provides

adequate assurance of future performance by the assignee."  <u>In re Dura Auto. Sys.</u>,

No. 06-11202, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

---

[10]    The Sale Order also contains customary terms related to the limitation of any purchaser's liability as a
successor-in-inter after purchasing the Kemmerer Assets.  The WMLP Debtors submit that the facts set
forth in this Section II.D provides the basis for such a finding by the Court.

59.     The assumption and assignment of certain Executory Contracts may be an important component of the sale of the Kemmerer Assets.  For example, much of the value of certain of the Kemmerer Assets comes from the WMLP Debtors' coal leases that provide the right to mine coal on the underlying property.  It is thus an appropriate exercise of business judgment for the WMLP Debtors to agree to assume and assign the Assigned Contracts. Additionally, the WMLP Debtors submit that the notice provisions and objection deadline for counterparties to raise objections to the assumption and assignment of the Assigned Contracts, as proposed in this Motion, are adequate to protect the rights of counterparties to the WMLP Debtors' Executory Contracts.  Further, the WMLP Debtors will demonstrate adequate assurance of future performance based on the procedures described above.

60.     Upon finding that a debtor has exercised its business judgment in determining that assuming an Executory Contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, i.e., that a debtor or assignee (a) cure, or provide adequate assurance of promptly curing, prepetition defaults under the Assigned Contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.  See 11 U.S.C. § 365(b)(1).  This subsection "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain[.]" Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (internal citations omitted).

61.     The WMLP Debtors submit that the statutory requirements of sections 365(b)(1) and 365(f)(2)(A) of the Bankruptcy Code will be satisfied because any

- 42 -

Successful Bidder's Asset Purchase Agreement will require such Successful Bidders to cure all defaults associated with, or that are required to properly assume, the Assigned Contracts (to the extent that such agreements have not already been assumed and defaults cured).  In addition, the Bidding Procedures Order provides a clear process by which to provide notice of and resolve disputes over Cure Costs.  Under these procedures, any outstanding Cure Costs will be identified and any disputes with nondebtor contract counterparties can be identified and resolved or adjudicated.  As such, curing defaults under any Assigned Contracts will be achieved fairly and appropriately, consistent with the Bankruptcy Code and the rights of nondebtor contract counterparties.  Finally, the procedures described herein provide nondebtor counterparties to Executory Contracts with (a) notice of the identity of any party that is a Successful Bidder and (b) an opportunity to raise issues relating to such party's ability to provide adequate assurance of future performance consistent with section 365(f)(2)(B) of the Bankruptcy Code.

### F.       Waiver of Bankruptcy Rules 6004(h) and 6006(d)

62.       The WMLP Debtors request that, upon entry of a Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) will allow any Sale Transaction to close as soon as possible and prevent further delay in the administration of these cases.  In addition, because many of the Kemmerer Assets impose holding costs on the WMLP Debtors during their period of ownership and control, any delay in closing may diminish the WMLP Debtors' estates to the detriment of creditors.  Thus, the WMLP Debtors respectfully submit that a waiver of the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d) is appropriate under the circumstances.

**Notice**

63.     Notice of this Motion will be provided to counsel to (a) the Office of the United States Trustee for the Southern District of Texas; (b) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (c) the ad hoc group of lenders under the WLB Debtors' prepetition term loan due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (d) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (e) the administrative agent under the WLB Debtors' bridge loan facility due 2019; (f) the administrative agent under the WMLP Debtors' term loan facility due 2018; (g) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (h) the administrative agent under the WLB Debtors' debtor-in-possession financing facility; (i) the lenders under the WLB Debtors' debtor-in-possession financing facility; (j) the Creditors' Committee and any other statutory committee appointed in these cases; (k) the United States Attorney's Office for the Southern District of Texas; (l) all taxing authorities having jurisdiction over any of the Kemmerer Assets, including the Internal Revenue Service; (m) the United States Environmental Protection Agency and similar state environmental agencies for states in which the WMLP Debtors conduct business; (n) the offices of the attorneys general for the states in which the WMLP Debtors operate; (o) the United States Securities and Exchange Commission; (p) the Stalking Horse Bidder (if any); (q) all sureties that have issued bonds relating to the Kemmerer Assets; (r) all parties that are known or reasonably believed to have expressed an interest in acquiring the Kemmerer Assets; (s) all parties that are known or reasonably believed by the WMLP Debtors to have asserted any lien, encumbrance, claim or other interest in the Kemmerer Assets; (t) governmental agencies that are known or reasonably believed by the WMLP Debtors to be an interested party with respect to any Sale Transactions; (u) the Pension Benefit Guaranty Corporation; (v) the United Mine Workers of America; (w) any party that has

requested notice pursuant to Bankruptcy Rule 2002; and (x) all other parties (if any) identified by the WMLP Debtors as having a particular interest in the Kemmerer Assets.  In light of the nature of the relief requested, the WMLP Debtors submit that no further notice is necessary.

## **No Prior Request**

64.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the WMLP Debtors respectfully request that the Court (i) enter the Bidding Procedures Order substantially in the form attached hereto as Exhibit A; (ii) after a Sale Hearing, enter the Sale Order approving the sale of the Kemmerer Assets to the Successful Bidder; and (iii) grant such other and further relief to the WMLP Debtors as the Court may deem proper.

Dated:  January 18, 2019
       Houston, Texas

Respectfully submitted,

*/s/ Oliver Zeltner*
Heather Lennox  (admitted *pro hac vice*)
Oliver S. Zeltner (TX 24104000)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
E-mail:  hlennox@jonesday.com
                ozeltner@jonesday.com

Timothy W. Hoffmann (admitted *pro hac vice*)
JONES DAY
77 West Wacker
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
Email:  thoffmann@jonesday.com

*Conflicts Counsel for the WMLP Debtors and Counsel for the Conflicts Committee of the Westmoreland Resources GP, LLC Board of Directors*

- 46 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 18, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System of the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Oliver S. Zeltner*

**Oliver S. Zeltner**