# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/05/2019

In re:

Westmoreland Coal Company, et al.,[1]

Debtors.

Chapter 11

Case No. 18-35672 (DRJ)

(Jointly Administered)

## ORDER APPROVING JOINT EXPEDITED MOTION OF THE WLB DEBTORS AND THE WMLP DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF (A) SUBSTANTIALLY ALL OF THE ASSETS OF OXFORD MINING COMPANY, LLC, AND CERTAIN OF ITS SUBSIDIARIES AND (B) THE BUCKINGHAM MINE (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (III) GRANTING RELATED RELIEF, INCLUDING APPROVAL OF THE RELATED SALE PROCESS

Upon the joint motion (the "Joint Sale Motion")[2] [Docket No. 1116] dated January 22, 2019, of Westmoreland Coal Company and certain of its affiliates (the "WLB Debtors") and Westmoreland Resource Partners, LP ("WMLP") and WMLP's direct and indirect subsidiaries (collectively, with WMLP, the "WMLP Debtors" and, the WMLP Debtors, together with the WLB Debtors, the "Debtors"), as debtors and debtors-in-possession of their respective bankruptcy cases, pursuant to sections 105(a), 363, 365 and 503(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 5 and Exhibit C of the United

---

[1]    Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]    Capitalized terms used, but not defined, herein have the meaning ascribed to them in the Joint Sale Motion or the APAs (as defined herein), as applicable.  This order shall be deemed to incorporate any findings of fact and conclusions of law made on the record at the Sale Hearing (as defined herein) pursuant to Fed. R. Bankr. P. 7052.

States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures"), for, among other things, (i) approval of the sales of (a) substantially all of the assets of Debtor Oxford Mining Company, LLC and the assets of each of its subsidiaries other than the assets of Debtor Westmoreland Kemmerer Fee Coal Holdings, LLC (Debtor Oxford Mining Company, LLC and each of its subsidiaries other than Debtor Westmoreland Kemmerer Fee Coal Holdings, LLC are referred to herein as the "Oxford Sellers"), including certain executory contracts and unexpired leases (collectively, the "Oxford Assets"), and (b) substantially all of the assets of Debtor Buckingham Coal Company, LLC (the "Buckingham Seller" and, with WCC Land Holding Company, Inc. and the Oxford Sellers, the "Sellers") including the active thermal coal mine located in Perry County, Ohio, and all substantially related assets including certain executory contracts and unexpired leases (collectively, the "Buckingham Mine" and, together with the Oxford Assets, the "Assets"), free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature except as expressly provided in the APAs (as defined below); (ii) authorization to enter into (a) that certain Asset Purchase Agreement (the "New Buckingham APA"), dated February 1, 2019, with CCU Coal and Construction, LLC (in its role as Purchaser under the New Buckingham APA, the "New Buckingham Buyer"), which contemplates the sale of the Buckingham Mine and consummation of the transaction contemplated thereby (the "Buckingham Sale Transaction"); and (b) that certain Asset Purchase Agreement (the "Oxford APA" and, collectively with the New Buckingham APA, the "APAs"), dated February 1, 2019, with CCU Coal and Construction, LLC (in its role as Purchaser under the Oxford APA, the "Oxford Buyer" and, in its combined role as the New Buckingham Buyer and the Oxford Buyer, the "Buyer"),

which contemplates the sale of the Oxford Assets, and consummation of the transaction contemplated thereby (the "Oxford Sale Transaction" and, together with the Buckingham Sale Transaction, the "Sale Transactions"); (iii) approval of the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transactions (collectively, such executory contracts and unexpired leases that are proposed to be assumed and assigned pursuant to each of the APAs, the "Assigned Contracts"); (iv) approval and ratification of the Debtors' processes utilized to solicit and consider further offers for the respective Assets and conduct an auction, if necessary (the "Auction"), for the Assets in accordance with the terms and conditions of the procedures used to achieve such sales (the "Bidding Procedures"), attached as Exhibit B to the Joint Sale Motion, including, among other things, (a) the form and manner of notice of the Auction and the Sale Hearing (defined below) and (b) the manner in which the notice of the assignment and proposed cure amounts of the Assigned Contracts (the "Assumption/Assignment Notice") was provided; and the Bankruptcy Court having conducted a hearing on the Joint Sale Motion on February 4, 2019 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Joint Sale Motion; and the Bankruptcy Court having reviewed and considered the Joint Sale Motion, and the arguments of counsel made, and the evidence adduced, at the Sale Hearing; and upon the record of the Sale Hearing, and these chapter 11 cases and proceedings, and after due deliberation thereon, and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.     **Jurisdiction and Venue**.  The Bankruptcy Court has jurisdiction over the Joint Sale Motion and the Sale Transactions pursuant to 28 U.S.C. § 1334.  This matter is a core

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

NAI-1506300228v7

proceeding pursuant to 28 U.S.C. § 157(b).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

  B. **Statutory Predicates**.  The statutory predicates for the relief requested in the Joint Sale Motion are sections 105, 363, 365 and 503(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Complex Case Procedures Rule 5 and Exhibit C.

  C. **Notice**.  Proper, timely, adequate and sufficient notice of the Joint Sale Motion, including, without limitation, the Sale Transactions, the assumption and assignment of the Assigned Contracts, the Auction, the Sale Hearing and the Bidding Procedures employed have been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Complex Case Procedures Rule 5 and Exhibit C.  Such notice was good and sufficient and appropriate under the circumstances.  No other or further notice of the Joint Sale Motion, including, without limitation, the Sale Transactions, the assumption and assignment of the Assigned Contracts, the Auction, the Sale Hearing or the Bidding Procedures, is necessary or shall be required.

  D. An Assumption/Assignment Notice has been provided to each of the non-Debtor counterparties to the Assigned Contracts identified on the list(s) the Debtors have filed (including, without limitation, Exhibits 1 and 2 to Exhibit E to the Joint Sale Motion, identifying potential Assigned Contracts under the New Buckingham APA and Oxford APA, respectively), all as provided in the Joint Sale Motion, as demonstrated by the Affidavit of Service filed on January 28, 2019 [Docket No. 1184].  The service of the Assumption/Assignment Notice was appropriate and sufficient under the circumstances, and no further notice need be given in respect of assumption and assignment of the Assigned Contracts or establishing Cure Costs (as defined below).  Non-Debtor parties to the Assigned Contracts

- 4 -

have had an adequate opportunity to object to assumption and assignment of the Assigned Contracts and the associated Cure Costs (as defined below).

E.      **Opportunity to Object**.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

F.      **The Bidding Procedures Were Proper**.  The Debtors have articulated good and sufficient reasons for the Bankruptcy Court to enter this Order and thereby approve of the Bidding Procedures utilized in obtaining the APAs as provided in the Joint Sale Motion. The Bidding Procedures were reasonably designed to maximize the value of the Assets, were fair, reasonable and appropriate under the circumstances and were in the best interest of the Debtors' estates.

G.      **Business Justification for Sale Transactions**.  The Debtors have demonstrated an adequate business justification supporting their decision to enter into the APAs, assume and assign the Assigned Contracts and sell the Assets pursuant to the Sale Transactions.  Such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  Such business reasons include, but are not limited to, the facts that (i) the Assets have been aggressively marketed and the APAs constitute the highest or otherwise best offers for the Assets; (ii) the continued operation of the Assets and corresponding costs will continue to deplete the Debtors' assets, so there is a good reason to consummate the Sale Transactions; (iii) the APAs and the Sale Transactions will present the best opportunity for the Debtors to realize the value of the Assets on a going concern basis and to avoid decline and devaluation of the related businesses; (iv) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Assets; and (v) the Debtors engaged in good faith, arm's-length negotiations with the Buyer in order to achieve the Sale

NAI-1506300228v7

Transactions contemplated in the APAs.  Entry of this Order and all provisions hereof is a necessary condition precedent to the Buyer consummating the Sale Transactions.

H.     **Opportunity to Bid**.  The Debtors and their professionals robustly marketed the Assets and conducted the marketing and sale process as set forth in the Joint Sale Motion.  This Auction and marketing process afforded a full and fair opportunity for any entity to make a higher or otherwise better offer to purchase the Assets.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

I.     **Auction**.  An Auction was conducted in accordance with the Bidding Procedures and, after conclusion of the Auction, the Buyer was declared to have made the highest or otherwise best offer.  The Auction was conducted at arm's length, without collusion and in good faith.

J.     **Highest or Otherwise Best Offer**.  The total consideration provided by the Buyer for the Assets is the highest or otherwise best offer received by the Debtors.  The Buyer is the successful bidder for the Assets in accordance with the Bidding Procedures.

K.     **Good Faith Purchaser**.  The APAs and the Sale Transactions contemplated thereby have been negotiated by the Debtors and the Buyer (and their respective affiliates and representatives) in good faith, at arm's length and without collusion or fraud.  The terms and conditions of the APAs and the Sale Transactions, including the total consideration to be realized by the Debtors pursuant to the APAs, are fair and reasonable, and the Sale Transactions are in the best interest of the Debtors, their creditors and their estates.

L.     The Buyer is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the sale and assignment of the Assets and the Sale Transactions.

NAI-1506300228v7

M.     The APAs were not controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code.  The Debtors and the Buyer have not engaged in any conduct that would cause or permit the APAs or the consummation of the Sale Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The Buyer is entitled to all the protections and immunities of section 363(n) of the Bankruptcy Code.

N.     Cause has been shown as to why this Order should not be stayed pursuant to Bankruptcy Rules 6004(h) and 6006(d).  The Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

O.     **Assumption and Assignment in Best Interests**.  The assumption and assignment of the Assigned Contracts by the Debtors pursuant to the terms of this Order is integral to the APAs and is in the best interests of the Debtors, their estates and their creditors, and represents the exercise of reasonable business judgment by the Debtors.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision of the Assigned Contracts or other restriction prohibiting their assignment or transfer.

P.     **Cure/Adequate Assurance**.  The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts.  The Debtors have provided adequate assurance of cure of any default existing prior to the Closing Date under any of the Assigned Contracts, within the meaning of section 365(b)(1) of the Bankruptcy Code. The Buyer has provided adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3)).

Q.    **Free and Clear**.  The sale and assignment of the Assets to the Buyer will be, as of the Closing Date, a legal, valid and effective transfer of such assets, and each such transfer and assignment shall, upon the Closing Date, vest the Buyer with all right, title and interest of the Debtors to the Assets free and clear of all Liens (as defined herein) and Excluded Liabilities, with any such Liens or Excluded Liabilities to attach to the net proceeds to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as were in existence on the Closing Date.  The Buyer would not enter into the APAs to acquire the Assets if the sale of the Assets were not free and clear of all Liens and Excluded Liabilities, or if the Buyer would, or in the future could, be liable for any such Liens or Excluded Liabilities.

R.    **Satisfaction of 363(f) Standards**.  The Debtors may sell and assign the Assets free and clear of all Liens to the maximum extent permitted by law, because, with respect to each creditor asserting a Lien, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens who did not object or who withdrew their objections to the Sale Transactions or any Assumption/Assignment Notice and proposed Cure Costs are deemed to have consented to the Joint Sale Motion and sale and assignment of the Assets to the Buyer pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Liens who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Liens, if any, attach to the net proceeds of the Sale Transactions ultimately attributable to the Assets in which such holders allege a Lien, in the same order of priority, with the same validity, force and effect that such holder had prior to the Sale Transactions, and subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

S.    **No Successor Liability**.  The Buyer and its affiliates and their respective predecessors,  successors,  assigns,  members,  partners,  principals,  directors,  officers

and shareholders (or equivalent) are not successors of the Debtors and shall have no obligations with respect to any liabilities of the Debtors other than those liabilities expressly assumed under or pursuant to the APAs (the "Assumed Liabilities").

       T.    **The Termination Payment was Appropriate**.  The WMLP Debtors have demonstrated a sound business justification for (1) approval of the termination payment of $250,000 (the "Termination Payment") contained in Section 4.6(b) of the Asset Purchase Agreement, dated as of January 22, 2019, by and among Sabine Pass Coal Company, LLC, as purchaser, with Merida Natural Resources, LLC, as guarantor (together, the "Stalking Horse"), and the WMLP Debtors, as sellers, in the form of Exhibit F to the Joint Sale Motion (the "Oxford Stalking Horse Agreement") and (2) performance of their respective obligations under the Oxford Stalking Horse Agreement, including the payment to the Stalking Horse of the Termination Payment under the circumstances described in Sections 4.4(c), (f) or (g) of the Oxford Stalking Horse Agreement.

       U.    In particular, the WMLP Debtors agreed to pay the Termination Payment in connection with an extensive sales process that resulted in the WMLP Debtors receiving a higher and better offer for the Oxford Assets, which has resulted in the maximization of the value of the Oxford Assets for the benefit of the WMLP Debtors' estates, their creditors and other parties in interest.

       V.    The Oxford Stalking Horse Agreement, including the Termination Payment, was negotiated, proposed and entered into by the WMLP Debtors and the Stalking Horse without collusion, in good faith and after being negotiated at arm's-length.

       W.    The Termination Payment (1) is an actual and necessary cost of preserving the WMLP Debtors' estates, (2) is reasonable and appropriate in light of among other things, the substantial benefits that the WMLP Debtors realized through the Stalking Horse's

participation in the sale process of the Oxford Assets and (3) was necessary to induce the Stalking Horse to serve thereas which resulted in the WMLP Debtors receiving a higher and better offer for the Oxford Assets of sufficient size to pay the Termination Payment.

X.      Accordingly, the payment of the Termination Payment is in the best interest of the WMLP Debtors, their respective estates and their creditors.  The Stalking Horse has provided a material benefit to the WMLP Debtors and their creditors by increasing the likelihood that the best possible price for the Oxford Assets was received.

Y.      **Time is of the Essence**.  Time is of the essence in consummating the Sale Transactions.  In order to maximize the value of the Debtors' assets, it is essential that the sale and assignment of the Assets and the Assigned Contracts occur within the time constraints set forth in the APAs.  Specifically, the Sale Transactions must be approved and consummated promptly in order to preserve the viability of the businesses subject to the Sale Transactions as going concerns, to maximize the value to the Debtors, their estates, their creditors and all other parties in interest.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

## IT  IS  THEREFORE,  ORDERED,  ADJUDGED  AND  DECREED THAT:

1.      **Relief Granted**.  The relief requested in the Joint Sale Motion is granted as set forth herein.

2.      **Objections Overruled**.  All objections and responses to the Joint Sale Motion, this Order or the relief granted herein that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on the merits with prejudice.

3.      **Notice**.  Notice of the Joint Sale Motion, including without limitation, the transactions set forth in the APAs and the assumption and assignment of the Assigned

Contracts, the Auction, the Sale Hearing and the Sale Transactions was fair and reasonable under the circumstances and complied with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007 and Rule 5 of and Exhibit C to the Complex Case Procedures.

4. **Approval of Bidding Procedures**.  The Bidding Procedures utilized by the Debtors related to the Sale Transactions are hereby approved and ratified and were appropriate under the circumstances in order to maximize the value obtained from the Sale Transactions for the benefit of the estates.

5. **Approval of Sale Transactions**.  The APAs and the Sale Transactions are hereby approved and authorized in all respects, and the Debtors are hereby authorized and empowered to enter into, and to perform their obligations under, the APAs and to execute and perform such agreements or documents, and take such other actions as are necessary or desirable to effectuate the terms of the APAs.

6. **Good Faith Buyer**.  The Buyer is a good faith purchaser of the Assets and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the APAs or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment shall be governed in all respects by the original provisions of this Order or the APAs, as the case may be.

7.      **Section 363(n) of the Bankruptcy Code**.  The sale approved by this Order is not subject to avoidance or any recovery or damages pursuant to section 363(n) of the Bankruptcy Code.

8.      **Authorization of Performance by the Debtors**.   The Debtors are authorized to fully perform under, consummate and implement the terms of the APAs together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the APAs, this Order and the Sale Transactions, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Assets, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the APAs, without any further corporate action or orders of the Bankruptcy Court.

9.      The Debtors are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the APAs, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

10.      **Valid Transfer Free and Clear**.  Effective as of the Closing, the sale and assignment of the Assets and the Assigned Contracts by the Debtors to the Buyer shall constitute a legal, valid and effective transfer of the Assets and the Assigned Contracts

notwithstanding any requirement for approval or consent by any person, and will vest the Buyer with all right, title and interest of the Debtors in and to the Assets, free and clear of all liens other than those assumed under the APAs, pursuant to section 363(f) of the Bankruptcy Code; provided, however, that Buyer agrees to waive affirmative prosecution of Avoidance Actions that constitute Purchased Assets (but retains all other rights).  The sale and assignment of the Assets and the assignment of the Assigned Contracts to the Buyer vests the Buyer with all right, title and interest of the Debtors to the Assets free and clear of any and all Liens, Excluded Liabilities and other liabilities of any kind or nature whatsoever, whether imposed by agreement, understanding, law, equity or otherwise, with all such Liens to attach only to the net proceeds of the sale and assignment of the Assets with the same priority, validity, force and effect as they now have in or against the Assets.  The Joint Sale Motion shall be deemed to provide sufficient notice as to the sale and assignment of the Assets free and clear of all Liens and Excluded Liabilities in accordance with the Bankruptcy Code, Bankruptcy Rules and Complex Case Procedure**s**; provided, however, that nothing in the Joint Sale Motion, this Order, or the APAs shall be deemed to release any environmental covenants recorded on properties purchased by the Buyer and recorded in accordance with Ohio Revised Code section 5301.  The recorded environmental covenants shall not be released.  Following the Closing, no holder of any Lien on the Assets may interfere with the Buyer's use and enjoyment of the Assets based on or related to such Lien or any actions that the Debtors may take in their chapter 11 cases.

11.    The term "Liens" shall include, among other things, any claim, interest, lien, or encumbrance described in the definition of "Excluded Liabilities" and, without limitation: all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments, or interests of any kind or nature in respect of the Debtors or any property of the Debtors, including, without limitation, the following: (a) any labor agreements; (b) all mortgages, deeds of trust, and security interests; (c) any pension, welfare, compensation, or other employee benefit plans, agreements, practices,

and programs, including, without limitations, any pension plan of any Debtor; (d) any other employee, workers' compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) state unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (e) any bulk sales or similar law; (f) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (g) any theories of successor liability, including any theories on product liability grounds; and (h) any environmental or other liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments, or interests of any kind or nature arising from existing conditions on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or other state statute.

12.    Notwithstanding anything to the contrary in this Order, to the extent permitted by applicable non-bankruptcy law, nothing in this Order or the APAs releases, nullifies, precludes or enjoins the enforcement of any liability of the Buyer to a governmental entity on account of the Buyer's prior ownership or operation of the Assets.

- 14 -

13.     The provisions of this Order authorizing the sale and assignment of the Assets free and clear of Liens and the Excluded Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.     **The Debtors Shall Not Retain Liability for Assigned Contracts and Assumed Liabilities**.  Notwithstanding anything to the contrary in this Order, the APAs or otherwise, effective on the Closing, (a) the assumption of the Assigned Contracts and the Assumed Liabilities by the Buyer constitutes a legal, valid, effective, complete and absolute sale, conveyance and transfer from the Sellers to the Buyer of any and all liabilities relating to, in connection with or arising under the Assigned Contracts and Assumed Liabilities and (b) the Debtors and, except with respect to any governmental unit, their non-Debtor affiliates shall have no liability to Buyer, any governmental agency, surety or any other person for any liabilities with respect to the Assigned Contracts and such Assumed Liabilities (which shall, for the avoidance of doubt, include, among other things, all Assumed Liabilities arising under or relating to (x) any Environmental Laws and (y) the Transferred Permits/Licenses, including such liabilities thereunder arising out of or relating to all Reclamation and post-mining Assumed Liabilities of the Business and the Assets).  Notwithstanding anything to the contrary in the APAs, the term "Environmental Law" in both of the APAs shall mean "any Law relating to (i) the pollution, protection or restoration of the environment, (ii) any spill, emission, release or disposal into the environment of, or human exposure to, any pollutant, contaminant or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or (iii) acid mine drainage, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq.; Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et

- 15 -

seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§ 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701, et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651, et seq.; and the Surface, Mining, Control and Reclamation Act, 30 U.S.C. §§ 1201, et seq., any applicable tribal, state or local law counterparts, as the same may be reauthorized or amended from time to time."

15.     Further, it is the Parties' express intention that the Sale Transactions be, and be treated for all purposes, as an absolute sale, conveyance and transfer of all Liabilities relating to, in connection with or arising under the Assigned Contracts and Assumed Liabilities.

16.     **Direction to Creditors**.   On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens in the Assets, if any, as such Liens may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanics liens, lis pendens or other documents, instruments, notices or agreements evidencing any Lien against or in the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Assets, then with regard to the Assets, (a) the Debtors and/or the Buyer are authorized to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Assets and (b) the Debtors and/or Buyer are authorized to file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens against the Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

- 16 -

17.     **Direction to Government Agencies**.  Subject to paragraph 22, each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APAs and this Order.  All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Liens against the Assets from their records.

18.     **Direction to Surrender Possession and Control**.    All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Assets are directed to surrender possession and control of the Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

19.     **Licenses and Permits**.  Subject to paragraph 22, to the extent provided in the APAs and if available under applicable law, the Buyer may, as of the Closing Date, operate on an interim basis under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Assets and the Assigned Contracts. To the extent any license or permit necessary for the operation of the business is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such licenses or permits of the Debtors shall remain in place for the Buyer's benefit until new licenses and permits are obtained.  Nothing in this paragraph 19 shall impair the police or regulatory authority of any governmental unit set forth in paragraph 22; provided, however, that Buyer may operate the applicable Assets on an interim basis until permits are transferred if in compliance with applicable law.

20.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APAs.

21.     **No Successor Liability**.  The Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the Sale Transactions contemplated by the APAs or any other event occurring in the chapter 11 cases under any theory of law or equity, (b) deemed to have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d) deemed to have a continuity of enterprise with the Debtors or (e) deemed to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. The Buyer shall not assume, nor be deemed to assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any Excluded Liabilities, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as may otherwise expressly provided in the APAs, and the Joint Sale Motion contains sufficient notice of such limitation in accordance with applicable law.  Except for the Assumed Liabilities, the transfer of the Assets and the Assigned Contracts to the Buyer under the APAs shall not result in (a) the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors (including, without limitation, Excluded Liabilities), (b) the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability whatsoever with

- 18 -

respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Liens or Excluded Liability or (c) the Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) or the Assets, having any liability or responsibility to the Debtors or any other person or entity except as is expressly set forth in the APAs.

22.     Notwithstanding anything to the contrary in this Order, including but not limited to paragraphs 11, 17 and 19 hereof, nothing in this Order or the APAs releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of this Order; provided, however, that nothing herein shall subject the Buyer to any liability to a governmental unit for penalties for days of violation prior to closing, response costs incurred by a governmental unit prior to closing, or any liability relating to offsite disposal that occurred prior to closing.  In addition, nothing in this Order or the APAs authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law.

23.     Certain commercial surety companies (collectively, the "Sureties" and each, individually, a "Surety") – including, ACE American Insurance Company, Westchester Fire Insurance Company, First Surety Corporation, Lexon Insurance Company, Argo Surety, Evergreen National Indemnity Company and Travelers Casualty and Surety Company of America – have issued commercial surety bonds on behalf of the Oxford Sellers and their affiliates and Buckingham Sellers and their affiliates (collectively, the "Existing Surety Bonds" and, each individually, an "Existing Surety Bond").  These Existing Surety Bonds are issued

pursuant to certain existing indemnity agreements and/or related agreements (including coal reclamation bond agreements) by and between the Sureties, on the one hand, and the Oxford Sellers and their affiliates and Buckingham Sellers and their affiliates (as applicable) on the other hand (collectively, the "Existing Indemnity Agreements" and, each, an "Existing Indemnity Agreement").

24.     If the Closing Date of the Sale Transactions occur prior to (i) the Buyer's procurement of new operating permits, either replaced or transferred (the "Replacement Permits") with respect to the Assets, (ii) the execution of new indemnity agreements by and between the Sureties, on the one hand, and the Buyer, on the other hand (the "Replacement Indemnity Agreements"), and (iii) the replacement of all Existing Surety Bonds with new surety bonds (collectively, the "Replacement Surety Bonds"), the Oxford Sellers or the Buckingham Sellers (as applicable) will consult with the relevant Sureties with respect to entering into an agreement (an "Interim Agreement"), subject to regulatory authority approval, that would, among other provisions acceptable to the Sureties in the Sureties, the applicable Debtors, and the Buyer's respective sole discretion, allow the Buyer to operate the Assets under the Oxford Sellers' and the Buckingham Sellers' existing mining permits (collectively, the "Existing Permits"), Existing Indemnity Agreements and Existing Surety Bonds until the Buyer obtains Replacement Permits, Replacement Indemnity Agreements and Replacement Bonds. An Interim Agreement may require, among other provisions applicable to the Sureties in the Sureties, the applicable Debtors and the Buyer's respective sole discretion, that the Buyer (a) assumes all obligations under the Existing Permits, Existing Indemnity Agreements and the Existing Surety Bonds for the mining and other activities the Buyer conducts during the term of the Interim Agreement and (b) indemnifies the Oxford Sellers and/or the Buckingham Sellers

- 20 -

(as applicable) and their respective affiliates and the Sureties from and against any and all claims, liability, loss or default that occur during the term of the Interim Agreement.

25.    With regard to each Surety, upon the (a) issuance of the Replacement Permits, (b) execution of the Replacement Indemnity Agreements (if applicable), (c) termination and/or release of all Existing Surety Bonds, (d) satisfaction of all obligations under the Existing Indemnity Agreements, including, without limitation, the payment and/or reimbursement of all premiums, fees and expenses, including reasonable attorneys' fees, (x) the applicable Surety shall release the collateral (if any) securing such Existing Surety Bonds (the "Surety Collateral") or the proceeds of such Surety Collateral, and such Surety shall be irrevocably directed to deliver such Surety Collateral or the proceeds thereof in accordance with the APAs to (i) the Surety providing Replacement Surety Bonds for the Existing Surety Bonds issued by such Surety, in the case of the Surety Collateral or proceeds thereof associated with the Oxford Sellers and (ii) Buckingham Coal Company, LLC in the case of the Surety Collateral or proceeds thereof associated with the Buckingham Seller, in each case as identified in Exhibit A and (y) the WLB Debtors and WMLP Debtors (including the Oxford Sellers and the Buckingham Sellers) and their affiliates shall have no further obligations to such Surety under the Existing Indemnity Agreements with such Surety on account of the Assets or any obligations related thereto.

26.    Nothing in this Order, the APAs or any documents related to any of the foregoing shall be construed to authorize or permit the Buckingham Sellers' or the Oxford Sellers' assumption and assignment of any Existing Surety Bond or Existing Indemnity Agreement or to obligate any Surety to replace any Existing Surety Bond in connection with the Sale Transactions.

- 21 -

27.    Nothing herein, in any APA, or any asset purchase agreement shall be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Existing Surety Bond or Existing Indemnity Agreement.

28.    Except as set forth in an Interim Agreement referenced in paragraph 25 above, the Buyer shall not be (a) liable for any Existing Surety Bonds and/or obligations arising under the Existing Indemnity Agreements to the extent they relate to any assets that are not transferred to the Buyer or (b) deemed a substitute principal under any Existing Surety Bond or an indemnitor under any Existing Indemnity Agreement.

29.    Except as otherwise provided in paragraphs 23 through 28 of this Order, nothing in this Order, the APAs or otherwise shall be deemed to:  (a) alter, limit, expand, modify, release, waive or prejudice any rights, remedies and/or defenses of any Surety or obligee under any Existing Surety Bond relating to any assets, obligations or liabilities to be transferred to Buyer, including, without limitation, mining permits, surface and coal leases and mine-related facilities and other contractual obligations; (b) authorize or permit the assignment or assumption of any Existing Surety Bonds, any Existing Indemnity Agreements, including without limitation, any coal bond reclamation agreement, collateral agreement or other agreements of the WLB Debtors or WMLP Debtors with such Surety or Sureties, (collectively, the "Surety Agreements"); (c) alter, limit, expand, modify, prejudice, release or waive any rights of such Sureties or obligees under the Surety Agreements; (d) alter, limit, expand, modify, prejudice, waive or release any rights of such sureties in any and all collateral of such Surety or Sureties that secures any and all obligations of the WLB Debtors or the WMLP Debtors under any Existing Surety Bonds or Existing Indemnity Agreements; or (e) alter, limit, expand,

modify, prejudice, waive or release any rights of the Sureties or obligees in connection with any of the WLB Debtors' or WMLP Debtors' chapter 11 cases.

30.     Notwithstanding anything to the contrary in the Joint Sale Motion, the APAs, this Order or any document related to any of the foregoing, (i) none of the insurance policies or any related agreements (collectively, the "Chubb Insurance Contracts") issued by ACE American Insurance Company, Westchester Surplus Lines Insurance Company, ACE Property & Casualty Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, ACE Insurance Company of Texas, Federal Insurance Company, Great Northern Insurance Company, Chubb Insurance Company of Canada, and/or their respective affiliates (collectively, and with each of their successors, "Chubb") or any rights, benefits, claims, rights to payments and/or recoveries under the Chubb Insurance Contracts, shall be included among the Assigned Contracts or the Assets; and (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Chubb Insurance Contracts, and any proceeds due under the Chubb Insurance Contracts shall be paid only to the applicable Debtors (as opposed to the Buyer) or other insured or claimant thereunder; provided, however, that to the extent any claim arises under the Chubb Insurance Contracts with respect to any Assets, the Debtors or other insured or claimant thereunder may pursue such claims in accordance with the terms of the Chubb Insurance Contracts, and, if applicable, turn over to the Buyer any proceeds in accordance with the terms of the APAs; provided further, however, that, Chubb Insurance Contract policy number M00982556 issued by ACE Property & Casualty Insurance Company for the period of July 1, 2018, to July 1, 2019 (the "Umbrella Policy"), shall be modified such that the Umbrella Policy shall no longer provide any insurance coverage with respect to any of the Assets as of the Closing Date, and the automatic stay imposed by section 362(a) of the

Bankruptcy Code, to the extent applicable, is lifted to effectuate such modification in a form agreed-upon by ACE Property & Casualty Insurance Company and the Debtors.

31.     **No Bulk Sales; No Brokers**.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transactions.  No brokers were involved in consummating the Sale Transactions, and no brokers' commissions are due to any person or entity in connection with the Sale Transactions.  The Buyer is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Sale Transactions based upon any arrangement made by or on behalf of the Debtors.

32.     **Assumption and Assignment of Assigned Contracts**.     Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transactions, the Debtors' assumption and assignment of the Assigned Contracts to the Buyer free and clear of all Liens and Excluded Liabilities pursuant to the terms set forth in the APAs, as modified by the terms of any amendments reached directly by the Buyer with the respective counterparty, is hereby approved, and the requirements of sections 365(b)(1) and 365(f)(2) (including to the extent, if any, modified by section 365(b)(3)) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Other than as set forth in paragraph 33 hereof, each counterparty to the Assigned Contracts is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtors or the Buyer, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated senior

- 24 -

or subordinate) arising under or out of, in connection with, or in any way related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.

33.     **Cure Costs**.  All defaults or other obligations shall be deemed cured by the payment or other satisfaction of the cure amounts, if any, associated with the Assigned Contracts (the "Cure Costs").  Payment of the Cure Costs pursuant to the APAs is hereby authorized.  To the extent any objections to proposed cure amounts were filed (a "Cure Objection"), there will be a separate hearing to resolve such Cure Objections, if any such objection has not been resolved as of the date hereof.  To the extent the closing of the Sale Transactions has occurred prior to the resolution of any outstanding Cure Objections, the applicable Assigned Contracts will be conditionally assumed and assigned as of the date of the closing of the Sale Transactions, subject to the consent of the Buyer, pending a resolution of the objection after notice and a hearing.  If a Cure Objection is not resolved to the satisfaction of the Buyer, the Buyer may determine that such Assigned Contract should be rejected and not assigned, in which case the Buyer will not be responsible for any Cure Costs in respect of such contract.  Consistent with the APAs, until the Closing of the Sale Transactions, the Buyer may add or remove any contract or lease from the schedule of Assigned Contracts under each APA for any reason.

34.     **Adequate Assurance**.  All objections relating to adequate assurance of future performance of the Buyer (an "Adequate Assurance Objection") have been overruled, resolved or withdrawn.  The Buyer has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3)).  All other requirements and conditions (other than the resolution of any

- 25 -

remaining Cure Objections (as set forth in paragraph 33 hereof) under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts have been satisfied.

35.    **Anti-Assignment Provisions Unenforceable**.  No sections or provisions of the Assigned Contracts that purport to (a) prohibit, restrict or condition the Debtors' assignment of the Assigned Contracts, including, but not limited to, the conditioning of such assignment on the consent of the nondebtor party to such Assigned Contracts, (b) authorize the termination, cancellation or modification of the Assigned Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances, (c) declare a breach or default as a result of a change in control in respect of the Debtors, or (d) provide for additional payments, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the nondebtor third party to the Assigned Contracts, or modification of any term or condition upon the assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  The entry of this Order constitutes the consent of the nondebtor parties to the Assigned Contracts to the assumption and assignment of the Assigned Contracts.  Each of the Assigned Contracts shall remain in full force and effect, without existing default(s), subject only to payment by the Buyer of the Cure Cost, if any, payable with respect to such Assigned Contract.

36.    **No Fees for Assumption and Assignment**.  There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer, its successors

- 26 -

or assigns or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

37.    **Notice of Assumption and Assignment**.  The Debtors have served all of the nondebtor counterparties to the Assigned Contracts identified on the lists the Debtors have filed with the Bankruptcy Court, by overnight mail, an Assumption/Assignment Notice that included (a) the title of the Assigned Contract, (b) the name of the counterparty to the Assigned Contract, (c) any applicable Cure Costs, and (d) the deadline by which any such Assigned Contract counterparty must file an objection ("Objection") to the proposed assumption and assignment.  No other or further notice is required.

38.    **Objections to Assumption and Assignment**.  Except as provided herein, all Objections have been overruled, withdrawn, waived, settled or otherwise resolved. Any Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Bankruptcy Court.  The pendency of a dispute relating to a particular Assigned Contract shall not prevent or delay the assumption and assignment of any other Assigned Contract or the Closing.

39.    Any nondebtor counterparty to the Assigned Contract designated to be assumed and assigned to the Buyer who has not filed an Objection by the deadline as set forth in the Assumption/Assignment Notice shall hereafter be barred from objecting or asserting monetary or non-monetary defaults with respect to any such Assigned Contract, and such Assigned Contract shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date.

40.    **Direction to Counterparties of Assigned Contracts**.  All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the

reasonable requests of the Buyer, and shall not charge the Buyer for, any instruments, applications, consents or other documents that may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transactions.

41.    **Payment of the Termination Payment**.  For the reasons set forth in this Order, the Termination Payment as set forth in the Oxford Stalking Horse Agreement is hereby approved.  This Order approves a "Competing Transaction" as described in Section 4.4(f) and (g) of the Oxford Stalking Horse Agreement, and, accordingly, the WMLP Debtors are authorized and directed to pay the Termination Payment, in cash, as provided under the terms of the Oxford Stalking Horse Agreement, without need for any further motion, application, notice, approval or order of the Bankruptcy Court.

42.    **Return of Deposit Amount**.  Because the Stalking Horse was not the Successful Bidder, pursuant to the Bidding Procedures, the Stalking Horse is entitled to the return of the deposit amount (the "Stalking Horse Deposit Amounts") held by (a) the WMLP Debtors pursuant to Section 3.2 of the Oxford Stalking Horse Agreement and (b) the WLB Debtors pursuant to Section 3.2 of the Asset Purchase Agreement by and among Bayou Coal Partners, LLC, as buyer, with Merida Natural Resources, LLC, as guarantor (collectively, with the Stalking Horse, the "Original Stalking Horses"), and the Buckingham Sellers, as seller, dated as of February 22, 2019 (together, with the Oxford Stalking Horse Agreement, the "Stalking Horse Agreements").  Accordingly,  WMLP and Buckingham Coal Company, LLC, are authorized and directed to return the respective Stalking Horse Deposit Amounts to the Original Stalking Horses under each of the Stalking Horse Agreements pursuant to the terms provided therein without any further order of the Bankruptcy Court.

NAI-1506300228v7

43. **Amendments**. Subject to the terms of the APAs, the APAs and any related agreements may be waived, modified, amended or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Bankruptcy Court; provided, however, that any such waiver, modification, amendment or supplement does not have a material and adverse effect on the Debtors and their estates. The Debtors and the Buyer are expressly authorized, without further order of the Bankruptcy Court, to execute an amendment to the APAs to provide for the Closing to occur on one or more Closing Dates. Any material modification, amendment or supplement to the APAs that has an adverse effect on the Debtors and their estates must be approved by order of the Bankruptcy Court following a motion on notice to all interested parties.

44. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APAs (including any amendments thereof authorized hereby) or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court, the Debtors and the Buyer that the APAs and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

45. **Binding Order**. This Order and the APAs shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case if any of the Debtors' cases are converted from chapter 11, all creditors of any Debtor (whether known or unknown), all nondebtor parties to any Assigned Contracts, filing

- 29 -

agents, filing officers, title agents, recording agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets.  The APAs and Sale Transactions shall not be subject to rejection or avoidance under any circumstances.  This Order and the APAs shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer and its respective successors and assigns.

46.     **Allocation of Consideration**.  Except as provided in the APAs, all rights of the respective Debtors' estates with respect to the allocation of consideration received from the Buyer in connection with the Sale Transactions (including, without limitation, the value of the assumption of the Assumed Liabilities) are expressly reserved for later determination by the Bankruptcy Court and, to the extent consideration is received by any Debtor that is determined to be allocable to another Debtor, the recipient Debtor shall be liable to such other Debtor for a claim with the status of an expense of administration in the case of the recipient Debtor under section 503(b) of the Bankruptcy Code.

47.     **No Stay of Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  Time is of the essence in closing the Sale Transactions referenced herein, and the Debtors and the Buyer intend to close the Sale Transactions as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing or risk its appeal being foreclosed as moot.

NAI-1506300228v7

48.     **Lift of Automatic Stay**.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Bankruptcy Court, to allow the Buyer to deliver any notice provided for in the APAs and allow the Buyer to take any and all actions permitted under the APAs, in each case in accordance with the terms and conditions thereof.

49.     **Retention of Jurisdiction**.   The Bankruptcy Court shall retain jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order and the APAs, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, and (b) to decide any disputes concerning this Order and the APAs, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APAs and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning (x) the transfer of the assets free and clear of all Liens and (y) the absolute conveyance of the Assumed Liabilities and Assigned Contracts.

50.     **Further Assurances**.  From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transactions, including such actions as may be necessary to (a) vest in the Buyer its right, title and interest, free and clear of all Liens and Excluded Liabilities, in and to the Assets and the

NAI-1506300228v7

Assigned Contracts, and (b) perfect, confirm or record the vesting of such Assets and Assigned Contracts in the Buyer, free and clear of all Liens and Excluded Liabilities.

51. **Governing Terms**.  To the extent this Order is inconsistent with any prior order or pleading in these chapter 11 cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the applicable APA (including all ancillary documents executed in connection therewith and any amendments thereto authorized hereby), the terms of the applicable APA, as amended, and such documents shall govern.

52. Notwithstanding anything to the contrary in the Oxford APA, Section 2.3(d) thereof shall be deleted and replaced with the following:  "all Liabilities of Sellers arising out of or relating to (i) the Transferred Permits/Licenses, including such Liabilities thereunder arising out of or relating to all Reclamation and post-mining Liabilities of the Business or the Purchased Assets and such Liabilities thereunder arising with respect to the Interim Period, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Business, but excluding any Excluded Pre-Closing Fines, (iii) the Purchased Assets' or the Business's compliance with Environmental Laws and Mine and Mining Safety Laws, and (iv) any conditions arising from a spill, emission, release or disposal into the environment of, or human exposure to, hazardous materials resulting from the operation of the Business or Purchased Assets." **

Signed:  February 05, 2019.

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

- 32 -

** Any claim arising out of the closing of the contemplated sale shall be filed within 30 days of such closing.

# EXHIBIT A

## Surety Collateral

The below surety collateral for Buckingham shall be delivered to Buckingham Coal Company, LLC or its designee in accordance with paragraph 25 of this Order:

| Bank Account Number | Applicable Surety | Amount as of 12/31/2018 (amounts may be different at Closing) |
|---|---|---|
| Wells Fargo/Wellington Account Ending 4579 | First Surety | $75,496.85 |

The below surety collateral for Oxford shall be delivered to the Buyer or its designee in accordance with paragraph 25 of this Order:

| Bank Account Number | Applicable Surety | Amount as of 12/31/2018 (amounts may be different at Closing) |
|---|---|---|
| Wells Fargo/Wellington Account Ending 9315 | First Surety | $2,700,000 |
| BNY Mellon Capital Markets, LLC Account Ending 8335 | Lexon | $2,939,928.69 |