UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) ) ) | Case No. 18-35672 (DRJ) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
AUTHORIZING AND APPROVING INTERCOMPANY SETTLEMENT TERM SHEET**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**
>
> **A HEARING WILL BE HELD ON THIS MATTER ON FEBRUARY 26, 2019, AT 1:00 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion (this "Motion").[3]

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet (as defined herein).

[3] A detailed description of the Debtors' businesses and the reasons for commencing the chapter 11 cases is set forth in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of Westmoreland Coal Company, in Support of*

**Preliminary Statement**

1. Following months of good faith, arm's-length discussions between the WLB Debtors, the WMLP Debtors, the WLB Secured Lenders, and the MLP Secured Lenders, the parties have agreed, subject to Court approval, to resolve all disputes between the estates (collectively, the "Settlement") on the terms set forth in the term sheet attached hereto as **Annex 1** (the "Term Sheet") to **Exhibit A**. The Term Sheet represents a significant achievement for these cases that will facilitate confirmation of the WLB Debtors' chapter 11 plan, resolve potentially costly and distracting litigation regarding the estates' relative responsibilities regarding the now-transferred Oxford mining complex in Ohio, and provide certainty to the market regarding the extent of the WLB Debtors' support for the Kemmerer sale process. Therefore, the Debtors respectfully request that the Court approve the Settlement in connection with the WLB Debtors' forthcoming confirmation hearing, which is scheduled to commence on February 26, 2019.

2. As detailed herein and in the Term Sheet, the Settlement provides a host of benefits to the estates, including the following key terms.

- *Intercompany Transition Services.* The WLB Purchaser will continue to provide management and back-office services to the WMLP Debtors for a period of at least six (6) months following the WLB Debtors' emergence from chapter 11, which will provide clarity to prospective bidders in the Kemmerer sale process and facilitate an orderly separation of the estates in the coming months.

- *Professional Fee Allocation.* The Settlement resolves potentially disruptive, expensive litigation regarding the allocation of professional fees and expenses between the estates regarding inter-Debtor matters, as well as the allocation of fees and expenses related to the forthcoming trial on the Debtors' pending motion for relief under sections 1113 and 1114 of the Bankruptcy Code.

- *Pension Plan.* The WLB Purchaser has agreed to assume the Elkol-Sorenson Plan (as frozen), which covers former and current employees associated with the Kemmerer mine, eliminating a potentially significant general unsecured

---

*Chapter 11 Petitions and First Day Pleadings* [Docket No. 54] (the "First Day Declaration"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.

2

claim against the Debtors' control group. This arrangement, together with the WLB Purchaser's prior agreement to assume the WLB Debtors' two other PBGC-backed pension plans (as frozen) will allow for the smooth transition of these pension plans to the WLB Purchaser upon emergence, without an interruption to benefits.

- ***Retiree Benefits Settlement.***  The Debtors have agreed to support a settlement proposal to the UMWA to resolve retiree benefit obligations, pursuant to which the WMLP Debtors would fund $1 million of such settlement amount[4] and the WLB Debtors or the WLB Secured Lenders would fund the balance of such settlement amount; provided that any payment from the WLB Debtors or the WLB Secured Lenders in excess of $5 million requires the WLB Secured Lenders' consent.

- ***CBA Modifications.***  The WLB Debtors have agreed, following entry of any relief granted in the forthcoming trial on the Debtors' pending motion for relief under sections 1113 and 1114 of the Bankruptcy Code, to voluntarily continue certain existing compensation and benefit arrangements for employees associated with the Kemmerer mine. (For the avoidance of any doubt, the Debtors will ***not*** continue to provide any Coal Act-related or similar benefits to their UMWA-affiliated retirees.) The Debtors believe this proposal will minimize possible personnel disruptions at the Kemmerer mine during the final stages of its chapter 11 sale process and permit an orderly transition of that asset to its ultimate successful bidder.

- ***Non-Solicitation of Certain Employees.***  The WLB Debtors have agreed not to reassign certain key employees who work at the Kemmerer mine to other parts of the WLB Debtors' operations until after the WLB Debtors' emergence from chapter 11. The WLB Purchaser has agreed not to hire or solicit for hire such employees for a period of six (6) months following the closing of a sale of the Kemmerer mine.

- ***Tender Offer.***  The WLB Debtors have agreed, with the consent of the WLB Secured Lenders, to tender for all of WMLP's outstanding public units not directly or indirectly held by WLB, and to pay certain fees and expenses associated therewith, which will address certain possible federal income tax effects of the ultimate resolution of WMLP Debtors' chapter 11 cases on WMLP's unaffiliated common unitholders.

- ***Wyoming Tax Claim.***  The WMLP Debtors have agreed to pay a pending Wyoming severance tax claim in an amount not to exceed $572,000, with the WLB Debtors to pay any go-forward interest and penalties in excess of $572,000.

---

[4] The WMLP Debtors' contribution is solely with respect to Kemmerer-related UMWA retiree benefit obligations.

3

Accordingly, the Debtors respectfully request that the Court approve the Settlement and authorize the Debtors to enter into the Term Sheet.

### Relief Requested

3.  The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), authorizing the Debtors' entry into the Term Sheet and approving the Settlement.

### Jurisdiction, Venue and Procedural Background

4.  The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.  The bases for the relief requested herein are sections 105(a), 363(b), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Bankruptcy Rules 2002 and 9019.

6.  On October 9, 2018 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On October 18, 2018, the United States Trustee for the Southern District of

Texas appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 206] (the "Committee").

### The Debtors' Intercompany Arrangements

I.   **Corporate Relationships Between the WLB Debtors and WMLP Debtors.**

7.   WLB holds approximately 94.4 percent of the common limited partnership interests of WMLP (the "Common Units"), which is a publicly-traded master limited partnership that owns the Kemmerer mining complex in Kemmerer, Wyoming.[5]  The remaining approximately 5.6 percent of Common Units are primarily publicly held (the "Public Units"), with WMGP holding 0.164 percent of the Public Units.  WLB also owns 100 percent of the equity interests of WMGP.

8.   In addition to the foregoing, there are numerous intercompany relationships between the WLB Debtors and the WMLP Debtors: (a) the WLB Debtors provide all personnel and management services necessary for the WMLP Debtors' operations; (b) WLB is the employer under the United Mine Workers of America collective bargaining agreement with respect to the employees who work at the WMLP Debtors' assets; and (c) the WLB Debtors provide back-office support, including enterprise-wide insurance coverage, health and benefits coverage, and compensation administration for the employees who work at the WMLP Debtors' assets.

9.   To facilitate the various forms of operational support between the WLB Debtors and the WMLP Debtors, WMLP and WMGP (but not WLB or any other WLB Debtor) are parties to that certain administrative and operational services agreement, dated as of January 1, 2015 (as amended, restated, modified and supplemented from time to time in accordance with the terms thereof, the "Shared Services Agreement").  Under the Shared Services Agreement, the WLB

---

[5]   In connection with the filing of this Motion, the WMLP Debtors closed the sale of the Oxford mining complex in Ohio, which was their only other operating asset.

Debtors (through WMGP) provide services and personnel to WMLP, and are reimbursed for related costs incurred on WMLP's behalf. The services provided by the WLB Debtors (through WMGP) include, among other things, operating services, engineering services, and general and administrative services, including legal, accounting, treasury, insurance administration and claims processing, risk management, health, safety and environmental, information technology, human resources, credit, payroll, internal audit, taxes, and engineering services. Where costs are specifically incurred on behalf of one of WMLP's affiliates, those costs are billed directly to WMLP, and are allocated to WMLP in a variety of methods when the cost or service applies equally to all employees.

10. The Shared Services Agreement provides for an annual fixed fee, which is currently set at $2.2 million, to compensate the WLB Debtors for providing management and other back-office services necessary to operate the WMLP Debtors' operations. For the year ended December 31, 2017, in addition to the annual fixed fee, WMLP reimbursed the WLB Debtors approximately $64.5 million on account of expenses incurred by the WLB Debtors with respect to employee and certain other costs.

11. In light of the various connections between the WLB Debtors and the WMLP Debtors, the WMGP's Board of Directors established a conflicts committee (the "Conflicts Committee") to provide a forum to address potential conflicts of interest. The Conflicts Committee consists solely of independent directors, and has its own independent legal counsel (Jones Day) and an independent investment banker (Lazard Freres & Co. LLC).

**II.    The Restructuring Discussions and Intercompany Disputes.**

12. Before and after the Petition Date, the Debtors have worked with their respective lender constituents to develop and execute restructuring transactions that maximize the value of the respective estates. Specifically, on October 9, 2018, the WLB Debtors entered into a

6

restructuring support agreement (the "RSA") with their Consenting Stakeholders (as defined in the RSA), which includes milestones for the consummation of a sale of substantially all of the WLB Debtors' assets to the WLB Purchaser (or an alternative purchaser selected via an auction), the conditions of which were also included in the WLB Debtors' final DIP order.  In accordance with the RSA, the WLB Debtors and the Consenting Stakeholders have engaged in good faith discussions with WMLP and its secured creditors regarding the terms of any transition services or similar arrangements with respect to the shared services provided by the WLB Debtors to WMLP in the event a chapter 11 plan with respect to the WMLP Debtors does not become effective on or before the effective date of the WLB Debtors' chapter 11 plan.

13.     The WLB Debtors ultimately did not receive any alternative qualified bids and declared that the stalking horse bid submitted by the Consenting Stakeholders was the highest and best bid for their assets.  As a result, pursuant to the WLB Debtors' plan, the stalking horse bidder will acquire substantially all of the WLB Debtors' assets (including certain back-office, information technology, and related systems and records that historically were used to provide services to the WMLP Debtors' business) and employ the WLB Debtors' executive management team.  Ahead of closing the WLB Debtors' sale transaction, the parties have engaged in discussions regarding certain transition-related matters to provide for an orderly separation of the businesses in accordance with the provisions of the RSA.  The parties' efforts have accelerated in recent weeks due to the impending confirmation hearing on the WLB Debtors' plan and certain claims asserted by the WMLP Debtors and their secured lenders [Docket Nos. 1199, 1201] and confirmation-related objections [Docket Nos. 1200, 1201].  These issues and others, if left unresolved, may inhibit the ability of the WLB Debtors and WMLP Debtors to move forward with their respective contemplated restructuring transactions.

**Summary of the Material Terms of the Settlement**

14. After extensive discussions between the WLB Debtors, the WMLP Debtors, and their respective secured creditors, the parties have agreed to the Settlement, which resolves all outstanding matters between the WLB Debtors and the WMLP Debtors, and ensures the support of the parties with respect to chapter 11 plans for the WLB Debtors and WMLP Debtors and the sale of the Kemmerer mine. The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Term Sheet. In the event of any inconsistency between this summary and the Term Sheet, the Term Sheet controls in all respects.

- *Intercompany Transition Services.* The WLB Purchaser will continue to provide Management Services and Back-Office Services to the WMLP Debtors for a period of at least six (6) months following the WLB Debtors' emergence from chapter 11. In exchange for such services, the WMLP Debtors will pay the WLB Purchaser an amount equal to (x) $400,000 per month for months that both Back-Office Services and Management Services are provided and (y) $200,000 per month for months that only Back-Office Services are provided.

- *Professional Fee Allocation.* The Settlement contemplates the allocation of professional fees and expenses between the estates regarding inter-Debtor matters, as well as the allocation of fees and expenses related to the forthcoming trial on the Debtors' pending motion for relief under sections 1113 and 1114 of the Bankruptcy Code. Shared fees and expenses of professionals retained by the Debtors or the Official Committee of Unsecured Creditors shall be allocated 70% to the WLB Debtors and 30% to the WMLP Debtors, except with respect to (x) professional fees and expenses incurred for seeking modifications to the collective bargaining agreements with the UMWA, for which the WMLP Debtors will pay $1 million and the balance will be paid by the WLB Debtors, (y) professional fees and expenses incurred for seeking modifications to retiree benefits, all of which will be paid by the WLB Debtors, and (z) the fees and expenses of the Tender Offer (including expenses related to the negotiation, documentation, implementation and execution of such Tender Offer), for which the WMLP Debtors shall bear 70% of the expenses and the WLB Debtors shall bear 30% of the expenses.

- *Pension Plan.* Upon the entry of the 1113/1114 Order, the Elkol-Sorenson Plan shall be frozen and the WLB Purchaser shall become the plan sponsor of the Elkol-Sorenson Plan and assume all obligations thereunder. The Kemmerer Assets shall be sold free and clear of any pension obligations and none of the WMLP Debtors (or any purchaser of any of the WMLP Debtors' assets) shall

assume, or become the plan sponsor, of any defined benefit pension plan, including the Elkol-Sorenson Plan.

- **Retiree Benefits Settlement.** The Debtors have agreed to support a settlement proposal to the UMWA to resolve retiree benefit obligations, pursuant to which the WMLP Debtors would fund $1 million of such settlement amount[6] and the WLB Debtors or the WLB Secured Lenders would fund the balance of such settlement amount; provided that any payment from the WLB Debtors or the WLB Secured Lenders in excess of $5 million requires the WLB Secured Lenders' consent.

- **CBA Modifications.** Pursuant to an agreement with the UMWA or authority granted to WLB pursuant to the 1113/1114 Order, WLB shall (a) reject the Kemmerer CBA, (b) implement any of WLB's final proposals made by the WLB Debtors to the UMWA pursuant to section 1113 of the Bankruptcy Code agreed to by the UMWA (and acceptable to the MLP Secured Lenders and the Required Consenting Stakeholders), (c) modify pursuant to section 1114 of the Bankruptcy Code any "retiree benefits" (as such term is defined in section 1114 of the Bankruptcy Code) in return for the retiree benefits settlement referenced above, and (d) freeze the Elkol-Sorenson Plan. Pursuant to the Settlement, WLB will agree to continue the terms and conditions of employment of UMWA members (unless otherwise authorized to change such terms and conditions by the purchaser of the Kemmerer Assets (following the closing of the sale of such assets) or as otherwise agreed with the WMLP Debtors and MLP Secured Lenders (prior to closing of such sale).

- **Tender Offer.** The WLB Debtors have agreed, with the consent of the Required Consenting Stakeholders, to allow a subsidiary of WLB to tender for all of the equity interests in WMLP not directly or indirectly held by WLB for a total price, for all such equity interests collectively, not to exceed $15,000, and to pay certain fees and expenses associated therewith. In the event a subsidiary of WLB does not tender for such interests, the Required Consenting Stakeholders will cause the WLB Purchaser to make such tender. The consummation of the acquisition of Public Units is conditioned on (x) the entry of an order granting approval of the Tender Offer and (y) the Settlement being approved by the Court.

- **Wyoming Tax Claim**: The WMLP Debtors, with the consent of their secured lenders, have agreed to pay a pending Wyoming severance tax claim in an amount not to exceed $572,000, with the WLB Debtors to pay any go-forward interest and penalties in excess of $572,000. Such payment shall be effectuated no later than two (2) business days after entry of the order approving the Settlement.

---

[6] The WMLP Debtors' contribution is solely with respect to Kemmerer-related UMWA retiree benefit obligations.

9

15. Accordingly, the Debtors have determined that the Settlement is in the best interest of both the WLB Debtors' and WMLP Debtors' estates, and seek authorization from the Court to effectuate the Settlement and implement its terms consistent with the Term Sheet.

**Basis for Relief**

16. Bankruptcy Rule 9019(a) provides, in relevant part: "On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a).

17. "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted). Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[s] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

18. Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, equitable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court. *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d 599, 602-603 (same).

19. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the

court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).[7]

20. The standard set forth under Bankruptcy Rule 9019(a) is similar to the requirements for relief of section 363(b)(1) of the Bankruptcy Code.[8] It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business if there is a good business reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.C.C.)*, 650 F. 3d 593, 601(5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1308 (5th Cir. 1985) (holding that the standard to assume a lease is the business judgment standard).

21. "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005). "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d at 1309.

---

[7] Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Authorizing the Debtors to proceed with the Settlement falls squarely within the spirit of Bankruptcy Rule 9019, if not the letter, as well as the Bankruptcy Code's predilection for compromise. Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

[8] The Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. § 363(b)(1).

22. The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors a court must consider in determining whether a compromise is "fair, equitable, and within the best interest of the estate are: '(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise.'" *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008) (citing the factors set forth by the court in *Jackson Brewing*); s*ee also Age Ref. Inc.*, 801 F.3d at 540 (same).

23. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. **First**, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors). "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *Foster Mortgage*, 68 F.3d at 917 (quoting *In re Transcontinental Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985)). **Second**, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

I.  **The Settlement is in the Best Interest of the Debtors' Estates.**

24. The Debtors respectfully submit that the Settlement satisfies the standards for approval pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code, and that the Court should therefore approve the Settlement. The Settlement, which is the product of extensive good-faith, arm's-length discussions between the Debtors and their respective stakeholders,

12

obviates possible litigation between the estates regarding potential claims and causes of action. In doing so, it clears the way for all parties to support confirmation of the WLB Debtors' chapter 11 plan and the WMLP Debtors' Kemmerer sales process.

25.     The Settlement also sets forth the terms on which the WMLP Debtors (and, potentially, a purchaser of the Kemmerer Assets) will receive support from the WLB Purchaser for a transition period following the WLB Debtors' emergence from chapter 11.  The continuation of shared services will provide clarity to the market and other key stakeholders (including government regulators and sureties) that the WMLP Debtors will continue to receive the support necessary to complete their sales process.  The Settlement will also obviate possible litigation between the estates regarding their responsibility for the costs of the fees, expenses, and any consideration paid in connection with the 1113/1114 trial.

26.     The proposed Settlement is not without cost, however.  The Settlement requires the WMLP Debtors and their lenders to withdraw and waive any possible postpetition Oxford-related asset reclamation obligation claims they may have, including those purported administrative expense claims they asserted against the WLB Debtors in court filings.  The Settlement also requires the WLB Debtors and the WMLP Debtors to waive certain claims and causes of action. Finally, the Settlement will require both estates to satisfy a larger than anticipated share of certain fees, costs, expenses, and other disbursements related to the administration of these cases and the prosecution of the 1113/1114 trial.  The Debtors, in consultation with their advisers, strongly believe that the Settlement's benefits far outweigh any such costs.  Accordingly, the Debtors respectfully request that the Court approve the Settlement and authorize the Debtors to enter into the Term Sheet.

**II. The Tender Offer is an Integral Component of the Settlement and Should be Approved.**

27. The Settlement will address the possible federal income tax effects of the WMLP Debtors' forthcoming Kemmerer sale transaction on WMLP's public unit holders (the "Public Unitholders"). Absent the Tender Offer, the Public Unitholders face the prospect of a "double loss" in the form of a potentially significant tax bill (triggered by the compromise of WMLP's debt in these cases, which will give rise to "cancellation of debt income" ("CODI"), in addition to the loss of all value in their Public Units. This result is plainly inequitable, particularly given that the vast majority of Public Unitholders are individual, rather than institutional, investors. The Tender Offer would provide Public Unitholders the opportunity to tender their Public Units to the extent that Public Unitholders determine that it is in their best interests to do so, at a relatively minimal cost to the estates.

28. In the *LINN Energy* chapter 11 cases, this Court approved a remedy similar to the proposed Tender Offer under analogous circumstances. *See In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (Docket No. 124) In *LINN Energy*, the debtors requested an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing them to consummate an exchange offer, commenced prepetition, by which holders of units in one debtor – which units were subject to CODI anticipated to result from the debtor's restructuring – were given the opportunity to exchange such units for shares in another debtor, a limited liability company, for the express purpose of ameliorating the negative impacts of CODI on certain unitholders. *See In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 11, 2016) (Docket No. 12). In the motion, the debtors argued that the proposed exchange offer represented an appropriate exercise of the debtors' business judgment, because "[t]he Exchange Offer represents the rare opportunity for Debtors to provide a potential benefit to a diverse group

14

of stakeholders at minimal cost and without the risk of harm to any other constituency, . . . [and] the decision of an individual LINN unitholder to participate in the Exchange Offer is entirely at the option of such holder based on its assessment of the potential benefits[.]" *Id*. at ¶ 9. The Court entered an order granting the motion and approving the exchange offer. *See In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (Docket No. 124).

29. Here, as in *LINN Energy*, the Tender Offer presents a "rare opportunity" for the Debtors to enable Public Unitholders to avoid deleterious tax consequences of WMLP's chapter 11 case, at minimal cost to the estates, and on a purely voluntary basis for Public Unitholders. Accordingly, the Debtors submit that the Tender Offer represents a valid exercise of the Debtors' business judgment and should be approved.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

30. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Emergency Consideration

31. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. The confirmation hearing for the WLB Debtors' chapter 11 plan is currently scheduled to begin on February 26, 2019. The Settlement resolves inter-Debtor issues that would otherwise require briefing and argument at the confirmation hearing. Accordingly, the Debtors respectfully request that the Court consider the relief requested in this Motion on an emergency basis so the Settlement may be heard concurrently with the proposed confirmation of the WLB Debtors' chapter 11 plan.

**Notice**

32. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Official Committee of Unsecured Creditors; (c) the indenture trustee under the WLB Debtors' 8.75% senior secured notes due 2022; (d) the ad hoc group of lenders under the WLB Debtors' prepetition term loan facility due 2020 and the WLB Debtors' 8.75% senior secured notes due 2022; (e) the administrative agent under the WLB Debtors' prepetition term loan facility due 2020; (f) the administrative agent under the WMLP Debtors' term loan facility due 2018; (g) the ad hoc committee of certain lenders under the WMLP Debtors' term loan facility due 2018; (h) the administrative agent under the WLB Debtors' debtor-in-possession financing facility; (i) the lenders under the WLB Debtors' debtor-in-possession financing facility; (j) any statutory committee appointed in these cases; (k) the United States Attorney's Office for the Southern District of Texas; (l) the Internal Revenue Service; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) the offices of the attorneys general for the states in which the Debtors operate; (o) the Securities and Exchange Commission; (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
February 13, 2019

/s/ *Patricia B. Tomasco*
Patricia B. Tomasco (Bar No. 01797600)
Matthew D. Cavenaugh (Bar No. 24062656)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: ptomasco@jw.com
mcavenaugh@jw.com

James H.M. Sprayregen, P.C.
Michael B. Slade (Bar No. 24013521)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
michael.slade@kirkland.com
gregory.pesce@kirkland.com

-and-

Edward O. Sassower, P.C.
Stephen E. Hessler, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
stephen.hessler@kirkland.com

*Counsel to the Debtors*

/s/ *Oliver S. Zeltner*
Heather Lennox (admitted *pro hac vice*)
Oliver S. Zeltner (TX 24104000)
**JONES DAY**
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
E-mail: hlennox@jonesday.com
ozeltner@jonesday.com

Timothy W. Hoffmann (admitted *pro hac vice*)
**JONES DAY**
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: hlennox@jonesday.com
Email: thoffmann@jonesday.com

*Conflicts Counsel for the WMLP Debtors and Counsel for the Conflicts Committee of the Westmoreland Resources GP, LLC Board of Directors*

## Certificate of Service

      I certify that on February 13, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                */s/ Patricia B. Tomasco*
                                                Patricia B. Tomasco