UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | ) ) ) | Case No. 18-35672 (DRJ) |
| Debtors. | ) ) ) | (Jointly Administered) |

**AMENDED STATEMENT AND RESERVATION OF RIGHTS
WITH RESPECT TO THE STATE OF OHIO, ENVIRONMENTAL
PROTECTION AGENCY'S APPLICATION FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSE**

CCU Coal and Construction, LLC ("CCU"), by and through its undersigned counsel, hereby files this amended statement and reservation of rights with respect to the State of Ohio, Environmental Protection Agency's Application for Allowance and Payment of Administrative Expense (the "Application") (Docket No. 1347),[2] and respectfully states:

    1.    CCU purchased certain assets (the "Sale") of Westmoreland Resource Partners, LP and its directly and indirectly wholly owned subsidiaries (the "Sellers") comprising the Debtors' Oxford mining business pursuant to the terms of (i) that certain Asset Purchase Agreement by and among CCU and the Sellers (the "APA"), a copy of which is on file with the Court (Docket No. 1252-2), and (ii) the *Order Approving Joint Expedited Motion of the WLB Debtors and the WMLP Debtors for Entry of an Order (I) Approving the Sale of (A)*

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] This statement amends the *Statement and Reservation of Rights With Respect to the State of Ohio, Environmental Protection Agency's Application for Allowance and Payment of Administrative Expense* (Docket No. 1492).

*Substantially All of the Assets of Oxford Mining Company, LLC, and Certain of its Subsidiaries and (B) the Buckingham Mine (II) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief, Including the Approval of the Related Sale Process* (the "Sale Order") (Docket No. 1289). The Sale closed on February 11, 2019 (the "Closing") (Doc. No. 1351).

2. In the Application, the State of Ohio, on behalf of its Environmental Protection Agency ("Ohio EPA"), requests an administrative claim against the Debtors for the costs of purported surface water mitigation obligations (the "Surface Water Obligations") allegedly required under Ohio law for 50 inactive coal mines (the "Inactive Mines"), or mines where active mining operations have ceased. Ohio EPA states clearly its belief that these purported obligations were not transferred to CCU in the Sale, and that they remain with the bankruptcy estates. Application, ¶¶ 12-13.

3. The Debtors filed a preliminary objection to the Application (Docket No. 1417) (the "Objection") asserting that CCU assumed such purported liabilities under the APA. However, the Application is vague and does not present sufficient information to enable CCU to ascertain critical details about, among other things: (i) the full nature, scope, and amount of the purported Surface Water Obligations,[3] and (ii) whether the Surface Water Obligations are in fact liabilities that CCU assumed under the terms of the APA.

---

[3] A majority of the purported obligations appear to be legacy obligations associated with permits issued by the Ohio Department of Natural Resources ("ODNR") to conduct surface mining where active mining has ceased, post-mining reclamation has been completed, and ODNR is either conducting post-reclamation monitoring or has acknowledged that all reclamation obligations have been satisfied through its release of the surety bond associated with the permit.

Those purported obligations appear to relate to certifications issued by Ohio EPA approving impacts to wetlands and jurisdictional waters in connection with those former mining operations. Moreover, CCU believes that the majority of the purported obligations do not relate to properties ***ever owned by the Debtors***; rather, they appear to relate to properties that were at one point leased by the Debtors long ago, but were ***not subject to an existing lease as of the Closing***. CCU further understands from discussions with the Ohio EPA that only 18 of

4. The Ohio EPA admits that the amount of the Surface Water Obligations has not been fixed. Application, ¶ 15. There is no dollar amount asserted in the Application—nor is there any attempt to identify which of the 50 Inactive Mines correspond with purported liability. *Id*. Simply put, the Application is unclear at best, and CCU cannot determine exactly what the Ohio EPA asserts in the Application.

5. What is clear from the Application is that the Ohio EPA believes the Sale to CCU did not involve CCU assuming the liabilities underlying the Application.[4] Application, ¶ 13. Indeed, there would have been no reason to file the Application against the estates otherwise. Furthermore, the Ohio EPA believes that the Sale included only the 13 active mines that comprise Oxford's mining operations, and not the 50 Inactive Mines that are no longer in operation. *Id*. at ¶ 12-14. The Ohio EPA believes that liability for the Surface Water Obligations, whether for costs actually incurred or for costs that may be incurred at some undisclosed point in the future, remained with the Sellers and their bankruptcy estates following the Sale. *Id*. at ¶ 13.

6. The Debtors dispute the Ohio EPA's assertion that liability for the Surface Water Obligations remains with the Sellers, and have sought an emergency hearing in regards to the Application. Objection, ¶¶ 11-15. However, it is important to note that the Application *seeks no*

---

the certifications at issue are actually the subject of Ohio EPA's referral to the Ohio Attorney General's Office for enforcement of the requirements of the certifications. The remainder of the certifications *do not appear to be subject to any enforcement proceedings at present*, and the assertion that amounts may be owed at some point in the future is entirely speculative.

[4] Notwithstanding this admission in the Application, the Ohio EPA filed a response earlier today (the "Ohio EPA Response") (Docket No. 1523) in which it now appears to suggest the exact opposite – that the Surface Water Obligations were transferred to CCU. Ohio EPA Response, ¶¶ 1-2. This about face suggests that the Ohio EPA is itself confused about its own position.

*relief against CCU*.[5]  The issue of whether CCU is liable on an unqualified wholesale basis for all conceivable Surface Water Obligations now existing or hereafter arising under the terms of the APA is not properly before the Court.  Such declaratory relief must be obtained through an adversary proceeding (Fed. R. Bankr. P. 7001(9)), or at least on a basis that provides CCU with a full and fair opportunity to take discovery regarding material facts in dispute that would impact the issue of whether the Surface Water Obligations are in fact "Assumed Liabilities" under the APA – for example, facts regarding the amount, nature, extent, scope and validity of the purported Surface Water Obligations.

### A.     The APA and the Sale Order Speak For Themselves; The APA Cannot Be Unilaterally Re-Written.

7.     CCU respectfully submits that the APA and the Sale Order speak for themselves.  CCU, as well as the signatory Debtors/Sellers, are bound by the terms of the APA and the Sale Order.  CCU intends on fully complying with all its obligations thereunder.  In this regard, the APA may not be unilaterally re-written to alter the rights and obligations of any party thereto, without the impacted party's written and signed agreement.  CCU submits that any attempt to so modify or "clarify" the parties' rights and obligations under the APA (including through a chapter 11 plan) would be void without CCU specifically agreeing to any such modification in a writing signed by CCU.  That is what the APA and the Sale Order require.  *See*, Sale Order at ¶ 43; APA § 12.6.

### B.     It is Impossible to Determine what the Application Asserts.

8.     The Application is so vague and ambiguous that CCU does not have sufficient information to determine whether the Surface Water Obligations are "Assumed Liabilities" (as

---

[5]  In the Ohio EPA Response filed earlier today, the Ohio EPA for the first time (less than 24 hours before the hearing on its Application) asks the Court to grant declaratory relief as to the rights and obligations of CCU under the APA.  This last minute request is procedurally improper and highly prejudicial to CCU.

defined in the APA).  It is clear that the Ohio EPA knew about this purported liability for Surface Water Obligations for the Inactive Mines prior to the Sale and prior to the Sale Hearing, which included the hours-long negotiations over the language of the Sale Order. The Ohio EPA participated in that negotiation process and specifically negotiated language into the Sale Order that replaced a provision of the APA.

9. Put simply, the Application came as a surprise given the events leading up to the Sale and the extensive negotiations over the Sale Order, in which the Ohio EPA was involved.  It begs the question why did the Ohio EPA not bring this up sooner or ensure that it was specifically provided for in the APA and/or the Sale Order.  In this regard, setting aside the Sale itself, the Ohio EPA was required to bring this up on at least February 7, 2019 (before the Closing), which was the bar date for a governmental entity to file a request against the WLB Debtors for administrative claims arising before January 4, 2019.  Disclosure Statement Order, ¶ 9, Docket No. 841.  CCU cannot be prejudiced because of a late-filed administrative claim, which itself fails to assert a claim with any level of certainty.  Any prejudice that would befall CCU would be patently unfair and inappropriate in any proceeding, let alone an emergency proceeding concerning the Application.

### C. **CCU Did Not Assume Every Conceivable Liability Under the APA, Even if the Application Could Identify A Liability with Certainty (Which It Does Not).**

10. CCU did not necessarily assume the liabilities underlying the Application *ipso facto*, even if CCU could determine what the Ohio EPA asserts.  The terms "Purchased Assets" and "Assumed Liabilities" are specifically defined in the APA.  The term "Purchased Assets" means "all of the properties, assets and rights of any Seller wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent,

5

whether owned, leased, licensed, used or held for use, *but in each case primarily in the conduct of the Business*, and whether or not reflected on the books and records of Sellers, *existing as of the Closing*…[.]" APA, § 2.1(b) (emphasis added). The bolded qualifying language is important – "Purchased Assets" are only those that are used or held for use primarily in the conduct of the "Business . . . existing as of the Closing."

11. The term "Business" is defined in the APA as well, and is essential to understanding the scope of what the parties to the APA mean by "Purchased Assets" and what CCU acquired in the Sale. The term "Business" is referred to as follows: "Sellers directly and indirectly mine, process, market and sell thermal coal from the mining complexes commonly referred to as 'Oxford' located in the state of Ohio and the state of Kentucky (the 'Business'), *as set forth on the map attached hereto as Schedule A*." *Id*., Recital A (emphasis added). The map attached to the APA identifies active mining sites (indicated in yellow), mine support facilities (indicated by triangles), and areas where mining is complete but active reclamation remains. Under the terms of the APA, this map is the "Business."

12. The definition of "Purchased Assets" in Section 2.1(b) goes on to list specific categories of property included within that defined term, but does not specifically refer to mines that are inactive or to permits that have expired and are no longer in existence. To be sure, the list does refer to, among other things: (a) the "Owned Real Property" set forth on Schedule 1.1(c); (b) the "Leases" and "Leased Real Property" set forth on Schedule 1.1(b); and (c) the "Permits" and "Licenses" set forth on Schedule 2.1(b)(vi) and all other Permits and Licenses held by any Seller and exclusively related to the Business.

13. Regarding the scheduled Permits and Licenses, the term "Permits" includes only those permits that are "held by Sellers *in the operation of the Business and Purchased Assets*,

6

and all pending applications for additional permits, renewals of existing permits or amendments to existing permits which have been submitted to any Governmental Body by any Seller *necessary for the operation of the Business*." APA, § 1.1.  The permits related to the Inactive Mines are not "held" for the operation of the Business and Purchased Assets, nor are they necessary for the operation of the Business.  As a result, these permits do not fall within the definition of "Permits" under the APA.

14.   The same holds true for expired licenses.  The term "Licenses" includes only those licenses that are "held for use by Sellers *in connection with the operation of the Business*, and all pending applications for additional licenses, renewals of existing licenses, or amendments to existing licenses which have been submitted to any Governmental Body by any Seller *necessary for the operation of the Business*."  APA, § 1.1.  The licenses related to Inactive Mines are not "held for use" by Sellers for the operation of the Business, nor are they necessary for the operation of the Business.  As a result, these licenses are thus not "Licenses" under the terms of the APA.

15.   With respect to the Sellers' liabilities, nowhere in the APA does it state that CCU assumed all liabilities in existence.  It specifically assumed only the subset of liabilities constituting "Assumed Liabilities."  APA, §§ 2.3 and 2.4.  The liabilities constituting "Assumed Liabilities" are set forth in Section 2.3 of the APA, and include, in relevant part:

> (d) all Liabilities of Sellers arising out of or relating to (i) the Transferred Permits/Licenses, including such Liabilities thereunder arising out of or relating to all Reclamation and post-mining Liabilities of the Business or the Purchased Assets and such Liabilities thereunder arising with respect to the Interim Period, (ii) any mine operation or safety compliance matters related to the condition of the Purchased Assets or the mining areas of the Business, but excluding any Excluded Pre-Closing Fines, (iii) the Purchased Assets' or the Business's compliance with Environmental Laws and Mine and Mining Safety Laws, and (iv)

7

>any conditions arising from a spill, emission, release or disposal into the environment of, or human exposure to, hazardous materials resulting from the operation of the Business or Purchased Assets.

APA, § 2.3(d) (as amended by the Sale Order, ¶ 52).

16. The Surface Water Obligations, to the extent any exist, would relate to compensatory mitigation associated with impacts to wetlands and jurisdictional waters, and not reclamation obligations. The extent to which such obligations are "post-mining Liabilities of the *Business* or the *Purchased Assets*" is necessarily dependent on the definitions of those defined terms, which are discussed in detail above. To the extent the Surface Water Obligations are not part of the Business or the Purchased Assets, they are not "post-mining Liabilities" within the meaning of Section 2.3(d)(i) and the Sale Order.

17. The extent to which such obligations arise out of or relate to the "Transferred Permits/Licenses" is necessarily dependent on whether the schedule of Transferred Permits/Licenses includes the Permits and Licenses underlying the Surface Water Obligations (which is presently unknown). If a permit or a license is not related to the Business or Purchased Assets, it is not a "Permit" or "License" under the defined terms of the APA and, therefore, was not assumed by CCU.[6]

18. Again, the extent to which the Surface Water Obligations are the "Purchased Assets' or the Business's compliance with Environmental Laws" is necessarily dependent on

---

[6] An expired permit or license that is specifically included in Schedule 2(b)(iv) is only relevant to the extent it is actually a "Permit" or a "License" as those terms are defined in the APA. Each of those terms is qualified by language that it be "held by Sellers in the operation of the Business" (with respect to Permit) and "used or held for use by Sellers in connection with the operation of the Business" (with respect to License). If such expired permit or license does not meet those definitional requirements, their inclusion on the schedule to the APA is of no consequence. This, of course, was an appropriate qualification. As an illustration, if, for example, the schedules inadvertently included permits or licenses associated with the Debtors' Kemmerer mine for some reason, clearly those permits or licenses were not included in the sale to CCU because they do not relate to the Business or the Purchased Assets. Application, ¶¶ 12-14.

whether the Surface Water Obligations relate to the Business or Purchased Assets. If they are not related to the Business or Purchased Assets, these are not Assumed Liabilities within the meaning of Section 2.3(d)(iii) of the APA and the Sale Order.

19. For all of these reasons, no one can identify what liability asserted in the Application is now on CCU, and this is especially true given that the Ohio EPA does not appear to know exactly what it is asserting in the Application. CCU intends to abide by the terms of the APA and the Sale Order, and respectfully submits that the terms of the APA as approved by the Sale Order cannot be re-written absent a writing signed by CCU. Furthermore, CCU should not be prejudiced in an accelerated proceeding concerning a last-minute Application asserting an unknown and unidentified claim.

20. CCU expressly reserves all rights with respect to the Surface Water Obligations and all aspects of its obligations under the APA.

Dated: February 27, 2019
      Houston, Texas

Respectfully submitted,

*/s/ Kenneth E. McKay*
Kenneth E. McKay
SBN: 13690835
Daniel J. Ferretti
SBN: 24096066
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
1301 McKinney St., Suite 3700
Houston, TX 77010
Phone: 713.650.9700
Fax: 713.650.9701
kmckay@bakerdonelson.com
dferretti@bakerdonelson.com

and

Kelly E. Singer (pro hac vice)
SQUIRE PATTON BOGGS (US) LLP
1 E. Washington Street, Suite 2700
Phoenix, AZ 85004
Phone: (602) 528-4099
Kelly.singer@squirepb.com

*Counsel for CCU Coal and Construction, LLC*

## Certificate of Service

    I certify that on February 27, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                              */s/ Kenneth E. McKay*
                                              Kenneth E. McKay