**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.,*[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

## REPLY OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S. LLC TO THE PROTOCOL "RESPONSE" OF MAR-BOW VALUE PARTNERS, LLC [RELATED TO DKTS. 2020 AND 1907-1]

---

[1] Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

## PRELIMINARY STATEMENT

On May 31, 2019, McKinsey Recovery & Transformation Services U.S., LLC ("RTS") filed the Houston Disclosure Protocol (Dkt. 1907-1 ("Protocol")), which is the result of months of work by D.J. (Jan) Baker and Paul Singerman, two highly-regarded bankruptcy practitioners, with over sixty combined years of experience representing debtors and key stakeholders in dozens of complex restructuring cases.  The Protocol acknowledges "the complex legal and business issues surrounding the disclosure obligations arising from a Proposed Professional's retention under Section 327 in bankruptcy cases involving more than $50 million in claims" and explains that a survey of industry practices (Dkt. 1659-1 ("Survey")) and interviews with practitioners revealed that "Proposed Professionals have adopted widely disparate practices governing disclosure of Connections, even among similarly situated Proposed Professionals." Protocol at 1, 7.  In light of these observations, the Protocol endeavors to "provide general guidance regarding how Proposed Professionals may obtain information and make proper disclosures to support their retention in U.S. Bankruptcy cases" but is also careful to note that the Protocol is not meant to "provide definitive guidance to all Proposed Professionals in all circumstances."  *Id.* at 6.  Finally, the Protocol makes crystal clear that "[a] Proposed Professional bears the burden of making appropriate disclosure of Connections" regardless of what the Protocol advises, and the ultimate decision on whether a Proposed Professional has satisfied its disclosure obligations under Rule 2014 and is disinterested under Section 327 remains with the Court.  *Id.*  In light of the foregoing, there is no good faith argument to be made that the Protocol usurps the power of this Court.

Nevertheless, in what has now become its routine course of conduct, Mar-Bow Value Partners LLC ("Mar-Bow") filed a supposed "Response" to the Protocol (Dkt. 2020

("Response"))—a filing that Mar-Bow acknowledges requires no response.[2]  This time, Mar-Bow delivers its 45-page screed, which principally argues that the Protocol improperly supplants the law.  Mar-Bow advances this position despite the fact that this Court, McKinsey,[3] Messrs. Baker and Singerman, and, apparently Mar-Bow, all agree that the Protocol does not and cannot diminish the authority of bankruptcy courts to determine compliance with Rule 2014 and qualification under Section 327.  That Mar-Bow is willing to distort simple truths about the Protocol and about industry disclosure practices to proffer imagined disputes, disparaging the work of Mr. Baker and Mr. Singerman along the way, speaks volumes about its credibility as a bankruptcy litigant.

Mar-Bow deliberately mischaracterizes the Protocol as "McKinsey's Protocol" rather than acknowledging what is clear from the Protocol itself and the regular status reports that McKinsey has filed: following this Court's approval, the Protocol was drafted by Messrs. Baker and Singerman, with substantial input from industry professionals, including professionals at law firms, investment banks, and other restructuring advisory and turnaround firms.[4]

Notwithstanding this significant industry input into the Protocol, Mar-Bow has raised a litany of purported deficiencies with the Protocol, including its own exclusion from the process.[5] Among the things Mar-Bow fails to mention, however, is that AlixPartners—the firm founded by

---

[2] Mar-Bow both acknowledges the Court's prior statement that it does not intend to approve the Protocol and further states: "Mar-Bow does not submit this response to McKinsey's protocol to participate with McKinsey in diverting the Court's attention from the primary issue before it—whether McKinsey is qualified to serve as a professional in these cases.  Mar-Bow seeks neither litigation nor adjudication concerning the merits of McKinsey's protocol." Response at 3-4.  This begs the question why Mar-Bow submitted any "Response" to the Protocol at all, other than to disparage and attack the thoughtful work-product of two industry-leading experts, Mr. Baker (who worked entirely *pro bono*) and Mr. Singerman.  Increasingly, Mar-Bow's unauthorized filings reveal that it is Mar-Bow that undermines the integrity of the courts by filing anticompetitive attacks on McKinsey.

[3] RTS and McKinsey & Company, Inc. are hereafter referred to, collectively, as "McKinsey".

[4] *See* Status Reports, Dkts. 1586; 1626; 1686; 1759; 1803; 1842; 1894; 1907.

[5] Mar-Bow Response to RTS's Seventh Status Report, Dkt. 1906.

Mar-Bow's principal, Jay Alix, who is AlixPartners' largest shareholder and board member—was twice asked to participate in the process, but declined to respond to those invitations.

Mar-Bow's repeated trope that the Protocol is "unnecessary because Rule 2014, and the case law on it, are clear," Response at 5, is likewise demonstrably false.  Contrary to Mar-Bow's assertions, the Survey and other industry input into the Protocol revealed that there is wide variation in industry practice—and such practice does not remotely reflect the impractical and unusual view of the disclosure requirements propounded by Mar-Bow.  Even AlixPartners does not follow the rigid disclosure principles that Mar-Bow espouses.

Mar-Bow's other fundamental criticism of the Protocol—that the Protocol "obstructs and interferes with [the bankruptcy courts'] exclusive authority," *id.* at 8, also reflects a willful refusal to acknowledge fact.  The Protocol is explicit on its face that it is designed to provide guidance and clarity that would allow for more uniform disclosures by professionals but does not provide any kind of "safe harbor" for proposed professionals that choose to follow its guidance or otherwise supplant the authority of the bankruptcy courts to determine compliance with Rule 2014.  It is, in fact, Mar-Bow's radical view of disclosure under Rule 2014 and disinterestedness under section 327 that would supplant court authority because, under Mar-Bow's interpretation of the statute and rules, virtually no experienced professional could ever qualify to be retained.  In order to attack the Protocol that was developed and is being implemented in good faith, and obscure its own extreme view of the law, Mar-Bow has resorted to falsely characterizing both the Protocol's context and its purpose.

## I.  The Protocol Is Consistent with Law and General Practice Among Bankruptcy Professionals

Mar-Bow's repeated assertion that the Protocol is "unnecessary because Rule 2014, and the case law on it are clear," Response at 5, is wrong.  The case law recognizes just the opposite:

for example, that if Rule 2014 required disclosure of every possible connection, no matter how trivial or outdated, "the resulting volume of disclosures would, for all practical purposes, render the disclosure requirement meaningless and thereby thwart the purpose of the Rule which is to disclose all relevant connections." *In re Baron's Stores, Inc.*, No. 97 Bk. 25645 (BKC) (PGH), 2007 WL 1120296, at *13 (Bankr. S.D. Fla. Apr. 12, 2007) (emphasis in original). Nor can Mar-Bow's view be reconciled with public bankruptcy dockets across the country or the specific findings made by Messrs. Baker and Singerman in the Protocol. At the outset, the Protocol references the wide variety of approaches industry professionals have successfully adopted to comply with their obligations:

> "The formulation of this Protocol has been informed by the Survey. The Survey reflects that, in the absence of any definition of Connection and disclosure guidelines, Proposed Professionals have adopted widely disparate practices governing disclosure of Connections, even among similarly situated Proposed Professionals. This Protocol was further informed by the results of telephonic interviews conducted with representatives of more than a dozen separate professional firms with significant Chapter 11 experience . . ."

Protocol at 7. If, as Mar-Bow suggests, the rules of the road were clear, the Survey and interviews would not have revealed such different approaches to disclosure in current practice. Rather, as the Protocol makes plain on its face, its suggestions are a good faith effort to harmonize common practice in full conformity with the applicable law, and not, as Mar-Bow suggests, improper deviations from the Bankruptcy Code or Rules. In an effort to support its false premise, Mar-Bow contends there is uniformity and clarity about specific issues where there is none.

For example, Mar-Bow spends numerous pages attacking the Protocol for exempting "*de minimis*" connections from disclosure, arguing that the Protocol's position on such disclosures "has no basis in Rule 2014," "is contrary to applicable case law," and that "[n]othing in rule

2014 allows a professional to exclude" a "*de minimis*" connection.  This argument cannot be made in good faith.  In his deposition in this very case, Mr. Alix himself took the opposite position under oath:

- "And one of the key nuances in the case law is that ***de minimis connections do not have to be disclosed***, as an example.  That's one example.  So it wouldn't have to be disclosed."  Alix Dep. 83:23-84:4.

- "***other than de minimis connections***, it's all connections."  Alix Dep. 81:24-25.

- "[Professionals] may also conclude that there are connections before that period are ***de minimis*** and therefore ***they need not be disclosed***."  Alix Dep. 112:21-24.

- "just disclose all connections that are material, ***that are not de minimis*** in the context of this case and be prepared to defend it."  Alix Dep. 140:20-24.

- "I try and figure out if I'm connected in any way, ***other than a de minimis way***, to everybody in that [Interested Party] list and I report my connections to the [AlixPartners] firm and they report them."  Alix Dep. 333:14-18.

- Q: Any material connections that's not de minimis, that's what you just said? A: ***You don't report de minimis connections.***  Alix Dep. 334:5-9 (emphases added).

Even Jay Alix's own sworn testimony is no barrier when it comes to picking a fight with McKinsey.  Worse, Mar-Bow's latest position that even *de minimis* connections must be disclosed would do more to hinder than assist the court in making an assessment of disinterestedness under section 327.  Applications riddled with *de minimis* connections that Rule 2014 would not ordinarily require disclosure of would be impossible to evaluate meaningfully. Not only is the Protocol's treatment of *de minimis* connections consistent with (what had been) Mr. Alix's own view—at least prior to his astounding reversal in this most recent filing—but it is also consistent with the Survey's finding of a variety of industry approaches taken, including by AlixPartners, in determining what connections to disclose.  Survey, Column D; *see id.* at 33-36 (reflecting AlixPartners' practice).  Mar-Bow's  bespoke litigation position finds no support in law or practice.

Mar-Bow also argues that the Protocol is improper because it provides for a "look-back" period when "[n]othing in Rule 2014 justifies this limitation of a professional's disclosure obligation." Response at 31-32. Yet again, the Survey reflects a variety of lookback periods commonly used in the industry, including by AlixPartners [6]—which have been approved by bankruptcy courts—so Mar-Bow's suggestion that the Protocol is improper on this basis is either wrong, or an indictment of nearly everyone in the industry (including AlixPartners), and of every court that has ever approved an application with a lookback period. And yet again, the rationale for including a lookback period is to facilitate the court's assessment of disinterestedness. Without these limitations, "disclosure under Rule 2014 [would be] an impossible task subject to endless litigation over what [is] enough." *In re Enron Corp.*, No. 01-16034(AJG), 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), *aff'd*, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003). Mar-Bow's position on "look-back" is also without merit.

Mar-Bow also attacks the Protocol's proposed treatment of Asset Management Affiliates, Response at 14-23, but this section is directly based on—and proposes improvements to—the actual disclosure practices of other professionals, which have themselves already been accepted by other courts pursuant to Rule 2014. *See* Protocol at 9; *see also, e.g.*, Survey, Row F. Mar-Bow's insistence that the Protocol creates a "willful blindness" exception is another disingenuous characterization made in an attempt to single out McKinsey. *See* Response at 10-

---

[6] *E.g.*, Weil, Gotshal & Manges LLP (2 years); Kirkland & Ellis LLP (3 years); Jones Day (2 years); Milbank LLP (3 years); Paul, Weiss, Rifkind, Wharton & Garrison LLP (3 years); Gibson Dunn, & Crutcher LLP (3 years); Proskauer Rose LLP (3 years); Willkie Farr & Gallagher LLP (5 years); Kramer Levin Naftalis & Frankel LLP (2 years); Haynes & Boone, LLP (2 years); Vinson & Elkins LLP (3 years); Cadwalader, Wickersham & Taft LLP (3 years); AlixPartners (5 years); Goldin Associates, LLC (3 years); Moelis & Company (2 years); Lazard (3 years); Guggenheim Partners (3 years); Jefferies Group LLP (3 years). For the avoidance of doubt, McKinsey (unlike Mar-Bow) does not criticize any of these industry participants for their divergent points of view as to what the appropriate lookback period should be, or for any of the other differing approaches that were identified the Survey. An important takeaway from the Protocol development process is that professional firms can have different good faith interpretations of the rules, as evidenced by the fact that highly-qualified and well-motivated professional firms come out differently on this and other areas of the rules.

14.   In its own retention applications, AlixPartners has conceded that identifying all potential connections, especially those arising from the activities of Asset Management Affiliates, presents significant logistical hurdles, and that in some instances, AlixPartners affiliates may very well hold the debt and equity of various interested parties without AlixPartners' knowledge.   Survey at 33-36.[7]   That did not stop AlixPartners from being retained.   Other bankruptcy industry professionals with large Asset Management Affiliates, such as E&Y[8] and Rothschild Inc.[9] offer similar qualifications in their own Rule 2014 disclosures.   And they, too, have been retained on the basis of those disclosures.   Mar-Bow's position on Asset Management Affiliates is particularly disingenuous.   In most cases, the information Mar-Bow seeks from McKinsey's Asset Management Affiliates is currently walled off from the consultants who work on Chapter 11 cases and is thus wholly unknown to them during the course of their work for debtors.   This mirrors the practice of many other professionals whose disclosures Mar-Bow endorses in the Response.   *See* Response at 6; Survey at 52 (quoting Lazard Decl., *In re Sears Holding Corporation*, Case No. 18-23528-RDD (Bankr. S.D.N.Y.), Dkt. 345, at ¶ 9 (describing compliance procedures to ensure information barriers as between asset management affiliate and rest of firm)).   The Protocol thus provides uniform guidance to all professionals with Asset Management Affiliates who choose to disclose such connections.   Yet, as Mar-Bow signals in its

---

[7] "Although AlixPartners has performed a conflicts check of the Investor Conflicts Parties as set forth above, as a result of, among other things, the sheer size of the investments of the Investor Conflicts Parties, one or more of the Investor Conflicts Parties may, in the ordinary course and from time to time, hold, control and/or manage loans to, or investments in, the Debtors and/or Potential Parties in Interest and/or may trade debt and/or equity securities in the Debtors and/or Potential Parties in Interest."  Survey at 33-36.

[8] "Despite the efforts described above to identify and disclose connections with parties in interest in this case, because the Debtor is a large enterprise with numerous creditors and other relationships, EY is unable to state with certainty that every client representation or other connection of EY with parties in interest in this case has been disclosed herein." *Id.*

[9] "One or more of the Affiliated Entities may in the ordinary course from time to time hold or manage funds that hold investment positions in the Debtors and/or parties in interest in these chapter 11 cases." *Id.*

Response, *see* Response at 15-17, Mar-Bow seeks greater disclosure from McKinsey's Asset Management Affiliate, so that it can use this information—heretofore walled off from McKinsey consultants—to argue that those consultants now lack disinterestedness, not to protect the integrity of the bankruptcy industry.  In other words, Mar-Bow is spending millions of dollars in hopes of manufacturing apparent conflicts of interest where none currently exist.  Nothing lays bare Jay Alix's anticompetitive motives more plainly than his approach to Asset Management Affiliates.

Indeed, if the burdensome investment affiliate disclosure principles espoused by Mar-Bow were adopted, virtually no investment bank would be qualified to serve in a chapter 11 case, and all debtors would find themselves at a loss for critical financial advice.  Taken together, the three limitations that Mar-Bow's position requires would require disqualification of many sophisticated bankruptcy professionals, because of the difficulty in meeting his exacting disclosure standards.  Critically, Mar-Bow's insistence that "[a]ll other bankruptcy professionals" but RTS provide "proper disclosure declarations" is at odds with the Rule 2014 and section 327 interpretation that Mar-Bow insists must apply to McKinsey.  Compliance with Mar-Bow's view of disclosure would require disclosure of all connections, with no temporal or other limitation.  Moreover, Mar-Bow's position that any connections to competitors and any investment connections to interested parties are *per se* disqualifying would simply drive professionals out of the market.  Mar-Bow's objection to the Protocol's treatment of *de minimis* connections, lookback periods, and Asset Management Affiliates—which is based on the practices of those "other bankruptcy professionals"—make clear that Mar-Bow's goal is to convince this Court to apply different standards to McKinsey than it would for the other professionals who make disclosures contrary to Mar-Bow's dictates.

That Mar-Bow wants different rules to apply to McKinsey is further revealed in its opposition to the Protocol's guidance on sealed filings.  As Mar-Bow itself acknowledges, the Protocol's guidance is simply to seek relief under Rule 9018—which expressly provides for authority to seal orders to protect "any entity," Fed. Bankr. P. 9018—and, if the Court grants the sealing order, to "proceed in accordance [with that order]."  Protocol at 14.  Mar-Bow's response to this straightforward, unremarkable guidance to follow the Rules and court orders is bizarre: it describes this guidance as "cavalier," and, in some unspecified way violative of Section 107(b).  Response at 23-25.  But the very purpose of Rule 9018 is to *apply* Section 107; there is no tension between them.  Mar-Bow is essentially demanding that the Court graft a *new* requirement onto Rule 2014—a requirement that RTS not file any connections under seal notwithstanding Rule 9018—and then complaining that the Protocol does not incorporate Mar-Bow's new requirement.  More egregiously, Mar-Bow complains about a professional's utilization of the Bankruptcy Code and Rules to protect confidential information without once noting or acknowledging the fact that Mar-Bow's own position contradicts common and established industry practice—including in this Court.  Hearing Transcript, June 5, 2019 at 24:9–25:3, *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex.) (permitting Evercore Partners L.L.C. to file portions of its employment application under seal after concluding that a fully public disclosure risked harm to Evercore's confidential clients and noting that "when we crossover to the point where transparency hurts innocent third parties, there has to be a balance."); *see also* Dkt. 1661, *In re PG&E Corporation*, No. 19-30088 (DM) (Bankr. N.D. Cal.) (allowing Centerview Partners to make similar disclosures under seal in connection with its own retention application).

Mar-Bow makes these unprincipled arguments in order to paint the Protocol as a self-serving creation of McKinsey, when in fact it is anything but.  Messrs. Baker and Singerman were the drafters of the Protocol (along with lawyers from Mr. Singerman's law firm).  Their draft was informed by the discussions that they had with numerous industry professionals, including McKinsey (and that were open to AlixPartners had it chosen to participate),[10] as well as their review of the Survey.  However, Messrs. Baker and Singerman at all times retained full discretion over the terms of the Protocol; McKinsey did not.  Indeed, McKinsey took an entirely "hands-off" approach to the Protocol, emphasizing its willingness to defer to the experts.  As a result, the Protocol is no more "McKinsey's" than any other industry professional that provided input and suggested edits.  The lead draftsman, Jan Baker, undertook his work on the Protocol on a *pro bono* basis to underscore his independence from McKinsey and the Court should disregard this attempt to impugn the admirable and independent work that Messrs. Baker and Singerman undertook to prepare the Protocol.

## II.  The Protocol Provides "General Guidance" and Does Not Obstruct or Interfere with the Bankruptcy Courts' Exclusive Authority

From the beginning of the Protocol process, RTS has been clear that the purpose of the Protocol is not to supplant the bankruptcy courts' authority or any statute or Bankruptcy Rule, but to harmonize disparate disclosure practices, which have already been found consistent with Rule 2014, for the benefit of McKinsey and the entire industry.  *See* Dkt. 1626-1 at 2 (Agreement for Consulting Services).  Mar-Bow repeatedly mischaracterizes the Protocol as a "dangerous," "illegal[]" attempt to "amend," "constrict" or "limit[]" the scope of disclosures, to "create" a "standard," and to "allow" deficient disclosures, and generally complains that the Protocol is an attempt to "obstruct[] and interfere[]" "with the bankruptcy court's exclusive authority."  *E.g.*,

---

[10] AlixPartners was twice invited to participate in interviews but did not respond to either invitation.

Response at 1-2, 8, 45.  Once again, even a cursory review of the facts reveals that Mar-Bow's assertions are contrived.

The Protocol takes great pains to state both its purpose and its boundaries, making clear that it is simply an attempt to provide "recommendations" and "general guidance" to ensure that the Court will have "information adequate to evaluate whether a Proposed Professional is a disinterested person and qualified to serve under Section 327." Protocol at 1, 7.  This is repeated throughout the Protocol:

- "This Summary outlines the Protocol's disclosure recommendations and the means or process to satisfy them." *Id.* at 1.

- "This Protocol: (a) suggests definitions for a Connection requiring disclosure and categorizes such Connections; . . . [and] (c) differentiates the disclosure of Connections recommended for the four Types of AMAs." *Id* at 6.

- "This Protocol does not endeavor to and could not effectively provide definitive guidance to all Proposed Professionals in all circumstances." *Id.*

- "This Protocol therefore provides general guidance regarding how Proposed Professionals may obtain information and make proper disclosures to support their retention in U.S. bankruptcy cases that are within the scope of this Protocol, but this Protocol does not provide specific guidance for all Proposed Professionals. . ." *Id.*

- "This Protocol recognizes that a Proposed Professional may deviate from its suggested data gathering procedures and disclosure recommendations based upon its particular facts and circumstances." *Id.*

- "This Protocol provides guidance to Proposed Professionals regarding such disclosures." *Id*. at 7.

Mar-Bow's attempt to recast the Protocol as a set of hard and fast rules designed to replace both the applicable law and the Court's authority and judgment is a false narrative.  The Protocol does not seek to rewrite or amend the Bankruptcy Rules, but rather to provide guidance to industry participants (McKinsey in the first instance, but it is available to anyone else as well) regarding

*how* to comply with those rules, based on the practices of other professionals that courts have already accepted.

The Protocol in fact expressly acknowledges the applicability of Rule 2014 and Section 327: "Connection should be broadly defined to respect the term's ordinary meaning and accomplish the important purposes of Rule 2014 and Section 327 to ensure that a Proposed Professional is a 'disinterested person' as defined in Section 101(14)." *Id.* at 6. Similarly, the Protocol makes clear that "[a] Proposed Professional bears the burden of making appropriate disclosures of Connections in its initial retention application and an Estate Professional bears a continuing burden to supplement that disclosure as appropriate in the circumstances." *Id.* In other words, notwithstanding any Proposed Professional's compliance with the guidance offered in the Houston Protocol, the document is explicit that the burden remains with the Proposed Professional to comply with the law and there is nothing in the Protocol that even suggests that compliance with the Protocol should be dispositive of any question before the Court. Indeed, the Court said that it would not approve the Protocol and McKinsey has not asked it to do so.

RTS has never disagreed with Mar-Bow that the Court must find that its disclosures satisfy Rule 2014 and that the Court must make a finding of disinterestedness under Section 327. Nothing in the Protocol suggests otherwise.

## CONCLUSION

For the foregoing reasons, Mar-Bow's Response should be disregarded, and the Court should consider RTS's new application for retention as a section 327(a) professional when it is filed in due course.

Dated:   June 24, 2019
         Houston, TX

Respectfully submitted,


_____Faith E. Gay_____

Faith E. Gay (*pro hac vice*)
Christine H. Chung (*pro hac vice*)
Jennifer M. Selendy (*pro hac vice*)
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
        cchung@selendygay.com
        jselendy@selendygay.com

Zack A. Clement
ZACK A. CLEMENT PLLC
3753 Drummond Street
Houston TX 77025
Telephone: (832) 274-7629
E-mail: zack.clement@icloud.com

M. Natasha Labovitz (*pro hac vice*)
Erica Weisgerber (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Email: nlabovitz@debevoise.com
        eweisgerber@debevoise.com

*Attorneys for RTS*