UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: § | | Chapter 11 |
| § | | |
| WESTMORELAND COAL COMPANY § | | Case No. 18-35672 (DRJ) |
| *et al.*,[1] § | | |
| § | | |
| Reorganized Debtors. § | | (Jointly Administered) |

**ACTING UNITED STATES TRUSTEE'S RESPONSE
TO WLB DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I)
AUTHORIZING THE RETENTION AND EMPLOYMENT OF MCKINSEY
RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND
CERTAIN OF ITS AFFILIATES AS PERFORMANCE IMPROVEMENT
ADVISORS FOR THE WLB DEBTORS EFFECTIVE *NUNC PRO TUNC*
TO THE PETITION DATE AND (II) GRANTING RELATED RELIEF (DKT. 2119)**

TO THE HONORABLE DAVID R. JONES
CHIEF UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Henry G. Hobbs, Jr., the Acting United States Trustee for Region 7 (the "U.S. Trustee"), by and through the undersigned counsel, who respectfully responds to *WLB Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the*

---

[1] Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

*Petition Date and (II) Granting Related Relief* (the "New Application") (Dkt. No. 2119) as follows:

## PRELIMINARY STATEMENT[2]

All professionals—regardless of firm size, scale, complexity, and geographic footprint and regardless of the sophistication or the lack of internal conflicts-checking systems and databases—must comply with the rigorous disclosure requirements set forth in the Code and the Bankruptcy Rules. Bankruptcy Rule 2014 puts the burden on estate professionals to disclose sufficient information to ensure their disinterestedness under Code Section 327. These requirements ensure that professionals will render services with undivided loyalties and set a level playing field to protect the balance of equities in bankruptcy cases.

The disclosures in the latest McKinsey RTS Application seeking employment as performance improvement advisors to the WLB Debtors[3] remain incomplete, inadequate and, in some areas, raise questions. McKinsey RTS's disclosures are inadequate in three specific areas:

- **McKinsey RTS Must Disclose Affiliate Connections:** While McKinsey RTS appears to seek Court approval for the WLB Debtors to indemnify *all* of its affiliates, it has disclosed the connections of *only certain* of those affiliates it labels "Retained Affiliates"—not including its parent company, McKinsey & Company, Inc. McKinsey RTS failed to explain the disparity between its affiliate disclosures and its indemnification request.

- **McKinsey RTS Must Publicly Disclose Connections:** It remains unclear whether McKinsey has disclosed all confidential connections in the New Application. While McKinsey RTS's First Application identified one "Confidential Client" comprising 17.5% of its revenues, McKinsey RTS's New Application does not identify any client comprising more than 9% of its revenues. McKinsey RTS failed to explain this disparity.

---

[2] Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to them below. All other capitalized terms used but not defined in this Response have the meanings ascribed to them in the New Application and Krivin Declaration.

[3] The New Application is filed by Westmoreland Coal Company and certain of its affiliates—other than Westmoreland Resource Partners GP LLC and Westmoreland Resource Partners, LP and its subsidiaries (the "WLB Debtors").

2

- **McKinsey RTS Must Disclose Connections Based On Investments:** McKinsey RTS continues to withhold critical details about investments made through its internal investment office, MIO Partners, Inc. ("MIO"). McKinsey RTS failed to clarify how it keeps its consulting services separate from MIO, what information its professionals have about MIO's investments and vice versa, and whether the McKinsey organization restricts MIO's investments in McKinsey clients.

More generally, McKinsey RTS relied on the Debtors' Interested Parties List without conducting its own reasonable due diligence in reviewing and disclosing its connections, and the employee survey as described appears inadequate to compensate for the informational gaps that limit its "global database of client engagements" as a conflict-checking tool. McKinsey RTS also applied various materiality standards in compiling its disclosures, but it does not provide any reasoned explanation for these standards based on the facts and circumstances of these particular cases.[4]

Over the course of these cases, the U.S. Trustee has devoted substantial time and effort in investigating and prodding McKinsey RTS's disclosures, and the U.S. Trustee continues to actively engage with McKinsey RTS on these issues to narrow the focus of his concerns.[5] Although the U.S. Trustee anticipates that some of the issues raised herein could be adequately addressed by additional disclosures, on the present record it is still not possible for the Court, the U.S. Trustee, and all interested parties to assess whether McKinsey RTS or any of its affiliates have disabling conflicts that prevent McKinsey RTS's retention as a professional in these cases. After multiple filings in aid of its employment, its employment must finally be denied.

---

[4] McKinsey RTS references a protocol as the basis for certain of its disclosures. McKinsey RTS's disclosure obligations in these cases begin and end with the Code and the Bankruptcy Rules, and whether its actions satisfied an internal protocol is irrelevant to the question of whether disclosure is adequate. A professional's internal protocol does not provide a "safe harbor" from the law's requirements. Rather, the reasonableness of disclosures depends on the Code and the Rules as applied to the facts and circumstances of a particular case.

[5] Shortly before the filing of this response, in connection with the U.S. Trustee's engagement of McKinsey on these issues, McKinsey provided initial responses to information requests to the U.S. Trustee and has represented that it will make supplemental disclosures on the record. The U.S. Trustee is evaluating this information and hopes that McKinsey's additional disclosures on the record will address concerns raised herein and also provide additional transparency for the benefit of all interested parties in these cases.

3

## JURISDICTION, VENUE, AND
## CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.  The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district under 28 U.S.C. § 1408.

2.  The Court has constitutional authority to enter a final order in this matter. If it is determined that the bankruptcy judge does not have the constitutional authority to enter a final order or judgment in this matter, the U.S. Trustee consents to the entry of a final order or judgment by this Court in this matter.

3.  Henry G. Hobbs, Jr. is the duly appointed Acting United States Trustee for Region 7, Southern and Western Districts of Texas, under 28 U.S.C. § 581(a)(7). Pursuant to 11 U.S.C. § 307, the Acting United States Trustee has standing to appear and be heard on any issue in a case or proceeding under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code"). Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is statutorily obligated to monitor the administration of cases commenced under the Code. Specifically, the U.S. Trustee is charged with a number of supervisory responsibilities in reorganization bankruptcy cases under chapter 11 of the Code, including monitoring the progress of such cases and taking such actions as the U.S. Trustee deems to be appropriate to prevent undue delay. 28 U.S.C. § 586(a)(3)(G).

## BACKGROUND

4.  On October 9, 2018 (the "Petition Date"), the Debtors commenced these Chapter 11 cases.

5.  On November 8, 2018, the Debtors filed an application (the "First Application") seeking to employ McKinsey Recovery & Transformation Services, U.S., LLC ("McKinsey RTS") as performance improvement advisor, supported by the Declaration of Mark W. Hojnacki,

4

a Practice Leader at McKinsey RTS (the "First Hojnacki Declaration"). Dkt. No. 452. The First Application stated that one of its "Confidential Clients" "account[ed] for approximately 17.5% of McKinsey RTS's gross annual revenues as of September 30, 2018," (the "17.5% Client"). *See First Hojnacki Declaration* at ¶ 77.

6. The U.S. Trustee filed an objection to the First Application on December 14, 2018, based in part on the inadequacy of McKinsey RTS's disclosures of connections including the failure to disclose a confidential client that represented 17.5% of McKinsey RTS's gross revenues. Dkt. No. 785.

7. On July 3, 2019—four months after the Court confirmed the WLB Debtors' plan of reorganization and after a mediated settlement resolving disclosure disputes across multiple cases between the USTP and McKinsey RTS[6]—the Debtors filed the New Application seeking to employ McKinsey RTS and certain Retained Affiliates as performance improvement advisors *nunc pro tunc* to the Petition Date. Dkt. No. 2119.[7]

## MCKINSEY RTS'S DISLOSURES ARE INADEQUATE AND DO NOT COMPLY WITH THE CODE AND BANKRUPTCY RULES

8. As discussed below, McKinsey RTS continues to make incomplete disclosures that do not comply with the disclosure and conflict provisions of the Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The scope of McKinsey RTS's affiliate disclosures do not include disclosures for all affiliates for whom it seeks indemnification. McKinsey RTS's disclosures do not explain the disparity between its prior disclosures regarding

---

[6] The settlement preserved all rights of the U.S. Trustee with respect to McKinsey's request for retention in these cases apart from the adequacy of past retention-related disclosures.

[7] The New Application is supported by (i) Exhibit B to the Application, the Declaration of Mark Hojnacki, a Practice Leader at McKinsey RTS (the "Hojnacki Declaration"); (ii) the Declaration of Dmitry Krivin, a partner at McKinsey & Company, Inc. (Dkt. No. 2120, the "Krivin Declaration"); and (iii) an Assessment of Proposed Professionals' Procedures to Disclose Connections in Accordance with the Houston Disclosure Protocol (Dkt. No. 2121).

5

a confidential client comprising 17.5% of its revenues with its New Application stating that no client comprises more than 9% of its revenues. And McKinsey RTS still omits critical details about how its consulting professionals are separated from MIO and what controls exist to maintain the separation.

9. As a threshold matter, McKinsey RTS failed to conduct reasonable due diligence in reviewing its connections and disclosing all relevant information to this Court.[8] McKinsey RTS states that it reviewed its connections against the WLB Debtors' Interested Parties List ("IPL"). *See Krivin Declaration* at ¶ 8-9. But McKinsey RTS did not conduct any due diligence of its own to determine whether the WLB Debtors' IPL included all important interested parties. While the IPL is certainly the principal tool to assist professionals as they conduct their due diligence to identify and disclose relevant connections, professionals may not circumvent their obligations under the Code and Bankruptcy Rules to disclose connections by relying upon the IPL as a safe harbor.[9] Here, the only diligence McKinsey RTS appears to have engaged in was to email its team members to ask whether they were aware of any parties missing from the IPL.[10] *See id.* at ¶ 18. Bankruptcy Rule 2014 places the burden of disclosure on McKinsey RTS.[11]

---

[8] McKinsey RTS notes that it uses a "global database of client engagements" rather than the "computerized conflicts databases" law firms typically employ. *See Krivin Declaration* at ¶ 6, 26. McKinsey RTS does not explain the distinction between these databases or why it cannot use its computerized system to review conflicts. McKinsey RTS's efforts to work around its apparent limitations—sending email surveys to members of its Engagement Team and retaining Ernst & Young to review its procedures—are inadequate.

[9] *See* Transcript of Hearing on Mot. to Reopen Case at 24-25, *In Re Alpha Natural Resources, Inc., et al.,* No. 15-33896 (Bankr. E.D. Va. Jan. 9, 2019), ECF No. 4182 (In responding to McKinsey's failure to disclose a connection because it was not included on the interested parties list, the court explains, "you don't get to rely on that. Everyone's got to still disclose their connections.").

[10] Similarly, upon determining which of its clients matched parties on the IPL, it appears that McKinsey RTS simply emailed personnel involved with a particular client engagement—at least some of which may have been three years prior—to ask whether the engagement related to the WLB Debtors. *See Krivin Declaration* at ¶ 12, 15.

[11] McKinsey RTS's lack of diligence also raises questions about some of the conclusory statements it makes in its disclosures—for instance, that while McKinsey RTS provides strategic analysis to companies in the same sectors in

10. Moreover, McKinsey RTS applied various materiality standards in compiling its disclosures, but it does not provide any reasoned explanation for its use of these standards based on the facts and circumstances of these cases.[12] For example, McKinsey RTS reviewed connections occurring during a "Look-Back Period" commencing three years before the Petition Date and ending on the Confirmation Date.[13] *See Krivin Declaration* at ¶ 7. Similarly, McKinsey RTS limited its disclosure of revenues derived from connected parties to those who provided "more than 1.00% of the gross revenue of any Proposed Professional during the period from October 1, 2017, through October 31, 2018 (the "Revenue Period")." *See id.* at ¶ 28. But McKinsey RTS does not explain why the Look-Back Period or 1% or the Revenue Period are appropriate standards for disclosure in these cases.[14] As discussed below, the lack of transparency begs the question of whether the standards McKinsey RTS applied limited its disclosures (or whether it applied other standards that it has not disclosed).

A. **McKinsey RTS Must Disclose Affiliate Connections.**

11. Although McKinsey RTS appears to ask this Court to approve the WLB Debtors' indemnification of *all* of its affiliates, even those that performed no work in these cases, it has disclosed the connections of only certain "Retained Affiliates"—not including its parent

---

which the WLB Debtors operate that at times includes review and comment on the WLB Debtors, this is not a conflict because of the nature of the market. *See Krivin Declaration* at ¶ 35.

[12] As noted previously, McKinsey RTS's disclosure obligations in these cases begin and end with the Code and the Bankruptcy Rules, and whether its actions satisfied an internal protocol is irrelevant to the question of whether disclosure is adequate.

[13] McKinsey RTS discloses Engagement Team members' service on a Program Management Tool Team or a Benchmarking Tool Team during that same period.

[14] As another example, McKinsey RTS decided not to disclose its connections with equity holders who held less than 5% of the public securities of Westmoreland as of the Petition Date. *See id.* at ¶ 8. As a result, McKinsey RTS did not disclose *any* connections related to the Debtors' shareholders because the WLB Debtors apparently determined that no individual or entity held more than 5% of the WLB Debtors' common stock as of the Petition Date. *See id.* In the First Application, McKinsey RTS listed a number of 5% or more shareholders as interested parties to whom it had connections. *See First Hojnacki Declaration* at ¶ 50.

7

company, McKinsey & Company, Inc.  The "Indemnification Provisions" set forth in the New Application apply to McKinsey RTS and "past, present, and future affiliates."  *See New Application* at ¶ 22.  McKinsey RTS uses the term "Retained Affiliates" to describe all of its affiliates whose consultants "comprise the working group that directly provided the services for which the WLB Debtors are seeking to retain."  *See Krivin Declaration* at ¶ 4.  It appears that McKinsey RTS at least attempted to review relevant connections between interested parties on the IPL and each of McKinsey RTS and every Retained Affiliate.  It is not clear whether its review included affiliates of these parties or whether the ultimate parent company, McKinsey & Co., has disclosed any of its connections.[15]  Similarly, while McKinsey RTS provides limited information on revenues each Retained Affiliate derived from connected parties, it provides no information on such revenues across the Retained Affiliates or across the entire McKinsey organization.  *See Krivin Declaration* at ¶ 29-34.  Such distinctions, where they exist, must be made crystal clear in order to assess the adequacy of the disclosures.  Either McKinsey RTS must disclose the connections of all of its affiliates—regardless of whether affiliate personnel worked directly on these cases—or provide evidence demonstrating that McKinsey RTS is sufficiently separate from its affiliated practices or companies such that broader affiliate disclosure is not necessary.  It would seem difficult, however, for McKinsey RTS to make that showing if the affiliates are sufficiently connected to require the WLB Debtors to indemnify them for matters on which they did no work.

**B.      McKinsey RTS Must Publicly Disclose Connections.**

---

[15]  The term Proposed Professionals includes McKinsey RTS and each of the Retained Affiliates.  *See Krivin Declaration* at ¶ 1.  At various points, the Krivin Declaration refers to the Proposed Professionals and their affiliates, but it is unclear whether or where the disclosures provided include any affiliates beyond the Retained Affiliates.  *See Krivin Declaration* at ¶ 27, 35.

8

12. McKinsey RTS has not clarified on the public record whether all clients previously identified as confidential are disclosed as connections in the New Application, or, if they are not, whether McKinsey RTS intends to seek protection of the identities of such confidential clients. In the First Application, McKinsey RTS disclosed the existence of six purportedly "Confidential Client" connections. *See First Hojnacki Declaration* at ¶ 50, 55, 58 and 77. Neither the New Application nor the Krivin Declaration reference "Confidential Clients."[16] McKinsey RTS has a pattern in previous cases of withholding the identities of some of its clients and has made changes to provide greater disclosures in response to the United States Trustees' objections in those cases. [17]

13. The lack of clarity in the New Application around confidentiality also raises questions about whether the New Application omits relevant information. Unlike the First Application, the New Application does not reference any client who accounts for approximately 17.5% of McKinsey RTS's gross annual revenues. *See First Hojnacki Declaration* at ¶ 77. McKinsey RTS does not explain why the New Application does not disclose the 17.5% Client— the source of by far the largest amount of McKinsey RTS's gross annual revenues of all disclosed connections in the First Application. Is McKinsey RTS seeking to file information about the 17.5% Client under seal? Has McKinsey RTS changed its mind about its need to identify the 17.5% Client? Does the 17.5% Client no longer account for 17.5% of McKinsey RTS's gross annual revenues?[18]

---

[16] Schedule 2 lists two clients that are named but also referred to as "Confidential" or "Confidential client."

[17] *See In re Alpha Natural Resources, Inc.*, No. 15-33896 (Bankr. E.D. Va. May 3, 2016); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. May, 12, 2016).

[18] For example, is the 17.5% Client the named client in the New Application who represents approximately 7-9% of McKinsey RTS's gross annual revenues? *See Krivin Declaration* at ¶ 29.

9

14.     McKinsey RTS's inadequate disclosures also raise questions regarding whether the various materiality standards McKinsey RTS used in compiling its disclosures materially changed—or limited—those disclosures. In the First Application, McKinsey RTS disclosed connected parties who were the source of 1.00% or more of its revenues as of September 30, 2018. *See First Hojnacki Declaration* at ¶ 77. In the New Application, McKinsey RTS discloses connected parties who were the source of 1.00% or more of its revenues during a "Revenue Period" from October 1, 2017, through October 31, 2018. *See Krivin Declaration* at ¶ 28. McKinsey RTS has failed to explain why and how it chose the Revenue Period, why it changed this period in the New Application, and whether the selection of a longer period or a different cut-off date would have resulted in materially different revenue disclosures.[19]

15.     Similarly, in addition to changes in the Applicable Revenue Period, the New Application also differs from the First Application with respect to disclosures relating to what are characterized as *de minimis* amounts. For example, when applying "*de minimis*" standards such as the 1% revenue threshold, the *Krivin* Declaration explains that no interested party accounted for more than 1% of the gross revenue of any Proposed Professional (subject to limited exceptions). *See id.* It is unclear whether such "Proposed Professionals" include McKinsey and Co. or just McKinsey RTS and the specified affiliates. Even less than 1% of the aggregate gross revenue of global McKinsey is likely a very substantial amount that could bear upon

---

[19] Moreover, setting aside the propriety of the use of limiters such as the "Revenue Period" or *de minimis* exclusions, McKinsey RTS has not provided any detail as to why clients who accounted for substantial amounts of McKinsey entities' revenues do not impact its disinterestedness in these cases beyond conclusory self-serving statements that the services rendered were not related to the Debtors or these cases. Given the potentially substantial revenues involving clients such as Anthem, Inc. (representing 7-9% of McKinsey RTS gross revenues and 1-3% of McKinsey US gross revenues), detail regarding the nature and scope of the services rendered should be disclosed to enable the Court, the U.S. Trustee, and interested parties to assess whether such connections represent a disabling conflict. The Code and Rules require disclosure and do not abdicate this determination to the professional seeking employment.

10

disinterestedness in these cases. If it is the latter, it may be necessary to disclose what the actual gross revenues are in order to properly assess the impact of such "*de minimis*" amounts.

16. Moreover, by parsing out the income levels across affiliates, amounts that would be substantial in the aggregate can be made to appear *de minimis*, thereby not warranting disclosure. Here too, because of the complex, multi-faceted organizational structure of McKinsey and its affiliates, it is appropriate to disclose, at a minimum, the representative revenue amounts for the affiliates with respect to which McKinsey has not disclosed based on *de minimis* exceptions.

### C. McKinsey RTS Must Disclose Connections Based On Investments.

17. McKinsey RTS continues to provide inadequate disclosure regarding its internal investment fund, MIO. McKinsey RTS has failed to clarify how it maintains the separation of MIO from McKinsey RTS and the Retained Affiliates and what information its professionals have about MIO's investments and vice versa. Providing the results of an e-mail survey evidencing that no Engagement Team member worked with a member of MIO's board in "his or her capacity as an MIO director" is inadequate. *See Krivin Declaration* at ¶ 17. Such surveys suffer from inherent limitations. As the Declaration acknowledges, several Engagement Team members were no longer employed at the time the surveys were sent. Apparently, no effort was made to find other sources for the needed information. *See Krivin Declaration* at ¶ 16.

18. McKinsey RTS must also clarify on the public record whether and to what extent MIO is restricted from investing in McKinsey clients.

### CONCLUSION

19. Professionals' rigorous compliance with the disclosure and conflict provisions of the Code and the Bankruptcy Rules is critical to the integrity and transparency required of the bankruptcy system. Full and complete disclosures ensure that bankruptcy professionals render

11

undivided loyalty and untainted advice to their clients and enhance creditor and public confidence in the fairness of the bankruptcy proceedings.  The Code and Rules place the burden on professionals to provide transparent, timely, and accurate disclosures, and do not contemplate the U.S. Trustee, the Court, or interested parties having to search for needles in haystacks to ensure the disinterestedness of professionals.  No party, including the U.S. Trustee, should have to repeatedly prod the professional to make these disclosures.  Throughout these cases, McKinsey RTS has had repeated opportunities to provide all relevant information and yet there continues to be a lack of timely, voluntary candor to allow the Court, the U.S. Trustee, and all interested parties to adequately assess whether McKinsey RTS has any disabling conflicts in these cases that prevent its retention as a professional under section 327 of the Code and Bankruptcy Rule 2014.  Because McKinsey RTS's disclosures in the New Application continue to be inadequate, incomplete, and not fully transparent, the New Application should be denied.

## RESERVATION OF RIGHTS

20.     The U.S. Trustee reserves his rights to make additional objections based upon the content of any future supplemental disclosures prior to or at the hearing on the New Application. To the extent that McKinsey RTS files amendments to the New Application or otherwise supplements its disclosures after the objection deadline but before the hearing, interested parties will be deprived of proper notice as required under Bankruptcy Rule 2002.  Accordingly, the U.S. Trustee also reserves his rights to object on the grounds that any amendments should require proper notice under the Bankruptcy Rules with adequate time to object.

**WHEREFORE**, the U.S. Trustee respectfully requests that this Court enter an order denying the Application unless McKinsey RTS cures the defects cited herein, and order any and all further relief as may be equitable and just.

Dated:  August 20, 2019                                         Respectfully Submitted,

12

HENRY G. HOBBS, JR.<br>
ACTING UNITED STATES TRUSTEE<br>
REGION 7, SOUTHERN and WESTERN<br>
DISTRICTS OF TEXAS<br>
<br>
By: /s/ *Diane G. Livingstone*<br>
Diane G. Livingstone<br>
Assistant United States Trustee<br>
Texas Bar #08517100, Fed, Bar #8781<br>
515 Rusk, Suite 3516<br>
Houston, TX  77002<br>
713/718-4650 Ext. 242<br>
713/718-4680 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that on August 14, 2019, counsel for the U.S. Trustee conferred with counsel for McKinsey RTS, as required by BLR 9013-1(g), but the parties were unable to completely resolve the matter and it requires court determination. The parties will continue to discuss and attempt to reach a resolution. Further, on August 20, 2019, counsel for the U.S. Trustee conferred with counsel for the WLB Debtors, but were unable to resolve the matter and it requires court determination.

By: /s/ *Diane G. Livingstone*<br>
Diane G. Livingstone,<br>
Assistant U.S. Trustee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means on all PACER participants on August 20, 2019.

By: /s/ *Diane G. Livingstone*<br>
Diane G. Livingstone,<br>
Assistant U.S. Trustee