# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.,*[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

**OMNIBUS RESPONSE OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC TO (I) OBJECTION [DKT. 2274] TO THE WLB DEBTORS' APPLICATION TO EMPLOY MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND CERTAIN OF ITS AFFILIATES [DKT. 2119]; AND (II) MOTION TO DISMISS FOR LACK OF JURISDICTION OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE PLEADINGS [DKT. 2275] OF MAR-BOW VALUE PARTNERS LLC**

---

[1] Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland.  Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................4

I.    Mar-Bow Lacks Standing to Object to the WLB Debtors' Application.......................4

    A.    Mar-Bow Lacks Standing as a Discharged Creditor.................................6

    B.    Mar-Bow's Interest in HoldCo Does Not Constitute a Direct Pecuniary
    Interest in the Proposed Professionals' Retention ...................................7

    C.    Equitable Arguments Are Unavailing to Confer Standing .....................9

II.    Mar-Bow's Standing and Jurisdictional Arguments Are Without Merit .................11

    A.    Mar-Bow's Jurisdictional Argument Constitutes a Collateral Attack on
    This Court's Prior Orders.......................................................................12

    B.    The Plan Itself Preserves the Court's Jurisdiction Over the Application .............15

    C.    Mar-Bow's Argument That the WLB Debtors and the Proposed
    Professionals Lack a Pecuniary Interest Is Meritless.............................17

III.    The Proposed Professionals Are Qualified to Serve the WLB Debtors in
    These Cases............................................................................................................19

    A.    Mar-Bow Misstates the Law Applicable to Disqualification Under Section
    327(a) .....................................................................................................20

    B.    Mar-Bow's Motion Relies on False Factual Allegations and Should Be
    Denied ....................................................................................................22

        1.    Mar-Bow Manipulates and Misrepresents the Krivin Declaration...........22

        2.    The Proposed Professionals Do Not Own Equity in the Debtors or
        Interested Parties Through MIO Investments .............................................25

        3.    The Proposed Professionals' Connections are Not Disqualifying as
        a Matter of Law.....................................................................................27

    C.    To the Extent the Court Considers the Section 327 Arguments in Mar-
    Bow's Objection, They Should Be Overruled ......................................27

1. The Proposed Professionals Do Not Hold Disqualifying Interests Through MIO ............................................................28

2. The Proposed Professionals' Connections to the WLB Debtors' Competitors Are Not Disqualifying............................................38

3. Mar-Bow's Preference Allegation Is Based on Double Counting............41

IV. **The Proposed Professionals Satisfy the Requirements of Rule 2014(a) By Fully Disclosing the Proposed Professionals' Connections** ............................................**43**

A. Rule 2014(a) Does Not Require the Proposed Professionals to Disclose the Connections of Non-Retained Consulting Affiliates ...............................................45

B. The Proposed Professionals Satisfied Their Disclosure Obligations Under Rule 2014(a)...........................................................................................50

1. The Proposed Professionals Maintain Client Confidentiality Walls and Information Barriers to Ensure Disinterested Service to Their Debtor Clients ..............................................................50

2. Rule 2014(a) Permits the Use of a Lookback Period................................51

3. The Proposed Professionals Described Their Connections in Sufficient Detail to Meet the Requirements of Rule 2014(a) ...................52

4. The Proposed Professionals' Overinclusive Disclosure of MIO Connections is More Than Sufficient to Satisfy Rule 2014(a)................53

V. **The Remainder of Mar-Bow's Arguments Similarly Fail**............................................**54**

A. The Proposed Professionals Did Not Violate Any Fiduciary Obligations to the WLB Debtors .................................................................................54

B. The Krivin and Hojnacki Declarations Do Not Violate 28 U.S.C. § 1746............55

VI. **The WLB Debtors' Motion to Retain the Proposed Professionals Should Be Granted *Nunc Pro Tunc* to the Petition Date** ............................................**57**

VII. **The Remaining Scope of Issues Related to the Application**........................................**58**

**CONCLUSION** ..........................................................................................**60**

# TABLE OF AUTHORITIES

## Cases

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) ........................................................................................... 6

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ........................................................................ 56

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ......................................................................................... 45

*Fortune Nat. Res. Corp. v. U.S. Dep't of Interior,*
    806 F.3d 363 (5th Cir. 2015) ............................................................................ 5

*Garza v. Smith Int'l, Inc.,*
    No. C-10-100, 2011 WL 835820 (S.D. Tex. Mar. 7, 2011) ............................ 56

*Hendrick v. Avent,*
    891 F.2d 583 (5th Cir. 1990) .......................................................................... 14

*In Matter of 22 Acquisition Corp.,*
    No. CIV.A.02-907, 2004 WL 870813 (E.D. Pa. Mar. 23, 2004) ..................... 41

*In re 7677 E. Berry Ave. Assocs., L.P.,*
    419 B.R. 833 (Bankr. D. Colo. 2009) .............................................................. 39

*In re Alliance Consulting Grp. LLC,*
    588 B.R. 169 (Bankr. S.D. Miss. 2018), *aff'd sub nom. Plant Materials, LLC v.*
    *Alliance Consulting Grp., LLC,* 596 B.R. 851 (S.D. Miss. 2019) ..................... 9

*In re Alpha Nat. Res.,*
    No. 15-33896-KRH, 2016 Bankr. LEXIS 4374 (Bankr. E.D. Va. Dec. 20, 2016) ......... 6, 9

*In re Alpha Nat. Res., Inc.,*
    736 F. App'x 412 (4th Cir. 2018) ..................................................................... 7

*In re Am. Int'l Refinery,*
    676 F.3d 455 (5th Cir. 2012) ....................................................... 21, 27, 28, 53

*In re Anver Corp.,*
    44 B.R. 615 (Bankr. D. Mass. 1984) .............................................................. 26

*In re Baron's Stores, Inc.,*
    No. 97-25645-BKC-PGH, 2007 WL 1120296 (Bankr. S.D. Fla. Apr. 12, 2007) ........... 47

*In re Caesars Entm't Op. Co., Inc.*,
   561 B.R. 420 (Bankr. N.D. Ill. 2015) ....................................................... 30, 37

*In re Caldor, Inc.*,
   193 B.R. 165 (Bankr. S.D.N.Y. 1996) ............................................................. 39

*In re Cambridge Analytica LLC*,
   600 B.R. 750 (Bankr. S.D.N.Y. 2019) ..................................................... 10, 11

*In re Caspri Corp.*,
   No. 07-30485-LMC, 2010 WL 743914 (Bankr. W.D. Tex. Feb. 25, 2010) ...................... 5

*In re Cent. Ice Cream Co.*,
   62 B.R. 357 (N.D. Ill. 1986) ............................................................................. 9

*In re Churchfield Mgmt. & Inv. Corp.*,
   100 B.R. 389 (Bankr. N.D. Ill. 1989) .............................................................. 53

*In re Coho Energy Inc.*,
   395 F.3d 198 (5th Cir. 2004) ............................................................................. 5

*In re Cont'l Inv. Corp.*,
   No. 3:02-CV-0682-P, 2002 WL 1315514 (N.D. Tex. June 11, 2002)............................ 14

*In re Crescent Res., LLC*,
   455 B.R. 115 (Bankr. W.D. Tex. 2011).............................................................. 4

*In re Cygnus Oil & Gas Corp.*,
   No. 07-32417, 2007 WL 1580111 (Bankr. S.D. Tex. May 29, 2007) ................. 26, 32, 45

*In re Cyrus II P'ship*,
   358 B.R. 311 (Bankr. S.D. Tex. 2007) ........................................................ 5, 7

*In re Decor Corp.*,
   171 B.R. 288 (Bankr. S.D. Ohio 1994).............................................................. 41

*In re Diabetes Am., Inc.*,
   485 B.R. 340 (Bankr. S.D. Tex. 2012) .......................................................... 17

*In re El San Juan Hotel Corp.*,
   239 B.R. 635 (B.A.P. 1st Cir. 1999)................................................................ 51

*In re Enron Corp.*,
   No. 01-16034 (AJG), 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002), *aff'd*,
   No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003)........................ 41, 47

*In re Enron Corp.*,
   No. 02-CV-5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003)................................ 43

*In re Fibermark*,
No. 04-10463, 2006 WL 723495 (Bankr. D. Vt. Mar. 11, 2006) ........................ 45, 46, 49

*In re Filene's Basement*, Inc.,
239 B.R. 850 (Bankr. D. Mass 1999) .............................................................. 39

*In re Intech Capital Corp.*,
87 B.R. 232 (Bankr. D. Conn. 1988) .............................................................. 26

*In re Keravision, Inc.*,
273 B.R. 614 (N.D. Cal. 2002), *aff'd sub nom. U.S. Tr. v. Keravision, Inc.*, 421
F.3d 1153 (9th Cir. 2005) ............................................................................. 26

*In re Lehman Bros. Holdings Inc.*,
No. 11 Civ. 3760 (RJS), 2012 WL 1057952 (S.D.N.Y. Mar. 26, 2012) ........................... 9

*In re Leisure Dynamics*,
32 B.R. 753 (Bankr. D. Minn.), *aff'd sub nom. In re Leisure Dynamics, Inc.*, 33
B.R. 121 (D. Minn. 1983) .............................................................................. 26

*In re Leslie Fay Cos., Inc.*,
175 B.R. 525 (Bankr. S.D.N.Y. 1994) .............................................................. 39

*In re Linn Energy, L.L.C.*,
927 F.3d 862 (5th Cir. 2019) ......................................................................... 14

*In re Midway Indus. Contractors, Inc.*,
272 B.R. 651 (Bankr. N.D. Ill. 2001) .............................................................. 53

*In re Millenium Seacarriers, Inc.*,
No. 04 CIV. 6482 (DLC), 2005 WL 2398014 (S.D.N.Y. Sept. 28, 2005), *aff'd*,
458 F.3d 92 (2d Cir. 2006) ............................................................................. 14

*In re Miners Oil Co., Inc.*,
502 B.R. 285 (Bankr. W.D. Va. 2013) .............................................................. 53

*In re Mitchell*,
497 B.R. 788 (Bankr. E.D.N.C. 2013) .............................................................. 53

*In re Molten Metal Tech., Inc.*,
289 B.R. 505 (Bankr. D. Mass. 2003) .............................................................. 52

*In re Noram Res., Inc.*,
No. 08-38222, 2011 WL 6936361 (Bankr. S.D. Tex. Dec. 30, 2011) ............................. 14

*In re Nw. Airlines Corp.*,
No. 05-17930 (ALG), 2008 WL 630449 (Bankr. S.D.N.Y. Mar. 5, 2008) ....................... 14

*In re Ochoa*,
 74 B.R. 191 (Bankr. N.D.N.Y. 1987) ....................................................................... 26

*In re Odin Demolition & Asset Recovery, LLC*,
 544 B.R. 615 (Bankr. S.D. Tex. 2016) ..................................................................... 5

*In re Old ANR, LLC*,
 No. 19-00302-KRH, 2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019),
 *reconsideration denied,* 2019 WL 3264576 (Bankr. E.D. Va. July 18, 2019) .............. 7, 9

*In re Powers*,
 93 B.R. 513 (Bankr. S.D. Tex. 1988) ........................................................................ 16

*In re Provident Royalties, LLC*,
 No. 09-33886, 2010 WL 2404278 (Bankr. N.D. Tex. June 10, 2010) ........................... 5

*In re Radnor Holdings Corp.*,
 528 B.R. 245 (D. Del. 2014) ..................................................................................... 37

*In re Rodriguez*,
 252 F.3d 435 (5th Cir. 2001) ..................................................................................... 14

*In re Rusty Jones, Inc.*,
 134 B.R. 321 (Bankr. N.D. Ill. 1991), *abrogated on other grounds by In re*
 *Grabill Corp.*, 983 F.2d 773 (7th Cir. 1993) ............................................................... 52

*In re Sea Island Co.*,
 No. 10-21034, 2010 WL 4386855 (Bankr. S.D. Ga. Oct. 20, 2010) .............................. 33

*In re SunEdison, Inc.*,
 No. 16-10992 (SMB), 2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019) .............. 7, 9

*In re Technicool Sys., Inc.*,
 896 F.3d 382 (5th Cir. 2018) ............................................................................. 5, 8, 11

*In re Tex. Wyo. Drilling, Inc.*,
 647 F.3d 547 (5th Cir. 2011) ..................................................................................... 17

*In re Timber Creek, Inc.*,
 187 B.R. 240 (Bankr. W.D. Tenn. 1995)..................................................................... 33

*In re Tour Train P'ship*,
 15 B.R. 401 (Bankr. D. Vt. 1981)................................................................................ 9

*In re Tribeca Mkt., LLC*,
 516 B.R. 254 (S.D.N.Y. 2014)................................................................................... 51

*In re Wells Benrus Corp.*,
   48 B.R. 196 (Bankr. D. Conn. 1985) ............................................................... 26

*In re Wheatfield Bus. Park LLC*,
   286 B.R. 412 (Bankr. C.D. Cal. 2002) ............................................................. 43

*In re WorldCom, Inc.*,
   311 B.R. 151 (Bankr. S.D.N.Y. 2004) ...................................................... 21, 34

*In re Yuba Westgold, Inc.*,
   157 B.R. 869 (Bankr. N.D. Iowa 1993) ........................................................... 26

*KLG Gates LLP v. Brown*,
   506 B.R. 177 (E.D.N.Y. 2014) ......................................................................... 53

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S.
      LLC*,
   139 S. Ct. 1601 (2019) ........................................................................................ 7

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S.,
      LLC*,
   578 B.R. 325 (E.D. Va. 2017) ............................................................................. 7

*Matter of Triangle Chem., Inc.*,
   697 F.2d 1280 (5th Cir. 1983) ......................................................................... 57

*Mission Prods. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652 (2019) ........................................................................................ 9

*Nissho-Iwai Am. Corp. v. Kline*,
   845 F.2d 1300 (5th Cir. 1988) ......................................................................... 56

*Snyder v. Soc'y Bank*,
   181 B.R. 40 (S.D. Tex. 1994), *aff'd sub nom In re Snyder*, 52 F.3d 1067 (5th Cir.
   1995) ................................................................................................................. 11

*U.S. v. 8 Gilcrease Lane, Quincy Fla. 32351*,
   587 F. Supp. 2d 133 (D.D.C. 2008) ................................................................. 56

*United States v. Roberts*,
   308 F.3d 1147 (11th Cir. 2002) ....................................................................... 56

*Weir v. Fed. Asset Disposition Ass'n*,
   123 F.3d 281 (5th Cir. 1997) ........................................................................... 25

**Statutes**

11 U.S.C. § 101 ............................................................................................... passim

11 U.S.C. § 1107 ................................................................................................ 20

11 U.S.C. § 1109 .................................................................................................. 5

11 U.S.C. § 1123 ................................................................................................ 16

11 U.S.C. § 1129 ................................................................................................ 27

11 U.S.C. § 1141 ................................................................................................ 15

11 U.S.C. § 327 ............................................................................................ passim

15 U.S.C. § 78 .................................................................................................... 25

28 U.S.C. § 1746 .................................................................................... 54, 55, 56

28 U.S.C. § 445 ................................................................................................. 35

## Rules

Bankr. S.D. Tex. R. 2014 .................................................................................. 57

Bankr. S.D. Tex. R. 9014 .................................................................................. 57

Fed. R. Bankr. P. 2014 .............................................................................. passim

Fed. R. Bankr. P. 9011 ................................................................................ 56, 57

## Other Authorities

AlixPartners, LLP 401(k) Savings Plan and Trust, 2017 Annual Return/Report of
     Employee Benefit Plan (Form 5500) (Sep. 21, 2018), *available at*
     https://www.efast.dol.gov/portal/app/disseminate?execution=e1s2# ........................ 34, 37

Code of Conduct for United States Judges, Canon 3 ................................................ 35

McKinsey Recovery & Transformation Services U.S., LLC ("RTS") submits this brief in response to both (a) the Motion to Dismiss for Lack Of Jurisdiction Or, In the Alternative, Judgment On the Pleadings (Dkt. 2275, the "Motion" or "Mot.") and (b) the Objection to the WLB Debtors' Application (the "Application") to Employ McKinsey Recovery and Transformation Services, U.S. LLC and Certain of Its Affiliates (the "Proposed Professionals") (Dkt. 2274, the "Objection" or "Obj."),[2] filed by Mar-Bow Value Partners LLC ("Mar-Bow") on August 20, 2019.

## PRELIMINARY STATEMENT

On July 3, 2019, the Westmoreland Coal Company and certain of its subsidiaries (other than the WMLP Debtors)[3] (collectively the "WLB Debtors") filed an application to retain the Proposed Professionals as their performance improvement advisor *nunc pro tunc* to the Petition Date.[4] That same day, the WLB Debtors separately filed a declaration from Dmitry Krivin (the "Krivin Declaration") in support of the Application.[5]  The Krivin Declaration was submitted pursuant to Bankruptcy Rule 2014(a) and followed the guidelines and recommendations of the disclosure protocol developed by D.J. (Jan) Baker and Paul Singerman (the "Houston Protocol") pursuant to this Court's February 21, 2019 Order.  The Krivin Declaration goes above and beyond the disclosures typically filed by bankruptcy professionals in this or any other case or court and provides ample basis for this Court to determine that the Proposed Professionals are disinterested persons qualified to be retained under Section 327(a) of the Bankruptcy Code.

---

[2] The Office of the U.S. Trustee was the only other party to file an objection to the Application.  The Proposed Professionals and the WLB Debtors are working to address the U.S. Trustee's concerns by submitting certain disclosures and clarifications on the record in advance of the hearing on the merits of the Application.  To the extent the U.S. Trustee's objection is not consensually resolved, McKinsey will address any outstanding issues at a later date.

[3] "WMLP Debtors" means Westmoreland Resource GP, LLC, Westmoreland Resources, LP ("WMLP"), and WMLP's subsidiaries.  For the avoidance of any doubt, the WMLP Debtors did not seek to retain, and will not seek to retain, the Proposed Professionals for any purpose in these chapter 11 cases.  Furthermore, the WMLP Debtors have not paid, and will not pay, any fees or expenses of the Proposed Professionals in connection with these chapter 11 cases.

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Application.

[5] The WLB Debtors also attached a declaration by Mark Hojnacki describing the engagement team, the qualifications of the Proposed Professionals, the terms and scope of the engagement, and the fee and expense structure.  Dkt. 2119-2.  The Krivin Declaration includes the disclosures at issue here.

On August 20, 2019, Mar-Bow filed a one-hundred-page Objection and a sixty-two-page Motion, each of which argues that the Court should reject the WLB Debtors' Application. Mar-Bow's arguments range from fanciful to unprecedented and extraordinary, advancing a standard of disclosure untethered to modern practice and to which few—if any—professionals ever could adhere. As explained below, and to the extent the Court even considers Mar-Bow's filings (which it need not do because Mar-Bow lacks standing), Mar-Bow's Motion provides no basis for the Court to deny the Application on the law, and the Court can and should overrule Mar-Bow's Objection as well. The Court then should proceed promptly to a retention hearing on the Application, in which any remaining interested parties can participate. The Proposed Professionals stand ready to present to this Court any evidence and witnesses necessary for the Court to determine that they satisfy the standards for retention under the Bankruptcy Code.

*First*, the Court should reject both the Motion and the Objection outright because Mar-Bow lacks standing to be heard in this Court. The Amended Joint Chapter 11 Plan (Dkt. 1561, the "Plan") discharged Mar-Bow's claim as a purported First Lien Creditor. In exchange, upon consummation of the Plan, Mar-Bow received a fixed recovery, eliminating any direct pecuniary interest it once may have had in the outcome of the Application. Mar-Bow does not even attempt to show that it has a pecuniary interest in these proceedings. Its Motion should be denied, and its Objection should be overruled on this basis alone. (*See infra* at Section I.)

*Second*, Mar-Bow's newly-minted arguments that this Court lacks jurisdiction over the Application and that the Plan purportedly extinguished the WLB Debtors' standing are wrong. The jurisdictional arguments constitute improper collateral attacks on this Court's prior orders, which expressly deferred consideration of the Proposed Professionals' retention until after confirmation. *See* Dkt. 1427 (February 21, 2019 "Settlement Order") (deferring consideration of RTS's retention to allow RTS to develop a new disclosure protocol to guide its submission of a new retention application and retaining jurisdiction); Dkt. 2118 ("July 3 Order") (directing the WLB Debtors to file a new application to retain the Proposed Professionals). They also ignore the plain

language of the Plan, which expressly preserves the Court's jurisdiction over these chapter 11 cases and all matters arising out of, or related to, them, including professional fees and the Court's prior orders. Mar-Bow's standing argument—that the WLB Debtors lack a pecuniary interest in retaining the Proposed Professionals because they already received the benefit of the Proposed Professionals' services prior to payment—also fails. The WLB Debtors received valuable services from the Proposed Professionals' services and entered into an engagement letter providing that the Application would be made. The July 3 Order then allowed the WLB Debtors to file the Application. And Mar-Bow's other standing argument—that the Proposed Professionals lack a pecuniary interest in having their own fees paid—makes no legal or common sense. Mar-Bow's Motion to dismiss for lack of jurisdiction and standing should be denied. (*See infra* at Section II.)

*Third*, Mar-Bow's argument that the Court should dismiss the Application because the Proposed Professionals cannot satisfy the disinterestedness standard of 11 U.S.C. § 327(a), as a matter of law, is likewise incorrect. Because the Proposed Professionals do not own equity interests in the WLB Debtors (and were never directors, officers, or employees of the WLB Debtors), Mar-Bow is left to argue that the employees of the Proposed Professionals hold interests adverse to the estate through connections of an unretained investment affiliate, MIO Partners, Inc. ("MIO"). Mar-Bow is wrong that the indirect connections of MIO disclosed in the Krivin Declaration (which include the third-party managers that invest certain pension and after-tax monies of McKinsey employees) are disqualifying as a matter of law, and Mar-Bow's mischaracterization of the Krivin Declaration to fit its warped view of the law is especially troubling and should be rejected. Indeed, the facts established in the Krivin Declaration demonstrate that the Proposed Professionals are disinterested and qualified to serve the WLB Debtors. Mar-Bow's arguments to the contrary in its Objection are baseless and should be overruled. (*See infra* at Section III.)

*Fourth*, the Court should reject the arguments raised in Mar-Bow's Objection that the Krivin Declaration fails to satisfy Bankruptcy Rule 2014(a). Mar-Bow incorrectly argues that Rule 2014(a) requires disclosure of all connections of all the Proposed Professionals' affiliates

anywhere in the world, regardless of remoteness caused by temporal limitations, corporate separateness, nature of connection, or information barriers.  It does not.  Mar-Bow's reading of the Rule is unsupported by statutory text, legal precedent, or years of industry practice, and for good reason as the new and patently unworkable legal standard for bankruptcy professionals for which Mar-Bow advocates would, if adopted, deter professionals of any meaningful size from providing much-needed services in complex bankruptcy cases in this District.  (*See infra* at Section IV.)

*Finally*, the Court should reject the other spurious arguments raised in Mar-Bow's Objection, proceed to a retention hearing to address any remaining factual issues raised by real parties in interest and relevant to adjudication of the Application, and grant the WLB Debtors' Application *nunc pro tunc* to the Petition Date.  (*See infra* at Sections V-VII.)

RTS respectfully submits that Mar-Bow's Motion should be denied, and its Objection overruled.

## ARGUMENT

## I.      Mar-Bow Lacks Standing to Object to the WLB Debtors' Application

A party seeking to appear in federal court bears the burden of establishing its standing.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 279 F.R.D. 395, 403 (S.D. Tex. 2011); *accord* Mot. at 27 ("[T]he burden of establishing federal jurisdiction rests on the party seeking the federal forum." (quoting *Howrey v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001))).  Standing is a jurisdictional threshold that a party must meet to be heard.  *In re KLN Steel Prods. Co., LLC*, 506 B.R. 461, 474 (Bankr. W.D. Tex. 2014) ("Standing is a jurisdictional requirement, and the Court is obliged to ensure it is satisfied regardless whether the parties address the matter." (internal citations and quotations omitted)); *In re Crescent Res., LLC*, 455 B.R. 115, 118 (Bankr. W.D. Tex. 2011) (recognizing that "[s]tanding is a jurisdictional requirement" and that "the Court has an independent obligation to ensure it has jurisdiction to hear a matter" (internal citations and quotations omitted)).

To appear and be heard in a bankruptcy case, a party must meet the requirements established by Congress in 11 U.S.C. § 1109(b).[6] That section provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." *Id.* If a party does not fall within these enumerated categories, it can still be a party in interest provided it has "pecuniary interests [that] are directly affected by the bankruptcy proceedings." *In re Cyrus II P'ship*, 358 B.R. 311, 315 (Bankr. S.D. Tex. 2007) (internal citation omitted); *see also Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806 F.3d 363, 366 (5th Cir. 2015) (a party seeking to establish that it is a party in interest must prove that it would be "directly and adversely affected pecuniarily by the order of the bankruptcy court" (quoting *In re Coho Energy Inc.*, 395 F.3d 198, 203 (5th Cir. 2004))); *In re Caspri Corp.*, No. 07-30485-LMC, 2010 WL 743914, at *8 n.7 (Bankr. W.D. Tex. Feb. 25, 2010) (party-in-interest standing exists where there is "actual pecuniary interest in the outcome of a given dispute").[7] This direct pecuniary interest test is "an even more exacting standard than [the] traditional constitutional standing" test because it requires a "higher causal nexus between act and injury." *In re Coho Energy Inc.*, 395 F.3d at 202-03.

Because Mar-Bow does not fall within one of the enumerated categories of Section 1109(b), and because it has no direct pecuniary interest in the Proposed Professionals' retention,

---

[6] In evaluating a party's standing, bankruptcy courts in the Fifth Circuit do not apply the traditional requirements established by Article III of the Constitution because they are not Article III courts. *In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018) ("Bankruptcy courts are not Article III creatures bound by traditional standing requirements.").

[7] *See also In re Provident Royalties, LLC*, No. 09-33886, 2010 WL 2404278, at *8 (Bankr. N.D. Tex. June 10, 2010) (requiring a party seeking standing to have "the type of direct pecuniary interests or sufficient stake in the confirmation of the Plan itself that can confer standing to be heard with respect thereto"); *In re Odin Demolition & Asset Recovery, LLC*, 544 B.R. 615, 625 (Bankr. S.D. Tex. 2016) (a party "was not a party-in-interest and therefore lacked standing"); *In re Miller*, 347 B.R. 48, 51 (Bankr. S.D. Tex. 2006) ("Merck is not a party in interest in this bankruptcy case. Therefore, Merck has no standing to object to the administration of this bankruptcy estate.").

Mar-Bow lacks standing to be heard on its Objection and accompanying Motion. Mar-Bow's Motion and Objection therefore should be dismissed.

### A.     Mar-Bow Lacks Standing as a Discharged Creditor

Prior to Plan confirmation, Mar-Bow represented that it was a holder of a First Lien Claim.[8] When the Plan became effective on March 15, 2019, *see* Dkt. 1608, it discharged the First Lien Claims and their associated liens.[9] Because First Lien Claims were discharged by the Plan, Mar-Bow cannot rely on them to establish standing today. The requirements of standing must be met "at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).

Mar-Bow's inability to rely on its former status as a creditor was recognized by courts at every level in the *Alpha Natural Resources* case, where, as here, Mar-Bow filed an objection before the effective date of the plan but did not have standing once the Plan was confirmed. *See In re Alpha Nat. Res., Inc.,* No. 15-33896-KRH, Dkts. 2603, 3152 (establishing that Mar-Bow filed its objection before the effective date of the plan); *In re Alpha Nat. Res.*, No. 15-33896-KRH, 2016 Bankr. LEXIS 4374, at *35-*36 (Bankr. E.D. Va. Dec. 20, 2016) (holding that Mar-Bow did not have standing "[o]nce the Debtors' Plan was confirmed"). On appeal, the district court agreed.

---

[8] Mar-Bow never has presented any evidence confirming its holdings. In its objection to the WLB Debtors' initial application to retain RTS, Mar-Bow stated that it was "a creditor" that "owns $1,500,000 face value of Westmoreland Coal Co. 144A Bonds." Dkt. 629 at 14 n.1. The "144A Bonds" appear to refer to the only notes issued by the Debtor, which were senior secured notes with an 8.750% coupon issued in a private placement under SEC Rule 144A. *See* http://cbonds.com/emissions/issue/99719 (describing the bonds at issue). The Plan defined these as "First Lien Notes." Dkt. 1561 at 53. Mar-Bow also pleaded that it was an equity holder "in shares of Westmoreland's MLP affiliate." Dkt. 629 at 14 n.1. That could not confer standing because the WMLP Debtors did not receive services from the Proposed Professionals, will not be responsible for any fees, and do not seek to retain the Proposed Professionals. *See supra* n.3. Mar-Bow has pleaded no facts in support of its standing post-confirmation in either its Motion or Objection. As the party seeking to be heard, Mar-Bow has the burden to establish its standing but has made no effort to meet this burden. *Enron*, 279 F.R.D. at 403.

[9] Under the Plan, Holders of First Lien Claims (including Mar-Bow) "waive[d] . . . any recovery or distribution on account of any Allowed First Lien Deficiency Claim," and were given a "Pro Rata share of (w) the Purchaser Stock; (x) the New Second Lien Debt; (y) the Non-Core Asset Sale Proceeds; and (z) all other proceeds of the WLB Debtors' assets that constitute Collateral of the Holders of First Lien Secured Claims and are not Transferred Assets." Dkt. 1561 at 71-72 (Order Confirming Amended Joint Chapter 11 Plan).

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S., LLC*, 578

B.R. 325, 355 (E.D. Va. 2017).  The Fourth Circuit then affirmed this decision, *In re Alpha Nat.*

*Res., Inc.*, 736 F. App'x 412 (4th Cir. 2018)*,* and the Supreme Court denied Mar-Bow's petition

for certiorari, *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S.*

*LLC*, 139 S. Ct. 1601 (2019).[10]  *See also In re SunEdison, Inc.*, No. 16-10992 (SMB), 2019 WL

2572250, at *6 (Bankr. S.D.N.Y. June 21, 2019) (dismissing Mar-Bow's claims for lack of stand-

ing where Mar-Bow purchased rights of a former creditor after the plan's effective date).

　　Just as in *Alpha Natural Resources*, Mar-Bow now lacks the necessary pecuniary interest

to have standing to file the Motion and the Objection or to appear further in this case.

### B.     Mar-Bow's Interest in HoldCo Does Not Constitute a Direct Pecuniary Interest in the Proposed Professionals' Retention

　　Because Mar-Bow cannot derive standing from its status as a former creditor, it has stand-

ing only if it currently has "pecuniary interests [that] are directly affected by the bankruptcy pro-

ceedings."  *In re Cyrus II P'ship*, 358 B.R. at 315 (internal quotation marks and citation omitted).

Mar-Bow holds no such interest.  It received a fixed recovery under the Plan in full and final

satisfaction of its claim and will not receive any further distributions, regardless of whether the

Proposed Professionals are retained.

　　Under the Plan, Westmoreland Mining LLC (the "Purchaser") is responsible for the pay-

ment of the Proposed Professionals' fees.  Upon Court approval of the Proposed Professionals'

fees, the owed fees will become Allowed Administrative Claims, which in turn constitute Funded

Liabilities that the Purchaser will be obligated to satisfy under the Plan and the Stalking Horse

Purchase Agreement between the WLB Debtors and the Purchaser.  Dkt. 1621; *see also* Dkt. 1561

at 67 (noting that the Purchaser shall satisfy all Allowed Priority Claims, which includes

---

[10] Mar-Bow refashioned its objections in a motion to re-open the case based on purported fraud on the court; again, Judge Huennekens rejected Mar-Bow's standing theory and dismissed its motion.  *In re Old ANR, LLC*, No. 19-00302-KRH, 2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019), *reconsideration denied,* 2019 WL 3264576 (Bankr. E.D. Va. July 18, 2019).

Administrative Claims); Dkt. 1621 at 135-36 (explaining that "Administrative Claims (as defined in the Plan)" constitute "Funded Liabilities"); *id.* at 173 (stating that the Purchaser "shall satisfy Retained Funded Liabilities").[11]

Former holders of First Lien Claims received some shares of "Purchaser Stock," which ultimately became shares in Westmoreland Mining Holdings, LLC ("HoldCo"), which in turn owns 100% of the membership interests in the Purchaser. Dkt. 1621 at 12-14. Mar-Bow may thus contend that it possesses some shares in HoldCo, which, in turn, owns stock in the Purchaser, the entity responsible for payment of the Proposed Professionals' fees. This is far from a *direct* pecuniary interest. As a shareholder of a shareholder of the party with a direct interest, Mar-Bow's interest would be indirect and remote—two steps removed from the actual direct interest.

It is settled law that such an indirect interest does not create standing. For example, in *Technicool Systems*, the Fifth Circuit affirmed Judge Isgur's ruling that the owner of the debtor lacked standing to object to the appointment of special counsel with a purported conflict of interest because the owner did not have an adequately direct stake in the estate. 896 F.3d at 386. Other courts similarly have held that "party-in-interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding." *In re Refco Inc.*, 505 F.3d 109, 117 n.10 (2d Cir. 2007). Shareholder interests are derivative because the possibility that "stock might change in value as a result of the court's action *is not enough* to confer standing upon the shareholders." *In re Cent. Ice Cream Co.*, 62 B.R. 357,

---

[11] The Purchaser acknowledged this obligation in its Response to the MLP Lenders' Statement In Connection With the Proposed Settlement Between McKinsey and the United States Trustee, stating that it "is funding . . . the payment of allowed administrative and priority claims." Dkt. 1709 at 5.

360 (N.D. Ill. 1986) (emphasis added).  Mar-Bow's position here is even less direct than in those cases because it is a stockholder of a stockholder.[12]  It thus lacks standing.[13]

### C.    Equitable Arguments Are Unavailing to Confer Standing

Mar-Bow's preemptive argument that it should be permitted to object because it was prejudiced by RTS's supposed inequitable delay of Mar-Bow's initial objection, *see* Obj. at 19, is contrary to the record and should be rejected.  In January, *Mar-Bow*—not RTS—demanded months of discovery not long before Plan confirmation that in any event would have extended resolution of the Proposed Professionals' retention application past the Plan Effective Date.  Mar-Bow criticized RTS for asking to have the retention application decided "extremely quickly, perhaps in a matter of weeks," and suggested instead a timeline on which discovery would be completed in "approximately five months."  Dkt. 1029 ¶ 4.  Mar-Bow argued that "there is no need to resolve Mar-Bow's Objection prior to confirmation," and accused RTS of trying to push through a "rushed and restrictive process."  Dkt. 854 ¶¶ 1, 4.  At this time, Mar-Bow already understood from the dismissal of its objection in *Alpha Natural Resources* that standing based solely on an extinguished creditor claim would not survive Plan confirmation, 2016 Bankr. LEXIS 4374, at *35-*36, but it

---

[12] Mar-Bow's interest is even less direct than that possessed by a creditor of a creditor, which, unlike Mar-Bow's twice derivative interest, is only once derivative.  "[C]ourts have consistently held that creditors of creditors do not have standing to participate in bankruptcy cases."  *In re Alliance Consulting Grp. LLC*, 588 B.R. 169, 174 (Bankr. S.D. Miss. 2018), *aff'd sub nom. Plant Materials, LLC v. Alliance Consulting Grp., LLC*, 596 B.R. 851 (S.D. Miss. 2019); *see also In re Refco Inc.*, 505 F.3d at 117 (holding that "[o]nly [the creditor], not individual Investors" therein "could assert a claim against the . . . estate" because the investors in the creditor are not a 'party in interest' within the meaning of the Bankruptcy Code."); *In re Lehman Bros. Holdings Inc.*, No. 11 Civ. 3760 (RJS), 2012 WL 1057952, at *3 (S.D.N.Y. Mar. 26, 2012) (holding that "a creditor once removed does not have party-in-interest standing"); *In re Tour Train P'ship*, 15 B.R. 401, 402 (Bankr. D. Vt. 1981) (finding that a creditor of a creditor was "a stranger to this proceeding" without standing to appear).

[13] Mar-Bow cannot rely on *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019), to confer standing, because that case concerned mootness (when a party may assert a claim) rather than standing (*who* has a right to assert a claim).  *See SunEdison*, 2019 WL 2572250, at *10 (rejecting Mar-Bow's argument for "conflating mootness with standing"); *In re Old ANR, LLC*, 2019 WL 3264576, at *2 (noting that "*Tempnology* discussed only mootness, not standing").

proposed this extended schedule nonetheless.  Mar-Bow should not be heard to rewrite history now.  Obj. at 19.[14]

Because Mar-Bow no longer has any pecuniary interest in the resolution of the Application (or this case), it is Mar-Bow's participation—absent standing—in the proposed retention of its competitor McKinsey that would be inequitable.  When Mar-Bow was a creditor, it had the opportunity to challenge issues that would have affected its recovery.  But any legitimate claim Mar-Bow once may have held as a creditor has been adjudicated and resolved, and Mar-Bow's participation in these proceedings should accordingly end.  Mar-Bow's allegations, fueled by Jay Alix's personal and professional animus against McKinsey, are not rooted in any legitimate pecuniary interest as a creditor in the Proposed Professionals' fees or this chapter 11 case.  Rather, Mar-Bow's goal is to co-opt the bankruptcy process for illegitimate, anticompetitive ends.[15]

The recent decision in *In re Cambridge Analytica LLC*, 600 B.R. 750 (Bankr. S.D.N.Y. 2019) is illustrative.  In *Cambridge Analytica*, a creditor, similar to Mar-Bow, purchased a claim against a debtor in an attempt to manufacture standing to further its litigation agenda outside of the bankruptcy case.  The court denied the creditor's discovery motion and held:

> The Court would set a very troubling precedent by allowing the Movant's Rule 2004 Motion to go forward.  Such a result would incentivize parties to purchase nominal claims in bankruptcy cases solely to pursue their outside litigation agendas . . .  The cost of such compliance would benefit only the outside litigation at the

---

[14] Mar-Bow was on notice that the Court would not delay Plan confirmation for its objection.  In mid-December 2018, the Court warned the parties that it would not permit the resolution of Mar-Bow's 145-page objection to delay Plan confirmation, which was then scheduled for mid-February.  Dkt. 760.  On February 21, a week before the planned confirmation hearing, the Court made clear that "[c]onsideration of Westmoreland's application to retain McKinsey RTS is deferred" until after the creation of a new protocol.  Dkt. 1427 at 2.  Mar-Bow knew that the Plan would become effective before the retention issue was resolved.  Mar-Bow did not object to confirmation.

[15] Demonstrating his true motivation here, Jay Alix separately asserted a civil RICO action against several McKinsey entities and employees  claiming that AlixPartners had been harmed by losing business to RTS.  The RICO claims recently were dismissed with prejudice.  *See Alix v. McKinsey & Co. Inc.*, No. 18-CV-4141 (JMF), 2019 WL 3889855 (S.D.N.Y. Aug. 19, 2019).  In that case, Alix admitted that "there is no proof that any debtor or interested party suffered a financial loss" because of Defendants' alleged "scheme."  *Alix v. McKinsey & Co.,* 1:18-cv-04141 (JMF) (S.D.N.Y. November 28, 2018), Dkt. 93 at 30.  Mar-Bow—which lacks standing—should not be allowed to use this forum to achieve the anticompetitive goals that Alix failed to achieve elsewhere.

expense of the bankruptcy estate and its creditors.  Such a result cannot be countenanced by the Court.

*Id.* at 753; *cf. Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), *aff'd sub nom In re Snyder*, 52 F.3d 1067 (5th Cir. 1995) (holding that "[t]he use of Rule 2004 to further [the movant's] case in state court constitutes an abuse of Rule 2004").  Similar abuse of process is apparent here, where Mar-Bow's true interest in the Application is to harm the Proposed Professionals, rather than to pursue any economic interest in these chapter 11 cases, since those interests were fully satisfied pursuant to the Plan.

Mar-Bow's anticompetitive agenda is creating undue burden and expense for this Court and on the parties with standing.  *See, e.g.*, Dkt. 2196, July 24, 2019 Hr'g Tr. at 21:14-16 (counsel for the WLB Debtors, at a status conference, recognizing that the process set off by Mar-Bow's objection "has obviously gone on for quite a while" and "continues to cost the Debtor money").  Standing principles exist precisely for circumstances like those presented here—to protect bankruptcy courts from litigation like Mar-Bow's that has been launched by parties without any legitimate monetary interest in the outcome.  As the Fifth Circuit stated in *Technicool*, an "order must burden [a party's] pocket before he burdens a docket."  896 F.3d at 386.

Dismissing Mar-Bow from the process, of course, would not end the scrutiny over the Proposed Professionals' retention in this case.  All parties with standing—the WLB Debtors, the U.S. Trustee, and the Purchaser—have the right to be heard on the Application.  The Proposed Professionals remain fully accountable to the Court and stand prepared as necessary to show that they satisfy all the requirements of 11 U.S.C. § 327.

## II.    Mar-Bow's Standing and Jurisdictional Arguments Are Without Merit

No doubt anticipating its own dismissal for lack of standing, Mar-Bow attempts to invert the case law by arguing (incorrectly) that it is the WLB Debtors and the Proposed Professionals who now lack standing and that *the Court itself* has no jurisdiction over the Application.  Not so.

Mar-Bow's jurisdictional argument fails because the Court expressly retained jurisdiction over the parties' post-confirmation Application process.  Mar-Bow's argument that the Plan

11

eliminated the Court's jurisdiction to hear the Application is thus a collateral attack on the Court's orders and is inconsistent with the Plan itself.  Mar-Bow's argument that the WLB Debtors and the Proposed Professionals lack a pecuniary interest in compensating the Proposed Professionals for the work they performed for the benefit of the WLB Debtors likewise ignores reality.  The WLB Debtors received valuable services from the Proposed Professionals and agreed to submit the Application to pay for those services; the Proposed Professionals have an obvious pecuniary interest in being compensated.

### A.   Mar-Bow's Jurisdictional Argument Constitutes a Collateral Attack on This Court's Prior Orders

Mar-Bow's argument constitutes a collateral attack on this Court's Settlement Order.  Dkt. 1427.  After mediation with Judge Isgur, and before Plan confirmation, RTS and the WLB Debtors reached a settlement agreement providing that RTS would work with a nationally recognized bankruptcy expert to create the new Houston Protocol for Rule 2014 disclosures and jointly moved for a court order deferring consideration of the WLB Debtors' application until the Houston Protocol was in place—which, obvious to all at the time, would extend beyond confirmation.  Dkt. 1422.  On February 21, a week prior to Plan confirmation, the Court issued an order granting this joint motion.  Dkt. 1427.  The Settlement Order noted the Court's authority to "enter a final order" and held that "[c]onsideration of Westmoreland's application to retain McKinsey RTS is deferred until" the Houston Protocol was established.  *Id.* at 1, 2.  The Settlement Order then stated expressly that the Court "retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order."  *Id.* at 2.[16]  The Court confirmed the Plan shortly after the issuance of the Settlement Order, on March 2, and expressly preserved the Court's jurisdiction to "[e]nforce all orders previously entered by the Bankruptcy Court."  Dkt. 1561 at 117.

---

[16] The Court also issued an order approving RTS's settlement with the U.S. Trustee, preserving the U.S. Trustee's right to object to RTS's retention, and stating that the Court "retain[ed] exclusive jurisdiction over all matters subject to this Order" and "retain[ed] exclusive jurisdiction to hear and adjudicate any motions related to this Order."  Dkt. 1763 at 6.

Thereafter, Mar-Bow made numerous filings objecting to the Houston Protocol process. On March 6, Mar-Bow moved for reconsideration of the Settlement Order.  Dkt. 1585.  On March 29, April 9, April 25, May 31, and June 11, Mar-Bow filed so-called responses, without permission of the Court, to RTS's Court-authorized status reports further objecting to the development of the Houston Protocol and to the Houston Protocol itself.  *See, e.g.*, Dkts. 1672, 1699, 1781, 1906, 2020.  Notably, despite numerous filings totaling 139 pages, Mar-Bow did not raise any argument in any of those filings that the Court lacked jurisdiction or that the Proposed Professionals or the WLB Debtors lacked standing to proceed.  Dkt. 1585.[17]  On April 9, Mar-Bow moved for an order compelling RTS to disclose information about the investments of MIO and its other affiliates.  Dkt. 1701.

This Court denied that motion *sua sponte*, noting that Mar-Bow was attempting to avoid the stay of discovery in the Settlement Order, and stating that, "[a]t worst, the motion constitutes an improper collateral attack on the Court's prior order at Docket No. 1427 [the Settlement Order] for an illegitimate purpose."  Dkt. 1702.  And on July 3, after the protocol process was completed, this Court issued an order permitting the WLB Debtors to "file the New Application for retention *nunc pro tunc* to the petition date, on or before July 3, 2019."  Dkt. 2118 at 2.  The July 3 Order also specifically noted that the Court "retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order."  *Id.* at 3.  Even as recently as the July 24 hearing, Mar-Bow did not suggest that it had any concerns about this Court's jurisdiction or any party's standing.[18]

---

[17] At the April 16 Joint Settlement Conference, the Court set forth a schedule by which the WLB Debtors would submit revised disclosures on July 3 and the Court would conduct a status conference on July 24. Dkt. 1752, Apr. 16, 2019 Hr'g Tr. at 47:10-17.  Mar-Bow's counsel had no objection to the Application and said that a July 24 scheduling conference was "fine."  *Id.* at 43:23-44:14, 47:18-19.

[18] After the Plan became effective, RTS noted in its Response to Mar-Bow's Motion To (i) Reconsider the Court's Order Granting the Joint Motion in Furtherance of Mediation Agreement, and (ii) Set a Hearing Regarding Discovery on Mar-Bow's Amended Objection, dated March 27, 2019, that the issue of Mar-Bow's standing should be addressed.  Dkt. 1659 at 11 n.7.  Counsel for RTS then noted this issue again at the July 24 hearing.  Dkt. 2185, July 24, 2019 Hr'g Tr. at 9:22-25.

Mar-Bow's Motion cannot be squared with the Settlement Order and the July 3 Order, which expressly deferred consideration of RTS's retention, reserved the Court's jurisdiction to consider RTS's retention thereafter, and permitted the WLB Debtors to file the Application. Accordingly, the Motion must be denied. Collateral attacks on bankruptcy orders must be rejected, because "final bankruptcy orders (*i.e.*, orders that are affirmed upon direct review, or, as in this case, not appealed or contested) become res judicata to the parties and those in privity with them." *In re Linn Energy, L.L.C.*, 927 F.3d 862, 866 (5th Cir. 2019) (internal quotations omitted). This preclusive effect applies "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Id.*[19] The Court is exercising its well-established authority to maintain jurisdiction over the implementation of its preexisting orders. As the Fifth Circuit has recognized, during the administration of an estate, "a bankruptcy court retains jurisdiction to interpret and enforce its own orders to ensure their proper execution." *In re Rodriguez*, 252 F.3d 435 (5th Cir. 2001); *see also In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2008 WL 630449, at *2 (Bankr. S.D.N.Y. Mar. 5, 2008) (recognizing that the court had jurisdiction over the implementation of a settlement order because a "*bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders*" (quoting *In re Millenium Seacarriers, Inc.*, No. 04 CIV. 6482 (DLC), 2005 WL 2398014, at *7 (S.D.N.Y. Sept. 28, 2005), *aff'd,* 458 F.3d 92 (2d Cir. 2006)) (emphasis in original)).

Mar-Bow's jurisdictional arguments are thus unavailing.

---

[19] *See also In re Cont'l Inv. Corp.*, No. 3:02-CV-0682-P, 2002 WL 1315514, at *3 (N.D. Tex. June 11, 2002) (rejecting an attack on an "order which appointed the Disbursing Agent" as "an impermissible collateral attack"); *In re Noram Res., Inc.*, No. 08-38222, 2011 WL 6936361, at *6 (Bankr. S.D. Tex. Dec. 30, 2011) (Isgur, J.) (rejecting collateral attacks on a sale order and recognizing that "[a]n order issued by the bankruptcy court authorizing the sale of part of the bankrupt estate is a final judgment even though the order neither closes the bankruptcy cases nor disposes of any claim" (quoting *Hendrick v. Avent*, 891 F.2d 583, 586 (5th Cir. 1990))).

14

B.     **The Plan Itself Preserves the Court's Jurisdiction Over the Application**

Mar-Bow's argument also fails because, consistent with the Court's Settlement Order, the Plan further preserved the Court's jurisdiction over the Application.

*First*, contrary to Mar-Bow's argument, the Proposed Professionals' claim for fees was not discharged by 11 U.S.C. § 1141.  Mar-Bow points to Section 1141(d)(1), which it argues discharges the WLB Debtors from any debt arising before Plan confirmation.  Mot. at 17-18.  But each subsection of that statute makes clear that it applies only "except as otherwise provided in the plan or the order confirming the plan."  11 U.S.C. § 1141.  This Plan did so; indeed, even Mar-Bow admits that the Plan did not discharge professional fee claims "as the Court may allow post-confirmation on a timely filed fee application."  Mot. at 18.  The Proposed Professionals are Professionals within the meaning of the Plan and so the Court retains jurisdiction over the WLB Debtors' Application for the Proposed Professionals' retention to the extent the Plan provided for it. *See* Dkt. 1561 at 58 (defining "Professional").

The Plan expressly retains the Court's jurisdiction over the WLB Debtors' Application. The Plan explicitly preserved the Court's jurisdiction over matters relating to professionals' employment and fees.  Article XIII of the Plan provides that, "[n]otwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters[] arising out of, or related to" them. Dkt. 1561 at 116.  As relevant here, the Plan specified that the Court retains jurisdiction to "[d]ecide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan." *Id.* at 116. Because the Plan retained jurisdiction over matters relating to professional fees, the Court has jurisdiction to evaluate the WLB Debtors' Application.

*Second*, the Plan also expressly preserves the Court's jurisdiction over the WLB Debtors' Application because it preserves the Court's jurisdiction to enforce its previous orders.  As described above, the Settlement Order, entered just one week before Plan confirmation at a time

15

when all parties knew confirmation was imminent, deferred consideration of the WLB Debtors' Application until after confirmation to allow for the Houston Protocol process and retained jurisdiction over that process, the Application, and all related matters. Dkt. 1427 at 2. The Plan then expressly preserved jurisdiction over the Court's prior orders: it stated that the Court retained jurisdiction to "[e]nforce all orders previously entered by the Bankruptcy Court," Dkt. 1561 at 117, thereby confirming that all prior orders will remain valid and enforceable. The fact that the July 3 Order permitted the Proposed Professionals to file a *new* application in place of the prior pending application is of no import—this order was in furtherance of the Court's prior orders relating to McKinsey's settlement with the WLB Debtors and was well within the court's retention of jurisdiction of all matters arising from or related to the Settlement Order. This Court's retention of jurisdiction throughout this process reflects the Court's "range of discretion in granting or denying retroactive approval of professional appointment applications." *In re Powers*, 93 B.R. 513, 516 (Bankr. S.D. Tex. 1988). Thus, the plain language of the Plan gave effect to the Court's preservation of jurisdiction over the Proposed Professionals' retention.

*Finally*, Mar-Bow is incorrect that Section 1123(b)(3)(B) bars the Application because it requires plans to expressly preserve a debtors' right to pursue claims against third-parties after confirmation. Mot. at 23. Section 1123(b)(3)(B) is wholly irrelevant because the Application is clearly not a cause of action against a third-party. As described above, the Plan treats the Proposed Professionals' claims for fees as Administrative Claims, over which jurisdiction is preserved pursuant to the Plan. *See* Dkt. 1561 at 45 (defining "Administrative Claim" as including "Allowed Professional Fee Claims").[20]

---

[20] Alix's argument that Section 1123(b)(3)(B) precludes any plan from preserving jurisdiction over retention and fee applications, Mot. at 23, is also specious and ignores other recent cases approving retention applications that were filed after plan confirmation and the effective date. *See In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex.) (approving the retention application of PricewaterhouseCoopers filed after the April 11, 2016 plan confirmation date); *In re FullBeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y.) (approving the retention applications of AlixPartners, Kirkland & Ellis LLP, PJT and Prime Clerk filed after the February 7, 2019 effective date); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y.) (approving the retention applications of AP

16

### C.   Mar-Bow's Argument That the WLB Debtors and the Proposed Professionals Lack a Pecuniary Interest Is Meritless

Mar-Bow argues that both the WLB Debtors and the Proposed Professionals lack a financial interest in the outcome of the WLB Debtors' Application.  That makes no sense, as payment for services rendered cannot be severed from the WLB Debtors' interest in the provision of those services.  And obviously the Proposed Professionals have a pecuniary interest in receiving their fees.

Mar-Bow argues that the WLB Debtors' position here is somehow "bizarrely **contrary**" to the WLB Debtors' interests because the WLB Debtors are seeking to allow the Proposed Professionals to be compensated.  Mot. at 14 (emphasis in original).  This is another area where Mar-Bow seemingly attacks decades of established industry practice.  In every retention, in every case, the debtor seeks court approval to retain and pay professionals, subject to further court order, even though that approval will cost the estate money.  Mar-Bow's logic would suggest that all such debtors are acting contrary to their interests when they apply for such retention, whether before or after confirmation.  Seeking payment for professional services rendered during their bankruptcy is not contrary to the WLB Debtors' interests; it is simply paying professionals for their services rendered.  The logical conclusion of Mar-Bow's position is that the law requires the WLB Debtors to find ways to avoid paying reasonable compensation to professionals it engaged and who rendered services in good faith for the benefit of the estate.  That is not, and should not be, the law.

---

Services, Centerview Partners and Kirkland & Ellis LLP filed after the May 3, 2019 effective date); *In re Arsenal Energy Holdings LLC*, No. 19-10226 (BLS) (Bankr. D. Del.) (approving the retention applications of Barclays Capital Inc., Simpson Thacher & Bartlett LLP, Prime Clerk and Young Conway Stargatt & Taylor, LLP filed after the February 14, 2019 effective date); *In re Roust Corp.*, No. 16-23786 (RDD) (Bankr. S.D.N.Y.) (approving the retention applications of Houlihan Lokey and Skadden, Arps, Slate, Meagher & Flom LLP filed after the January 10, 2017 plan confirmation date); *In re Global A&T Electronics LTD*, No. 17-23931 (RDD) (Bankr. S.D.N.Y.) (approving the retention applications of Alvarez & Marsal, Kirkland & Ellis LLP and Moelis & Company after the December 17, 2017 plan confirmation date). These same cases defeat Mar-Bow's argument that the WLB Debtors cannot make this Application because they are no longer a debtor in possession.  *See* Mot. 39-40.  Mar-Bow's citations to *In re Diabetes America, Inc.*, 485 B.R. 340 (Bankr. S.D. Tex. 2012) and *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547, 552 (5th Cir. 2011) are inapposite, Because both cases evaluated whether plans preserved the rights of debtors to pursue causes of action against third parties.

Here, RTS and the WLB Debtors entered into a settlement following court-ordered mediation, and, as part of that settlement and their engagement agreement, the parties agreed that the Application would be asserted after the Houston Protocol had been developed, and thus after confirmation. The Court approved that settlement process in the Settlement Order and retained jurisdiction over the process. If the WLB Debtors had failed to file the Application, as Mar-Bow implicitly suggests they should have done, the Proposed Professionals could have sought to enforce their settlement and the Settlement Order. Mar-Bow does not and cannot cite any authority to support its wrong-headed notion that, simply because the retention application was deferred, the WLB Debtors should receive the benefit of the professional services already rendered as a windfall and lose standing to make any retention application.

Equally unsupportable is Mar-Bow's suggestion that the Application is not in the WLB Debtors' interest as the WLB Debtors are not "under any moral obligation" to seek compensation for the services they received because McKinsey took a risk by working prior to the approval of its retention. Mot. at 32. The WLB Debtors have lived up to their obligation: they signed an engagement agreement that requires them to file an application "to obtain approval of [the Proposed Professionals'] retention and retainer, *nunc pro tunc* to the date of filing," Dkt. 2119 at 16, entered into the settlement, submitted a joint motion with RTS that resulted in the Settlement Order, and now have submitted an Application in compliance with the Settlement Order and the July 3 Order. Mar-Bow conflates the risk that the Proposed Professionals actually took—that their retention might be denied—with a specious argument that they agreed to risk not having their retention or fees even be considered by this Court.

Mar-Bow's suggestion that the Proposed Professionals themselves lack a pecuniary interest in their own retention, despite Mar-Bow's acknowledgement that "millions of dollars in fees" are at stake, similarly must be rejected. Mot. at 16. It goes without saying that the Proposed Professionals have a stake in being compensated for the services they provided. Mar-Bow fails to

18

acknowledge the obvious point that first seeking retention is an essential prerequisite to seeking payment of fees.  This two-step process holds true for every professional seeking retention.[21]

At bottom, Mar-Bow's standing and jurisdictional arguments should be rejected as baseless arguments preemptively made to distract the Court from Mar-Bow's own lack of standing under the Plan.

## III.    The Proposed Professionals Are Qualified to Serve the WLB Debtors in These Cases

Mar-Bow next argues that the Proposed Professionals are disqualified, as a matter of law, because certain McKinsey partners and employees held or hold "beneficial equity interests" in the WLB Debtors and interested parties through McKinsey's investment affiliate, MIO.  The Court should reject Mar-Bow's arguments, which rest on false factual premises and extreme and unsupported interpretations of the relevant law.

Mar-Bow knows that most, if not all, bankruptcy professionals have pension plans and other investments.  Mar-Bow also knows that certain industry professionals (especially investment banks) whose retentions routinely are approved under Section 327(a)—including in this Court and in this case—disclose that their affiliates may trade *directly* in the debtor's securities.  Mar-Bow asks this Court to become an outlier jurisdiction by ruling that the possibility that the Proposed Professionals' employees' pension monies are held by a separate affiliate that in turn invests the monies with third parties that may make independent decisions to invest in the debtors or other interested parties precludes the retention of McKinsey entities that are walled off from those asset management activities.  Mar-Bow singles out McKinsey in this way, and intentionally manipulates the Proposed Professionals' disclosures, because its ultimate goal is to obtain a ruling that precludes McKinsey from competing to advise chapter 11 debtors at all.

---

[21] To the extent Mar-Bow argues that the Proposed Professionals lack a pecuniary interest because the Plan deprived them of any ability to seek fees after April 15, Mot. at 16-17, that argument fails for the same reasons stated above: the Plan and the Court's prior orders permitted the protocol process and delayed the retention (notwithstanding that it would go past confirmation) and ultimately permitted the WLB Debtors to submit the Application on July 3.  There is, therefore, no doubt that the Application is timely.

The law does not preclude retention of professionals that may have indirect interests in interested parties through investments managed by third-party managers.  In an effort to achieve its anti-competitive goal, Mar-Bow therefore misstates the law and resorts to manufacturing false factual allegations, going so far as to misleadingly edit an exhibit to the Krivin Declaration so that it can argue about supposed investment connections that do not actually exist.

Mar-Bow's Motion should be denied because it is based on a distortion of the law and on these false allegations of purportedly disqualifying investment connections.  To the extent the Court considers Mar-Bow's Objection, it should be overruled as well, because it rests on the same false foundations as the Motion.  The Application contains more than a sufficient basis for the Court to find that the Proposed Professionals are disinterested.  The Proposed Professionals look forward to demonstrating their qualifications at any retention hearing.

### A.      Mar-Bow Misstates the Law Applicable to Disqualification Under Section 327(a)

To qualify for retention, a bankruptcy professional must satisfy the standards of Bankruptcy Code Section 327(a), which provides in relevant part that a debtor "may employ one or more . . . professional persons, that do not hold or represent an *interest adverse* to the estate, and that are disinterested persons . . . ."  11 U.S.C. § 327(a) (emphasis added); *see also* § 1107(a).  A "disinterested person" is one "that . . . (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not within 2 years . . . a director, officer, or employee of the debtor," and that "(C) does not have an *interest materially adverse* to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14) (emphasis added).  The proposed professional must show that it has met these standards.  Mar-Bow's Motion attempts to prove that the Proposed Professionals are "interested" as a matter law.  Mar-Bow does not and cannot establish that the Proposed Professionals fail the tests under Sections 327(a) and 101(14)(C) as a matter of law, and its Motion to dismiss the Application on this ground should be denied.

To be clear, no Proposed Professional owns equity in the WLB Debtors, and no Proposed Professional was, at any relevant time, a director, officer, or employee of the WLB Debtors.  Krivin Decl. ¶ 46.  Subsections 101(14)(A) and (B) of the disinterestedness definition are thus plainly inapplicable.  Mar-Bow acknowledges as much, asserting that the "adverse interest" standard of Sections 101(14)(C) and 327(a) is the appropriate test by which to evaluate the Application.  *See* Mot. at 51.  Mar-Bow argues that MIO's attenuated connections to interested parties—including through vendor relationships and other contracts—"mandates" disqualification as a matter of law.  Mot. at 55.  In effect, Mar-Bow claims that the Proposed Professionals' indirect *connections* through MIO, no matter how remote, are disqualifying *conflicts*.

Mar-Bow is wrong that the alleged connections of MIO are interests adverse to the WLB Debtors' estate, and thus disqualifying, as a matter of law.  The Fifth Circuit analyzes the "adverse interest" tests in Sections 327(a) and 101(14)(C) interchangeably, and asks whether the "totality of the circumstances" indicates that the professional "(1) [ ] possess[es] or assert[s] any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) possesses a predisposition under circumstances that render such a bias against the estate."  *In re Am. Int'l Refinery*, 676 F.3d 455, 461-62 & n.7 (5th Cir. 2012) (quoting *In re WorldCom, Inc.*, 311 B.R. 151, 164 (Bankr. S.D.N.Y. 2004)).[22]  As explained in the Krivin Declaration, the policies and other safeguards that prevent the flow of information between MIO and the McKinsey consulting affiliates defeat any argument that the Proposed Professionals' remote, indirect connections through MIO are disqualifying.  To the extent Mar-Bow argues that these safeguards are deficient, that is a question of fact that cannot be determined as a matter of law.  Accordingly, Mar-Bow cannot establish that the Proposed Professionals are disqualified as a matter of law under Sections 327(a) or 101(14)(C).

---

[22] Mar-Bow spends six pages of its Motion expounding on the concept of plain meaning.  Mot. at 32-38. What Mar-Bow cannot do, however, is show that the meanings it has created for Section 327(a) and Rule 2014(a) are plain.  Mar-Bow's recurring assertion that it is relying on the "plain meaning" of these statutes is belied by the lack of relevant precedent endorsing Mar-Bow's idiosyncratic interpretations.

**B.      Mar-Bow's Motion Relies on False Factual Allegations and Should Be Denied**

Mar-Bow's Motion mischaracterizes and manipulates the facts stated in the Krivin Declaration in an attempt to fit them into its warped legal theory that the Proposed Professionals are disqualified as a matter of law.  These false factual allegations cannot be a basis for granting Mar-Bow's Motion or dismissing the Application as a matter of law.

### 1.      Mar-Bow Manipulates and Misrepresents the Krivin Declaration

Mar-Bow falsely claims that the Proposed Professionals own beneficial interests in the securities that underlie their investments with MIO, misrepresenting the Krivin Declaration in support of its argument that the Proposed Professionals must be disqualified.  *See, e.g.*, Mot. at 42-44, 46-48 (reproducing altered versions of charts of MIO connections).  For example, Mar-Bow falsely alleges that the Krivin Declaration discloses "MIO-Managed" investments in interested parties, such as "Microsoft Corp.," when it does not.  *See* Mot. at 43 (column header and item 20).

MIO does not directly invest in Microsoft.  MIO follows a "fund of funds" investment approach to managing assets for McKinsey's pension plan, as well as certain after-tax investments for current and former McKinsey partners and their families through the same fund of funds strategy.  As a "fund of funds," roughly 90% of MIO's managed funds are invested through approximately 170 third-party managers, who have complete investment discretion over the investments they manage.  That means no Proposed Professional has any control over the investments made by those third parties.  Although MIO professional staff directly invest approximately 10% of MIO assets under management, MIO is "*prohibited from investing directly in the debt or equity of single-named issuers . . . .*"  *See* Krivin Decl. ¶ 22 (emphasis added).  As a result, MIO cannot, and does not, exercise its own investment discretion to invest directly in the debt or equity of corporate debtors or interested parties in any RTS bankruptcy, including this one.  That policy is intended, among other things, to avoid any situation where MIO professional staff would be investing in a McKinsey client.

To support its false assertion that MIO "manages investments" in interested parties, Mar-Bow resorts to manipulating Schedule 3 to the Krivin Declaration.  This Schedule reflects that MIO rigorously searched for indirect connections in these cases.  MIO compared a list of its "third-party investment managers, direct investments, financial counterparties and service providers (such as vendors)," not only with the list of interested parties prepared by the WLB Debtors (the "Interested Parties List"), but also with an expanded list of interested parties (the "Expanded IPL") that the Proposed Professionals used to check for their own client connections.  The Expanded IPL uses the S&P Capital IQ platform ("Capital IQ"), a third-party commercial platform that generally identifies not only corporate affiliates, parents, and subsidiaries, but also certain investment relationships between corporate entities.  *See* Krivin Decl. ¶ 10.  So, for example, if "Microsoft Corp." is input into Capital IQ, the program will return not only corporate affiliates associated with "Microsoft Corp.," but also entities like "Sequoia Capital," a fund manager with which Microsoft has a relationship.

The first column of Schedule 3 lists the names as found on the Interested Parties List.  The second column of Schedule 3 lists the names of the entities appearing on the Expanded IPL to which MIO found a connection, as well as to entities that have names that are similar to entities on the Expanded IPL (for example, because the Expanded IPL includes "Sequoia Capital," MIO also disclosed connections to entities with similar names, such as "Sequoia Capital China" funds).  The third column discloses the type of connection MIO has *with the entities listed in column two* (the entity names appearing on the Expanded IPL).[23]

In its Objection and Motion, Mar-Bow *removes* the column labeled "MIO Connection Name" entirely to give the misleading impression that the referenced MIO connections are direct connections to the Interested Parties List (which are listed in column one), rather than much more

---

[23] MIO discloses three types of connections: "investment," "counterparty," and "vendor" connections.  "Investment" connections are MIO's connections to third-party managers and/or direct investments.  *See* Krivin Decl. ¶ 24.  "Counterparty" connections are financial counterparties to MIO-managed transactions.  *Id.*  And "vendors" are entities with which MIO contracts to provide operational services.  *Id.*

remote connections to the *affiliates* and *investments* of interested parties (which are listed in column two) as per the Expanded IPL. This deliberately mischaracterizes the Proposed Professionals' disclosed connections.

To illustrate, Mar-Bow alleges in its chart on pages 42-44 that there is an "MIO-Managed Investment[] in [Microsoft Corp.] Per Schedule 3" of the Krivin Declaration, as shown below:

| | MIO-Managed Investments in Interested Parties Per Schedule 3 | IPL Connection Category Per Schedule 1 |
|---|---|---|
| 20 | Microsoft Corp. | Top 50 Creditors, Vendors |

Mot. at 43 (column header and row 20). This is false. The Krivin Declaration does not include *any* disclosure of an MIO-Managed Investment in interested party Microsoft Corp. It does disclose that five funds (Sequoia Capital; Sequoia Capital China II; Sequoia Capital China II, L.P.; Sequoia Capital China Growth I; and Intellectual Ventures Management, LLC), with which Microsoft apparently has a relationship according to Capital IQ, are also funds with which MIO has an investment connection—either because they are third-party managers with which MIO contracts, or funds in which MIO directly invests. *See* Krivin Decl. ¶ 24 & Schedule 3-7, item 62 (page 224). Microsoft is listed only as a vendor, as shown below:

| | Interested Party Name | MIO Connection Name | Connection Type |
|---|---|---|---|
| 62. | Microsoft Corp. | Microsoft | Vendor |
| | | Insight (Microsoft Corporation) | Vendor |
| | | Sequoia Capital | Investment |
| | | Sequoia Capital China II | Investment |
| | | Sequoia Capital China II, L.P. | Investment |
| | | Sequoia Capital China Growth I | Investment |
| | | Intellectual Ventures Management, LLC | Investment |

Mar-Bow repeats this type of misrepresentation throughout its Motion and Objection. For example, Mar-Bow alleges that MIO "manages" an "investment" in Tennenbaum Capital Partners, an interested party. Obj. at 26. This is false. The Krivin Declaration discloses a connection with various BlackRock entities, including through a BlackRock TIPS fund. ("TIPS" refers to United States Treasury Inflation-Protected Securities). Krivin Decl., Schedule 3 at 3-8, item 84 (page

24

225).  BlackRock TIPS is therefore listed as an "investment" connection on Schedule 3.  *Id.*  BlackRock TIPS is an affiliate of BlackRock, which is also a parent entity of interested party Tennenbaum Capital Partners.  Mar-Bow's claim that MIO "manages" an "investment" in Tennenbaum ignores MIO's *actual* connections, including BlackRock TIPS, which appears nowhere on Mar-Bow's charts.  It should be evident to Mar-Bow that investments in assets such as United States Treasury Securities—government bonds—is not an investment in a third-party asset manager like Tennenbaum Capital Partners.

### 2.      The Proposed Professionals Do Not Own Equity in the Debtors or Interested Parties Through MIO Investments

Mar-Bow next twists facts to argue that the Proposed Professionals are *per se* disqualified from serving the WLB Debtors because they are "beneficial owners" of, or hold "beneficial equity interests" in, both the WLB Debtors and other interested parties through MIO.  Mot. at 41-55.  This allegation is doubly false—first, because as discussed above, MIO itself does not directly invest in the debt or equity of any corporate interested party, and second, because Mar-Bow's use of the phrase "beneficial owner" and "beneficial equity interest" mischaracterizes the nature of MIO investments.  "Beneficial ownership" of equity securities is a term of art, the hallmark of which is ownership of not just the economic interest but also "voting and/or investment power over the securities."  *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 289 (5th Cir. 1997) (citing 15 U.S.C. § 78m).  As a factual matter, there is no allegation that any McKinsey partner or employee (let alone the Proposed Professionals themselves) holds any of these rights, whether through MIO investments or otherwise.

As discussed above, MIO manages assets on behalf of McKinsey employees' pension plans and after-tax investment funds through a "fund of funds" structure in which the assets are invested through MIO-managed investment vehicles, which in turn invest with third-party managers.[24]  The

---

[24] Mar-Bow's assertion that "the MIO has no policy prohibiting investments in McKinsey clients or in the interested parties" ignores the filings in this and other cases that make clear that MIO *does* have a policy against direct investment in *any* single-issuer corporate securities, including but not limited to the types of entities Mar-Bow highlights.  *See, e.g.*, Dkt. 1659-7 at 69 (Final Investigative Report, *In re FOMB*, No. 17-

25

suggestion that employees are "owners" of the underlying equities is incompatible with the very idea of a fund of funds or pension plan structure, and would mean, counter-factually, that every investor in a widely diversified mutual fund is an "owner" of the underlying equities.  *See* Krivin Decl. ¶ 22 (describing instruments through which MIO assets under management are placed).  This is plainly not the case.

As the Krivin Declaration makes clear, MIO's policies ensure that any investments its funds make in any equity securities are *at least* twice removed from the Proposed Professionals— first, pension and investment monies are invested in an MIO fund, and second, that MIO fund then in turn invests or contracts with a third-party fund manager that independently invests in another fund or in securities.  Mar-Bow provides no authority for the proposition that such attenuated connections are disqualifying.  Indeed, the cases cited by Mar-Bow in its Motion are inapposite, because they concern situations where an employee of the professional in question actually held equity of the debtor, or was an insider, creditor, or employee of the debtor as those terms are defined in Section 101(14)(A) and (B).[25]  Mar-Bow's argument that McKinsey has an "actual

---

BK-03283 (D.P.R. filed February 18, 2019), Dkt. 5154 ); *In re Old ANR, LLC*, Dkt. 71 at 5 (Certification of McKinsey) at 8-9 (E.D. Va. June 13, 2019), attached hereto as Exhibit A.  Importantly, the policy is not limited to prohibiting investment in McKinsey clients because creating a "restricted list" could inform the MIO portfolio managers of the identity of non-public clients of McKinsey, undermining the informational separation between MIO and McKinsey's consulting affiliates.

[25] *See In re Intech Capital Corp.*, 87 B.R. 232 (Bankr. D. Conn. 1988) (firm disqualified because numerous partners were equity security holders of the debtor); *In re Anver Corp.*, 44 B.R. 615, 617 (Bankr. D. Mass. 1984) (denying retention application where law firm partner was an equity holder and an officer); *In re Leisure Dynamics*, 32 B.R. 753, 755 (Bankr. D. Minn.), *aff'd sub nom. In re Leisure Dynamics, Inc.*, 33 B.R. 121 (D. Minn. 1983) (disqualifying a firm "because two of its members are 'insiders' and non-disinterested persons by virtue of their positions as director, secretary, and equity security holders of the debtor"); *In re Yuba Westgold, Inc.*, 157 B.R. 869, 872 (Bankr. N.D. Iowa 1993) (proposed professional "is not a disinterested person because it is both a creditor and an insider"); *In re Wells Benrus Corp.*, 48 B.R. 196, 198 (Bankr. D. Conn. 1985) (denying retention application where members of professional were officers and investors in the Debtors); *In re Ochoa*, 74 B.R. 191, 195 (Bankr. N.D.N.Y. 1987) (denying fee application where law firm partner was also a partner in a creditor of the Debtors).

Not only are the cases cited by Mar-Bow inapposite, but other cases have concluded that an individual partner or employee's *per se* conflicts cannot be imputed to the professional entity.  *See, e.g.*, *In re Cygnus Oil & Gas Corp.*, No. 07-32417, 2007 WL 1580111, at *3 (Bankr. S.D. Tex. May 29, 2007) (Isgur, J.) (listing cases); *In re Keravision, Inc.*, 273 B.R. 614, 616 (N.D. Cal. 2002), *aff'd sub nom. U.S. Tr. v. Keravision, Inc.*, 421 F.3d 1153 (9th Cir. 2005).

conflict of interest," Mot. at 53, thus fails because it does not and cannot point to any actual equity interests that the Proposed Professionals hold or own in the WLB Debtors or interested parties.[26] Its characterization of MIO investments as "beneficially owned" by individual professionals is false.

### 3.    The Proposed Professionals' Connections are Not Disqualifying as a Matter of Law

The factual premise for Mar-Bow's motion—that McKinsey professionals hold purported "beneficial interests" in equities of interested parties managed by MIO—is false and clearly contradicted by the Krivin Declaration.  Mar-Bow then claims that these purported "interests" mandate disqualification of the Proposed Professionals as a matter of law.  Given the evident factual dispute at the core of Mar-Bow's motion, the Court cannot conclude on a motion for judgment on the pleadings that the Proposed Professionals hold "adverse interests" to the estate under Sections 327(a) and 101(14)(C) because the controlling Fifth Circuit test that Mar-Bow admits is applicable here is fact-specific, requiring a "totality of the circumstances approach."  *Am. Int'l Refinery*, 676 F.3d at 462.  Mar-Bow's Motion asks the Court to skip over this analysis entirely and to accept its heavily disputed, false factual allegations.

The Court cannot make a determination on this record that any of the purported connections that Mar-Bow alleges are disqualifying, and its Motion for judgment on the pleadings on this ground should be rejected.

### C.    To the Extent the Court Considers the Section 327 Arguments in Mar-Bow's Objection, They Should Be Overruled

The Krivin Declaration makes clear that the Proposed Professionals *are* disinterested and qualified to be retained under Section 327.  None of the "connections" disclosed in the Krivin

---

[26] Mar-Bow's argument that the absolute priority rule of Section 1129(b)(2)(B) must lead to the Proposed Professionals' disqualification because "the interests of equity holders are always adverse to the interests of creditors" fails for the same reason.  Mot. at 38.  Again, Mar-Bow's argument rests on falsehoods: the Proposed Professionals are not equity holders of the WLB Debtors, and nothing in the Krivin Declaration suggests otherwise.

Declaration relating to MIO investments or to competitors of the WLB Debtors pose "conflicts" that are disqualifying under the "totality of the circumstances" present here. *Am. Int'l Refinery*, 676 F.3d at 462. When the true facts about MIO, as set forth in the Krivin Declaration, are considered, it is clear that the Proposed Professionals do not hold or represent "interests adverse" to the estate.

### 1. The Proposed Professionals Do Not Hold Disqualifying Interests Through MIO

Mar-Bow's primary argument as to why the Proposed Professionals are disqualified relates to connections held through MIO, which is not seeking retention and does not provide services to McKinsey clients, including the WLB Debtors. At its core, Mar-Bow contends that professionals must be disqualified if their employees invest in pension funds, mutual funds, or 401(k) plans that may hold securities in interested parties. *See* Obj. at 22.[27] Mar-Bow provides *no* authority for this extraordinary interpretation of the Code, and the Proposed Professionals are aware of none. Indeed, other professionals retained in this case have disclosed direct investment connections of their asset management affiliates without issue. *See* Dkt. 556 ¶ 14 (Jefferies) ("Jefferies may also trade securities and other instruments of the Potential Parties in Interest on behalf of itself or its affiliates or third parties."); Dkt. 622 (Order Authorizing Retention of Jefferies); Dkt. 216, Ex. D ¶ 10 (Lazard) (Lazard discloses that its affiliates "may have held, may now hold or may in the future hold

---

[27] Mar-Bow's assertion that MIO has "ten investments through which McKinsey partners and employees held equity interests in the WLB Debtors" is also false because it again assumes—incorrectly and without any basis or authority—that MIO directly "invests in" the listed entities, or that an indirect investment in an entity that has an investment in the Debtors is *per se* disqualifying. Obj. at 21-22. The ten entities Mar-Bow identifies are asset managers; MIO places money with those asset managers for those managers to invest. There is no basis to suggest that such an indirect, uncertain connection is disqualifying. *See* Ex. A, *In re Old ANR, LLC*, Dkt. 71. This argument also rests on how these ten interested parties were characterized on the Interested Parties List attached to the WLB Debtors' prior November 9, 2018 application to retain RTS. Mar-Bow ignores that these entities were erroneously listed as "5% shareholders" of the WLB Debtors on the original list furnished by the WLB Debtors. In fact, "no individual or entity held more than 5% of the WLB Debtors' common stock as of the Petition Date." Krivin Decl. ¶ 8.

debt or equity securities of the WMLP Debtors or the WMLP Debtors' creditors, equity holders, or other parties in interest in these cases"); Dkt. 492 (Order Authorizing Retention of Lazard).

There are at least four reasons why none of the MIO connections disclosed in the Krivin Declaration are disqualifying. *First*, MIO is a separate entity, legally and operationally. *Second*, MIO is an SEC-regulated investment advisor that maintains policies and procedures designed to prevent conflicts or the appearance of conflicts with McKinsey's consulting businesses. Those policies and procedures strictly limit the information flowing to McKinsey or its employees and are subject to compliance training, certification, and monitoring. *Third*, MIO's separation and fund-of-funds structure allows McKinsey employees working on chapter 11 engagements to select investment strategies but gives them no control to select the funds that make security-level investments and no real-time knowledge of those security-level investments. *Fourth*, even assuming any such interest is appropriately considered, any given McKinsey employee's interest in any particular security underlying an MIO investment is so insignificant that it cannot create any sort of "predisposition" adverse to the estate, creditors, or equity holders.

### a.    MIO Is Legally and Operationally Separate from the Proposed Retained Affiliates

To convince the Court to impute MIO's purportedly disqualifying connections to the Proposed Professionals, Mar-Bow asserts that MIO and its consulting affiliates should be treated as "one firm" and that the Krivin Declaration "conceals how McKinsey and the MIO really work." Obj. at 41-42, 49 (alleging, *inter alia*, that McKinsey, including MIO, is "one unified operationally integrated firm."). The Krivin Declaration demonstrates that this is false. Mar-Bow has no evidentiary basis on which to question the veracity of the Krivin Declaration, and its serious allegations of concealment are malicious speculation without any good-faith basis.

MIO is legally separate from the Proposed Professionals. *See* Obj. at 43 ("Another wholly owned McKinsey subsidiary is the MIO Partners, Inc. . . . which [is] wholly owned by the MIO Group, Inc. which, in turn is wholly owned by McKinsey & Co."); Krivin Decl. ¶ 19 ("MIO is a wholly-owned indirect subsidiary of McKinsey & Co."). Mar-Bow's argument that it is "legally

29

irrelevant" that MIO is legally separate and is not sought to be retained here, Mot. at 53, demonstrates a baseless disregard of corporate separation that violates a "fundamental tenet of American law." *In re Caesars Entm't Op. Co., Inc.*, 561 B.R. 420, 432 (Bankr. N.D. Ill. 2015) (refusing to disregard corporate separateness of professional person's client for purposes of imputing connection to professional).

In addition to legal separation, MIO is operationally separate from McKinsey's consulting affiliates, including the Proposed Professionals. Krivin Decl. ¶ 20-21. MIO has its own offices and a dedicated professional investment staff that does not overlap with the rest of McKinsey. Its limited support functions shared with McKinsey, such as procurement, are strictly regulated by policy. Its day-to-day operations are separate, its IT systems are separate, and its activities are distinct from the rest of McKinsey—MIO is a registered investment advisor with the SEC and does not provide any management consultant services. MIO employs advisors who are available to counsel McKinsey partners on their pension or other investments, including investments held outside of MIO, but these advisors are not privy to information that is protected by MIO and McKinsey separation policies.

Mar-Bow already has admitted that it relies on speculation and theorizing when it makes its false allegations about the nature of MIO's relationship with McKinsey. In his deposition earlier in this case, Alix admitted that "I don't know how it works inside MIO." Dkt. 905-1 at 388:11-14. Alix nonetheless stuck by his wholly baseless allegation that "there's complete control, complete dominance and control by McKinsey of this MIO," *id.* at 404:8-11, even though he conceded that he did not "have any idea about the level of information or the type of information that is provided to investors in [MIO reports]," *id.* at 379:23-380:3, had never seen MIO newsletters, or policies, and was making assumptions based on his "general familiarity" and experience with investor newsletters. *Id.* at 368:5-9, 379:16-380:3, 384:7-25, 402:4-9. Notably, in the *NII* case, Mar-Bow similarly made baseless factual claims based on Jay Alix's supposition and theorizing; Judge Chapman rejected this speculation, calling Mar-Bow's suggestion that the Court rely on Alix's

30

sworn declaration "extraordinary" because "there's no firsthand knowledge there," and stating "that's not evidence, that's not even opinion, that's just argument, as far as I'm concerned." *In re NII Holdings, Inc.*, Case No. 14-12611 (Bankr. S.D.N.Y. Nov. 6, 2014) ("*NII Holdings*"), July 31, 2019 Hr'g Tr. at 15:10-19.

### b. The Proposed Professionals' Information About MIO Investments Is Limited

In addition to legal and operational separation, the Proposed Professionals and MIO maintain strict informational barriers that prevent the flow of information between the two. Mar-Bow is wrong that separation between the Proposed Professionals and MIO is not relevant to the Court's determination.[28] These information barriers help demonstrate why it is not "plausible" that the Proposed Professionals—or the McKinsey consultants serving the WLB Debtors—could have a disqualifying "adverse interest." A Proposed Professional cannot be influenced by information it does not possess.

The Proposed Professionals do not have information about the underlying security-level holdings in MIO's third-party managed investments. Consultants do not determine the investments MIO makes. Even the MIO Board has limited information: its role is limited to setting and monitoring investment policies and risk parameters, and it does not choose whether to invest with any particular fund manager. The MIO Board delegates all security-level investment decisions to third parties or MIO professional staff and, as discussed above, MIO professional staff are prohibited from investing in single-name corporate debt or equity.[29] Moreover, there also are policies in

---

[28] Section VIII.E of Mar-Bow's Motion rests entirely on the premise—contradicted elsewhere in the Motion—that Section 327(a) "mandates" disqualification in the factual circumstances Mar-Bow describes. Mot. at 55. Accordingly, Mar-Bow argues, the Proposed Professionals' description of "information barriers" is an attempt to carve out an exception to this rule regarding the *per se* disqualification standard. *Id.* As discussed at length in this Response, that standard is not applicable here. The function of MIO and the Proposed Professionals' separateness from MIO are highly relevant circumstances to consider, in part because they limit knowledge of connections from reaching the Proposed Professionals.

[29] Mar-Bow resorts to baseless speculation when it makes claims about the MIO Board. Mar-Bow argues that the Proposed Professionals are not qualified to serve the WLB Debtors because the fiduciary duties of the MIO Board "clash directly" with the Proposed Professionals' fiduciary obligations to their bankruptcy clients. Obj. at 36-37. This argument ignores both the function and operations of MIO and the separation

place that strictly limit communications between MIO and McKinsey's consulting affiliates, including policies that prohibit any MIO employee or board member from discussing any MIO investments outside of MIO.  These policies are the subject of training and compliance monitoring at both MIO and McKinsey.

The recent Final Investigative Report of the Special Counsel to the Financial Oversight and Management Board for Puerto Rico examined this separation between the Proposed Professionals and MIO, confirming that "McKinsey employees are not provided with information related to MIO's underlying investments and have no ability to influence MIO's investment decisions."  Dkt. 1659-7 at 10 (Final Investigative Report, *In re FOMB*, No. 17-BK-03283 (D.P.R. filed February 18, 2019), Dkt. 5154).  The Special Counsel concluded that "[t]he McKinsey consulting arm is effectively walled off from its investment arm, and there is no sharing of confidential information . . . except in very limited circumstances" between MIO and the consulting affiliates.  *Id.* at 81.

McKinsey hardly is alone in using information barriers to limit the flow of information between affiliated entities and employees.  Courts repeatedly have held that retained professionals are not disqualified under Section 327(a) where information barriers prevent information flow to and from a not-disinterested employee of a retained professional.  *See, e.g.*, *In re Cygnus Oil & Gas Corp.*, No. 07-32417, 2007 WL 1580111, at *3 (Bankr. S.D. Tex. May 29, 2007) (Isgur, J.) (holding retained professional was not disqualified where non-disinterested attorney had been

---

between MIO and the rest of McKinsey, described above.  It also fundamentally misapprehends the function of the MIO Board.  The MIO Board is tasked with overseeing the decisions made by MIO's professional staff.  *See ANR*, Dkt. 4152, Lipscomb Decl. ¶¶ 7, 9-11.  Because the MIO Board does not direct *any* investments and because MIO is prohibited from investing in single-name corporate securities, the MIO Board's fiduciary obligations cannot conflict with the Proposed Professionals' obligations to the WLB Debtors. Mar-Bow further alleges that there is a "conflict[]" between the Krivin Declaration and the declaration of MIO General Counsel Casey Lipscomb in *ANR* with regard to statements concerning the MIO Board.  Obj. at 50.  There is no inconsistency.  As Messrs. Krivin and Lipscomb explain, and as discussed above, the MIO Board may receive limited information concerning the third-party managers who manage MIO investments as a function of their supervisory role, but they delegate to the MIO professional staff responsibility to select managers and allocate monies to those managers.  Krivin Decl. ¶ 22.

Mar-Bow's specific reference, Obj. at 51, to Jon Garcia—a former MIO Board member and current president of RTS—is irrelevant to this bankruptcy and should be ignored for many reasons, among them that Mr. Garcia has not been a member of the MIO Board for over two years.

"walled off"); *In re Sea Island Co.*, No. 10-21034, 2010 WL 4386855, at *3 (Bankr. S.D. Ga. Oct. 20, 2010) (approving screens that prohibit access to files, discussion of the case, and fee-sharing with the screened attorney); *In re Timber Creek, Inc.*, 187 B.R. 240, 244 (Bankr. W.D. Tenn. 1995) (holding "lack of disinterestedness" of one member of a professional "should not be imputed" to other members "provided that sufficient 'screening mechanisms' or 'curative measures' are implemented to prevent or insulate against the flow of, for example, confidential information"). If such information barriers effectively screen off conflicted employees of the proposed professional, then surely they are effective to screen off unretained affiliates of a proposed professional.

AlixPartners similarly has relied on such barriers in its retention application, including "information barrier[s]" and "separate IT systems and workspaces," in a case where entities including its controlling investor and a lender were possibly also lenders and investors in the debtors. Declaration of Alan D. Holtz in Support of the Debtors' Application To Employ and Retain AlixPartners, LLP As Their Restructuring Advisor *Nunc Pro Tunc* To the Petition Date, *In re Dendreon Corp., et al.*, No. 14-12515, Dkt. 74-3 at 8-9 (filed November 12, 2014). AlixPartners represented to the court that "[b]ased on, among other things, the business separation between the CVC Funds and the CVC Credit Partners' Funds, the business separation between the CVC Entities and AlixPartners, and the confidentiality obligations referred to above, AlixPartners believes that it does not hold or represent an interest adverse to the estate with respect to the engagement." *Id.* So, too, do many other professionals active in restructuring engagements.[30]

---

[30] *See, e.g.*, Response of the U.S. Trustee to Mar-Bow Value Partners, LLC's Motion for Leave to File Motion to Reopen, *NII Holdings* ("The allegation that McKinsey was required to disclose investments made through MIO may extend more broadly to reach other bankruptcy professionals that are retained in this and other cases—including law firms, investment banks and financial advisory firms—and that also may have investment vehicles."); *In re Tintri, Inc.*, Case No. 18-11625-KJC (Bankr. D. Del.) (Alvarez & Marsal), Dkt. 133, ¶ 4(b) ("In addition, in an abundance of caution, A&M has instituted an information barrier to ensure that confidentiality of information is protected."); *In re Synergy Pharms. Inc.*, Case No. 18-14010-JLG (Bankr. S.D.N.Y.) (Prime Clerk), Dkt. 131 ¶ 11 ("Further, Carlyle maintains an internal information barrier between its Global Credit funds and the rest of the Carlyle funds. Accordingly, the conflicts search does not include the names of the Real Assets funds, the Investment Solutions funds or any of their or the other Global Credit funds' investments, nor does it include any portfolio companies of any of the Funds

In addition to strict policies against information sharing, the nature of MIO reporting to its investors prevents those investors from learning security-level information about their investments. Most importantly, Mar-Bow has presented no evidence that McKinsey consultants give advice "colored" by MIO investments of which they lack knowledge.[31]

In other words, a consultant trying to determine which stocks or bonds are owned by hedge funds whose investment funds create exposure in his or her retirement portfolio would not be able to do it—at best, he or she could develop (as Jay Alix has) an *outdated* list of stocks pieced together from an array of public filings that *might* be in one of the funds creating exposure in his or her portfolio. This is no different than the sort of information available to investors in 401(k) plans offered by other professionals, including, for example, AlixPartners.[32] It is *not* "plausible that [this] interest may cause the professional to act any differently than they would without that [interest]." *In re WorldCom, Inc.*, 311 B.R. 151, 163–64 (Bankr. S.D.N.Y. 2004). Mar-Bow's assertions of vague, potential conflicts are therefore not "plausible." They are "fantasy," as one judge recently described other speculative allegations by Mar-Bow based on Jay Alix's supposition and conspiracy theorizing. *NII Holdings*, July 31, 2019 Hr'g Tr. at 25:11.

---

(other than those of CSP and the Corporate Private Equity funds as described above)."); *see also* Chart of Industry Professionals, Dkt. 1686-1.

[31] Indeed, until this dispute with Mar-Bow, information regarding the identity of third-party managers with which MIO contracts to invest employee pension and other monies was guarded behind MIO information barriers and was only shared confidentially with MIO Board members. This guarding of information pertaining to MIO allocations to third-party funds helped to ensure that McKinsey employees would not know even the identities of third-party managers with whom their pension or other monies were ultimately invested. As described herein, the disclosed MIO information does not impact the Proposed Professionals' disinterestedness because it does not reveal disqualifying information about underlying investments. Mar-Bow's argument that the Krivin Declaration eliminates the information barriers designed to protect material non-public information and underlying investment information from reaching the Proposed Professionals is factually wrong. *See* Obj. at 62. The MIO disclosures are not disqualifying on the basis of this "knowledge."

[32] AlixPartners, LLP 401(k) Savings Plan and Trust, 2017 Annual Return/Report of Employee Benefit Plan (Form 5500) (Sep. 21, 2018), *available at* https://www.efast.dol.gov/portal/app/disseminate?execution=e1s2# (detailing investment funds available in AlixPartners 401(k) Plan).

### c.      Consultants Do Not Control Investments Within MIO

A function of MIO's fund-of-funds structure is that McKinsey employees who invest with MIO have no investment discretion over security-level investments to which they gain exposure through the fund-of-funds structure: those decisions are made by third-party professionals.  Even Mar-Bow, which has spent untold sums investigating MIO investments through historic public filings with the SEC or Department of Labor, cannot determine whether the third-party funds in which MIO is invested are the same third-party funds that may turn up as equity or debt holders in any given bankruptcy.  MIO's third-party managers may have dozens of their own funds.[33]  Not only do McKinsey employees receive only limited and periodic reporting concerning their MIO investments, but they also lack any control or ownership rights over the underlying securities se-lected by third-party managers—so, for example, a McKinsey consultant cannot vote the shares that may underlie his or her retirement investments and could not stop a third-party manager from buying or selling shares of a given issuer at any given moment.  Nor could a McKinsey consultant direct or stop a third-party manager from offsetting one investment with a short position or hedging position.  This lack of information and control makes it impossible for any McKinsey consultant to manipulate his or her MIO holdings in response to specific client engagements (or vice versa).

The stringent requirements for judicial disclosures provide a useful analogy to demonstrate why a lack of control over (or practical knowledge of) an indirect investment weighs against find-ing a disqualifying adverse interest.  Federal judges must disqualify themselves whenever they have a "financial interest" in a controversy or a party to the proceeding, in order to avoid even the suggestion of potential bias—but "ownership in a mutual or common investment fund that holds securities *is not a 'financial interest' in such securities* unless the judge participates in the man-agement of the fund."  28 U.S.C. § 445 (b), (d)(4)(i); Code of Conduct for United States Judges, Canon 3(C)(1)(c)(i) (emphasis added).  Similarly, because McKinsey employees who participate in MIO funds have no control over the security-level investments to which they are exposed

---

[33] For example, asset managers BlackRock and PIMCO manage numerous funds.

through their fund of funds investments, and do not "participate in the management" of any of the funds that make those security-level investments, they cannot be said to have any meaningful "financial interest" in the specific underlying securities, let alone a disqualifying interest.  Just as a judge could not reasonably be said to have even a perceived conflict of interest resulting from an investment in a mutual fund that holds a given security, the Proposed Professionals cannot have a disqualifying interest from third-party managed investments held through an unretained and separate affiliate.

### d.    Purported MIO Connections Would Be Inconsequential

As a result of the legal, informational, and investment-control separation between McKinsey and MIO, it would be impossible for a McKinsey employee to develop an understanding of his or her exposure to a particular security across his or her MIO investment portfolio, let alone develop such information on a timely basis that would allow for contemporaneous decisionmaking.  Furthermore, because of the fund-of-funds nature of MIO investments, any indirect exposure to any debt or equity security would necessarily be a vanishingly small component of an individual's investment portfolio: it would be one of many holdings of one of many investment funds in which MIO invests.  Assuming such a position was not offset by short positions held in other third-party managed funds—that "value" would be distributed pro rata to some 30,000 pension participants or after-tax investors to the extent they, in turn, had selected the MIO funds at issue as part of their retirement or after-tax investment strategy.  Moreover, MIO funds do not actually realize any return on investments made by third-party managers in third-party funds unless and until those investments are closed out at a profit by the third-party manager and MIO's interest in that third-party fund is also redeemed.  The individual participant also would need to close out his or her investment in MIO funds to realize any benefit from that indirect equity holding.  This speculative chain demonstrates why it is especially unlikely that any McKinsey employee could achieve an improper benefit from any given debt or equity security held by a fund in which MIO invests.

Such connections are not disqualifying. *See Caesars Entm't*, 561 B.R. at 433 ("Kirkland, though, does not represent the debtor's principal—or the principal's principal, or even the principal of the principal's principal. Kirkland represents in unrelated matters companies in which Apollo and TPG, three layers of corporate ownership removed from CEOC, have an interest. Those attorney-client relationships are too remote from the bankruptcy cases to conclude that Kirkland would be predisposed to act adversely to the estates as a result of them."); *see also In re Radnor Holdings Corp.*, 528 B.R. 245 (D. Del. 2014) (finding that Skadden partners' investments in an interested party were too small to result in an adverse interest). Indeed, indirect exposure to securities through retirement plans, like those managed through MIO, is routine—if not universal—for bankruptcy professionals.[34]

Mar-Bow also asserts that the Proposed Professionals should be disqualified because *MIO* "presumably" has a "strong interest" in maintaining its vendor relationships, which purportedly creates an unspecified "conflict" between the Proposed Professionals' duties to the WLB Debtors and MIO's vendor contracts. Obj. at 29. Mar-Bow's argument is absurd. Among MIO's purportedly disqualifying connections are entities such as AT&T and Microsoft, two of the largest telecommunications and software providers in the world, both of whom appear on the Interested Parties List as vendors to the Debtors. *Id.* The Proposed Professionals cannot be disqualified because both their *unretained* affiliate and the Debtors use AT&T phone lines or Microsoft Excel. If every professional who used Excel or AT&T were disqualified, chapter 11 debtors would find themselves with little or no choice of qualified advisory professionals. Mar-Bow's extreme argument about vendor connections is a prime example of why the Court should reject its radical view of Section 327: Mar-Bow's Objection is an unprincipled attempt to disqualify the Proposed Professionals no matter the facts of this case or the consequences to the bankruptcy system.

---

[34] For example, AlixPartners discloses that among the retirement options available to its employees are numerous Fidelity funds, the holdings of which are publicly visible and include many publicly-traded equities. AlixPartners, LLP 401(k) Savings Plan and Trust, 2017 Annual Return/Report of Employee Benefit Plan (Form 5500).

## 2. The Proposed Professionals' Connections to the WLB Debtors' Competitors Are Not Disqualifying

Mar-Bow further argues that the Proposed Professionals are not qualified for retention in this case because of their client connections. In particular, Mar-Bow argues that the Proposed Professionals' service for the WLB Debtors' competitors "is an actual conflict of interest" because the Proposed Professionals' consulting services were intended to give their clients "an advantage over their competitors, including the Debtors." Obj. at 69-70. Per Mar-Bow, it is of no import that the Proposed Professionals' consulting service to those competitors was wholly unrelated to the WLB Debtors. In essence, Mar-Bow makes a "*per se*" argument that the very fact of the Proposed Professionals' service to competitor entities mandates disqualification, ignoring the difference between a connection and an actual conflict of interest—and a wealth of case law to the contrary.[35]

As a matter of law, there is no *per se* rule barring a professional from representing competitors of a debtor. *See In re Synergy Pharms. Inc.*, Case No. 18-14010, Dkt. 322 at 26:19-21 (Bankr. S.D.N.Y. Feb. 6, 2019) (rejecting argument that Centerview Partners' work for Ironwood, a competitor of Synergy Pharmaceuticals, barred Centerview's retention as financial advisor); *In re Aloha Airgroup, Inc.*, No. 04-03063, 2005 WL 1156094, at *2 (Bankr. D. Haw. Mar. 11, 2005) (overruling argument that law firm's relationship with Hawaii Airlines barred its employment as counsel to Aloha Airgroup and concluding that "[a] professional's simultaneous representation of the debtor-in-possession and a competitor of the debtor does not, in and of itself, render the professional not 'disinterested' or require disqualification of the professional"); *In re Aloha Airgroup, Inc.*, Case No. 04-03063, Hr'g Tr. at 27:1-3 (Bankr. D. Haw. Feb. 2, 2005) (overruling argument that Giuliani Capital Advisors' relationship with Hawaii Airlines barred its retention as financial advisors to the Debtor and stating that "concurrent representation of a competitor does not create a per se bar on retention under Section 327"); *In re Filene's Basement*, Inc., 239 B.R. 850, 856

---

[35] Indeed, Section 327(c) expressly *permits* a proposed professional to represent or be employed by a creditor unless there is an actual conflict. 11 U.S.C. § 327(c).

(Bankr. D. Mass 1999) (stating that "[t]he mere fact of competition between two clients is not disqualifying where the two parties do not hold or assert claims against each other and do not 'assert competing claims to an economic interest'" (quoting *In re Caldor, Inc*., 193 B.R. 165, 171 (Bankr. S.D.N.Y. 1996))).  Instead, bankruptcy courts analyze a proposed professional's service to the debtors' competitors on a case-by-case basis to determine whether that service constitutes an "adverse interest" pursuant to Sections 101(14)(C) and 327(a).

Mar-Bow's speculation about the Proposed Professionals' consulting work, including their work for the WLB Debtors' competitors, cannot disqualify them from serving the WLB Debtors. Unsupported assumptions, of a party without standing, about the nature of the Proposed Professionals' work are not enough to raise even the specter of a hypothetical potential conflict.  *In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833, 849, 855 (Bankr. D. Colo. 2009) (granting the debtors' application to employ law firm where "concerns regarding competition [we]re speculative" and "the 'competition' issue appear[ed] to be a more theoretical than a present reality"); *In re Caldor, Inc*., 193 B.R. at 181 ("That the debtors are economic competitors in an allegedly consolidating marketplace is too speculative a basis for finding that [counsel's] loyalty to each of its clients will be divided as a result of the representation"); *In re Leslie Fay Cos., Inc*., 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994) ("[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash"); *In re Martin*, 817 F.2d 175, 183 (1st Cir. 1987) ("[H]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending counsel away to lick his wounds").  The Krivin Declaration confirms that all work for the clients listed in Schedule 1 was "unrelated" to the WLB Debtors and this case.  Mar-Bow provides no support for its argument that service to interested parties in *unrelated* matters poses a *per se* disqualifying conflict of interest.[36]

---

[36] The WLB Debtors and their affiliates were included on the Interested Parties List that the Proposed Professionals used to check for connections.  Accordingly, they appear on Schedule 1 as connections, consistent with the Proposed Professionals' pre- and post-petition work for the WLB as discussed in the Application.  *See* Krivin Decl. ¶ 12 & n.8.

Other professionals in this case have been retained despite making the same type of disclosure about their representations to the WLB Debtors' competitors. For example, Alvarez & Marsal—also a consulting firm—disclosed that Consol Energy, Inc., a "Significant Competitor" of the debtors, was also a "Significant Equity Holder[] of Current and Former A&M Clients" in unrelated matters. *See* Dkt. 210, Campagna Decl., Schedule A; Schedule B at 2-3. Lazard, investment banker to the conflicts committee, disclosed that it represented Peabody Energy Corp., a competitor of the Debtors. Dkt. 216, Ex. D. ("Cowan Decl.") ¶ 9; Schedule 1 at 7 (characterizing Peabody Energy Corp. as a "competitor"); Schedule 2 (listing Peabody Energy Corp. among the "Potential Parties in Interest" that entered into an engagement agreement with Lazard within the last three years").[37] These retentions make sense because, as is the case with the Proposed Professionals' client connections, unrelated representations of competitors—without more—do not pose a disqualifying conflict.

This same attempt to conflate connections and conflicts is present in Mar-Bow's specious argument that the Proposed Professionals' connections to non-competitor interested parties are disqualifying. Obj. at 64-67. Mar-Bow, throughout this section of its Objection, openly speculates about the sorts of conflicts that the Proposed Professionals might have faced without providing any reason to believe that such conflicts actually arose. The only inference that Mar-Bow supplies is that because the Proposed Professionals performed work for commercial entities appearing on the Interested Parties List, the Proposed Professionals must be disqualified from working for the

---

[37] Jones Day, counsel to the conflicts committee of the Board of Debtor WMGP and for Westmoreland Resource Partners, LP, disclosed that six of the Debtors' competitors were current or former clients of the firm. *See* Dkt. 214, Lennox Decl. ¶ 16(n) ("In matters unrelated to the WMLP Debtors, the WCC Debtors, the Conflicts Committee or these chapter 11 cases, Jones Day currently represents or formerly represented certain of the Debtors' competitors, or affiliates thereof, including ANR, Inc. (f/k/a Alpha Natural Resources, Inc.), CONSOL Energy, Inc., Foresight Energy, L.P., Murray Energy Corporation, NACCO Industries, Inc. and Peabody Energy Corporation."). Pricewaterhouse Coopers LLP, a consultant to the Debtors, disclosed that it represented five "Significant Competitors" of the Debtors. Dkt. 333, Caywood Decl. at Schedule 1 ("PwC or its affiliates currently perform, or have previously performed, services in matters unrelated to these chapter 11 cases" for five Significant Competitors: Alliance Resource Partners LP; Foresight Energy LP; Hallador Energy Co.; Peabody Energy Corp.; and Rhino Resource Partners LP).

WLB Debtors.  Obj. at 65.  This argument eliminates any "totality of the circumstances" analysis by assuming that all client "connections" disclosed under Rule 2014(a) must be "conflicts" barred by Section 327(a).  Mar-Bow does not even attempt to furnish legal support for its sweeping assertion that service for interested parties at some point in the prior three years and in matters wholly unrelated to the WLB Debtors is "the very essence of an actual conflict of interest."  *Id.*  The Court should reject Mar-Bow's illogical leap from "connection" to "conflict."

### 3.    Mar-Bow's Preference Allegation Is Based on Double Counting

Mar-Bow next argues that the Proposed Professionals must be disqualified for an alleged unresolved preference liability of $325,000.  Specifically, Mar-Bow alleges two instances of preference payments:  (1) when RTS applied $325,000 of the retainer amount received on August 1, 2018 towards payment for the week of services through July 27, 2018; and (2) when RTS applied $1,240,000 of the retainer replenishment amount received on October 5, 2018 to cover a shortfall for that same amount.  Mar-Bow contends that although RTS may have returned the "second" alleged preference payment of $1,240,000, RTS nevertheless continued to hold an interest adverse to the estate because it never returned the "first" alleged preference payment of $325,000.

Mar-Bow is wrong: no potential preference liability issues remains outstanding.  Mar-Bow's allegation is based on double counting.  By returning $1,240,000 to the relevant WLB Debtor entity,[38] RTS resolved the full amount of its possible preference exposure.  This is because

---

[38] In order to avoid any appearance of conflict, RTS chose to return the payment to avoid any dispute regarding potential preference exposure, notwithstanding the availability of viable defenses against any claim that these substantially contemporaneous and ordinary course payments were preferences.  *See, e.g., In Matter of 22 Acquisition Corp.,* No. CIV.A.02-907, 2004 WL 870813, at *1 (E.D. Pa. Mar. 23, 2004) (affirming a bankruptcy court's decision to approve the retention of a management consultant firm, provided the firm returned a $30,000 preference payment to the debtors); *In re Enron Corp.,* No. 01-16034 (AJG), 2002 WL 32034346, at *10 (Bankr. S.D.N.Y. May 23, 2002), *aff'd,* No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that by waiving the right to challenge preference actions, bankruptcy professionals satisfy the disinterestedness standard of § 101(14)(A) despite being the recipients of presumptively preferential payments); *In re Decor Corp.,* 171 B.R. 288, 290 (Bankr. S.D. Ohio 1994) (approving the retention of debtors' counsel upon the repayment of $53,906.00 in preferential prepetition payments); *see also, e.g.,* Order Authorizing Retention of Lazard Frères & Co. LLC as Investment Banker

41

the $1,240,000 payment already encapsulates the earlier $325,000 amount; there is no *additional* $325,000 to be paid back.

Mar-Bow's contention that RTS failed to return the $325,000 representing the "first" alleged preference payment is flawed because it ignores the fact that any adjustment to an earlier invoice payment/retainer balance entry would affect all subsequent entries.  Had RTS refunded the alleged preference payment of $325,000 associated with the week of services ending on July 27, 2018 (and accordingly re-credited the retainer balance for $325,000), the balance of the retainer would have been $325,000 higher at each subsequent point in time—including on October 5, 2018, resulting in a shortfall (and alleged second preference payment) of only $915,000 as of that date rather than $1,240,000.  In other words, in returning the $1,240,000, RTS effectively *was* paying back *both* the initial alleged preference payment amount of $325,000 *as well as* the second alleged preference payment amount, which—following RTS's refund of the first amount—would only have been $915,000.

As RTS has resolved the full amount of its possible preference exposure by paying back the $1,240,000 already, there are no preference liability grounds on which to disqualify the Proposed Professionals.

* * *

For the reasons set forth in this Section, none of Mar-Bow's arguments have merit.  The Proposed Professionals have demonstrated their disinterestedness on the face of the Krivin Declaration.  Mar-Bow's objection to the Application on disinterestedness grounds should be overruled.

---

to the Debtors, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017), ECF No. 732 (approving the retention of an investment banker after it returned duplicative prepetition payment to the debtors, ECF No. 213 at 11, 65); Order Authorizing the Retention of Lazard Frères & Co. LLC as Investment Banker, *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 3, 2015), ECF No. 994 (approving the retention of an investment bank despite the debtor previously overpaying a prepetition invoice creating a credit for professional, ECF 266 ¶ 26); Order Granting Debtors' Application to Employ Evercore Partners as Investment Banker and Financial Advisor, *In re Trico Marine Services, Inc.*, No. 10-12653 (BRL) (Bankr. D. Del. Oct. 6, 2010), ECF No. 261 (same, ECF No. 248-3 at 10).

IV.     **The Proposed Professionals Satisfy the Requirements of Rule 2014(a) By Fully Disclosing the Proposed Professionals' Connections**

Mar-Bow's contention that the Krivin Declaration does not meet the standard for disclosure required by Bankruptcy Rule 2014(a), *see* Obj. at 73-91, is without merit.  The purpose of Rule 2014(a) is to allow the Court and any party in interest to determine whether the Proposed Professionals are disinterested and whether their retention is in the best interest of the estate.  *In re Enron Corp.*, No. 02-CV-5638 (BSJ), 2003 WL 223455, at *4 (S.D.N.Y. Feb. 3, 2003) ("The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interest of the estate."); *In re Wheatfield Bus. Park LLC*, 286 B.R. 412, 419 (Bankr. C.D. Cal. 2002) ("The purpose of Rule 2014 is to assure that both the court and the parties in interest receive full disclosure of all actual or potential conflicts that might affect the professional's representation of a trustee, committee or debtor in possession.").

The Proposed Professionals satisfied the Rule by disclosing all known connections of all "professional persons" proposed for retention under Section 327.  Following the recommendations of the Houston Protocol, the Application seeks the retention of all McKinsey consulting entities with individual consultants who provided the services for which the WLB Debtors seek to retain the Proposed Professionals ("Engagement Team").  *See* Hojnacki Decl. ¶ 3.  RTS convened a working group (the "Working Group"), which then searched for and disclosed: (1) all client connections of the Proposed Professionals within a three-year "lookback" period; (2) all vendor and banking connections of the Proposed Professionals within a three-year "lookback" period; (3) equity or debt holdings of all professional personnel of any McKinsey consulting affiliate worldwide in the WLB Debtors; (4) personal connections of all professional personnel of any McKinsey consulting entity worldwide to any of the Bankruptcy Judges, to the U.S. Trustee, or to anyone employed in the U.S. Trustee's office, in each case in the Southern District of Texas; (5) personal connections of the Engagement Team to any party on the Interested Parties List; and (6) any relationships between members of the Engagement Team and the MIO Board.  The Working Group

43

also asked MIO to search for connections to parties on the Expanded IPL, the creation of which is described *supra* in Section III(B)(1), and to explain the "type" of connection (investment, counterparty, or vendor) to those parties. The result is an exceptionally expansive set of disclosures that not only satisfies Rule 2014(a) but also exceeds industry practice.

The Working Group undertook an extensive investigation and disclosure process to make these disclosures, as described in detail in the Krivin Declaration. In summary, the Working Group engaged in "a multi-stage analysis of the Proposed Professionals' client and other relationships with parties on the Interested Parties List . . . pursuant to the guidance set forth in the Houston Disclosure Protocol." Krivin Decl. ¶ 7. This included expanding the Interested Parties List furnished by the WLB Debtors to some 400,000 names in order to capture connections to affiliates of interested parties, *see id.* at ¶ 10; checking the Expanded IPL for client connections to each of the Proposed Professionals, *id.* at ¶¶ 11-12; checking for vendor and banking connections, *id.* at ¶ 13; surveying the professional personnel of the Engagement Team, the McKinsey partners responsible for each identified client service connection, and the professional personnel of every McKinsey consulting affiliate worldwide, *id.* at ¶¶ 14-18; and requesting that MIO provide a list of connections pursuant to the guidelines identified in the Houston Protocol, *id.* at ¶ 24.[39] All connections identified were disclosed.

Mar-Bow's Objection nonetheless challenges these disclosures, urging an idiosyncratic and extreme approach to disclosure that is not supported by Rule 2014(a) and far exceeds industry practices. If adopted, it would needlessly burden professionals, result in the disclosure of potentially voluminous but immaterial "connections" to the detriment of interested parties, and compromise the ability of bankrupt companies to retain competent professionals to help them swiftly and efficiently navigate the bankruptcy and restructuring process.

---

[39] To further ensure the adequacy of their disclosure process, the Proposed Professionals retained Ernst & Young as an independent third-party to assess the process. Dkt. 2121. Ernst & Young concluded that "McKinsey developed and implemented adequate procedures in accordance with the recommendations and general guidelines set forth in the Protocol to identify and disclose Connections." *Id.* at 14.

44

### A.   Rule 2014(a) Does Not Require the Proposed Professionals to Disclose the Connections of Non-Retained Consulting Affiliates

Mar-Bow erroneously reads Rule 2014(a) to require the Proposed Professionals to disclose the connections of non-retained corporate affiliates.  Nowhere in the text of Rule 2014(a) or in the case law addressing Rule 2014(a) does such a requirement exist.  Rule 2014(a) facilitates the bankruptcy court's determination of whether a connection poses an actual, disqualifying conflict of interest.  Disclosure of the Proposed Professionals' connections—rather than disclosure of all of their affiliate connections and connections of connections *ad infinitum*—is what the Rule requires. *In re Fibermark*, No. 04-10463, 2006 WL 723495, at *1 (Bankr. D. Vt. Mar. 11, 2006) (disclosure requirements must balance the text of Rule 2014 "against the common sense analysis of what connections are reasonably defined as pertinent to the ultimate question of disinterestedness").

Recognizing the proper scope of Rule 2014(a) the Houston Protocol therefore recommends disclosure of the connections of the entities seeking retention under Section 327.  The Houston Protocol's recommendation on this point is well-grounded in the text and the case law.  The plain language of Rule 2014(a) does not require the Proposed Professionals to disclose the connections of affiliates.  Rule 2014(a) requires professionals seeking to be retained to disclose "all of the *person's* connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Fed. R. Bankr. P. 2014(a) (emphasis added).  The Bankruptcy Code defines the word "person" to include an "individual, partnership, and corporation."  11 U.S.C. § 101(41).  Conspicuously absent from this definition is any mention of "affiliate," a term that is separately defined under the Code.  11 U.S.C. § 101(2).  If Congress had intended to include a corporation's affiliates in the definition of "person," it would have done so.  *See In re Cygnus*, 2007 WL 1580111, at *3 ("Rules of statutory interpretation direct the Court to 'presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).  The term "disinterested person" is also defined in Section 101 of the Bankruptcy Code; this definition also excludes any mention of "affiliates."

45

*See* 11 U.S.C. § 101(14). Here, the "professional person[s]" contemplated by Rule 2014(a) are the Proposed Professionals, only.

Mar-Bow fails, yet again, to point to any case that would support its reading of Rule 2014(a). This is because courts never have imposed a *per se* rule requiring professional persons to investigate the connections of their affiliates. To the contrary, courts evaluate a professional's disclosure obligations on a "case by case basis." *Fibermark*, 2006 WL 723495, at *10 ("[T]he circumstances of each case will define the 'connections' that must be disclosed to provide the Court and parties in interest with sufficient information to determine whether the applicant is disinterested").

The Houston Protocol recognizes that certain types of investment affiliates *could* implicate a professional's disinterestedness under Section 327. For example, investment affiliates that do not maintain adequate information barriers or are not subject to regulatory oversight (per the Houston Protocol, "Type 4" asset management affiliates would fall under this category) or that make direct investments in named issuers (per the Houston Protocol, "Type 3" and "Type 4" asset management affiliates) should disclose all known indirect connections—including "remote" indirect connections, *i.e.*, the underlying investments of any funds with which the asset management affiliate may have an investment connection, that are discoverable through a search for such connections. By contrast, regulated asset management affiliates that maintain information barriers and do not invest directly in named issuers need not disclose remote indirect connections and need only search for and disclose "immediate" indirect connections, *i.e.*, the direct connections that the asset management affiliate has with the debtors or interested parties.

The Proposed Professionals' disclosure of the set of connections, including MIO connections, described in the Houston Protocol provides the relevant information to allow the Court to assess disinterestedness. A more expansive view of Rule 2014(a) would require the Proposed Professionals and similarly-situated professionals to disregard corporate separateness contrary to the plain text of the Code and Rules, and the case law construing both. The Houston Protocol

46

recognizes this when it acknowledges that a "Type 2" asset management affiliate like MIO does not need to disclose any connections to satisfy Rule 2014(a).  The Proposed Professionals agree that Rule 2014(a) does not in fact require such disclosure but have nonetheless followed the strictest interpretation of the Protocol's guidance as to Type 2 asset management affiliates.  The Proposed Professionals have done so not only out of an abundance of caution but also because disclosure of such "connections" and additional disclosure of information related to MIO's function and structure makes plain that such connections are irrelevant to this Court's disinterestedness inquiry.

Despite cases to the contrary and the Proposed Professionals' expansive disclosure in accordance with the Houston Protocol—which was informed not only by Jan Baker and Paul Singerman, but also by a robust survey of industry practices and interviews with industry professionals—Mar-Bow insists that the Proposed Professionals must disclose the connections of all McKinsey affiliates worldwide regardless of whether any employee of that affiliate is working on the Engagement Team.  Mar-Bow's reading of the law "would make disclosure under Rule 2014(a) an impossible task subject to endless litigation over what would be enough." *In re Enron*, No. 01-1034 (AJG), 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. 2002).  "[T]he resulting volume of disclosures" from Mar-Bow's extreme interpretation of Rule 2014(a) "would, for all practical purposes, render the disclosure requirement meaningless and thereby thwart the purpose of the Rule which is to disclose all *relevant* connections so as to 'subject potentially adverse interests to review before employment is approved.'" *In re Baron's Stores, Inc.*, No. 97-25645-BKC-PGH, 2007 WL 1120296, at *13 (Bankr. S.D. Fla. Apr. 12, 2007) (emphasis in original).  Under Mar-Bow's extreme view, professionals would be required to disclose vast numbers of connections that have no bearing whatsoever on whether the actual professional is disinterested, including connections of all corporate affiliates, connections of personnel not engaged on a particular matter, and connections of wholly separate investment affiliates.  This Court should reject that view.

As a matter of industry practice, restructuring professionals—including professionals retained in this case—do not typically investigate or disclose connections of their affiliates.

47

Centerview Partners LLC ("Centerview"), for example, was retained as financial advisor and investment banker to the Debtors even though it expressly acknowledged that it would not be disclosing affiliate connections:

> Centerview is a global investment banking and advisory firm. Centerview has several legal and separate affiliates and related parties (the "Corporate Group Entities") that engage in a variety of investment activities. **However, none of the Corporate Group Entities is being retained in connection with this engagement**, and none of the professionals of Centerview has discussed or will discuss the Debtors' cases with any professional of the Corporate Group Entities. Thus, there has not been and will not be any flow of information between Centerview and any Corporate Group Entity with respect to any matter pertaining to the Debtors or these chapter 11 cases. **Centerview can make no representation as to the disinterestedness of the Corporate Group Entities in respect of the Debtors or these chapter 11 cases**."

Dkt. No. 209, Ex. C ("Puntus Declaration") ¶ 16 (emphasis added).

Lazard Frères & Co. LLC ("Lazard") was also retained in this case notwithstanding its express acknowledgement that it would not be disclosing affiliate connections.  *See* Dkt. No. 216, Cowan Decl. ¶ 8 ("Lazard is a U.S. operating subsidiary of an international investment banking, financial advisory, and asset management firm and thus has legally separate and distinct affiliates. Although it is possible that employees of certain affiliates may assist Lazard in connection with Lazard's engagement, as only Lazard is being retained in these chapter 11 cases, we have researched only the electronic client files and records of Lazard, not of all of its affiliates, to determine connections with any Potential Parties in Interest.").[40]

---

[40] Other professionals similarly exclude disclosure by affiliated entities not providing services to the debtors.  *See, e.g.*, *In re GenOn Energy, Inc.*, Case No. 17-33695-DRJ (Bankr. S.D. Tex.) (Rothschild), Dkt. 122-2 ¶ 20 ("As Rothschild is the only entity being retained by the Debtors (of entities affiliated with Rothschild), we have researched only the electronic client databases of Rothschild, not of all its affiliates, to determine if Rothschild has connections with any Potential Parties in Interest."); *In re Limited Stores Company, LLC*, Case No. 17-10124-KJC (Bankr. D. Del.) (Guggenheim), Dkt. 126-3 ¶ 18 ("Although employees of certain affiliated and related entities may sometimes assist Guggenheim Securities in connection with a restructuring engagement, as Guggenheim Securities is the only entity being retained in these cases, the Client Match List described in Paragraph 7 above reflects solely such Potential Parties in Interest that are or were current or former investment banking clients of Guggenheim Securities, and not of all of its

Some professionals limit the descriptions of affiliate connections even if they otherwise search for and disclose certain of those connections. AlixPartners, for example, does not search for or describe details of the connections of its major investors, including Jay Alix. *See In re Linn Energy, LLC*, Case No 16-60040 (DRJ) (Bankr. S.D. Tex. June 1, 2016), Dkt. 201-2 ¶ 25 ("Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature and/or full scope of any business relationships or connections that the CVC Entities may have with the Potential Parties in Interest, the Debtors and their affiliates or the Chapter 11 Cases."); *In re David's Bridal, Inc.*, Case No. 18-12635-LSS (Bankr. D. Del. Nov. 29, 2018), Dkt. 132-4 ¶ 27 ("The Lakeview Parties and related entities are entities owned or controlled by Jay Alix that, among other things, make investments on behalf of Mr. Alix and his family. . . . Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature, and/or full scope of any business relationships or connections that the Investor Conflicts Parties [including Lakeview] may have with the Potential Parties in Interest, the Debtors and their affiliates, or these chapter 11 cases.").

The *Fibermark* court recognized the need to approach Rule 2014(a) in the context of real-world practicalities when it rejected the U.S. Trustee's expansive interpretation of the Rule, which would have required professionals to disclose "all cases in which it was involved where a party or professional in this case was also involved, regardless of whether there was any pecuniary or attorney-client or adversarial relationship." *Fibermark*, 2006 WL 723495, at *7. The court ruled that this interpretation would place no limits on disclosure in part because of the "volume of disclosure" and "amount of time" that would be required to conduct such a check for connections. *Id.* at *9. The court worried that the U.S. Trustee's interpretation, "if strictly enforced, could have the effect of discouraging qualified professionals from seeking or accepting appointment in bankruptcy cases." *Id.* So too, accepting Mar-Bow's overly broad reading of Rule 2014(a) here would

---

affiliated and related entities."). Additional examples of other professionals' disclosure practices abound. *See, e.g.*, Chart of Industry Professionals, Dkt. 1686-1.

be a radical departure from industry standards and that would have significant consequences for debtors and professionals without improving the quality of the information for evaluation by the court and interested parties.  Mar-Bow's reading should be rejected.

**B.      The Proposed Professionals Satisfied Their Disclosure Obligations Under Rule 2014(a)**

The Proposed Professionals disclosed their connections to interested parties in sufficient detail to satisfy the requirements of Rule 2014(a).  As described above, the Working Group undertook a meticulous search for connections to interested parties and has provided more than sufficient information for any party with an interest in its retention to evaluate its qualifications to serve the WLB Debtors.  Consistent with the interpretation of Rule 2014(a) set out above, the Working Group was not required to search beyond the Proposed Professionals for connections to interested parties.  Each of the Proposed Professionals is a legally distinct corporate entity and, therefore, a distinct "person" for purposes of Rule 2014(a).  Mar-Bow's arguments to the contrary should be rejected.

**1.      The Proposed Professionals Maintain Client Confidentiality Walls and Information Barriers to Ensure Disinterested Service to Their Debtor Clients**

Because the Proposed Professionals are legally distinct corporate entities, they are only required to disclose their own connections—and not the connections of their non-retained corporate affiliates—to satisfy Rule 2014(a).  Even so, the Proposed Professionals safeguard against the possibility of conflicted service by maintaining strict confidentiality policies and information barriers between client service teams.  The Krivin Declaration makes plain that the Proposed Professionals serve clients "in a manner that protects the confidentiality of each client's information to the maximum extent possible," Krivin Decl. ¶ 6, including by "placing information barriers between client service teams."  *Id.*  Even access to the Proposed Professionals' global client database is restricted—"[n]o client service professionals have access to this database."  *Id.*

50

In the *NII* case, RTS filed a supplemental declaration describing these confidentiality policies and procedures in detail. *NII Holdings*, Dkt. 196 ¶ 7. For example, RTS described McKinsey's "physical and IT infrastructure [] designed to enforce strict document access controls." *Id.* RTS explained that "[a]ll McKinsey personnel undergo rigorous training and testing on confidentiality and must acknowledge their understanding of this responsibility by signing a confidentiality agreement with McKinsey." *Id.* Finally, RTS made clear that "[a]ll McKinsey personnel are apprised of McKinsey's professional standards," including "the vigorous protection of confidential client information." *Id.* These confidentiality procedures ensure that the Proposed Professionals provide disinterested service to clients like the WLB Debtors.

### 2.    Rule 2014(a) Permits the Use of a Lookback Period

The Working Group's application of a three-year lookback period is reasonable, supported by the Bankruptcy Code, and consistent with industry practice. In accordance with the Houston Protocol, the Working Group investigated connections "during the period commencing three years prior to the Petition Date." Krivin Decl. ¶ 7. Mar-Bow suggests that this was not sufficient, ignoring the fact that bankruptcy courts have interpreted Rule 2014(a) to permit the use of a lookback period. Those courts have found that the Rule requires disclosure of "connections *presently* or recently existing . . . ." *In re Tribeca Mkt., LLC*, 516 B.R. 254, 279 (S.D.N.Y. 2014) (quoting *In re El San Juan Hotel Corp.*, 239 B.R. 635, 647 (B.A.P. 1st Cir. 1999)) (emphasis added). That is, professionals are not required to search for all connections that have ever existed.

The Bankruptcy Code's definition of "disinterested person" further supports the use of a lookback period. 11 U.S.C. § 101(14) defines a "disinterested person," in part, as a person who "(B) is not and was not, *within 2 years before the date of the filing of the petition*, a director, officer, or employee of the debtor." (emphasis added). That Congress was satisfied with applying a *two*-year lookback for purposes of determining disinterestedness strongly suggests that applying a three-year lookback for searching for connections to support a finding of disinterestedness is entirely acceptable.

The rationale for applying a lookback period is consistent with the purpose of Rule 2014(a). As set forth above, the Rule does not require "disclos[ure of] every past or remote connection with every party in interest" but rather only those that "could reasonably have an effect on the [professional's] judgment in the case." *In re Molten Metal Tech., Inc.*, 289 B.R. 505, 511 (Bankr. D. Mass. 2003); *accord In re Rusty Jones, Inc.*, 134 B.R. 321, 346 (Bankr. N.D. Ill. 1991), *abrogated on other grounds by In re Grabill Corp.*, 983 F.2d 773, 777 (7th Cir. 1993) ("Rule 2014 does not require an attorney to dredge up every past connection, however remote, that he or she ever had with the parties in interest in the case.").

Industry practice further supports this approach. As Alix himself recognized, "it's generally the practice that many [advisors to chapter 11 debtors] use lookback periods," Alix Dep. Tr. at 90:24-91:4,[41] and courts—including this Court—routinely approve applications of professionals who apply lookback periods. *Id.* at 118:15-19; *see also, e.g.*, Dkt. 209, Puntus Decl. ¶ 13 (Centerview applying three-year lookback); Dkt. 210, Campagna Decl. ¶ 8 (Alvarez & Marsal applying two-year lookback); Dkt. 214, Ex. B ("Lennox Declaration") ¶ 15 (Jones Day applying two-year lookback); Dkt. 216, Cowan Decl. ¶ 6 (Lazard applying three-year lookback); Dkt. 306, Ex. C ("Green Declaration") ¶ 11 (Ernst & Young disclosing connections from the "recent past").

### 3. The Proposed Professionals Described Their Connections in Sufficient Detail to Meet the Requirements of Rule 2014(a)

Mar-Bow's contention that the Proposed Professionals have not identified their connections in "sufficient detail" must be rejected. Mar-Bow states that "McKinsey's disclosures of its connections must be detailed and explicit enough for the Court and the other parties to 'gauge whether [McKinsey RTS] is not disinterested or holds an adverse interest.'" Obj. at 89-90. In fact, the Proposed Professionals have disclosed every one of their known connections. Unsurprisingly, Mar-Bow does not point to even one insufficiently-detailed disclosure in the Krivin

---

[41] AlixPartners also uses a "lookback period" in its disclosures, searching for connections in the five years prior to the bankruptcy petition date. *See, e.g.*, *In re David's Bridal, Inc.*, Case No. 18- 12635-LSS (Bankr. D. Del.), Dkt. 132-4 ¶ 26.

Declaration.  Mar-Bow merely cites irrelevant case law primarily focused on a professional's failure to disclose actual and potential *conflicts*.  In this case, Mar-Bow has not pointed to any specific facts that would raise even the possibility of an actual or potential conflict—Mar-Bow simply points to the Proposed Professionals' unrelated connections and assumes that they must pose conflicts.[42]  And as explained above and in the Krivin Declaration, the Working Group employed a robust search and disclosure process, reviewed and certified by an independent advisory firm, to make adequate and complete disclosure in compliance with Rule 2014(a) and with the Houston Protocol.  The Proposed Professionals' disclosures enable the Court and interested parties to ascertain the Proposed Professionals' disinterestedness in this case.

### 4.    The Proposed Professionals' Overinclusive Disclosure of MIO Connections is More Than Sufficient to Satisfy Rule 2014(a)

Mar-Bow speculates that MIO did not search for connections as of the Petition Date.  Obj. at 74.  Mar-Bow is wrong.  MIO also applied the three-year lookback period used in the Application and searched for "investment" connections from three years prior to the Petition Date through April 30, 2019, disclosing any connections appearing during that period.  For "vendor" and "counterparty" connections, MIO used a series of historically maintained lists capturing timeframes longer than the three-year lookback period recommended in the Houston Protocol.  This search

---

[42] Obj. at 89-91 (citing *In re Mitchell*, 497 B.R. 788 (Bankr. E.D.N.C. 2013) (failure to disclose a "potential conflict" arising out of dual representation of debtor and 50% owner of company that purchased debtor's property three weeks prior to petition date violates disclosure obligations under Rule 2014(a)); *Am. Int'l Refinery*, 676 F.3d at 465-66 (negligently failing to disclose retainer source and "previous *relationship with the debtors*" as opposed to unrelated representations) (emphasis added); *KLG Gates LLP v. Brown*, 506 B.R. 177, 194-95 (E.D.N.Y. 2014) (failure to disclose simultaneous, primary attorney representations for creditors and bondholders of the debtors); *In re Miners Oil Co., Inc.*, 502 B.R. 285, 308 (Bankr. W.D. Va. 2013) (failure to disclose information about pre-petition representation of debtor where debtor claimed that attorney had agreed to represent him in a personal capacity and continued attempt to "obscure" pre-petition relationship with debtor amounted to violation of Rule 2014(a)); *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664-65 (Bankr. N.D. Ill. 2001) (involving failure to disclose professional's own creditor claim against the estate); *In re Churchfield Mgmt. & Inv. Corp.*, 100 B.R. 389, 392-93 (Bankr. N.D. Ill. 1989) (recounting U.S. Trustee allegation that professional failed to disclose simultaneous representation of debtor and controlling officer of debtor in chapter 7 filing before same bankruptcy court)).

surpassed the requirements of Rule 2014(a).  Any Mar-Bow objection on this basis should be overruled.

For all the reasons articulated in this Section, this Court should accept the Krivin Declaration as fully compliant with Rule 2014(a), overrule the contrary arguments in Mar-Bow's Objection, and find that the Proposed Professionals disclosed their connections in accordance with the Rule.

## V.     The Remainder of Mar-Bow's Arguments Similarly Fail

Mar-Bow next argues (1) that McKinsey's engagement agreement disclaiming its fiduciary obligations to the WLB Debtors was allegedly unlawful, and (2) that the Krivin and Hojnacki Declarations allegedly violate 28 U.S.C. § 1746 because they were made "to the best of" each declarant's knowledge.  Obj. at 93-95; 96-98.  Both of these arguments fail.

### A.     The Proposed Professionals Did Not Violate Any Fiduciary Obligations to the WLB Debtors

RTS has not violated any duties to the WLB Debtors.  In its Objection, Mar-Bow challenges a provision in RTS's engagement agreement regarding fiduciary duties, contending that RTS has somehow "reject[ed]" its legal obligation to provide the WLB Debtors its "full loyalty" and "untainted advice."  *Id.* at 94.  McKinsey attested, repeatedly, that the connections it identified did not "constitute interests adverse to the WLB Debtors"—confirming that it *would* provide undivided loyalty.  *See, e.g.*, Dkt. 2120 ¶¶ 13, 24; *see also id.* at ¶¶ 27, 29, 31, 32, 33.  In fact, RTS consistently has provided value to its debtor clients and has faced no objections to its client service from the debtors or any party-in-interest.  In his other litigation, Alix has acknowledged that RTS never has caused financial harm to debtors or interested parties.[43]  Here, Mar-Bow oddly contends that the WLB Debtors' satisfaction that McKinsey "provided unvarnished and independent advice" is "irrelevant."  Obj. at 95.  Moreover, other professionals in this case have included language in

---

[43] *See Alix v. McKinsey & Co.*, 1:18-cv-04141 (JMF) (S.D.N.Y. Jan. 23, 2019), Dkt. 93 at 4, 30 (claiming that no debtors or interested parties have ever suffered financial losses as a result of RTS's purported "scheme" to conceal its connections in chapter 11 cases).

their engagement letters that mirrors the language that Mar-Bow complains about in RTS's engagement letter.[44]   In fact, AlixPartners likewise has the same language in its standard General Terms and Conditions attached to its engagement letters.[45]   In any case, the argument is academic because if the Court rules that a proposed professional's engagement letter in this District cannot include such language, it undoubtedly can modify the retention letter to cure any potential infirmity.[46]

### B.   The Krivin and Hojnacki Declarations Do Not Violate 28 U.S.C. § 1746

Mar-Bow also contends that because they included the words "to the best of my knowledge" in their declarations, Krivin and Hojnacki lacked sufficient first-hand knowledge to serve as declarants in this case under 28 U.S.C. Section 1746.  *See id.* at 96-98.  Mar-Bow again takes an extreme, unreasonable, and incorrect legal position, citing no case law for its argument.

28 U.S.C. § 1746 states that the required attestation does not need to be *exactly* as written in 28 U.S.C. § 1746(2); instead, it must only be "in substantially" that form.  To comply with

---

[44] *See, e.g.*, Lazard Engagement Letter in Westmoreland, Dkt. 216, Ex. B ¶ 11 ("In addition, it is understood and agreed that this Agreement and our engagement do not create a fiduciary relationship between Lazard and any person."); Jefferies LLC Engagement Letter in Westmoreland, Dkt. 556 at 28 ("The Committee acknowledges that Jefferies will act as an independent contractor hereunder, and that Jefferies' responsibility to the Committee is solely contractual in nature and that Jefferies does not owe the Committee, or any other person or entity, any fiduciary or similar duty as a result of its engagement hereunder or otherwise.").

[45] *See In re Linn Energy, LLC*, Case No 16-60040(DRJ) (Bankr. S.D. Tex.), Dkt. 201-2 ("Nothing in this Agreement is intended to create, nor shall be deemed or construed to create a fiduciary or agency relationship between AlixPartners and the [debtor]."); *In re CJ Holding Co*., Case No. 16-33590 (DRJ) (Bankr. S.D. Tex.), Dkt 165-2 (same).

[46] *See, e.g.*, *In re EdgeMarc Energy Holdings, LLC*, Case No. 19-11104 (JTD) (Bankr. D. Del. July 19, 2019), Dkt. 363 ¶ 12 ("Notwithstanding anything to the contrary in the Application, the Engagement Letter or the Goldstein Declaration, during the course of the Bankruptcy Cases, Evercore shall have whatever fiduciary duty (if any) is imposed upon it by applicable law."); *In re Charlotte Russe Holding, Inc.*, Case No. 1-10210 (LSS) (Bankr. D. Del Mar. 6, 2019), Dkt. 310 ¶ 8 ("Notwithstanding anything to the contrary in the [Guggenheim] Application, the Engagement Letter, or the Erickson Declaration, during these chapter 11 cases, that portion of the second sentence of Paragraph N of Annex A to the Engagement Letter concerning fiduciary duties shall have no force or effect."); *In re ACIS Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. July 27, 2018), Dkt. 439 ¶ 13 ("Notwithstanding anything to the contrary in the Engagement Letter, Miller Buckfire shall have whatever fiduciary duty, if any, is imposed upon it under applicable law.").

28 U.S.C. § 1746, there are two required elements: (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury. *See Garza v. Smith Int'l, Inc.*, No. C-10-100, 2011 WL 835820, at *4 n.2 (S.D. Tex. Mar. 7, 2011); *see also U.S. v. 8 Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008) (citing *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988)). A "cursory glance" at the Krivin and Hojnacki Declarations reveals that they "plainly contain[] both of the required statements." *8 Gilcrease Lane*, 587 F. Supp. 2d at 139. The Krivin Declaration states: "[p]ursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge." Dkt. 2120 at 25. The Hojnacki Declaration similarly states: "[p]ursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge." Dkt. 2119-2 at 16.

Consistent with the statute's language, courts have rejected Mar-Bow's very argument. *Garza*, 2011 WL 835820, at *4 n.2 (overruling an objection to a declaration that included the qualifier that it was "true to the best of [the declarant's] information and belief" because that "substantially conforms with the requirements of § 1746"); *8 Gilcrease Lane*, 587 F. Supp. 2d at 139; *Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004) ("A declaration or certification that includes the disclaimer 'to the best of [the declarant's] knowledge, information or belief' is sufficient under [28 U.S.C. § 1746]." (citing *United States v. Roberts*, 308 F.3d 1147, 1154-55 (11th Cir. 2002))). Mar-Bow's contention that the Krivin and Hojnacki Declarations violated § 1746 has no substance and should be rejected.[47]

---

[47] Mar-Bow also argues that because the WLB Debtors' Application was signed by a corporate individual and not an attorney for the Debtors, the Application must be dismissed. Mot. at 60-61. Mar-Bow suggests that the signature on the Application indicates that the WLB Debtors "are unable to hire an attorney who is willing to sign the Application." *Id.* at 61. That argument is specious. *First*, Rule 2014 requires that a retention application be signed by a "trustee or committee." *Second*, the Application was filed via ECF by the WLB Debtors' attorneys, Mathew Cavenaugh of Jackson Walker L.L.P., counsel to the WLB Debtors. The very act of that filing by ECF operates as a signature by the filer. *See* Administrative Procedures For The Filing, Signing, And Verifying Of Documents By Electronic Means In Texas Bankruptcy Courts, Rule III.B.2 (available at https://www.txs.uscourts.gov/sites/txs/files/adminproc_1.pdf). *Third*, Bankruptcy Rule 9011 applies to documents that are signed or "fil[ed]" with the Court and constitute the WLB Debtors'

## VI.     The WLB Debtors' Motion to Retain the Proposed Professionals Should Be Granted *Nunc Pro Tunc* to the Petition Date

This Court authorized the WLB Debtors to file the Application *nunc pro tunc* to the Petition Date in the July 3 Order.  Dkt. 2118.  The record here demonstrates that the Proposed Professionals readily meet the requirements of Local Bankruptcy Rule 9014(b) for *nunc pro tunc* retention.  Mar-Bow's arguments to the contrary fail.

The decision to grant *nunc pro tunc* relief rests firmly within the Court's discretion.  *See e.g.*, *Matter of Triangle Chem., Inc.*, 697 F.2d 1280, 1289 (5th Cir. 1983).  The unique facts of this case clearly present the Court with the sort of "extraordinary circumstances" in which such relief is appropriate.  *See id.* at 1289.  The Debtors first filed an application to retain McKinsey RTS in November, before Plan confirmation.  Following court-ordered mediation before Judge Isgur, McKinsey RTS proposed to engage independent experts to draft a revised disclosure protocol.  The result, the Houston Protocol, was a significant undertaking that involved dozens of conversations with industry participants, many rounds of drafting and revisions, and extensive internal dialogue among Jan Baker, Paul Singerman, and others—all while McKinsey and the Debtors responded to numerous filings by Mar-Bow.  After a months-long drafting process, McKinsey RTS filed the Houston Protocol on May 31, 2019.  Using the Houston Protocol, the Proposed Professionals then worked diligently to implement an industry-leading search and disclosure process that goes beyond the requirements of Bankruptcy Code and Rule 2014.  On July 3, with the Court's permission, the Debtors filed the Application based on that new disclosure process and withdrew the prior application.  *See* Dkt. 2118.

The WLB Debtors here clearly have satisfied the requirements of Local Bankruptcy Rule 2014(b)(2)(A)-(C) governing *nunc pro tunc* applications.  Subsection A requires an explanation of

---

attorneys' representations to the Court in connection with the Application.  Fed. R. Bankr. P. 9011(b).  The Local ECF Procedures in this district further recognize that an ECF filer may not always match the name on the filed document.  *See* Local Rule II.B.4 ("Retention of Documents With Third-Party Signatures").  Moreover, the practice of having a client representative sign a declaration is not only common in the retention context but in practice generally (including in this case).  That Mar-Bow would contort this common-place occurrence to cast a cloud over the Application is just another example of its bad-faith attack on the Proposed Professionals.

why the Application was not filed earlier.  As described above, the Application was not filed earlier because it was subject to the Houston Protocol process, which arose out of litigation with Mar-Bow, a global mediation, and a settlement with the WLB Debtors.

Subsection B requires an explanation of why the *nunc pro tunc* relief is required.  Here, an order is required *nunc pro tunc* because the Proposed Professionals performed work as of the Petition Date believing that they were in compliance with Rule 2014(a) and Section 327, and then filed the Application based on a new, rigorous disclosure protocol.  It would be inequitable not to enter that order given the background and circumstances presented by this case.

Finally, subsection C requires an explanation of how approval of *nunc pro tunc* relief may prejudice any parties-in-interest.  There is no prejudice here because the retention of the Proposed Professionals working on the Westmoreland bankruptcy has been contemplated since the beginning of these cases.  This is not a situation where a professional providing services to the debtor failed to promptly file a retention application until many months into a bankruptcy case.  The typical concerns presented by belated *nunc pro tunc* applications are unexpected and unbudgeted professional fees accruing to the estate months into the bankruptcy case.  Here, all interested parties have been on notice of the Proposed Professionals' work for the WLB Debtors and thus this concern is inapplicable.  Moreover, there is no prejudice based on the purported filing delay if, as Mar-Bow says, the Proposed Professionals performed the work anyway.  And there certainly is no prejudice to Mar-Bow, because it was no longer a party in interest when the Application was filed.

## VII.   The Remaining Scope of Issues Related to the Application

The only remaining question for this Court is whether the Proposed Professionals are "disinterested" and qualified to serve the WLB Debtors.  The Proposed Professionals submit that the information included in the Hojnacki and Krivin Declarations is more than sufficient to permit this Court to answer that question in the affirmative.  The Proposed Professionals are nonetheless ready to provide additional information at the Court's request in advance of any hearing, and they have

been working with the U.S. Trustee to clarify any lingering questions it may have about the Application.

RTS can be prepared to produce its evidence immediately after the Court's ruling on Mar-Bow's Motion and Objection and to produce witnesses for this Court's or the U.S. Trustee's examination, if so required.

## CONCLUSION

For the foregoing reasons, Mar-Bow's Motion should be denied, its Objection should be overruled, and the WLB Debtors' Application should be granted.

Dated:   September 10, 2019
         Houston, Texas

Respectfully submitted,

ZACK A. CLEMENT PLLC

By:   /s/         *Faith E. Gay*
      Faith E. Gay (*pro hac vice*)
      Jennifer M. Selendy (*pro hac vice*)
      Erica R. Iverson (*pro hac vice*)
      SELENDY & GAY PLLC
      1290 Avenue of the Americas
      New York, New York 10104
      Telephone: (212) 390-9000
      E-mail: fgay@selendygay.com
            jselendy@selendygay.com
            eiverson@selendygay.com

      Zack A. Clement
      ZACK A. CLEMENT PLLC
      3753 Drummond Street
      Houston, Texas 77025
      Telephone: (832) 274-7629
      E-mail: zack.clement@icloud.com

      M. Natasha Labovitz (*pro hac vice*)
      Erica Weisgerber (*pro hac vice*)
      DEBEVOISE & PLIMPTON LLP
      919 Third Avenue
      New York, New York 10022
      Telephone:  (212) 909-6000
      Email: nlabovitz@debevoise.com
            eweisgerber@debevoise.com

      *Attorneys for McKinsey Recovery and Transformation Services U.S., LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2019, I caused the foregoing pleading to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.

/s/        *Zack A. Clement*