## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.,*[1] | Case No. 18-35672 (DRJ) |
| Reorganized Debtors. | (Jointly Administered) |

### NOTICE OF FILING IN SUPPORT OF WLB DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND CERTAIN OF ITS AFFILIATES AS PERFORMANCE IMPROVEMENT ADVISORS FOR THE WLB DEBTORS EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on July 3, 2019, the *WLB Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief* (the "Application") was filed. Dkt. No. 2119.

**PLEASE TAKE FURTHER NOTICE** that, on August 20, 2019, the Acting Untied States Trustee for Region 7 (the "U.S. Trustee") filed an objection to the Application, Dkt. No. 2273, noting that McKinsey[2] provided initial responses to the U.S. Trustee's information requests and that the U.S. Trustee "hopes that McKinsey's additional disclosures on the record

---

[1]      Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]      Defined terms used herein but not otherwise defined shall have meanings ascribed to such terms in the Application.

will address [the U.S. Trustee's concerns] and also provide additional transparency for the benefit of all interested parties in these cases." Dkt. No. 2272, n. 5.

PLEASE TAKE FURTHER NOTICE that, as noted in McKinsey's omnibus response filed on September 10, 2019, Dkt. No. 2340, n.2, the "Proposed Professionals and the WLB Debtors are working to address the U.S. Trustee's concerns by submitting certain disclosures and clarifications on the record in advance of the hearing on the merits of the Application."

PLEASE TAKE FURTHER NOTICE that, in order to provide transparency for the benefit of the Court and all parties in interest, McKinsey hereby files a copy of its responses to the U.S. Trustee's initial information requests, which is attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that McKinsey and the WLB Debtors respectfully reserve all their rights to supplement the record, including by filing additional responses to the supplemental information requests received from the U.S. Trustee on September 10, 2019 or any objections to the Application.

Dated:   September 12, 2019          Respectfully submitted,
         Houston, TX

                      By:      /s/ *Zack A. Clement*
                               Zack A. Clement
                               ZACK A. CLEMENT PLLC
                               3753 Drummond Street
                               Houston, TX 77025
                               Telephone: (832) 274-7629
                               E-mail: zack.clement@icloud.com

                               M. Natasha Labovitz *(pro hac vice)*
                               Erica Weisgerber *(pro hac vice)*
                               DEBEVOISE & PLIMPTON LLP
                               919 Third Avenue
                               New York, New York 10022
                               Telephone:  (212) 909-6000
                               Email: nlabovitz@debevoise.com
                                        eweisgerber@debevoise.com

                               Faith E. Gay *(pro hac vice)*
                               Jennifer M. Selendy *(pro hac vice)*
                               Erica R. Iverson *(pro hac vice)*
                               SELENDY & GAY PLLC
                               1290 Avenue of the Americas
                               New York, NY 10104
                               Telephone: (212) 390-9000
                               E-mail: fgay@selendygay.com
                                        jselendy@selendygay.com
                                        eiverson@selendygay.com

                               *Attorneys for McKinsey Recovery &*
                               *Transformation Services U.S., LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2019, I caused the foregoing Notice to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.

/s/   Zack A. Clement_____

**<u>Exhibit A</u>**

### McKinsey Responses to U.S. Trustee Program Information Requests Regarding Westmoreland Retention Application

A.  The Application and Declaration at various times refer to "McKinsey."  Please explain what the term McKinsey means as used in the Application and Declaration.  Unless otherwise specified, the use of McKinsey herein is intended to be inclusive of all McKinsey entities, affiliates, consulting affiliates, employees, and consultants.
   i.   What are the McKinsey consulting affiliates and consulting businesses as those terms are used in the Declaration?
   ii.  Please provide an organizational chart for McKinsey.

*Unless otherwise specified, the term "McKinsey" refers collectively to those McKinsey entities that provide consulting and bankruptcy advisory services and their employees (including those entities defined as "Proposed Professionals" in the Krivin Declaration), namely:  McKinsey Recovery & Transformation Services, U.S., LLC; McKinsey & Company, Inc. United States; McKinsey and Company Africa (Pty) Ltd.; McKinsey Knowledge Centre India Private Limited; McKinsey & Company Canada/McKinsey & Compagnie Canada; and McKinsey & Company LME Limited.  The term "McKinsey" does not include MIO Partners, Inc. ("MIO") or MIO employees inasmuch as MIO does not provide consulting and bankruptcy advisory services.*

*Attached as Exhibit A is an organizational chart for the Proposed Professionals sought to be retained in the July 3, 2019 retention application (the "Application").*

B.  Unlike the original RTS application, the "confidential client" categorization is not included in the Application.
   i.   Are there any remaining "confidential clients"?
   ii.  If not, are all clients previously identified as "confidential" disclosed as connections in the Application?
   iii. If so, does McKinsey or the debtor intend to seek protection of those entities' identities under 11 U.S.C. § 107?

*There are no "confidential clients" referenced in the Application.  Any client previously identified as "confidential" is now disclosed by name and there is no need to seek confidentiality treatment under section 107 of the Bankruptcy Code for any connections.*

C.  Explain the absence of any connection comprising 17% of RTS's revenues as disclosed in connection with the original RTS application.
   i.   We note that this Application applies a "Revenue Period."
      (1) What was the basis for the selection of this period?

        (2) Would the selection of a longer period have resulted in materially different revenue disclosures?

  ii.  Confirm the identity of the 17% confidential client in connection with the original RTS application.  Explain with specificity why the original RTS application disclosed a 17% figure for that client while the current Application discloses a range of 7-9%.

*There is no connection that, in fact, comprises 17% of annual RTS revenues.  The original retention application stated that a confidential client – which was Anthem Inc. – accounted for approximately 17.5% of RTS's gross annual revenue as of September 30, 2018.  The 17.5% figure resulted from a calculation error that was identified and corrected when the Application was being prepared.  Specifically, in the original retention application, it appears that Anthem's gross annual revenue accruing to all McKinsey affiliates was used as the numerator while only RTS's total gross annual revenue for all RTS clients was used as the denominator in calculating the applicable percentage.*

*The Application uses the gross revenue for each client accruing to the relevant McKinsey entity during the relevant time period as the numerator and the total gross revenue for the same McKinsey entity during the relevant time period as the denominator (rather than the total gross revenue generated for the whole firm).  This results in an entity-specific calculation for each of the Proposed Professionals that performed work for the connection.  As indicated in the Application, Anthem generally actually accounted for a much lower percentage of RTS's gross revenue than indicated in the original retention application (i.e., during the Revenue Period, Anthem accounted for 7-9% of RTS's gross revenues).  Anthem also accounted for slightly more than 1% of McKinsey U.S.'s gross revenues during the Revenue Period, as disclosed in the Application.*

*The "Revenue Period" is based on industry practice of disclosing connections that account for 1% or more of revenue in the year preceding the filing of the petition.  The Application discloses connections that account for 1% or more of revenue for any Proposed Professional from October 1, 2017 to October 31, 2018.  The Application uses a 13-month period because the Petition Date was October 9, 2018 and because McKinsey's ordinary course accounting data was only available on a full monthly basis.*

*We did not run different time periods other than the Revenue Period as described above.  We do not know whether the use of different periods would result in materially different percentiles for different entities.*

D.  Did McKinsey review connections of McKinsey with entities that filed a notice of appearance?

*No, McKinsey did not conduct an independent review of notices of appearance.  Following the amicable resolution of the mediation between McKinsey and the WLB Debtors, the WLB Debtors and their counsel prepared and provided an Interested Parties List for McKinsey to use in its connections checking process.  McKinsey checked for any connections with parties listed on the Interested Parties List received from the WLB Debtors' counsel and, in addition, surveyed the Engagement Team regarding whether, to its knowledge, any entities were not, but should have been, included on the Interested Parties List.  McKinsey did not identify any additional entities as a result of those inquiries.*

E.  Did McKinsey review the claims register to determine the nature and size of claims asserted by claimants?  If the register reflected claimants not listed on the IPL, did McKinsey survey its professionals and its affiliated entities to determine if McKinsey had connections with those entities?

*No, McKinsey did not conduct an independent review of the claims register.  As described above, the WLB Debtors and their counsel prepared and provided an Interested Parties List for McKinsey to use in its connections checking process.  McKinsey checked for any connections with parties listed on the Interested Parties List received from the WLB Debtors' counsel and, in addition, surveyed the Engagement Team regarding whether, to its knowledge, any entities were not, but should have been, included on the Interested Parties List.  McKinsey did not identify any additional entities as a result of those inquiries.*

F.  Provide samples of all types of periodic investment statements provided by MIO to professionals and other McKinsey-related persons to reflect the performance and/or holdings of all investments and investment accounts managed directly or indirectly under MIO's auspices.

*McKinsey has requested samples from MIO.*

G.  What are the factual and legal bases for the three-year lookback period in this case?

*McKinsey prepared its disclosure filing in this case by following the guidance in the Houston Disclosure Protocol (the "Protocol").  Section 9 of the Protocol discusses look-back periods and diligence, and provides: "A Proposed Professional should disclose Connections during the three years preceding the commencement of the bankruptcy case unless the circumstances reasonably warrant a longer period."  The guidance provided by the Protocol reflects a look-back period that is widely used in the industry and has long been accepted by*

*bankruptcy courts nationwide.  <u>See</u>, <u>e.g.</u>, Declaration of Stephen E. Hessler, Dkt. 227 ¶ 22, Debtors' Application to Retain Kirkland & Ellis LLP as Attorneys for the Debtors; Declaration of Lorenzo Marinuzzi, Dkt. 555 ¶ 7, Application to Retain Morrison & Foerster LLP as Counsel to the Official Committee of Unsecured Creditors; <u>see also</u> Declaration of Christopher T. Greco, Dkt. 115-3 ¶ 21, Debtor's Application to Retain Kirkland & Ellis LLP as Attorneys for the Debtors, <u>In re Things Remembered, Inc.</u>, Case No. 19-10234-KG (Bankr. D. Del.); Declaration of Robert White, Dkt. 106 ¶ 10, Debtors' Application to Retain Jefferies LLC as Investment Banker for the Debtors, <u>In re Forbes Energy Services Ltd.</u>, Case No 17-20023-DRJ (Bankr. S.D. Tex.); Declaration of Brandon Aebersold, Dkt. 345 ¶ 5, Debtors' Application to Retain Lazard Frères & Co. LLC as Investment Banker to the Debtors, <u>In re Sears Holding Corp.</u>, Case No. 18-23528-RDD (Bankr. S.D.N.Y.).  Indeed, as the industry-wide survey that was filed on March 27, 2019 as Docket Number 1659-1 and subsequently on April 3, 2019 as Docket Number 1686-1 (attached as Exhibit B) reflects, look-back periods (including periods shorter than three years) are commonly accepted by bankruptcy courts evaluating retention applications and Rule 2014 disclosures by industry professionals.  <u>See</u>, <u>e.g.</u>, Declaration of Adam Keil, Dkt. 266-3 ¶ 27, Debtors' Application to Retain Moelis & Company LLC as Investment Banker for the Debtors, <u>In re iHeartMedia, Inc.</u>, Case No. 18-31274-MI (Bankr. S.D. Tex.) (Moelis & Company LLC using a two-year look-back period).*

H. Paragraph 6 seeks to draw a distinction between McKinsey's "global database of client engagements" and law firms' "computerized conflict databases."
   i. Provide additional information on the differences between these resources and why those differences are relevant.
   ii. Describe McKinsey's global database in more detail.
      (1) Who has access to it?
      (2) What information is in it?

*As discussed in the Krivin Declaration, McKinsey does not maintain a computerized conflicts database common at law firms and accounting firms.  The McKinsey client database stores information relating to clients and client engagements, but does not capture information about third parties because consultants, unlike lawyers, do not have adverse parties in their engagements and also may serve multiple companies in the same industry at the same time without waivers.  Because McKinsey's database is not designed to identify conflicts or third-party connections, McKinsey developed a stepwise, labor-intensive process for checking Rule 2014 connections.  McKinsey RTS has consistently supplemented searches of its client database with an additional manual process for checking connections in chapter 11 engagements and, in this case, Ernst & Young also reviewed each step in McKinsey's process and its report was submitted with the Application.  The distinction referenced above is relevant because the Protocol requires third-party review of any connections-checking*

4

*process of a proposed professional that does not maintain a computerized conflicts database like those used by law firms.*

*Further, access to the McKinsey client engagement database is limited to employees whose roles support McKinsey's client practices, researchers, risk, and legal staff.  No client service professionals (consultants) have access to the database.  See ¶ 6 of the Krivin Declaration.*

I.  Paragraph 8 reflects a decision by McKinsey not to disclose connections with equity holders who hold less than 5% of the public securities of Westmoreland.  What is the basis for this decision in this case?
   i.  What other de minimis and materiality standards were applied in compiling these disclosures?
   ii.  Who established these standards, and who made these judgment calls?

*McKinsey did not decide to withhold disclosure of connections with equity holders that hold less than 5% of the public securities of Westmoreland.  No equity holders holding less than 5% of the public securities of Westmoreland were identified on the Interested Parties List.  Since federal securities law does not require those who hold less than a 5% equity stake in publicly traded companies to file public reports, there is no way to accurately and comprehensively identify those parties whose equity holdings do not exceed 5%.  See also Protocol at Exhibit A.*

*The original Interested Parties List that McKinsey received from the WLB Debtors' counsel included a category for shareholders of 5% or more of Westmoreland's equity – a category that the WLB Debtors' counsel removed from subsequent versions of the list because, to our understanding, the WLB Debtors' counsel concluded there were no such parties.*

*So there is no confusion on the matter, McKinsey looked for connections to every party on the Interested Parties List, irrespective of the size of its equity holdings, if any.  All connections to any party on the Interested Parties List were disclosed in the Application, without applying any "de minimis" or "materiality" standards.*

J.  Paragraph 21 states:  "The operational separation between MIO and McKinsey is designed to restrict the flow of information between MIO staff and McKinsey consultants and ensure that information regarding MIO investments will not influence McKinsey's client engagements and that information from McKinsey's client engagements will not influence MIO's investment decisions."  Does MIO restrict investments in McKinsey clients?

*MIO maintains a policy that prohibits MIO from exercising its own investment discretion to invest in the debt or equity of single name corporate entities (beyond liquidating securities received in-kind, or as part of unwinding a separately managed account relationship).  Given the nature of McKinsey's client base, the policy serves to significantly mitigate the risk of any such investment taking place.  In addition, MIO investment professionals are subject to policies and procedures that restrict them from gaining access to any nonpublic information regarding McKinsey clients, including the identity of such clients.*

*MIO directly manages (i.e., makes security level investment decisions for) roughly 10% of assets under its management ("AUM").  As stated above, that 10% of trading activity carried out by MIO professional staff is subject to the restriction on investing in the debt or equity of single name corporate entities.  The other approximately 90% of MIO's capital is managed by third-party managers, who exercise sole investment discretion.  This means that MIO professional staff members do not make decisions about the security level investments for 90% of MIO's AUM.  MIO professional staff members have sole authority to choose which third-party fund managers receive allocations of assets to manage.*

*McKinsey does consult for asset management clients.  MIO is an asset manager that primarily places capital with third party asset managers.  From time to time, our consulting affiliates may be retained by these third party hedge funds to consult on strategic, operational, organizational or technological issues.  McKinsey does not advise hedge funds on open market investments or public trading activities. In other words, we do not provide hedge funds with recommendations, analysis or any other service regarding public trades in specific stocks, funds, bonds, debt or any other publicly traded security.*

K. Paragraph 22 states:  "[T]o the best of my knowledge, based on the results of the Surveys, no member of the Engagement Team served on [the MIO] board, or worked with any members of that board in their capacities as board members, during the Look-Back Period."  What questions and answers on the Survey in question enabled Mr. Krivin to reach this conclusion?

*In connection with preparing the Application, McKinsey reviewed the names of individuals who had served on the board of directors of MIO and no Engagement Team member appeared on that list.  As described in the Krivin Declaration, Engagement Team members also received a survey that included the question: "Have you worked with any of the MIO Partners, Inc. ('MIO') directors listed below in their capacities as MIO board members?" Each respondent affirmatively answered "no" to this question.*

L. Paragraph 22 states:  "As a matter of MIO policy, however, primarily to avoid any appearance of conflicts of interest with McKinsey's consulting businesses, MIO is prohibited from investing directly in the debt or equity of single-named issuers or governmental issuers,

except securities issued by sovereign governments and, instead, follows primarily a fund-of-funds strategy."  When and for what reason was this policy implemented?

  i.  Is it possible that any of the MIO funds invest:

  (1) Solely in McKinsey clients; or

  (2) Industries in which McKinsey represents more than one client.

*MIO has confirmed that the direct trading policy has been in effect since at least 2012.  As early as 2009, MIO policy required additional scrutiny of such investments.  The policies were implemented, as noted in paragraph 22, primarily to avoid any appearance of conflicts of interest with McKinsey's consulting businesses, which, by and large, service corporations and businesses whose debt and equity would be excluded from eligibility for direct investment under the policy.*

*None of the MIO funds invest solely in McKinsey clients.  Nor is MIO aware of any third-party funds or separately managed accounts managed by third-party managers that follow a strategy predicated on investing in McKinsey clients, let alone solely in McKinsey clients.*

*Third-party managers (unaffiliated with McKinsey) who manage assets for MIO are, of course, free to invest in industries in which McKinsey advised more than one client.  As noted above, MIO professional staff members do not make decisions about the security level investments for assets managed by third-party managers.*

M.  Paragraph 28 lists disclosures of revenues derived from connected parties to those who were the source of more than 1% of the revenues relevant to the proposed professional during the "Revenue Period."  What is the legal and/or factual basis for this 1% cutoff in this case?

*In connection with the determination of whether a professional seeking retention in a bankruptcy has an interest that is "materially" adverse to the debtor's estate, industry professionals have consistently disclosed any clients that represent more than 1% of their revenue for an applicable time period.  In addition, courts have found that a client that represents less than 1% of a professional's revenue does not create an economic interest adverse to the estate.  In fact, in two recent cases, courts have overruled objections and recognized this 1% economic threshold as being standard in the industry.  See Hearing Transcript, Dkt. 111 at 44-47, In re New Cotai Holdings, LLC, No. 19-22911 (RDD) (Bankr. S.D.N.Y. June 10, 2019) (overruling objection to the retention of Skadden by the debtors where Skadden had represented Silver Point in structuring its investment in the debtors); Hearing Transcript at 81, In re Stearns Holdings, LLC, No 19-12226 (SCC) (Bankr. S.D.N.Y. July 31, 2019) (overruling similar objection to Skadden's retention and applying the 1% "benchmark").  In this case and others in this district, industry professionals have also employed the same 1% economic benchmark to guide their disclosures.  See, e.g.,*

*Declaration of Stephen E. Hessler, Dkt. 227 ¶¶ 27, 39-40, Application to Retain Kirkland &
Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors; <u>see</u> <u>also</u>
Declaration of Keith A. Simon, Dkt. 233 ¶ 25, Debtors' Application to Retain Latham &
Watkins LLP as Bankruptcy Co-Counsel, <u>In re Weatherford International PLC</u>, No. 19-
33694 (DRJ) (Bankr. S.D. Tex.); Declaration of Todd Snyder, Dkt. 122-2 ¶ 2, Debtors'
Application to Retain Rothschild Inc. as Investment Banker to the Debtors, <u>In re GenOn
Energy, Inc.</u> No. 17-33695 (DRJ) (Bankr. S.D. Tex. 2017).  Indeed, as Judge Chapman noted
in the <u>Stearns</u> case, even if a client represents 1% of a proposed professional's revenue, it
would only be a disqualifying interest if it "would cause significant disruption were [the
client] to take its business elsewhere and cease to use" that professional.  See July 31, 2019
Stearns Hearing Transcript at 81.  Therefore, it is appropriate to likewise use this 1%
economic benchmark.*

N. Paragraph 35 describes the provision of "strategic analysis and advice," including "strategic
   considerations" with respect to the WLB Debtors to others in the business sectors in which
   the WLB Debtors operate, but states that "the nature of the market" makes such information
   sharing harmless.
   i. Elaborate on the special nature of this market.
   ii. In what way, if any, is this market different from other markets?

*The "strategic analysis and advice" referenced in Paragraph 35 is based on publicly
available macroeconomic data. Public information in this market is, by its nature, not
competitively sensitive, and thus any public information would not contain any competitor's
confidential or competitively sensitive information.  There is no sharing of the WLB Debtors'
confidential information.  Paragraph 35 makes no reference to "information sharing."*

*Furthermore, McKinsey has disclosed all relevant connections arising from this particular
aspect of McKinsey's consulting business.*

O. Paragraph 36 states that no member of the Engagement Team served on the Program
   Management Tool Team during the "lookback period."  Did any member of the Engagement
   Team ever serve on the Program Management Tool Team?
   i. Describe by skill-set and job-title the persons serving on the Program Management
      Tool Team.
   ii. Do these persons have any responsibilities in direct client service, or are they fully
       dedicated to the Program Management Tool Team?

*The Program Management Tool Team consists of those McKinsey employees who provide
client services pertaining to McKinsey's proprietary "Wave" program management solution.
Wave is a digital information aggregation platform that provides numerous administrative*

*and project management-focused client service capabilities and client development tools through a user-friendly interface.  This includes account planning, client billing, scheduling, budgeting, and project scoping and tracking capabilities.  Some members of the Program Management Tool Team are responsible for developing new client relationships, while others work with existing clients to ensure that they are using Wave to its full capacity, such as for client communications, feedback, project management tracking, and related capabilities. Consistent with this focus, the skill-set for such employees largely focuses on account and project management, IT operation experience, and business development capabilities.*

*No member of the Engagement Team ever served on the Program Management Tool Team. As indicated in the Application, certain McKinsey & Co. employees and agents are dedicated to supporting the Program Management Tool, separate from McKinsey's client service teams. The members of the Program Management Tool Team are bound to maintain the confidentiality of client information.*

P.  Why do rights of indemnification run to all affiliates of McKinsey RTS, when those affiliates are not being engaged to provide services under the engagement letter?

*As discussed in the Application, the indemnification provisions of the engagement letter were fully negotiated between the WLB Debtors and RTS at arm's length and in good faith.  The broad scope of the provisions is customary and reasonable for restructuring advisory, consulting, and support engagements, both in and out of court.  Similar indemnification arrangements – as modified by the applicable retention orders in ways substantially similar to those proposed in McKinsey's proposed retention order here – have been approved in other large chapter 11 cases by both the Bankruptcy Court for the Southern District of Texas, and other bankruptcy courts around the country.*

*       *       *