## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.,*[1] | Case No. 18-35672 (DRJ) |
| Reorganized Debtors. | (Jointly Administered) |

### NOTICE OF SUPPLEMENTAL FILING IN SUPPORT OF WLB DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND CERTAIN OF ITS AFFILIATES AS PERFORMANCE IMPROVEMENT ADVISORS FOR THE WLB DEBTORS EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on July 3, 2019, the *WLB Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief* (the "Application") was filed.  Dkt. No.  2119.

**PLEASE TAKE FURTHER NOTICE** that, on August 20, 2019, the Acting United States Trustee for Region 7 (the "U.S. Trustee") filed an objection to the Application, Dkt. No. 2273, noting that McKinsey[2] provided initial responses to the U.S. Trustee's information requests and that the U.S. Trustee "hopes that McKinsey's additional disclosures on the record

---

[1]     Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2]     Defined terms used herein but not otherwise defined shall have meanings ascribed to such terms in the Application.

will address [the U.S. Trustee's concerns] and also provide additional transparency for the benefit of all interested parties in these cases." Dkt. No. 2272, n. 5.

PLEASE TAKE FURTHER NOTICE that, as noted in McKinsey's omnibus response filed on September 10, 2019, Dkt. No. 2340, n.2, the "Proposed Professionals and the WLB Debtors are working to address the U.S. Trustee's concerns by submitting certain disclosures and clarifications on the record in advance of the hearing on the merits of the Application."

PLEASE TAKE FURTHER NOTICE that, on September 12, 2019, McKinsey filed a copy of its responses (the "Initial Responses") to the U.S. Trustee's initial information requests and noted that it received supplemental information requests from the U.S. Trustee.  Dkt. No. 2348.

PLEASE TAKE FURTHER NOTICE that, attached hereto as **Exhibit 1**, is an organizational chart for the Proposed Professionals sought to be retained in the Application, which was referred to as "Exhibit A" in the Initial Responses.

PLEASE TAKE FURTHER NOTICE that, attached hereto as **Exhibit 2**, is the industry-wide survey, which was referred to as "Exhibit B" in the Initial Responses, a copy of which was previously filed on March 27, 2019 as Dkt. No. 1659-1 and subsequently on April 3, 2019 as Dkt. No. 1686-1.

PLEASE TAKE FURTHER NOTICE that, in order to provide transparency for the benefit of the Court and all parties in interest, McKinsey hereby files a copy of its responses to the U.S. Trustee's supplemental information requests, which is attached hereto as **Exhibit 3**.

PLEASE TAKE FURTHER NOTICE that McKinsey and the WLB Debtors respectfully reserve all their rights to supplement the record, including by filing additional responses to any objections to the Application.

Dated:  October 24, 2019                    Respectfully submitted,
        Houston, TX


By:      /s/ *Zack A. Clement*
         Zack A. Clement
         ZACK A. CLEMENT PLLC
         3753 Drummond Street
         Houston, TX 77025
         Telephone: (832) 274-7629
         E-mail: zack.clement@icloud.com

         M. Natasha Labovitz *(pro hac vice)*
         John Gleeson *(pro hac vice)*
         Erica Weisgerber *(pro hac vice)*
         DEBEVOISE & PLIMPTON LLP
         919 Third Avenue
         New York, New York 10022
         Telephone:  (212) 909-6000
         Email: nlabovitz@debevoise.com
                 jgleeson@debevoise.com
                 eweisgerber@debevoise.com

         Faith E. Gay *(pro hac vice)*
         Jennifer M. Selendy *(pro hac vice)*
         Erica R. Iverson *(pro hac vice)*
         SELENDY & GAY PLLC
         1290 Avenue of the Americas
         New York, NY 10104
         Telephone: (212) 390-9000
         E-mail: fgay@selendygay.com
                 jselendy@selendygay.com
                 eiverson@selendygay.com

         *Attorneys for McKinsey Recovery &*
         *Transformation Services U.S., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2019, I caused the foregoing Notice to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.

/s/   Zack A. Clement_____

**Exhibit 1**

# Organizational Chart of Proposed Professionals



**McKinsey & Company, Inc. Canada**
Domestic Jurisdiction: DE
Formation Date: 10/29/2003

**McKinsey & Company LME Limited**
Domestic Jurisdiction: UK
Formation Date: 11/08/2013

**McKinsey & Company, Inc.**
Domestic Jurisdiction: NY
Formation Date: 06/25/1956

**McKinsey & Company Canada/
McKinsey & Compagnie Canada**
Domestic Jurisdiction: NS, Canada
Formation Date: 12/17/2003

**McKinsey, Incorporated**
Domestic Jurisdiction: DE
Formation Date: 06/24/1987

**McKinsey Holdings, Inc.**
Domestic Jurisdiction: DE
Formation Date: 12/21/1994

**McKinsey Knowledge Centre India Private Limited**
Domestic Jurisdiction: India
Formation Date: 02/15/1999

**McKinsey and Company Inc Africa (Pty) Ltd**
Domestic Jurisdiction: South Africa
Formation Date: 01/28/2013

**McKinsey & Company, Inc. United States**
Domestic Jurisdiction: DE
Formation Date: 12/21/1994

**McKinsey Recovery & Transformation Services U.S., LLC**
Domestic Jurisdiction: DE
Formation Date: 01/04/2011

**McKinsey and Company Africa (Pty) Ltd**
Domestic Jurisdiction: South Africa
Formation Date: 06/03/2013

Note: The WLB Debtors are seeking to retain those entities shaded in grey in the Westmoreland bankruptcy.

**Exhibit 2**

# Summary of Industry Affiliate Investment Disclosures[1]

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| Weil Gotshal & Manges LLP<br><br>*In re Sears Holdings Corporation,* Case No. 18-23538-RDD (Bankr. S.D.N.Y.)<br><br>*In re Claire's Stores, Inc.,* Case No. 18-10584-MWF (Bankr. D. Del.)<br><br>*In re Waypoint Leasing Holdings Ltd.,* Case No. 18-13648-SMB (Bankr. S.D.N.Y.) | "Weil compared the names of [clients] for which professional time was recorded during the two (2) years prior to the comparison." [Schrock Declaration ¶ 5(d), *Claire's*, Docket No. 191, 3/30/18] | None described. | "Weil has represented, and may currently represent, entities that hold, or may in the future hold, certain of the Debtors' debt in beneficial accounts on behalf of unidentified parties. Because distressed debt is actively traded in the commercial markets, Weil may be unaware of the actual holder of such debt at any given moment. Weil also represents numerous entities in unrelated matters that may buy and/or sell distressed debt of chapter 11 debtors. Moreover, from time to time, Weil is engaged by various entities that buy and/or sell distressed debt to analyze the capital structure of a distressed company based on a review of publicly available information. The Firm does not undertake such reviews after it has been engaged to represent any such company, including the Debtors, and does not view any public debt review as an adverse representation to a | None described. | "Weil compiled responses to the foregoing inquiries for the purposes of preparing this Declaration. Responses to the inquiry described in Paragraph 5(g) hereof indicate that, as of the Commencement Date, and except as otherwise disclosed herein, no Weil attorneys and/or support staff and/or their family members: (i) own any debt or equity securities of any of the Debtors or their non-Debtor affiliates; (ii) hold a claim against or interest adverse to any of the Debtors; (iii) are or were officers, directors, or employees of any of the Debtors; (iv) are related to or have any connections to Bankruptcy Judges in the District of Delaware; or (v) are related to or have any connections to anyone working in the Office of the U.S. Trustee." [Schrock Declaration ¶ 6, *Claire's*, Docket No. 191, 3/30/18] | None mentioned. |

[1] This chart is based on a review of the sample retention applications listed in column A and does not include any subsequently filed supplemental declarations.  Each professional's disclosures were substantially similar in all sample engagements, unless otherwise noted.

Capitalized terms used but not defined in the excerpts quoted herein have the meanings ascribed to such terms in the applicable retention application.

| | | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|---|
| **A** **Professional** | **B** **Look-back period** | **C** **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** **Explanation of limits on conflict of interest check and disclosure** | **E** **Description of information screen and other protective measures** | **F** **Employee personal investment disclosures, if any** | **G** **Are international affiliates included with connections?** |
| | | | debtor. Despite the efforts described herein to identify and disclose Weil's connections with the parties in interest in these chapter 11 cases, because of the Debtors' numerous relationships, Weil is unable to state with absolute certainty that every client relationship or other connection has been disclosed. Weil will continue to follow the Firm Disclosure Procedures, and if any new material relevant facts or relationships are discovered or arise, Weil will promptly file a supplemental disclosure detailing the same with the Court." [Schrock Declaration ¶¶ 17-18, *Claire's*, Docket No. 191, 3/30/18] | | "Certain Weil personnel or members of the household of the Firm's personnel may unknowingly hold certain interests in the Debtors through blind or discretionary accounts." [Holtzer Declaration ¶ 6 n.4, *Waypoint Leasing*, Docket No. 162, 12/23/18] | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G<br>Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | | | | | |
| **Kirkland & Ellis LLP**<br><br>*In re Things Remembered, Inc.*, Case No. 19-10234-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceuticals Inc.*, Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re ATD Corporation*, Case No. 18-2221-KJC (Bankr. D. Del.) | "To the extent that I have been able to ascertain that Kirkland has been retained within the last three years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto." [Greco Declaration ¶ 21, *Things Remembered*, Docket No. 115, 2/13/19] | See column F regarding employee investments. | "Generally, it is Kirkland's policy to disclose entities in the capacity that they first appear in a conflicts search. For example, if an entity already has been disclosed in this Declaration in one capacity (e.g., a customer), and the entity appears in a subsequent conflicts search in a different capacity (e.g., a vendor), Kirkland does not disclose the same entity again in supplemental declarations, unless the circumstances are such in the latter capacity that additional disclosure is required." [Greco Declaration ¶ 29, *Things Remembered*, Docket No. 115, 2/13/19] | "Furthermore, prior to joining Kirkland, certain Kirkland attorneys represented clients adverse to Kirkland's current and former restructuring clients. Certain of these attorneys (the 'Screened Kirkland Attorneys') will not perform work in connection with Kirkland's representation of the Debtors and will not have access to confidential information related to the representation. Kirkland's formal ethical screen provides sufficient safeguards and procedures to prevent imputation of conflicts by isolating the Screened Kirkland Attorneys and protecting confidential information.<br><br>Under Kirkland's screening procedures, Kirkland's conflicts department distributes a memorandum to all Kirkland attorneys and legal assistants directing them as follows: (a) not to discuss any aspects of Kirkland's representation of the Debtors with the Screened Kirkland Attorneys; (b) to conduct meetings, phone | "From time to time, Kirkland partners, of counsel, associates, and employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds, and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire an interest in debt or equity securities of many companies, one of which may be one of the Debtors, their creditors, or other parties in interest in these chapter 11 cases, often without Kirkland's knowledge. Each Kirkland person generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Kirkland persons make an investment in the Investment Fund, he, she, or they do not know what securities the blind pool Investment Fund | Kirkland explicitly seeks to also retain Kirkland & Ellis International LLP and appears to search both firms' clients. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| | | | | conferences, and other communications regarding Kirkland's representation of the Debtors in a manner that avoids contact with the Screened Kirkland Attorneys; (c) to take all measures necessary or appropriate to prevent access by the Screened Kirkland Attorneys to the files or other information related to Kirkland's representation of the Debtors; and (d) to avoid contact between the Screened Kirkland Attorneys and all Kirkland personnel working on the representation of the Debtors unless there is a clear understanding that there will be no discussion of any aspects of Kirkland's representation of the Debtors. Furthermore, Kirkland already has implemented procedures to block the Screened Kirkland Attorneys from accessing files and documents related to the Debtors that are stored in Kirkland's electronic document managing system." [Greco Declaration ¶¶ 52-53, *Things Remembered*, Docket No. 115, 2/13/19] | will purchase or sell, and have no control over such purchases or sales.<br><br>From time to time one or more Kirkland partners and of counsel voluntarily choose to form an entity (a 'Passive-Intermediary Entity') to invest in one or more Investment Funds. Such Passive-Intermediary Entity is composed only of persons who were Kirkland partners and of counsel at the time of the Passive-Intermediary Entity's formation (although some may later become former Kirkland partners and of counsel). Participation in such a Passive-Intermediary Entity is wholly voluntary and only a portion of Kirkland's partners and of counsel choose to participate. The Passive-Intermediary Entity generally owns substantially less than one percent of any such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. Each Investment Fund in which a | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| | | | | | Passive-Intermediary Entity invests is operated as a blind pool, so that the Passive-Intermediary Entity does not know what securities the blind pool Investment Funds will purchase or sell, and has no control over such purchases or sales. And, indeed, the Passive-Intermediary Entity often arranges for statements and communications from certain Investment Funds to be sent solely to a blind administrator who edits out all information regarding the identity of the Investment Fund's underlying investments, so that the Passive-Intermediary Entity does not learn (even after the fact) the identity of the securities purchased, sold, or held by the Investment Fund. To the extent the Passive-Intermediary Entity is or becomes aware of the identity of the securities purchased, sold, or held by the Investment Funds ('Known Holdings'), such Known Holdings are submitted to Kirkland's conflict checking system. From time to time, Kirkland partners, of counsel, | |

5

| | | | | | | LAW FIRMS |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| **Professional** | **Look-back period** | | | | | |
| | | | | | associates, and employees personally directly acquire a debt or equity security of a company which may be (or become) one of the Debtors, their creditors, or other parties in interest in these chapter 11 cases. Kirkland has a long-standing policy prohibiting attorneys and employees from using confidential information that may come to their attention in the course of their work, so that, all Kirkland attorneys and employees are barred from trading in securities with respect to which they possess confidential information." [Greco Declaration ¶¶ 42-44, *Things Remembered*, Docket No. 115, 2/13/19] | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| **Professional** | **Look-back period** | | | | | |
| **Jones Day**<br><br>*In re M&G USA Corporation,* Case No. 17-12307-BLS (Bankr. D. Del.)<br><br>*In re Paragon Offshore PLC,* Case No. 16-10386 (Bankr. D. Del.)<br><br>*In re Toys "R" Us Property Company I, LLC,* Case No. 18-31429-KLP (Bankr. E.D. Va.) | "To the extent that I have been able to ascertain that Jones Day has been retained within the last two (2) years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 3 attached hereto." [Levinson Declaration ¶ 15, *Paragon Offshore,* Docket No. 1604, 6/6/17] | None described. | "The disclosure of stockholder interests or other affiliate relationships among potentially related entities reflects only information known to Jones Day through its conflict reporting system. Jones Day has not performed independent research to identify all stockholder interests or other affiliate relationships with respect to interested parties. Moreover, Jones Day has not disclosed representations of trade associations and similar industry or special interest organizations in which interested parties are members." [Levinson Declaration, Schedule 3 n.1, *Paragon Offshore,* Docket No. 1604, 6/6/17] | None described. | "Jones Day has more than 2,500 attorneys in 43 offices around the world. It is possible that certain Jones Day attorneys or employees hold the Debtors' securities or interests in mutual funds or other investment vehicles that own the Debtors' securities or the securities of entities that own the Debtors' securities." [Moss Declaration ¶ 13(f), *Toys "R" Us,* Docket No. 280, 6/29/18]<br><br>No similar disclosure in *Paragon Offshore.* | None mentioned . |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Akin Gump Strauss Hauer & Feld LLP**<br><br>*In re FirstEnergy Solutions Corp.*, Case No. 18-5057-AMK (Bankr. D.D. Ill.)<br><br>*In re Emerald Oil, Inc.*, Case No. 16-10704-KG (Bankr. D. Del.)<br><br>*In re Hercules Offshore, Inc.*, Case No. 16-11385-KJC (Bankr. D. Del.) | None specified | None described. | None described. | None described. | "To the best of my knowledge and information based on the responses received to the foregoing information request, no member or employee of Akin Gump holds any of the Debtors' equity or notes. It is possible that a professionally managed retirement plan on behalf of Akin Gump employees or members of a 401(k) type plan may hold equity interests in or other securities of the Debtors, but it is unknown to me at this time." [Botter Declaration ¶ 23, *Emerald Oil*, Docket No. 321, 5/16/16]<br><br>No similar disclosure in *FirstEnergy* or *Hercules*. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A** <br><br><br> **Professional** | **B** <br><br><br> **Look-back period** | **C** <br><br> **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** <br><br> **Explanation of limits on conflict of interest check and disclosure** | **E** <br><br> **Description of information screen and other protective measures** | **F** <br><br> **Employee personal investment disclosures, if any** | **G** <br> **Are international affiliates included with connections?** |
| **Milbank LLP** <br><br> *In re M & G USA Corporation,* Case No. 17-12307-BLS (Bankr. D. Del.) <br><br> *In re Remington Outdoor Company, Inc.,* Case No. 18-10684-BLS (Bankr. D. Del.) <br><br> *In re Westinghouse Electric Company LLC,* Case No. 17-10751-MEW (Bankr. S.D.N.Y.) | "To the extent that such searches indicated that Milbank has or had a relationship with any such entity within the last three years, the identity of such entity, and Milbank's relationship therewith, are set forth on Schedule 2 attached hereto and incorporated herein." [Raval Declaration ¶ 15, *M & G*, Docket No. 361, 12/5/17] | None described. | "The Debtors have numerous relationships and creditors. Consequently, although every reasonable effort has been made to discover and eliminate the possibility of any connection or conflict, including the efforts outlined above, Milbank is unable to state with certainty which of its clients or such clients' affiliated entities hold claims or otherwise are parties in interest in these Chapter 11 Cases." [Raval Declaration ¶ 22, *M & G*, Docket No. 361, 12/5/17] | None described. | None described. | None mentioned. |

9

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| **Skadden, Arps, Slate, Meagher & Flom LLP**<br><br>*In re Exide Technologies,* Case No. 13-11482-KJC (Bankr. D. Del.)<br><br>*In re SunEdison, Inc.,* Case No. 16-10992-SMB (Bankr. S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | See column F regarding employee investments. | "Skadden has instituted and is currently engaged in extensive further inquiry regarding the Debtor's constituencies through further inquiries of its partners, counsel and associates with respect to the matters contained herein, including the circulation of a special disinterestedness questionnaire to each of the approximately 1,700 partners, counsel and associates in the Firm's numerous domestic and international offices. Skadden will promptly file a supplemental declaration should the results of this inquiry or any further inquiries reveal material facts not disclosed herein. Skadden will continue to comply with its ongoing duty under the Bankruptcy Code to notify this Court if any actual conflict arises and, if necessary, arrange for an 'ethical wall' with respect to the Skadden attorney who worked on such matter." [Ziman Declaration ¶ 45, *Exide*, Docket No. 145, 6/19/13] | "Prior to the Petition Date, Skadden, Arps established a formal screening procedure or 'Ethical Wall' to ensure that lawyers and legal assistants ('Professional Staff') who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of Citigroup or Barclays regarding the Joint Venture, on the one hand, and Professional Staff who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of the Debtors, on the other hand, do not exchange any information protected as confidential with respect to either Citigroup or Barclays, on the one hand, or the Debtors, on the other hand. In addition, prior to the Petition Date, Skadden, Arps obtained specific waivers relating to this representation of Barclays. Skadden, Arps continues to represent Barclays in these matters; however, Skadden, Arps has made it clear to Barclays that | "In addition, some of the Firm's professionals have assets managed by financial advisors or hold mutual funds which are managed by third party fund managers. Neither the Firm nor its professionals have any control over the investments in such funds, including investment purchases, sales and the timing of such activities. Securities of the Debtor or potential parties in interest may be held through the foregoing investments. In addition, certain professionals may hold securities of potential parties in interest or their affiliates in the ordinary course. To the best of my knowledge, no employee of the Firm working directly on this engagement holds securities of the Debtor." [Ziman Declaration ¶ 40, *Exide*, Docket No. 145, 6/19/13]<br><br>"Skadden maintains three retirement plans (the 'Plan(s)') into which contributions are made by attorneys and employees and/or by the firm on their behalf ('Employee Contribution(s)'). Attorneys and employees of the firm serve as trustees of the Plans | None mentioned . |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | | | it is prohibited from appearing or taking positions adverse to the Debtors on Barclays' behalf." [Goffman Declaration ¶ 14, *SunEdison*, Docket No. 100, 4/26/16]<br><br>"Out of an abundance of caution, Skadden established a formal screening procedure or 'Ethical Wall' to ensure that lawyers and legal assistants ('Professional Staff') who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representations of Eco-Bat, on the one hand, and Professional Staff who previously worked on, are currently working on, or are later assigned to work on, matters in connection with Skadden's representation of the Debtor, on the other hand, do not exchange any information protected as confidential with respect to either Eco-Bat or Exide." [Ziman Declaration ¶ 38(a), Exide, Docket No. 145, 6/19/13]<br><br>No similar disclosure in *Synergy*. | (the 'Trustees'). With respect to one of the Plans, the Trustees select mutual funds and similar investment vehicles ('Fund(s)') and individual participants direct into which of those Funds their contributions will be invested. Regarding the other two Plans, the Trustees select the Funds in which such Plans invest Employee Contributions. The Trustees only decide whether Employee Contributions are invested in a particular Fund or whether a participant may direct that his/her Employee Contributions should be invested in such Funds. Neither Skadden nor the Trustees have any ability to (i) cause the Funds to invest Employee Contributions in any particular investment opportunity or (ii) know whether the Funds are invested in clients of the Firm and/or in entities as to which the Firm has an adverse representation. It is possible that the Funds including the component of the Funds which are 'Hedge Funds' may have invested in debt or equity securities of Synergy Pharmaceuticals Inc. or Synergy Advanced Pharmaceuticals, Inc. No | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | | | investment by any Plan in any particular Hedge Fund exceeds 2.6% of the total value of such Plan." [Meisler Declaration ¶ 17, *Synergy*, Docket No. 122, 12/26/18]<br><br>The second paragraph above appears only in *Synergy*, and not *Exide* or *SunEdison*. | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br><br>*In re Cumulus Media Inc.,* Case No. 17-13381-SCC (Bankr. S.D.N.Y.)<br><br>*In re Sears Holdings Corporation,* Case No. 18-23538-RDD (Bankr. S.D.N.Y.)<br><br>*In re The Bon-Ton Stores, Inc.,* Case No. 18-10248-MWF (Bankr. D. Del.) | "Paul, Weiss currently represents, or has in the past three years represented, the Potential Parties-in-Interest, or parties who may be affiliated with such Potential Parties-in-Interest, set forth in Schedule 2 hereto, in matters unrelated to the Debtors and these Chapter 11 Cases." [Cornish Declaration ¶ 3, *Bon-Ton*, Docket No. 181, 2/14/18] | None described. | "In light of the extensive number of the Debtors' creditors and parties in interest and because definitive lists of all such creditors and other parties have not yet been obtained, neither I nor the Firm are able to conclusively identify all potential relationships at this time, and we reserve the right to supplement this disclosure as additional relationships come to our attention. To the extent that I become aware of any additional relationships that may be relevant to Paul, Weiss's representation of the Debtors, I will promptly file a supplemental declaration." [Basta Declaration ¶ 23, *Sears*, Docket No. 417, 11/1/18] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br>Explanation of limits on conflict of interest check and disclosure | E<br>Description of information screen and other protective measures | F<br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Gibson, Dunn & Crutcher LLP**<br><br>*In re Energy Future Holdings Corp.*, Case No. 14-10979-CSS (Bankr. D. Del.)<br><br>*In re Sports Authority Holdings, Inc.*, Case No. 16-10527-MFW (Bankr. D. Del.)<br><br>*In re Brookstone Holdings Corp.*, Case No. 18-11780-BLS (Bankr. D. Del.)<br><br>*In re RCS Capital Corporation, et al.*, Case 16-10223-MFW (Bankr. D. Del.) | "To the extent that Gibson Dunn currently represents, or has represented within the last three years, any of the Interested Parties, the identities of such entities is set forth in Exhibit 4, which is attached hereto. In determining whether a client is presently represented by Gibson Dunn, I relied on the existence of an 'active' notation on the report to reflect current representation. With respect to matters showing as 'inactive,' I relied on the 'closed date' to determine whether the representation occurred within the past three years. If an 'inactive' matter showed no 'closed date,' I assumed for purposes of this disclosure that the matter was inactive during the past three years and did not include the client on Exhibit 4, except | None described. | "Gibson Dunn is confident that its diligence has resulted, to the greatest extent possible, in the disclosure of all potential conflicts. However, despite the efforts described above to identify and disclose Gibson Dunn's connections with parties in interest in the Chapter 11 Cases, Gibson Dunn is unable to state with absolute certainty that every client representation or other connection has been disclosed, because Gibson Dunn is an international law firm with over 1,200 attorneys across the globe." [Klyman Declaration ¶ 23, *Sports Authority*, Docket No. 233, 3/8/16] | None described. | "Gibson Dunn has over 1,200 attorneys. A general inquiry of all Gibson Dunn attorneys was sent by electronic mail to determine whether any such individuals holds claims against, or stock or securities of the Debtors (other than in connection with investments in mutual funds, blind trusts or other investments as to which such individual has no discretion as to the selection of the individual underlying assets). As of the date hereof, no Gibson Dunn attorneys reported owning any debt or equity securities of the Debtors (other than securities that may be owned in connection with investments in mutual funds, blind trusts or other investments as to which such individual has no discretion as to the selection of the individual underlying assets)." [Klyman Declaration ¶ 21(c), *Sports Authority*, Docket No. 233, 3/8/16] | None mentioned. |

14

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | 'inactive' matters opened on or after December 14, 2012 which showed no 'closed date' for which the client is included on Exhibit 4." [Klyman Declaration ¶ 20(c), *Sports Authority*, Docket No. 233, 3/8/16] | | | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G Are international affiliates included with connections? |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| **Proskauer Rose LLP**<br><br>*In re Breitburn Energy Partners LP,* Case No. 16-11390-SMB (Bankr. S.D.N.Y.)<br><br>*In re Energy Future Holdings Corp.,* Case No. 14-10979-CSS (Bankr. D. Del.)<br><br>*In re PES Holdings, LLC,* Case No. 18-10122-KG (Bankr. D. Del.) | "Proskauer compared the names of each of the Potential Parties in Interest against the names contained in Proskauer's Conflicts Database for which professional time was recorded during the two (2) years prior to the comparison." [Abelson Declaration ¶ 20(c), *Breitburn Energy,* Docket No. 921, 1/9/18]<br><br>"Specifically, Proskauer obtained from Kirkland the names of individuals and entities that may be parties in interest in these chapter 11 cases (the 'Potential Parties in Interest') and such parties are listed on Schedule 1 hereto. Proskauer has searched on its electronic database for its connections to the entities listed on Schedule 1 hereto. To the extent that I have been able to ascertain that Proskauer has been retained within | None described. | None described. | None described. | "From time to time, Proskauer partners, of counsel, associates, and employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds, and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire a debt or equity security of many companies, one of which may be the Debtor or an affiliate, often without Proskauer's knowledge. Each Proskauer person generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund, and has no influence over the Investment Fund's decision to buy, sell, or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Proskauer persons make an investment in the Investment Fund, he, she, or they do not know what securities the blind pool Investment Fund will purchase or sell, and have no control over such purchases or sales. | None mentioned. |

| | | | | | LAW FIRMS | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| | the last three years to represent any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto." [Young Declaration ¶ 20, PES Holdings, Docket No. 144, 2/2/18]<br><br>"Proskauer compared each of the Potential Parties in Interest to the names that Proskauer has compiled into a master client database from its conflicts clearance and billing records, comprised of the names of the entities for which any attorney time charges have been billed since the database was first created (the 'Client Database')." [Marwil Declaration ¶ 22(b), EFH, Docket No. 3037, 12/16/14] | | | | From time to time, Proskauer partners, of counsel, associates and employees personally directly acquire a debt or equity security of a company which may be the Debtor or an affiliate. Proskauer has a long-standing policy prohibiting attorneys and employees from using confidential information that may come to their attention in the course of their work. In this regard, all Proskauer attorneys and employees are barred from trading in securities with respect to which they possess confidential information." [Young Declaration ¶¶ 34-35, *PES Holdings*, Docket No. 144, 2/2/18]<br><br>No similar disclosure in *Breitburn* or *EFH*. | |

17

| | | | LAW FIRMS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Willkie Farr & Gallagher LLP**<br><br>*In re Aralez Pharmaceuticals US Inc.,* Case No. 18-12425-MG (Bankr. S.D.N.Y)<br><br>*In re DACCO Transmission Parts (NY), Inc.,* Case No. 16-13245-MKV (Bankr. S.D.N.Y.)<br><br>*In re AOG Entertainment, Inc.,* Case No. 16-11090-SMB (Bankr. S.D.N.Y.)<br><br>*In re Rural/Metro Corporation,* Case No. 13-11952-KJC (Bankr. D. Del.)<br><br>*In re Otelco Inc.,* Case No. | "WF&G has in the past five (5) years represented the Potential Parties in Interest or their affiliates listed on Schedule 2 hereto." [Shalhoub Declaration ¶ 6(b), *Aralez*, Docket No. 55, 8/27/18] | None described. | None described. | None described. | "In reviewing its records and the relationships of its attorneys, WF&G did not seek information as to whether any WF&G attorney or member of his/her immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain WF&G partners have invested but as to which such partners have no control over or knowledge of investment decisions, securities of any party in interest; or (b) has engaged in any ordinary course consumer transaction with any party in interest. If any such relationship does exist, I do not believe it would impact WF&G's disinterestedness or otherwise give rise to a finding that WF&G holds or represents an interest adverse to the Debtors' estates." [Shalhoub Declaration ¶ 4(c) n.3, *Aralez*, Docket No. 55, 8/27/18]<br><br>"Certain of my partners at WF&G and certain of the associates and counsel to, WF&G and certain of such persons' relatives may directly or indirectly be | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| Professional | Look-back period | | | | | |
| 13-10593 (Bankr. D. Del.)<br><br>*In re Broadview Networks Holdings, Inc.,* Case No. 12-13581-SCC (Bankr. S.D.N.Y.)<br><br>*In re Carey Limousine L.A., Inc.,* Case No. 12-12664-BLS (Bankr. D. Del.) | | | | | shareholders of creditors of the Debtors, competitors of the Debtors and/or other Parties in Interest in these cases." [Shalhoub Declaration ¶ 6(e), *Aralez,* Docket No. 55, 8/27/18]<br><br>"In addition, certain partners of WF&G are limited partners of a WF&G partnership that is itself a limited partner of Warburg Pincus Private Equity X, LP ('WP X'), the majority equity holder of Rural/Metro Corporation, and certain of its affiliates (collectively, 'Warburg'). WP X holds large and diverse interests, of which the Debtors' stock constitutes only a small percentage. Based on the information provided to me, I believe such holdings are insignificant and none of the attorneys controls or has any influence over Warburg in connection with this matter. Moreover, the investment by certain partners in the WF&G partnership which has invested in WP X are not material to any individual partner. Finally, none of the partners who is invested in the WF&G partnership will | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | | | | represent the Debtors. I do not believe any of these interests, considered separately or collectively, are material." [Strickland Declaration ¶ 4(f), *Rural/Metro*, Docket No. 70, 8/7/13][2] | |

---

[2] This disclosure appears specific to *Rural/Metro* and did not appear in the other searched Willkie cases, due to the relationship between Warburg Pincus and that particular debtor.

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G<br>Are international affiliates included with connections? |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Kramer Levin Naftalis & Frankel LLP<br><br>*In re CHC Group Ltd.,* Case No. 16-31854-BJH (Bankr. N.D. Tex.)<br><br>*In re VER Technologies Holdco LLC,* Case No. 18-10834-KG (Bankr. D. Del.)<br><br>*In re Toys "R" Us, Inc.,* Case No. 17-34665-KLP (Bankr. E.D. Va.)<br><br>*In re Residential Capital, LLC,* Case No. 12-12020-MG (Bankr. S.D.N.Y.)<br><br>*In re Patriot Coal Corporation,* Case No. 12- | "Those connections in which Kramer Levin had represented the client or an affiliate within the last two years were compiled for purposes of being disclosed in this Declaration." [Mannal Declaration ¶ 18(c), *CHC*, Docket No. 302, 6/10/16] | None described. | None described. | "To the extent any employee of Kramer Levin has a relationship that, in the view of Kramer Levin, could give rise to an actual or potential conflict, an ethical screen will be put in place to ensure that such employee does not have access to information related to Kramer Levin's representation of the Committee." [Mannal Declaration ¶ 24, *CHC*, Docket No. 302, 6/10/16] | "Based upon an email inquiry made of all Kramer Levin personnel, and the lack of any affirmative replies to such inquiry, it is my understanding that no Kramer Levin attorney or their respective immediate family members own any debt or equity securities (ticker symbol 'HELI' or 'HELIF') of any of the Debtors or their non-Debtor affiliates. The Debtors' stock has been placed on Kramer Levin's 'restricted list' since June 6, 2016. Kramer Levin attorneys invest in a broad array of mutual funds and 'exchange-traded funds', some number of which either currently or may in the future own securities of the Debtors, their non-Debtor affiliates, or some of its creditors." [Mannal Declaration ¶ 23, *CHC*, Docket No. 302, 6/10/16] | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| 12900-SCC (Bankr. S.D.N.Y.)<br><br>*In re Hostess Brands, Inc.,* Case No. 12-22052-RDD (Bankr. S.D.N.Y.) | | | | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Latham & Watkins LLP**<br><br>*In re Imerys Talc America, Inc.,* Case No. 19-10289-LSS (Bankr. D. Del.)<br><br>*In re Enduro Resource Partners LLC,* Case No. 18-11174-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | None described. | "Although L&W has undertaken, and continues to undertake, extensive efforts to identify connections with the Debtors and other Potential Parties in Interest, it is possible that connections with some Potential Parties in Interest have not yet been identified. Should L&W, through its continuing efforts, learn of any new connections of the nature discussed herein, L&W will so advise the Court in a timely manner as soon as reasonably practicable." [Reckler Declaration ¶ 27, *Enduro,* Docket No. 78, 5/21/18] | None described. | "Shortly after the Petition Date, L&W intends to circulate a memorandum to attorneys requiring that all attorneys who own any equity securities issued by the Debtors or any note or other debt instrument issued by the Debtors provide the details of such ownership. I will supplement this Declaration, as necessary, based on any affirmative responses to the memorandum that are received as soon as reasonably practicable." [Reckler Declaration ¶ 17, *Enduro,* Docket No. 78, 5/21/18] | None mentioned. |

23

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br>Explanation of limits on conflict of interest check and disclosure | E<br>Description of information screen and other protective measures | F<br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Young Conaway Stargatt & Taylor, LLP**<br><br>*In re: David's Bridal, Inc.,* Case No. 18-12635-LSS (Bankr. D. Del.)<br><br>*In re Mattress Firm, Inc.,* Case No. 18-12241-CSS (Bankr. D. Del.)<br><br>*In re The Bon-Ton Stores, Inc.,* Case No. 18-10248-MFW (Bankr. D. Del.) | None specified | None described. | "Based upon its review of the Interested Parties, Young Conaway has determined that it does not represent any party in these proceedings with a material adverse interest with respect to the Debtors. Young Conaway will supplement this Declaration, as necessary, with additional information or disclosures in the event that additional information is developed." [Morgan Declaration ¶ 5, *Bon-Ton*, Docket No. 182, 2/14/18] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Haynes and Boone LLP**<br><br>*In re MF Global Inc.,* Case No. 11-02790-MG (Bankr. S.D.N.Y.)<br><br>*In re Global Aviation Holdings Inc.,* Case No. 13-12945-MFW (Bankr. D. Del.)<br><br>*In re Panda Temple Power, LLC,* Case No. 17-10839-LSS (Bankr. D. Del.) | "H&B entered the names of the Potential Parties-in-Interest into a computer database containing the names of all clients and conflict information concerning such clients of H&B. This inquiry revealed that certain of the Potential Parties-in-Interest are current, or were H&B clients within the past two years." [Powers Declaration ¶ 12, *Panda Temple,* Docket No. 180, 6/6/17] | None described. | "The disclosures identified above are based upon all information reasonably available to Haynes and Boone at the time of submission of the Application to the Bankruptcy Court for approval. Haynes and Boone will, to the extent necessary, supplement this Declaration as may be required by the Bankruptcy Code and Rules if and when any other relationships exist or are modified such that further disclosure is required." [Kattner Declaration ¶ 14, *Global Aviation,* Docket No. 100, 11/22/13]<br><br>"…H&B intends to disclose clients in the capacity that they first appear in a conflicts search. For example, if a client has already been disclosed in this Declaration in one capacity (i.e., a bank), and the client appears in a subsequent conflicts search in a different capacity (i.e., a major contract counterparty), then H&B does not intend to disclose the same client again in supplemental declarations, unless the circumstances are such in the latter capacity that additional disclosure is required." [Powers Declaration ¶ 14, *Panda Temple,* Docket No. | "Haynes and Boone will implement appropriate internal procedures to protect the interests of the Debtors in connection with the representations and relationships set forth above." [Kattner Declaration ¶ 14, Global Aviation, Docket No. 100, 11/22/13] | None described. | None mentioned. |

| | | | **LAW FIRMS** | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | 180, 6/6/17]<br><br>"H&B's investigation and research of the Potential Parties-in-Interest has thus far failed to eliminate the possibility that Potential Parties-in-Interest other than those listed on Appendix 2 hereto may be current or recent former clients of H&B because: (a) the names of the Potential Parties-in-Interest are similar to, but not identical to, current or former H&B clients; or (b) the names of the Potential Parties-in-Interest are common names that appeared on our conflict search results, but do not appear to be the same individuals or entities that are parties-in-interest herein." [Powers Declaration ¶ 16, *Panda Temple*, Docket No. 180, 6/6/17]<br><br>"Although H&B has undertaken, and continues to undertake, extensive efforts to identify connections with the Debtors and other Potential Parties-in-Interest, it is possible that connections with some Potential Parties-in-Interest have not yet been identified. Should H&B, through its continuing efforts, learn of any new connections of the nature | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | | discussed herein, H&B will so advise the Court in a timely manner as soon as reasonably practicable." [Powers Declaration ¶ 17, *Panda Temple*, Docket No. 180, 6/6/17] | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Togut, Segal & Segal LLP**<br><br>*In re Pacific Drilling S.A.,* Case No. 17-13193-MEW (S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re Trident Holding Company, LLC*, Case No. 19-10384-SHL (Bankr. S.D.N.Y.) | "Other than as set forth herein, neither I nor any member, attorney or employee of the Togut Firm has ever been a member, officer or employee of the Debtors or had an interest materially adverse to the interests of the Debtors' estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors or any of the other Debtors." [Oswald Declaration ¶ 14, *Trident*, Docket No. 94, 2/20/2019] | None described. | Limits representation of having no connections to potential parties in interest to "the directors and officers of the Debtors; the Debtors' lenders and lienholders; [and] the Debtors' 20 largest unsecured creditors (on a consolidated basis)." [Oswald Declaration ¶ 13, *Trident*, Docket No. 94, 2/20/2019]<br><br>"The Togut Firm will periodically review its files during the pendency of these Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Togut Firm will use its reasonable efforts to identify any such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014(a)." [Oswald Declaration ¶ 18, *Trident*, Docket No. 94, 2/20/2019] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Vinson & Elkins LLP**<br><br>*In re Stallion Oilfield Services Ltd.,* Case No. 09-13562-BLS (Bankr. D. Del.)<br><br>*In re Trico Marine Services, Inc.,* Case No. 10-12653-BLS (Bankr. D. Del.)<br><br>*In re Blockbuster, Inc.,* Case No. 10-14997-CGM (Bankr. S.D.N.Y.) | Listed on Schedule 3 to this Declaration are the results of the conflicts searched of the entities listed on Schedule 2.<br><br>As referenced in Schedule 3 the term 'current' client means a client to whom time was posted in the 12 months preceding the Petition Date. As referenced in Schedule 3 the term 'former' client means a client to whom time was posted between 12 and 36 months preceding the Debtor's petition date, but for which the client representation has been closed. As referenced in Schedule 3, the term 'closed' client means a client to whom time was posted in the 36 months preceding the Debtor's petition date, but for which the client representations has been closed."<br>[Collins Declaration ¶ 6 and n.2, *Stallion*, | None described. | "Despite the efforts described above to identify and disclose Vinson & Elkins's connections with the parties in interest in these chapter 11 cases, because Vinson & Elkins is a large firm with many personnel, and because the Debtors are a large enterprise, Vinson & Elkins is unable to state with certainty that every client relationship or other connection with it or its affiliates has been disclosed. In this regard, if Vinson & Elkins discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court."<br>[Collins Declaration ¶ 11, *Stallion*, Docket No. 256, 12/28/09] | None described. | None described. | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | Docket No. 256, 12/28/09]<br><br>None specified in *Trico* or *Blockbuster*. | | | | | |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Cadwalader Wickersham & Taft**<br><br>*In re Vertis Holdings, Inc.*, Case No. 12-12821-BLS (Bankr. D. Del. 2012)<br><br>*In re Sbarro, Inc.*, Case No.11-11527-SCC (Bankr. S.D.N.Y. 2011)<br><br>*In re Acorn Elston, LLC*, Case No. 10-14807-SHL (Bankr. S.D.N.Y. 2010) | "Since 1963, CWT has maintained a database containing the names of each current and former client, the names of the parties who are or were related or adverse to such current or former clients, and the names of the CWT personnel who are or were responsible for current or former matters for such clients (the 'Database'). CWT updates the Database periodically to include additional entities that become related to current and former clients. Using the information contained in the Database and its billing records, CWT compiled the names of the entities for which any CWT attorney time charges were recorded at any time during the past three (3) years (the 'Client Compilation')."<br>[Block Declaration ¶ | None described. | None described. | None described. | "Responses to the inquiry described in paragraph 8(f) of this declaration indicate that no CWT employee or anyone in the immediate family of a CWT employee holds any claims against, stock of, or other interests in any of the Debtors and that no such individuals were ever employed by any of the Debtors." [Rapisardi Declaration ¶ 12, Vertis, Docket No. 211, 11/02/12] | None mentioned. |

| LAW FIRMS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | 10(b), *Sbarro*, Docket No. 102, 4/19/11] | | | | | |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br><br>Professional | B<br><br><br><br><br>Look-back period | C<br><br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br><br>Description of information screen and other protective measures | F<br><br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| AlixPartners, LLP<br><br>*In re David's Bridal, Inc.,* Case No. 18-12635-LSS (Bankr. D. Del.)<br><br>*In re Bon-Ton Stores, Inc.,* Case No. 18-10248-MWF (Bankr. D. Del.)<br><br>*In re Charming Charlie Holdings Inc.,* Case No. 17-12906-CSS (Bankr. D. Del.) | "A search was performed for connections to the Potential Parties in Interest within the past five (5) years, and results were disclosed as to AlixPartners Holdings, LLP ('Holdings'), AlixPartners' parent company, and each of AlixPartners Holdings' U.S. and non-U.S. subsidiary affiliates." [Basler Declaration ¶ 26, *David's Bridal,* Docket No. 132, 11/29/18] | "AlixPartners is a wholly owned subsidiary of Holdings. The equity capital of Holdings is owned individually by: (i) the Managing Directors of AlixPartners; (ii) Lakeview Capital Holdings, Inc., the Jay Alix Living Trust and other affiliates of Jay Alix (collectively the 'Lakeview Parties'); (iii) affiliates of each of (a) Caisse de dépôt et placement du Québec ('CDPQ'), (b) Investcorp Bank B.S.C. ('IVC'), and (c) Public Sector Pension Investment Board ('PSP Investments'); and (iv) other individuals and trusts. Neither CDPQ, nor IVC, nor the Lakeview Parties, nor PSP Investments (collectively, the 'Investors'), nor any Managing Director, other individual or trust separately owns a majority of the equity capital of Holdings directly or indirectly or separately controls the Boards of either Holdings or AlixPartners. None of the Investors own any of the bank or other debt of AlixPartners.<br><br>CDPQ is an institutional investor that manages funds primarily on behalf of a number of Quebec-based public pension and insurance plans. As one of | "AlixPartners has searched the names of the Debtors and the list of Potential Parties in Interest against the names of (i) the Investors, (ii) the subsidiaries of the Investors that either hold a direct position in Holdings or hold a direct position in the entity that holds a direct position in Holdings (collectively, the 'InvestCos'), and (iii) the subsidiaries of the Investors that hold, directly or indirectly, positions in the respective InvestCos. In addition, AlixPartners has searched and/or will request each Investor to search the names of the Debtors against the companies that the InvestCos have a direct greater than 10% investment in (collectively, with (i) – (iii) the 'Investor Conflicts Parties'). AlixPartners has determined, to the best of its knowledge based solely on that search, that there are no connections with the Investor Conflicts Parties that require disclosure other than as noted herein. Because of the information barriers described above, the sheer size of the investment portfolios of the Investor Conflicts Parties, and any applicable securities laws, | "Designees of the Investors or their subsidiaries serve as some of the members of the Boards of Directors of each of AlixPartners and Holdings (collectively, the 'Boards'). In addition to their investments in Holdings, all of the Investors have substantial investments unrelated to AP. Accordingly, as a precautionary matter, AP maintains information barriers designed to prevent confidential client information, including the names of clients likely to be involved in reorganization proceedings under the Bankruptcy Code, from being shared with the Investors or their designees on the Boards.<br><br>To that end, no material nonpublic information about the Debtors has been or will be furnished by AP to the Investors, the InvestCos (as defined below) or their Board designees, and AP will continue to abide by its confidentiality obligations to the Debtors. AP operates | "To the best of my knowledge, none of the members of the engagement team or AP is a direct holder of any of the Debtors' securities. It is possible that members of the engagement team or certain of AlixPartners employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing, may own interests in mutual funds or other investment vehicles (including various types of private funds) that own the Debtors' or other parties in interest's debt or equity securities or other financial instruments, including bank loans and other obligations. Typically, the holders of such interests have no control over investment decisions related to such investment funds or financial instruments. AlixPartners' policy prohibits its employees from personally trading in the Debtors' securities." [Basler Declaration ¶ 31, *David's Bridal,* Docket No. 132, 11/29/18] | Yes, see column B. |

| | | | | | |
|---|---|---|---|---|---|
| **CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS** | | | | | |
| A | B | C | D | E | F | G |
| Professional | Look-back period | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | Are international affiliates included with connections? |
| | | Canada's leading institutional fund managers, CDPQ invests globally in major financial markets, private equity, infrastructure and real estate.

Investcorp is a leading global provider and manager of alternative investment products.

The Lakeview Parties and related entities are entities owned or controlled by Jay Alix that, among other things, make investments on behalf of Mr. Alix and his family." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]

"PSP Investments manages a diversified global portfolio composed of investments in public financial markets, private equity, infrastructure, natural resources, real estate and private debt." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]

"Although AlixPartners has performed a conflicts check of the Investor Conflicts Parties as set forth above, as a result of, among other things, the sheer size of the investments of the Investor Conflicts Parties, one or more of the Investor Conflicts Parties may, | prior to the Petition Date, AlixPartners was unable to further investigate any potential or actual connections between the Investor Conflicts Parties and the Debtors and the Potential Parties in Interest. To the extent any potential or actual connections are discovered after the Petition Date, if there exists a material connection, AlixPartners will promptly supplement this disclosure.

Notwithstanding the foregoing, AlixPartners' conflicts check did not and will not extend to entities owned by mutual funds in which an Investor Conflicts Party has an interest; entities owned by separate accounts managed by non-affiliates for an Investor Conflicts Party; entities owned by private equity funds in which an Investor Conflicts Party has a limited partnership interest managed by non-affiliates (even though the particular Investor Party may be represented on the limited partner advisory board or investor committee and even though the particular Investor Conflicts Party may have a passive interest in the general partner); entities where any of the Investor Conflicts Parties | independently of the Investor Conflicts Parties (as defined below), and does not share employees, officers or other management with any such Investor Conflicts Parties (as defined below). AP and each of the Investor Conflicts Parties have separate offices in separate buildings, use separate Internet email addresses, and do not otherwise share IT systems. No personnel of the Investor Conflicts Parties work on AlixPartners client matters or have access to AlixPartners client information or client files or client personnel. No AP executive or employee is a director, officer or employee of any Investor. Each Investor is governed by its own board of directors or similar body and managed by its own management team. Each Investor is independent of each other Investor." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18] | "Certain of AlixPartners' employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing may have financial accounts or insurance relationships with a potential party in interest." [Basler Declaration ¶ 33, *David's Bridal,* Docket No. 132, 11/29/18] | |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | in the ordinary course and from time to time, hold, control and/or manage loans to, or investments in, the Debtors and/or Potential Parties in Interest and/or may trade debt and/or equity securities in the Debtors and/or Potential Parties in Interest. In addition, one or more of the Investor Conflicts Parties may also have had, currently have, or may in the future have business relationships or other connections with the Debtors or other Potential Parties in Interest. To the extent AlixPartners learns of material business relationships or other material connections that are not included herein, AlixPartners will promptly file a supplemental disclosure.<br><br>Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature, and/or full scope of any business relationships or connections that the Investor Conflicts Parties may have with the Potential Parties in Interest, the Debtors and their affiliates, or these chapter 11 cases.<br><br>Further, AlixPartners may have had, currently have or may in the future have business relationships | serves as general partner or investment manager holding interests representing, directly or indirectly, 10% or less. Nor does it or will it necessarily include indirect investments, such as businesses owned or investments made by an Investor Conflicts Party's portfolio company(ies), or passive investments held or managed by any of the Investor Conflicts Parties. In addition, because of the sheer size of the investments of the Investors and their respective affiliates and subsidiaries, except as described herein, AlixPartners' conflicts check did not and it will not necessarily include any other affiliates or subsidiaries owned, directly or indirectly, by each Investor, or any investments made by such other affiliates or subsidiaries, nor will it include, to the extent applicable, any depositors of the Investors." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18]<br><br>"Despite the efforts described above to identify and disclose the connections that AP has with parties in interest in these chapter 11 cases, because the Debtors form a large enterprise with numerous creditors and | | | |

35

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | with, among other entities, portfolio companies of the Investors and portfolio companies of private equity funds in which they are limited partners, in matters unrelated to the Debtors or their affiliates in these chapter 11 cases. Based on, among other things, the business separation between each of the Investor Conflict Parties and AlixPartners, the contractual client confidentiality obligations of AlixPartners and the information barriers referred to above, AlixPartners believes that it does not hold or represent an interest adverse to the estate with respect to the engagement." [Basler Declaration ¶ 27, *David's Bridal,* Docket No. 132, 11/29/18] | other relationships, AlixPartners is unable to state with certainty that every client relationship or other connection has been identified and disclosed." [Basler Declaration ¶ 34, *David's Bridal,* Docket No. 132, 11/29/18] | | | |

| | | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **E&Y**<br><br>*In re Walter Investment Management Corp.*, Case No. 17-13446-JLG (Bankr. S.D.N.Y.)<br><br>*In re Eaglet Corporation*, Case No. 18-12439-BLS (Bankr. D. Del.)<br><br>*In re One Aviation, Corp.*, Case No. 18-12309-CSS (Bankr. D. Del.) | "EY searched or caused to be searched certain databases to determine whether it has provided in the recent past or is currently providing services to the parties listed on the October 24 List. To the extent that EY's research of relationships with the parties listed on the October 24 List indicated that EY has in the recent past, or currently has, a client relationship with such parties in interest in matters unrelated to this Chapter 11 Case, it has so indicated on Exhibit 'B-1' to this Declaration." [Haines Declaration ¶ 21, Walter Investment Management, Docket No. 119, 12/22/17] | None described. | "Despite the efforts described above to identify and disclose connections with parties in interest in this case, because the Debtor is a large enterprise with numerous creditors and other relationships, EY is unable to state with certainty that every client representation or other connection of EY with parties in interest in this case has been disclosed herein. In this regard, if EY discovers additional information that requires disclosure, EY will file appropriate supplemental disclosures with this Court." [Haines Declaration ¶ 37, *Walter Investment Management*, Docket No. 119, 12/22/17] | None described. | "EY has thousands of professional employees. It is possible that certain employees of EY may have business associations with parties in interest in this case or hold securities of the Debtor or interests in mutual funds or other investment vehicles that may own securities of the Debtor." [Haines Declaration ¶ 36, *Walter Investment Management*, Docket No. 119, 12/22/17] | Mentioned.[3] |

[3] The declarations mention Ernst & Young Global Network which provides certain administrative services to EY, including performing conflict checks. Such costs are not billed to the debtors. [Haines Declaration ¶ 25, *Walter Investment Management*, Docket No. 119, 12/22/17]

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Alvarez and Marsal North America, LLC**<br><br>*In re Aralez Pharmaceuticals US Inc.,* Case No. 18-12425-MG (Bankr. S.D.N.Y.)<br><br>*In re Synergy Pharmaceuticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.)<br><br>*In re Tintri, Inc.,* Case No. 18-11625-KJC (Bankr. D. Del.) | None specified. | None described. | None described. | "A&M's affiliate, Alvarez & Marsal Valuation Services, LLC ('A&M VS'), provides portfolio valuation services to various clients in the financial industry. A&M VS provides such services to Silver Lake Kraftwerks and/or its affiliates ('Silver Lake') solely for financial reporting purposes including a portfolio that formerly contained an interest in the Debtor. No persons providing A&M's services related to the Debtor in the Chapter 11 case are involved in such valuation services for Silver Lake and A&M VS has not been asked to perform valuation services for Silver Lake in matters related to its interest in the Debtor since the first quarter of 2017. In addition, in an abundance of caution, A&M has instituted an information barrier to ensure that confidentiality of information is protected." [Newman Declaration ¶ 4(b), *Tintri*, Docket No. 133, 8/7/17] | "In reviewing its records and the relationships of its professionals, A&M did not seek information as to whether any A&M professional or member of his/her immediate family: (a) indirectly owns, through a public mutual fund or through partnerships in which certain A&M professionals have invested but as to which such professionals have no control over or knowledge of investment decisions, securities of the Debtor or other parties in interest; or (b) has engaged in any ordinary course consumer transaction with any party in interest." [Newman Declaration ¶ 2(c) n.4, *Tintri*, Docket No. 133, 8/7/17]<br><br>"It is also noted that in the course of our review it came to A&M's attention that A&M personnel hold *de minimis* investments, representing not more than 0.01% of the equity interests in various Potential Parties in Interest, including but not limited to AT&T, Comcast, Time Warner Cable, | None mentioned. |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | | | | Verizon and Wells Fargo." [Greenberg Declaration ¶ 1(c) n.4, *Synergy*, Docket No. 243, 1/17/19] | |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>Professional | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **FTI Consulting, Inc.**<br><br>*In re Geokinetics Inc.*, Case No. 18-33410-DRJ (Bankr. S.D. Tex.)<br><br>*In re R.E. Gas Development, LLC*, Case No. 18-22032-JAD (Bankr. W.D. Pa.)<br><br>*In re Tops Holding II Corporation*, Case No. 18-22279-RDD (Bankr. S.D.N.Y.) | Reviewed database of "current and former clients." [Buenzow Declaration ¶ 2(b), *Tops*, Docket No. 111, 3/6/18]<br><br>Reviewed "present or recent former clients of FTI." [Conly Declaration ¶ 2, *R.E. Gas Development*, Docket No. 190, 6/1/18] | None described. | None described. | None described. | None described. | None mentioned. |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Goldin Associates**<br><br>*In re Real Industry, Inc.,* Case No. 17-12464-KJC (Bankr. D. Del.)<br><br>*In re Wonderwork, Inc.,* Case No. 16-13607-MKV (Bankr. S.D.N.Y.) | "Goldin's research of its relationships with Interested Parties covered the past three (3) years." [Polkowitz Declaration ¶ 17, *Real Industry*, Docket No. 193, 12/20/17] | None described. | "Goldin's review has identified certain connections that have been disclosed in connection with Goldin's Application, but such review was restricted to the individuals and entities listed in Schedule 1 and may not include all parties related to the Debtor." [Polkowitz Declaration ¶ 21(a), *Real Industry*, Docket No. 193, 12/20/17] | None described. | "Goldin and its affiliates have numerous employees, some of whom may have personal investments in the Debtors. However, no member, investor or controlling party of Goldin has any investment in the Debtors." [Polkowitz Declaration ¶ 21(e), *Real Industry*, Docket No. 193, 12/20/17] | None mentioned. |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Prime Clerk**<br><br>*In re Altegrity, Inc.,* Case No. 15-10226-LSS (Bankr. D. Del.)<br><br>*In re Nine West Holdings, Inc.,* Case No. 18-10947-CSS (Bankr. S.D.N.Y.)<br><br>*In re Orchard Acquisition Company, LLC,* Case No. 17-12914-KG (Bankr. D. Del.)<br><br>*In re Synergy Pharmaceu-ticals Inc.,* Case No. 18-14010-JLG (Bankr. S.D.N.Y.) | None specified. | "On December 7, 2017, Prime Clerk received an investment from an investment vehicle formed by Carlyle Strategic Partners IV, L.P. ('CSP IV'), an investment fund managed by Carlyle Investment Management L.L.C., each affiliates of The Carlyle Group (together with its subsidiaries, 'Carlyle'). As a result of the transaction, Prime Clerk and CSP IV are affiliates under applicable law. As of the date hereof, CSP IV is not identified on the Potential Parties in Interest list. However, the following disclosure is made out of an abundance of caution and in an effort to comply with the Bankruptcy Code and Bankruptcy Rules." [Steele Declaration ¶ 8, *Nine West*, Docket No. 205, 5/6/18]<br><br>"Carlyle is a global alternative asset manager with approximately 1,550 employees in 19 countries over six continents that manages over $170 billion in over 300 investment vehicles spanning Corporate Private Equity, Real Assets, Global Credit, and Investment Solutions. Carlyle's Corporate Private Equity funds, Real Assets funds, Global Credit funds, and Investment Solutions funds (collectively, the 'Funds') | "Prime Clerk has searched the names of the Debtors and the names of the potential parties in interest against the: (i) the names of the CSP funds, (ii) the names of Carlyle's other Global Credit funds, and (iii) the names of the Corporate Private Equity funds. Prime Clerk also has searched the names of the Debtors against the publicly-known investments of the Corporate Private Equity funds as set forth in the list most recently provided to Prime Clerk by Carlyle's internal compliance department ('Carlyle Compliance'). The conflicts search does not include the names of the Real Assets funds, the Investment Solutions funds or any of their or the other Global Credit funds' investments, nor does it include any portfolio companies of any of the Funds (other than those of CSP and the Corporate Private Equity funds as described above)." [Steele Declaration ¶ 11, *Nine West*, Docket No. 205, 5/6/18]<br><br>"Because of any applicable securities laws and the fact that Prime Clerk and Carlyle operate independently, prior to the | "Prime Clerk has a policy prohibiting its partners and employees from using confidential information that may come to their attention in the course of their work. In this regard, all Prime Clerk partners and employees are barred from trading in securities with respect to which they possess confidential information." [Schrag Declaration ¶ 12, *Altegrity*, Docket No. 132, 2/27/15]<br><br>"Designees of CSP IV are members of the Board of Managers of Prime Clerk's ultimate parent company ('Parent Board Designees'), Prime Clerk Holdings LLC ('HoldCo'). HoldCo wholly owns Prime Clerk MidCo Holding LLC ('MidCo'), which wholly owns Prime Clerk. No Carlyle designees are Board members of MidCo or Prime Clerk. Further, Prime Clerk and CSP IV have the following restrictions in place (collectively, the 'Barrier'): (i) prior to the Debtors commencing these cases, Prime Clerk did not share the names or any other | "From time to time, Prime Clerk partners or employees personally invest in mutual funds, retirement funds, private equity funds, venture capital funds, hedge funds and other types of investment funds (the 'Investment Funds'), through which such individuals indirectly acquire a debt or equity security of many companies, one of which may be one of the Debtors or their affiliates, often without Prime Clerk's or its personnel's knowledge. Each Prime Clerk partner or employee generally owns substantially less than one percent of such Investment Fund, does not manage or otherwise control such Investment Fund and has no influence over the Investment Fund's decision to buy, sell or vote any particular security. The Investment Fund is generally operated as a blind pool, meaning that when the Prime Clerk partners or employees make an investment in the Investment Fund, he, she or they do not know what securities the blind pool Investment Fund will purchase or sell, and have no | None mentioned. |

| | | CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | |
|---|---|---|---|---|---|---|
| **A** <br><br><br><br> **Professional** | **B** <br><br><br><br> **Look-back period** | **C** <br><br> **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** <br><br> **Explanation of limits on conflict of interest check and disclosure** | **E** <br><br> **Description of information screen and other protective measures** | **F** <br><br> **Employee personal investment disclosures, if any** | **G** <br> **Are international affiliates included with connections?** |
| | | are managed independently from each other, and Carlyle maintains an internal information barrier between its Global Credit funds and the rest of the Carlyle funds. CSP IV, Carlyle Strategic Partners II, L.P. and Carlyle Strategic Partners III, L.P. (collectively, 'CSP') are Global Credit funds that each are owned by a diverse group of limited partners, which exert no control over CSP's investment decisions, and a general partner affiliated with Carlyle.  All CSP investment professionals involved with Prime Clerk are dedicated solely to CSP and are not involved in the Corporate Private Equity, Real Assets, or Investment Solutions businesses, although, from time to time, one or more CSP investment professionals may sit on the investment committee of another Global Credit fund. CSP operates autonomously from and makes independent investment decisions from the other Global Credit funds, the Corporate Private Equity funds, the Real Assets funds, and the Investment Solutions funds." [Steele Declaration ¶ 9, *Nine West*, Docket No. 205, 5/6/18]<br><br><br>"Based on, among other things, | Petition Date, Prime Clerk was unable to further investigate with Carlyle Compliance, to the extent necessary, any potential or actual connection between any of CSP, the other Global Credit funds, and the Corporate Private Equity funds, and the Debtors and the potential parties in interest.  In addition, after the Petition Date, Prime Clerk has requested Carlyle Compliance to search the names of the Debtors against CSP's respective investments.  To the extent Prime Clerk learns of any material connections involving such entities and/or such investments with the Debtors, Prime Clerk will promptly file a supplemental disclosure." [Steele Declaration ¶ 11, *Nine West*, Docket No. 205, 5/6/18] | information identifying the Debtors with the Parent Board Designees; (ii) Prime Clerk has not and will not furnish any material nonpublic information about the Debtors to CSP, the Parent Board Designees or any Carlyle entity; (ii) no CSP personnel nor any other Carlyle personnel work on Prime Clerk client matters or have access to Prime Clerk client information, client files or client personnel; (iii) no CSP personnel nor any other Carlyle personnel work in Prime Clerk's offices; (iv) other than the Parent Board Designees, Prime Clerk operates independently from Carlyle, including that it does not share any employees, officers or other management with Carlyle, has separate offices in separate buildings, and has separate IT systems; and (v) no Prime Clerk executive or employee is a director, officer or employee of Carlyle (or vice versa other than the Parent Board Designees)."  [Steele Declaration ¶ 10, *Nine West*, Docket No. 205, 5/6/18] | control over such purchases or sales." [Steele Declaration ¶ 19, *Nine West*, Docket No. 205, 5/6/18; Steele Declaration ¶ 19, *Synergy Pharmaceuticals*, Docket No. 131, 12/28/18]<br><br>"From time to time, Prime Clerk partners or employees may personally directly acquire a debt or equity security of a company which may be one of the Debtors or their affiliates." [Steele Declaration ¶ 20, *Nine West*, Docket No. 205, 5/6/18] | |

| CONSULTING FIRMS & OTHER BANKRUPTCY PROFESSIONALS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | the business separation between Prime Clerk and Carlyle and in light of the administrative nature of the services proposed to be performed by Prime Clerk for the Debtors, Prime Clerk believes that it does not hold or represent an interest adverse to the Debtors with respect to its engagement." [Steele Declaration ¶ 14, *Nine West*, Docket No. 205, 5/6/18] | | "Further, Carlyle maintains an internal information barrier between its Global Credit funds and the rest of the Carlyle funds. Accordingly, the conflicts search does not include the names of the Real Assets funds, the Investment Solutions funds or any of their or the other Global Credit funds' investments, nor does it include any portfolio companies of any of the Funds (other than those of CSP and the Corporate Private Equity funds as described above)." [Steele Declaration ¶ 11, *Synergy Pharmaceuticals*, Docket No. 131, 12/28/18] | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br>**Professional** | **B**<br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Rothschild Inc.**<br><br>*In re Cenveo, Inc.*, Case No. 18-22178-RDD (Bankr. S.D.N.Y.)<br><br>*In re GenOn Energy, Inc.*, Case No. 17-33695-DRJ (Bankr. S.D. Tex.)<br><br>*In re Terravia Holdings, Inc.*, Case No. 17-11655-CSS (Bankr. D. Del.) | None specified. | "Rothschild is an indirect subsidiary of Rothschild & Co. ('Holdings'), a foreign holding company. Through Holdings, Rothschild has affiliate relationships with numerous direct and indirect affiliates of Holdings located worldwide that engage in investment banking, asset management, debt fund management (including collateralized loan obligation management), private equity, merchant banking, and other financial service and investment advisory businesses (collectively, the 'Affiliated Entities'). However, none of the Affiliated Entities are being retained in connection with this engagement, and none of the professionals or employees of the Affiliated Entities will provide services to the Debtors in connection with this engagement." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | "As Rothschild is the only entity being retained by the Debtors (of entities affiliated with Rothschild), we have researched only the electronic client databases of Rothschild, not of all its affiliates, to determine if Rothschild has connections with any Potential Parties in Interest, and Rothschild makes no representation as to the disinterestedness of its affiliates or their respective professionals or employees in respect of the Debtors' chapter 11 cases." [Snyder Declaration ¶ 20, *GenOn*, Docket No. 122, 6/23/17]<br><br>"One or more of the Affiliated Entities may in the ordinary course from time to time hold or manage funds that hold investment positions in the Debtors and/or parties in interest in these chapter 11 cases; however, based on the business separation and compliance information barriers referred to above, the Affiliated Entities' business activities do not constitute a conflict of interest that would disqualify Rothschild from providing the services as described in the Engagement Letter." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | "Rothschild's business is and will continue to be operated in a legal entity separate from the Affiliated Entities. Rothschild and the Affiliated Entities maintain strict compliance information barriers to ensure that (i) no information will be provided to the Affiliated Entities, and (ii) none of the professionals or employees of the Affiliated Entities will disclose any confidential or non-public information concerning any investment position or intention to the team working on these cases. Thus, there has not been and will not be any flow of information between the professionals or employees of Rothschild providing services to the Debtors in connection with this engagement and the Affiliated Entities with respect to any matter pertaining to the Debtors or these chapter 11 cases." [Snyder Declaration ¶ 26(d), *GenOn*, Docket No. 122, 6/23/17] | Not addressed. | Mentioned, but no disclosures made. See explanation in columns C&D. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| Moelis & Company LLC<br><br>*In re iHeartMedia, Inc.,* Case No. 18-31274-MI (Bankr. S.D. Tex.)<br><br>*In re Global A&T Electronics Ltd.,* Case No. 17-23931-RDD (Bankr. S.D.N.Y.)<br><br>*In re Cumulus Media Inc.,* Case No. 17-13381-SCC (Bankr. S.D.N.Y.) | "To the extent that I have been able to ascertain to date that Moelis has been engaged within the last two years or is currently engaged by any of the Potential Parties in Interest (or their affiliates, as the case may be) in matters unrelated to these cases, such facts are disclosed on Schedule 2 attached hereto. Schedule 2 also sets forth certain other relationships Moelis has with certain Potential Parties in Interest." [Keil Declaration ¶ 27, *iHeartMedia,* Docket No. 266, 3/22/18] | "Moelis Asset Management has a separate private equity business ('Moelis Capital Partners'), which holds investment positions in various entities, some of which may be parties in interest in these chapter 11 cases. To the best of my knowledge, Moelis Capital Partners does not hold any investment positions that constitute a conflict of interest that would disqualify Moelis from providing services described in the Engagement Letter. The Moelis professionals providing services to the Debtors will not share confidential or otherwise non-public information they receive in the course of this engagement with Moelis Capital Partners." [Keil Declaration ¶ 31, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management also has an economic interest in NexPhase Fund III, a private equity fund managed by NexPhase Capital LP ('NexPhase Capital'), a private equity manager formed by the former Managing Partners of Moelis Capital Partners. NexPhase Capital LLC and NexPhase Fund III Capital are not affiliates of Moelis. NexPhase Capital is owned and controlled by its | "Given the large number of parties in interest in these chapter 11 cases, despite the efforts described above to identify and disclose Moelis' relationships with parties in interest in these chapter 11 cases, Moelis is unable to state with certainty that every client relationship or other connection has been disclosed. In particular, among other things, Moelis may have relationships with persons who are beneficial owners of parties in interest and persons whose beneficial owners include parties in interest or persons who otherwise have relationships with parties in interest. Moreover, Moelis' employees may have relationships with Potential Parties in Interest, persons that may become parties in interest in these cases, and/or persons that have business relationships with the Debtors, are competitors of the Debtors, or that are customers of the Debtors." [*See also* Keil Declaration ¶ 28, *iHeartMedia,* Docket No. 266, 3/22/18] | "Moelis Asset Management is operated separately from the public company Moelis & Company and its subsidiaries, including Moelis. The executive officers of Moelis & Company are different from the executive officers of Moelis Asset Management." [Keil Declaration ¶ 30, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>See column C for protective measures for the Gracie Credit, Freeport, and Steele Creek affiliates. [Keil Declaration ¶¶ 33, 34 and 35, *iHeartMedia,* Docket No. 266, 3/22/18] | "To the best of my knowledge, information, and belief, some of Moelis' present and future employees may have, or may in the future have, personal investments in funds, or other investment vehicles, over whose investment decisions such employees have no input or control. Such entities may have made, or may in the future make, investments in the claims or securities of the Debtors, or those of their creditors, or other parties in interest in these chapter 11 cases." [Keil Declaration ¶ 36, *iHeartMedia,* Docket No. 266, 3/22/18] | None mentioned. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | | | | | |
| | | investment management team. Moelis, Moelis Asset Management and Kenneth Moelis do not have control or influence or participate in the investment decisions of NexPhase Capital. Moelis Asset Management is entitled to 25% of the carried interest of NexPhase Fund III. In addition, Moelis Asset Management and Kenneth Moelis own up to $7.5 million and $7.5 million, respectively, of limited partnership interests in NexPhase Fund III. NexPhase Fund III holds investment positions in various entities, some of which may be parties in interest in these chapter 11 cases." [Keil Declaration ¶ 32, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a separate credit focused investment management business ('Gracie Credit'). Gracie Credit is operated as a separate business from Moelis, and Gracie Credit will continue to be operated in separate legal and operating entities from Moelis. Gracie Credit employees will not work on these cases and Moelis employees working on these cases will not have any involvement in Gracie Credit's investment decisions. Moelis and Gracie Credit maintain strict | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | compliance information barriers between Moelis on the one hand and Gracie Credit on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these cases to any Gracie Credit employee; and (b) no Gracie Credit employee will disclose any non-public information concerning a Gracie Credit position or Gracie Credit's intention with respect to any consent, waiver, tender, or vote decision to any Moelis employee. Moelis and Gracie Credit currently have separate offices with access to the other's offices physically restricted and use the separate Internet email addresses (@moelis.com and @graciecap.com, respectively). Gracie Credit may in the ordinary course from time to time hold investment positions in the Debtors and parties in interest in these cases." [Keil Declaration ¶ 33, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a separate direct lending business, Freeport Financial Group ('Freeport'). Freeport is operated as a separate business from Moelis, and Freeport will continue to be operated in separate legal | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | and operating entities from Moelis. Freeport employees will not be working on these chapter 11 cases and Moelis employees working on these chapter 11 cases will not have any involvement in Freeport's investment decisions. Moelis and Freeport maintain strict compliance information barriers between Moelis on the one hand and Freeport on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these chapter 11 cases to any Freeport employee and (b) no Freeport employee will disclose any non-public information concerning a Freeport position or Freeport's intention with respect to any consent, waiver, tender, or vote decision to any Moelis employee. Moelis and Freeport both currently have offices in Chicago in the same building with access to each other's offices restricted. The Moelis team on these chapter 11 cases is not located in the Chicago office. Moelis and Freeport also currently use separate Internet email addresses (@moelis.com and @freeportfinancial.com, respectively). Freeport may in the ordinary course from time to time hold investment positions in the | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | Debtors and parties in interest in these cases." [Keil Declaration ¶ 34, *iHeartMedia,* Docket No. 266, 3/22/18]<br><br>"Moelis Asset Management has a business of managing collateralized loan obligations through a subsidiary Steele Creek Investment Management LLC ('Steele Creek'). Steele Creek is operated as a separate business from Moelis, and Steele Creek will continue to be operated in separate legal and operating entities from Moelis. Steele Creek employees will not be working on these chapter 11 cases and Moelis employees working on these chapter 11 cases will not have any involvement in Steele Creek's investment decisions. Moelis and Steele Creek maintain strict compliance information barriers between Moelis on the one hand and Steele Creek on the other hand to ensure that: (a) no Moelis employee will disclose any non-public information concerning the Debtors or these chapter 11 cases to any Steele Creek employee and (b) no Steele Creek employee will disclose any non-public information concerning a Steele Creek position or Steele Creek's intention with respect to any consent, waiver, tender or vote | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A** **Professional** | **B** **Look-back period** | **C** **Format and scope of affiliate investment activity and extent of disclosure, if any** | **D** **Explanation of limits on conflict of interest check and disclosure** | **E** **Description of information screen and other protective measures** | **F** **Employee personal investment disclosures, if any** | **G** **Are international affiliates included with connections?** |
| | | decision to any Moelis employee. Moelis and Steele Creek currently have separate offices. Moelis and Steele Creek also currently use separate Internet email addresses (@moelis.com and @freeportfinancial.com, respectively). Steele Creek may in the ordinary course from time to time hold investment positions in the Debtors and parties in interest in these cases." [Keil Declaration ¶ 35, *iHeartMedia*, Docket No. 266, 3/22/18] | | | | |

| | | | **INVESTMENT BANKS** | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Lazard Frères & Co. LLC**<br><br>*In re Sears Holding Corporation*, Case No. 18-23528-RDD (Bankr. S.D.N.Y.)<br><br>*In re Beauty Brands, LLC*, Case No. 19-10031-CSS (Bankr. D. Del.)<br><br>*In re Nine West Holdings Inc.*, Case No. 10947-SCC (Bankr. S.D.N.Y.) | "Lazard then compared the names of the Potential Parties in Interest with the names of entities that have entered into engagement agreements with Lazard in the last three years."  [Aebersold Declaration ¶ 5, *Sears*, Docket No. 345, 10/26/18] | "Lazard also has asset management affiliates, Lazard Asset Management LLC ('LAM') and Lazard Frères Gestion SAS ('LFG'), and an affiliate, Edgewater HoldCo LLC, that hold interests in the management companies for certain private funds (collectively, 'Edgewater'). Although Lazard receives payments from LAM, LFG, and Edgewater generated by their respective business operations, each of LAM, LFG, and Edgewater is operated as a separate and distinct affiliate and is separated from Lazard's other businesses.  As part of their regular business operations, LAM and LFG may act as investment advisor for or trade securities (including in discretionary client accounts, and through the operation of hedge funds and mutual funds, in which cases investment decisions are made by LAM or LFG), including on behalf of creditors, equity holders or other parties in interest in these cases, and Lazard or its respective affiliates, managing directors and employees. Some of these LAM or LFG accounts and funds may have held, may now hold or may in the future hold debt or equity securities of the Debtors or the Debtors' creditors, equity holders, | "Lazard is a U.S. operating subsidiary of an international investment banking, financial advisory, and asset management firm and thus has legally separate and distinct affiliates. Although it is possible that employees of certain affiliates may assist Lazard in connection with Lazard's engagement, as only Lazard is being retained in these chapter 11 cases, we have researched only the electronic client files and records of Lazard, not of all of its affiliates, to determine connections with any Potential Parties in Interest." [Aebersold Declaration ¶ 7, *Sears*, Docket No. 345, 10/26/18] | "Lazard has in place compliance procedures to ensure that no confidential or nonpublic information concerning the Debtors has been or will be available to employees of LAM, LFG, or Edgewater." [Aebersold Declaration ¶ 9, *Sears*, Docket No. 345, 10/26/18]<br><br>See column C for additional disclosures regarding LAM, LFG and Edgewater. | "In addition, as of the date hereof, Lazard and its affiliates have approximately 2,800 employees worldwide. It is possible that certain of Lazard's and its affiliates' respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (a) the Debtors, (b) Potential Parties in Interest, or (c) funds or other investment vehicles that may own debt or securities of the Debtors or Potential Parties in Interest." [Aebersold Declaration ¶ 8, *Sears*, Docket No. 345, 10/26/18] | Mentioned, but no disclosures made.  See column D. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| | | **Format and scope of affiliate investment activity and extent of disclosure, if any** | **Explanation of limits on conflict of interest check and disclosure** | **Description of information screen and other protective measures** | **Employee personal investment disclosures, if any** | **Are international affiliates included with connections?** |
| **Professional** | **Look-back period** | | | | | |
| | | or other parties in interest in these cases, and LAM or LFG may have relationships with such parties. Furthermore, some of the investment funds managed by Edgewater may have held, may now hold or may in the future hold debt or equity securities of the Debtors or the Debtors' creditors, equity holders, or other parties in interest in these cases. Additionally, the Debtors, their creditors, equity holders, or other parties in interest in these cases, and Lazard or its affiliates, managing directors, and employees, may be investors in investment funds that are managed by Edgewater. Lazard has in place compliance procedures to ensure that no confidential or nonpublic information concerning the Debtors has been or will be available to employees of LAM, LFG, or Edgewater." [Aebersold Declaration ¶ 9, *Sears*, Docket No. 345, 10/26/18] | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| **Guggenheim Securities, LLC**<br><br>*In re Limited Stores Company, LLC*, Case No. 17-10124-KJC (Bankr. D. Del.)<br><br>*In re Appvion, Inc.*, Case No. 17-12082-KJC (Bankr. D. Del.)<br><br>*In re Mattress Firm,* Inc., Case No. 18-12241-CSS (Bankr. D. Del.) | "To the extent that this inquiry has revealed that certain Potential Parties in Interest were current or former investment banking clients of Guggenheim Securities within the past three years, these parties have been identified on a list (the 'Client Match List') attached hereto as Schedule 2." [Savini Declaration ¶ 7, *Limited Stores*, Docket No. 126, 1/26/17] | "As noted above, Guggenheim Securities is part of a global financial services firm which provides a broad range of services to its clients. Guggenheim Securities' financial advisory and investment banking services are provided primarily through its investment banking department (the 'Investment Banking Department')." [Savini Declaration ¶ 10, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Additionally, certain affiliated and related entities of Guggenheim Securities (the 'Investment Advisor Affiliates') serve as managers for a number of funds and other investment vehicles (the 'Managed Funds'). The Managed Funds are intended principally for investments by third parties unrelated to Guggenheim Securities. However, such investors may also include financial institutions (some of which may be parties in interest in these cases), or affiliated and related entities of Guggenheim Securities and various of its directors, officers and employees (some of which may include Guggenheim Securities' employees providing services in connection with these cases). Guggenheim Securities' | "The Debtors have numerous creditors and relationships with various individuals and entities that may be parties in interest in these cases. Consequently, although every reasonable effort has been made to identify such connections, including the efforts outlined above, Guggenheim Securities is unable to state with certainty whether any of its clients or an affiliated entity of a client holds a claim or otherwise is a party in interest in these cases. Additionally, Guggenheim Securities may be involved in litigation from time to time that may, or may in the future, involve entities that may be parties in interest in these cases. If Guggenheim Securities discovers any information that is contrary to or pertinent to the statements made herein, Guggenheim Securities will promptly disclose such information to the Court. Also, as noted above, Guggenheim Securities is part of a global financial services firm and thus has several legally separate and distinct foreign and domestic affiliated and related entities. Although employees of certain affiliated and related entities may sometimes assist Guggenheim Securities in | "Information barriers exist between Guggenheim Securities' Investment Banking Department and the remainder of Guggenheim Securities (including the fixed income and equity departments of Guggenheim Securities, the 'Sales and Trading Department'), Guggenheim Partners and its affiliates. These information barriers include physical and technological barriers, compliance and surveillance mechanisms and policies and procedures designed to prevent confidential information from being shared improperly." [Savini Declaration ¶ 10, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>'Guggenheim Securities' employees providing services in connection with these cases have no control over investment decisions or business decisions made for the Managed Funds." [Savini Declaration ¶ 14, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"In order to comply with | "As of the date hereof, Guggenheim Securities and its affiliated and related entities have approximately 2,500 employees worldwide. It is possible that certain of Guggenheim Securities' and its affiliated and related entities' respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) Potential Parties in Interest, or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest. To the best of my knowledge, and except as otherwise disclosed herein, Guggenheim Securities' professionals that will be responsible for this engagement do not have any material business associations with, or hold any material interests in or adverse to, the Debtors or Potential Parties in Interest in these cases. Such professionals, however, may personally own and/or continue to own securities or other interests or investments in various of the Potential Parties in Interest (all | Mentioned, but no disclosures made. See column D. |

| | | | | INVESTMENT BANKS | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | | | | | |
| | | employees providing services in connection with these cases have no control over investment decisions or business decisions made for the Managed Funds." [Savini Declaration ¶ 14, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Among other things, the Managed Funds are (i) active investors in a number of portfolio companies (the 'Equity Investment') and (ii) investors in a variety of debt instruments and mezzanine loans or similar securities (the 'Debt Investments' and together with the Equity Investments, the 'Fund Investments')[.]" [Savini Declaration ¶ 14(a), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"The Guggenheim Partners portfolio managers with fund management responsibilities for the Managed Funds maintain investment discretion and control over investment decisions with respect to the Fund Investments unless such investment discretion is outsourced to a third-party fund manager unrelated to Guggenheim Partners. Many financial institutions and parties in interest who may be involved in these cases may also be investors in the Managed Funds. Moreover the | connection with a restructuring engagement, as Guggenheim Securities is the only entity being retained in these cases, the Client Match List described in Paragraph 7 above reflects solely such Potential Parties in Interest that are or were current or former investment banking clients of Guggenheim Securities, and not of all of its affiliated and related entities." [Savini Declaration ¶ 18, *Limited Stores*, Docket No. 126, 1/26/17] | securities laws, and to avoid any appearance of impropriety, the employees of the Managed Funds are strictly separated from the employees of Guggenheim Securities, including Guggenheim Securities' professionals expected to provide services to the Debtors, by an information barrier, as described in Paragraph 10 above." [Savini Declaration ¶ 14(b), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities, however, will not hold any securities or other instruments of the Debtors on behalf of itself or its affiliated and related entities during the pendency of these cases. Moreover, any Guggenheim Securities Sales and Trading Department operations are separated from Guggenheim Securities' Investment Banking Department (including the investment banking professionals working on these cases) by an information barrier." [Savini Declaration ¶ 15, *Limited Stores*, Docket No. | unrelated to the Debtors and these cases)." [Savini Declaration ¶ 11, *Limited Stores*, Docket No. 126, 1/26/17] | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br><br>Description of information screen and other protective measures | F<br><br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | Managed Funds may invest from time to time in Fund Investments of or relating to the Debtors or parties in interest in these cases." [Savini Declaration ¶ 14(b), *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"In addition, as part of their regular business operations, Guggenheim Securities and its affiliated and related entities may trade securities and other instruments of the Debtors and/or the Potential Parties in Interest on behalf of third parties (some of whom may be parties in interest in these cases) or on their own behalf, including, without limitation, through Guggenheim Securities' Sales and Trading Department." [Savini Declaration ¶ 15, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities also has an affiliate that provides funding solutions for financial institutions as the manager of a series of debt programs (the 'Institutional Finance Group'). Many financial institutions and parties in interest who may be involved in these cases may also be clients of the Institutional Finance Group and/or investors in one or more of the Institutional Finance Group's debt | | 126, 1/26/17]<br><br>"In order to comply with securities laws, and to avoid any appearance of impropriety, the employees of the Institutional Finance Group and the Insurance Company Affiliates are strictly separated from the employees of Guggenheim Securities, including Guggenheim Securities' professionals expected to provide services to the Debtors, by an information barrier, as described in Paragraph 10 above." [Savini Declaration ¶ 16, Limited Stores, Docket No. 126, 1/26/17]<br><br>"Consistent with applicable legal and regulatory requirements, Guggenheim Securities has adopted policies, procedures, and information barriers to maintain the independence of the Equity Research Department's personnel." [Savini Declaration ¶ 17, *Limited Stores*, Docket No. 126, 1/26/17] | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br>Description of information screen and other protective measures | **F**<br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | programs. Additionally, certain affiliated and related entities of Guggenheim Securities are insurance companies that may invest in securities or other financial instruments for their own account (the 'Insurance Company Affiliates'). The Insurance Company Affiliates may also retain the services of investment advisors to manage their investment portfolios, which may then invest on behalf of the relevant Insurance Company Affiliate for its account. Such investments may from time to time include securities or other financial instruments of or relating to the Debtors or Potential Parties in Interest." [Savini Declaration ¶ 16, *Limited Stores*, Docket No. 126, 1/26/17]<br><br>"Guggenheim Securities also has a research department that publishes equity research (the 'Equity Research Department'). During the course of these cases, Guggenheim Securities' research analysts may hold views, make statements or investment recommendations, or publish research reports with respect to the Debtors or other Potential Parties in Interest. Such views may or may not differ from the views of Guggenheim Securities' | | | | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | Investment Banking Department personnel." [Savini Declaration ¶ 17, *Limited Stores*, Docket No. 126, 1/26/17] | | | | |

| | | | INVESTMENT BANKS | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **PJT Partners LP**<br><br>*In re VER Technologies Holdco LLC*, Case No. 18-10834-KG (Bankr. D. Del.)<br><br>*In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (Bankr. D. Del.)<br><br>*In re Ascent Resources Marcellus Holdings LLC*, Case No. 18-10265-LSS (Bankr. D. Del.) | None specified. | As part of the conflict results, PJT discloses connections of certain affiliates, but does not describe the investment activities of its affiliates.[Flanagan Declaration ¶ 5, *VER Technologies*, Docket No. 148, 4/27/18] | "Given the large number of parties in interest in these chapter 11 cases, despite the efforts to identify and disclose PJT's relationships with the Parties-In-Interest, I am unable to state with absolute certainty that every client relationship or other connection has been disclosed in this Declaration. PJT, therefore, has informed the Debtors that PJT will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, PJT will promptly file a supplemental declaration with the Court as required by Local Bankruptcy Rule 2014-1(a)." [Leone Declaration ¶ 22, *VER Technologies*, Docket No. 148, 4/27/18] | None described. | "Partners and/or employees of PJT or its affiliates may, from time to time, directly or indirectly hold equity and/or debt in certain of the [Parties-In-Interest]. However, to the best of my knowledge, none of PJT, its affiliates or any partner or employee of PJT or its affiliates currently holds any direct or indirect interest in any debt or equity securities of the Debtors." [Flanagan Declaration ¶ 6, *VER Technologies*, Docket No. 148, 4/27/18] | None mentioned. |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br>Professional | B<br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| Evercore Group L.L.C.<br><br>*In re Southeastern Grocers, LLC,* Case No. 18-10700-MWF (Bankr. D. Del.)<br><br>*In re New Mach Gen, LLC,* Case No. 18-11368-MWF (Bankr. D. Del.)<br><br>*In re Enduro Resource Partners LLC,* Case No. 18-11174-KG (Bankr. D. Del.) | None specified. | "Evercore also operates an Institutional Equities ('IE') business. As part of its regular business operations as an introducing broker, IE is engaged in sales, trading and research activities with its institutional clients, some of which may be creditors, equity holders or other parties-in-interest in these cases. Some of these IE clients may now or in the future hold debt or equity securities of the Debtors or other parties-in-interest in these cases. There is an information barrier in place between the investment bank and IE. Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of IE." [Goldstein Declaration ¶ 30(d), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"Evercore has two U.S. affiliates that are in the asset management business: Evercore Wealth Management, LLC ('EWM') and Evercore Trust Company, N.A. ('ETC'). As part of its regular business operations, EWM, a registered investment adviser with the U.S. Securities and Exchange Commission, acts as an investment advisor (whether on a | None described. | "There is an information barrier in place between the investment bank and IE. Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of IE." [Goldstein Declaration ¶ 30(d), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"There is an information barrier in place between Evercore, on the one hand, and EWM and ETC, on the other, and Evercore has in place compliance procedures to ensure that no confidential or non-public information concerning the Debtors has or will be available to employees of EWM and ETC. Evercore's parent company also invests, directly or indirectly, in securities issued by various companies, which may include creditors, equity holders or other parties-in-interest in these cases; however, the parent company does not hold any equity or debt securities issued by the Debtors or | "Certain professionals employed by Evercore may have mortgages, consumer loans, investment, brokerage accounts, or other banking, brokerage, or other customer relationships with institutions that are creditors, equity holders or other parties-in-interest in these chapter 11 cases or with funds sponsored by or affiliated with such parties. Evercore does not believe that these relationships create a conflict of interest regarding the Debtors or their chapter 11 cases." [Goldstein Declaration ¶ 30(g), *Southeastern Grocers,* Docket 179, 1/26/17]<br><br>"Certain professionals employed by Evercore may hold, directly or indirectly, debt or equity securities issued by, or other economic interests in, creditors, equity holders or other parties-in-interest in these chapter 11 cases. To the best of my knowledge, (i) none of these professionals' holdings would be considered material from the perspective of the issuers of | None mentioned. |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>Professional | **B**<br><br><br><br>Look-back period | **C**<br><br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | **D**<br><br><br>Explanation of limits on conflict of interest check and disclosure | **E**<br><br><br>Description of information screen and other protective measures | **F**<br><br><br>Employee personal investment disclosures, if any | **G**<br>Are international affiliates included with connections? |
| | | discretionary or non-discretionary basis) for its clients, and ETC, a national trust bank limited to fiduciary activities, acts as an independent fiduciary, trustee or custodian for its clients. In both cases, such clients may be creditors, equity holders or other parties-in-interest in these cases. Some of these client accounts may now or in the future hold debt or equity securities of the Debtors or other parties-in-interest in these cases." [Goldstein Declaration ¶ 30(e), *Southeastern Grocers,* Docket No. 179, 1/26/17]<br><br>"(Evercore also has several affiliated private equity funds (the 'Funds'). The Funds invest, directly or indirectly, in securities issued by various companies, which may include creditors, equity holders or other parties-in-interest in these cases; however, the Funds do not hold any equity or debt securities issued by the Debtors or their affiliates, nor will they acquire any such securities while Evercore remains employed by the Debtors. Certain institutional investors that are limited partners in the Funds also may be creditors, equity holders or other parties-in-interest in these chapter 11 cases. In addition, the Funds may be co-investors with | | their affiliates, nor will it acquire any such securities while Evercore remains employed by the Debtors." [Goldstein Declaration ¶ 30(e), *Southeastern Grocers,* Docket No. 179, 1/26/17] | such securities, and (ii) as described in more detail in Exhibit 2 hereto, no professional employed by Evercore holds a material interest in debt or equity securities issued by the Debtors." [Goldstein Declaration ¶ 30(h), *Southeastern Grocers,* Docket No. 179, 1/26/17] | |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br><br>**Professional** | **B**<br><br><br><br>**Look-back period** | **C**<br><br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br><br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br><br>**Description of information screen and other protective measures** | **F**<br><br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| | | interested parties in these cases in certain investments." [Goldstein Declaration ¶ 30(f), *Southeastern Grocers,* Docket No. 179, 1/26/17] | | | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| **A**<br><br><br>**Professional** | **B**<br><br><br>**Look-back period** | **C**<br>**Format and scope of affiliate investment activity and extent of disclosure, if any** | **D**<br>**Explanation of limits on conflict of interest check and disclosure** | **E**<br>**Description of information screen and other protective measures** | **F**<br>**Employee personal investment disclosures, if any** | **G**<br>**Are international affiliates included with connections?** |
| **Jefferies LLC**<br><br>*In re Forbes Energy Services Ltd.,* Case No. 17-20023-DRJ (Bankr. S.D. Tex.)<br><br>*In re Goodman Networks Incorporated,* Case No. 17-31575-MI (Bankr. S.D. Tex.)<br><br>*In re Gibson Brands, Inc.,* Case No. 18-11025-CSS (Bankr. D. Del.) | "To the extent that this inquiry has revealed that certain Potential Parties in Interest were current or former investment banking clients of Jefferies within the past three years, these parties have been identified on Schedule 2 hereto (the 'Client Match List')." [White Declaration ¶ 10, *Forbes Energy Services,* Docket No. 106, 2/3/17] | "Certain affiliates of Jefferies serve as managers for a number of investment vehicles (collectively, the 'Managed Funds'). The Managed Funds are principally intended for investments by third parties unrelated to Jefferies. Such investors may, however, also include financial institutions (some of which may be parties in interest in these chapter 11 cases), affiliates of Jefferies, or their respective officers and employees (some of whom may be Jefferies' employees providing services in connection with these chapter 11 cases). Jefferies' employees working in connection with these chapter 11 cases have no control over or involvement in investment decisions made by the Managed Funds. With respect to the Managed Funds, Jefferies makes the following additional disclosures: (a) Among other things, the Managed Funds are (i) active direct investors in a number of portfolio companies (the 'Equity Investments') and (ii) investors in a variety of debt instruments and mezzanine loans or similar securities (the 'Income Investments' and, together with the Equity Investments, the 'Portfolio Holdings'); and (b) The fund managers of the Managed Funds maintain control over | "Jefferies is a global investment banking firm with broad activities covering, in addition to its investment banking and financial advisory practice, trading in equities, convertible securities, and corporate bonds. With more than 80,000 customer accounts and thousands of relationships and transactions around the world, it is possible that one or more of Jefferies' clients or a counterparty to a securities transaction may hold a claim or interest or otherwise be Potential Parties in Interest in these chapter 11 cases and that Jefferies and/or its affiliates may have other business relationships and/or connections with such Potential Parties in Interest. Further, as a major market maker in equity securities as well as a major trader of corporate bonds and convertible securities, including those of creditors or parties in interest in these chapter 11 cases, Jefferies regularly enters into securities transactions with other registered broker-dealers as a part of its daily activities. Some of these counterparties may be creditors, equity holders or other parties in interest in these cases. Jefferies believes that none of these business relationships | "The fund managers of the Managed Funds maintain control over investment decisions with respect to the Portfolio Holdings. Many financial institutions and parties in interest who may be involved in these chapter 11 cases may also be investors in the Managed Funds. Moreover, the Managed Funds may invest from time to time in Portfolio Holdings relating to the Debtors or the Potential Parties in Interest. In order to comply with securities laws and to avoid any appearance of impropriety, the employees of the Managed Funds are strictly separated from the employees of Jefferies. Jefferies maintains a strict separation between its employees assigned to these chapter 11 cases and employees involved in the management of Jefferies' investment banking division, on the one hand, and other employees of Jefferies (e.g., sales and trading employees) and its affiliates (including the employees of the Managed Funds), on the other hand. This separation is maintained through the use | "In addition, as of the date hereof, Jefferies and its affiliates have thousands of employees worldwide. It is possible that certain of Jefferies' and its affiliates' respective directors, officers and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) the Potential Parties in Interest and/or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest. Furthermore, in addition to the Potential Parties in Interest, Jefferies may also represent, or may have represented, affiliates, equity holders and/or sponsors of the Potential Parties in Interest. Certain of the Potential Parties in Interest may also be vendors or insurers of Jefferies and/or have other non-investment banking relationships with Jefferies." [White Declaration ¶ 13, *Forbes Energy Services,* Docket No. 106, 2/3/17] | Mentioned, but no disclosures made. See column D. |

| | | INVESTMENT BANKS | | | | |
|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G |
| | | | | | | Are international affiliates included with connections? |
| | | Format and scope of affiliate investment activity and extent of disclosure, if any | Explanation of limits on conflict of interest check and disclosure | Description of information screen and other protective measures | Employee personal investment disclosures, if any | |
| Professional | Look-back period | | | | | |
| | | investment decisions with respect to the Portfolio Holdings. Many financial institutions and parties in interest who may be involved in these chapter 11 cases may also be investors in the Managed Funds. Moreover, the Managed Funds may invest from time to time in Portfolio Holdings relating to the Debtors or the Potential Parties in Interest." [White Declaration ¶ 14, *Forbes Energy Services*, Docket No. 106, 2/3/17]

"In addition, as part of its regular business operations, Jefferies may trade securities and other instruments of the Debtors on behalf of third parties (some of which may be parties in interest in these chapter 11 cases). Jefferies may also trade securities and other instruments of the Potential Parties in Interest on behalf of itself or its affiliates or third parties. Any such trading operations are separated from Jefferies' investment banking department and its managing directors and employees (including the investment banking professionals working on these chapter 11 cases) by an information barrier." [White Declaration ¶ 15, *Forbes Energy Services*, Docket No. 106, 2/3/17] | constitute interests adverse to the interests of the Debtors' estates or of any class of creditors or equity security holders in matters upon which Jefferies is to be employed, and none are in connection with these chapter 11 cases." [White Declaration ¶ 12, *Forbes Energy Services*, Docket No. 106, 2/3/17]

"The Debtors have numerous creditors and relationships with a large number of individuals and entities that may be parties in interest in these chapter 11 cases. Consequently, although every reasonable effort has been made to discover Jefferies' connections with the Potential Parties in Interest, Jefferies is unable to state with certainty whether any of its clients or an affiliated entity of a client holds a claim or otherwise is a party in interest in these chapter 11 cases. If Jefferies discovers any information that is contrary or pertinent to the statements made herein, Jefferies will promptly disclose such information to the Court. Additionally, as noted above, Jefferies is part of a global investment banking firm and thus has several legally separate and distinct foreign and domestic affiliates. Although | of information walls. These information walls include physical and technological barriers, compliance, and surveillance mechanisms and policies and procedures designed to prevent confidential information from being shared improperly. Consequently, as no confidential information concerning the Debtors is permitted to be communicated to any persons working for the Managed Funds, Jefferies does not believe that the relationships outlined above constitute interests adverse to the estates or render Jefferies not disinterested in these chapter 11 cases." [White Declaration ¶ 14(b), *Forbes Energy Services*, Docket No. 106, 2/3/17] | | |

| INVESTMENT BANKS | | | | | | |
|---|---|---|---|---|---|---|
| A<br><br><br><br>Professional | B<br><br><br><br>Look-back period | C<br><br>Format and scope of affiliate investment activity and extent of disclosure, if any | D<br><br>Explanation of limits on conflict of interest check and disclosure | E<br><br>Description of information screen and other protective measures | F<br><br>Employee personal investment disclosures, if any | G<br>Are international affiliates included with connections? |
| | | | employees of certain affiliates may sometimes assist Jefferies in connection with a restructuring engagement, <u>as</u> Jefferies is the only entity being retained in these cases, we have researched only the electronic client files and records of Jefferies, not of all of its affiliates, to determine connections with any Potential Parties in Interest." [White Declaration ¶ 16, *Forbes Energy Services*, Docket No. 106, 2/3/17] | | | |

**Exhibit 3**

**McKinsey Responses to U.S. Trustee Program ("USTP") Supplemental Information Requests Regarding Westmoreland Retention Application (the "Application")**

Reference herein is made to McKinsey's September 12, 2019 responses (the "Responses") to the USTP's initial information requests (the "Requests").  Dkt. 2348.  These Supplemental Information Responses incorporate and adopt the Responses.[1]

**Section A - Organization**

  1. **The term "Proposed Professionals" under the Application and Declaration appears to be defined to only include McKinsey RTS and the Retained Affiliates (McKinsey US, McKinsey and Co. Africa, McKinsey Knowledge Center India, McKinsey & Co. Canada, and McKinsey LME).**

*Confirmed.  See Krivin Declaration ¶ 1.*

    i. **Please confirm that "McKinsey & Co." is not included amongst the definition of Proposed Professionals.  Please also confirm whether McKinsey & Co. is included as part of the use of "McKinsey."**

*Confirmed that McKinsey & Company, Inc. is (i) not one of the Proposed Professionals; and (ii) included in the defined term "McKinsey."  McKinsey & Company, Inc. is not an operating entity for consulting services in the United States.*

  2. **When describing the use of "McKinsey" in the Application and Declaration, the Responses provide that "McKinsey" refers not just to the Proposed Professionals seeking to be retained, but includes any "McKinsey entities that provide consulting and bankruptcy advisory services and their employees."  Please:**

    i. **Confirm that the use of "McKinsey" is not synonymous with the use of Proposed Professionals in the Application and Declaration;**

*Confirmed.*

    ii. **Identify any other McKinsey entities that are included in the definition of McKinsey (other than the Proposed Professionals seeking to be retained under the Application).**

*Attached as Exhibit A is a list of McKinsey entities included in the definition of the term "McKinsey" as used in the Krivin Declaration.*

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Requests, the Application, or the Krivin Declaration, as applicable.

1

3. **The Responses did not include an answer to Request A.i. Will a response to this Request be provided?**

*Please see Exhibit A.*

4. **Please describe how the "Proposed Professionals" were identified for purposes of identifying those McKinsey entities and professionals that would make disclosures of connections versus those that would not make disclosures of connections.**

*The Proposed Professionals are the entities that employed the individuals on the Engagement Team. See Krivin Declaration ¶ 11; Ernst & Young ("EY") Report, Dkt. 2121 § 6.2.1.*

5. **If a McKinsey employee or affiliate rendered or was involved in the rendering of services prior to the Petition Date, but did not provide services after the Petition Date, would the affiliate or employee have been included as a Proposed Professional?**

*No. Only McKinsey employees rendering services on or after the Petition Date were taken into account for the purposes of determining the list of Proposed Professionals, because bankruptcy court approval is not needed for prepetition services or payment. McKinsey employees that rendered services both pre- and post-Petition Date are subject to the information barriers and other safeguards described below in response to Question A(6)(i). Moreover, such employees also were subject to the connections-checking diligence processes described below in response to Question D(5).*

*For clarity, the defined term "Proposed Professional" refers to the entity employing the individual on the Engagement Team, not the individual.*

6. **Are any partners of the Proposed Professionals also partners of any other McKinsey entity or affiliate other than the McKinsey entity they disclosed?**

*Each of the partners of the Proposed Professionals on the Engagement Team is also an equity-holding partner in McKinsey & Company, Inc. McKinsey & Company, Inc. does not provide consulting services in the United States.*

   i. **If so, what information barriers are in place with respect to the Proposed Professionals & other McKinsey affiliates and entities relating to the services rendered to the Debtors in the Westmoreland bankruptcy cases?**

*Significant safeguards are in place to ensure that information relating to the services rendered to any client, including the WLB Debtors in the Westmoreland bankruptcy cases, is not shared outside of the client service team for that client. Pursuant to the McKinsey Firmwide Information Sharing Policy, confidential information acquired or developed in connection with a client engagement may only be shared within the firm on a need-to-know basis. In particular,*

*any information developed from nonpublic client sources, whether written or not, is confidential to that client, including information from third-party sources that is available to the client service team only through access provided by the client.  Such confidential client information may not be shared outside of the client service team.  McKinsey employees are subject to annual compliance training and certification on this and other policies.*

*McKinsey also uses password-protected "virtual team rooms"—secure electronic workspaces accessible only by members of the client service team—to store work product and confidential client information.  Moreover, at the time they begin their employment, McKinsey employees are required to sign nondisclosure agreements which prohibit disclosure of confidential client information, even to other employees of the firm.  Employees are required to report potential or actual violations of McKinsey's policies.*

## Section C - Confidentiality

1. **McKinsey's Responses to section C clarify that no client represents 17.5% of the RTS revenues and this earlier representation was the result of a calculation error.  The Application and Declaration disclose that the calculations in the Application for clients that represented more than 1% of revenue for any Proposed Professional utilized the total gross revenue for each client with respect to the applicable McKinsey entity compared to the total overall gross revenue for the applicable McKinsey entity during that time period (Response at ¶ C).**

   i. **Setting aside the calculation error, does this calculation methodology differ from the method and manner in which McKinsey identified clients that accounted for revenues that exceeded 1% in the Original Application?**

*The calculation methodology did not change. The revenue percentages listed in the Original Application were based on a 12-month window of data (October 2017 through September 2018), while the revenue percentages listed in the Application were based on a 13-month window (October 2017 through October 2018), to encompass revenue data for October 2018. In light of the October 9, 2018 Petition Date and the fact that McKinsey's books and records generally do not report revenue for periods of less than a calendar month, October 2018 revenue data was not available to McKinsey RTS at the time of the filing of the Original Application, which occurred shortly after the Petition Date.*

   ii. **Did the calculations undertaken in connection with the Original Application utilize the same one year look back?**

*No.  As explained in the response to C(1)(i) above, both revenue periods begin on October 1, 2017, but the Original Application only reported revenue data through September 2018 because revenue data for the month of October 2018 was not yet available at the time the Original Application was filed.  The Application included one additional month of revenue data, i.e., through October 2018.*

2. **GenOn and Anthem each account for 7-9% of RTS revenues.  As to GenOn and Anthem respectively, please describe:**

   i. **The nature of any relationship or engagement between RTS and Anthem/GenOn;**

   ii. **The scope of RTS's retention by Anthem/GenOn;**

   iii. **The nature of services rendered, and the fees earned from its engagement(s);**

   iv. **The time frame during which McKinsey was retained by or performed services for Anthem/GenOn;**

*Anthem*

*RTS and McKinsey US have previously been engaged by Anthem since at least 2016.  The principal services provided to Anthem have related to performance improvement and growth initiatives, including the identification and implementation of opportunities for operating and administrative improvements (including in IT and digital), cost analytics, optimization of client relationships, and a review of business diversification and strategies.*

*The total fees attributable to Anthem across all McKinsey consulting entities were approximately 0.8% of gross revenue of such entities for the period from October 1, 2017 to October 31, 2018.*

*GenOn*

*RTS and McKinsey US have previously been engaged by GenOn since at least 2016.*

*RTS's initial work for GenOn, from October 2016 until GenOn's bankruptcy filing in June 2017, helped the company realize operational efficiencies.  Throughout its Chapter 11 case, RTS provided GenOn with support services related to cash management, strategic advice, development of financial reports, development of diligence materials to be used in meetings with various stakeholders, identification of opportunities for operational cost reductions, provision of litigation testimony, and general assistance with all other restructuring matters requested by the GenOn debtors.  Further details regarding RTS's services for GenOn can be found in the fee applications filed on the GenOn bankruptcy docket, Case No. 17-33695 (DRJ) (Bankr. S.D. Tex.).*

*McKinsey US was engaged by the reorganized GenOn in 2019 to reduce general and administrative expenses and has been primarily focused on evaluating existing assets and finding ways to reduce costs.*

*The total fees attributable to GenOn across all McKinsey consulting entities was approximately 0.3% of the gross revenue of such entities for the period from October 1, 2017 to October 31, 2018.*

v.    **Why the Proposed Professionals believe these connections did not in any way impact their disinterestedness in these cases; and**

vi.    **The nature of the relationship between Anthem/GenOn and the Debtors and whether or not McKinsey's duties/advice impacted Anthem/GenOn and if so, how.**

*Anthem is listed on the Interested Parties List in the "Vendor," "HR Benefits," and "Contract Counterparties" categories. More specifically, Anthem provided insurance coverage and benefits to the WLB Debtors' employees in the ordinary course of business. The work performed by the Proposed Professionals was wholly unrelated to any matters involving the health plans/benefits provided to the WLB Debtors' employees. Therefore, the Proposed Professionals' services could not have impacted Anthem or Anthem's relationship with the WLB Debtors.*

*GenOn itself was not a party-in-interest in the Westmoreland bankruptcy and was not listed on the Interested Parties List. GenOn was only included in the connection checking process because it was formerly owned by NRG Energy, Inc., which did appear on the Interested Parties List. Specifically, as described in more detail in the Krivin Declaration, GenOn was previously a wholly-owned subsidiary of NRG Energy, Inc., which was listed in the "Contract Counterparties" category on the Interested Parties List. On December 14, 2018, the Chapter 11 plan of reorganization for GenOn and its debtor affiliates became effective in accordance with its terms, and all equity interests in GenOn, including those held by NRG Energy, Inc., were cancelled. In light of GenOn's relationship with NRG Energy, Inc., the work for GenOn was disclosed for the sake of additional transparency. As noted in the Krivin Declaration, McKinsey US has not served NRG Energy, Inc. since late 2014.*

*In addition to the above, the Proposed Professionals did not negotiate directly with NRG Energy, Inc. or any other party-in-interest during the Westmoreland bankruptcy. Furthermore, at no point during the Westmoreland Chapter 11 reorganization did the Engagement Team advise that any particular executory contract be assumed or rejected.*

*In any event, neither GenOn nor Anthem "would cause significant disruption were [either] to take its business elsewhere and cease to use" the Proposed Professionals. See Hearing Transcript at 81, In re Stearns Holdings, LLC, No 19-12226 (SCC) (Bankr. S.D.N.Y. July 31, 2019).*

*For these reasons, the Proposed Professionals' connections to Anthem and GenOn could not have impacted their disinterestedness, within the meaning of section 327(a) of the Bankruptcy Code.*

3.    **Other than the Proposed Professionals, what other McKinsey entities have been retained by and/or performed services for Anthem/GenOn?**

*Other than RTS and McKinsey US, no McKinsey entities have been retained by Anthem or GenOn. RTS and McKinsey US from time to time borrow employees from other McKinsey*

*consulting affiliates when providing client services, similar to the Engagement Team serving the WLB Debtors.*

4. **What percentage of aggregate gross revenue do the Anthem/GenOn connections represent across McKinsey (the entire firm)?**

*During the Revenue Period utilized for the Application, GenOn represented 0.3%, and Anthem represented 0.8%, of gross revenue across the entire McKinsey firm.*

5. **Please explain the differences between the connections disclosed, and the amount of revenue those connections accounted for, in the current Declaration Paragraphs 29-34, versus the disclosures made in the Declaration under the Original Application at paragraph 77 (e.g., JP Morgan Chase (Original Declaration), Johnson Controls (Declaration in Current Application))?**

*The differences are a result of the Application including one additional month of revenue data—October 2018, in which the Petition Date occurred—that was not available at the time of the Original Application.  See response to Question C(1) above.*

*For the revenue period reviewed for the Original Application—October 1, 2017 through September 30, 2018—JPMChase & Co. accounted for approximately 1.01% of RTS's gross revenue.  For the Revenue Period reviewed for the Application—October 1, 2017 through October 31, 2018—JPMorgan Chase & Co. accounted for less than 1.00% of gross revenue for each of the Proposed Professionals.  Accordingly, there was no revenue disclosure for this client in the Application.*

*Similarly, for the revenue period reviewed for the Original Application—October 1, 2017 through September 30, 2018—Johnson Controls, Inc. accounted for less than 1.00% of RTS's gross revenue.  Accordingly, there was no revenue disclosure for this client in the Original Application.  For the Revenue Period reviewed for the Application—October 1, 2017 through October 31, 2018—Johnson Controls, Inc. accounted for less than 1.00% of gross revenue for each of the Proposed Professionals other than RTS and approximately 4.02% of RTS's gross revenue.*

**Section D - Review of Connections/Claims Register**

1. **Please generally describe what was involved in the "stepwise, labor intensive process for checking Rule 2014 connections" in the Debtors cases.**

*The reference to the "stepwise, labor-intensive process for checking Rule 2014 connections" in the Responses to the Requests was the process set forth in Section 6 of the EY Report, Dkt. 2121, and paragraphs 6–18 and 25–26 of the Krivin Declaration.*

2.  **Please describe what additional due diligence was undertaken by any McKinsey entity as part of its "connections checking process" to review and identify connections other than:**

    i.  **Checking connections against the Interested Parties List (utilizing the "global database" or otherwise); or**

    ii.  **Surveying employees (including the Engagement Team) of the Proposed Professionals or other McKinsey affiliates.**

*The Working Group expanded the Interested Parties List from approximately 4,200 parties to more than 400,000 parties, to include affiliates of corporate interested parties, as described below, as a method of supplementing the information in McKinsey's client database. The Working Group expanded the Interested Parties List using the following multistep process:*

- *The Working Group reviewed the initial Interested Parties List and categorized parties on the Interested Parties List as either individuals, government entities, or corporate entities;*

- *The Working Group utilized Capital IQ to extract corporate affiliates, including subsidiaries, and investments within the corporate structure for each corporate party and its ultimate corporate parent; and*

- *The Working Group reviewed the ownership percentage of extracted corporate affiliates where available. An entity was deemed an affiliate and included in the Expanded IPL if a parent entity owned 20% or more of an equity stake. In instances where the Working Group was unable to determine the ownership percentage, the Working Group included the party in the Expanded IPL.*

*See also Krivin Declaration ¶¶ 6 –18, 25–26 and EY Report, Dkt. 2121, § 6.*

3.  **Other than Dmitry Krivin, who served on the "Working Group" identified in the Declaration? Were any members of the Working Group, including Mr. Krivin, employees or partners of the Proposed Professionals?**

*Other than Dmitry Krivin, the members of the Working Group were: Nadine El Ashkar, Matthieu De Vergnes, James Hu, Anubhav Jha, Nazrul Johari, Steven K. Lee, Ivan Makar, Aashish Manchanda, Tafari Mbadiwe, Bob Morabia, Amar Rai, Raphael Ruscassie, Pranav Vadrevu, Arjun Venkat, Angela Yu, Faeez Zafar, Aman Ahuja, Kashi Hejazi, Dinal Shah, Shou Zhang, Jodi Pearlstein, Jagbir Kaur, Emily Ruff, Katie Owen, and Wayne Redmond. Additional McKinsey employees provided temporary or administrative support as needed.*

*Certain members of the Working Group are employees of the Proposed Professionals, and Dmitry Krivin is a partner of one of the Proposed Professionals, McKinsey US.*

i. **Was the Working Group solely responsible for identifying and disclosing connections?  Was the Working Group subject to any other internal oversight at McKinsey?**

*No, the Working Group was not "solely" responsible for identifying and disclosing connections. While the Working Group was responsible for identifying and disclosing connections in the first instance, each member of the Engagement Team was also responsible for reviewing the Interested Parties List to determine whether, to his or her knowledge, any entities were not, but should have been, included on the Interested Parties List.*

*Mark Hojnacki, a Westmoreland client service team  leader, provided information to the Working Group about the Engagement Team's work during this process.*

*In addition, EY was engaged to assess the adequacy of the connections-checking procedures used by the Working Group to identify and disclose Connections.  As the EY Report explains, in order to assess the adequacy of the Working Group's procedures, EY, among other things:*

- *Reviewed the Protocol to obtain background information and to understand the recommendations and general guidelines set forth therein;*
- *Held meetings with key individuals at McKinsey who had knowledge of the implementation of the recommendations and general guidelines set forth in the Protocol and were responsible for the identification of Connections to be included in the Krivin Declaration;*
- *Reperformed procedures to identify unique Interested Parties List parties and extracted corporate trees from Capital IQ for a sample of entities to test completeness of the Expanded IPL;*
- *Reperformed procedures to identify the Proposed Professionals;*
- *Held discussions and interactive walkthroughs with business-line professionals responsible for the maintenance and extraction of client, vendor, and banking relationship data;*
- *Reviewed queries run by McKinsey to extract relevant data;*
- *Verified that the procedures McKinsey performed covered the Look-Back Period contemplated in the Protocol;*
- *Reviewed McKinsey's comparison of the Expanded IPL against the client, vendor, and banking relationships, including reperformance of a sample of searches;*
- *Reviewed survey and questionnaire templates, distribution lists, and a sample of responses;*
- *Obtained listing of Connections identified by MIO; and*
- *Reviewed the Krivin Declaration and disclosed Connections.*

*See EY Report, Dkt. 2121, § 4.*

4. **Please share samples of the surveys utilized as part of the connections review.**

*The template surveys utilized as part of the connections-checking process are attached here as Exhibits B through F.  Please note that Exhibits B through E are also attached to the EY Report filed on July 3, 2019.  See EY Report, Dkt. 2121, App'x C-F.*

i. **Who was responsible for preparing and sending the surveys?**

*The Working Group was responsible for preparing and sending the surveys.  The "Proposed Professionals' and Unretained Affiliates' Client Serving Personnel Questionnaire" attached here as Exhibit E was substantially identical to the model survey attached to the Protocol (Protocol Exhibit B).*

*A detailed description of the survey process can be found in paragraphs 14–18 of the Krivin Declaration.*

ii. **Who received and analyzed the responses to the surveys and any data shared therein?**

*The Working Group was responsible for analyzing the data contained in survey responses.*

5. **The Declaration refers to RTS and the Retained Affiliates as comprising the Proposed Professionals.  Please explain the process employed by McKinsey to identify and disclose the connections of any McKinsey entities and affiliates (aside from MIO) other than the Proposed Professionals.**

*We refer to the Krivin Declaration for a complete description of the process.  In particular, consistent with the recommendations in the Protocol, a survey was sent to all professional personnel (as distinguished from staff, support, or administrative personnel) of McKinsey's consulting affiliates worldwide, inquiring if any such person (i) held debt, equity, or other claims against any of the WLB Debtors (other than investments, including through mutual funds and other investment vehicles, that are managed by third parties with delegated investment authority and discretion) at any time after 90 days prior to the Petition Date; or (ii) had any connections to any of the Bankruptcy Judges, to the United States Trustee, or to anyone employed in the office of the United States Trustee, in each case for the Southern District of Texas.  The results of this survey are reflected in the disclosures set forth in the Krivin Declaration; there were no responses disclosing any debt, equity, or other claims against any of the WLB Debtors.*

6. **McKinsey identified a number of connections to direct competitors of the Debtors.  The Proposed Professionals state that these connections are not disqualifying.  Please explain:**

i. **What steps were taken to reach this conclusion?**

*Each director of client services ("DCS") or other senior member of the client service team who handled an engagement for a client that appeared on the Expanded IPL (including such*

9

*competitors) received a survey in which the DCS (or other senior team leader) was asked to indicate whether the work for his or her client was in any way related to the WLB Debtors. Of the hundreds of surveys sent out, seven recipients indicated that their work might possibly be related; every other recipient responded in the negative. The Working Group, after follow-up diligence on the seven possibly related matters, determined that only one, in fact, had any relation to the WLB Debtors. That was Edison Mission, which is addressed in paragraph 38 of the Krivin Declaration.*

*As discussed in more detail in McKinsey's omnibus reply to Mar-Bow's pleadings on September 10, 2019, Dkt. 2340, p. 38, such unrelated representations of competitors are not disqualifying, and there is no per se rule barring a professional from representing competitors of a debtor.*

*Other professionals in this case have been retained despite making the same type of disclosure about their representations of the WLB Debtors' competitors. For example, Alvarez & Marsal— also a consulting firm—disclosed that Consol Energy, Inc., a "Significant Competitor" of the debtors, was also a "Significant Equity Holder[] of Current and Former A&M Clients" in unrelated matters. See Dkt. 210, Campagna Decl., Schedule A; Schedule B at 2–3. Lazard, investment banker to the conflicts committee, disclosed that it represented Peabody Energy Corp., a competitor of the Debtors. Dkt. 216, Ex. D, ¶ 9; Schedule 1 at 7 (characterizing Peabody Energy Corp. as a "competitor"); Schedule 2 (listing Peabody Energy Corp. among the "Potential Parties in Interest" that entered into an engagement agreement with Lazard within the last three years).*

     ii. **How it was determined that all services McKinsey entities provided to direct competitors of the debtors were unrelated to these debtors and the services rendered in these cases, and state who was responsible for reaching this determination?**

*The Working Group used the surveys described above, as well as follow-ups with the applicable survey respondents when necessary, to determine that the services provided to WLB Debtors' direct competitors were unrelated to the WLB Debtors.*

## Section F - Periodic Investment Statements

     1. **Will McKinsey be providing samples of the periodic investment statements?**

*Yes. Please see attached Exhibits G through K, samples of the periodic investment statements.*

## Section I - Application of De Minimis and Materiality Standards

1. **In its Response to Section I of the Requests, McKinsey states that "All connections to any party on the Interested Parties List were disclosed in the Application, without applying any 'de minimis' or 'materiality' standards."**

   i. **For clarification, this statement applies with respect to any connection identified by McKinsey in its review process, not just the equity related connections raised in Section I?**

*Correct —all known connections were disclosed.*

   ii. **And, if so, because no limiters of any kind were applied in determining whether a connection should be disclosed, there was no discretion exercised in determining whether a connection should/need be disclosed because all connections were disclosed?**

*Correct —all known connections were disclosed.*

**Section J – MIO Disclosures**

1. **In the Krivin Declaration, ¶20, McKinsey states that "*The staff of MIO is dedicated to MIO. No investment professional of MIO is engaged in McKinsey client service activities or is an employee of any McKinsey affiliate that provides client consulting services.*" Please provide information about the MIO staff, including:**

   i. **Are any MIO professionals employees of any McKinsey affiliate?**

   ii. **Are any MIO professionals partners of any McKinsey affiliate?**

   iii. **Please describe MIO's management structure;**

*The term "investment professional" in the Krivin Declaration refers to members of the investment management team at MIO who are responsible for selecting third-party managers and making MIO's direct investments. None of those professionals is an employee or partner of any McKinsey affiliate other than MIO. Pursuant to policies governing separation, McKinsey and MIO are permitted to share certain limited support-function personnel, such as employees responsible for administrative and legal functions or procurement.*

*MIO is headed by co-Chief Executive Officers to whom the heads of MIO's various departments, including Advisory, Client Services, Operations, Risk, Investments, Legal, Compliance, IT, HR, and Finance, report. The co-Chief Executive Officers report to MIO's Board of Directors.*

*Investments is led by MIO's Chief Investment Officer ("CIO"), who manages the investment professionals. All MIO investment decisions are approved by the CIO.*

*The investment professionals referenced in the Krivin Declaration exclude MIO's Client Services and Advisory Personnel ("advisory personnel"), who are different from MIO's "investment professionals." The advisory personnel are wealth management professionals who provide wealth management advice and services to McKinsey partners. MIO's advisory personnel operate independently from MIO's investment professional team and are not incentivized to recommend MIO-managed or -sponsored investment products. Advisory personnel are MIO employees, but MIO is compensated by McKinsey & Company, Inc. for the costs related to their services, and those services are provided to McKinsey partners free of charge. Advisory personnel do not maintain offices at MIO, and they are not provided any information regarding the underlying investments made by third-party managers or MIO's direct investments.*

2.    **In the Responses, McKinsey states that "*MIO investment professionals are subject to policies and procedures that restrict them from gaining access to any nonpublic information regarding McKinsey clients, including the identity of such clients.*"**

    i.    **Please provide these policies and procedures and explain how these policies and procedures are transmitted to MIO investment professionals.**

    ii.    **Please also describe any electronic access restrictions between MIO personnel and McKinsey personnel.**

*Relevant Policies*

*McKinsey and MIO have multiple complementary and overlapping policies designed to restrict information flow between the two entities. Those policies include: (1) the MIO—CSP Collaboration Policy (the "Collaboration Policy"); (2) the McKinsey Firmwide Information Sharing Guidelines; (3) the Conflicts of Interest Mitigation Processes; (4) the MIO Personal Investment and Trading Policy and Code of Ethics; and (5) the MIO Board Conflict and Confidentiality Policy. McKinsey employees are required to complete related training modules, and there are periodic training presentations regarding the McKinsey and MIO policies. McKinsey and MIO employees also complete annual policy certifications confirming that they have read and understand McKinsey and MIO policies ensuring separation and appropriate treatment of confidential information.*

*MIO personnel are required to attend annual trainings on the Collaboration Policy, and regular trainings are held for all newly hired MIO personnel. The Collaboration Policy has been circulated to all MIO employees, and it is also available on an internal website accessible to all MIO employees. All MIO personnel must certify that they have attended required Collaboration Policy training and that they have received, read, and understood the policy.*

*(1) The Collaboration Policy is intended to guard against potential real or perceived conflicts of interest. It addresses communications between McKinsey consultants and MIO employees and sets forth policies to ensure that confidential information and potential conflicts of interest are managed appropriately. The Collaboration Policy includes an "information barrier" between McKinsey's consulting activities and MIO's investment activities and dictates that the two must be managed independently and with separate operations, including separate offices, IT systems (including servers), and with limited exceptions (e.g., certain employees of the McKinsey legal department), employees. MIO does not provide information that would identify MIO's direct investments or third-party managers to McKinsey employees or partners who are not on the MIO Board. MIO does, however, comply with all legal or regulatory obligations to make public filings, some of which may reflect historical information related to MIO's investments with third-party managers.*

*Nonpublic information regarding McKinsey's consulting relationships, including the identity of clients, is not disclosed to MIO personnel. MIO personnel do not participate in client interactions within McKinsey's consulting business. There are restrictions on the sharing of information between McKinsey consultants and MIO, including general prohibitions against:*

13

*McKinsey providing client information to MIO; MIO employees attending McKinsey practice meetings; MIO discussing with McKinsey client service professionals any investments made by the MIO funds (outside of the limited information the MIO Board receives in connection with its oversight responsibilities); and MIO disclosing to McKinsey consultants the entities in which MIO holds investments.*

*The Collaboration Policy requires interactions between MIO and McKinsey to be limited and, to the extent practicable, monitored. Exceptions to the Collaboration Policy require approval by the Chairman of the MIO Board. Employees violating the Collaboration Policy are subject to remedial measures, which can range from a warning to termination or referral to civil or criminal authorities.*

*(2) Pursuant to the McKinsey Firmwide Information Sharing Policy, confidential information acquired or developed may only be shared within the firm on a need-to-know basis. In particular, information, whether written or not, developed from nonpublic client sources is confidential to that client, including information from third-party sources that is available to the client service team only through access provided by the client. Such information may not be shared outside of the client service team.*

*(3) Pursuant to the Conflicts of Interest Mitigation Processes, McKinsey uses password-protected "virtual team rooms." Employees are required to sign nondisclosure agreements that prohibit disclosure of confidential information, even to other employees of the firm. Employees are required to report potential or actual violations of McKinsey's policies.*

*(4) Pursuant to the MIO Personal Investment and Trading Policy and Code of Ethics, MIO officers, directors, and employees ("Supervised Persons") must put the interests of MIO ahead of their own. These are detailed principles and standards of conduct that require Supervised Persons to act with competence, dignity, and integrity, and in an ethical manner. The Code of Ethics places considerable restrictions on the trading activities of Supervised Persons and requires annual certifications from all Supervised Persons that they have read the policy, understand its terms, and are bound by it. The MIO Policies and Procedures to Detect and Prevent Insider Trading likewise prohibits trading on material nonpublic information ("MNPI").*

*(5) The MIO Board Conflict and Confidentiality Policy lays out the MIO Board's principal policies regarding avoiding real and perceived conflicts of interest. The policy provides that MIO Board Members may not advise asset managers for two years following their Board tenure. It also incorporates a broader, McKinsey-wide policy which generally prohibits McKinsey partners from providing advice regarding public trading in specific stocks, funds, bonds, debt, or any other publicly traded security.*

*The MIO Board Conflict and Confidentiality Policy also provides that MIO Board Members' engagements be reviewed to determine whether any conflict exists; that all MIO Board Members must disclose potential conflicts to the Board Governance Committee and recuse themselves from any related discussion; that all MIO Board Members are subject to the Collaboration Policy and are obligated to guard client confidences and MIO's intellectual property; and that*

14

*board members who are active partners of McKinsey are subject to McKinsey's personal trading policy, which prohibits buying or selling securities while in possession of MNPI and buying or selling publicly traded securities of any McKinsey client.*

*Each MIO Board Member must annually certify that they have received, read, and understood the MIO Board Conflict and Confidentiality Policy, the Collaboration Policy, and, if on the Investments Committee, the Investments Committee Personal Account Trading Policy. The Investments Committee Personal Account Trading Policy imposes further restrictions on the members of the Investments Committee and imposes enhanced reporting and additional restrictions on the ability of Investments Committee members to make personal investments.*

*The Governance Committee of the MIO Board is responsible for monitoring conflict issues and ensuring implementation of the MIO Board's policies in coordination with the Chairman of the MIO Board, MIO's General Counsel, and McKinsey's Legal Department. Each active McKinsey partner on the MIO Board must also have his or her client service reviewed in a process overseen by the Governance Committee to confirm there are not conflicts of interest.*

*Electronic Access Restrictions*

*MIO is operationally separate from McKinsey's consulting affiliates, including the Proposed Professionals. Krivin Declaration ¶¶ 20–21. MIO has its own offices and a dedicated professional investment staff that does not overlap with the rest of McKinsey. Its limited support functions shared with McKinsey, such as procurement, are strictly regulated by the written policies described above.*

*MIO maintains information (electronic documents and files) related to its past and existing investments on servers that are controlled by MIO, and only New York-based MIO employees have access to the information contained on these servers. MIO personnel do not have access to McKinsey's systems where client engagement materials are stored. No MIO employee has access to any McKinsey client files or McKinsey client service team materials.*

*As an SEC-registered investment advisor, MIO employee communications are monitored, and MIO performs regular targeted review of email and Bloomberg communications.*

*Effectiveness of Policies and Procedures*

*The Final Investigative Report re: McKinsey & Company, Inc. prepared by the Special Counsel for The Financial Oversight & Management Board for Puerto Rico (the "Special Counsel Report") in the PROMESA Title III proceedings examined the separation of McKinsey and MIO and confirmed that "[t]he McKinsey consulting arm is effectively walled off from its investment arm, and there is no sharing of confidential information or resources, except in very limited circumstances, none of which were implicated [by the Special Counsel investigation]. There are physical barriers—for example, separate offices, email accounts, and computer systems—as well as detailed policies designed to ensure that client information is kept confidential and not shared between the consulting and investment sides, and that if it is, the information is not acted on. Indeed, even on the consulting side, McKinsey has robust policies in place to ensure that*

15

*information is shared only on a 'need-to-know' basis, and for example, uses password-protected document repositories to ensure that information is not shared beyond the client service team. MIO and McKinsey personnel are required to undergo training, to review the policies on an annual basis, to certify their compliance with these policies, and to report any violations." Special Counsel Report, p. 81. McKinsey and MIO personnel interviewed by the Special Counsel preparing the Special Counsel Report confirmed their participation in the training program, their periodic certifications, and their compliance with the policies and procedures.*

3.    **McKinsey's prior responses explain that MIO investment professionals are responsible for making investment decisions for approximately 10% of the assets under MIO's management, while the remaining 90% of MIO's capital is managed by third party fund managers.  As to that 10% of direct investments:**

    i.    **Please explain MIO's investment policy, including what type of investments it makes directly and how that differs from investments made by third-party fund managers.**

    ii.    **Why does MIO make direct investments?**

    iii.    **You state that "*MIO maintains a policy that prohibits MIO from exercising its own investment discretion to invest in the debt or equity of single name corporate entities*."  Please provide that policy.**

*(i) Direct investments are governed by MIO's Direct Trading Policy.  The Direct Trading Policy provides for a "white" list and not a "black" list of investments; that is, it provides a list of investments MIO is permitted to make itself (i.e., without delegating a fully discretionary investment mandate to a third-party advisor), such as investments in sovereign debt, credit default protection, commodities, and debt or equity indices.  The list of investments that MIO is permitted to make does not include debt or equity of single-name corporate entities. The purpose of this prohibition, as articulated in the policy itself, is to avoid even the appearance of a conflict by foreclosing any investments in the debt or equity of single-name corporate entities.*

*MIO's direct investments are also constrained by MIO's proprietary benchmark.  MIO manages its investment portfolio using a proprietary strategic asset allocation, or benchmark, which dictates how much equity exposure MIO has, how much fixed income exposure it has, how much commodities exposure it has, and so on.  MIO then seeks to beat the performance of that benchmark by varying from it in many different and uncorrelated ways.  Every decision to invest, whether through a third-party fund, separately managed account, or a direct investment, must be made with an eye toward achieving that benchmark allocation, or varying exposure from the benchmark with an explainable rationale.  As a consequence, MIO is not free to place unconstrained opportunistic "bets" on particular markets or instruments.*

*(ii) MIO utilizes direct investments to further the diversification goals of its benchmark investing approach.  To connect the third-party managers and the fund-of-funds approach to MIO's benchmark investing approach, MIO looks at each third-party fund and estimates or "attributes" an asset class exposure to that fund.  Roughly speaking, each investment must be*

*slotted into that framework. At the end of the process, there are inevitably "gaps" in the benchmark that have not been filled by an external investment. MIO fills those gaps and addresses its macrohedging needs through MIO direct investments.*

*(iii) The MIO Direct Trading Policy is intended to eliminate the possibility of MIO inadvertently investing in the securities of a McKinsey client. The policy is designed to enable MIO to acquire macro-style or asset class-type exposures without seeking Board pre-approval, but to not allow trading in individual name securities. The policy is not worded as an affirmative prohibition because providing to MIO portfolio managers a "restricted list" of McKinsey clients would violate other MIO and McKinsey policies that are designed to prevent MIO professionals from learning of confidential and nonpublic McKinsey client engagements. With limited exceptions (e.g., certain basket trades for which there must be an independent basis such as an outside manager list, or an index), MIO is prohibited from purchasing single-name corporate issuer securities and debt instruments.*

4. **Is it accurate that MIO could invest, either directly or indirectly, in securities, investments, funds, or investment vehicles that consist of or specialize or focus:**

    i.    **in the specific industries and business sectors in which McKinsey entities render services and hold specialized expertise;**

    ii.    **in distressed debt; and**

    iii.    **in distressed debt in those industries and business sectors in which McKinsey entities render services and hold specialized expertise;**

<u>*Response to 4(i) and 4(iii)*</u>:  *Because of the prohibition against investing in single-name corporate issuer securities and debt instruments (subject to the limited exceptions noted above), MIO could not invest directly in individual securities or other investments of corporate entities "in the specific industries and business sectors in which McKinsey entities render services and hold specialized expertise."*

*As McKinsey has previously stated, the identity of nonpublic McKinsey client engagements is the subject of information barriers between McKinsey and MIO and none of the MIO funds invests solely in McKinsey clients. MIO is not aware of any third-party funds or accounts managed separately by third-party managers that follow a strategy predicated on investing in McKinsey clients or "industries and business sectors in which McKinsey entities render services and hold specialized expertise," let alone solely in McKinsey clients or McKinsey-specific "industries and business sectors."*

*Third-party managers (unaffiliated with McKinsey) that manage assets for MIO may invest in industries in which McKinsey advises clients or in which "McKinsey entities render services and hold specialized expertise." Indeed, McKinsey provides a broad range of consulting services and solutions across numerous, diverse industries and business functions. It is thus possible that a third-party manager may invest in specific industries or business sectors that are "industries or business sectors in which McKinsey entities render services or hold specialized expertise," but*

*neither MIO nor McKinsey has any discretion over investments made by third-party managers. Nor does McKinsey share any information with any third parties identifying its non-public client engagements.*

<u>Response to 4(ii)</u>:  *See 5 (direct investments) and 6 (indirect investments) below.*

5.      **Does MIO directly invest in distressed debt?  Has MIO ever directly invested in distressed debt?**

*As explained above, MIO does not directly invest in the debt, distressed or otherwise, of single-name corporate entities.  Under MIO's Direct Trading Policy, MIO may only directly invest in single-issuer debt issued by sovereign entities (e.g., U.S. Treasury Bonds), or trade credit default swaps, futures, and total return swaps on that debt.*

6.      **Do any of the MIO third-party fund managers invest MIO AUM in distressed debt? Have any of the third-party managers ever invested MIO AUM in distressed debt?**

*MIO third-party managers do sometimes invest, and have previously invested MIO funds, in distressed debt.  Again, as noted above, neither McKinsey consulting affiliates nor MIO control the investment decisions made by third-party managers.*

7.      **Please provide information on the MIO board's role in overseeing MIO.  In the Krivin Declaration, ¶ 22, McKinsey states "*MIO's board of directors includes current and retired McKinsey partners, including, as of the Petition Date and through the Confirmation Date, current McKinsey & Co. partners employed by McKinsey US (but no other Proposed Professional).  Two members of the board are independent and are not current or retired partners of McKinsey.  While members of the MIO board of directors have oversight responsibilities with respect to MIO's management of the assets of the Pension Plans and the MIO Funds . . . .*"**

   i.      **Does the MIO board ratify MIO's direct investment decisions?  If so, please explain that process.**

   ii.     **Does the MIO board ratify or otherwise oversee MIO's choice of third-party fund managers?**

   iii.    **How often do the members of the board change?  How long is a board member's term?**

   iv.     **Please provide the supporting documentation given to MIO board members for ratifying investment decisions and the supporting documentation currently provided to MIO board members in connection with their investment oversight.**

*The MIO board delegates all responsibility for making investment decisions to MIO's professional investment staff, which is led by MIO's CIO.  The MIO Board does not ratify MIO's*

*direct investment decisions; nor does the MIO Board ratify or otherwise oversee MIO's choice of third-party fund managers. On a quarterly basis, the Investments Committee of the Board reviews investment performance updates, risk management information, discussions of MIO's benchmark and overall investment approach, and allocation and redemption decisions made by MIO's investment team in the prior quarter, meaning on a post-hoc basis.  While this information references the names of third-party managers, it only rarely refers to specific investments made by third-party managers.*

*Until recently, there were no formal terms for MIO Board Members. Last year, MIO instituted 12-year terms.  For certain long-serving Board Members whose tenure exceeded 12 years at the time of the change, MIO assigned a term of remaining years of service.*

8. **The Responses provide that although MIO professionals do not make investment level decisions for most of MIO's investment capital, "*MIO professional staff members have sole authority to choose which third-party fund managers receive allocations of assets to manage.*"**

    i. **Please provide any written policies and procedures governing MIO's selection of investment managers and samples of engagement agreements between MIO and investment managers.**

*We are unable to provide copies of the requested materials because they are highly sensitive and confidential and therefore cannot be disclosed publicly.*

    ii. **Who has authority to determine the amount of capital allocated to any particular third party fund manager?**

*Capital allocation decisions are made by MIO's professional investment staff.  As previously explained, the MIO Board has delegated all investment-making decisions to MIO's investment professionals. MIO's investment decisions are supervised by MIO's CIO, who oversees a team of portfolio managers.  The portfolio managers' role is to ensure that MIO's investment strategy is being followed, including with respect to MIO's benchmark approach.  All MIO investment decisions are approved by the CIO.  This includes allocating or reducing capital directed to any third-party fund manage*r.

iii.   **What is the typical amount of capital allocated to a third-party fund manager?**

iv.   **Are there policies as to how much capital can be allocated to a third-party fund manager?**

v.   **What is the largest amount of capital that can be allocated to a third-party fund manager?**

*Response to Questions (iii)–(v)*

*The amount of capital allocated to any manager is determined by a number of investment-related factors, such as the requirements of MIO's benchmark exposures (as noted above), as well as each third-party manager's investment strategy, expected risks, past or expected performance, and fees (discussed in more detail in response to Question 8(viii), below).*

*Diversification is central to MIO's investment strategy.  As such, MIO invests with well over 100 third-party managers, with any given manager receiving a small minority of MIO's total capital.  For example, across the 100 managers with the highest capital allocation in MIO's flagship "Special Situations" strategy as of July 31, 2019, the average allocation was approximately 1.4% of the capital within the Special Situations strategy.  Directionally, MIO believes that this is a reasonably representative average of what it has been over time.  However, there is no specific typical allocation size.  As of July 31, 2019, for example, the amount invested in each of the 100 top managers varied substantially around the average mentioned, and this is expected to always be the case.  MIO tends to allocate only a small percentage of MIO's capital to any one manager.*

vi.   **How many third-party fund managers does MIO use?**

*The number of third-party fund managers used by MIO varies over time, but is, typically, over 100.  MIO currently invests MIO's assets under management with approximately 170 third-party managers.*

vii.   **How often do MIO professionals choose third-party fund managers (for instance, could the fund managers change every year or are they retained under long-term contracts?)**

*MIO professionals onboard third-party fund managers on an ongoing basis.  MIO has long-standing relationships with some third-party fund managers, while MIO may contract with others for only a short period of time.  Third-party fund managers typically are considered for onboarding and/or removal on a quarterly basis.  Moreover, capital allocations to existing third-party managers may also be increased or decreased on a quarterly basis.*

> viii. **Under what criteria are third-party fund managers chosen and under what criteria does MIO decide to terminate a relationship with a third-party fund manager?**

*MIO's investment professionals, overseen by MIO's CIO, make all decisions to initiate, modify, or terminate a relationship with any third-party manager, having been delegated that decision-making power by MIO's Board. They make those decisions based on a set of considerations that are broadly similar to those used by their industry peers: most importantly, expected return on investment and expected risk characteristics. Reviewing these considerations as part of an investment decision includes analysis of past performance—of the specific investment in question (if it has a track record at the time of investment), as well as other investments employing similar strategies. MIO's team also performs prudent operational due diligence on each third-party manager, checking their practices against accounting and auditing standards, any past regulatory violations, cybersecurity, etc. Other investment considerations include costs and operational and liquidity risks associated with the structure that would be involved in the investment (e.g., investment in a fund or a separate managed account) and the size of MIO's capital available for investment at any given point in time. A qualitative synthesis of these considerations would form the base of an initial investment decision, as well as any subsequent decisions to increase or decrease the size of an investment and any ultimate decision to terminate the relationship.*

> ix. **Please confirm that McKinsey employees/partners who are not also MIO professionals or on the MIO board do not know the identity of the third-party managers who manage their assets.**

*Confirmed in general, noting, however, that certain third-party manager connections are publicly identified in the ANR and Westmoreland bankruptcies or in the McKinsey pension plan's Forms 5500 filed with the Department of Labor and MIO's Forms ADV filed with the Securities and Exchange Commission. Per the policies described above in response to Question J(2), MIO does not supply information to McKinsey employees/partners who are not on the MIO Board that would reveal the identity of third-party fund managers. More specifically, McKinsey has recently publicly disclosed the identity of certain third-party managers in accordance with Judge Huennekens' order in ANR, and pursuant to the Protocol in Westmoreland. Under the Protocol, as part of its disclosures in Westmoreland, McKinsey filed a declaration including an appendix based on information provided by MIO specifically for this purpose that identified certain current or former MIO third-party managers appearing on the Expanded IPL.*

9.     **In the Responses, McKinsey states that it "*does consult for asset management clients. However, McKinsey policies bar it from ever advising any asset managers on investments or investment strategy.*"**

    i.     **What types of consulting services does McKinsey provide for its asset management clients?**

    ii.    **Does any McKinsey entity provide any services to MIO third-party fund managers?**

    iii.   **Are any asset management clients also MIO third-party fund managers?**

*From time to time, McKinsey's consulting affiliates may be retained by third-party funds under contract with MIO to consult on strategic, operational, organizational, or technological issues. McKinsey does not advise hedge funds on open-market investments or public trading activities. In other words, McKinsey does not provide investment funds with recommendations, analysis, or any other service regarding public trading in specific stocks, funds, bonds, debt, or any other publicly traded security.*

*Due to the operational separation between MIO and McKinsey, MIO personnel have no nonpublic knowledge regarding the client engagements of McKinsey's consulting affiliates. Similarly, and as explained in response to Question 8(ix), MIO does not supply information to McKinsey employees or partners who are not on the MIO Board that would reveal the identity of MIO's third-party managers.  MIO does, however, comply with all legal or regulatory obligations to make public filings, some of which contain historical information related to MIO's investments with third-party managers.*

10.    **In the Krivin Declaration, McKinsey states, ¶22, "[T]o the best of my knowledge, based on the results of the Surveys, no member of the Engagement Team . . . worked with any members of that board in their capacities as board members, during the Look-Back Period."**

    i.     **How would members of the Engagement Team have worked with MIO board members in their capacities as board members?**

*The survey questions were deliberately broad on this point, to solicit the broadest set of responses.  We expect that, if any member of the Engagement Team had worked with an MIO Board Member in connection with that Board Member's service on or duties for the MIO Board, then that member of the Engagement Team would have reported such interactions in response to the survey questions.  No member of the Engagement Team reported any such work.*

    ii.    **Did members of the Engagement Team ever work with MIO board members in their capacities as board members prior to the Look-Back Period?**

*The Working Group limited their diligence to the Look-Back Period throughout this process, as explained in and for the reasons described in the Responses.  See Dkt. 2348.  Therefore, the*

*Proposed Professionals do not have this information regarding members of the Engagement Team prior to the commencement of the Look-Back Period.*

iii. **Did members of the Engagement Team work with MIO board members in other capacities?**

*An email survey was sent to each member of the Engagement Team asking, among other things, whether such member was related to or had a relationship with any such MIO director other than arising out of having McKinsey as a common employer. Each member of the Engagement Team answered "no" to this question, indicating no such relationship. See Krivin Declaration ¶ 17.*

*In any event, even if members of the Engagement Team worked with MIO Board Members, e.g., on a consulting engagement for a client other than the WLB Debtors, any connection to the WLB Debtors already would be disclosed and any confidential client information would be subject to the same safeguards described above. Again, informed by the survey, the Proposed Professionals have no knowledge that any member of the Engagement Team has any such relationship.*

\* \* \*

**<u>Exhibit A – McKinsey Entities List</u>**

**EXHIBIT A**

| Entity Name |
|---|
| 4tree GmbH |
| 52nd Street Associates, Inc. |
| Aberkyn Deutschland GmbH |
| Aberkyn Holding B.V. |
| Aberkyn Nederland B.V. |
| Aberkyn South East Asia Pte. Ltd. |
| Aberkyn USA, Inc. |
| AFAC Equity, L.P. |
| AFOS Canada Co. |
| AFOS Canada Holdings, Inc. |
| AFOS, LLC |
| Belgium Holdings, Inc. |
| CAS Holdings, Inc. |
| Center for Modern Management Practice, Limited Liability Company |
| Client Service Administration, Inc. |
| Consulting and Implementation Solutions Poland sp. z o.o. |
| Consulting and Implementation Solutions Poland sp. z o.o. sp.k. |
| Elixir Creative Solutions Limited |
| Ergonomidesign Fastighets AB |
| FGT Equity, LLC |
| Finalta Enterprises Limited |
| GCI Analytics, LLC |
| HRCP, LLC |
| Komplementarselskabet McKinsey ApS |
| LIXTO Management GmbH |
| LIXTO Software GmbH & Co KG |
| LLC McKinsey & Company CIS |
| Lunar Design, LLC |
| M-Treasury Management SPRL |
| McKinsey & Co. Israel Tel-Aviv (2002) Ltd. |
| McKinsey & Co., (Phils) |
| McKinsey & Company (Azerbaijan), Inc. |
| McKinsey & Company (Thailand) Co., Ltd. |
| McKinsey & Company Bulgaria, LLC |
| McKinsey & Company Canada/McKinsey & Compagnie Canada |
| McKinsey & Company Chile Limitada |
| McKinsey & Company Colombia, Inc. |
| McKinsey & Company Colombo (Private) Limited |
| McKinsey & Company d.o.o. Beograd |
| McKinsey & Company Denmark P/S |
| McKinsey & Company Inc. do Brasil Consultoria Ltda. |
| McKinsey & Company India LLP |
| McKinsey & Company Kazakhstan LLP |
| McKinsey & Company KB |
| McKinsey & Company LME Limited |
| McKinsey & Company Morocco, SARL |
| McKinsey & Company Myanmar Limited |
| McKinsey & Company Nigeria Global Limited |
| McKinsey & Company Pakistan (Private) Limited |
| McKinsey & Company Panama Consulting, Inc. |

**EXHIBIT A**

| Entity Name |
| --- |
| McKinsey & Company Poland Sp. z o.o. |
| McKinsey & Company Puerto Rico Consulting, Inc. |
| McKinsey & Company S.R.L. |
| McKinsey & Company Service AB |
| McKinsey & Company Singapore, Pte Ltd |
| McKinsey & Company Support Services C.R. |
| McKinsey & Company Turkey, Inc. |
| McKinsey & Company Ukraine LLC |
| McKinsey & Company Unit Trust |
| McKinsey & Company Vietnam Limited |
| McKinsey & Company, Holdings Limited |
| McKinsey & Company, Inc. |
| McKinsey & Company, Inc. (Malaysia) |
| McKinsey & Company, Inc. Angola |
| McKinsey & Company, Inc. Austria |
| McKinsey & Company, Inc. Bahrain |
| McKinsey & Company, Inc. Baltics |
| McKinsey & Company, Inc. Belgium |
| McKinsey & Company, Inc. Bulgaria |
| McKinsey & Company, Inc. Canada |
| McKinsey & Company, Inc. Chile |
| McKinsey & Company, Inc. China |
| McKinsey & Company, Inc. Croatia |
| McKinsey & Company, Inc. Czech Republic |
| McKinsey & Company, Inc. Denmark |
| McKinsey & Company, Inc. Finland |
| McKinsey & Company, Inc. France |
| McKinsey & Company, Inc. Ghana |
| McKinsey & Company, Inc. Global |
| McKinsey & Company, Inc. Hong Kong |
| McKinsey & Company, Inc. Hungary |
| McKinsey & Company, Inc. Hungary Holdings |
| McKinsey & Company, Inc. India |
| McKinsey & Company, Inc. Indonesia |
| McKinsey & Company, Inc. International |
| McKinsey & Company, Inc. Ireland |
| McKinsey & Company, Inc. Israel |
| McKinsey & Company, Inc. Italy |
| McKinsey & Company, Inc. Japan |
| McKinsey & Company, Inc. Kazakhstan |
| McKinsey & Company, Inc. Luxembourg |
| McKinsey & Company, Inc. Mexico, Sociedad Civil |
| McKinsey & Company, Inc. Morocco |
| McKinsey & Company, Inc. Myanmar |
| McKinsey & Company, Inc. New Zealand |
| McKinsey & Company, Inc. NG |
| McKinsey & Company, Inc. Nigeria |
| McKinsey & Company, Inc. Norway |
| McKinsey & Company, Inc. Panama |
| McKinsey & Company, Inc. Peru |

**EXHIBIT A**

| Entity Name |
| --- |
| McKinsey & Company, Inc. Prague |
| McKinsey & Company, Inc. Puerto Rico |
| McKinsey & Company, Inc. Qatar |
| McKinsey & Company, Inc. Romania |
| McKinsey & Company, Inc. Russia |
| McKinsey & Company, Inc. Scandinavia |
| McKinsey & Company, Inc. Singapore |
| McKinsey & Company, Inc. Slovakia |
| McKinsey & Company, Inc. Sweden |
| McKinsey & Company, Inc. Switzerland |
| McKinsey & Company, Inc. Thai Holdings |
| McKinsey & Company, Inc. Thailand |
| McKinsey & Company, Inc. The Netherlands |
| McKinsey & Company, Inc. Ukraine |
| McKinsey & Company, Inc. United Kingdom |
| McKinsey & Company, Inc. United States |
| McKinsey & Company, Inc. Venezuela |
| McKinsey & Company, Inc. Washington D.C. |
| McKinsey & Company, S.A.S. |
| McKinsey & Company, S.L. |
| McKinsey & Consulting Company Inc., Shanghai |
| McKinsey (China) Consulting Co., Ltd. (aka McKinsey & Consulting Company, Inc., China) |
| McKinsey Advisory Services, Inc. |
| McKinsey and Company Africa (Pty) Ltd |
| McKinsey and Company Inc Africa (Pty) Ltd |
| McKinsey Argentina, S.R.L. |
| McKinsey Asia Services Pte. Ltd. |
| McKinsey Asia Services, Inc. |
| McKinsey Asia, LLC |
| McKinsey Business Consultancy |
| McKinsey Business Consultants Sole Partner Limited Liability Company |
| McKinsey Chile Holdings Limitada |
| McKinsey Chile Holdings, Inc. |
| McKinsey Consulting Co., Ltd. Beijing |
| McKinsey Consulting Services, Inc. |
| McKinsey Danismanlik Hizmetleri Limited Sirketi |
| McKinsey Defense and Security Germany GmbH & Co KG |
| McKinsey Defense and Security Germany Verwaltungs GmbH |
| McKinsey Development Partners Limited |
| McKinsey EMEA Shared Services sp. z o.o. |
| McKinsey European Employment Legal Support, Inc. |
| McKinsey European Legal Support Centre, Inc. |
| McKinsey Global Limited |
| McKinsey Global Services India Private Limited |
| McKinsey GmbH & Co. KG |
| McKinsey Holdings, Inc. |
| McKinsey India Holdings, Inc. |
| McKinsey International Asia, Inc. |
| McKinsey International de Venezuela, Inc. |
| McKinsey International de Venezuela, S.C.A. |

**EXHIBIT A**

| Entity Name |
| --- |
| McKinsey International, Inc. |
| McKinsey Kazakhstan Holdings, Inc. |
| McKinsey Knowledge Center Poland sp. z o.o. |
| McKinsey Knowledge Centre Belgium, Inc. |
| McKinsey Knowledge Centre India Private Limited |
| McKinsey Kuwait for Management Consultancy W.L.L. |
| McKinsey Management, Inc. |
| McKinsey ME Holdings, Inc. |
| McKinsey Myanmar Holdings, Inc. |
| McKinsey Pacific Rim, Inc. |
| McKinsey Pakistan Holdings, Inc. |
| McKinsey PM, Inc. |
| McKinsey PriceMetrix Co. |
| McKinsey Recovery & Transformation Services Australia Co. |
| McKinsey Recovery & Transformation Services Canada Co./McKinsey Services de Redressement et de Transformation Canada cie |
| McKinsey Recovery & Transformation Services France Co. |
| McKinsey Recovery & Transformation Services U.S., LLC |
| McKinsey Recovery & Transformation Services UK Limited |
| McKinsey RTS Holdings, Inc. |
| McKinsey Russia Holdings, Inc. |
| McKinsey S.R.L. |
| McKinsey Solutions Holdings, Inc. |
| McKinsey Solutions SPRL |
| McKinsey Transatlantic, Inc. |
| McKinsey Treasury Holdings, Inc. |
| McKinsey Verwaltungs GmbH |
| McKinsey, Incorporated |
| MCKT Management, Inc. |
| MIO Group, Inc. |
| MIO Partners (EU) Limited |
| MIO Partners, Inc. |
| MIO-Partners (EU) GmbH |
| Orphoz GmbH & Co. KG |
| Orphoz Verwaltungs GmbH |
| Orphoz, SAS |
| P.T. McKinsey Indonesia |
| PEC Holdings, LLC |
| QuantumBlack Visual Analytics Limited |
| Risk Dynamics Ltd |
| Risk Dynamics S.à r.l. |
| Risk Dynamics SPRL |
| Vasco, Inc. |
| Veryday AB |
| Veryday, LLC |

## Exhibit B – Additional IP Parties Email

**EMAIL TEMPLATE**

From: Westmoreland RTS

Subject: [IMPORTANT] Westmoreland Legal Disclosures: Additional Question

Dear Colleague,

You are receiving this email because you have been identified as a member of the team providing services to Westmoreland Coal Company. You previously reviewed the Westmoreland interested parties list in connection with your responses to earlier surveys (please find the list attached). Thank you for your prior response(s). This survey asks a different question.

**Question**: Are you aware of any person or entity not included on the list that you think should have been included because it was an interested party in Westmoreland's bankruptcy (for example, because it is or was a creditor of, or has or had some other business connection to, Westmoreland, Westmoreland's assets, or the work being performed by the Westmoreland team)?

- If your response is **YES**, please reply to this email as soon as possible, and no later than **5:00 pm Eastern on Monday, July 1**, and provide the names of the missing persons or entities.

- If your response is **NO**, you do not need to respond to this email.

Thank you.

**<u>Exhibit C – DCS Survey</u>**

**EMAIL TEMPLATE**

From: McKinsey RTS Legal Disclosure
Subject: [MASTER CLIENT] – Response Required by June 19 – Important Legal
Disclosure Obligations

This email requires your response by June 19, 2019. You may receive multiple survey
requests – this is by design to capture all information. Please complete each request.
We appreciate your time in completing this survey.

**CONFIDENTIAL**

Dear [DCS First Name],

You are receiving this email in connection with McKinsey RTS's recent engagement by
Westmoreland Coal Company and its affiliates listed below during their Chapter 11
bankruptcy, and a submission that RTS is required to file with the U.S. Bankruptcy
Court by July 3, 2019 for that engagement. That submission must contain disclosures,
including RTS and certain of its affiliates' connections with entities previously identified
as parties in interest to Westmoreland in the bankruptcy case.

**The submission will be a public filing and will include [MASTER CLIENT], and the
related [MASTER CLIENT] entities listed below, in the list of Firm clients that are,
or are an affiliate of, a party in interest. Provided the work was not related to
Westmoreland, the disclosure will be limited to listing the client's name, among a
list of hundreds of Firm clients, with no further detail.  In the event the work was
related to Westmoreland, we will need more information to evaluate further and to
draft the relevant disclosure.  We will be notifying the client of the disclosure as
described below.**

In the event revenues associated with a client exceed certain thresholds, we also will
disclose that fact. We are undertaking an analysis to determine which, if any, clients
meet such a threshold and will reach out to the relevant DCSs in advance of such
disclosure.

You were identified as leading or having led a CST providing services to [MASTER
CLIENT] on the engagements provided in the link below. If you do not have enough
information about your designated engagements to complete the survey, please discuss
with your colleagues who can provide you this information and then complete the
survey.

**Please find the list of engagements that require your review here** – [LIST OF
ENGAGEMENTS]

In case you require the names of the engagements listed above, please reach out to
westmoreland_rts@mckinsey.com.

The link to the survey is provided as a separate link below. For completeness, we request a response from each DCS by June 19, 2019.

Standardized Legal Notice to Client: Unless you check the appropriate box in the survey link below, Firm Legal will send a standardized notice of the disclosure either to the client contact specified in the relevant client consulting agreement or to the client's general counsel.  If you would like to send this notice yourself, would prefer to provide the appropriate client legal contact for the notification, or have already given notice to your client in connection with McKinsey's first round of Westmoreland disclosures, please check the appropriate box in the survey and provide the name, email and title of the recipient and indicate if you will contact them, already have contacted them, or would like to use the listed name as the recipient of the notice from Firm Legal.  Below is a sample email if you are reaching out yourself.

**Please find the survey link here – [LINK TO SURVEY]**

Contacts for Questions

If you have questions, please review the FAQ provided through this link:  **LINK TO FAQ**

Should you have any further questions please reach out to westmoreland_rts@mckinsey.com.

If you are having any technical issues filling out this survey, please contact the Global Helpdesk.

Thanks in advance for your help.

- - - -

| Westmoreland Affiliates | |
|---|---|
| Absaloka Coal LLC | Westmoreland Canadian Investments, LP |
| Basin Resources Inc. | Westmoreland Coal Co. Asset Corp |
| Buckingham Coal Co. LLC | Westmoreland Coal Sales Co. Inc. |
| Dakota Westmoreland Corporation | Westmoreland Energy LLC |
| Daron Coal Co. LLC | Westmoreland Energy Services Inc. |
| Harrison Resources LLC | Westmoreland Energy Services New York Inc. |
| Haystack Coal Co. | Westmoreland Kemmerer Fee Coal Holdings LLC |
| Oxford Conesville LLC | Westmoreland Kemmerer LLC |
| Oxford Mining Co. - Kentucky LLC | Westmoreland Mining LLC |
| Oxford Mining Co. LLC | Westmoreland North Carolina Power LLC |
| Prairie Mines & Royalty ULC | Westmoreland Partners |
| San Juan Coal Co. | Westmoreland Power Inc. |

| San Juan Transportation Co. | Westmoreland Prairie Resources Inc. |
| Texas Westmoreland Coal Co. | Westmoreland Resource Partners, LP |
| WCC Holding B.V. | Westmoreland Resources GP LLC |
| WCC Land Holding Co. Inc. | Westmoreland Resources Inc. |
| WEI - Roanoke Valley Inc. | Westmoreland Risk Management Inc. |
| Western Energy Co. | Westmoreland San Juan Holdings Inc. |
| Westmoreland - Roanoke Valley, LP | Westmoreland San Juan LLC |
| Westmoreland Canada Holdings Inc. | Westmoreland Savage Corporation |
| Westmoreland Canada LLC | WRI Partners Inc. |

**Sample email for client in work unrelated to Westmoreland**

Dear _____,

I'm writing to inform you that McKinsey Recovery & Transformation Services U.S., LLC ("RTS") will be making a public filing on or before July 3, 2019 with the U.S. Bankruptcy Court for the Southern District of Texas in connection with its service to Westmoreland Coal Company that will refer to [CLIENT] as one of many clients of McKinsey. This disclosure contains no description of the work performed by RTS or McKinsey. RTS -- McKinsey's restructuring practice -- has served as an advisor to Westmoreland Coal Company and certain of its subsidiaries ("Westmoreland") in its recent chapter 11 case. Westmoreland identified [MASTER CLIENT] or one of its affiliates on a list of creditors and other parties related to its Chapter 11 case (the "Interested Parties List").

In the event our revenues from your engagements exceed certain thresholds, we also will disclose that fact.  We are undertaking an analysis to determine whether [MASTER CLIENT] meets such a threshold and will reach out to you again in advance of any such disclosure.

For context, all advisors to a company that files for bankruptcy are required to file disclosures with the Bankruptcy Court of any connection to parties on the Interested Parties List. The filing will list [MASTER CLIENT] and any [MASTER CLIENT] affiliates and/or business units that McKinsey served along with many other McKinsey clients that appear on the Interested Parties List, and will not describe anything about the work that we did for you other than a statement that it was unrelated to Westmoreland.

Happy to address any questions or concerns you may have.

Best,
XXXX

_____

**SURVEY TEMPLATE**

**Instructions: Please answer the questions below and provide additional information as relevant. Press submit at the bottom of this survey once you are done. In case you have erroneously entered this survey, please exit by closing this browser window.**

**1.      To your knowledge, is (or was) our work for [MASTER CLIENT] with respect to your designated engagements below, or any other [MASTER CLIENT] engagement, in any way related to Westmoreland?**

| |
|---|
| *[Check-box 1] -- Yes* |

| |
|---|
| *[Check-box 2] -- No* |

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS CHECK-BOX 1 ABOVE]*

**2. How are (or were) such services related to Westmoreland?**

| |
|---|
| |
| |
| |
| |
| |

**3.      On June 25, 2019, unless you check the box below, Firm Legal will send a standardized notice of the disclosure either to the client contact specified in our consulting agreement with the client or to the client's general counsel.  If you would like to send this notice yourself, would prefer to provide the appropriate client legal contact for the notification, or have already given notice to your client in connection with McKinsey's first round of Westmoreland disclosures, please check the box below and provide the name, email and title of the recipient and indicate if you will contact them, already have contacted them, or would like to use the listed name as the recipient of the notice from Firm Legal.**

| |
|---|
| *[Check-box 3] – I would like to contact the client myself, would prefer to provide the appropriate legal contact for the notification, or have already given my client notice in connection with McKinsey's first round of Westmoreland disclosures.* |

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS CHECK-BOX 3 ABOVE]*

**Please see the list of engagements copied below. Please note that the table layout may change if viewed on a mobile phone. For best results, please access this link on a computer**

## [LIST OF ENGAGEMENTS]

**<u>Exhibit D – Proposed Professional Personnel Survey</u>**

**EMAIL TEMPLATE**

From: McKinsey RTS Legal Disclosure
Subject: Westmoreland RTS - Your Response Required by June 19, 2019 – Important Legal Disclosure Obligations

**This email requires your response by <u>June 19, 2019</u>. You may receive multiple emails on this subject. You are required to respond to each email.**

**You may not delegate this responsibility.**

Dear [NAME],

You are receiving this email in connection with McKinsey RTS's recent engagement by Westmoreland Coal Company and certain of its affiliates during their Chapter 11 bankruptcy, and a submission that RTS is required to file with the U.S. Bankruptcy Court by July 3, 2019 for that engagement.  That submission must contain disclosures, including RTS and certain of its affiliates' connections with entities previously identified as parties in interest to Westmoreland in the bankruptcy case.

In order for RTS's engagement to be approved by the Bankruptcy Court, we are required to submit certain disclosures, including RTS's connections with parties in interest in Westmoreland's bankruptcy case.  RTS has identified you as a member of the team providing services to Westmoreland.  Accordingly, we are reaching out to you to determine whether you have any **personal** connections with any parties in interest in the Westmoreland bankruptcy described below. The list of interested parties can be accessed using the link provided at the bottom of this email or directly through the survey link. Please review this list before completing the survey.

**Please answer the questions below by clicking on the appropriate option in the survey link provided. Your response is required by close of business <u>June 19, 2019</u>.**

If you have any questions, please do not hesitate to reach out to westmoreland_rts@mckinsey.com.

Thanks in advance for your help.

**[Interested Parties List]**

**SURVEY TEMPLATE**

**Please answer the questions below by clicking on the appropriate option. Your response is required by close of business June 19, 2019.**

**1.      From July 11, 2018 to the present, to your knowledge, did you or do you have any connections, other than professional client relationships in your capacity as a McKinsey professional, with any entity, person, or any person employed by any entity on the attached interested parties list?**

**This would include, for example, social or family relationships with, stock you hold directly in (but not through mutual funds and other investment vehicles that are managed by third parties with delegated investment authority and discretion), or prior employment by a party or someone employed by a party on the attached list.**

| *[Check-box 1] -- Yes* |
|---|

| *[Check-box 2] -- No* |
|---|

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS CHECK-BOX 1 ABOVE]*

**2.      What is the nature of such connections(s)?**

|  |
|---|
|  |

# Exhibit E – Proposed Professionals' and Unretained Affiliates' Client Serving Personnel Questionnaire

**EMAIL TEMPLATE**

From: McKinsey RTS Legal Disclosure
Subject:  Deadline Friday (June 14) - McKinsey Legal Conflicts Check for all Firm CSP – Westmoreland Coal Company Bankruptcy Case – Urgent Request for Information

**THIS IS AN URGENT REQUEST FOR INFORMATION THAT REQUIRES YOUR IMMEDIATE ATTENTION AND RESPONSE IF YOU HAVE ANY INFORMATION TO REPORT OR MATTERS TO DISCLOSE.**

**FAILURE TIMELY TO RESPOND WILL CONSTITUTE YOUR AFFIRMATION THAT YOU HAVE NO INFORMATION TO REPORT OR MATTERS TO DISCLOSE.**

**IF YOU WOULD RESPOND IN THE NEGATIVE TO EACH OF THE THREE QUESTIONS BELOW, YOU DO NOT NEED TO RESPOND TO THIS QUESTIONNAIRE OR CLICK ON THE SURVEY LINK PROVIDED.**

**THANK YOU IN ADVANCE FOR YOUR PROMPT ASSISTANCE.**

Dear [Preferred Name],

You are receiving this message in connection with McKinsey RTS's ("**RTS**") recent engagement by Westmoreland Coal Company and its affiliates listed below ("**Westmoreland**") during their Chapter 11 bankruptcy, and a submission that RTS is required to file with the U.S. Bankruptcy Court by July 3, 2019 for that engagement.  That submission must contain disclosures, including RTS and certain of its affiliates' connections with entities previously identified as parties in interest to Westmoreland in the bankruptcy case.

As an advisor to Westmoreland, there are several types of disclosures that we must make to the Bankruptcy Court.  Most of the information required to be disclosed can be obtained from the Firm's databases and records. That process is underway.  We also need a limited amount of information, from Client Service Professionals ("**CSPs**") through questionnaires ("**Questionnaire Recipients**").  We ask these questions of all CSPs, not only CSPs who worked for Westmoreland.

**First**, we must disclose to the Bankruptcy Court presiding over the Westmoreland cases any holdings by Questionnaire Recipients in either the debt or equity securities of Westmoreland (e.g., excluding any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; "**Third-Party Managed Investments**"), as well as the existence of any other claims against Westmoreland held by any Questionnaire Recipient.

1

**Second,** we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to the United State Trustee or any person employed in the Office of the United States Trustee for the Southern District of Texas.

**Third,** we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to any of the Bankruptcy Judges for the Southern District of Texas.

<u>Please review the categories of connections below that require disclosure and click on the survey link provided to submit your response **ONLY IF** you have a connection of the nature described</u>.

Please complete the survey by end of day on **Friday, June 14, 2019**.

1.    <u>**Debt or Equity Securities, or Other Claims Against Westmoreland**</u>*

Have you, on or after July 11, 2018, owned or held a beneficial interest in any debt or equity securities (other than Third-Party Managed Investments) of, or claims against, any of Westmoreland or its debtor affiliates (listed below)?

2.    <u>**Connections to the United States Trustee or any Person Employed by the Office of the United States Trustee for the Southern District of Texas**</u>.  The names of the United States Trustee and employees in the office of the United States Trustee for the Southern District of Texas are listed below.  Do you have any connection to the United States Trustee or to someone employed in the office of the United States Trustee for the Southern District of Texas?

| | |
|---|---|
| Jacqueline Boykin | Linda Motton |
| Hector Duran | Glenn Otto |
| John, P. Fitzgerald, III | Shannon F. Pecoraro |
| Peggy T. Flinchum | Patricia Schmidt |
| Barbara Griffin | Gwen Smith |
| Luci Johnson-Davis | Stephen Statham |
| Henry G. Hobbs, Jr. | June E. Turner |
| Diane Livingstone | Robert B. Van Arsdale |
| Christine March | Clarissa Waxton |
| Teresa E. McPherson | |

3.    <u>**Connections to any Bankruptcy Judges in the Southern District of Texas**</u>. The names of the Bankruptcy Judges in the Southern District of Texas are listed below. Do you have any connection to a Bankruptcy Judge for the Southern District of Texas?

2

| David R. Jones | Jeffrey P. Norman |
| Jeff Bohm | Eduardo V. Rodriguez |
| Marvin Isgur | |

**LINK TO SURVEY HERE**

If you have questions about this survey or need clarification, please reach out to us at westmoreland_rts@mckinsey.com and we will respond promptly.

If you are having any technical issues filling out this survey, please contact the Global Helpdesk.

Thank you for your attention to this request.

- - - -

**\* Bankruptcy Case and list of Westmoreland affiliates**

Westmoreland and its affiliates operate the sixth-largest coal-mining enterprise in North America including nineteen coal mines in six states and Canada.  Westmoreland and its affiliates primarily produce and sell thermal coal to investment grade power plants under long-term, cost-protected contracts, as well as to industrial customers and barbeque charcoal manufacturers.

The list of relevant Westmoreland Coal Company affiliates is provided below:

| Absaloka Coal LLC | Westmoreland Canadian Investments, LP |
| Basin Resources Inc. | Westmoreland Coal Co. Asset Corp |
| Buckingham Coal Co. LLC | Westmoreland Coal Sales Co. Inc. |
| Dakota Westmoreland Corporation | Westmoreland Energy LLC |
| Daron Coal Co. LLC | Westmoreland Energy Services Inc. |
| Harrison Resources LLC | Westmoreland Energy Services New York Inc. |
| Haystack Coal Co. | Westmoreland Kemmerer Fee Coal Holdings LLC |
| Oxford Conesville LLC | Westmoreland Kemmerer LLC |
| Oxford Mining Co. - Kentucky LLC | Westmoreland Mining LLC |
| Oxford Mining Co. LLC | Westmoreland North Carolina Power LLC |
| Prairie Mines & Royalty ULC | Westmoreland Partners |
| San Juan Coal Co. | Westmoreland Power Inc. |

3

| San Juan Transportation Co. | Westmoreland Prairie Resources Inc. |
| --- | --- |
| Texas Westmoreland Coal Co. | Westmoreland Resource Partners, LP |
| WCC Holding B.V. | Westmoreland Resources GP LLC |
| WCC Land Holding Co. Inc. | Westmoreland Resources Inc. |
| WEI - Roanoke Valley Inc. | Westmoreland Risk Management Inc. |
| Western Energy Co. | Westmoreland San Juan Holdings Inc. |
| Westmoreland - Roanoke Valley, LP | Westmoreland San Juan LLC |
| Westmoreland Canada Holdings Inc. | Westmoreland Savage Corporation |
| Westmoreland Canada LLC | WRI Partners Inc. |

**SURVEY TEMPLATE**

**Instructions: Please check the most relevant option as it applies to you in each of the categories below and provide additional information as relevant. Press submit at the bottom of this survey once you are done. In case you have erroneously entered this survey, please exit by closing this browser window.**

I.      **Debt or Equity Securities, or Other Claims Against Westmoreland Coal Company or its debtor affiliates\***

If you have owned or held a beneficial interest in any debt or equity securities (other than any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; "**Third-Party Managed Investments**") of, or claims against, Westmoreland Coal Company or one or more of its debtor affiliates\* on or after July 11, 2018, please check the appropriate box below and provide the requested information.

> *[Check-box 1] -- I currently hold debt or equity securities of, or other claims against, Westmoreland Coal Company or one or more of its debtor affiliates\*. (If selecting this option, please describe in your reply the type of debt or equity securities that you hold, the legal name of the issuer, and/or the nature of any claim that you may hold or assert in the text field below.)*

> *[Check-box 2] -- I have held but no longer hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, Westmoreland Coal Company and one or more of its debtor affiliates\*.  (If selecting this option, please describe in your reply the date on which you sold or otherwise disposed of your securities or claims, the type of debt or equity securities that you hold, the legal name of the issuer, and/or the nature of any claim that you may hold or assert in the text field below.)*

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS EITHER CHECK-BOX FOR QUESTION 1 ABOVE]*

If you have selected either option, please provide further details below:

**II.** **Connections to the United States Trustee or any Person Employed by the Office of the United States Trustee for the Southern District of Texas.** The names of the United States Trustee and employees in the office of the United States Trustee for the Southern District of Texas are listed below.

| | |
|---|---|
| Jacqueline Boykin | Linda Motton |
| Hector Duran | Glenn Otto |
| John, P. Fitzgerald, III | Shannon F. Pecoraro |
| Peggy T. Flinchum | Patricia Schmidt |
| Barbara Griffin | Gwen Smith |
| Luci Johnson-Davis | Stephen Statham |
| Henry G. Hobbs, Jr. | June E. Turner |
| Diane Livingstone | Robert B. Van Arsdale |
| Christine March | Clarissa Waxton |
| Teresa E. McPherson | |

[Check-box] I have connections to the United States trustee or to someone employed in the office of the United States trustee for the Southern District of Texas.

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS THE CHECK-BOX IN QUESTION #2 ABOVE]*

Please describe in the text field below the connections that you have to the United States Trustee or to anyone employed in the office of the United States Trustee, including the name of such person:

**III.** **Connections to any Bankruptcy Judges in the Southern District of Texas.** The names of the Bankruptcy Judges in the Southern District of Texas are listed below:

| | |
|---|---|
| David R. Jones | Jeffrey P. Norman |
| Jeff Bohm | Eduardo V. Rodriguez |
| Marvin Isgur | |

6

| | |
|---|---|
| [Check-box] I have connections to a Bankruptcy Judge for the Southern District of Texas. | |

*[BELOW IS A MANDATORY FREE TEXT FIELD FOR ANYONE WHO SELECTS THE CHECK-BOX IN QUESTION #3 ABOVE]*

Please describe in the text field below the connections that you have to a Bankruptcy Judge for the Southern District of Texas, including the name of such person:

| |
|---|
| |

**\* Westmoreland affiliates**

The list of relevant Westmoreland Coal Company affiliates is provided below:

| | |
|---|---|
| Absaloka Coal LLC | Westmoreland Canadian Investments, LP |
| Basin Resources Inc. | Westmoreland Coal Co. Asset Corp |
| Buckingham Coal Co. LLC | Westmoreland Coal Sales Co. Inc. |
| Dakota Westmoreland Corporation | Westmoreland Energy LLC |
| Daron Coal Co. LLC | Westmoreland Energy Services Inc. |
| Harrison Resources LLC | Westmoreland Energy Services New York Inc. |
| Haystack Coal Co. | Westmoreland Kemmerer Fee Coal Holdings LLC |
| Oxford Conesville LLC | Westmoreland Kemmerer LLC |
| Oxford Mining Co. - Kentucky LLC | Westmoreland Mining LLC |
| Oxford Mining Co. LLC | Westmoreland North Carolina Power LLC |
| Prairie Mines & Royalty ULC | Westmoreland Partners |
| San Juan Coal Co. | Westmoreland Power Inc. |
| San Juan Transportation Co. | Westmoreland Prairie Resources Inc. |
| Texas Westmoreland Coal Co. | Westmoreland Resource Partners, LP |
| WCC Holding B.V. | Westmoreland Resources GP LLC |
| WCC Land Holding Co. Inc. | Westmoreland Resources Inc. |

| | |
|---|---|
| WEI - Roanoke Valley Inc. | Westmoreland Risk Management Inc. |
| Western Energy Co. | Westmoreland San Juan Holdings Inc. |
| Westmoreland - Roanoke Valley, LP | Westmoreland San Juan LLC |
| Westmoreland Canada Holdings Inc. | Westmoreland Savage Corporation |
| Westmoreland Canada LLC | WRI Partners Inc. |

**<u>Exhibit F – Email Survey to Deal Team re MIO Board</u>**

Dear [Engagement Team Member],

You are receiving this email because you have been identified as a member of the team providing services to Westmoreland.

Please answer the following two questions by responding to this email.  Indicate which question you are responding to in your answer.

Question 1

Have you worked with any of the MIO Partners, Inc. ("MIO") directors listed below in their capacities as MIO board members?

Question 2

Are you related to or do you have a relationship with any of these MIO board members, other than one arising out of having McKinsey as a common employer?

Please respond **YES** or **NO** to each question.  If your answer is **YES**, please provide further details.

William Huyett
Kevin Buehler
Toos Daruvala
Jon Garcia
Gordon Orr
Stefan Spang
Donald C. Waite, III
Paal Weberg
Ivo Bozon
Adil Zainulbhai
Martin Huber
Elizabeth Lempres
Vikram Malhotra
Tom Barkin
Christine M. Cumming
Tomothy P. Flynn
Kevin J. Speicher
Magnus Tyreman
Jean-Christophe Mieszala

Thank you.

## **Exhibit G – Sample Consolidated MIO Investor Report (US)**

# Consolidated Statement of Partner's Share Holdings, Pensions and Investments with MIO



**SAMPLE**

**The numbers contained in this sample are fictitious**

| | |
|---|---|
| Account name: | **Zuser6, Demo - Individual Account** |
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

## Table of Contents

Overview of Holdings ........................................................................... 2

Portfolio Summary ............................................................................... 3

MIO Investments ................................................................................. 4

Pensions Plans ................................................................................... 5

Firm Shares ........................................................................................ 6

Notes and Definitions .......................................................................... 7

**Contacts (please click to email)**

**For questions on this statement:**
   at

**For questions on Firm capital:**
   at

**For MIO investment counselling:**
   at

## Exchange Rates

| | 31-Dec-18 | 31-May-19 |
|---|---|---|
| CHF / USD | 1.0144 | 0.9942 |
| GBP / USD | 1.2736 | 1.2604 |

**SAMPLE**

**The numbers contained in this sample are fictitious**

## Overview of Holdings

| | |
|---|---|
| Account name: | **Zuser6, Demo - Individual Account** |
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

**Overview**

| Assets | 31-Dec-18 | 31-May-19 |
|---|---|---|
| Firm Shares & Debentures | 1,611 | 1,811 |
| MIO Investments | 836 | 836 |
| Partner Cash Balance Plan | 264 | 264 |
| Retirement Program | 1,381 | 1,381 |
| **Total Assets** | **4,094** | **4,294** |
| **Total Portfolio** | **4,094** | **4,294** |

**Summary of Changes**

| | Year to Date |
|---|---|
| Beginning value | 4,094 |
| Net additions/withdrawals | 0 |
| Profit/loss | 200 |
| **Total Portfolio** | **4,294** |

**SAMPLE**

<span style="color:red">The numbers contained in this sample are fictitious</span>

## Portfolio Summary

| Account name: | **Zuser6, Demo - Individual Account** |
|---|---|
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

| | Valuations as of 31-Dec-18 | YTD additions/ withdrawals | YTD profit/(loss) | Current valuation |
|---|---|---|---|---|
| Firm Shares and Debentures | 1,611 | 0 | 200 | 1,811 |
| **Total Firm Shares & Debentures** | **1,611** | **0** | **200** | **1,811** |
| US MIO Investments | 836 | 0 | 0 | 836 |
| **Total MIO Investments** | **836** | **0** | **0** | **836** |
| Partner Cash Balance Plan | 264 | 0 | 0 | 264 |
| **Total Partner Cash Balance Plan** | **264** | **0** | **0** | **264** |
| PSRP/ MPPP | 1,381 | 0 | 0 | 1,381 |
| **Total Retirement Program** | **1,381** | **0** | **0** | **1,381** |
| **Total Portfolio** | **4,094** | **0** | **200** | **4,294** |

MIO Partners

SAMPLE
The numbers contained in this sample are fictitious

## MIO Investments

| Account name: | **Zuser6, Demo - Individual Account** |
|---|---|
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

| | Fund currency | Units held | Valuations as of 31-Dec-18 | YTD additions/ withdrawals | YTD profit/(loss) | Current valuation | Valuation date | Performance % (time-weighted) Month | YTD |
|---|---|---|---|---|---|---|---|---|---|
| **US MIO Investments** | | | | | | | | | |
| Compass Special Situations Fund LLC | USD | | 836 | 0 | 0 | 836 | 31-Jul-17 | 1.07 | 1.37 |
| **Total US MIO Investments** | | | **836** | **0** | **0** | **836** | | | |
| | | | | | | | | | |
| **Total MIO Investments** | | | **836** | **0** | **0** | **836** | | | |

SAMPLE
Case 18-35672   Document 2426   Filed in TXSB on 10/24/19   Page 129 of 145
The numbers contained in this sample are fictitious

## Pension Plans

| | | |
|---|---|---|
| Account name: | **Zuser6, Demo - Individual Account** | |
| Statement date: | **31-May-19** | |
| Reporting currency: | **USD** | |

| | Fund currency | Units held | Valuations as of 31-Dec-18 | YTD additions/ withdrawals | YTD profit/(loss) | Current valuation | Valuation date | Performance % (time-weighted) Month | YTD |
|---|---|---|---|---|---|---|---|---|---|
| **PSRP/ MPPP** | | | | | | | | | |
| Special Situations Portfolio | USD | | 1,381 | 0 | 0 | 1,381 | 31-Jul-18 | (0.11) | 4.89 |
| **Total PSRP/ MPPP** | | | **1,381** | **0** | **0** | **1,381** | | | |
| **Total Pensions Plans** | | | **1,381** | **0** | **0** | **1,381** | | | |

SAMPLE
The numbers contained in this sample are fictitious

## Firm Shares

| | |
|---|---|
| Account name: | **Zuser6, Demo - Individual Account** |
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

| | Units held | Valuations as of 31-Dec-18 | YTD additions/ withdrawals | YTD profit/(loss) | Current valuation | Valuation date |
|---|---|---|---|---|---|---|
| **Firm Shares and Debentures** | | | | | | |
| Required Shares | 49.0000 | 1,611 | 0 | 200 | 1,811 | 31-May-19 |
| **Total Firm Shares and Debentures** | | **1,611** | **0** | **200** | **1,811** | |
| **Total Firm Shares Less Loans** | | **1,611** | **0** | **200** | **1,811** | |

SAMPLE

## Notes and Definitions

| | |
|---|---|
| Account name: | **Zuser6, Demo - Individual Account** |
| Statement date: | **31-May-19** |
| Reporting currency: | **USD** |

This statement reflects your balances as of 31-May-19. Any activity in your fund holdings effective after this date is not included herein. The holdings on the statement are based on the most recent price available and delays are possible when data is provided by an external administrator.

Statements are available monthly. They are generally produced 45 days after the effective date. In addition, you may request a current statement of your holdings by contacting the MIO Investment Counselling team.

**Definitions:**

1.  Time-weighted Performance is equivalent to the performance reported by the fund or product. It ignores the impact of your contributions and withdrawals from the fund on your effective performance during the reporting period.
2.  YTD additions / withdrawals is the net amount of all additions less all withdrawals for the current calendar year. A detailed list of all transactions for the current calendar year is included in the "Transactions" section of this report.
3.  YTD unrealized profit / (loss) is the amount of gain or loss generated from holdings for the current calendar year. Since all holdings are reported  in the reporting currency per the exchange rate on the statement date, gains or losses may include exchange rate movements.
4.  For Private Equity investments:
    Current value is the latest available valuation received from the manager (typically with at least one quarter lag) adjusted for any unaccounted capital calls and distributions for the period.
    Total value / capital called ratio is the ratio of current value plus total distributions received over total capital called.

MIO Partners

**<u>Exhibit H – Sample CPI PCAP</u>**



Compass Private Investments
Sample
Investor Account Statement (Page 1 of 1)

**The numbers contained in this sample are fictitious**

MIO PARTNERS, Inc.

### 03/31/2019 Cumulative Underlying Investment:

| Fund | Investment Commitment | Investment Unfunded Commitment | Investment value | Investment Contributions | Investment Distributions | Cumulative Investment value |
|---|---|---|---|---|---|---|
| **Compass Private Investments 2015 Master LP** | $ 45,000,000 | $ 10,000,000 | $ 80,000,000 | $ 35,000,000 | $ 6,245,706 | $ 86,245,706 |
| **Compass Private Investments 2017 Master LP** | 50,000,000 | 20,000,000 | 200,000,000 | 30,000,000 | 561,333 | 200,561,333 |
| **Total** | $ 95,000,000 | $ 30,000,000 | $ 280,000,000 | $ 65,000,000 | $ 6,807,039 | $ 286,807,039 |

### 03/31/2019 Underlying Investments, gross multiple:

| | Gross Investment multiple [1] | Gross Investment DPI [1] | Gross Investment IRR |
|---|---|---|---|
| **Compass Private Investments 2015 Master LP** | 2.46 | 0.18 | 30.24% |
| **Compass Private Investments 2017 Master LP** | 6.69 | 0.02 | 50.78% |
| **Total** | 9.15 | 0.20 | |

### Cumulative as of 03/31/2019:

| Fund | Capital Commitment | Capital Contributions | Net gain (loss) | Distributions | Transfers | Ending net value |
|---|---|---|---|---|---|---|
| **Compass Private Investments 2015 LLC** | $ 200,000 | $ 158,811 | $ 46,359 | ($ 33,905) | - | $ 171,265 |
| **Compass Private Investments 2017 LLC** | 200,000 | 101,127 | 16,454 | - | - | 117,581 |
| **Total** | $ 400,000 | $ 259,938 | $ 62,813 | ($ 33,905) | - | $ 288,846 |

### 03/31/2019 Total value investor, net multiple:

| | Cumulative net value | Net multiple [2] | Net DPI [2] | Net IRR [3] |
|---|---|---|---|---|
| **Compass Private Investments 2015 LLC** | $ 205,171 | 1.29 | 0.21 | 10.36% |
| **Compass Private Investments 2017 LLC** | 117,581 | 1.16 | | 13.74% |
| **Total** | $ 322,752 | 1.24 | 0.13 | |

### YTD as of 03/31/2019:

| Fund | Beginning net value | Capital Contributions | Net gain (loss) | Distributions | Transfers | Ending net value |
|---|---|---|---|---|---|---|
| **Compass Private Investments 2015 LLC** | $ 161,106 | $ 10,000 | $ 159 | - | - | $ 171,265 |
| **Compass Private Investments 2017 LLC** | 107,098 | 10,000 | 483 | - | - | 117,581 |
| **Total** | $ 268,205 | $ 20,000 | $ 642 | - | - | $ 288,846 |

### Unfunded Commitment as of 03/31/2019 :

| Fund | Commitment | Capital Contributions [4] | Recallable Distributions [5] | Unfunded Commitment |
|---|---|---|---|---|
| **Compass Private Investments 2015 LLC** | $ 200,000 | $ 157,841 | ($ 13,841) | $ 56,000 |
| **Compass Private Investments 2017 LLC** | 200,000 | 100,000 | - | 100,000 |
| **Total** | $ 400,000 | $ 257,841 | ($ 13,841) | $ 156,000 |

### QTD as of 03/31/2019:

| Fund | Beginning net value | Capital Contributions | Net gain (loss) | Distributions | Transfers | Ending net value |
|---|---|---|---|---|---|---|
| **Compass Private Investments 2015 LLC** | $ 161,106 | $ 10,000 | $ 159 | - | - | $ 171,265 |
| **Compass Private Investments 2017 LLC** | 107,098 | 10,000 | 483 | - | - | 117,581 |
| **Total** | $ 268,205 | $ 20,000 | $ 642 | - | - | $ 288,846 |

### Post 03/31/2019 Activity:

| | Capital Called | Distributions | Adjusted ending net value |
|---|---|---|---|
| **Compass Private Investments 2015 LLC** | - | - | $ 171,265 |
| **Compass Private Investments 2017 LLC** | - | - | 117,581 |
| **Total** | - | - | $ 288,846 |

1. Gross TVPI and DPI are net of fees and carry at the underlying investment level where applicable, and are gross of MIO Partners, Inc. operational expenses.
2. Net TVPI (Total Value (Ending Net value plus Distributions) to Paid-in Capital) and DPI (Distributions to Paid-in Capital) are net of fees and carry at the underlying investment level where applicable, and are also net of MIO Partners, Inc. operational expenses. Calculations exclude transferred activity.
3. Net IRR are net of fees and carry of the underlying investment level where applicable, and are also net of MIO Partners, Inc. operational and management expenses.
   Net IRR may fluctuate significantly in the early years of a private investment partnership.
4. Capital contributions reflected in this section are exclusive of catch up interest paid.
5. Recallable distributions are added back to remaining commitment as defined in section 5.2 (a) of the Limited Liability Agreement.

## Exhibit I – SSGI Inflation Linked Bond Index Fund Fact Sheet

**STATE STREET GLOBAL ADVISORS.**

**State Street U.S. Inflation Protected Bond Index Non-Lending Series Fund - Class A**

31 March 2019

*State Street U.S. Inflation Protected Bond Index Fund Class A (the "Fund") represents units of ownership in the State Street U.S. Inflation Protected Bond Index Non-Lending Series Fund.*

**The Fund seeks to offer broad, low cost exposure to U.S. Treasury bonds which automatically adjust to protect from increases in inflation.**

## Investment Objective

The Fund seeks an investment return that approximates as closely as practicable, before expenses, the performance of the Bloomberg Barclays U.S. Treasury Inflation Protected Securities (TIPS) Index (the "Index") over the long term.

## Investment Strategy

The Fund is managed using an "indexing" investment approach, by which SSGA attempts to approximate, before expenses, the performance of the Index over the long term. The Fund will not necessarily own all of the securities included in the Index.

The Fund may attempt to invest in the securities comprising the Index, in the same proportions as they are represented in the Index. However, due to the diverse composition of securities in the Index and the fact that many of the securities comprising the Index may be unavailable for purchase, it may not be possible for the Fund to purchase some of the securities comprising the Index. In such a case, SSGA will select securities for the Fund comprising a portfolio that SSGA expects will provide a return comparable to that of the Index.

SSGA expects that it will typically seek to replicate Index returns for the Portfolio through investments in the "cash" markets - actual holdings of debt securities and other instruments - rather than through "notional" or "synthetic" positions achieved through the use of derivatives, such as futures contracts or swap transactions (except in the unusual case where SSGA believes that use of derivatives is necessary to achieve an exposure that is not readily available through the cash markets).

SSGA may implement the Fund's asset allocations through investments in indexed investment vehicles, which typically attempt to replicate the returns of a specific index or group of indices. These will typically include investment pools (which may, but will not necessarily, be registered under the U.S. Investment Company Act of 1940, as amended) managed or sponsored by SSGA or an affiliate. Because of the unit issuance processes employed by the various underlying investment pools, allocations by the Fund to certain pools on a given trading day may be invested in such pools at the next trading day's net asset value per unit. This will result in the portion of the Fund's assets being invested in such investment pools being held in cash for the trading day and may result in increased tracking error. This could adversely impact the return to any investor.

The Fund's return may not match the return of the Index.

## Key Facts

- The Fund is managed using an indexing strategy
- The Fund does not normally use futures or other derivatives to create "notional" or "synthetic" index exposures
- The Fund may invest in other investment pools, including those managed by SSGA and its affiliates
- The Fund is not leveraged
- The Fund will not sell securities short

## Performance

| Total Returns | Fund | Benchmark |
|---|---|---|
| Q1 2019 | | |
| YTD | | |
| 1 Year | | |
| 3 Year | | |
| 5 Year | | |
| 10 Year | | |
| Inception to Date (01 Aug 2000) | | |
| Best Year Since Inception (2002) | | |
| Worst Year Since Inception (2013) | | |

The returns are provided in accordance with the description of the Fund's total expense ratio information that can be found on the last page under the fee disclosure section of the fact sheet. All returns greater than 1 year are annualized. Past performance is not a guarantee of future results. Current performance may be lower or higher than the performance shown above. Fund returns reflect all items of income, gain and loss and the reinvestment of dividends and other income and are calculated in US dollars. Index returns are unmanaged and do not reflect the deduction of any fees or expenses. Index returns reflect all items of income, gain and loss and the reinvestment of dividends and other income.

## Growth of $10,000



The hypothetical $10,000 investment chart is plotted quarterly, and includes reinvestment of dividends and capital gains. There is no direct correlation between a hypothetical investment and the anticipated performance of the Fund.

---

The Fund is a collective investment trust and is not FDIC insured, nor is it an obligation or deposit of, or guaranteed by State Street Corporation, SSGA or its affiliates.

Bloomberg Barclays U.S. Treasury Inflation Protected Securities (TIPS) Index is limited to U.S. Treasury Inflation Protected Securities (TIPS). The coupon payments and underlying principal are automatically increased to compensate for inflation as measured by the consumer price index (CPI). The maturities of the bonds in the index are more than one year.

The Bloomberg Barclays U.S. Treasury Inflation Protected Securities (TIPS) Index is a trademark of Bloomberg Barclays, Inc.

Please see the Fee Disclosure section on the last page for a complete disclosure of the Fund's total operating expense.

**This fact sheet provides summary information about the Fund. It should be read in conjunction with the Fund's applicable Strategy Disclosure Document, which is available upon request. The Disclosure Document contains important information about the Fund, including a description of a number of risks associated with investing in the fund.**

**State Street U.S. Inflation Protected Bond Index Non-Lending Series Fund - Class A**    31 March 2019    State Street Global Advisors

## Characteristics

| | |
|---|---|
| Average Credit Quality | ■ |
| Average Effective Convexity | |
| Average Effective Maturity | |
| Real Duration | |
| Real Yield | |
| Total Number of Holdings | |
| Turnover (As-of FYE 12/31) | |

## Sector Allocation

| | |
|---|---|
| TREASURY | ■ |
| OTHER | |

## Top Issuers

| | |
|---|---|
| US/T | ■ |

## Credit Quality Breakdown

| | |
|---|---|
| Aaa | ■ |

Certain supplemental information may be rounded and may result in the total not adding up to 100.

The top holdings are presented to illustrate examples of the securities that the Fund has bought and may not be representative of the Fund's current or future investments. In the case of fixed income and cash funds the securities are aggregated and shown at the issuer level. The top holdings do not include other assets or instruments that may be held by the Fund including, for example and not by way of limitation, cash or cash equivalents and derivatives such as futures, options and swaps. The figures presented are as of the date shown above, do not include the Fund's entire investment portfolio, and may change at any time.

The portfolio turnover rate is as-of the prior fiscal year-end ("FYE").  It is calculated consistent with Form N-1A by dividing the lesser amounts of purchases or sales of portfolio securities (i.e., underlying Fund shares) for the fiscal year by the monthly average value of the portfolio securities owned by the Fund during the fiscal year.

Characteristics are calculated using the month-end market value of holdings of the representative account, and where averages are shown these reflect the market weights of the securities in the representative account. For beta and standard deviation, these reflect Composite month-end  returns. Characteristics are as of the date indicated, are subject to change, and should not be relied upon as current thereafter.

Market data, prices, and estimates for characteristics calculations provided by Bloomberg Barclays POINT. Average Credit Quality reflects market value weight of all the rated securities held by the portfolio (excludes unrated securities) using the middle rating provided by either S&P, Moody's and Fitch or lower if only two agency ratings are available. All other portfolio data provided by SSGA. Characteristics are as of the date indicated, are subject to change, and should not be relied upon as current thereafter. Fixed income asset class and country reporting based on Bloomberg Barclays indices which are trademarks of Bloomberg Barclays Inc. and have been licensed for use by State Street.  Bloomberg Barclays or its affiliates ("Bloomberg Barclays") shall not be liable for any inaccuracies or errors with respect to any data or Index referenced herein, nor does Bloomberg Barclays sponsor, endorse or promote the Strategy.

## Important Message About Risk

This section explains some of the general risks involved with investing in the Fund, including possible loss of principal. Bonds generally present less short-term risk and volatility than stocks, but are subject to: interest rate risk (as interest rates raise, bond prices usually fall); issuer default risk; issuer credit risk; liquidity risk; and inflation risk. These effects are usually more pronounced for longer-term securities. Any fixed income security sold or redeemed prior to maturity may be subject to a substantial gain or loss. An increase in real interest rates can cause the price of inflation-protected debt securities to decrease, and interest payments on inflation-protected debt securities can be unpredictable. In addition, the Fund may use derivative instruments which may involve additional risks such as potential illiquidity of the markets, credit risk, currency risk, leverage risk and counterparty risk.

This section does not purport to be a complete explanation; rather, an investment in the Fund is subject to a number of other risks, which are described in more detail in the Fund's Strategy Disclosure Document. Carefully review the complete description of the risks prior to investing in the Fund.

Further, there can be no guarantee that the Investment Objective of the Fund will be met.  Risk management does not promise any level of performance or guarantee against loss of principal. SSGA encourages investors to seek the advice of well-qualified financial and tax advisors, accountants, attorneys and other professionals before making any investment or retirement decision.

## Risk Management

SSGA monitors the overall risk of the Fund, in order to avoid unintended risk relative to the Index. SSGA manages portfolio characteristics and transaction costs in a manner intended to provide a return as close as practicable to the benchmark return.

## About SSGA

The Fund is managed by State Street Global Advisors Trust Company, a wholly owned subsidiary of State Street Bank and Trust Company, and a global leader in providing investment management solutions to clients worldwide. To learn more about SSGA, visit our web site at www.ssga.com.



**State Street regards the Fact Sheets in their distributed form to be complete documents that include material information regarding the Funds for investor consideration. You are not authorized to make any material modifications to this information without our express consent, and we assume no liability in connection with these Plan Materials or with regard to any modifications to or misuse of the information contained therein.**

## Exhibit J – US Retirement Program Individual Monthly Statement



### Cumulative Performance at 03/31/2019

| | Percent Growth Rates in US Dollars | Percent Growth Rates in Local Currency |
|---|---|---|
| Target Retirement Income Fund | | |
| Target Retirement 2020 Fund | | |
| Target Retirement 2025 Fund | | |
| Target Retirement 2030 Fund | | |
| Target Retirement 2035 Fund | | |
| Target Retirement 2040 Fund | | |
| Target Retirement 2045 Fund | | |
| Target Retirement 2050 Fund | | |
| Target Retirement 2055 Fund | | |
| Target Retirement 2060 Fund | | |
| Special Situations | | |
| Special Situations Enhanced-Liquidity USD | | |
| Passive US Equities | | |
| Passive Non-US Equities | | |
| Passive US Bonds | | |
| Passive Inflation-Linked Bonds | | |
| Passive Money Markets (US dollar) | | |



**To view benchmark performance, log on to MyAccount.McKinsey.com and go to the Historical Performance page (accessible from the Investments menu).**

### Beneficiary Information as of 06/30/2004

**Beneficiary(ies)**

50%
50%

Are your beneficiaries up to date? If not, complete and submit a new beneficiary designation on MyAccount.McKinsey.com.

---

## McKinsey&Company

New York, NY

## Retirement Program Statement as of March 31, 2019

**Important Information**

**You must notify the Alight Resource Center of any errors within 31 days of the issuance of this statement.**

The Alight Resource Center can be reached by email at mckinsey@alight.com or by phone at +1-650-352-4497 or 1-866-208-0303 (toll-free for US calls). The mailing address is Alight Solutions, 2 CityPlace Drive, 2nd Floor, St. Louis, MO 63141, USA.

If your total balance on the 1st day of any month is less than $3,500, you will not be charged an administrative fee for that month.

If you are a citizen or permanent resident of the US, you will be subject to US income taxes on your withdrawals.

If you are not a citizen or permanent resident of the US and reside outside of the US, your withdrawals will be subject to a 30 percent US withholding tax on the investment gain portion and on any contributions earned working in the US. This tax may not apply if you reside at the time of withdrawal in a country with an applicable US tax treaty.

You have the opportunity once each year to allocate your balances among available portfolios. To help achieve long-term retirement security, you should give careful consideration to the benefits of a well-balanced and diversified investment portfolio. Spreading your assets among different types of investments can help you achieve a favorable rate of return, while minimizing your overall risk of losing money. Although diversification is not a guarantee against loss, it is an effective strategy to help you manage investment risk.



**As of 03/31/2019**
**Your total balance is $** ▮▮▮▮

**In US Dollars, for the three months ended March 31, 2019**

| | Total | Special Situations |
|---|---|---|
| Cumulative YTD Growth Rates | | |
| Value as of 12/31/2018 | $ | $ |
| Employee Contributions | $ | $ |
| Investment Change | $ | $ |
| Administrative fees, including recordkeeping, audit, legal | -$ | |
| Value as of 03/31/2019 | $ | $ |
| Percentage of Program Value | 100% | 100% |



**Summary**

| | In US Dollars |
|---|---|
| Firm Contributions - PSRP | $ |
| Firm Contributions - MPPP | $ |
| Traditional 401(k) Contributions | $ |
| Roth Contributions | $ |
| Voluntary Contributions Post-1986 | $ |
| Rollovers | $ |
| Investment Change from Inception | $ |
| Value as of 03/31/2019 | $ |

## Exhibit K – US Retirement Monthly Performance Report

McKinsey&Company | MyAccount

# Historical Investment Performance

## Rates of Return – (*shown in U.S. Currency*)

All numbers are percentages, except Sharpe Ratios.

| Portfolio Name | 2019 | | Calendar Year Ended | | | | | 5-Year Annualized | | | 10-Year Annualized | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | JUNE | YTD | 2018 | 2017 | 2016 | 2015 | 2014 | Return | Volatility | Sharpe Ratio | Return | Volatility | Sharpe Ratio |
| **■ TARGET RETIREMENT[1]** | | | | | | | | | | | | | |
| Target Retirement Income Fund | | | | | | | | | | | | | |
| Target Retirement 2020 Fund | | | | | | | | | | | | | |
| Target Retirement 2025 Fund | | | | | | | | | | | | | |
| Target Retirement 2030 Fund | | | | | | | | | | | | | |
| Target Retirement 2035 Fund | | | | | | | | | | | | | |
| Target Retirement 2040 Fund | | | | | | | | | | | | | |
| Target Retirement 2045 Fund | | | | | | | | | | | | | |
| Target Retirement 2050 Fund | | | | | | | | | | | | | |
| Target Retirement 2055 Fund | | | | | | | | | | | | | |
| Target Retirement 2060 Fund | | | | | | | | | | | | | |
| **■ MANAGED PORTFOLIOS** | | | | | | | | | | | | | |
| Special Situations | | | | | | | | | | | | | |
| *Benchmark[2]* | | | | | | | | | | | | | |
| Special Situations Enhanced-Liquidity USD | | | | | | | | | | | | | |
| *Benchmark[3]* | | | | | | | | | | | | | |
| **■ EQUITIES** | | | | | | | | | | | | | |
| Passive US Equities | | | | | | | | | | | | | |
| *Benchmark[4]* | | | | | | | | | | | | | |
| Passive Non-US Equities | | | | | | | | | | | | | |
| *Benchmark[5]* | | | | | | | | | | | | | |
| **■ DEFLATION SENSITIVE** | | | | | | | | | | | | | |
| Passive US Bonds | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **■ INFLATION SENSITIVE** | | | | | | | | | | | | | |
| Passive Inflation-Linked Bonds | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

McKinsey&Company | MyAccount

| CASH | |
|---|---|
| Passive US Dollar Money Markets | ██████████████████████ |
| *Benchmark: Merrill Lynch 3-Month U.S. Treasury Bills Index* | ██████████████████████ |

ⓘ The performance information for Portfolios in this chart is after expenses and any applicable management and/or incentive fees, which are reported separately in Comparing Fees and Expenses. Each Portfolio and benchmark performance was computed on a calendar-year basis. In addition, the returns for each Portfolio and benchmark were annualized (using the geometric average method) for 5 years for the period of January 1, 2013 to December 31, 2017 and for 10 years from January 1, 2008 to December 31, 2017 and will only be updated following subsequent calendar year ends. If 5 or 10 years of data were not available for the Portfolio, the 5 or 10-year annualized performance information is not provided, and annualized performance information for the corresponding benchmark(s) are provided for comparison purposes. Annualized volatility, a measure of the dispersion or uncertainty of returns, was computed from the monthly returns of a Portfolio and benchmark over the same 5 or 10-year period (or since a Portfolio's inception date where noted). Volatility is one commonly used measure of investment risk; typically, the higher the volatility of investment returns, the higher the investment risk. To illustrate, equities have a higher level of volatility than a money market fund.

ⓘ The Sharpe Ratio is a measure of return adjusted for the volatility risk of the portfolio. It is defined as the average return of the portfolio in excess of the risk-free rate (1) divided by the portfolio return volatility (2). A high Sharpe Ratio indicates that a manager has achieved higher excess returns for a similar level of volatility than a manager with lower Sharpe Ratio. The Sharpe ratio has become a commonly-used measure of the risk/reward profile of portfolios and broad market indices; however it has some significant limitations: The Sharpe Ratio may materially understate the true risk profile of a Portfolio, because each Portfolio is subject to the risk that a participant could lose all or a substantial amount of his or her account balance -- that is not reflected in the standard deviation of returns, the only measure of risk used in calculating Sharpe ratios. The markets in which the Portfolios trade, the liquidity characteristics of the traded securities, the risks of leverage, the use of derivative securities with non-linear risk sensitivities, the use of non-representative historical data for estimating standard deviation, manager error, bad judgment and/or misconduct create the possibility of sudden, dramatic and unexpected losses — losses that are not reflected in Sharpe ratios or standard deviations. Participants must recognize this risk as a material risk involved in investing in any Portfolio. The Sharpe Ratio does not distinguish between volatility due to systemic risk—i.e. risk induced by market cycles—vs. idiosyncratic risk. A portfolio where a greater proportion of volatility is caused by systemic risk is more likely to suffer losses at the same time as an investor's other assets. (1) The calculated Sharpe Ratios use the Merrill Lynch Three-Month US Treasury Bills Index as the risk-free rate. (2) An adjusted definition of the Sharpe Ratio subtracts the risk free rate from portfolio returns before calculating the return volatility; the numbers provided here do not make this adjustment,

$$\text{Sharpe Ratio} = \sqrt{12} \times \frac{(\overline{r_p} - \overline{r_f})}{\sigma_{r_p}}$$

i.e. they are calculated as ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀ where $r_p$ is the average monthly return of the portfolio over the period, $r_f$ is the average monthly risk-free rate, and $\sigma_{r_p}$ is the standard deviation (i.e. volatility) of the monthly portfolio return. The $\sqrt{12}$ factor is used to annualize the Sharpe Ratio when calculated based on monthly data.

ⓘ Past performance is not necessarily indicative of future results and may differ depending on the actual date of investment. The performance information provided above reflects, where applicable, returns of the respective Portfolios as of December 31 of each respective year based on an investment as of January 1 of that year. Returns may vary.

ⓘ MIO's Investment Program includes trading, directly or indirectly, in commodity futures, currencies, and swaps, which involve substantial risk of loss. These risks are discussed further in the descriptions of each Portfolio on the MyAccount.McKinsey.com website. There is no guarantee that the financial instruments, hedging strategy and levels, investments, and exposure levels presented herein would be held in the respective Portfolios in the future. Benchmark indices used for comparison are sourced from third-party providers and may be affected by factors that may differ from those affecting the applicable Portfolio, and therefore cannot be solely relied upon as an accurate measure of comparison.

ⓘ Portfolio performance is denominated in USD.

**Notes**

1. The inception date of the Target Retirement Funds in the Retirement Program was ████████████. As a result prior years, 5 and 10-year performance data are not provided.

2. As of January 1, 2018, the benchmark for the Portfolio has been comprised of ████████████████████████████████████████████████████████████████████████████████████████████████████████████████



3. As of January 1, 2018, the benchmark for the Portfolio has been comprised of



4. As of January 1, 2018, the Portfolio's benchmark

5. As of January 1, 2018, the Portfolio's benchmark has been