UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | Case No. 18-35672 (DRJ) |
| Reorganized Debtors. | (Jointly Administered) |

### REPLY OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND CERTAIN OF ITS AFFILIATES TO U.S. TRUSTEE'S RESPONSE TO THE WLB DEBTORS' APPLICATION TO RETAIN AND EMPLOY MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND CERTAIN OF ITS AFFILIATES [DKT. 2273]

McKinsey Recovery & Transformation Services U.S., LLC ("**RTS**") and the Retained Affiliates (together, the "**Proposed Professionals**") respectfully submit this reply to the response (Dkt. 2273, the "**Response**") filed by the United States Trustee for Region 7 (the "**U.S. Trustee**") to the WLB Debtors' application (the "**Application**")[2] seeking entry of an order authorizing the WLB Debtors to employ and retain the Proposed Professionals as performance improvement advisors *nunc pro tunc* to the Petition Date (Dkt. 2119). In further support of entry of the Application, the Proposed Professionals respectfully state as follows:

---

[1] Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

[2] Capitalized terms not defined herein shall have the meaning given to them in the Application or the *Declaration of Dmitry Krivin in Support of WLB Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief*, Dkt. 2120, (the "**Krivin Declaration**"), as applicable.

**PRELIMINARY STATEMENT**

1. The Proposed Professionals and the U.S. Trustee have been engaged in a lengthy and productive dialogue regarding the disclosures (the "**Disclosures**") made in the Krivin Declaration, and in particular the Proposed Professionals have responded to formal and informal discovery requests to address the U.S. Trustee's questions, both before and after the Response was filed. This type of process—in which the U.S. Trustee probes initial disclosures and asks clarifying and follow-up questions—is consistent with the U.S. Trustee's regulatory function, and the Proposed Professionals have worked hard to engage on all of the questions posed, as they understand other retained professionals also do as a matter of course.

2. At this time, the Proposed Professionals believe the discovery they have provided responds fully to all of the U.S. Trustee's stated questions and concerns. That said, the Proposed Professionals understand the U.S. Trustee's position that certain of the questions raised should be put before the Court for review and ultimate determination. To aid the Court in its review, this reply will address in detail the two primary issues raised by the Response: (1) whether Rule 2014 requires disclosure of the connections of *all* of the Proposed Professionals' affiliates; and (2) whether the Proposed Professionals must disclose additional information relating to their investment affiliate, MIO. In addition, part III of the reply provides short-form answers to the U.S. Trustee's other questions in the Response, in an effort to aid the parties and the Court in confirming that each item has in fact been thoughtfully considered and addressed.

3. The Proposed Professionals' attentive engagement with the U.S. Trustee is consistent with their overall approach to the Disclosures. Both the breadth of the Disclosures, and the conscientious process by which they were developed—in which the Proposed Professionals sought guidance from respected industry participants including D.J. ("Jan") Baker

and embraced a third-party process reviewer in the form of EY—underscore the Proposed Professionals' good faith efforts to comply with Rule 2014.

4. Well after the Disclosures were developed and filed according to a disclosure protocol developed under the auspices of Mr. Baker, the U.S. Trustee issued its own "Principles to Guide USTP Enforcement of the Duty of Professionals to Disclose Connections to a Bankruptcy Case Under 11 U.S.C. §§ 327 and 1103 and Fed. R. Bankr. P. 2014" (the "**New Guidance**"). *See* Memorandum from Clifford White III, Director, Exec. Office for U.S. Trustees (Dec. 4, 2019). Since the New Guidance did not exist at the time the Disclosures were made, the Disclosures were not expressly tailored to address it and could not have taken it into account. On its face, the New Guidance advocates for a baseline rule of disclosure of all connections of all affiliates—including investment affiliates. That said, the New Guidance does recognize that each firm's particular corporate structure and internal separation policies must be taken into account and may affect disclosure obligations. As described herein, even by this new standard (which is beyond previous industry practice)[3] the Disclosures are appropriate because, taking McKinsey's structure and policies into account, the Disclosures the Proposed Professionals made regarding direct and indirect connections satisfied both the letter and spirit of Rule 2014.

5. The Proposed Professionals and the U.S. Trustee are in agreement that neither the protocol developed by Mr. Baker to guide the Proposed Professionals' disclosures, nor the New Guidance promulgated by the U.S. Trustee, is a substitute for this Court's legal determination as to the sufficiency of disclosure or as to the ultimate question of whether the Proposed

---

[3] *See* Summary of Industry Affiliated Investments Disclosures filed on March 27, 2019 (Dkt. 1659-1), listing numerous professionals, including those retained in these chapter 11 case, that do not disclose their affiliates' connections.

3

Professionals are disinterested.[4] At its heart, the disinterestedness requirement in Bankruptcy Code section 327(a) seeks to guard against a debtor or creditors' committee retaining a conflicted bankruptcy professional, one that is incentivized to pursue outcomes other than those to maximize the value of the bankruptcy estate. McKinsey's internal policies described herein, including with respect to MIO and its federally regulated information barriers, ensure that the Proposed Professionals lack any information about or control over investments that might cause them to be conflicted or appear to be conflicted. After extensive disclosure and lengthy discovery as to the Proposed Professionals' connections, it is clear that there is, in fact, no conflict of the sort that would prohibit retention.

6.    Therefore, the objections in the Response should be overruled, and the Application should be granted.

## ARGUMENT

### I. Connections of the Proposed Professionals' Unretained Affiliates Need Not Be Disclosed and Are Not Disqualifying

7.    The Response and the New Guidance provide two possible approaches to disclosure of connections of the Proposed Professionals' unretained affiliates: either those connections must be disclosed, or the Proposed Professionals must provide evidence demonstrating that the entities seeking to be retained are sufficiently separate from the unretained affiliates that this sort of disclosure is not necessary. *See* Response ¶ 11; New Guidance § 3.

8.    As a threshold matter, this standard is not rooted in either the Bankruptcy Code or the Bankruptcy Rules, nor is it supported by past practice as evidenced by retention orders for

---

[4] The New Guidance acknowledges that it is not binding and approval of any retention application "resides solely with the court." New Guidance at 3.

other professionals in this Court and bankruptcy courts nationwide.[5]  However, it is not necessary in this case to reach the broad question of whether the New Guidance's standard is over-reaching as a matter of law, because in *this* case ample evidence shows that the Proposed Professionals meet even the U.S. Trustee's standard:  the Proposed Professionals are sufficiently separate from their unretained affiliates that there is no need to require and evaluate additional affiliates' connections for a possible impact on the Proposed Professionals' disinterestedness.

9. This interpretation is in accord with the text of the Bankruptcy Code and Rule 2014, neither of which requires any disclosures on behalf of a professional's unretained affiliates.  Rule 2014 requires the disclosure of a professional "person's connections."  Fed. R. Bankr. P. 2014(a).  "Person" is defined in the Bankruptcy Code as an "individual, partnership, and corporation."   11 U.S.C. § 101(41).  The definition of "disinterested person" in the Bankruptcy Code excludes creditors, equity security holders, insiders, recent directors and officers of a debtor and persons with materially adverse interests to the estate.  *Id.* § 101(14).  Neither definition mentions an "affiliate," which is a term separately defined in the Bankruptcy Code.  *See id.* § 101(2) (defining "affiliate").  If Congress had intended to include a corporation's affiliates in the definition of "person," it would have done so.  *In re Cygnus Oil & Gas Corp.*, No. 07–32417, 2007 WL 1580111, at *3–4 (Bankr. S.D. Tex. May 29, 2007) ("Rules of statutory interpretation direct the Court to 'presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

10. Case law similarly recognizes professionals can be retained without disclosing every connection of every unretained affiliate.  This Court has regularly approved retention applications (including in these chapter 11 cases) when a professional explicitly states that it has

---

[5] *See* Summary of Industry Affiliated Investments Disclosures filed on March 27, 2019 (Dkt. 1659-1).

5

neither searched for, nor disclosed, affiliate connections.[6] This Court is in good company, as bankruptcy courts around the country follow the same practice.[7]

11. The U.S. Trustee also agrees that it is not necessary for a professional to disclose connections of all affiliates in all circumstances. Specifically, the New Guidance provides:

> **Disclose Affiliate Connections**. It is the USTP's position that a professional firm being employed must disclose the connections of all its affiliates. Every case is fact specific and, in some circumstances, a professional firm may be able to show that it is

---

[6] *See, e.g.,* Order Authorizing Retention of Jefferies LLC, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 28, 2018), Dkt. 622 (approving retention where connections-checking process only searched retained entities, *see* Slezinger Decl. ¶ 15, Dkt. 556); Order Authorizing Retention of Lazard Freres & Co., *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 14, 2018), Dkt. 492 (approving retention where connections-checking process only searched retained entities, *see* Cowan Decl. ¶ 8, Dkt. 216); Order Authorizing Retention of Centerview Partners LLC, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 14, 2018), Dkt. 494 (approving retention where connections-checking process only searched retained entities, *see* Puntus Decl. ¶ 16, Dkt. 209); Order Authorizing Retention of Lazard Frères & Co., *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Oct. 3, 2019), Dkt. 378 (approving retention where connections-checking process only searched retained entities, *see* Yearley Decl. ¶ 9, Dkt. 226); Order Authorizing Retention of Credit Suisse Securities (USA) LLC, *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Oct. 5, 2017), Dkt. 861 (approving retention where connections-checking process only searched retained affiliates, *see* Kaufman Decl. ¶ 19, Dkt. 685); Order Authorizing Retention of Rothschild Inc., *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. July 14, 2017), Dkt. 247 (approving retention where connections-checking process only searched retained entities, *see* Snyder Decl. ¶ 20, Dkt. 122); Order Authorizing Retention of Jefferies LLC, *In re Forbes Energy Servs.*, No. 17-20023 (DRJ) (Bankr. S.D. Tex. Mar. 14, 2017), Dkt. 179 (approving retention where connections-checking process only searched retained entities, *see* White Decl. ¶ 16, Dkt. 106); Order Authorizing Retention of Lazard Frères & Co, *In re Ameriforge Group Inc*., No. 17-32660 (DRJ) (Bankr. S.D. Tex. June 16, 2017), Dkt. 175 (approving retention where connections-checking process only searched retained entities, *see* Aebersold Decl. ¶ 8, Dkt. 150); Order Authorizing Retention of Lazard Frères & Co, *In re Expro Holdings US Inc*., No. 17-60179 (DRJ) (Bankr. S.D. Tex. Jan. 19, 2018), Dkt. 185 (approving retention where connections-checking process only searched retained entities, *see* Lefkovits Decl. ¶ 10, Dkt. 156); Amended Order Authorizing Retention of Lazard Frères & Co., *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 12, 2016), Dkt. 557 (approving retention where connections-checking process only searched retained entities, *see* Yearley Decl. ¶ 8, Dkt. 202-4); Order Authorizing Retention of Rothschild Inc. and Petrie Partners Securities LLC, *In re Ultra Petroleum Corp.,* No. 16-32202 (MI) (Bankr. S.D. Tex. June 20, 2016), Dkt. 337 (approving retention where connections-checking process only searched retained entities, *see* Snyder Dec. at ¶ 20, Dkt. 192).

[7] *See, e.g*., Order Authorizing Retention of Guggenheim Securities, LLC, *In re Mattress Firm, Inc*., No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018), Dkt. 771 (approving retention where connections-checking process only searched retained entities, *see* Savini Decl. ¶ 18, Dkt. 341); Order Authorizing the Retention of Lazard Frères & Co., *In re Sears Holdings Corporations*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018), Dkt. 606 (approving retention where connections-checking process only searched retained entities, *see* Aebersold Decl. ¶ 7, . 345); Order Authorizing Retention of Rothschild Inc., *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018), Dkt. 177 (approving retention where connections-checking process only searched retained entities, *see* Antinelli Decl. ¶ 20, Dkt. 88); Order Authorizing Retention of Guggenheim Securities, LLC, *In re Limited Stores Company, LLC*, No. 17-10124 (KJC) (Bankr. D. Del. Feb. 16, 2017), Dkt. 234 (approving retention where connections-checking process only searched retained entities, *see* Savini Decl. ¶ 28, Dkt.126).

> sufficiently separate from its affiliates to excuse affiliate disclosure. The applicant seeking to employ the professional firm bears the burden of proof and only the court has authority to excuse affiliate disclosure.

New Guidance § 3.  Under the New Guidance each professional seeking to be retained should make a showing sufficient to satisfy the presiding court that, under the particular circumstances presented, an affiliate connection disclosure is not needed in order to evaluate disinterestedness.

12. Here, the Proposed Professionals have presented sufficient evidence demonstrating that no further disclosure is necessary in order for the Court to evaluate disinterestedness due to (i) the breadth of the existing Disclosures, which already captures clients served by unretained affiliates where any consultant employed by a Proposed Professional during the Look-Back Period was "borrowed" by that unretained affiliate to serve the client (capturing all connections of unretained affiliates that might bear upon the disinterestedness of the Engagement Team); and (ii) McKinsey's internal policies and procedures relating to information sharing and conflicts mitigation that prevent information flow between different client teams and thereby circumscribe the knowledge of client connections that any McKinsey consultant (including the Westmoreland Engagement Team) may have.

13. ***The Disclosures Capture Relevant Unretained Affiliate Connections.***  As explained in the Krivin Declaration, the connections disclosed in the Application capture the salient connections of unretained affiliates. The connections disclosed span well beyond the clients of the Proposed Professionals themselves, and included: "(i) each client engagement where time was charged by a consulting professional belonging to a Proposed Professional during the Look-Back Period, and (ii) each client engagement opened during the Look-Back Period for which the project office (i.e., the project GOC code) is a part of a Proposed Professional."  Krivin Decl. ¶ 11.  The resulting list of *all of those connections* formed the Client

7

List against which the Expanded IPL was checked. This Client List goes well beyond the entities that form the Proposed Professionals and makes clear that the process was not one designed to narrow the search. The resulting Client List also includes all clients served by consultants working for any of the Proposed Professionals at any time during the Look-Back Period, including (a) clients served by all consultants at each of the Proposed Professionals, regardless of whether the consultants served on the Engagement Team; (b) clients served by consultants in the Look-Back Period even when the consultants are no longer employed by any of the Proposed Professionals; and (c) clients served by consultants employed by one of the Proposed Professional even where an unretained affiliate was the entity engaged by the client. For example, if a former McKinsey U.S. consultant was borrowed by McKinsey Japan in 2016 to serve ABC Corp., ABC Corp. was included as a client connection to be checked against the Expanded IPL. Accordingly, the Krivin Declaration's disclosures encompass all clients served by consultants employed at any time during the Look-Back Period by any of the Proposed Professionals *and* take into account the "lending" and "borrowing" of individual consultants to any McKinsey affiliate during the Look-Back Period. This is much more inclusive than simply a list of all engagements where one of the Proposed Professionals signed an engagement letter with a client,[8] and pulls in relevant clients of McKinsey consulting affiliates worldwide.

14. ***Internal Confidentiality Policies and Information Barriers Protect Confidential Client Information.*** In addition, the Proposed Professionals employ restrictive internal information barriers that preclude the dissemination of confidential client information —

---

[8] As noted in the Krivin Declaration, the Interested Parties List was also expanded to include all corporate affiliates that shared a common parent with each party listed on the Interested Parties List in order to further broaden the Disclosures and connection searching process. *See* Krivin Decl. ¶ 10. As a result, the list of potential clients that was searched was expanded from approximately 4,200 parties to over 400,000 parties on the Expanded IPL. *See id*. Any suggestion that the Proposed Professionals have not cast a wide enough net in preparing the Disclosures is belied by their process and would have a chilling effect on the industry as to the extent of a proposed professional's obligations with respect to disclosure.

including the fact of an engagement that is not otherwise public — within the firm. These information barriers are highly relevant to disinterestedness because they restrict the knowledge of any member of the Engagement Team could have regarding a client connection, and this eliminates any resulting potential conflict. As explained by Mr. Krivin, the Proposed Professionals serve clients across a broad range of industries, functions and geographies, and, within industries, serve competitors, in each case in a manner and through use of means, including information barriers between client service teams, that protect the confidentiality of each client's information. *See* Krivin Decl. ¶ 27. These walls are robust and have been borne out by discovery:

- Pursuant to the McKinsey Firmwide Information Sharing Policy, any information developed from nonpublic client sources, whether written or not, is confidential to that client, including information from third-party sources that is available to the client service team only through access provided by the client. Confidential client information may not be shared outside of the client service team.

- McKinsey uses "virtual team rooms"—secure electronic workspaces accessible only by members of the client service team—to store work product and confidential client information on each engagement.

- At the time they begin their employment, McKinsey employees are required to sign nondisclosure agreements which prohibit disclosure of confidential client information, even to other employees of the firm. Employees are required to report potential or actual violations of McKinsey's policies.

- McKinsey employees are subject to annual compliance training and certification on confidentiality and related policies.[9]

    15.    The Proposed Professionals' confidentiality safeguards protect against potential conflicts of interest or any incentive to act contrary to the best interest of the WLB Debtors,

---

[9] *See* Exhibit 3 to the *Notice of Supplemental Filing In Support of WLB Debtors' Application For Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date And (II) Granting Related Relief,* Dkt. 2426, as amended by the *Notice of Second Supplemental Filing in Support of WLB Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief,* Dkt. 2554 (the "Supplemental U.S. Trustee Responses").

which are the objectives of Section 327(a).[10] After months of formal and informal discovery,[11] the U.S. Trustee has found no evidence to dispute the integrity of these walls. There is none.

16. As is logical and customary in this Court and nationwide, only the entities that are providing services to the debtor should be required to comply with Rule 2014's disclosure requirements[12] – particularly where, as here, such disclosures are extensive and overinclusive, and the advisor maintains information barriers that protect against potential conflicts.

### II. The Proposed Professionals Lack Knowledge and Control Over MIO Investments

17. The second significant issue raised in the Response is a derivative of the first: the U.S. Trustee has argued that the Proposed Professionals provided "inadequate disclosure regarding its investment fund, MIO." Response ¶ 17; *see also id.* ¶ 8 ("McKinsey RTS still omits critical details about how its consulting professionals are separated from MIO and what controls exist to maintain the separation."). Since the Response was filed, the Proposed

---

[10] *See In re Marble*, No. 07-50099 (RLJ), 2007 WL 1556836, at *3 (Bankr. N.D. Tex. May 25, 2007) ("Courts have interpreted the meaning of disinterested as a professional [who] can make unbiased decisions, free from personal interest, in any matter pertaining to the debtor's estate . . . . The purpose of the rule that [the professional] be disinterested is to assure undivided loyalty to the debtor.") (alteration in original) (citations omitted); *In re Kings River Resorts, Inc.*, 342 B.R. 76, 87 (Bankr. E.D. Cal. 2006) ("A disinterested professional is one that can make unbiased decisions, free from personal interest, in any matter pertaining to the debtor's estate . . . . The purpose of the rule that [the professional] be disinterested is to assure undivided loyalty to the debtor." (quoting *First Interstate Bank of Nevada, N.A. v. CIC Invest. Corp.* (*In re CIC Invest. Corp.*), 192 B.R. 549, 553–554 (9th Cir. BAP 1996)).

[11] In connection with the informal discovery requests, the Proposed Professionals and the U.S. Trustee entered into a stipulation agreeing that the Initial U.S. Trustee Responses and the Supplemental U.S. Trustee Responses shall have the same force and effect as answers to written interrogatories and/or requests to admit and may be used in in any proceeding or trial relating to the Application to the extent allowed by the Federal Rules of Evidence. *See* Dkt. 2567.

[12] The U.S. Trustee also frames this argument as arising out of the Proposed Professionals' request for indemnification from the WLB Debtors of affiliates not performing work for the WLB Debtors. *See* Response ¶ 11. Bankruptcy courts around the country, including in these chapter 11 cases, have approved similar requests based on connections disclosures like those in the Application. *See Notice of Filing In Support of WLB Debtors' Application For Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates as Performance Improvement Advisors for the WLB Debtors Effective Nunc Pro Tunc to the Petition Date And (II) Granting Related Relief,* Dkt. 2348 (the "Initial U.S. Trustee Responses"), at § P.

10

Professionals have provided extensive discovery, including documents, policies and multiple depositions on topics related to MIO and its separation from the Proposed Professionals (and all McKinsey affiliates).

18. As a preliminary matter, MIO is not a retained entity that provided any services to the WLB Debtors – it is a non-consulting investment affiliate of the Proposed Professionals. Accordingly, for the same reasons described above, *see supra* ¶ 9, neither Section 327(a) of the Bankruptcy Code nor Bankruptcy Rule 2014 necessitates disclosures regarding the Proposed Professionals' unretained affiliate, MIO. Indeed, bankruptcy courts in this District and around the country regularly issue orders approving retention applications of professionals with walled-off investment affiliates.[13]

19. The U.S. Trustee's New Guidance recognizes that a robust information barrier between a retained professional and its investment affiliate eliminates the need for disclosure. Specifically, although the New Guidance provides that "relevant bankruptcy law requires the professional firm to disclose connections that extend to investments in clients and other entities that may be a party in interest in the case," and "[i]nvestments include direct investments in such entity, as well as investments made through third parties," it explains that in deciding whether

---

[13] *See, e.g.*, Order Authorizing Retention of Evercore Group L.L.C. as Investment Banker and Financial Advisor to the Debtors, *In re Vanguard Nat. Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. June 5, 2019), Dkt. 449 (approving information barriers described in Shah Declaration ¶ 23, Dkt. 197); Order Authorizing Retention of Rothschild Inc. as Investment Banker to the Debtors, *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. July 14, 2018), Dkt. 247 (approving information barriers described in Snyder Declaration ¶ 26(d), Dkt. 122); Order Authorizing Retention of Lazard Frères & Co. LLC as Investment Banker to the Debtors, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017), Dkt. 732 (approving information barriers described in Kurtz Declaration ¶ 9, Dkt. 213); Order Authorizing Retention of Rothschild Inc. as Financial Adviser and Investment Banker to the Debtors, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018), Dkt. 177 (approving information barriers described in Antinelli Declaration at ¶ 25(d), Dkt. 88); Order Authorizing Retention of Moelis & Co. LLC as Investment Bankers to the Debtors, *In re Aegean Marine Petroleum Network Inc.*, No. 18-13375 (MEW) (Bankr. S.D.N.Y. Feb 20, 2019) Dkt. 394 (approving information barriers described in Jamal Declaration ¶ 29, Dkt. 289).

investments must be disclosed, the U.S. Trustee will analyze two key factors: (1) knowledge and (2) control. New Guidance § 4.

20. As the U.S. Trustee's New Guidance recognizes, the Proposed Professionals were not incentivized to pursue outcomes other than those to maximize the value of the WLB Debtors' estates because they lacked (i) knowledge of and (ii) control over MIO's investments.[14]

21. *Lack of Knowledge.* By design, the Proposed Professionals lack information, and the ability to obtain information, concerning MIO investments. MIO is a separate legal entity that operates independently of the Proposed Professionals. McKinsey consultants do not have contemporaneous access to any information regarding MIO's specific investments, and this dearth of knowledge is reinforced by:

- Physical information barriers, including separate offices in separate buildings with strict access controls, email accounts, and computer systems.

- Separate operations and separate employees.

- The McKinsey/MIO Collaboration Policy, including an "information barrier" between McKinsey's consulting activities and MIO's investment activities. Nonpublic information regarding McKinsey's consulting relationships, including the identity of clients, is not disclosed to MIO personnel. MIO personnel do not participate in client interactions within McKinsey's consulting business.

- Other general prohibitions against MIO employees attending McKinsey practice meetings; MIO discussing with McKinsey client service professionals any investments made by the MIO funds (outside of the limited information that the MIO board receives in connection with its oversight responsibilities which is subject to strict internal confidentiality policies[15]); and MIO disclosing to McKinsey consultants the entities in which MIO holds investments.

---

[14] MIO bears no resemblance to the U.S. Trustee's example of a circumstance that would require disclosure: a "professional firm that sponsors pooled investments in clients who may be parties in interest in the case." New Guidance § 4.

[15] To be clear, the MIO board does not make decisions regarding or otherwise approve fund-level redemption and allocation decisions made by MIO's investment team. Therefore, it is very unusual for the quarterly investment report presented to the MIO board to refer to an individual security or for the MIO board to discuss an individual security at a quarterly board meeting.

12

- Training and compliance monitoring at both MIO and the Proposed Professionals regarding confidentiality and separation policies.

- Monitoring of MIO employee communications and regular targeted review of email and Bloomberg communications. During discovery in this case, the Proposed Professionals searched for and produced communications between the *Westmoreland* Engagement Team and MIO professionals between July 17, 2018 and April 15, 2019. That review revealed no improper communications.

- The fact that no member of the Engagement Team was an employee, officer or director of MIO.

22. ***Lack of Control.*** The Proposed Professionals have no control over the investments made by MIO, and the U.S. Trustee has never contended to the contrary. Instead, the U.S. Trustee has focused on whether *MIO itself* controls its own investments. This is not the correct inquiry – the inquiry focuses on the professional person seeking to be retained.

23. First and foremost, McKinsey does not control the investment activity of its wholly-owned subsidiary, MIO. In order to sever governance control over MIO investments, the MIO board of directors formally delegated full authority to invest funds received by MIO to MIO's Chief Investment Officer, subject to risk parameters set by the board. This formal delegation is accompanied by the additional formal steps addressed herein that are taken to ensure that the Proposed Professionals cannot be influenced in their consulting work by information about the securities that are purchased on their behalf by MIO or its third party managers.

24. To further demonstrate how and why MIO connections need not be disclosed, the Proposed Professionals have explained that even MIO itself does not have investment discretion over the assets managed by any third-party managers, which account for 90% of MIO's assets under management. Such third-party managers make all investment decisions in their sole discretion without input or approval from MIO.

13

25. The remaining 10% of assets under MIO's management – MIO Direct Investments – are subject to restrictions that ensure that MIO could not directly invest in a debtor or an interested party in a chapter 11 case. Specifically, MIO's Direct Trading Policy bars MIO from investing in the securities of single-name corporate entities. The purpose of this prohibition is to avoid even the appearance of a conflict.

26. Notwithstanding all of the above, in an exercise of good faith and to demonstrate over-and-above-the-rules compliance efforts that are consistent with the recommendations of Mr. Baker, the Krivin Declaration disclosed the names and nature of MIO's connections to Interested Parties in these cases. Krivin Decl. ¶¶ 19–24. That should end the matter, absent articulable and supported concern that one or more of these MIO connections somehow represents a specific conflict for the Proposed Professionals. The U.S. Trustee has not raised any such concerns.

27. The Proposed Professionals submit that the record is clear that the Proposed Professionals lack (i) knowledge and (ii) control over investments made by MIO or by third-party managers on behalf of MIO.[16] Accordingly, the Proposed Professionals submit that the Disclosures are more than adequate and that MIO and its connections cannot be a basis for the Proposed Professionals to be found not disinterested.

### III. All Other Points Raised by the Response Have Been Addressed

As the Response noted, it was filed at a time when the Proposed Professionals and the U.S. Trustee were in active, ongoing dialogue in an effort to narrow or resolve issues for the

---

[16] The Proposed Professionals also refer to the Final Investigative Report of the Special Counsel to the Financial Oversight and Management Board for Puerto Rico which found that McKinsey "has organized itself and adopted policies and procedures, which it has enforced and continues to enforce, that are designed to, and in fact do, maintain client confidences, ensure that information does not leak between the consulting side and the investing side of McKinsey's business, and minimize the likelihood of conflicts." *In re The Fin. Oversight & Mgmt. Board for Puerto Rico*, No. 17-03283 (LTS) (D.P.R. Feb. 18, 2019), Dkt. 5154. Accordingly, the report concluded that the "[t]he McKinsey consulting arm is effectively walled off from its investment arm." *Id.*

Court.  Since that time, the Proposed Professionals have provided extensive further information and discovery that, coupled with significant precedent in this and other courts, should satisfy all concerns that were raised.  For example:

- The Response asked the Proposed Professionals to "clarify" whether all "Confidential Client" connections were disclosed.  *See* Response ¶ 12.  As previously noted, the Proposed Professionals confirmed that there are no "Confidential Clients" and any client previously identified as "confidential" is now disclosed by name.  *See* Initial U.S. Trustee Responses § B.

- The Response raised a question about the Proposed Professionals' reliance on the Interested Parties List prepared by the WLB Debtors and that the Proposed Professionals "did not conduct any due diligence . . . to determine whether the WLB Debtors' [Interested Parties List] included all important interested parties." Response ¶ 9.  The Proposed Professionals demonstrated that they surveyed the Engagement Team to determine whether any additional interested parties should have been included on the Interested Parties List, and also expanded the Interested Parties List from approximately 4,200 entities to over 400,000 to ensure a comprehensive process that captured affiliates of Interested Parties.  *See* Krivin Decl. ¶¶ 6-18, 25-16; Supplemental U.S. Trustee Responses § D(2); Dkt. 2121 § 6.

- The Response questioned the use of a three-year "Look-Back Period" as a guideline for disclosures.  *See* Response ¶ 10.  The use of a Look-Back Period is consistent with the Bankruptcy Code's definition of "disinterested person" and retention precedent in this and other districts. *See* Initial U.S. Trustee Responses § G.  In addition, the Proposed Professionals took steps to identify and disclose material known connections from before the Look-Back Period.  *See, e.g.*, Krivin Decl. ¶¶ 42-44.

- The Response asked certain clarifying questions about a "Revenue Period" and other calculations that the Proposed Professionals used to provide additional disclosure about certain Interested Parties. *See* Response ¶ 10. The Proposed Professionals provided clarifying information (*see* Initial U.S. Trustee Responses § C) and demonstrated that when determining whether a professional has an interest that is "materially" adverse to the debtor's estate under Bankruptcy Code section 101(14)(C), industry professionals have consistently used the 1% client revenue threshold for an applicable time period for disclosure.  *See* Initial U.S. Trustee Responses § M.

- The Response also requested additional detail "regarding the nature and scope of the services rendered" for two large clients.  *See* Response at 10 n.19.  The Proposed Professionals provided such additional information and confirmed that (i) any services provided to those clients were unrelated to the WLB Debtors and

> (ii) during these chapter 11 cases, the Proposed Professionals did not provide any services to or on behalf of the WLB Debtors related to such entities. *See* Supplemental U.S. Trustee Responses § C(2).

- The Response also argued that that the Proposed Professionals "decided not to disclose its connections with equity holders who held less than 5% of the public securities of Westmoreland as of the Petition Date." *See* Response at 7 n.14. The Proposed Professionals previously explained that since federal securities law does not require those who hold less than a 5% equity stake in publicly traded companies to file public reports, there is no way to accurately and comprehensively identify those parties whose equity holdings do not exceed 5%. *See* Initial U.S. Trustee Responses § I.

- The Response also seeks additional information to explain why McKinsey's database of clients is different than a law firms' typical computerized conflicts database. *See* Response at 6 n.8. The Proposed Professionals explained that McKinsey's client database stores information relating to clients and client engagements, but does not capture information about third parties because consultants, unlike lawyers, do not have adverse parties in their engagements and also may serve multiple companies in the same industry at the same time without waivers. *See* Krivin Decl. ¶ 6; Initial U.S. Trustee Reponses § H. *See also* Ernst & Young's Assessment of Proposed Professionals' Procedures to Disclose Connections in Accordance with the Houston Disclosure Protocol, Dkt. 2121.

## CONCLUSION

28. For the foregoing reasons, and those stated in the Application and prior submissions, the Proposed Professionals respectfully request that the Court overrule the objections raised in the Response, approve the Application and grant such other relief as is just and proper.

Dated: January 31, 2020        Respectfully submitted,
       Houston, TX

By:    */s/ Zack A. Clement*
     Faith E. Gay (*pro hac vice*)
     Jennifer M. Selendy (*pro hac vice*)
     Joshua S. Margolin (*pro hac vice*)
     SELENDY & GAY PLLC
     1290 Avenue of the Americas
     New York, NY 10104
     Telephone: (212) 390-9000
     E-mail: fgay@selendygay.com
             jselendy@selendygay.com
             jmargolin@selendygay.com

     Zack A. Clement
     ZACK A. CLEMENT PLLC
     3753 Drummond Street
     Houston TX 77025
     Telephone: (832) 274-7629
     E-mail: zack.clement@icloud.com

     M. Natasha Labovitz (*pro hac vice*)
     John Gleeson (*pro hac vice*)
     Erica Weisgerber (*pro hac vice*)
     DEBEVOISE & PLIMPTON LLP
     919 Third Avenue
     New York, New York 10022
     Telephone: (212) 909-6000
     Email: nlabovitz@debevoise.com
            jgleeson@debevoise.com
            eweisgerber@debevoise.com

     *Attorneys for the Proposed Professionals*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2020, I caused the foregoing pleading to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.

/s/ Zack A. Clement