IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WESTMORELAND COAL COMPANY, *et al.*,[1] | Case No. 18-35672 (DRJ) |
| Debtors. | (Jointly Administered) |

**REPLY OF MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC AND ITS AFFILIATES IN OPPOSITION TO MAR-BOW'S LIMITED OBJECTION AND IN FURTHER SUPPORT OF ITS SETTLEMENT WITH THE UNITED STATES TRUSTEE PROGRAM**

---

[1] Due to the large number of debtors in these chapter 11 cases, which are consolidated for procedural purposes only, a complete list of the debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent in these chapter 11 cases at www.donlinrecano.com/westmoreland. Westmoreland Coal Company's service address for the purposes of these chapter 11 cases is 9540 South Maroon Circle, Suite 300, Englewood, Colorado 80112.

McKinsey Recovery & Transformation Services U.S., LLC and its affiliates (collectively, "McKinsey") respectfully submit this reply in response to Mar-Bow Value Partners, LLC's ("Mar-Bow") Limited Objection (Dkt. No. 3198) (the "Objection") and in support of the Joint Emergency Motion by the United States Trustee and McKinsey Recovery & Transformation Services U.S., LLC and Its Affiliates in Furtherance of Mediation Agreement (Dkt. No. 3186) (the "Motion")[2] filed on December 4, 2020.

## PRELIMINARY STATEMENT

Yesterday afternoon, Mar-Bow filed a 70-plus page objection to the mediated settlement agreement jointly presented by the United States Trustee Program (the "USTP") and McKinsey (the "Agreement"). Mar-Bow's intentionally late filing, defamatory allegations and frivolous demands reveal that the sole litigation objective of Mar-Bow and its owner, Jay Alix, is to eliminate McKinsey from the chapter 11 marketplace. Waiting until the eve of the hearing—despite knowing about the terms of the settlement for over a month—Mar-Bow has filed an opus that has little if anything to do with the pending settlement, and which demands that the Court make material changes to—or outright reject—a settlement that was the product of months of negotiation between the USTP and McKinsey. Incredibly, Mar-Bow makes this demand after declining Judge Isgur's invitation to join a three-way mediation in which it could have put forth its requests and had an impact on the negotiations. Among other things, Mar-Bow now demands that the Court require McKinsey to use a 5-year look-back period in its disclosures (rather than the 3 years to which McKinsey has committed and which is commonly used in the industry), manufacture standing for Mar-Bow to later claim that McKinsey is acting in contempt of the settlement (even though Mar-Bow is not a party to the settlement and lacks standing), require a monitor to

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

1

oversee McKinsey's future disclosures for the next five years, and—most egregiously—ban McKinsey from serving chapter 11 debtors in this Court for a period of three years (presumably to permit AlixPartners to reclaim market share it has lost since McKinsey entered the market).

Mar-Bow's Objection is the latest iteration in its seven-year campaign to force McKinsey out of the chapter 11 business by crying "fraud" because McKinsey did not adhere to Alix's view of what Rule 2014 requires (for McKinsey alone). Arguing that McKinsey is forbidden from using disclosure methodology (such as the look-back period) that is industry-standard, that the firm should be viewed as a monolithic entity without any regard to corporate and operational separateness, and that the mere existence of the investment affiliate MIO is per se disqualifying, Alix recasts McKinsey's reasonable, good faith positions as "fraud." Jay Alix repeated those accusations of fraud in his now-dismissed RICO action, in multiple dismissed actions across numerous bankruptcy courts, and in his original pleadings in this Court, only to have seemingly walked those latter allegations back in previous colloquies when this Court challenged his statements.

Notably, Mar-Bow does not oppose—and, in fact, encourages—the withdrawal of the pending retention application. The direct consequence of such a withdrawal would be to end the current trial which is, of course, a hearing on whether or not McKinsey should be retained. Brazenly revealing its improper motive, Mar-Bow nevertheless demands that the Court either drastically modify the settlement between the USTP and McKinsey or permit a continued trial, not on the retention application but rather on the alleged necessity of the new measures Mar-Bow wants imposed upon its competitor. Both requests are frivolous.

As set forth below, the Court is presented with a settlement agreement that has been heavily negotiated between the USTP and McKinsey. The USTP and McKinsey have voluntari-

ly agreed to the terms of that deal, and it is being presented to the Court for a decision on whether it meets the standard for approval—that is, whether it is fair and reasonable. Mar-Bow cites no authority for the proposition that the Court can modify the Agreement to include punitive additional terms demanded by Mar-Bow, which is, by choice, a non-party to the settlement and the mediation from which it arose. The Agreement should be either approved—in which case the litigation will be over for all parties because there will be no pending application and therefore no case or controversy—or denied—in which case the litigation will continue for all.

The Court should overrule Mar-Bow's Objection and grant the Motion.

## ARGUMENT

I. **The Agreement Should Be Approved by the Court**

   A. **The Agreement Is Fair and Reasonable**

The Agreement should be approved because it is a good-faith, fair, and reasonable compromise of the disputes between the USTP and McKinsey. The USTP and McKinsey spent months convening with the court-appointed mediator, Judge Isgur, and negotiating the terms of their agreement. The Agreement resolves a significant outstanding dispute, and if approved, brings this retention proceeding to a close. The Agreement reflects—as is common in bankruptcy cases—the Parties' decision to avoid the expense, delay and risks of protracted and hard-fought litigation in favor of a consensual resolution in the best interests of the Parties and other stakeholders.

Rather than acknowledge the basic terms of the Agreement, Mar-Bow attempts to inject confusion when there is none. For instance, in its Objection, Mar-Bow spends pages ignoring[3]

---

[3] *See* Objection at 46 (claiming that McKinsey's "future disclosures will ***not*** make 'any required legal disclosures,' but rather a carefully-culled ***subset*** of disclosures based on its hackneyed, self-serving 'Proposed Professionals' construct. In other words, McKinsey will continue to omit connections to Interested Parties (even those ***directly adverse***

3

McKinsey's commitment to disclose its affiliate connections, which by definition means McKinsey will disclose connections beyond the Proposed Professionals. Despite the fact that Agreement plainly speaks for itself, Mar-Bow insists on favoring its own reality, instead of what is clear in the settlement terms.

For the avoidance of doubt, the principal terms of the Agreement are as follows:

- Upon approval of the Agreement by the Court, McKinsey's Second Retention Application shall be deemed withdrawn with prejudice against refiling, and the USTP Objection shall be deemed withdrawn, with prejudice against refiling..

- McKinsey's future Rule 2014 disclosures in any bankruptcy case will include, at a minimum, disclosures of affiliate connections and disclosures of confidential client connections (except to the extent ordered otherwise by the bankruptcy court with jurisdiction over the case). McKinsey represents that it will always make all legally required disclosures.

- The USTP agrees that the Agreement, together with the Initial Settlement Agreement between the parties, resolves all USTP allegations that McKinsey failed to make full and complete disclosures under applicable law or failed to fully comply with Rule 2014 in prior bankruptcy cases and in this case.

- McKinsey releases all claims against the USTP arising out of or pertaining to the adequacy of McKinsey's disclosures or its disinterestedness in this case, and reaffirms the releases contained in the Initial Settlement Agreement.

- The USTP releases all claims against McKinsey pertaining to any allegation that McKinsey failed to make full and complete disclosures under applicable law or failed to fully comply with Rule 2014 in this case, and reaffirms the releases contained in the Initial Settlement Agreement.

- The Agreement is only between McKinsey and the USTP and does not restrict the rights of any other person or entity.

- The Agreement does not constitute an admission of liability, wrongdoing or misconduct by McKinsey or any of its employees, officers, directors or agents.

---

to an Interested Party) unless they happen to be related to whichever "Proposed Professionals" it chooses to cherry-pick for a given assignment"); Objection at 66 ("Absent this Court's public findings (or an adequate settlement), there will be no end in sight to McKinsey's faulty disclosure practices. There is no evidence that McKinsey will stop hiding behind false constructs like the 'Proposed Professionals' and truncating its disclosures to less than half the firm.").

McKinsey respectfully submits that the Agreement is in the best interests of the Parties, as well as the WLB Debtors. Importantly for McKinsey, the Agreement provides a framework for McKinsey's future Rule 2014 disclosures and a clearer path forward to serving its clients in chapter 11, by aligning McKinsey's Rule 2014 disclosures with the December 4, 2019 *Principles to Guide USTP Enforcement of the Duty of Professionals to Disclose Connections to a Bankruptcy Case Under 11 U.S.C. §§ 327 and 1103 and Fed. R. Bankr. P. 2014* statement regarding affiliate disclosures (the "USTP Guidance"), which was issued after the July 3, 2019 Retention Application was filed. Approval of the Agreement will allow McKinsey to serve other clients, including debtors and potential debtors, in a manner that will minimize the risk of future litigation.

The Agreement also benefits the WLB Debtors by concluding the years-long litigation regarding retention of its turnaround advisor, McKinsey, who they recognize played a key role in the success of the Westmoreland bankruptcy case. (Westmoreland Debtor's Statement, Oct. 29, 2019, Tr. 47:25-48:7.) Not only does the Agreement avoid future litigation costs, it allows the WLB Debtors to retain the fees that McKinsey would have received for its services during the bankruptcy. Approval will also allow the USTP to achieve the result sought by its pending objection without further litigation.

Given growing health concerns and travel restrictions arising from COVID-19 and the unlikelihood that the hearing in this matter can resume in person any time soon, coupled with the fact that businesses across the country are struggling to navigate financial difficulty (including by filing for bankruptcy), the Agreement represents the best opportunity to resolve this matter and move forward.

### B. The Settlement Is an Integrated Agreement Presented for Court Approval or Rejection—Not to Be Refashioned by an Objecting Party

Mar-Bow's Objection attempts to transform the hearing on the Agreement into Mar-Bow's own opportunity to change the result of a mediation it chose not to participate in, through a proposed series of absurd modifications to a carefully negotiated outcome. The Agreement is a comprehensive, integrated settlement resolving all claims between the USTP and McKinsey. *See* Proposed Settlement Order ¶ 18 ("The terms set forth in this Order are part of a comprehensive compromise and each element is an integral aspect of the agreed settlement and is non-severable."). It reflects the result of a months-long, arm's-length negotiation process mediated by Judge Isgur, and is a carefully calibrated balance of concessions and agreements reached between the parties during that mediation. It is fair and reasonable, and it should be given effect as a whole. *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 239 (Bankr. N.D. Tex. 2007) (stating that, because the amended plan "contains a comprehensive, integrated settlement, the Court cannot approve the settlement terms as they may relate to individual [claimants or a party to the adversary proceeding]; rather, the Court must consider the proposed settlement … as a whole.").[4]

Mar-Bow's various proposed modifications to the integrated Agreement are not only procedurally inappropriate, they are anything but fair or reasonable. Indeed, the provisions Mar-Bow seeks to impose, or the alternative delay it has requested, are all in furtherance of a competitor's documented effort to make McKinsey's participation in bankruptcy "public and pain-

---

[4] Indeed, the Objection seems to reflect a misunderstanding of the appropriate procedures for Court review of a proposed settlement: the Parties to the settlement have entered into a final Agreement that has been submitted to this Court for a ruling at today's settlement hearing. To the extent that Mar-Bow contends that the Agreement is not fair or reasonable because of some undefined "evidence" Mar-Bow would like to put forward, the time to present that evidence is at the settlement hearing. Mar-Bow has had the settlement term sheet in hand for over a month, more than adequate opportunity to prepare for today's hearing. Mar-Bow's request that the Court postpone ruling on the Agreement is simply an attempt to achieve further delay, in furtherance of Mar-Bow's own anticompetitive agenda.

ful."[5] Following the Agreement, McKinsey's disclosures will follow the approach used in the July 3, 2019 *Westmoreland* application, as supplemented by the USTP Guidance regarding affiliate disclosures and the Agreement between the U.S. Trustee Program and McKinsey, and as McKinsey already has implemented in *In re Valaris PLC*, No. 20-34114.

Notwithstanding this thorough and further enhanced approach to future Rule 2014 disclosures, Mar-Bow wants the Court to allow the founder, board member, and largest shareholder of McKinsey's competitor to impose obligations on McKinsey so onerous that they would effectively prevent McKinsey from serving as a retained professional in any future chapter 11 case—even after outright banning McKinsey from serving debtors in this district for three years. Indeed, in most of its proposals, Mar-Bow seeks to impose its judgment not only in place of the reasonable judgment of the settling Parties, but also in place of the sound judgment of bankruptcy courts. Examination of even a few of Mar-Bow's proposed terms[6] reveals Mar-Bow's true intent to shut McKinsey out of the industry entirely:

- Mar-Bow tries to enforce on McKinsey a five-year look-back period yet provides no support for why its proposed five-year look-back period is required under and/or satisfies Rule 2014, Objection at 47-49, but a three-year look-back period, which is frequently used in industry practice, does not.[7]

- Mar-Bow also demands that McKinsey affirmatively "acknowledge that it serves as a fiduciary," Objection at 6. Mar-Bow's complaint is about fiduciary disclaimer language in McKinsey's engagement letter, but engagement letters for non-legal restructuring professionals are often executed before a chapter 11 filing, when non-Bankruptcy law governs and fiduciary disclaimers are important for a professional firm's risk management. More to the point, non-legal professionals' engagement letters frequently contain language similar to that

---

[5] *See* Dkt 2999-3, F. Crawford Depo Tr. 68:3-16.

[6] McKinsey reserves all rights to address the deficiencies of each of Mar-Bow's proposals at the hearing.

[7] MBX-853 at 007-072 (Summary of Industry Affiliate Investments Disclosures filed on October 24, 2019); *see also* Dkt. 2426-2.

7

which Mar-Bow finds so offensive.[8]  Bankruptcy courts are perfectly capable of modifying an engagement's letter's fiduciary duty disclaimers as necessary if and when a bankruptcy occurs, and they routinely do so without requiring anything near what Mar-Bow seeks to impose on McKinsey.[9]

- Mar-Bow makes the incredible assertion that McKinsey requires a monitor to scrutinize its future disclosures over the next five years, Objection at 54.  This, notwithstanding the lack of any evidence of misconduct, and McKinsey's demonstrated commitment to enhancing its disclosures.  Far from reasonable, this suggestion would impose an onerous burden on McKinsey purely based on Mar-Bow's own say-so premised on its idiosyncratic interpretation of the law.

- Despite failing to prove wrongdoing and seemingly abandoning its claims of fraud,[10] Mar-Bow seeks to bar McKinsey from the industry for three years over good-faith disputes about what the bankruptcy rules and laws require, Objection at 59—a severe punishment not endorsed by the USTP itself, the federal regulator charged with promoting the integrity and efficiency of the bankruptcy system.

- Mar-Bow unilaterally seeks to give itself standing to object to McKinsey's future disclosures. Objection at 58.  It seeks to impose its own idiosyncratic interpretation of the bankruptcy rules and statutes – tainted by the competitive focus of Mar-Bow's owner – on McKinsey in all future bankruptcy cases by preserving standing to bring a contempt order in this jurisdiction.  Thus, Mar-Bow seeks to police McKinsey—a job left squarely to the USTP and the actual parties-in-interest in chapter 11 cases, and the bankruptcy courts—in any future retentions.

McKinsey should not be subjected to a competitor's desired restrictions on McKinsey's ability to compete.

---

[8] *See, e.g.*, Centerview Partners LLC Engagement Letter (Dkt. 209-B); Lazard Frères & Co. Engagement Letter (Dkt. 216-B); Jefferies LLC Engagement Letter (Dkt 556-B).

[9] *See, e.g.*, Order Authorizing Retention of Centerview Partners LLC (Dkt. 494); Order Authorizing Retention of Lazard Frères & Co. (Dkt. 492); Order Authorizing Retention of Jefferies LLC (Dkt 704).

[10] Indeed this is fitting with Mar-Bow's consistent modus operandi of making serious allegations only to walk them back when required to prove them in a court of law, or to simply leave the initial assertion as the only evidence of wrongdoing.  For example, Mr. Alix has accused McKinsey of pay-to-play repeatedly, including under oath, and now after contradictory statements by the former head of his namesake firm Alix Partners, see Dkt 2999-3, F. Crawford Depo Tr. 31:19-33:3, he has jettisoned those allegations here.  See Dkt. 905-1, J. Alix Depo Tr. 275:18-276:13; Amended Compl. ¶ 15, Alix v. McKinsey & Co., Inc., No. 18-CV-04141 (S.D.N.Y.), Dkt. 73; see also Hr'g Tr. January 23, 2020, at 14:8-10, 23:1-37:3-5.  Moreover, after 5+ years of making these accusations, Mr. Alix has yet to name a single law firm that engaged in pay-to-play.

## II. The Court Should Reject Mar-Bow's Arguments Against Withdrawal of the July 3, 2019 Retention Application

Mar-Bow next argues that the Court must separately apply Bankruptcy Rule 7041 (which incorporates Federal Rule of Civil Procedure 41) to preclude withdrawal of the July 3, 2019 Retention Application, claiming that the request to withdraw should not be granted if "the non-moving party will suffer some plain legal prejudice." Objection at 65. Mar-Bow does not explain how the with-prejudice withdrawal of the July 3, 2019 Retention Application here—as part of a settlement—is comparable to situations or cases where courts have applied Rule 7041. Indeed, the very cases that Mar-Bow cites make clear that Rule 7041 has been applied to preclude withdrawal of a contested matter *where such withdrawal would be without prejudice.* *See* Objection at 65-66 (collecting cases, all seeking withdrawal without prejudice).

For this reason, even if the Court were to apply Rule 7041, McKinsey satisfies it. Rule 41(a)(2) only requires court approval to dismiss in order to avoid prejudice to another party. *See Templeton v. Nedlloyd Lines*, 901 F.2d 1273, 1274 (5th Cir. 1990) ("Rule 41(a)(2) of the Federal Rules of Civil Procedure allows plaintiffs to freely dismiss their suits, subject to court approval, provided the dismissal does not prejudice any party." (internal citation omitted)); *see also In re Dworek*, 589 B.R. 267, 272 (Bankr. W.D. Pa. 2018) ("The primary purpose of Rule 41(a)(2) is to thwart voluntary dismissals by plaintiffs that would result in clear legal prejudice to defendants." (internal citation omitted)).

Mar-Bow cannot legitimately claim that it is prejudiced when McKinsey's withdrawal fully resolves the only issue before the Court in this chapter 11 hearing: whether to approve the July 3, 2019 Retention Application. In fact, the Agreement provides for the very outcome that Mar-Bow sought through its extended litigation against McKinsey, because it provides for withdrawal of the July 3, 2019 Retention Application "with prejudice against refiling." Agreement

9

§ 2.  Indeed, this is the *only* relief that Mar-Bow has sought.  There is nothing left for the Court to adjudicate or Mar-Bow to contest, and Mar-Bow's plea to go forward regardless puts its bad faith and abuse of this Court's process in this case into stark relief.  *See In re Dworek*, 589 B.R. at 272 (finding no prejudice when moving party conceded that its position was legally barred by statute, meaning "there is no likelihood of any subsequent litigation of the [ ] issue, at least as to these particular debtors" and ordering dismissal with prejudice to protect nonmovant).  Mar-Bow's meritless arguments should be rejected.

### III.  McKinsey's Disclosure Practices

#### A.  McKinsey's Prior Disclosures

Mar-Bow's Objection spends plenteous pages attacking McKinsey's disclosure practices from many years, and even decades, ago – none of which are before the Court in this application, and all of which were the subject of a prior settlement between McKinsey and the USTP.  Those long-abandoned procedures reflected McKinsey's prior attempts to reconcile its client confidentiality obligations with the need for adequate disclosure in chapter 11 cases in which it served as a professional.  The testimony at trial laid out McKinsey's understanding at that time and its reasons for disclosing connections in this manner, and they need not be revisited here.[11]

Mar-Bow also repeatedly attacks McKinsey's since-withdrawn November 2018 retention application, which was prepared using a disclosure method that, as extensive testimony indicated, McKinsey believed in good faith was a sufficient approach to disclosure.[12]  McKinsey and the USTP's good-faith disputes regarding those disclosure practices were also the subject of

---

[11] *See, e.g.,* 2/11/20 P.M. Tr. at 149:1-150:25 (Carmody); 2/6/20 A.M. Tr. at 86:23-87:6, 92:6-14, 107:9-12, 112:4-7, 121:3-8 (Basch); 2/6/20 P.M. Tr. at 146:22-25 (Hojnacki); 2/26/20 A.M. Tr. at 129:1-11 (Molino).

[12] *See, e.g.*, 2/11/20 P.M. Tr. at 150:21-25 (Carmody); 2/6/20 A.M. Tr. at 86:23-87:6, 92:6-14, 107:9-12, 121:5-8 (Basch); 2/6/20 P.M. Tr. at 112:4-7. (Basch); 2/6/20 P.M. Tr. at 146:22-25 (Hojnacki); 2/26/20 A.M. Tr. at 129:1-11 (Molino).

McKinsey's Initial Settlement Agreement with the USTP, which was mediated by Judge Isgur last year. *See* Mediator's Notice to Court, Feb. 19, 2019, Dkt. No. 1406.

### B. The Krivin Declaration's Application of the Baker Protocol

#### i. Affiliate Disclosures

McKinsey has previously briefed the ample legal support and precedent regarding affiliate disclosures under Rule 2014, and incorporates those arguments here. *See* Dkt. 2744. As stated in that briefing, neither the text of the Bankruptcy Code nor Rule 2014 require any disclosures on behalf of unretained entities. Rule 2014 requires only the disclosure of a professional "person's connections." Fed. R. Bankr. P. 2014(a). "Person" is defined in the Bankruptcy Code as an "individual, partnership, and corporation." 11 U.S.C. § 101(14). This definition does not include "affiliate," a term separately defined in the Bankruptcy Code. *See id*. § 101(2) (defining "affiliate"). The definition of "disinterested person" in the Code also notably does not include "affiliates." *Id*. § 101(14).[13] Nor have the Courts come to any clear standard requiring disclosure of affiliate connections. Indeed, this Court has regularly approved retention applications (including in these chapter 11 cases) when a professional explicitly states that it has neither searched for, nor disclosed, affiliate connections.[14] Other bankruptcy courts around the country follow the same practice.[15]

---

[13] If Congress had intended to include a corporation's affiliates in the definition of "person," it would have done so. *In re Cygnus Oil & Gas Corp.*, No. 07–32417, 2007 WL 1580111, at *3–4 (Bankr. S.D. Tex. May 29, 2007) ("Rules of statutory interpretation direct the Court to 'presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).

[14] *See, e.g.,* Order Authorizing Retention of Jefferies LLC, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 28, 2018), Dkt. 622 (approving retention where connections-checking process only searched retained entities, see Slezinger Decl. ¶ 15, Dkt. 556); Order Authorizing Retention of Lazard Freres & Co., *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 14, 2018), Dkt. 492 (approving retention where connections-checking process only searched retained entities, see Cowan Decl. ¶ 8, Dkt. 216); Order Authorizing Retention of Centerview Partners LLC, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 14, 2018), Dkt. 494 (approving retention where connections-checking process only searched retained entities,

In the Krivin Declaration, the Proposed Professionals followed the guidance set forth in the Baker Protocol that was based on Mr. Baker's research and analysis regarding Rule 2014, including extensive discussions with industry professionals regarding Rule 2014 disclosures.[16] As a result of following the Protocol, the July 3, 2019 Retention Application disclosed connections of all affiliates that sought to be retained in the *Westmoreland* case. Mar-Bow derides the Baker Protocol as "disastrous," "inscrutable," and "self-serving," but McKinsey rejects any such characterizations of the Baker Protocol, created by an independent and highly-esteemed bankruptcy expert whose integrity cannot be challenged by any serious person. McKinsey still be-

---

see Puntus Decl. ¶ 16, Dkt. 209); Order Authorizing the Retention of Guggenheim Securities, LLC, *In re California Pizza Kitchen, Inc.*, No. 20-33752 (DRJ) (Bankr. S.D. Tex. Oct. 6, 2020) (approving retention where connections-checking process only searched retained entity, see Erickson Decl. ¶ 18, Dkt. 295-1); Order Authorizing Retention of Jefferies LLC, *In re J.C. Penny Company, Inc.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. Sept. 30, 2020) (approving retention where connections-checking process only searched retained entities, see White Decl. ¶ 15, Dkt. 931); Order Authorizing the Retention of Lazard Frères & Co, *In re Neiman Marcus Group, Ltd LLC*, No. 20-32519 (DRJ) (Bankr. S.D. Tex. Jul. 16, 2020) (approving retention where connections-checking process only searched retained entity, see Cowan Decl. ¶ 7, Dkt. 762); Order Authorizing Retention of Lazard Frères & Co, *In re J.C. Penny Company, Inc.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. Jul. 2, 2020) (approving retention where connections-checking process only searched retained entity, see Kurtz Decl. ¶ 7, Dkt. 238-1); Order Authorizing Retention of Jefferies LLC, *In re Sanchez Energy Corp.*, No. 19-34508 (DRJ) (Bankr. S.D. Tex. Nov. 6, 2019) (approving retention where connections-checking process only searched retained entity, see Szlezinger Decl. ¶ 16, Dkt. 433-3); Order Authorizing Retention of Lazard Frères & Co., *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Oct. 3, 2019), Dkt. 378 (approving retention where connections-checking process only searched retained entities, see Yearley Decl. ¶ 9, Dkt. 226); Order Authorizing Retention of Credit Suisse Securities (USA) LLC, *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Oct. 5, 2017), Dkt. 861 (approving retention where connections-checking process only searched retained affiliates, see Kaufman Decl. ¶ 19, Dkt. 685); *see also* Reply of McKinsey Recovery & Transformation Services U.S., LLC and Certain of Its Affiliates to U.S. Trustee's Response to the WLB Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC and Certain of Affiliates [Dkt. 2273], Jan, 31, 2020, Dkt. 2744 at 6 n.6 (collecting cases).

[15] *See, e.g.*, Order Authorizing Retention of Guggenheim Securities, LLC, *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018), Dkt. 771 (approving retention where connections-checking process only searched retained entities, *see* Savini Decl. ¶ 18, Dkt. 341); Order Authorizing the Retention of Lazard Frères & Co., *In re Sears Holdings Corporations*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018), Dkt. 606 (approving retention where connections-checking process only searched retained entities, *see* Aebersold Decl. ¶ 7, . 345); Order Authorizing Retention of Rothschild Inc., *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018), Dkt. 177 (approving retention where connections-checking process only searched retained entities, *see* Antinelli Decl. ¶ 20, Dkt. 88); Order Authorizing Retention of Guggenheim Securities, LLC, *In re Limited Stores Company, LLC*, No. 17-10124 (KJC) (Bankr. D. Del. Feb. 16, 2017), Dkt. 234 (approving retention where connections-checking process only searched retained entities, *see* Savini Decl. ¶ 28, Dkt.126).

[16] Baker Protocol at 7, attached as Exhibit A to McKinsey Recovery & Transformation Services U.S., LLC's Eight Status Report in Accordance with Order on Joint Motion in Furtherance of Mediation Agreement [Dkt. 1427], May 31, 2019, Dkt. 1907.

lieves in the strength, accuracy, and importance of the Baker Protocol, and its decision to settle with the USTP regarding affiliate disclosures—and, in doing so, go beyond the requirements of the Baker Protocol—does not change its views regarding Mr. Baker's significant contributions, which are well grounded in relevant law and practice.

Notwithstanding, in order to ensure that there is a Court-approved framework that has the support of the USTP for future Rule 2014 disclosures, McKinsey has agreed that it will file disclosures for all of its consulting affiliates in future cases. The fact that McKinsey has agreed to further expand its already extensive disclosures in no way indicates flaws or defects in the thorough process undertaken in this case in accordance with the Baker Protocol, nor does it suggest that the process Mr. Krivin followed was legally incorrect. Instead, the Agreement represents a consensual resolution of a dispute that this Court has previously acknowledged as "an issue that commentators, scholars, lawyers have struggled with for a long time,"[17] in order to provide a framework for McKinsey to continue to provide valuable services to clients in chapter 11 cases.

### ii. MIO

Mar-Bow complains that the Settlement is deficient because it fails to, in Mar-Bow's telling, address the allegation that "McKinsey's current methodology for MIO disclosures (as embodied in Schedule 3 to the Krivin Declaration) is full of holes, highly manipulable, provides almost no meaningful information, and requires an hour of explanatory testimony to be understood even at a rudimentary level." (Obj. at 49-50.) To the contrary, the Krivin Declaration included clear, fulsome disclosures regarding MIO connections that, McKinsey submits, went beyond the requirements of Rule 2014, given the Proposed Professionals' lack of knowledge of or control over MIO's investments. The testimony adduced at trial confirmed these points.

---

[17] Hr'g Tr. April 16, 2019, at 41:19-20.

***Lack of Information.*** By design, the Proposed Professionals lack information or ability to obtain information regarding MIO investments. MIO is a separate legal entity that operates independently of the Proposed Professionals, and McKinsey consultants do not have contemporaneous access to any information regarding MIO's specific investments. MIO and McKinsey maintain separate physical offices, workforces, and computer servers;[18] there are also robust policies prohibiting the sharing of information between McKinsey and MIO personnel. In particular, the Collaboration Policy between MIO and McKinsey's Client Service Professionals prevents the free flow of information between MIO and the rest of McKinsey, including by prohibiting McKinsey consultants from having information about MIO investments, and conversely by prohibiting MIO employees from having any visibility into McKinsey's consulting work. (MBX-021 at 2.)  MIO employees receive training on the Collaboration policy, certify their compliance with it annually, and compliance with the policy is audited and monitored.[19]

***Lack of Control.*** Additionally, McKinsey lacks control over MIO's investment activity. The MIO board of directors has formally delegated full authority to invest funds received by MIO to MIO's Chief Investment Officer, subject to risk parameters set by the board.[20]  Furthermore, even MIO does not have investment discretion over the assets managed by any of MIO's third-party managers, which account for 90% of MIO's assets under management.  Such third-party managers make all investment decisions in their sole discretion without input or approval

---

[18] 2/28/20 A.M. Tr. at 13:8-23 (Lipscomb).

[19] 2/28/20 A.M. Tr. at 14:9–25, 15:19-24 (Lipscomb) (describing annual training and certification requirements, monitoring efforts).

[20] 2/7/20 A.M. Tr. at 13:20-14:10, 87:8-88:2 (Tibbets) (describing his responsibility for investment decisions).

from MIO.[21]  The remaining 10% of assets under MIO's management—MIO Direct Investments—are subject to restrictions set forth in MIO's Direct Trading Policy, which bars MIO from investing in the securities of single-name corporate entities.[22]  The purpose of this prohibition is to avoid even the appearance of a conflict.[23]

MIO was not a retained professional in this case, and does not provide consulting services.  Nevertheless, in compliance with the Baker Protocol and consistent with McKinsey's commitment to greater transparency in its disclosures, the Krivin Declaration disclosed the names and nature of MIO's connections to Interested Parties (Krivin Decl. ¶¶ 19–24)—including MIO's third-party investment managers, funds managed by third-party investment managers, direct investments, financial counterparties, and service providers (*e.g.*, vendors).  Mr. Lipscomb explained in detail how those disclosures were formulated and what they show.[24]  Mar-Bow now feigns confusion, but McKinsey and the USTP have agreed that the facts adduced to date at trial regarding MIO "provide a sufficient basis for the United States Trustee to make this settlement resolving disputes with McKinsey in the Westmoreland Case." (Dkt. 3184-1 at 1.)  That is all that is required to approve the Agreement.

---

[21] 2/7/20 A.M. Tr. at 21:11-19 (Tibbetts) ("Q Does MIO play any role in managing those security-level investments, once they're made by the third-party managers? A No, no. That discretion is delegated to them. Q What about in the separately managed accounts; does MIO play any role in managing the investments in those separately managed accounts? A No. We -- we have -- our role is to select the managers, and we have a rigorous process around selecting the managers, but that is where our role ends.").

[22] 2/7/20 A.M. Tr. at 41:1-5 (Tibbetts) (describing the asset classes that the Direct Trading Policy permits MIO to invest in).

[23] 2/7/20 A.M. Tr. at 40:13-16 (Tibbetts).

[24] 2/28/20 A.M. Tr. at 22:5-15, 24:18-25:1, 27:2-14, 54:12-19, 61:6-11 (Lipscomb) (describing McKinsey's request that MIO provide information about its connections and MIO's process for identifying those connections).

## CONCLUSION

The Agreement before the Court is in the best interests of the WLB Debtors, the USTP, McKinsey, judicial economy, and even Mar-Bow, if its motives were benign. Mar-Bow had every opportunity to join the mediation process and, afterwards, to join the Agreement, but it chose not to do so for no reason other than to maintain, at all costs, its public offensive against McKinsey. McKinsey respectfully requests that the Court approve the Agreement, enter the Proposed Settlement Order, overrule Mar-Bow's Objection, and grant such other and further relief as this Court may deem just and proper.[25]

---

[25] McKinsey reserves all rights to fully respond to each of Mar-Bow's allegations at a later time.

| | | |
|---|---|---|
| Dated: | December 22, 2020<br>Houston, Texas | Respectfully submitted,<br><br>ZACK A. CLEMENT PLLC |
| | By: | /s/ Faith E. Gay |

        Faith E. Gay (*pro hac vice*)
        Jennifer M. Selendy (*pro hac vice*)
        Maria Ginzburg (*pro hac vice*)
        David S. Flugman (*pro hac vice*)
        Joshua S. Margolin (*pro hac vice*)
        SELENDY & GAY PLLC
        1290 Avenue of the Americas
        New York, New York 10104
        Telephone: (212) 390-9000
        E-mail: fgay@selendygay.com
        jselendy@selendygay.com
        mginzburg@selendygay.com
        dflugman@selendygay.com
        jmargolin@selendygay.com

        Zack A. Clement
        ZACK A. CLEMENT PLLC
        3753 Drummond Street
        Houston, Texas 77025
        Telephone: (832) 274-7629
        E-mail: zack.clement@icloud.com

        M. Natasha Labovitz (*pro hac vice*)
        Winston M. Paes (*pro hac vice*)
        Erica S. Weisgerber (*pro hac vice*)
        Meredith Stewart (*pro hac vice*)
        Elizabeth Costello (*pro hac vice*)
        DEBEVOISE & PLIMPTON LLP
        919 Third Avenue
        New York, New York 10022
        Telephone: (212) 909-6000
        Email: nlabovitz@debevoise.com
        wmpaes@debevoise.com
        eweisgerber@debevoise.com
        mstewart@debevoise.com
        ecostello@debevoise.com

        *Attorneys for McKinsey Recovery and Transformation Services U.S., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I caused the foregoing pleading to be filed with the Court and thereby served by the Court's CM/ECF noticing to all parties registered to receive electronic notice in this case.

                                                                         */s/  Zack A. Clement*